UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PATRICIA GONZALEZ and JENNIFER
GONZALEZ, individually and as co-
administrators of the Estate of KENNY LAZO,

                  Plaintiffs,

      -against-

COUNTY OF SUFFOLK, SUFFOLK POLICE
DEPARTMENT, POLICE COMMISSIONER
RICHARD DORMER, in his individual and
official capacity, POLICE OFFICER JOHN
NEWTON, in his individual and official
capacity, POLICE OFFICER JAMES
SCIMONE, in his individual and official
capacity, POLICE OFFICER WILLIAM
JUDGE, in his individual and official capacity,
POLICE OFFICER CHRISTOPHER TALT, in
his individual and official capacity, POLICE
OFFICER JOSEPH LINK, in his individual
and official capacity, COUNTY OF SUFFOLK
OFFICE OF DISTRICT ATTORNEY,
SUFFOLK COUNTY DISTRICT ATTORNEY
THOMAS SPOTA, in his individual and official
capacity, ASST. DISTRICT ATTORNEY
JOHN B. COLLINS, in his individual and
official capacity, and "JOHN AND JANE
DOES 1-10" representing as yet unknown and
unidentified members of the Office of the
Suffolk County District Attorney (all in their
individual and official capacities as employees
of the Office of Suffolk County District
Attorney),

                  Defendants.

DOCKET NO.: CV-09-1023
(JS)(GRB)

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS SPOTA'S AND COLLINS' MOTION FOR SUMMARY JUDGMENT

LAW OFFICES OF
FREDERICK K. BREWINGTON
*Attorneys for Plaintiffs*
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959

OF COUNSEL: FREDERICK K. BREWINGTON

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ................................................. iii

FACTS AS TO DEFENDANTS' RULE 41(b) APPLICATION ..................... 1

ARGUMENT ................................................................ 2

POINT I

    RULE 41 (b) OF THE FED. R. CIV. PRO. IS INAPPLICABLE TO THE FACTS OF THIS CASE, DEFENDANTS ARE *NOT* ENTITLED TO DISMISSAL OF ALL CLAIMS AGAINST THEM .......................... 2

POINT II

    DEFENDANTS SPOTA AND COLLINS ARE *NOT* ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO THE FOURTH, SIXTH, AND SEVENTH COUNTS OF PLAINTIFF'S AMENDED COMPLAINT ........... 6

    Summary Judgment Standard of Review ................................. 6

POINT III

    DEFENDANTS COLLINS AND SPOTA ARE NOT SHIELDED BY ABSOLUTE OR QUALIFIED IMMUNITY FOR THEIR *"INVESTIGATION"* AND THEIR ASSISTANCE IN COVERING-UP SAME ..................... 6

    FACTUAL ALLEGATIONS RELEVANT TO THE IMMUNITY ISSUE ........ 6

        a.    Defendant Collins *"Took Over"* And Led The Police Department's Alleged Investigation Into The Homicide of Mr. Lazo: ........... 6

        b.    The Defendant Officers Were Not Criminally Charged And Probable Cause To Indict or Charge Same Was Not Determined: ........... 8

        c.    The Defendant Suffolk Police Department Issued Public Statements Exonerating Defendant Police Officers *Prior To* The Conclusion Of Collins' Investigation: ........................................ 9

-i-

d.   Collins Hides And/Or Avoids Advising The Grand Jury About The Medical Examiner's Determination That Mr. Lazo's Death Was A "Homicide": .............................................. 9

e.   Collins Asked The Medical Examiner Questions Specifically Designed To Avoid The "Manner Of Death" While Misleading The Grand Jury By Discussing Only The Alleged Non-Severity Of Mr. Lazo's Injuries: ................................................... 12

f.   Collins Asked The Medical Examiner To Speculate As To Other Possible Causes of Mr. Lazo's Death - Other Than Mr. Lazo's Death Being A "Homicide": ......................................... 12

g.   As A Result Of Collins' Misleading Preparation and Presentation, The Investigation Was Dismissed By The Grand Jury And Defendant Officers Were Exonerated By The Police Department Though They Caused The Death/Homicide Of Mr. Lazo: ..................... 13

h.   Following The Grand Jury's Dismissal Of The Investigation, Collins, Together With His Office, Immediately Issued A Press Release Regarding The Dismissal: .................................. 15

A.   Defendants Collins and Spota Are Not Entitled To Absolute Immunity:  .. 16

B.   Defendants Collins And Spota Are Not Entitled To Qualified Immunity:  . 18

POINT IV

ISSUES OF FACT EXIST AS TO DEFENDANT SPOTA'S
INVOLVEMENT AND SUPERVISION (PERSONAL INVOLVEMENT)
OF THE "INVESTIGATION" INTO THE DEATH OF KENNY LAZO.  ....... 21

POINT V

DEFENDANTS ARE NOT ENTITLED TO ELEVENTH AMENDMENT
IMMUNITY IN HIS OFFICIAL OR INDIVIDUAL CAPACITIES  .......... 23

A.   Spota's And Collins' "Investigation" Was Not A Prosecutorial Function And thus they Are Not Entitled To 11th Amendment Immunity  ......... 24

B.   Plaintiffs Can Maintain Their Cause Of Action (Pursuant to §1983) Against Spota And Collins In Their Individual Capacities, Regardless:  ........ 25

CONCLUSION  ....................................................... 25

# TABLE OF AUTHORITIES

**CASE NAME**       **PAGE NOS.**

*Adams v. Lever Bros. Co.,*
874 F.2d 393 (7th Cir. 1989) ...................................................... 4

*Board of the County Commissioners v. Brown,*
520 U.S. 397 (1997) ............................................................ 21

*Buckley v. Fitzsimmons,*
509 U.S. 259 (1993) ...................................................... 17, 18, 25

*Burns v. Reed,*
500 U.S., at 491 ............................................................... 25

*Carbajal v. County of Nassau,*
271 F.Supp.2d 415 (E.D.N.Y.2003) ............................................. 16

*Colon v. Coughlin,*
58 F.3d 865 (2d Cir. 1995) ..................................................... 21

*Fielding v. Tollaksen,*
257 Fed. Appx. 400 (2d Cir. 2007) ............................................. 16

*Freeman v. Pittsburgh Glass Works, LLC,*
709 F.3d 240 (3d Cir. 2013) .................................................. 4,5

*Gentile v. County of Suffolk,*
926 F.2d 142 (2d Cir.1991) .................................................... 24

*Graham v. Connor,*
490 U.S. 386 (U.S. 1989) ...................................................... 19

*Hafer v. Melo,*
502 U.S. 21 (1991) ............................................................ 24

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ........................................................... 20

