UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

PATRICIA GONZALEZ and JENNIFER
GONZALEZ, individually and as co-administrators of
the Estate of KENNY LAZO,

<div style="text-align:center">Plaintiffs,</div>

<div style="margin-left:2em">-against-</div>

COUNTY OF SUFFOLK, SUFFOLK POLICE
DEPARTMENT, POLICE COMMISSIONER
RICHARD DORMER, in his individual and official
capacity, POLICE OFFICER JOHN NEWTON, in his
individual and official capacity, POLICE OFFICER
JAMES SCIMONE, in his individual and official
capacity, POLICE OFFICER WILLIAM JUDGE, in his
individual and official capacity, POLICE OFFICER
CHRISTOPHER TALT, in his individual and official
capacity, POLICE OFFICER JOSEPH LINK, in his
individual and official capacity, COUNTY OF
SUFFOLK OFFICE OF DISTRICT ATTORNEY,
SUFFOLK COUNTY DISTRICT ATTORNEY
THOMAS SPOTA, in his individual and official
capacity, ASST. DISTRICT ATTORNEY JOHN B.
COLLINS, in his individual and official capacity, and
"JOHN AND JANE DOES 1-10" representing as yet
unknown and unidentified members of the Office of the
Suffolk County District Attorney (all in their individual
and official capacities as employees of the Office of
Suffolk County District Attorney),

<div style="text-align:center">Defendants.</div>
_____

**DOCKET NO.:** CV-09-1023
(JS)(GRB)

---

<div style="text-align:center">

**PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN OPPOSITION TO
DEFENDANTS' COLLINS AND SPOTA'S MOTION FOR SUMMARY
JUDGMENT AND COUNTER-STATEMENT OF FACTS PURSUANT
TO LOCAL RULE 56.1**

</div>

Pursuant to Local Rule 56.1 for the Eastern District of New York, Plaintiff PATRICIA

GONZALEZ and JENNIFER GONZALEZ, individually and as co-administrators of the Estate of

KENNY LAZO, submit this Statement of Disputed Material Facts in Opposition to Defendants'

DISTRICT ATTORNEY THOMAS SPOTA, AND JOHN B. COLLINS' (hereinafter "Defendants")

Motion for Summary Judgment.

Further, Plaintiffs respectfully aver that, in addition to those assertions made by the Defendants, which are disputed here, this document is provided, pursuant to Local Civil Rule 56.1, as a counter-statement of facts in support of Plaintiffs' contentions that genuine facts are in dispute. The facts and contentions listed below in Plaintiffs' Counter Statement are not all-inclusive of each and every disputed issue, but are provided to demonstrate the level and complexity of the disputed issues which permeate this case.

Further, references provided in support of each of the issues raised are not all-inclusive, and are offered to comply with the Local Rule. Further, Plaintiffs object to Defendants' improper misstatement of facts so as to lead to deceptive and inaccurate conclusions and Plaintiffs do not concur with the subject titles adopted by Defendants and only utilize them for purposes of recognition and consistency. Plaintiffs object to having to file this Rule 56.1 Statement without having had the opportunity any meaningful discovery from Defendants.

## DISPUTED FACTS

1.  **Not Disputed.**

2.  **Not Disputed.**

3.  **Not Disputed.**

4.  **Disputed.** In June 2008, the medical examiner declared Mr. Lazo's death a homicide -as opposed to an accidental or natural death. (*Exhibit A.*, Collins Depo. 24). From that point going forward, according to Defendant Collins, "there came a point in the Lazo case that **I took over the investigation.**" (*Infra*) At that time Defendant Collins met with sergeants and detectives of the

2

Suffolk County Homicide Squad. (*Id*. 12:11-24). At that point in time [Collins] they discussed the ongoing investigation. (*Id*.) The officers disclosed the results of their investigation before Collins took-over same. (Depo. 14:2-9)

5. **Disputed (See 4 above).** Specifically, with regard to "[taking] over the investigation", according to Defendant Collins, the detectives involved took orders from Collins and performed tasks, such as interviewing witnesses, on Collins' behalf. (*Exhibit A*, Collins Depo. 16:2-7) Then, Defendant Collins gave the detectives assignments "to follow up on." (*Id*. 12:25 - 13) In addition, Collins also had several meetings with the lead detective (Portela) regarding the Grand Jury investigation." (*Id*.) Defendant Collins instructed the investigating detectives to "help [Collins] contact witnesses." (*Id*. at 13:3-16). Defendant Collins also visited the scene(s) where Mr. Lazo was arrested and the scene where Mr. Lazo was killed to take photographs. (*Id*. 47:18)  In addition, Defendant Collins actively interviewed eye-witnesses and expert witnesses. (*Id*.). Defendant Collins participated in the decisions to visit the scene(s), speak to witnesses, and to partake in every other aspect of his investigation. (*Id*. 13:17)

6. **Disputed in Part.** In June 2008, the medical examiner declared Mr. Lazo's death a homicide - as opposed to an accidental or natural death. (*Exhibit A*, Collins Depo. 24-25). From that point going forward, the District Attorney's Office had a duty to get involved in the investigation in conjunction with the police department - *not only for the purposes of presentation to the Grand Jury* -but also to determine if the Defendant officers should be disciplined via administrative charges for killing Mr. Lazo. (*Id*.)

7. **Disputed.** The U.S. Attorney's considerations whether to investigate this matter had nothing to do with waiting for the conclusion of the medical examiner. (*Infra*). In fact, the U.S.