*Hill v. City of New York,*
45 F.3d 653 (2d Cir. 1995) ................................................. 17, 18

*Mitchell v. Forsyth,*
472 U.S. 511 (1985) ........................................................... 18

*Imber v. Pachtman,*
424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*Jeffes v. Barnes,*
208 F.3d 49  (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*K.D. ex rel. Duncan v. White Plains Sch. Dist.,*
921 F. Supp. 2d 197  (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kentucky v. Graham,*
473 U.S. 159  (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lehman v. Revolution Portfolio L.L.C.,*
166 F.3d 389 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Malley v. Briggs,*
475 U.S. 335  (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Nita v. Connecticut Dept. of Environmental Protection,*
16 F.3d 482   (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*Oliveira v. Mayer,*
23 F.3d 642 (2d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Penn West Associates v. Cohen,*
371 F.3d 118  (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Scheuer v. Rhodes,*
416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Shannon v. General Elec. Co.,*
186 F.3d 186  (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3

*Shmueli v. City of New York,*
424 F.3d 231 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Smith v. Garretto,*
147 F.3d 91  (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tomika v. Seiler Corp.,*
66 F.3d 1295 (2d. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Walker v. City of New York,*
974 F.2d 293  (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Washington Square Post # 1212 American Legion v. Maduro,*
   907 F.2d 1288 (2d Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Wright v. Smith,*
   21 F.3d 496  (2d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wu v. City of New York,*
   934 F. Supp. 581 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ying Jing Gan v. City of New York,*
   996 F.2d 522  (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Zahrey v. Coffey,*
   211 F.3d 342  (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTES

Fed. R. Civ. P. 41(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## FACTS AS TO DEFENDANTS' RULE 41(b)  APPLICATION

On  April 8, 2015, then presiding Judge Leonard D. Wexler issued a Notice of Electronic

Filing to both Plaintiff and Defense Counsel wherein he adjourned this matter without a date. (Dkt.

Entry #63). The Notice provided that:

> Jury selection scheduled for April 13, 2015 is hereby adjourned without a date.
> **Parties are directed to advise this Court within sixty (60) days of the date of this**
> **order of possible dates in July 2015 in which all parties are available for Jury**
> **Selection/Trial.** (emphasis added). IT IS HEREBY ORDERED that this case be
> **Administratively Closed** until such time that a new date is *agreed upon by all*
> *parties* (emphasis added). *Ordered* by Judge Leonard D. Wexler on 4/8/2015. *Id*.
(Brew. Decl. Exhibit R)

Moreover, on May 27, 2015, in compliance with Judge Wexler's *Order*, Plaintiffs' Counsel

submitted a letter, via Electronic Conference Filing, to Judge Wexler with Defense Counsel Stephen

O'Brien and Brian Mitchell copied to the response as well. (Dkt. Entry #64)(Brew. Decl. Exh. T)

In said letter, Plaintiffs' Counsel provided a comprehensive description of his schedule with respect

to other ongoing matters. (*Id*.). More pertinently, Plaintiffs' Counsel advised Judge Wexler that:

> We have contacted the counsel for Defendants and their schedules pose challenges
> as well. The only window of time in July that seemed possible to us was around July
> 21, 2015, however, when conferring with Defense Counsel, they would run into
> witness availability concerns in the last week of July, specifically the 27[th] through the
> 31[st].  (*Id*.)

Plaintiffs' Counsel, furthermore, gave further options and respectfully requested to "try this case in

October or [...] starting the third week of November."  (*Id*.)

By contrast, since Judge Wexler issued the April 8, 2015 Order, Defense Counsel has made

*no* attempt to comply with said order. Moreover, on November 9, 2018, Plaintiff's Counsel filed a

motion to request this matter to be restored to the Court's calendar so that the both parties may

discuss a trial date. (Dkt. Entry #65). Thereafter, this matter was reassigned to Judge Joanna Seybert.

(Dkt. Entry #66). Defendant's instant motion for dismissal and/or summary judgment has been the

first affirmative action taken on behalf of Defendants since Judge Wexler's Order was issued. (Dkt. Entry #67).

## ARGUMENT
### POINT I
### RULE 41 (b) OF THE FED. R. CIV. PRO. IS INAPPLICABLE TO THE FACTS OF THIS CASE DEFENDANTS ARE *NOT* ENTITLED TO DISMISSAL OF ALL CLAIMS AGAINST THEM

Defense Counsel's reliance on Rule 41(b) of the Federal Rules of Civil Procedure is misguided at the outset, because of the very text of the rule. Rule 41(b) provides that:

> **If the plaintiff fails to prosecute or to comply with the rules or a court order, a defendant may move to dismiss the action or any claim against it.** Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule – except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 – operates as an adjudication on the merits.

Fed. R. Civ. P. 41(b). (Emphasis added)

As aforementioned in the factual allegations for this section of this Memorandum, Plaintiffs' Counsel promptly took the appropriate measures to proceed with a timely prosecution of this instant matter. (*Supra.* Dkt. Entry #64). Plaintiffs' Counsel's affirmative actions satisfy the essence of Rule 41(b) because Plaintiffs' Counsel appropriately provided a detailed letter to both Judge Wexler and Defense Counsel in which he proposed multiple times to conduct jury selection and requested time frames to commence the trial. (*Id.*).

Moreover, Defense Counsel, in their motion, has misapplied the five factor test referenced in citing *Shannon v. General Elec. Co.*, 186 F.3d 186, 193-94 (2d Cir. 1999). Defense Counsel improperly interprets the test to apply to "whether involuntary dismissal is appropriate". (*See*, Def's Memo., p.2, Argument I.). However, in *Shannon,* the court stated "[o]ur review of a district court's decision to dismiss an action for failure to prosecute is limited to whether the court abused its

2

discretion ... In making this determination, we examine five principal factors[.]" *Shannon*, 186 F.3d at 193.

In *Shannon*, the court **dismissed** a plaintiff's action for failure to prosecute a case after the plaintiff failed to comply with a court order for more than two years. *Id.* at 190-91. In that case, the court issued an order for the plaintiff to amend his complaint, however the plaintiff elected to disregard the order. *Id.* Moreover, the plaintiff was notified by the court clerk via a dismissal notice that his lawsuit was scheduled for a dismissal calender call. *Id.* Although he was directed to submit an affidavit in response to his dismissal notice, the plaintiff failed to do so and furthermore failed to articulate "any justification for his failure to take action on his case for over two years." *Id.* at 191. The exact opposite is present in the within matter. Here, Plaintiff has complied with the direct order of the Court and it is the Defendant who completely failed to honor the Court's order.