Attorney's Office indicated that it would not conduct it own investigation before the medical examiner's and police department's conclusions result were revealed. (*Infra*) At that point, the Homicide Bureau (alone) began to investigate the death of Mr. Lazo - pursuant to orders from Defendant Spota to go forward. (*Infra*) Before Mr. Lazo's death was declared a homicide, the investigation of his death was conducted solely by the police department. (*Exhibit A*, Collins Depo. 25:9-15). Then, in June 2008, the medical examiner declared Mr. Lazo's death a homicide (*Id* at 24-25). From that point going forward, the District Attorney's Office had a duty to get involved in the investigation in conjunction with the police department. (*Id*.)

8.     **Disputed.** (See ¶7 above). At the time that the medical examiner concluded that Mr. Lazo's death was a homicide, the U.S. Attorney's office had already previously determined that it was not going to conduct its own investigation. Then the Police Department began its investigation. Before Mr. Lazo's death was declared a homicide, the investigation of his death was conducted solely by the police department. (Depo. 25:9-15). In June 2008, the medical examiner declared Mr. Lazo's death a homicide - as opposed to an accidental or natural death. (*Id*. 24). From that point going forward, the District Attorney's Office had a duty to get involved in the investigation in conjunction with the police department. (*Id*.)

9.     **Disputed.** *In June 2008* - as opposed to July - the medical examiner declared Mr. Lazo's death a homicide. (*Exhibit A*, Collins Depo. 24-25). From that point going forward, the District Attorney's Office had a duty to get involved in the investigation in conjunction with the police department. (Id.) Defendant Spota notified Defendant Collins to move forward with an investigation - to be conducted under the control and supervision of the Suffolk District Attorney's Office. (*Exhibit A*, Collins Depo. 42:3-12)

10.     **Disputed.** Collins "took over the [ongoing] investigation" and supervised same - as opposed to "handling the Homicide Bureau's review." According to Defendant Collins, "there came a point in the Lazo case that **I took over the investigation**." (*Infra*) At that time Defendant Collins met with sergeants and detectives of the Suffolk County Homicide Squad. (*Exhibit A*, Collins Depo. 12:11-24). At that point in time [Collins] they discussed the ongoing investigation. (*Id*.) The officers disclosed the results of their investigation before Collins took-over same. (*Id*. 14:2-9)

11.     **Not Disputed.**

12.     **Not Disputed.**

13.     **Disputed.** Detective Portella was just one witness among many. The Grand Jury presentation could have commenced even though Detective Portella was testifying in another matter.

14.     **Disputed.** Defendant Collins was in charge of the presentation of evidence to the grand jury. *(Exhibit A,* Collins Depo. 56:6-12). In this regard, Collins chose which witnesses to call and which witnesses not to call. (*Id*. 56. 21-25). Plaintiff's Counsel advised Collins that Plaintiffs had no ability to dictate what witnesses he could call for the Grand Jury. (*Exhibit D*, letter from F. Brewington to J. Collins, dated 10/17/08). But, Plaintiff's Counsel assured Collins that they would "attempt to provide what support we can." (*Id*.) Further, Defendant Collins chose not to interview Dr. Thanning or call Dr. Thanning to testify at the grand Jury. (*Exhibit A*, Collins Depo. 64:12-19). Collins testified that the reason why he (independently) chose not to call Dr. Thanning to testify in the grand jury was because the medical examiner - Dr. Milewski - did not like Dr. Thanning and had negative experiences with Dr. Thanning in the past. (*Exhibit A*, Collins Depo. 67:3-9). Collins allowed Dr. Milewski's personal opinion of Dr. Thanning's alleged "acumen" to be his deciding factor to not call Dr. Thanning. (*Id*.)

15.    **Not Disputed.**

16.    **Disputed.** Defendant Collins could not answer whether Defendant Spota supervised his presentation to the Grand Jury - except to say that "*I consulted with him.*" (*Exhibit B*, Collins Depo. 6/3/2014, p. 33:14 - 35). Collins stated that the question as to the degree of supervision of District Attorney Spota "would be a question better addressed to him." (*Id.*) Further, Collins "could not recall" if Defendant Spota ever made any inquires to Collins regarding the Grand Jury presentation - except that they had discussions about "many things" involving the Grand Jury presentation (*Id.* 33:2-13) As Plaintiffs were precluded by the District Court from deposing District Attorney Spota regarding this issue, this remains an issue of fact (*See* Docket No. 36, dated 11/10/2011 and minutes of Plaintiff's re-application to depose Spota, Docket No. 52, dated 5/20/2014).

17.    **Disputed.** (See 16 above)

18.    **Disputed.** As Collins did not inquire with the medical examiner as to the manner of death (i.e "homicide"), and as not a single question was asked of the medical examiner as to the manner of death being a "homicide," issues of fact exist as to whether Collins refused to enter the medical examiner's report in an effort to conceal the medical examiner's determination that the manner of death was a "homicide" from the Grand Jury. (*See Exhibit E*, GJ transcr. Yvonne Milewski and Plaintiff's Counter-Statement of Facts below).

19.    **Disputed.** Defendant Collins had the ability to contact and interview Dr. Thanning prior to the grand jury presentment (*Exhibit A*, Collins Depo. 55:2-18). But, Defendant Collins chose not to interview Dr. Thanning or call Dr. Thanning to testify at the grand jury. (*Id.*). Collins made the determination to not call Dr. Thanning (Depo. 64:12-19). Collins testified that the reason why

he chose not to call Dr. Thanning to testify in the grand jury was because the medical examiner - Dr. Milewski - did not like Dr. Thanning and had negative experiences with Dr. Thanning in the past. (*Id.* 67:3-9). Collins allowed Dr. Milewski's (irrelevant) personal opinion of Dr. Thanning's alleged "acumen" to be his deciding factor to not call Dr. Thanning. (*Id.*) Further, Plaintiff's Counsel advised Collins that Plaintiffs had no ability to dictate what witnesses he could call for the Grand Jury. (*Exhibit D,* letter from F. Brewington to J. Collins, dated 10/17/08). But, Plaintiff's Counsel assured Collins that they would "attempt to provide what support we can" at Collins' request (Id.)