Moreover, Defense Counsel, cites to *Nita v. Connecticut Dept. of Environmental Protection*, 16 F.3d 482, 485 (2d Cir. 1994), which similarly stands for the proposition with respect to evaluating whether there was an abuse of discretion in **dismissing** an action for failure to prosecute a claim. *Nita,* 16 F.3d at 485. In that case, the plaintiff  commenced a lawsuit against the defendants *pro se* and was initially denied *pro bono* counsel twice by the court. *Id.* at 483. The defendants, in turn, filed numerous motions seeking dismissal of all the claims made against them which were not responded to by plaintiff due to plaintiff's lack of counsel. *Id.* at 484.  Plaintiff was finally appointed a *pro bono* attorney after her third application to the court. *Id.* However, on appeal, the appellate court applied the aforementioned five factor test and determined that the lower court did abuse its discretion in **dismissing** the plaintiff's complaint. *Id.* at 487. The situation now raised to this Court is clearly distinguishable on multiple levels. Here, Plaintiffs have been responsive; there has been no

3

dismissal; and Defendants are the party who has failed to comply.

Defense Counsel's reliance on *Shannon* and *Nita* as legal authority in this matter is misguided and wholly incorrect because those cases dealt with plaintiffs' cases that were **dismissed** as opposed to being **administratively closed**. This matter, when assigned to Judge Wexler, was not **dismissed** at any point. Judge Wexler, without the input of Plaintiffs' Counsel, **administratively closed** this matter *sua sponte*. (*Supra*, Dkt. Entry #64). While it may be tempting to conflate the terms, "[f]ederal courts have long distinguished dismissals from administrative closings." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240 (3d Cir. 2013).

The *Freeman* decision is particularly instructive in this case. First, the court noted that "administrative closings are not final orders," and furthermore, that "[d]istrict courts often use administrative closings to prune their overgrown dockets (i.e. as was done in this matter). *Freeman*, 709 F.3d at 247 (quoting *Penn West Associates v. Cohen*, 371 F.3d 118, 128 (3d Cir. 2004). Courts utilize administrative closings to "remove a case from the court's active docket and permit the transfer of records associated with the case to an appropriate storage repository." *Id.* (quoting *Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 392 (1st Cir. 1999). Moreover, the First Circuit explicitly held that, "administrative closings comprise a familiar, albiet essentially ad hoc, way in which courts remove cases from their active files without making any final adjudication." *Id.* (quoting *Lehman*, 166 F.3d at 392). Therefore, a court may reopen a case *sua sponte* or at the request of either party. *Freeman*, 709 F.3d at 247. In *Freeman*, the appellate court rejected a litigants request to construe the lower court's order directing the case to be "marked CLOSED" as a dismissal. *Id.* at 248. The court began its explanation, in short, by saying that "Words matter." *Id.* Moreover, the court further cited a Seventh Circuit case, *Adams v. Lever Bros. Co.*, 874 F.2d 393,

4

397 (7th Cir. 1989) which stated:

> The judicial process works best when orders mean what they say. Surprising
> interpretations of simple language – perhaps on the basis of a judicial intent not
> revealed in the words – unnecessarily create complex questions and can cause
> persons to forfeit their rights unintentionally.

Furthermore, the Third Circuit court also stated that "we have rejected previous attempts to

characterize an administrative closing as a final order in disguise, as have other circuits." *Freeman,*

709 F.3d at 248.

In this matter, Judge Wexler's *Order* is not, and should not, be construed as a dismissal. The

plain language of the *Order* gives no such warning and does not include any language that

characterizes the case as "dismissed". *Supra,* Dkt. Entry #64. Defense Counsel is merely attempting

to morph Judge Wexler's "Administratively Closed" language into a dismissal which, on its face,

does not evidence Judge Wexler's intent. *Id.* Moreover, the "within sixty (60) days of the date of

this order of possible dates in July 2015 in which all parties are available for Jury Selection/Trial"

language does not evidence any intent for the order to mature into a final decision. *Id.* Even if it were

so construed, Plaintiffs fully complied. However, at this stage, the Defense Counsel's utter failure

to honor Judge Wexler's Order remains unexplained.

Defense Counsel's reference to Rule 41(b) and the five factor balancing test they seek to

apply is inapplicable because, according to the text of the rule, a defendant's remedy for a plaintiff's

failure to prosecute is that a defendant *may* merely move to dismiss the action. Fed. R. Civ. P. 41(b).

Moreover, the balancing test which Defense Counsel cites is utilized *after* a court has already

dismissed an action. *See, e.g., Nita v. Connecticut Dept. of Environmental Protection*, 16 F.3d 482

(2d Cir. 1994). Therefore, irrespective of the Defense Counsel's attempt to depict the current

circumstances as a dismissal, there is no support to be found in Rule 41(b) nor the balancing test on which they rely. Defense Counsel's analysis of the balancing test in relation to the facts of this matter should be rejected, as should be their claim that Plaintiffs have somehow failed to follow Judge Wexler's Order.

**POINT II**

**DEFENDANTS SPOTA AND COLLINS ARE *NOT* ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO THE FOURTH, SIXTH, AND SEVENTH COUNTS OF PLAINTIFF'S AMENDED COMPLAINT**

**Summary Judgment Standard of Review**

This Court is well aware of the standard to be applied in a Motion for Summary Judgment. "A motion for summary judgment may be granted only when there are no genuine issues of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." *Tomika v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d. Cir. 1995).

**POINT III**

**DEFENDANTS COLLINS AND SPOTA ARE NOT SHIELDED BY ABSOLUTE OR QUALIFIED IMMUNITY FOR THEIR *"INVESTIGATION"* AND THEIR ASSISTANCE IN COVERING-UP SAME**

**FACTUAL ALLEGATIONS RELEVANT TO THE IMMUNITY ISSUE**

a.     **Defendant Collins *"Took Over"* And Led The Police Department's Alleged Investigation Into The Homicide of Mr. Lazo:**

Before Mr. Lazo's death was declared a homicide, the investigation of his death was conducted solely by the police department. (Plaint's 56.1 Count. Stmnt. Section B, ¶ 7). In June 2008, the medical examiner declared Mr. Lazo's death a homicide - as opposed to an accidental or natural death. *Id.*, ¶ 8. From that point going forward, the District Attorney's Office had a duty to get involved in the investigation in conjunction with the police department. *Id.* Indeed, according to

6

Defendant Collins, "**there came a point in the Lazo case that I took over the investigation**." (Plaint's 56.1 Count Stmnt, Section B, ¶¶ 4-21). At that time Defendant Collins met with sergeants and detectives of the Suffolk County Homicide Squad. *Id*.