20. **Not Disputed.**

21. **Not Disputed.**

22. **Not Disputed.**

## PLAINTIFFS' COUNTER STATEMENT OF FACTS

**A.      Defendant Collins was a Policy-Maker At All Times Relevant
To The Complaint:**

1.      Collins was the "Chief Trial Prosecutor" for the Suffolk County District Attorney's Office at all time relevant to the Complaint (*Exhibit A,* Collins Depo. 7:13-21).

2.      As the Chief Trial Prosecutor, Collins' duties included: "oversight of the Homicide, Major Crime, Child Abuse and Domestic Violence, Case Advisory, East End and District Court bureaus and their day-to-day operations. (*Exhibit A,* Collins Depo. 9:11)

3.      In addition to having oversight over the above-described bureaus, Collins **"ha[d] oversight with regard to hiring and other policy decisions in the office."** (*Exhibit A,* Collins Depo. 10:8-14). Indeed, Collins had supervisory authority over "100 lawyers" in the Suffolk District Attorney's Office (*Exhibit A,* Collins Depo. 10:19 - 11:9). In addition to lawyers, Collins also had supervisory authority over "investigators and support staff." (Depo. 11:10-15).

**B.      Defendant Collins Was In Charge Of, and/or "Took Over"
The Investigation Of The Death Of Kenny Lazo:**

4.      Initially, the U.S. Attorney's Office indicated that they were conducting an investigation into the death of Kenny Lazo. (*Infra*)

5.      Defendant Spota remained in contact with the U.S. Attorney's Office (Exhibit A, Collins Depo. 30). Defendant Spota made a determination that the Suffolk District Attorney's Office would not investigate the matter until the U.S. Attorney's Office indicated whether it would investigate (*Id*.)

6.      Soon thereafter, the U.S. Attorney's Office advised Defendant Spota that it was not going to pursue an investigation. (*Exhibit A*, Collins Depo. 42:3-7) At that point, Defendant Spota

8

notified Defendant Collins to move forward with an investigation - to be conducted under the control and supervision of the Suffolk District Attorney's Office. (*Id*. 42:3-12)

7.    Before Mr. Lazo's death was declared a homicide, the investigation of his death was conducted solely by the police department. (*Exhibit A*, Collins Depo. 25:9-15).

8.    In June 2008, the medical examiner declared Mr. Lazo's death a homicide - as opposed to an accidental or natural death. (*Exhibit A*, Collins Depo. 24). From that point going forward, the District Attorney's Office had a duty to get involved in the investigation in conjunction with the police department. (*Id*.)

9.    With regard to the investigation into the death of Mr. Lazo, when asked if he had any oversight or direct contact with investigators, Defendant Collins replied "not from the District Attorney's Office. Only from the police department." (*Exhibit A*, Collins Depo. 12:3-10).

10.    Specifically, Defendant Collins "had contact with Detective Patrick Portela, who was the lead detective assigned by the homicide squad of the police department . . . [as well as] his supervisor 1, Sgt. Edward Fandrey." (*Id*.)

11.    According to Defendant Collins, "there came a point in the Lazo case that I took over the investigation." (*Infra*) At that time Defendant Collins met with sergeants and detectives of the Suffolk County Homicide Squad. (*Exhibit A*, Collins Depo. 12:11-24).

12.    At that point in time [Collins] they discussed the ongoing investigation. (*Id*.) The officers disclosed the results of their investigation before Collins took-over same. (*Exhibit A*, Collins Depo. 14:2-9).

13.    According to Defendant Collins, the detectives involved took orders from Collins and performed tasks, such as interviewing witnesses, on Collins' behalf. (*Exhibit A*, Collins Depo.

9

16:2-7)

14.     Then, Defendant Collins gave the detectives assignments "to follow up on." (*Exhibit A*, Collins Depo. 12:25 - 13)

15.     In addition, Collins also had several meetings with the lead detective (Portela) regarding the Grand Jury investigation." (*Id.*) Defendant Collins instructed the investigating detectives to "help [Collins] contact witnesses." (*Id.* at 13:3-16).

16.     Defendant Collins also visited the scene(s) where Mr. Lazo was arrested and the scene where Mr. Lazo was killed to take photographs. (*Exhibit A,* Collins Depo. 47:18) In addition, Defendant Collins actively interviewed eye-witnesses and expert witnesses. (*Id.*).

17.     Defendant Collins participated in the decisions to visit the scene(s), speak to witnesses, and to partake in every other aspect of his investigation. (*Exhibit A*, Collins Depo. 13:17)

18.     Though Collins had the ability to utilize his own (independent) investigators, Defendant Collins did not utilize investigators within the District Attorney's Office. (*Exhibit A,* Collins Depo. 42:22-25) Defendant Collins chose to be assisted by members of the Suffolk County Police Department. (*Exhibit A*, Collins Depo. 43:17-23).

19.     When asked if he had any concerns about the fact that members of the Police Department undertook the investigation knowing that other police officers within the same department were the targets of same, Defendant Collins replied "no." (*Exhibit A,* Collins Depo. 43:17-23).

20.     Further, the investigation was conducted by officers of the homicide bureau - as opposed to internal affairs. Essentially, Collins was aware that the Defendant Police that killed Mr. Lazo Officers were being investigated by their own fellow officers. This did not concern Collins.