On July 10, 2008, Collins, in a letter addressed to Plaintiffs' Counsel, advised that the SCPD and medical examiner have completed their respective investigations concerning the death of Lazo, and that the agencies will forward their investigations to the District Attorney's Office for review and action. (*Exhibit D*).

Defendant Collins then met with sergeants and detectives of the Suffolk County Homicide Squad in order to catch up on their investigation because he was now taking over same. (Plaint's 56.1 Count Stmnt, Section B, ¶¶ 4-21). When asked if he had any oversight or direct contact with investigators, Defendant Collins replied "not from the District Attorney's Office. Only from the police department." *Id*. Specifically, Defendant Collins "had contact with Detective Patrick Portela, who was the lead detective assigned by the homicide squad of the police department ... [as well as] his supervisor 1, Sgt. Edward Fandrey." *Id*. The officers disclosed the results of their investigation before Collins took-over same. *Id*.

According to Defendant Collins, the detectives involved **took orders from Collins** and performed tasks, such as interviewing witnesses, on Collins' behalf. (Plaint's 56.1 Count Stmnt, Section B, ¶¶ 4-21). Then, Defendant Collins gave the detectives assignments and leads "to follow up on." *Id*. In addition, Collins also had several meetings with the lead detective (Portela) regarding the Grand Jury investigation." *Id*. Defendant Collins instructed the investigating detectives to "help [Collins] contact witnesses." *Id*.

Defendant Collins also visited the scene(s) where Mr. Lazo was arrested and the scene where

7

Mr. Lazo was killed to take photographs. (Plaint's 56.1 Count Stmnt, Section B, ¶¶ 4-21). In addition, Defendant Collins actively interviewed eye-witnesses and expert witnesses. (*Id.*). Defendant Collins participated in the decisions to visit the scene(s), speak to witnesses, and to partake in every other aspect of his investigation. *Id.*

Though Collins had the ability to utilize his own (independent) investigators, Defendant Collins did not utilize investigators within the District Attorney's Office. (Plaint's 56.1 Count Stmnt, Section B, ¶¶ 4-21). Defendant Collins chose to be assisted by members of the Suffolk County Police Department. *Id.* When asked if he had any concerns about the fact that members of the Police Department undertook the investigation knowing that other police officers within the same department were the targets of same, Defendant Collins replied "no." (Plaint's 56.1 Count Stmnt, Section B, ¶ 19). Further, the investigation was conducted by officers of the homicide bureau - as opposed to internal affairs. Essentially, Collins was aware that the Defendant Police Officers that killed Mr. Lazo were being investigated by their own fellow officers. This did not concern Collins. (*Id.* ¶¶ 20-21).

### b. The Defendant Officers Were Not Criminally Charged And Probable Cause To Indict or Charge Same Was Not Determined:

At all times, Defendant Collins was involved in, and/or "took over," an "*investigation* into the death of *Kenny Lazo*." (*Exhibit E*, GJ Minutes, Caption). The Defendant Officers herein were never charged with any crimes in relation to the death of Mr. Lazo. Defendant Collins' presentation to the Grand Jury was for purposes of an "investigation" to find probable cause and/or to determine if a criminal prosecution should go forward. (*Plaint's 56.1 Count Stmnt*, Section I, ¶¶69-72). At the time of the alleged investigation, no criminal proceedings were initiated by the District Attorney's

8

Office. *Id.* As such, Defendant Collins was acting strictly in an investigatory role and was not engaged in the act of prosecuting any of the Defendant Officers. *Id.*

      c.    **The Defendant Suffolk Police Department Issued Public Statements Exonerating Defendant Police Officers *Prior To* The Conclusion Of Collins' Investigation:**

Despite the clear designation of Lazo's death as a homicide by the medical examiner, on July 18, 2008, months before Collins' investigation was concluded, Richard Dormer, Police Commissioner, stated in a Department Directive that "the police officers involved used the minimum force necessary to subdue Mr. Lazo - a large, strong, [sic] man who tried to grab an officer's gun and was pulling the officers dangerously close to the entrance ramp of the Southern State Parkway. Considering these circumstances, the officers had an obvious right to defend themselves." (*Exhibit F*, Department Memorandum by Police Commissioner Richard Dormer, dated July 18, 2008.). This announcement was followed by a Newsday article, "Commish backs cops in Lazo arrest." (*Exhibit K*). The article summed up the information set forth in Dormer's July 18th Department Directive. *Id.* The article reported that Richard Dormer defended the officers in subduing Lazo and provided, in part, Dormer's explanation for the marks on Lazo's neck. *Id.*

Defendant Collins said and/or did nothing in response to the Commissioner's public statements although same were made prior to the end of his alleged investigation.

      d.    **Collins Hides And/Or Avoids Advising The Grand Jury About The Medical Examiner's Determination That Mr. Lazo's Death Was A *"Homicide"*:**

In his deposition, Defendant Collins testified that he met with - and prepared - the medical examiner, who performed the autopsy on Mr. Lazo for testimony before the Grand Jury "at least once, perhaps twice." (Plaint's 56.1 Count. Stmnt., Section F, ¶¶26-45). Collins prepared the medical

9

examiner and was aware of what the medical examiner would testify to in the grand jury. (Id.) But, during the Grand Jury investigation, Collins asked the Medical Examiner questions specifically designed to avoid the ultimate conclusion - that Mr. Lazo's death was a "Homicide."(Id.)

First, though Defendant Collins presented the medical examiner to testify about portions of the autopsy report, Collins refused to enter - or show - the autopsy report to the Grand Jury as part of the evidence.(Plaint's 56.1 Count. Stmnt., Section F, ¶¶26-45). Collins confirmed that when an autopsy report is available at the time of the grand jury presentation, it was his normal practice to have the report itself marked as an exhibit and entered before the grand jury. (Id.). But in the case of Mr. Lazo, Defendant Collins refused to enter the report as an Exhibit.

The autopsy report ruled that Mr. Lazo's death was a "Homicide." (Exhibit C, "Report Of Autopsy," re: Kenny Lazo, dated 6/8/08, p. 2).Yet, the medical examiner, as planned, never stated or mentioned the word/term "Homicide" at all, or at any time during her testimony in the Grand Jury. (Plaint's 56.1 Count. Stmnt., Section F, ¶¶26-45).) Further, Defendant Collins intentionally withheld the Medical Examiner's findings as to the "manner of death" of Mr. Lazo. (Id.) Collins never asked the Medial Examiner to state her important findings as to the manner of Mr. Lazo's Death. (See Exhibit E, entire Grand Jury Transcr. Re: Y. Milewski testimony).