(*Exhibit A*, Collins Depo. 44).

21.     Collins understood that - ordinarily - officers would be separated and asked to each write their own reports regarding the incident. It was against the homicide bureau's "usual practice" to allow officer to write their statements or reports together. (*Exhibit A*, Collins Depo. 45:22-46:16) Collins did not recall whether he inquired as to whether the subject officers wrote their statements together. (Id.)

### C.     Medical Examiner's Autopsy Report Determines The Manner of Death To Be A "Homicide."

22.     Collins had the medical examiner's autopsy report available to him at the time of the Grand Jury presentation. (*Exhibit A*, Collins Depo 74).

23.     The report stated, among other things, that Mr. Lazo received multiple contusions (bruises) in and around his body, including, but not limited to, (1) "two full thickness, red scapular [shoulder region] contusions of both occipital regions [which is the bone forming the rear of the skull], one on the left and one on the right"; (2) "red swelling/contusion extending from the inferior border of the left eye onto the left cheek. Within this area of contusion are multiple pinpoint red abrasion/contusions"; (3) "[w]ithin the right lateral forehead is a...purple/red hematoma/swelling"; and (4) "[w]ithin the superior portion of the left ear is a...red-purple contusion with a central...linear laceration." (*Exhibit C*, "Report Of Autopsy," re: Kenny Lazo, dated 6/8/08).

24.     The Final Anatomic Diagnoses of Mr. Lazo's Autopsy report states, in part:

I.     SUDDEN CARDIAC DEATH FOLLOWING EXERTION ASSOCIATED WITH PROLONGED PHYSICAL ALTERCATION WITH MULTIPLE BLUNT IMPACTS

11

II.      OBESITY

A.      BODY MASS INDEX - 38.4
B.      HEPATIC STEATOSIS, SLIGHT

III.     BLUNT IMPACTS TO HEAD WITH MULTIPLE ABRASIONS, CONTUSIONS AND LACERATIONS OF FACE AND SCALP

IV.      BLUNT IMPACTS TO TORSO WITH MULTIPLE CONTUSIONS AND ABRASION

V.       BLUNT IMPACTS TO UPPER EXTREMITIES WITH MULTIPLE CONTUSIONS

VI.      GRANULOMATOUS INFLAMMATION, PARA-TRACHEAL AND HILAR LYMPH NODES (MICROSCOPIC)

(*Exhibit C*, "Report Of Autopsy," re: Kenny Lazo, dated 6/8/08)

25.      The autopsy report further stated that the manner of death was "**HOMICIDE**."

(*Exhibit C*, "Report Of Autopsy," re: Kenny Lazo, dated 6/8/08).

**D.      Collins Intentionally Withheld The Medical Examiner's
*Most Important* Determination (I.E. "Homicide") From
The Grand Jury During the Investigation:**

26.      Collins testified that he met with - and prepared - the medical examiner, who performed the autopsy on Mr. Lazo for testimony before the Grand Jury "at least once, perhaps twice." (*Exhibit B*, Collins Depo. 6/3/2014, p. 33:14 - 35).

27.      Collins prepared the medical examiner and was aware of what the medical examiner would testify to in the grand jury (*Exhibit B*, Collins Depo. 6/3/2014, p. 33:14 - 35).

28.      Collins asked the Medical Examiner questions specifically designed to avoid the ultimate conclusion - that Mr. Lazo death was a "Homicide." (*Exhibit E*, entire Grand Jury Trans. Yvonne Milewski).

12

29.     Though Defendant Collins presented the medical examiner to testify about portions of the autopsy report, Collins did not enter - or show - the autopsy report to the Grand Jury as evidence. (*Exhibit A*, Collins Depo. 75:5-10).

30.     Collins confirmed that when an autopsy report is available at the time of the grand jury presentation, it was his normal practice to have the report itself marked as an exhibit and entered before the grand jury. (*Exhibit A*, Depo. 76:7-13). But in the case of Mr. Lazo, Defendant Collins refused to enter the report as an Exhibit.

31.     The autopsy report ruled that Mr. Lazo's death was a "**Homicide**." (*Exhibit C*, "Report of Autopsy," re: Kenny Lazo, dated 6/8/08, p. 2).Yet, the medical examiner never stated or mentioned the word/term "**Homicide**" at all, or at any time during her testimony in the Grand Jury. (*See Exhibit E*, entire Grand Jury Transcr. Re: Y. Milewski testimony)

32.     Further, Defendant Collins intentionally withheld the Medical Examiner's findings as to the "manner of death" of Mr. Lazo. (*See Exhibit E*, entire Grand Jury Transcr. Re: Y. Milewski testimony)

33.     Collins never asked the Medial Examiner to state her important findings as to the manner of Mr. Lazo's Death. (*See Exhibit E,* entire Grand Jury Transcr. Re: Y. Milewski testimony)

34.     The Grand Jurors never learned or heard that Mr. Lazo's death was a homicide.(*See Exhibit E*, entire Grand Jury Transcr. Re: Y. Milewski testimony)

35.     It was never explained to the Grand Jurors that Mr. Lazo died as a direct result of his interactions with the Defendant Police Officers and/or that Mr. Lazo would not have died had it not been for his interactions with the police. (*See Exhibit E*, entire Grand Jury Transcr. Re: Y. Milewski testimony).

36.     Not one time during the Medical Examiner's testimony in the Grand Jury, was the word "Homicide" stated or mentioned by the Medical Examiner or Defendant Collins (*See Exhibit E*, entire Grand Jury Transcr. Re: Y. Milewski testimony).