During the investigation, the Grand Jurors never learned or heard that Mr. Lazo's death was a homicide.(*Plaint's 56.1 Count. Stmnt., Section F, ¶¶26-45*).It was never explained to the Grand Jurors that Mr. Lazo died as a direct result of his interactions with the Defendant Police Officers and/or that Mr. Lazo would not have died had it not been for what occurred during his interactions with the police. (*Id*). **The Grand Jury never even learned that the officers involved in the arrest of Mr. Lazo failed to take Mr. Lazo to the hospital after beating him with flashlights, among other things.** Not one time during the Medical Examiner's testimony in the Grand Jury, was the

10

word "Homicide" stated or mentioned by the Medical Examiner or Defendant Collins (*Id.*). Defendant Collins was sure to go-over aspects of the Autopsy report in great detail. However, he intentionally skipped-over, or declined to discuss, the "manner of death" portion of the autopsy report. (*Id.*).

Defendant Collins utilized *some* of the photographs of Mr. Lazo's injuries in the Grand Jury (*Plaint's 56.1 Count. Stmnt., Section F, ¶¶26-45*).All of the photographs of Mr. Lazo's injuries were available to Defendant Collins during the Grand Jury presentation. (*Id.*). Collins claims that he utilized the photographs of Mr. Lazo and/or his injuries during the testimony of the medical examiner (*Id*). There were numerous photographs taken of Lazo's injuries during the autopsy but the Assistant District Attorney only presented photographs numbered as 39 to 55 -**which showed only superficial injuries sustained by Mr. Lazo.** (*Id*).

Defendant Collins was in charge of the preparation and presentation of evidence to the Grand Jury during the investigation. (*Plaint's 56.1 Count. Stmnt., Section F, ¶¶40-45*). In this regard, Collins chose which witnesses to call and which witnesses not to call. (*Id.*) Defendant Collins had the ability to contact and interview the medical expert hired by Plaintiffs - Dr. Thanning - prior to the grand jury presentment (*Id*). But, Defendant Collins chose *not* to interview Dr. Thanning or call Dr. Thanning to testify at the grand Jury. Collins made the determination to not call Dr. Thanning (*Id*. 64:12-19). Collins testified that the reason why he chose not to call Dr. Thanning to testify in the Grand Jury was because the medical examiner - Dr. Milewski - did not like Dr. Thanning and had negative experiences with Dr. Thanning in the past. (*Id*). Collins allowed Dr. Milewski's personal opinion of Dr. Thanning's alleged "acumen" to be his deciding factor to not call Dr. Thanning. (*Id.*) This clearly was not in role of prosecution.

At all times, Plaintiffs and their Counsel were ready, willing, able, and available to provide whatever witnesses or support was requested by Collins. (*Infra*) Indeed, Plaintiff's Counsel advised Collins that Plaintiffs had no ability to dictate what witnesses Collins could call for the Grand Jury.

11

(*Exhibit D*, letter from F. Brewington to J. Collins, dated 10/17/08). But, Plaintiff's Counsel assured Collins that they would "attempt to provide what support we can." (*Id.*)

### e.    Collins Asked The Medical Examiner Questions Specifically Designed To Avoid The "Manner Of Death" While Misleading The Grand Jury By Discussing Only The Alleged Non-Severity Of Mr. Lazo's Injuries:

Though the medical examiner determined that it was the totality of these "blunt impacts" together, that contributed to Mr. Lazo's death, the medical examiner was instead asked to discuss each individual "blunt impact" and the non-life threatening nature thereof, instead of describing how the totality of these blunt impacts contributed to the death of Mr. Lazo. (*Plaint's 56.1 Count. Stmnt.,Section E, ¶¶46-49*). This rehearsed discussion between Collins and the Medical Examiner was misleading to the Grand Jury insofar as the Grand Jurors were [mis]led to believe that all of Mr. Lazo's injuries were "non life threatening." (*Id*).

Collins then went through each individual "blunt impact" injury with the medical examiner and asked her to specify that each individual impact was "non life threatening." (*Plaint's 56.1 Count. Stmnt., Section E, ¶¶46-49*). Collins concluded his questioning of Dr. Milewski by asking her whether she believed that any of the blunt traumas observed by her were life threatening or that taken together were they life threatening and the doctor replied that they were not life threatening. Dr. Milewski agreed with the Assistant District attorney's descriptions of the injuries as "superficial". (*Id.*)

### f.    Collins Asked The Medical Examiner To *Speculate* As To Other Possible Causes of Mr. Lazo's Death - Other Than Mr. Lazo's Death Being A "Homicide":

Though the medical examiner ruled that Mr. Lazo's death was a homicide, Defendant Collins asked the medical examiner to speculate as to other possible causes of Mr. Lazo's death. (*Plaint's 56.1 Count. Stmnt., Section F, ¶¶50-56*). The medical examiner was never asked how the totality of the injuries sustained contributed to Mr. Lazo's Death, although this was what the medical examiner determined in her autopsy report. (*Id*). During her testimony before the Grand Jury on October 27,

2008, Dr. Milewski was asked her opinion on the "cause of death" of Kenny Lazo - being "Sudden

Cardiac Death following prolonged physical altercation with multiple blunt impacts." (*Exhibit E,* GJ

Transcript, p. 24, l. 14 - p. 25, l.4) Collins questioned Dr. Milewski with respect to the toxicology

exam and there was a **gratuitous mention of alleged cocaine use** by Lazo days before his death

even though cocaine and/or drugs were not found to have contributed to Mr. Lazo's death during the

autopsy. (*Id.*).

Dr. Milewski was also asked to speculate about stress and the effect of stress on Mr. Lazo

- although no such determination was part of the medical examiner's autopsy report. (*Id*). Although

Mr. Lazo had no founded illnesses associated with his heart, Dr. Milewski was asked to speculate

as to how Mr. Lazo's obesity and stress caused his death. (*Id.*)

Dr. Milewski, in a response to the Collins' question of how does the body handle stress

responded that "epinephrine goes up in the face and body and also drop very quickly and after the

threat is removed, it also lingers in the body beyond, past the time of physical activity so also is very

much directly related to how a person perceives the risk, the fear and feeling the stress themselves"

(*Id.*) None of this was contained in Dr. Milewski's autopsy report.(*Exhibit C*, autopsy report)

Collins continued to ask the Medical Examiner speculative questions based on factors not

included in her autopsy report or findings. (*Plaint's 56.1 Count. Stmnt., Section F, ¶¶50-56*). For

example, Collins asked: "*Mr. Lazo found himself at the precinct and charged with two Class B*

*felonies following this altercation. Is it possible that Mr. Lazo's stress level and his acute stress*

*response continued beyond the time frame of the actual physical altercation*?" Dr. Milewski's

speculative reply was that it was possible that a perceived threat could cause fear and could have a

"*deleterious effect*". (*Id*) This was not a finding that was ever mentioned in the autopsy report.