37.     Defendant Collins was sure to go-over each aspect of the Autopsy report in great detail. However, he intentionally skipped-over, or declined to discuss, the "manner of death" portion of the autopsy report. (*See Exhibit E*, entire Grand Jury Transcr. Re: Y. Milewski testimony).

38.     Defendant Collins utilized some of the photographs of Mr. Lazo's injuries in the Grand Jury (*Exhibit A*, Collins Depo. 51:3-9). All of the photographs of Mr. Lazo's injuries were available to Defendant Collins during the Grand Jury presentation. (*Id.* 52:17-19).

39.     Collins claims that he utilized the photographs of Mr. Lazo and/or his injuries during the testimony of the medical examiner (*Exhibit A*, Depo. 78:8-11). There were numerous photographs taken of Lazo's injuries during the autopsy but the Assistant District Attorney only presented photographs 39 to 55 to Dr. Milewski. (*Exhibit E*, GJ Transcript, p. 12, 1.9-12).

40.     Defendant Collins was in charge of the presentation of evidence to the Grand Jury. (*Exhibit A*, Collins Depo. 56:6-12). In this regard, Collins chose which witnesses to call and which witnesses not to call. (Id. 56. 21-25).

41.     Defendant Collins had the ability to contact and interview the medical expert hired by Plaintiffs - Dr. Thanning - prior to the grand jury presentment (*Exhibit A*, Collins Depo. 55:2-18). But, Defendant Collins chose *not* to interview Dr. Thanning or call Dr. Thanning to testify at the grand Jury. (*Id.*). Collins made the determination to not call Dr. Thanning (*Id.* 64:12-19).

42.     Collins testified that the reason why he chose not to call Dr. Thanning to testify in the grand jury was because the medical examiner - Dr. Milewski - did not like Dr. Thanning and had

14

negative experiences with Dr. Thanning in the past. (*Exhibit A*, Collins Depo. 67:3-9).

43.     Collins allowed Dr. Milewski's personal opinion of Dr. Thanning's alleged "acumen" to be his deciding factor to not call Dr, Thanning. (*Id.*)

44.     At all times. Plaintiffs and their Counsel was ready, willing, able, and available to provide whatever witnesses or support was requested by Collins. (*Infra*)

45.     Plaintiff's Counsel advised Collins that Plaintiffs had no ability to dictate what witnesses he could call for the Grand Jury. (*Exhibit D*, letter from F. Brewington to J. Collins, dated 10/17/08). But, Plaintiff's Counsel assured Collins that they would "attempt to provide what support we can." (*Id.*)

**E.     Collins Asked the Medical Examiner Questions Specifically Designed To Avoid The "Manner Of Death" While Misleading The Grand Jury By Discussing Only The Alleged Non-Severity Of Mr. Lazo's Injuries:**

46.     Though the medical examiner determined that it was the totality of these "blunt impacts" together, that contributed to Mr. Lazo's death, the medical examiner was instead asked to discuss each individual "blunt impact" and the non-life threatening nature thereof, instead of describing how the totality of these blunt impacts contributed to the death of Mr. Lazo. (*Exhibit E*, Grand Jury Trans. Yvonne Milewski, pp. 10-23).

47.     This rehearsed discussion between Collins and the Medical Examiner was misleading to the Grand Jury insofar as the Grand Jurors were [mis]led to believe that all of Mr. Lazo's injuries were "non life threatening." (*Exhibit E*, Grand Jury Trans. Yvonne Milewski, pp. 10-23).

48.     For example, Collins continually asked the Medical Examiner:

Q.     Did you find any injuries in your autopsy of Mr. Lazo that were life
threatening injuries?

The Medical examiner responded:

A.     No, there were no injuries to any life sustaining organs, the brain, heart, no
areas of major internal hemorrhage. (*Exhibit E* Grand Jury Trans. Yvonne
Milewski, 11:18).

49.     Collins then went through each individual "blunt impact" injury with the medical

examiner and asked her to specify that each individual impact was "non life threatening." (*Exhibit

E* Grand Jury Trans. Yvonne Milewski, pp. 10-23).

50.     Collins concluded his questioning of Dr. Milewski by asking her whether she believed

that any of the blunt traumas observed by her were life threatening or that taken together were they

life threatening and the doctor replied that they were not life threatening.  Dr. Milewski agreed with

the Assistant District attorney's descriptions of the injuries as "superficial". (*Exhibit E*, G.J.

Transcript, p. 28, l. 10 -23)

**F.     Collins Specifically Called Upon the Medical Examiner to Speculate
About The Manner of Death Being Related To Stress And Drug Use -
As Opposed To It Being A Result Of A Homicide:**

51.     The medical examiner was never asked how the totality of the injuries sustained

contributed to Mr. Lazo's Death, although this was what the medical examiner determined in her

autopsy report. (*Exhibit E* Grand Jury Trans. Yvonne Milewski, pp. 10-23, see also, *Exhibit C*,

Autopsy Report).

52.     During her testimony before the Grand Jury on October 27, 2008, Dr. Milewski was

asked her opinion on the "cause of death" of Kenny Lazo - being "Sudden Cardiac Death following

16

prolonged physical altercation with multiple blunt impacts." (*Exhibit E,* GJ Transcript, p. 24, l. 14 - p. 25, l.4)

53.　　Collins questioned Dr. Milewski with respect to the toxicology exam and there was a gratuitous mention of alleged cocaine use by Lazo days before his death even though cocaine and/or drugs were not found to have contributed to Mr. Lazo's death during the autopsy. (*Exhibit E,* G.J. Transcript, p. 23, l.9-24).

54.　　Dr. Milewski was asked to speculate about stress and the effect of stress on Mr. Lazo - although no such determination was part of the medical examiner's autopsy report. (*Infra*).