    **g.**    **As A Result Of Collins' Misleading Preparation and Presentation, The Investigation Was Dismissed By The Grand Jury And Defendant Officers Were Exonerated By The Police Department Though They Caused The Death/*Homicide* Of Mr. Lazo:**

13

The Grand Jury did not indict and/or "dismissed" the investigation against Defendant Police Officers. (*Plaint's 56.1 Count. Stmnt., Section H, ¶¶63-68*).

Further, Defendant Police Officers were exonerated by the Suffolk County Police Department for excessive force, false arrest and failure to perform duty after causing the death of Mr. Lazo (*Exhibit G*, "Internal Correspondence," dated 2/10/09). It is important to note that the Police Department, who's investigation was spear-headed by Collins and Spota's Office, **waited until the Grand Jury investigation was over to exonerate Defendant Officers**. (*Id.*) Once the Grand Jury dismissed the investigation, a recommendation was made that the complaint against Defendant Sgt Scimone be substantiated for violating the rules and procedures of the Suffolk Police with regard to transport of arrestees to the hospital for treatment following use of force. (*Id*). Further, once the Grand Jury's investigation was over, *only then* did the Police Department ask for a detailed statement from each Defendant Officer regarding their involvements in the arrest and death of Mr. Lazo. (*Exhibit I*). However, the fact that Mr. Lazo **died** - in part - as a result of collective Defendants' failures to take Mr. Lazo to the hospital following their use of force was not addressed by the Police Department or by the D.A.'s Office (*Id.*)

All of the Defendant Officers (including Sgt. Simone) explained that they were each aware that Mr. Lazo sustained injury after his alleged confrontation with the police. (*See Exhibit I*, I.A.B Memos and *Exhibit H*, I.A. B investigation).However, none of these Defendant Officers (except only Sgt. Simone) were found to have violated any rule(s) or regulation(s) for failing to take Mr. Lazo to the hospital after force was used. (*Id.*) (*See Exhibit I and H*, I.A.B investigation). The Defendant Officers, including Scimone, were exonerated from the allegations of false arrest, excessive force, and failure to perform duties. (*Id.*)

None of the Defendant Officers were disciplined for causing the death of Kenny Lazo. So, although there were two independent sources (i.e. the medical examiner and the police department) that determined that the Defendant Officers' actions caused the death of Mr. Lazo and/or violated

14

protocol, which led to the death of Mr. Lazo, the Defendant officers suffered *absolutely no consequences* for same.

    **h.**    **Following The Grand Jury's Dismissal Of The Investigation, Collins, Together With His Office, Immediately Issued A Press Release Regarding The *Dismissal*:**

To add insult to death, following the Grand Jury's dismissal of the investigation, a press release was issued by the Suffolk District Attorney's Office (*Plaint's 56.1 Count. Stmnt., Section G, ¶¶57-62*). The press release contained several incorrect and false statements regarding the investigation. Among other things, the press release *falsely asserted* that Mr. Lazo's family and attorney had an ongoing "civil suit" against the police officers. (*Id.*) The press release also falsely indicated that Mr. Lazo's family "*declined an offer from the district attorney's office to include the family's privately hired forensic expert or any other relevant witnesses*." (*Id.*).

The false information in the press release "came from [Collins]" and/or was made by Collins to members of the district attorney's office, who created the press release. (*Plaint's 56.1 Count. Stmnt., Section G, ¶¶57-62*). Collins reviewed the press release prior to same being issued to the public and was fully aware of its (false) contents. (*Id.*).

Plaintiffs' family and/or attorney never declined to make any witnesses available to the District Attorney's Office. (*Infra*) In fact, a letter provided to Collins, by counsel for Mr. Lazo's family, specifically indicated that it was the District Attorney's office that had the responsibility to decide what witnesses would be called to testify. (*Id.*) Further, the Lazo family and/or their attorney, asked the District Attorney to "make the independent decision as to who and what needs to be presented and [Plaintiff's family and attorney] would provide what support [they could]." (*Id.*) So, clearly, the press release (a non-prosecutorial function) was designed to assure the public that the Defendant Officers were viewed as innocent and to mislead the public into believing that Plaintiffs did not wish to assist in the investigation, and/or had no relevant evidence against the Police - which was false!

On February 10, 2009, the Internal Affairs Bureau completed its investigative report and it

was determined that Defendant Scimone failed to ensure that Lazo was transported from the scene directly to the hospital in violation of SCPD Rules and Procedures for not transporting a person for medical treatment after physical force was used and physical injury was sustained. (Annexed hereto as Exhibit "K" is a copy of the Internal Affairs Bureau Correspondence and Finding, dated February 10, 2009.)

A.     **Defendants Collins and Spota Are Not Entitled To Absolute Immunity:**

"It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under §1983." *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (*quoting Imber v. Pachtman*, 424 U.S. 409, 410, 431 (1976)(*citation and quotation marks omitted*)). Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings. **"[W]hen a prosecutor <u>supervises, conducts, or assists in the investigation of a crime</u>, or gives advice as to the existence of probable cause to make a warrantless arrest-that is, when <u>he performs functions normally associated with a police investigation-he loses his absolute protection from liability</u>."** [*emphasis added*] *Carbajal v. County of Nassau*, 271 F.Supp.2d 415, 421 (E.D.N.Y.2003).

"The Second Circuit has held that prosecutors are entitled to absolute immunity for conduct 'intimately associated with the judicial phase of the criminal process'." *Fielding v. Tollaksen*, 257 Fed.Appx. 400, 401 (2d Cir. 2007) (*quoting Imber*, 424 U.S. at 430, 96 S.Ct. 984). In particular, "[s]uch immunity ... extends to 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as advocate for the State." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent."

16

(*Infra* ) "**Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings.**" *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995); *see also Zahrey v. Coffey*, 211 F.3d 342, 347 (2d Cir. 2000) (emphasis added).

Contrary to the assertions of Defendant Collins and Spota in their motion papers, Defendant Collins was in charge of the investigations into the death of Mr. Lazo "under the supervision of" Defendant Spota and the District Attorney's Office. By Collins' own account, Defendant Spota, his supervisor, notified Defendant Collins to take over the investigation *from the police department*, and to move forward with an investigation - to be conducted under the control and supervision of the Suffolk District Attorney's Office. *Id*.

Further, Defendants Collins' and Spota's "investigation" was conducted while none of the Defendant Police Officers were charged with crimes, and probable cause had not been determined against the officers. As such, Collins' and Spota's investigation was not "prosecutorial" in nature. "A prosecutor's conduct prior to the establishment of probable cause should be considered investigative." (*Infra*) "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Zahrey*, 221 F.3d at 347 (*quoting Buckley v. Fitzsimmons*, 509 U.S. 259, 277, 278 (1993); *see also Hill*, 45 F.3d at 661 (*no immunity for acts taken* "*before any formal legal proceeding has begun and before there is probable cause to arrest.*").