55.　　Dr. Milewski in a response to the Assistant District Attorney's question of how does the body handle stress responded that "epinephrine goes up in the face and body and also drop very quickly and after the threat is removed, it also lingers in the body beyond, past the time of physical activity so also is very much directly related to how a person perceives the risk, the fear and feeling the stress themselves" (*Exhibit E,* G.J. Transcript, p. 25, l. 22 - p.27, l. 9)

56.　　Collins continued to ask the Medical Examiner speculative questions based on a factors not included in her autopsy report or findings. For example, Collins asked: "Mr. Lazo found himself at the precinct and charged with two Class B felonies following this altercation. Is it possible that Mr. Lazo's stress level and his acute stress response continued beyond the time frame of the actual physical altercation?" Dr. Milewski's speculative reply was that it was possible that a perceived threat could cause fear and could have a "deleterious effect". (*Exhibit E,* G.J. Transcript, p. 27, l. 15 - 24)

**G.    Following The Grand Jury's Dismissal Of The Investigation,
Collins, Together With His Office, Immediately Issued A Press
Release Regarding The Dismissal:**

57.    Following the grand jury presentment, a press release was issued by the Suffolk District Attorney's Office (*Exhibit F, Press Release, dated, 11/3/08*; *Exhibit A,* Collins Depo. 57:23 - 58:3).

58.    The press release contained several incorrect and false statements regarding the investigation. Among other things, the press release falsely asserted that Mr. Lazo's family and attorney had an ongoing "civil suit" against the police officers. (*Id.*)

59.    The press release also falsely indicated that Mr. Lazo's family "declined an offer from the district attorney's office to include the family's privately hired forensic expert or any other relevant witnesses." (*Exhibit F*, Press Release, dated, 11/3/08; *See also, Exhibit A*, Depo. 59:2-9; *Exhibit D,* letter from F. Brewington to J. Collins, dated 10/17/08).

60.    The false information in the press release "came from [Collins]" and/or was made by Collins to members of the district attorney's office, who created the press release. (*Exhibit A*, Collins Depo. 60:2). Collins reviewed the press release prior to same being issued to the public and was fully aware of its contents. (*Id.* 60:10-21).

61.    Plaintiffs' family and/or attorney never declined to make any witnesses available to the District Attorney's Office. (Infra) In fact, a letter provided to Collins, by counsel for Mr. Lazo's family, specifically indicated that it was the district attorney's office that had the responsibility to decided what witnesses would be called to testify. (*Exhibit D*, letter from F. Brewington to J. Collins, dated 10/17/08)

62.   Further, the Lazo family and/or their attorney, asked the district attorney to "make the independent decision as to who and what needs to be presented and [Plaintiff's family and attorney] would to provide what support [they could]." (*Exhibit D*, letter from F. Brewington to J. Collins, dated 10/17/08)

**H.   As A Result Of Collins' Misleading Presentation, The Investigation Against Defendant Officers Was Dismissed By The Grand Jury And Defendant Officers Were Exonerated By The Police Department Though They Caused The Death/"Homicide" Of Mr. Lazo:**

63.   The Grand Jury did not indict and/or "dismissed" the investigation against Defendant Police Officers.

64.   Defendant Police Officers were exonerated by the Suffolk County Police Department for excessive force, false arrest and failure to perform duty after causing the death of Mr. Lazo (*Exhibit G,* "Internal Correspondence," dated 2/10/09).

65.   A recommendation was made that the complaint against Defendant Sgt Scimone be substantiated for violating the rules and procedures of the Suffolk Police with regard to transport of arrestees to the hospital for treatment following use of force. (*Exhibit G*, "Internal Correspondence," dated 2/10/09). However, the fact that Mr. Lazo died - in part - as a result of collective Defendants' failures to take Mr. Lazo to the hospital following their use of force was not addressed by the Police Department or by the D.A.'s Office (*Id.*)

66.   All of the Defendant officers (including Sgt. Simone) explained that they were each aware that Mr. Lazo sustained injury after his alleged confrontation with the police. (*See Exhibit I*, I.A.B Memos and *Exhibit H,* I.A. B investigation).

67.     However, none of these Defendant officers (except only Sgt. Simone) were found to have violated any rule(s) or regulation(s) for failing to take Mr. Lazo to the hospital after force was used. (*Id.*) (*See Exhibit I*, I.A.B Memos and *Exhibit H*, I.A. B investigation).

68.     None of the Defendant Officers were disciplined in any way for causing the death of Kenny Lazo.

**I.      No Criminal Process Was Initiated During The Investigation Into The Death Of Kenny Lazo:**

69.     At all times, Defendant Collins was involved in, and/or "took over," an "investigation into the death of Kenny Lazo." (*Exhibit E*, GJ Minutes, Caption)

70.     The Defendant Officers herein were never charged with any crimes in relation to the death of Mr. Lazo. Defendant Collins' presentation to the Grand Jury was for purposes of an "investigation" to find probable cause and/or to determine if a criminal prosecution should go forward. (*Exhibit E*).

71.     At the time of the alleged investigation, no criminal proceedings were initiated by the District Attorney's Office. (*Id.*)

72.     At the time of the alleged investigation, Defendant Collins was acting strictly in an investigatory role and was not engaged in the act of prosecuting the Defendant Officers. (*Id.*)

**J.      Defendant Officers Were Only Asked Perfunctory Questions Regarding Their Involvements In The Arrest Of Kenny Lazo And Were Only Asked To Describe Photographs Of Alleged Drugs Being Carried By Mr. Lazo. Defendants Were Not Asked To Explain The Injuries Sustained By Mr. Lazo, Or The Death Of Mr. Lazo:**

**1.      With Regard To Defendant Officer Link:**

73.     Officer Link was notified as a witness to the Grand Jury "shortly before the Grand

Jury." (*Exhibit M*, Link Dep. 105:6 - 111:2.)