Also, just because Collins and Spota (half-heartedly) presented evidence to the Grand Jury, does not turn their investigative actions prior the presentation into a prosecutorial action. (*Infra*) Notably, the mere fact that a prosecutor might later convene a grand jury and obtain an indictment does not automatically serve to cloak his prior investigatory actions with the protection of absolute

17

immunity. As the Supreme Court stated in *Buckley*:

> **That the prosecutors later called a grand jury to consider the evidence this work produced _does not_ retroactively transform that work from the administrative into the prosecutorial.** A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . .

*Buckley*, 509 U.S. at 275–76, *supra* (emphasis added).

## B. Defendants Collins And Spota Are Not Entitled To Qualified Immunity:

"Like absolute immunity, qualified immunity "is an *immunity from suit* rather than a mere defense to liability ... [and] is effectively lost if a case is erroneously permitted to go to trial." *Hill v. City of New York, supra, citing Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "To some extent the availability of qualified immunity turns on inquiries into specific facts." *Id.* "Under qualified immunity, a government official may claim immunity from suit only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *(Id., citing, Washington Square Post # 1212 American Legion v. Maduro,* 907 F.2d 1288, 1292 (2d Cir.1990).

In Point II, Subsection E of their memorandum, Defendants seek to cloud the issues, and misread Plaintiffs' Complaint, in stating the Plaintiffs assert that they had some "constitutional right" "as crime victim[s]" to the "outcome in the prosecution of the perpetrator of a crime ..." (*See,* Def's Memo., p 18, Point II, Subsection E). Defendants missed the point completely. Clearly here, initially, Mr. Lazo had a right, under the Fourth Amendment, to be free from excessive force. (*Infra*) Further, as Mr. Lazo was in police custody, he was handcuffed and held in the police precinct against his will at the time of his "homicide," Mr. Lazo had a right against summary punishment and an absolute right to due process and equal protection. (*Infra*) "In addressing an excessive force claim brought

18

under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (U.S. 1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Id*.

Furthermore, Mr. Lazo had substantive due process rights to bodily integrity, among other things, which Plaintiffs allege was violated by the collective Defendants herein when they caused his death and then sought to cover-up their actions - with assistance from Defendants Collins and Spota *who were the only persons* in charge of the investigation. Because Mr. Lazo died at the hands of the Defendant Police Officers herein, Mr. Lazo was entitled to a full and fair investigation into his own "homicide" and the summary, cruel and unusual punishment he faced at the hands of the Defendant Police in April 2008 - without obstruction from Defendants Collins and Spota.

At a minimum, issues of fact exist as to whether Defendant Collins and Spota actively assisted the Police Defendants - after they "took over the investigation" - in covering up and concealing the facts and in preventing the Defendant Officers from indictment, discipline, and public ridicule, for their abusive actions against Mr. Lazo. The facts as outlined in the above Factual Allegations, as well as in Plaintiffs' 56.1 statement raise sufficient issues as to Defendants' Collins' and Spota's involvement in the cover-up of Mr. Lazo's Homicide during the investigation that they "took over" from the police. Also, issues of fact exist as to whether Collins' and Spota's defamatory and false statements to the media after the dismissal of the investigation was calculated to further shield the police while causing public harm to Plaintiffs. Clearly, these statements *are not* deserving of immunity in any form.

19

"The qualified immunity doctrine shields government officials performing discretionary functions from personal liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' so long as it is objectively reasonable for the officials to believe that they did not violate those rights. *Wu v. City of New York*, 934 F. Supp. 581, 590 (S.D.N.Y. 1996), *citing*; *Washington Square Post # 1212 American Legion v. Maduro*, 907 F.2d 1288, 1290–91 (2d Cir.1990); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir.1994). Defendants are not protected by immunity if it is obvious that no reasonably competent prosecutor would have assisted police officers accused of a "homicide" against a citizen (i.e. Mr. Lazo) in covering-up said offense. *See, Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Referring the Court's attention to the Factual Allegations above, as well as Plaintiff's 56.1 Statement, issues of fact exist as to whether Defendants Collins and Spota, who "took over" the investigation into the homicide of Mr. Lazo from the Suffolk Police Department, assisted same in thwarting the investigation and then actively misrepresented facts to the public regarding the investigation in an effort to cause further harm to Plaintiffs. *Given that it was determined that Mr. Lazo's death was a homicide*, issues of fact exist as to whether Collins' and Spota's actions in taking over the investigation, seeking evidence during their investigation, failing to include information and evidence, and then concealing said evidence to protect the Police Officer Defendants from liability, indictment and administrative discipline were reasonable. Plaintiffs assert that said actions were not reasonable and that no reasonable prosecutor should contend that the cover-up of Police Officer Defendants' crimes was reasonable under any circumstance.

20

## POINT IV
## ISSUES OF FACT EXIST AS TO DEFENDANT SPOTA'S INVOLVEMENT AND SUPERVISION (PERSONAL INVOLVEMENT) OF THE *INVESTIGATION*" INTO THE DEATH OF KENNY LAZO.

In their memorandum at Point II, Defendants claim that Defendant Spota is entitled to summary judgment. Defendant did not challenge the elements of Sections 1983 and/or 1981. Instead, they assert that Defendant Spota should be dismissed from this action because there was no evidence that he was "personally involved" in any of the alleged unlawful acts. Plaintiffs disagree.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983'." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), *citing*; *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) "In other words, a supervisory official cannot be held liable solely on the basis of the acts or omissions of his subordinates; the supervisor must be personally involved in the alleged deprivation, and there must be 'an affirmative *causal link* between the supervisor's actions (or inactions) and the injury'." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 206 (S.D.N.Y. 2013); *see also Wright*, 21 F.3d at 501 (explaining that a defendant cannot be held personally responsible merely because he or she is in a high position of authority). Also, "[a] plaintiff may prove the causation element by showing either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights . . . or that while the policymaker himself engaged in 'facially lawful ... action,' he indirectly caused the misconduct of a subordinate municipal employee." *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000), *citing*; *Board of the County Commissioners v. Brown*, 520 U.S. 397, 405–07 (1997).