74.     Officer Link met with Defendant Collins for a pre-grand jury interview that lasted "probably about half an hour." (*Id.*)

75.     During the interview, Link "narratively laid out what happened" and "cleared up" questions Collins had about the case. (*Id.*) Thereafter Link received a notification to testify before the grand jury. (*Id.*)

76.     Officer Link was before the grand jury for "maybe five minutes." (*Id.*) According to Link at the grand jury, Collins "asked [Link] to say what happened during [his] involvement." (*Id.*) Link does not recall if Collins asked him any questions at the grand jury. (*Id.*)

77.     At most, Officer Link was asked to provide a narrative. (*Id.*)

78.     According to Officer Link, the only photographs Link used during the grand jury proceeding were apparently "to indicate on the parkway where we were and...maybe pictures of the earrings." (*Id.*)  Link testified that he only recalls seeing one photograph. (*Id.*)

79.     Officer Link had no true recollection of what evidence was presented to him during the grand jury proceedings.

80.     Officer Link does not remember if he was asked during the proceedings if he saw "any abrasions or marks on Mr. Lazo." (*Id.*)  Link does not remember if he testified "that he saw marks and abrasions on Mr. Lazo's body" - which was what Officer Link was there to discuss in the first place (*Id.*)

### 2.     With Regard to Defendant Sgt. Simone:

81.     Defendant James Scimone was the Patrol Sergeant on April 12, 2008. (*Exhibit N*, Scimone Dep. 25:1.)

82.     During the arrest of Mr. Lazo, Defendant Scimone hit Lazo with the metal "mag" flashlight at least eight times on the wrist, back, and head. (*Exhibit N*, Scimone Dep. 70:5 - 81:18)

83.     Mr. Lazo did not hit Scimone or deploy any weapon at any point in time before or after Scimone struck him with the flashlight. (*Id.*)

84.     Defendant Scimone did not see Lazo reach for a gun. (*Id.*) Scimone had Lazo's right arm during the encounter. (*Id.*, Scimone Dep. 85:18 - 86:12.) According to Scimone's internal correspondence to Internal Affairs, "[a]fter the struggle [Scimone] observed an abrasion to the face of Mr. Lazo." (*Exhibit "I"* Sgt. Scimone's Internal Correspondence to Internal Affairs, dated December 17, 2008.)

85.     Scimone was the ranking officer on the scene and had the responsibility to make sure that Lazo was transported in accordance with the rules and regulations. (*Exhibit N*, Scimone Dep. 90:9 - 97:10.) Scimone did not ensure that Lazo was properly transported. (*Id.*)

86.     Internal Affairs determined that Scimone violated Department General Order Chapter 2, Section 11: "If it has been necessary to use physical force, the Officer shall immediately determine if the person requires medical treatment. 1. If the person has suffered a physical injury..., the person shall be transported to a hospital emergency room." (*Exhibit G*)

87.     The Internal Affairs report states that a "review of the available evidence indicates that the involved officers utilized physical force" against Lazo; that Lazo "suffered a physical injury"; and that Lazo was "not transported from the incident location to the hospital." (*Id.*)

88.     The investigator "[was] compelled to classify the allegation of Rules and Procedures Violation against Sergeant James Scimone as SUBSTANTIATED." (*Id.*)

89.     This determination, or fact, was never disclosed (by Collins) to the Grand Jury during

the investigation and Officer Simone was not discipline for his failure - which led to the death of Mr. Lazo. Officer Simone was never asked about his duties to take Mr. Lazo to the hospital and his failure to do so.

### 3. With Regard To Defendant Police Officer William Judge and Defendant Detective John Newton:

90.     On April 12, 2008, Defendant Officer Judge was on patrol with Sgt. Scimone. (*Exhibit O,* Judge Dep. 33 - 34.) Defendant Judge admittedly used force on Lazo. (*Exhibit I,* Judge Internal Correspondence.)

91.     According to Judge, after feeling a tug on his left side in the location of his holstered gun, during the struggle with Lazo, he forcefully elbowed Lazo on his hand. (*Exhibit O,* Judge Dep. 102:7 - 105:8.)

92.     Judge yelled "gun, gun, gun" and then he struck Lazo in the head three to five times with a flashlight while Lazo was underneath him. (*Id.*105:12 - 106:7.)

93.     In one account given by Judge, he observed "scratches and abrasions on [Lazo's] face...[on] his forehead area and his eye area." (*Exhibit O,* Judge Dep. 124:15-23.) However, Judge did not indicate in his supplementary report, dated April 12, 2008, that he observed injuries on Lazo's face. (*Exhibit I,* Judge internal correspondence)

94.     It was not until after the grand jury proceeding that on December 6, 2008 Judge wrote in correspondence to Internal Affairs that "[a]t the scene of the arrest the only injury that was observed was an abrasion near the right eye." (*Id*)

95.     Like the other Defendants, who were being "investigated" by Collins, Judge was not asked questions about Mr. Lazo's injuries, nor was he shown pictures of same.

### 4.    With Regard To Defendant Detective John Newton:

96.    Defendant John Newton was deposed on January 6, 2011. According to Newton, after Lazo was stopped by a marked police unit, Newton became involved in the stop. (*Exhibit P*, Newton Dep. 66:19-23.)

97.    Newton had no intention of arresting Mr. Lazo, whom he had pulled over for an alleged hand-to-hand transaction. (*Exhibit P*, Newton Dep. 78:5-9.)