Sufficient facts exist to demonstrate that Defendant Spota was, indeed, personally involved

21

in, and supervised, Defendant Collins' and the District Attorney's Offices' "take over" of the Polices' investigation into the death of Mr. Lazo. (*See* Plaintiffs' 56.1, Section B). The degree of Defendant Spota's personal involvement in the investigation is an issue of fact. It is beyond dispute that Defendant Spota remained in contact with the U.S. Attorney's Office prior to "taking over" the police's investigation (*Exhibit A*, Collins Depo. 30). It was Defendant Spota who made a determination that the Suffolk District Attorney's Office would not investigate the matter until the U.S. Attorney's Office indicated whether it would investigate *Id.* Also, once the U.S. Attorney's Office advised Defendant Spota that it was not going to pursue an investigation (*Exhibit A*, Collins Depo. 42:3-7), Defendant Spota notified Defendant Collins to "take over" the Police investigation and move forward with same - *to be conducted under the control and supervision of the Suffolk District Attorney's Office*. (*Id.* 42:3-12).

Moreover, Defendant Collins would not answer whether Defendant Spota supervised his investigation and presentation to the Grand Jury - except to say that Spota "*consulted with him*." (*Exhibit B*, Collins Depo. 6/3/2014, p. 33:14 - 35). Remarkably, Collins stated that the question as to the degree of supervision of District Attorney Spota "*would be a question better addressed to [Spota]*." (*Id.*) Further, Collins "*could not recall*" if Defendant Spota ever made any inquires to Collins regarding the Grand Jury presentation - except that they had discussions about "*many things*" involving the Grand Jury presentation (*Id.* 33:2-13). As Plaintiffs were precluded by the District Court from deposing District Attorney Spota regarding this issue, this remains an issue of fact. (See Docket No. 36, dated 11/10/2011 and minutes of Plaintiff's re-application to depose Spota, Docket No. 52, dated 5/20/2014).

District Attorney Spota (a policy-maker), assigned his "Chief Trial Prosecutor," Defendant

22

Collins to spear-head the investigation under Defendant Spota's supervision. As per his own testimony, Defendant Collins is also a "policy-maker" within the Suffolk District Attorney's Office as well - who answers directly to Defendant Spota (*See* Plaintiffs' 56.1 Count. Stmnt., Section A, ¶¶1-3).

Given the above, in conjunction with the facts asserted in Plaintiffs' above Statement of Facts, issues of fact exist as to Spota's personal involvement in the cover-up during the investigation into the death of Mr. Lazo. Together, these two policy-makers within the Suffolk District Attorney's office, assisted the Police Officer Defendants in the intentional mishandling of the investigation and cover-up into the circumstances surrounding the homicide of Mr. Lazo. In this regard, summary judgment as to Collins and Spota should be denied - *as a matter of law*.

## POINT V
### DEFENDANTS *ARE NOT* ENTITLED TO ELEVENTH AMENDMENT IMMUNITY IN HIS OFFICIAL OR INDIVIDUAL CAPACITIES

In Point V of their memo, Defendant assert that Defendants Spota and Collins, as members of the District Attorney's Office, were acting as employees of the State Of New York and are therefore entitled to Eleventh Amendment immunity from suits, pursuant to §1983. The Courts are clear, however, that the question as to whether Defendants Spota and Collins were acting as employees of the State (thus entitled to 11th Amendment protection), or Employees of the Municipal Defendant County Of Suffolk (thus *not* entitled to 11th amendment protection) is decided based upon the nature of their actions at issue. With regard to their alleged cover-up during the homicide investigation of Mr. Lazo (*which is not a prosecutorial function*), the Courts maintain that the district attorney is acting as an employee of the Municipal County Of Suffolk. (*Infra*) Therefore, they would not be entitled to 11th Amendment protections as they were not representing the "People of the State

23

Of New York" in a prosecutorial capacity during their "investigation." (*Infra*)

The case-law upon which Defendants rely [*Ying Jing Gan v. City of New York*, (infra)] actually supports that Defendants were acting in an administrative, municipal, capacity - as opposed to as State employee representatives of the People Of The State Of New York - and *are not* entitled to 11th Amendment Immunity.

### A.    Spota's And Collins' "Investigation" *Was Not* A Prosecutorial Function And thus they *Are Not* Entitled To 11th Amendment Immunity:

Normally, "the immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Id., citing; Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985); *Hafer v. Melo*, 502 U.S. 21, —, 112 S.Ct. 358, 362 (1991).

*However,* "with respect to claims not centering on decisions whether or not, and on what charges, to prosecute **but rather on the administration of the district attorney's office, the district attorney has been treated** *not as a state official* **but rather as an official of the municipality to which he is assigned**." [*emphasis added*] *Ying Jing Gan, Supra, citing; Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir.1992); *See also Gentile v. County of Suffolk*, 926 F.2d 142, 152 n. 5 (2d Cir.1991) (office policy as to disciplining of law enforcement personnel *is not* a state function of the District Attorney).

Here, with regard to their act(s) of "taking over" *an investigation* of the Police Department into the death of Mr. Lazo - *as opposed to actually prosecuting the Police Officer Defendants on*

24

*behalf of the People of the State Of New York* - and as no charges were filed against Police Officer Defendants at the time of Spota and Collins' "investigation," Defendants Spota and Collins ***were not*** acting in a prosecutorial capacity.

Further, it is beyond dispute that Defendant Spota's and Collins' malicious and false press release and/or statements to the public are not prosecutorial functions. (*Infra*) "Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 277, 278 (1993). By issuing this press release, Collins and/or Spota "did not act in [thier] roles as advocate for the State." *Id.*, citing, *Burns v. Reed*, 500 U.S., at 491, *quoting*; *Imbler v. Pachtman*, 424 U.S., at 431. "The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." (*Id.*)  *See, Ying Jing Gan, Supra*. For these actions, and their violations related thereto, Defendants Spota and Collins cannot enjoy 11th Amendment immunity.

**B.**     **Plaintiffs Can Maintain Their Cause Of Action (Pursuant to §1983) Against Spota And Collins In Their Individual Capacities, Regardless:**

There is no question, however, that Defendants Spota and Collins are being sued here in their individual capacities as well. In this regard, "as to a claim brought against him **in his individual capacity, the state official has no Eleventh Amendment immunity**." *Ying Jing Gan v. City of New York, supra, citing*; *Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974) (*Eleventh Amendment does not bar award of damages to be paid not from the state treasury but from the official's personal funds*).

## CONCLUSION

For all the above-cited reasons, as well as based on the facts as set-forth in Plaintiffs' 56.1 Counter Statement of Facts, Defendants Spotas' and Collins' motion for summary judgment should be denied in its entirety.

Dated: Hempstead, New York
January 9, 2019

Respectfully submitted,

THE LAW OFFICES OF
FREDERICK K. BREWINGTON

By: _____

FREDERICK K. BREWINGTON
*Attorneys for Plaintiffs*
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959