98.    According to Newton, Lazo was not yelling and he was not agitated yet he appeared to be nervous. (*Exhibit P*, Newton Dep. 87:24 - 88:11.) Newton was facing Lazo and asking him questions. Newton noticed that Lazo did not have any bruises on him. (*Exhibit P*, Newton Dep. 90:3-23.)

99.    According to Newton, Mr. Lazo elbowed Newton and moved a few strides before Officer Judge stopped him. (*Exhibit P*, Newton Dep. 95:21 - 98:9.)

100.    Newton grabbed hold of Lazo's left arm after Judge brought Lazo to the ground. (*Id.*, 103:21 - 115:23.)

101.    Officer Judge was on top of Lazo; Scimone was on the other side of Lazo. (*Id.*) Newton heard Judge yell "my gun, my gun." (*Id.*) Newton could see Lazo did not have a gun or Officer Judge's gun. (*Id.*)

102.    Defendant Newton claims that he did not observe an officer strike Lazo, but he could "feel" and "sense" that Lazo was being "hit with something." (*Id.*) Newton saw an abrasion on Lazo's face. (Newton Dep. 126:12-15.)

103.    Defendant Newton was a target of Collins' investigation. (*Exhibit P*, Newton Dep. 177:13-17.)

104.     In his supplementary report, dated April 12, 2008, Newton did not indicate that Lazo was hit with something. (*Exhibit I,* Newton internal correspondence.) In an incident report, dated April May 28, 2008, Newton did not indicate that Lazo was hit was something, that force was used, or that Lazo had injuries on his face.

105.     It was not until after the grand jury proceedings that Newton identified to Internal Affairs that "[d]uring Lazo's arrest, the only visible injuries that the undersigned observed were abrasions to his face. Lazo apparently received the abrasions as we were on the ground attempting to place him under arrest." (*Id.*)

### 5.     Detective Christopher Talt:

106.     According to Talt, on or about April 12, 2008, Talt was investigating an individual who he believed to be Kenny Lazo for being involved in drug transactions. (*Exhibit Q*, Talt Dep.)

107.     Defendant Talt was on patrol checking known drug locations, but not specifically on a mission or out with the intent to arrest Lazo. (*Exhibit Q,* Talt Dep. 109:3-14.)

108.     Shortly after 8:00 p.m. on April 12, 2008, Talt tailed a blue Cadillac he later learned contained Lazo. (*Exhibit Q*, Talt Dep. 116 - 119.) Talt eventually had the vehicle containing who was later learned to be Lazo stopped by a marked police unit because of an alleged hand-to-hand drug transaction and for engaging in traffic infractions. (*Id.* 137 - 140.)

109.     Defendant Talt arrived on the scene where the struggle occurred after it concluded. (*Exhibit Q*, Talt Dep. 154 - 159.) Talt knew that the officers "obviously" used force in order to bring Lazo into compliance. (*Exhibit Q*, Talt Dep. 157:9-24.)

110.     Talt returned to the precinct and entered the interview room where Lazo was being held. (*Exhibit Q*, Talt Dep. 168.) Talt saw bruising on one side of Lazo's face. (*Exhibit Q*, Talt Dep.

174:14-25.)

111.    Mr. Lazo slumped down and became unresponsive in front of Talt. (*Exhibit Q*, Talt Dep. 210:1 - 212:14.)

112.    Talt did not identify in his supplementary report, dated April 12, 2008, that force was used in order to subdue Lazo. (*Exhibit I*, Talt Supplementary Report, dated April 12, 2008.) Talt did not identify in his supplementary report that he saw a physical injury on Lazo's face. (*Id*.)

113.    Talt was a witness in the grand jury. (*Exhibit Q*, Talt Dep. 75:8.) It was not until after the grand jury presentation that Talt identified to Internal Affairs that "Lazo had abrasions and contusions on his face." (*Exhibit I*).

114.    According to Collins, he interviewed Talt prior to the grand jury proceedings either three or four times to discuss the April 12, 2008 incident. (*Exhibit A*, Collins Dep. 17:20 - 19:22.)

115.    Defendant Talt states that he gave a "long narrative" detailing his own recollection of the incident without being questioned, and then he also received questions from the Grand Jury and Collins. (*Exhibit Q*, Talt Dep. 77:2-16.)

116.    Talt states that he was before the Grand Jury for more than 30 but less than 40 minutes. (*Exhibit Q*, Talt Dep. 76:6-16.)

117.    In fact, Collins "does not recall specifically asking the officers...about each individual injury that may be present in that photograph. [Collins] did ask them questions or they volunteered in the Grand Jury about areas of the body of Mr. Lazo that they struck either with their hands or with their flashlight or flashlights.(*Id*.)

118.    Defendant Talt stated in his deposition that photographs were used during the presentation. Yet, the photographs used were photographs depicting large amounts of drugs,

currency, and earrings. (*Exhibit Q*, Talt Dep. 77:20 - 80:25.)  The inquiry was supposed to be about

the death of Lazo, but no photographs of Mr. Lazo's injuries were discussed.

119.    The photographs did not include pictures of Lazo's injuries, and Talt cannot recall

if the photographs included pictures of Lazo in anyway. (*Id.*) Talt does not recall what photographs

of the scene, of the road, or of the precinct were used. (*Id.*)

Dated: Hempstead, New York
      January 9, 2018

                  Respectfully submitted,

                  LAW OFFICES OF
                  FREDERICK K. BREWINGTON

By:                
                  FREDERICK K. BREWINGTON
                  *Attorneys for Plaintiffs*
                  556 Peninsula Boulevard
                  Hempstead, New York 11550
                  (516) 489-6959