# EXHIBIT A

**Page 1**

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   ------------------------------------------x
     PATRICIA GONZALEZ and JENNIFER GONZALEZ,
 4   individually and as co-administrators of
     the Estate of KENNY LAZO,
 5
                                 Plaintiffs,
 6
 7              - against -
 8   COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT,
     POLICE COMMISSIONER RICHARD DORMER, in his
 9   individual and official capacity, POLICE
     OFFICER JOHN NEWTON, in his individual and
10   official capacity, POLICE OFFICER JAMES
     SCIMONE, in his individual and official
11   capacity, POLICE OFFICER WILLIAM JUDGE, in his
     individual and official capacity, POLICE
12   OFFICER CHRISTOPHER TALT, in his individual
     and official capacity, POLICE OFFICER LINK, in
13   his individual and official capacity, COUNTY
     OF SUFFOLK OFFICE OF DISTRICT ATTORNEY,
14   SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA,
     in his individual and official capacity, ASST.
15   DISTRICT ATTORNEY JOHN B. COLLINS, in his
     individual and official capacity, and "JOHN
16   AND JANE DOES 1-10" representing as yet
     unknown and unidentified members of the Office
17   of the Suffolk County District Attorney (all
     in their individual and official capacities as
18   employees of the Office of Suffolk County
     District Attorney),
19
                                 Defendants.
20   ------------------------------------------x
21                    October 12, 2011
                      10:22 a.m.
22         (Continued.)
23         REALTIME REPORTING, INC.
           124 East Main Street, Suite 202
24             Babylon, New York 11702
                    516-938-4000
25             www.realtimereporting.com
```

**Page 2**

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   ------------------------------------------x
     PATRICIA GONZALEZ and JENNIFER GONZALEZ,
 4   individually and as co-administrators of
     the Estate of KENNY LAZO,
 5
                                 Plaintiffs,
 6
 7              - against -
 8   COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT,
     POLICE COMMISSIONER RICHARD DORMER, in his
 9   individual and official capacity, POLICE
     OFFICER JOHN NEWTON, in his individual and
10   official capacity, POLICE OFFICER JAMES
     SCIMONE, in his individual and official
11   capacity, POLICE OFFICER WILLIAM JUDGE, in his
     individual and official capacity, POLICE
12   OFFICER CHRISTOPHER TALT, in his individual
     and official capacity, POLICE OFFICER LINK, in
13   his individual and official capacity, COUNTY
     OF SUFFOLK OFFICE OF DISTRICT ATTORNEY,
14   SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA,
     in his individual and official capacity, ASST.
15   DISTRICT ATTORNEY JOHN B. COLLINS, in his
     individual and official capacity, and "JOHN
16   AND JANE DOES 1-10" representing as yet
     unknown and unidentified members of the Office
17   of the Suffolk County District Attorney (all
     in their individual and official capacities as
18   employees of the Office of Suffolk County
     District Attorney),
19
                                 Defendants.
20   ------------------------------------------x
21                 100 Veterans Memorial Highway
                   Hauppauge, New York
22                    October 12, 2011
                      10:22 a.m.
23
               Deposition of the Defendant, JOHN
24   B. COLLINS, ESQ., pursuant to Notice, taken
     before Florence Syskrot, a Notary Public of
25   the State of New York.
```

**Page 3**

```
 1
 2   A P P E A R A N C E S:
 3   LAW OFFICES OF FREDERICK K. BREWINGTON
 4   Attorneys for Plaintiffs
 5        556 Peninsula Boulevard
 6        Hempstead, New York 11550
 7   BY:   FREDERICK K. BREWINGTON, ESQ.
 8
 9   SUFFOLK COUNTY ATTORNEY
10   CHRISTINE MALAFI, ESQ.
11        Attorney for Defendants
12        100 Veterans Memorial Highway
13        P.O. Box 6100
14        Hauppauge, New York 11788-0099
15   BY:   RICHARD T. DUNNE, ESQ.
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2           IT IS HEREBY STIPULATED AND
 3   AGREED by and between the attorneys
 4   for the respective parties herein,
 5   that the filing, sealing and
 6   certification of the within deposition
 7   be waived.
 8           IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except
10   as to the form of the question,
11   shall be reserved to the time of the
12   trial.
13           IT IS FURTHER STIPULATED AND
14   AGREED that the within deposition
15   may be sworn to and signed before
16   any officer authorized to administer an
17   oath with the same force and effect as
18   if signed and sworn to before the
19   Court.
20
21               - oOo -
22
23
24
25
```

5

1  J O H N   B.   C O L L I N S ,   E S Q.,   having
2       been first duly sworn by a Notary Public
3       of the State of New York, was examined
4       and testified as follows:
5  EXAMINATION BY
6  MR. BREWINGTON:
7       Q.     Please state your name.
8       A.     John B. Collins.
9       Q.     What is your present address?
10      A.     Suffolk County District
11  Attorney's Office, 200 Center Drive South,
12  Riverhead, New York 11901.
13      Q.     Good morning.
14      A.     Good morning.
15      Q.     Mr. Collins, my name is
16  Fred Brewington.  We have had a chance to meet
17  each other before.
18      A.     Yes, we have.
19      Q.     I'm going to be asking you some
20  questions concerning the matter which is
21  currently pending in the Eastern District of
22  New York relating to Kenny Lazo.
23             You understand that you are a
24  defendant in that case?

6

1            Collins
2       A.     I do.
3       Q.     Sir, I am going to be asking you
4  questions relative to your knowledge, and any
5  information that you may have that is relevant
6  to the case, as well as other information that
7  may be relevant to the underlying litigation.
8             If at any time you don't
9  understand the question, let me know that.  I
10 will be happy to rephrase the question so that
11 you do understand it.
12            If you don't hear the question,
13 for some reason my voice drops down, or we get
14 something that happens that obliterates my
15 voice, let me know that.  I will be happy to
16 try and have the question rephrased, or I will
17 restate it, or I will ask our court reporter,
18 who is writing down everything, to repeat the
19 question.  All right?
20      A.     Yes, sir.
21      Q.     Just as you did respond verbally
22 to that inquiry, I'll ask that you respond
23 verbally to each of the inquiries that I'm
24 about to make.
25            If there is a need for a break or

7

1  anything, let me know that.  We will be happy
2  to accommodate you for any of your needs.
3             If you need to speak to your
4  attorney who is seated to your left, let me
5  know that as well.  We will take a break for
6  that.
7             The only request that I have is
8  that if there is a question pending, if at all
9  possible, we try and get an answer, a question
10 and answer on the record.  All right?
11      A.     Thank you.
12      Q.     Thank you.  Now, sir, are you
13 currently employed?
14      A.     I am.
15      Q.     By whom are you employed?
16      A.     Suffolk County.
17      Q.     In what capacity, please?
18      A.     I am the Chief Trial Prosecutor
19 for the Suffolk County District Attorney's
20 Office.
21      Q.     How long have you held that
22 particular position?
23      A.     Approximately five years.
24      Q.     Sir, how long have you been

8

1            Collins
2  employed by the Suffolk County District
3  Attorney's Office?
4       A.     Slightly more than thirty years.
5       Q.     Sir, just tell us, what is your
6  highest level of education?
7       A.     I graduated law school.
8       Q.     Which law school did you graduate
9  from?
10      A.     Fordham University School of Law
11 in 1981.
12      Q.     Where did you do your
13 undergraduate work, please?
14      A.     Boston College School of Arts and
15 Sciences.  I graduated in 1977 Magna Cum
16 Laude.
17      Q.     That is a good accomplishment.
18 That is wonderful for you.
19      A.     Thank you.
20      Q.     Thank you.  Sir, can you tell us,
21 other than working in the District Attorney's
22 Office, did you have any other employment
23 prior to 1981?
24      A.     Yes, I did.
25      Q.     Was there any other employment?

9

Collins

1   A.    Yes.

2   Q.    Where did you work, please?

3   A.    I worked at the Delmonico Hotel

4   on 59th Street and Park Avenue during law

5   school.  I worked the desk and the door there.

6   Q.    After law school any other

7   employment other than the District Attorney's

8   Office?

9   A.    No, sir.

10  Q.    Sir, I will ask you:  Could you

11  please tell us, currently what are your job

12  responsibilities?

13  A.    My current responsibilities

14  include oversight of the Homicide, Major

15  Crime, Child Abuse and Domestic Violence, Case

16  Advisory, East End and District Court bureaus

17  and their day-to-day operations.

18  I also have administrative duties

19  as the Chief Trial Prosecutor, along with two

20  other Division Chiefs in the office, as well

21  as with the Chief Assistant.

22  The hierarchy in the office is

23  the District Attorney, the Chief Assistant,

24  and then three equal Division Chiefs.

25

---

10

Collins

1   Q.    Of which you are one?

2   A.    Yes, sir.

3   Q.    What is your level of

4   responsibility in terms of making decisions

5   within the office, that being decisions that

6   are either binding to the office or otherwise?

7   A.    Well, I have oversight over the

8   aforementioned bureaus.  So I am involved in

9   decisions that are made by those Bureau Chiefs

10  and the subordinates.

11  I also have some input with

12  regard to hiring and other policy decisions in

13  the office.

14  Q.    With regard to the actual number

15  of persons that are under your decision making

16  end or supervision, what is the approximate

17  number?  Can you approximate?

18  A.    Well, we have I think 185 lawyers

19  total in the office.  I could try and do a

20  rough count, if you would like.

21  I don't have a number of those

22  that I am --

23  Q.    If you could, please.

24  A.    -- directly responsible for.

25

---

11

Collins

1   Q.    I am sorry to interrupt you.

2   If you can give me your best

3   estimate, I would appreciate that.

4   A.    I would venture to guess

5   approximately one hundred.

6   Q.    That would be approximately a

7   hundred lawyers?

8   A.    Yes.

9   Q.    Now, with regard to any other

10  employees in those bureaus, do you have any

11  oversight or supervisory responsibility, that

12  being for persons that are not attorneys?

13  A.    Yes.  There are investigators and

14  support staff as well as attorneys.

15  Q.    What oversight responsibilities

16  do you have for let's say investigators?

17  A.    Technically the Bureau Chief of

18  the actual bureaus have direct responsibility.

19  And I have more oversight.

20  I don't have much direct contact

21  with the investigators, except for perhaps

22  specific cases that I am directly involved in.

23  Q.    With regard to the case relating

24  to Kenneth Lazo, did you have any oversight or

25

---

12

Collins

1   direct contact with investigators?

2   A.    Not from the District Attorney's

3   Office.  Only from the Police Department.

4   Q.    What was that contact?

5   A.    I had contact with Detective

6   Patrick Portela, who was the lead detective

7   assigned by the Homicide Squad of the Police

8   Department.  And I believe his Supervisor 1,

9   Sgt. Edward Fandrey.

10  Q.    Can you describe what your

11  interaction was with both of those gentlemen

12  as part of the Kenny Lazo case?

13  A.    There came a point in the Lazo

14  case that I took over the investigation.  At

15  that point in time I met with the

16  aforementioned sergeant and the detective.

17  They disclosed the results of

18  their investigation to me at that time.  I may

19  have given them an assignment or two to follow

20  up upon.

21  And then I had several meetings

22  with Detective Portela thereafter pursuant to

23  the Grand Jury investigation.

24  Q.    When you say assignments, what

13

Collins

1  are you referring to?
2      A.    I may have asked the detective to
3  help me contact witnesses.
4          I did return to the scene with
5  the detective.  I believe we took some
6  additional photographs when we were at the
7  scene of the event.
8          He accompanied me in interviewing
9  some expert witnesses as well as witnesses to
10 the events of that night.
11     Q.    Just so that I'm clear, when you
12 refer to "the scene of the event," are you
13 talking about on the highway, or in the
14 precinct, or both?
15     A.    Both.
16     Q.    The decision to actually go to
17 those places, was that your decision?
18     A.    I think it was a mutual decision.
19 But I certainly participated in making that
20 decision.  I wanted to go to both places.
21     Q.    With regard to Sgt. Fandrey, what
22 interaction did you have with him relative to
23 this case?
24     A.    I believe I only met with the

14

Collins

1  sergeant the one time.  And that would have
2  been at around the time of the preliminary
3  meeting I had with Detective Portela where
4  they first disclosed the results of their
5  investigation.
6          I don't believe I had subsequent
7  contact with the sergeant prior to or during
8  the Grand Jury.
9      Q.    When or about when was it that
10 you had this initial meeting that you can
11 recall?
12     A.    My best estimation is around the
13 end of July of '08.
14     Q.    Where did that meeting take
15 place?
16     A.    In my office in Riverhead in the
17 same room in which you and I met.
18     Q.    Right.  The conference room that
19 kind of winds its way in the back?
20     A.    Yes, sir.
21     Q.    When you met with Detective
22 Portela and Sgt. Fandrey, what was it that
23 they disclosed to you?
24     A.    They basically laid out to me

15

Collins

1  their understanding of the events of the night
2  of April the 12th and those events that lead
3  to Mr. Lazo's death, the interviews that they
4  had conducted to that point, their contact
5  with the Medical Examiner, and a summary of
6  the radio calls between the involved officers
7  that particular evening, meaning the 12th of
8  April.
9      Q.    Did they disclose, if you recall,
10 to you that there had been communications
11 between the officers other than radio calls?
12     A.    I am not sure that they disclosed
13 that at that time.
14          But I think upon my review of the
15 radio calls I vaguely recall there having been
16 some reference to telephone contact between
17 the involved police officers.
18          But I can't say for sure that
19 either the detective or the sergeant
20 referenced those that day.
21     Q.    With regard to whenever it was
22 you did learn of the telephone conversations,
23 did you have any inquiry made as to what the
24 content of those telephone conversations were,

16

Collins

1  either you directly or someone on your behalf?
2      A.    I believe that Detective Portela
3  did that on my behalf.  And I may have asked
4  the quote unquote non-target officers who may
5  have been on the other end of that
6  conversation what was the content.
7      Q.    When you say you may have, in
8  other words, you may have spoken to them
9  directly about that?
10     A.    The non-target police personnel,
11 yes, meaning such as Christopher Talt or -- I
12 think -- my recollection is he might be the
13 only one that had telephone contact with the
14 involved police officers.
15          I did not speak with any of the
16 potential targeted police officers until they
17 were in the Grand Jury.
18     Q.    With regard to any of the
19 officers being target or non target, were
20 there any statements taken from them, other
21 than their initial written statements that you
22 are aware of?
23     A.    No, not by me, not that I'm aware
24 of.

Collins                                                17

Q.    With regard to Officer Talt, did
you take any further statement from him either
in writing, or audio, or video?

A.    No.

I believe it is Detective Talt.

Q.    I am sorry.  You may be right.

With regard to any of the
officers, that being whether or not they were
target or not, were any of them interviewed by
anyone from your office or from the Police
Department, other than their written
statements?

A.    I'm sorry.  Your question
confused me.

Q.    That is all right.  I will try
and rephrase it.

Other than --

MR. BREWINGTON:  Withdrawn.

Q.    When you spoke to Detective Talt,
did you take any notes of your conversation?

A.    I did not.  And I spoke to him on
more than one occasion.

Q.    Was that in person or by
telephone, do you recall?

---

Collins                                                18

A.    The only conversation I may have
had with him over the telephone would have
been scheduling.  Anything substantive was in
person.

Q.    Each time that you met, was that
in your office?

A.    Yes, I believe so.

Q.    You indicated it was more than
once.  Do you recall approximately how many
times it was?

A.    Per -- somewhere between three,
or four tops.

Q.    I understand that is an
approximation.

A.    Yes.

Q.    During your conversations with
Detective Talt, what subjects were discussed?

A.    The events of April the 12th
regarding Mr. Lazo.

Q.    With regard to those events, were
you questioning him, was he providing
information to you?

What was the process by which the
discussions went forward?

---

Collins                                                19

A.    Both.  I would ask questions.  I
would attempt to direct his attention to my
areas of interest.

And sometimes he would answer
those questions most directly.  Sometimes he
would answer them in a narrative, attempting
to give me a -- what is the word I'm looking
for -- sort of a timeline to the events that
night.

Q.    Chronology?

A.    Chronology.  Thank you, sir.

A chronology of the events that
night.

Q.    With regard to the chronology or
the sequence of events that he was trying to
provide you when he did, did you find anything
in contradiction to either what he had said
before or any of the other information that
had been provided to you by the other officers
in their written statements?

A.    Not that I recall.

Q.    Now, did you actually present
this matter to the Grand Jury?

A.    I did.

---

Collins                                                20

Q.    When you presented this to the
Grand Jury -- you referenced target officers.
Who were the target officers?

A.    The officers who were involved in
the physical altercation and confrontation
with Mr. Lazo.

That would be Detective Newton.
I believe his first name was John.  Sgt.
Scimone.  I don't recall his first name.  And
Police Officer Judge.  I think his first name
was William.

Q.    Did each of those individuals
have attorneys?

A.    They did.

Q.    At any time prior to the Grand
Jury, were any of those officers provided an
opportunity to give a further statement to the
District Attorney's Office?

A.    No.

Q.    Were any of those individuals
presented with an option to come in and give a
further statement?

A.    Could you rephrase that, please?

Q.    Surely.  At any time prior to the

21

Collins

1  presentation in the Grand Jury, were any of
2  those officers, either directly or through
3  their attorneys, contacted and advised that if
4  they would like to come in to give a further
5  statement to their written statements, that
6  that was available to them?
7       A.    No, sir, that did not happen.
8       Q.    Do you recall who the attorneys
9  were representing the individuals, the
10 individual officers?
11      A.    Not specifically.  Because I
12 literally met each one of them about two
13 minutes before they went into the Grand Jury.
14            One young fella was relatively
15 familiar.  He had dark hair.  And I think his
16 name was Chris.
17            The other attorneys, I don't
18 think I had any prior dealings with, and
19 literally shook their hand and met them on the
20 way into the Grand Jury.
21            (Phone ringing.)  Excuse me for
22 one second.
23            MR. BREWINGTON:  Let's take a
24      break.

22

Collins

1            (Recess taken.)
2       Q.    Now, sir, with regard to the
3  investigation leading up to the Grand Jury
4  presentation -- this event I think took place
5  on April 12, 2008.
6            When in relationship to that date
7  was the case actually assigned to you or did
8  you take it on?
9            MR. BREWINGTON:  Withdrawn.
10      Q.    Those may be two different
11 things.
12            Let me ask the question this way:
13 When for the first time did you take on this
14 case?
15      A.    I believe it was at the very
16 beginning of --
17            No.  I'm sorry.  Withdrawn.
18            I believe it was towards the end
19 of July.
20      Q.    Of 2008?
21      A.    Yes.  But there are things that
22 would refresh my recollection to be more
23 specific.
24      Q.    I'll try and do that.  I think I

23

Collins

1  have got some letters and things.  So that may
2  be helpful.  I understand that is right now
3  your general memory.  We'll see if we can make
4  it more specific as we go forward.
5       A.    It was originally assigned to
6  someone else in my office.  And I took it over
7  from them.
8       Q.    Who was it originally assigned
9  to?
10      A.    ADA Merrifield took the initial
11 call from Homicide, I believe, on the late
12 evening or early morning hours of the 13th.
13      Q.    What is the ADA's full name?
14      A.    Denise Merrifield.  She was
15 assigned to the Homicide Bureau of the
16 District Attorney's Office at the time.
17            The following Monday, which I
18 believe was the 14th, it was assigned to
19 Bureau Chief Janet Albertson.
20            I ultimately took it over from
21 Miss Albertson at a later date in the summer.
22      Q.    How did that come about?
23      A.    It came about as a result of the
24 Medical Examiner's findings toward the end of

24

Collins

1  June declaring Mr. Lazo's death a homicide,
2  and also as a result of potential conflicts
3  with Miss Albertson's trial schedule.
4       Q.    What about it being declared a
5  homicide by the Medical Examiner would have
6  resulted or lead to you taking it over?
7       A.    The fact that the Medical
8  Examiner declared it a homicide, as opposed to
9  an accidental or natural death, dictated the
10 involvement of the District Attorney's
11 Homicide Bureau in conjunction with the Police
12 Department's Homicide Squad.
13            The Medical Examiner's finding
14 that it was a homicide, a death at the hands
15 of another, dictated that the case would
16 ultimately be presented to a Grand Jury by the
17 District Attorney's Homicide Bureau in
18 conjunction with the Suffolk County Police
19 Department's Homicide Squad.
20            And I believe that determination
21 was made toward the end of June of '08.  And I
22 probably have a more specific date than that.
23      Q.    As I said, we will get to
24 documents that may be helpful to you.

25

Collins

1  When the case was originally
2  assigned to ADA Denise Merrifield, do you know
3  what actions, if any, she took on the case?
4       A.    I believe she was merely the
5  recipient of a notification by the Homicide
6  Squad that the event and the death had
7  occurred.
8       Q.    Was there any investigation
9  undertaken at that time by the District
10 Attorney's Office?
11      A.    No.  It is the province of the
12 Suffolk County Police Department's Homicide
13 Squad at that point, and it is their
14 investigation.
15      Q.    Then at some point you said it
16 went to Janet Albertson?
17      A.    That following Monday, the 14th,
18 Janet was assigned to oversee or be the
19 recipient of information for the District
20 Attorney's Office from the Police Department.
21      Q.    Do you know if she did have any
22 contact with the Police Department?
23      A.    I don't know specifically.  I
24 imagine she may have had some phone calls.

26

Collins

1       Q.    At that time, that being within
2  the first two days to a week, were there --
3       MR. BREWINGTON:  Withdrawn.
4       Q.    At that time, within the first
5  week, was there any ability by the District
6  Attorney's Office to start its own
7  investigation of this incident?
8       A.    Ability?
9       Q.    Ability is my first question.
10      A.    Yes.
11      Q.    With regard to both your
12 experience and your knowledge in this
13 situation, was there any authority to do so?
14      A.    I believe so.
15      Q.    With the death of Kenneth Lazo,
16 is it always, as far as your experience is
17 concerned, the process where a police officer
18 is involved that there is some waiting period
19 for the police to conduct an investigation
20 rather than the DA's Office to conduct an
21 investigation?
22      A.    That was typical.  However, there
23 was one complicating factor here that was
24 somewhat unusual is that there was involvement

27

Collins

1  by the Federal government early on.
2       I received a phone call within
3  the first several days from F.B.I. Special
4  Agent Johanna Esposito, who I understood to
5  have been stationed in Suffolk County.
6       She indicated that she was
7  monitoring, her word, the situation on behalf
8  of the F.B.I. and in particular on behalf of
9  an Assistant U.S. Attorney.
10      And she gave some indication that
11 there could be or would be a concurrent or
12 supplanting investigation by the Federal
13 authorities.
14      Q.    Did that call in any way prevent
15 the District Attorney's Office from conducting
16 its own investigation?
17      A.    Prevent?
18      Q.    Yes.
19      A.    No.
20      Q.    Was there a decision made not to
21 conduct its own investigation as a result of
22 that call?
23      A.    As a result of that call it was
24 yet early for us to have undertaken an

28

Collins

1  investigation because the death had not been
2  determined by the Medical Examiner to be other
3  than natural or accidental.
4       However, the involvement of the
5  Federal authorities was a complicating factor
6  in undertaking the usual investigation, even
7  after the Medical Examiner had declared the
8  death as a homicide.
9       And I believe the involvement of
10 the Federal authorities was called for both by
11 your predecessor, Mr. Chakmakian, as well as
12 your office, both publicly and by letter.
13      Q.    Let's take those one at a time.
14 And I appreciate that, because we most
15 certainly have documentation that supports
16 that the Federal government was asked to come
17 in and take a look at this.
18      Did the involvement, if indeed
19 the F.B.I. or the U.S. Attorney's Office was
20 involved for the purpose of I think you said
21 monitoring the situation, was that preclusive
22 of your office doing an investigation?
23      A.    Not necessarily.
24      Q.    You also said that there were

29

Collins

```
 1  complications.
 2              Were there complications other
 3  than those that you have just outlined?
 4       A.     No.  And maybe complications is
 5  too strong a word.  It was an extra
 6  circumstance.
 7       Q.     What about those extra
 8  circumstances that lead to a determination, if
 9  such a determination was made, for the
10  District Attorney's Office not to conduct its
11  own investigation?
12       A.     There came a point before the end
13  of July with the possibility or the actuality
14  of a Federal investigation, that the District
15  Attorney sought some clarification from the
16  U.S. Attorney in charge as to whether they
17  were conducting an investigation or we were to
18  conduct our usual investigation.
19       Q.     Were you a party in any way, that
20  being secondhand or directly, to that exchange
21  of information between the offices?
22       A.     I do believe I may have had a
23  subsequent conversation with Agent Esposito in
24  the course of the case.
25
```

30

Collins

```
 1       I did not have any conversations
 2  with the U.S. Attorney or any Assistant U.S.
 3  Attorney.  Mr. Spoda had those conversations.
 4       Q.     What were the conversations that
 5  you did have with Agent Esposito, other than
 6  the one that you indicated that she was
 7  monitoring this situation on behalf of her
 8  office?
 9       A.     I believe we spoke again sometime
10  in July.  But I would need to refresh my
11  recollection.
12       Q.     I wasn't asking the time.  My
13  question was:  What was the further content,
14  if there was any?
15       A.     I am not clear on what the
16  further content was, other than the fact that
17  we were yet standing down, waiting for them to
18  do what they were going to do or not.
19       Q.     Understanding that the term
20  "standing down" meaning backing off or not
21  talking any action at that particular time, is
22  that accurate?
23       A.     Yes, sir.
24       Q.     Who made that determination?
```

31

Collins

```
 1       A.     Which determination?
 2       Q.     To stand down.
 3       A.     The District Attorney.
 4       Q.     Mr. Spoda?
 5       A.     Yes.
 6       Q.     Was that in consultation with
 7  you?
 8       A.     He told me that.  I don't think I
 9  was necessarily consulted.
10       Q.     Did you agree with that decision?
11       MR. DUNNE:  Object to the form of
12       that question.
13              Go ahead and answer that the best
14       you can.
15       A.     I had no problem with his
16  decision.
17       Q.     At the time that that decision
18  was made, had you reviewed any documents or
19  statements, including any photographs,
20  relative to this matter?
21       A.     I don't believe so.
22              If we are talking -- if we are
23  talking July, I may have seen the Medical
24  Examiner's autopsy report.  But that would be
25
```

32

Collins

```
 1  it.
 2       Q.     At that time that the
 3  determination was made to essentially stand
 4  down, was the case assigned to you at that
 5  point?
 6       A.     That would be fair to say.
 7       Q.     I thank you for allowing me to be
 8  fair.  Was it accurate?
 9       A.     I think that means the same
10  thing.
11       Q.     I just want to be clear.  In your
12  mind, that is what it means?
13       A.     In my mind if it was after the
14  Medical Examiner's issuance of the autopsy
15  report, then I had it assigned to me by that
16  point.
17       Q.     Sir, perhaps we can try and pin
18  down some dates.  This may be helpful.
19              I'm going to show you what we
20  will mark today as Plaintiffs' Collins 1 for
21  identification.
22              It is a letter dated July 10,
23  2008.
24       MR. BREWINGTON:  Please mark
```

33

Collins

this.

(Plaintiffs' Collins Exhibit 1,
Letter dated July 10, 2008, marked for
identification.)

Q.    (Handing.)

A.    (Perusing.)  I have seen number
1.

Q.    Sir, do you recognize that
document?

A.    I do.

Q.    What is that, please?

A.    That is a letter I wrote to you.

Q.    This would be from your file
copy; is that correct, or from someone's file?

A.    From someone's file.

I'm surprised that your copy
doesn't have my signature on it.

Q.    It didn't come from my office.
It came from being produced by Mr. Dunne's
office.

A.    Your copy should have my
signature on it.

Q.    Right, which is actually just my
question.  What is the normal process?

34

Collins

Is there a process by which some
of the copies are signed and some of them are
not signed?

A.    I believe whatever I sent to you
would have been signed by me.

Q.    With regard to this letter, what
prompted you to send this letter?

A.    Our previous contact.

Q.    Do you recall what that was?

A.    Yes.  There were multiple letters
exchanged between yourself and myself from as
early as the first week of the case.

Q.    With regard to any of those
letters that lead up to this letter of July
10, 2008, from the time of whatever the first
letter was until this time, was there any
investigation done by the DA's Office up until
this time, July 10, 2008, that you recall?

A.    Specifically, no.  Perhaps with
the exception of providing the Police
Department with whatever subpoenas or the like
they may have needed to accomplish their
investigation.  But I don't specifically
recall any.

35

Collins

Q.    The second sentence of this
letter says, "Each agency is forwarding the
results of their investigation to the District
Attorney's Office for review and the
appropriate action."

Just to be clear, that was the
Police Department and the Medical Examiner as
the agencies that you were referring to?

A.    Correct.

Q.    Were there any other agencies
which were involved within the County of
Suffolk that were part of any investigation in
the death of Kenneth Lazo or Kenny Lazo?

A.    Technically, no.  But I believe
the Toxicology Department of the Medical
Examiner's Office was involved.  And
technically they are under the aegis of the
Health Department, not the Medical Examiner.

But that would be the only
addition I would make.  And it is probably
hyper technical.

Q.    Okay.  I appreciate your
specificity.

Let's put that one aside.  We

36

Collins

will start making a pile.

A.    Over here good?

Q.    That is a good place for it.

Let's just take a look at this
letter dated "July 15, 2008."

MR. BREWINGTON:  We will identify
this as Collins 2 for identification.

(Plaintiffs' Collins Exhibit 2,
Letter dated July 15, 2008, marked for
identification.)

Q.    (Handing.)

A.    (Perusing.)  Oh, I have seen
number 2.

Q.    Have you seen that letter before?

A.    Yes.

Q.    Did you have any involvement or
any hand in drafting its content?

A.    I don't believe so.

Q.    Within the letter there is a
reference in the first paragraph, the second
sentence, being the third line, says
"Subsequent to his death a police department
investigation was conducted and the matter has
been turned over to my office for official

37

Collins

review."

Is that an accurate statement,
that it was turned over to the DA's Office for
official review only after the Police
Department investigation?

A.    I believe so.

Q.    So at that time, that being at
the time of Kenny Lazo's death forward, up
until I guess late June or early July, was
there any "official review," using that term,
by your office?

A.    I am not quite sure what you mean
by that.

Q.    Well, I'm trying to understand
what, you know -- in this situation, is there
an actual turning over of the case by someone
for your office's official review?

A.    That would be the ordinary course
in a case of this type, that the police would
conduct their investigation and then make
their findings known to us, as I think I
related to you in the letter of the 10th.

Q.    Is that just the normal course
that is kind of followed within Suffolk

---

38

Collins

County, or is that something which is set by
rules, regulations or other requirements?

A.    It is the normal course for the
District Attorney's Office.  Whether there are
specific written rules in the Police
Department's regulations, I'm not sure.

Q.    The next line says, "A letter to
this effect was sent to counsel for the
deceased's family, Mr. Frederick K.
Brewington, on July 10, 2008."

That is the letter that we just
identified as Collins's 1, as far as you know?

A.    It is.

Q.    In the second paragraph it says,
"Sometime shortly after the death of Mr.
Lazo..."  Excuse me.  I'm so sorry.

A.    Sure.

Q.    In the second paragraph,
"Sometime shortly after the death of Mr. Lazo,
FBI Agent Johanna Esposito spoke to members of
my office and the Suffolk County Police
Department.  Today, at the direction of AUSA
Sarah Coyne, Agent Esposito contacted my
office again to inquire into the status of our

---

39

Collins

investigation."

Now this is "July 15, 2008."
Looking at this, did you actually speak to
Agent Esposito wherein there was an inquiry
into the status of the District Attorney's
investigation?

A.    I think I referenced earlier a
subsequent conversation I had with Agent
Esposito.  This appears to be it.

And Mr. Spoda obviously got some
of the information in this letter from me.

Q.    At that time, that being
approximately July 15, 2008, was there a
status of your investigation?

A.    Yes.

Q.    What was the status?

A.    Under investigation.

Q.    Had an investigation commenced?

MR. DUNNE:  By whom?

MR. BREWINGTON:  By the District
Attorney's Office.

A.    I don't specifically remember
when I started listening to the radio tapes.
So I might have started doing that subsequent

---

40

Collins

to the Medical Examiner's issuance of her
autopsy report at the end of June.  I don't
specifically remember.

Had I met with witnesses, or the
like, or any such thing at that point?  No.

Q.    At the end of the letter, it asks
to "Please advise as to your contemplated
course of action as soon as possible.  In the
interim my office will not take any further
action on this matter until I hear from you."

Did you have any discussion about
this particular letter, particularly that
portion of the letter, when it was sent out
with Mr. Spoda?

A.    I believe I did.

Q.    What was the discussion, if you
can tell me, about taking no action at that
particular time?

A.    This is what I referred to
earlier in my instructions from District
Attorney to stand down until the Federal
authorities decided whether they were going to
investigate it or not.

Q.    Did you receive any further

41

Collins

contact from the Federal authorities
indicating that they were not going to do an
investigation?

A.     I did not.

Q.     Do you know if anyone did?

A.     I believe the District Attorney
did at a date subsequent to this letter,
perhaps ten days, two weeks later.

Q.     Do you know in what form that
came?  Was it a letter?

A.     My recollection is it was a phone
call only and was not memorialized in writing.
But that is my recollection.

       If you know differently, you can
help me.

Q.     I'm trying to --

A.     My recollection is a phone call.

Q.     Were you involved in that phone
call at all?

A.     I was not.

Q.     Did anyone speak to you about a
conversation, whether or not it was by phone
or in person, about the U.S. Attorney's Office
or the F.B.I. deciding not to investigate this

42

Collins

case?

A.     The District Attorney notified me
that he had heard from someone on behalf of
the U.S. Attorney that they were not going to
pursue an investigation.  And I was ordered to
move forward.

Q.     Who ordered you to move forward?

A.     Mr. Spoda.

Q.     Was that order verbally or in
writing?

A.     Verbally.

Q.     Now, with regard to the moving
forward, did the District Attorney's --

       MR. BREWINGTON:  Withdrawn.

Q.     Within your bureau or in your
office, did the District Attorney's Office
have investigators working with you?

A.     On this case?

Q.     Yes.

A.     No.

Q.     Are there investigators within
the District Attorney's Office that existed
that could have worked with you on this case?

A.     Had I requested assistance, yes.

43

Collins

Q.     With regard to this particular
case, once it was identified as a homicide,
how was it that you identified who the
targets, for lack of a better term, were going
to be for the Grand Jury?

A.     It came from discussing with
Detective Portela his investigation, which I
believe I did in less than a week's time from
the District Attorney ordering me to move
forward.

       It also came from my personal
review of the radio tapes made available to me
regarding the time frame of this incident.

       When I say radio tapes, I mean
Police Department radio tapes.

Q.     Well, did you have any concern
with the Police Department undertaking the
investigation knowing that other police were
the targets?

A.     Did I have a concern?

Q.     Yes.

A.     No.

Q.     With regard to the investigation
that was being done, was anyone from Internal

44

Collins

Affairs working with you?

A.     With me, no.

Q.     Was there an Internal Affairs'
investigation going on at the same time?

A.     I don't believe so.  I don't know
for a fact.

Q.     Did you ever request or suggest
to anyone that Internal Affairs review this as
well as Homicide investigators?

A.     My understanding of the Police
Department protocol is that the Homicide Squad
is charged with investigation of incidents
such as this.  And the Internal Affairs Bureau
of the Police Department may follow up
following the Homicide investigation.  But
they are not to do a concurrent investigation.
That's my understanding of their protocol.

Q.     Did you at any point consider the
need for an Internal Affairs' investigation to
take place while you were preparing yourself
to present to the Grand Jury?

A.     No.  I believe I had one of the
best investigators in the Police Department
assigned to me in the person of Detective

45

Collins

Portela.  And I did not seek to supplement his
help.

Q.     So with regard to the assistance
and work that you were having done by
Detective Portela, did you at any time ask him
to compare the statements that were given by
each of the subject officers for similarities?

A.     I don't recall making that
specific request.

Q.     Do you recall any specific
requests that you made to him for him to make
part of his investigation?

A.     I asked him to tell me what the
involved officers reported, if anything.  And
he did so.

Q.     Did you read their reports?

A.     I read whatever paperwork the
detective had as part of his file.  And that
included the reports submitted by any of those
involved.

Q.     At any time did you learn or seek
to learn if any of the officers had created
their statements in conjunction with one
another?

46

Collins

A.     I don't specifically recall
asking that.

However, permitting that would be
against Homicide's usual practice.

Q.     That being permitting what?

A.     Permitting them to do their
statements or reports together.

Ordinarily those officers would
be separated and asked to each write their own
report.  And that is my understanding.

Q.     Do you know if any inquiry was
made as to whether or not that did or did not
occur?

A.     Sitting here now three years plus
later, I don't remember.

Q.     Let me ask you to take a look at
this letter that we will identify as Collins 3
for identification.

MR. BREWINGTON:  It is a
single-page letter dated "October 14,
2008."

(Plaintiffs' Collins Exhibit 3,
Letter dated October 14, 2008, marked
for identification.)

47

Collins

Q.     (Handing.)

A.     (Perusing.)  I have seen number
3.

Q.     So you have that document before
you?

A.     I do.

Q.     Did you actually receive this
document in or about the middle of October
2008?

A.     I did.

Q.     When you received it, had you
begun --

MR. BREWINGTON:  Withdrawn.

Q.     When you received it, what level,
if any, had your investigation gotten to, that
being October 2008?

A.     By that point I was in the
process of going to the scene, both scenes,
having additional photographs taken at my
request, and meeting with various witnesses to
the events, as well as experts who might have
relevant information but were not witnesses to
the events.

Q.     Which experts did you meet with?

48

Collins

A.     I certainly met with the Medical
Examiner at some point during this time.

I may have met with someone from
the Toxicology Department of the Health
Department.

And I met with an individual from
Fire, Rescue and Emergency Services with
regard to the workings and use of the
defibrillator, with which I was not familiar.

Q.     This letter references a meeting
which took place with you on or about August
19, 2008.  Do you recall that meeting?

A.     I do.

Q.     That took place in your office?

A.     It did.

Q.     With myself and I think
Mr. Pincus was there, and you had someone else
in the room.  I don't recall who that was.

A.     And so did you.

Q.     Yes.  I'm trying to think --

A.     You had Miss Cartwright, if I
recall.

Q.     Miss Cartwright, yes.

A.     I don't recall having anyone with

49

Collins

1  me, frankly.  If I did, I defer to you.  But I
2  don't recall.
3      Q.    At that time, that being August
4  19th of 2008, during that meeting would it be
5  accurate to say that there was no Grand Jury
6  presentation done at that point?
7      A.    Sure.
8      Q.    Would it also be accurate to say
9  that at the time of this letter, October 14,
10  2008, there was no Grand Jury presentation
11  which had taken place yet?
12      A.    That is true.
13      Q.    At that time, August 14, 2008 --
14      A.    Do you mean the 19th?
15      Q.    Excuse me.  October 14, 2008, the
16  time of this letter -- at the time of this
17  letter, October 14, 2008, what, if anything,
18  was missing from your investigation?
19      A.    I believe there were days
20  subsequent to the 14th that I was yet meeting
21  with witnesses.
22      Q.    Do you recall what witnesses
23  those were?
24      A.    There were police officers who

50

Collins

1  had rendered medical aid and were present in
2  the precinct or were called to the precinct.
3          There was personnel that
4  transported Mr. Lazo from the precinct to the
5  hospital.
6          There were civilian witnesses who
7  had made 911 calls from the highway at the
8  time of the event.
9          And again, some of them I may
10  have met just prior to this letter, some
11  thereafter.  But I don't believe the
12  presentation began until October the 20th or
13  thereabouts.
14          So in that prior week I was doing
15  many of those things.  On which side of this
16  letter each of them were, I can't specifically
17  recall.  But it was all ongoing at this time.
18      Q.    At the time, or in or about the
19  time of this letter, had you seen photographs
20  of Mr. Lazo that were part of any
21  investigation?
22      A.    Yes.
23      Q.    Had any of those photographs been
24  utilized in the Grand Jury presentation?

51

Collins

1      A.    Many.
2      Q.    Were any of the photographs that
3  were used in the Grand Jury presentation used
4  in conjunction with any of the officers that
5  testified?
6      A.    I imagine I showed photographs
7  from the case to each of the people who
8  testified in the Grand Jury.
9          MR. DUNNE:  Can I just clarify?
10          Are you referring to strictly
11      photographs of Mr. Lazo?
12          MR. BREWINGTON:  Yes.
13          MR. DUNNE:  Or are you also
14      referring to scene photos?
15          MR. BREWINGTON:  I'm referring to
16      Mr. Lazo.
17      Q.    If my question wasn't clear, let
18  me rephrase it.
19      A.    Sure.  I'm sorry if I
20  misunderstood it.
21      Q.    No problem.  Were any photographs
22  of Mr. Lazo that were taken as part of any
23  investigation shown to the police witnesses
24  that were targets in this case?

52

Collins

1      A.    I don't remember.  It would have
2  been only in the Grand Jury, so I don't
3  specifically recall what I showed them or did
4  not show them.
5      Q.    Would that be your normal course
6  when there are police targets, to show them
7  photographs of the deceased?
8          MR. DUNNE:  I'll object to the
9      form.
10          Go ahead and answer that as best
11      you can.
12      A.    I don't know that there is a
13  normal course.  Each case is very different.
14          I just don't specifically
15  remember if I did or did not in this case.
16      Q.    Were those photographs available
17  to you to show them?
18      A.    Yes, most definitely.
19      Q.    Now, in speaking to any of the
20  police officers at the Grand Jury, do you
21  recall asking them if they used flashlights to
22  hit Mr. Lazo?
23      A.    I don't know if I specifically
24  asked them or they volunteered it.  But it

53

Collins

1  definitely -- that information came before the
2  Grand Jury.
3         As you know, the potential target
4  gets to testify in the narrative.  It may well
5  have been in their narrative.  And there may
6  well have been follow-up questions.  But that
7  information was certainly put before the Grand
8  Jury.
9      Q.    Were there any questions from you
10 that were not at the direction of the Grand
11 Jury members?
12     A.    I am sure there were.
13     Q.    Do you recall in total the number
14 of times that were said by the officers to
15 have hit Kenny Lazo with their flashlight?
16     A.    I do not.
17         MR. BREWINGTON:  Let's identify
18     this next document.  It is a document
19     dated "October 17, 2008."  It is a
20     two-page document.
21         We saved a tree and copied it
22     back and front.  It is okay to label it
23     on the front Collins 4 for
24     identification.

54

Collins

1         (Plaintiffs' Collins Exhibit 4,
2     Letter dated October 17, 2008, marked
3     for identification.)
4      Q.    (Handing.)
5      A.    (Perusing.)  I have seen number
6  4.
7      Q.    Thank you, sir.
8         In this document, which appears
9  to be signed by you -- is it?
10     A.    That is my signature.
11     Q.    In this document there is a
12 reference to the meeting that took place on
13 August 19, 2008.
14        In it you state at number "(1)"
15 that "you did not desire that your forensic
16 expert, Dr. Thanning, be called before the
17 Grand Jury."  Then it says "(2) that you had
18 no other relevant witnesses that you request
19 be called before the Grand Jury."
20        Now, with regard to Dr. Thanning,
21 when you say that I did not desire to have
22 Dr. Thanning called, just taking that
23 statement as it is on the page --
24     A.    Um hum.

55

Collins

1      Q.    -- knowing that Dr. Thanning
2  might have information, did you have the
3  ability to contact her, and interview her, and
4  speak to her about speaking -- coming before
5  the Grand Jury?
6      A.    I had the opportunity.
7      Q.    Did you take that opportunity?
8      A.    I did not.
9      Q.    Who chose not to do that?
10     A.    Me, based on my conversation with
11 you on the 19th.
12     Q.    When you say you chose not to do
13 that, in your presentation to the Grand Jury,
14 was it your intent to provide the Grand Jury
15 with as much information, relevant information
16 that you could in turn for them to make their
17 determination?
18     A.    Yes.
19     Q.    Who was it, if anyone, that
20 controlled the Grand Jury presentation at the
21 time that you were preparing and actually
22 presenting?
23        MR. DUNNE:  Object to the use of
24     the word "controlled."

56

Collins

1         MR. BREWINGTON:  Sure.
2         MR. DUNNE:  I think the witness
3     understands the intended meaning.
4         MR. BREWINGTON:  Withdrawn.
5      Q.    Who was it that oversaw the
6  presentation of what evidence would go into
7  the Grand Jury at the time that you were
8  preparing and actually presenting?
9      A.    Technically the District
10 Attorney.  But I think he had yielded that
11 authority to me.
12     Q.    So you were actually calling the
13 shots on that one; is that correct?
14     A.    So to speak.
15     Q.    When you say "so to speak," is
16 that not accurate?
17     A.    I don't know that I would use the
18 terminology "calling the shots."  But, yes, I
19 called the witnesses.
20     Q.    And chose which witnesses to call
21 and which ones not to call?
22     A.    I chose which witnesses to call.
23     Q.    Did you also choose which
24 witnesses not to call?

---

**57**

Collins

1
2    A.    I'm not aware of any witnesses I
3 didn't call.
4    MR. BREWINGTON:  Let's identify
5 this letter as Collins 5 for
6 identification.  It is a letter dated
7 "November 3, 2008."
8    (Plaintiffs' Collins Exhibit 5,
9 Letter dated November 3, 2008, marked
10 for identification.)
11    Q.    (Handing.)
12    A.    (Perusing.)  I have seen number
13 5.
14    Q.    So with regard to number 5, did
15 you actually receive this letter?
16    A.    I did.
17    Q.    In the body of the letter, there
18 is a reference to a "Press Release," that
19 being in the second sentence starting in the
20 third line.  Do you see that?
21    A.    I see the words "Press Release"
22 four lines down.
23    Q.    Was there a press release issued
24 by your office following the Grand Jury
25 presentation?

---

**58**

Collins

1
2    A.    There might have been.  I don't
3 specifically remember.
4    But your letter seems to imply
5 that there was, so I take that on faith.
6    Q.    Do you know if there was
7 actually --
8    MR. BREWINGTON:  Withdrawn.
9    Q.    Did anyone speak to you about
10 putting together or creating a press release
11 following the Grand Jury presentation?
12    A.    I vaguely recall Mr. Clifford and
13 perhaps the District Attorney talking to me
14 about that.
15    Q.    Mr. Clifford being?
16    A.    Mr. Clifford is a civilian
17 employee of the DA's Office.  He is quote
18 unquote our press person.
19    Q.    In the body of the letter there
20 is a reference where it is actually quoting a
21 statement.
22    It says -- I'll read the whole
23 sentence.  "Shortly after receipt of your
24 letter and copy of the "Finding of Dismissal"
25 we obtained a copy of your Press Release which

---

**59**

Collins

1
2 made false statements about there being a
3 "civil lawsuit" and that we "declined" to
4 "offer..." --
5    A.    "Declined an offer."
6    Q.    -- "declined an offer from the
7 district attorney's office to include the
8 family's privately hired forensic expert or
9 any other relevant witnesses..."
10    Now, when you say declined an
11 offer to include the privately hired forensic
12 expert, do you recall if indeed the
13 declination that you claim that happened here
14 again prevented you from having anyone testify
15 in the Grand Jury?
16    A.    Well, first of all, it was the
17 press release that quote is taken from, not
18 me.
19    Q.    Did you make that statement?
20    A.    Did I make that statement?
21    Q.    Yes, sir.
22    A.    I did not make that statement,
23 no.
24    Q.    Do you know where that statement
25 came from, where its origins came from?

---

**60**

Collins

1
2    A.    The information may have come
3 from me in a discussion with the District
4 Attorney and Mr. Clifford.
5    Q.    With regard to that information,
6 did you review any statements or press release
7 that were made by your office attributing
8 statements to the office or to yourself?
9    A.    I'm sorry.  Say it again.
10    Q.    Sure.  Did you review any press
11 release that was released by your office which
12 attributed any statements to yourself or
13 anyone else in your office?
14    A.    I believe I reviewed a press
15 release regarding this case prior to its
16 issuance.
17    Q.    With regard to that press
18 release, did you seek to change, alter or
19 amend any aspect of the press release?
20    A.    Whatever went out was in accord
21 with my recollections.
22    Q.    Prior to the presentation to the
23 Grand Jury, did you receive a letter from our
24 office dated October 17, 2008?
25    MR. DUNNE:  Would that be number

Collins                                61

4?

MR. BREWINGTON:  No.  That is his letter.

MR. DUNNE:  I'm sorry.  Wrong letter.

A.    I believe I have the letters here with me.  I would have to look at them.

Q.    Do you want to take a look real quickly?

A.    Sure.

MR. BREWINGTON:  I will give the witness the opportunity to look in his file.

A.    You are referring to a letter from you to me on the 17th?

Q.    Yes.

A.    I did receive a letter dated October 17th from you which followed your number 4 for this examination.

Q.    Which is a letter from you?

A.    Correct.

MR. BREWINGTON:  Mr. Dunne, can I just see that document?

MR. DUNNE:  Sure.  Let me make

---

Collins                                62

some copies.

Let's take a break.

(Recess taken.)

MR. BREWINGTON:  Mark this as Plaintiffs' 6.

(Plaintiff's Exhibit 6, Letter dated October 17, 2008, marked for identification.)

Q.    This letter, which I thank you for supplying out of your file, dated "October 17, 2008," did you actually receive a copy of this letter?

A.    I did receive this letter.

Q.    Was this prior to, that being October 17th or the day that you received it, prior to your Grand Jury presentation?

A.    I'm not positive I received it on the 17th.  But certainly it was prior.

Q.    In that letter it references the letter that we previously marked --

MR. DUNNE:  As 4.

Q.    -- as Collins 4.

Can you pull that out for me, please?

---

Collins                                63

It is over there (indicating.)

A.    Do you need it?

Q.    No.  It is just for you to refer to.

A.    Got it.

Q.    In that letter it refers to your number "(1)" in the second paragraph, that being part of the second sentence -- excuse me -- the second paragraph on October 17th in my letter.

A.    I have the reference.

Q.    In that letter in response to that, this letter indicates that "It is your office that should be prosecuting this death case in the same fashion and with the same zeal that you approach others."

Is that a comment with which you disagree?

A.    No.

Q.    Then it goes on to read "The fact that Dr. Thanning was hired by the family does not place any obligation on them to supply or dictate what witnesses will or will not be presented to the Grand Jury."

---

Collins                                64

Is that an inaccurate statement?

A.    It is not.

Q.    Then it goes on to state "We ask that you and your office make the independent decision as to who and what needs to be presented and we will attempt to provide what support we can."

Was that statement in that letter unclear to you at that time?

A.    Not in the least.

Q.    With regard to the determination not -- or the determination not to call Dr. Thanning, who made that decision?

A.    I did.

Q.    When you made that decision, did you make it with the understanding that it was your decision to make one way or the other?

A.    I knew that.

Q.    With regard to the press release that is referenced in Collins 5, that being this letter (indicating) which is there --

A.    Can I put 4 back?

Q.    You can put it back.

A.    I have got 5.

65

Collins

Q.      With regard to 5, the reference to us declining an offer, that being my office declining "an offer from the district attorney's office to include the family's privately hired forensic expert," is that accurate?

A.      100 percent.

Q.      Sir, when you say it is "100 percent," in my letter of October 17th to you, is that what that is saying?

A.      I don't know what it is saying.

Q.      Well, to you is that declining to --

A.      Based on my conversation --

Q.      Let me finish my question, please.

A.      I'm sorry.  Sure.

Q.      Sure.

A.      I'm sorry.  (Phone ringing.)

Q.      Do you need to take it?

A.      No, I'm not.

Q.      Based on my letter of October 17th, is that declining "an offer from the district attorney's office to include the

66

Collins

family's private hired forensic expert"?

A.      Yes, it is.

Q.      How does my letter of October 17, 2008 indicate to you that we declined an offer from your office to include the family's privately hired forensic expert?

A.      Because on the 19th of August when we met in my office, I discussed with you the findings of the Suffolk County Medical Examiner in addition to providing you on that day with an addendum to her previously issued report.

When you and I discussed that autopsy finding, or those autopsy findings, you indicated to me that you were good with them and that my medical examiner, your words, had done a fine job.

I then asked you, knowing that you had had Dr. Thanning review the work of Dr. Milewski, offered you the opportunity to have Dr. Thanning come and testify before the Grand Jury nonetheless.

You told me at that point that that was not necessary.

67

Collins

Q.      Okay.  Now, sir --

A.      I also spoke to Dr. Milewski about her assessment of Dr. Thanning, and her previous work, and her previous experience with her.

Dr. Milewski was less than positive in her review of Dr. Thanning's acumen.

Q.      After the discussion that you indicate happened in our meeting and then your discussion with the Medical Examiner of Suffolk County, you did receive my letter of October 17, 2008 as we just discussed, correct?

A.      I still received it.

Q.      At that time the words that are in this letter, even though your statements, you know, as to what you believe happened in the August meeting, if there was any question, did this clarify my position?

A.      Your position did not need clarification.

Q.      With regard to you deciding from an independent determination who would and who

68

Collins

would not be called as a witness, you made that determination even after having received this letter of October 17, 2008?

A.      No doubt.

Q.      Would it be accurate to say, sir, that in this letter of October 17, 2008 there was also a request for additional information so that we could see if there were other relevant witnesses?

A.      (Perusing.)  Actually, it is not a request.  It is a statement of fact.

Q.      With regard to that statement of fact -- and I agree it is a fact.  With regard to that statement of fact, that is in the last sentence of the second paragraph, which reads "Finally, we know that you should have records of all the persons in the Precinct on the night of the death of Mr. Lazo and since we have not been provided with any of that information -- "

A.      (Phone ringing.)  I am sorry.  I am with you.

Q.      "-- information and have not been able to interview those persons, we cannot

69

Collins

1  affirm that there are "no other relevant
2  witnesses that [we] request be called before
3  the Grand Jury.""
4          Now, with regard to that
5  statement of fact, was that declining, as you
6  saw it, to provide other witnesses?
7      A.      My request of you with regard to
8  witnesses other than Dr. Thanning had to do
9  with any witnesses that perhaps I was unaware
10  of, not police personnel who were on-site for
11  whom I had records.
12          (Phone ringing.)  I'm sorry.  Can
13  I take this quickly?
14      Q.      Sure.  Let's take a short break.
15          (Recess taken.)
16      A.      I apologize.
17      Q.      No problem.
18          With regard to your letter of
19  October 17th, which is Collins 4, the one that
20  is upside down.
21      A.      Got it.
22      Q.      In that letter, number "(2)" says
23  "that you had no other relevant witnesses that
24  you request be called before the Grand Jury."

70

Collins

1          That doesn't reference -- am I
2  looking at the right document?
3      A.      Yes.  I have the same one.
4      Q.      That doesn't reference police --
5          MR. BREWINGTON:  Withdrawn.
6      Q.      -- other than police witnesses,
7  does it?
8      A.      Specifically no.
9      Q.      Then it also says "If that
10  position has changed, please notify me
11  immediately, prior to Tuesday October 21,
12  2008."
13          What position were you referring
14  to?
15      A.      Both number (1) and number (2).
16      Q.      Did my letter of October 17th
17  sent "by certified mail return receipt
18  requested and by fax" provide you with any
19  change or clarification of my position?
20      A.      None.
21      Q.      With regard to Collins 6, which
22  is my letter of October 17, 2008, was there
23  any response that you provided and/or had
24  provided to this letter?

71

Collins

1      A.      I don't think so.  I don't recall
2  if we talked over the phone after this or not.
3          May I just look at my
4  correspondence file?
5      Q.      Sure, please do.
6          MR. BREWINGTON:  The witness is
7  looking at his records.
8      A.      I did not respond in writing.
9          THE WITNESS:  This is my copy.
10          MR. DUNNE:  It might be an extra
11  one.
12          THE WITNESS:  I think it came out
13  of here.  It is mine.
14          MR. DUNNE:  Good.
15      Q.      At that time, that being October
16  17, 2008, was the issue of whether or not the
17  U.S. Attorney's Office would investigate this
18  matter or the F.B.I., whether or not they were
19  going to investigate this matter, still a
20  question for you?
21      A.      Only to the extent that you kept
22  requesting their intervention.
23      Q.      After my request for their
24  intervention, did you make any further contact

72

Collins

1  or attempt to make any contact with that
2  office indicating that that request was being
3  made?
4      A.      I never made contact with the
5  Federal authorities at any time.
6          Any contact I had with them was
7  initiated by them.
8      Q.      At any point did you attempt to
9  or ask anyone on your behalf to -- on your
10  behalf to attempt to contact them to ask them
11  to take over this investigation or to assist
12  in this investigation?
13      A.      I didn't think you needed any
14  assistance in that regard.
15      Q.      I said you.
16      A.      No, I did not.  I didn't think
17  you needed any assistance in requesting their
18  assistance.
19      Q.      That wasn't my question.
20      A.      Say it again then.
21          MR. BREWINGTON:  Can we have it
22  read back, please.
23          (Record read.)
24      A.      I stand by my answer.

Collins

73

Q.    Which is what?

A.    I never contacted the Federal authorities regarding this investigation.  And you continued to request their investigation through to today.

Q.    Okay.

MR. BREWINGTON:  Mark that.  I move to strike that portion which is unresponsive.

Q.    Did you at any time on behalf of the District Attorney's Office of Suffolk County request that the U.S. Attorney's Office or the F.B.I. to take on this investigation?

A.    Not ever.

Q.    Now, sir, you indicated that you did receive the autopsy report issued by the Suffolk County Medical Examiner's Office; is that correct?

A.    I did.

MR. BREWINGTON:  Let's mark this, please, as Collins 7 for identification.

It is a multi-page document, again copied back and front to save a tree.

---

Collins

74

It was previously marked as Scimone 7 on January 5, 2011.

(Plaintiffs' Collins Exhibit 7, Report of Autopsy, marked for identification.)

Q.    (Handing.)

A.    (Perusing.)  I have seen number 7.

Q.    Do you recognize what this document is?

A.    I do.

Q.    What is it, please?

A.    It is the "Report Of Autopsy" issued by the Suffolk County Medical Examiner's Office with reference to the death of "Kenny J. Lazo."

Q.    With regard to this document, did you have this in your possession prior to your presentation to the Grand Jury?

A.    Yes.

Q.    Was a copy of this document presented to the Grand Jury?

A.    I don't recall.

Q.    Do you recall if the "Final

---

Collins

75

Anatomic Diagnoses," which are listed on the front of this document were presented to the Grand Jury?

A.    They were.  However, I don't recall if this specific document was introduced.  It may have been only through the testimony of the Medical Examiner herself.  I don't recall whether this was entered as an exhibit.

Q.    Sir, in your normal course when there is a death homicide presentation to the Grand Jury, is it your normal practice to have the autopsy report marked as an exhibit?

A.    Actually, it is our normal course to present only a letter from the Medical Examiner summarizing the autopsy, short of the complete report, pursuant to Article 190 of the Criminal Procedure Law.

Sometimes the full autopsy report is not ready by the time the case is presented to the Grand Jury and the Medical Examiner issues a letter in its stead pursuant to Article 190.

However, in this instance, the

---

Collins

76

Medical Examiner who performed the autopsy testified in person herself, which is why I can't recall whether any of those aforementioned documents were actually entered into evidence.

Q.    When an autopsy report such as this is available at the time of a Grand Jury presentation, is it in your normal practice to have the report itself marked as an exhibit and entered before the Grand Jury?

A.    In lieu of the aforementioned letter, yes.

Q.    Sir, did you keep a listing of what exhibits were marked and which exhibits were not marked as the part of the Grand Jury presentation?

A.    The Secretary of the Grand Jury kept a record of what items were entered into evidence in the course of the proceeding.  And that record is part of the file I turned over to Mr. Dunne.

Q.    Sir, have you reviewed that file?

A.    No.

Q.    Sir, did you actually keep the

77

Collins

Grand Jury exhibits?

A.      That would have been my normal practice.

Q.      Based on this presentation that you made to the Grand Jury, as you sit here today you don't recall whether or not there was the autopsy itself being marked as an exhibit; is that correct?

A.      That's correct.

Q.      Now, with regard to the references to the anatomic diagnoses that are listed on this front page --

A.      Yes.

Q.      -- do you recall asking any specific questions about the "Cardiac death following exertion associated with prolonged physical altercation with multiple blunt impacts," asking questions about that to the Medical Examiner?

A.      Yes.

Q.      Do you recall what it was that you inquired about?

A.      Not specifically.

Q.      Do you recall what blunt impacts

78

Collins

were discussed by the Medical Examiner?

A.      Specifically, no.  But I do recall that Mr. Lazo had various areas of bruising about his body, in particular about his head and face.  And those injuries were definitely discussed.

Q.      When those were discussed, were photographs of those injuries utilized during the testimony of the Medical Examiner?

A.      Yes.

Q.      Do you recall as you sit here now which photographs were actually utilized?

A.      I do not.

Q.      Going to the second page, this is referenced as a "Homicide."

When you first received a copy of this report, did you have any discussion with the Medical Examiner about her findings?

A.      I believe I did.

When I first received it?  I am sorry.

Q.      Yes, sir.

A.      When I first received it or shortly thereafter.

79

Collins

Q.      Or learned of its existence?

A.      We talked about it.

Q.      When you spoke to her about it, did you talk about the fact that there had been a finding that the manner of death was homicide?

A.      I did.

Q.      What was the conversation that you had with her, what did she say, what did you say, as best you can recall?

A.      Her general feeling with regard to that finding was, since Mr. Lazo's death resulted as a result of interaction with these other police officers, that she was left with no conclusion other than to call it a homicide because it involved the interaction of others.

Q.      Did she describe --

A.      Excuse me -- along with her other concomitant findings.

Q.      Did she describe for you in your discussion with her the type of injuries that he suffered with regard to any blunt impacts?

A.      I'm sure we did on several occasions.

80

Collins

Q.      At any time did you sit with her before the Grand Jury to review any photographs?

A.      Yes.

Q.      When or about when did that occur?

A.      Sometime between the end of July and the end of October, on more than one occasion.

MR. BREWINGTON:  Let us mark this please, as --

We are going to come back to that, Richie, so leave that out (indicating).

Let us mark this as Collins 8 for identification.  It is a single-page photograph that was previously marked on May 19, 2011.

(Plaintiffs' Exhibit 8, Copy of photo, marked for identification.)

Q.      (Handing.)  Sir, do you have that document before you?

A.      (Perusing.)  I do.

Q.      Do you recognize who is depicted

81

Collins

1  in that photograph?

2      A.     I believe it to be Mr. Lazo.

3             The photograph looks familiar to

4  me.

5      Q.     During any of your conversations

6  with --

7             What's the doctor name?

8      A.     Milewski.

9      Q.     -- Milewski concerning Mr. Lazo,

10 did you ask specific questions about the

11 instrumentality of any of the injuries based

12 on her opinion that appear in this picture?

13     A.     We definitely discussed

14 instrumentalities and any injuries that she

15 could attribute to in particular a flashlight,

16 or hands, or feet.  Yes.

17     Q.     Was she able to attribute any

18 injuries to a flashlight, or hands, or feet?

19     A.     I don't specifically recall if

20 she was able to tell me which

21 instrumentalities may have caused which blunt

22 impact injuries.

23     Q.     Did you ask her, either in your

24 interviews prior to the Grand Jury or in the

---

82

Collins

1  Grand Jury, for her to make that assessment?

2      A.     I did ask her to do that to the

3  best of her ability.

4      Q.     In both situations, that being in

5  your initial interviews with her as well as in

6  the Grand Jury?

7      A.     I don't know that I specifically

8  asked her that in the Grand Jury.  That would

9  depend on what her answer was when we talked

10 about the case.  And I don't specifically

11 recall if she was able to pinpoint specific

12 instrumentalities to specific injuries.

13     Q.     Sir, with regard to flashlights

14 in this case, were any flashlights utilized as

15 Grand Jury exhibits?

16     A.     Yes.

17     Q.     How many, if you recall?

18     A.     Certainly I recall one.  That is

19 my answer.

20     Q.     With regard to any of those

21 flashlights, the one, or if there was more

22 than one, but in particular with regards to

23 the one, were any of the officers asked to

24 identify any of the flashlights?

---

83

Collins

1      A.     I don't recall if I used one of

2  the flashlights that belonged to one of the

3  involved officers or if I used a similar

4  demonstrative type flashlight.  I don't

5  specifically remember.

6             MR. BREWINGTON:  Let's take

7             another look at what we will mark as

8             Collins 9 for identification.

9             These are a series of four

10            photographs that were taken in or about

11            April 15th of 2008.  We will mark these

12            as Collins 9.

13            (Plaintiffs' Collins Exhibit 9,

14            Photocopy of four photos, marked for

15            identification.)

16     Q.     I will ask you to look at Collins

17 9 for identification.

18            I'll represent to you that these

19 were photographs taken on or about April 15,

20 2008 by Dr. Thanning (handing).

21     A.     (Perusing.)  Um hum.

22     Q.     Were photos similar to these

23 presented to the Grand Jury, if you recall?

24     A.     Yes.  With perhaps the exception

---

84

Collins

1  of the one on the bottom right corner which

2  highlights the Y suture, which really is

3  dispositive of no injuries.

4      Q.     With regard to the injuries which

5  are depicted in the other three, aside from

6  the Y sutures, was there specific testimony as

7  to each of these injuries by the Medical

8  Examiner?

9      A.     I believe so.

10     Q.     At any time did the Medical

11 Examiner indicate as you recall, let's start

12 with the one in the upper left-hand corner --

13     A.     Okay.

14     Q.     -- was there any opinion offered

15 as to the instrumentality of any of the

16 injuries which are depicted in that

17 photograph?

18     A.     I don't specifically recall that

19 at this time.

20            Certainly the doctor testified

21 that some of the injuries were consistent with

22 or not inconsistent with having been caused by

23 the department issued flashlight, which was

24 the subject of some discussion.

85

Collins

1
2    Q.    Were there any other discussions
3 with regard to instrumentality other than the
4 flashlight?
5    A.    We may have talked about hands
6 and feet as additional instrumentalities.  I
7 don't specifically recall.
8    Q.    Sir, the same questions for the
9 upper right-hand corner and lower left-hand
10 corner.  Was there any discussion as to the
11 injuries which are depicted in those
12 photographs as to instrumentality leading to
13 those injuries?
14    A.    There was certainly discussion of
15 the depicted injuries.
16    Whether the doctor was able to
17 attribute them to a specific instrumentality,
18 I don't recall.
19    Q.    When the subject officers
20 testified, were they allowed to testify in the
21 narrative?  I just wanted to clarify that.
22    A.    They were allowed to testify in
23 the narrative, as is required by law.
24    Q.    At that time would it be accurate
25 to say that none of those officers were under

---

86

Collins

1 arrest; is that correct?
2    A.    True.
3    Q.    Those officers at that time had
4 been informed that they were the subject of
5 the Grand Jury investigation?
6    A.    As required by law they were.
7    Q.    Were there written documents
8 advising them of that?
9    A.    There were.
10    Q.    Did you keep copies of those
11 documents?
12    A.    I kept the originals.  And I
13 believe there may be copies as well.
14    Excuse me.  And they were entered
15 as exhibits before the Grand Jury.
16    Q.    As best you recall, were copies
17 of those documents provided to Mr. Dunne on
18 your behalf?
19    A.    I believe so.
20 RQ    MR. BREWINGTON:  Mr. Dunne, I'm
21 just going to ask that you take a look
22 at some point.  I don't recall seeing
23 them.
24    MR. DUNNE:  They are commonly

---

87

Collins

1
2 called Waiver Of Immunity Forms.
3    MR. BREWINGTON:  Right.  Well,
4 whatever they are, my question is maybe
5 you could just look for them.
6    I didn't see them.  If I missed
7 them, I'm sorry that I did.
8    A.    Each quote unquote targeted
9 officer executed one of those documents in the
10 presence of his attorney before the Grand
11 Jury.
12    Q.    Was there anything -- and I
13 understand those forms, those are forms that
14 are filled out before they actually go into
15 the Grand Jury.
16    A.    No.  They are actually filled out
17 in the presence of and executed before the
18 Grand Jury.
19    Q.    When you say "executed" before,
20 in the front of --
21    A.    In front of.  Not ahead of time.
22    Q.    So my question is again:  Was
23 there correspondence other than the Waiver Of
24 Immunity forms that we commonly see when
25 someone goes in and waives immunity before a

---

88

Collins

1
2 Grand Jury, were there correspondence which
3 were sent to these officers indicating to them
4 that they were targets of the Grand Jury
5 investigation?
6    A.    No.
7    Q.    Were there any correspondence
8 from yourself or to you from their lawyers
9 which indicated that they had been informed
10 that they were targets of the Grand Jury
11 investigation, other than the Waiver of
12 Immunity forms?
13    A.    No.
14    Q.    Sir, when each of these officers
15 testified in the Grand Jury, that being the
16 officers that were identified as targets, were
17 they asked questions from their written
18 statements, that being were there
19 statements --
20    MR. BREWINGTON:  Withdrawn.
21    Q.    -- were there questions which
22 were asked of them utilizing portions of their
23 written statements which had been previously
24 provided?
25    A.    I don't recall.

89

Collins

Q.   At any time were the officers asked to demonstrate anything in the Grand Jury?

A.   I don't recall whether they were specifically asked.

But I do recall at least one officer engaging in a demonstration in his narrative.

Q.   Would that be Officer Judge?

A.   I believe Judge definitely did. And I don't recall if Scimone did as well.

Q.   Do you recall what it was that Officer Judge demonstrated, if anything?

A.   He demonstrated his actions and his positions relative to the roadway in the course of his physical confrontation with Mr. Lazo.

Q.   Sir, at any time during the Grand Jury presentation, were there any specific questions that you asked of the target officers?

A.   I don't remember.

Q.   Was there anything about their testimony which lead you to ask questions

90

Collins

based on there appearing to be inconsistencies?

A.   I still don't remember.

Q.   Was there anything from any of their reports that appeared to be inconsistent that you asked them questions about?

A.   I don't recall.  I'm sorry.

Q.   That is okay.  You have been doing a lot since then, I'm sure.

MR. BREWINGTON:  Let's take a two minute leg stretch.

(Recess taken.)

Q.   With regard to the fact that Mr. Lazo was a male Hispanic, was that anything which was ever discussed in your office with either the detectives, investigators, or amongst your staff?

A.   I don't think so.

Q.   Was there ever any question raised about the treatment that was afforded to Mr. Lazo concerning --

MR. BREWINGTON:  Withdrawn.

Q.   Was there ever any discussion about the treatment that Mr. Lazo received

91

Collins

which in any way related to his race or ethnicity?

A.   I am not sure I understand.

Q.   Was there ever any discussion about how the officers interacted with Mr. Lazo with regard to the stop, the physical interaction, or the treatment that he received or did not receive in the precinct which in any way related to him being an Hispanic man?

A.   I don't recall any discussion whatsoever with anyone involved in the case with regard to Mr. Lazo's race or ethnicity.

Q.   Was that ever a consideration?

A.   I don't understand.

Q.   Was that ever anything either by you -- particularly by you in looking at whether or not Mr. Lazo was treated in any particular fashion because of his race or ethnicity?

A.   I don't believe Mr. Lazo's race or ethnicity was a factor in this case at all.

Q.   And I appreciate that response.

My question was:  Was that ever a consideration that you made or a consideration

92

Collins

that you went through?

A.   Did his race or ethnicity ever cross my mind?

Q.   With regard to the treatment that he was subjected to.

A.   I am not even sure I knew Mr. Lazo's ethnicity.

Q.   With regard to Mr. Lazo's ethnicity, to this day do you know what his ethnicity is?

A.   I believe him to be of Hispanic descent.

Q.   When for the first time, if at all, do you recall learning that?

A.   I'm not sure if it is referenced in the autopsy report or not.

Can I look at that?

Q.   Sure, why don't you take a look?

A.   (Perusing.)

Q.   First page.

A.   The autopsy report refers to him as "White."

Q.   On the first page as well (indicating)?

**93**

Collins

A.    The race is listed as "White."

However, I do recall in the course or the -- in the course of the case that he -- I think his mother's name was Gonzalez, if I recall.

Q.    Sir, with regard to your investigation in this case, was there any question asked of the subject officers if they filled out Use Of Force forms?

A.    I don't recall asking that.

Q.    Are you familiar with that form?

A.    I have heard of the form.  I'm not positive that I have seen one in recent years.

But my understanding also is that a supplementary report may supplement that requirement.

Q.    The Use Of Force form or Use Of Force report, do you know if any of the subject officers issued any supplemental reports?

A.    I believe they wrote supplementary reports.

Q.    Do you know why they did not

---

**94**

Collins

issue any reports initially?

A.    I'm not sure what that question means.

Q.    Did they issue any reports initially?

A.    That wasn't your question.

Q.    I'm now asking a different question.

A.    I don't remember.

Q.    Were there any reports, that being Use Of Force reports, utilized as Grand Jury exhibits?

A.    I don't believe so.

Q.    Were any of the written statements made by officers utilized as Grand Jury exhibits?

A.    I don't believe so, but I don't specifically remember.

Q.    Was a death report prepared by the Suffolk County Police Department prior to the Grand Jury presentation?

A.    I would certainly expect that they did prepare one prior to then.  I don't specifically remember.  But that would be the

---

**95**

Collins

ordinary course.

Q.    Did you see one in this case?

A.    I'm sure I did.

MR. BREWINGTON:  Let us mark this as Collins 10 for identification. Multiple-page document that in the upper right-hand corner says "ME number 08-1311 Death Report."

(Plaintiffs' Collins Exhibit 10, ME # 08-1311 Death Report, marked for identification.)

Q.    (Handing.)  Sir, do you have that document before you?

A.    (Perusing.)  I do.

Q.    Have you seen this document before?

A.    I have.

Q.    In what context have you seen it?

A.    I have seen it with regard to Detective Portela and Sgt. Fandrey explaining their investigation to me.

And I believe a copy of that report has been in my file since I received it.

---

**96**

Collins

Q.    Was this report, which appears to have I think nine pages or ten pages in total, which is back and front, was this marked and identified as a Grand Jury exhibit?

A.    I don't believe so.

Q.    Just as Mr. Dunne just pointed out, the description of the deceased here indicates the race is "White."  Do you see that?

A.    It does say that.

Q.    At the time of this report, had you seen photographs of Mr. Lazo?

A.    At the time of this report?

Q.    Yes, sir.

A.    No.

Q.    When for the first time did you see photographs of Mr. Lazo?

A.    Probably in my meeting with the Medical Examiner toward the end of June or early July.

Q.    At any time --

A.    There may have been one in the newspaper.  I don't remember.

Q.    At any time in your discussion

97

Collins

with these investigators or the District
Attorney's Office, was there any discussion
about Mr. Lazo having been identified as being
an individual of the White race?

A.     I don't believe so.

There is also a classification of
White Hispanic.  I don't know if the Police
Department has changed that designation or
not.

But since it never came up, I
can't tell you what it meant.

Q.     Very well.  I appreciate the fact
that you cannot tell me that.  I can only ask
you to tell me what you can tell me.

With regard to this document, did
either one of the investigators, that being
Fandrey or --

Is it Portelo?

A.     Portela.

Q.     -- testify in the Grand Jury?

A.     Portela did.  I don't believe
Fandrey did.

Q.     Was there a particular aspect of
the Grand Jury presentation that Portela was

---

98

Collins

asked to testify about?

A.     He testified regarding his
investigation.  He testified with regard to
what his investigation revealed as a quote
unquote timeline.

He testified I believe to the
procurement of the radio tapes that were
introduced and their authenticity.  That is
what I specifically remember.

Q.     With regard to his timeline, was
there a document or an exhibit utilized to
present a timeline to the Grand Jury?

A.     I believe there was.

Q.     Was that in the form of a
demonstrative exhibit?

A.     I think it was in the form of a
typewritten document.

Q.     Was that part of the documents
that you supplied to the County Attorney's
Office?

A.     It was.  Whether it be as part of
the Grand Jury exhibits or part of my file, I
believe it was.

Q.     With regard to this death report

---

99

Collins

and the pages which make up the nine or ten
pages that are here, did you have any
questions about any aspect of this report that
was of concern to you that you raised to the
investigator?

A.     I believe I talked with the
investigator about everything that is included
in this report.  Whether it makes it a
concern to me or not, I don't know.  But we
discussed every aspect of this report.

Q.     Was there anything in this report
about which you had any particular questions
as to either not understanding or needing
further clarification of?

A.     Anything that required further
clarification I attempted to get from the
referred to witness themselves.

Q.     During the Grand Jury
presentation?

A.     Or in my interviews if it was not
a target police officer.

Q.     What other officers, other than
the target officers, did you interview?  I
think you mentioned Talt was one.

---

100

Collins

A.     Talt was certainly one.  Link was
another.

The officers listed on page 6,
the ones listed seriatim at the bottom.  I
interviewed all of them.

Q.     That would be "Broderick, Cotter,
Friedrich, Quesada and Zurl"?

A.     That's correct.

Q.     In any of those interviews, did
you take any notes?

A.     I did not.

Q.     For any of those interviews, did
you have statements written by those
individuals in front of you from which to
work?

A.     If they had written one, I had
it.

Q.     Other than those individuals that
are referenced on page 6, the officers, and
Officer Link and Officer Talt, did you speak
to any other members of the Suffolk County
Police Department as part of your
investigation?

A.     Detective McAlvin who interviewed

101

Collins

911 caller Mr. Morrow that is referenced on
page 3. I also interviewed Mr. Morrow. Also
there is a Mr. Baratta on page 3, I believe
another 911 caller. I interviewed him.

I interviewed "Sgt. Koerber,"
referred to on the first page.

There are civilians mentioned on
page 8, one being a "Leslie Brewster." I
interviewed her.

Also another gentleman referred
to, "Eric Melendez," on that same page. I did
not interview him, but I did have access to
the sworn statement he gave the investigating
police officers.

Q.    Any others that you can recall?

A.    Again, there is the gentleman
from Fire and Rescue with regard to the
defibrillator and its usage and its
capacities. I don't remember his name. But
he testified in the Grand Jury.

Q.    With regard to Eric Melendez, you
indicated that you didn't interview
Mr. Melendez. What was the reason?

A.    Mr. Melendez was a witness that

---

102

Collins

was given to us by Mr. Chakmakian in my first
conversation with him during the first week
following this incident.

And the information that
Mr. Chakmakian gave to me over the telephone
was immediately given to the Homicide
investigators. And they interviewed
Mr. Melendez.

And I was of the opinion that
Mr. Melendez's information was not relevant to
the proceeding as explained to me. And I did
not call him or interview him.

Q.    At the time that you actually
received this document, did you speak to -- I
think you said you spoke to Lesley Brewster?

A.    Yes. She testified in the Grand
Jury.

Q.    Did she indicate that she saw
Mr. Lazo?

A.    Yes.

Q.    She indicates that she saw him
and described him as "Puerto Rican man"?

A.    I don't specifically recall that,
but I'm not taking issue with that.

---

103

Collins

Q.    If this helps refresh your
recollection, if you go to page 8, the last
paragraph.

A.    (Perusing.) That is what it
says.

Q.    At that time did you have any
belief or sense that Mr. Lazo was a Hispanic
male?

A.    I guess I had a sense.

Q.    Anyone else that you recall
describe Mr. Lazo as an Hispanic male other
than Lesley Brewster that you recall?

A.    I don't recall how the target
quote unquote police officers referred to him.

I know they took various
information from him on the traffic stop, I
think, including his license.

I don't know how he is designated
or characterized on his driver's license.

It really didn't make any
difference to me.

Q.    Sir, let me ask you to take a
look -- we will do two documents side by side.

MR. BREWINGTON:  Mark these,

---

104

Collins

please, as Collins 11 and 12.

(Plaintiffs' Collins Exhibit 11,
Letter dated October 14, 2008, marked
for identification.)

(Plaintiffs' Collins Exhibit 12,
Grand Jury Subpoena, marked for
identification.)

Q.    (Handing.)

A.    (Perusing.) I have seen both.

Q.    Sir, do you recognize these
documents?

A.    I certainly recognize 12.

I'm not positive I recognize 11.
But 11 pertains to 12.

Q.    I showed them in sequence to you
just so you had them both in your hand. It
seems like they kind of --

A.    It looks like one begat the
other.

Q.    Yes. The reference in -- let's
go to 12, because that may be the document
that you are most familiar with.

A.    Okay.

Q.    That is a Grand Jury subpoena?

105

Collins

A.     Um hum.

Q.     Is that correct?

A.     It is.

Q.     That is issued by you as an Assistant District Attorney?

A.     It was.

Q.     Who is it issued to, please?

A.     It says "Robert Delagi, Chief Pre-Hospital Medical Operations and Acting Director."

Q.     Acting Director of what?

A.     I'm trying to remember.

       I believe he had a position at the hospital to which your client was taken. And I think that was Southside.

Q.     Did you get a response to this subpoena, if you recall?

A.     I believe we did.

Q.     Now, the issuance of this subpoena like --

       MR. BREWINGTON:  Withdrawn.

Q.     Was the issuance of this subpoena part of an authority that you understood you had at the time that you issued it?

106

Collins

A.     Of course.

Q.     Could you do this for any witnesses that you felt or thought were relevant to provide information to the Grand Jury?

A.     Yes.

Q.     Is that true of civilian witnesses as well as members of the service, that being the Police Department?

A.     Civilian witnesses, but not expert witnesses.

Q.     When you say "not expert witnesses," it was your belief that such a subpoena was not available to you to issue to let's say Dr. Thanning?

A.     That is my understanding.

Q.     What do you base that on?

A.     I don't believe that I can compel an expert to come before the Grand Jury and offer an opinion.

Q.     What do you base that on?

A.     Law school.

Q.     With regard to the hospital, did anyone come in to testify on behalf of the

107

Collins

hospital or to bring records in?

A.     Ambulance personnel testified.

       I don't recall if any hospital personnel testified.

Q.     With regard to the Medical Examiner of Suffolk County, was a subpoena issued for the Medical Examiner?

A.     It wasn't necessary.

Q.     Was there any requirement --

       MR. BREWINGTON:  Withdrawn.

Q.     Was there anything which was given to the Medical Examiner requiring the Medical Examiner to come in and testify before the Grand Jury?

A.     No.  I called her and asked her to do so, and she agreed.

Q.     Other than the Medical Examiner testifying in the Grand Jury, were there any other persons that came to testify with any technical expertise, that being, you know, potential experts or persons to talk about any technical aspects of the case?

A.     The defibrillator fellow, whose name I can't remember, and also some of the

108

Collins

responding police officers had EMT, or AEMT, or PA training.  So I guess they would be experts to some degree insofar as their medical response.

Q.     Did they appear by Grand Jury subpoena?

A.     They appeared by virtue of a teletype to the Police Department, which doesn't have the same claws.

Q.     With regard to them, you didn't have to subpoena them, it wasn't necessary?

A.     It was not.

Q.     Basically you just asked that they be present, and then their commands told them to be present?

A.     That is true.

Q.     With regard to this subpoena that is before us, Collins 12 for identification, how was this provided, if you recall?

A.     This subpoena emanates from an interview I had with some of the ambulance personnel who transported Mr. Lazo.

       And I became aware in that interview that there may have been documents

Collins                                109

1  or recordings that I did not receive from the
2  hospital when I subpoenaed the hospital
3  records.
4          The ambulance crew chief lead me
5  to believe that there were either recordings
6  or documents as a result of the ambulance's
7  conversations with the hospital while en
8  route.
9          And this subpoena was drafted as
10 a result of my interview with the ambulance
11 crew chief to find out whether or not such
12 recordings or writings existed outside the
13 four corners of what I received as quote
14 unquote hospital records.
15     Q.     As a result of my inquiry, did
16 you learn if there were further documents
17 and/or recordings?
18     A.     I know there was a response to
19 the subpoena.
20         I do not recall if materials were
21 delivered or whether I was told that there
22 were no such records.  I don't specifically
23 remember.
24         If I got them, they were in my

Collins                                110

1  file.
2      Q.     With regard to the presentation
3  itself, were there recordings which were
4  presented to the Grand Jury, whether or not
5  they were from the hospital or from police
6  recordings?
7      A.     Police recordings were certainly
8  presented.
9          The radio, or what they call car
10 to car transmissions, were played for the
11 Grand Jury.
12         I don't recall specifically
13 whether I got any hospital recordings that I
14 referred to earlier.
15         But I don't believe if I got
16 them, that they were played.  I don't recall
17 playing anything other than perhaps 911 calls
18 and the car to car transmissions.
19     Q.     At any point during the
20 conversation --
21         MR. BREWINGTON:  Withdrawn.
22     Q.     At any time during the
23 presentation to the Grand Jury, was there ever
24 any discussion about subpoenaing telephone

Collins                                111

1  records from the officers?
2      A.     I don't think so.  I don't
3  believe so.
4      Q.     Did the investigators or did you
5  ever attempt to subpoena the telephone records
6  of the police officers?
7      A.     I don't think we did.
8          If I did, it was in my file.
9          MR. BREWINGTON:  Let's take a
10 break.
11         (Recess taken.)
12     Q.     Mr. Collins, did you ever see any
13 photographs of Mr. Lazo's car?
14     A.     Yes.
15     Q.     Were those part of what was
16 turned over as part of your file?
17     A.     If not my file, the police file
18 certainly.
19         I mean there were photos of his
20 car and its interior introduced into evidence
21 in the Grand Jury.
22     Q.     With regard to Mr. Lazo's
23 condition at the time that he arrived at the
24 precinct, what did you understand based on the

Collins                                112

1  testimony to be his condition at the time that
2  he arrived at the precinct based on the
3  investigation and what you learned?
4      A.     My understanding is he arrived at
5  the precinct in the company of Officer Link
6  looking like he had been in a physical
7  altercation.
8          As he passed the cell in which
9  Lesley Brewster was housed was conversant and
10 responsive to the officer accompanying him,
11 which I know to have been -- um --
12         There came a point after he was
13 seated in one of the rooms adjacent to the
14 squad room and was in the process I believe of
15 talking to Detective Talt where he appeared to
16 go into distress of some type.
17         Officers with medical experience
18 responded to the Squad Room.  And they worked
19 on him in that area.
20     Q.     Did you at any time ask any of
21 the subject officers, the target officers,
22 whether or not the bruises and injuries that
23 were present in what we marked as Collins' 8
24 for identification -- I'll place that back in

113

Collins

front of you so you can see it.  Did you ask any of the officers if those injuries which are identified in that photograph were seen by them when Mr. Lazo was in their presence?

A.    I don't recall specifically asking the officers that about each individual injury that may be presented in that photograph.

I did ask them questions or they volunteered in the Grand Jury about areas of the body of Mr. Lazo that they struck either with their hands or with their flashlight or flashlights.

I did not attempt to account for every single minor injury that Mr. Lazo suffered in the Grand Jury.

Q.    I understand with regard to any sense of any minor injury.

I am actually referring to the injuries that are depicted in this photograph, which is Collins 8 for identification.

Was there any specific questions to the officers about their observations of Mr. Lazo in seeing those injuries when he was .

---

114

Collins

in their presence?

A.    I don't think so.

Q.    Did you in your capacity as an Assistant District Attorney have any reporting requirements to any New York State agency about your investigation or the death of Kenny Lazo?

A.    Other than to report the findings of the Grand Jury, no.

Q.    With regard to the officers' testimony that was provided, did you find as part of their testimony anything which you particularly questioned them on that was inconsistent one with the other?

A.    I don't recall specifically doing that.

Q.    Was there any aspect of any one officer's testimony or any number of officers' testimony that came before the Grand Jury that you found unbelievable?

MR. DUNNE:  Object to the form of that on many grounds.

For our purposes today, you go ahead and answer that as best you can.

---

115

Collins

A.    No.

Q.    With regard to the officers' testimony provided to you or provided to the Grand Jury when these officers did testify, were there any questions of them about their consulting with other officers prior to their testimony?

A.    I don't recall specifically asking that question.

Q.    Sir, have you seen any letter or correspondence from the U.S. Department of Justice to Mr. Levy of the Suffolk County government?

A.    I have seen many documents over the years.

Q.    In particular with regard to anything within the past month and a half or two months, have you seen any letter from the Department of Justice referring to technical assistance to the Suffolk County Police Department?

A.    I believe I saw the letter that you are referring to.  In particular I recall a newspaper article about it.  I'm not sure I

---

116

Collins

have seen the entire letter.

Q.    Have you had any conversations with anyone about any portion of the letter?

A.    Maybe my wife.

Q.    Other than your wife?

A.    I don't believe so.

Q.    Anyone related to the office, that being the Police Department and/or the District Attorney's Office?

A.    The Police Department, no.

Members of the office, perhaps at the water cooler as a result of the newspaper article, but nothing that I would call official.

Q.    Sir, with regard to the Justice Department, have you been asked to provide them with any information relative to any investigation that they have been involved with relating either to the death of Kenny Lazo or your investigation of the Police Department's interaction with members of the Hispanic community?

A.    Yes.

Q.    What have you been asked to

## Page 117

Collins

1  provide, and what have you provided?
2      A.    Myself and the Chief Assistant,
3  Emily Constant, sat with two members of the
4  U.S. Attorney's Office for probably half a day
5  or more with regard to the investigation into
6  incidents in Patchogue that was precipitated
7  by the Lucero killing.
8      Q.    In that interview any other
9  discussions about any other cases?
10     A.    Many cases.
11     Q.    Was the Lazo case one of them?
12     A.    No, not to my recollection.  No.
13     Q.    Did you keep any notes of that
14 discussion?
15     A.    I did not.
16     Q.    Did anyone that you are aware of?
17     A.    The U.S. Attorneys may have.
18 Miss Constant may have.  I did not.
19     Q.    With regard to your discussions
20 with the U.S. Attorney's Office, other than
21 what we have talked about here today, have you
22 had any discussion or correspondence with the
23 U.S. Attorney's Office concerning the case of
24 Kenny Lazo?

## Page 118

Collins

1      A.    None.
2           MR. BREWINGTON:  I have no
3  further questions of this witness at
4  this time.
5      Q.    I thank you for your time.
6           (Time noted:  1:30 p.m.)

## Page 119

Collins

A C K N O W L E D G M E N T

STATE OF NEW YORK    )
                     :ss
COUNTY OF            )

         I, JOHN B. COLLINS, ESQ., hereby
certify that I have read the transcript of my
testimony taken under oath in my deposition of
October 12, 2011; that the transcript is a
true, complete and correct record of my
testimony, and that the answers on the record
as given by me are true and correct.

                    _____
                    JOHN B. COLLINS, ESQ.

Signed and subscribed to before
me, this 5th         day
of DECEMBER          , 2011.

_____
Notary Public, State of New York

ROSANNE SIERE
Notary Public, State of New York
No. 01SI6018008, Suffolk County
Term Expires February 5th, 20 14

## Page 120

-----------------I N D E X-------------------

WITNESS                EXAMINATION BY     PAGE
JOHN B. COLLINS, ESQ.  MR. BREWINGTON      5

---------------DOCUMENT REQUEST---------------

PAGE 86    Provide Waiver Of Immunity forms

-------------------EXHIBITS-------------------

PLAINTIFFS' COLLINS                    FOR I.D.
    1      Letter dated July 10, 2008      33
    2      Letter dated July 15, 2008      36
    3      Letter dated October 14, 2008   46
    4      Letter dated October 17, 2008   54
    5      Letter dated November 3, 2008   57
    6      Letter dated October 17, 2008   62
    7      Autopsy Report                  74
    8      Photocopy of photo              80
    9      Photocopy of four photos        83
   10      Death Report                    95
   11      Letter dated October 14, 2008  104
   12      Grand Jury Subpoena            104
           (Counsel retained exhibits.)

41:2, 72:6, 73:3
feet [3] - 81:17, 81:19, 85:6
fella [1] - 21:15
fellow [1] - 107:24
felt [1] - 106:4
file [16] - 33:14, 33:15, 33:16, 45:19, 61:14, 62:11, 71:5, 76:21, 76:23, 95:24, 98:23, 110:2, 111:9, 111:17, 111:18
filing [1] - 4:5
filled [3] - 87:14, 87:16, 93:10
Final [1] - 74:25
Finally [1] - 68:17
findings [7] - 23:25, 37:22, 66:10, 66:15, 78:19, 79:20, 114:9
fine [1] - 66:18
finish [1] - 65:16
Fire [2] - 48:6, 101:16
first [24] - 5:3, 14:5, 20:9, 20:10, 20:11, 22:14, 25:3, 26:5, 26:10, 27:4, 34:13, 34:16, 36:21, 59:16, 78:17, 78:21, 78:24, 92:14, 92:21, 92:24, 96:17, 101:7, 102:2, 102:3
five [1] - 7:24
flashlight [7] - 53:16, 81:16, 81:19, 83:5, 84:24, 85:4, 113:13
flashlights [7] - 52:22, 82:14, 82:15, 82:22, 82:25, 83:3, 113:14
Florence [1] - 2:24
FLORENCE [2] - 121:7, 121:25
follow [3] - 12:20, 44:16, 53:7
follow-up [1] - 53:7
followed [2] - 37:25, 61:19
following [7] - 23:18, 25:18, 44:16, 57:24, 58:11, 77:17, 102:4
follows [1] - 5:5
FOR [1] - 120:10
Force [4] - 93:10, 93:19, 93:20, 94:12
force [1] - 4:17
Fordham [1] - 8:10
forensic [6] - 54:16, 59:8, 59:11, 65:6, 66:2, 66:7
form [10] - 4:10, 31:12, 41:10, 52:10, 93:12, 93:13, 93:19, 98:15, 98:17, 114:22
Forms [1] - 87:2
forms [6] - 87:13, 87:24, 88:12, 93:10, 120:7
forth [1] - 121:12
forward [7] - 18:25, 23:5, 37:9, 42:7, 42:8, 42:14, 43:11
forwarding [1] - 35:3
four [6] - 18:13, 57:22, 83:10, 83:15, 109:14, 120:19
frame [1] - 43:14
frankly [1] - 49:2
Fred [1] - 5:17
Frederick [1] - 38:10
FREDERICK [2] - 3:3, 3:7
Friedrich [1] - 100:8
front [10] - 53:23, 53:24, 73:24, 75:3, 77:13, 87:20, 87:21, 96:4, 100:15, 113:2
full [2] - 23:14, 75:20
FURTHER [2] - 4:8, 4:13

G

general [2] - 23:4, 79:12
gentleman [2] - 101:11, 101:17
gentlemen [1] - 12:12
given [7] - 12:20, 45:7, 102:2, 102:7, 107:13, 119:13, 121:14
Gonzalez [1] - 93:6
GONZALEZ [4] - 1:3, 2:3
government [3] - 27:2, 28:17, 115:14
graduate [1] - 8:8
graduated [2] - 8:7, 8:15
Grand [96] - 12:24, 14:9, 18:18, 19:24, 20:3, 20:18, 21:2, 21:14, 21:21, 22:4, 24:17, 43:6, 44:22, 49:6, 49:11, 50:25, 51:4, 51:9, 52:3, 52:21, 53:3, 53:8, 53:11, 54:18, 54:20, 55:6, 55:14, 55:15, 55:21, 56:8, 57:24, 58:11, 59:15, 60:23, 62:17, 63:25, 66:23, 69:4, 69:25, 74:20, 74:23, 75:4, 75:13, 75:22, 76:8, 76:11, 76:18, 76:18, 77:2, 77:6, 80:3, 81:25, 82:2, 82:7, 82:9, 82:16, 83:24, 86:8, 86:18, 87:10, 87:15, 87:18, 88:2, 88:4, 88:10, 88:15, 89:3, 89:19, 94:12, 94:16, 94:22, 96:5, 97:21, 97:25, 98:13, 98:23, 99:19, 101:21, 102:17, 104:7, 104:25, 106:5, 106:20, 107:15, 107:19, 108:6, 110:5, 110:12, 110:24, 111:22, 113:11, 113:17, 114:10, 114:20, 115:5, 120:22
grounds [1] - 114:23
guess [4] - 11:5, 37:10, 103:10, 108:3

H

hair [1] - 21:16
half [2] - 115:18, 117:5
hand [6] - 21:20, 36:18, 84:13, 85:9, 95:8, 104:17, 121:21
handing [1] - 57:11
Handing [8] - 33:6, 36:12, 47:2, 54:5, 74:7, 80:22, 95:13, 104:9
handing) [1] - 83:21
hands [5] - 24:15, 81:17, 81:19, 85:5, 113:13
happy [3] - 6:10, 6:15, 7:2
Hauppauge [2] - 2:21, 3:14
head [1] - 78:6
Health [2] - 35:19, 48:5
hear [2] - 6:12, 40:11
heard [2] - 42:4, 93:13
held [1] - 7:22
help [3] - 13:4, 41:16, 45:3
helpful [3] - 23:3, 24:25, 32:19
helps [1] - 103:2
Hempstead [1] - 3:6
hereby [2] - 119:7, 121:9
HEREBY [1] - 4:2
herein [1] - 4:4
hereinbefore [1] - 121:11
hereunto [1] - 121:21
herself [2] - 75:8, 76:3
hierarchy [1] - 9:23
highest [1] - 8:6
highlights [1] - 84:3
highway [2] - 13:14, 50:8
Highway [2] - 2:20, 3:12
hired [6] - 59:8, 59:11, 63:22, 65:6, 66:2, 66:7
hiring [1] - 10:13
Hispanic [7] - 90:15, 91:10, 92:12, 97:8, 103:8, 103:12, 116:23
hit [2] - 52:23, 53:16
homicide [9] - 24:2, 24:6, 24:9, 24:15, 28:9, 43:3, 75:12, 79:7, 79:16
Homicide [16] - 9:15, 12:8, 23:12, 23:16, 24:12, 24:13, 24:18, 24:20, 25:6, 25:13, 44:10, 44:12, 44:16, 78:16, 102:7
Homicide's [1] - 46:5
Hospital [1] - 105:10
hospital [11] - 50:6, 105:16, 106:24, 107:2, 107:4, 109:3, 109:8, 109:15, 110:6, 110:14
Hotel [1] - 9:4
hours [1] - 23:13
housed [1] - 112:10
hum [3] - 54:25, 83:22, 105:2
hundred [2] - 11:6, 11:8
hyper [1] - 35:22

I

I.D [1] - 120:10
identification [25] - 32:22, 33:5, 36:8, 36:11, 46:19, 46:25, 53:25, 54:4, 57:6, 57:10, 62:9, 73:22, 74:6, 80:17, 80:21, 83:9, 83:16, 83:18, 95:6, 95:12, 104:5, 104:6, 108:19, 112:25, 113:22
identified [7] - 38:13, 43:3, 43:4, 88:16, 96:5, 97:4, 113:4
identify [5] - 36:7, 46:18, 53:18, 57:4, 82:25
imagine [2] - 25:25, 51:7
immediately [2] - 70:12, 102:7
immunity [4] - 87:2, 87:24, 88:12, 120:7
Immunity [1] - 87:25
impact [1] - 81:23
impacts [3] - 77:19, 77:25, 79:23
imply [1] - 58:4
IN [1] - 121:20
inaccurate [1] - 64:2
INC [1] - 1:23
incident [3] - 26:8, 43:14, 102:4
incidents [2] - 44:13, 117:7
include [6] - 9:15, 59:7, 59:11, 65:5, 65:25, 66:6
included [2] - 45:20, 99:8
including [2] - 31:20, 103:18
inconsistencies [1] - 90:3
inconsistent [3] - 84:23, 90:6, 114:15
indeed [2] - 28:19, 59:12
independent [2] - 64:5, 67:25
indicate [4] - 66:5, 67:11, 84:12, 102:19
indicated [7] - 18:9, 27:7, 30:7, 66:16, 73:16, 88:9, 101:23
indicates [3] - 63:14, 96:9, 102:22
indicating [6] - 41:3, 63:2, 64:22, 72:3, 88:3, 92:25
indicating) [1] - 80:15
indication [1] - 27:11
individual [22] - 1:8, 1:9, 1:10, 1:11, 1:11, 1:12, 1:14, 1:15, 1:17, 2:8, 2:9, 2:10, 2:11,

2:11, 2:12, 2:14, 2:15, 2:17, 21:11, 48:7, 97:5, 113:7
individually [2] - 1:4, 2:4
individuals [5] - 20:13, 20:21, 21:10, 100:15, 100:19
information [23] - 6:5, 6:8, 18:23, 19:19, 28:20, 29:22, 39:12, 47:23, 53:2, 53:8, 55:3, 55:16, 60:2, 60:5, 68:8, 68:21, 68:24, 102:5, 102:11, 103:17, 106:5, 116:18
informed [2] - 86:5, 88:9
initial [4] - 14:11, 18:22, 23:11, 62:6
initiated [1] - 72:8
injuries [20] - 78:6, 78:9, 79:22, 81:12, 81:15, 81:19, 81:23, 82:13, 84:4, 84:5, 84:8, 84:17, 84:22, 85:11, 85:13, 85:15, 112:23, 113:3, 113:21, 113:25
injury [3] - 113:8, 113:16, 113:19
input [1] - 10:12
inquire [1] - 38:25
inquired [1] - 77:23
inquiries [1] - 8:23
inquiry [3] - 6:22, 15:24, 39:5, 46:12, 109:16
insofar [1] - 108:4
instance [1] - 75:25
instructions [1] - 40:21
instrumentalities [4] - 81:15, 81:22, 82:13, 85:8
instrumentality [5] - 81:12, 84:16, 85:3, 85:12, 85:17
intended [1] - 56:4
intent [1] - 55:15
interacted [1] - 91:6
interaction [6] - 12:12, 13:23, 79:14, 79:17, 91:8, 116:22
interest [1] - 19:4
interested [1] - 121:18
interim [1] - 40:10
interior [1] - 111:21
internal [5] - 43:25, 44:4, 44:9, 44:14, 44:20
interrupt [1] - 11:2
intervention [2] - 71:23, 71:25
interview [10] - 55:4, 68:25, 99:24, 101:13, 101:23, 102:13, 108:22, 108:25, 109:11, 117:9
interviewed [6] - 17:10, 100:6, 100:25, 101:3, 101:5, 101:6, 101:10, 102:8
interviewing [1] - 13:9
interviews [8] - 15:4, 61:25, 62:6, 99:21, 100:10, 100:13
introduced [3] - 75:7, 98:9, 111:21
investigate [4] - 40:24, 41:25, 71:18, 71:20
investigating [1] - 101:14
investigation [55] - 12:15, 12:19, 12:24, 14:6, 22:4, 25:9, 25:15, 26:8, 26:20, 26:22, 27:13, 27:17, 27:22, 28:2, 28:7, 28:23, 29:12, 29:15, 29:16, 29:19, 34:18, 34:24, 35:4, 35:13, 36:24, 37:6, 37:21, 39:2, 39:7, 39:15, 39:18, 39:19, 41:4, 42:6, 43:8, 43:19, 43:24, 44:5, 44:13, 44:16, 44:17, 44:20, 45:13, 47:16, 49:19, 50:22, 51:24, 72:12, 72:13, 73:4, 73:5, 73:14, 86:8, 86:25, 88:11, 93:8, 95:22, 98:4, 98:5, 100:24, 112:4, 114:7, 116:19, 118:21, 117:6
investigator [2] - 99:6, 99:8
investigators [13] - 11:14, 11:17, 11:22, 12:2, 42:18, 42:22, 44:10, 44:24, 90:18, 97:2, 97:17, 102:8, 111:5
involved [17] - 10:9, 11:23, 15:7, 15:18, 16:15, 20:5, 26:19, 28:21, 35:12, 35:17, 41:19, 45:15, 45:21, 79:17, 83:4, 91:12, 116:19
involvement [6] - 24:11, 26:25, 28:5, 28:10, 28:19, 36:17
IS [3] - 4:2, 4:6, 4:13
issuance [5] - 32:16, 40:2, 60:16, 105:20, 105:23
issue [6] - 71:17, 94:2, 94:5, 102:25, 106:15
issued [10] - 57:23, 66:12, 73:17, 74:15, 84:24, 93:21, 105:5, 105:8, 105:25, 107:8
issues [1] - 75:23
IT [1] - 4:2, 4:8, 4:13
items [1] - 76:19
itself [3] - 76:10, 77:8, 110:4

J

JAMES [2] - 1:9, 2:9
JANE [2] - 1:15, 2:15
Janet [3] - 23:20, 25:17, 25:19
January [1] - 74:3
JENNIFER [2] - 1:3, 2:3
job [2] - 9:12, 66:18
Johanna [2] - 27:5, 38:21
JOHN [11] - 1:9, 1:14, 1:15, 2:9, 2:14, 2:15, 2:23, 119:7, 119:17, 120:4, 121:10
John [2] - 5:9, 20:9
Judge [4] - 20:11, 69:10, 69:11, 89:14
JUDGE [2] - 1:10, 2:10
July [19] - 14:14, 22:20, 29:14, 30:11, 31:24, 32:23, 33:4, 34:15, 34:19, 36:6, 36:10, 37:10, 38:11, 39:3, 39:14, 80:8, 96:21, 120:11, 120:12
June [3] - 24:2, 24:22, 37:10, 40:3, 96:20
Jury [98] - 12:24, 14:9, 18:18, 19:24, 20:3, 20:17, 21:2, 21:14, 21:21, 22:4, 24:17, 43:6, 44:22, 49:6, 49:11, 50:25, 51:4, 51:9, 52:3, 52:21, 53:3, 53:8, 53:12, 54:18, 54:20, 55:6, 55:14, 55:15, 55:21, 56:8, 57:24, 58:11, 59:15, 60:23, 62:17, 63:25, 66:23, 69:4, 69:25, 74:20, 74:23, 75:4, 75:13, 75:22, 76:8, 76:11, 76:16, 76:18, 77:2, 77:6, 80:3, 81:25, 82:2, 82:7, 82:9, 82:16, 83:24, 86:6, 86:16, 87:11, 87:15, 87:18, 88:2, 88:4, 88:10, 88:15, 89:4, 89:20, 94:13, 94:17, 94:22, 96:5, 97:21, 97:25, 98:13, 98:23, 99:19, 101:21, 102:18, 104:7, 104:25, 106:6, 106:20, 107:15, 107:19, 108:6, 110:5, 110:12, 110:24, 111:22, 113:11, 113:17, 114:10, 114:20, 115:5, 120:22

K

keep [4] - 78:14, 78:25, 86:11, 117:14
Kenneth [3] - 11:25, 26:16, 35:14
Kenny [9] - 5:23, 12:13, 35:14, 37:9, 53:16, 74:17, 114:7, 115:20, 117:25
KENNY [2] - 1:4, 2:4
kept [3] - 71:22, 76:19, 86:13
killing [1] - 117:8
kind [3] - 14:20, 37:25, 104:18
knowing [2] - 43:19, 55:2, 65:19
knowledge [2] - 5:4, 26:13
known [1] - 37:22
Koerber [1] - 101:6

L

label [1] - 53:23
lack [1] - 43:5
laid [1] - 14:25
last [3] - 68:15, 103:3
late [2] - 23:12, 37:10
Laude [1] - 8:16
LAW [1] - 3:3
law [7] - 6:7, 8:8, 8:9, 8:17, 85:23, 88:7, 108:23
Law [2] - 8:10, 75:19
lawsuit [1] - 59:3
lawyers [3] - 10:19, 11:8, 88:8
Lazo [45] - 5:23, 11:25, 12:13, 12:14, 18:20, 20:7, 26:16, 35:14, 38:20, 50:5, 50:21, 51:12, 51:17, 51:23, 52:23, 53:16, 58:19, 74:17, 78:4, 81:3, 81:10, 89:18, 90:15, 90:22, 90:25, 91:7, 91:18, 96:13, 96:18, 97:4, 102:20, 103:8, 103:12, 108:23, 113:5, 113:12, 113:16, 113:25, 114:8, 116:21, 117:12, 117:25
LAZO [2] - 1:4, 2:4
Lazo's [10] - 15:4, 24:2, 37:9, 79:13, 91:13, 91:21, 92:8, 92:9, 111:14, 111:23
Lazo.. [1] - 38:17
lead [7] - 12:7, 15:3, 24:7, 29:9, 34:15, 69:25, 109:5
leading [2] - 22:4, 85:12
learn [4] - 15:23, 45:22, 45:23, 109:17
learned [2] - 79:2, 112:4
learning [1] - 92:15
least [2] - 64:11, 89:7
leave [1] - 80:14
left [4] - 7:5, 79:15, 84:13, 85:9
left-hand [2] - 84:13, 85:9
leg [1] - 90:12
Lesley [3] - 102:16, 103:13, 112:10
Leslie [1] - 101:9
less [2] - 43:9, 57:7
letter [73] - 28:13, 32:23, 33:13, 34:7, 34:8, 34:15, 34:17, 35:3, 35:6, 36:15, 38:12, 39:12, 40:7, 40:13, 40:14, 41:8, 41:11, 46:18, 46:21, 48:11, 49:10, 49:17, 49:18, 50:11, 50:17,

50:20, 57:5, 57:6, 57:15, 57:17, 58:4, 58:19, 58:24, 60:23, 61:4, 61:6, 61:15, 61:18, 61:21, 62:10, 62:13, 62:14, 62:20, 62:21, 63:7, 63:11, 63:13, 63:14, 64:9, 64:22, 65:10, 65:23, 66:4, 67:13, 67:18, 68:4, 68:7, 69:19, 69:23, 70:17, 70:23, 70:25, 75:16, 75:23, 76:13, 115:11, 115:19, 115:23, 116:2, 116:4
Letter [14] - 33:4, 36:10, 46:24, 54:3, 57:9, 62:7, 104:4, 120:11, 120:12, 120:13, 120:14, 120:15, 120:16, 120:21
letters [4] - 23:2, 34:11, 34:15, 61:7
level [3] - 8:6, 10:4, 47:15
Levy [1] - 115:13
license [2] - 103:18, 103:20
lieu [1] - 76:12
line [3] - 36:22, 36:8, 57:20
lines [1] - 57:22
link [1] - 100:2
LINK [2] - 1:12, 2:12
Link [2] - 100:21, 112:6
listed [5] - 75:2, 77:13, 93:2, 100:4, 100:5
listening [1] - 39:24
listing [1] - 76:14
literally [2] - 21:13, 21:20
litigation [1] - 6:7
took [14] - 28:18, 36:5, 46:17, 61:8, 61:9, 61:13, 71:4, 83:8, 83:17, 86:22, 87:5, 92:18, 92:19, 103:24
looking [8] - 19:8, 39:4, 70:3, 71:8, 91:17, 112:7
looks [2] - 81:4, 104:19
lower [1] - 85:9
Lucero [1] - 117:8

M

Magna [1] - 8:15
mail [1] - 70:18
Main [1] - 1:23
Major [1] - 9:15
MALAFI [1] - 3:10
male [3] - 90:15, 103:9, 103:12
man [2] - 91:10, 102:23
manner [1] - 79:6
mark [11] - 32:21, 32:25, 62:5, 73:8, 73:21, 80:11, 80:16, 83:8, 83:12, 95:5, 103:25
marked [22] - 33:4, 36:10, 46:24, 54:3, 57:9, 62:8, 62:21, 74:2, 74:5, 75:14, 76:10, 76:15, 76:16, 77:8, 80:18, 80:21, 83:15, 95:11, 96:4, 104:4, 104:7, 112:24
marriage [1] - 121:17
materials [1] - 109:21
matter [8] - 5:21, 19:24, 31:21, 36:24, 40:11, 71:19, 71:20, 121:19
McAlvin [1] - 100:25
ME [2] - 95:8, 95:11
mean [4] - 37:13, 43:15, 49:15, 111:20
meaning [4] - 15:8, 16:12, 30:21, 56:4
means [3] - 32:10, 32:13, 94:4
meant [1] - 97:12
medical [4] - 50:2, 66:17, 108:5, 112:18
Medical [35] - 15:6, 23:25, 24:6, 24:8, 24:14, 28:3, 28:8, 31:24, 32:15, 35:8, 35:16, 35:19, 40:2, 48:2, 66:10, 67:12, 73:18, 74:15, 75:8, 75:16, 75:22, 76:2, 77:20, 78:2, 78:10, 78:19, 84:8, 84:11, 96:20, 105:10, 107:6, 107:8, 107:13, 107:14, 107:18
meet [2] - 5:17, 47:25
meeting [12] - 14:4, 14:11, 14:15, 47:21, 48:11, 48:13, 49:5, 49:21, 54:13, 67:11, 67:20, 96:19
meetings [1] - 12:22
Melendez [5] - 101:12, 101:22, 101:24, 101:25, 102:9
Melendez's [1] - 102:11
members [9] - 1:16, 2:16, 38:21, 53:12, 100:22, 106:9, 116:12, 116:22, 117:4
Memorial [2] - 2:20, 3:12
memorialized [1] - 41:13
memory [1] - 23:4
mentioned [2] - 99:25, 101:8
merely [1] - 25:5
Merrifield [3] - 23:11, 23:15, 25:3
met [13] - 12:16, 13:25, 14:16, 14:22, 16:6, 21:13, 21:20, 40:5, 48:2, 48:4, 48:7, 50:11, 66:9
middle [1] - 47:9
might [6] - 16:13, 39:25, 47:22, 55:3, 58:2, 71:11
Milewski [5] - 66:21, 67:3, 67:7, 81:9, 81:10
mind [3] - 32:13, 32:14, 92:4
mine [1] - 71:14
minor [2] - 113:16, 113:19
minute [1] - 90:12
minutes [1] - 21:14
miss [2] - 48:24, 117:19
Miss [3] - 23:22, 24:4, 48:22
missed [1] - 87:5
missing [1] - 49:19
misunderstood [1] - 51:21
Monday [2] - 23:18, 25:18
monitoring [3] - 27:8, 28:22, 30:8
month [1] - 115:18
months [1] - 115:19
morning [3] - 5:14, 5:15, 23:13
Morrow [2] - 101:2, 101:3
most [4] - 19:6, 28:15, 52:19, 104:23
mother's [1] - 93:5
move [4] - 42:7, 42:8, 43:10, 73:9
moving [1] - 42:13
MR [56] - 5:7, 17:19, 21:24, 22:10, 26:4, 31:12, 32:25, 36:7, 39:20, 39:21, 42:15, 46:20, 47:14, 51:10, 51:13, 51:14, 51:16, 52:8, 53:18, 55:24, 56:2, 56:3, 56:5, 57:4, 58:8, 60:25, 61:3, 61:5, 61:12, 61:23, 61:25, 62:5, 62:22, 70:6, 71:7, 71:11, 71:15, 72:22, 73:8, 73:21, 80:11, 83:7, 86:21, 86:25, 87:3, 88:20, 90:11, 90:23, 95:5, 103:25, 105:22, 107:11, 110:22, 111:10, 114:22, 118:3
multi [1] - 73:23
multi-page [1] - 73:23
multiple [3] - 34:11, 77:16, 95:7
multiple-page [1] - 95:7
mutual [1] - 13:19

N

name [11] - 5:8, 5:16, 20:9, 20:10, 20:11, 21:17, 23:14, 61:8, 93:5, 101:20, 107:25
narrative [6] - 19:7, 53:5, 53:6, 85:21, 85:23, 89:9
NASSAU [1] - 121:5
natural [2] - 24:10, 28:4
necessarily [2] - 28:24, 31:10
necessary [3] - 68:25, 107:9, 108:12
need [7] - 6:25, 7:4, 30:11, 44:20, 63:3, 65:21, 67:22
needed [3] - 34:23, 72:14, 72:16
needing [1] - 99:14
needs [2] - 7:3, 64:6
never [3] - 72:5, 73:3, 97:11
NEW [4] - 1:2, 2:2, 119:4, 121:3
New [11] - 1:24, 2:21, 2:25, 3:6, 3:14, 5:4, 5:13, 5:23, 114:6, 119:23, 121:8
newspaper [2] - 96:24, 115:25, 116:13
Newton [1] - 20:8
NEWTON [2] - 1:9, 2:9
next [2] - 38:8, 53:19
night [5] - 13:11, 15:2, 19:10, 19:14, 68:19
nine [2] - 96:3, 99:2
non [3] - 16:5, 16:11, 16:20
non-target [2] - 16:5, 16:11
none [3] - 70:21, 85:25, 118:2
nonetheless [1] - 68:23
normal [10] - 33:25, 37:24, 38:4, 52:8, 52:14, 75:11, 75:13, 75:15, 76:9, 77:3
Notary [4] - 2:24, 5:3, 119:23, 121:7
noted [1] - 118:7
notes [3] - 17:21, 100:11, 117:14
nothing [1] - 116:14
Notice [1] - 2:24
notification [1] - 25:6
notified [1] - 42:3
notify [1] - 70:11
November [3] - 57:7, 57:9, 120:15
number [20] - 10:15, 10:18, 10:22, 33:7, 38:14, 47:3, 53:14, 54:6, 54:15, 57:12, 57:14, 60:25, 61:20, 63:8, 69:23, 70:16, 74:8, 95:8, 114:19

O

oath [2] - 4:17, 119:9
object [4] - 31:12, 52:9, 55:24, 114:22
objections [1] - 4:9
obligation [1] - 63:23
obliterates [1] - 6:14
observations [1] - 113:24
obtained [1] - 58:25
obviously [1] - 39:11
occasion [2] - 17:23, 80:10
occasions [1] - 79:25

occur [2] - 46:14, 80:7
occurred [1] - 25:8
October [37] - 1:20, 2:22, 46:21, 46:24, 47:9, 47:17, 49:10, 49:16, 49:18, 50:13, 53:20, 54:3, 60:24, 61:19, 62:8, 62:11, 62:16, 63:10, 65:10, 65:23, 66:4, 67:14, 68:4, 68:7, 69:20, 70:12, 70:17, 70:23, 71:16, 80:9, 104:4, 119:10, 120:13, 120:14, 120:16, 120:21, 121:22
OF [13] - 1:2, 1:7, 1:13, 2:2, 2:7, 2:13, 3:3, 119:4, 119:5, 121:3, 121:5
offer [8] - 59:5, 59:8, 59:11, 65:3, 65:4, 65:24, 66:5, 106:21
offer.. [1] - 59:4
offered [2] - 66:21, 84:15
office [40] - 9:21, 9:23, 10:6, 10:7, 10:14, 10:20, 14:17, 17:11, 18:7, 23:7, 28:13, 28:23, 30:9, 33:19, 33:21, 36:25, 37:12, 38:22, 38:25, 40:10, 42:17, 48:15, 57:24, 59:7, 60:7, 60:8, 60:11, 60:13, 60:24, 63:15, 64:5, 65:3, 65:5, 65:25, 66:6, 66:9, 72:3, 90:17, 116:8, 116:12
OFFICE [2] - 1:13, 2:13
Office [40] - 1:16, 1:17, 2:16, 2:17, 5:12, 7:21, 8:3, 8:22, 9:9, 12:4, 20:19, 23:17, 25:11, 25:21, 26:7, 26:21, 27:16, 28:20, 29:11, 34:18, 35:5, 35:17, 37:4, 38:5, 39:22, 41:24, 42:17, 42:23, 58:17, 71:16, 73:12, 73:13, 73:18, 74:16, 97:3, 98:21, 116:10, 117:5, 117:21, 117:24
office's [1] - 37:18
officer [6] - 4:16, 26:18, 87:9, 89:8, 99:22, 112:11
OFFICER [10] - 1:9, 1:9, 1:10, 1:11, 1:12, 2:8, 2:9, 2:10, 2:11, 2:12
Officer [7] - 17:2, 20:11, 89:10, 89:14, 100:21, 112:6
officer's [1] - 114:19
officers [55] - 15:7, 15:12, 15:18, 16:5, 16:15, 16:17, 16:20, 17:9, 19:20, 20:3, 20:4, 20:5, 20:17, 21:3, 21:11, 45:8, 45:15, 45:23, 46:9, 49:25, 51:5, 52:21, 53:15, 79:15, 82:24, 83:4, 85:19, 85:25, 86:4, 88:3, 88:14, 88:16, 89:2, 89:22, 91:6, 93:9, 93:21, 94:16, 99:23, 99:24, 100:4, 100:20, 101:45, 103:15, 108:2, 111:2, 111:7, 112:18, 112:22, 113:3, 113:7, 113:24, 115:5, 115:7
officers' [3] - 114:11, 114:19, 115:3
OFFICES [1] - 3:3
offices [1] - 29:22
official [23] - 1:8, 1:9, 1:10, 1:11, 1:12, 1:12, 1:14, 1:15, 1:17, 2:8, 2:9, 2:10, 2:11, 2:12, 2:12, 2:14, 2:15, 2:17, 36:25, 37:5, 37:11, 37:18, 116:15
on-site [1] - 69:11
once [2] - 18:10, 43:3
one [44] - 10:2, 11:6, 14:2, 16:14, 17:23, 21:13, 21:15, 21:23, 26:24, 28:14, 30:7, 35:25, 44:23, 45:24, 56:14, 64:18, 69:20, 70:4, 71:12, 80:9, 82:19, 82:22, 82:23, 82:24, 83:2, 83:3, 84:2, 84:13, 87:9, 89:7, 93:14, 94:24, 95:3, 96:23, 97:17, 99:25, 100:2, 100:17, 101:9, 104:19, 112:14, 114:15, 114:18, 117:12
ones [2] - 56:22, 100:5
ongoing [1] - 50:16
oOo [1] - 4:21
operations [1] - 9:18
Operations [1] - 105:10
opinion [4] - 61:13, 84:15, 102:10, 106:21
opportunity [5] - 20:18, 55:7, 55:8, 61:13, 68:21
opposed [1] - 24:9
option [1] - 20:22
order [1] - 42:10
ordered [2] - 42:6, 42:8
ordering [1] - 43:10
ordinarily [1] - 46:9
ordinary [2] - 37:19, 95:2
originally [3] - 23:6, 23:9, 25:2
originals [1] - 85:13
origins [1] - 59:25
otherwise [1] - 10:7
outcome [1] - 121:18
outlined [1] - 29:4
outside [1] - 109:13
oversaw [1] - 56:6
oversee [1] - 25:19
oversight [6] - 9:15, 10:8, 11:12, 11:16, 11:20, 11:25
own [5] - 26:7, 27:17, 27:22, 29:12, 46:10

P

p.m [1] - 118:7
P.O [1] - 3:13
PA [1] - 108:3
page [16] - 46:21, 53:21, 54:24, 73:23, 77:13, 78:15, 80:17, 92:21, 92:24, 95:7, 100:4, 100:20, 101:3, 101:4, 101:7, 101:9, 101:12, 103:3
PAGE [2] - 120:3, 120:7
pages [4] - 96:3, 99:2, 99:3
paperwork [1] - 45:18
paragraph [7] - 36:21, 38:15, 38:19, 63:8, 63:10, 68:16, 103:4
Park [1] - 9:5
part [17] - 12:13, 35:13, 45:13, 45:19, 50:21, 51:23, 63:9, 76:16, 76:21, 98:19, 98:22, 98:23, 100:23, 105:24, 111:16, 111:17, 114:13
participated [1] - 13:20
particular [16] - 7:23, 15:8, 27:9, 30:22, 40:13, 40:19, 43:2, 78:5, 81:16, 82:23, 91:19, 97:24, 99:13, 115:17, 115:24
particularly [3] - 40:13, 91:17, 114:14
parties [2] - 4:4, 121:16
party [1] - 29:20
passed [1] - 112:9
past [1] - 115:18
Patchogue [1] - 117:7
PATRICIA [2] - 1:3, 2:3
Patrick [1] - 12:7
pending [2] - 5:22, 7:9
Peninsula [1] - 3:6
people [1] - 51:8
per [1] - 18:12
percent [2] - 65:8, 65:10
performed [1] - 76:2
perhaps [9] - 11:22, 32:18, 34:20, 41:9, 58:13, 69:10, 83:25, 110:18, 116:12
period [1] - 26:19
permitting [3] - 46:4, 46:6, 46:7
person [6] - 17:24, 18:5, 41:24, 44:25, 58:18, 76:3
personal [1] - 43:12
personnel [6] - 16:11, 50:4, 69:11, 107:3, 107:5, 108:23
persons [6] - 10:16, 11:13, 68:18, 68:25, 107:20, 107:22
pertains [1] - 104:15
Perusing [13] - 33:7, 36:13, 47:3, 54:6, 57:12, 68:11, 74:8, 80:24, 83:22, 92:20, 95:15, 103:5, 104:10
Phone [4] - 21:22, 65:20, 68:22, 69:13
phone [7] - 25:25, 27:3, 41:12, 41:18, 41:19, 41:23, 71:3
photo [2] - 80:21, 120:18
Photocopy [3] - 83:15, 120:18, 120:19
photograph [7] - 80:18, 81:2, 81:4, 84:16, 113:4, 113:9, 113:21
photographs [20] - 13:7, 31:20, 47:20, 50:20, 50:24, 51:3, 51:7, 51:12, 51:22, 52:8, 52:17, 78:9, 78:13, 80:4, 83:11, 83:20, 85:12, 96:13, 96:18, 111:14
photos [5] - 51:15, 83:15, 83:23, 111:20, 120:19
physical [5] - 20:6, 77:18, 89:17, 91:7, 112:7
picture [1] - 81:13
pile [1] - 36:2
pin [1] - 32:16
Pincus [1] - 48:18
pinpoint [1] - 82:12
place [10] - 14:16, 22:5, 36:4, 44:21, 48:12, 48:15, 49:12, 54:13, 63:23, 112:25
places [2] - 13:18, 13:21
Plaintiff's [1] - 62:7
Plaintiffs [3] - 1:5, 2:5, 3:4
Plaintiffs' [13] - 32:21, 33:3, 36:9, 46:23, 54:2, 57:8, 62:6, 74:4, 80:20, 83:14, 95:10, 104:3, 104:6
PLAINTIFFS' [1] - 120:10
played [2] - 110:11, 110:17
playing [1] - 110:18
plus [1] - 46:16
point [18] - 12:14, 12:16, 15:5, 25:14, 25:16, 29:13, 32:6, 32:17, 40:6, 44:19, 47:18, 48:3, 49:7, 66:24, 72:9, 86:23, 110:20, 112:13
pointed [1] - 96:7
POLICE [14] - 1:7, 1:8, 1:8, 1:9, 1:10, 1:11, 1:12, 2:7, 2:8, 2:8, 2:9, 2:10, 2:11, 2:12
police [25] - 15:16, 16:11, 16:15, 16:17, 26:18, 26:20, 36:23, 37:20, 43:19, 49:25,

**129**

51:24, 52:7, 52:21, 63:11, 72:5, 70:7, 79:16, 99:22, 101:15, 103:15, 108:2, 110:5, 110:8, 111:7, 111:18

Police [2] - 12:4, 12:8, 17:11, 22:11, 24:12, 24:19, 25:13, 25:21, 25:23, 34:21, 35:8, 37:5, 38:6, 38:22, 43:16, 43:18, 44:11, 44:15, 44:24, 94:21, 97:8, 100:23, 108:10, 109:9, 115:21, 116:9, 116:11, 116:21

policy [1] - 12:7

Portals [2] - 12:7, 12:23, 14:4, 14:23, 16:3, 43:8, 45:2, 45:8, 95:21, 97:20, 97:22, 97:25

Portelo [1] - 97:10

portion [3] - 48:14, 73:9, 116:4

portions [2] - 88:22

position [7] - 7:23, 67:21, 67:22, 70:11, 70:14, 70:20, 105:14

positions [1] - 69:16

positive [2] - 62:18, 57:8, 53:14, 104:14

possession [1] - 74:19

possibility [1] - 29:14

possible [3] - 71:10, 42:8

potential [2] - 16:17, 24:3, 53:4, 107:22

practice [4] - 45:5, 75:13, 78:9, 77:4

Pre [1] - 106:10

Pre-Hospital [1] - 106:10

Precinct [3] - 65:18

precinct [4] - 13:15, 59:3, 60:5, 81:9, 111:25, 112:3, 112:6

precipitated [1] - 117:7

preclusive [1] - 28:22

predecessor [1] - 26:12

preliminary [1] - 143

prepare [1] - 94:24

prepared [1] - 94:20

preparing [2] - 44:21, 55:22, 65:9

presence [4] - 87:10, 97:1, 113:2, 114:22

present [5] - 6:10, 19:23, 44:22, 50:2, 75:16, 98:13, 108:15, 108:16, 112:24

presentation [2] - 21:2, 22:5, 49:7, 49:11, 50:13, 50:25, 51:4, 52:14, 53:21, 56:7, 57:25, 58:11, 92:23, 92:17, 76:10, 73:12, 75:8, 77:8, 79:20, 94:20, 96:17, 97:13, 98:20, 108:12, 110:24

presented [3] - 20:2, 20:22, 24:17, 63:25, 64:7, 74:23, 78:3, 76:21, 83:24, 110:6, 110:6, 113:3

presenting [4] - 55:23, 58:9

Press [2] - 57:18, 57:21, 58:25

press [3] - 57:23, 58:10, 58:18, 58:17, 60:6, 62:10, 60:14, 60:17, 60:19, 84:20

prevent [2] - 27:15, 27:18

prevented [4] - 59:14

previous [3] - 34:9, 67:5

previously [3] - 62:21, 66:12, 74:2, 80:18, 88:23

privacy [1] - 68:2

privately [3] - 59:8, 59:11, 65:6, 66:7

problem [3] - 31:16, 51:22, 69:18

Procedure [1] - 75:19

proceeding [2] - 75:23, 102:12

process [3] - 18:24, 26:15, 33:25, 34:2, 47:19, 112:16

procurement [1] - 96:6

produced [2] - 33:20

prolonged [1] - 71:7

prompted [1] - 34:8

prosecuting [1] - 53:15

Prosecutor [2] - 7:18, 9:20

protocol [2] - 44:12, 44:18

Provide [1] - 120:7

provide [4] - 19:17, 55:15, 64:7, 89:7, 115:6, 116:4, 116:12, 116:13, 116:24, 117:2

provided [2] - 11:22, 70:24, 70:25, 86:16, 86:24, 108:20, 114:12, 116:4, 117:2

providing [2] - 18:22, 34:21, 66:11

province [1] - 25:12

Public [4] - 2:24, 6:3, 119:23, 121:8

publicly [1] - 28:13

Puerto [1] - 102:23

pull [1] - 62:24

purpose [1] - 28:21

purposes [1] - 114:24

pursuant [3] - 2:24, 12:23, 75:18, 75:23

pursue [1] - 42:5

put [2] - 35:22, 53:8, 64:23, 64:24

putting [1] - 58:10

**Q**

Quesada [2] - 102:18

questioned [1] - 114:14

questioning [1] - 18:22

questions [3] - 5:21, 5:4, 19:2, 19:6, 53:7, 53:10, 77:16, 77:15, 81:18, 87:1, 88:21, 89:23, 99:2, 99:7, 99:13, 113:10, 113:23, 113:24

quickly [2] - 61:10, 69:14

quite [3] - 37:13

quote [3] - 18:5, 58:17, 59:17, 87:8, 98:5, 108:15, 108:14

quoting [1] - 59:20

**R**

rate [3] - 91:2, 91:13, 91:19, 91:21, 92:3, 93:2, 96:9, 97:5

radio [3] - 15:12, 15:16, 39:24, 43:13, 43:15, 43:16, 99:8, 110:10

raised [1] - 90:21

**130**

release [3] - 57:23, 58:10, 59:17, 60:8, 60:11, 60:15, 60:18, 60:19, 64:20

released [1] - 60:11

relevant [3] - 6:5, 6:7, 47:23, 64:18, 55:15, 59:9, 66:15, 69:2, 69:24, 102:11, 109:5

remember [4] - 39:23, 40:4, 46:16, 52:2, 62:16, 55:3, 53:6, 56:23, 99:4, 94:10, 94:19, 94:25, 98:24, 99:10, 101:20, 103:15, 107:25, 108:24

rendered [1] - 50:2

repeat [1] - 5:18

rephrase [1] - 67:10, 17:17, 23:24, 51:19

rephrased [3] - 6:16

reported [1] - 31:25, 32:16, 42:3, 48:11, 66:13, 73:17, 73:14, 75:18, 75:20, 76:7, 76:10, 78:18, 82:17, 92:22, 93:17, 93:20, 94:22, 95:24, 96:2, 96:12, 96:14, 98:25, 99:4, 99:8, 99:14, 99:15, 99:12, 114:9

Report [4] - 74:5, 74:14, 95:9, 95:11, 120:17, 120:20

reported [1] - 45:15

reporter [5] - 6:17

REPORTING [1] - 1:23

reporting [1] - 114:5

reports [3] - 43:17, 45:20, 48:5, 92:6, 93:22, 93:24, 94:2, 94:5, 94:11, 94:12

representing [1] - 61:23

representing [3] - 1:15, 2:15, 21:10

REQUEST [1] - 120:6

requested [1] - 7:8, 44:8, 45:10, 47:21, 54:19, 68:9, 68:12, 69:3, 82:6, 89:25, 71:24, 72:3, 73:5, 73:13

requested [2] - 45:11, 25:12, 70:19

requesting [1] - 71:23, 72:18

requests [2] - 45:12

required [1] - 55:23, 58:10, 59:17, 60:8

requirement [1] - 55:18

requirements [2] - 38:3, 114:9

requiring [1] - 383, 114:9

Rescue [2] - 48:8, 101:18

reserved [1] - 4:11

respective [1] - 4:4

respond [3] - 6:21, 6:22, 71:9

responded [2] - 112:19

responding [1] - 122

responds [1] - 53:13, 70:24, 91:23, 105:17, 108:5, 109:19

responsibilities [2] - 8:13, 9:14, 11:18

responsibility [1] - 10:5, 11:12, 11:18

responsible [1] - 112:11

restate [1] - 6:17

result [4] - 23:24, 24:3, 27:22, 27:24, 74:9, 77:10, 109:18, 116:13

SCIMONE [2] - 1:10, 2:10

sealing [1] - 4:8

seated [1] - 7:5, 112:14

second [4] - 21:23, 35:2, 36:21, 38:15, 38:19, 57:19, 63:8, 63:9, 63:16, 66:15, 78:15

secondhand [1] - 75:18

Secretary [1] - 76:18

see [3] - 23:4, 57:20, 57:21, 61:24, 68:9, 87:6, 87:25, 95:3, 96:9, 98:18, 111:13, 113:2

seeking [1] - 53:22, 113:25

seek [3] - 45:2, 37:4

seen [3] - 34:23, 103:10, 113:19

sent [3] - 34:5, 33:9, 40:14, 70:18, 88:3

sentence [3] - 35:2, 38:22, 57:19, 58:23, 63:9, 68:16

**131**

TALT [2] - 1:11, 2:11

Talk [3] - 16:12, 17:2, 17:8, 17:20, 18:18, 99:25, 102:2, 112:16

tapes [3] - 39:24, 43:13, 43:15, 43:16, 98:8

target [3] - 16:5, 16:11, 16:20, 17:10, 20:3, 20:4, 53:4, 54:6, 68:16, 82:21, 86:9, 90:24, 103:14, 112:22

targeted [2] - 16:17, 17:8, 81:8

targets [2] - 43:5, 43:20, 51:25, 59:7, 58:6, 68:10, 58:18

technical [2] - 35:22, 107:21, 107:23, 118:20

technically [3] - 11:10, 35:11, 35:18, 74:15, 94:21, 100:22, 107:2, 115:13, 116:7, 117:8, 88:25, 90:14

stead [2] - 78:23

still [3] - 67:16, 69:8, 69:19, 70:22, 72:15, 74:18, 77:11, 70:12, 79:23, 82:14, 82:18, 82:21, 94:3, 95:3, 90:14, 91:7, 91:13, 92:5, 92:9, 93:7, 96:21, 101:25, 107:8, 108:12, 111:14, 115:17, 116:4, 116:16, 117:16, 117:20

regarding [3] - 18:20, 43:14, 60:15, 72:4, 99:3

regards [1] - 82:23

regulations [1] - 38:3, 38:7

related [3] - 37:23, 91:2, 91:16, 116:8, 121:16

relationship [1] - 72:23, 112:24

relatively [1] - 21:15

Release [1] - 57:21, 58:25

**132**

upper [3] - 54:13, 95:7

upside [1] - 92:21

usage [3] - 101:19

usual [3] - 28:7, 28:19, 45:5

utilized [2] - 50:25, 78:9, 79:19, 81:5, 84:12, 94:16, 98:12

utilizing [1] - 89:22

**V**

vaguely [2] - 15:16, 55:12

various [3] - 47:21, 78:4, 102:15

venture [3] - 1:15

verbally [3] - 6:21, 6:23, 42:10, 42:12

Veterans [2] - 2:20, 3:12

video [1] - 17:4

Violence [1] - 9:16

virtue [2] - 103:6, 110:5

volunteered [2] - 52:25, 113:11

**W**

waiting [2] - 26:19, 30:16

waive [1] - 4:7

Waiver [2] - 67:2, 57:23, 58:11, 120:17

waives [1] - 57:25

waiver [2] - 118:13, week [2] - 26:2, 26:5, 34:13, 50:15, 102:3

weeks [3] - 42:9

whatsoever [1] - 91:12

wherein [2] - 39:5

WHEREOF [1] - 121:20

While [2] - 92:23, 93:2, 96:9, 97:5, 97:8, whole [2] - 58:22

wife [2] - 115:5, 116:8

William [2] - 2:12

WILLIAM [2] - 1:10, 2:10

winds [2] - 14:20

withdrawn [4] - 17:19, 22:10, 22:18, 26:4, 42:15, 47:14, 50:9, 53:8, 70:6, 88:20, 92:23, 93:23, 105:22

zeal [1] - 63:17

133

C E R T I F I C A T E

STATE OF NEW YORK   )

                    ) ss.:

COUNTY OF NASSAU    )

I, FLORENCE SYSKROT, a Notary Public within and for the State of New York, do hereby certify:

That JOHN B. COLLINS, ESQ., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of October, 2011.

*Florence Syskrot*
-----------------------------
FLORENCE SYSKROT

---

*** ERRATA SHEET ***
REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702
516-938-4000

NAME OF CASE: GONZALEZ -V- COUNTY OF SUFFOLK
DATE OF DEPOSITION: OCTOBER 12, 2011
NAME OF WITNESS: JOHN B. COLLINS, ESQ.

| FROM | TO | REASON |
|------|----|----|
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |
| ___|___| | _____| | _____ |

*all references to Mr Spota should be "Spota"*

*J. Nickel*
-------------------------
JOHN B. COLLINS, ESQ.

Subscribed and sworn before me this 25th day of November, 2011.

*Roseanne Giese*
(Notary Public)        My Comm. Expires:

ROSEANNE GIESE
Notary Public, State of New York
No. 01GI4419808, Suffolk County
Term Expires February 28, 2014

# EXHIBIT B

**3**

```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
     ----------------------------------------x
 4   PATRICIA GONZALEZ and JENNIFER GONZALEZ,
     individually and as co-administrators of the
 5   Estate of KENNY LAZO,
                    Plaintiffs,
 6         - against -
     COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT,
 7   POLICE COMMISSIONER RICHARD DORMER, in his
     individual and official capacity, POLICE OFFICER
 8   JOHN NEWTON, in his individual and official
     capacity, POLICE OFFICER JAMES SCIMONE, in his
 9   individual and official capacity, POLICE OFFICER
     WILLIAM JUDGE, in his individual and official
10   capacity, POLICE OFFICER CHRISTOPHER TALT, in his
     individual and official capacity, POLICE OFFICER
11   LINK, in his individual and official capacity,
     COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY,
12   SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in
     his individual and official capacity, ASST.
13   DISTRICT ATTORNEY JOHN B. COLLINS, in his
     individual and official capacity, and "JOHN AND
14   JANE DOES 1-10" representing as yet unknown and
     unidentified members of the Office of the Suffolk
15   County District Attorney (all in their individual
     and official capacities as employees of the Office
16   of Suffolk County District Attorney),
                    Defendants.
17   Index No.:  CV 09-1023(TCP)(ETB)
     ----------------------------------------x
18
                         210 Centre Drive
19                       Riverhead, New York
20                       June 3, 2014
                         1:29 p.m.
21
           Deposition of the Defendant JOHN B.
22   COLLINS, ESQ., pursuant to Order, before Erika
     Gunther, RPR, a Notary Public of the State of
23   New York.
24        REALTIME REPORTING, INC.
          124 East Main Street, Suite 202
25           Babylon, New York 11702
               516-938-4000
           www.realtimereporting.com
```

---

**1**

```
 1                                              1
 2   A P P E A R A N C E S:  (Continued)
 3   O'BRIEN & O'BRIEN, LLP
 4   Attorneys for Defendants Suffolk County
 5   District Attorney Thomas Spota and Asst.
 6   District Attorney John B. Collins
 7        168 Smithtown Boulevard
 8        Nesconset, New York 11767
 9   BY:   STEPHEN L. O'BRIEN, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**2**

```
 1
 2   A P P E A R A N C E S:
 3   LAW OFFICES OF FREDERICK K. BREWINGTON
 4   Attorneys for Plaintiff
 5        556 Peninsula Boulevard
 6        Hempstead, New York 11550
 7   BY:   GREGORY CALLISTE, JR., ESQ.
 8
 9   SUFFOLK COUNTY ATTORNEY
10   Attorneys for Defendants County of Suffolk,
11   Suffolk Police Department, Police
12   Commissioner Richard Dormer, Police Officer
13   John Newton, Police Officer James Scimone,
14   Police Officer William Judge, Police Officer
15   Christopher Talt, Police Officer Link, and
16   County of Suffolk Office of District Attorney
17        100 Veterans Memorial Highway
18        Hauppauge, New York 11788
19   BY:   BRIAN C. MITCHELL, ESQ.
20
~
23
24
25
```

---

**4**

```
 1
 2            IT IS HEREBY STIPULATED AND
 3   AGREED by and between the attorneys
 4   for the respective parties herein,
 5   that the filing, sealing and
 6   certification of the within deposition
 7   be waived.
 8            IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except
10   as to the form of the question,
11   shall be reserved to the time of the
12   trial.
13            IT IS FURTHER STIPULATED AND
14   AGREED that the within deposition
15   may be sworn to and signed before
16   any officer authorized to administer an
17   oath with the same force and effect as
18   if signed and sworn to before the
19   Court.
20
21            - oOo -
22
23
24
25
```

**5**

1
2         (Collins Exhibit A, Portion of
3     grand jury minutes, premarked for
4     identification.)
5         (Collins Exhibit B, Autopsy
6     report, premarked for identification.)
7   J O H N   B.   C O L L I N S ,   E S Q .,
8     called as a witness, having been duly
9     sworn by a Notary Public, was examined
10    and testified as follows:
11  EXAMINATION BY
12  MR. CALLISTE:
13        Q.     Please state your full name for
14  the record.
15        A.     John B. Collins, Esq.
16        Q.     What is your address?
17        A.     **210 Centre Drive, Riverhead, New**
18  **York 11901.**
19        Q.     Good afternoon, your Honor.
20        A.     **Good afternoon.**
21        Q.     My name is Gregory Calliste, Jr.
22  I'm an associate at the Law Offices of
23  Frederick K. Brewington.
24        A.     **Nice to meet you.**
25        Q.     Nice to meet you as well.

**6**

1                    Collins
2         We represent the plaintiff and
3   the family of Ms. Gonzales, Mr. Lazo,
4   representing the estate of Mr. Lazo in this
5   lawsuit filed against the County of Suffolk.
6         As I understand, you've already
7   sat in for a deposition one time with
8   Mr. Brewington in this matter.
9         A.     **About three years ago.**
10        Q.     That's right.
11        At first I was referring to this
12  as a continued deposition, but as per our
13  agreement with your counsel this is a new
14  deposition regarding some items that have been
15  released by the Federal Court, that being the
16  grand jury minutes, and this deposition is
17  pertaining to that item and any closely
18  related items or matters.
19        We are conducting a deposition
20  today just to ask a few follow-up questions,
21  if you will, regarding your involvement in the
22  grand jury presentment with respect to
23  Mr. Lazo, and I do understand that you have
24  taken a deposition before.
25        A.     **That's correct.  I think I**

**7**

1                    Collins
2   **understand why we're here.**
3         Q.     Right.
4         A.     **We're here because I was ordered**
5   **to be here.**
6         Q.     Absolutely.
7         A.     **Here I am.**
8         Q.     Welcome.
9         A.     **Thank you.**
10        Q.     Just a few ground rules.  As you
11  know, the court reporter can't record gestures
12  such as shrugging the shoulders or head nods.
13  We ask that you keep all your responses
14  verbal.
15        You can take a break at any time.
16  We just ask that if there is any questions
17  pending that you answer the question first to
18  the best of your ability before speaking to
19  counsel, as well as taking breaks for any
20  reason.
21        A.     **Fine.**
22        Q.     Sir, have you reviewed any
23  documents in preparation for this deposition
24  today?
25        A.     **Only Judge Brown's or Magistrate**

**8**

1                    Collins
2   **Brown's electronic decision.**
3         Q.     Okay.
4         That was the decision wherein the
5   grand jury minutes were released; would that
6   be accurate?
7         A.     **I believe so.**
8         MR. O'BRIEN:  I object.  A
9   portion of the grand jury minutes were
10  released.
11        Q.     Wherein a portion of the grand
12  jury minutes were release, right?
13        A.     **What I recall from Judge Brown's**
14  **order was that I was ordered to sit for**
15  **another 90 minutes and have questions asked by**
16  **your firm with restrictions that were placed**
17  **on the record of which I'm unaware.**
18        Q.     Okay, very well.
19        In preparation for your
20  deposition today, did you review the grand
21  jury minutes that are at issue in this
22  deposition?
23        A.     **No, sir.**
24        Q.     At any time after the grand jury
25  minutes were -- or a portion of the grand jury

**9**

Collins

2 minutes were released by the judge or by the
3 court, did you review any portion or portions
4 of that -- of those grand jury minutes?
5 A.    No, sir.
6 Q.    During your last deposition with
7 Mr. Brewington you were asked several
8 questions regarding the presentment to the
9 grand jury with respect to the investigation
10 into the death of Kenny Lazo. Did you refresh
11 your recollection as to any of those questions
12 that were previously asked by Mr. Brewington?
13 A.    No, sir. I haven't seen my
14 deposition minutes since I settled them.
15 Q.    Okay.
16       You did read that deposition at
17 some point then, correct?
18 A.    On the date of settlement,
19 whatever date that was.
20 Q.    All right.
21       Sir, at any time following that
22 deposition up to this date, did you review any
23 items that were placed before the grand jury,
24 any exhibits or any testimony, any notes,
25 anything in that regard?

**10**

Collins

2 A.    No, sir.
3 Q.    Did you speak to anyone in
4 preparation for your deposition, other than
5 your counsel?
6 A.    No, sir. Other than saying hello
7 to Mr. Mitchell this morning or this
8 afternoon.
9 Q.    Okay.
10      During your last deposition you
11 indicated that the DA's office and/or you
12 would have maintained some sort of file
13 related to your presentment to the grand jury
14 in this case. Do you recall saying --
15 A.    The DA's office would have a
16 file.
17 Q.    At that time Mr. Brewington made
18 a request for those items and for the -- a
19 copy of the file that was maintained by the
20 district attorney's office. Are you aware as
21 to --
22 A.    Not of me.
23 Q.    Well, the request was made of
24 your counsel at that time through you.
25 A.    My counsel at that time was the

**11**

Collins

2 county attorney.
3 Q.    Right. My question is: Was
4 there any discussions with the county attorney
5 regarding the procurement of that file and/or
6 releasing of that file to us?
7       MR. MITCHELL: I object to that,
8       other than him answering yes, he may
9       have discussed that. Beyond that, it's
10      privileged.
11 A.    I don't recall discussing it. I
12 thought they already had the file.
13 Q.    Okay.
14      Have you seen any of those items
15 or that file at all following your deposition
16 with Mr. Brewington that day?
17 A.    No, sir.
18 Q.    Based upon your testimony thus
19 far, would it be accurate to say that your
20 recollection of the events is the same as --
21 right now as they were at the time or maybe
22 even you have less recollection seeing as how
23 the time has past than you did you were
24 deposed by Mr. Brewington?
25 A.    Hopefully it's as good, but I

**12**

Collins

2 don't really know.
3 Q.    Okay.
4       At any time following your
5 deposition with Mr. Brewington previously, did
6 you look into at all the questions that you
7 have asked or posed to the medical examiner
8 during the investigation into the death of
9 Kenny Lazo?
10 A.    No.
11 Q.    I'm going to place --
12 A.    If I may, I want to correct
13 something, if I might.
14 Q.    Certainly.
15 A.    There was a point where Mr. Spota
16 and I had to engage in correspondence to
17 request counsel, so there were those
18 discussions and a letter to the county
19 attorney requesting counsel once Mr. Dunne had
20 left the office. Other than that, my answer
21 stands.
22 Q.    Very well.
23      I'm going to show you what's been
24 previously marked as Collins A.
25      MR. CALLISTE: I'm sorry I only

**13**

Collins

1    have one copy at this point.
2         **MR. MITCHELL:** That's okay.
3         **Q.**    It's a copy of the grand jury
4    minutes that were -- or a portion of the grand
5    jury minutes that were released by the court.
6         Sir, do you have that document
7    before you?
8         **A.**    **I have what is marked as Collins**
9    **A before me.**
10        **Q.**    During your presentment of
11   this --
12        **MR. CALLISTE:** Withdrawn.
13        **Q.**    During your questioning to the
14   medical examiner during your presentment of
15   this matter to the grand jury, do you recall
16   asking the medical examiner questions with
17   respect to the injuries that were sustained by
18   Mr. Lazo?
19        **A.**    **Yes, sir.**
20        **Q.**    With regard to those questions,
21   do you recall asking the medical examiner
22   particularly about specific bruises that were
23   found on Mr. Lazo's person, on his body?
24        **A.**    **I do recall asking the medical**

**14**

Collins

1    **examiner about injuries on Mr. Lazo's body,**
2    **including bruises.**
3         **Q.**    Okay.
4         During your questioning of the
5    medical examiner, in those questions you
6    asked, you elicited testimony from the medical
7    examiner regarding the fact the injuries seen
8    on Mr. Lazo were not life threatening. Do you
9    recall that inquiry?
10        **A.**    **Specifically, no.**
11        **Q.**    If you will --
12        **A.**    **Sure.**
13        **Q.**    -- with respect to the Collins A,
14   turn to page 11.
15        **A.**    **I left my glasses inside. Can I**
16   **go get them. I'm sorry.**
17        **Q.**    Certainly.
18        (Discussion off the record.)
19        **Q.**    If you would take a moment, I
20   guess page 11 beginning at line 18, if you
21   could just review that.
22        **A.**    **I see that question.**
23        **Q.**    Okay.
24        Just for the record, this

**15**

Collins

1    question at page 11 line 18 of the deposition
2    states: "Question: Did you find any injuries
3    in your autopsy of Mr. Lazo that were
4    life-threatening injuries?"
5         **A.**    **That's what it says.**
6         **Q.**    Right.
7         "Answer: No, there were no
8    injuries to any of the life sustaining organs,
9    the brain, the heart, no areas of major
10   internal hemorrhaging."
11        Do you see that there?
12        **A.**    **I see it.**
13        **Q.**    At that time you went on to
14   discuss photographs that were previously
15   marked. Do you see that there?
16        **A.**    **I see that at the very end of**
17   **page 11.**
18        **Q.**    Sir, do you recall at all ever
19   asking the medical examiner whether any of the
20   injuries that Mr. Lazo sustained could have
21   contributed to his death, whether life
22   threatening or not?
23        **A.**    **I don't recall if I asked that**
24   **specific question.**

**16**

Collins

1         **Q.**    Is that a question that you would
2    have asked or do you believe that's a question
3    that you would have asked pursuant to a
4    presentation wherein an individual has expired
5    as a result of actions taken by the subjects
6    of that investigation?
7         **MR. MITCHELL:** I object.
8         **A.**    **I --**
9         **MR. O'BRIEN:** Objection.
10        **Q.**    Sir?
11        **THE WITNESS:** Do I answer now?
12   DI   **MR. O'BRIEN:** We're not going to
13   have him answer. I'm objecting to form.
14        **Q.**    Sir, do you understand my
15   question?
16        **A.**    **I think I do.**
17        **Q.**    Can you answer my question,
18   please.
19        **MR. O'BRIEN:** I object to form.
20        **A.**    **I'm not going to answer it if my**
21   **lawyer tells me not to.**
22        **MR. CALLISTE:** Under Federal
23   Rules, as you know -- hopefully you
24   know, that's not a proper objection. If

17

Collins

1 the witness understands the question,
2 you can only direct him to not answer
3 questions that are based on privilege.
4     MR. O'BRIEN: You can answer,
5 then.
6     A.    Can you ask it again, please,
7 just so I'm sure now. I apologize.
8     Q.    Certainly.
9     MR. CALLISTE: Can we have it
10 read back.
11    THE WITNESS: That would be fine.
12    (Record read.)
13    A.    There are no normal questions in
14 any death investigation that I'm aware of.
15 Each case is peculiar to its own facts.
16 Sometimes I might have. Sometimes I wouldn't
17 have.
18    Q.    In this situation here where
19 Mr. Lazo died after his interaction with the
20 police or shortly thereafter and that being
21 the subject of this investigation, do you
22 believe that whether the injuries that were
23 sustained by Mr. Lazo, which were not life
24 threatening, do you believe that it would have
25

18

Collins

1 been important to ask the medical examiner or
2 to explore the issue as to whether the
3 injuries sustained by Mr. Lazo were life
4 threatening?
5     MR. MITCHELL: I object to form.
6     MR. O'BRIEN: Do you understand
7 that question?
8     THE WITNESS: That question is a
9 little confusing.
10    Q.    Let me ask again.
11    A.    Sure.
12    Q.    Is it your understanding that
13 Mr. Lazo died in the police precinct that
14 evening, on the evening of the incident?
15    A.    My understanding is he died at
16 the hospital. He may have been without vital
17 signs and the like at the precinct, but I
18 don't think he was declared dead until the
19 hospital.
20    Q.    Certainly, but is it your
21 understanding that Mr. Lazo died as a result
22 of and/or immediately following his
23 interactions with the officers here?
24    A.    It's my -- it's my understanding

19

Collins

1 that Mr. Lazo died at some point after his
2 interaction with the officers. I would not
3 describe it as immediate.
4     Q.    Right.
5     Based on the report of the
6 medical examiner, is -- what do you recall
7 regarding what the cause of death was?
8     MR. MITCHELL: I object to the
9 form.
10    MR. O'BRIEN: You can answer,
11 though, if you know.
12    A.    I don't recall the specific cause
13 of death. I know the medical examiner was
14 brought to the grand jury to testify to it.
15    Q.    Right.
16    Do you recall whether Mr. Lazo
17 did, in fact, have injuries that were visible
18 to his body?
19    A.    Absolutely.
20    Q.    Do you think that it, at that
21 point, was relevant to discuss with the
22 medical examiner during this presentment
23 whether those injuries could have contributed
24 to his death?
25

20

Collins

1     A.    I believe I discussed all of the
2 injuries that Mr. Lazo exhibited with the
3 medical examiner before the grand jury, and I
4 let the medical examiner tell the grand jury
5 the significance of those injuries.
6     Q.    My question is: Do you believe
7 that it was -- it would have been important to
8 ask the medical examiner the question as to
9 whether those injuries contribute ed to his
10 death?
11    MR. MITCHELL: I object to form.
12    MR. O'BRIEN: You can answer it
13 anyway.
14    A.    Do I believe?
15    Q.    Correct.
16    A.    I believe I did a thorough
17 examination of the medical examiner with
18 regard to Mr. Lazo's injuries and any effect
19 they may have had on his death before the
20 grand jury. That's what I believe.
21    Q.    Well, I'm not sure that your
22 answer is responsive to my question, which is:
23 Do you believe that it would have been
24 important to ask the medical examiner in this

GONZALES vs. COUNTY OF SUFFOLK                                                                JOHN B. COLLINS

21

Collins

2  situation whether any of those injuries that
3  were not life threatening could have
4  contributed to his death?
5       MR. MITCHELL:  I object to the
6    form.
7       MR. O'BRIEN:  I object to the
8    form.
9       Do you understand that question?
10  Q.   It's the same question?
11  A.      Yeah, I know.  I already answered
12  it.  You just told me it's the same question.
13  I gave you my answer.
14  Q.   Well, I don't believe that your
15  answer, respectfully, was responsive to my
16  question.
17  A.      I take your objection
18  respectfully.
19  Q.   Judge, I do understand that you
20  are a judge.
21  A.      Today I'm not --
22  Q.   In this situation --
23  A.      -- as far as I'm concerned, so
24  you don't have to worry about that.
25  Q.   I'm asking you if you could

22

Collins

2  please answer my question, please, the
3  question before you.
4       MR. O'BRIEN:  I object to the
5    form again.
6       Can you answer?
7  A.      I believe I did discuss with the
8  medical examiner the cause of death and any
9  contributory factors to the death in front of
10  the grand jury, and I let the medical examiner
11  explain the significance of those injuries to
12  the grand jury, because I have the wrong
13  letters after my name.
14  Q.   The wrong letters after your
15  name, I'm --
16  A.      I'm not an expert.  I'm not a
17  medical expert.
18  Q.   Very well.
19  A.      I let the medical examiner
20  explain the cause of death to the grand jury
21  and any injuries that were apparent or
22  significant.
23  Q.   Do you specifically recall asking
24  the medical examiner with respect to any
25  injuries that were significant?

23

Collins

2  A.      I --
3  Q.   Do you have a specific memory of
4  that?
5  A.      Sure.
6  Q.   Could you show me where you asked
7  that question to the grand jury?
8  A.      I believe I used photographs and
9  asked the medical examiner to describe the
10  injury and then describe its possible effect,
11  if any, on Mr. Lazo's demise.
12  Q.   With respect to those photographs
13  that you just indicated you showed the medical
14  examiner --
15  A.      The grand jury minutes says I
16  did.
17  Q.   Yes, do you recall how many
18  photographs you showed to the grand jury?
19  A.   No.
20  Q.   Do you recall how many
21  photographs were contained in your file with
22  respect to the injuries sustained by Mr. Lazo?
23  A.      The specific number?  No.
24  Q.   Yeah.
25  A.      Many.

24

Collins

2  Q.   Do you know how many photographs
3  were included with the autopsy report, if any?
4  A.      I'm not sure I understand that
5  one.
6  Q.   Were there any photographs relied
7  upon by the medical examiner in making her
8  determination as to the --
9  A.      She has an entire --
10       (Reporter clarification.)
11  Q.   -- as to Mr. Lazo's autopsy?
12  A.      I know the medical examiner has a
13  large number of photos both external and
14  internal with regard to her investigation of
15  Mr. Lazo's death.  I had access to those
16  photographs for purposes of the grand jury
17  presentation.  How many there were, I don't
18  know.  How many I used, I don't recall.
19  Q.   Well, you indicated that you do
20  recall presenting them or some photos to the
21  grand jury, correct?
22  A.      Absolutely.
23  Q.   Do you know if you presented them
24  all?
25  A.      I doubt it.

25

Collins

2     **Q.**    Who made the determination as to
3 what pictures you would present to the grand
4 jury and what pictures you would exclude?
5     **A.**    **Myself and the medical examiner**
6 **in conjunction, and then, had the grand jury**
7 **requested any more or further photographs,**
8 **they would have been provided, if they**
9 **existed.**
10     **Q.**    Well, was the grand jury advised,
11 to your recollection, as to whether there were
12 more photographs for them to review if they
13 wanted to?
14     **A.**    **I doubt it.**
15     **Q.**    Directing your attention --
16     **A.**    **I doubt it by me. I don't know**
17 **if the medical examiner did or not.**
18     **Q.**    Directing your attention to
19 page 12 of the minutes --
20     **A.**    **Yes, sir.**
21     **Q.**    -- if you could just take a
22 moment to review that page and I will ask you
23 a question.
24     **A.**    **I did.**
25     **Q.**    Okay.

26

Collins

2     Here you indicate that -- well,
3 on this page you ask the medical examiner
4 whether she is familiar with Photographs 39
5 through 55. Do you see that there?
6     **A.**    **I do, line 6.**
7     **Q.**    Right.
8     With respect to --
9     MR. CALLISTE: Withdrawn.
10     **Q.**    Do you know if there were
11 Pictures 1 through 39?
12     **A.**    **I don't remember what the first**
13 **38 exhibits were.**
14     **Q.**    My question to you is: Do you
15 know if those first 38 exhibits --
16     MR. CALLISTE: Withdrawn.
17     **Q.**    Here on this transcript you
18 indicate that there were Photographs 39
19 through 55. Do you see that there?
20     **A.**    **I still see it.**
21     **Q.**    Were the first 38 items exhibits
22 or were they photographs? Do you know?
23     MR. O'BRIEN: I'm going to
24 object. It's outside the scope of what
25 the judge ordered. You're supposed --

27

Collins

2     MR. CALLISTE: I'm asking
3 about --
4     MR. O'BRIEN: You're supposed to
5 be asking about the medical examiner's
6 testimony --
7     MR. CALLISTE: I'm asking --
8     MR. O'BRIEN: -- not the prior
9 exhibits.
10     MR. CALLISTE: I'm asking about
11 the medical examiner's testimony as seen
12 right here in this transcript, right off
13 the transcript that was released by the
14 court.
15     MR. O'BRIEN: The transcript
16 refers to Photographs 39 through 55.
17 You're asking about 1 through 38.
18     MR. CALLISTE: Right. I'm asking
19 the witness if he recalls what
20 Photographs 1 through 38 were.
21     MR. O'BRIEN: They have nothing
22 to do with the ME's testimony.
23     MR. CALLISTE: How do you know
24 that if the witness didn't --
25     MR. O'BRIEN: You have the ME's

28

Collins

2 testimony in front of you.
3     MR. CALLISTE: How do you know
4 that if the witness didn't answer?
5     MR. O'BRIEN: You have the
6 testimony --
7     MR. CALLISTE: Counsel, you're
8 kind of taking up my time, so if you
9 will, I'm asking as to whether
10 Photographs 1 through 39 were autopsy
11 photos. I'm getting there, if you can
12 allow me to ask that question.
13     MR. O'BRIEN: I will allow this
14 question: Do you know if 1 through 38
15 were photographs?
16     Is that your question?
17     MR. CALLISTE: Were photographs
18 taken by the medical examiner during
19 this autopsy?
20     MR. O'BRIEN: If you know, John.
21     THE WITNESS: I do not recall. I
22 doubt it.
23 BY MR. CALLISTE:
24     **Q.**    Is there something that would
25 refresh your recollection as to what items 1

---

**29**

Collins

2  through 38 were?
3      A.      Sure, the exhibits or the list of
4  exhibits that was part of my file.
5  RQ      MR. CALLISTE:  Once again I call
6      for the production of those exhibits or
7      the file that was maintained by the
8      district attorney's office with respect
9      to the presentment of this case.
10              MR. O'BRIEN:  Once again I'm
11      going to refer you to Judge Brown's
12      order.  He saw the grand jury minutes.
13      He read the grand jury minutes and
14      released a portion of the grand jury
15      minutes, which is what you have before
16      you right now, and that's it.
17              MR. CALLISTE:  That's fine.  If
18      you could just take it under advisement
19      and hold the speaking objections, thank
20      you.  It's Federal Rules we're dealing
21      with here.
22      Q.      Sir --
23      A.      I'm listening.
24      Q.      -- do you know if there were more
25  than 55 photographs?

---

**30**

Collins

2      A.      I'm looking at page 33, because I
3  was flipping through, and it indicates that
4  there were 14 witnesses and 60-some-odd
5  exhibits, and some of those exhibits had
6  subdivisions, so there may have been as many
7  as a hundred pieces of evidence, according
8  page 33.  Do I specifically recall what 1
9  through 38 were?  No.
10      Q.      Based on your recollection, it
11  would be accurate to say that you did not
12  present all the photographs that were
13  contained in the autopsy report; would that be
14  accurate?
15      A.      In the medical examiner's file?
16      Q.      Yes.
17      A.      You said autopsy report.
18      Q.      In the medical examiner's file.
19      A.      That would be fair to say.
20      Q.      Just for clarity, the
21  determination as to what photos would be
22  presented was made by whom?
23      A.      It was a result of my meeting
24  with the medical examiner and her considered
25  expertise as to which photographs would best

---

**31**

Collins

2  help her explain Mr. Lazo's injuries and their
3  significance to the grand jury.
4      Q.      With regard to your presentation
5  of this matter to the grand jury, were you
6  working with anyone that was above you in the
7  chain of command?
8              MR. MITCHELL:  I object to the
9      form of the question.
10      Q.      Within in your office, a
11  supervisor?
12      A.      This was '09?
13              MR. O'BRIEN:  There's an
14      objection from the County.
15      Can you answer the question?
16              THE WITNESS:  Yeah, I think so.
17              MR. O'BRIEN:  Okay.  Go ahead.
18      A.      There were only two people
19  superior to me in the office, and that was
20  chief assistant -- that was the chief
21  assistant and the district attorney.
22      Q.      Who was the chief assistant?
23      A.      I'm trying to remember at the
24  time whether it was Emily Constant or John
25  Buonora.  I believe it was Emily Constant.

---

**32**

Collins

2      Q.      If it was Ms. Constant, do you
3  recall whether Ms. Constant had any
4  involvement at all with respect to your
5  presentment of this matter to the grand jury?
6      A.      I don't believe she had any.
7      Q.      Was anyone, in other words,
8  supervising you with respect to your
9  presentation of this matter to the grand jury?
10      A.      I answered directly to the
11  district attorney.
12      Q.      Is that Mr. Spota?
13      A.      That would be Mr. Spota.
14      Q.      Did Mr. Spota supervise you
15  directly or indirectly with regard to your
16  presentment of this matter to the grand jury?
17              MR. MITCHELL:  I object to form.
18      A.      Mr. Spota was my boss 24 hours a
19  day.
20      Q.      My question is specifically with
21  respect to this matter, not with respect to
22  his overall supervision of you.  Did he
23  supervise you with respect to this particular
24  presentment of this matter to the grand jury?
25      A.      I think that would be a question

---

33

Collins

1 better addressed to him, whether he thought he
2 was supervising me or not. I consulted with
3 him. He and I had conversations about many
4 things, and mostly the potential involvement
5 of the federal authorities. With regard to
6 the specific presentation, I don't recall
7 having discussions with Mr. Spota about that
8 other than the fact I was doing it.
9     Q.     Did Mr. Spota at all ever make
10 any inquiries to you about the evidence that
11 you were presenting to the grand jury?
12     A.     Not that I recall.
13     Q.     Prior to your presentment of this
14 matter to the grand jury, did you meet with
15 the medical examiner?
16     A.     Yes.
17     Q.     On how many occasions?
18     A.     At least once, perhaps twice.
19     Q.     During those meetings did you go
20 over the questions and answers that would be
21 posed to the grand jury?
22     A.     In general terms.
23     Q.     Did you also go over the
24 photographs and the exhibits?

34

Collins

1     A.     As I previously indicated, yes.
2     Q.     Did you go over the autopsy
3 report with the medical examiner --
4     A.     Yes.
5     Q.     -- prior to the grand jury?
6     A.     Yes.
7     Q.     You were familiar with the
8 questions and -- that you were asking and the
9 answers that she would be giving?
10     A.     Relatively. I don't get that
11 specific with a witness. We discuss areas of
12 inquiry. I don't do Q and A and practice it.
13 I don't do that.
14     Q.     Did you discuss with the medical
15 examiner the aspect of the case or aspect of
16 Mr. Lazo's injuries dealing with those nonlife
17 threatening wounds that Mr. Lazo had? Did you
18 discuss that with the medical examiner?
19     A.     I'm sorry, could you say that
20 again.
21     Q.     Certainly.
22     Did you have any discussions with
23 the medical examiner regarding the wounds that
24 were visible to Mr. Lazo's body prior to the

35

Collins

1 presentation to the grand jury?
2     A.     Yes, sir.
3     Q.     Did you seek any sort of answers
4 from the medical examiner during your
5 interviews with the medical examiner regarding
6 whether any of those injuries could have
7 contributed to Mr. Lazo's death?
8     A.     Did I ask her those things?
9     Q.     Yes.
10     A.     I don't specifically recall the
11 questions that I asked Dr. Milewski in
12 preparation for going to the grand jury. I do
13 believe that her report would have included in
14 it any contributory factors.
15     Q.     My question is: Did you ask the
16 medical examiner in any detail with respect to
17 whether any of those wounds could have
18 contributed to Mr. Lazo's death before the
19 grand jury presentment?
20     A.     I don't specifically remember.
21     Q.     Is that something that you would
22 have asked the medical examiner in a
23 presentment to the grand jury under these
24 circumstances where --

36

Collins

1     A.     If I didn't, it wouldn't be.
2     Q.     It wouldn't be what, sir?
3     A.     If I didn't ask her, it wouldn't
4 be something I would ask her, was your
5 question.
6     Q.     My question is: Did you ask her?
7     A.     You --
8     Q.     Is that something that you would
9 have asked in a case where the matters are
10 dealing with the death of a person during a
11 grand jury investigation?
12     A.     As I told you earlier, each case
13 is different, and the facts are peculiar, and
14 if I thought it was prudent and important to
15 the grand jury to ask her that, I would have
16 asked her that.
17     Q.     Do you have any specific
18 recollection of asking her that?
19     A.     About contributory causes of
20 death?
21     Q.     Whether those injuries that were
22 sustained by Mr. Lazo could have contributed
23 to his death, injuries that were --
24     A.     I'm not sure I appreciate the

---

**37**

Collins

1  distinction.  I discussed each and every
2  apparent injury with the medical examiner
3  before the grand jury.
4      Q.    Did the district attorney's
5  office conduct their own investigation into
6  this matter before it was presented to the
7  grand jury?
8      A.    I would say no.
9      Q.    Did the district attorney's
10 office ever come to any conclusions as to
11 whether they believed that Mr. Lazo's death
12 was caused by these officers?
13     MR. MITCHELL:  I object to the
14  form.
15     A.    I believe the district attorney's
16 understanding is predicated on the
17 investigation conducted by the police
18 department and the medical examiner --
19     Q.    Right, so --
20     A.    -- and as far as things that may
21 have contributed to the -- Mr. Lazo's death,
22 that would be the medical examiner's
23 bailiwick.
24     Q.    My question to you is:  Did the

---

**38**

Collins

1  district attorney's office ever come to any
2  sort of conclusion as to what they believed
3  was the cause of Mr. Lazo's death, whether
4  relying on the medical examiner's reports or
5  the testimony of the officers or anything
6  else?
7      A.    I believe, with regard to the
8  cause of Mr. Lazo's death, the district
9  attorney's office would be reliant on the
10 medical examiner's opinion.
11     Q.    Right.
12     So my question is:  Did the
13 district attorney's office ever come to any
14 conclusions of their own?
15     MR. O'BRIEN:  I object.  You've
16  asked and answered that.
17     MR. CALLISTE:  The question
18  wasn't answered.
19     MR. O'BRIEN:  You can answer it,
20  John.
21     A.    I thought I did, but the district
22 attorney's conclusion as to the cause of
23 Mr. Lazo's death would be reliant upon the
24 medical examiner's opinion, which I think you

---

**39**

Collins

1  have sworn under oath both in the grand jury
2  and sworn to under jurat in the autopsy
3  report.
4      As far as the district attorney
5  himself's conclusion, you would have to ask
6  him.
7      Q.    I asked if the district
8  attorney's office, with respect to this matter
9  that you were presenting to the grand jury,
10 ever came to its own conclusion based on any
11 investigation or any determination that it
12 looked at or reviewed regarding the -- what
13 caused Mr. Lazo's death?
14     MR. MITCHELL:  I object to the
15  form.
16     MR. O'BRIEN:  I object also.
17     A.    The district attorney presented
18 this matter for -- to a grand jury for the
19 grand jury to decide whether or not the
20 officers had any criminal culpability in
21 Mr. Lazo's death.  The grand jury made their
22 decision.
23     Q.    My question is not about the
24 grand jury's decision.  My question is with

---

**40**

Collins

1  respect to --
2      A.    I don't speak for the DA's
3  office.
4      Q.    At the time you were --
5      A.    You want my personal opinion?
6      Q.    No, no.
7      A.    Okay.
8      Q.    At the time you were -- you were
9  the lead on this matter, correct?
10     A.    I was the lead prosecutor, yes.
11     Q.    Right.
12     Has the district attorney's
13 office ever made any determinations as to
14 whether they believed -- whether they believe
15 the subject of a grand jury presentment is
16 guilty or innocent before?
17     MR. O'BRIEN:  I object to that.
18     THE WITNESS:  Am I answering
19  that?
20     MR. O'BRIEN:  You can answer if
21  you can answer.
22     A.    I don't think I can answer it.
23 I'm not quite sure I understood it.
24     Q.    In this situation did the

---

41

Collins

1  district attorney's office, based on your
2  interaction, your employment with them, your
3  resentment of this matter to the grand jury,
4  ever come to its own conclusion as to whether
5  they believed the officers were culpable?
6
7     A.     **Criminally?**
8     Q.     Yes.
9     A.     **The grand jury decided that.**
10 RL  Q.   That's great.
11         My question is with respect to
12 the district attorney's office.  Did the
13 district attorney's office ever come to any
14 conclusions of its own.
15         MR. MITCHELL:  I object to the
16     form.
17         MR. O'BRIEN:  I object again, but
18     we've objected four or five times.
19    A.     **The district attorney is required**
20 **by law to abide by the grand jury's decision.**
21 **That's what we did, as far as I know.**
22         MR. CALLISTE:  Okay.  I don't
23     believe that this witness is answering
24     this question, so can we mark this for a
25     ruling just to allow everyone to know

42

Collins

1  that I will reserve the right to
2  recall -- to ask for more time on this
3  deposition.
4         MR. O'BRIEN:  You know we'll
5     object to that.
6         MR. CALLISTE:  I wouldn't expect
7     any less.
8     Q.     Sir, let me ask this way:  Did
9  the district attorney's office, based on your
10 interactions with them and your employment
11 with them, ever determine whether Mr. Lazo's
12 death was a homicide?
13         MR. MITCHELL:  I object to the
14     form.
15    A.     **The medical examiner determined**
16 **that.**
17    Q.     Did the medical examiner
18 determine that Mr. Lazo's death was a
19 homicide, to your knowledge?
20    A.     **In the medical sense, yes.**
21    Q.     Okay.
22         Sir, was this autopsy report ever
23 admitted as an exhibit in the grand jury?
24    A.     **I don't specifically remember.  I**

43

Collins

1     **don't specifically remember.**
2     Q.     If you can take a look --
3     A.     **But it would have --**
4     Q.     -- at the transcript, maybe that
5  will refresh your recollection as to whether
6  the actual autopsy report was admitted as an
7  exhibit --
8     A.     **I can tell you --**
9     Q.     -- into evidence?
10    A.     **-- that my gut is it wasn't**
11 **because I produced the medical examiner**
12 **herself.  However, I don't have all of the**
13 **minutes before me, so I don't know, but it**
14 **would not have ordinarily been my practice to**
15 **produce the report if I had the doctor who**
16 **performed the autopsy, which I had in this**
17 **case.**
18    Q.     Do you not believe or did you not
19 believe that the medical examiner's actual
20 report would have been important to show to
21 the grand jury during this presentation?
22         MR. MITCHELL:  I object to the
23     form.
24         MR. O'BRIEN:  You can answer

44

Collins

1  that, John.
2     A.     **I do not believe it is an**
3  **appropriate substitute for the actual**
4  **testimony of the doctor who did the work.**
5     Q.     Did the doctor testify as to
6  every aspect of the medical report, of the
7  autopsy, if you know?
8     A.     **Every aspect of it, I doubt it.**
9     Q.     It was your conclusion, as the
10 person presenting this matter to the grand
11 jury, that the report was less important than
12 the actual doctor's testimony?
13         MR. MITCHELL:  I object to the
14     form.
15    Q.     Would that be accurate?
16    A.     **It was my opinion, as the legal**
17 **advisor to the grand jury, under my statutory**
18 **obligations under Article 190, that producing**
19 **the doctor who was fully informed on all**
20 **aspects of the autopsy before the grand jury**
21 **was preferable to producing simply the report,**
22 **because the grand jury would then have the**
23 **opportunity to ask questions of the doctor**
24 **where they could not do that with a report.**

---

45

Collins

1
2    **Q.**    If the grand jury had the report
3  while the doctor -- if the grand jury did have
4  the report, the grand jury would have had the
5  opportunity to call the doctor if they so
6  chose, correct --
7    **A.    The grand jury --**
8    **Q.**    -- or recall the doctor, one or
9  the other?
10    **A.    I'm sorry.**
11    **The grand jury could have called**
12  **any witness they wanted.  I called the medical**
13  **examiner, but I'm sure if I hadn't they may**
14  **have wanted to hear from her.**
15    **Q.**    Just to be clear, it was your
16  determination alone to not include the autopsy
17  report in the grand jury or include it as an
18  exhibit for the grand jury?
19    **A.    First of all, under the rules of**
20  **evidence it's generally thought to be**
21  **inappropriate to produce both the report and**
22  **the author, at least in my experience in State**
23  **Court, and I think the better alternative --**
24  **don't look at me like that, please, please.**
25  **And I thought it preferable to produce the**

---

46

Collins

1
2  **doctor than produce papers that could not be**
3  **questioned.**
4    **Q.**    It's your testimony that the
5  rules of evidence does not allow the doctor
6  and the doctor's report?
7    **A.    It's my testimony that my**
8  **understanding is that sometimes that's**
9  **inappropriate.**
10    **Q.**    In this situation, where this
11  matter was being presented to the grand jury,
12  did you believe that it was inappropriate
13  based on the rules of evidence?
14    **A.    I thought it was better to do it**
15  **the way I did it for the grand jury's**
16  **purposes.**
17    **Q.**    Again, so it was your decision
18  not to put that autopsy in?
19    **A.    If I didn't, it was my decision.**
20    **Q.**    Sir, directing your attention to
21  page 15 of Collins A.
22    **A.    I'm there.**
23    **Q.**    Directing your attention to
24  page 15, line 10.
25    **A.    Yes, sir.  15, line 10 appears to**

---

47

Collins

1
2  **be an answer.**
3    **Q.**    Right.  This --
4    **A.    Actually a continued answer.**
5    **Q.**    Right.
6    In this aspect of the grand jury
7  presentation you're asking about a wound to
8  Mr. Lazo that appeared to be a bite.  Do you
9  see that there?
10    **A.    Not in line 10.  Where?  I'm**
11  **sorry, okay, the following question, line 12**
12  **through 14.**
13    **Q.**    Right.
14    **A.    It says bit, but I presume it**
15  **means bite.  I did -- I did ask the doctor**
16  **whether a particular bruise in Photograph 42**
17  **was consistent with a bite, although it says**
18  **bit.  The doctor follows up with bite, so I**
19  **presume I said bite also.**
20    **Q.**    Do you recall actually making
21  that specific inquiry to the medical examiner?
22    **A.    No.**
23    **Q.**    At any time prior to your
24  presentation of this matter to the grand jury
25  did you discuss with the medical examiner

---

48

Collins

1
2  whether there were wounds on Mr. Lazo's
3  buttock or anywhere else on his body that were
4  consistent with a bite wound?
5    **A.    I'm sure I did.**
6    **Q.**    Based on your recollection of
7  your discussions with the medical examiner, do
8  you know if the medical examiner made any
9  conclusions as to whether Mr. Lazo was indeed
10  bit or bitten?
11    MR. MITCHELL:  I object to the
12  form.
13    MR. O'BRIEN:  If you know, John.
14    **A.    In the following page the doctor**
15  **says that it could be consistent with a bite,**
16  **but I think that's as far as a doctor can go**
17  **anyways.**
18    **Q.**    When you say "that's as far as a
19  doctor can go," what do you mean by that?
20    **A.    When a doctor describes a wound**
21  **as consistent with a particular**
22  **instrumentality, unless there is an absolute**
23  **way to match it up with that instrumentality,**
24  **the testimony usually goes as quote/unquote**
25  **consistent with.**

---

49

Collins

Q.   At any time prior to your presentation of this matter to the grand jury, did you ask the medical examiner questions as to whether the medical examiner believed that Mr. Lazo was bit -- bitten?

A.   **I'm sure that we discussed prior to the grand jury presentation a wound or wounds that looked like or could have been bite marks based either on my experience or hers.**

Q.   At any time prior to, during or after the presentment of this matter to the grand jury, did you do any follow-up with respect to whether Mr. Lazo was indeed bit?

A.   **Did I do follow-up?  No.**

Q.   Yes.

Did you ask the medical examiner to do any sort of further examination into whether Mr. Lazo was bit or bitten on any part of his body?

A.   **I did not.**

Q.   Did you believe that a potential bite wound on Mr. Lazo's body would have been important or an important matter to

50

Collins

investigate during a grand jury presentment?

A.   **Yes.**

Q.   Is there any reason why you didn't follow up with that?

A.   **Yes.**

Q.   What would that reason be, sir?

A.   **It's my recollection that one of the officers testified to biting him.**

Q.   Which officer was that, sir?

A.   **I don't remember.**

Q.   Did you believe that there were any -- did you have any concerns with the fact that an officer claimed to have bitten somebody?

A.   **Did I have concerns?**

Q.   Yes, as the person presenting this matter to the grand jury.

MR. MITCHELL:  Objection to form.

MR. O'BRIEN:  If you can answer.

A.   **I was concerned about everything in this case, and, actually, if you look at line 21 on page 15 the medical examiner describes it as a bite.**

Q.   The medical examiner in this

51

Collins

situation concluded that it was a bite?

A.   **I don't know what the operation of her mind was, but I can tell you there is sort of a small, puffy purple from the bite itself in her testimony on line 21.**

Q.   The fact that Mr. Lazo was -- there was a bite wound on him and the officer actually admitted to biting Mr. Lazo --

A.   **I said I believe that to have been the case in the grand jury.**

Q.   Do you have any specific recollection of an officer claiming that he bit Mr. Lazo?

A.   **I have a recollection of one of the officers claiming or thinking he had bit Mr. Lazo, the decedent.**

Q.   Did you believe that that action by the police officer in this situation where Mr. Lazo was also being hit with other objects was significant during the grand jury presentation --

MR. MITCHELL:  Objection to form.

Q.   -- or during your investigation?

MR. O'BRIEN:  You can answer,

52

Collins

John.

A.   **I thought that was significant.**

Q.   Did you, as the assistant district attorney in this matter -- and at that time you were -- you had supervisory authority, correct?

A.   **I did.  Not over the police department or ME, but, yes, I did.**

Q.   You had supervisory authority over other assistant district attorneys, correct?

A.   **I did.**

Q.   And over investigators in the district attorney's office as well, correct?

A.   **I did.**

Q.   Did you ever ask anyone to inquire further or to follow up on that aspect of the incident?

A.   **No.**

Q.   Based on your recollection of the medical examiner's testimony and report, do you know if there were any injuries to Mr. Lazo below the skin level?

A.   **I believe there were.**

Case 2:09-cv-01023-ST   Document 70-3   Filed 01/09/19   Page 50 of 252 PageID #: 1819

GONZALES vs. COUNTY OF SUFFOLK
JOHN B. COLLINS

**53**

Collins

1
2  Q.    Do you recall, as you sit here
3  today, what those injuries were?
4  A.    I believe that some of the
5  bruises may have had hemorrhaging beneath the
6  skin level.  I believe there were some
7  lacerations or abrasions that broke the skin
8  surface.  That's my answer.
9  Q.    Do you know if the -- if there
10  were any injuries to Mr. Lazo's bones?
11  A.    I believe I recall there were no
12  fractures.
13  Q.    Do you know there were any
14  injuries to Mr. Lazo's organs?
15  A.    Other than the part that you just
16  had me read of the medical examiner's
17  testimony with regard to there being no major
18  life -- sorry, no life-threatening injuries to
19  the major organs, that's what I recall.
20  Q.    Regardless of whether the
21  injuries were life threatening or not, do you
22  recall if there were any injuries to the
23  organs?
24  A.    Not specifically.
25  Q.    Taking a look at the autopsy

**54**

Collins

1
2  report that's been previously marked as
3  Collins B --
4  A.    I didn't see that before.  Do you
5  want me to look at it now?
6  Q.    Yes, please.
7  A.    Okay, I have it.
8  Q.    Do you know if the medical
9  examiner made any determinations as to whether
10  there were injuries to Mr. Lazo's organs?
11  A.    Do you want me to go through the
12  whole report?
13  Q.    If you will?
14  A.    Okay.
15      In reviewing the report, I do not
16  see any injuries to any organs reported.
17  Q.    At any time did you -- at any
18  time did you ever ask the medical examiner to
19  go back and take a closer look at the
20  evidence?
21  A.    I'm sure I asked the medical
22  examiner to go back and look at the
23  photographs preparatory to our meeting, and,
24  of course, I reviewed the report with her when
25  I met.  I do not think I recall -- I don't

**55**

Collins

1
2  think I asked her to do any further
3  examination after we met.
4  Q.    What --
5  A.    I don't --
6      I'm sorry, I didn't mean to cut
7  you off.
8      I don't think we met until
9  October.
10  Q.    The first time you met the
11  medical examiner, in other words, was sometime
12  after the autopsy had been completed, a couple
13  months after?
14  A.    Correct.  I was only assigned to
15  the case after the autopsy was completed and
16  the report issued.
17  Q.    Very well.
18      Do you know if anyone in the
19  district attorney's office was monitoring that
20  case prior to you being --
21  A.    Prior --
22  Q.    -- involved in it?
23  A.    I'm sorry.  I cut you off again.
24  Q.    It's okay.
25  A.    Prior to my involvement?

**56**

Collins

1
2  Q.    Yes.
3  A.    This was '08?
4  Q.    Yes.
5  A.    Prior to my involvement Homicide
6  Bureau Chief Janet Albertson was assigned to
7  the case, Assistant DA Merrifield had received
8  the call when the incident was reported to the
9  homicide squad.  Ms. Albertson took the case
10  over immediately after Ms. Merrifield reported
11  in to her, and I think I took over the case
12  because Ms. Albertson was otherwise occupied
13  sometime late June/early July of '08, so, yes.
14  The short answer is yes, other people were
15  involved before me.
16  Q.    That was Ms. Albertson?
17  A.    Albertson.
18  Q.    What is Ms. Albertson's title --
19  A.    I believe at the time --
20  Q.    -- or was at the time?
21  A.    -- it was homicide bureau chief.
22  Q.    Directing your attention to
23  page 20 of the minutes.
24  A.    I'm there.
25  Q.    Starting from line 5 through

57

Collins

1
2  line 13, if you could just review that and let
3  me know when you're done.
4      A.      Did you say through 19, sir?
5      Q.      5 through 13.
6      A.      13. I'm done.
7      Q.      In these questions here you asked
8  the doctor whether she dissected the chest
9  area to see what was beneath that area of
10 injury.
11     A.      Um-hmm.
12             MR. O'BRIEN:  Answer that
13 question, John --
14     A.      I'm sorry, yes, I did.
15             MR. O'BRIEN:  -- for the
16 reporter.
17             THE WITNESS:  I apologize.
18     Q.      Here the medical examiner gives
19 the answer that they -- that she -- in sum and
20 substance that she peeled off the skin and the
21 soft tissue of the skeleton and there was no
22 fractured ribs in that area.  Do you see that?
23     A.      I do.
24     Q.      Besides the medical examiner
25 speaking to fractured ribs in the area, the

58

Collins

1
2  medical examiner gave no indication as to
3  whether she reviewed any organs or any areas
4  of the body beneath the ribs.  Do you see that
5  there?
6      A.      In that set of questions, that's
7  accurate.
8      Q.      Well, do you know if the medical
9  examiner ever gave any testimony during this
10 grand jury presentment as to whether she
11 reviewed areas below the ribs?
12     A.      I'm sorry, below the ribs.
13     Q.      Yes, underneath the ribs within
14 the rib cage cavity?
15     A.      I believe that would be
16 encompassed by her discussion of major organs.
17     Q.      Okay.
18             Well, here when the medical
19 examiner indicated that there was no fractured
20 ribs in that area, did you -- do you see
21 yourself asking any follow-ups as to any
22 injuries below the ribs?
23     A.      On that page, at those lines, no.
24     Q.      Do you recall ever asking the
25 medical examiner whether there were any

59

Collins

1
2  injuries to the organs beneath the ribs or
3  within the rib cage?
4      A.      I thought she talked about the
5  major organs in a spot prior to this testimony
6  on page 20.
7      Q.      Well, is it your recollection
8  that the autopsy dealt with life-threatening
9  wounds as opposed to -- or life-threatening
10 injuries as opposed to any other injury?
11     A.      No.  The autopsy report deals
12 with everything.
13     Q.      Do you see anywhere in the
14 autopsy report where there is an indication
15 that the organs were checked for
16 nonlife-threatening injuries?
17     A.      I don't see that on this page.
18     Q.      Not on this page.  In the autopsy
19 report.
20             MR. O'BRIEN:  I don't know if his
21 question --
22     A.      I'm sorry, are you asking about
23 the report or the minutes?
24             I'm asking you based on your
25 presentment of this matter to the grand jury

60

Collins

1
2  whether this medical examiner was ever asked
3  about nonlife-threatening injuries to the
4  organs within the rib cage?
5              MR. O'BRIEN:  I object to form.
6              If you can answer it, John,
7  answer it.
8      A.      I don't recall.  Do you want me
9  to read all her testimony?
10     Q.      Well, if the clock stops, then
11 sure, but if the clock doesn't stop then I
12 will continue asking questions.
13     A.      I'm sorry, I'm not in charge of
14 the clock.  I don't know what the restrictions
15 were that were placed on the record by
16 Magistrate Brown.  They're not in the
17 electronic order.
18     Q.      Well, do you recall the medical
19 examiner testifying to any injuries that were
20 not life threatening?
21     A.      Yes.
22     Q.      What injuries specifically do you
23 recall the medical examiner testifying to
24 regarding nonlife-threatening injuries?
25     A.      All of them.  Every injury she

61

Collins

2 **described she described as nonlife**
3 **threatening.**
4 **Q.** My question is --
5 **A. And he had many injuries.**
6 **Q.** With respect to the organs --
7 **A. Um-hmm.**
8 **Q.** -- is the question I was asking.
9 At that time I was focussing on the organs or
10 the areas within the rib cage.
11 **A. Is that a question?**
12 **Q.** Yes. Well, that's -- my previous
13 question was: Do you recall the medical
14 examiner testifying as to injuries to the
15 organs?
16 **A. "Following your examination of**
17 **Mr. Lazo externally, did you then progress to**
18 **the internal examination of his organs and the**
19 **underlying area of external injuries that you**
20 **noted," page 10 --**
21 **Q.** Reading page 10 --
22 **A.** -- line 16, following.
23 **"Yes, I did. With the exception**
24 **of bruises of the scalp which were identified**
25 **by dissecting the scalp of his head, there**

62

Collins

2 **were no internal components to an external**
3 **injury.**
4 **"What do you mean by that?"**
5 **Line 23, "The injuries were**
6 **limited to the external aspect of the body.**
7 **No internal organ injury, no significant area**
8 **of major hemorrhage or blood loss," was the**
9 **doctor's answer.**
10 **I guess you didn't prepare that**
11 **question. I see you smiling.**
12 **Q.** I'm just making -- well, I'm just
13 making sure that we're on the same --
14 **A. Did I read something incorrectly?**
15 **Q.** No, not at all.
16 **A. Okay.**
17 **Q.** That was for my own edification,
18 if you will.
19 **A. I didn't think you needed me to**
20 **read for you.**
21 **Q.** Did not.
22 When you examined the autopsy
23 report wherein the conclusion with respect to
24 injury was sudden cardiac death, did it ever
25 occur to you to ask personally how any of

63

Collins

2 those injuries to Mr. Lazo could have
3 contributed to his death?
4 MR. MITCHELL: I object to form.
5 MR. O'BRIEN: I object also, but
6 if you can answer, John.
7 **A. Yeah. I asked the medical**
8 **examiner about all of the injuries and whether**
9 **they had any effect on Mr. Lazo's death, and**
10 **her opinion was no.**
11 **Q.** The conclusion, the sudden
12 cardiac death, is that something that you have
13 ever heard of before? Were you familiar with
14 that?
15 MR. MITCHELL: I object to the
16 form.
17 MR. O'BRIEN: You can answer.
18 **A. Yeah, I'm sure I've seen it**
19 **before.**
20 **Q.** Right, and would it also be
21 accurate to say that the medical examiner also
22 concluded that -- among other things, that
23 Mr. Lazo had no illnesses or injuries in his
24 organs that would have contributed to his
25 death either? Do you recall that?

64

Collins

2 **A. I thought -- I thought I saw some**
3 **signs of natural disease in some of the**
4 **microscopic examination, but, again, none of**
5 **that, as far as I know, caused Mr. Lazo's**
6 **death. He had some hypertrophy in his heart. I'm not**
7 **going to read the report to you, but there was**
8 **evidence of illness or deterioration in some**
9 **of his organs.**
10 **Q.** Do you know if the medical
11 examiner concluded that any of those illnesses
12 or deterioration of organs contributed to his
13 death on that date that he was in the presence
14 of the police?
15 **A. I don't know.**
16 **Q.** Directing your attention to
17 page 24 of the minutes.
18 **A. I'm there.**
19 **Q.** Starting from line 19 to I guess
20 the end, 25 --
21 **A. Okay.**
22 **Q.** -- and continuing on to page 25.
23 **A. Would you start from line 14**
24 **where I define the opinion?**

65

1    Collins
2    Q.    Well --
3    A.    Line 19, "Would you please tell
4    is what that opinion was and explain it."
5    That's where you want me to start?
6    Q.    I'm asking you to -- whatever
7    allows you to place the question in the
8    context, you can start from that line.  If 14
9    is better to you...
10    A.    Well, I don't know what the
11    question is yet.
12    Q.    I'm asking you to review, well,
13    then from line 14 to 25.
14    A.    The answer continues into
15    page 25.  Do you want me to keep going?
16    Q.    Well, did you review lines 14 to
17    25?
18    A.    I did.
19    Q.    Within --
20    A.    Do you want me to finish reading
21    what continues on to page 25 or not?
22    Q.    You can.
23    Here the doctor --
24    A.    I've gone as far as line 4 on 25.
25    Q.    Here the doctor indicates that

66

1    Collins
2    there are -- the absence of any significant
3    internal injuries to explain his death and in
4    the absence of any life threatening diseases
5    that would affect his internal organs.
6    A.    I see that.
7    Q.    Here the doctor finds that there
8    were no illnesses that Mr. Lazo -- preexisting
9    illnesses that Mr. Lazo had that she could
10    determine contributed to his death that day;
11    would that be accurate?
12    A.    No.  What it says is in the
13    absence of any major life threatening diseases
14    that would effect his internal organs.
15    Q.    Is that --
16    A.    That's my answer.
17    Q.    Is it your conclusion that
18    Mr. Lazo had any preexisting injuries or
19    illnesses that contributed to his death that
20    day?
21    A.    It's my opinion that he had some
22    preexisting conditions.  I don't have an
23    opinion as to his cause of death.
24    Q.    Not your opinion.  I'm asking
25    as -- I'm asking whether you know whether it

67

1    Collins
2    was ever determined as to whether Mr. Lazo had
3    any preexisting conditions that contributed to
4    his death?
5    MR. MITCHELL:  I object to form.
6    MR. O'BRIEN:  I object also.
7    Can you answer it?
8    A.    Yeah, the ME does it right here
9    on page 24 and 25.
10    Q.    Um-hmm.
11    A.    She continues through page --
12    Q.    What preexisting conditions does
13    the ME point out?
14    A.    I didn't say she pointed out any.
15    I'm saying the autopsy report points out that
16    he had some preexisting conditions, which was
17    an answer to your previous question, whether
18    he had any illnesses.
19    Q.    Right.
20    Did the medical examiner in her
21    testimony for the grand jury advise the grand
22    jury as to whether any preexisting injuries
23    that Mr. Lazo may have had contributed to his
24    death?
25    A.    I believe she did not, other than

68

1    Collins
2    his morbid obesity and whatever else.
3    Q.    Did you see the medical examiner
4    stating that the morbid -- or that Mr. Lazo's
5    morbid obesity contributed to his death?  Do
6    you see anywhere where the medical examiner
7    has testified to that?
8    A.    Say again.
9    Q.    Do you see anywhere where the
10    medical examiner may have indicated or
11    testified that Mr. Lazo's morbid obesity was a
12    contributing factor to his death?
13    A.    I believe she describes him
14    earlier as obese.  Page 28, he had --
15    "Question," line 3, "he had no significant
16    life threatening disease that affected his
17    heart?
18    "Answer:  No.
19    "Question:  He was five-six and
20    238 pounds?
21    "Answer:  Yes, and that put him
22    highly or morbidly obese.  I think also he was
23    at risk being in intensive exertion
24    physically, so to me that was significant."
25    That's the medical examiner's

69

Collins

1    testimony.
2    **Q.**    During medical examiner's
3    testimony, whether it be before a grand jury
4    or petit jury, is the medical examiner allowed
5    to opine with respect to items or issues that
6    are not in the report?
7    MR. MITCHELL:  I object to form.
8    **Q.**    To give her own opinion?
9    **A.**    **If it's within the realm of her**
10   **expertise, it could be permitted.**
11   **Q.**    Okay.
12   Well, on page 25 of the minutes
13   starting at line 22 --
14   **A.**    **Okay.**
15   **Q.**    -- you ask: "Question:  How does
16   the body, Dr. Milewski, handle stress
17   altercations, like what's going on in the body
18   chemically?"
19   Do you see that there?
20   **A.**    **I do.**
21   **Q.**    There you ask the doctor to
22   explain how the body handles stress.  Would
23   that be accurate?
24   **A.**    **In a medical sense, yes.**

70

Collins

1    **Q.**    Why did you do that?  Why did you
2    ask that question?
3    **A.**    **Because she's talking in the**
4    **previous answer about stress and exertion.**
5    **Q.**    Okay.
6    Where, if anywhere, in Mr. Lazo's
7    autopsy report does the doctor make any
8    reference to stress?
9    **A.**    **I don't know.  I don't know if**
10   **it's in there or not.**
11   **Q.**    Well, sir, can you check it?
12   It's right before you, Lazo B.
13   **A.**    **Do you want me to read the whole**
14   **autopsy report again?**
15   **Q.**    Well, you just did.  Do you see
16   anything there with reference --
17   **A.**    **I don't recall seeing the word**
18   **stress in there, but I'm going to look again.**
19   **Other than the reference to quote/unquote,**
20   **Following exertion associated with prolonged**
21   **physical altercation, I do not see any**
22   **particular reference to stress.**
23   **Q.**    So my question particularly is:
24   Here where you ask the doctor how the body

71

Collins

1    handles stress, what was your basis for asking
2    that question?
3    **A.**    **The previous answer.**
4    **Q.**    Which is what?
5    **A.**    **Do you want me to read all 14**
6    **lines?**
7    **Q.**    No.  Which aspect of that answer
8    caused you to ask that?
9    **A.**    **The witness begins talking about**
10   **EKG tracing, cardiac death and exertion**
11   **associated with physical altercation.  To me**
12   **that sounds stressful.**
13   **Q.**    Well --
14   **A.**    **And I asked the doctor in**
15   **layman's terms the effect that a stressful**
16   **altercation could have on one's body.**
17   **Q.**    Then --
18   **A.**    **Then she continued onto describe**
19   **the fight-or-flight syndrome for a full page.**
20   **Q.**    Do you see anywhere in the
21   medical report where the doctor mentions any
22   of this to which she testified to on page 26,
23   fight or flight, stress, any of that in
24   response to the questions you ask her?

72

Collins

1    **A.**    **I don't believe, other than what**
2    **I said, "Following exertion associated with**
3    **prolonged physical altercation."  There may be**
4    **toxicological findings in there that I don't**
5    **understand or didn't ask about.  I think that**
6    **question would be better directed to the**
7    **medical examiner with the expertise.  My**
8    **effort was to present the medical examiner's**
9    **findings to the grand jury.**
10   **Q.**    Right, and if it was your -- if
11   that's what you were trying to do, that is
12   present the medical examiner's findings,
13   then -- and the medical examiner didn't
14   mention anything about stress in her
15   findings --
16   **A.**    **Um-hmm.**
17   **Q.**    -- then what was the basis of
18   that question?
19   MR. O'BRIEN:  It's been asked and
20   answered.  You can answer again --
21   MR. CALLISTE:  Withdrawn.
22   **Q.**    Were you asking the medical
23   examiner to speculate?
24   **A.**    **No, I certainly don't think so.**

73

Collins

Q.    Do you believe that this question about how the body handles stress, given the autopsy report where nothing related to stress was specifically mentioned, was speculative?

MR. MITCHELL:  I object to the form.

A.    No, I don't believe anything that the medical examiner said was speculative.

Q.    Well, not what the medical examiner said but what you asked the medical examiner to give an opinion about regarding stress?

MR. MITCHELL:  I object to the form.

A.    I'm sorry, I don't understand that question.

Q.    This answer that the medical examiner gives here on page 26, do you see that there?

A.    I see a full page of answer on page 26 that starts on page 25 --

Q.    Right.

A.    -- Yes.

Q.    Can you agree with me that none

74

Collins

of this or nothing that the medical examiner has testified to here on page 26 was ever made part of this medical report or the autopsy?

A.    No, because a lot of the things the medical examiner is talking about in here, some of the things are negatives.

Q.    So show me where, if at all, the medical examiner makes reference in the report to --

A.    I already did that, and I already told you that with regard to that what I find is on page 1 in the cause of death. I do not see the word stress in the body of the report itself.

Q.    Was this doctor ever qualified as an expert?

A.    I believe so.

Q.    Can you show me where?

A.    Page 6 and 7.

Q.    Now, here the doctor gives testimony regarding her experience --

A.    That's correct.

Q.    -- right?

A.    Yes, sir.

75

Collins

Q.    My question is:  Was this doctor ever qualified as an expert before this grand jury?  Was the grand jury ever told that the doctor was an expert?

A.    That would be inappropriate.  The grand jury decides if someone was an expert.  What she did was list her qualifications and experience, and that's all that's necessary.

Q.    Okay.

A.    It's actually, I believe, inappropriate for the court to define someone as an expert.  Although courts do it, I think it's inappropriate.  It should be up to the jury to decide whether someone is an expert or not.

Q.    That's your personal opinion, right?

A.    That's my personal and legal opinion.

Q.    The rules do allow the designation of an expert by the judge, correct?

A.    The rules do allow that someone can be recognized as an expert.  Usually it's

76

Collins

by stipulation.

Q.    My question with regard to the doctor's response on page 26 is --

A.    Which one?

Q.    On page 26 of the minutes.

A.    Okay.

Q.    This doctor goes into a very speculative account as to what could happen in the body. Do you see that there?

MR. MITCHELL:  Object to form.

MR. O'BRIEN:  I object.

Q.    During times of stress.  Do you see that?

A.    I see that the doctor gives her opinion and experience with regard to the physiology of someone under the stress that Mr. Lazo was under.

Q.    Did this doctor ever come to any conclusion that Mr. Lazo did actually experience what she testified to here on page 26?

A.    I don't know.

Q.    Did you ever see that before from this doctor?

77

Collins

2   A.   I don't understand.

3   Q.   Did you ever see this doctor
4   concluding that Mr. Lazo, for example,
5   experienced anything that the doctor testified
6   to here on page 26?

7   A.   I'm sorry?

8        MR. O'BRIEN: I object to the
9   form.

10   Q.   In the doctor's autopsy report or
11   at any time prior to her testifying to this in
12   the grand jury, do you see anything written
13   down by the doctor that Mr. Lazo, the person
14   who died in this situation, actually
15   experienced what it is that she testified to
16   on page 26?

17   A.   The only way to do that, as far
18   as I'm able to determine, would have been to
19   have had that discussion with Mr. Lazo
20   himself, and the doctor did not have that
21   advantage.

22   Q.   My question is whether you've
23   ever seen the doctor come to these
24   conclusions, as she testified on page 26 in
25   writing or in any other way, prior to her

78

Collins

1   testifying to this in the grand jury?

3   A.   I don't understand the question.

4   Q.   These things that the doctor
5   testifies to on page 26, did you ever see the
6   doctor put that in writing anywhere, that
7   Mr. Lazo did actually experience any of these
8   things that she testified to for a whole page
9   and a half?

10   A.   The answer to that is no.

11   Q.   Directing your attention to
12   page 27, starting from line 10.

13   A.   I'm there.

14   Q.   You asked the question, "Mr. Lazo
15   found himself at the precinct and charged with
16   two class B felonies following this
17   altercation. Is it possible that Mr. Lazo's
18   stress level and his acute stress response
19   continued beyond the time frame of the actual
20   physical altercation?"

21        Do you see that there?

22   A.   I do.

23   Q.   Why did you ask that question?

24   A.   Because when the doctor referred
25   to stress and exertion, my layman's

79

Collins

2   understanding of what she was describing
3   indicated to me that the stress was not yet
4   over when the altercation ended, and I aske
5   her if she had an opinion and experience with
6   regard to the continuing stress that the
7   defendant or decedent might have seen himself
8   under following the altercation.

9   Q.   Do you see any evidence that
10   Mr. Lazo ever experienced stress as a result
11   of being charged with class B felonies? Did
12   you ever see that anywhere?

13   A.   I don't understand.

14   Q.   Did you ever learn from any of
15   the officers or from anyone in the police
16   precinct or anyone who treated Mr. Lazo that
17   Mr. Lazo experienced any sort of stress as a
18   result of being charged with two felonies as
19   opposed to being beaten in the street by
20   police?

21        MR. MITCHELL: I object.

22        MR. O'BRIEN: I object to the
23   form.

24   Q.   Or in addition to --

25        MR. O'BRIEN: Can you answer it.

80

Collins

2   Q.   Or in addition to being in an
3   altercation with police in the street?

4   A.   Why don't we clarify what the
5   question is. Everybody was talking. I'm
6   sorry.

7   Q.   Certainly.

8        Here on page 27 you ask --

9   A.   Yup.

10   Q.   -- "Question:" -- you ask the
11   doctor to --

12   A.   What I asked the doctor was, "Is
13   it possible that Mr. Lazo's stress level and
14   his acute stress response continued beyond the
15   time frame of the actual physical
16   altercation," and then the doctor answered in
17   her expert opinion.

18   Q.   Well, here you preface that
19   question with, "Mr. Lazo found himself at the
20   precinct and charged with two class B felonies
21   following this altercation."

22        Do you see that there?

23   A.   Um-hmm. It had been previously
24   testified to that Mr. Lazo was under arrest
25   for those charges by previous witnesses.

81

Collins

2   Q.   Right, so where, if -- did any
3   witness testify that Mr. Lazo exhibited any
4   sort of stress after learning he was being
5   charged with class B felonies?
6   A.   Not that I recall specifically.
7   Q.   Here do you know if the doctor,
8   this medical examiner, was present in the
9   precinct when Mr. Lazo was arrested?
10   A.   I know that she wasn't.
11   Q.   So how would the doctor know if
12   Mr. Lazo experienced stress as a result of
13   being charged with two felonies?
14   A.   The question was and -- actually,
15   the first part of that question is a
16   statement, and then the question was, Is it
17   possible that his stress level and
18   physiological stress response would continue
19   even though the quote/unquote fight was over?
20   Q.   So the first part of this
21   question, you were testifying yourself?
22   A.   No, that's not true.
23   Q.   In this situation, were you
24   asking --
25   A.   It's my informing the witness of

82

Collins

2   previous testimony, which is not testifying.
3   Q.   Here you're asking the witness to
4   speculate as to whether those B felonies
5   contributed to stress that Mr. Lazo was
6   experiencing; is that --
7   A.   Not --
8   Q.   -- would that be accurate?
9   A.   Not true.
10   Q.   The answer that the witness gave
11   to your question, did you take a look at that
12   or could you to look at that if you have not?
13   A.   Sure.  I have.
14   Q.   The response that that witness
15   gave, was it speculative?
16   A.   I don't think so.
17   Q.   Here did you ask the witness to
18   speculate as to how felonies could have caused
19   or --
20   A.   No, sir.
21   Q.   -- or contributed to his death?
22   A.   No, sir.
23   MR. MITCHELL:  I object.
24   Q.   Was there ever anything in the
25   doctor's report or reports which concludes

83

Collins

2   that the charges that Mr. Lazo was g.
3   caused and/or contributed to his death.
4   A.   No, not specifically.
5   Q.   On the autopsy report, Collins
6   B --
7   A.   Yes.
8   Q.   -- under final anatomic diagnoses
9   on the first page of that document the medical
10   examiner points to at least six items here --
11   A.   Correct.
12   Q.   -- which the medical examiner
13   believes contributed to the death.  Do you see
14   that?
15   A.   I don't know that those
16   necessarily contributed to the death.  That's
17   the final anatomic diagnoses.  The cause of
18   death is listed below.
19   Q.   "Sudden cardiac death following
20   exertion with prolonged physical altercation
21   with multiple blunt impacts."
22   A.   That's what it says.
23   Q.   Do you see anything there in that
24   cause of death related to stress?
25   A.   Again, no.

84

Collins

2   Q.   Sir, but you do see things there
3   related to multiple blunt impacts.  Do you see
4   that?
5   A.   I sure do.
6   Q.   Right, and with respect to the
7   final anatomic diagnoses above that area
8   described as cause of death, there are several
9   numbers there wherein blunt -- multiple blunt
10   impacts are mentioned.  Would that be
11   accurate?
12   A.   In III, IV and V and also I, yes.
13   Q.   Would it be accurate to say that,
14   at least in the report, the medical examiner
15   describes that the multiple blunt impacts was
16   a contributing factor to Mr. Lazo's death?
17   MR. O'BRIEN:  Objection.
18   You can answer.
19   A.   Multiple blunt impacts is listed
20   as part of the cause of death.
21   Q.   Right, when you took a look at
22   this medical examiner autopsy report for the
23   first time, did you understand that the
24   medical examiner indicated that multiple blunt
25   impacts contributed to the cause of death?

85

Collins

MR. MITCHELL: Objection to form.

MR. O'BRIEN: Objection.

Q.    Was that your understanding?

A.    **My understanding is multiple blunt impacts was included in the cause of death.**

Q.    As one of the factors that caused the death, correct?

MR. O'BRIEN: Objection.

A.    **My answer is what it was.**

Q.    Well, I'm asking what your understanding is.

A.    **My answer is: In the cause of death, multiple blunt impacts is listed and referred to.**

Q.    Okay.

Directing your attention to page 28 of the minutes.

A.    **I'm there.**

Q.    Starting from line 10 you begin to ask the medical examiner about the blunt impact traumas. Do you see that there?

A.    **Um-hmm. I don't know that I begin there, but that's that question. I may**

86

Collins

**have discussed blunt trauma injuries before that.**

Q.    Right. You asked all throughout this presentment, correct, all throughout her testimony; would that be correct?

A.    **What's the question?**

Q.    You asked her about the blunt impact traumas all throughout her testimony?

A.    **Many times.**

Q.    Here you ask, starting on line 10, "Question: With regard to the blunt impact trauma observed by you, is it fair to say that none of these blunt impact traumas were life threatening."

Do you see that there?

A.    **I do.**

Q.    She indicates that none of them were?

A.    **She does.**

Q.    Then going to line 14, you ask, "Either taken by themselves or all together?"

Do you see that there?

A.    **I do.**

Q.    And she agrees with you, "That's

87

Collins

right."

A.    **She didn't agree with me. That's her testimony, because I asked her in the alternative.**

Q.    She says, "That's right," correct?

A.    **Yeah, but that's not agreeing with me.**

Q.    She says, "That's right," does she not?

A.    **She says, "That's right." That's her opinion. She answered the question. She didn't agree with me.**

Q.    In going down -- whether she agreed with you or not, that speaks for itself, but going down to line 18 --

MR. O'BRIEN: If that's a question, I object.

Q.    Going down to line 18, the question is: "Taken alone or combined, they were not of the severity that caused Mr. Lazo's death?"

Do you see that there?

A.    **I do.**

88

Collins

Q.    She says, "That's correct"?

A.    **She does.**

Q.    Did you believe that testimony to be consistent with the autopsy report?

MR. MITCHELL: Objection to form.

MR. O'BRIEN: Objection.

If you can, answer it, John.

A.    **Yes.**

Q.    With respect to the autopsy report, did you ever ask her any questions as to how -- as to whether the blunt impacts contributed to his death?

A.    **Did I ask her that specific question when?**

Q.    Well, let's say in these scopes -- within this scope of questioning here on page 28.

A.    **I do not see the word contributory or contributed.**

Q.    Is there any reason why you did not delve or ask questions as to how those injuries could have contributed to his death in addition to the questions about stress and other things --

89

Collins

1
2      A.      I believe I did.
3      Q.      -- that you asked -- in addition
4  to the questions about stress and other things
5  that you asked the medical examiner to
6  speculate about?
7              MR. MITCHELL:  Objection to form.
8              MR. O'BRIEN:  Objection and asked
9      and answered also.
10             THE WITNESS:  Am I answering
11     that?
12             MR. O'BRIEN:  If you can.
13             THE WITNESS:  I can't.
14     Q.      The multiple blunt impacts that
15  were sustained by Mr. Lazo actually did
16  contribute to his cause of death, did it not?
17     A.      I don't know.
18             MR. O'BRIEN:  Objection.
19     Q.      As per the medical report, you
20  have that in front of you, don't you, sir?
21     A.      I have that report.
22     Q.      Was it your understanding that
23  the medical report was indicating that
24  multiple blunt impacts contributed to his
25  death?

90

Collins

1
2              MR. MITCHELL:  Objection.
3      A.      The report says what it says.
4      Q.      What is your understanding as to
5  what the report says with respect to blunt
6  impacts?
7              MR. MITCHELL:  Object to the
8      form.
9      A.      I don't think my understanding of
10  it is relevant.
11     Q.      Sir, could you answer my
12  question, please?
13             MR. O'BRIEN:  Objection.  He
14     answered your question.
15             MR. CALLISTE:  Whether he thinks
16     it's relevant is not a basis to not
17     answer a question.
18     A.      You want to know what I think?
19     Q.      Based on -- you presented this
20  matter to the grand jury, correct?
21     A.      I did.
22     Q.      You had to have an understanding
23  of the documents and the testimony that you
24  were presenting to the grand jury, did you
25  not?

91

Collins

1
2      A.      To the extent that I could, I
3  did.
4      Q.      Did you go into the grand jury
5  not understanding what the medical report
6  read?
7      A.      No.
8      Q.      You understood what it read when
9  you read it -- when it was --
10     A.      I know -- I know what it read.
11     Q.      If I could finish my question.
12             You understood what the medical
13  examiner's report stated when you went into
14  the grand jury, correct?
15     A.      I understood what it stated when
16  I went to --
17     Q.      What was --
18     A.      -- the grand jury.
19     Q.      -- your understanding as to what
20  it stated with regard to the blunt or multiple
21  blunt impacts to Mr. Lazo's body?
22     A.      It says in I, "Sudden cardiac
23  death following exertion associated with
24  prolonged physical altercation with multiple
25  blunt impacts."  In III, it says, "Blunt

92

Collins

1
2  impacts to head with multiple abrasions,
3  contusions and lacerations of face and scalp."
4  IV says, "Blunt impacts to torso with multiple
5  contusions and abrasion."  V says, "Blunt
6  impacts to upper extremities with multiple
7  contusions."  The cause of death says, "Sudden
8  cardiac death following exertion associated
9  with prolonged physical altercation with
10  multiple blunt impacts.  Contributory is
11  obesity."  That's on page 2.
12     Q.      Did the medical examiner ever
13  testify during this -- during her testimony in
14  the grand jury that any of the multiple blunt
15  impacts that were sustained by Mr. Lazo
16  actually contributed to his death?
17     A.      I believe that she testified that
18  the blunt impacts resulted in
19  nonlife-threatening injuries, which to me
20  would say that they did not contribute
21  themselves -- in and of themselves.  However,
22  as part of the physical exertion during the
23  altercation, coupled with Mr. Lazo's physical
24  condition, that is what I understood the cause
25  of death to be.

Case 2:09-cv-01023-ST   Document 70-3   Filed 01/09/19   Page 60 of 252 PageID #: 1829

**93**

Collins
1
2    MR. O'BRIEN:  It's 90 minutes.
We're all set?
4    MR. CALLISTE:  What time did we
5  start?
6    THE REPORTER:  We started at
7  1:28.
8    MR. O'BRIEN:  You got two minutes
9  more.
10    MR. MITCHELL:  Because you marked
11  some questions for rulings, there wasn't
12  a lot, but I want to clarify.  I
13  objected to the form of a couple of
14  questions that Mr. Calliste marked for
15  rulings, and just for clarification
16  because he marked it for a ruling, the
17  words that he used in his questions
18  were -- he used the phrase "district
19  attorney's office" in part of these
20  questions, whether the district
21  attorney's office, and I can't remember
22  exactly what he said, formed an opinion
23  or had a conclusion.  My objection was
24  based on that a -- the district
25  attorney's office is not an entity.

**94**

Collins
1  It's an -- what I'm really getting at
2  here is my objection was interposed
3  because, in essence, the district
4  attorney's office would be inferred as
5  against the County itself, and so my
6  objection to his questions that had the
7  phrase "district attorney's office,"
8  because I am representing the County,
9  that's why I interposed those
10  objections, because I viewed those
11  questions as actually asking did the
12  County as an entity have an opinion or
13  come to a conclusion.  To the extent
14  that the questions were directed towards
15  the district attorney in his official
16  capacity, that would be a similar thing,
17  that it would be questions asking about
18  the County, and, lastly, to the extent
19  the questions were in regard to the
20  actual internal opinions of the district
21  attorney's office, meaning between
22  lawyers in the office, my objection
23  would be based on that they would be
24  privileged or work product.  I'm putting

**95**

Collins
1
2  this on the record because it's been
3  marked for a ruling.
4    MR. O'BRIEN:  Mr. Calliste, do
5  you want to do a couple more follow-up
6  questions?  I don't know if you knew it
7  was 3:00.
8    MR. CALLISTE:  No.
9    MR. O'BRIEN:  Are you satisfied?
10    MR. CALLISTE:  I think I got what
11  I needed, yes.
12    MR. O'BRIEN:  Are you sure?
13    MR. CALLISTE:  Absolutely.
14    THE WITNESS:  Okay.  I indicated
15  to Mr. O'Brien I could stay for a bit.
16    MR. CALLISTE:  That's fine.  I
17  got what I needed.
18    (Time noted:  3:02 p.m.)

**96**

1
2    A C K N O W L E D G M E N T
3
4  STATE OF NEW YORK   )
              :ss
5  COUNTY OF        )
6
7    I, JOHN B. COLLINS, ESQ., hereby
8  certify that I have read the transcript of my
9  testimony taken under oath in my deposition of
10  June 3, 2014; that the transcript is a true,
11  complete and correct record of my testimony,
12  and that the answers on the record as given by
13  me are true and correct.
14
15
16    _____
17    JOHN B. COLLINS, ESQ.
18
19
20  Signed and subscribed to before
me, this        day
21  of         , 2014.
22
    _____
23  Notary Public, State of New York
24
25

97

1
2      ------------------I N D E X------------------
3    WITNESS          EXAMINATION BY      PAGE
4    JOHN B. COLLINS, ESQ. MR. CALLISTE        5

6    DIRECTIONS:      PAGE 16

7
     RULINGS:         PAGE 41
8

9    --------------DOCUMENT REQUEST--------------

10   PAGE  29   Exhibits or the file that was
11              maintained by the district
12              attorney's office with respect
13              to the presentment of this case
14
15   ------------------EXHIBITS------------------
16   COLLINS                    FOR I.D.
17     A    Portion of grand jury
18          minutes                         5
19     B    Autopsy report                  5
20
21          (Counsel retained exhibits.)
22
23
24
25

107

1
2          C E R T I F I C A T E
3

STATE OF NEW YORK    )
4
                    ) ss.:
5

COUNTY OF NASSAU     )
6
7              I, ERIKA GUNTHER, RPR, a Notary
8    Public within and for the State of New
9    York, do hereby certify:
10             That JOHN B. COLLINS, ESQ., the
11   witness whose deposition is hereinbefore
12   set forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by such witness.
15             I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage; and that I am
18   in no way interested in the outcome of
19   this matter.
20             IN WITNESS WHEREOF, I have
21   hereunto set my hand this 11th day of
     June, 2014.
23
24

25          --------------------------
            ERIKA GUNTHER, RPR

'08 [2] - 56:3, 56:13
'09 [1] - 31:12

**0**

09-1023(TCP)(ETB)
[1] - 1:16

**1**

1 [8] - 26:11, 27:17,
27:20, 28:10, 28:14,
28:25, 30:8, 74:13
1-10 [1] - 1:13
10 [8] - 46:24, 46:25,
47:10, 61:20, 61:21,
78:12, 85:21, 86:12
100 [1] - 2:17
11 [4] - 14:15, 14:21,
15:2, 15:18
11550 [1] - 2:6
11702 [1] - 1:24
11767 [1] - 3:8
11788 [1] - 2:18
11901 [1] - 5:18
11th [1] - 98:21
12 [2] - 25:19, 47:11
124 [1] - 1:24
13 [3] - 57:2, 57:5,
57:6
14 [8] - 30:4, 47:12,
64:24, 65:8, 65:13,
65:16, 71:6, 86:21
15 [4] - 46:21, 46:24,
46:25, 50:23
16 [2] - 61:22, 97:6
168 [1] - 3:7
18 [4] - 14:21, 15:2,
87:17, 87:20
19 [3] - 57:4, 64:20,
65:3
190 [1] - 44:19
1:28 [2] - 1:20, 93:7

**2**

2 [1] - 92:11
20 [2] - 56:23, 59:6
2014 [4] - 1:19,
96:10, 96:21, 98:22
202 [1] - 1:24
21 [2] - 50:23, 51:6
210 [2] - 1:18, 5:17
22 [1] - 69:14
23 [1] - 62:5
238 [1] - 68:20
24 [3] - 32:18, 64:18,
67:9

25 [10] - 64:21,
64:23, 65:13, 65:15,
65:17, 65:21, 65:24,
67:9, 69:13, 73:22
26 [11] - 71:23,
73:19, 73:22, 74:3,
76:4, 76:6, 76:22,
77:6, 77:16, 77:24,
78:5
27 [2] - 78:12, 80:8
28 [3] - 68:14, 85:19,
88:18
29 [1] - 97:10

**3**

3 [3] - 1:19, 68:15,
96:10
33 [2] - 30:2, 30:8
38 [8] - 26:13, 26:15,
26:21, 27:17, 27:20,
28:14, 29:2, 30:9
39 [5] - 26:4, 26:11,
26:18, 27:16, 28:10
3:00 [1] - 95:7
3:02 [1] - 95:18

**4**

4 [1] - 65:24
41 [1] - 97:7
42 [1] - 47:16

**5**

5 [5] - 56:25, 57:5,
97:4, 97:18, 97:19
516-938-4000 [1] -
1:25
55 [4] - 26:5, 26:19,
27:16, 29:25
556 [1] - 2:5

**6**

6 [2] - 26:6, 74:20
60-some-odd [1] -
30:4

**7**

7 [1] - 74:20

**9**

90 [2] - 8:15, 93:2

**A**

abide [1] - 41:20
ability [1] - 7:18

able [1] - 77:18
abrasion [1] - 92:5
abrasions [2] - 53:7,
92:2
absence [3] - 66:2,
66:4, 66:13
absolute [1] - 48:22
absolutely [4] - 7:6,
19:20, 24:22, 95:13
access [1] - 24:15
according [1] - 30:7
account [1] - 76:9
accurate [12] - 8:6,
11:19, 30:11, 30:14,
44:16, 58:7, 63:21,
66:11, 69:24, 82:8,
84:11, 84:13
action [2] - 51:18,
98:17
actions [1] - 16:6
actual [7] - 43:7,
43:20, 44:4, 44:13,
78:19, 80:15, 94:21
acute [2] - 78:18,
80:14
addition [4] - 79:24,
80:2, 88:24, 89:3
address [1] - 5:16
addressed [1] - 33:2
administer [1] - 4:16
administrators [1] -
1:4
admitted [3] - 42:24,
43:7, 51:9
advantage [1] -
77:21
advise [1] - 67:21
advised [1] - 25:10
advisement [1] -
29:18
advisor [1] - 44:18
affect [1] - 66:5
affected [1] - 68:16
afternoon [3] - 5:19,
5:20, 10:8
ago [1] - 6:9
agree [3] - 73:25,
87:3, 87:14
agreed [1] - 87:16
AGREED [3] - 4:3,
4:9, 4:14
agreeing [1] - 87:8
agreement [1] - 6:13
agrees [1] - 86:25
ahead [1] - 31:17
Albertson [5] - 56:6,
56:9, 56:12, 56:16,
56:17
Albertson's [1] -
56:18
allow [6] - 28:12,

28:13, 41:25, 46:5,
75:21, 75:24
allowed [1] - 69:5
allows [1] - 65:7
alone [2] - 45:16,
87:21
altercation [15] -
70:22, 71:12, 71:17,
72:4, 78:17, 78:20,
79:4, 79:8, 80:3,
80:16, 80:21, 83:20,
91:24, 92:9, 92:23
altercations [1] -
69:18
alternative [2] -
45:23, 87:5
anatomic [3] - 83:8,
83:17, 84:7
AND [4] - 1:13, 4:2,
4:8, 4:13
answer [54] - 7:17,
12:20, 16:12, 16:14,
16:18, 16:21, 17:3,
17:5, 19:11, 20:13,
20:23, 21:13, 21:15,
22:2, 22:6, 28:4,
31:15, 38:20, 40:21,
40:22, 40:23, 43:25,
47:2, 47:4, 50:20,
51:25, 53:8, 56:14,
57:12, 57:19, 60:6,
60:7, 62:9, 63:6,
63:17, 65:14, 66:16,
67:7, 67:17, 70:5,
71:4, 71:8, 72:21,
73:18, 73:21, 78:10,
79:25, 82:10, 84:18,
85:11, 85:14, 88:8,
90:11, 90:17
Answer [3] - 15:8,
68:18, 68:21
answered [9] -
21:11, 32:10, 38:17,
38:19, 72:21, 80:16,
87:13, 89:9, 90:14
answering [4] - 11:8,
40:19, 41:23, 89:10
answers [4] - 33:21,
34:10, 35:4, 96:12
anyway [1] - 20:14
anyways [1] - 48:17
apologize [2] - 17:8,
57:17
apparent [2] - 22:21,
37:3
appeared [1] - 47:8
appreciate [1] -
36:25
appropriate [1] -
44:4
area [8] - 57:9,

57:22, 57:25, 58:20,
61:19, 62:7, 84:7
areas [5] - 15:10,
34:12, 58:3, 58:11,
61:10
arrest [1] - 80:24
arrested [1] - 81:9
Article [1] - 44:19
aspect [8] - 34:16,
44:7, 44:9, 47:6,
52:18, 62:6, 71:8
aspects [1] - 44:21
assigned [2] - 55:14,
56:6
assistant [5] - 31:20,
31:21, 31:22, 52:4,
52:11
Assistant [1] - 56:7
associate [1] - 5:22
associated [5] -
70:21, 71:12, 72:3,
91:23, 92:8
ASST [1] - 1:12
Asst [1] - 3:5
attention [8] - 25:15,
25:18, 46:20, 46:23,
56:22, 64:17, 78:11,
85:18
attorney [10] - 11:2,
11:4, 12:19, 31:21,
32:11, 39:5, 39:18,
41:19, 52:5, 94:16
ATTORNEY [4] -
1:11, 1:11, 1:12, 2:9
Attorney [5] - 1:14,
1:15, 2:16, 3:5, 3:6
attorney's [24] -
10:20, 29:8, 37:5,
37:10, 37:16, 38:2,
38:10, 38:14, 38:23,
39:9, 40:13, 41:2,
41:12, 41:13, 42:10,
52:15, 55:19, 93:19,
93:21, 93:25, 94:5,
94:8, 94:22, 97:12
attorneys [2] - 4:3,
52:11
Attorneys [3] - 2:4,
2:10, 3:4
author [1] - 45:22
authorities [1] - 33:6
authority [2] - 52:7,
52:10
authorized [1] - 4:16
autopsy [34] - 15:4,
24:3, 24:11, 28:10,
28:19, 30:13, 30:17,
34:3, 39:3, 42:23,
43:7, 43:17, 44:8,
44:21, 45:16, 46:18,
53:25, 55:12, 55:15,



59:8, 59:11, 59:14,
59:18, 62:22, 67:15,
70:8, 70:15, 73:4,
74:4, 77:10, 83:5,
84:22, 88:5, 88:10
**Autopsy** [2] - 5:5,
97:19
**aware** [2] - 10:20,
17:15

**B**

**Babylon** [1] - 1:24
**bailiwick** [1] - 37:24
**based** [15] - 11:18,
17:4, 19:6, 30:10,
39:11, 41:2, 42:10,
46:13, 48:6, 49:10,
52:21, 59:24, 90:19,
93:24, 94:24
**basis** [3] - 71:2,
72:18, 90:16
**beaten** [1] - 79:19
**begin** [2] - 85:21,
85:25
**beginning** [1] - 14:21
**begins** [1] - 71:10
**believes** [1] - 83:13
**below** [5] - 52:24,
58:11, 58:12, 58:22,
83:18
**beneath** [4] - 53:5,
57:9, 58:4, 59:2
**best** [2] - 7:18, 30:25
**better** [5] - 33:2,
45:23, 46:14, 65:9,
72:7
**between** [2] - 4:3,
94:22
**beyond** [3] - 11:9,
78:19, 80:14
**bit** [9] - 47:14, 47:18,
48:10, 49:6, 49:15,
49:20, 51:14, 51:16,
95:15
**bite** [13] - 47:8,
47:15, 47:17, 47:18,
47:19, 48:4, 48:15,
49:10, 49:24, 50:24,
51:2, 51:5, 51:8
**biting** [2] - 50:9, 51:9
**bitten** [4] - 48:10,
49:6, 49:20, 50:14
**blood** [2] - 62:8,
98:17
**blunt** [27] - 83:21,
84:3, 84:9, 84:15,
84:19, 84:24, 85:6,
85:15, 85:22, 86:2,
86:8, 86:12, 86:14,
88:12, 89:14, 89:24,

90:5, 91:20, 91:21,
91:25, 92:4, 92:5,
92:10, 92:14, 92:18
**body** [18] - 13:24,
14:2, 19:19, 34:25,
48:3, 49:21, 49:24,
58:4, 62:6, 69:17,
69:18, 69:23, 70:25,
71:17, 73:3, 74:14,
76:10, 91:21
**bones** [1] - 53:10
**boss** [1] - 32:18
**Boulevard** [2] - 2:5,
3:7
**brain** [1] - 15:10
**break** [1] - 7:15
**breaks** [1] - 7:19
**BREWINGTON** [1] -
2:3
**Brewington** [8] -
5:23, 6:8, 9:7, 9:12,
10:17, 11:16, 11:24,
12:5
**BRIAN** [1] - 2:19
**broke** [1] - 53:7
**brought** [1] - 19:15
**Brown** [1] - 60:16
**Brown's** [4] - 7:25,
8:2, 8:13, 29:11
**bruise** [1] - 47:16
**bruises** [4] - 13:23,
14:3, 53:5, 61:24
**Buonora** [1] - 31:25
**Bureau** [1] - 56:6
**bureau** [1] - 56:21
**buttock** [1] - 48:3
**BY** [6] - 2:7, 2:19,
3:9, 5:11, 28:23, 97:3

**C**

**cage** [4] - 58:14,
59:3, 60:4, 61:10
**Calliste** [3] - 5:21,
93:14, 95:4
**CALLISTE** [30] - 2:7,
5:12, 12:25, 13:13,
16:23, 17:10, 26:9,
26:16, 27:2, 27:7,
27:10, 27:18, 27:23,
28:3, 28:7, 28:17,
28:23, 29:5, 29:17,
38:18, 41:22, 42:7,
72:22, 90:15, 93:4,
95:8, 95:10, 95:13,
95:16, 97:4
**capacities** [1] - 1:15
**capacity** [9] - 1:7,
1:8, 1:8, 1:9, 1:10,
1:10, 1:12, 1:13,
94:17

**cardiac** [6] - 62:24,
63:12, 71:11, 83:19,
91:22, 92:8
**case** [15] - 10:14,
17:16, 29:9, 34:16,
36:10, 36:13, 43:18,
50:22, 51:11, 55:15,
55:20, 56:7, 56:9,
56:11, 97:13
**caused** [8] - 37:13,
39:14, 64:5, 71:9,
82:18, 83:3, 85:8,
87:22
**causes** [1] - 36:20
**cavity** [1] - 58:14
**Centre** [1] - 1:18,
5:17
**certainly** [7] - 12:14,
14:18, 17:9, 18:21,
34:22, 72:25, 80:7
**certification** [1] - 4:6
**certify** [3] - 96:8,
98:9, 98:15
**chain** [1] - 31:7
**charge** [1] - 60:13
**charged** [6] - 78:15,
79:11, 79:18, 80:20,
81:5, 81:13
**charges** [2] - 80:25,
83:2
**check** [1] - 70:12
**checked** [1] - 59:15
**chemically** [1] -
69:19
**chest** [1] - 57:8
**chief** [4] - 31:20,
31:22, 56:21
**Chief** [1] - 56:6
**chose** [1] - 45:6
**CHRISTOPHER** [1] -
1:9
**Christopher** [1] -
2:15
**circumstances** [1] -
35:25
**claimed** [1] - 50:14
**claiming** [2] - 51:13,
51:16
**clarification** [2] -
24:10, 93:15
**clarify** [1] - 80:4,
93:12
**clarity** [1] - 30:20
**class** [4] - 78:16,
79:11, 80:20, 81:5
**clear** [1] - 45:15
**clock** [3] - 60:10,
60:11, 60:14
**closely** [1] - 6:17
**closer** [1] - 54:19
**co** [1] - 1:4

**co-administrators**
[1] - 1:4
**Collins** [10] - 3:6,
5:2, 5:5, 5:15, 12:24,
13:9, 14:14, 46:21,
54:3, 83:5
**COLLINS** [7] - 1:12,
1:21, 96:7, 96:17,
97:4, 97:16, 98:10
**combined** [1] - 87:21
**command** [1] - 31:7
**Commissioner** [1] -
2:12
**COMMISSIONER** [1]
- 1:6
**complete** [1] - 96:11
**completed** [2] -
55:12, 55:15
**components** [1] -
62:2
**concerned** [2] -
21:23, 50:21
**concerns** [2] - 50:13,
50:16
**concluded** [3] - 51:2,
63:22, 64:12
**concludes** [1] -
82:25
**concluding** [1] - 77:4
**conclusion** [12] -
38:3, 38:23, 39:6,
39:11, 41:5, 44:10,
62:23, 63:11, 66:17,
76:20, 93:23, 94:14
**conclusions** [5] -
37:11, 38:15, 41:14,
48:9, 77:24
**condition** [1] - 92:24
**conditions** [4] -
66:22, 67:3, 67:12,
67:16
**conduct** [1] - 37:6
**conducted** [1] -
37:18
**conducting** [1] -
6:19
**confusing** [1] - 18:10
**congested** [1] - 64:6
**conjunction** [1] -
25:6
**considered** [1] -
30:24
**consistent** [6] -
47:17, 48:4, 48:15,
48:21, 48:25, 88:5
**Constant** [2] - 31:24,
31:25
**constant** [2] - 32:2,
32:3
**consulted** [1] - 33:3
**contained** [2] -

23:21, 30:13
**context** [1] - 65:8
**continue** [2] - 60:12,
81:18
**continued** [5] - 6:12,
47:4, 71:19, 78:19,
80:14
**Continued** [1] - 3:2
**continues** [3] -
65:14, 65:21, 67:11
**continuing** [2] -
64:23, 79:6
**contribute** [3] -
20:10, 89:16, 92:20
**contributed** [26] -
15:22, 19:24, 21:4,
35:8, 35:19, 36:23,
37:22, 63:3, 63:24,
64:13, 66:10, 66:19,
67:3, 67:23, 68:5,
82:5, 82:21, 83:3,
83:13, 83:16, 84:25,
88:13, 88:20, 88:23,
89:24, 92:16
**contributing** [2] -
68:12, 84:16
**contributory** [5] -
22:9, 35:15, 36:20,
88:20, 92:10
**contusions** [1] -
92:3, 92:5, 92:7
**conversations** [1] -
33:4
**copy** [3] - 10:19,
13:2, 13:4
**correct** [23] - 6:25,
9:17, 12:12, 20:16,
24:21, 40:10, 45:6,
52:7, 52:12, 52:15,
55:14, 74:23, 75:23,
83:11, 85:9, 86:5,
86:6, 87:7, 88:2,
90:20, 91:14, 96:11,
96:13
**correspondence** [1]
- 12:16
**Counsel** [2] - 28:7,
97:21
**counsel** [7] - 6:13,
7:19, 10:5, 10:24,
10:25, 12:17, 12:19
**county** [3] - 11:2,
11:4, 12:18
**COUNTY** [6] - 1:6,
1:11, 1:11, 2:9, 96:5,
98:5
**County** [11] - 1:14,
1:15, 2:10, 2:16, 3:4,
6:5, 31:14, 94:6, 94:9,
94:13, 94:19
**couple** [3] - 55:12,

93:13, 95:5
coupled [1] - 92:23
course [1] - 54:24
court [5] - 7:11, 9:3, 13:6, 27:14, 75:12
COURT [1] - 1:2
Court [3] - 4:19, 6:15, 45:23
courts [1] - 75:13
criminal [1] - 39:21
criminally [1] - 41:7
culpability [1] - 39:21
culpable [1] - 41:6
cut [2] - 55:6, 55:23
CV [1] - 1:16

**D**

DA [1] - 56:7
DA's [3] - 10:11, 10:15, 40:3
date [4] - 9:18, 9:19, 9:22, 64:14
dead [1] - 18:19
dealing [3] - 29:20, 34:17, 36:11
deals [1] - 59:11
dealt [1] - 59:8
death [69] - 9:10, 12:8, 15:22, 17:15, 19:8, 19:14, 19:25, 20:11, 20:20, 21:4, 22:8, 22:9, 22:20, 24:15, 35:8, 35:19, 36:11, 36:21, 36:24, 37:12, 37:22, 38:4, 38:9, 38:24, 39:14, 39:22, 42:13, 42:19, 62:24, 63:3, 63:9, 63:12, 63:25, 64:6, 64:14, 66:3, 66:10, 66:19, 66:23, 67:4, 67:24, 68:5, 68:12, 71:11, 74:13, 82:21, 83:3, 83:13, 83:16, 83:18, 83:19, 83:24, 84:8, 84:16, 84:20, 84:25, 85:7, 85:9, 85:15, 87:23, 88:13, 88:23, 89:16, 89:25, 91:23, 92:7, 92:8, 92:16, 92:25
decedent [2] - 51:17, 79:7
decide [2] - 39:20, 75:15
decided [1] - 41:9
decides [1] - 75:7
decision [7] - 8:2, 8:4, 39:23, 39:25,

declared [1] - 18:19
Defendant [1] - 1:21
defendant [1] - 79:7
Defendants [3] - 1:16, 2:10, 3:4
define [2] - 64:25, 75:12
delve [1] - 88:22
demise [1] - 23:11
department [2] - 37:19, 52:9
Department [1] - 2:11
DEPARTMENT [1] - 1:6
deposed [1] - 11:24
deposition [24] - 4:6, 4:14, 6:7, 6:12, 6:14, 6:16, 6:19, 6:24, 7:23, 8:20, 8:22, 9:6, 9:14, 9:16, 9:22, 10:4, 10:10, 11:15, 12:5, 15:2, 42:4, 96:9, 98:11, 98:13
Deposition [1] - 1:21
describe [4] - 19:4, 23:9, 23:10, 71:19
described [3] - 61:2, 84:8
describes [4] - 48:20, 50:24, 68:13, 84:15
describing [1] - 79:2
designation [1] - 75:22
detail [1] - 35:17
deterioration [2] - 64:9, 64:13
determination [5] - 24:8, 25:2, 30:21, 39:12, 45:16
determinations [2] - 40:14, 54:9
determine [4] - 42:12, 42:19, 66:10, 77:18
determined [2] - 42:16, 67:2
DI [1] - 16:13
diagnoses [3] - 83:8, 83:17, 84:7
died [6] - 17:20, 18:14, 18:16, 18:22, 19:2, 77:14
different [1] - 36:14
direct [1] - 17:3
directed [2] - 72:7, 94:15
directing [8] - 25:15, 25:18, 46:20, 46:23,

56:22, 64:17, 78:11, 85:18
DIRECTIONS [1] - 97:6
directly [2] - 32:10, 32:15
discuss [7] - 15:15, 19:22, 22:7, 34:12, 34:15, 34:19, 47:25
discussed [5] - 11:9, 20:2, 37:2, 49:7, 86:2
discussing [1] - 11:11
discussion [2] - 58:16, 77:19
Discussion [1] - 14:19
discussions [5] - 11:4, 12:18, 33:8, 34:23, 48:7
disease [2] - 64:3, 68:16
diseases [2] - 66:4, 66:13
dissected [1] - 57:8
dissecting [1] - 61:25
distinction [1] - 37:2
DISTRICT [5] - 1:2, 1:2, 1:11, 1:11, 1:12
district [32] - 10:20, 29:8, 31:21, 32:11, 37:5, 37:10, 37:16, 38:2, 38:9, 38:14, 38:22, 39:5, 39:8, 39:18, 40:13, 41:2, 41:12, 41:13, 41:19, 42:10, 52:5, 52:11, 52:15, 55:19, 93:18, 93:20, 93:24, 94:4, 94:8, 94:16, 94:21, 97:11
District [5] - 1:14, 1:15, 2:16, 3:5, 3:6
doctor [46] - 43:16, 44:5, 44:6, 44:20, 44:24, 45:3, 45:5, 45:8, 46:2, 46:5, 47:15, 47:18, 48:14, 48:16, 48:19, 48:20, 57:8, 65:23, 65:25, 66:7, 69:22, 70:8, 70:25, 71:15, 71:22, 74:16, 74:21, 75:2, 75:5, 76:8, 76:15, 76:19, 76:25, 77:3, 77:5, 77:13, 77:20, 77:23, 78:4, 78:6, 78:24, 80:11, 80:12, 80:16, 81:7, 81:11
doctor's [6] - 44:13, 46:6, 62:9, 76:4,

77:10, 82:25
document [2] - 13:7, 83:9
DOCUMENT [1] - 97:9
documents [2] - 7:23, 90:23
DOES [1] - 1:13
done [2] - 57:3, 57:6
Dormer [2] - 2:12
DORMER [1] - 1:6
doubt [5] - 24:25, 25:14, 25:16, 28:22, 44:9
down [4] - 77:13, 87:15, 87:17, 87:20
Dr [2] - 35:12, 69:17
Drive [2] - 1:18, 5:17
duly [2] - 5:8, 98:12
Dunne [1] - 12:19
during [23] - 9:6, 10:10, 12:8, 13:11, 13:14, 13:15, 14:5, 19:23, 28:18, 33:20, 35:5, 36:11, 43:22, 49:12, 50:2, 51:21, 51:24, 58:9, 69:3, 76:13, 92:13, 92:22

**E**

East [1] - 1:24
EASTERN [1] - 1:2
ed [1] - 20:10
edification [1] - 62:17
effect [6] - 4:17, 20:19, 23:10, 63:9, 66:14, 71:16
effort [1] - 72:9
Either [1] - 86:22
either [2] - 49:10, 63:25
EKG [1] - 71:11
electronic [2] - 8:2, 60:17
elicited [1] - 14:7
Emily [1] - 31:24, 31:25
employees [1] - 1:15
employment [2] - 41:3, 42:11
encompassed [1] - 58:16
end [2] - 15:17, 64:21
ended [1] - 79:4
engage [1] - 12:16
entire [1] - 24:9
entity [2] - 93:25, 94:13

Erika [1] - 1:21
ERIKA [1] - 98:7, 98:25
Esq [1] - 5:15
ESQ [8] - 1:21, 2:7, 2:19, 3:9, 96:7, 96:17, 97:4, 98:10
essence [1] - 94:4
Estate [1] - 1:4
estate [1] - 6:4
evening [1] - 18:15
events [1] - 11:20
evidence [9] - 30:7, 33:11, 43:10, 45:20, 46:5, 46:13, 54:20, 64:9, 79:9
exactly [1] - 93:22
EXAMINATION [2] - 5:11, 97:3
examination [6] - 20:18, 49:19, 55:3, 61:16, 61:18, 64:4
examined [2] - 5:9, 62:22
examiner [95] - 12:7, 13:15, 13:17, 13:22, 14:2, 14:6, 14:8, 15:20, 18:2, 19:7, 19:14, 19:23, 20:4, 20:5, 20:9, 20:18, 20:25, 22:8, 22:10, 22:19, 22:24, 23:9, 23:14, 24:7, 24:12, 25:5, 25:17, 26:3, 28:18, 30:24, 33:16, 34:4, 34:16, 34:19, 34:24, 35:5, 35:6, 35:17, 35:23, 37:3, 37:19, 42:16, 42:18, 43:12, 45:13, 47:21, 47:25, 48:7, 48:8, 49:4, 49:5, 49:18, 50:23, 50:25, 54:9, 54:18, 54:22, 55:11, 57:18, 57:24, 58:2, 58:9, 58:19, 58:25, 60:2, 60:19, 60:23, 61:14, 63:8, 63:21, 64:12, 67:20, 68:3, 68:6, 68:10, 69:5, 72:8, 72:14, 72:24, 73:9, 73:11, 73:12, 73:19, 74:2, 74:6, 74:9, 81:8, 83:10, 83:12, 84:14, 84:22, 84:24, 85:22, 89:5, 92:12
examiner's [16] - 27:5, 27:11, 30:15, 30:18, 37:23, 38:5, 38:11, 38:25, 43:20, 52:22, 53:16, 68:25,

69:3, 72:9, 72:13, 91:13
  **example** [1] - 77:4
  **except** [1] - 4:9
  **exception** [1] - 61:23
  **exclude** [1] - 25:4
  **exertion** [10] - 68:23, 70:5, 70:21, 71:11, 72:3, 78:25, 83:20, 91:23, 92:8, 92:22
  **Exhibit** [2] - 5:2, 5:5
  **exhibit** [3] - 42:24, 43:8, 45:18
  **exhibited** [2] - 20:3, 81:3
  **exhibits** [12] - 9:24, 26:13, 26:15, 26:21, 27:9, 29:3, 29:4, 29:6, 30:5, 33:25, 97:21
  **Exhibits** [1] - 97:10
  **EXHIBITS** [1] - 97:15
  **existed** [1] - 25:9
  **expect** [1] - 42:7
  **experience** [8] - 45:22, 49:10, 74:22, 75:9, 76:16, 76:21, 78:7, 79:5
  **experienced** [5] - 77:5, 77:15, 79:10, 79:17, 81:12
  **experiencing** [1] - 82:6
  **expert** [11] - 22:16, 22:17, 74:17, 75:3, 75:5, 75:7, 75:13, 75:15, 75:22, 75:25, 80:17
  **expertise** [3] - 30:25, 69:11, 72:8
  **expired** [1] - 16:5
  **explain** [6] - 22:11, 22:20, 31:2, 65:4, 66:3, 69:23
  **explore** [1] - 18:3
  **extent** [3] - 91:2, 94:14, 94:19
  **external** [4] - 24:13, 61:19, 62:2, 62:6
  **externally** [1] - 61:17
  **extremities** [1] - 92:6

**F**

  **face** [1] - 92:3
  **fact** [5] - 14:8, 19:18, 33:9, 50:13, 51:7
  **factor** [2] - 68:12, 84:16
  **factors** [3] - 22:9, 35:15, 85:8
  **facts** [2] - 17:16,

36:14
  **fair** [2] - 30:19, 86:13
  **familiar** [3] - 26:4, 34:8, 63:13
  **family** [1] - 6:3
  **far** [10] - 11:19, 21:23, 37:21, 39:5, 41:21, 48:16, 48:18, 64:5, 65:24, 77:17
  **federal** [1] - 33:6
  **Federal** [6] - 6:15, 16:23, 29:20
  **felonies** [1] - 78:16, 79:11, 79:18, 80:20, 81:5, 81:13, 82:4, 82:18
  **few** [2] - 6:20, 7:10
  **fight** [3] - 71:20, 71:24, 81:19
  **fight-or-flight** [1] - 71:20
  **file** [13] - 10:12, 10:16, 10:19, 11:5, 11:6, 11:12, 11:15, 23:21, 29:4, 29:7, 30:15, 30:18, 97:10
  **filed** [1] - 6:5
  **filing** [1] - 4:5
  **final** [3] - 83:8, 83:17, 84:7
  **findings** [4] - 72:5, 72:10, 72:13, 72:16
  **fine** [4] - 7:21, 17:12, 29:17, 95:16
  **finish** [2] - 65:20, 91:11
  **firm** [1] - 8:16
  **first** [11] - 6:11, 7:17, 26:12, 26:15, 26:21, 45:19, 55:10, 81:15, 81:20, 83:9, 84:23
  **five** [2] - 41:18, 68:19
  **five-six** [1] - 68:19
  **flight** [2] - 71:20, 71:24
  **flipping** [1] - 30:3
  **focussing** [1] - 61:9
  **follow** [7] - 6:20, 49:14, 49:16, 50:5, 52:18, 58:21, 95:5
  **follow-up** [4] - 6:20, 49:14, 49:16, 95:5
  **follow-ups** [1] - 58:21
  **following** [15] - 9:21, 11:15, 12:4, 18:23, 47:11, 48:14, 61:16, 61:22, 72:3, 78:16, 79:8, 80:21, 83:19, 91:23, 92:8
  **Following** [1] - 70:21

**follows** [2] - 5:10, 47:18
  **FOR** [1] - 97:16
  **force** [1] - 4:17
  **form** [35] - 4:10, 16:14, 16:20, 18:6, 19:10, 20:12, 21:6, 21:8, 22:5, 31:9, 32:17, 37:15, 39:16, 41:16, 42:15, 43:24, 44:15, 48:12, 50:19, 51:23, 60:5, 63:4, 63:16, 67:5, 69:8, 73:7, 73:15, 76:11, 77:9, 79:23, 85:2, 88:6, 89:7, 90:8, 93:13
  **formed** [1] - 93:22
  **forth** [1] - 98:12
  **four** [1] - 41:18
  **fractured** [2] - 57:22, 57:25, 58:19
  **fractures** [1] - 53:12
  **frame** [2] - 78:19, 80:15
  **FREDERICK** [1] - 2:3
  **Frederick** [1] - 5:23
  **front** [3] - 22:9, 28:2, 89:20
  **full** [3] - 5:13, 71:20, 73:21
  **fully** [1] - 44:20
  **FURTHER** [2] - 4:8, 4:13

**G**

  **general** [1] - 33:23
  **generally** [1] - 45:20
  **gestures** [1] - 7:11
  **given** [4] - 73:3, 83:2, 96:12, 98:14
  **glasses** [1] - 14:16
  **Gonzalez** [1] - 6:3
  **GONZALEZ** [2] - 1:3
  **grand** [104] - 5:3, 6:16, 6:22, 8:5, 8:9, 8:11, 8:20, 8:24, 8:25, 9:4, 9:9, 9:23, 10:13, 13:4, 13:5, 13:16, 19:15, 20:4, 20:5, 20:21, 22:10, 22:12, 22:20, 23:7, 23:15, 23:18, 24:16, 24:21, 25:3, 25:6, 25:10, 29:12, 29:13, 29:14, 31:3, 31:5, 32:5, 32:9, 32:16, 32:24, 33:12, 33:15, 33:22, 34:6, 35:2, 35:13, 35:20, 35:24, 36:12, 36:16,

37:4, 37:8, 39:2, 39:10, 39:19, 39:20, 39:22, 39:25, 40:16, 41:4, 41:9, 41:20, 42:24, 43:22, 44:11, 44:18, 44:21, 44:23, 45:2, 45:3, 45:4, 45:7, 45:11, 45:17, 45:18, 46:11, 46:15, 47:6, 47:24, 49:3, 49:8, 49:14, 50:2, 50:18, 51:11, 51:21, 58:10, 59:25, 67:21, 69:4, 72:10, 75:3, 75:4, 75:7, 77:12, 78:2, 90:20, 90:24, 91:4, 91:14, 91:18, 92:14, 97:17
  **great** [1] - 41:10
  **GREGORY** [1] - 2:7
  **Gregory** [1] - 5:21
  **ground** [1] - 7:10
  **guess** [3] - 14:21, 62:10, 64:20
  **guilty** [1] - 40:17
  **GUNTHER** [2] - 98:7, 98:25
  **Gunther** [1] - 1:22
  **gut** [1] - 43:11

**H**

  **half** [1] - 78:9
  **hand** [1] - 98:21
  **handle** [1] - 69:17
  **handles** [3] - 69:23, 71:2, 73:3
  **Hauppauge** [1] - 2:18
  **head** [3] - 7:12, 61:25, 92:2
  **hear** [1] - 45:14
  **heard** [1] - 63:13
  **heart** [3] - 15:10, 64:7, 68:17
  **hello** [1] - 10:6
  **help** [1] - 31:2
  **hemorrhage** [1] - 62:8
  **hemorrhaging** [2] - 15:11, 53:5
  **Hempstead** [1] - 2:6
  **hereby** [2] - 96:7, 98:9
  **HEREBY** [1] - 4:2
  **herein** [1] - 4:4
  **hereinbefore** [1] - 98:11
  **hereunto** [1] - 98:21
  **herself** [1] - 43:13
  **highly** [1] - 68:22

**Highway** [1] - 2:17
  **himself** [4] - 77:20, 78:15, 79:7, 80:19
  **himself's** [1] - 39:6
  **hit** [1] - 51:20
  **hmm** [6] - 57:11, 61:7, 67:10, 72:17, 80:23, 85:24
  **hold** [1] - 29:19
  **homicide** [4] - 42:13, 42:20, 56:9, 56:21
  **Homicide** [1] - 56:5
  **Honor** [1] - 5:19
  **hopefully** [2] - 11:25, 16:24
  **hospital** [2] - 18:17, 18:20
  **hours** [1] - 32:18
  **hundred** [1] - 30:7
  **hypertrophy** [1] - 64:7

**I**

  **I.D** [1] - 97:16
  **identification** [2] - 5:4, 5:6
  **identified** [1] - 61:24
  **Ill** [1] - 84:12, 91:25
  **illness** [1] - 64:9
  **illnesses** [6] - 63:23, 64:12, 66:8, 66:9, 66:19, 67:18
  **immediate** [1] - 19:4
  **immediately** [2] - 18:23, 56:10
  **impact** [4] - 85:23, 86:9, 86:13, 86:14
  **impacts** [20] - 83:21, 84:3, 84:10, 84:15, 84:19, 84:25, 85:6, 85:15, 88:12, 89:14, 89:24, 90:6, 91:21, 91:25, 92:2, 92:4, 92:6, 92:10, 92:15, 92:18
  **important** [8] - 18:2, 20:8, 20:25, 36:15, 43:21, 44:12, 49:25
  **IN** [1] - 98:20
  **inappropriate** [6] - 45:21, 46:9, 46:12, 75:6, 75:12, 75:14
  **INC** [1] - 1:23
  **incident** [3] - 18:15, 52:19, 56:8
  **include** [2] - 45:16, 45:17
  **included** [3] - 24:3, 35:14, 85:6
  **including** [1] - 14:3



**incorrectly** [1] - 62:14
**indeed** [2] - 48:9, 49:15
**Index** [1] - 1:16
**indicate** [2] - 26:2, 26:18
**indicated** [9] - 10:11, 23:13, 24:19, 34:2, 58:19, 68:10, 79:3, 84:24, 95:14
**indicates** [3] - 30:3, 65:25, 86:18
**indicating** [1] - 89:23
**indication** [2] - 58:2, 59:14
**indirectly** [1] - 32:15
**individual** [10] - 1:7, 1:7, 1:8, 1:9, 1:10, 1:10, 1:12, 1:13, 1:14, 16:5
**individually** [1] - 1:4
**inferred** [1] - 94:5
**informed** [1] - 44:20
**informing** [1] - 81:25
**injuries** [55] - 13:18, 14:2, 14:8, 15:3, 15:5, 15:9, 15:21, 17:23, 18:4, 19:18, 19:24, 20:3, 20:6, 20:10, 20:19, 21:2, 22:11, 22:21, 22:25, 23:22, 31:2, 34:17, 35:7, 36:22, 36:24, 52:23, 53:3, 53:10, 53:14, 53:18, 53:21, 53:22, 54:10, 54:16, 58:22, 59:2, 59:10, 59:16, 60:3, 60:19, 60:22, 60:24, 61:5, 61:14, 61:19, 62:5, 63:2, 63:8, 63:23, 66:3, 66:18, 67:22, 86:2, 88:23, 92:19
**injury** [8] - 23:10, 37:3, 57:10, 59:10, 60:25, 62:3, 62:7, 62:24
**innocent** [1] - 40:17
**inquire** [1] - 52:18
**inquiries** [1] - 33:11
**inquiry** [3] - 14:10, 34:13, 47:21
**inside** [1] - 14:16
**instrumentality** [2] - 48:22, 48:23
**intensive** [1] - 68:23
**interaction** [3] - 17:20, 19:3, 41:3
**interactions** [2] - 18:24, 42:11

**interested** [1] - 98:18
**internal** [9] - 15:11, 24:14, 61:18, 62:2, 62:7, 66:3, 66:5, 66:14, 94:21
**interposed** [2] - 94:3, 94:10
**interviews** [1] - 35:6
**investigate** [1] - 50:2
**investigation** [11] - 9:9, 12:8, 16:7, 17:15, 17:22, 24:14, 36:12, 37:6, 37:18, 39:12, 51:24
**investigators** [1] - 52:14
**involved** [2] - 55:22, 56:15
**involvement** [5] - 6:21, 32:4, 33:5, 55:25, 56:5
**IS** [3] - 4:2, 4:8, 4:13
**issue** [2] - 8:21, 18:3
**issued** [1] - 55:16
**issues** [1] - 69:6
**IT** [3] - 4:2, 4:8, 4:13
**item** [1] - 6:17
**items** [9] - 6:14, 6:18, 9:23, 10:18, 11:14, 26:21, 28:25, 69:6, 83:10
**itself** [4] - 51:6, 74:15, 87:17, 94:6
**IV** [2] - 84:12, 92:4

---

**J**

**James** [1] - 2:13
**JAMES** [1] - 1:8
**JANE** [1] - 1:13
**Janet** [1] - 56:6
**JENNIFER** [1] - 1:3
**John** [13] - 2:13, 3:6, 5:15, 28:20, 31:24, 38:21, 44:2, 48:13, 52:2, 57:13, 60:6, 63:6, 88:8
**JOHN** [8] - 1:7, 1:12, 1:13, 1:21, 96:7, 96:17, 97:4, 98:10
**Jr** [1] - 5:21
**JR** [1] - 2:7
**judge** [5] - 9:2, 21:19, 21:20, 26:25, 75:22
**JUDGE** [1] - 1:9
**Judge** [4] - 2:14, 7:25, 8:13, 29:11
**July** [1] - 56:13
**June** [1] - 1:19, 96:10, 98:22

**June/early** [1] - 56:13
**jurat** [1] - 39:3
**jury** [103] - 5:3, 6:16, 6:22, 8:5, 8:9, 8:12, 8:21, 8:24, 8:25, 9:4, 9:9, 9:23, 10:13, 13:4, 13:6, 13:16, 19:15, 20:4, 20:5, 20:21, 22:10, 22:12, 22:20, 23:7, 23:15, 23:18, 24:16, 24:21, 25:4, 25:6, 25:10, 29:12, 29:13, 29:14, 31:3, 31:5, 32:5, 32:9, 32:16, 32:24, 33:12, 33:15, 33:22, 34:6, 35:2, 35:13, 35:20, 35:24, 36:12, 36:16, 37:4, 37:8, 39:2, 39:10, 39:19, 39:20, 39:22, 40:16, 41:4, 41:9, 42:24, 43:22, 44:12, 44:18, 44:21, 44:23, 45:2, 45:3, 45:4, 45:7, 45:11, 45:17, 45:18, 46:11, 47:6, 47:24, 49:3, 49:8, 49:14, 50:2, 50:18, 51:11, 51:21, 58:10, 59:25, 67:21, 67:22, 69:4, 69:5, 72:10, 75:4, 75:7, 75:15, 77:12, 78:2, 90:20, 90:24, 91:4, 91:14, 91:18, 92:14, 97:17
**jury's** [3] - 39:25, 41:20, 46:15

---

**K**

**keep** [2] - 7:13, 65:15
**KENNY** [1] - 1:4
**Kenny** [2] - 9:10, 12:9
**kind** [1] - 28:8
**knowledge** [1] - 42:20

---

**L**

**lacerations** [2] - 53:7, 92:3
**large** [1] - 24:13
**last** [2] - 9:6, 10:10
**lastly** [1] - 94:19
**late** [1] - 56:13
**law** [1] - 41:20
**LAW** [1] - 2:3
**Law** [1] - 5:22

**lawsuit** [1] - 6:5
**lawyer** [1] - 16:22
**lawyers** [1] - 94:23
**layman's** [2] - 71:16, 78:25
**LAZO** [1] - 1:4
**Lazo** [59] - 6:3, 6:4, 6:23, 9:10, 12:9, 13:19, 14:9, 15:4, 15:21, 17:20, 17:24, 18:4, 18:14, 18:22, 19:2, 19:17, 20:3, 23:22, 34:18, 36:23, 47:8, 48:9, 49:6, 49:15, 49:20, 51:7, 51:9, 51:14, 51:17, 51:20, 52:24, 61:17, 63:2, 63:23, 66:8, 66:9, 66:18, 67:2, 67:23, 70:13, 76:18, 76:20, 77:4, 77:13, 77:19, 78:7, 78:14, 79:10, 79:16, 79:17, 80:19, 80:24, 81:3, 81:9, 81:12, 82:5, 83:2, 89:15, 92:15
**Lazo's** [36] - 13:24, 14:2, 20:19, 23:11, 24:11, 24:15, 31:2, 34:17, 34:25, 35:8, 35:19, 37:12, 37:22, 38:4, 38:9, 38:24, 39:14, 39:22, 42:12, 42:19, 48:2, 49:24, 53:10, 53:14, 54:10, 63:9, 64:5, 68:4, 68:11, 70:7, 78:17, 80:13, 84:16, 87:23, 91:21, 92:23
**lead** [2] - 40:10, 40:11
**learn** [1] - 79:14
**learning** [1] - 81:4
**least** [4] - 33:19, 45:22, 83:10, 84:14
**left** [2] - 12:20, 14:16
**legal** [2] - 44:17, 75:19
**less** [3] - 11:22, 42:8, 44:12
**letter** [1] - 12:18
**letters** [2] - 22:13, 22:14
**level** [5] - 52:24, 53:6, 78:18, 80:13, 81:17
**life** [17] - 14:9, 15:5, 15:9, 15:22, 17:24, 18:4, 21:3, 53:18, 53:21, 59:8, 59:9, 60:20, 66:4, 66:13, 68:16, 86:15

**life-threatening** [4] - 15:5, 53:18, 59:8, 59:9
**limited** [1] - 62:6
**line** [27] - 14:21, 15:2, 26:6, 46:24, 46:25, 47:10, 47:11, 50:23, 51:6, 56:25, 57:2, 61:22, 62:5, 64:20, 64:24, 65:3, 65:8, 65:13, 65:24, 68:15, 69:14, 78:12, 85:21, 86:12, 86:21, 87:17, 87:20
**lines** [3] - 58:23, 65:16, 71:7
**LINK** [1] - 1:10
**Link** [1] - 2:15
**list** [2] - 29:3, 75:8
**listed** [3] - 83:18, 84:19, 85:15
**listening** [1] - 29:23
**liver** [1] - 64:6
**LLP** [1] - 3:3
**look** [12] - 6:6, 43:3, 45:24, 50:22, 53:25, 54:5, 54:19, 54:22, 70:19, 82:11, 82:12, 84:21
**looked** [2] - 39:13, 49:9
**looking** [1] - 30:2
**loss** [1] - 62:8

---

**M**

**Magistrate** [2] - 7:25, 60:16
**Main** [1] - 1:24
**maintained** [4] - 10:12, 10:19, 29:7, 97:11
**major** [7] - 15:10, 53:17, 53:19, 58:16, 59:5, 62:8, 66:13
**mark** [1] - 41:24
**marked** [8] - 12:24, 13:9, 15:16, 54:2, 93:10, 93:14, 93:16, 95:3
**marks** [1] - 49:10
**marriage** [1] - 98:17
**match** [1] - 48:23
**matter** [25] - 6:8, 13:16, 31:5, 32:5, 32:9, 32:16, 32:21, 32:24, 33:15, 37:7, 39:9, 39:19, 40:10, 41:4, 44:11, 46:11, 47:24, 49:3, 49:13, 49:25, 50:18, 52:5,

59:25, 90:20, 98:19
matters [2] - 6:18, 36:10
ME [3] - 52:9, 67:8, 67:13
ME's [2] - 27:22, 27:25
mean [3] - 48:19, 55:6, 62:4
meaning [1] - 94:22
means [1] - 47:15
medical [120] - 12:7, 13:15, 13:17, 13:22, 13:25, 14:6, 14:7, 15:20, 18:2, 19:7, 19:14, 19:23, 20:4, 20:5, 20:9, 20:18, 20:25, 22:8, 22:10, 22:17, 22:19, 22:24, 23:9, 23:13, 24:7, 24:12, 25:5, 25:17, 26:3, 27:5, 27:11, 28:18, 30:15, 30:18, 30:24, 33:16, 34:4, 34:15, 34:19, 34:24, 35:5, 35:6, 35:17, 35:23, 37:3, 37:19, 37:23, 38:5, 38:11, 38:25, 42:16, 42:18, 42:21, 43:12, 43:20, 44:7, 45:12, 47:21, 47:25, 48:7, 48:8, 49:4, 49:5, 49:18, 50:23, 50:25, 52:22, 53:16, 54:8, 54:18, 54:21, 55:11, 57:18, 57:24, 58:2, 58:8, 58:18, 58:25, 60:2, 60:18, 60:23, 61:13, 63:7, 63:21, 64:11, 67:20, 68:3, 68:6, 68:10, 68:25, 69:3, 69:5, 69:25, 71:22, 72:8, 72:9, 72:13, 72:14, 72:23, 73:9, 73:10, 73:11, 73:18, 74:2, 74:4, 74:6, 74:9, 81:8, 83:9, 83:12, 84:14, 84:22, 84:24, 85:22, 89:5, 89:19, 89:23, 91:5, 91:12, 92:12
meet [3] - 5:24, 5:25, 33:15
meeting [2] - 30:23, 54:23
meetings [1] - 33:20
members [1] - 1:14
Memorial [1] - 2:17
memory [1] - 23:3
mention [1] - 72:15
mentioned [2] - 73:5,

84:10
mentions [1] - 71:22
Merrifield [2] - 56:7, 56:10
met [4] - 54:25, 55:3, 55:8, 55:10
microscopic [1] - 64:4
might [3] - 12:13, 17:17, 79:7
Milewski [2] - 35:12, 69:17
mind [1] - 51:4
minutes [28] - 5:3, 6:16, 8:5, 8:9, 8:12, 8:15, 8:21, 8:25, 9:2, 9:4, 9:14, 13:5, 13:6, 23:15, 25:19, 29:12, 29:13, 29:15, 43:14, 56:23, 59:23, 64:18, 69:13, 76:6, 85:19, 93:2, 93:8, 97:18
Mitchell [1] - 10:7
MITCHELL [34] - 2:19, 11:7, 13:3, 16:8, 18:6, 19:9, 20:12, 21:5, 31:8, 32:17, 37:14, 39:15, 41:15, 42:14, 43:23, 44:14, 48:11, 50:19, 51:23, 63:4, 63:15, 67:5, 69:8, 73:6, 73:14, 76:11, 79:21, 82:23, 85:2, 88:6, 89:7, 90:2, 90:7, 93:10
moment [2] - 14:20, 25:22
monitoring [1] - 55:19
months [1] - 55:13
morbid [4] - 68:2, 68:4, 68:5, 68:11
morbidly [1] - 68:22
morning [1] - 10:7
mostly [1] - 33:5
MR [121] - 5:12, 8:8, 11:7, 12:25, 13:3, 13:13, 16:8, 16:10, 16:13, 16:20, 16:23, 17:5, 17:10, 18:6, 18:7, 19:9, 19:11, 20:12, 20:13, 21:5, 21:7, 22:4, 26:9, 26:16, 26:23, 27:2, 27:4, 27:7, 27:8, 27:10, 27:15, 27:18, 27:21, 27:23, 27:25, 28:3, 28:5, 28:7, 28:13, 28:17, 28:20, 28:23, 29:5, 29:10, 29:17, 31:8, 31:13, 31:17, 32:17, 37:14,

38:16, 38:18, 38:20, 39:15, 39:17, 40:18, 40:21, 41:15, 41:17, 41:22, 42:5, 42:7, 42:14, 43:23, 43:25, 44:14, 48:11, 48:13, 50:19, 50:20, 51:23, 51:25, 57:12, 57:15, 59:20, 60:5, 63:4, 63:5, 63:15, 63:17, 67:5, 67:6, 69:8, 72:20, 72:22, 73:6, 73:14, 76:11, 76:12, 77:8, 79:21, 79:22, 79:25, 82:23, 84:17, 85:2, 85:3, 85:10, 87:18, 88:6, 88:7, 89:7, 89:8, 89:12, 90:2, 90:7, 90:13, 90:15, 93:2, 93:4, 93:8, 93:10, 95:4, 95:8, 95:9, 95:10, 95:12, 95:13, 95:16, 97:4
multiple [17] - 83:21, 84:3, 84:9, 84:15, 84:19, 84:24, 85:5, 85:15, 89:14, 89:24, 91:20, 91:24, 92:2, 92:4, 92:6, 92:10, 92:14

## N

name [4] - 5:13, 5:21, 22:13, 22:15
NASSAU [1] - 98:5
natural [1] - 64:3
necessarily [1] - 83:16
necessary [1] - 75:9
needed [3] - 62:19, 95:11, 95:17
negatives [1] - 74:7
Nesconset [1] - 3:8
new [1] - 6:13
New [9] - 1:18, 1:22, 1:24, 2:6, 2:18, 3:8, 5:17, 96:23, 98:8
NEW [3] - 1:2, 96:4, 98:3
Newton [1] - 2:13
NEWTON [1] - 1:7
nice [1] - 5:24, 5:25
none [2] - 64:4, 73:25, 86:14, 86:18
nonlife [6] - 34:17, 59:16, 60:3, 60:24, 61:2, 92:19
nonlife-threatening [4] - 59:16, 60:3,

60:24, 92:19
normal [1] - 17:14
Notary [4] - 1:22, 5:9, 96:23, 98:7
noted [2] - 61:20, 95:18
notes [1] - 9:24
nothing [3] - 27:21, 73:4, 74:2
number [2] - 23:23, 24:13
numbers [1] - 84:9

## O

O'BRIEN [62] - 3:3, 3:9, 8:8, 16:10, 16:13, 16:20, 17:5, 18:7, 19:11, 20:13, 21:7, 22:4, 26:23, 27:4, 27:8, 27:15, 27:21, 27:25, 28:5, 28:13, 28:20, 29:10, 31:13, 31:17, 38:16, 38:20, 39:17, 40:18, 40:21, 41:17, 42:5, 43:25, 48:13, 50:20, 51:25, 57:12, 57:15, 59:20, 60:5, 63:5, 63:17, 67:6, 72:20, 76:12, 77:8, 79:22, 79:25, 84:17, 85:3, 85:10, 87:18, 88:7, 89:8, 89:12, 89:18, 90:13, 93:2, 93:8, 95:4, 95:9, 95:12
O'Brien [1] - 95:15
oath [3] - 4:17, 39:2, 96:9
obese [2] - 68:14, 68:22
obesity [4] - 68:2, 68:5, 68:11, 92:11
object [42] - 8:8, 11:7, 16:8, 16:20, 18:6, 19:9, 20:12, 21:5, 21:7, 22:4, 26:24, 31:8, 32:17, 37:14, 38:16, 39:15, 39:17, 40:18, 41:15, 41:17, 42:6, 42:14, 43:23, 44:14, 48:11, 60:5, 63:4, 63:5, 63:15, 67:5, 67:6, 69:8, 73:6, 73:14, 76:11, 76:12, 77:8, 79:21, 79:22, 82:23, 87:19, 90:7
objected [2] - 41:18, 93:13
objecting [1] - 16:14

Objection [3] - 85:3, 88:7, 90:13
objection [18] - 16:10, 16:25, 21:17, 31:14, 50:19, 51:23, 84:17, 85:2, 85:10, 88:6, 89:7, 89:8, 89:18, 90:2, 93:23, 94:3, 94:7, 94:23
objections [3] - 4:9, 29:19, 94:11
objects [1] - 51:20
obligations [1] - 44:19
observed [1] - 86:13
occasions [1] - 33:18
occupied [1] - 56:12
occur [1] - 62:25
October [1] - 55:9
OF [9] - 1:2, 1:6, 1:11, 2:3, 96:4, 96:5, 98:3, 98:5
office [29] - 10:11, 10:15, 10:20, 12:20, 29:8, 31:10, 31:19, 37:6, 37:11, 38:2, 38:10, 38:14, 39:9, 40:4, 40:14, 41:2, 41:12, 41:13, 42:10, 52:15, 55:19, 93:19, 93:21, 93:25, 94:5, 94:8, 94:22, 94:23, 97:12
OFFICE [1] - 1:11
Office [3] - 1:14, 1:15, 2:16
officer [6] - 4:16, 50:10, 50:14, 51:8, 51:13, 51:19
OFFICER [5] - 1:7, 1:8, 1:8, 1:9, 1:10
Officer [5] - 2:12, 2:13, 2:14, 2:15
officers [9] - 18:24, 19:3, 37:13, 38:6, 39:21, 41:6, 50:9, 51:16, 79:15
OFFICES [1] - 2:3
Offices [1] - 5:22
official [10] - 1:7, 1:7, 1:8, 1:9, 1:10, 1:10, 1:12, 1:13, 1:15, 94:16
once [4] - 12:19, 29:5, 29:10, 33:19
one [8] - 6:7, 13:2, 24:5, 45:8, 50:8, 51:15, 76:5, 85:8
one's [1] - 71:17
oOo [1] - 4:21



Case 2:09-cv-01023-ST   Document 70-3   Filed 01/09/19   Page 68 of 252 PageID #: 1837

GONZALES vs. COUNTY OF SUFFOLK                                                                 JOHN B. COLLINS

**operation** [1] - 51:3
**opine** [1] - 69:6
**opinion** [20] - 38:11, 38:25, 40:6, 44:17, 63:10, 64:25, 65:4, 66:21, 66:23, 66:24, 69:9, 73:12, 75:17, 75:20, 76:16, 79:5, 80:17, 87:13, 93:22, 94:13
**opinions** [1] - 94:21
**opportunity** [2] - 44:24, 45:5
**opposed** [3] - 59:9, 59:10, 79:19
**order** [3] - 8:14, 29:12, 60:17
**Order** [1] - 1:21
**ordered** [3] - 7:4, 8:14, 26:25
**ordinarily** [1] - 43:15
**organ** [1] - 62:7
**organs** [21] - 15:9, 53:14, 53:19, 53:23, 54:10, 54:16, 58:3, 58:16, 59:2, 59:5, 59:15, 60:4, 61:6, 61:9, 61:15, 61:18, 63:24, 64:10, 64:13, 66:5, 66:14
**otherwise** [1] - 56:12
**outcome** [1] - 98:18
**outside** [1] - 26:24
**overall** [1] - 32:22
**own** [8] - 17:16, 37:6, 38:15, 39:11, 41:5, 41:14, 62:17, 69:9

**P**

**p.m** [2] - 1:20, 95:18
**PAGE** [4] - 97:3, 97:6, 97:7, 97:10
**page** [51] - 14:15, 14:21, 15:2, 15:18, 25:19, 25:22, 26:3, 30:2, 30:8, 46:21, 46:24, 48:14, 50:23, 56:23, 58:23, 59:6, 59:17, 59:18, 61:20, 61:21, 64:18, 64:23, 65:15, 65:21, 67:9, 67:11, 68:14, 69:13, 71:20, 71:23, 73:19, 73:21, 73:22, 74:3, 74:13, 74:20, 76:4, 76:6, 76:21, 77:6, 77:16, 77:24, 78:5, 78:8, 78:12, 80:8, 83:9, 85:19, 88:18, 92:11

**papers** [1] - 46:2
**part** [9] - 29:4, 49:20, 53:15, 74:4, 81:15, 81:20, 84:20, 92:22, 93:19
**particular** [4] - 32:23, 47:16, 48:21, 70:23
**particularly** [2] - 13:23, 70:24
**parties** [2] - 4:4, 98:16
**past** [1] - 11:23
**PATRICIA** [1] - 1:3
**peculiar** [2] - 17:16, 36:14
**peeled** [1] - 57:20
**pending** [1] - 7:17
**Peninsula** [1] - 2:5
**people** [2] - 31:18, 56:14
**per** [2] - 6:12, 89:19
**performed** [1] - 43:17
**perhaps** [1] - 33:19
**permitted** [1] - 69:11
**person** [5] - 13:24, 36:11, 44:11, 50:17, 77:13
**personal** [3] - 40:6, 75:17, 75:19
**personally** [1] - 62:25
**pertaining** [1] - 6:17
**petit** [1] - 69:5
**Photograph** [1] - 47:16
**Photographs** [5] - 26:4, 26:18, 27:16, 27:20, 28:10
**photographs** [18] - 15:15, 23:8, 23:12, 23:18, 23:21, 24:2, 24:6, 24:16, 25:7, 25:12, 26:22, 28:15, 28:17, 29:25, 30:12, 30:25, 33:25, 54:23
**photos** [4] - 24:13, 24:20, 28:11, 30:21
**phrase** [1] - 93:18, 94:8
**physical** [10] - 70:22, 71:12, 72:4, 78:20, 80:15, 83:20, 91:24, 92:9, 92:22, 92:23
**physically** [1] - 68:24
**physiological** [1] - 81:18
**physiology** [1] - 76:17
**pictures** [2] - 25:3,

25:4
**Pictures** [1] - 26:11
**pieces** [1] - 30:7
**place** [2] - 12:11, 65:7
**placed** [3] - 8:16, 9:23, 60:15
**Plaintiff** [1] - 2:4
**plaintiff** [1] - 6:2
**Plaintiffs** [1] - 1:5
**point** [6] - 9:17, 12:15, 13:2, 19:2, 19:22, 67:13
**pointed** [1] - 67:14
**points** [2] - 67:15, 83:10
**police** [9] - 17:21, 18:14, 37:18, 51:19, 52:8, 64:15, 79:15, 79:20, 80:3
**Police** [7] - 2:11, 2:12, 2:13, 2:14, 2:15
**POLICE** [7] - 1:6, 1:6, 1:7, 1:8, 1:8, 1:9, 1:10
**Portion** [2] - 5:2, 97:17
**portion** [6] - 8:9, 8:11, 8:25, 9:3, 13:5, 29:14
**portions** [1] - 9:3
**posed** [2] - 12:7, 33:22
**possible** [4] - 23:10, 78:17, 80:13, 81:17
**potential** [2] - 33:5, 49:23
**pounds** [1] - 68:20
**practice** [2] - 34:13, 43:15
**precinct** [6] - 18:14, 18:18, 78:15, 79:16, 80:20, 81:9
**predicated** [1] - 37:17
**preexisting** [7] - 66:8, 66:18, 66:22, 67:3, 67:12, 67:16, 67:22
**preface** [1] - 80:18
**preferable** [2] - 44:22, 45:25
**premarked** [2] - 5:3, 5:6
**preparation** [4] - 7:23, 8:19, 10:4, 35:13
**preparatory** [1] - 54:23
**prepare** [1] - 62:10
**presence** [1] - 64:14

**present** [5] - 25:3, 30:12, 72:9, 72:13, 81:8
**presentation** [12] - 16:5, 24:17, 31:4, 32:9, 33:7, 35:2, 43:22, 47:7, 47:24, 49:3, 49:8, 51:22
**presented** [6] - 24:23, 30:22, 37:7, 39:18, 46:11, 90:19
**presenting** [6] - 24:20, 33:12, 39:10, 44:11, 50:17, 90:24
**presentment** [21] - 6:22, 9:8, 10:13, 13:11, 13:15, 19:23, 29:9, 32:5, 32:16, 32:24, 33:14, 35:20, 35:24, 40:16, 41:4, 49:13, 50:2, 58:10, 59:25, 86:5, 97:13
**presume** [2] - 47:14, 47:19
**previous** [6] - 61:12, 67:17, 70:5, 71:4, 80:25, 82:2
**previously** [7] - 9:12, 12:5, 12:24, 15:15, 34:2, 54:2, 80:23
**privilege** [1] - 17:4
**privileged** [2] - 11:10, 94:25
**procurement** [1] - 11:5
**produce** [4] - 43:16, 45:21, 45:25, 46:2
**produced** [1] - 43:12
**producing** [2] - 44:19, 44:22
**product** [1] - 94:25
**production** [1] - 29:6
**progress** [1] - 61:17
**prolonged** [5] - 70:21, 72:4, 83:20, 91:24, 92:9
**proper** [1] - 16:25
**prosecutor** [1] - 40:11
**provided** [1] - 25:8
**prudent** [1] - 36:15
**Public** [4] - 1:22, 5:9, 96:23, 98:8
**puffy** [1] - 51:5
**purple** [1] - 51:5
**purposes** [2] - 24:16, 46:16
**pursuant** [2] - 1:21, 16:4
**put** [3] - 46:18, 68:21, 78:6

**putting** [1] - 94:25

**Q**

**qualifications** [1] - 75:8
**qualified** [2] - 74:16, 75:3
**questioned** [1] - 46:3
**questioning** [3] - 13:14, 14:5, 88:17
**questions** [34] - 6:20, 7:16, 8:15, 9:8, 9:11, 12:6, 13:17, 13:21, 14:6, 17:4, 17:14, 33:21, 34:9, 35:12, 44:24, 49:4, 57:7, 58:6, 60:12, 71:25, 88:11, 88:22, 88:24, 89:4, 93:11, 93:14, 93:17, 93:20, 94:7, 94:12, 94:15, 94:18, 94:20, 95:6
**quite** [1] - 40:24
**quote/unquote** [3] - 48:24, 70:20, 81:19

**R**

**read** [16] - 9:16, 17:11, 17:13, 29:13, 53:16, 60:9, 62:14, 62:20, 64:8, 70:14, 71:6, 91:6, 91:8, 91:9, 91:10, 96:8
**reading** [2] - 61:21, 65:20
**really** [2] - 12:2, 94:2
**realm** [1] - 69:10
**REALTIME** [1] - 1:23
**reason** [4] - 7:20, 50:4, 50:7, 88:21
**received** [1] - 56:7
**recognized** [1] - 75:25
**recollection** [14] - 9:11, 11:20, 11:22, 25:11, 28:25, 30:10, 36:19, 43:6, 48:6, 50:8, 51:13, 51:15, 52:21, 59:7
**record** [10] - 5:14, 7:11, 8:17, 14:19, 14:25, 60:15, 95:2, 96:11, 96:12, 98:13
**Record** [1] - 17:13
**refer** [1] - 29:11
**reference** [5] - 70:9, 70:17, 70:20, 70:23, 74:9
**referred** [2] - 78:24,

104 

85:16
referring [1] - 6:11
refers [1] - 27:16
refresh [3] - 9:10, 28:25, 43:6
regard [16] - 9:25, 13:21, 20:19, 24:14, 31:4, 32:15, 33:6, 38:8, 53:17, 74:12, 76:3, 76:16, 79:6, 86:12, 91:20, 94:20
regarding [12] - 6:14, 6:21, 9:8, 11:5, 14:8, 19:8, 34:24, 35:6, 39:13, 60:24, 73:12, 74:22
regardless [1] - 53:20
related [6] - 6:18, 10:13, 73:4, 83:24, 84:3, 98:16
relatively [1] - 34:11
release [1] - 8:12
released [7] - 6:15, 8:5, 8:10, 9:2, 13:6, 27:13, 29:14
releasing [1] - 11:6
relevant [3] - 19:22, 90:10, 90:16
reliant [2] - 38:10, 38:24
relied [1] - 24:6
relying [1] - 38:5
remember [7] - 26:12, 31:23, 35:21, 42:25, 43:2, 50:11, 93:21
report [57] - 5:6, 19:6, 24:3, 30:13, 30:17, 34:4, 35:14, 39:4, 42:23, 43:7, 43:16, 43:21, 44:7, 44:12, 44:22, 44:25, 45:2, 45:4, 45:17, 45:21, 46:6, 52:22, 54:2, 54:12, 54:15, 54:24, 55:16, 59:11, 59:14, 59:19, 59:23, 62:23, 64:8, 67:15, 69:7, 70:8, 70:15, 71:22, 73:4, 74:4, 74:9, 74:14, 77:10, 82:25, 83:5, 84:14, 84:22, 88:5, 88:11, 89:19, 89:21, 89:23, 90:3, 90:5, 91:5, 91:13, 97:19
reported [3] - 54:16, 56:8, 56:10
reporter [2] - 7:11, 57:16

REPORTER [1] - 93:6
Reporter [1] - 24:10
REPORTING [1] - 1:23
reports [2] - 38:5, 82:25
represent [1] - 6:2
representing [3] - 1:13, 6:4, 94:9
REQUEST [1] - 97:9
request [3] - 10:18, 10:23, 12:17
requested [1] - 25:7
requesting [1] - 12:19
required [1] - 41:19
reserve [1] - 42:2
reserved [1] - 4:11
respect [26] - 6:22, 9:9, 13:18, 14:14, 22:24, 23:12, 23:22, 26:8, 29:8, 32:4, 32:8, 32:21, 32:23, 35:17, 39:9, 40:2, 41:11, 49:15, 61:6, 62:23, 69:6, 84:6, 88:10, 90:5, 97:12
respectfully [2] - 21:15, 21:18
respective [1] - 4:4
response [6] - 71:25, 76:4, 78:18, 80:14, 81:18, 82:14
responses [1] - 7:13
responsive [2] - 20:23, 21:15
restrictions [2] - 8:16, 60:14
result [6] - 16:6, 18:22, 30:23, 79:10, 79:18, 81:12
resulted [1] - 92:18
retained [1] - 97:21
review [9] - 8:20, 9:3, 9:22, 14:22, 25:12, 25:22, 57:2, 65:12, 65:16
reviewed [5] - 7:22, 39:13, 54:24, 58:3, 58:11
reviewing [1] - 54:15
rib [4] - 58:14, 59:3, 60:4, 61:10
ribs [9] - 57:22, 57:25, 58:4, 58:11, 58:12, 58:13, 58:20, 58:22, 59:2
RICHARD [1] - 1:6
Richard [1] - 2:12
risk [1] - 68:23

Riverhead [2] - 1:18, 5:17
RL [1] - 41:10
RPR [3] - 1:22, 98:7, 98:25
RQ [1] - 29:5
Rules [2] - 16:24, 29:20
rules [6] - 7:10, 45:19, 46:5, 46:13, 75:21, 75:24
ruling [3] - 41:25, 93:16, 95:3
rulings [2] - 93:11, 93:15
RULINGS [1] - 97:7

S

sat [1] - 6:7
satisfied [1] - 95:9
saw [2] - 29:12, 64:2
scalp [3] - 61:24, 61:25, 92:3
Scimone [1] - 2:13
SCIMONE [1] - 1:8
scope [2] - 26:24, 88:17
scopes [1] - 88:17
sealing [1] - 4:5
see [49] - 14:23, 15:12, 15:13, 15:16, 15:17, 26:5, 26:19, 26:20, 47:9, 54:4, 54:16, 57:9, 57:22, 58:4, 58:20, 59:13, 59:17, 62:11, 66:6, 68:3, 68:6, 68:9, 69:20, 70:16, 70:22, 71:21, 73:19, 73:21, 74:14, 76:10, 76:14, 76:15, 76:24, 77:3, 77:12, 78:5, 78:21, 79:9, 79:12, 80:22, 83:13, 83:23, 84:2, 84:3, 85:23, 86:16, 86:23, 87:24, 88:19
seeing [2] - 11:22, 70:18
seek [1] - 35:4
sense [2] - 42:21, 69:25
set [4] - 58:6, 93:3, 98:12, 98:21
settled [1] - 9:14
settlement [1] - 9:18
several [2] - 9:7, 84:8
severity [1] - 87:22
shall [1] - 4:11
short [1] - 56:14

shortly [1] - 17:21
shoulders [1] - 7:12
show [5] - 12:23, 23:6, 43:21, 74:8, 74:19
showed [2] - 23:13, 23:18
shrugging [1] - 7:12
signed [2] - 4:15, 4:18
Signed [1] - 96:20
significance [3] - 20:6, 22:11, 31:3
significant [8] - 22:22, 22:25, 51:21, 52:3, 62:7, 66:2, 68:15, 68:24
signs [2] - 18:18, 64:3
similar [1] - 94:17
simply [1] - 44:22
sit [2] - 8:14, 53:2
situation [5] - 17:19, 21:2, 21:22, 40:25, 46:10, 51:2, 51:19, 77:14, 81:23
six [2] - 68:19, 83:10
skeleton [1] - 57:21
skin [4] - 52:24, 53:6, 53:7, 57:20
small [1] - 51:5
smiling [1] - 62:11
Smithtown [1] - 3:7
soft [1] - 57:21
someone [5] - 75:7, 75:12, 75:15, 75:24, 76:17
sometime [2] - 55:11, 56:13
sometimes [3] - 17:17, 46:8
sorry [15] - 12:25, 14:17, 34:20, 45:10, 47:11, 53:18, 55:6, 55:23, 57:14, 58:12, 59:22, 60:13, 73:16, 77:7, 80:6
sort [7] - 10:12, 35:4, 38:3, 49:19, 51:5, 79:17, 81:4
sounds [1] - 71:13
speaking [3] - 7:18, 29:19, 57:25
speaks [1] - 87:16
specific [11] - 13:23, 15:25, 19:13, 23:3, 23:23, 33:7, 34:12, 36:18, 47:21, 51:12, 88:14
specifically [13] - 14:11, 22:23, 30:8,

32:20, 35:11, 35:21, 42:25, 43:2, 53:24, 60:22, 73:5, 81:6, 83:4
speculate [4] - 72:24, 82:4, 82:18, 89:6
speculative [4] - 73:5, 73:9, 76:9, 82:15
spot [1] - 59:5
SPOTA [1] - 1:11
Spota [8] - 3:5, 12:15, 32:12, 32:13, 32:14, 32:18, 33:8, 33:10
squad [1] - 56:9
ss [2] - 96:4, 98:4
stands [1] - 12:21
start [4] - 64:24, 65:5, 65:8, 93:5
started [1] - 93:6
starting [5] - 56:25, 64:20, 69:14, 78:12, 85:21, 86:11
starts [1] - 73:22
state [1] - 5:13
STATE [2] - 96:4, 98:3
State [4] - 1:22, 45:22, 96:23, 98:8
statement [1] - 81:16
STATES [1] - 1:2
states [1] - 15:3
stating [1] - 68:4
statutory [1] - 44:18
stay [1] - 95:15
STEPHEN [1] - 3:9
still [1] - 26:20
STIPULATED [3] - 4:2, 4:8, 4:13
stipulation [1] - 76:2
stop [1] - 60:11
stops [1] - 60:10
street [2] - 79:19, 80:3
Street [1] - 1:24
stress [32] - 69:17, 69:23, 70:5, 70:9, 70:19, 70:23, 71:2, 71:24, 72:15, 73:3, 73:4, 73:13, 74:14, 76:13, 76:17, 78:18, 78:25, 79:3, 79:6, 79:10, 79:17, 80:13, 80:14, 81:4, 81:12, 81:17, 81:18, 82:5, 83:24, 88:24, 89:4
stressful [2] - 71:13, 71:16
subdivisions [1] -





30:6
subject [2] - 17:22, 40:16
subjects [1] - 16:6
subscribed [1] - 96:20
substance [1] - 57:20
substitute [1] - 44:4
sudden [5] - 62:24, 63:11, 83:19, 91:22, 92:7
SUFFOLK [5] - 1:6, 1:11, 1:11, 2:9
Suffolk [7] - 1:14, 1:15, 2:10, 2:11, 2:16, 3:4, 6:5
Suite [1] - 1:24
sum [1] - 57:19
superior [1] - 31:19
supervise [2] - 32:14, 32:23
supervising [2] - 32:8, 33:3
supervision [1] - 32:22
supervisor [1] - 31:11
supervisory [2] - 52:6, 52:10
supposed [2] - 26:25, 27:4
surface [1] - 53:8
sustained [8] - 13:18, 15:21, 17:24, 18:4, 23:22, 36:23, 89:15, 92:15
sustaining [1] - 15:9
sworn [6] - 4:15, 4:18, 5:9, 39:2, 39:3, 98:12
syndrome [1] - 71:20

## T

TALT [1] - 1:9
Talt [1] - 2:15
terms [2] - 33:23, 71:16
testified [13] - 5:10, 50:9, 68:7, 68:11, 71:23, 74:3, 76:21, 77:5, 77:15, 77:24, 78:8, 80:24, 92:17
testifies [1] - 78:5
testify [4] - 19:15, 44:6, 81:3, 92:13
testifying [7] - 60:19, 60:23, 61:14, 77:11, 78:2, 81:21, 82:2
testimony [34] -

9:24, 11:18, 14:7, 27:6, 27:11, 27:22, 28:2, 28:6, 38:6, 44:5, 44:13, 46:4, 46:7, 48:24, 51:6, 52:22, 53:17, 58:9, 59:5, 60:9, 67:21, 69:2, 69:4, 74:22, 82:2, 86:6, 86:9, 87:4, 88:4, 90:23, 92:13, 96:9, 96:11, 98:14
THE [11] - 16:12, 17:12, 18:9, 28:21, 31:16, 40:19, 57:17, 89:10, 89:13, 93:6, 95:14
themselves [3] - 86:22, 92:21
thereafter [1] - 17:21
thinking [1] - 51:16
thinks [1] - 90:15
Thomas [1] - 3:5
THOMAS [1] - 1:11
thorough [1] - 20:17
threatening [21] - 14:9, 15:5, 15:23, 17:25, 18:5, 21:3, 34:18, 53:18, 53:21, 59:8, 59:9, 59:16, 60:3, 60:20, 60:24, 61:3, 66:4, 66:13, 68:16, 86:15, 92:19
three [1] - 6:9
throughout [3] - 86:4, 86:5, 86:9
tissue [1] - 57:21
title [1] - 56:18
today [5] - 6:20, 7:24, 8:20, 21:21, 53:3
together [1] - 86:22
took [3] - 56:9, 56:11, 84:21
torso [1] - 92:4
towards [1] - 94:15
toxicological [1] - 72:5
tracing [1] - 71:11
transcript [7] - 26:17, 27:12, 27:13, 27:15, 43:5, 96:8, 96:10
trauma [2] - 86:2, 86:13
traumas [3] - 85:23, 86:9, 86:14
treated [1] - 79:16
trial [1] - 4:12
true [5] - 81:22, 82:9, 96:10, 96:13, 98:13
trying [2] - 31:23,

72:12
turn [1] - 14:15
twice [1] - 33:19
two [6] - 31:18, 78:16, 79:18, 80:20, 81:13, 93:8

## U

um-hmm [6] - 57:11, 61:7, 67:10, 72:17, 80:23, 85:24
unaware [1] - 8:17
under [14] - 16:23, 29:18, 35:24, 39:2, 39:3, 44:18, 44:19, 45:19, 76:17, 76:18, 79:8, 80:24, 83:8, 96:9
underlying [1] - 61:19
underneath [1] - 58:13
understood [5] - 40:24, 91:8, 91:12, 91:15, 92:24
unidentified [1] - 1:14
UNITED [1] - 1:2
unknown [1] - 1:13
unless [1] - 48:22
up [11] - 6:20, 9:22, 28:8, 47:18, 48:23, 49:14, 49:16, 50:5, 52:18, 75:14, 95:5
upper [1] - 92:6
ups [1] - 58:21

## V

vascularly [1] - 64:6
verbal [1] - 7:14
Veterans [1] - 2:17
viewed [1] - 94:11
visible [2] - 19:18, 34:25
vital [1] - 18:17

## W

waived [1] - 4:7
welcome [1] - 7:8
wherein [5] - 8:4, 8:11, 16:5, 62:23, 84:9
WHEREOF [1] - 98:20
whole [3] - 54:12, 70:14, 78:8
William [1] - 2:14
WILLIAM [1] - 1:9

Withdrawn [4] - 13:13, 26:9, 26:16, 72:22
witness [17] - 5:8, 17:2, 27:19, 27:24, 28:4, 34:12, 41:23, 45:12, 71:10, 81:3, 81:25, 82:3, 82:10, 82:14, 82:17, 98:11, 98:14
WITNESS [12] - 16:12, 17:12, 18:9, 28:21, 31:16, 40:19, 57:17, 89:10, 89:13, 95:14, 97:3, 98:20
witnesses [2] - 30:4, 80:25
word [3] - 70:18, 74:14, 88:19
words [3] - 32:7, 55:11, 93:17
worry [1] - 21:24
wound [6] - 47:7, 48:4, 48:20, 49:8, 49:24, 51:8
wounds [6] - 34:18, 34:24, 35:18, 48:2, 49:9, 59:9
writing [2] - 77:25, 78:6
written [1] - 77:12
www. realtimereporting. com [1] - 1:25

## Y

years [1] - 6:9
YORK [3] - 1:2, 96:4, 98:3
York [9] - 1:18, 1:22, 1:24, 2:6, 2:18, 3:8, 5:18, 96:23, 98:9
you.. [1] - 65:9
yourself [2] - 58:21, 81:21
yup [1] - 80:9



# EXHIBIT C

## SUFFOLK COUNTY, NEW YORK



## OFFICE OF THE MEDICAL EXAMINER

### REPORT OF AUTOPSY

NAME __Kenny J. Lazo__

ME# __08-1311__

AGE __24 Years__     SEX __Male__     RACE __White__

AUTOPSY PERFORMED BY __Yvonne I. Milewski, M.D.__

DATE __April 13, 2008__     TIME __9:15 A.M.__

### FINAL ANATOMIC DIAGNOSES

I.     SUDDEN CARDIAC DEATH FOLLOWING EXERTION ASSOCIATED WITH PROLONGED PHYSICAL ALTERCATION WITH MULTIPLE BLUNT IMPACTS

II.    OBESITY
    A.   BODY MASS INDEX – 38.4
    B.   HEPATIC STEATOSIS, SLIGHT

III.   BLUNT IMPACTS TO HEAD WITH MULTIPLE ABRASIONS, CONTUSIONS AND LACERATIONS OF FACE AND SCALP

IV.    BLUNT IMPACTS TO TORSO WITH MULTIPLE CONTUSIONS AND ABRASION

V.     BLUNT IMPACTS TO UPPER EXTREMITIES WITH MULTIPLE CONTUSIONS

VI.    GRANULOMATOUS INFLAMMATION, PARA-TRACHEAL AND HILAR LYMPH NODES (MICROSCOPIC)

<u>OPINION:</u>

<u>CAUSE OF DEATH:</u>          SUDDEN CARDIAC DEATH FOLLOWING EXERTION ASSOCIATED WITH PROLONGED PHYSICAL ALTERCATION WITH MULTIPLE BLUNT IMPACTS

EXHIBIT
Collins B
6/3/14 EG

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

KENNY J. LAZO

CASE 08-1311

<u>CONTRIBUTORY:</u>          OBESITY

<u>MANNER OF DEATH:</u>      HOMICIDE

Yvonne I. Milewski, M.D.
Chief Medical Examiner

Jan 23, 2008
Date

YIM/dmc/vsf

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY

Virginia Falcone

2

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

**KENNY J. LAZO**

CASE 08-1311

I hereby certify that I, Yvonne I. Milewski, M.D., Chief Medical Examiner, have performed an autopsy on the body identified as Kenny J. Lazo on April 13, 2008, at the Suffolk County Medical Examiner's Office commencing at 9:15 A.M.

## EXTERNAL EXAMINATION:

The body is examined unclad and is that of a 66", 238 pound, well developed, well nourished White man who appears the given age of 24 years. Rigor mortis is present. Livor mortis is dark purple in color, distributed posteriorly and anteriorly in the face and upper chest distribution; it blanches in multiple places and is generally unfixed. The body is cool.

The dark brown to black straight scalp hair is 1/4" long. There is a mustache and beard. The irides are brown-hazel. There are no petechiae of the bulbar or palpebral conjunctivae; the sclerae are congested. Natural teeth in good condition are present on the maxilla and mandible. The chest is symmetric. The abdomen is distended. The extremities are symmetric. The external genitalia are those of a normally developed circumcised adult man.

There are no tattoos. Prominent abdominal striae are present over the hip regions. Numerous irregular and faded scars are present about the knees. There is a 1/2" irregularly horizontal scar above the left buttock in close proximity to the hip. There is a 3-1/2" x 1/2" hyperpigmented irregularly oval scar of the right buttock region. Inferior to this scar is a 2" linear, slightly hypertrophic scar. There is a 1" curvilinear hypopigmented scar of the posterior proximal right leg.

Except for the therapeutic interventions and injuries to be described presently, the external examination of the head, neck, torso and extremities is otherwise unremarkable.

## THERAPEUTIC INTERVENTIONS

An endotracheal tube resides in the trachea. Five EKG monitor pads are adherent to the upper chest wall. Two defibrillator pads are in place. A triple lumen intravenous catheter is within the left femoral vein. A cervical collar is in place.

## INJURIES, EXTERNAL AND INTERNAL:
I.    HEAD AND NECK

A.    Within the right lateral forehead is a 2" x 1" subcutaneous purple/red hematoma/swelling. Within the contused area are two distinct patterns, one 1-1/4" linear contusion within the superior portion, and

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

*Vincenne Ambrose*

3

*[signature]*

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

**KENNY J. LAZO**

CASE 08-1311

one roughly "Y" shaped, 1-1/2" to 1/4" x 1/2" shaped within the medial portion. Within the inferior portion are two, 3/8"-1/2" long fine linear abrasions.

In close proximity to the lateral corner of the right eye are a pair of fine 1/8" long linear cutaneous markings separated by 1/8", and each 1/16" wide.

Two oval pinpoint to 1/8" wide red abrasions are present within the medial right orbit.

B.    Above the medial left eyebrow region is a 1" subcutaneous swelling, with a central 1/4" fine laceration.

Three 1/8" to 1/4" oval purple contusions are present within the left upper eyelid, involving the lateral corner of the eye.

There is a 2-1/2" x 1-1/2" (in surface area region) of red swelling/contusion extending from the inferior border of the left eye onto the left cheek. Within this area of contusion are multiple pinpoint to 1/8" in diameter red abrasion/contusions, oval and some linear in morphology. There is a fine 1/4" linear laceration over the cheek prominence.

Within the superior portion of the left ear is a 1/2" in diameter oval red-purple contusion with a central 1/4" fine linear laceration.

C.    There are 2 1"- 2 1/2" wide red, full thickness scalpular contusions of right frontal scalp (underlying previously described facial injuries.) There is a 1" wide, red, full thickness contusion of the right vertex scalp. There is a 1 1/2" wide, red, full thickness hemorrhage of the left front-temporal scalp, that extends into the left temporalis muscle.

There are two full thickness, red scalpular contusions of both occipital regions, one on the left and one on the right, up to 2" in diameter maximally.

There is a 1-1/2" left vertex scalpular hemorrhage.

D.    There are no subdural or epidural blood accumulations. There is no subarachnoid hemorrhage. The leptomeninges are congested. The brain weighs 1525 grams. The external examination of the brain fails

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY,
*Virginia Falcone*

4

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

**KENNY J. LAZO**

CASE 08-1311

to reveal any focal abnormalities.  The brain is fixed in formaldehyde, prior to additional examination.

E.   One inch to 1-1/2" hemorrhage is present within the deep adipose tissue of the neck bilaterally.  (Comment: secondary to prior venous catheterization attempts.)  These areas of hemorrhage are in close proximity to the jugular veins.

There are no injuries to the strap muscles or cartilages of the neck.

There are fine punctate petechiae of the laryngeal mucosa.

## II.   TORSO

There is a 1-1/2" curvilinear row of approximately 1/2" triangular shaped 1/8" to 1/4" abrasions below the right nipple.

There are two fine linear superficial cuts to the right of the umbilicus, 1/8" and 3/4" in length.

There is a fine linear superficial 3-1/4" cut of the left scapular region.  There are three patterned cutaneous injuries, 3/4"-1 1/8" in diameter, on the back: the left upper, right scapular and right flank regions.  They consist of a complex of red abrasions demonstrating a specific pattern.  The pattern is comprised of an approximately 1" long row of fine red linear abrasions, 1/16" wide and 1/8" long.  Along the inferior border of this abrasion is a 1/8" thick red-purple contusion.

One 3/4" oval purple contusion and a 1/2" x 1/4" pale band-like abrasion are present within the lateral left gluteal region in close proximity to the hip.  A 1/4" oval contusion is present within the medial right gluteal fold.

There are no fractures of the ribs, sternum, vertebral column or pelvis.

There are no injuries of the viscera or hemorrhagic fluid accumulations within the body cavities.

## III   EXTREMITIES

A.   There is a 3/4" x 1/4" purple contusion of the lateral right antecubital fossa.

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY.
*Virginia Falcone*

5

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

**KENNY J. LAZO**

CASE 08-1311

There is a 1" purple contusion overlying the proximal phalanx of the right third finger.  There is a 1-1/2" to 2" purple contusion overlying the metatarsal phalangeal joint of the right index finger.  There is a 1-1/2" red contusion overlying the right third metatarsal-phalangeal joint.

B.  Two near parallel linear red abrasions are present of the extensor left arm, 1/4" wide, and 1/8" long.

On the extensor left wrist are two 1/8" wide linear purple contusions, the more distal segment 1-1/2" in length, in close proximity to the thumb; and the more proximal 2" long in close proximity to the distal end of the forearm.  Between these two segments is a 1/2" irregularly oval purple contusion.

Two near parallel 1/8" wide linear purple contusions are present on the flexor left wrist, on the thenar side.  The more distal segment is 1" long, and the proximal 3/4" long.

C.  There are no significant subcutaneous or skeletal injuries of the lower extremities.

D.  There are no fractures of the long bones.

These injuries having been described once will not be repeated.

INTERNAL EXAMINATION:

HEAD:
See injury described above.

NECK:
See injury described above.

BODY CAVITIES:
There are no liquid accumulations of the pleural, pericardial or peritoneal cavities. The organs are normally situated and markedly congested.

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.
Veronica Falcone

6

OFFICE OF THE MEDICAL EXAMINER

**KENNY J. LAZO**

SUFFOLK COUNTY, N.Y.

CASE 08-1311

## CARDIOVASCULAR:

The 420 gram heart has a smooth pericardium, epicardium and endocardium. There is no cardiac chamber dilatation. The valves are thin without vegetations, fibrosis or calcification. The coronary arteries arise from patent ostia and distribute in a right dominant pattern. There is no atherosclerosis. Myocardial cut surfaces are red-brown without fibrosis or necrosis. The pulmonary trunk has no thromboemboli. The vena cava have no thrombi. The aorta has no atherosclerotic plaque.

## RESPIRATORY:

The right and left lungs weigh 425 and 500 grams respectively. The pleural surfaces are thin and delicate. The cut surfaces are red-brown without focal induration, cavitation, hemorrhage or injury. The bronchi and pulmonary arteries are patent.

## LIVER, GALLBLADDER AND PANCREAS:

The 2220 gram liver has a thin capsule and unremarkable red-brown parenchyma without fatty change or cirrhosis. The gallbladder has no stones. The pancreas as tan lobulated parenchyma.

## HEMIC AND LYMPHATIC:

The 120 gram spleen has a thin capsule and unremarkable red-brown parenchyma. Lymph nodes are not enlarged.

## GENITOURINARY:

The right and left kidneys weigh 145 and 150 grams respectively. The external surfaces are smooth. The cut surfaces are red-brown without focal abnormality. The ureters are slender. The bladder contains approximately 300 ml of urine.

## ENDOCRINE SYSTEM:

The pituitary, adrenal and thyroid glands have no nodularity, hyperplasias or infiltrates.

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

*Virginia Falcone*

7

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

**KENNY J. LAZO**

**CASE 08-1311**

GASTROINTESTINAL TRACT:
There are no ulcers of the esophagus, stomach or duodenum. Approximately 300 ml of partially digested gastric material is present within the gastric lumen. Small and large intestines are unremarkable. The appendix is in place.

MUSCULOSKELETAL:
There are no fractures of the ribs, sternum, vertebral column or pelvis. The musculature is developed.

The skin, subcutis and deep soft tissues are incised and dissected off the skeleton. There are no additional soft tissue injuries found.

YIM/dmc/vsf

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY
Virginia Holcome —

8

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

KENNY J. LAZO

CASE  08-1311

## MICROSCOPIC EXAMINATION

**HEART:  (thirty four sections, including conduction system):**  Focal slight myocyte hypertrophy.  Rare subtle perivascular fibrosis surrounding myocardial arterioles.  Focally infiltrative microscopic fat within right ventricular wall (not transmural).

**MITRAL VALVE (one section):**  No pathologic abnormality.

**KIDNEY (two sections):**  Rare sclerosed glomerulus.  No significant pathologic abnormality of the tubules, interstitium or blood vessels.

**LIVER (one section):**  Marked vascular congestion.  Slight  centri-lobular steatosis.  Focal, rare centrilobular lymphocytic aggregates.

**SPLEEN (one section):**  No pathologic diagnosis.

**ADRENAL GLANDS (two sections):**  No pathologic diagnosis.

**LUNGS (nine sections):**  Abundant gastric material present within bronchioles, some associated with post mortem bacterial growth.  Microscopic cellular granulomas within hilar lymph nodes present.  Special stains for micro-organisms ordered.

**GASTROINTESTINAL TRACT (three sections):**  No pathologic abnormality.

**TRACHEA (one section):**  Para-tracheal lymph node with several microscopic cellular granulomas.  Special stains for microscopic organisms ordered.

**DIAPHRAGM (one section):**  No pathologic diagnosis.

**PANCREAS (one section):**  Extensive autolysis.

**PITUITARY GLAND (one section):**  No pathologic diagnosis.

**PROSTATE GLAND (one section):**  No pathologic diagnosis.

**BONE MARROW (two sections):**  No pathologic diagnosis.

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY

*Virginia Falcone*

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

KENNY J. LAZO

CASE 08-1311

## SOFT TISSUE SAMPLES

**RIGHT FRONTAL SCALP (one section):** Acute hemorrhage without reactive inflammation.

**LEFT FRONTAL SCALP (three sections):** Acute hemorrhage without reactive inflammation

**LEFT SCALP (one section):** Acute hemorrhage without reactive inflammation

**RIGHT VERTEX SCALP (one section):** Acute hemorrhage without reactive inflammation

**RIGHT OCCIPITAL SCALP (one section):** Acute hemorrhage without reactive inflammation

**LEFT OCCIPITAL SCALP (one section):** Acute hemorrhage without reactive inflammation

**LEFT EAR (one section):** Acute hemorrhage without reactive inflammation

**TONGUE (one section):** No pathologic abnormality.

**RIGHT NECK (one section):** Acute hemorrhage without reactive inflammation

**LEFT NECK (one section):** Acute hemorrhage without reactive inflammation

**NECK, SIDE NOT SPECIFIED (one section):** Acute hemorrhage without reactive inflammation

**RIGHT BACK (one section):** Acute hemorrhage without reactive inflammation

**LEFT BACK (one section):** Acute hemorrhage without reactive inflammation

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

*Virginia Falcone*

2

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

KENNY J. LAZO

CASE  08-1311

**LEFT WRIST (one section):**  Acute hemorrhage without reactive inflammation

**SKIN AND SUBCUTIS, SITE NOT SPECIFIED (BLOCK #36):**  Acute
hemorrhage without reactive inflammation

Yvonne I. Milewski M.D.
Chief Medical Examiner

June 23, 2008
Date

YIM/vsf

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

Virginia Falcone

3

*Toxicologic Report*                              Page 1 of 2



Division of Medicolegal Investigation and Forensic Science
Suffolk County, New York

NAME: LAZO, KENNY J.

TOX NO: 0301-2008        ME NO: 2008-1311

EXAMINATION DATE: 4-13-08 ___ ANALYSIS PERFORMED: GENERAL UNKNOWN

SPECIMENS SUBMITTED:

Femoral Blood, Pulmonary Artery Blood, Aortic Blood, Chest Blood, Vitreous Fluid, Bile, Urine, Brain, Liver, Gastric Contents, Small Intestinal Contents, Mouth Swab, Retainer Serum - Chest, Retainer Blood - Chest

SPECIMENS USED FOR ANALYSIS:

Femoral Blood, Pulmonary Artery Blood, Aortic Blood, Urine, Liver, Gastric Contents, Small Intestinal Contents

RESULTS

## VOLATILE SUBSTANCES

ETHANOL:
Femoral Blood - Not Detected  (4/14/2008)

OTHER VOLATILE SUBSTANCES:
Femoral Blood - Not Detected  (4/14/2008)

## EMIT SCREEN

URINE - Acetaminophen, Amphetamines, Barbiturates, Benzodiazepine Metabolites, Methadone, Opiates, PCP, Propoxyphene, Salicylates Not Detected  (4/15/2008)

## DRUG RESULTS

COCAINE:
Aortic Blood - Not Detected  (4/17/2008)
Urine - Not Detected  (4/17/2008)
Gastric Contents - Not Detected  (4/17/2008)
Small Intestinal Contents - Not Detected  (4/17/2008)

COCAETHYLENE:
Aortic Blood - Not Detected  (4/17/2008)
Urine - Not Detected  (4/17/2008)
Gastric Contents - Not Detected  (4/17/2008)
Small Intestinal Contents - Not Detected  (4/17/2008)

BENZOYLECGONINE:
Aortic Blood - Not Detected  (4/21/2008)
Urine - Less Than 0.125 mg/L (4/21/2008)

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

*Virginia Falcone*



**Toxicologic Report**
Division of Medical Legal Investigation, Suffolk County
Suffolk County, New York

NAME: LAZO, KENNY M.                                     LAB NOS 030-2008          ME NO 2008-1301

**LIDOCAINE:**
Liver - Present  (4/21/2008)

**TETRAHYDROCANNABINOL:**
Pulmonary Artery Blood - 14.5 mcg/L (4/15/2008)

**CARBOXYLIC ACID METABOLITE OF TETRAHYDROCANNABINOL:**
Pulmonary Artery Blood - 212 mcg/L (4/15/2008)
Urine - 943 mcg/L (4/28/2008)

**OTHER BASIC DRUGS:**
Liver - Not Detected (4/21/2008)

**OTHER ACIDIC AND NEUTRAL DRUGS:**
...monary Artery Blood - Not Detected (4/14/2008)

Michael Lehrer, PhD.                    Date: 5/21/08
Chief - Toxicology Laboratory

5/16/2008 bak

Y M
I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.
Virginia Falcone

*Toxicologic Report*                                                    *Page 1 of 1*

Division of Medical Legal Investigation and Forensic Sciences
Suffolk County, New York

NAME: LAZO, KENNY J.

TOX NO: 0301-2008     ME NO: 2008-1311

EXAMINATION DATE: 4-13-08     ANALYSIS PERFORMED: DRUG QUANTITATION

SPECIMENS SUBMITTED:

None

SPECIMENS USED FOR ANALYSIS:

Antemortem Blood

RESULTS

DRUG RESULTS

BENZOYLECGONINE:

Antemortem Blood - Not Detected  (5/5/2008)  (Sm. Purple top tube in bag labeled 04/12/08 #31231810)

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

_Virginia Falcone_
Y M.

_Michael Lehrer_                          Date: 5/21/08

Michael Lehrer, PhD
Chief - Toxicology Laboratory              5/21/2008 bak

# SUFFOLK COUNTY MEDICAL EXAMINERS OFFICE
## *NEUROPATHOLOGY REPORT*

**CASE NUMBER: 2008-1311**
**NAME OF DECEDENT: KENNY J. LAZO**

## GROSS EXAMINATION:

Brain weight:  1525 grams (fresh).

The specimen is the dura and brain of an adult.

The cerebral dura is not remarkable.

The brain is not swollen. There is no sign of herniation or cerebral midline shift. The leptomeninges are thin and delicate. The cerebral gyri are of normal size, configuration and consistency. The external aspects of the brainstem and cerebellum are not remarkable. The arteries at the base of the brain follow a normal distribution and are free of atherosclerosis.

Serial sections of the brain, brainstem and cerebellum reveal uneven formalin fixation, as evidenced by residual pink-grey discoloration of the deep white matter and nuclei, the basal portions of the brain, and central brainstem (Comment: Fixation artifact). Coronal sections of the cerebrum reveal no focal lesions in the cortex, white matter or deep nuclear structures. Sections of the brainstem and cerebellum show no focal abnormalities. The ventricles are of normal size and configuration.

**PHOTOGRAPHS:**  Yes.

**MICROSCOPIC EXAMINATION:**  Yes.

H & E sections:
1. Frontal lobe - not remarkable
2. Cingulate gyrus and corpus callosum - not remarkable
3. Hypothalamus - not remarkable
4. Basal ganglia, internal capsule and insular cortex - not remarkable
5. Thalamus and internal capsule - not remarkable
6. Right hippocampus - not remarkable
7. Left hippocampus - not remarkable
8. Occipital lobe - not remarkable
9. Midbrain – not remarkable
10. Pons – not remarkable
11. Medulla – not remarkable
12. Cerebellum with dentate – not remarkable
13 – 17.  Spinal cord – not remarkable

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.
*Virginia Falcone*

Comment:  There is extensive irregular vacuolization of the white matter in many of the sections, from various different parts of the brain.  In some of the sections, the cortical neurons appear shrunken and discolored.  These findings are consistent with autolysis.

DIAGNOSIS:

ADULT BRAIN; NO PATHOLOGIC ABNORMALITIES

YVONNE I. MILEWSKI, MD    6/18/08
Chief Medical Examiner

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

Virginia Falcone

# EXHIBIT D

LAW OFFICES OF
# FREDERICK K. BREWINGTON

*ATTORNEYS AND COUNSELORS AT LAW*
50 CLINTON STREET, SUITE 501
HEMPSTEAD, N.Y. 11550-4282

TELEPHONE: (516) 489-6959
FACSIMILE: (516) 489-6958

FREDERICK K. BREWINGTON

IRA FOGELGAREN

GREGORY CALLISTE, JR.
VALERIE M. CARTRIGHT
MILI MAKHIJANI

October 17, 2008

**BY CERTIFIED MAIL RETURN RECEIPT REQUESTED and BY FAX**
John Collins, Esq., Chief of the Homicide Bureau
Suffolk County District Attorney's Office
Homicide Bureau
Criminal Courts Building
200 Center Drive
Riverhead, NY 11901-3388

> Re:  Kenny Lazo- D.O.B 12/30/83
>       Date of Incident: 4/12/08
>       Cental Complaint #: 08-185633

Dear Mr. Collins,

We are in receipt of yours dated today.  Your letter does not give us any further information than was provided on August 19, 2008 when we met.  The claim that "the District Attorney's investigation is proceeding" fails to give any substantive statement that the matter is being or about to be presented to the Grand Jury as your office promised and stated publicly. The actions being taken now appear strikingly similar to the mode of operations of your office in the past where police officers have been involved.  The statement that I am to notify you prior to Tuesday, October 21, 2008 of any change in our position is curious.  We have heard nothing from you for nearly two months and now you are asking for input within two business days. What is reason why October 21, 2008 is our cut-off?

The comment that,  "[I] did not desire [ ]our forensic expert, Dr. Thanning, be called before the Grand Jury", is unclear.  It is your office that should be prosecuting this death case in the same fashion and with the same zeal that you approach others.  The fact that Dr. Thanning was hired by the family does not place any obligation on them to supply or dictate what witnesses will or will not be presented to the Grand Jury.  We ask that you and your office make the independent decision as to who and what needs to be presented and we will attempt to provide what support we can.  Finally, we know that you should have records of all the persons in the Precinct on the night of the death of Mr. Lazo and since we have not been provided with any of that information and have not been able to interview those persons, we cannot affirm that there are "no other relevant witnesses that [we] request be called before the Gand Jury."

We asked you to inform us if and when this matter will be presented and your most recent letter still fails to respond to this basic request.  Accordingly, we demand that you give this case up and release this entire case to the United States Attorney for prosecution.

Thank you for your consideration in this matter.

Sincerely,

FREDERICK K. BREWINGTON

cc: David A. Pincus, Esq.

Lazo  366

# EXHIBIT E

COUNTY COURT : SUFFOLK COUNTY
-------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK    :    Term  XI
                                       :
    INVESTIGATION INTO THE DEATH       :    Grand Jury 1A
                                       :
              of                       :
                                       :
    KENNY LAZO                         :
                                       :
-------------------------------------X
              October 27, 2008
              Riverhead, New York


            G R A N D   J U R Y   M I N U T E S
                 #D-2913-A-B-C-2008



APPEARANCES:HON. THOMAS J. SPOTA, ESQ., District Attorney of

              SUFFOLK COUNTY, by: JOHN COLLINS, ESQ.,

              Assistant District Attorney of Counsel, for the

              People.


                    Myrtle Kiefer
                  Grand Jury Reporter

EXHIBIT
Collins A
6/3/14 EG
PENGAD 800-631-6989

5

1   I'm going to call in Dr. Yvonne Milewski.

2   (No questions by any members of the Grand Jury)

3   MR. COLLINS: Step in, Doctor.

4   (Witness entering the Grand Jury Room)

5   MR. COLLINS: I'll ask you to stand in front of that

6   chair and look to the back of the room, please.

7   THE FOREPERSON: Dr. Yvonne Milewski, called as a

8   witness on behalf of the People, having been duly

9   sworn by the Grand Jury Foreperson, testifies as

10   follows:

11   Q   May we have your name and affiliation for the record?

12   A   Yvonne Milewski, M-I-L-E-W-S-K-I, Chief Medical Examiner of

13   Suffolk County.

14   MR. COLLINS: Are you comfortably situated there,

15   Doctor?

16   THE WITNESS: Yes.

17   EXAMINATION BY MR. COLLINS:

18   Q   What's your current assignment?

19   A   I'm Chief Medical Examiner for Suffolk County.

20   Q   How long have you held that particular position?

21   A   Over one year, near one year and a half.

22   Q   Could you describe your duties there as Chief Medical

23   Examiner for Suffolk County?

24   A   Well as Chief Medical Examiner, I'm the Administrative Head

25   of the Medical Examiner's Office. What that means is I have

6

1      one hundred and five people who work in the ME's Office and

2      we have our building which houses the Crime Lab, Toxicology

3      Lab and we also perform medical examiner functions. I

4      perform autopsies on individuals who died in undetermined

5      or violent circumstances. There are four Medical Examiner

6      positions on staff and I'm the boss of many of the staff

7      and I also do autopsies myself.

8    Q   Would you tell us Doctor Milewski, are you a medical

9        doctor?

10   A   Yes.

11   Q   Would you please tell me your education and professional

12       background toward your becoming the Suffolk County Chief

13       Medical Examiner?

14   A   I attended Northwestern University, Chicago where I

15       received a Bachelor of Science and M.D. Degree and I did a

16       year at Temple University Medical Internship at Lankenau

17       Hospital, Philadelphia as well as Anatomic Pathology

18       Residency Program, two years at the University of

19       California, San Francisco and one year at NYU, I completed

20       a Forensic Pathology Fellowship and brought me to the

21       Office of the Chief Medical Examiner, New York City. After

22       finishing that Fellowship, I stayed as a Senior Medical

23       Examiner for eleven years. Over the last four of those

24       years I ran the Bronx operation for the City of New York

25       and after that I went to Columbia University and did a

7

1  residency for two years, a Neuropathology Fellowship which

2  studies the brain and diseases. After that I went to the

3  University of Texas, Galveston where I stayed with the

4  Faculty for two and a half years teaching Forensic

5  Pathology and Neuropathology. I left that position to come

6  here as Chief Medical Examiner.

7  Q  Are you Board Certified, Doctor in any particular medical

8     discipline?

9  A  Yes, Anatomic and Forensic and Neuropathology and I'm also

10    a Diplomat with the National Board of Medical Examiners.

11 Q  Could you describe for the jurors what that means?

12 A  Well in order to get a license to practice medicine, you

13    have to have a Diplomat of Satisfaction by the Board of

14    Medical Examiners. That's what my credentials refer to.

15 Q  Are you licensed to practice medicine in several states of

16    the United States?

17 A  Yes. I'm licensed to practice in New York, Texas and

18    California. I let my Pennsylvania license go.

19 Q  So you were at one time licensed to practice in

20    Pennsylvania?

21 A  Yes, I decided not to renew it. I let it lapse.

22 Q  Doctor Milewski, would you tell us what Pathology is?

23 A  Well it's really a general term used in medicine.

24    Basically, it means it is an explanation for disease or

25    abnormal conditions.

8

1  Q    What is Forensic Pathology?

2  A    That's a sub-specialty area of pathology. It focuses on

3       findings  on the body, one may see that it's a result of

4       physical force or trauma and application of forensic

5       pathology, most times, the ME or pathologist are asked to

6       come to determine the cause of death and autopsies are

7       done.

8  Q    What is an autopsy?

9  A    An autopsy is an examination of a body after death. It

10      includes several parts. We have an external exam which

11      involves taking x-ray photographs and noting height, weight

12      and age and we identify information where there is external

13      evidence of trauma and that's documented and then there is

14      the internal part of the autopsy, you look for evidence of

15      disease and also look for internal injuries that correlates

16      with what someone may see on the outside of the body and

17      another part of the internal, you take samples of tissues

18      and bodily fluids for additional tests and all that is done

19      to arrive at cause of death.

20 Q    What is Toxicology?

21 A    That's a sub-specialty area of medicine in the forensic

22      area it's to study fluids and body tissues which are

23      removed at autopsy to determine the presence of medication

24      or illicit drugs.

25 Q    Does an autopsy generally include a toxicological

9

1      examination?

2  A    Yes, in our facility, we do that.

3  Q    So that is done in house, so to speak?

4  A    Yes, we certify the Toxicology Lab.

5  Q    In house?

6  A    Yes.

7  Q    Doctor, I'd like to direct your attention, if I may, to

8      April 13th of 2008. Do you recall being requested to

9      perform an autopsy on a person, now known as Kenny Lazo,

10     that day?

11  A    Yes.

12  Q    Were you at your office Hauppauge on that particular date?

13  A    Yes.

14  Q    Did there come a time on that same day that you conducted

15     an autopsy on Kenny Lazo with regard to his cause of death?

16  A    Yes.

17  Q    Would you please, if you could Doctor, describe and tell us

18     the manner how that autopsy progressed?

19  A    Well, just as I described before there is a further,

20     externally you make certain observations and document

21     different things.

22  Q    What do you mean by that?

23  A    Well, say at the time of the autopsy he was 5'6" tall and

24     238 pounds and he appeared as an obese Hispanic man who

25     appeared to be the age of 24 years and as is the case in

10

1          many of these cases, we worked up to the cause of death. We

2          did body x-rays and I did full body photographs and we

3          documented what we saw externally. We reviewed the external

4          exam and if there is evidence of blunt force trauma outside

5          the body, if we find contusions which are abrasions with

6          scrapes of skin and lacerations which are tears of skin. If

7          these findings were present on the face and head and torso

8          and extremities, we check all this.

9    Q     Did you document these particular injuries photographically

10         as you described?

11   A     Yes.

12   Q     With regard to the x-rays that you conducted pursuant

13         through your office, did Mr. Lazo have any fractures

14         whatsoever?

15   A     No fractures.

16   Q     Following your examination of Mr. Lazo externally, did you

17         then progress to the internal examination of his organs and

18         the underlying area of external injuries that you noted?

19   A     Yes I did, with the exception of bruises of the scalp which

20         were identified by dissecting the scalp of his head and

21         there were no internal components to an external injury.

22   Q     What do you mean by that?

23   A     The injuries were limited to the external aspect of the

24         body, no internal organ injury, no significant area of

25         major hemorrhage or blood loss.

11

1  Q    Did Mr. Lazo's body exhibit any indication of medical

2       intervention, that was noted, as well?

3  A    Yes, there were two areas of hemorrhage on the side of the

4       neck, internally there was distribution typically for

5       jugular vein catheterization attempted.

6  Q    Do your medical records reveal external jugular ports were

7       attempted by the ambulance crew and people assisting the

8       ambulance crew?

9  A    Yes.

10 Q    So were your findings with regard to internal bleeding in

11      Mr. Lazo's neck consistent with the attempted placement of

12      external jugular port, my word?

13 A    Yes, those injuries were determined to come from the

14      attempted placement of the external jugular port.

15 Q    And were there any other injuries to Mr. Lazo's neck area

16      of any significance?

17 A    No injury to the muscle or larynx or cartilage of the neck.

18 Q    Did you find any injuries in your autopsy of Mr. Lazo that

19      were life threatening injuries?

20 A    No, there were no injuries to any of the life sustaining

21      organs, the brain, the heart, no areas of major internal

22      hemorrhage

23      MR. COLLINS: What I'd like to do Doctor, if I may, is show

24      you a series of photographs that have been previously

25      marked as Numbers Thirty-nine through Fifty-five.

12

1        I'll ask you to take a moment Doctor, and I'll ask you

2     to take a look at each of these items and tell us whether

3     or not you are familiar with these photographs. You can do

4     them en masse. Do you want the list for each exhibit?

5        THE WITNESS: Not yet.

6  Q   Are you familiar with Photographs Thirty-nine through

7     Fifty-five?

8  A   Yes, I am.

9  Q   Were these photographs that were caused to be taken by you

10    to illustrate the injuries to Mr. Lazo in the course of the

11    autopsy?

12 A   Yes.

13 Q   Do they fairly and accurately reflect the areas of his body

14    as you recall them on April 13, 2008?

15 A   Yes.

16    MR. COLLINS: Would they assist you in describing your

17       findings of the injuries?

18    THE WITNESS: Yes.

19    MR. COLLINS: What I'd like to do Doctor, is put them

20       on the screen so everyone can see them. You may want

21       to use the laser pointer. You may want to just stay in

22       your seat or you can stand and I'll ask you to please

23       make every effort to keep your voice up so everyone

24       can hear you. I know you can do that.

25       I'm going to show you this photograph, Number

13

1         Thirty-nine and I'm going to ask you, how is the light

2         for everyone?

3         (Grand Jury indicating collectively the light in the

4         room is satisfactory)

5  Q   Could you describe for us, if you will Doctor, you have

6        number Thirty-nine, is there any evidence of injuries noted

7        in your autopsy?

8  A   This is the back of the deceased, the first thing I'll

9        point out to you, you may question this bowed area, red

10      discoloration is livor mortis, pool of blood after death

11      happened. Mostly depending on the part of the body after

12      death. The first question, is that a bruise? It's not

13      bruise, it's livor mortis. But these three pattern

14      injuries, any contusions and we'll have a picture later

15      show more pattern injuries, they're really short little

16      abrasions. They have three areas here representing the

17      superficial cutaneous injury which means it's limited to

18      the skin.

19  Q   Did you learn during the course of your investigation into

20      this case that involved police officers striking Mr. Lazo

21      with a flashlight?

22  A   Yes, I came to learn that these pattern injuries have the

23      same pattern really linear impressions beneath these three

24      injuries. Noted on the back, they were surface injuries.

25      The picture does show part of the autopsy was the dissected

14

1      skin off the entire body to demonstrate large area bruising

2      that may not be obvious to the naked eye. The red color is

3      because of hemorrhage of the skin just underneath but it is

4      superficial. So there is no underlying fracture or

5      significant injury below. All the bruises are confined to

6      the skin, just the fatty underneath.

7  Q   If I could direct your attention to that photograph Doctor,

8      to Mr. Lazo's neck, the back of his neck?

9  A   That is the horizontal line across the back of his neck.

10     That's a piece of medical tape that secures, that holds and

11     secures the endocranial tube of the trachea.

12  Q  So that area in the back of the neck that extends

13    horizontally, slightly in the back of the neck is not an

14    injury?

15  A  No, it's red because of some blood fluid there.

16        MR. COLLINS: I'm going to show you Exhibit Number

17        Forty.

18  A  (Interjecting) Yes, in this photograph, well this is a

19    picture we see one of the pattern injuries I referred to

20    before and sort of a faint livor mortis, a very superficial

21    cut about three inches long, kind of like you would see if

22    you took a fingernail and scraped it confined to the skin.

23        MR. COLLINS: Photograph Number Forty-one, Doctor?

24  A  This is the lower half of the body of Mr. Lazo and you see

25    some livor mortis changes I have described before. In this

15

1    picture, you can see an abrasion and contusion on the

2    lateral left buttock area, small bruises here right below

3    the buttock here (indicating) and these injuries, one on

4    the left buttock and one on the right buttock were limited

5    to the skin as were the injuries to the back as well as the

6    bruises -- so it's a little bit on the skin and fatty

7    underneath skin but they are superficial injuries.

8         MR. COLLINS: I think we have two choices, those two

9              bruises, Doctor. Exhibit Forty-two.

10   A    Here is the lower side of the left buttock area, there's a

11        bruise, very superficial abrasion of the skin.

12   Q    In your experience Doctor, would that bruise indicated in

13        Photograph Number Forty-two be consistent with a bit

14        through clothing?

15   A    It could be consistent with that. When people bite the

16        skin, they would use both the upper and lower jaw to cause

17        an injury. That's a possible explanation for that.

18        MR. COLLINS: Number Forty-three, Doctor?

19   A    Well this is a crease in the middle area of the buttock

20        area. It's the bottom there (indicating), there's sort of a

21        small puffy purple from the bite itself.

22   Q    How deep an injury, how severe an injury?

23   A    Again, it is a superficial bruise. There's some blood,

24        that's why it's purple. It does go into the fat a little

25        bit on the skin but it's superficial.

1   Q   Doctor, but could the injury in Exhibit Forty-three be

2       consistent with a human bite?

3   A   Sure, anything that's blunt that touches the body on the

4       surface would make a bruise so it's consistent.

5       MR. COLLINS: Exhibit Number Forty-four now Doctor?

6   A   This left face, the first thing once you see this piece of

7       bloody gauze, it is related to endotracheal tube

8       (indicating) an area of the decedent's mouth. Here you see

9       a few impact sites, there is small laceration abrasion

10      above the eyebrow area of an irregular bruise that's

11      depicted on the skin, sort of a laceration and scrape so

12      the brow area here, also bruise and laceration on the left

13      over the front eyelid swollen because of pressure on a

14      bruise. Well in this case, when I explain there is a scar

15      within the left eyebrow which is seen and documented.

16  Q   Doctor, in regard to each of the injuries denoted on the

17      left side of Mr. Lazo's face and in the vicinity of his

18      ear, did you dissect the area of those injuries as well and

19      determine how severe they were?

20  A   Yes. It was limited to the skin and fat beneath the skin,

21      no fractures associated with these injuries.

22      MR. COLLINS: Number Forty-five Doctor. I believe this

23      is a close-up of the same general area?

24  A   Yes, that's a close-up. Here in this photograph you can see

25      more clearly what's depicted. The skin has lacerations here

17

1    (indicating) and the sort of lacerations, some of them

2    almost look like little cuts, this pattern (indicating).

3    This type of bruising with multiple cuts and abrasions,

4    typically what I would call road rash, something striking

5    gravel or an irregular road surface, we see that pretty

6    much in car accident investigations.

7    MR. COLLINS: Number Forty-six, Doctor?

8  A  Well we have a wider view of the face and some more of the

9    injuries we saw before but here we see the right side of

10   the face from the front. This large area here is bruising

11   and then an abrasion right here. (indicating)

12 Q  You're indicating Doctor, the area of the right eyebrow?

13 A  Yes.

14 Q  Doctor, the injuries that's depicted here on Mr. Lazo's

15   face, they were superficial in nature?

16 A  Yes.

17 Q  There were no fractures demonstrated in any of those

18   depicted injuries?

19 A  No, no fractures.

20   MR. COLLINS: Number Forty-seven, Doctor?

21 A  This is the right side of the face here. You can see it a

22   little better than what you saw before. It's a broad area

23   of contusion and bruising and you can see a little pattern

24   here with some irregular lines, linear abrasions and

25   lacerations here (indicating) to which tears the skin from

18

1    blunt force trauma.

2  Q   With regard to the injury to the right temple depicted in
3      the photograph, did you dissect that injury to determine
4      the severity?

5  A   Yes.

6  Q   What were your findings?

7  A   Well what we do is, we look at the injury like that in the
8      scalp and we peel the scalp back, two areas where the
9      bruises underneath the scalp, this is like a broad,
10     continuous area, two impacts. It appears the injury, the
11     injury to the right temple area is consistent with having
12     been caused by the previously described flashlight and a
13     flashlight is a blunt instrument and sure, that instrument
14     would cause injury like that.

15        MR. COLLINS: Number Forty-eight?

16 Q   This appears to be a close-up of this same area, right
17     temple area?

18 A   Yes, it was taken in that area so you can appreciate this
19     abrasion a little bit more medium end of the right eye
20     area,  you can see irregularity of pattern in here.

21     (indicating)

22        MR. COLLINS: Number Forty-nine.

23 A   This appears to show the right eye and nose area and with
24     this picture you really see the pinpoint type of abrasion
25     associated with both, very small, this is barely a quarter

19

1     inch in width.

2          MR. COLLINS: Number Fifty, Doctor?

3   A   Number Fifty is a bruise on the left ear with a laceration
4       in the middle so this is a blunt force injury that caused
5       bleeding into the skin and tear of the ear.

6   Q.  Again Doctor, did you dissect that injury as well?

7   A   Yes, this part of the scalp area is peeled back. There was
8       no fracture under that area and no tear to cause major
9       blood loss behind the ear.

10         MR. COLLINS: Doctor, Number Fifty-one?

11  A   This is the right side of the decedent's chest looking at
12      the front here, the right nipple here (indicating) the red
13      pattern, red abrasion, sort of each individual one of these
14      triangular shape injury is limited to the skin.

15  Q   In the course of your investigation did you learn that Mr.
16      Lazo, at the time of his altercation with the police, was
17      wearing a rather heavy, large necklace with a silver cross
18      on the end of it?

19  A   Yes.

20  Q   Would that injury to the right chest area be consistent
21      with having been caused by, abraded by that particular
22      cross and chain?

23  A   Yes.

24  Q   Other than that particular injury on the right chest
25      denoted in Exhibit Fifty-one, did the front of Mr. Lazo's

20

1    body from the waist up show any other area of injury?

2  A  Well not depicted in that picture, two short little

3    scratches near the belly but that was limited to the skin

4    but is not shown on the picture.

5  Q  Did you have occasion Doctor, as part of your autopsy to

6    dissect the chest area and see what was beneath that area

7    of injury you just denoted on the front of Mr. Lazo's body?

8  A  Yes, like with the rest of the body we did peel off the

9    area skin and soft tissue off the skeleton and there was no

10   fractured ribs in that area.

11 Q  Is there an injury denoted in the right breast?

12 A  Basically, a superficial injury limited to the skin

13   superficially.

14   MR. COLLINS: Exhibit Fifty-two?

15 A  This is the right hand of Mr. Lazo. This is the pinky here

16   (indicating) and you can see a broad area of purple

17   bruising on the back of the hand, sort of spilling onto the

18   knuckle here (indicating) the back of, not even over the

19   knuckle, between the knuckle and middle finger.

20 Q  Are there any fractures denoted, any injuries to the hand?

21 A  No fractures to the area.

22 Q  Are these injuries consistent with Mr. Lazo's hand having

23   been struck multiple times by a blunt instrument?

24 A  Yes, by a blunt instrument.

25   MR. COLLINS: Number Fifty-three, Doctor?

21

1  A  This is the right wrist of Mr.Lazo. You can see the start

2     of some purple discoloration, livor mortis, so not a

3     bruise, post mortem changes increases here but no bruises,

4     the injury increases here. (indicating)

5        MR. COLLINS: Number Fifty-four?

6  A  This is like the same picture. It's kind of the right wrist

7     and again, the absence of any significant injury to this

8     area.

9        MR. COLLINS: Number Fifty-five?

10  A  This is the right palm and right wrist. Again, it basically

11     shows the absence of any significant injury here.

12        MR. COLLINS: Doctor, I have five more photographs to

13        show you. If you could just take a look at those

14        please and tell me whether or not you recognize them.

15           (Photographs published to Dr. Milewski and viewed

16           by Dr. Milewski)

17        MR. COLLINS: Photographs Fifty-six through Sixty. Do

18        you recognize them?

19  A  Yes, I do.

20  Q  Do they also fairly and accurately depict the portions of

21     Kenny Lazo's body as observed by you during your autopsy on

22     April 13th of 2008?

23  A  Yes.

24  Q  Do you represent that those areas of Mr. Lazo's body are

25     fair and accurate as you recall them?

22

1   A    Yes, they are.

2           MR. COLLINS: Ladies and Gentlemen, Items Fifty-six

3        through Sixty will be received in evidence as well.

4           (Documents placed in evidence)

5           MR. COLLINS: I will now put Number Fifty-six up on the

6        screen.

7   Q    Doctor, could you tell us about that?

8   A    This is the left hand and wrist of Kenny Lazo and you can

9        see purple discolorations come into view and the bruises or

10       contusions, this is one area skin dissection, we peel off

11       the skeleton, this is the left hand area and it shows a

12       bruise.

13          MR. COLLINS: Number Fifty-seven, Doctor?

14  A    This shows a couple of areas of bruising. This oval bruise

15       or band like bruise here and a faint bruise area over here

16       (indicating) to the left wrist, the area is a band like

17       bruise which we refer to the left wrist area.

18  Q    Doctor, is that your experience, is that consistent perhaps

19       with having been caused by a handcuff?

20  A    Yes.

21          MR. COLLINS: Number Fifty-eight, Doctor?

22  A    This is a side view of what you just saw earlier, one of

23       the bruises here sort of looks oval here but part of a band

24       like configuration and bruising around the left wrist.

25          MR. COLLINS: Fifty-nine, Doctor?

23

1   A   Again, more bruising. This is part of the bruise which I

2       looked at the side and there are two faint linear areas,

3       two rows of bruising here.

4           MR. COLLINS: And Sixty, Doctor?

5   A   It shows the same thing we were talking about earlier,

6       slightly overexposed but it shows the purple color and

7       bruising.

8           MR. COLLINS: You can have a seat, Doctor.

9   Q   Now in addition to the autopsy as described by you thus

10      far, did your Office conduct a toxicological exam on

11      Mr.Lazo's bodily fluids?

12  A   Yes, the Toxicological Report verified the presence of a

13      kind of a breakdown product, Benzoylecgonine was present in

14      the urine and it was a very trace amount.

15  Q   So there was no active cocaine or active cocaine in the

16      blood?

17  A   No.

18  Q   Was that indicative of usage close to the time of death or

19      some past usage?

20  A   Perhaps it's more consistent in past usage because the body

21      can store this breakdown product in the tissues. It sort of

22      enters the blood stream and goes to the urine. It could

23      reflect use that was days before the death, otherwise you

24      would see the presence of it in the blood.

25  Q   How about marijuana in the system?

24

1   A   Well the same, the active cannabis compound, so Mr. Lazo

2       may have used marijuana that day, maybe even close to the

3       time of his death.

4   Q   Was there anything life threatening about the presence of

5       the amount of marijuana in Mr. Lazo's system?

6   A   No, nothing life threatening in the presence of marijuana.

7   Q   And the presence of cocaine by-product, would that be life

8       threatening in the presence of that in Mr. Lazo's system?

9   A   No, for it being life threatening it has to be present in

10      the blood and it's not present in the blood.

11  Q   Did the presence of either of those drugs in Mr. Lazo's

12      system contribute to his death?

13  A   No.

14  Q   Doctor, based on your autopsy and all the information

15      available to you in this case, did you reach a conclusion

16      to a reasonable degree of medical and scientific certainty

17      with regard to the cause of Mr. Lazo's death?

18  A   Yes.

19  Q   Could you please tell us what that opinion was and explain

20      if you would please?

21  A   The cause of death that was determined was by Sudden

22      Cardiac Death following prolonged physical altercation with

23      multiple blunt impacts. I arrived at the cause of death in

24      the absence of any significant internal injuries to explain

25      his death and in the absence of any major life threatening

25

1      diseases that would affect his internal organs and I also

2      used my determination by the medical information given to

3      me and witnesses' testimony that was described during the

4      period of time surrounding his death.

5  Q   How is that period of time surrounding his death perhaps,

6      the altercation and his becoming unresponsive according to

7      witnesses, how did you enter that into your assessment?

8  A   Well Sudden Cardiac Death, the heart takes a sudden heart

9      stoppage, not something diagnosed from looking at the body

10     at the time of the autopsy. In other words, the autopsy

11     fails to reveal any life threatening major injury that

12     caused his death and also failed, it did not uncover any

13     disease to cause him to die suddenly and unexpectedly but

14     having eye witness accounts of a man who was overweight,

15     walking, talking, alert and awake, who died like a light

16     gets turned off, specifically the a heart suddenly stops

17     and there is no other explanation. So the autopsy findings,

18     rather the lack of findings and the eye witness accounts as

19     well as EKG tracing, all significant, all points to him

20     having died a cardiac death following exertion associated

21     with physical altercation.

22  Q   How does the body Doctor Milewski, handle stress,

23     altercations like what's going on in the body chemically?

24  A   We're programmed for what happens within our bodies

25     physiologically, each one of us is programmed. If an

26

1   individual perceives stress or feeling fearful, the
2   subconscious way the brain is already sending a signal to
3   the adrenal glands to fight fear. So if you perceive on the
4   street a threat, you're going to fight or run away from the
5   fight. Both things require your muscles to have more oxygen
6   and more calories to determine energy to go ahead and do
7   what's required, a lot of physical activity to fight or
8   flight. So it disrupts energy in every organ and your
9   muscles start getting more blood so more cells are revved
10  up, but more engaged, and other activities get more oxygen
11  because the blood is being shifted. Your muscle and heart
12  rate goes up because of more blood, blood delivers on a
13  faster schedule to your muscles and cells are more active
14  to metabolite, sends the rate higher, more energy for fight
15  or flight. You either stay and fight for the finish or you
16  have to digress and the ability to perceive pain continues
17  to move with fight or flight regarding sometimes the injury
18  that you may have, because you have diminished capacity to
19  perceive pain, so psychologically it makes you a little
20  anxious and that cascades. So perception is really
21  important here to program in place whether or not to
22  perceive the risk. There has to be evidence of an
23  altercation with a police officer or between the police
24  officers and Mr. Lazo had ended some half hour perhaps
25  prior to his becoming unresponsive in the precinct.

27

1  Q    Could you describe how, perhaps that acute stress response
2       has any significance to post-altercation with Mr. Lazo?
3  A    Sure, epinephrine goes up in the face and body and also can
4       drop very quickly and after the threat is removed, it also
5       lingers in the system for a prolonged period of time. So
6       epinephrine lingering in the body beyond, past the period
7       of time of physical activity so also is very much directly
8       related to how a person perceives the risk, the fear and
9       feeling the stress themselves.
10  Q   Mr. Lazo found himself at the precinct and charged with two
11      Class B felonies following this altercation. Is it possible
12      that Mr. Lazo's stress level and his acute stress response
13      continued beyond the time frame of the actual physical
14      altercation?
15  A   Sure because the stress relates to something perceived as a
16      threat is very much related to the individual at the time
17      if there was what seemed to be something that causes fear
18      or a threat and stress somebody may not even physically
19      active still be engaged and epinephrine and adrenalin in
20      the body can have a deleterious effect.  For example,
21      people under the influence of a drug, it may affect the
22      heart for some heart disease and then the heart pushes the
23      blood expects the heart to work harder to prepare the body
24      for any compromise.
25  Q   So, if I understand you correctly, Mr. Lazo had no

28

1      significant life threatening disease?

2   A   That's correct.

3   Q   He had no significant life threatening disease that

4      affected his heart?

5   A   No.

6   Q   He was 5'6" and 238 pounds?

7   A   Yes and that put him highly or morbidly obese. I think

8      also, he was at risk being in intensive exertion

9      physically. So to me, that was significant.

10  Q   With regard to the blunt impact trauma observed by you, is

11     it fair to say that none of these blunt impact traumas were

12     life threatening?

13  A   None of them.

14  Q   Either taken by themselves or taken altogether?

15  A   That's right.

16  Q   Was evidence of multiple blunt impact your observations?

17  A   Yes, they were to the head, torso and extremities.

18  Q   Taken alone or combined they were not of the severity to

19     cause Mr. Lazo's death?

20  A   That's correct.

21  Q   They were all superficial, no underlying injury to skeleton

22     or organs of the body of Mr. Lazo?

23  A   That's correct.

24         MR. COLLINS: I don't believe I have any further

25         questions of Dr. Milewski.  Do any of the jurors have

29

1       any questions?

2       GRAND JUROR: Would it be normal procedure to be

3       selected to do an autopsy or did it have something to

4       do with the fact that the police officers were

5       involved, that they went to the Chief Medical Examiner

6       versus one of your co- workers?

7       THE WITNESS: I was on call that weekend. I inherited

8       the case as a rotator on the schedule.

9       GRAND JUROR: Do you do a background check on his

10      physical history from a family doctor, do you get any

11      medical records, do you have any kind of check on his

12      medical records with his doctor of what he had, if he

13      had a doctor?

14      THE WITNESS: Investigators for the Medical Examiner or

15      physician's assistant, for that reason they interview

16      family members and ask about medical history. We do

17      not know off the top of our head which doctors or

18      hospital to check with so they do a review and then

19      the family came and they ask the family if there was

20      any significant medical history and they said he was

21      healthy and offered no other medical history.

22      MR. COLLINS: Let me interrupt you for just one second

23      Doctor Milewski.

24  Q   Could you tell us or estimate for us approximately how many

25      autopsies you have been involved in, either conducting or

30

1       assisting in?

2   A   Many thousands, several thousands.

3           GRAND JUROR: Just to clarify, as far as you know Mr.

4           Lazo was pronounced dead by the Emergency Room doctor

5           as soon as he arrived?

6           THE WITNESS: There was an initial assessment and

7           pronouncement within one-half hour to forty minutes,

8           from my memory.

9           MR. COLLINS: Does that answer your question, ma'am?

10          GRAND JUROR: Yes, thank you.

11          GRAND JUROR: Stress is a risk factor and if you're

12          obese, that's a factor?

13          THE WITNESS: It is my opinion he goes into this

14          stressful event with obesity as being his main risk

15          factor, a potential risk factor.

16          GRAND JUROR: Thank you.

17          GRAND JUROR: The autopsy, you said you looked at the

18          brain.  Was there any contusion or any other trauma in

19          the back of the head, did you notice a concussion?

20          THE WITNESS: To answer your question, when we examine

21          the brain we peel the scalp back. That's important to

22          do because if you bruise the scalp, you don't because

23          there's layers, you peel the scalp and it reveals

24          seven separate areas of bruising, bruising back here

25          (indicating) back, two points of injury, there was no

1       fracture, no bleeding around the brain. The brain is

2       very carefully examined and there may be very subtle

3       things that are found but there was no abnormality in

4       the brain and the issue with concussion, that's purely

5       an electrical event. In other words, a concussion is

6       described as a loss of unconsciousness that does not

7       have a sort of tissue based abnormality. If you have a

8       concussion, most of the times they're not fatal.

9       People lose consciousness and you may have an altered

10      mental state and they recover and they have an MRI

11      scan, it will be absolutely normal because it's purely

12      an electrical event. There is no way to diagnose a

13      concussion in the brain because it's electrical with

14      no physical presence of tissue to look at.

15      GRAND JUROR: No swelling of the brain?

16      THE WITNESS: No.

17      GRAND JUROR: You stated the bruising to the right

18      temple could have been made by a flashlight, could it

19      also be caused by him hitting a rock in the ground or

20      curb because there was a curb by the grassy part and

21      sometimes an injury could be caused by that and not a

22      flashlight?

23      THE WITNESS: Yes, any blunt surface the body struck.

24      It could be both because sometimes you have two things

25      happen. The body moves, the surface moves, could cause

32

1      bruises. So that is another potential explanation why

2      the bruises may be there.

3      GRAND JUROR: How about the desk?

4      THE WITNESS: Sure, that could be an explanation.

5      MR. COLLINS: Any further questions of Dr. Milewski?

6      GRAND JUROR; So is it your opinion none of those

7      bruises were life threatening to him?

8      THE WITNESS: No, bruises are not life threatening.

9      GRAND JUROR: The hospital you work at?

10     THE WITNESS: We have the Medical Examiners Office in

11     Hauppauge.

12     GRAND JUROR: Are you employed by the State?

13     THE WITNESS: No, I'm at the County level.

14  Q   Do you work for the Police Department?

15  A   No.

16  Q   Do you work for the DA's Office?

17  A   No.

18     MR. COLLINS: There being no further questions for Dr.

19     Milewski, thank you very much. You're excused.

20         (No further questions by any members of the Grand

21         Jury)

22         (Recess of Investigation into the Death of

23          Kenny Lazo)

24         (Continuation of Investigation into the death of

25          Kenny Lazo)

33

1    MR. COLLINS: Good afternoon everyone. At this point it
2    is my intention to charge you on the law with regard
3    to this case that you heard over the last two weeks. I
4    believe this case has been consumed pretty much by all
5    of these four days of testimony last Monday, last
6    Wednesday, last Thursday and today.
7        Over those four days you heard some fourteen
8    witnesses and there were sixty some odd exhibits
9    entered into evidence and some of various subdivisions
10   so maybe as much as one hundred pieces, so to speak, I
11   expect, that have been received in evidence and are
12   available in the course of your deliberations. You
13   don't need to ask my permission to look at them when I
14   leave the room during your deliberations and at any
15   point, if you need assistance during the course of
16   your deliberations with any of the equipment, feel
17   free to knock on the door should you need to use any
18   of it and also, with regard to any of the fourteen
19   witnesses.
20       Should there be a consensus amongst yourselves by
21   conducting a vote of twelve or more to hear a
22   particular witness or a portion of the witness's
23   testimony I will make that available to you should you
24   require it.  Mrs. Kiefer is here and also Ms.
25   Ruthowski and Mr. Galante, the two other reporters who

34

1    took a portion of this case will be available should

2    you need any of them to readback. Again, with  regard

3    to any readback, I would request that you discuss that

4    amongst yourselves and decide as a group whether or

5    not you need any individual's testimony read back and

6    I would request that you take a vote and have a

7    discussion amongst yourselves before you let me know

8    if it is necessary to have something read back to you.

9        There are three potential targets for your action

10   in this particular Grand Jury. They are Detective John

11   Newton, Sergeant James Scimone and Police Officer

12   William Judge. If you recall they were the three

13   officers that testified under a waiver of immunity

14   before you.

15       Any of the other witnesses who testified in this

16   matter, if you recall, no one else was requested to

17   waive immunity. Everyone else who testified before you

18   testified as a regular witness. Therefore, since

19   immunity in a criminal charge implicates that

20   particular incident as to those three persons, it is

21   against them and I'll ask you to consider charges as

22   to Detective John Newton, Sergeant James Scimone and

23   Police Officer William Judge.

24       The charges I'm going to ask you to consider

25   thereafter will be defined for you:

35

1    Manslaughter in the First Degree which is Penal

2    Law 125.20(1).

3    Assault in the Second Degree which is Penal Law

4    120.05(2).

5    You are to consider those charges as against each

6    officer individually, and acting in concert as well

7    and I will read to you article 20 of the Penal Law

8    which defines accomplice liability and acting in

9    concert will be defined for you when I give you the

10   charges for those particular crimes and the elements.

11   There are three potential targets and two

12   potential crimes. That means that there at least six

13   individual votes, each officer for each crime so that

14   will be six votes also there's also further elements

15   to this voting process which I will get to. The

16   officers involved have claimed through their testimony

17   that they were justified in their actions that they

18   took this particular night regarding Kenny Lazo and

19   his death. Justification is commonly called self-

20   defense and there are a number of theories of self-

21   defense that are available to the officers in this

22   particular instance. I will read you the legal

23   definitions and help define for you those particular

24   elements of self-defense and how you are to apply them

25   in this particular case, should you find it necessary

36

1    to apply them.

2         The voting is going to go in stages with regard to

3    the crimes presented. You will first make a

4    determination as a group whether or not there is

5    reasonable cause to believe that the elements of those

6    crimes did, in fact, exist or if there is reasonable

7    cause to believe that the elements have been satisfied

8    by the testimony. Should you find that any elements of

9    the crimes defined for you is not present, then you

10   may vote a no-true-bill for this particular crime and

11   that goes as to both Manslaughter and Assault in the

12   Second Degree.

13        If you find as a group and you make a finding that

14   the elements are, in fact, present and have been

15   established to your satisfaction, then you would take

16   a second step of consideration whether or not the

17   officers were justified in committing those acts.

18        I will give you the parameters of justification.

19   There are going to be two basic theories of

20   justification presented. The first would be called

21   justification in defense of another person. The second

22   theory of justification is just justification or self-

23   defense in the course of making an arrest. So there

24   are two separate theories of justification.

25        I will present justification defense of another

37

1    person and justification in the course of making an

2    arrest. There are going to be a number of terms that

3    are going to be used with frequency throughout my

4    defining these particular laws to you.

5        I'm going to try to give you the definitions up

6    front, the terms will be:

7        "Intent"

8        "Serious physical injury"

9        "Deadly physical force"

10       "Physical injury"

11       Again, I spoke of "acting in concert"

12       "Dangerous instrument"  and "Reasonably believes"

13       I'll go ahead and define all of those definitional

14   sections for you first and then we'll define the

15   crimes that I want to ask you to consider and their

16   elements and then I will give you the law of

17   justification as it may pertain to this case.

18       Are there any questions on anything I have done

19   thus far?

20       (Collective Grand Jury response, negative)

21   MR. COLLINS: I'll read some of the definitional

22   sections first.

23       The first definitional section, the first term is

24   "physical injury" which is defined in Article 10,

25   subdivision 9.

38

1          "Physical injury" means impairment of physical

2     condition or substantial pain.

3          That is the entire definition of physical injury

4     in the New York State Penal Law, impairment of

5     physical condition or substantial pain.

6          "Serious physical injury" is defined in

7     subdivision 10 of that same section.

8          "Serious physical injury" means physical injury

9     which creates a substantial risk of death or which

10    causes death or serious and protracted disfigurement,

11    protracted impairment of health or protracted loss or

12    impairment of the function of any bodily organ.

13         I will read that again.

14         "Serious physical injury" means physical injury

15    which creates a substantial risk of death or which

16    causes death or serious and protracted disfigurement,

17    protracted impairment of health or protracted loss or

18    impairment of the function of any bodily organ.

19         "Deadly physical force" is defined in subdivision

20    11 of that same section.

21         "Deadly physical force" means physical force

22    which, under the circumstances in which it is used, is

23    readily capable of causing death or other serious

24    physical injury.

25         "Dangerous instrument" is also defined in that

39

1    section, subdivision 13.

2        "Dangerous instrument" means any instrument,

3    article or substance which includes a vehicle as that

4    term is used or defined in this section which, under

5    the circumstances in which it is used, attempted to be

6    used, or threatened to be used, is readily capable of

7    causing death or other serious physical injury.

8        Okay again, "dangerous instrument" means any

9    instrument article or substance which, under the

10   circumstances in which it is used or attempted to be

11   used, or threatened to be used, is readily capable of

12   causing death or other serious physical injury.

13       The Penal Law also defines "intentional conduct"

14   and that is article 15.05(1).

15       A person acts "intentionally" with respect to a

16   result or to conduct described by a statute defining

17   an offense when his conscious objective is to cause

18   such result or to engage in such conduct.

19       "Intentionally."    A person acts "intentionally"

20   with respect to a result or to conduct described by a

21   statute defining an offense when his conscious

22   objective is to cause such result or to engage in such

23   conduct.

24       "Reasonably believes"  the term will be used on

25   several occasions defined in the Penal Law. When the

40

1    term "reasonably believes" is used, reasonably
2    believes is a two pronged test.  When the Penal Law
3    uses the term "reasonable belief" or "reasonably
4    believes" there is a two step process that must be
5    engaged by you.
6          First, the subject must have actually believed,
7    when they say they believed. In other words, if a
8    person believes that someone was about to use physical
9    force against them, the defendant or subject must have
10   actually believed that someone was about to use
11   physical force against him or her or someone else and
12   it is the subject's own use of physical force that is
13   necessary to defend himself or herself or others from
14   it.
15         The second stage of "reasonable belief" would it a
16   reasonable person in the subject's position, knowing
17   what the subject knew believe the same circumstances,
18   would a reasonable person have the same belief.
19         So it's a two step process in determining whether
20   someone reasonably believes something is going to
21   happen.
22         The first step is to find factually the person
23   claims that belief, actually believed it.
24         The second step to the process is the reasonable
25   person standard, not only in that the person actually

41

1    believed it but would a reasonable person placed in

2    the same circumstances as the subject have had those

3    same beliefs based on all of the circumstances as

4    known to the subject.

5        So the first objective standard, did the person

6    actually believe what they say they believe and the

7    second is a more subjective standard, what we call the

8    "reasonable person standard" would a reasonable person

9    in the same circumstances also have been justified

10   having that belief based on everything that was known.

11       You have those definitions and you are going to

12   hear those terms used defining the statute and I'll

13   gladly re-define any definitions and answer any of

14   your questions when I'm done but now what I'd like to

15   do is progress to the actual sections of law

16   themselves.

17       Article 20 of the Penal law defines accessorial

18   liability or accomplice liability for conduct of

19   another and you may be familiar with it now as acting

20   in concert.

21       There are occasions in criminal law where someone

22   can actually be held accountable for actions of

23   another and the Penal Law defines those occasions.

24       It is entitled, "Criminal liability for conduct of

25   another."  Again, "target officers", they alleged both

42

1    to have acted both individually and in concert for

2    actions of one of their fellow officers in some of the

3    circumstances described.

4        Section 20 of the Penal Law:   When one person

5    engages in conduct which constitutes an offense,

6    another person is criminally liable for such conduct

7    when, acting with the mental culpability required for

8    the commission thereof, he solicits, requests,

9    commands, importunes or intentionally aids such person

10   to engage in such conduct.

11       I'm now going to define for you Manslaughter in

12   the First Degree.

13   Manslaughter in the First Degree reads as follows and

14   this is subdivision (1) of Penal Law 125.20.

15       A person is guilty of Manslaughter in the First

16   Degree when, with intent to cause serious physical

17   injury to another person, he causes the death of such

18   person, okay with intent to cause "serious physical

19   injury" to another person he causes the death of such

20   person.

21       So the definitions I have gave you previously of

22   "intentional conduct" and serious physical injury as I

23   previously defined for you, are in the Manslaughter in

24   the First Degree, with intent to cause serious

25   physical injury to another person, he causes the death

43

1    of such person or a third person.

2        Assault in the Second Degree is defined in Penal

3    Law 120.05(2).

4        A person is guilty of Assault in the Second Degree

5    when, with intent to cause physical injury to another

6    person, he or she causes such injury to such person by

7    means of a dangerous instrument, with intent to cause

8    physical injury to such person by means of a dangerous

9    instrument.

10       I have already defined for you "physical injury,"

11   "intent" and "dangerous instrument" for you.

12       I'm going to ask that you consider each of those

13   crimes as against the three officers again, that will

14   require six votes amongst yourselves, whatever fashion

15   you see fit you must then determine whether or not

16   there is reasonable cause to believe these elements as

17   I have given them to you exist and that these are the

18   individuals who committed those acts.

19       If you find, with regard to any of the officers,

20   and any of the crimes, that in fact, reasonable cause

21   to believe that exists, that the act was committed by

22   that particular "target" then there will be a second

23   step you must take.

24       If you find that the elements do not exist, then

25   you may vote a no-true-bill. If you find they do

44

1    exist, then you may take a further step now, of

2    considering "justification" or "self-defense." There

3    are several definitions outlined in Penal Law Article

4    35.

5         Article 35 defines the defense of "justification"

6    and Section 35 itself, reads as follows:

7         In any prosecution for an offense, justification,

8    as defined in the ensuing sections, Defense Section

9    35.05 deals with "justification," generally unless

10   otherwise limited by the ensuing provisions of this

11   article defining justifiable use of physical force,

12   conduct which would otherwise constitute an offense is

13   justifiable and not criminal when such conduct is

14   required or authorized by law or by a judicial decree,

15   or is performed by a public servant in the reasonable

16   exercise of his official powers, duties or functions;

17   or such conduct is necessary as an emergency measure

18   to avoid an imminent public or private injury which is

19   about to occur by reason of a situation occasioned or

20   developed through no fault of the actor and which is

21   of such gravity that, according to the ordinary

22   standards of intelligence and morality, the

23   desirability and urgency of avoiding such injury

24   clearly outweigh the desirability of avoiding the

25   injury sought to be prevented by the statute defining

45

1    the offense. The necessity and justifiability of such

2    conduct may not rest upon considerations pertaining

3    only to the morality and advisability of the statute,

4    either in its general application or with respect to

5    its application to a particular class of cases arising

6    thereunder.

7        Whenever evidence relating to the defense of

8    justification under this subdivision is offered by the

9    defendant, the court shall rule, as a matter of law,

10   whether the claimed facts and circumstances would, if

11   established, constitute a defense.

12       That's just very general language. The thrust of

13   the language, there are situations where conduct that

14   may otherwise be criminal is justified under the law

15   and that segment in general, we'll get to the

16   particulars of justification and it's application to

17   this particular case, should you find reasonable cause

18   to believe that justification factors into this case.

19       "Justification," that's Section 35.10, it is

20   deemed use of physical force generally.

21       I'm going to read only one subdivision. That is

22   Penal Law Section 35.10(6). The use of physical force

23   upon another person which would otherwise constitute

24   an offense is justifiable and not criminal under any

25   of the following circumstances.

46

1        I'll now go to subdivision (6):

2        A person may use physical force upon another

3 person in self-defense or defense of a third person,

4 or in defense of premises, or in order to prevent

5 larceny of or criminal mischief to property, or in

6 order to affect an arrest or prevent an escape from

7 custody. Whenever a person is authorized by any such

8 provision to use deadly physical force in any given

9 circumstance, nothing contained in any other such

10 subdivision may be deemed to negate or qualify such

11 authorization.

12        That's the general section for the use of physical

13 force.    Penal Law Section 35.15 is entitled,

14 "Justification: Use of physical force in defense of a

15 person." Now we're going to get more particulars.

16        A person may, subject to the provisions of

17 subdivision (2), we'll get to that, use of physical

18 force upon another person when and to the extent he or

19 she reasonably believes such to be necessary to defend

20 himself o herself or a third person from what he or

21 she reasonably believes to be the use or imminent use

22 of unlawful physical force by such other person

23 unless: the latter's conduct was provoked by the actor

24 with intent to cause physical injury to another person

25 or the actor was the initial aggressor.

47

1    Subdivision (2) of this section deals with the use
2  of deadly physical force.  Subdivision (2) reads as
3  follows:
4    A person may not use deadly physical force upon
5  another person under circumstances specified in
6  subdivision (1). Okay, a person may not use deadly
7  physical force upon another person under circumstances
8  specified in subdivision (1) unless the actor
9  reasonably believes that such other person is using or
10  is about to use deadly physical force. Even in such
11  case however, the actor may not use deadly physical
12  force if he or she knows that with complete personal
13  safety to oneself and others, he or she may avoid the
14  necessity of so doing by retreating, except that the
15  actor is under no duty to retreat if he or she is a
16  police officer or peace officer or a person assisting
17  a police officer or peace officer at the latter's
18  direction. Pursuant to section 35.27 talks about use
19  of physical force in resisting arrest, Penal Law
20  Section 35.27:
21    A person may not use physical force to resist an
22  arrest whether the arrest was authorized or
23  unauthorized, which is being effected or attempted by
24  a police officer when it would reasonably appear that
25  the latter is a police officer or police officers.

48

1      Again, Section 35.27: A person may not use

2   physical force to resist an arrest whether the arrest

3   was authorized or unauthorized, which is being

4   affected or attempted by a police officer when it

5   would reasonably appear that the latter is a police

6   officer or police officers.

7      Now Section 35.30, this is a different type of

8   justification that's just physical force used in

9   making an arrest or preventing an escape. So Section

10  35.15 is justification in defense of another or third

11  person.

12     Now this justification, use of physical force in

13  making an arrest or in preventing an escape, that is

14  Penal Law 35.30.  A police officer or peace officer in

15  the course of affecting or attempting to effect an

16  arrest or of preventing or attempting to prevent the

17  escape from custody of a person whom he or she

18  reasonably believes to have committed an offense, may

19  use physical force when and to the extent he or she

20  reasonably believes such to be necessary to effect the

21  arrest or to prevent an escape from custody or in self

22  based defense or to defend a third person from what he

23  or she reasonably believes to be the imminent use of

24  physical force; except that deadly physical force may

25  be used for such purposes only when he or she

49

1    reasonably believes that regardless of the particular

2    offense which is the subject of the arrest or

3    attempted escape, the use of deadly physical force is

4    necessary to defend a police officer or another person

5    from what the police officer reasonably believes to be

6    the use or imminent use of deadly physical force.

7        I'll read that whole section again, 35.30 (1)(a)

8    and (1)(c).

9        A police officer or peace officer in the course of

10   affecting or attempting to effect an arrest or of

11   preventing or attempting to prevent the escape from

12   custody of a person whom he or she reasonably believes

13   to have committed an offense, may use physical force

14   when and to the extent he or she reasonably believes

15   such to be necessary to effect the arrest or to

16   prevent an escape from custody or in self based

17   defense or to defend a third person from what he or

18   she reasonably believes to be the imminent use of

19   physical force; except that deadly physical force may

20   be used for such purposes only when he or she

21   reasonably believes that regardless of the particular

22   offense which is the subject of the arrest or

23   attempted escape, the use of deadly physical force is

24   necessary to defend a police officer or another person

25   from what the police officer reasonably believes to be

50

1    the use or imminent use of deadly physical force.

2        I want to go back to "reasonably believes" and

3    I'll give you that definition one more time.

4        The determination of whether a person reasonably

5    believes physical force to be necessary to defend

6    himself or herself or someone else from what he or she

7    reasonably believes to be the use or imminent use of

8    physical force by another individual requires the

9    application of a two part test.

10       That test applies to this case in the following

11   way.

12       First, a subject must have actually believed, not

13   someone was using or was about to use physical force

14   against him or someone else and that his own use of

15   physical force was necessary to defend himself or

16   someone else from it.

17       And second, a reasonable person in the subject's

18   position, knowing what the subject knew and being in

19   the same circumstances would have had those same

20   beliefs. It does not matter that the subject was or

21   may have been mistaken in his or her belief provided

22   that such belief was both honestly held and

23   reasonable.

24       Alright Ladies and Gentlemen, that is the law as

25   defined in the application sections of the Penal Law

51

1    and Criminal Procedure Law.

2         I will go through the voting process with you one
3    more time, briefly.

4         You have two crimes to consider and you have three
5    people against whom to consider those crimes. I will
6    ask you to consider them separately and as a group you
7    vote separately as to each potential target and crime
8    you are considering.

9         So with regard to Detective Newton, you will
10   consider whether or not the elements are present to
11   establish Manslaughter in the First Degree, and also
12   for Assault in the Second Degree.  You do that with
13   each of the officers.

14        In the event that you find that the elements have
15   not been established to your satisfaction, then you
16   may vote a no-true-bill as to a particular target and
17   that particular crime.

18        Should you vote a no-true-bill with regard to the
19   establishment of the elements, you need go no further.

20        With regard to considering justification, if you
21   find that the elements of the crime have been
22   established as to each and any overall of the
23   potential targets, you then take an additional step of
24   considering justification, both justification defense
25   of a person or third person and justification in the

52

1  course of making an arrest or preventing an escape.

2      Should you find the officer, again if you find the

3  elements have been established was justified under

4  either theory, in defense of a person or third person

5  or in the course of making an arrest or preventing an

6  escape, if you find that has been established to your

7  satisfaction, you may vote a no-true-bill based on

8  justification as to the officer and that particular

9  crime.

10      Should you find that the elements have been

11  established and the officer in question was not

12  justified in his actions, then you may vote a true

13  bill to this particular crime and those particular

14  officers.

15      Is this process I have given to you proper and

16  clear?

17  (Collective Grand Jury response, affirmative)

18  MR. COLLINS: If there are no further questions, myself

19  and the reporter will leave the room and all the

20  evidence is present here in the room with you and I

21  believe the secretary has available her list of

22  evidence that may assist you in finding anything in

23  particular that you are looking for and in the event

24  you have any problem or any questions, Myrtle will be

25  here for any readback at your beck and call.

# EXHIBIT F



# Suffolk County District Attorney's Office
## Thomas J. Spota, District Attorney

Home

Message From The DA

About the D.A.'s Office

Court Calendar

Press Releases & Media Coverage

Press Releases - Archived

DA Speeches & Remarks

Criminal Justice Procedures

Crime Victims Service Unit

Criminal History Categories

Careers & Recruiting

Helpful Links

Frequently Asked Questions

Office Locations & Directions

Contact Information

**November 3, 2008**

## No indictment following death investigation

A Suffolk County Grand Jury returned a "no true bill" in the investigation of the death of Kenneth Lazo of Bay Shore.  The finding means that the grand jury declined to charge the Suffolk police officers involved in a roadside physical altercation with the suspect on April 12, 2008.

Suffolk County Medical Examiner Yvonne Milewski, reported last summer that it was her medical determination that Lazo had a "sudden cardiac death" that followed "exertion associated with prolonged physical altercation with multiple blunt impacts."  The medical examiner reported no evidence of broken bones or damage to internal organs, citing obesity as a contributory cause of death.  Lazo was 5 foot 6-inches tall and weighed 238 pounds.

The police investigation of this matter revealed the following:  On the night of April 12 during an investigation of street level drug dealing in the third precinct, detectives observed Lazo participate in a hand-to-hand drug transaction.  Uniformed patrol officers were called in to pull the suspect over for arrest.  Lazo stopped his vehicle on the shoulder of the northbound Robert Moses Causeway exit to the Southern State Parkway.

An altercation began behind Lazo's car during questioning when he suddenly elbowed a detective and attempted to run from the scene.  After tackling Lazo, two police officers and a detective struggled with the suspect on the shoulder of the highway within a few feet of speeding traffic.  Lazo grasped at and succeeded in putting his hand on one of the police officer's holstered service weapon.  As police fought for several minutes to regain control of the situation, necessary force was used and the suspect was struck multiple times with flashlights before the officers were able to restrain and handcuff him for transport to the third precinct.

The incident was observed by both civilians and police officers.  Recordings of 911 calls made by two motorists who drove by the scene and saw the suspect fighting with police on the shoulder of the highway confirmed eyewitness accounts.

The arresting police officers recovered more than one-half ounce of crack and powdered cocaine from Lazo.  Sixteen separate packets of crack and twelve packets of powdered cocaine were concealed in his clothing and police recovered approximately $2,500, in $100, $20 and $10 denominations, and three cell phones, from the suspect's car.

Lazo collapsed approximately a half-hour after being transported to the Suffolk County police department's third precinct stationhouse.  Despite resuscitation efforts by police trained as EMT's and rescue personnel, he was pronounced dead after being rushed to the emergency room of Southside Hospital in Bay Shore.

The officers involved in the struggle with Lazo waived immunity and testified before the grand jury.  The grand jury reviewed more than 60 exhibits during the

presentation.

In August, an attorney representing the Lazo family in a civil lawsuit against Suffolk County declined an offer from the district attorney's office to include the family's privately hired forensic expert, or any other relevant witnesses, in the presentation of evidence to the grand jury.

District Attorney Thomas Spota said the presentation of evidence gathered during the police investigation was comprehensive. "Great care was taken to present the facts of this case in a clear and deliberate manner and we will abide by the grand jury's decision," DA Spota said.

The US Attorney for the Eastern District of New York had previously deferred investigation of this matter to the district attorney's office.

###

Copyright 2009 Suffolk County District Attorney

**EXHIBIT G**

## POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK

### INTERNAL CORRESPONDENCE

TO: Inspector David Ferrara
        Commanding Officer Internal Affairs Bureau
FROM: Captain Christopher Hatton
        Internal Affairs Bureau
SUBJECT: Internal Affairs Case # 08-0254i

DATE: 2/10/2009

COPY TO:

I have reviewed the attached investigative report of Lt. Joseph Capolino that addresses allegations of **FALSE ARREST, EXCESSIVE FORCE** and **FAIL TO PERFORM DUTY** against Sgt. James Scimone #983/330, Det. John Newton #1096/3130 and P.O. William Judge #5390/330. These allegations were received in a notice of claim filed o/b/o Mr. Kenneth Lazo (deceased) by his family.

On 04/12/08 the involved officers arrested Lazo on drug charges after a violent physical confrontation on the Southern State Parkway. Lazo was transported from the scene directly to the Third Squad for processing. Shortly after arrival at the precinct, Lazo went into cardiac arrest. Numerous officers immediately rendered aid by performing CPR and using an automatic external defibrillator on Lazo. Lazo was transported via ambulance to a hospital where he was pronounced dead. Lazo's family alleges he was falsely arrested, subjected to excessive force and denied appropriate medical attention.

Lt. Capolino's investigation revealed there was probable cause to arrest Lazo and the force used to effect the arrest was legal, proper and necessary. Officers rendered immediate medical aid to Lazo when he suffered cardiac arrest. Lt. Capolino therefore recommends the allegations of **FALSE ARREST, EXCESSIVE FORCE** and **FAIL TO PERFORM DUTY** be classified as **EXONERATED.** I concur with his conclusion.

This investigation revealed Lazo suffered several injuries during his initial confrontation with police. These injuries consisted of contusions around his eyes and an abrasion on his face. Lt. Capolino has determined Sgt. Scimone failed to ensure that Lazo was transported from the scene directly to a hospital for treatment. He recommends an allegation of **RULES AND PROCEDURES VIOLATION** against Sgt. Scimone be classified as **SUBSTANTIATED.** I concur.

Respectfully submitted,

Christopher Hatton
Captain
Internal Affairs Bureau

COPY

PDCS 2042                              Page 1 OF 1

# EXHIBIT H

**POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK**

INTERNAL CORRESPONDENCE

TO:   Inspector David Ferrara                    DATE:   2/9/09
      Commanding Officer, Internal Affairs Bureau
FROM:   Lieutenant Joseph Capolino              COPY TO:
      Internal Affairs Bureau
SUBJECT:   **INTERNAL AFFAIRS BUREAU CASE #2008-254i**
      **(NOTICE OF CLAIM)**

### SOURCE:

Alert Report #2007-0254i                         **Att. # 1**

### CLAIMANTS:

Name: Family of Kenneth J. Lazo (deceased)  D.O.B. 12/30/83
Address: 2 Waldbridge Ave. Bayshore, NY
Telephone: 631 968-7993    Race: Hispanic

Attorneys:
1. **Schoenfeld, Schoenfeld & Pincus**, P.C.
   Attorney Telephone: 631 673-5004

2. **Frederick K. Brewington**
   Attorney Telephone: 516 489-6959

### NATURE:

    A Notice of Claim dated April 19, 2008, **(Attachment # 2)** was served upon
the Department by the Estate of Mr. Kenny Lazo.  The Notice of Claim asserts that
at approximately 2030 hours on April 12, 2008, the decedent Mr. **Lazo**, was
"wrongfully accused, abused, harassed, battered, searched and imprisoned" by
unspecified members of this Department.  The subject Notice of Claim also indicates
that Mr. **Lazo** sustained severe, permanent and painful physical damages and
injuries including death. Additionally, said Claim alleges that members of this
Department failed to render medical assistance to the decedent.

    Said allegations are characterized as <u>False Arrest</u>, <u>Excessive Force</u> and <u>Fail
to Perform Duty</u>.

PDCS 2042

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 2

## INVOLVED OFFICER:

Name: James Scimone    Rank: Sergeant    Shield: 983 Command: 330 Sqd.:T2

| Specific Allegation: | Disposition: |
| --- | --- |
| **False Arrest** | **Exonerated** |
| **Excessive Force** | **Exonerated** |
| **Fail to Perform Duty** | **Exonerated** |
| **Rules and Procedures Violation** | **Substantiated** |
| (Chapter 2, Section 11, V.I. C.1) | |

Involved Officer's Immediate Supervisor: Lt. Robert Williams


Name: John Newton   Rank: Detective   Shield: 1096 Command: 3130 Sqd.:T3

| Specific Allegation: | Disposition: |
| --- | --- |
| **False Arrest** | **Exonerated** |
| **Excessive Force** | **Exonerated** |
| **Fail to Perform Duty** | **Exonerated** |

Involved Officer's Immediate Supervisor: D/Sgt. John Diffley 542/3130


Name: William Judge   Rank: Police Officer   Shield: 5390 Command: 330 Sqd.:T2

| Specific Allegation: | Disposition: |
| --- | --- |
| **False Arrest** | **Exonerated** |
| **Excessive Force** | **Exonerated** |
| **Fail to Perform Duty** | **Exonerated** |

Involved Officer's Immediate Supervisor: Sgt. James Scimone

INTERNAL AFFAIRS BUREAU CASE #08-254i
(NOTICE OF CLAIM)

2/9/09
Page 3

<u>INVESTIGATION</u>:  The investigation included the following steps:

- A review of Department Records
- A review of Communications Recordings
- E-mail; Transaction Analysis
- Interview and/or statement of complainants/witnesses
- Medical Records
- Internal Correspondences
- Photographs
- Medical Examiners Report

<u>DEPARTMENTAL RECORDS:</u>

Duty Chart PDCS-2004f- April 12, 2008 (3x11) Third Precinct            Att. # 3

Third Squad Tour Report- April 12, 2008 (5x1)                          Att. # 4

Third Precinct Patrol Tour Report- April 12, 2008 (3x11) Third Precinct   Att. # 5

Duty Officer's Confidential Log Report – Death Investigation
(April 12, 2008 to April 13, 2008)                                    Att. # 6


**SCPD Incident Report PDCS-1099 CG (2008-185917)          Att. # 7**

Det. John Newton 1096/3130 on 5/1/08 prepared the above report and indicated the following:

On 4/12/08, he and Det. Christopher **Talt** of the Third Pct. NESOT were conducting a drug investigation in the West Islip area.  Det. **Talt**, in a separate unmarked police vehicle, witnessed an unknown male operating a dark blue Cadillac conduct a hand-to-hand transaction with the operator of a second vehicle.  Det. **Newton**, assisted by Cope officers Sgt. James **Scimone** and P.O. William **Judge**, conducted a traffic stop of the subject Cadillac at the entrance of the Southern State Parkway in Bayshore.  *(Det. Talt did not participate in the traffic stop of Mr. Lazo).*

INTERNAL AFFAIRS BUREAU CASE #08-254i                              2/9/09
(NOTICE OF CLAIM)                                                  Page 4

The operator of the Cadillac, identified as Kenny Lazo, attempted to flee on foot from the scene. The officers engaged in a physical struggle with Mr. Lazo and eventually subdued him. Another assisting officer at the scene, PO Joseph **Link**, recovered a clear plastic bag containing what appeared to be crack/cocaine from Mr. **Lazo**. PO **Link** then transported Mr. **Lazo** to the Third Precinct. At some point after arriving at the precinct, PO Joseph **Link** recovered another clear plastic bag containing what appeared to be crack/cocaine from Mr. **Lazo**.
*(The officers subsequently recovered $2,252.00 in U.S. Currency from Mr. Lazo).*

**Property Section Invoice PDCS-4201-1 (CC# 2008-185917)        Att. # 8**
**Suspected Controlled Substances**

Det. Christopher **Krucher** #1314 invoiced two quantities of suspected controlled substances possessed by Mr. **Lazo** on April 12, 2008. The material consisted of white power and an off–white rock like substance.

*It should be noted that the substances recovered from Mr. Lazo were discovered packaged in a manner characteristic of possessing them to sell.*

**Evidence Analysis Request PDCS-3220-9c (2008-185917)          Att. # 9**

On 4/13/08, Det. Christopher **Krucher** #1314 requested that the S.C. Crime Lab conduct quantitative and qualitative tests, on the suspected substances recovered from Mr. **Lazo** on April 12, 2008.

**S.C. Crime Laboratory Report- (CC# 2008-185917)              Att. # 10**

With respect to the requested analysis, Forensic Scientist Vorathip **Chinookoswong** submitted a report dated May 23, 2008. The findings indicate that analysis of the suspected substances revealed the presence of cocaine in each submitted quantity.

The report further indicates Item # 1 contained sixteen bags and Item # 2 seven bags.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 5

**Report of Inmate Death to State Commission of Correction**          Att. # 11

    On 4/13/08, D/Sgt. Edward **Fandry** notified the New York State Commission of Corrections regarding Mr. **Lazo**'s death while in this Department's custody.

**Use of Force Report PDCS-1040c (2008-185633) UOF (2008-0231)**          Att. # 12

    Lt. Robert **Williams**/310/3 on 4/13/08 prepared the above report and indicated the following:

    On 4/12/08, at eastbound Southern State Parkway and Bayshore Rd in Bayshore, P.O. William **Judge** and Sgt. James **Scimone** utilized physical force and "other" (type of force), with respect to the arrest of Mr. Kenneth **Lazo**. Mr. **Lazo** was charged with two counts of Criminal Possession of a Controlled Substance 3rd.

    The indicated reasons for the utilized force are as follows: **to overcome resistance**, to **restrain, prevent escape and to terminate unlawful conduct**. The report further indicates that Mr. **Lazo** offered "weaponless" resistance to the officers and suffered a physical injury for which he received treatment. Both officers also suffered a physical injury, which required medical attention.

*The involved officers' indicated their accounts of the incident on separate Supplementary Reports.*

**Injured Employee Report PDCS-1008e**          Att. #s 13, 14, and 15
**CC#'s 2008-186197, 186198, 185970**

    All three involved officers were injured during their interaction with Mr. **Lazo** on April 12, 2008. The officers were treated at Southside Hospital and released. Following below are the injured employees and their respective diagnosis:

> Sgt. James **Scimone** - Sprained right wrist.

> P.O. William **Judge** - Sprains and contusions to his left thumb, hand and wrist.

> Det. John **Newton** - Left thumb sprain and abrasion to left index finger.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 6

Evidence Analysis Request PDCS-3220-9c (2008-185633)        Att. # 16
Involved Officers Flashlights

    Det. Patrick **Portella** submitted for examination, two flashlights used during the confrontation with Mr. **Lazo**.  Det. **Portella** reports that Medical Examiner Dr. **Milewski** compared the submitted items with bruises located on Mr. **Lazo**, during her examination.

*The undersigned investigator contacted Ms. Morea of the Suffolk County Crime Lab.  Ms. Morea confirmed that no laboratory analysis was conducted with respect to the above property.*

**Communications Records**                          **Media Attachment # 1**

    The records indicate the following relevant transmissions (not verbatim):

**911 Calls Received by Two Passing Motorists:**

20.26.22 Hours:      Suffolk Cop is being beat up by two "guys".

20.27.27 Hours:      Uniformed officer has somebody down on the ground- I don't know if he needs help.

**Detective Command**

20.26.27 Hours:      Echo Unit (Det. **Newton**) I need an assist Bayshore Rd and Southern State Parkway eastbound.

**Third Precinct Radio Transmissions Regarding Mr. Lazo's Arrest at Bayshore Road**

20:26:38 Hours:      3- Echo 42 to 3rd Dispatch – My partner is looking for an assist at eastbound Bayshore Rd. at Southern State Pkwy.

20:27:47 Hours:      COPE 46 to 3rd Dispatch- Subject is in custody.

20:28:21 Hours:      U-314 to 3rd Dispatch- Controlled no further.

INTERNAL AFFAIRS BUREAU CASE #08-254i             2/9/09
(NOTICE OF CLAIM)                                        Page 7

__20:32:25__ Hours:      U-314 to 3rd Dispatcher- I am transporting an arrestee to the Squad.

__20:34:55__ Hours:      U-314 to 3rd Dispatcher- I have arrived at the Third Precinct.

__Third Precinct Desk  to Third Precinct Dispatcher Telephone__
__Regarding Mr. Lazo's medical emergency at Third Precinct__

__21:00:21__ Hours:      Third Precinct Desk Officer to 3rd Dispatcher- Have rescue respond to precinct- prisoner unresponsive.

__21:00:35__ Hours:      3rd Dispatcher to F.R.E.S. Dispatcher- Have rescue respond to precinct for unresponsive prisoner. "Rush on rescue".

__Third Precinct Radio Transmissions__
__Regarding Mr. Lazo's Medical Emergency at the Third Precinct__

__21.01.17__ Hours      U-334 to Headquarters put a rush on rescue.

__21.05.10__ Hours:      U-315 hold me out to the precinct.

__21.08.01__ Hours:      3- Echo 42 to Headquarters advise rescue to come around by the Squad in the parking lot.

__21.11.13__ Hours:      Unit-302 to Headquarters we are going to be assisting B.L.A. (Brentwood Legion Ambulance) with a 10-26 (transport) to Southside Hospital.  We are going to shut down intersections on Fifth Avenue.

__21.18.20__ Hours:      Unit 302 to Headquarters the ambulance is leaving the precinct now. (Multiple Third Precinct units requested to shut intersections of Fifth Ave).

__21.19.48__ Hours:      Unit 302 to Headquarters the ambulance is leaving now.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 8


**P.D. South Command**

**Transmissions Regarding Securing the Arrest Scene**

21.21.14 Hours:      Unit-336 can you hook up with Unit-314 and go back to where they did the
                     32 (arrest) from, with Joe (U-314), and hold the scene.


**Suffolk County Fire Rescue – Communications Incident Report**        Att. # 18
  ((F.R.E.S. Event # CC08041352)

**Unit Responses:**
21:05:02 Hours:      Brentwood Ambulance dispatch/enroute.

21:09:37 Hours:      Brentwood Ambulance on scene at Third Precinct.

21:25:57 Hours:      Brentwood Ambulance enroute to hospital.

21:27:05 Hours:      Brentwood Ambulance at hospital.


**"Relevant" Event Notes (F.R.E.S.):**

21:02:15 Hours:      Prisoner is patient

21:02:23 Hours:      All info from Third Dispatch

21:05:18 Hours:      S.C.P.D. 3rd Dispatch advises C.P.R. is now in progress.


**C.A.D. (Computer Aided Dispatch) Printout**              Att. # 19

The printout of Central Complaint #2008-185633 indicates the following relevant issues:

- ➢ At **2102** Hours:      The Communications Section on April 12, 2008, activated the
  above central complaint number, in response to a request for rescue regarding an
  unresponsive prisoner at the Third Precinct.

- ➢ At **2106** Hours:      C.P.R. is indicated as in progress.

- ➢ At **2106** Hours:      Rescue unit arrives at the Third Precinct.

- ➢ At **2138** Hours:      Rescue unit departs the Third Precinct enroute to the hospital.

INTERNAL AFFAIRS BUREAU CASE #08-254i                          2/9/09
(NOTICE OF CLAIM)                                              Page 9

**Scene Logs PDCS-1060**                    Att. #s 20, 21 and 22

    A log was prepared for each of the three subject scenes regarding the incident.

❖ **Log # 1- Entrance ramp for Southern State Parkway (Eastbound) from Bayshore Road and Robert Moses Parkway, Bayshore.**
Sgt. Scott **Welshimer** #1080 prepared said log, which was initiated on 4/12/08 at 2129 hours, and terminated at 0035 hours (4/13/08).

❖ **Log # 2- Third Precinct 1630 Fifth Ave, Bayshore**
P.O. William **Zambito** #4816 prepared said log, which was initiated on 4/12/08 at 2102 hours, and terminated at 0215 hours (4/13/08).

❖ **Log # 3- Southside Hospital 310 E. Main St. Bayshore**
P.O. Mark **Broderick** #5588 prepared said log, which was initiated on 4/12/08 at 2145 hours, and terminated at 2328 hours.

**Photograph Evidence**                     Photograph Atts # 1-14

    Detective Patrick **Portella**/Homicide took the following photograph on October 15, 2008:

➢ **Photograph Att. # 1**- depicts the location of Mr. **Lazo's** arrest; Eastbound Southern State Parkway at Bayshore Road.

    Police Officer Andrew **LaRocca**/Crime Scene Section took the following photographs on April 12th and 13th 2008:

➢ **Photograph Att. # 2**- depicts Interview Room # 129 within the Third Squad suite.

➢ **Photograph Att. # 3**- depicts chair and desk within Room # 129.

➢ **Photograph Att. # 4**- depicts oxygen respirator and A.E.D. device within Room # 129.

➢ **Photograph Att. # 5**- depicts frontal view of Sgt. James **Scimone**, his uniform indicating an appearance of a struggle.

INTERNAL AFFAIRS BUREAU CASE #08-254i         2/9/09
(NOTICE OF CLAIM)         Page 10

> **Photograph Att. # 6-** depicts frontal view of Det. John **Newton**, his pants indicating an appearance of a struggle.

> **Photograph Att. # 7** – depicts a close-up view of Det. **Newton**'s injured left hand.

> **Photograph Att. # 8-** depicts frontal view of P.O. William **Judge**, his uniform indicating an appearance of a struggle.

> **Photograph Att. # 9** – depicts a close-up view of P.O. **Judge**'s injured left hand.

> **Photograph Att. # 10-** depicts a view of Mr. **Lazo's** LEFT profile, indicating facial abrasions. (Photograph taken at Southside Hospital post pronouncement.)

> **Photograph Att. # 11-** depicts a view of Mr. **Lazo's** RIGHT profile, indicating facial abrasions/contusions. (Photograph taken at Southside Hospital post pronouncement).

Police Officer Jodi **Rios**/Crime Scene Section took the following photographs at the S.C.P.D. Westhampton Impound Garage on April 17, 2008:

> **Photograph Att. # 12-** depicts a view of the vehicle operated by Mr. **Lazo's** on the date of his arrest.

Detective Patrick **Portella**/Homicide took the following photograph at the S.C.P.D. Property Section on October 16, 2008:

> **Photograph Att. #13 -** depicts a view of the cocaine and crack recovered from Mr. **Lazo** on the date of his arrest.

> **Photograph Att. #14-** depicts a view of a portion of the U.S. Currency recovered from Mr. **Lazo** on the date of his arrest.

INTERNAL AFFAIRS BUREAU CASE #08-254i         2/9/09
(NOTICE OF CLAIM)                          Page 11

## INVOLVED OFFICERS

**Supplementary Report – Detective John Newton 1096/3130/NESOT**      Att. # 23

*In the above report, Det. Newton indicated that he assisted Sgt. Scimone and P.O. Judge in subduing and arresting Mr. Lazo on 4/12/08.*

Det. Newton further indicates the following:

The marked Cope unit conducted the traffic stop of Mr. Lazo's vehicle at the entrance to the Southern State Parkway from Bayshore Rd. Upon the stop, Det. Newton approached Mr. Lazo's vehicle. Mr. Lazo exited his vehicle and went to the back of his vehicle. As the officers were interviewing him, he (Lazo) was facing the officers and acting very nervous.

Mr. Lazo then started to turn towards his vehicle. As he did, he (Lazo) threw his right elbow toward Det. Newton knocking him back a step. Mr. Lazo then started to run. The officers attempted to stop Mr. Lazo but he was able to get free from their grasp and started to run towards the roadway. P.O. Judge tackled Mr. Lazo before he reached the roadway. Sgt. Scimone and P.O. Judge were struggling to control Mr. Lazo. Det. Newton attempted to handcuff Mr. Lazo but was unable to. PO Judge then shouted that Mr. Lazo attempted to grab P.O. Judge's gun.

Mr. Lazo continued his resistance and the officers were unable to subdue him. Det. Newton ran back to the "marked unit" and used the radio to request an assist. Det. Newton then ran back to assist the officers struggling with Mr. Lazo, and eventually they were able to subdue and handcuff him. PO Joseph Link transported Mr. Lazo into the Third Precinct.

**Internal Correspondence- Detective John Newton 1096/3130/NESOT**      Att. # 24

Det. Newton indicates fundamentally the same account in his I.O.C. as he did in his previously submitted Supplementary Report. The following are relevant points not previously addressed:

- During Mr. Lazo's arrest, the only visible injuries Det. Newton observed were abrasions to Mr. Lazo's face.

- Mr. Lazo apparently received the abrasions as the officers were on the ground attempting to place him under arrest.

INTERNAL AFFAIRS BUREAU CASE #08-254i                  2/9/09
(NOTICE OF CLAIM)                                                Page 12

- At no time during his arrest at the scene did Mr. Lazo complain of any pain or injury.

- Mr. Lazo did not appear to be suffering from any type of injury.

- At no time did Mr. Lazo ever request medical attention.

- At no time did Det. Newton ask Mr. Lazo if he required medical attention.

- Mr. Lazo did not appear to be intoxicated.

- Mr. Lazo was talking (at the scene).

- Mr. Lazo walked up to, and entered the police (transporting) vehicle on his own power.

- Mr. Lazo did not immediately require medical attention and was transported to the Third Squad for processing.

**Supplementary Report –Sergeant James Scimone 983/330/T2**        **Att. # 25**

Sgt. Scimone indicated the following:

On 4/12/08, Sgt. Scimone worked a 4x12 tour in Cope-37, doubled with P.O. Judge. At approximately 2005 hours, they assisted the 3rd Pct. NESOT Team with the traffic stop of Mr. Lazo's vehicle. Upon stopping the vehicle, P.O. Judge approached Mr. Lazo and requested his drivers license. The officers asked Mr. Lazo to turn off the vehicle and he complied. P.O. Judge, with the drivers license, returned to the Cope unit to conduct a data inquiry.

Det. Newton arrived on the scene in an unmarked police vehicle. Det. Newton had a brief conversation with P.O. Judge before approaching Mr. Lazo's vehicle. Sgt. Scimone advised Det. Newton that Mr. Lazo's vehicle had a push button ignition system that would allow Mr. Lazo to restart his car at anytime while inside the vehicle. At that point, the officers asked Mr. Lazo to exit his vehicle. Mr. Lazo complied and walked to the rear of the Cadillac. Sgt. Scimone asked Det. Newton for his flashlight to perform a cursory search of the Cadillac.

Mr. Lazo was standing with P.O. Judge and Det. Newton near the passenger rear quarter panel of the Cadillac. Sgt. Scimone was standing opposite from them on the drivers' side rear. Sgt. Scimone saw Mr. Lazo violently and quickly flail his arm by throwing his elbow out towards Det. Newton's face. Mr. Lazo then ran towards the front of the Cadillac. P.O. Judge and Det. Newton gave chase and Sgt. Scimone followed. P.O. Judge was able to bring Mr. Lazo to ground where he was fighting and out of control. P.O. Judge was directly behind Mr. Lazo's back while Sgt. Scimone positioned himself to Mr. Lazo's right side.

INTERNAL AFFAIRS BUREAU CASE #08-254i                                   2/9/09
(NOTICE OF CLAIM)                                                       Page 13

Sgt. Scimone described Mr. Lazo as a large male approximately 250 lbs and extremely strong.  The struggle placed Sgt. Scimone in a dangerous position, almost into the right travel lane of the entrance ramp to the parkway with vehicles closely speeding by.  The officers repeatedly ordered Mr. Lazo to stop fighting, and to put his hands behind his back.  He refused. Mr. Lazo's body remained rigid and the officers were unable to control him.

Sgt. Scimone began to strike Mr. Lazo in the right hand and arm with Det. Newton's flashlight.  Mr. Lazo continued to resist.  During the struggle, Sgt. Scimone heard P.O. Judge yell the word "gun" which led him (Scimone), to immediately believe that Mr. Lazo possessed a gun.  Sgt. Scimone, fearing for his life and the safety of the other officers, struck Mr. Lazo in the back and head with the flashlight.  Sgt. Scimone then dropped the flashlight and held onto Mr. Lazo's right arm as P.O. Judge held his body.  Sgt. Scimone told Det. Newton to call for further assistance.

Sgt. Scimone and P.O. Judge continued to hold onto Mr. Lazo who continued to struggle and fight until Det. Newton returned.  At that point, Det. Newton advised that he had Mr. Lazo's left arm handcuffed.  Sgt. Scimone was then able to get Mr. Lazo's right hand behind his back and he was then fully handcuffed.  The assisting units responded after Mr. Lazo was controlled. Sgt. Scimone had no further interaction with Mr. Lazo.

**Internal Correspondence- Sergeant James Scimone 983/330/T2          Att. # 26**

**Sgt. Scimone indicates fundamentally the same account in his I.O.C. as he did in his previously submitted Supplementary Report.  The following are relevant points not previously addressed:**

- After the struggle with Mr. Lazo ended, Sgt. Scimone observed an abrasion to Mr. Lazo's face.

- The abrasion injury may have occurred when Mr. Lazo was taken to the ground during the struggle.

- Sgt. Scimone did not recall any other observable injuries on Mr. Lazo.

- At the scene, Mr. Lazo never complained of pain or requested medical attention.

INTERNAL AFFAIRS BUREAU CASE #08-254i                           2/9/09
(NOTICE OF CLAIM)                                               Page 14

- While at the scene, Sgt. **Scimone** did not ask Mr. **Lazo** if he required medical attention.

- Mr. **Lazo** did not appear to be intoxicated or impaired by alcohol or drugs.

- Mr. **Lazo** was not immediately transported to the hospital because he did not appear to require immediate medical attention.

- Mr. **Lazo** was walking and talking while at the scene, and he never requested medical attention.

- After the altercation, Sgt. **Scimone** instructed P.O. **Link** to transport Mr. **Lazo** into the precinct.

- As Mr. **Lazo** was placed into the U-314 (vehicle), Sgt. **Scimone** turned away to dust himself off and check on the status of Det. **Newton** and P.O. **Judge**.

- As Sgt. **Scimone** was doing so, P.O. **Link** departed from the scene with Mr. **Lazo**.

- Sgt. **Scimone** was unaware that Officer **Link** has transported Mr. **Lazo** as a solo unit until later in the tour.

**Supplementary Report –Police Officer William Judge 5390/330/T2          Att. # 27**

**PO Judge's description of the events leading up to Mr. Lazo's traffic stop is essentially the same as Sgt. Scimone's.**

PO **Judge** indicated the following details regarding the events that took place after the officers stopped Mr. **Lazo**'s vehicle:

Upon the officer's request, Mr. **Lazo** exited his vehicle and stepped to the rear of the vehicle. The officers began talking to Mr. **Lazo** who was standing with his hands on the fender. During their discussion, Mr. **Lazo** became agitated and suddenly threw his right elbow back at Det. **Newton**. Mr. **Lazo** then attempted to flee the scene on foot. P.O. **Judge** tackled Mr. **Lazo** from behind in a "football like" manner. While on the ground, Mr. **Lazo** was stating, "I'll take it out, I'll take it out." P.O. **Judge** released his grip at which time Mr. **Lazo** began to flee again. P.O. **Judge** tackled Mr. **Lazo** again at which time Det. **Newton** and Sgt. **Scimone** attempted to restrain him.

INTERNAL AFFAIRS BUREAU CASE #08-254i                                2/9/09
(NOTICE OF CLAIM)                                                    Page 15

While on the ground, Mr. Lazo reached back and attempted to grab P.O. Judge's gun. P.O. Judge began screaming "my gun, my gun," and started striking Mr. Lazo about the head with his Stringer flashlight in an attempt to prevent him from taking possession of his gun. Mr. Lazo continued to struggle, and was dragging P.O. Judge and Sgt. Scimone toward passing vehicles on the Southern State Parkway.

At that point, Det. Newton returned to his vehicle to broadcast a request for an assist. In an attempt to avoid being dragged into traffic, P.O. Judge began biting Mr. Lazo in the buttock area. Detective Newton returned and was able to place one cuff on Mr. Lazo's left hand. P.O. Judge took out his handcuffs and joined them with Det. Newton's empty cuff. He handed the cuff to Sgt. Scimone who placed it on Mr. Lazo's right hand. After Mr. Lazo was in custody, P.O. Judge rolled off Mr. Lazo and grabbed his left hand in pain. P.O. Judge was subsequently transported to Southside Hospital for treatment. P.O. Judge advised the transporting officer P.O. Link, that Mr. Lazo had not yet been frisked.

**Internal Correspondence—Police Officer William Judge 5390/330/T2        Att. # 28**

P.O. Judge indicates fundamentally the same account in his I.O.C. as he did in his previously submitted Supplementary Report. The following are relevant points not previously addressed:

- At the scene of the arrest, the only injury P.O. Judge observed on Mr. Lazo was an abrasion near his right eye.

- The "minor' injury was the result of a "violent" struggle.

- Mr. Lazo never complained of an injury or requested medical attention.

- P.O. Judge never asked Mr. Lazo if he required medical attention.

- Mr. Lazo did not appear to be intoxicated, or impaired by alcohol or narcotics.

- After checking Mr. Lazo for injuries, it appeared to P.O. Judge that there was none that required medical attention.

- Mr. Lazo was alert and able to move "freely" on his own.

INTERNAL AFFAIRS BUREAU CASE #08-254i        2/9/09
(NOTICE OF CLAIM)                              Page 16

## ASSISTING POLICE PERSONNEL

**Supplementary Report- Police Officer Joseph Link 2889/310/3**      Att. # 29

P.O. **Link** indicated the following:

On 4/12/08, P.O. **Link** worked a 3x11 tour in Unit-314. At approximately 2029 hours, P.O. **Link** responded to the Southern State Parkway to assist a Third Precinct detective who had requested an assist. P.O. **Link** arrived at the scene within one minute and advised the dispatcher that the scene was controlled. P.O. **Link** observed Mr. **Lazo** lying face down and handcuffed on the shoulder of the road.

P.O. **Link** observed that P.O. **Judge**, Sgt. **Scimone** and Det. **Newton** were each disheveled and out of breath. Sgt. **Scimone** asked P.O. **Link** to put Mr. **Lazo** into his police unit to transport to the precinct. P.O. **Link** helped Mr. **Lazo** to his feet and he walked to the police unit. While P.O. **Link** was putting Mr. **Lazo** into the rear of the police unit, P.O. **Judge** informed him that Mr. **Lazo** had not yet been frisked. While P.O. **Link** was checking Mr. **Lazo's** pants, Det. **Newton** informed him that there were drugs in the crotch of Mr. **Lazo's** pants. P.O. **Link** opened Mr. **Lazo's** pants and retrieved a large quantity of crack cocaine.

At 2033 hours, P.O. **Link** advised Headquarters that he was transporting Mr. **Lazo** to the Third Precinct for the detectives. At 2035 hours, P.O. **Link** arrived at the precinct and removed Mr. **Lazo** from the police vehicle. In doing so, Mr. **Lazo's** pants fell to the ground. For safety purposes, P.O. **Link** told Mr. **Lazo** to step out of his pants. As Mr. **Lazo** did, another large quantity of cocaine fell from his boxer shorts. P.O. **Link** retrieved the drugs and Mr. **Lazo's** pants from the ground and escorted him into the precinct.

Inside the precinct, P.O. **Link** secured his weapon in a gun locker and walked Mr. **Lazo** into the Detective Squad. He put Mr. **Lazo** into an interview room where he was secured by handcuffs. P.O. **Link** removed Mr. **Lazo's** earrings and placed them into a property bag. He then gave the second bag of cocaine to Det. **Newton** and left the squad room. According to P.O. **Link**, during the transport of Mr. **Lazo**, he (**Lazo**) never complained of any injuries and only said that he "messed up and got arrested." P.O. **Link** further reported that Mr. **Lazo** walked under his own power without any assistance, whenever he moved from "point to point."

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 17

**Internal Correspondence- Police Officer Joseph Link 2889/310/3**          **Att. # 30**

P.O. Link indicates fundamentally the same account in his I.O.C. as he did in his previously submitted Supplementary Report.  The following are relevant points not previously addressed:

- Upon arrival to the arrest scene, P.O. Link observed the struggle over and Mr. Lazo in custody.

- Due to the "close proximity" to the highway of Mr. Lazo's vehicle stop and subsequent arrest, P.O. Link asked Sgt. Scimone if "we should head to the precinct."

- Sgt. Scimone agreed and P.O.s Link and Judge helped Mr. Lazo to his feet.

- P.O. Link "looked" Mr. Lazo over for injuries and observed only a small abrasion to the right side of Mr. Lazo's face near his eye.

- Mr. Lazo did not appear to require any medical aid.

- P.O. Link, upon his arrival to the arrest scene, observed Mr. Lazo to be no longer physically agitated.

- P.O. Link did observe Mr. Lazo to be emotionally upset regarding his arrest.

- Mr. Lazo did not complain about any injuries to P.O. Link, nor did he ever request medical treatment.

- P.O. Link never asked Mr. Lazo if he was injured or desired medical aid.

**Supplementary Report- Detective Christopher Talt 1327/3130/T4**          **Att. # 31**

Det. Talt indicated the following:

On 4/12/08, Det. Talt worked a 5x1 tour assigned to the Third Pct. NESOT with Det. Newton.  The detectives in separate vehicles were investigating a complaint based on anonymous information that an unknown male operating a dark blue Cadillac, was dealing drugs along the Sunrise Hwy.  At approximately 2015 hrs, Det. Newton observed a dark blue Cadillac in the Bob's Store parking lot on the north side of Sunrise Hwy in Wets Islip.  The detectives began to follow the Cadillac.  Det. Talt requested the assistance of COPE 31 Sgt. Scimone regarding a future possible future traffic stop.

INTERNAL AFFAIRS BUREAU CASE #08-254i         2/9/09
(NOTICE OF CLAIM)         Page 18

The vehicle proceeded east on the service road before turning onto West 1st Street in West Islip. Det. Newton continued east on the service road and Det. Talt followed the Cadillac. Det. Talt then observed the operator of the Cadillac meet up with another unknown vehicle. Det. Talt then observed the operator of the Cadillac conduct a hand-to-hand transaction with the operator of the second vehicle.

The Cadillac immediately turned left and proceeded east on 1st St., then north on Pine St. before making a right turn onto the Sunrise Hwy service road without signaling. The Cadillac, traveling at a high rate of speed, headed east on the service road and then north on the Robert Moses Causeway. Det. Newton, with the assistance of Sgt. Scimone and P.O. Judge, conducted a traffic stop of the Cadillac, at the entrance to the Southern State Parkway from Bayshore Rd. Det. Talt continued east on the parkway passing the traffic stop.

Det. Talt, after hearing Det. Newton call for an assist on the Detective Band, notified the Third Pct. dispatcher of the location and situation. Mr. Lazo was subsequently taken into custody prior to Det. Talt arriving at the scene. Det. Talt responded to the Third Precinct to begin the arrest processing of Mr. Lazo, who was lodged in room # 129A. The transporting officer, P.O. Link, turned over a quantity of cocaine that was packaged in a manner consistent with street level drug sales.

Det. Talt entered the interview room at 2050 hours. Mr. Lazo requested a drink of water and Det. Talt supplied him with two cups of water. D/Sgt. Robert Koerber entered the room to complete a Prisoner Activity Log. It became apparent that Mr. Lazo needed medical treatment. D/Sgt. Koerber left the room to make that notification and Det. Talt stayed with Mr. Lazo.

A short time later Mr. Lazo put his head back and became unresponsive. Det. Talt alerted the squad of the situation and with the assistance of P.O. Broderick, began CPR on Mr. Lazo. P.O. Broderick and other assisting officers continued CPR until Brentwood Legion Ambulance responded. Mr. Lazo was transported to Southside Hospital for medical treatment and was pronounced dead at 2145 hours by Dr. Rutman.

**Internal Correspondence– Detective Christopher Talt 1327/3130/T4**     **Att. # 32**

**Det. Talt indicates fundamentally the same account in his I.O.C. as he did in his previously submitted Supplementary Report. The following are relevant points not previously addressed:**

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 19

- Det. **Talt** initially entered the interview room containing Mr. **Lazo**, at approximately 2050 hours.

- Mr. **Lazo** had been inside room # 129 for approximately ten minutes before Det. **Talt** initially entered.

- Upon entering room # 129, Det. **Talt** did not observe any other Department members with Mr. **Lazo**.

- Mr. **Lazo**, wearing boxer shorts and socks, was sitting in the prisoner chair with his left hand cuffed to the desk.

- Mr. **Lazo** was angry and upset at the same time while cursing and yanking the handcuffs from the desk.

- Mr. **Lazo** calmed down and began to talk to Det. **Talt**.

- Mr. **Lazo** said he did not want to go to jail and that he was sorry for fighting with the officers.

- Mr. **Lazo** then began cursing again before asking Det. **Talt** for some water.

- Det. **Talt** left the room and immediately returned with two cups of water.

- The cups were placed on the corner of the desk and Mr. **Lazo**, with his right hand, picked up one of the cups and drank from it.

- Det. **Talt** observed abrasions and contusions on Mr. **Lazo's** face.

- Mr. **Lazo** stopped talking to Det. **Talt** and just started staring at the wall in front of him.

- Det. **Talt** was in room # 129 with Mr. **Lazo** for approximately five minutes prior to D/Sgt. **Koerber** entering the room.

- Mr. **Lazo** did not respond to any of D/Sgt. **Koerber's** questions.

- Mr. **Lazo** started to lose color in his face while breathing normally and sitting in his chair.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 20

- Almost immediately after D/Sgt. Koerber entered room # 129, it became apparent that Mr. Lazo needed medical attention.

- Approximately one minute after D/Sgt. Koerber left the room to request an ambulance, Mr. Lazo's head fell back against the wall and he slumped in his chair.

- Det. Talt yelled to the detectives in the detective squad room, notifying them of the situation.

- Det. Talt immediately uncuffed Mr. Lazo and with the assistance of P.O. Broderick, laid Mr. Lazo down on the floor of the interview room.

- P.O.s Broderick, Friedrich, Quesada and Cotter performed C.P.R.

- Det. Talt via police radio notified Brentwood Legion Ambulance of the exact location in the precinct of the medical emergency.

- At no time did Mr. Lazo ever complain of pain or request medical treatment.

**Supplementary Report- Detective Sergeant Robert Koerber # 587        Att. # 33**

D/Sgt. Koerber indicated the following:

On 4/12/08, D/Sgt. Koerber worked a 5x1 tour in the Third Squad. At approximately 2055 hours, D/Sgt. Koerber entered interview room # 129A to complete a Prisoner Activity Log on Mr. Lazo. While attempting to interview Mr. Lazo, it became apparent that he needed medical attention. D/Sgt. Koerber left the room to request an ambulance for Mr. Lazo.

Upon returning several minutes later, D/Sgt. Koerber observed Det. Talt and P.O. Broderick performing C.P.R. on Mr. Lazo. P.O. Broderick and other assisting officers continued C.P.R. until the ambulance arrived. Brentwood Legion Ambulance transported Mr. Lazo to Southside Hospital for medical treatment. D/Sgt. Koerber subsequently responded to the hospital and learned that Mr. Lazo had been pronounced dead at 2145 hours.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 21

Internal Correspondence– Detective Sergeant Robert Koerber # 587      Att. # 34

**Detective/ Sergeant Robert Koerber indicates fundamentally the same account in his I.O.C. as he did in his previously submitted Supplementary Report. The following are relevant points not previously addressed:**

- At approximately 2040 hours, D/Sgt. Koerber observed P.O. Link enter the hallway that leads into the squad, with a prisoner later known as Mr. Lazo.

- P.O. Link entered the squad with Mr. Lazo and D/Sgt. Koerber observed that Mr. Lazo, who appeared to be in an agitated state, was wearing green boxer shorts and white socks.

- The sergeant noticed that Mr. Lazo had bruising on his face around his eyes before directing P.O. Link to secure him in room 129A.

- At approximately 2055 hours, about fifteen minutes after Mr. Lazo's arrival, D/Sgt. Koerber entered room # 129A to conduct his required interview.

- On entry into the room, D/Sgt. Koerber observed Mr. Lazo sitting in the prisoner chair with his left hand cuffed to the desk.

- Det. Talt had immediately advised D/Sgt. Koerber that Mr. Lazo had just stopped talking and he "suddenly wasn't lookin good."

- D/Sgt. Koerber attempted to ask Mr. Lazo the required questions as to medications and complaints of pain or injuries, however, Mr. Lazo was unresponsive to both questions.

- Mr. Lazo was breathing, his eyes were open, he looked pale and he was staring straight ahead.

- D/Sgt. Koerber at that time left the room to call for medical assistance.

- D/Sgt. Koerber immediately responded to the Third Precinct front desk and requested that an ambulance respond to the Third Squad for an unresponsive prisoner.

INTERNAL AFFAIRS BUREAU CASE #08-254i
(NOTICE OF CLAIM)

2/9/09
Page 22

- P.O. Michael Drew 5959/310 called the dispatcher from the direct line and made that request.

- D/Sgt. Koerber then responded back to the Third Squad and observed Mr. Lazo, prone on the floor in the interview room, being assisted by Det. Talt, P.O.'s Broderick, Freidrich and Zurl.

- The above officers, assisted by additional personnel P.O.s Quesada and Cotter, were performing C.P.R. on Mr. Lazo.

- The officers utilized an A.E.D. (Automatic External Defibrillator), and oxygen.

- The officers continued C.P.R. until Brentwood Legion Ambulance arrived and transported Mr. Lazo to Southside Hospital.

- D/Sgt. Koerber responded to the hospital and at 2145 hours, Mr. Lazo was pronounced.

- Homicide Squad was notified and they initiated their investigation.

- At no time did D/Sgt. Koerber have conversation with Mr. Lazo during his time at the Third Squad.

- D/Sgt. Koerber completed the observational parts (visible physical/emotional condition) of the Prisoner Activity Log.

- D/Sgt. Koerber was unable to complete the verbal part of the log (prisoner claim of pain/injury or Illness/Medications) due to Mr. Lazo's unresponsiveness.

**Supplementary Report- Police Officer Mark Broderick 5588/310/3a1     Att. # 35**

P.O. Broderick indicated the following:

On 4/12/08, P.O. Broderick worked a 3x11 tour in Unit-323, doubled with P.O. Jose Cardus. While in the uniformed squad room, at approximately 2100 hours, P.O. Broderick overheard that a male was in distress in the Third Squad. P.O. Broderick responded into the Third Squad and initiated C.P.R. to Mr. Lazo. He continued C.P.R. until Brentwood Legion Ambulance arrived and transported Mr. Lazo to the hospital.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 23

**Supplementary Report- Police Officer Kathleen Cotter 5360/310/3**     **Att. # 36**

P.O. **Cotter** indicated the following:

     On 4/12/08, P.O. **Cotter** worked a 3x11 tour in Unit-315. At approximately 2100 hours, she received an email on the M.D.C from Desk Sergeant Peter **Hansen** requesting that she respond to the Third Precinct forthwith. Upon arrival at the precinct, P.O. **Cotter** was advised to go to the Third Squad and assist a person in cardiac arrest. She found a male on the floor having C.P.R. performed by Officer's **Broderick** and **Zurl**. P.O. **Cotter** relieved P.O. **Broderick** and performed Bag Valve Mask ventilations until the ambulance arrived. P.O. **Cotter** rode inside the ambulance enroute to Southside Hospital and assisted the medical team with C.P.R.

**E-Mail Transaction Inquiry**          **Att. # 37**

     The undersigned investigator conducted a transaction inquiry with respect to Police Officer Kathleen **Cotter's** report that she was ordered to the precinct via the Mobile Data Computer. The inquiry revealed that at 21:02:51 hours, Sergeant Peter **Hansen** #1142 transmitted an e-mail to P.O. **Cotter** ordering her to the Third Precinct forthwith.

**Supplementary Report- Police Officer David Friedrich 5729/310/3**     **Att. # 38**

P.O. **Friedrich** indicated the following:

     On 4/12/08, P.O. **Friedrich** worked a 3x11 tour in Unit-302 double with P.O. Joseph **Zurl**. At approximately 2100 hours, P.O. **Friedrich** was in the Crime Control office when he learned that a prisoner needed medical assistance. P.O. **Friedrich** responded to the interview room where he observed P.O. **Broderick** administering first aid to Mr. **Lazo**. P.O. **Friedrich** assisted in administering C.P.R. until Mr. **Lazo** was transported to the hospital.

INTERNAL AFFAIRS BUREAU CASE #08-254i          2/9/09
(NOTICE OF CLAIM)                              Page 24

**Supplementary Report- Police Officer Lola Quesada 5557/310/3          Att. # 39**

P.O. **Quesada** indicated the following:

> On 4/12/08, P.O. **Quesada** worked a 3x11 tour in Unit-324. At
> approximately 2100 hours, P.O. **Quesada** responded to the Third Squad
> to assist with the C.P.R. in progress. Upon arrival, P.O. **Quesada**
> observed two officers administering C.P.R. to Mr. **Lazo**, who was on the
> floor. P.O. **Quesada** assisted both officers with oxygen and the
> positioning of Mr. **Lazo**.

**Supplementary Report- Police Officer Joseph Zurl 5349/310/3          Att. # 40**

P.O. **Zurl** indicated the following:

> On 4/12/08, P.O. **Zurl** worked a 3x11 tour in Unit-302, double with P.O.
> David **Friedrich**.

> At approximately 2100 hours, P.O. **Zurl** and his partner were in the Crime
> Control office when they were advised of a male in distress in the Third
> Squad. P.O. **Zurl** responded to the interview room and administered
> C.P.R. to Mr. **Lazo** until the ambulance arrived.

**Internal Correspondence- Sergeant Scott Welshimer 1080/310/3          Att. # 41**

Sgt. **Welshimer** reported the following:

- On 4/12/08, Sgt. **Welshimer** worked a 3x11 tour in Unit -336.

- At approximately 2025 hours, Sgt. **Welshimer** responded to "an officer needs
  assistance" call from a NESOT unit.

- Arriving within five minutes of the call, Sgt. **Welshimer** observed P.O. **Link**
  in the process of leaving the scene with a prisoner in the vehicle.

INTERNAL AFFAIRS BUREAU CASE #08-254i
(NOTICE OF CLAIM)

2/9/09
Page 25

- Sgt. Welshimer also observed Sgt. Scimone, P.O. Judge and Det. Newton to be disheveled and dirty, indicative of a struggle.

- Sgt. Welshimer was told that the situation was under control and he resumed patrol.

- At 2129 hours, Lt. Robert Williams directed Sgt. Welshimer to respond to the "NESOT scene" and establish security.

- Sgt. Welshimer immediately complied by responding and setting up a secure crime scene.

CIVILIAN WITNESSES:

**Passing Motorist- John Baratta**                              Att. # 42
(DOB 6/30/65) 27 Mark Dr. Smithtown, NY

On 4/12/08, Detective Patrick Portella #1086 took a sworn written statement from Mr. John Baratta. Mr. Baratta indicated the following:

On 4/12/08 at approximately 2030 hours, Mr. Baratta was driving with his family from the Bayshore area. Mr. Baratta had just entered onto the Sagtikos Pkwy heading northbound from the Southern State Pkwy. Mr. Baratta noticed a blue and white Suffolk County Police car on the right shoulder of the road. He further noticed a struggle going on and told his family that a cop was down. Mr. Baratta told his family to call 911. Mr. Baratta also noticed a person in a white t-shirt on the ground. Mr. Baratta observed that person's upper body elevated off the ground.

A guy in blue was on top of him and they were struggling. A third person wearing a green shirt was standing behind the "guy" in blue. Mr. Baratta could not tell who the police were as he drove past however, he knew "something was wrong". Mr. Baratta's sister in law called 911 and subsequently clarified the exact location of the incident.

**Passing Motorist- Mr. Frank Morrow**

Detective Gerald McAlvin/Homicide Section, interviewed Mr. Morrow regarding the incident. Mr. Morrow indicated to Det. McAlvin that he was eastbound on the parkway in the middle lane, heading towards the Sagtikos Pkwy with his wife. He observed a car stopped on the grass portion with a marked police car behind it. He noticed the police car had flashing lights.

INTERNAL AFFAIRS BUREAU CASE #08-254i          2/9/09
(NOTICE OF CLAIM)                               Page 26

Mr. **Morrow** also believed that there was another car stopped behind the police car. Mr. **Morrow** stated he observed a uniformed officer on top of a subject on the ground, and believed the officer was trying to make an arrest. Mr. **Morrow** further stated that the cars were on the entrance portion to the Southern State Pkwy from either the Robert Moses Causeway or the Bayshore Rd. exit. Mr. **Morrow** called 911 from his cell phone as he was driving northbound on the Sagtikos Pkwy.

**Third Precinct Arrestee- Ms. Lesley Brewster- Sworn Statement**          Att. # 43
**(DOB 6/29/78) 30 Parkway Blvd. Wyandanch, NY**

Det. **Portella** took a two-page sworn statement from Ms. **Brewster** on May 4, 2008. Ms. **Brewster** was being processed in the uniform squad room, when she observed Mr. **Lazo** upon his arrival at the precinct on April 12, 2008. Ms. **Brewster** stated that she observed Mr. **Lazo** handcuffed from behind, and walking slowly on his own power while being escorted through the precinct by two uniformed officers. She describes Mr. **Lazo** as having a reddish complexion and wearing shorts with no shirt. Ms. **Brewster** further describes Mr. **Lazo** as moving his head from side to side.

Ms. **Brewster** stated that approximately five to ten minutes later, she observed a uniformed officer run from the direction where Mr. **Lazo** was taken. Ms. **Brewster** then observed a "bunch" of officers run past the uniform squad room towards the direction where Mr. **Lazo** was taken.

**Death Report PDCS-1002b – Detective Patrick Portella 1086/3310**          Att. # 44

On April 12, 2008 at approximately 2200 hours, the S.C.P.D. Homicide Section initiated an investigation into Mr. **Lazo**'s death. Detectives Gerard **McAlvin** and Philip **Frendo** assisted the lead investigator, Det. **Portella**. The detectives conducted a thorough and comprehensive investigation of the incident. In furtherance of their examination, all of the evidence recovered was presented to the respective offices of the medical examiner and district attorney.

**Automatic External Defibrillator (A.E.D.) – Download**          Att. # 45

    In furtherance of his investigation, Det. **Portella** recovered the A.E.D. download from the device utilized during Mr. **Lazo's** medical emergency.  The recovered data indicates that the A.E.D. was attached to Mr. **Lazo** at **21:03:06** hours on 4/12/08.  The device subsequently cycled **FOUR** times, each time indicating the command: "No Shock Advised".

    Homicide Section personnel forwarded the downloaded information to Medical Examiner Dr. **Milewski** for her review.


**Mr. Kenny Lazo's  Medical Records**          Att. # 46

**Pre- Hospital Report- Brentwood Legion Ambulance**

    Brentwood Legion Ambulance Chief Joseph **Kornahrens** responded to the call for service at the Third Squad on April 12, 2008.  He prepared a pre-hospital report with respect to his response to the incident.  The report indicates the following under the heading *"Objective Physical Assessment"*:

*"23-year-old male found on the floor in a holding room in cardiac arrest, P.D. doing C.P.R. A.E.D. applied with no shock advised".*


**Southside Hospital**          Att. # 47

    The medical records indicate that Brentwood Ambulance transported Mr. **Lazo** to Southside Hospital where he was triaged at 2139 hours.  The "Southside Hospital Emergency Record" indicates that Mr. **Lazo** arrived intubated in the field, and with no detectable vital signs.  Mr. **Lazo** was treated for cardiac arrest and placed on a cardiac monitor.  Medical support was withdrawn at 2145 hours and Mr. **Lazo** expired at 2145 hours.  Dr. Matthew **Rutman** made said pronouncement.

    The emergency record further indicates that Mr. **Lazo** had arrived at the hospital with bruising noted to his right temporal area, and a laceration above his left eye.  Further noted was a bruise to Mr. **Lazo's** right chest, bump above left eye, bruising above both eyes and an abrasion to his left cheek.  The "Southside Hospital Physician Highlights Record" indicates a "final primary diagnosis" as Cardiac Arrest.

INTERNAL AFFAIRS BUREAU CASE #08-254i              2/9/09
(NOTICE OF CLAIM)                                   Page 28

<u>Suffolk County Medical Examiner's INVESTIGATIVE SUMMARY</u>     Att. # 48

     On April 12, 2008, Mr. Bryan **Bobrowsky** R.P.A. conducted a preliminary investigation into Mr. **Lazo**'s death.  He subsequently submitted to the Medical Examiner's Office, an investigative report regarding his findings.  The report also includes post autopsy information regarding Mr. **Lazo**.

     In Mr. **Bobrowsky**'s report, under the heading "<u>Pertinent Negatives</u>", the following is indicated: *"No internal injuries of head and torso; No strap muscle of neck cartilage injury; No foreign bodies/obvious drugs found in GI tract."*

     Under the heading "<u>Autopsy Findings</u>", the report indicates *"Multiple contusions/abrasions of face and scalp; Bilateral soft tissues (SubQ & Deep fat not muscular). Hemorrhage of neck uncertain if due to vascular access attempts; Abrasions/contusions of torso/extremities".*

     *The Morgue Screening Tests indicate NO presence of alcohol or opiates. An examination of Mr. Lazo's urine produced a positive result for THC.*

Office of Medical Examiner- Report of Autopsy (ME# 08-1311)     Att. # 49

     Dr. Yvonne I. Milewski performed an autopsy of Mr. Lazo on April 13, 2008.  The subsequent report filed by Dr. Milewski with respect to said autopsy indicates several diagnoses under the heading *"<u>Final Anatomic Diagnoses.</u>"*  The diagnoses include but are not limited to *<u>sudden cardiac, blunt impacts to torso and upper extremities and obesity.</u>*

     Under the heading, *"<u>Cause of Death</u>"* the following is indicated: *<u>"Sudden cardiac death following exertion associated with prolonged physical altercation with multiple blunt impacts."</u>*

     Under the heading, *"<u>Contributory</u>"* the following is indicated: *<u>"Obesity".</u>*

     The *<u>"Manner of Death"</u>* is indicated as *<u>"Homicide".</u>*

INTERNAL AFFAIRS BUREAU CASE #08-254i                          2/9/09
(NOTICE OF CLAIM)                                              Page 29

**Supplementary Report PDCS-1002b- Detective Patrick Portella          Att. # 50**

The report indicates that in October 2008, a Grand Jury, convened by the Suffolk County District Attorney's Office, heard testimony into the facts surrounding the death of Mr. Lazo.  On October 31, 2008, the Grand Jury returned a "No True Bill" with respect to the police officers involved.

*The report further indicates the status of Homicide Sections investigation into the Mr. Lazo's death as "Closed Non-Criminal".*

**Investigative Summary:**

On April 12, 2008, the Third Precinct NESOT Team was conducting a drug investigation in the West Islip area.  At approximately 2015 hours, Detectives **Newton** and **Talt**, in separate vehicles, began following the operator of a blue Cadillac (Mr. **Lazo**), traveling east on the Sunrise Hwy. service road.  Det. **Talt** requested the assistance of COPE 31 Sgt. **Scimone**, regarding a possible future traffic stop.  Det. **Talt** followed Mr. **Lazo** on to West 1st St. in West Islip, and observed Mr. **Lazo** conduct a hand-to-hand transaction with the operator of a second vehicle.

Mr. **Lazo** immediately left the location and made a right turn on to the service road without signaling.  Det. **Newton**, with the assistance of Sgt. **Scimone** and partner P.O. **Judge** conducted a traffic stop of Mr. **Lazo's** vehicle, on the Robert Moses Causeway at the Bayshore Rd. exit.  Det. **Talt** observed the traffic stop and continued east on the parkway.

Because Mr. **Lazo's** vehicle had a push button ignition system that would allow him to restart his vehicle at any time, the officers requested that Mr. **Lazo** exit his vehicle.  Mr. **Lazo** complied and walked to the rear of his vehicle.  Sgt. **Scimone** asked Det. **Newton** for his flashlight to perform a cursory search of Mr. **Lazo's** vehicle.

Mr. **Lazo** was standing with P.O. **Judge** and Det. **Newton** while appearing nervous.  Mr. **Lazo** suddenly flailed his arm, and threw his right elbow back towards Det. **Newton**.  Mr. **Lazo** started to run towards the front of his vehicle.  The officers gave chase and P.O. **Judge** was able to tackle Mr. **Lazo** to the ground.  P.O. **Judge** in his I.O.C. states that Mr. **Lazo** was saying- 'I'll take it out" "I'll take it out."  P.O. **Judge** released his grip at which time Mr. **Lazo** began to flee again.  P.O. **Judge** tackled him again and Det. **Newton** and Sgt. **Scimone** attempted to restrain him.  Mr. **Lazo**, weighing approximately 250 lbs. and described as "extremely strong," was fighting and "out of control".  At approximately 2026 hours, two passing motorists notified 911 of police officers possibly in need of assistance.

INTERNAL AFFAIRS BUREAU CASE #08-254i                    2/9/09
(NOTICE OF CLAIM)                                        Page 30

The officers repeatedly ordered Mr. **Lazo** to stop fighting and to put his hands behind his back. The struggle continued and moved dangerously close to the right travel lane of the entrance ramp to the parkway. Sgt. **Scimone** began to strike Mr. **Lazo** in the right hand and arm with a flashlight. P.O. **Judge** reports that during the continued struggle, Mr. **Lazo** reached back and attempted to grab P.O. **Judge's** gun. Sgt. **Scimone** and Det. **Newton** stated that they heard P.O. **Judge** yell "My gun", "My gun."

Sgt. **Scimone** fearing for his safety proceeded to strike Mr. **Lazo** in the back and head with the flashlight. Mr. **Lazo** continued his resistance and P.O. **Judge**, in an attempt to prevent himself from being dragged into the travel lane, began biting Mr. **Lazo** in the buttock area. At approximately 2026 hours, Det. **Newton** ran back to the police vehicle and requested assistance on the Detective Radio Band. Det. **Talt** monitoring the band relayed that request to the Third Precinct Dispatcher. At 2027 hours, the involved officers were able to secure Mr. **Lazo's** custody.

The first assisting unit, P.O. **Link** U-314, arrived on scene at 2028 hours. P.O. **Link** observed Mr. **Lazo** handcuffed and lying facedown on the shoulder of the roadway. In his I.O.C., P.O. **Link** reported that he observed the three involved officers disheveled and out of breath.

The three involved officers suffered various sprains and contusions for which they received treatment at Southside Hospital.. The involved officers each reported observing an "abrasion" to Mr. **Lazo's** face at the conclusion of the struggle. Each officer in his I.O.C., however, stated that Mr. **Lazo** did not appear to require medical attention for the observed "abrasion." According to the officers, Mr. **Lazo** did not have any medical complaints, nor did he request any medical attention while at the scene. Mr. **Lazo** walked on his own power to the transporting police vehicle (U-314), where he was field searched.

In furtherance of the search at the arrest scene, P.O. **Link** recovered a large quantity of crack cocaine from Mr. **Lazo's** pants. At 2032 hours, P.O. **Link** transported Mr. **Lazo** to the Third Squad, arriving at the precinct at 2034 hours. According to P.O. **Link**, Mr. **Lazo**, during the transport, never complained of an injury nor requested any medical attention. Mr. **Lazo**, however, did appear emotionally upset regarding his arrest. While walking Mr. **Lazo** into the Third Precinct, P.O. **Link** recovered another large quantity of cocaine from Mr. **Lazo's** pants, which had fallen down.

INTERNAL AFFAIRS BUREAU CASE #08-254i                          2/9/09
(NOTICE OF CLAIM)                                             Page 31

P.O. **Link** escorted Mr. **Lazo** into the precinct and down a hallway leading to the Third Squad suite. Ms. **Brewster**, under arrest in the uniform squad room, observed Mr. **Lazo** walking through the hallway on his own power. At approximately 2040 hours, D/Sgt. **Koerber** directed P.O. **Link** to secure Mr. **Lazo** in interview room # 129 of the Third Squad. Det. **Talt** entered room # 129 at approximately 2050 hours. Mr. **Lazo** was angry and upset while yanking the handcuffs from the desk. He eventually calmed down and began to talk to Det. **Talt**, apologizing for fighting with the officers. Mr. **Lazo** began cursing again before asking Det. **Talt** for some water. Det. **Talt** provided Mr. **Lazo** with two cups of water.

At approximately 2055 hours, D/Sgt. **Koerber** entered room # 129 to conduct the required prisoner interview. Det. **Talt** immediately advised the sergeant that Mr. **Lazo** had just stopped talking, and "suddenly wasn't looking good." The officers observed Mr. **Lazo** to be breathing and his eyes were open. According to the officers, Mr. **Lazo** looked pale and was staring straight ahead. D/Sgt. **Koerber** left the room to secure medical assistance for Mr. **Lazo**.

At 2100 hours, Third Precinct Desk personnel notified the Third Precinct dispatcher that rescue was needed for an unresponsive prisoner. At 2101 hours, a request for a "Rush on Rescue" was transmitted on the Third Pct. radio band from the Third Pct. D/Sgt. **Koerber** returned to the Squad and observed Mr. **Lazo** prone on the floor, being assisted by several officers. The assisting officers performed C.P.R. and utilized an A.E.D. in attempting to revive Mr. **Lazo**.

At 2109 hours, Brentwood Legion Ambulance arrived at the Third Squad. The report prepared by ambulance personnel indicate that upon their arrival, Mr. **Lazo** was in cardiac arrest and the police were performing C.P.R. At 2125 hours, the ambulance transported Mr. **Lazo** to Southside Hospital where he was pronounced at 2145 hours.

## CONCLUSION:

After a careful review of the information derived pursuant to the subject investigation, the undersigned investigator was unable to determine any credible evidence to support any of the allegations made by the claimants. A review of the available evidence indicates that:

- Justification existed for the involved officers to make the traffic stop of Mr. **Lazo's** vehicle on the entrance ramp to the Southern State Parkway;

INTERNAL AFFAIRS BUREAU CASE #08-254i                                    2/9/09
(NOTICE OF CLAIM)                                                        Page 32

- Probable cause existed at the time of the subject arrest to support all of the
  criminal charges against Mr. **Lazo**;

- The force used by the involved officers against Mr. **Lazo** was reasonable and
  justified; and

- Members of the Department appropriately responded to Mr. Lazo's medical
  emergency at the Third Precinct.

Based on the above, the undersigned investigator is compelled to classify the
allegations against all of the involved officers as follows:

| Specific Allegation | Disposition |
| --- | --- |
| **False Arrest** | Exonerated |
| **Excessive Force** | Exonerated |
| **Fail to Perform Duty** | Exonerated |

This investigation did determine that Sergeant James **Scimone** violated S.C.P.D. Rules
and Procedures Chapter 2, Section 11.VI.C.1;

If it has been necessary to use physical force, the Officer
shall immediately determine if the person requires medical
treatment.

1. If the person has suffered a physical injury and/or
   complains of injury or pain, the person shall be
   transported to a hospital emergency room.

**See Att. # 51**



INTERNAL AFFAIRS BUREAU CASE #08-254i        2/9/09
(NOTICE OF CLAIM)        Page 33

A review of the available evidence indicates that:

- The involved officers utilized physical force against Mr. **Lazo**;
- Mr. **Lazo** suffered a physical injury; and
- Mr. **Lazo** was not transported from the incident location to the hospital.

Based on the above, the undersigned investigator is compelled to classify the allegation of **Rules and Procedures Violation** against Sergeant James Scimone as **SUBSTANTIATED.**

**Secondary Complaint-** (Unprofessional Language/Attitude)

**Mr. Eric Menendez·(DOB 7/23/87)**        Att. # 52
**(Sworn Statement)**

*Mr. Menendez's comments initially came to the attention of the Department via Newsday.com, where an interview of Mr. Menendez was posted. Mr. Menendez, in the interview, asserted that Third Precinct officers made inappropriate comments and simulations with a flashlight, on the night Mr. Lazo was arrested. .*

Department records indicate that Mr. **Menendez** was in the lobby on the night of Mr. **Lazo's** arrest, in order to sign a court information regarding a civilian arrest (CC# 2008-185571).

In furtherance of his death investigation, Det. **Portella**, on April 18, 2008, took a two-page sworn statement from Mr. **Menendez** regarding his allegations.

In his statement, Mr. **Menendez** alleged that a uniformed sergeant described as white and balding, with a gray moustache and beard entered onto the front desk area, took out his flashlight and simulated "how a person was beat with a flashlight." The "sergeant" then allegedly said to other police officers on the desk "we need to take that dead guy out of here before he stinks up the place." All of the officers started to laugh with the "sergeant." Mr. **Menendez** claimed that another citizen, a black female with a child, was also in the lobby at the time of the alleged conduct.

Det. **Portella** presented Mr. **Menendez** a photo-array (assembled by the Internal Affairs Bureau), containing all of the officers involved in Mr. **Lazo's** arrest or transport. Mr. **Menendez** did not pick any of them.

INTERNAL AFFAIRS BUREAU CASE #08-254i                           2/9/09
(NOTICE OF CLAIM)                                               Page 34

---

**Ms. Karen Lajara – Third Precinct Lobby Witness**          Media Att. # 2
**(Telephonic Interview)**

On April 23, 2008, the undersigned investigator conducted a telephonic interview with Ms. **Lajara** regarding Mr. **Menendez**'s allegations. Ms. **Lajara** confirmed that she and her nine- year old granddaughter were in the lobby of the Third Precinct on the night of Mr. **Lazo**'s arrest. She had arrived at approximately 2100 hours and remained for about one hour. Ms. **Lajara** stated that she recalled observing a "balding" uniformed sergeant in his forties with a black uniformed officer, watching a baseball game on television.

Ms. **Lajara** did not recall hearing any improper comments, or observing any inappropriate simulations involving a flashlight.

**Mr. Robert Brown- Third Precinct Lobby Witness**          Media Att. # 2
**(Telephonic Interview)**

On April 23, 2008, the undersigned investigator conducted a telephonic interview with Mr. **Brown** regarding Mr. **Menendez**'s allegations. Mr. **Brown** confirmed that he was in the Third Precinct lobby on the night of Mr. **Lazo**'s arrest. He recalled observing Mr. **Menendez** being brought into the lobby with his bicycle.

Mr. **Brown** did not recall hearing any improper comments, or observing any inappropriate simulations involving a flashlight. He did state that his girlfriend Ms. Lesley **Brewster** might have information regarding my inquiry, because she was inside the precinct on evening of April 12, 2008.

**Ms. Lesley Brewster- Third Precinct Arrestee**          Media Att. # 2
**(Telephonic Interview)**

The undersigned investigator conducted a telephonic interview with Ms. **Brewster** on April 28, 2008. Ms. **Brewster** fundamentally provided a similar account as to what she subsequently indicated to the Homicide Section, with respect to what she observed while being processed on April 12, 2008.

INTERNAL AFFAIRS BUREAU CASE #08-254i                 2/9/09
(NOTICE OF CLAIM)                                     Page 35

The reporting officer also questioned Ms. **Brewster** with respect to Mr. **Menendez**'s allegation.

Ms. **Brewster** did not recall any inappropriate statements or simulations made by any officer while she was confined in the Third Precinct on April 12, 2008.

## CONCLUSION

After a careful analysis of the information derived pursuant to the subject secondary investigation, the undersigned investigator was unable to determine any credible evidence to support any of the allegations made by Mr. Eric **Menendez**.

Based on the above, the undersigned investigator is compelled to classify the allegation of **Unprofessional Language/Attitude** as **UNFOUNDED**.

Respectfully submitted,

Joseph Capolino
Lieutenant
Internal Affairs Bureau

JC:rc

attachments

# EXHIBIT I

POLICE DE_____

SUPPLEMENTARY REPORT

| CC NUMBER | PCT. | COMMAND | STOP | GRID |
|-----------|------|---------|------|------|
| 08-185633 | 3 | 3130 | 3_ | |

| DATE OF REPORT | DATE AND TIME OF OCCURRENCE |
|----------------|------------------------------|
| 4/12/08 | 04/12/08    2100 |

| STATUTE | | PLACE OF OCCURRENCE | ☒ INSIDE | ☐ OUTSIDE |
|---------|---|---------------------|----------|-----------|

INCIDENT
Death Investigation

PLACE OF OCCURRENCE
Third Squad, 1630 Fifth Ave. , Bay Shore

| COMPLAINANT | PHONE | ADDRESS |
|-------------|-------|---------|
| SCPD | 854-8300 | Third Squad, 1630 Fifth Ave. , Bay Shore |

DETAILS

On 04/12/08 the undersigned detective was working a 5x1 tour assigned to NESOT with Det. John Newton # 1096. The undersigned and Det. Newton were in separate vehicles. We had received information that a unknown male subject in a new dark blue Cadillac was selling drugs along Sunrise Hwy, in the Third Precinct area. At approximately 2015 hrs, we entered the Bob's Store parking lot, on the north side of Sunrise Hwy, in West Islip. The undersigned and partner were in radio contact with each other. Det Newton alerted the undersigned that he observed a vehicle fitting the description of the aforementioned vehicle. The vehicle left the parking lot and we began to follow it. The undersigned requested the assistance of COPE 31 Sgt Scimone # 983 and PO Judge #5390 for a possible future traffic stop. As we were following the vehicle Det. Newton observed a newer dark blue Cadillac in front of Herbee Dodge, on the southside of Sunrise Hwy, West Islip. That vehicle began to travel east on the south service road of Sunrise Hwy. We began to follow that vehicle. The vehicle made a right turn onto West First St.  The undersigned followed the vehicle and observed it meet up with another vehicle that was travelling west on West First St. The operator of the Cadillac and the operator of the other vehicle were involved in a clearly visable hand to hand transaction between windows. The undersigned followed the Cadillac which was travelling at a high rate of speed, initially west on West First St, then north on Pine Ave, then east on Sunrise Hwy, then north on Robert Moses and then east on the Southern State Pkwy. Det Newton and the COPE Unit conducted a traffic stop at the entrance to the Southern State Pkwy from Bayshore Road. The undersigned continued east on the parkway passing the traffic stop. The undersigned heard Det. Newton call for an assist on the detective band and the undersigned notified the Third Precinct dispatcher of the location and the situation. The subject, now known to me as Lazo, Kenny DOB 12/30/83 was eventually subdued and taken into custody prior to the undersigned arriving at the scene.  PO Link #2889 transported him into the precinct. The undersigned responded to the precinct to begin arrest processing. Lazo was lodged in Interview room # 129 A. PO Link turned over to the undersigned a quantity of Cocaine which was packaged in a manner consistent with street level drug sales. At approximately 2050 hrs, the undersigned entered the interview room. Lazo requested a drink of water and the undersigned supplied him with two cups of water.  D/Sgt Koerber # 587 entered the room to complete a prisoner activity log.  It became apparent that Lazo needed medical treatment.  D/Sgt Koerber left the room to make that notification, and the undersigned stayed with Lazo.  A short time later, Lazo put his head back and became unresponsive. The undersigned alerted the squad of the situation and with the assistance of PO Broderick #5588 began CPR on Lazo. PO Broderick and other assisting officers continued CPR until Brentwood Legion Ambulance responded. Lazo was transported to Southside Hospital for medical treatment. The undersigned also responded to the hospital. At 2145 hrs, Dr. Rutman pronounced Lazo dead.

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER OR REVERSE |
|---------|-------------|---------------------------------------------|
| ☒ YES  ☐ NO | ☒ ACTIVE  ☒ CLEARED BY ARREST  ☐ CLOSED NON-CRIMINAL<br>☐ PENDING  ☐ EXCEPTIONALLY CLEARED | ☐ RECLASSIFICATION OF INCIDENT<br>☐ STOLEN OR RECOVERED PROPERTY |

NOTE: BOTH T.T. MESS. NO'S WITH DATES MUST BE OBTAINED & ENTERED BY COMMAND REPORTING THE RECOVERY OF STOLEN AND/OR LOST PROPERTY.

| T.T. MESS NO REPORTING THE STOLEN AND OR LOST PROPERTY | DATE SENT | T.T. MESS. NO. CANCELLING ABOUE T.T. MESS | DATE CANCELLED |
|---|---|---|---|

| REPORTING OFFICER'S SIGNATURE | SUPERVISOR'S SIGNATURE |
|---|---|
| Christopher Tait Det 1327 / 3130 / T-4 | |

PDCS 1084c (CG)

Cl Tait Det 1327 / 3130 / T-4

53-274..7/91cs

Att # (31)

**POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.**

*ACCREDITED LAW ENFORCEMENT AGENCY*

| CC NUMBER | PCT. | COMMAND | SECTOR | GRID |
|---|---|---|---|---|
| 08-185633 | 3 | 330 | 315 | |

**SUPPLEMENTARY REPORT**

| DATE OF REPORT | DATE OF OCCURRENCE | TIME OF OCCURRENCE | |
|---|---|---|---|
| 4/13/08 | 4/12/08 | 2100 hrs. | PLACE OF OCCURRENCE  ☒ INSIDE  ☐ OUTSIDE |

| INCIDENT | STATUTE | PLACE OF OCCURRENCE |
|---|---|---|
| Death Investigation | | Third Squad, Fifth Ave. Bay Shore |

| COMPLAINANT | PHONE | ADDRESS |
|---|---|---|
| SCPD | 854-8300 | Third Squad, Fifth Ave. Bay Shore |

DETAILS

On 4/12/08 the undersigned officer was working a 4x12 tour of duty in Cope-37 doubled with PO Judge #5390/330/T2, who was operating the police vehicle. At approx. 2005 hrs., Det. Tait of the 3rd PCT. NE/SOT Unit requested assistance with a Vehicle and Traffic stop of a late model blue Cadillac STS. At approx. 2015 hrs., Officer Judge and I stopped said vehicle at the eastbound entrance to the Southern State Parkway at Bay Shore Rd. Officer Judge approached the operator, who was alone in the vehicle. I approached the vehicle from the passenger side. Officer Judge requested the operator's drivers license. At that point I motioned to Officer Judge indicating that he should instruct the operator to turn off the ignition. When requested to do so by Officer Judge, the operator stated that this Cadillac was operated by push button and not by keys. The operator turned the Cadillac off, and then Officer Judge returned to the police vehicle to run data. I then walked around to observe the operator to be sure he did not re-start the vehicle by pushing the ignition button. While Officer Judge was running data in the police vehicle, Det. Newton arrived in an un-marked police vehicle. Officer Judge and Det. Newton had a brief conversation and then Det. Newton approached the Cadillac. I spoke with Det. Newton and advised him that we could not remove the Cadillac's key and that the Cadillac started by an ignition button, and it could be re-started by the operator instantly. At that point we asked the operator to exit the Cadillac. He complied and walked to the rear of the Cadillac. I asked Det. Newton for his flashlight to perform a cursory search of the Cadillac. The operator was at the passenger rear quarter panel with Det. Newton and Officer Judge. I was standing opposite from them on the driver's side rear. I then saw the operator violently and quickly flail his arm by throwing his elbow out toward Det. Newton's face. The operator then ran toward the front of the Cadillac. Officer Judge and Det. Newton gave chase and I followed. Officer Judge was able to bring the operator to the ground where he was fighting and out of control. Officer Judge was directly behind the operator's back while I positioned myself to the operator's right side. I lost sight of Det. Newton at that point in time. The operator was a large male approx. 250 lbs. and extremely strong. The struggle placed me in a dangerous position almost in the right travel lane of the entrance ramp to the parkway with vehicles closely speeding by. We ordered the subject repeatedly to stop fighting and put his hands behind his back. He refused. His body remained rigid and we were unable to control him. I began to strike the operator in the right hand and arm with Det. Newton's flashlight. The subject continued to resist. During the struggle, I heard Officer Judge yell the word "gun" which led me to immediately believe that the subject possessed a gun. Fearing for my life and the safety of the other officers, I struck the subject in the back and head with the flashlight. I then dropped the flashlight and held onto the subjects right arm as Officer Judge held his body. I yelled to Det. Newton to call for assistance. He did not have a radio and had to go back to a police vehicle to call for an assist. Officer Judge and I continued to hold onto the subject, who continued to struggle and fight until Det. Newton returned. At that point, Det. Newton advised that he had his left arm handcuffed. I was then able to get the subject's right hand behind his back and he was then fully handcuffed. Assisting officers responded after the subject was controlled. The subject was then transported to the Third Precinct by U-314. I had no further interaction with the subject.

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---|---|---|
| ☒ YES  ☐ NO | ☒ ACTIVE   ☐ CLEARED BY ARREST   ☐ CLOSED NON-CRIMINAL | ☐ RECLASSIFICATION OF INCIDENT |
| | ☐ PENDING   ☐ EXCEPTIONALLY CLEARED | ☐ STOLEN OR RECOVERED PROPERTY |

NOTE BOTH T T MESS NO S WITH DATES MUST BE OBTAINED & ENTERED BY COMMAND REPORTING THE RECOVERY OF STOLEN AND OR LOST PROPERTY

| T T MESS NO REPORTING THE STOLEN AND OR LOST PROPERTY | DATE SENT | T T MESS NO. CANCELLING ABOVE T.T MESS NO | DATE CANCELLED |
|---|---|---|---|
| | | | |

| REPORTING OFFICERS SIGNATURE | SUPERVISOR'S SIGNATURE | |
|---|---|---|
| #982/330/T2 | 2T 314 | 53-274. 7/91c9 |

PDCS 10246

**Att # 25**

| CC NUMBER | PCT. | COMMAND | SECTOR | GRID |
|-----------|------|---------|--------|------|
| 08-185633 | 3rd | 330 | 315 | |

**POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.**
*ACCREDITED LAW ENFORCEMENT AGENCY*

**SUPPLEMENTARY REPORT**

| DATE OF REPORT | DATE OF OCCURRENCE | TIME OF OCCURRENCE |
|----------------|--------------------|--------------------|
| 4/12/08 | 4/12/08 | 2100 |

| INCIDENT | STATUTE |
|----------|---------|
| Death Investigation | |

PLACE OF OCCURRENCE ☒ INSIDE ☐ OUTSIDE
Third Squad 1630 5th Avenue

| COMPLAINANT | PHONE |
|-------------|-------|
| SCPD | 854-8300 |

ADDRESS
3rd Precinct 1630 5th Avenue Bay Shore, N.Y. 11706

**DETAILS**

On 4/12/08 the undersigned officer was working a 4x12 tour in marked unit COPE 32 with Sgt. James Scimone. At approximately 20:00 hours Detective Tait from the Third Precinct NESOT section requested our assistance in a narcotics transaction. Detective Newton, who also works in NESOT, gave a description and direction of travel of a vehicle that had been involved in a drug transaction. The vehicle was a blue Cadillac New York registration EDU-7050. We were traveling northbound on the Robert Moses Parkway at the Sunrise Highway overpass when we observed the vehicle. The undersigned initiated a vehicle and traffic stop in the vicinity Bayshore Road on the Southern State Parkway. The undersigned officer approached the vehicle from the driver's side while Sgt. Scimone approached from the passenger side. The driver, now known to me as Lazo, Kenny, J 12/30/83, produced a New York learners permit. The undersigned instructed the driver to exit the vehicle. Lazo complied and stepped to the rear passenger side. At this point, Detective Newton, Sgt. Scimone and the undersigned began talking to Lazo, who was standing with his hands on the fender at the rear of the car. During the discussion Lazo became aggitated and suddenly threw back at Detective Newton. Lazo then attempted to flee the scene on foot. The undersigned tackled Lazo from behind in a football like manner. While Lazo was on the ground he stated "I'll take it out, I'll take it out". The undersigned released his grip at which time Lazo began to flee again. The undersigned tackled Lazo again at which time Detective Newton and Sgt. Scimone attempted to restrain him. While on the ground Lazo reached back and grabbed the undersigned's gun. The undersigned began screaming "my gun, my gun," and began striking Lazo about the head with his Stinger flashlight in attempt to prevent him from taking possession of the undersigned's gun. Lazo continued to struggle and was dragging the undersigned and Sgt. Scimone toward passing vehicles on the Southern State Parkway. At this point, Detective Newton returned to his vehicle to broadcast an assist over the radio. In an attempt to avoid being dragged into traffic the undersigned was biting Lazo in the left buttock area. Eventually, Detective Newton returned and was able to place one cuff on Lazo's left hand. The undersigned took out his handcuffs and joined them with Detective Newton's empty cuff and handed the cuff to Sgt. Scimone who placed it on Lazo's right hand. After Lazo was in custody the undersigned rolled off of Lazo and grabbed his left hand in pain. Officer Joseph Link arrived at the scene and took custody of Lazo. As P.O. Link was escorting Lazo to his patrol car, the undersigned informed P.O. Link that Lazo had not been frisked. The undersigned was transported to South Side Hospital by Sgt. Scimone for left hand pain.

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---------|-------------|---------------------------------------------|
| ☐ YES ☐ NO | ☐ ACTIVE ☐ CLEARED BY ARREST ☐ CLOSED NON-CRIMINAL | ☐ RECLASSIFICATION OF INCIDENT |
| | ☐ PENDING ☐ EXCEPTIONALLY CLEARED | ☐ STOLEN OR RECOVERED PROPERTY |

NOTE BOTH T.T MESS NO S WITH DATES MUST BE OBTAINED & ENTERED BY COMMAND REPORTING THE RECOVERY OF STOLEN AND OR LOST PROPERTY

| T.T MESS NO REPORTING THE STOLEN AND OR LOST PROPERTY | DATE SENT | T.T MESS NO. CANCELLING ABOVE T.T MESS NO | DATE CANCELLED |
|--------------------------------------------------------|-----------|--------------------------------------------|----------------|
| | | | |

REPORTING OFFICERS SIGNATURE
*William Judge P.o. 5390/330 T2*

William Judge   Po 5390 / 330   T2

SUPERVISOR S SIGNATURE

PDCS 1066                                          53-274.7/91cs

**Att # 27**

**POLICE DE        .tMENT COUNTY OF SUFFOLK, NL        .ORK**

INTERNAL CORRESPONDENCE

TO:   Joseph Capolino, LT. Internal Affairs Bureau          DATE:   12/6/08

FROM:   Joseph A. Link PO 2889 310 3B1          COPY TO:   AS NEEDED

SUBJECT:   **INTERNAL AFFAIRS BUREAU CASE #08-254i**

    This statement is being submitted for administrative purposes only, and under orders of Lt. Capolino of the Internal Affairs Bureau. I have not done so voluntarily, and I expressly decline to waive any right against self-incrimination and right to counsel. In addition, this statement, or any part thereof, may not be used against me in any subsequent criminal proceeding, and I submit this statement to avoid disciplinary sanctions for not submitting same.

    On 4/12/08 the undersigned officer was working a 3x11 shift assigned to marked unit 314. At approximately 2030 hrs the undersigned responded to a call for an assist by the NESOT unit on the Robert Moses Causeway and Southern State Parkway. Upon arrival I found the subject to be in custody and the physical struggle to be over. The location of the car stop and subsequent arrest was unsafe due to the close proximity to the highway so I asked Sgt. Scimone if we should head to the precinct. He agreed so PO Judge and I helped the subject to his feet. I looked him over for injuries and only saw a minor abrasion to the right side of his face near his eye. He had no other injuries that I observed and did not appear to need any immediate medical treatment. From the time I got to the scene the subject was no longer physically agitated, he was only emotionally upset that he had gotten arrested. At no time during my interaction with the subject did he ever complain of any injuries or his treatment nor did he request any medical aid. At no time during this same period did I ask the subject if he was injured or if he needed or wished medical aid. At no time while the subject was in my custody did appear to be in need of medical aid and if he did in fact have any injuries that needed immediate medical attention I would have transported him directly to Southside Hospital.

Respectfully Submitted.

Joseph A. Link PO 2889 310 3b1

**Att#** (30)

 

**POLIC**    **TMENT COUNTY OF SUFFOLK, NE    K**

INTERNAL CORRESPONDENCE

TO: Joseph Capolino, Lt./ I.A.B.                                    DATE: December 17, 2008

FROM: James Scimone, Sgt.983/330/T-2                    COPY TO: as required

SUBJECT: **IAB Case #08-254i**

This statement is being submitted for administrative purposes only and because I have been
ordered to do so by Lt. Capolino and refusal to do so would result in disciplinary action
against me. I expressly to decline to waive my constitutional rights against self
incrimination and this document may not be admissible against me in any criminal
proceeding.

On April 12, 2008 I was working a 4x12 tour of duty doubled in COPE 37 with Officer
Judge, William #5390/330/T2. During this tour of duty at approximately 2000 hrs. we
assisted the Third Precinct NESOT detectives at the Bay Shore Rd. entrance ramp to the e/b
Southern State Parkway. We became involved in a physical struggle with arrestee Lazo,
Kenny 12/30/83 while attempting to affect a lawful arrest.

After the struggle I observed an abrasion to the face of Mr. Lazo and I do not recall any other
observable injuries. That injury may have been caused when the subject was taken to the
ground during the struggle or during the struggle itself.

At the scene, Mr. Lazo never complained of pain or requested medical attention nor did I ask
if he required medical attention. Mr. Lazo did not appear to be intoxicated or impaired by
alcohol or any drugs.

The subject was not immediately transported to the hospital due to the fact that he did not
appear to require immediate medical attention. He was walking and talking, and as stated
previously in this report, Mr. Lazo never requested medical attention at the scene.

After the altercation, as Mr. Lazo was being escorted to U-314, I instructed Officer Link
#2289/310/3 to transport the subject into the precinct. As Mr. Lazo was placed into U-314, I
turned away and began dusting myself off from the struggle. I then immediately checked the
status of Det. Newton and Officer Judge. As I was doing so U-314 departed with the subject
from the scene. I was unaware that P.O. Link transported Mr. Lazo as a solo unit until later
in the tour.

Respectfully submitted,

983/330 /72
James Scimone, Sgt.983/330/T-2

**Att#** 26

**POLICE DEPARTMENT, COUNTY OF SUFFOLK, NEW YORK**
INTERNAL CORRESPONDENCE

**TO:** Lieutenant Joseph Capolino                                    **DATE:** 12-6-08
     Internal Affairs / Inspectional Services Bureau

**FROM:** William Judge P.O. 5390/330/T2                    **COPY TO:** As needed

**SUBJECT:** INTERNAL AFFAIRS BUREAU CASE #08-254i

     This statement is being submitted for administrative purposes only, and under orders of Lt. Joseph Capolino of the Internal Affairs Bureau. I have not done so voluntarily, and I expressly decline to waive any right against self-incrimination and right to counsel. In addition, this statement, or any part thereof, may not be used against me in any subsequent criminal proceeding, and I submit this statement to avoid disciplinary sanctions for not submitting same.

     On 4/12/08 the undersigned officer was working a 4x12 tour in marked unit COPE 37 with Sgt. James Scimone. At approximately 2000 hours we assisted NESOT in a vehicle traffic stop which culminated in an arrest situation. At the scene of the arrest the only injury that was observed was an abrasion near the right eye. This minor injury was the result of a violent struggle. The subject never complained of injury or the need for medical assistance. At no time did I ask the subject if he required medical attention. During my interaction with the subject it did not appear that he was intoxicated or impaired by alcohol or any narcotics. After checking the subject for injuries it appeared there were none that required immediate medical attention and the subject was alert and able to move freely on his own.

                  Respectfully submitted.

                  *William Judge*

                  William Judge P.O. 5390/330/T2

**Att#** (28)



## POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK

### INTERNAL CORRESPONDENCE

TO:   Lt. Joseph Capolino, Internal Affairs Bureau

DATE:   12/09/08

FROM:   Christopher Talt, Det. #1327/3130/NE-SOT

COPY TO:   as needed

SUBJECT:   **IAB ALERT #08-254i**

"This statement is being submitted for administrative purposes only and under orders of Lt. Joseph Capolino. I have not done so voluntarily and expressly decline to waive my right against self-incrimination and right to counsel. In addition, this statement, or any part thereof, may not be used against me in subsequent criminal proceeding and I submit this statement to avoid disciplinary sanctions".

On 04/12/08, the undersigned was working a 5x1 tour, assigned to the Third Squad Neighborhood Enforcement Special Operations Team, with Det. John Newton #1096. At approximately 2050 hrs., the undersigned entered interview room #129A in the Third Precinct Detective Squad Room. Kenny Lazo, dob: 12/30/83, was sitting in the room, in the prisoner chair, with his left hand cuffed to the desk. Lazo was wearing socks and boxer shorts. Lazo was still worked up. Lazo was angry and upset at the same time. Lazo kept yanking the handcuffs away from the desk and kept cursing. Lazo calmed down and began to talk to me. Lazo said he didn't want to go to jail, and that he was sorry for fighting with the officers. Then Lazo started cursing again. Lazo then asked me for some water. The undersigned left the room and immediately returned with two cups of water. The undersigned placed the water on the corner of the interview desk. Lazo, with his right hand, picked up and drank from one of the cups. Lazo had abrasions and contusions on his face. Lazo was in interview room #129A for approximately ten minutes prior to the undersigned entering the room. Upon entering interview room #129A, the undersigned did not observe any other members of the department with Lazo. The undersigned was in the interview room with Lazo for approximately five minutes prior to D/Sgt. Koerber #587 entering the room. Lazo stopped talking to me and just started staring straight at the wall in front of him. Lazo didn't respond to any of D/Sgt. Koerber's questions. Lazo started to lose color in his face. Lazo was breathing normally and sitting in his chair. Lazo never complained of any pain or requested any medical treatment. Lazo's only request was for a drink of water, which the undersigned gave to him. Almost immediately after D/Sgt. Koerber entered the interview room, it became apparent that Lazo needed medical attention. Approximately one minute after D/Sgt. Koerber left the room to request an ambulance, Lazo's head fell back against the wall and he slumped down in the chair. The undersigned yelled to the detectives in the detective squad room, notifying them of the situation. The undersigned immediately uncuffed Lazo, and with the assistance of P.O. Broderick #5588, laid Lazo down on the floor in the interview room. P.O.'s Broderick, Zurl #5349, Friedrich #5729, Quesada #5557 and Cotter #5360 performed CPR. The undersigned, via radio, notified the Brentwood Legion Ambulance of the exact location in the precinct of the medical emergency.

Respectfully submitted,

*CL Talt Det 1327/3130*

Christopher Talt, Det. #1327
Command 3130/NE-SOT

CT;kb



**Att#** (32)

## POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK

### INTERNAL CORRESPONDENCE

TO:   Lt. Joseph Capolino, Internal Affairs Bureau

FROM:   John Newton, Det. #1096/3130/NE-SOT

SUBJECT:   **INTERNAL AFFAIRS BUREAU CASE #08-254i**

DATE:   12/10/08

COPY TO:   as needed

"This statement is being submitted for administrative purposes only and because I have been ordered to do so by Lt. Capolino and to refuse to do so would result in disciplinary action against me. I expressly decline to waive my Constitutional Rights against self-incrimination and this document may not be admissible against me in any criminal proceeding".

On April 12, 2008, the undersigned was assigned to the 3rd Squad NE-SOT. I was working a 5-1 tour. At approximately 2030 hrs., at the Southern State Parkway eastbound entrance ramp from Bay Shore Rd., Bay Shore, Kenny Lazo (12/30/83) was placed under arrest for CPCS 3rd, Resisting Arrest and Harassment. During Lazo's arrest, the only visible injuries that the undersigned observed were abrasions to his face. Lazo apparently received the abrasions as we were on the ground attempting to place him under arrest. At no time during his arrest at the scene did Lazo complain of any pain or injury and did not appear to be suffering from any type of injury. At no time did Lazo ever request any medical attention and at no time did the undersigned ask Lazo if he required any medical attention. Lazo did not appear to be intoxicated. He was talking and was able to walk to and enter the police car on his own. Lazo did not immediately require any medical attention and was transported into the 3rd Squad for processing.

Respectfully submitted,

John Newton, Det. #1096
Command 3130/NE-SOT

JN;kb

**Att# 24**

# EXHIBIT J

| POLICE DEPARTMENT  COUNTY OF SUFFOLK *ACCREDITED LAW ENFORCEMENT AGENCY* DEPARTMENT DIRECTIVE PDCS-2008a | | | PAGE 1 OF 1 PAGES |
|---|---|---|---|
| | | | ORDER NUMBER 08-209 |
| TYPE DEPARTMENT MEMORANDUM | AUTHORITY | RICHARD DORMER POLICE COMMISSIONER | SIGNATURE |
| SUBJECT/TOPIC/TITLE KENNY LAZO | | | |
| DISTRIBUTION ALL COMMANDS | | DATE ISSUED 07/18/08 | DATE EFFECTIVE 07/18/08 | DATE TO BE REVIEWED N/A |

I wanted to keep you informed about the investigation into the death of Kenny Lazo, who died while in police custody on April 12. The department has been investigating the death of Mr. Lazo and will continue to do so if additional witnesses come forward. I am providing you with this information to ensure that you have a balanced account of what transpired, considering the inaccuracies that have been reported about this situation to date.

It is important to note that the police officers involved used the minimum force necessary to subdue Mr. Lazo—a large, strong, man who tried to grab an officer's gun and was pulling the officers dangerously close to the entrance ramp of the Southern State Parkway. Considering these circumstances, the officers had an obvious right to defend themselves.

There is no indication that Mr. Lazo was brutalized or terrorized, as stated by the Lazo family's attorney; the police officers involved in the situation acted professionally and humanely. In addition, there is no indication that Mr. Lazo was struck while his hands were cuffed behind him. Also, the marks on Mr. Lazo's neck resulted from resuscitation efforts by EMTs—there is no indication that he was choked by police officers, as was asserted by the family's attorney.

After he was placed in custody, Mr. Lazo was calm, and he engaged in conversation. He was offered water at the precinct, and he drank it. Furthermore, as soon as it became apparent that Mr. Lazo needed medical attention, detectives and officers at the precinct, including advanced EMTs, administered first aid and did everything possible to revive Mr. Lazo. An ambulance was immediately called, and life-saving efforts continued without interruption to the hospital.

I will keep you apprised about this case, as warranted.

-END-

CERTIFIED
Police Department
County of Suffolk, NY

# EXHIBIT K



# Newsday

### LONG ISLAND

**SUNDAY, JULY 20, 2008**

NASSAU EDITION

$1.59

## Commish backs cops in Lazo arrest

**BY ANDREW STRICKLER**
andrew.strickler@newsday.com

Suffolk Police Commissioner Richard Dormer, in an internal department memo, again defended officers' actions in subduing Kenny Lazo, saying they used "the minimum force necessary" in a violent struggle during a roadside arrest.

Lazo, 24, of Bay Shore, died in police custody the day of the struggle. The Lazo family has filed a notice that they intend to bring a lawsuit related to the April 12 death, and their attorney has said he will file a federal civil-rights suit.

Dormer, in the four-paragraph memo distributed via e-mail Fri-

day to all department members, addressed some specifics of the incident, writing that Lazo was "a large young man who tried to grab an officer's gun and was pulling the officers dangerously close to the outside ramp of the Southern State Parkway. Considering these circumstances, the officers had no obvious right to defend themselves."

Dormer gave an explanation for marks on Lazo's neck, saying they "resulted from resuscitation efforts by EMTs — there is no indication that he was choked by police officers."

Frederick Brewington, the lawyer representing the mother of Lazo's child, accused Dormer of deciding the facts of the case "be-

fore a proper evaluation."

He said the police commissioner's memo "is an attempt to influence anyone who reads this statement, including potential grand jury members and jurors if criminal charges are filed."

Brewington repeated his previous calls for the case to be investigated by an independent federal prosecutor.

Lazo was caught allegedly selling drugs in West Islip before officers pulled him over on the Southern State Parkway. As officers tried to arrest him, police said, Lazo elbowed one detective and tried to grab an officer's gun as they grappled, prompting officers to hit him with flashlights.

Lazo was taken to the Third Precinct in Bay Shore, where he collapsed about 30 minutes later. He later was pronounced dead at Southside Hospital in Bay Shore.

In June, Suffolk County Medical Examiner Yvonne Milewski ruled the death a homicide, saying that Lazo suffered "cardiac death following exertion associated with prolonged physical altercation with multiple blunt impacts." Obesity was listed as a contributing factor.

The medical examiner's finding is a medical determination and "does not imply any potential criminal responsibility or civil liability on the part of any individuals," Milewski said

when the finding was released.

On Monday, Dormer issued a written statement that said "the investigation indicates that the officers did not violate Police Department policies, rules, procedures or New York State law, and we stand behind their actions in defending themselves."

Friday, Dormer confirmed that he wrote the memo.

"I felt they were entitled to hear the facts of the case ... and to have correct information," Dormer said. He declined to discuss details of the memo, which a police source provided to Newsday. The memo does not include the names of the three officers involved, which police have declined to release.

NEWSDAY, SUNDAY, JULY 20, 2008 · · www.newsday.com

PlaintiffLazo 00131

Levy admits Suffolk withheld info from victim's family -- Newsday.com                      Page 1 of 1

newsday.com/news/local/crime/ny-lilazo145800528aug14,0,2938811.story

# Newsday.com

## Levy admits Suffolk withheld info from victim's family

BY KEITH HERBERT AND ALFONSO A. CASTILLO

keith.herbert@newsday.com; alfonso.castillo@newsday.com

August 14, 2008

Suffolk County Executive Steve Levy acknowledged yesterday that the county
failed the relatives of Kenny Lazo, a suspected drug dealer who died in police
custody April 12, by keeping them in the dark for too long on what should have
been easily accessible information about the death.

In doing so, Levy, while saying county police acted appropriately, admitted that the
county withheld information that the family has been requesting for months.



Levy told Newsday yesterday that while civil service laws prohibit the county from
releasing the names of the five officers involved in Lazo's arrest, the county plans to
enact new protocols to make sure information such as profiles of arresting officers
and disciplinary records is made quickly available in similar cases.

"I think it took way too long to give the family information as far as whether the
officers had previous complaints against them and what the profiles were of these
officers," Levy said yesterday, adding that he wants, "the greatest sense of transparency."

Lazo, 26, of Bay Shore, died after a violent struggle with police as they tried to arrest him. Frederick Brewington, the Hempstead
attorney representing Lazo's family in a suit against the county, has maintained that police unrelentingly beat Lazo as his hands
were cuffed behind his back. Police have said they struck Lazo with flashlights to subdue him just after he reached for an officer's
gun.

Brewington said despite numerous requests to authorities, Lazo's family went months without such information as the identities of
the officers or the medical examiner's report.

Suffolk prosecutors said Tuesday that they intended to present the case to a grand jury.

Bill Tricarico, first vice president of the Suffolk County Police Benevolent Association, said the union won't comment on an
ongoing criminal investigation.

"If indeed the case is presented to a grand jury, at the conclusion of the grand jury finding, the PBA may make a statement,"
Tricarico said.

When asked if any of the officers had requested union representation in connection with the Lazo case, Tricarico said, "That has
not happened."

Brewington said some important information about the officers remains elusive.

"I have asked this question over and over," Brewington said yesterday. "Have they been disciplined?"

Police would not comment on the officers' status.

Copyright © 2008, Newsday Inc.

Case 2:09-cv-01023-ST   Document 70-3   Filed 01/09/19   Page 195 of 252 PageID #: 1964

 

FBI reviewing Lazo death, Suffolk police say -- Newsday.com



newsday.com

August 23, 2008

EmblemHealth
The plan that works.

Photos & Video | Blogs | Things to Do | Hot Topics | Subscribe to Newsday | Login or register

Search | Go

Text size:



## FBI reviewing Lazo death, Suffolk police say

BY MICHAEL AMON AND KEITH HERBERT | michael.amon@newsday.com;
keith.herbert@newsday.com
August 23, 2008

Suffolk police officials said Friday federal authorities are reviewing the death of a Bay Shore man struck by officers with flashlights and who later died after passing out in a precinct interview room.

FBI agents met Suffolk police brass and detectives earlier this year to discuss the April 12 death of Kenny Lazo and look at the department's investigatory file, Suffolk police officials said. Those files will soon be sent to the U.S. attorney's office for the Eastern District in Brooklyn, officials said.

"They're basically monitoring the case," said Insp. David Ferrara, chief of the Suffolk police's Internal Affairs Bureau, adding that the FBI "looked at everything."

Suffolk Police Commissioner Richard Dormer called the meeting - the timing of which he wouldn't reveal - "a preliminary sit-down," "We don't know what they're going to do with it," Dormer said. Suffolk police were cooperating, he said.

**Ads by Google**

Legal Advice
Find New York Injury Attorneys & Get Legal Help.
It's Fast & Free!
www.InjuryHelpLineLawyer.com

Legal advice
Low Cost Lawyer, Attorneys On Call. Expert Legal
Advice For $1 A Day.
www.bestlegaladvice.com

Legal Advice Now
Legal Advice Now. Response in Minutes! No
Obligation.
www.bargainlaw.com

Legal Advice guide
Looking to find Legal Advice? See our Legal
Advice guide.
Lawguru.Com

Monica McLean, a spokeswoman for the FBI's New York field office, would not confirm the meeting nor the request for files, saying only the FBI was "aware" that Suffolk County District Attorney Thomas Spota was probing the case.

"We are not involved at this time," she said.

A spokesman for Benton Campbell, U.S. attorney for the Eastern District of New York, declined to comment.

The federal inquiries add another level of scrutiny to Lazo's death, which is also being probed by Suffolk homicide detectives, internal affairs and district attorney's office investigators.

Prosecutors have told Lazo's family attorney a grand jury will soon consider the case.

The New York State Commission of Correction, which regulates prisons, jails and precinct lockups, said Friday it had closed its own probe because Lazo did not die in a lockup. He was pronounced dead on arrival at Southside Hospital.

Lazo, 24, was struck multiple times with metal flashlights while struggling with officers who had stopped him on the Southern State Parkway, police have said. Lazo was struck after trying to grab an officer's gun, according to police.

Police have said they believed Lazo had just completed a drug deal, and that they found cocaine and $2,400 in cash on him. He was taken for questioning to the Third Precinct where, less than 45 minutes after the altercation, he lost consciousness. He died 25 minutes later.

A Suffolk autopsy classified the death a homicide, calling it a "cardiac death following exertion associated with prolonged physical altercation with multiple blunt impacts." Homicide is a medical determination and may not imply any potential criminal responsibility.

In a subsequent memo to officers, Dormer said the officers involved "used the minimum force necessary to subdue Mr. Lazo." The officers are Sgt. James Scimone, Det. John Newton, Det. Christopher Talt, Officer William Judge and Officer Joseph Link. The role each played is unclear.

Lazo's family believes the officers used excessive force. An autopsy commissioned by the family's attorney, Frederick Brewington of Hempstead, suggested Lazo was beaten about the face with his hands bound behind his back. Brewington requested a federal probe in a May 12 letter to Campbell.

**Newsday Special Reports**



NEWSDAY SPECIAL INVESTIGATION
PUBLIC DOLLARS, PERSONAL GAIN

LAWYERS GETTING FULL-TIME BENEFITS

In districts across Long Island, attorneys have been improperly reported as state employees - and are raking in big pensions as a result.

READ MORE >

SUPERINTENDENT DOUBLE-DIPPERS
SPECIAL DISTRICTS





We clearly offer the best window value in America

ClearChoice WINDOWS

$350 Window
$395 any size installed
While vinyl double hung replacement window with full complement of accessories.

Click here for more information

Video





PARTNERS

am New York
CW11
Metromix

8/23/2008

00136

 

FBI reviewing Lazo death, Suffolk police say -- Newsday.com                    Page 2 of 4

Parents & Children
Weddings
Distinction
Magazine
Wellness
FutureCorps
Star Publishing

"We would hope that someone other than Suffolk County police would be looking closely at this," Brewington said.

Dormer said federal authorities ask for information on high-profile cases involving allegations of police misconduct. Neither he nor the FBI would say when authorities last expressed interest in a Long Island case.

Home > Top News > Suffolk

✉ E-mail     Share     🖨 Print     🔁 Reprint

Related topic galleries: Thomas Spota, Metal and Mineral, Police, Police Investigations, Murder, Long Island, Justice System                                        All topics

Get breaking news | Most popular stories | Dining and Travel deals all via e-mail!

Copyright © 2008, Newsday Inc.



**Popular stories**

| Most viewed | Most e- | Hot topics |
| --- | --- | --- |

Couple hurt in boat crash on Long Island Sound

Massapequa party-goers injured after gunfire

Man arrested for impersonating police officer

Cops: Bystanders beat cabbie at crash scene

Obama introduces running mate Biden

More most viewed

**Vonage**

career**builder**
Top Jobs

COLLECTORS
NATIONAL
FINANCIAL SYSTEMS

AUTO SALES
5 TOWNS NISSAN

LEGAL
SECRETARY

PROJECT
MANAGER

WAREHOUSE
SUPERVISOR
IMPACT LOGISTICS
SERVICES

View all Top Jobs

Search Jobs

All Long Island Jobs
Post resume
powered by
career**builder**

amNY | Baltimore Sun | Chicago Tribune | Daily Press | Hartford Courant | LA Times | Orlando Sentinel | Sun-Sentinel | The Morning Call | The Virginia Gazette

New York News from amNY.com | Island Publications | Parents & Children | Weddings | Hampton Travel Guide | Wellness | CW11 | Metromix

CareerBuilder.com for Jobs | Cars.com for Autos | Apartments.com for Rentals | Homescape.com for Homes | Open Houses | Houses for Rent | Discount Shopping | FSBO

Privacy Policy | Contact Newsday | Terms of Service

Plaintiff L220  00137

# EXHIBIT L

# COUNTY OF SUFFOLK
## OFFICE OF DISTRICT ATTORNEY



### THOMAS J. SPOTA
### DISTRICT ATTORNEY

November 3, 2008

Frederick Brewington, Esq.
50 Clinton Street
Suite 501
Hempstead, New York 11550

Re: Investigation into the death of
Kenny Lazo
Court Case No.: D-2913 A/B/C-08

Dear Mr. Brewington:

In your capacity as representative of the family of Kenny Lazo, enclosed please find a copy of the Grand Jury's findings with regard to the above named investigation. The Grand Jury heard testimony beginning on October 20, 2008 and concluded its investigation on October 27, 2008.

Should you have any questions, I can be reached at (631) 852-2575.

Yours very truly,

JOHN B. COLLINS
Chief Trial Prosecutor

JBC/km
Enclosure
fax: (516) 489-6958

COUNTY COURT : COUNTY OF SUFFOLK

---------------------------------------------------------X

INVESTIGATION INTO THE DEATH OF
KENNY LAZO,

---------------------------------------------------------X

FINDING OF DISMISSAL
C.P.L. § 190.75(1)
Court Case No.  D-2913A/B/C-08
CC No. 08-185633

On October 20, October 22, October 23 and October 27, 2008, the Grand

Jury received evidence concerning the circumstances surrounding the death of KENNY

LAZO which occurred on April 12, 2008.

The Grand Jury received evidence concerning the actions of JOHN

NEWTON, JAMES SCIMONE and WILLIAM JUDGE of the Suffolk County Police

Department.

After hearing the witnesses, the Grand Jury did not indict JOHN

NEWTON, JAMES SCIMONE or WILLIAM JUDGE for any offense and made an entry

to that effect upon its records.

FOREPERSON
OCTOBER 2008
GRAND JURY 1A, TERM XI

COURT CLERK'S OFFICE
STATE OF NEW YORK
COUNTY OF SUFFOLK

I, JUDITH A. PASCALE, Clerk of the County of Suffolk and the
Court of Record thereof, do hereby certify that I have compared the annexed with
the original _dismissal order_
filed with the Court on _10·31·08_ and, that the same is a
true copy thereof, and of the whole of such original.

In Testimony Whereof, I have hereunto set my hand and affixed the
seal of said Court _11·3·08_ :

JUDITH A. PASCALE
                                                                  Clerk

# EXHIBIT M

# GONZALEZ -V- COUNTY OF SUFFOLK

# JOSEPH A. LINK - 5/19/11

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**REALTIME REPORTING, INC.**
**124 East Main Street**
**Suite 202**
**Babylon, New York   11702**
**Phone:  (516) 938-4000**
**Fax:  (631) 983-8938**

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

**1**

```
 1                                    1
 2      UNITED STATES DISTRICT COURT
 3      EASTERN DISTRICT OF NEW YORK
        -------------------------------x
 4      PATRICIA GONZALEZ and JENNIFER GONZALEZ,
        individually and as co-administrators of the
        Estate of KENNY LAZO,
 5                            Plaintiffs,
 6          - against -
 7      COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT,
        POLICE COMMISSIONER RICHARD DORMER, in his
 8      individual and official capacity, POLICE
        OFFICER JOHN NEWTON, in his individual and
 9      official capacity, POLICE OFFICER JAMES
        SCIMONE, in his individual and official
10      capacity, POLICE OFFICER WILLIAM JUDGE, in his
        individual and official capacity, POLICE
11      OFFICE CHRISTOPHER TALK, in his individual and
        official capacity, POLICE OFFICER JOSEPH LINK,
12      in his individual and official capacity,
        COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY,
13      SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA,
        in his individual and official capacity, ASST.
14      DISTRICT JOHN B. COLLINS, in his individual
        and official capacity, and "JOHN AND JANE
15      DOES 1-10" representing as yet unknown and
        unidentified members of the Office of Suffolk
16      County District Attorney (all in their
        individual and official capacities as
17      employees of the Office of Suffolk County
        District Attorney),
18                            Defendants.
19      -------------------------------x
                        100 Federal Court Plaza
20                      Central Islip, New York
21                      May 19, 2011
                        11:18 a.m.
22          (Continued)
23          REALTIME REPORTING, INC.
24      124 East Main Street, Suite 202
          Babylon, New York 11702
25              516-938-4000
          www.realtimereporting.com
```

**3**

```
 1
 2   A P P E A R A N C E S :
 3   FREDERICK K. BREWINGTON, Esq.
 4   Attorneys for Plaintiff
 5        556 Peninsula Boulevard
 6        Hempstead, New York  11550
 7   BY:  WILLIAM GERMANO, JR., ESQ.
 8
 9   CHRISTINE MILAFI
10   Attorneys for Defendants
11   100 Veterans Memorial Highway
12   Hauppauge, New York
13   BY:  RICHARD T. DUNNE ESQ. Firm
14
15   ALSO PRESENT:
16   SCHOENFELD, SCHOENFELD & PINCUS, P.C.
17   Attorneys for Plaintiff
18        999 Walt Whitman Road
19        Melville, New York 11747
20   BY:  DAVID A. PINCUS, ESQ.
21
22        JAMES SCIMONE
23        CHRISTOPHER TALT
24        BILLY JUDGE
25        JOHN NEWTON
```

**2**

```
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
     ----------------------------------x
 4   PATRICIA GONZALEZ and JENNIFER GONZALEZ, ,
     individually and as co-administrators of the
 5   Estate of KENNY LAZO,
                         Plaintiffs,
 6       - against -
 7   COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT,
     POLICE COMMISSIONER RICHARD DORMER, in his
 8   individual and official capacity, POLICE
     OFFICER JOHN NEWTON, in his individual and
 9   official capacity, POLICE OFFICER JAMES
     SCIMONE, in his individual and official
10   capacity, POLICE OFFICER WILLIAM JUDGE, in his
     individual and official capacity, POLICE
11   OFFICE CHRISTOPHER TALK, in his individual and
     official capacity, POLICE OFFICER JOSEPH LINK,
12   in his individual and official capacity,
     COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY,
13   SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA,
     in his individual and official capacity, ASST.
14   DISTRICT JOHN B. COLLINS, in his individual
     and official capacity, and "JOHN AND JANE
15   DOES 1-10" representing as yet unknown and
     unidentified members of the Office of Suffolk
16   County District Attorney (all in their
     individual and official capacities as
17   employees of the Office of Suffolk County
     District Attorney),
                         Defendants.
     ----------------------------------x
20       Examination Before Trial of the
21   Defendant, JOSEPH A. LINK, pursuant to Notice,
22   before a Notary Public of the State of New
23   York.
24
25
```

**4**

```
 1
 2        IT IS HEREBY STIPULATED AND
 3   AGREED by and between the attorneys
 4   for the respective parties herein,
 5   that the filing, sealing and
 6   certification of the within deposition
 7   be waived.
 8        IT IS FURTHER STIPULATED AND
 9   AGREED that all objections, except
10   as to the form of the question,
11   shall be reserved to the time of the
12   trial.
13        IT IS FURTHER STIPULATED AND
14   AGREED that the within deposition
15   may be sworn to and signed before
16   any officer authorized to administer an
17   oath with the same force and effect as
18   if signed and sworn to before the
19   Court.
20
21            - oOo -
22
23
24
25
```

GONZALEZ -V- COUNTY OF SUFFOLK                                                JOSEPH A. LINK

**5**

1
2   J O S E P H   A.   L I N K,   called as a
3       witness, having been first duly sworn by
4       a Notary Public, was examined and
5       testified as follows:
6   EXAMINATION BY
7   MR. GERMANO:
8       **Q.**   State your name for the record,
9   please.
10      **A.   Joseph A. Link**
11      **Q.**   What is your address?
12      **A.   1630 Fifth Avenue, Bayshore,**
13  New York 11706.
14      **Q.**   Good morning officer, my name
15  is William Germano. I along with Fred
16  Brewington and David Pincus represent the
17  plaintiffs in this matter.
18          I will be asking you a series
19  of questions concerning your knowledge of
20  the relevant allegations in the complaint.
21  If you don't understand the question, just
22  state so and I will rephrase or I will ask
23  again.
24          When you respond, please use
25  words and not gestures or groans.  The

**6**

1   Link.
2   court reporter is here to accurately take
3   down the record of our discussion.
4           If you need a break, feel free
5   to do so, but please try to answer any
6   questions that are pending.
7           Do you understand?
8       **A.   Yes.**
9       **Q.**   Just state your name and
10  business address for the record.
11      **A.   Joseph A. Link.  1630 Fifth**
12  Avenue, Bayshore, New York 11706.
13      **Q.**   Officer, are you currently
14  employed?
15      **A.   Yes.**
16      **Q.**   By whom are you employed?
17      **A.   Suffolk County.**
18      **Q.**   For how long have you been
19  employed by Suffolk County?
20      **A.   Nineteen years.**
21      **Q.**   In those nineteen years, have
22  you been employed in any other capacity
23  but police officer?
24      **A.   No.**
25      **Q.**   When did you take the

**7**

1                   Link
2   competitive examination?
3       **A.   1987.**
4       **Q.**   Approximately, how many times
5   did you take the competitive examination?
6       **A.   I believe just once.**
7       **Q.**   What are your duties and
8   responsibilities as a police officer?
9       **A.   Uniform patrol.**
10      **Q.**   Is that your current duty and
11  responsibility?
12      **A.   Yes.**
13      **Q.**   What precinct are you currently
14  working in?
15      **A.   Third Precinct.**
16      **Q.**   Prior to the Third Precinct,
17  have you worked at any other precinct?
18      **A.   No.**
19      **Q.**   You have been at the Third
20  Precinct for nineteen years?
21      **A.   Other than the academy, yes.**
22      **Q.**   Do you have a partner?
23      **A.   No.**
24      **Q.**   Have you ever had a partner?
25      **A.   I rode in a double car in the**

**8**

1                   Link
2   early '90s for three or four years.
3   Midnight.
4       **Q.**   Prior to working with the
5   County of Suffolk, had you had any prior
6   law enforcement experience?
7       **A.   New York City.**
8       **Q.**   How long did you work in New
9   York City?
10      **A.   Slightly over three years.**
11      **Q.**   When did you work there?
12      **A.   1989 to the time I resigned to**
13  come out here.
14      **Q.**   What was your rank with the
15  New York City police department?
16      **A.   Police officer.**
17      **Q.**   What were your duties and
18  responsibilities?
19      **A.   Uniformed patrol.**
20      **Q.**   When you say uniformed patrol,
21  what does that mean?
22      **A.   Patrol a certain geographic**
23  area in uniform.
24      **Q.**   Were your duties essentially
25  the same or similar in uniformed patrol in

**9**

Link

1  Suffolk and in the city?
2      **A.    Essentially, yes.**
3      **Q.**    When did you take the New York
4  City competitive examination?
5      **A.    Same time, within months.  It**
6  was the fall of 1987.
7      **Q.**    Prior to working with the New
8  York City Police Department, did you have
9  any other law enforcement experience?
10     **A.    No.**
11     **Q.**    Did you graduate high school?
12     **A.    Yes.**
13     **Q.**    When did you graduate high
14 school?
15     **A.    1979.**
16     **Q.**    Did you attend college?
17     **A.    Suffolk Community for one**
18 semester.
19     **Q.**    When did you do that semester?
20     **A.    Fall of 1979.**
21     **Q.**    For what reason, if any, did
22 you stop attending Suffolk Community?
23     **A.    I joined the U.S. Navy.**
24     **Q.**    For, approximately, how long

**10**

Link

1  were you in the Navy?
2      **A.    Exactly six years.**
3          MR. GERMANO:  Mr. Pincus
4  has entered the room.
5      **Q.**    When were you discharged?
6      **A.    February 10, 1986.**
7      **Q.**    For what reason, if any, were
8  you discharged?
9      **A.    Finished my obligation.**
10     **Q.**    Where were you stationed while
11 you were in the Navy?
12     **A.    Started in Orlando, Florida**
13 for boot camp.  Millington, Tennessee for
14 trade school.  Lemore, California for
15 another school.  China Lake, California.
16 San Diego, California.  Three aircraft
17 carriers.
18     **Q.**    What were your duties and
19 responsibilities in the Navy?
20     **A.    I worked on electronic systems**
21 on aircraft.
22     **Q.**    What kind of course work did
23 you have to take to be able to perform
24 that responsibility?

**11**

Link

1      **A.    Basic to college level**
2  electronics.
3      **Q.**    Did you ever receive a college
4  degree?
5      **A.    No.**
6      **Q.**    Did you have any other duties
7  or responsibilities with the Navy other
8  than working on electronic systems?
9      **A.    No.**
10     **Q.**    In February 1986, when your
11 obligation with the Navy ended, did you
12 seek other employment?
13     **A.    Yes.**
14     **Q.**    Did you obtain other employment?
15     **A.    Yes.**
16     **Q.**    Where did you obtain employment?
17     **A.    I worked for a moving company**
18 in San Diego briefly until I came back to
19 New York.  After that I worked for a
20 custom home builder, and following that
21 Grumman Aerospace.
22     **Q.**    What job did you hold for
23 Grumman?
24     **A.    I worked on electronic systems**

**12**

Link

1  and EA6Bs.
2      **Q.**    For how long did you work there?
3      **A.    Approximately two years.**
4      **Q.**    After you worked for Grumman,
5  where did you work?
6      **A.    New York City Police Department.**
7      **Q.**    You indicated that you took
8  the Suffolk examination approximately the
9  same time you took the New York City
10 examination in 1987.
11         Were you put on a wait list to
12 get into Suffolk?
13     **A.    Yes.  You are put on the list,**
14 the open list, I guess, it's called.
15     **Q.**    Have you ever been arrested?
16     **A.    I was picked up as a juvenile.**
17 I am not sure if I was arrested or not.  I
18 was 12 years old.
19     **Q.**    Were you charged with
20 violating the law?
21     **A.    No charges, I was released.**
22     **Q.**    Do you know why you were
23 picked up?
24     **A.    I was roaming around a factory**

GONZALEZ -V- COUNTY OF SUFFOLK                                                      JOSEPH A. LINK

**13**

Link

1  yard with my friends.
2
3      Q.    That would have been a
4  loitering or trespassing charge?
5      A.    **Trespassing, at best.**
6      Q.    Have you ever been convicted
7  of a crime?
8      A.    **No.**
9      Q.    During your stint with the New
10  York City Police Department, were you ever
11  the subject of a civilian complaint?
12          MR. DUNNE:  Note my
13          objection to the entire line
14          of questioning.  Understanding
15          that it goes to the Manel
16          (Phonetic) portion of the
17          claims.
18          Go ahead and answer the
19          best that you can.
20      A.    **I was not specifically named,**
21  but they gave me one because I happened to
22  be operating a van at the time, somebody
23  made a claim against a van operator.
24      Q.    What was that complaint?
25      A.    **Something to do with a member**

**14**

Link

1  of the public asked for assistance on an
2  accident and the guy drove away.
3      Q.    Were you disciplined?
4      A.    **No.**
5      Q.    Was there a finding?
6      A.    **As far as I know I was**
7  **exonerated.**
8      Q.    Do you recall when that complaint
9  was made?
10      A.    **Probably it was the spring of**
11  **'90.**
12      Q.    What precinct were you working
13  in at the NYPD?
14      A.    **I was assigned to a division**
15  at the time in field training.  Division 17.
16      Q.    Where is that located?
17      A.    **Queens.**
18      Q.    While with the NYPD, did you
19  have any other -- were you aware of any
20  other complaints made naming you in a
21  civilian complaint?
22      A.    **None that I am aware of.**
23      Q.    Are you aware if you have been
24  named in any complaints with any Internal

**15**

Link

1  Affairs Bureau within the New York City
2  Police Department?
3      A.    **I was only interviewed for**
4  that one.  I am not sure if there was
5  anything else.
6      Q.    Were you ever disciplined when
7  you worked for the city?
8      A.    **No.**
9      Q.    Have you ever been named in
10  any Internal Affairs Bureau complaint in
11  the County of Suffolk?
12      A.    **Yes.**
13      Q.    When was the first one?
14      A.    **1993, '94.**
15      Q.    Were you named in any other
16  complaints?
17      A.    **I have had a few, yes.**
18      Q.    When was the next complaint?
19      A.    **I am not sure.  Probably**
20  shortly after that.  I don't keep track.
21      Q.    What was the sum and substance
22  of the first complaint?
23      A.    **I honestly don't know.**
24      Q.    Do you recall if it had to do

**16**

Link

1  with a complaint of excessive force?
2      A.    **I have had complaints**
3  throughout my career.  Some are unlawful
4  arrest, some are excessive force, I don't
5  know which are which.  I don't know the
6  time frames.
7      Q.    Have you been named in more
8  than five IAB complaints?
9      A.    **Yes.**
10      Q.    Have you been named in more
11  than ten?
12      A.    **Probably close to ten, ten to**
13  fifteen.
14      Q.    You indicated that the sum and
15  substance of some of those was unlawful
16  arrests and excessive force.
17          Do you recall any other
18  allegations made concerning your conduct
19  as a police officer?
20      A.    **I believe one of them was**
21  something to do with unlawful search of a
22  car and that is it.
23      Q.    Have you ever been disciplined?
24      A.    **As a result of Internal Affairs?**

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

### 17

Link

1
2    Q.    As a result of anything in the County of Suffolk.
3
4    A.    **I believe I have been**
5    disciplined for MBC use, which is the
6    mobile computer in the car for
7    unauthorized e-mail.
8    Q.    Is that using the computer for
9    personal reasons?
10   A.    **No. We were responding to a**
11   call. The other officer asked me if I
12   found it, and I said, it was a female and
13   male arguing. He e-mailed me "looks like
14   a BJ gone bad", meaning prostitute. I
15   said, yes. We got disciplined.
16   Q.    So the incident involved
17   inappropriate conduct rather than --
18   A.    **I guess the term BJ on the**
19   computer.
20   Q.    It was not about actually
21   using the computer it was as a result of
22   the conduct?
23   A.    **Yes.**
24   Q.    What kind of discipline did
25   you receive?

### 18

Link

1
2    A.    **I believe I lost a vacation day.**
3    Q.    Have you been disciplined in
4    any other point in time?
5    A.    **I don't believe so, no.**
6    Q.    Do you recall the claim of
7    excessive force that was made against you?
8    A.    **There was a few that were**
9    made. The one I was named specifically?
10   Q.    Yes.
11   A.    **Was Matthew McCawly.**
12   Q.    Is that the complainant?
13   A.    **Yes. He is the complainant**
14   and eventually the guy who brought the
15   lawsuit.
16   Q.    When was that?
17   A.    **1990 somewhere. I am not sure.**
18   Q.    You said he filed a lawsuit?
19   A.    **Yes.**
20   Q.    What was the result of his IAB
21   complaint?
22   A.    **IAB complaint was either**
23   unfounded or unsubstantiated.
24   Q.    What was the sum and substance
25   of his complaint?

### 19

Link

1
2    A.    **Unnecessary force and unlawful**
3    arrest.
4    Q.    Could you describe what he
5    specifically alleged in that complaint?
6    A.    **Something to do with, I don't**
7    know if he specifically said I punched
8    him, or beat him, and I pulled him over
9    for no reason.
10   Q.    Did the complaint indicate if
11   you allegedly used a weapon or equipment
12   during the course of the beating?
13   A.    **No. Actually yes. He said I**
14   hit his head on the trunk of my car.
15   Q.    Where was the lawsuit filed?
16   A.    **I believe Mineola.**
17   Q.    That would have been in state
18   court?
19   A.    **Not sure.**
20         MR. DUNNE: Still federal
21   court.
22   Q.    Was any other officer named in
23   that lawsuit?
24   A.    **No, just me.**
25   Q.    Did that action go to trial?

### 20

Link

1
2    A.    **They settled prior to or right**
3    after jury selection.
4    Q.    How much did the case settle for?
5    A.    **I believe it was less than**
6    $10,000.
7    Q.    Other than the incident with
8    Matthew McCawly, were you named in any
9    other IAB complaint for excessive force or
10   using undue force?
11   A.    **I am sure I was. I don't**
12   remember who, but I would say yes.
13   Q.    When was the next time you
14   were named?
15   A.    **I am not sure. I don't keep**
16   track.
17   Q.    Do you recall when the last
18   one was?
19   A.    **Probably Mario, but I was not**
20   named specifically.
21   Q.    Who was Mario?
22   A.    **Mario Cedeno, C-E-D-E-N-O.**
23   Q.    What was the sum and substance
24   of that complaint?
25   A.    **I believe it was unlawful**

**21**

Link

1  arrest and unnecessary force.
2      Q.    What were the specific
3  allegations of unnecessary force?
4      A.    **He claimed he got beaten by**
5  police officers.
6      Q.    Did you have any contact with
7  Mario Cedeno during the course of that
8  incident?
9      A.    **Yes.**
10     Q.    What contact did you have with
11  him?
12     A.    **I helped arrest him.**
13     Q.    Did your actions or conduct
14  get called into question as a result of
15  the IAB complaint?
16     A.    **Not my specific actions.  No,**
17  I don't believe so.
18     Q.    Do you know whose actions got
19  called into question in terms of police
20  officers?
21     A.    **There was two other officers**
22  named, and I believe he had the officer
23  using the force as a John Doe.
24     Q.    The officer that used force,

**22**

Link

1  what did the complaint specifically allege
2  was used?
3      A.    **I believe he was hit by --**
4  claimed he was hit by a flashlight.  He
5  also claimed that one officer, Frank
6  Rendon, pistol whipped him.
7      Q.    Did you carry a flashlight on
8  your person at or about the time of this
9  incident?
10     A.    **No.**
11     Q.    Was a flashlight housed in the
12  vehicle you drove?
13     A.    **Yes.**
14     Q.    What other officers were
15  involved?
16     A.    **Named in the suit was Frank**
17  Rendon, R-E-N-D-O-N, Christine Cunningham,
18  myself.  That was the only three.
19     Q.    Was a lawsuit filed?
20     A.    **Yes.**
21     Q.    When was the lawsuit filed?
22     A.    **Maybe five years ago.  2005,**
23  2006.
24     Q.    Did the matter go to trial?

**23**

Link

1      A.    **Yes.**
2      Q.    Was there a verdict?
3      A.    **Yes.**
4      Q.    What was the verdict?
5      A.    **They found for us.**
6      Q.    As a result of that
7  investigation that occurred from this
8  complaint, were you ever disciplined?
9      A.    **No.**
10     Q.    Prior to this Mario Cedeno
11  matter, do you recall when any other
12  complaint naming you for any actions of
13  yours were ever called into question?
14     A.    **There was a -- I can't**
15  remember the kid's name.  Last name was
16  Blacklidge.  He made a complaint.  I
17  believe that was also a John Doe.  I made
18  the arrest.  I was part of the
19  investigation so it was my complaint.  I
20  don't think I was named specifically.
21     Q.    What was the last name?
22     A.    **Blacklidge, B-L-A-C-K-L-I-D-G-E.**
23     Q.    What was the sum and substance
24  of the complaint?

**24**

Link

1      A.    **During an arrest he claimed**
2  they, an officer, I want to say punched
3  him or slapped him in the face.  During
4  the depositions, he insisted it wasn't me.
5      Q.    What other officers were named?
6      A.    **Nobody.**
7      Q.    Did he claim that a weapon or
8  any type of equipment was used?
9      A.    **No, just a hand.**
10     Q.    What was the result of that
11  complaint?
12     A.    **Lawsuit that went to trial and**
13  found in our favor.
14     Q.    Was any other officer named in
15  the lawsuit?
16     A.    **I don't believe so, but I**
17  believe my partner at the time was
18  involved because I was in a double car.
19     Q.    Who was your partner?
20     A.    **William Miller.  As a matter**
21  of fact he was not named.  He was not
22  sitting in the courtroom.
23     Q.    Do you remember if there was
24  an officer --

## 25

Link

1    Link

2    **A.**    **No, it was just me at the table.**

3    **Q.**    Prior to the Blacklidge

4    complaint, do you remember any other

5    complaints made to Internal Affairs

6    concerning your conduct?

7    **A.**    **These are all ones that ended**

8    in lawsuit. There were other complaints

9    that I have no idea about. I was very

10    active.

11    **Q.**    Any other lawsuits that you

12    can remember --

13    **A.**    **The last one I believe is Noel**

14    Almedina (phonetic). He sued probably a

15    group of three or four of us.

16    **Q.**    What was the sum and substance

17    of that complaint?

18    **A.**    **Unnecessary force by female**

19    officer and a male. I think they named my

20    partner, Jack Catalina, and unlawful arrest.

21    **Q.**    What were the specific

22    allegations of unnecessary force?

23    **A.**    **I am not sure.**

24    **Q.**    Do you recall if it had to do

    with physical abuse?

## 26

Link

1    Link

2    **A.**    **I believe he claimed he was**

3    struck. With what, I don't remember.

4    **Q.**    It could have been with a

5    piece of equipment or something else?

6    **A.**    **Could have been, yes.**

7    **Q.**    Did that matter go to trial?

8    **A.**    **No, it did not.**

9    **Q.**    Did it settle?

10    **A.**    **I think it stopped without a**

11    settlement prior to depositions.

12    **Q.**    Do you know why it stopped?

13    **A.**    **No, I don't.**

14    **Q.**    As a result of that complaint,

15    did you receive any discipline?

16    **A.**    **No.**

17    **Q.**    Do you recall any other

18    lawsuits that you were named or a part of?

19    **A.**    **That is it.**

20    **Q.**    Other than those that you

21    previously mentioned, did you ever have to

22    give testimony concerning a lawsuit naming

23    other officers for the department?

24    **A.**    **I don't believe so, no.**

25    **Q.**    What type of training did you

## 27

Link

1    Link

2    receive in the police academy?

3    **A.**    **The same as everybody else.**

4    Rules and procedures, various aspects of

5    law, EMT training, physical and defense

6    tactics.

7    **Q.**    Were you ever retrained in any

8    of these areas?

9    **A.**    **We are trained periodically**

10    throughout the year.

11    **Q.**    How often do you get retraining?

12    **A.**    **I know there are probably at**

13    least five films which are self taught.

14    We have to do every year. Then whatever

15    else -- they send you to the range.

16    **Q.**    Have you ever been required to

17    be retrained in rules and procedures or

18    tactics, after a complaint named you?

19    **A.**    **Not that I know of.**

20    **Q.**    Did you review anything in

21    preparation for this deposition?

22    **A.**    **My sub reports, my 42, memo**

23    book, timestamps for the radio

24    transmissions.

25    **Q.**    What was the item you just

## 28

Link

1    Link

2    mentioned? The 42, is that what you said?

3    **A.**    **Sub reports, 42 --**

4    **Q.**    What is a 42?

5    **A.**    **That is the internal**

6    **correspondence.**

7    **Q.**    What do you keep in your memo

8    book?

9    **A.**    **Memo book pages, plastic**

10    ruler, various inserts for whatever the

11    department requires you to have.

12    **Q.**    Are you required to carry a

13    memo book?

14    **A.**    **Yes.**

15    **Q.**    What, if anything, do you

16    write in your memo book?

17    **A.**    **Your assignments for the day,**

18    cars you stop, precinct conditions, if you

19    take a meal.

20    **Q.**    Is every officer required to

21    carry a memo book?

22    **A.**    **Uniformed patrol.**

23    **Q.**    Did you carry a memo book on

24    April 12, 2008?

25    **A.**    **Yes, I did.**

**29**

Link

1
2  RQ                MR. GERMANO:  Call for
3        the production of Officer
4        Link's memo book from April 12
5        2008 and April 13, 2008.
6     **Q.**    What tour were you working on
7  April 12, 2008?
8     **A.    3:00 to 11:00.**
9     **Q.**    Did you work overtime that day?
10    **A.    I was held over to fill out**
11 the report to reference this.
12    **Q.**    Did you review any video
13 recordings in preparation for your
14 deposition?
15    **A.    Video recordings?**
16    **Q.**    Yes.
17    **A.    No.**
18    **Q.**    Did you have any conversation
19 with any other officers, or employees of
20 the County, in preparation for your
21 deposition today?
22    **A.    Other than just talking about**
23 this, not reviewing anything specific
24 about times or what happened, no.
25    **Q.**    Who did you talk to?

**30**

Link

1
2     **A.    Probably just about everybody**
3  in the precinct.
4     **Q.**    When was the last conversation
5  you had concerning this matter?
6     **A.    This morning when I found out**
7  I was coming here and I didn't know.
8     **Q.**    Who did you speak to?
9     **A.    I told people at work around**
10 me I was leaving, so that would be Police
11 Officer Paul Salace, Paula Donnely, Dana
12 Rodriguez, Richard Steck, Jose Cartas, Jim
13 Brukaleary, Sergeant Shurer (phonetics).
14    **Q.**    Other than that conversation
15 this morning, what other conversations did
16 you have with other employees or
17 personnel?
18    **A.    Like I said, nothing specific.**
19 Just I can't believe this happened and
20 going back for another trial.
21    **Q.**    When you said you can't
22 believe this happened, what do you mean by
23 that?
24    **A.    My only involvement is about**
25 six minutes and I am sitting in federal

**31**

Link

1
2  court.  So pretty much, I can't believe
3  this happened.
4     **Q.**    You are aware that a man died
5  on April 12, 2008?
6     **A.    Yes, I am.**
7     **Q.**    Do you care?
8                MR. DUNNE:  Objection to
9        that.
10    **A.    I care that he died.  It's a**
11 shame he is dead, but it's just part of my
12 business.
13    **Q.**    Approximately, in your career
14 as a police officer, how many subjects
15 have died in custody while you have been
16 involved?
17    **A.    This is my first.**
18    **Q.**    Did you ever seek, as a result
19 of his death, any counseling?
20    **A.    No.**
21    **Q.**    Did you ever feel that you
22 needed counseling?
23    **A.    No.**
24    **Q.**    Do you recall observing Kenny
25 Lazo on April 12, 2008?

**32**

Link

1
2     **A.    Yes, I did.**
3     **Q.**    What observations, if any, did
4  you make of Kenny Lazo's face?
5     **A.    There was an abrasion on the**
6  cheek bone on the right side of his face.
7  That is about it.
8                MR. GERMANO:  Can you
9        mark this as Plaintiff's
10       Exhibit 1?
11             (Photograph was marked as
12       Plaintiff's Exhibit 1 for
13       identification, as of this
14       date.)
15    **Q.**    Officer Link, I am placing
16 Plaintiff's Exhibit 1 in front you.
17       Do you recognize the man
18 depicted in this picture?
19    **A.    Yes, that is Kenny Lazo.**
20    **Q.**    The abrasion that you just
21 indicated on his cheek bone, is that the
22 abrasion in this area of the picture where
23 I am pointing to?
24    **A.    Yes.**
25    **Q.**    That would be on the left side

GONZALEZ -V- COUNTY OF SUFFOLK                                    JOSEPH A. LINK

---

**33**

Link

1  of Mr. Lazo's face on his left cheekbone,
2  correct?
3      **A.    Correct.  I thought it was right.**
4      **Q.    After seeing this abrasion,
5  did you have any communications or inform
6  any sergeant, or superior, or supervisor
7  of his condition?
8          MR. DUNNE:  The only
9          basis of my objection, and
10         Officer you can answer this,
11         is that there is no reference
12         in time to when this picture
13         was taken and when the Officer
14         observed him.
15             With that objection,
16         answer that as best as you
17         can.
18     **A.    I am not sure I understand the**
19  question.
20     **Q.    I will rephrase.**
21             When you first saw Mr. Lazo
22  you indicated that you saw --
23     **A.    Well --**
24     **Q.    At some point you indicated**

---

**34**

Link

1  that you saw an abrasion on his face?
2      **A.    Yes.**
3      **Q.    This is the abrasion that you
4  saw, correct?  The one that is depicted in
5  Plaintiff's Exhibit 1?
6      **A.    Yes.**
7      **Q.    After having seen that
8  abrasion on his face, did you inform any
9  superior officer of Mr. Lazo's injury?
10     **A.    At the scene, Sergeant**
11  Scimone.
12     **Q.    What did you tell Sergeant
13  Scimone?
14     **A.    I basically asked him or told**
15  him, he is not injured, he is not
16  bleeding.  Let's just go to the precinct,
17  or do you want to go to the precinct.
18     **Q.    Did you tell that to Sergeant
19  Scimone or did you ask Sergeant Scimone a
20  question?
21     **A.    I basically asked because we**
22  were on the side of a road.
23     **Q.    Did you tell Sergeant Scimone
24  that you saw the abrasion on Lazo's face?

---

**35**

Link

1     **A.    Not specifically.**
2      **Q.    What specifically did you tell
3  Sergeant Scimone?
4      **A.    I don't remember my exact**
5  words, but I basically said, he doesn't
6  appear to be injured and in need of
7  hospitalization, can we go to the
8  precinct.
9      **Q.    Do you have a medical
10  background?
11     **A.    I am trained by Suffolk County**
12  Police Department as an EMT.  Expired.
13     **Q.    When did it expire?
14     **A.    Sometime, probably, around**
15  2005 maybe.
16     **Q.    Have you ever sought to renew
17  that?
18     **A.    The county schedules the**
19  recertification.  I don't.
20     **Q.    That was three years it
21  expired prior to this incident, correct?
22     **A.    Probably, yes.**
23     **Q.    The marking on Lazo's face,
24  with your background, would you say that

---

**36**

Link

1  that was an injury?
2      **A.    The abrasions?**
3      **Q.    Yes.
4      **A.    Yes.**
5      **Q.    Do you see the area in the
6  photograph under Lazo's nose?
7      **A.    Yes.**
8      **Q.    Does that appear to be blood?
9      **A.    It appears to be blood that**
10  was not there at the time I first met him.
11     **Q.    Do you see in the photograph
12  Mr. Lazo's left eye and the dark circles
13  around his left eye?
14     **A.    Yes.**
15     **Q.    Is that a fair representation
16  that it appears to be a dark circle?
17     **A.    It appears to be a bruise, yes.**
18     **Q.    Did you notice that bruise on
19  Mr. Lazo?
20     **A.    The bruise was not apparent**
21  either when I first met him.
22     **Q.    The portion on Mr. Lazo's left
23  ear depicted in the photograph --
24          MR. GERMANO:  Withdrawn.

---

## 37

Link

1
2  Q.  Do you see the left ear of
3  Mr. Lazo depicted in the photograph?
4  A.  Yes.
5  Q.  Does his left ear appear to
6  have dark marks on it?
7  **A.  Yes, but I can't tell if it's**
8  dirt or a bruise.
9  MR. GERMANO:  Mark this
10  as Plaintiff's Exhibit 2.
11  (Photographs were marked
12  as Plaintiff's Exhibit 2 for
13  identification, as of this
14  date.)
15  Q.  Officer, I am placing before
16  you Plaintiff's Exhibit 2.  Another series
17  of photographs.
18  Do you see the photograph that
19  depicts Lazo's left ear on the upper
20  right-hand quadrant?
21  A.  Yes.
22  Q.  Does his ear appear to be
23  marked there?
24  **A.  Yes, there is some sort of**
25  mark or prior injury.

## 38

Link

1
2  Q.  Did you notice that mark when
3  you came in contact with Mr. Lazo?
4  A.  No.
5  Q.  If you look at the first
6  quadrant, the upper left-hand side, do you
7  see the lower lip of Mr. Lazo?
8  A.  Yes.
9  Q.  Does that appear to be a cut
10  on his lip?
11  **A.  It appears to be a brown mark.**
12  Q.  Did you notice that brown mark
13  when you came into contact with Mr. Lazo
14  at any point in time?
15  A.  No.
16  Q.  In the lower left-hand
17  quadrant, do you see, above the ruler
18  looking contraption, the marking on
19  Mr. Lazo's right side of his forehead?
20  A.  Yes.
21  Q.  Does that appear to be a
22  bruise and a cut?
23  **A.  Could be, yes.**
24  Q.  Did you notice that when you
25  had contact with Mr. Lazo on April 12,

## 39

Link

1
2  2008?
3  A.  No.
4  Q.  Having viewed Plaintiff's
5  Exhibit 1 and the abrasion that you
6  identified, is it your responsibility --
7  MR. GERMANO:  Withdrawn.
8  Q.  Do you have a responsibility
9  to inform supervising officers of any
10  injuries on subjects?
11  A.  Yes.
12  Q.  Did you inform a supervising
13  officer of the injury on Mr. Lazo?
14  **A.  At the scene?**
15  Q.  At any time.
16  **A.  At the scene there was a**
17  sergeant there, so I don't have to notify
18  him of something he observes and at the
19  precinct I just lodged him and left.
20  Q.  Prior to April 12, 2008, did
21  you have any contact with Mr. Lazo?
22  A.  No.
23  Q.  Had you ever seen him before?
24  A.  No.
25  Q.  Had you ever heard of his

## 40

Link

1
2  name?
3  A.  No.
4  Q.  Who was your supervisor on
5  April 12, 2008?
6  **A.  I believe Sergeant Welschimer.**
7  Q.  How do you spell his name?
8  **A.  W-E-L-S-C-H-I-M-E-R.**
9  Q.  What is his rank?
10  **A.  Sergeant.**
11  Q.  Is he the sergeant of a
12  particular unit?
13  **A.  Patrol Sergeant.**
14  Q.  On that date, did you have a
15  partner?
16  **A.  No.**
17  Q.  What were your general tasks
18  and duties on that day?
19  **A.  Uniform patrol.**
20  Q.  What vehicle were you
21  operating?
22  **A.  I believe, I was assigned to**
23  Sector 314 and I believe I had the 314
24  car, not a spare car.
25  Q.  What is Sector 314?

**41**

Link

1
2    **A.     That is the area of the**
3  precinct that I cover.
4       **Q.**     What is that area?
5       **A.     Bay Shore, Brightwaters, West**
6  Bay Shore.
7       **Q.**     Does the sector that you
8  patrol in change regularly?
9       **A.     No.**
10      **Q.**     How long had you been
11  patrolling that sector?
12      **A.     Probably 2002.**
13      **Q.**     On April 12, 2008, did you
14  have any general -- did you have any
15  purpose that day, or mission?
16      **A.     Uniform patrol.**
17      **Q.**     How was it that you came into
18  contact with Kenny Lazo on April 12, 2008?
19      **A.     I responded to the radio**
20  transmission of Detective Talt saying that
21  the other units needed an assist on the
22  parkway.
23      **Q.**     Was the radio transmission
24  from Detective Talt directed to you?
25      **A.     No.**

**42**

Link

1
2       **Q.**     Who was it directed to, if you
3  know?
4       **A.     The Third Precinct.**
5       **Q.**     Approximately what time was
6  this?
7       **A.     I don't know the time off the**
8  top of my head, without reviewing some
9  paperwork, 8:30, 8:20 something.
10      **Q.**     Was it light out?
11      **A.     No.**
12      **Q.**     Was it dark?
13      **A.     It probably just turned dark.**
14  It was April.
15      **Q.**     Where were you located when
16  you received or heard the radio
17  transmission from Detective Talt?
18      **A.     On Munsy Road just east of**
19  Robert Moses Parkway.
20      **Q.**     When you heard the
21  transmission what, if anything, did you
22  do?
23      **A.     I wasn't sure of the exact**
24  location so I started heading towards the
25  Bay Shore Road ramp of the Robert

**43**

Link

1
2  Moses/Southern State Parkway interchange
3  there.
4       **Q.**     What direction were you
5  heading on Munsy Road when you received
6  the call?
7       **A.     Eastbound.**
8       **Q.**     When you heard the call, did
9  you have to direct your vehicle in any
10  different direction?
11      **A.     No.**
12      **Q.**     From Munsy Road, where did you
13  go?
14      **A.     Made a left on Manor Lane,**
15  left on Bay Shore Road, and right onto the
16  entrance ramp.
17      **Q.**     Which entrance ramp?
18      **A.     On Bay Shore Road. I guess**
19  that is considered northbound going onto
20  northbound Robert Moses, which empties
21  onto eastbound Southern State Parkway.
22  It's kind of a mess over there.
23      **Q.**     When you were on Bay Shore
24  Road and you turned right onto the
25  entrance ramp, there are two entrance

**44**

Link

1
2  ramps.  Did you pass the first entrance
3  ramp and then turn right onto the second
4  entrance ramp or did you turn right onto
5  the first entrance ramp?
6       **A.     There is only one entrance**
7  ramp for the direction I was going.
8       **Q.**     I understand.
9       The question, did you turn
10  right on the first entrance ramp or the
11  second entrance ramp?
12      **A.     I am still lost.  There is**
13  only one entrance ramp for the direction I
14  needed to go.
15      If you are heading from the
16  Third Precinct into the First on Bay Shore
17  Road, there is one ramp, and only one ramp
18  to go in the direction.
19      The next ramp is to go in the
20  opposite direction on Robert Moses.
21      MR. GERMANO:  We'll mark
22  this as Plaintiff's Exhibit 3.
23      (Map was marked as
24  Plaintiff's Exhibit 3 for
25  identification, as of this

**45**

Link

1
2     date.)
3     Q.    I am showing you Plaintiff's
4  Exhibit 3.  Which is a depiction of a map
5  from the Suffolk County atlas, Hagstrom.
6     A.    I was sitting about where that
7  C1 is.
8     Q.    That is Munsy Road.  From
9  Munsy Road you indicated you proceeded --
10    A.    To Manor Lane and I made a
11 left.  Manor Lane, Bay Shore Road and made
12 a left.  That is the first and only ramp
13 that I could have taken and that is what I
14 took.
15    Q.    So that would have been once
16 you take that ramp, that is the Southern
17 State Parkway eastbound ramp?
18    A.    Yes.
19    Q.    Then you have the option to
20 continue eastbound on the Southern State
21 Parkway or take the Sagtikos northbound?
22    A.    Correct.
23    Q.    Where did you drive next when
24 you took the ramp, in that direction?
25    A.    I made it a few hundred feet

**46**

Link

1
2  up and that is where they were, prior to
3  the Southern State Parkway.
4     Q.    So they were a few hundred
5  feet up before the road forked for the
6  Sagtikos northbound or the Southern State
7  Parkway eastbound?
8     A.    Correct.
9     Q.    That would have been after
10 exit 41 and before exit 42, correct?
11    A.    Correct.
12    Q.    Officer, I am going to place
13 Plaintiff's Exhibit 3 in front of you just
14 for one last question.
15          This mark here, this pen, is
16 that about the area where you saw the
17 stop?
18    A.    No.  Over here (indicating),
19 directly below the A in parkway.
20    Q.    So it was right off the
21 entrance ramp?
22    A.    It was on the entrance ramp,
23 yes.
24    Q.    You didn't actually yield into
25 the parkway at that point?

**47**

Link

1
2     A.    No.
3     Q.    Do you know if there are
4  traffic cameras in that region?
5     A.    Not that I know of.
6     Q.    Do you know if in April of
7  2008 there were traffic cameras in that
8  region?
9     A.    No.
10    Q.    Are you aware if there were
11 traffic cameras generally on that parkway?
12    A.    I have never seen any, so, no.
13    Q.    Approximately what time did
14 you arrive at the scene?
15    A.    I think it took me just under
16 a minute to get there from the first radio
17 transmission.
18    Q.    That first radio transmission
19 was approximately 8:20, 8:30?
20    A.    I am not sure of the time.  We
21 have to look at the CAD to get those time
22 stamps.
23          MR. GERMANO:  Off the
24 record.
25          (Discussion off the

**48**

Link

1
2     record.)
3     Q.    When you arrived, how many
4  vehicles did you see pulled over?
5     A.    Just the -- coming from the
6  rear was the gray SUV that Detective
7  Newton was operating, a marked COPE unit,
8  and parked in front of the COPE unit was
9  Mr. Lazo's Cadillac.
10    Q.    What color was the Cadillac?
11    A.    I believe blue.
12    Q.    What officers were at the
13 scene, when you first arrived?
14    A.    Sergeant Scimone, Officer
15 Judge, and Detective Newton.
16    Q.    Was Tait there?
17    A.    No.
18    Q.    Where did you park your car?
19    A.    I left my car in the roadway
20 to kind of give us a safety zone since
21 they were so close to the roadway.
22    Q.    How far back were you from the
23 closest vehicle?
24    A.    I was just about abreast to
25 the COPE unit car, maybe a little forward,

## 49

**Link**

1
2 and slightly behind Mr. Lazo's car.
3 Actually, no. I was abreast of Mr. Lazo's
4 car because he was in front of it.
5 **Q.** When you say abreast, what do
6 you mean?
7 **A. I was parked alongside. He**
8 was on the grass. I was in the roadway.
9 **Q.** If your car was parked
10 alongside of Lazo's car in the roadway,
11 would that mean that the gray SUV and the
12 COPE unit are behind your car?
13 **A. Directly behind his car on the**
14 grass. I was the only car in the roadway.
15 **Q.** Is the SUV in front of the
16 COPE unit or behind?
17 **A. Behind.**
18 **Q.** Is it directly behind the COPE
19 unit?
20 **A. Might have been off to one**
21 side.
22 **Q.** In terms of the COPE unit, was
23 your rear bumper in front of the COPE
24 unit's front bumper?
25 **A. I don't recall.**

## 50

**Link**

1
2 **Q.** Who was the first person you
3 saw when you pulled your car up next to
4 the blue Cadillac?
5 **A. I saw all four of them.**
6 **Q.** What position were they in?
7 **A. Mr. Lazo was on the ground,**
8 handcuffed, and the three others were
9 standing around breathing heavy, bending
10 over.
11 **Q.** Where were they standing?
12 **A. In front of the cars along --**
13 near Mr. Lazo.
14 **Q.** Was anybody standing directly
15 next to Mr. Lazo?
16 **A. Directly next to, I am sure**
17 somebody was. They were all within 8 feet
18 of him ten feet of him, but nobody was on
19 top of him.
20 **Q.** Did you remain in your car?
21 **A. No.**
22 **Q.** Did you have your emergency
23 lights on?
24 **A. Yes.**
25 **Q.** Did you actually see the

## 51

**Link**

1
2 handcuffs that were on Mr. Lazo?
3 **A. At that moment, no.**
4 **Q.** At that moment, what was
5 Lazo's position?
6 **A. I believe he was laying on the**
7 ground or some sort of form of lying on
8 the ground.
9 **Q.** Where on the ground was he
10 lying in terms of, was he lying on the
11 road, was he lying on the grass?
12 **A. On the grass.**
13 **Q.** Where was the blue Cadillac in
14 terms of where his body was?
15 **A. I believe he was in front of**
16 the car.
17 **Q.** Where was Officer Judge when
18 you saw Lazo lying in front of the car?
19 **A. Specifically in relation to**
20 Mr. Lazo, I don't know. He was nearby.
21 All three of them were nearby.
22 **Q.** Were they in front of the
23 Cadillac or on the side?
24 **A. All in front.**
25 **Q.** Was Mr. Lazo lying on his

## 52

**Link**

1
2 stomach, his back, or on his side?
3 **A. Either on his stomach or kind**
4 of on his hip.
5 **Q.** If he was lying on his hip,
6 does that mean that one of his shoulders
7 was raised?
8 **A. Could have been.**
9 **Q.** Do you recall what direction
10 his chest was facing?
11 **A. I believe his head was closet**
12 to the car. I am not sure.
13 **Q.** In which direction were his
14 feet?
15 **A. The opposite direction.**
16 **Q.** So he was lying in line with
17 the car, is that a fair way to put it?
18 **A. I guess. I don't remember**
19 specifically, yes.
20 **Q.** If that was the case, was his
21 right arm closest to the roadway?
22 **A. I am not sure, I guess.**
23 **Q.** What was Mr. Lazo wearing?
24 **A. He didn't have a shirt on. He**
25 had pants on. I believe some sort of

GONZALEZ -V- COUNTY OF SUFFOLK

**53**

Link

1 black jeans or something, and socks.
2 **Q.** Did he have shoes on?
3 **A.** **No.**
4 **Q.** Did you see his shoes anywhere
5 in the area, if you recall?
6 **A.** **No.**
7 **Q.** Did you ever learn where his
8 shoes may have gone?
9 **A.** **No.**
10 **Q.** When you exited your vehicle,
11 did you have any conversations with
12 anybody?
13 **A.** **I walked up and basically**
14 asked is everybody okay. They kind of
15 responded. At that point, I asked the
16 sergeant as my previous statement was,
17 because of the roadway we were on, there
18 is a lot of high speed traffic, and I
19 didn't want to get hit by a car so I said
20 let's go to the precinct.
21 **Q.** In terms of feet, how far was
22 Mr. Lazo from the roadway?
23 **A.** **Maybe six.**
24 **Q.** 6 feet?
25

**54**

Link

1 **A.** **Yes.**
2 **Q.** Is there a shoulder there?
3 **A.** **There is the shoulder. There**
4 is grass, small curb, and I believe two
5 lanes, two lanes merging down into one.
6 **Q.** Was there 6 feet of grass
7 between Mr. Lazo and the curb?
8 **A.** **Give or take, approximately.**
9 **Q.** In terms of feet, how wide is
10 the shoulder?
11 **A.** **The grass area?**
12 **Q.** Well, from the --
13 **A.** **There is no designated**
14 shoulder on the roadway. I am parked in a
15 lane.
16 **Q.** Is there a fog line?
17 **A.** **I believe there was a solid**
18 white line somewhere near my right tires
19 of my vehicle.
20 **Q.** What was the distance between
21 the fog line and the curb?
22 **A.** **Probably 4 inches.**
23 **Q.** You said you walked up, where
24 did you walk to?

**55**

Link

1 **A.** **To the group of them standing**
2 near Mr. Lazo.
3 **Q.** When you asked if everyone was
4 okay, did you direct your question to
5 anyone in particular?
6 **A.** **No.**
7 **Q.** What were your observations of
8 Officer Judge at that time?
9 **A.** **He like everybody else was**
10 breathing heavily. Their clothes was
11 disheveled, and it was quite apparent that
12 they were just in a struggle.
13 **Q.** Was Officer Judge holding
14 anything in his hand?
15 **A.** **No.**
16 **Q.** What were your observations of
17 Sergeant Scimone?
18 **A.** **The same.**
19 **Q.** By the same, you mean his
20 clothes were disheveled?
21 **A.** **He was breathing heavy and**
22 they were moving about.
23 **Q.** What were your observations
24 about Detective Newton?
25

**56**

Link

1 **A.** **Also the same.**
2 **Q.** Did any officer appear to be
3 injured?
4 **A.** **I believe Officer Judge was**
5 complaining about something to do with one
6 of his hands.
7 **Q.** Do you remember hearing
8 Officer Judge complaining about anything
9 specific about one of his hands?
10 **A.** **No.**
11 **Q.** Did you ask Officer Judge if
12 he was hurt?
13 **A.** **No.**
14 **Q.** Did you ask Sergeant Scimone
15 if he was hurt?
16 **A.** **No.**
17 **Q.** Did you ask Detective Newton
18 if he was hurt?
19 **A.** **No.**
20 **Q.** At any point in time, while
21 you were at the scene, did you come in
22 contact with Detective Tait?
23 **A.** **No.**
24 **Q.** After you spoke to the police

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

### 57

Link

1 Link
2 officers at the scene, did you speak to
3 Kenny Lazo?
4     **A.**    **No.**
5     **Q.**    Did you ask the police
6 officers and the other officers there what
7 occurred?
8     **A.**    **No.**
9     **Q.**    Did they tell you?
10     **A.**    **No.**
11     **Q.**    The next conversation you had
12 was with Sergeant Scimone, correct?
13     **A.**    **Yes, I said, can we leave**
14 because I didn't like where we were.
15     **Q.**    Did you in fact transport
16 Mr. Lazo.
17     **A.**    **Yes, I did.**
18     **Q.**    Did anybody in particular
19 direct you to transport him?
20     **A.**    **No.**
21     **Q.**    When you arrived at the scene,
22 what made you assume that it was your
23 responsibility to transport him?
24     **A.**    **I just volunteered.**
25     **Q.**    What did Sergeant Scimone say

### 58

Link

1 Link
2 to you when you volunteered?
3     **A.**    **Basically, let's get out of**
4 here.
5     **Q.**    Prior to that conversation,
6 did you have any conversations or
7 discussions with Kenny Lazo?
8     **A.**    **No.**
9     **Q.**    Did Kenny Lazo move from the
10 position you first saw him in until that
11 point in time?
12     **A.**    **He was moving about and**
13 started complaining that he was arrested,
14 and kind of talking trash to the officers,
15 that it took three of them to get him
16 handcuffed or in custody or whatever.
17     **Q.**    This was before you went over
18 to him?
19     **A.**    **Yes.**
20     **Q.**    Was Kenny Lazo directing those
21 statements to anybody in particular?
22     **A.**    **No.**
23     **Q.**    Did any police officer,
24 sergeant, or detective respond to Kenny
25 Lazo?

### 59

Link

1 Link
2     **A.**    **No.**
3     **Q.**    Approximately, how long was
4 Kenny Lazo there while you were there?
5     **A.**    **Maybe a minute.**
6     **Q.**    In total, how long were you at
7 the scene?
8     **A.**    **Just a couple of minutes.**
9     **Q.**    Did you at some point go over
10 to Kenny Lazo?
11     **A.**    **Yes.**
12     **Q.**    Did any other officer tend to
13 him with you?
14     **A.**    **We didn't tend to him.**
15 Officer Judge helped me get him on his
16 feet to walk him to my car.
17     **Q.**    You helped him up?
18     **A.**    **Yes.**
19     **Q.**    What led you to help Kenny
20 Lazo up?
21     **A.**    **He was handcuffed.**
22     **Q.**    In what position was he when
23 you walked over him?
24     **A.**    **I think he might have been**
25 seated at the time.

### 60

Link

1 Link
2     **Q.**    What was he seated on his
3 butt, his knees or something else?
4     **A.**    **I believe his butt.**
5     **Q.**    When Mr. Lazo changed his
6 position from lying down to sitting on his
7 butt, did that concern anybody?
8     **A.**    **No.**
9     **Q.**    Was Mr. Lazo a threat?
10     **A.**    **No, he was handcuffed.**
11     **Q.**    When you say you helped
12 Mr. Lazo up, how did you help him up?
13     **A.**    **We each grabbed one arm under**
14 his shoulder and helped him onto his feet.
15     **Q.**    What arm did you grab?
16     **A.**    **I am not sure.**
17     **Q.**    Were you standing closest to
18 the roadway or was Officer Judge standing
19 closest to the roadway?
20     **A.**    **I am not sure.**
21     **Q.**    Are you right handed or left
22 handed?
23     **A.**    **I am right handed.**
24     **Q.**    Do you recall if it is normal
25 for you to use your right hand to help

GONZALEZ -V- COUNTY OF SUFFOLK                                                    JOSEPH A. LINK

**61**

Link

1  someone up?
2           MR. DUNNE: I object to
3       whatever normal is.
4       **A.    He was large enough where I**
5  needed both of my hands to lift him up.
6       **Q.    But at this point you don't**
7  recall what side you grabbed?
8       **A.    No.**
9       **Q.    Did you have any conversation**
10  or did you say anything to Kenny Lazo at
11  that point in time?
12      **A.    I said come with me, and in no**
13  specific terms, put you in my car and take
14  you to the precinct.
15      **Q.    Did Officer Judge say anything**
16  to Kenny Lazo at that point in time?
17      **A.    Not that I recall.**
18      **Q.    Did he say anything to you?**
19      **A.    No.**
20      **Q.    Did he acquiesce to be brought**
21  to your car?
22      **A.    Yes, he went voluntarily.**
23      **Q.    Did you assist Mr. Lazo over**
24  to the car?

**62**

Link

1       **A.    Assist, no. He walked on his**
2  own.
3       **Q.    After Officer Judge and**
4  yourself helped him up, where did Officer
5  Judge go?
6       **A.    He stayed with me until we**
7  walked to the car. When Kenny Lazo sat
8  down, he was behind me somewhere.
9       **Q.    Did you walk side by side with**
10  Kenny Lazo, behind him, or in front of
11  him?
12      **A.    Alongside.**
13      **Q.    On his right side or left**
14  side?
15      **A.    I don't remember. I stayed by**
16  his side in case he falls. He can't break
17  his fall with his handcuffs.
18      **Q.    Did you open the car door?**
19      **A.    I don't recall who opened the**
20  car door.
21      **Q.    What side of the car was**
22  Mr. Lazo brought to?
23      **A.    Passenger side, rear seat.**
24      **Q.    That was the side adjacent to**

**63**

Link

1  the area at this scene?
2       **A.    Yes.**
3       **Q.    Did Officer Judge help place**
4  Mr. Lazo in the vehicle?
5       **A.    No. I opened the front door,**
6  moved the passenger seat forward, and he
7  got in the back seat, and that is where he
8  stayed.
9       **Q.    You opened the front door, but**
10  you don't recall who opened the passenger
11  back rear door?
12      **A.    I don't remember, but more**
13  than likely it was probably me.
14      **Q.    If you were standing on**
15  Mr. Lazo's right side to open the door,
16  then you would have seen the right side of
17  Mr. Lazo's face, is that correct?
18      **A.    One more time?**
19      **Q.    If you were standing on the**
20  right side of Mr. Lazo to open the car
21  door?
22      **A.    His right side?**
23      **Q.    Yes --**
24      **A.    Yes.**

**64**

Link

1       **Q.    -- then you could have seen**
2  the right side of Mr. Lazo's face, right?
3       **A.    I could have.**
4       **Q.    When did you first notice the**
5  abrasions on Mr. Lazo's face?
6       **A.    When he was getting seated in**
7  the car he had to face out and sit back.
8       **Q.    Mr. Lazo's right side would**
9  have been facing the passenger rear door,
10  correct?
11      **A.    At what point?**
12      **Q.    When he was seated.**
13      **A.    Yes.**
14      **Q.    It was at that point in time**
15  that you noticed the abrasion on his left
16  cheek, correct?
17      **A.    I was not sure which cheek it**
18  is. What does the picture show, right
19  cheek or left cheek?
20      **Q.    It was at that point when he**
21  was seated that you saw the abrasion?
22      **A.    Yes. Facing out.**
23      **Q.    Did Mr. Lazo say anything to**
24  you?

**65**

Link

1
2   **A.**   **No.**
3   **Q.**   Did you ask Mr. Lazo, from the
point in time you helped him up and walked
him to the car and placed him in the car,
if he needed medical attention?
7   **A.**   **No, I did not.**
8   **Q.**   Did you ask Mr. Lazo if he
needed medical attention when you first
arrived at the scene, before you stepped
over to him?
12   **A.**   **No.**
13   **Q.**   While you were at the scene,
were you informed that force was used in
order to subdue Mr. Lazo?
16   **A.**   **No, I just assumed it was.**
17   **Q.**   Having assumed that force was
used and noticing the abrasion on
Mr. Lazo's face, did you have a
responsibility to inform a sergeant that
he appeared to be injured?
22   **A.**   **I would operate under the**
assumption that since the sergeant was at
the scene, he knew.
25   **Q.**   I understand but the question

**66**

Link

1
2   is, did you have a responsibility?
3       MR. DUNNE:  He already
4       answered that.  Asked and
5       answered.  He said, yes.
6   **A.**   **Yes.**
7   **Q.**   Did you do any further
assessment of Mr. Lazo at the scene?
9   **A.**   **Medically?**
10   **Q.**   Yes.
11   **A.**   **No.**
12   **Q.**   Did you have any further
observations of Mr. Lazo at the scene?
14   **A.**   **Not at the scene, no.**
15   **Q.**   After Mr. Lazo was placed in
the vehicle, what did you do?
17   **A.**   **Somebody behind me, I am not**
sure, it might have been Billy Judge, said
that he was not checked for weapons, his
waistband or something.  That is when I
squeezed his pockets, I felt what was
money or whatever.  I checked his
waistband or whatever and I found the one
large bag of narcotics behind his belt
buckle.

**67**

Link

1
2   **Q.**   He was seated in the car at
the time you frisked him?
4   **A.**   **Yes.**
5   **Q.**   What did you do after you
found the money and the bag?
7   **A.**   **The money I left in the**
pockets.  I had to open the belt buckle
and his pants to pull the bag out and I
believe I gave it to Detective Newton.
11   **Q.**   What did you do next?
12   **A.**   **I told Sergeant Scimone I was**
going to the precinct.
14   **Q.**   What, if anything, did
Sergeant Scimone say to you?
16   **A.**   **Nothing.  Basically, we'll all**
see you back at the precinct.
18   **Q.**   Did Sergeant Scimone tell you
that Mr. Lazo required medical attention?
20   **A.**   **No, he did not.**
21   **Q.**   In a situation when force is
used and an injury occurs on a subject, do
you have a responsibility to bring the
individual to hospital for medical
evaluation?

**68**

Link

1
2       MR. DUNNE:  Objection to
3       the form of the question, but
4       Officer, go ahead and answer
5       the best that you can.
6   **A.**   **Yes, when the person appears**
to be injured and in need of medical
attention I will bring them, like I have
done in the past, directly to the
hospital.
11       Mr. Lazo had an abrasion that
was the only thing visible on his face at
the time I was there.
14   **Q.**   Did you ask him if he was
injured?
16   **A.**   **No, I did not.**
17   **Q.**   Is it your responsibility to
ask him if he was injured?
19   **A.**   **No, it is not.**
20   **Q.**   Assuming that force was used
and that he had an abrasion on his face
that you saw, and you previously indicated
that you assumed force was used, was it
your responsibility to ask him if he
needed medical attention?

GONZALEZ -V- COUNTY OF SUFFOLK                                                JOSEPH A. LINK

**69**

Link

1
2    **A.    Again, no it is not.**
3    Q.    Was it your responsibility to
4    just bring him directly to seek medical
5    attention?
6    **A.    If I believe that he is**
7    injured to the point where he is having
8    difficulty breathing or he is bleeding
9    excessively, I would bring him directly to
10   the hospital.  Not limited to those two
11   things.
12   Q.    Looking at Plaintiff's Exhibit
13   1, you indicated that he had a bruise
14   around his eye and he had the abrasion --
15        MR. DUNNE:  I am going to
16        renew my objection.  These are
17        post mortem photographs and
18        they were taken days after
19        Officer Link's contact with
20        Mr. Lazo. Go ahead an answer
21        his questions.
22   Q.    Do you recall seeing the
23   bruise around Mr. Lazo's eye?
24   **A.    There was no bruise there when**
25   I first saw him.

**70**

Link

1
2    Q.    Do you recall if there was the
3    mark above his left eyebrow when you
4    transported him?
5    **A.    Not that I recall.**
6    Q.    Do you recall if there was a
7    mark just below his right eyebrow, but
8    above his eye?
9    **A.    Not that I recall.**
10   Q.    So, it is fair to say that the
11   only mark that you recall is the abrasion
12   on his left cheek bone?
13   **A.    Yes.**
14   Q.    After you provided Detective
15   Newton with the bag, what did you do next?
16   **A.    After I gave him the bag of**
17   drugs I removed from Mr. Lazo's pants, I
18   got in my vehicle, made a radio
19   transmission that I was going to the third
20   precinct, and I proceeded there.
21   Q.    What, if anything, did you
22   state in the radio transmission?
23   **A.    Probably something along the**
24   lines of 314, 26 and a 32 to the precinct.
25   Q.    Can you describe what a 26 is?

**71**

Link

1
2    **A.    Transporting a subject to the**
3    precinct.
4    Q.    In your radio transmission to
5    headquarters, did you indicate that force
6    was used on the subject?
7    **A.    No.**
8    Q.    Did you state that Mr. Lazo
9    had an abrasion on his face?
10   **A.    No.**
11   Q.    Did you state to headquarters
12   that Mr. Lazo required medical attention?
13   **A.    No.**
14   Q.    After you made the radio
15   transmission, what did you do next?
16   **A.    I proceeded up the rest of the**
17   ramp, got on the Southern State Parkway
18   eastbound, exited Fifth Avenue northbound,
19   northbound on Fifth Avenue to the
20   precinct.
21   Q.    Approximately, how long did
22   that take you?
23   **A.    Probably there within a**
24   minute.
25   Q.    When you were transporting

**72**

Link

1
2    Mr. Lazo, were your lights on?
3    **A.    No.**
4    Q.    Emergency lights?
5    **A.    No.**
6    Q.    When you arrived at the
7    precinct, what did you do?
8    **A.    I parked in the back parking**
9    lot of the precinct.  I opened the rear
10   door and I assisted Mr. Lazo getting out
11   of the vehicle.
12   Q.    During the transport did
13   Mr. Lazo say anything to you?
14   **A.    Nothing directly to me.  He**
15   was just complaining how he fucked up and
16   he couldn't believe he got arrested.
17   Q.    Were those his words?
18   **A.    No, I am just summing it up.**
19   Q.    Do you recall specifically
20   what his words were?
21   **A.    No, I don't.**
22   Q.    Did you say anything to
23   Mr. Lazo during the transport?
24   **A.    The only thing I told him to**
25   do was he was moving about in the back

**73**

Link

1  seat and I told him to stop.
2       Q.    How was he moving about in the
3  back seat?
4       A.    **He was just fidgeting and**
5  sliding around and like other prisoners
6  have done in the past to secrete something
7  in my back seat.
8       Q.    Did you ask him why he was
9  sliding around?
10      A.    **No.  The ride didn't take that**
11 long.
12      Q.    Did Mr. Lazo say he was hurt?
13      A.    **No, he did not.**
14      Q.    Stepping back a moment.  When
15 you helped Mr. Lazo up and walked him to
16 the car, how did Mr. Lazo walk?
17      A.    **He walked fine, under his own**
18 power.
19      Q.    Did you have any observation
20 about Mr. Lazo's head positioning, was it
21 forward, back, to the side?
22      A.    **It was moving.**
23      Q.    While you were transporting
24 Mr. Lazo, did you notice his posture in

**74**

Link

1  the back seat other than him sliding
2  around?
3       A.    **He was upright, seated.**
4       Q.    Was he clipped in?
5       A.    **Seat belted?**
6       Q.    Yes.
7       A.    **Yes.**
8       Q.    Do you recall if he ever put
9  his head back to rest?
10      A.    **Not that I recall.**
11      Q.    Did you ever request that
12 another officer assist in the transport?
13      A.    **No.**
14      Q.    Is it your responsibility to
15 request that another officer assist in the
16 transport after force is used on a
17 subject?
18      A.    **No.**
19      Q.    Is it your responsibility to
20 ask for assistance in a transport if force
21 is used on a subject and that subject is
22 injured as a result?
23      A.    **No.**
24      Q.    After you arrived in the back

**75**

Link

1  lot of the precinct, what did you do next?
2       A.    **Like I said, I helped him out**
3  of the vehicle.  When he stood, his pants
4  fell to his ankles and out from his boxer
5  shorts fell another large bag of
6  narcotics.
7       Q.    Do you know what those
8  narcotics were?
9       A.    **At the time, no.**
10      Q.    Do you know what they are now?
11      A.    **I believe the bag was cocaine**
12 of some form or another.
13      Q.    Once the bag fell out, what
14 did you do?
15      A.    **I asked Mr. Lazo to completely**
16 step the rest of the way out of his pants
17 and once he was off to the side, I picked
18 up his pants and the drugs.
19      Q.    Were you outside or was it a
20 covered lot?
21      A.    **Outside.**
22      Q.    Was there any other officer
23 around?
24      A.    **Not that I know of.**

**76**

Link

1       Q.    What, if anything, did you do
2  with Mr. Lazo's pants?
3       A.    **I brought them into the**
4  precinct with me.
5       Q.    Where did you bring Mr. Lazo?
6       A.    **Walked up to the rear door of**
7  the precinct.  Officer Tom Parsons was
8  there.  He opened the door for me.  We
9  walked inside.  I stopped briefly to put
10 my gun in the gun locker, and then Officer
11 Parsons and I walked Mr. Lazo back to the
12 detective squad.
13      Q.    What is the detective squad?
14      A.    **It's the room where the**
15 detectives work.
16      Q.    What, if anything, did you do
17 with Mr. Lazo?
18      A.    **I brought him into the**
19 interview room.  I seated him down.  I
20 helped him remove one of his earings.  He
21 removed the other one.  I believe, that is
22 all he had on.  I put his left hand in the
23 handcuff on the desk.  There is another
24 handcuff on the wall that was broken, so I

**77**

Link

1   left his right hand free.
2   Q.   Officer Tom Parsons, is his
3   rank police officer?
4   A.   **Yes.**
5   Q.   What is his duty or
6   responsibility?
7   A.   **Uniform patrol on steady**
8   **midnights.**
9   Q.   Did you make any stops prior
10  to reaching the detective squad room?
11  A.   **No.**
12  Q.   In order to get to the
13  detective squad room, did you have to
14  climb any stairs?
15  A.   **Outside the precinct, there**
16  are maybe three steps going up.
17  Q.   After those three steps --
18        MR. GERMANO:  Withdrawn.
19  Q.   How did Mr. Lazo appear while
20  climbing those three steps?
21  A.   **He walked on his own.**
22  Q.   When you say he walked on his
23  own, did he walk on his own until he
24  reached the detective squad room?

**78**

Link

1   A.   **Yes.**
2   Q.   Where were your hands?
3   A.   **If anything it might have been**
4   on one of his arms, just guiding him
5   through the hallway.
6   Q.   Was Mr. Lazo swaying while he
7   was walking?
8   A.   **No.**
9   Q.   Was his head moving around
10  while he was walking?
11  A.   **Yes.**
12  Q.   How was his head moving?
13  A.   **He was just looking about.  He**
14  looked into the uniform squad room windows
15  as we walked by.
16  Q.   Did he say anything?
17  A.   **No.**
18  Q.   From the time that you arrived
19  at the precinct until you reached the
20  squad room, did you have any conversation
21  with him?
22  A.   **No.**
23  Q.   Did you give him any
24  direction?

**79**

Link

1   A.   **Not that I recall.  I might**
2   have told him to turn one way or the other
3   in the hallway, but that is it.
4   Q.   What about when you saw the
5   bag fall from his boxers?
6   A.   **That was outside.**
7   Q.   Did you have any conversation
8   with him then?
9   A.   **Yes.  I told him to step out**
10  of his pants.
11  Q.   Other than telling him to step
12  out of his pants?
13  A.   **No.**
14  Q.   Did Mr. Lazo say anything to
15  you from the time he stepped out of his
16  pants until the time he reached the
17  detective squad room?
18  A.   **No.**
19  Q.   Once you reached the detective
20  squad room, did you have any conversation
21  with Mr. Lazo?
22  A.   **Probably directed him to take**
23  off his earrings.
24  Q.   He responded, right?

**80**

Link

1   A.   **He took the one off and I**
2   helped him get the other one off, because
3   there was something wrong with the thing
4   on the back.
5   Q.   Did he ask you to help him
6   take the earing off?
7   A.   **Probably not.  He was probably**
8   just taking too long, so I took it off for
9   him.
10  Q.   Do you recall having any
11  conversation with Mr. Lazo?
12  A.   **Nothing specific, no.**
13  Q.   Do you recall hearing him
14  speak to you?
15  A.   **He was still complaining about**
16  being arrested, just muttering. I wasn't
17  paying attention.
18  Q.   Was he muttering in the
19  hallways or just in the detective squad
20  room?
21  A.   **Probably throughout the whole**
22  thing.
23  Q.   When you say he was muttering,
24  can you describe what muttering is?

GONZALEZ -V- COUNTY OF SUFFOLK

**81**

Link

1
2    A.    **Just complaining about being**
3  arrested.  Nothing that I was paying
   attention to.  It was not my arrest.
5    Q.    Was he speaking loudly?
6    A.    **No.**
7    Q.    Was he speaking softly or
8  somewhere in between?
9    A.    **Probably somewhere in between.**
10   Q.    Was his speech high pitched or
11 low?
12   A.    **I don't recall.**
13   Q.    When you reached in to help
14 Mr. Lazo take the earring off, was that
15 his left ear or right ear?
16   A.    **I am not sure which one.  I**
17 just remember they were square
18 checkerboard things.
19   Q.    Did you notice if there were
20 any markings on Mr. Lazo's ear?
21   A.    **Nothing that was apparent to me.**
22   Q.    Being close to take the earing
23 off of Mr. Lazo's ear, did you notice if
24 there was any blood on Mr. Lazo's face,
25 neck, or collar?

**82**

Link

1
2    A.    **No blood that was running.  He**
3  was dirty.  He was sweaty.  He had scuff
4  on his face.  There were red marks that I
5  guess you would normally get from
6  wrestling with somebody, but --
7    Q.    Where did you see dirt?
8    A.    **All over him.**
9    Q.    When you say all over him, do
10 you mean all over his body or all over his
11 face?
12   A.    **Mainly on his back and chest**
13 from apparently rolling around in the
14 grass.
15   Q.    He was shirtless at this time?
16   A.    **Yes.**
17   Q.    You said there was no running
18 blood, was there dry blood?
19   A.    **Just what I would call road**
20 rash or whatever the abrasions was.  I
21 didn't see any lacerations.
22   Q.    Other than the road rash, did
23 you see any other red marks on Mr. Lazo's
24 body or face?
25   A.    **No.  Just what I said.  He had**

**83**

Link

1
2  red marks that you would normally get from
3  wrestling around with somebody.
4    Q.    Where were the red marks?
5    A.    **In various parts.  Nothing**
6  that was from a blow.  He looked like he
7  was in a wrestling match.
8    Q.    Were the red marks from the
9  neck up or from the neck down?
10   A.    **Probably both.  Probably had**
11 some on his arms from where they were
12 struggling, trying to get his arms behind
13 his back.
14   Q.    Were the red marks in the
15 shape of a line, or a circle, or something
16 else?
17   A.    **Not a line, just -- not a**
18 perfect circle either, just a mark.
19   Q.    The red mark on the arm that
20 you saw, what was the shape of the red
21 mark?
22   A.    **Mark as if somebody was**
23 grabbing on to his arm, forcefully trying
24 to wrench it behind his back to get
25 handcuffs on.

**84**

Link

1
2    Q.    Did you see the print of a
3  hand?
4    A.    **No.**
5    Q.    Did you see the print of what
6  could have been a flashlight?
7    A.    **No, that would have showed up**
8  in a straight line.
9    Q.    Approximately, how long was
10 the mark on his arm?
11   A.    **I don't recall.**
12   Q.    Was it more than an inch?
13   A.    **More than likely if I was able**
14 to see it.
15   Q.    More than 5 inches?
16   A.    **I would have to say, no.**
17   Q.    It was between 1 inch and
18 5 inches?
19   A.    **Yes.**
20   Q.    Where else did you notice
21 marks on his body?
22   A.    **That is about it.**
23   Q.    Just on his arm?
24   A.    **No, like I said, he had**
25 splotches on him.  Could have been from

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

85

Link

1
2  him being out of shape and his skin was
3  getting splotchy.
4      Q.   Where on his body did you
5  notice --
6      A.   **Various parts of his body**
7  above his waist because he didn't have a
8  shirt on.  That is why I was able to see.
9      Q.   Can you direct me to where on
10  his body?
11      A.   **No, I cannot.**
12      Q.   Was it on his chest or on his
13  back?
14      A.   **Could have been on his chest**
15  and his back.
16      Q.   Do you recall if you saw more
17  than five marks on his body?
18      A.   **No, I can't.**
19      Q.   Was it more than one mark?
20      A.   **More than likely, yes.**
21      Q.   Was it less than ten marks?
22      A.   **Absolutely.**
23      Q.   It was between one and ten marks?
24      A.   **No, I would say closer to one**
25  and five.

86

Link

1
2      Q.   Between one and five marks?
3      A.   **Yes.**
4      Q.   Did you see any marks on his
5  neck?
6      A.   **No.**
7      Q.   Did you see any marks on his
8  forehead?
9      A.   **Other than the abrasion, no.**
10      Q.   Was there an abrasion on his
11  forehead?
12      A.   **No, just the one on his face.**
13      Q.   My question is, was there any
14  mark of any kind on his forehead?
15      A.   **No.**
16          MR. DUNNE:  Asked and
17          answered this twice before.
18          MR. GERMANO:  He just
19          misspoke.  I was clarifying it.
20      A.   **No, I did not see any other**
21  abrasions.  Whether he was red and
22  splotchy from the struggle, I don't know.
23      Q.   After you placed, after you
24  helped Mr. Lazo remove his earrings, what
25  did you do next?

87

Link

1
2      A.   **I put the earrings on the desk**
3  outside the door with his pants.  I gave
4  Detective Talt the drugs and I left and
5  went to the hospital to check on Officer
6  Judge.
7      Q.   Did you have any conversations
8  or discussions with any other officers
9  besides Tom Parsons when you were at the
10  precinct?
11      A.   **No.**
12      Q.   When was the first time you
13  came in contact with Detective Talt?
14      A.   **In the detective squad room.**
15      Q.   What, if anything, did you say
16  to him?
17      A.   **I just handed over the drugs**
18  and said, I found these.  They were in his
19  pants when they fell out.
20      Q.   What did Detective Talt say to
21  you, if anything?
22      A.   **Nothing that I recall.**
23      Q.   When you left Mr. Lazo who was
24  in the room with him?
25      A.   **Nobody.**

88

Link

1
2      Q.   What time did you leave
3  Mr. Lazo?
4      A.   **I don't know what the specific**
5  time was.  My whole involvement was
6  approximately six minutes.
7      Q.   Six minutes from what point to
8  what point?
9      A.   **From the point I made the**
10  radio transmission that I was going to go
11  help to the point I left the precinct was
12  probably -- actually no.  I got to the
13  precinct six minutes so, probably about 15
14  minutes total, maybe 12.
15      Q.   So from six to nine minutes
16  you were in the precinct?
17      A.   **Give or take, not that long.**
18      Q.   You only spoke to Detective
19  Talt and Officer Parsons, and no one else?
20      A.   **Yes.**
21      Q.   When you left Mr. Lazo in the
22  squad room, who, if anyone, did you tell
23  you were leaving?
24      A.   **I told Detective Talt.  He was**
25  in the room and I was leaving.

89

Link

Q.   Did you direct or have any conversation with Detective Talt about remaining with Mr. Lazo?

A.   No.

Q.   Was Mr. Lazo left alone at any point in time after you left him?

A.   After I left him, I left the building so I could not know if he was alone.

Q.   Did you at any point in time leave Mr. Lazo alone while you were in the building?

A.   No.

Q.   So the first person, the first officer that came into contact with Mr. Lazo after you handcuffed, transported him, was Detective Talt?

A.   The first person to come in contact with him after I put him in whatever interview room that is, was Detective Talt.  From the transport to that point Officer Parsons was with me.

Q.   Did you have any other conversations with Detective Talt?

90

Link

A.   No.

Q.   Did you tell Detective Talt that Mr. Lazo had an abrasion on his face?

A.   No.

Q.   Did you tell Detective Talt that you noticed he had red marks on his body?

A.   No.

Q.   Did you tell any supervisor at headquarters that Mr. Lazo had red marks on his body?

A.   No.

Q.   Did anyone direct you to --

MR. GERMANO:  Withdrawn.

Q.   Where did you go after you left the interview room?

A.   I returned to my vehicle, got my gun first, got in my car, and drove to Southside.

Q.   Did anyone direct you to go to Southside?

A.   No.

Q.   How did you know to go to Southside?

91

Link

A.   Because Officer Judge was in the hospital and I was going to check on him.

Q.   How did you know Officer Judge was in the hospital?

A.   I believe I heard them talking about it.

Q.   When you heard them talking about it, where were you?

A.   Probably right before I left, maybe.  I am not sure.

Q.   Did you see -- before you left where?

A.   The scene.

Q.   Did you have any radio or telephone contact with either Officer Judge, Detective Talt, Sergeant Newton or --

A.   No, I did not have any cell phone contact with them.  I don't have their numbers so.

Q.   Let me just finish the question because I misspoke.

Sergeant Scimone, or Detective

92

Link

Newton?

A.   No.

Q.   Approximately, what time did you leave to go to Southside?

A.   I don't know the exact times.  I was only in the precinct a few minutes and I immediately went down there.

Q.   Do you recall what time you arrive at Southside?

A.   I am sure it probably took me four, five minutes.

Q.   Do you have it documented in your memo book?

A.   I have not looked at my memo book in years, so maybe.

Q.   What did you do when you arrived at Southside?

A.   I found Officer Judge in the ER and went to check on him.

Q.   What conversation, if any, did you have with Officer Judge?

A.   Basically asked him how he was.  I don't remember what he injured.  I think it was his hand.

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

### 93

Link

1
2     Q.     Did you have any conversation
3  about Kenny Lazo at the hospital with
4  Officer Judge?
5     A.     No.
6     Q.     Did Officer Judge tell you
7  that he hit Mr. Lazo with a flashlight?
8     A.     No.
9     Q.     Did Officer Judge tell you
10 that someone else hit Kenny Lazo with a
11 flashlight?
12    A.     No.
13    Q.     Did you ask about the struggle
14 while you were with Officer Judge in the
15 hospital?
16    A.     He just described it as a very
17 intense struggle with the three of them
18 trying to control him and keep him out of
19 the roadway and get the handcuffs on him.
20 Nothing specific.  Nothing specific about
21 any force being used.
22    Q.     How long did you remain at
23 Southside for?
24    A.     I was there for a while, maybe
25 an hour.

### 94

Link

1
2     Q.     Did you have any contact with
3  any other officer at Southside, other than
4  Officer Judge?
5     A.     Not that I recall.
6     Q.     After an hour, what did you do?
7     A.     Well, it was at Southside when
8  I became aware of what happened at the
9  precinct and I heard when they brought Mr.
10 Lazo in.  I had no idea any of that was
11 going on.
12    Q.     How did you learn what was
13 going on at the precinct?
14    A.     I was told that they brought
15 in an unresponsive prisoner from the
16 precinct into the ER and then I was
17 informed that it was Mr. Lazo.
18    Q.     Did you see Mr. Lazo being
19 brought into the ER?
20    A.     I think he was already in the
21 trauma room by the time I got over there.
22    Q.     Were you not in the ER room at
23 that time?
24    A.     Yes.
25    Q.     You were?

### 95

Link

1
2     A.     But you can't see the trauma
3  room from every point in the emergency
4  room.
5     Q.     Did you see Mr. Lazo being
6  brought through the ER into the trauma
7  room?
8     A.     No, I was not near the entrance.
9     Q.     Did you go to the trauma room?
10    A.     I might have went to the area
11 near it, but I can't get into it.
12    Q.     Did you have any conversations
13 with anybody?
14    A.     No, I don't remember any.
15    Q.     Were you surprised to learn
16 that it was Mr. Lazo that was brought to
17 the trauma room?
18           MR. DUNNE:  Objection to
19           the form, but go ahead and
20           answer it.
21    A.     Yes, I was.
22    Q.     How long did you remain
23 outside of the trauma room for?
24    A.     Just for a few minutes then I
25 got out of the way.  It was kind of hectic

### 96

Link

1
2  over there.
3     Q.     Did you see any other officers
4  around?
5     A.     No.
6     Q.     What did you do next?
7     A.     Went back over to Officer Judge.
8     Q.     Did you tell Officer Judge who
9  was brought to the trauma room?
10    A.     I believe so or somebody made
11 him aware of it and he was the one who
12 told me.  I am not sure how.
13    Q.     What did you do next?
14    A.     We eventually left and went
15 back to the precinct.
16    Q.     Did you notice if homicide
17 arrived?
18    A.     First time I noticed homicide
19 was when I was sitting in the precinct.
20    Q.     What time did you arrive at
21 the precinct after Southside?
22    A.     I am not sure.  I would have
23 to check the CAD stamps on my radio.
24    Q.     Your shift, your tour ended
25 11:00 o'clock that night?

## 97

Link

1
2     A.     Yes.
3     Q.     That was the scheduled ending,
4  correct?
5     A.     Yes.
6     Q.     Would you say you arrived
7  before 11:00?
8     A.     Yes, I believe so.
9     Q.     When you say you were sitting
10 in the precinct, when you first noticed
11 homicide, what were you doing?
12    A.     Waiting to see what forms
13 needed to be filled out.
14    Q.     Had you filled out any
15 paperwork up until that point?
16    A.     No.
17    Q.     How long were you waiting for?
18    A.     I don't remember. A while.
19    Q.     More than a half an hour?
20    A.     Yes.
21    Q.     More than an hour?
22    A.     Probably.
23    Q.     More than an hour and a half?
24    A.     I doubt it, but maybe.
25    Q.     Who instructed you to fill out

## 98

Link

1  a form?
2     A.     I think the first homicide
3  person I talked to might have been
4  Detective Sergeant Fandry. I told him
5  what my limited involvement was and then
6  he asked me to do a sup.
7     Q.     Did you give an accurate
8  report to Detective Sergeant Fandry?
9     A.     Yes.
10    Q.     How long did you speak to
11 Detective Sergeant Fandry?
12    A.     It only took me about five or
13 ten minutes to tell my side of it, so not
14 that long.
15    Q.     But it was an accurate
16 representation of what your involvement
17 was, correct?
18    A.     Yes.
19    Q.     After you spoke to Detective
20 Sergeant Fandry, what did you do next?
21    A.     Waited around the precinct
22 until everything was over.
23    Q.     Did you fill out the
24 supplementary report at that point in

## 99

Link

1
2  time?
3     A.     Yes.
4     Q.     Did your supplementary report
5  get reviewed by anybody?
6     A.     No.
7     Q.     How long did it take to fill
8  out your sup report?
9     A.     I don't recall.
10    Q.     Did anybody assist you in
11 filling out your sup report?
12    A.     No.
13    Q.     Did you have any conversations
14 with anybody while you were filling out
15 the sup report?
16    A.     I doubt it.
17    Q.     Where were you filling it out?
18    A.     What is called the crime
19 control office. It is a plain clothes
20 unit.
21    Q.     Was any other officer in that
22 office while you were filling out sup
23 report?
24    A.     Probably Officer Judge,
25 Officer Friedrick, Officer Zurl, anybody

## 100

Link

1
2  else who was waiting to speak to homicide.
3  We were all sitting in the same office.
4     Q.     Did you have any conversations
5  with Judge while you were in the crime
6  control office?
7     A.     I am sure we were talking but
8  not specifically about this.
9     Q.     Did Officer Judge review what
10 you wrote?
11    A.     No.
12    Q.     Did you review what Officer
13 Judge wrote in his sup report?
14    A.     I probably read it. I would
15 not consider it reviewing, but yes.
16    Q.     For what reason did you read
17 Officer Judge's report?
18    A.     He asked me to.
19    Q.     Did he ask to read yours?
20    A.     Not specifically that I know of.
21    Q.     Did you let him read yours?
22    A.     Yes.
23    Q.     Did the sup report get signed
24 off on by a supervisor?
25    A.     Yes, they have to be.

GONZALEZ -V- COUNTY OF SUFFOLK                                                                JOSEPH A. LINK

### 101

Link

1
2    Q.    Who signed off on yours?
3    A.    I am not sure.  Either -- I
4    would have to guess, if I did, it would be
5    either Fandry or Koerber.
6          MR. GERMANO:  Mark this
7          as Exhibit 4.
8          (Document was marked as
9          Plaintiff's Exhibit 4 for
10         identification, as of this
11         date.)
12   Q.    Sir, I am placing before you
13   what has been marked as Plaintiff's
14   Exhibit 4.  Take a moment and read that
15   document.
16   A.    (Witness complying).
17   Q.    Do you recognize the document?
18   A.    Yes.
19   Q.    What do you recognize it to be?
20   A.    My supplementary report.
21   Q.    Is that your signature on the
22   bottom left-hand side?
23   A.    Yes.
24   Q.    What was the date of this report?
25   A.    April 12, 2008.

### 102

Link

1
2    Q.    It says date and occurrence,
3    is there a time there?
4    A.    20:29.
5    Q.    What time does that represent,
6    is that the time you filled out the report
7    or something else?
8    A.    That is about the time I got
9    involved.
10   Q.    On the bottom right-hand side,
11   is there a supervisor's signature there?
12   A.    No.
13   Q.    Is this the copy of the
14   supplementary report that you are familiar
15   with?
16   A.    Yes.
17   Q.    Do you know if a supervisor
18   signed off on this document?
19   A.    Not my responsibility, so no.
20   Q.    What supervisor did you hand
21   this document to?
22   A.    I believe it was the homicide
23   guys so either Portella or Fandry.
24   Q.    After you spoke to the
25   homicide guys Portella or Fandry on April

### 103

Link

1
2    12, 2008 or in the early morning of
3    April 13, 2008, did you meet with homicide
4    at any other time?
5    A.    I don't think so.
6    Q.    Were you ever contacted by
7    Internal Affairs?
8    A.    Yes.
9    Q.    When were you contacted by
10   Internal Affairs?
11   A.    Shortly thereafter, when a
12   notice of claim was filed probably.
13   Q.    Who contacted you from
14   Internal Affairs?
15   A.    I believe Captain Capalino.
16   Q.    In terms of time, was that a
17   month after the incident?
18   A.    I don't recall.
19   Q.    Do you recall if it was before
20   the summer?
21   A.    No.
22   Q.    Do you recall if it was before
23   the grand jury?
24   A.    Yes, because I believe the
25   grand jury was in the fall.  So it was

### 104

Link

1
2    before the grand jury, from what I
3    remember.
4    Q.    How did Captain Capalino
5    contact you?
6    A.    He sent me a message
7    requesting a 42 with detailed questions.
8    Q.    Did you speak to Capalino?
9    A.    I don't remember speaking to
10   him personally.
11   Q.    At any time, did you have any
12   conversation with Capalino about your
13   internal correspondence or the
14   circumstances from April 12, 2008?
15   A.    No conversations.  I think it
16   was just on the internal correspondence.
17   That was it.
18   Q.    When he sent you a message was
19   that a letter or an e-mail or something
20   else?
21   A.    A letter, internal correspondenc(
22   Q.    When did you complete the
23   internal correspondence?
24   A.    Within days of getting his
25   request.

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

**105**

Link

1
2    **Q.**   Is it your testimony that you
3    completed the internal correspondence
4    before the grand jury?
5    **A.**   **I thought I did.  I am not sure.**
6    **Q.**   Were you ever contacted by
7    anyone from the district attorney's office?
8    **A.**   **Mr. Collins.**
9    **Q.**   Who is Mr. Collins?
10   **A.**   **Prosecutor.**
11   **Q.**   When did he contact you?
12   **A.**   **Shortly before the grand jury.**
13   **Q.**   How did he contact you?
14   **A.**   **I got a notification to call**
15   him or see him.
16   **Q.**   Do you recall when it was?
17   **A.**   **I don't know.**
18   **Q.**   Was it in the summer?
19   **A.**   **I don't know.**
20   **Q.**   Was it a week before the grand
21   jury or more?
22   **A.**   **I don't know.**
23   **Q.**   How many times did you meet
24   with Mr. Collins?
25   **A.**   **Just once.**

**106**

Link

1
2    **Q.**   In total?
3    **A.**   **Yes.  He just asked me what**
4    happened and told me I would be a witness
5    or whatever, whatever it was.
6    **Q.**   Was anyone else present when
7    you met with Mr. Collins?
8    **A.**   **No.**
9    **Q.**   Did you ever speak with
10   Mr. Collins on the telephone?
11   **A.**   **No.**
12   **Q.**   Did you ever supply Mr.
13   Collins with any documents or evidence?
14   **A.**   **He had the copies of that already.**
15   **Q.**   Did you personally provide him
16   with anything?
17   **A.**   **No.**
18   **Q.**   How long did you meet with him
19   for?
20   **A.**   **Probably about half an hour.**
21   **Q.**   Was it a question and answer
22   session, similar to this?
23   **A.**   **No.  It's just basically, what**
24   happened.  He asked questions about what I
25   had said that I cleared up.  I guess he

**107**

Link

1    didn't understand what I was saying and
2    that was it.
3    **Q.**   What did you clear up for him?
4    **A.**   **Whatever he didn't understand.**
5    I don't remember.  I narratively laid out
6    what happened and that was it.
7    **Q.**   Did he prepare you before --
8         MR. GERMANO:  Withdrawn.
9    **Q.**   You were a witness for the
10   grand jury, right?
11   **A.**   **I was a witness.**
12   **Q.**   Did Mr. Collins prepare you
13   for the grand jury?
14   **A.**   **No.**
15   **Q.**   Did anybody talk to you about
16   testifying before the grand jury?
17   **A.**   **No.**
18   **Q.**   Did you receive a notice of
19   something in -- how did you know that you
20   were going to --
21   **A.**   **We got a court notification.**
22   **Q.**   How long were you at the
23   courthouse for?
24   **A.**   **I was there a while, just**
25

**108**

Link

1    waiting around and I think I finally went
2    on in the afternoon.  I was not on that
3    long.
4    **Q.**   Did you see any other of your
5    colleagues there?
6    **A.**   **I might have saw Detective**
7    Talt.  That was it.
8    **Q.**   Did you speak to Detective
9    Talt about the grand jury process?
10   **A.**   **No.**
11   **Q.**   Do you know if Detective Talt
12   gave testimony?
13   **A.**   **I believe he was on before me.**
14   **Q.**   Did you talk to him about the
15   testimony he gave?
16   **A.**   **No.**
17   **Q.**   Did you ask him?
18   **A.**   **No.**
19   **Q.**   Did he volunteer to you?
20   **A.**   **No.**
21   **Q.**   Did you see Mr. Collins that
22   morning?
23   **A.**   **In the grand jury room.**
24   **Q.**   The first time you saw Mr.

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

109

Link

1  Collins from the time you met him for a
2  half an hour, until that day, was in the
3  grand jury room?
4      **A.    Yes, when they called me in.**
5      **Q.**    How long were you before the
6  grand jury?
7      **A.    Maybe five minutes.**
8      **Q.**    Did Mr. Collins ask you questions?
9      **A.    He asked me to say what**
10 happened during my involvement.  I did.  I
11 believe there might have been one question
12 from the grand jury about, I don't
13 remember what, and that was the end of it.
14     **Q.**    Mr. Collins told you to give
15 another narrative?
16     **A.    Yes.**
17     **Q.**    Did he ask you any questions?
18     **A.    Not that I recall.  I have to**
19 look at the transcript.
20     **Q.**    Did he present any documents?
21     **A.    I used a photograph to**
22 indicate on the parkway where we were and
23 I believe maybe pictures of the earrings.
24 That was about it.

110

Link

1      **Q.**    How many pictures do you
2  recall seeing of the earrings?
3      **A.    Just the one he had.**
4      **Q.**    How did it come about that you
5  were asked to discuss the earrings?
6      **A.    Because I stated that I**
7  removed one of the earrings.
8      **Q.**    Did Mr. Collins question you
9  about that?
10     **A.    No.  I don't know.  It was**
11 brief.  I don't remember.  It was very
12 quick.  I gave a narrative.  Someone from
13 the gallery asked something, and it was
14 something to do with the earring.  That
15 was it.
16     **Q.**    Who presented the photograph?
17     **A.    I believe he did.  I didn't**
18 have it.
19     **Q.**    During your narrative in the
20 grand jury, were you asked if you saw any
21 abrasions or marks on Mr. Lazo?
22     **A.    Not that I remember.**
23     **Q.**    Do you recall, in the grand
24 jury, if you testified that you saw marks

111

Link

1  and abrasions on Mr. Lazo's body?
2      **A.    Not that I remember.**
3      **Q.**    After the grand jury, did you
4  have any further communications with the
5  District Attorney's office?
6      **A.    No.**
7      **Q.**    After the grand jury, did you
8  have any further communications with
9  Internal Affairs?
10     **A.    No.**
11     **Q.**    After the grand jury, did you
12 have any further communications with
13 homicide?
14     **A.    No.**
15     **Q.**    When you were driving Mr.
16 Lazo, when you were transporting Mr. Lazo,
17 and when you walked him through the
18 precinct through the detective squad room,
19 did you notice Mr. Lazo's breathing style,
20 pattern?
21     **A.    No.**
22     **Q.**    Did you, at any point in time,
23 check Mr. Lazo's pulse?
24     **A.    I assume since he was walking**

112

Link

1  he had one, so I didn't feel the need to.
2          MR. GERMANO:  I have no
3          further questions.
4  EXAMINATION BY
5  MR. DUNNE:
6      **Q.**    Officer Link, at any point in
7  time during your entire contact with Mr.
8  Lazo, from the road side until you left
9  him at the precinct, did he ever ask you
10 for medical attention?
11     **A.    No.**
12         MR. DUNNE:  Thank you.
13         (Time Noted:  2:36 p.m.)

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

113

1       Link
2       A C K N O W L E D G M E N T
3
4    STATE OF NEW YORK   )
                         :ss
5    COUNTY OF          )
6
7        I, JOSEPH A. LINK, hereby certify
8    that I have read the transcript of my
9    testimony taken under oath in my deposition of
10   May 19, 2011; that the transcript is a true,
11   complete and correct record of my testimony,
12   and that the answers on the record as given by
13   me are true and correct.
14
15
16       _____
17          JOSEPH A. LINK
18
19
20   Signed and subscribed to before
     me, this        day
21   of          , 2011.
22
23   _____
24   Notary Public, State of New York

125

1
2       C E R T I F I C A T E
3    STATE OF NEW YORK   )
4                ) ss.:
5    COUNTY OF NASSAU    )
6
7        I, JUDY GROB, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10       That JOSEPH A. LINK, the witness
11   whose deposition is hereinbefore set
12   forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by such witness.
15       I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage; and that I
18   am in no way interested in the outcome
19   of this matter.
20       IN WITNESS WHEREOF, I have
21   hereunto set my hand this 6th day of
22   June, 2011.
23
24       ----------------------
25          JUDY GROB

114

1
2    ------------------I N D E X------------------
3    WITNESS      EXAMINATION BY      PAGE
4    JOSEPH A. LINK    MR. GERMANO      5
5            MR. DUNNE      112
6
7    -------------DOCUMENT REQUESTS--------------
8    PAGE   29 Production of Officer Link's memo
9           book
10
11   ------------------EXHIBITS------------------
12   PLAINTIFF'S            FOR I.D.
13   1    Photograph         32
14   2    Photographs        37
15   3    Map               45
16   4    Document          101
17
18       (Counsel retained exhibits.)
19
20
21
23
24
25

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINK

**$**

**$10,000** [1] - 20:6

**'**

**'90** [1] - 14:12
**'90s** [1] - 8:2
**'94** [1] - 15:15

**1**

**1** [8] - 32:10, 32:12, 32:16, 34:6, 39:5, 69:13, 84:17, 113:13
**1-10** [2] - 1:15, 2:15
**10** [1] - 10:7
**100** [2] - 1:19, 3:11
**101** [1] - 113:16
**112** [1] - 113:5
**11550** [1] - 3:6
**11702** [1] - 1:24
**11706** [2] - 5:13, 6:12
**11747** [1] - 3:19
**11:00** [3] - 29:8, 96:25, 97:7
**11:18** [1] - 1:21
**12** [15] - 12:19, 28:24, 29:4, 29:7, 31:5, 31:25, 38:25, 39:20, 40:5, 41:13, 41:18, 88:14, 101:25, 103:2, 104:14
**124** [1] - 1:23
**13** [2] - 29:5, 103:3
**15** [1] - 88:13
**1630** [2] - 5:12, 6:11
**17** [1] - 14:16
**19** [1] - 1:21
**1979** [2] - 9:16, 9:21
**1986** [2] - 10:7, 11:11
**1987** [2] - 7:3, 9:7, 12:11
**1989** [1] - 8:12
**1990** [1] - 18:17
**1993** [1] - 15:15

**2**

**2** [4] - 37:10, 37:12, 37:16, 113:14
**2002** [1] - 41:12
**2005** [2] - 22:23, 35:16
**2006** [1] - 22:24
**2008** [16] - 28:24, 29:5, 29:7, 31:5, 31:25, 39:2, 39:20, 40:5, 41:13, 41:18, 47:7, 101:25, 103:2,

103:3, 104:14
**2011** [2] - 1:21, 114:22
**202** [1] - 1:23
**20:29** [1] - 102:4
**26** [2] - 70:24, 70:25
**29** [1] - 113:8
**2:36** [1] - 112:14

**3**

**3** [5] - 44:22, 44:24, 45:4, 46:13, 113:15
**314** [4] - 40:23, 40:25, 70:24
**32** [2] - 70:24, 113:13
**37** [1] - 113:14
**3:00** [1] - 29:8

**4**

**4** [5] - 54:23, 101:7, 101:9, 101:14, 113:16
**41** [1] - 46:10
**42** [6] - 27:22, 28:2, 28:3, 28:4, 46:10, 104:7
**45** [1] - 113:15

**5**

**5** [3] - 84:15, 84:18, 113:4
**516-938-4000** [1] - 1:24
**556** [1] - 3:5

**6**

**6** [2] - 53:25, 54:7
**6th** [1] - 114:21

**8**

**8** [1] - 50:17
**8:20** [2] - 42:9, 47:19
**8:30** [2] - 42:9, 47:19

**9**

**999** [1] - 3:18

**A**

**a.m** [1] - 1:21
**able** [2] - 10:24, 84:13, 85:8
**abrasion** [20] - 32:5, 32:20, 32:22, 33:5, 34:2, 34:4, 34:9, 34:25, 39:5, 64:16,

64:22, 65:18, 68:11, 68:21, 69:14, 70:11, 71:9, 86:9, 86:10, 90:4
**abrasions** [6] - 36:3, 64:6, 82:20, 86:21, 110:22, 111:2
**abreast** [3] - 48:24, 49:3, 49:5
**Absolutely** [1] - 85:22
**abuse** [1] - 25:25
**academy** [2] - 7:21, 27:2
**accident** [1] - 14:3
**accurate** [2] - 98:8, 98:16
**accurately** [1] - 6:2
**acquiesce** [1] - 61:21
**action** [2] - 19:25, 114:17
**actions** [4] - 21:14, 21:17, 21:19, 23:13
**active** [1] - 25:10
**address** [2] - 5:11, 6:10
**adjacent** [1] - 62:25
**administer** [1] - 4:16
**administrators** [2] - 1:4, 2:4
**Aerospace** [1] - 11:22
**Affairs** [8] - 15:2, 15:11, 16:25, 25:5, 103:7, 103:10, 103:14, 111:10
**afternoon** [1] - 108:3
**ago** [1] - 22:23
**AGREED** [3] - 4:3, 4:9, 4:14
**ahead** [4] - 13:18, 68:4, 69:20, 95:19
**aircraft** [2] - 10:17, 10:22
**allegations** [4] - 5:20, 16:19, 21:4, 25:22
**allege** [1] - 22:2
**alleged** [1] - 19:5
**allegedly** [1] - 19:11
**Almedina** [1] - 25:14
**alone** [3] - 89:6, 89:10, 89:12
**Alongside** [1] - 62:13
**alongside** [2] - 49:7, 49:10
**ALSO** [1] - 3:15
**AND** [5] - 1:14, 2:14, 4:2, 4:8, 4:13

**ankles** [1] - 75:5
**answer** [8] - 6:5, 13:18, 33:11, 33:17, 68:4, 69:20, 95:20, 106:21
**answered** [2] - 66:4, 66:5, 86:17
**apparent** [3] - 36:21, 55:12, 81:21
**appear** [8] - 35:7, 36:9, 37:5, 37:22, 38:9, 38:21, 56:3, 77:20
**appeared** [1] - 65:21
**April** [17] - 28:24, 29:4, 29:5, 29:7, 31:5, 31:25, 38:25, 39:20, 40:5, 41:13, 41:18, 42:14, 47:6, 101:25, 102:25, 103:3, 104:14
**area** [10] - 8:23, 32:22, 36:6, 41:2, 41:4, 46:16, 53:6, 54:12, 63:2, 95:10
**areas** [1] - 27:8
**arguing** [1] - 17:13
**arm** [7] - 52:21, 60:13, 60:15, 83:19, 83:23, 84:10, 84:23
**arms** [3] - 78:5, 83:11, 83:12
**arrest** [8] - 16:5, 19:3, 21:2, 21:13, 23:19, 24:2, 25:20, 81:4
**arrested** [6] - 12:16, 12:18, 58:13, 72:16, 80:17, 81:3
**arrests** [1] - 16:17
**arrive** [3] - 47:14, 92:10, 96:20
**arrived** [10] - 48:3, 48:13, 57:21, 65:10, 72:6, 74:25, 78:19, 92:18, 96:17, 97:6
**aspects** [1] - 27:4
**assessment** [1] - 66:8
**assigned** [2] - 14:15, 40:22
**assignments** [1] - 28:17
**assist** [5] - 41:21, 61:24, 74:13, 74:16, 99:10
**Assist** [1] - 62:2
**assistance** [2] - 14:2, 74:21
**assisted** [1] - 72:10
**ASST** [2] - 1:13, 2:13
**assume** [2] - 57:22,

**111:25**
**assumed** [3] - 65:16, 65:17, 68:23
**Assuming** [1] - 68:20
**assumption** [1] - 65:23
**atlas** [1] - 45:5
**attend** [1] - 9:17
**attending** [1] - 9:23
**attention** [10] - 65:6, 65:9, 67:19, 68:8, 68:25, 69:5, 71:12, 80:18, 81:4, 112:11
**ATTORNEY** [4] - 1:12, 1:13, 2:12, 2:13
**Attorney** [4] - 1:16, 1:17, 2:16, 2:17
**attorney's** [1] - 105:7
**Attorney's** [1] - 111:6
**attorneys** [1] - 4:3
**Attorneys** [3] - 3:4, 3:10, 3:17
**authorized** [1] - 4:16
**Avenue** [4] - 5:12, 6:12, 71:18, 71:19
**aware** [7] - 14:20, 14:23, 14:24, 31:4, 47:10, 94:8, 96:11

**B**

**B-L-A-C-K-L-I-D-G-E** [1] - 23:23
**Babylon** [1] - 1:24
**background** [2] - 35:11, 35:25
**bad** [1] - 17:14
**bag** [9] - 66:24, 67:6, 67:9, 70:15, 70:16, 75:6, 75:12, 75:14, 79:6
**Basic** [1] - 11:2
**basis** [1] - 33:10
**Bay** [8] - 41:5, 41:6, 42:25, 43:15, 43:18, 43:23, 44:16, 45:11
**Bayshore** [2] - 5:12, 6:12
**beat** [1] - 19:8
**beaten** [1] - 21:5
**beating** [1] - 19:12
**became** [1] - 94:8
**behind** [14] - 49:2, 49:12, 49:13, 49:16, 49:18, 62:9, 62:11, 66:17, 66:24, 83:12, 83:24
**Behind** [1] - 49:17
**below** [2] - 46:19,

114



70:7
**belt** [2] - 66:24, 67:8
**belted** [1] - 74:6
**bending** [1] - 50:9
**best** [4] - 13:5, 13:19, 33:17, 68:5
**between** [7] - 4:3, 54:8, 54:21, 81:8, 81:9, 84:17, 85:23
**Between** [1] - 86:2
**BILLY** [1] - 3:24
**Billy** [1] - 66:18
**BJ** [2] - 17:14, 17:18
**black** [1] - 53:2
**Blacklidge** [3] - 23:17, 23:23, 25:3
**bleeding** [2] - 34:17, 69:8
**blood** [7] - 36:9, 36:10, 81:24, 82:2, 82:18, 114:17
**blow** [1] - 83:6
**blue** [3] - 48:11, 50:4, 51:13
**body** [11] - 51:14, 82:10, 82:24, 84:21, 85:4, 85:6, 85:10, 85:17, 90:8, 90:12, 111:2
**bone** [3] - 32:6, 32:21, 70:12
**book** [11] - 27:23, 28:8, 28:9, 28:13, 28:16, 28:21, 28:23, 29:4, 92:14, 92:16, 113:9
**boot** [1] - 10:14
**bottom** [2] - 101:22, 102:10
**Boulevard** [1] - 3:5
**boxer** [1] - 75:5
**boxers** [1] - 79:6
**break** [2] - 6:4, 62:17
**breathing** [5] - 50:9, 55:11, 55:22, 69:8, 111:20
**BREWINGTON** [1] - 3:3
**Brewington** [1] - 5:16
**brief** [1] - 110:12
**briefly** [2] - 11:19, 76:10
**Brightwaters** [1] - 41:5
**bring** [5] - 67:23, 68:8, 69:4, 69:9, 76:6
**broken** [1] - 76:25
**brought** [11] - 18:14, 61:21, 62:23, 76:4, 76:19, 94:9, 94:14,

94:19, 95:6, 95:16, 96:9
**brown** [2] - 38:11, 38:12
**bruise** [8] - 36:18, 36:19, 36:21, 37:8, 38:22, 69:13, 69:23, 69:24
**Brukaleary** [1] - 30:13
**buckle** [2] - 66:25, 67:8
**builder** [1] - 11:21
**building** [2] - 89:9, 89:13
**bumper** [2] - 49:23, 49:24
**Bureau** [2] - 15:2, 15:11
**business** [2] - 6:10, 31:12
**butt** [3] - 60:3, 60:4, 60:7
**BY** [6] - 3:7, 3:13, 3:20, 5:6, 112:5, 113:3

---

**C**

**C-E-D-E-N-O** [1] - 20:22
**C1** [1] - 45:7
**CAD** [2] - 47:21, 96:23
**Cadillac** [5] - 48:9, 48:10, 50:4, 51:13, 51:23
**California** [3] - 10:15, 10:16, 10:17
**cameras** [3] - 47:4, 47:7, 47:11
**camp** [1] - 10:14
**cannot** [1] - 85:11
**capacities** [2] - 1:16, 2:16
**capacity** [17] - 1:8, 1:9, 1:10, 1:10, 1:11, 1:12, 1:13, 1:14, 2:8, 2:9, 2:10, 2:10, 2:11, 2:12, 2:13, 2:14, 6:22
**Capalino** [4] - 103:15, 104:4, 104:8, 104:12
**Captain** [2] - 103:15, 104:4
**car** [39] - 7:25, 16:23, 17:6, 19:14, 24:19, 40:24, 48:18, 48:19, 48:25, 49:2, 49:4, 49:9, 49:10, 49:12, 49:13, 49:14, 50:3,

50:20, 51:16, 51:18, 52:12, 52:17, 53:20, 59:16, 61:14, 61:22, 61:25, 62:8, 62:19, 62:21, 62:22, 63:21, 64:8, 65:5, 67:2, 73:17, 90:19
**care** [2] - 31:7, 31:10
**career** [2] - 16:4, 31:13
**carriers** [1] - 10:18
**carry** [4] - 22:8, 28:12, 28:21, 28:23
**cars** [2] - 28:18, 50:12
**Cartas** [1] - 30:12
**case** [3] - 20:4, 52:20, 62:17
**Catalina** [1] - 25:20
**Cedeno** [3] - 20:22, 21:8, 23:11
**cell** [1] - 91:20
**central** [1] - 1:20
**certain** [1] - 8:22
**certification** [1] - 4:6
**certify** [2] - 114:9, 114:15
**change** [1] - 41:8
**changed** [1] - 60:5
**charge** [1] - 13:4
**charged** [1] - 12:20
**charges** [1] - 12:22
**check** [5] - 87:5, 91:3, 92:20, 96:23, 111:24
**checked** [2] - 66:19, 66:22
**checkerboard** [1] - 81:18
**cheek** [7] - 32:6, 32:21, 64:17, 64:18, 64:20, 70:12
**cheekbone** [1] - 33:2
**chest** [4] - 52:10, 82:12, 85:12, 85:14
**China** [1] - 10:16
**Christine** [1] - 22:18
**CHRISTINE** [1] - 3:9
**CHRISTOPHER** [3] - 1:11, 2:11, 3:23
**circle** [3] - 36:17, 83:15, 83:18
**circles** [1] - 36:13
**circumstances** [1] - 104:14
**city** [2] - 9:2, 15:8
**City** [9] - 8:7, 8:9, 8:15, 9:5, 9:9, 12:7, 12:10, 13:10, 15:2
**civilian** [2] - 13:11, 14:22

**claim** [4] - 13:23, 18:6, 24:8, 103:12
**claimed** [5] - 21:5, 22:5, 22:6, 24:2, 26:2
**claims** [1] - 13:17
**clarifying** [1] - 86:19
**clear** [1] - 107:4
**cleared** [1] - 106:25
**climb** [1] - 77:15
**climbing** [1] - 77:21
**clipped** [1] - 74:5
**close** [3] - 16:13, 48:21, 81:22
**closer** [1] - 85:24
**closest** [4] - 48:23, 52:21, 60:17, 60:19
**closet** [1] - 52:11
**clothes** [3] - 55:11, 55:21, 99:19
**co** [2] - 1:4, 2:4
**co-administrators** [2] - 1:4, 2:4
**cocaine** [1] - 75:12
**collar** [1] - 81:25
**colleagues** [1] - 108:6
**college** [3] - 9:17, 11:2, 11:4
**COLLINS** [2] - 1:14, 2:14
**Collins** [12] - 105:8, 105:9, 105:24, 106:7, 106:10, 106:13, 107:13, 108:22, 109:2, 109:9, 109:15, 110:9
**color** [1] - 48:10
**coming** [2] - 30:7, 48:5
**COMMISSIONER** [2] - 1:7, 2:7
**communications** [4] - 33:6, 111:5, 111:9, 111:13
**Community** [2] - 9:18, 9:23
**company** [1] - 11:18
**competitive** [3] - 7:2, 7:5, 9:5
**complainant** [2] - 18:12, 18:13
**complaining** [6] - 56:6, 56:9, 58:13, 72:15, 80:16, 81:2
**complaint** [28] - 5:20, 13:11, 13:24, 14:9, 14:22, 15:11, 15:19, 15:23, 16:2, 16:21, 18:22, 18:25, 19:5, 19:10, 20:9, 20:24, 21:16, 22:2,

23:9, 23:13, 23:17, 23:20, 23:25, 24:12, 25:4, 25:17, 26:14, 27:18
**complaints** [7] - 14:21, 14:25, 15:17, 16:3, 16:9, 25:5, 25:8
**complete** [1] - 104:22
**completed** [1] - 105:3
**completely** [1] - 75:16
**complying)** [1] - 101:16
**computer** [4] - 17:6, 17:8, 17:19, 17:21
**concern** [1] - 60:7
**concerning** [5] - 5:19, 16:19, 25:6, 26:22, 30:5
**condition** [1] - 33:8
**conditions** [1] - 28:18
**conduct** [5] - 16:19, 17:17, 17:22, 21:14, 25:6
**consider** [1] - 100:15
**considered** [1] - 43:19
**contact** [19] - 21:7, 21:11, 38:3, 38:13, 38:25, 39:21, 41:18, 56:23, 69:19, 87:13, 89:16, 89:20, 91:17, 91:21, 94:2, 104:5, 105:11, 105:13, 112:8
**contacted** [4] - 103:6, 103:9, 103:13, 105:6
**continue** [1] - 45:20
**Continued** [1] - 1:22
**contraption** [1] - 38:18
**control** [3] - 93:18, 99:19, 100:6
**conversation** [14] - 29:18, 30:4, 30:14, 57:11, 58:5, 61:10, 78:21, 79:8, 79:21, 80:12, 89:3, 92:21, 93:2, 104:12
**conversations** [9] - 30:15, 53:12, 58:6, 87:7, 89:25, 95:12, 99:13, 100:4, 104:15
**convicted** [1] - 13:6
**COPE** [8] - 48:7, 48:8, 48:25, 49:12, 49:16, 49:18, 49:22, 49:23

copies [1] - 106:14
copy [1] - 102:13
correct [10] - 33:3,
34:5, 35:22, 46:10,
57:12, 63:18, 64:11,
64:17, 97:4, 98:18
Correct [4] - 33:4,
45:22, 46:8, 46:11
correspondence [6]
- 28:6, 104:13,
104:16, 104:21,
104:23, 105:3
Counsel [1] - 113:18
counseling [2] -
31:19, 31:22
COUNTY [7] - 1:7,
1:12, 1:13, 2:7, 2:12,
2:13, 114:5
county [1] - 35:19
County [12] - 1:16,
1:17, 2:16, 2:17, 6:17,
6:19, 8:5, 15:12, 17:3,
29:20, 35:12, 45:5
couple [1] - 59:8
course [3] - 10:23,
19:12, 21:8
COURT [2] - 1:2, 2:2
Court [2] - 1:19, 4:19
court [5] - 6:2, 19:18,
19:21, 31:2, 107:22
courthouse [1] -
107:24
courtroom [1] -
24:23
cover [1] - 41:3
covered [1] - 75:21
crime [3] - 13:7,
99:18, 100:5
Cunningham [1] -
22:18
curb [3] - 54:5, 54:8,
54:22
current [1] - 7:10
custody [2] - 31:15,
58:16
custom [1] - 11:21
cut [2] - 38:9, 38:22

D

Dana [1] - 30:11
dark [5] - 36:13,
36:17, 37:6, 42:12,
42:13
date [7] - 32:14,
37:14, 40:14, 45:2,
101:11, 101:24, 102:2
DAVID [1] - 3:20
David [1] - 5:16
days [2] - 69:18,
104:24

dead [1] - 31:11
death [1] - 31:19
Defendant [1] - 2:21
defendants [2] -
1:18, 2:18
Defendants [1] -
3:10
defense [1] - 27:5
degree [1] - 11:5
Department [1] - 9:9,
12:7, 13:10, 15:3,
35:13
department [3] -
8:15, 26:23, 28:11
DEPARTMENT [2] -
1:7, 2:7
depicted [4] - 32:18,
34:5, 36:24, 37:3
depiction [1] - 45:4
depicts [1] - 37:19
deposition [7] - 4:6,
4:14, 27:21, 29:14,
29:21, 114:11, 114:13
depositions [2] -
24:5, 26:11
describe [3] - 19:4,
70:25, 80:25
described [1] - 93:16
designated [1] -
54:14
desk [2] - 76:24, 87:2
detailed [1] - 104:7
Detective [30] -
41:20, 41:24, 42:17,
48:6, 48:15, 55:25,
56:18, 56:23, 67:10,
70:14, 87:4, 87:13,
87:20, 88:18, 88:24,
89:3, 89:18, 89:22,
89:25, 90:3, 90:6,
91:18, 91:25, 98:5,
98:9, 98:12, 98:20,
108:7, 108:9, 108:12
detective [11] -
58:24, 76:13, 76:14,
77:11, 77:14, 77:25,
79:18, 79:20, 80:20,
87:14, 111:19
detectives [1] -
76:16
died [3] - 31:4,
31:10, 31:15
Diego [1] - 10:17,
11:19
different [1] - 43:10
difficulty [1] - 69:8
direct [7] - 43:9,
55:5, 57:19, 85:9,
89:2, 90:14, 90:21
directed [3] - 41:24,
42:2, 79:23

directing [1] - 58:20
direction [11] - 43:4,
43:10, 44:7, 44:13,
44:18, 44:20, 45:24,
52:9, 52:13, 52:15,
78:25
Directly [2] - 49:13,
50:16
directly [7] - 46:19,
49:18, 50:14, 68:9,
69:4, 69:9, 72:14
dirt [2] - 37:8, 82:7
dirty [1] - 82:3
discharged [1] -
10:6, 10:9
discipline [2] -
17:24, 26:15
disciplined [7] -
14:4, 15:7, 16:24,
17:5, 17:15, 18:3,
23:9
discuss [1] - 110:6
discussion [2] - 6:3,
47:25
discussions [2] -
58:7, 87:8
disheveled [2] -
55:12, 55:21
distance [1] - 54:21
DISTRICT [10] - 1:2,
1:2, 1:12, 1:13, 1:14,
2:2, 2:2, 2:12, 2:13,
2:14
district [1] - 105:7
District [5] - 1:16,
1:17, 2:16, 2:17,
111:6
division [1] - 14:15
Division [1] - 14:16
DOCUMENT [1] -
113:7
Document [2] -
101:8, 113:16
document [4] -
101:15, 101:17,
102:18, 102:21
documented [1] -
92:13
documents [2] -
106:13, 109:21
Doe [2] - 21:24,
23:18
DOES [2] - 1:15, 2:15
done [2] - 68:9, 73:7
Donnely [1] - 30:11
door [12] - 62:19,
62:21, 63:6, 63:10,
63:12, 63:16, 63:22,
64:10, 72:10, 76:7,
76:9, 87:3
DORMER [2] - 1:7,

2:7
double [2] - 7:25,
24:19
doubt [2] - 97:24,
99:16
down [7] - 6:3, 54:6,
60:6, 62:9, 76:20,
83:9, 92:8
drive [1] - 45:23
driving [1] - 111:16
drove [3] - 14:3,
22:13, 90:19
drugs [4] - 70:17,
75:19, 87:4, 87:17
dry [1] - 82:18
duly [2] - 5:3, 114:12
DUNNE [14] - 3:13,
13:12, 19:20, 31:8,
33:9, 61:3, 66:3, 68:2,
69:15, 86:16, 95:18,
112:6, 112:13, 113:5
during [2] - 9:12,
21:8, 72:23, 109:11,
112:8
During [5] - 13:9,
24:2, 24:4, 72:12,
110:20
duties [6] - 7:7, 8:17,
8:24, 10:19, 11:7,
40:18
duty [2] - 7:10, 77:6

E

e-mail [2] - 17:7,
104:19
e-mailed [1] - 17:13
EA6Bs [1] - 12:2
ear [9] - 36:24, 37:2,
37:5, 37:19, 37:22,
81:15, 81:20, 81:23
earing [2] - 80:7,
81:22
earings [1] - 76:21
early [2] - 8:2, 103:2
earring [2] - 81:14,
110:15
earrings [7] - 79:24,
86:24, 87:2, 109:24,
110:3, 110:6, 110:8
east [1] - 42:18
East [1] - 1:23
Eastbound [1] - 43:7
eastbound [5] -
43:21, 45:17, 45:20,
46:7, 71:18
EASTERN [2] - 1:2,
2:2
effect [1] - 4:17
either [6] - 18:22,
36:22, 83:18, 91:17,

101:5, 102:23
Either [2] - 52:3,
101:3
electronic [3] -
10:21, 11:9, 11:25
electronics [1] - 11:3
Emergency [1] - 72:4
emergency [2] -
50:22, 95:3
employed [4] - 6:14,
6:16, 6:19, 6:22
employees [4] -
1:17, 2:17, 29:19,
30:16
employment [3] -
11:13, 11:15, 11:17
empties [1] - 43:20
EMT [2] - 27:5, 35:13
end [1] - 109:14
ended [3] - 11:12,
25:7, 96:24
ending [1] - 97:3
enforcement [2] -
8:6, 9:10
entered [1] - 10:5
entire [2] - 13:13,
112:8
entrance [14] -
43:16, 43:17, 43:25,
44:2, 44:4, 44:5, 44:6,
44:10, 44:11, 44:13,
46:21, 46:22, 95:8
equipment [3] -
19:11, 24:9, 26:5
ER [5] - 92:20, 94:16,
94:19, 94:22, 95:6
Esq [1] - 3:3
ESQ [3] - 3:7, 3:13,
3:20
essentially [1] - 8:24
Essentially [1] - 9:3
Estate [1] - 1:4, 2:4
evaluation [1] -
67:25
eventually [2] -
18:14, 96:14
evidence [1] -
106:13
exact [1] - 35:5,
42:23, 92:6
Exactly [1] - 10:3
EXAMINATION [3] -
5:6, 112:5, 113:3
examination [5] -
7:2, 7:5, 9:5, 12:9,
12:11
Examination [1] -
2:20
examined [1] - 5:4
except [1] - 4:9
excessive [5] - 16:2,

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LIN[

117



16:5, 16:17, 18:7, 20:9

**excessively** [1] - 69:9

**Exhibit** [16] - 32:10, 32:12, 32:16, 34:6, 37:10, 37:12, 37:16, 39:5, 44:22, 44:24, 45:4, 46:13, 69:12, 101:7, 101:9, 101:14

**EXHIBITS** [1] - 113:11

**exhibits** [1] - 113:18

**exit** [2] - 46:10

**exited** [2] - 53:11, 71:18

**exonerated** [1] - 14:8

**experience** [2] - 8:6, 9:10

**expire** [1] - 35:14

**Expired** [1] - 35:13

**expired** [1] - 35:22

**eye** [5] - 36:13, 36:14, 69:14, 69:23, 70:8

**eyebrow** [1] - 70:3, 70:7

---

**F**

**face** [22] - 24:4, 32:4, 32:6, 33:2, 34:2, 34:9, 34:25, 35:24, 63:18, 64:3, 64:6, 64:8, 65:19, 68:12, 68:21, 71:9, 81:24, 82:4, 82:11, 82:24, 86:12, 90:4

**facing** [2] - 52:10, 64:10

**Facing** [1] - 64:23

**fact** [2] - 24:22, 57:15

**factory** [1] - 12:25

**fair** [3] - 36:16, 52:17, 70:10

**fall** [4] - 9:7, 62:18, 79:6, 103:25

**Fall** [1] - 9:21

**falls** [1] - 62:17

**familiar** [1] - 102:14

**Fandry** [7] - 98:5, 98:9, 98:12, 98:21, 101:5, 102:23, 102:25

**far** [3] - 14:7, 48:22, 53:22

**favor** [1] - 24:14

**February** [2] - 10:7, 11:11

**Federal** [1] - 1:19

**federal** [2] - 19:20,

---

30:25

**feet** [11] - 45:25, 46:5, 50:17, 50:18, 52:14, 53:22, 53:25, 54:7, 54:10, 59:16, 60:14

**fell** [4] - 75:5, 75:6, 75:14, 87:19

**felt** [1] - 66:21

**female** [2] - 17:12, 25:18

**few** [6] - 15:18, 18:8, 45:25, 46:4, 92:7, 95:24

**fidgeting** [1] - 73:5

**field** [1] - 14:16

**fifteen** [1] - 16:14

**Fifth** [4] - 5:12, 6:11, 71:18, 71:19

**filed** [1] - 18:18, 19:15, 22:20, 22:22, 103:12

**filing** [1] - 4:5

**fill** [4] - 29:10, 97:25, 98:24, 99:7

**filled** [3] - 97:13, 97:14, 102:6

**filling** [4] - 99:11, 99:14, 99:17, 99:22

**films** [1] - 27:13

**finally** [1] - 108:2

**fine** [1] - 73:18

**finish** [1] - 91:23

**Finished** [1] - 10:10

**Firm** [1] - 3:13

**First** [2] - 44:16, 96:18

**first** [28] - 5:3, 15:14, 15:23, 31:17, 33:22, 36:11, 36:22, 38:5, 44:2, 44:5, 44:10, 45:12, 47:16, 47:18, 48:13, 50:2, 58:10, 64:5, 65:9, 69:25, 87:12, 89:15, 89:19, 90:19, 97:10, 98:3, 108:25

**five** [9] - 16:9, 22:23, 27:13, 85:17, 85:25, 86:2, 92:12, 98:13, 109:8

**flashlight** [6] - 22:5, 22:8, 22:12, 84:6, 93:7, 93:11

**Florida** [1] - 10:13

**fog** [2] - 54:17, 54:22

**following** [1] - 11:21

**follows** [1] - 5:5

**FOR** [1] - 113:12

**force** [23] - 4:17, 16:2, 16:5, 16:17,

---

18:7, 19:2, 20:9, 20:10, 21:2, 21:4, 21:24, 21:25, 25:18, 25:22, 65:14, 65:17, 67:21, 68:20, 68:23, 71:5, 74:17, 74:21, 93:21

**forcefully** [1] - 83:23

**forehead** [4] - 38:19, 86:8, 86:11, 86:14

**forked** [1] - 46:5

**form** [6] - 4:10, 51:7, 68:3, 75:13, 95:19, 98:2

**forms** [1] - 97:12

**forth** [1] - 114:12

**forward** [3] - 48:25, 63:7, 73:22

**four** [4] - 8:2, 25:15, 50:5, 92:12

**frames** [1] - 16:7

**Frank** [2] - 22:6, 22:17

**Fred** [1] - 5:15

**FREDERICK** [1] - 3:3

**free** [2] - 6:4, 77:2

**Friedrick** [1] - 99:25

**friends** [1] - 13:2

**frisked** [1] - 67:3

**front** [15] - 32:16, 46:13, 48:8, 49:4, 49:15, 49:23, 49:24, 50:12, 51:15, 51:18, 51:22, 51:24, 62:11, 63:6, 63:10

**fucked** [1] - 72:15

**FURTHER** [2] - 4:8, 4:13

---

**G**

**gallery** [1] - 110:14

**general** [2] - 40:17, 41:14

**generally** [1] - 47:11

**geographic** [1] - 8:22

**GERMANO** [17] - 3:7, 5:7, 10:4, 29:2, 32:8, 36:25, 37:9, 39:7, 44:21, 47:23, 77:19, 86:18, 90:15, 101:6, 107:9, 112:3, 113:4

**Germano** [1] - 5:15

**gestures** [1] - 5:25

**given** [1] - 114:14

**GONZALEZ** [4] - 1:3, 2:3

**grab** [1] - 60:15

**grabbed** [2] - 60:13, 61:8

---

**grabbing** [1] - 83:23

**graduate** [2] - 9:12, 9:14

**grand** [19] - 103:23, 103:25, 104:2, 105:4, 105:12, 105:20, 107:11, 107:14, 107:17, 108:10, 108:24, 109:4, 109:7, 109:13, 110:21, 110:24, 111:4, 111:8, 111:12

**grass** [8] - 49:8, 49:14, 51:11, 51:12, 54:5, 54:7, 54:12, 82:14

**gray** [2] - 48:6, 49:11

**groans** [1] - 5:25

**GROB** [2] - 114:7, 114:25

**ground** [4] - 50:7, 51:7, 51:8, 51:9

**group** [2] - 25:15, 55:2

**Grumman** [3] - 11:22, 11:24, 12:5

**guess** [8] - 12:15, 17:18, 43:18, 52:18, 52:22, 82:5, 101:4, 106:25

**guiding** [1] - 78:5

**gun** [3] - 76:11, 90:19

**guy** [2] - 14:3, 18:14

**guys** [2] - 102:23, 102:25

---

**H**

**Hagstrom** [1] - 45:5

**half** [4] - 97:19, 97:23, 106:20, 109:3

**hallway** [2] - 78:6, 79:4

**hallways** [1] - 80:20

**hand** [14] - 24:10, 37:20, 38:6, 38:16, 55:15, 60:25, 76:23, 77:2, 84:3, 92:25, 101:22, 102:10, 102:20, 114:21

**handcuff** [2] - 76:24, 76:25

**handcuffed** [5] - 50:8, 58:16, 59:21, 60:10, 89:17

**handcuffs** [4] - 51:2, 62:18, 83:25, 93:19

**handed** [4] - 60:21, 60:22, 60:23, 87:17

**hands** [4] - 56:7,

---

56:10, 61:6, 78:3

**Hauppauge** [1] - 3:12

**head** [7] - 19:14, 42:8, 52:11, 73:21, 74:10, 78:10, 78:13

**heading** [3] - 42:24, 43:5, 44:15

**headquarters** [3] - 71:5, 71:11, 90:11

**heard** [7] - 39:25, 42:16, 42:20, 43:8, 91:7, 91:9, 94:9

**hearing** [2] - 56:8, 80:14

**heavily** [1] - 55:11

**heavy** [2] - 50:9, 55:22

**hectic** [1] - 95:25

**held** [1] - 29:10

**help** [7] - 59:19, 60:12, 60:25, 63:4, 80:6, 81:13, 88:11

**helped** [12] - 21:13, 59:15, 59:17, 60:11, 60:14, 62:5, 65:4, 73:16, 75:3, 76:21, 80:3, 86:24

**Hempstead** [1] - 3:6

**HEREBY** [1] - 4:2

**hereby** [1] - 114:9

**herein** [1] - 4:4

**hereinbefore** [1] - 114:11

**hereunto** [1] - 114:21

**high** [4] - 9:12, 9:14, 53:19, 81:10

**Highway** [1] - 3:11

**hip** [2] - 52:4, 52:5

**hit** [6] - 19:14, 22:4, 22:5, 53:20, 93:7, 93:10

**hold** [1] - 11:23

**holding** [1] - 55:14

**home** [1] - 11:21

**homicide** [9] - 96:16, 96:18, 97:11, 98:3, 100:2, 102:22, 102:25, 103:3, 111:14

**honestly** [1] - 15:24

**hospital** [8] - 67:24, 68:10, 69:10, 87:5, 91:3, 91:6, 93:3, 93:15

**hospitalization** [1] - 35:8

**hour** [7] - 93:25, 94:6, 97:19, 97:21, 97:23, 106:20, 109:3

**housed** [1] - 22:12

**hundred** [2] - 45:25, 46:4
**hurt** [4] - 56:13, 56:16, 56:19, 73:13

**I**

**I.D** [1] - 113:12
**IAB** [5] - 16:9, 18:20, 18:22, 20:9, 21:16
**idea** [2] - 25:9, 94:10
**identification** [4] - 32:13, 37:13, 44:25, 101:10
**identified** [1] - 39:6
**immediately** [1] - 92:8
**IN** [1] - 114:20
**inappropriate** [1] - 17:17
**INC** [1] - 1:23
**inch** [2] - 84:12, 84:17
**inches** [3] - 54:23, 84:15, 84:18
**incident** [6] - 17:16, 20:7, 21:9, 22:10, 35:22, 103:17
**indicate** [3] - 19:10, 71:5, 109:23
**indicated** [8] - 12:8, 16:15, 32:21, 33:23, 33:25, 45:9, 68:22, 69:13
**indicating** [1] - 46:18
**individual** [19] - 1:8, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:16, 2:8, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16, 67:24
**individually** [2] - 1:4, 2:4
**inform** [5] - 33:6, 34:9, 39:9, 39:12, 65:20
**informed** [2] - 65:14, 94:17
**injured** [10] - 34:16, 35:7, 56:4, 65:21, 68:7, 68:15, 68:18, 69:7, 74:23, 92:24
**injuries** [1] - 39:10
**injury** [5] - 34:10, 36:2, 37:25, 39:13, 67:22
**inserts** [1] - 28:10
**inside** [1] - 76:10
**insisted** [1] - 24:5
**instructed** [1] - 97:25

**intense** [1] - 93:17
**interchange** [1] - 43:2
**interested** [1] - 114:18
**Internal** [8] - 14:25, 15:11, 16:25, 25:5, 103:7, 103:10, 103:14, 111:10
**internal** [2] - 28:5, 104:13, 104:16, 104:21, 104:23, 105:3
**interview** [3] - 76:20, 89:21, 90:17
**interviewed** [1] - 15:4
**investigation** [2] - 23:8, 23:20
**involved** [5] - 17:16, 22:16, 24:19, 31:16, 102:9
**involvement** [5] - 30:24, 88:5, 98:6, 98:17, 109:11
**IS** [3] - 4:2, 4:8, 4:13
**Islip** [1] - 1:20
**IT** [3] - 4:2, 4:8, 4:13
**item** [1] - 27:25

**J**

**Jack** [1] - 25:20
**JAMES** [3] - 1:9, 2:9, 3:22
**JANE** [2] - 1:14, 2:14
**jeans** [1] - 53:2
**JENNIFER** [2] - 1:3, 2:3
**Jim** [1] - 30:12
**job** [1] - 11:23
**John** [2] - 21:24, 23:18
**JOHN** [7] - 1:8, 1:14, 1:14, 2:8, 2:14, 2:14, 3:25
**joined** [1] - 9:24
**Jose** [1] - 30:12
**Joseph** [2] - 5:10, 6:11
**JOSEPH** [5] - 1:11, 2:11, 2:21, 113:4, 114:10
**JR** [1] - 3:7
**JUDGE** [3] - 1:10, 2:10, 3:24
**Judge** [31] - 48:15, 51:17, 55:9, 55:14, 56:5, 56:9, 56:12, 59:15, 60:18, 61:16, 62:4, 62:6, 63:4, 66:18, 87:6, 91:2,

91:5, 91:18, 92:19, 92:22, 93:4, 93:6, 93:9, 93:14, 94:4, 96:7, 96:8, 99:24, 100:5, 100:9, 100:13
**Judge's** [1] - 100:17
**JUDY** [2] - 114:7, 114:25
**June** [1] - 114:22
**jury** [20] - 20:3, 103:23, 103:25, 104:2, 105:4, 105:12, 105:21, 107:11, 107:14, 107:17, 108:10, 108:24, 109:4, 109:7, 109:13, 110:21, 110:25, 111:4, 111:8, 111:12
**juvenile** [1] - 12:17

**K**

**keep** [4] - 15:21, 20:15, 28:7, 93:18
**Kenny** [18] - 31:24, 32:4, 32:19, 41:18, 57:3, 58:7, 58:9, 58:20, 58:24, 59:4, 59:10, 59:19, 61:11, 61:17, 62:8, 62:11, 93:3, 93:10
**KENNY** [2] - 1:4, 2:4
**kid's** [1] - 23:16
**kind** [9] - 10:23, 17:24, 43:22, 48:20, 52:3, 53:15, 58:14, 86:14, 95:25
**knees** [1] - 60:3
**knowledge** [1] - 5:19
**Koerber** [1] - 101:5

**L**

**lacerations** [1] - 82:21
**laid** [1] - 107:6
**Lake** [1] - 10:16
**Lane** [3] - 43:14, 45:10, 45:11
**lane** [1] - 54:16
**lanes** [2] - 54:6
**large** [3] - 61:5, 66:24, 75:6
**last** [5] - 20:17, 23:22, 25:13, 30:4, 46:14
**Last** [1] - 23:16
**law** [4] - 8:6, 9:10, 12:21, 27:5
**lawsuit** [9] - 18:15, 18:18, 19:15, 19:23,

22:20, 22:22, 24:16, 25:8, 26:22
**Lawsuit** [1] - 24:13
**lawsuits** [2] - 25:11, 26:18
**laying** [1] - 51:6
**LAZO** [2] - 1:4, 2:4
**Lazo** [95] - 31:25, 32:19, 33:22, 36:20, 37:3, 38:3, 38:7, 38:13, 38:25, 39:13, 39:21, 41:18, 50:7, 50:13, 50:15, 51:2, 51:18, 51:20, 51:25, 52:23, 53:23, 54:8, 55:3, 57:3, 57:16, 58:7, 58:9, 58:20, 58:25, 59:4, 59:10, 59:20, 60:5, 60:9, 60:12, 61:11, 61:17, 61:24, 62:8, 62:11, 62:23, 63:5, 63:21, 64:24, 65:3, 65:8, 65:15, 66:8, 66:13, 66:15, 67:19, 68:11, 69:20, 71:8, 71:12, 72:2, 72:10, 72:13, 72:23, 73:13, 73:16, 73:17, 73:25, 75:16, 76:6, 76:12, 76:18, 77:20, 78:7, 79:15, 79:22, 80:12, 81:14, 86:24, 87:23, 88:3, 88:21, 89:4, 89:6, 89:12, 89:17, 90:4, 90:11, 93:3, 93:7, 93:10, 94:10, 94:17, 94:18, 95:5, 95:16, 110:22, 111:17, 112:9
**Lazo's** [32] - 32:4, 33:2, 34:10, 34:25, 35:24, 36:7, 36:13, 36:23, 37:19, 38:19, 48:9, 49:2, 49:3, 49:10, 51:5, 63:16, 63:18, 64:3, 64:6, 64:9, 65:19, 69:23, 70:17, 73:21, 76:3, 81:20, 81:23, 81:24, 82:23, 111:2, 111:20, 111:24
**learn** [3] - 53:8, 94:12, 95:15
**least** [1] - 27:13
**leave** [4] - 57:12, 88:2, 89:12, 92:5
**leaving** [3] - 30:10, 88:23, 88:25
**led** [1] - 59:19
**left** [40] - 32:25, 33:2, 36:13, 36:14, 36:23, 37:2, 37:5, 37:19,

38:6, 38:16, 39:19, 43:14, 43:15, 45:11, 45:12, 48:19, 60:21, 62:14, 64:16, 64:20, 67:7, 70:3, 70:12, 76:23, 77:2, 81:15, 87:4, 87:23, 88:11, 88:21, 89:6, 89:7, 89:8, 90:17, 91:11, 91:13, 96:14, 101:22, 112:9
**left-hand** [3] - 38:6, 38:16, 101:22
**Lemore** [1] - 10:15
**less** [2] - 20:5, 85:21
**letter** [2] - 104:19, 104:21
**level** [1] - 11:2
**lift** [1] - 61:6
**light** [1] - 42:10
**lights** [3] - 50:23, 72:2, 72:4
**likely** [2] - 63:14, 84:13, 85:20
**limited** [2] - 69:10, 98:6
**line** [8] - 13:13, 52:16, 54:17, 54:19, 54:22, 83:15, 83:17, 84:8
**lines** [1] - 70:24
**Link** [4] - 5:10, 6:11, 32:15, 112:7
**LINK** [5] - 1:11, 2:11, 2:21, 113:4, 114:10
**Link's** [3] - 29:4, 69:19, 113:8
**lip** [2] - 38:7, 38:10
**list** [3] - 12:12, 12:14, 12:15
**located** [2] - 14:17, 42:15
**location** [1] - 42:24
**locker** [1] - 76:11
**lodged** [1] - 39:19
**loitering** [1] - 13:4
**look** [3] - 38:5, 47:21, 109:20
**looked** [3] - 78:15, 83:6, 92:15
**looking** [2] - 38:18, 78:14
**Looking** [1] - 69:12
**looks** [1] - 17:13
**lost** [2] - 18:2, 44:12
**loudly** [1] - 81:5
**low** [1] - 81:11
**lower** [2] - 38:7, 38:16
**lying** [9] - 51:7, 51:10, 51:11, 51:18,

51:25, 52:5, 52:16, 60:6

## M

mail [2] - 17:7, 104:19
mailed [1] - 17:13
Main [1] - 1:23
male [2] - 17:13, 25:19
man [2] - 31:4, 32:17
Manel [1] - 13:15
Manor [3] - 43:14, 45:10, 45:11
Map [2] - 44:23, 113:15
map [1] - 45:4
Mario [5] - 20:19, 20:21, 20:22, 21:8, 23:11
Mark [3] - 37:9, 83:22, 101:6
mark [16] - 32:9, 37:25, 38:2, 38:11, 38:12, 44:21, 46:15, 70:3, 70:7, 70:11, 83:18, 83:19, 83:21, 84:10, 85:19, 86:14
marked [7] - 32:11, 37:11, 37:23, 44:23, 48:7, 101:8, 101:13
marking [3] - 35:24, 38:18
markings [1] - 81:20
marks [18] - 37:6, 82:4, 82:23, 83:2, 83:4, 83:8, 83:14, 84:21, 85:17, 85:21, 85:23, 86:2, 86:4, 86:7, 90:7, 90:11, 110:22, 110:25
marriage [1] - 114:17
match [1] - 83:7
matter [7] - 5:17, 22:25, 23:12, 24:21, 26:7, 30:5, 114:19
Matthew [2] - 18:11, 20:8
MBC [1] - 17:5
McCawly [2] - 18:11, 20:8
meal [1] - 28:19
mean [7] - 8:21, 30:22, 49:6, 49:11, 52:6, 55:20, 82:10
meaning [1] - 17:14
medical [10] - 35:10, 65:6, 65:9, 67:19, 67:24, 68:7, 68:25, 69:4, 71:12, 112:11

Medically [1] - 66:9
meet [3] - 103:3, 105:23, 106:18
Melville [1] - 3:19
member [1] - 13:25
members [2] - 1:15, 2:15
memo [10] - 27:22, 28:7, 28:13, 28:16, 28:21, 28:23, 29:4, 92:14, 92:15, 113:8
Memo [1] - 28:9
Memorial [1] - 3:11
mentioned [2] - 26:21, 28:2
merging [1] - 54:6
mess [1] - 43:22
message [2] - 104:6, 104:18
met [4] - 36:11, 36:22, 106:7, 109:2
Midnight [1] - 8:3
midnights [1] - 77:9
Might [1] - 49:20
might [8] - 59:24, 66:18, 78:4, 79:2, 95:10, 98:4, 108:7, 109:12
MILAFI [1] - 3:9
Miller [1] - 24:21
Millington [1] - 10:14
Mineola [1] - 19:16
minute [3] - 47:16, 59:5, 71:24
minutes [12] - 30:25, 59:8, 88:6, 88:7, 88:13, 88:14, 88:15, 92:7, 92:12, 95:24, 98:14, 109:8
mission [1] - 41:15
misspoke [1] - 86:19, 91:24
mobile [1] - 17:6
moment [4] - 51:3, 51:4, 73:15, 101:14
money [3] - 66:22, 67:6, 67:7
month [1] - 103:17
months [1] - 9:6
morning [5] - 5:14, 30:6, 30:15, 103:2, 108:23
mortem [1] - 69:17
Moses [3] - 42:19, 43:20, 44:20
Moses/Southern [1] - 43:2
move [1] - 58:9
moved [1] - 63:7
moving [8] - 11:18, 55:23, 58:12, 72:25,

73:3, 73:23, 78:10, 78:13
MR [29] - 5:7, 10:4, 13:12, 19:20, 29:2, 31:8, 32:8, 33:9, 36:25, 37:9, 39:17, 44:21, 47:23, 61:3, 66:3, 68:2, 69:15, 77:19, 86:16, 86:18, 90:15, 95:18, 101:6, 107:9, 112:3, 112:6, 112:13, 113:4, 113:5
Munsy [5] - 42:18, 43:5, 43:12, 45:8, 45:9
muttering [4] - 80:17, 80:19, 80:24, 80:25

## N

name [8] - 5:8, 5:14, 6:9, 23:16, 23:22, 40:2, 40:7
Named [1] - 22:17
named [19] - 13:20, 14:25, 15:10, 15:16, 16:8, 16:11, 18:9, 19:22, 20:8, 20:14, 20:20, 21:23, 23:21, 24:6, 24:15, 24:22, 25:19, 26:18, 27:18
naming [3] - 14:21, 23:13, 26:22
narcotics [3] - 66:24, 75:7, 75:9
narrative [3] - 109:16, 110:13, 110:20
narratively [1] - 107:6
NASSAU [1] - 114:5
Navy [6] - 9:24, 10:2, 10:12, 10:20, 11:8, 11:12
near [5] - 50:13, 54:19, 55:3, 95:8, 95:11
nearby [2] - 51:20, 51:21
neck [4] - 81:25, 83:9, 86:5
need [6] - 6:4, 35:7, 68:7, 112:2
needed [8] - 31:22, 41:21, 44:14, 61:6, 65:6, 65:9, 68:25, 97:13
never [1] - 47:12
NEW [3] - 1:2, 2:2, 114:3

New [19] - 1:20, 1:24, 2:22, 3:6, 3:12, 3:19, 5:13, 6:12, 8:7, 8:8, 8:15, 9:4, 9:8, 11:20, 12:7, 12:10, 13:9, 15:2, 114:8
Newton [2] - 48:7, 48:15, 55:25, 56:18, 67:10, 70:15, 91:18, 92:2
NEWTON [3] - 1:8, 2:8, 3:25
next [16] - 15:19, 20:13, 44:19, 45:23, 50:3, 50:15, 50:16, 57:11, 67:11, 70:15, 71:15, 75:2, 86:25, 96:6, 96:13, 98:21
night [1] - 96:25
nine [1] - 88:15
Nineteen [1] - 6:20
nineteen [2] - 6:21, 7:20
nobody [1] - 50:18
Nobody [2] - 24:7, 87:25
Noel [1] - 25:13
None [1] - 14:23
normal [2] - 60:24, 61:4
normally [2] - 82:5, 83:2
northbound [6] - 43:19, 43:20, 45:21, 46:6, 71:18, 71:19
nose [1] - 36:7
Notary [3] - 2:22, 5:4, 114:7
Note [1] - 13:12
Noted [1] - 112:14
nothing [1] - 30:18
Nothing [9] - 67:16, 72:14, 80:13, 81:3, 81:21, 83:5, 87:22, 93:20
notice [14] - 36:19, 38:2, 38:12, 38:24, 64:5, 73:25, 81:19, 81:23, 84:20, 85:5, 96:16, 103:12, 107:19, 111:20
Notice [1] - 2:21
noticed [4] - 64:16, 90:7, 96:18, 97:10
noticing [1] - 65:18
notification [2] - 105:14, 107:22
notify [1] - 39:17
numbers [1] - 91:22
NYPD [2] - 14:14, 14:19

O 119

o'clock [1] - 96:25
oath [1] - 4:17
object [1] - 61:3
Objection [3] - 31:8, 68:2, 95:18
objection [4] - 13:13, 33:10, 33:16, 69:16
objections [1] - 4:9
obligation [2] - 10:10, 11:12
observation [1] - 73:20
observations [5] - 32:3, 55:8, 55:17, 55:24, 66:13
observed [1] - 33:15
observes [1] - 39:18
observing [1] - 31:24
obtain [2] - 11:15, 11:17
occurred [2] - 23:8, 57:7
occurrence [1] - 102:2
occurs [1] - 67:22
OF [10] - 1:2, 1:7, 1:12, 2:2, 2:7, 2:12, 114:3, 114:5
office [6] - 99:19, 99:22, 100:3, 100:6, 105:7, 111:6
OFFICE [4] - 1:11, 1:12, 2:11, 2:12
Office [4] - 1:15, 1:17, 2:15, 2:17
Officer [49] - 6:13, 29:3, 30:11, 32:15, 33:11, 33:14, 37:15, 46:12, 48:14, 51:17, 55:9, 55:14, 56:5, 56:9, 56:12, 59:15, 60:18, 61:16, 62:4, 62:5, 63:4, 68:4, 69:19, 76:8, 76:11, 77:3, 87:5, 88:19, 89:23, 91:2, 91:5, 91:17, 92:19, 92:22, 93:4, 93:6, 93:9, 93:14, 94:4, 96:7, 96:8, 99:24, 99:25, 100:9, 100:12, 100:17, 112:7, 113:8
officer [29] - 4:16, 5:14, 6:23, 7:8, 8:16, 16:20, 17:11, 19:22, 21:23, 21:25, 22:6, 24:3, 24:15, 24:25, 25:19, 28:20, 31:14, 34:10, 39:13, 56:3,





120

58:23, 59:12, 74:13, 74:16, 75:23, 77:4, 89:16, 94:3, 99:21

**OFFICER** [8] - 1:8, 1:9, 1:10, 1:11, 2:8, 2:9, 2:10, 2:11

officers [15] - 21:6, 21:21, 21:22, 22:15, 24:6, 26:23, 29:19, 39:9, 48:12, 57:2, 57:6, 58:14, 87:8, 96:3

official [18] - 1:8, 1:9, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:16, 2:8, 2:9, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16

often [1] - 27:11
old [1] - 12:19
once [4] - 7:6, 45:15, 75:18, 105:25
Once [2] - 75:14, 79:20
One [1] - 63:19
one [40] - 9:18, 13:21, 15:5, 15:14, 16:21, 18:9, 20:18, 22:6, 25:13, 34:5, 44:6, 44:13, 44:17, 46:14, 49:20, 52:6, 54:6, 56:6, 56:10, 60:13, 66:23, 76:21, 76:22, 78:5, 79:3, 80:2, 80:3, 81:16, 85:19, 85:23, 85:24, 86:2, 86:12, 88:19, 96:11, 109:12, 110:4, 110:8, 112:2
ones [1] - 25:7
oOo [1] - 4:21
open [5] - 12:15, 62:19, 63:16, 63:21, 67:8
opened [6] - 62:20, 63:6, 63:10, 63:11, 72:9, 76:9
operate [1] - 65:22
operating [3] - 13:22, 40:21, 48:7
operator [1] - 13:23
opposite [2] - 44:20, 52:15
option [1] - 45:19
order [2] - 65:15, 77:13
Orlando [1] - 10:13
outcome [1] - 114:18
outside [4] - 75:20, 79:7, 87:3, 95:23
Outside [2] - 75:22, 77:16

overtime [1] - 29:9
own [5] - 62:3, 73:18, 77:22, 77:24

**P**

P.C [1] - 3:16
p.m [1] - 112:14
PAGE [2] - 113:3, 113:8
pages [1] - 28:9
pants [12] - 52:25, 67:9, 70:17, 75:4, 75:17, 75:19, 76:3, 79:11, 79:13, 79:17, 87:3, 87:19
paperwork [1] - 42:9, 97:15
park [1] - 48:18
parked [5] - 48:8, 49:7, 49:9, 54:15, 72:8
parking [1] - 72:8
Parkway [8] - 42:19, 43:2, 43:21, 45:17, 45:21, 46:3, 46:7, 71:17
parkway [5] - 41:22, 46:19, 46:25, 47:11, 109:23
Parsons [6] - 76:8, 76:12, 77:3, 87:9, 88:19, 89:23
part [3] - 23:19, 26:18, 31:11
particular [4] - 40:12, 55:6, 57:18, 58:21
parties [2] - 4:4, 114:16
partner [6] - 7:22, 7:24, 24:18, 24:20, 25:20, 40:15
parts [2] - 83:5, 85:6
pass [1] - 44:2
Passenger [1] - 62:24
passenger [3] - 63:7, 63:11, 64:10
past [2] - 68:9, 73:7
PATRICIA [1] - 1:3, 2:3
Patrol [2] - 8:22, 40:13
patrol [9] - 7:9, 8:19, 8:20, 8:25, 28:22, 40:19, 41:8, 41:16, 77:8
patrolling [1] - 41:11
pattern [1] - 111:21
Paul [1] - 30:11

Paula [1] - 30:11
paying [2] - 80:18, 81:3
pen [1] - 46:15
pending [1] - 6:6
Peninsula [1] - 3:5
people [1] - 30:9
perfect [1] - 83:18
perform [1] - 10:24
periodically [1] - 27:9
person [1] - 22:9, 50:2, 68:6, 89:15, 89:19, 98:4
personal [1] - 17:9
personally [2] - 104:10, 106:15
personnel [1] - 30:17
phone [1] - 91:21
phonetic [1] - 13:16
phonetic) [1] - 25:14
phonetics) [1] - 30:13
photograph [7] - 36:7, 36:12, 36:24, 37:3, 37:18, 109:22, 110:17
Photograph [1] - 32:11, 113:13
Photographs [2] - 37:11, 113:14
photographs [1] - 37:17, 69:17
physical [2] - 25:25, 27:5
picked [3] - 12:17, 12:24, 75:18
picture [4] - 32:18, 32:22, 33:13, 64:19
pictures [1] - 109:24, 110:2
piece [1] - 26:5
PINCUS [1] - 3:16, 3:20
Pincus [2] - 5:16, 10:4
pistol [1] - 22:7
pitched [1] - 81:10
place [2] - 46:12, 63:4
placed [3] - 65:5, 66:15, 86:23
placing [2] - 32:15, 37:15, 101:12
plain [1] - 99:19
Plaintiff [2] - 3:4, 3:17
PLAINTIFF'S [1] - 113:12
Plaintiff's [15] - 32:9, 32:12, 32:16, 34:6,

37:10, 37:12, 37:16, 39:4, 44:22, 44:24, 45:3, 46:13, 69:12, 101:9, 101:13
plaintiffs [3] - 1:5, 2:5, 5:17
plastic [1] - 28:9
Plaza [1] - 1:19
pockets [2] - 66:21, 67:8
point [28] - 18:4, 33:25, 38:14, 46:25, 53:16, 56:21, 58:11, 59:9, 61:7, 61:12, 61:17, 64:12, 64:15, 64:21, 65:4, 69:7, 88:7, 88:8, 88:9, 88:11, 89:7, 89:11, 89:23, 95:3, 97:15, 98:25, 111:23, 112:7
pointing [1] - 32:23
police [12] - 6:23, 7:8, 8:15, 16:20, 21:6, 21:20, 27:2, 31:14, 56:25, 57:5, 58:23, 77:4
POLICE [14] - 1:7, 1:7, 1:8, 1:9, 1:10, 1:10, 1:11, 2:7, 2:7, 2:8, 2:9, 2:10, 2:10, 2:11
Police [7] - 8:16, 9:9, 12:7, 13:10, 15:3, 30:10, 35:13
Portella [2] - 102:23, 102:25
portion [2] - 13:16, 36:23
position [5] - 50:6, 51:5, 58:10, 59:22, 60:6
positioning [1] - 73:21
post [1] - 69:17
posture [1] - 73:25
power [1] - 73:19
precinct [40] - 7:13, 7:17, 14:13, 28:18, 30:3, 34:17, 34:18, 35:9, 39:19, 41:3, 53:21, 61:15, 67:13, 67:17, 70:20, 70:24, 71:3, 71:20, 72:7, 72:9, 75:2, 76:5, 76:8, 77:16, 78:20, 87:10, 88:11, 88:13, 88:16, 92:7, 94:9, 94:13, 94:16, 96:15, 96:19, 96:21, 97:10, 98:22, 111:19, 112:10
Precinct [5] - 7:15, 7:16, 7:20, 42:4,

44:16
preparation [3] - 27:21, 29:13, 29:20
prepare [2] - 107:8, 107:13
PRESENT [1] - 3:15
present [2] - 106:6, 109:21
presented [1] - 110:17
pretty [1] - 31:2
previous [1] - 53:17
previously [2] - 26:21, 68:22
print [2] - 84:2, 84:5
prisoner [1] - 94:15
prisoners [1] - 73:6
procedures [2] - 27:4, 27:17
proceeded [3] - 45:9, 70:20, 71:16
process [1] - 108:10
Production [1] - 113:8
production [1] - 29:3
Prosecutor [1] - 105:10
prostitute [1] - 17:14
provide [1] - 106:15
provided [1] - 70:14
public [1] - 14:2
Public [2] - 2:22, 5:4, 114:7
pull [1] - 67:9
pulled [2] - 19:8, 48:4, 50:3
pulse [1] - 111:24
punched [2] - 19:7, 24:3
purpose [1] - 41:15
pursuant [1] - 2:21
put [9] - 12:12, 12:14, 52:17, 61:14, 74:9, 76:10, 76:23, 87:2, 89:20

**Q**

quadrant [3] - 37:20, 38:6, 38:17
Queens [1] - 14:18
questioning [1] - 13:14
questions [8] - 5:19, 6:6, 69:21, 104:7, 106:24, 109:9, 109:18, 112:4
quick [1] - 110:13
quite [1] - 55:12



## R

**radio** [13] - 27:23, 41:19, 41:23, 42:16, 47:16, 47:18, 70:18, 70:22, 71:4, 71:14, 88:10, 91:16, 96:23
**raised** [1] - 52:7
**ramp** [21] - 42:25, 43:16, 43:17, 43:25, 44:3, 44:4, 44:5, 44:7, 44:10, 44:11, 44:13, 44:17, 44:19, 45:12, 45:16, 45:17, 45:24, 46:21, 46:22, 71:17
**ramps** [1] - 44:2
**range** [1] - 27:15
**rank** [3] - 8:14, 40:9, 77:4
**rash** [2] - 82:20, 82:22
**rather** [1] - 17:17
**reached** [5] - 77:25, 78:20, 79:17, 79:20, 81:13
**reaching** [1] - 77:11
**read** [5] - 100:14, 100:16, 100:19, 100:21, 101:14
**REALTIME** [1] - 1:23
**rear** [7] - 48:6, 49:23, 62:24, 63:12, 64:10, 72:9, 76:7
**reason** [4] - 9:22, 10:8, 19:9, 100:16
**reasons** [1] - 17:9
**receive** [5] - 11:4, 17:25, 26:15, 27:2, 107:19
**received** [2] - 42:16, 43:5
**recertification** [1] - 35:20
**recognize** [3] - 32:17, 101:17, 101:19
**record** [6] - 5:8, 6:3, 6:10, 47:24, 48:2, 114:13
**recordings** [2] - 29:13, 29:15
**red** [11] - 82:4, 82:23, 83:2, 83:4, 83:8, 83:14, 83:19, 83:20, 86:21, 90:7, 90:11
**reference** [2] - 29:11, 33:12
**region** [2] - 47:4, 47:8
**regularly** [1] - 41:8
**related** [1] - 114:16
**relation** [1] - 51:19

**released** [1] - 12:22
**relevant** [1] - 5:20
**remain** [3] - 50:20, 93:22, 95:22
**remaining** [1] - 89:4
**remember** [22] - 20:12, 23:16, 24:24, 25:4, 25:12, 26:3, 35:5, 52:18, 56:8, 62:16, 63:13, 81:17, 92:24, 95:14, 97:18, 104:3, 104:9, 107:6, 109:14, 110:12, 110:23, 111:3
**remove** [2] - 76:21, 86:24
**removed** [3] - 70:17, 76:22, 110:8
**Rendon** [2] - 22:7, 22:18
**RENDON** [1] - 22:18
**renew** [2] - 35:17, 69:16
**rephrase** [2] - 5:22, 33:21
**report** [15] - 29:11, 98:9, 98:25, 99:4, 99:8, 99:11, 99:15, 99:23, 100:13, 100:17, 100:23, 101:20, 101:24, 102:6, 102:14
**reporter** [1] - 6:2
**REPORTING** [1] - 1:23
**reports** [2] - 27:22, 28:3
**represent** [2] - 5:16, 102:5
**representation** [2] - 36:16, 98:17
**representing** [2] - 1:15, 2:15
**request** [3] - 74:12, 74:16, 104:25
**requesting** [1] - 104:7
**REQUESTS** [1] - 113:7
**required** [5] - 27:16, 28:12, 28:20, 67:19, 71:12
**requires** [1] - 28:11
**reserved** [1] - 4:11
**resigned** [1] - 8:12
**respective** [1] - 4:4
**respond** [2] - 5:24, 58:24
**responded** [3] - 41:19, 53:16, 79:25
**responding** [1] -

17:10
**responsibilities** [4] - 7:8, 8:18, 10:20, 11:8
**responsibility** [15] - 7:11, 10:25, 39:6, 39:8, 57:23, 65:20, 66:2, 67:23, 68:17, 68:24, 69:3, 74:15, 74:20, 77:7, 102:19
**rest** [3] - 71:16, 74:10, 75:17
**result** [10] - 16:25, 17:2, 17:21, 18:20, 21:15, 23:7, 24:11, 26:14, 31:18, 74:23
**retained** [1] - 113:18
**retrained** [2] - 27:7, 27:17
**retraining** [1] - 27:11
**returned** [1] - 90:18
**review** [4] - 27:20, 29:12, 100:9, 100:12
**reviewed** [1] - 99:5
**reviewing** [1] - 29:23, 42:8, 100:15
**RICHARD** [3] - 1:7, 2:7, 3:13
**Richard** [1] - 30:12
**ride** [1] - 73:11
**right-hand** [1] - 37:20, 102:10
**Road** [12] - 3:18, 42:18, 42:25, 43:5, 43:12, 43:15, 43:18, 43:24, 44:17, 45:8, 45:9, 45:11
**road** [6] - 34:23, 46:5, 51:11, 82:19, 82:22, 112:9
**roadway** [12] - 48:19, 48:21, 49:8, 49:10, 49:14, 52:21, 53:18, 53:23, 54:15, 60:18, 60:19, 93:19
**roaming** [1] - 12:25
**Robert** [4] - 42:19, 42:25, 43:20, 44:20
**rode** [1] - 7:25
**Rodriguez** [1] - 30:12
**rolling** [1] - 82:13
**room** [29] - 10:15, 76:15, 76:20, 77:11, 77:14, 77:25, 78:15, 78:21, 79:18, 79:21, 80:21, 87:14, 87:24, 88:22, 88:25, 89:21, 90:17, 94:21, 94:22, 95:3, 95:4, 95:7, 95:9, 95:17, 95:23, 96:9, 108:24, 109:4, 111:19

**RQ** [1] - 29:2
**ruler** [2] - 28:10, 38:17
**Rules** [1] - 27:4
**rules** [1] - 27:17
**running** [2] - 82:2, 82:17

## S

**safety** [1] - 48:20
**Sagtikos** [1] - 45:21, 46:6
**Salace** [1] - 30:11
**San** [2] - 10:17, 11:19
**sat** [1] - 62:8
**saw** [20] - 33:22, 33:23, 34:2, 34:5, 34:25, 46:16, 50:3, 50:5, 51:18, 58:10, 64:22, 68:22, 69:25, 79:5, 83:20, 85:16, 108:7, 108:25, 110:21, 110:25
**scene** [17] - 34:11, 39:14, 39:16, 47:14, 48:13, 56:22, 57:2, 57:21, 59:7, 63:2, 65:10, 65:13, 65:24, 66:8, 66:13, 66:14, 91:15
**scheduled** [1] - 97:3
**schedules** [1] - 35:19
**SCHOENFELD** [2] - 3:16
**school** [4] - 9:12, 9:15, 10:15, 10:16
**SCIMONE** [1] - 1:9, 2:9, 3:22
**Scimone** [15] - 34:12, 34:14, 34:20, 34:24, 35:4, 48:14, 55:18, 56:15, 57:12, 57:25, 67:12, 67:15, 67:18, 91:25
**scuff** [1] - 82:3
**sealing** [1] - 4:5
**search** [1] - 16:22
**Seat** [1] - 74:6
**seat** [7] - 62:24, 63:7, 63:8, 73:2, 73:4, 73:8, 74:2
**seated** [6] - 59:25, 60:2, 64:7, 64:13, 64:22, 67:2, 74:4, 76:20
**second** [2] - 44:3, 44:11
**secrete** [1] - 73:7

**Sector** [2] - 40:23, 40:25
**sector** [2] - 41:7, 41:11
**see** [29] - 36:6, 36:12, 37:2, 37:18, 38:7, 38:17, 48:4, 50:25, 53:5, 67:17, 82:7, 82:21, 82:23, 84:2, 84:5, 84:14, 85:8, 86:4, 86:7, 86:20, 91:13, 94:18, 95:2, 95:5, 96:3, 97:12, 105:15, 108:5, 108:22
**seeing** [3] - 33:5, 69:22, 110:3
**seek** [3] - 11:13, 31:18, 69:4
**selection** [1] - 20:3
**self** [1] - 27:13
**semester** [2] - 9:19, 9:20
**send** [1] - 27:15
**sent** [2] - 104:6, 104:18
**Sergeant** [24] - 30:13, 34:11, 34:13, 34:19, 34:20, 34:24, 35:4, 40:6, 40:10, 40:13, 48:14, 55:18, 56:15, 57:12, 57:25, 67:12, 67:15, 67:18, 91:18, 91:25, 98:5, 98:9, 98:12, 98:21
**sergeant** [7] - 33:7, 39:17, 40:11, 53:17, 58:24, 65:20, 65:23
**series** [2] - 5:18, 37:16
**session** [1] - 106:22
**set** [2] - 114:11, 114:21
**settle** [2] - 20:4, 26:9
**settled** [1] - 20:2
**settlement** [1] - 26:11
**shall** [1] - 4:11
**shame** [1] - 31:11
**shape** [3] - 83:15, 83:20, 85:2
**shift** [1] - 96:24
**shirt** [2] - 52:24, 85:8
**shirtless** [1] - 82:15
**shoes** [3] - 53:3, 53:5, 53:9
**Shore** [6] - 41:5, 41:6, 42:25, 43:15, 43:18, 43:23, 44:16, 45:11
**shortly** [1] - 15:21



**Shortly** [2] - 103:11, 105:12
**shorts** [1] - 75:6
**shoulder** [5] - 54:3, 54:4, 54:11, 54:15, 60:14
**shoulders** [1] - 52:6
**show** [1] - 64:19
**showed** [1] - 84:7
**showing** [1] - 45:3
**Shurer** [1] - 30:13
**side** [29] - 32:6, 32:25, 34:23, 38:6, 38:19, 49:21, 51:23, 52:2, 61:8, 62:10, 62:14, 62:15, 62:17, 62:22, 62:24, 62:25, 63:16, 63:17, 63:21, 63:23, 64:3, 64:9, 73:22, 75:18, 98:14, 101:22, 102:10, 112:9
**signature** [2] - 101:21, 102:11
**signed** [5] - 4:15, 4:18, 100:23, 101:2, 102:18
**similar** [2] - 8:25, 106:22
**sit** [1] - 64:8
**sitting** [7] - 24:23, 30:25, 45:6, 60:6, 96:19, 97:9, 100:3
**situation** [1] - 67:21
**six** [6] - 10:3, 30:25, 53:24, 88:6, 88:13, 88:15
**Six** [1] - 88:7
**skin** [1] - 85:2
**slapped** [1] - 24:4
**sliding** [3] - 73:6, 73:10, 74:2
**slightly** [1] - 49:2
**Slightly** [1] - 8:10
**small** [1] - 54:5
**socks** [1] - 53:2
**softly** [1] - 81:7
**solid** [1] - 54:18
**Someone** [1] - 110:13
**someone** [2] - 61:2, 93:10
**Sometime** [1] - 35:15
**somewhere** [5] - 18:17, 54:19, 62:9, 81:8, 81:9
**sort** [3] - 37:24, 51:7, 52:25
**sought** [1] - 35:17
**Southern** [6] - 43:21, 45:16, 45:20, 46:3, 46:6, 71:17

**Southside** [10] - 90:20, 90:22, 90:25, 92:5, 92:10, 92:18, 93:23, 94:3, 94:7, 96:21
**spare** [1] - 40:24
**speaking** [3] - 81:5, 81:7, 104:9
**specific** [1] - 21:3, 21:17, 25:21, 29:23, 30:18, 56:10, 61:14, 80:13, 88:4, 93:20
**Specifically** [1] - 51:19
**specifically** [13] - 13:20, 18:9, 19:5, 19:7, 20:20, 22:2, 23:21, 35:2, 35:3, 52:19, 72:19, 100:8, 100:20
**speech** [1] - 81:10
**speed** [1] - 53:19
**spell** [1] - 40:7
**splotches** [1] - 84:25
**splotchy** [2] - 85:3, 86:22
**SPOTA** [2] - 1:13, 2:13
**spring** [1] - 14:11
**squad** [13] - 76:13, 76:14, 77:11, 77:14, 77:25, 78:15, 78:21, 79:18, 79:21, 80:20, 87:14, 88:22, 111:19
**square** [1] - 81:17
**squeezed** [1] - 66:21
**ss** [1] - 114:4
**stairs** [1] - 77:15
**stamps** [2] - 47:22, 96:23
**standing** [8] - 50:9, 50:11, 50:14, 55:2, 60:17, 60:18, 63:15, 63:20
**started** [2] - 42:24, 58:13
**Started** [1] - 10:13
**STATE** [1] - 114:3
**state** [6] - 5:22, 6:9, 19:17, 70:22, 71:8, 71:11
**State** [10] - 2:22, 5:8, 43:2, 43:21, 45:17, 45:20, 46:3, 46:6, 71:17, 114:8
**statement** [1] - 53:17
**statements** [1] - 58:21
**STATES** [2] - 1:2, 2:2
**stationed** [1] - 10:11
**stayed** [3] - 62:7,

62:16, 63:9
**steady** [1] - 77:8
**Steck** [1] - 30:12
**step** [3] - 75:17, 79:10, 79:12
**stepped** [2] - 65:10, 79:16
**Stepping** [1] - 73:15
**steps** [3] - 77:17, 77:18, 77:21
**Still** [1] - 19:20
**still** [2] - 44:12, 80:16
**stint** [1] - 13:9
**STIPULATED** [3] - 4:2, 4:8, 4:13
**stomach** [2] - 52:2, 52:3
**stood** [1] - 75:4
**stop** [4] - 9:23, 28:18, 46:17, 73:2
**stopped** [2] - 26:10, 26:12, 76:10
**stops** [1] - 77:10
**straight** [1] - 84:8
**Street** [1] - 1:23
**struck** [1] - 26:3
**struggle** [4] - 55:13, 86:22, 93:13, 93:17
**struggling** [1] - 83:12
**style** [1] - 111:20
**sub** [1] - 27:22
**Sub** [1] - 28:3
**subdue** [1] - 65:15
**subject** [7] - 13:11, 67:22, 71:2, 71:6, 74:18, 74:22
**subjects** [2] - 31:14, 39:10
**substance** [6] - 15:22, 16:16, 18:24, 20:23, 23:24, 25:16
**sued** [1] - 25:14
**SUFFOLK** [8] - 1:7, 1:12, 1:13, 2:7, 2:12, 2:13
**Suffolk** [16] - 1:15, 1:17, 2:15, 2:17, 6:17, 6:19, 8:5, 9:2, 9:18, 9:23, 12:9, 12:13, 15:12, 17:3, 35:12, 45:5
**suit** [1] - 22:17
**Suite** [1] - 1:23
**sum** [6] - 15:22, 16:15, 18:24, 20:23, 23:24, 25:16
**summer** [1] - 103:20, 105:18
**summing** [1] - 72:18
**sup** [7] - 98:7, 99:8,

99:11, 99:15, 99:22, 100:13, 100:23
**superior** [2] - 33:7, 34:10
**supervising** [2] - 39:9, 39:12
**supervisor** [6] - 33:7, 40:4, 90:10, 100:24, 102:17, 102:20
**supervisor's** [1] - 102:11
**supplementary** [4] - 98:25, 99:4, 101:20, 102:14
**supply** [1] - 106:12
**surprised** [1] - 95:15
**SUV** [3] - 48:6, 49:11, 49:15
**swaying** [1] - 78:7
**sweaty** [1] - 82:3
**sworn** [4] - 4:15, 4:18, 5:3, 114:12
**systems** [3] - 10:21, 11:9, 11:25

**T**

**table** [1] - 25:2
**tactics** [2] - 27:6, 27:18
**TALK** [2] - 1:11, 2:11
**Talt** [20] - 41:20, 41:24, 42:17, 48:16, 56:23, 87:4, 87:13, 87:20, 88:19, 88:24, 89:3, 89:18, 89:22, 89:25, 90:3, 90:6, 91:18, 108:8, 108:10, 108:12
**TALT** [1] - 3:23
**tasks** [1] - 40:17
**taught** [1] - 27:13
**telephone** [1] - 91:17, 106:10
**ten** [7] - 16:12, 16:13, 50:18, 85:21, 85:23, 98:14
**tend** [2] - 59:12, 59:14
**Tennessee** [1] - 10:14
**term** [1] - 17:18
**terms** [8] - 21:20, 49:22, 51:10, 51:14, 53:22, 54:10, 61:14, 103:16
**testified** [2] - 5:5, 110:25
**testifying** [1] - 107:17

**testimony** [5] - 26:22, 105:2, 108:13, 108:16, 114:14
**thereafter** [1] - 103:11
**third** [1] - 70:19
**Third** [5] - 7:15, 7:16, 7:19, 42:4, 44:16
**THOMAS** [2] - 1:13, 2:13
**threat** [1] - 60:9
**three** [12] - 8:2, 8:10, 22:19, 25:15, 35:21, 50:8, 51:21, 58:15, 77:17, 77:18, 77:21, 93:17
**Three** [1] - 10:17
**throughout** [3] - 16:4, 27:10, 80:22
**timestamps** [1] - 27:23
**tires** [1] - 54:19
**today** [1] - 29:21
**Tom** [3] - 76:8, 77:3, 87:9
**took** [10] - 12:8, 12:10, 45:14, 45:24, 47:15, 58:15, 80:2, 80:9, 92:11, 98:13
**top** [2] - 42:8, 50:19
**total** [3] - 59:6, 88:14, 106:2
**tour** [2] - 29:6, 96:24
**towards** [1] - 42:24
**track** [2] - 15:21, 20:16
**trade** [1] - 10:15
**traffic** [4] - 47:4, 47:7, 47:11, 53:19
**trained** [2] - 27:9, 35:12
**training** [3] - 14:16, 26:25, 27:5
**transcript** [1] - 109:20
**transmission** [11] - 41:20, 41:23, 42:17, 42:21, 47:17, 47:18, 70:19, 70:22, 71:4, 71:15, 88:10
**transmissions** [1] - 27:24
**transport** [9] - 57:15, 57:19, 57:23, 72:12, 72:23, 74:13, 74:17, 74:21, 89:22
**transported** [2] - 70:4, 89:17
**Transporting** [1] - 71:2
**transporting** [3] -

GONZALEZ -V- COUNTY OF SUFFOLK

JOSEPH A. LINI

123

71:25, 73:24, 111:17
**trash** [1] - 58:14
**trauma** [7] - 94:21, 95:2, 95:6, 95:9, 95:17, 95:23, 96:9
**trespassing** [1] - 13:4
**Trespassing** [1] - 13:5
**Trial** [1] - 2:20
**trial** [6] - 4:12, 19:25, 22:25, 24:13, 26:7, 30:20
**true** [1] - 114:13
**trunk** [1] - 19:14
**try** [1] - 6:5
**trying** [3] - 83:12, 83:23, 93:18
**turn** [4] - 44:3, 44:4, 44:9, 79:3
**turned** [2] - 42:13, 43:24
**twice** [1] - 86:17
**two** [6] - 12:4, 21:22, 43:25, 54:5, 54:6, 69:10
**type** [2] - 24:9, 26:25

### U

**U.S** [1] - 9:24
**unauthorized** [1] - 17:7
**under** [5] - 36:7, 47:15, 60:13, 65:22, 73:18
**undue** [1] - 20:10
**unfounded** [1] - 18:23
**unidentified** [2] - 1:15, 2:15
**Uniform** [4] - 7:9, 40:19, 41:16, 77:8
**uniform** [2] - 8:23, 78:15
**Uniformed** [2] - 8:19, 28:22
**uniformed** [2] - 8:20, 8:25
**unit** [9] - 40:12, 48:7, 48:8, 48:25, 49:12, 49:16, 49:19, 49:22, 99:20
**unit's** [1] - 49:24
**UNITED** [2] - 1:2, 2:2
**units** [1] - 41:21
**unknown** [2] - 1:15, 2:15
**unlawful** [6] - 16:4, 16:16, 16:22, 19:2, 20:25, 25:20

**Unnecessary** [2] - 19:2, 25:18
**unnecessary** [3] - 21:2, 21:4, 25:22
**unresponsive** [1] - 94:15
**unsubstantiated** [1] - 18:23
**up** [27] - 12:17, 12:24, 46:2, 46:5, 50:3, 53:14, 54:24, 59:17, 59:20, 60:12, 61:2, 61:6, 62:5, 65:4, 71:16, 72:15, 72:18, 73:16, 75:19, 76:7, 77:17, 83:9, 84:7, 97:15, 106:25, 107:4
**upper** [2] - 37:19, 38:6
**upright** [1] - 74:4

### V

**vacation** [1] - 18:2
**van** [2] - 13:22, 13:23
**various** [3] - 27:4, 28:10, 83:5
**Various** [1] - 85:6
**vehicle** [12] - 22:13, 40:20, 43:9, 48:23, 53:11, 54:20, 63:5, 66:16, 70:18, 72:11, 75:4, 90:18
**vehicles** [1] - 48:4
**verdict** [2] - 23:3, 23:5
**Veterans** [1] - 3:11
**video** [1] - 29:12
**Video** [1] - 29:15
**viewed** [1] - 39:4
**violating** [1] - 12:21
**visible** [1] - 68:12
**voluntarily** [1] - 61:23
**volunteer** [1] - 108:20
**volunteered** [2] - 57:24, 58:2

### W

**W-E-L-S-C-H-I-M-E-R** [1] - 40:8
**waist** [1] - 85:7
**waistband** [2] - 66:20, 66:23
**wait** [1] - 12:12
**Waited** [1] - 98:22
**Waiting** [1] - 97:12
**waiting** [3] - 97:17, 100:2, 108:2

**waived** [1] - 4:7
**walk** [5] - 54:25, 59:16, 62:10, 73:17, 77:24
**Walked** [1] - 76:7
**walked** [14] - 53:14, 54:24, 59:23, 62:2, 62:8, 65:4, 73:16, 73:18, 76:10, 76:12, 77:22, 77:23, 78:16, 111:18
**walking** [3] - 78:8, 78:11, 111:25
**wall** [1] - 76:25
**Walt** [1] - 3:18
**weapon** [2] - 19:11, 24:8
**weapons** [1] - 66:19
**wearing** [1] - 52:23
**week** [1] - 105:20
**Welschimer** [1] - 40:6
**West** [1] - 41:5
**WHEREOF** [1] - 114:20
**whipped** [1] - 22:7
**white** [1] - 54:19
**Whitman** [1] - 3:18
**whole** [2] - 80:22, 88:5
**wide** [1] - 54:10
**WILLIAM** [3] - 1:10, 2:10, 3:7
**William** [2] - 5:15, 24:21
**windows** [1] - 78:15
**Withdrawn** [5] - 36:25, 39:7, 77:19, 90:15, 107:9
**Witness** [1] - 101:16
**witness** [6] - 5:3, 106:4, 107:10, 107:12, 114:10, 114:14
**WITNESS** [2] - 113:3, 114:20
**words** [4] - 5:25, 35:6, 72:17, 72:20
**wrench** [1] - 83:24
**wrestling** [3] - 82:6, 83:3, 83:7
**write** [1] - 28:16
**wrote** [2] - 100:10, 100:13
**www.
realtimereporting.
com** [1] - 1:25

### Y

**yard** [1] - 13:2

**year** [2] - 27:10, 27:14
**years** [11] - 6:20, 6:21, 7:20, 8:2, 8:10, 10:3, 12:4, 12:19, 22:23, 35:21, 92:16
**yield** [1] - 46:24
**YORK** [3] - 1:2, 2:2, 114:3
**York** [19] - 1:20, 1:24, 2:23, 3:6, 3:12, 3:19, 5:13, 6:12, 8:7, 8:9, 8:15, 9:4, 9:9, 11:20, 12:7, 12:10, 13:10, 15:2, 114:8
**yourself** [1] - 62:5

### Z

**zone** [1] - 48:20
**Zurl** [1] - 99:25

**$**

**$10,000** [1] - 20:6

**•**

**'90** [1] - 14:12
**'90s** [1] - 8:2
**'94** [1] - 15:15

**1**

**1** [8] - 32:10, 32:12, 32:16, 34:6, 39:5, 69:13, 84:17, 113:13
**1-10** [2] - 1:15, 2:15
**10** [1] - 10:7
**100** [2] - 1:19, 3:11
**101** [1] - 113:16
**112** [1] - 113:5
**11550** [1] - 3:6
**11702** [1] - 1:24
**11706** [2] - 5:13, 6:12
**11747** [1] - 3:19
**11:00** [3] - 29:8, 96:25, 97:7
**11:18** [1] - 1:21
**12** [15] - 12:19, 28:24, 29:4, 29:7, 31:5, 31:25, 38:25, 39:20, 40:5, 41:13, 41:18, 88:14, 101:25, 103:2, 104:14
**124** [1] - 1:23
**13** [2] - 29:5, 103:3
**15** [1] - 88:13
**1630** [2] - 5:12, 6:11
**17** [1] - 14:16
**19** [1] - 1:21
**1979** [2] - 9:16, 9:21
**1986** [2] - 10:7, 11:11
**1987** [3] - 7:3, 9:7, 12:11
**1989** [1] - 8:12
**1990** [1] - 18:17
**1993** [1] - 15:15

**2**

**2** [4] - 37:10, 37:12, 37:16, 113:14
**2002** [1] - 41:12
**2005** [2] - 22:23, 35:16
**2006** [1] - 22:24
**2008** [16] - 28:24, 29:5, 29:7, 31:5, 31:25, 39:2, 39:20, 40:5, 41:13, 41:18, 47:7, 101:25, 103:2,

**103:3, 104:14
2011** [2] - 1:21, 114:22
**202** [1] - 1:23
**20:29** [1] - 102:4
**26** [2] - 70:24, 70:25
**29** [1] - 113:8
**2:36** [1] - 112:14

**3**

**3** [5] - 44:22, 44:24, 45:4, 46:13, 113:15
**314** [4] - 40:23, 40:25, 70:24
**32** [2] - 70:24, 113:13
**37** [1] - 113:14
**3:00** [1] - 29:8

**4**

**4** [5] - 54:23, 101:7, 101:9, 101:14, 113:16
**41** [1] - 46:10
**42** [6] - 27:22, 28:2, 28:3, 28:4, 46:10, 104:7
**45** [1] - 113:15

**5**

**5** [3] - 84:15, 84:18, 113:4
**516-938-4000** [1] - 1:24
**556** [1] - 3:5

**6**

**6** [2] - 53:25, 54:7
**6th** [1] - 114:21

**8**

**8** [1] - 50:17
**8:20** [2] - 42:9, 47:19
**8:30** [2] - 42:9, 47:19

**9**

**999** [1] - 3:18

**A**

**a.m** [1] - 1:21
**able** [3] - 10:24, 84:13, 85:8
**abrasion** [20] - 32:5, 32:20, 32:22, 33:5, 34:2, 34:4, 34:9, 34:25, 39:5, 64:16,

64:22, 65:18, 68:11, 68:21, 69:14, 70:11, 71:9, 86:9, 86:10, 90:4
**abrasions** [6] - 36:3, 64:6, 82:20, 86:21, 110:22, 111:2
**abreast** [3] - 48:24, 49:3, 49:5
**Absolutely** [1] - 85:22
**abuse** [1] - 25:25
**academy** [2] - 7:21, 27:2
**accident** [1] - 14:3
**accurate** [2] - 98:8, 98:16
**accurately** [1] - 6:2
**acquiesce** [1] - 61:21
**action** [2] - 19:25, 114:17
**actions** [4] - 21:14, 21:17, 21:19, 23:13
**active** [1] - 25:10
**address** [2] - 5:11, 6:10
**adjacent** [1] - 62:25
**administer** [1] - 4:16
**administrators** [2] - 1:4, 2:4
**Aerospace** [1] - 11:22
**Affairs** [8] - 15:2, 15:11, 16:25, 25:5, 103:7, 103:10, 103:14, 111:10
**afternoon** [1] - 108:3
**ago** [1] - 22:23
**AGREED** [3] - 4:3, 4:9, 4:14
**ahead** [4] - 13:18, 68:4, 69:20, 95:19
**aircraft** [2] - 10:17, 10:22
**allegations** [4] - 5:20, 16:19, 21:4, 25:22
**allege** [1] - 22:2
**alleged** [1] - 19:5
**allegedly** [1] - 19:11
**Almedina** [1] - 25:14
**alone** [3] - 89:6, 89:10, 89:12
**Alongside** [1] - 62:13
**alongside** [2] - 49:7, 49:10
**ALSO** [1] - 3:15
**AND** [5] - 1:14, 2:14, 4:2, 4:8, 4:13

**ankles** [1] - 75:5
**answer** [8] - 6:5, 13:18, 33:11, 33:17, 68:4, 69:20, 95:20, 106:21
**answered** [3] - 66:4, 66:5, 86:17
**apparent** [3] - 36:21, 55:12, 81:21
**appear** [5] - 35:7, 36:9, 37:5, 37:22, 38:9, 38:21, 56:3, 77:20
**appeared** [1] - 65:21
**April** [17] - 28:24, 29:4, 29:5, 29:7, 31:5, 31:25, 38:25, 39:20, 40:5, 41:13, 41:18, 42:14, 47:6, 101:25, 102:25, 103:3, 104:14
**area** [10] - 8:23, 32:22, 36:6, 41:2, 41:4, 46:16, 53:6, 54:12, 63:2, 95:10
**areas** [1] - 27:8
**arguing** [1] - 17:13
**arm** [7] - 52:21, 60:13, 60:15, 83:19, 83:23, 84:10, 84:23
**arms** [3] - 78:5, 83:11, 83:12
**arrest** [8] - 16:5, 19:3, 21:2, 21:13, 23:19, 24:2, 25:20, 81:4
**arrested** [6] - 12:16, 12:18, 58:13, 72:16, 80:17, 81:3
**arrests** [1] - 16:17
**arrive** [3] - 47:14, 92:10, 96:20
**arrived** [10] - 48:3, 48:13, 57:21, 65:10, 72:6, 74:25, 78:19, 92:18, 96:17, 97:6
**aspects** [1] - 27:4
**assessment** [1] - 66:8
**assigned** [2] - 14:15, 40:22
**assignments** [1] - 28:17
**assist** [5] - 41:21, 61:24, 74:13, 74:16, 99:10
**Assist** [1] - 62:2
**assistance** [2] - 14:2, 74:21
**assisted** [1] - 72:10
**ASST** [2] - 1:13, 2:13
**assume** [2] - 57:22,

111:25
**assumed** [2] - 65:16, 65:17, 68:23
**Assuming** [1] - 68:20
**assumption** [1] - 65:23
**atlas** [1] - 45:5
**attend** [1] - 9:17
**attending** [1] - 9:23
**attention** [10] - 65:6, 65:9, 67:19, 68:8, 68:25, 69:5, 71:12, 80:18, 81:4, 112:11
**ATTORNEY** [4] - 1:12, 1:13, 2:12, 2:13
**Attorney** [4] - 1:16, 1:17, 2:16, 2:17
**attorney's** [1] - 105:7
**Attorney's** [1] - 111:6
**attorneys** [1] - 4:3
**Attorneys** [3] - 3:4, 3:10, 3:17
**authorized** [1] - 4:16
**Avenue** [4] - 5:12, 6:12, 71:18, 71:19
**aware** [7] - 14:20, 14:23, 14:24, 31:4, 47:10, 94:8, 96:11

**B**

**B-L-A-C-K-L-I-D-G-E** [1] - 23:23
**Babylon** [1] - 1:24
**background** [2] - 35:11, 35:25
**bad** [1] - 17:14
**bag** [9] - 66:24, 67:6, 67:9, 70:15, 70:16, 75:6, 75:12, 75:14, 79:6
**Basic** [1] - 11:2
**basis** [1] - 33:10
**Bay** [8] - 41:5, 41:6, 42:25, 43:15, 43:18, 43:23, 44:16, 45:11
**Bayshore** [2] - 5:12, 6:12
**beat** [1] - 19:8
**beaten** [1] - 21:5
**beating** [1] - 19:12
**became** [1] - 94:8
**behind** [11] - 49:2, 49:12, 49:13, 49:16, 49:18, 62:9, 62:11, 66:17, 66:24, 83:12, 83:24
**Behind** [1] - 49:17
**below** [2] - 46:19,

**114**

70:7
**belt** [2] - 66:24, 67:8
**belted** [1] - 74:6
**bending** [1] - 50:9
**best** [4] - 13:5,
13:19, 33:17, 68:5
**between** [7] - 4:3,
54:8, 54:21, 81:8,
81:9, 84:17, 85:23
**Between** [1] - 86:2
**BILLY** [1] - 3:24
**Billy** [1] - 66:18
**BJ** [2] - 17:14, 17:18
**black** [1] - 53:2
**Blacklidge** [3] -
23:17, 23:23, 25:3
**bleeding** [2] - 34:17,
69:8
**blood** [7] - 36:9,
36:10, 81:24, 82:2,
82:18, 114:17
**blow** [1] - 83:6
**blue** [3] - 48:11,
50:4, 51:13
**body** [11] - 51:14,
82:10, 82:24, 84:21,
85:4, 85:6, 85:10,
85:17, 90:8, 90:12,
111:2
**bone** [3] - 32:6,
32:21, 70:12
**book** [11] - 27:23,
28:8, 28:9, 28:13,
28:16, 28:21, 28:23,
29:4, 92:14, 92:16,
113:9
**boot** [1] - 10:14
**bottom** [2] - 101:22,
102:10
**Boulevard** [1] - 3:5
**boxer** [1] - 75:5
**boxers** [1] - 79:6
**break** [2] - 6:4, 62:17
**breathing** [5] - 50:9,
55:11, 55:22, 69:8,
111:20
**BREWINGTON** [1] -
3:3
**Brewington** [1] -
5:16
**brief** [1] - 110:12
**briefly** [2] - 11:19,
76:10
**Brightwaters** [1] -
41:5
**bring** [5] - 67:23,
68:8, 69:4, 69:9, 76:6
**broken** [1] - 76:25
**brought** [11] - 18:14,
61:21, 62:23, 76:4,
76:19, 94:9, 94:14,

94:19, 95:6, 95:16,
96:9
**brown** [2] - 38:11,
38:12
**bruise** [8] - 36:18,
36:19, 36:21, 37:8,
38:22, 69:13, 69:23,
69:24
**Brukaleary** [1] -
30:13
**buckle** [2] - 66:25,
67:8
**builder** [1] - 11:21
**building** [2] - 89:9,
89:13
**bumper** [2] - 49:23,
49:24
**Bureau** [2] - 15:2,
15:11
**business** [2] - 6:10,
31:12
**butt** [3] - 60:3, 60:4,
60:7
**BY** [6] - 3:7, 3:13,
3:20, 5:6, 112:5,
113:3

**C**

**C-E-D-E-N-O** [1] -
20:22
**C1** [1] - 45:7
**CAD** [2] - 47:21,
96:23
**Cadillac** [5] - 48:9,
48:10, 50:4, 51:13,
51:23
**California** [3] -
10:15, 10:16, 10:17
**cameras** [1] - 47:4,
47:7, 47:11
**camp** [1] - 10:14
**cannot** [1] - 85:11
**capacities** [2] - 1:16,
2:16
**capacity** [17] - 1:8,
1:9, 1:10, 1:10, 1:11,
1:12, 1:13, 1:14, 2:8,
2:9, 2:10, 2:10, 2:11,
2:12, 2:13, 2:14, 6:22
**Capalino** [4] -
103:15, 104:4, 104:8,
104:12
**Captain** [2] - 103:15,
104:4
**car** [39] - 7:25, 16:23,
17:6, 19:14, 24:19,
40:24, 48:18, 48:19,
48:25, 49:2, 49:4,
49:9, 49:10, 49:12,
49:13, 49:14, 50:3,

50:20, 51:16, 51:18,
52:12, 52:17, 53:20,
59:16, 61:14, 61:22,
61:25, 62:8, 62:19,
62:21, 62:22, 63:21,
64:8, 65:5, 67:2,
73:17, 90:19
**care** [2] - 31:7, 31:10
**career** [2] - 16:4,
31:13
**carriers** [1] - 10:18
**carry** [4] - 22:8,
28:12, 28:21, 28:23
**cars** [2] - 28:18,
50:12
**Cartas** [1] - 30:12
**case** [3] - 20:4,
52:20, 62:17
**Catalina** [1] - 25:20
**Cedeno** [3] - 20:22,
21:8, 23:11
**cell** [1] - 91:20
**central** [1] - 1:20
**certain** [1] - 8:22
**certification** [1] - 4:6
**certify** [2] - 114:9,
114:15
**change** [1] - 41:8
**changed** [1] - 60:5
**charge** [1] - 13:4
**charged** [1] - 12:20
**charges** [1] - 12:22
**check** [5] - 87:5,
91:3, 92:20, 96:23,
111:24
**checked** [2] - 66:19,
66:22
**checkerboard** [1] -
81:18
**cheek** [7] - 32:6,
32:21, 64:17, 64:18,
64:20, 70:12
**cheekbone** [1] - 33:2
**chest** [4] - 52:10,
82:12, 85:12, 85:14
**China** [1] - 10:16
**Christine** [1] - 22:18
**CHRISTINE** [1] - 3:9
**CHRISTOPHER** [3] -
1:11, 2:11, 3:23
**circle** [3] - 36:17,
83:15, 83:18
**circles** [1] - 36:13
**circumstances** [1] -
104:14
**city** [2] - 9:2, 15:8
**City** [9] - 8:7, 8:9,
8:15, 9:5, 9:9, 12:7,
12:10, 13:10, 15:2
**civilian** [2] - 13:11,
14:22

**claim** [4] - 13:23,
18:6, 24:8, 103:12
**claimed** [5] - 21:5,
22:5, 22:6, 24:2, 26:2
**claims** [1] - 13:17
**clarifying** [1] - 86:19
**clear** [1] - 107:4
**cleared** [1] - 106:25
**climb** [1] - 77:15
**climbing** [1] - 77:21
**clipped** [1] - 74:5
**close** [3] - 16:13,
48:21, 81:22
**closer** [1] - 85:24
**closest** [4] - 48:23,
52:21, 60:17, 60:19
**closet** [1] - 52:11
**clothes** [3] - 55:11,
55:21, 99:19
**co** [2] - 1:4, 2:4
**co-administrators**
[2] - 1:4, 2:4
**cocaine** [1] - 75:12
**collar** [1] - 81:25
**colleagues** [1] -
108:6
**college** [3] - 9:17,
11:2, 11:4
**COLLINS** [2] - 1:14,
2:14
**Collins** [12] - 105:8,
105:9, 105:24, 106:7,
106:10, 106:13,
107:13, 108:22,
109:2, 109:9, 109:15,
110:9
**color** [1] - 48:10
**coming** [2] - 30:7,
48:5
**COMMISSIONER** [2]
- 1:7, 2:7
**communications** [4]
- 33:6, 111:5, 111:9,
111:13
**Community** [2] -
9:18, 9:23
**company** [1] - 11:18
**competitive** [3] - 7:2,
7:5, 9:5
**complainant** [2] -
18:12, 18:13
**complaining** [6] -
56:6, 56:9, 58:13,
72:15, 80:16, 81:2
**complaint** [28] -
5:20, 13:11, 13:24,
14:9, 14:22, 15:11,
15:19, 15:23, 16:2,
18:21, 18:22, 18:25,
19:5, 19:10, 20:9,
20:24, 21:16, 22:2,

23:9, 23:13, 23:17,
23:20, 23:25, 24:12,
25:4, 25:17, 26:14,
27:18
**complaints** [7] -
14:21, 14:25, 15:17,
16:3, 16:9, 25:5, 25:8
**complete** [1] -
104:22
**completed** [1] -
105:3
**completely** [1] -
75:16
**complying)** [1] -
101:16
**computer** [4] - 17:6,
17:8, 17:19, 17:21
**concern** [1] - 60:7
**concerning** [5] -
5:19, 16:19, 25:6,
26:22, 30:5
**condition** [1] - 33:8
**conditions** [1] -
28:18
**conduct** [5] - 16:19,
17:17, 17:22, 21:14,
25:6
**consider** [1] - 100:15
**considered** [1] -
43:19
**contact** [19] - 21:7,
21:11, 38:3, 38:13,
38:25, 39:21, 41:18,
56:23, 69:19, 87:13,
89:16, 89:20, 91:17,
91:21, 94:2, 104:5,
105:11, 105:13, 112:8
**contacted** [4] -
103:6, 103:9, 103:13,
105:6
**continue** [1] - 45:20
**Continued** [1] - 1:22
**contraption** [1] -
38:18
**control** [3] - 93:18,
99:19, 100:6
**conversation** [14] -
29:18, 30:4, 30:14,
57:11, 58:5, 61:10,
78:21, 79:8, 79:21,
80:12, 89:3, 92:21,
93:2, 104:12
**conversations** [9] -
30:15, 53:12, 58:6,
87:7, 89:25, 95:12,
99:13, 100:4, 104:15
**convicted** [1] - 13:6
**COPE** [8] - 48:7,
48:8, 48:25, 49:12,
49:16, 49:18, 49:22,
49:23

115

116

copies [1] - 106:14
copy [1] - 102:13
correct [10] - 33:3, 34:5, 35:22, 46:10, 57:12, 63:18, 64:11, 64:17, 97:4, 98:18
Correct [4] - 33:4, 45:22, 46:8, 46:11
correspondence [6] - 28:6, 104:13, 104:16, 104:21, 104:23, 105:3
Counsel [1] - 113:18
counseling [2] - 31:19, 31:22
COUNTY [7] - 1:7, 1:12, 1:13, 2:7, 2:12, 2:13, 114:5
county [1] - 35:19
County [12] - 1:16, 1:17, 2:16, 2:17, 6:17, 6:19, 8:5, 15:12, 17:3, 29:20, 35:12, 45:5
couple [1] - 59:8
course [3] - 10:23, 19:12, 21:8
COURT [2] - 1:2, 2:2
Court [1] - 1:19, 4:19
court [5] - 6:2, 19:18, 19:21, 31:2, 107:22
courthouse [1] - 107:24
courtroom [1] - 24:23
cover [1] - 41:3
covered [1] - 75:21
crime [3] - 13:7, 99:18, 100:5
Cunningham [1] - 22:18
curb [3] - 54:5, 54:8, 54:22
current [1] - 7:10
custody [2] - 31:15, 58:16
custom [1] - 11:21
cut [2] - 38:9, 38:22

**D**

Dana [1] - 30:11
dark [5] - 36:13, 36:17, 37:6, 42:12, 42:13
date [7] - 32:14, 37:14, 40:14, 45:2, 101:11, 101:24, 102:2
DAVID [1] - 3:20
David [1] - 5:16
days [2] - 69:18, 104:24

dead [1] - 31:11
death [1] - 31:19
Defendant [1] - 2:21
defendants [2] - 1:18, 2:18
Defendants [1] - 3:10
defense [1] - 27:5
degree [1] - 11:5
Department [1] - 9:9, 12:7, 13:10, 15:3, 35:13
department [3] - 8:15, 26:23, 28:11
DEPARTMENT [2] - 1:7, 2:7
depicted [4] - 32:18, 34:5, 36:24, 37:3
depiction [1] - 45:4
depicts [1] - 37:19
deposition [7] - 4:6, 4:14, 27:21, 29:14, 29:21, 114:11, 114:13
depositions [2] - 24:5, 26:11
describe [3] - 19:4, 70:25, 80:25
described [1] - 93:16
designated [1] - 54:14
desk [2] - 76:24, 87:2
detailed [1] - 104:7
Detective [30] - 41:20, 41:24, 42:17, 48:6, 48:15, 55:25, 56:18, 56:23, 67:10, 70:14, 87:4, 87:13, 87:20, 88:18, 88:24, 89:3, 89:18, 89:22, 89:25, 90:3, 90:6, 91:18, 91:25, 98:5, 98:9, 98:12, 98:20, 108:7, 108:9, 108:12
detective [11] - 58:24, 76:13, 76:14, 77:11, 77:14, 77:25, 79:18, 79:20, 80:20, 87:14, 111:19
detectives [1] - 76:16
died [3] - 31:4, 31:10, 31:15
Diego [2] - 10:17, 11:19
different [1] - 43:10
difficulty [1] - 69:8
direct [7] - 43:9, 55:5, 57:19, 85:9, 89:2, 90:14, 90:21
directed [3] - 41:24, 42:2, 79:23

directing [1] - 58:20
direction [11] - 43:4, 43:10, 44:7, 44:13, 44:18, 44:20, 45:24, 52:9, 52:13, 52:15, 78:25
Directly [2] - 49:13, 50:16
directly [7] - 46:19, 49:18, 50:14, 68:9, 69:4, 69:9, 72:14
dirt [2] - 37:8, 82:7
dirty [1] - 82:3
discharged [2] - 10:6, 10:9
discipline [2] - 17:24, 26:15
disciplined [7] - 14:4, 15:7, 16:24, 17:5, 17:15, 18:3, 23:9
discuss [1] - 110:6
discussion [2] - 6:3, 47:25
discussions [2] - 58:7, 87:8
disheveled [2] - 55:12, 55:21
distance [1] - 54:21
DISTRICT [10] - 1:2, 1:2, 1:12, 1:13, 1:14, 2:2, 2:2, 2:12, 2:13, 2:14
district [1] - 105:7
District [5] - 1:16, 1:17, 2:16, 2:17, 111:6
division [1] - 14:15
Division [1] - 14:16
DOCUMENT [1] - 113:7
Document [2] - 101:8, 113:16
documented [1] - 92:13
documents [2] - 106:13, 109:21
Doe [2] - 21:24, 23:18
DOES [2] - 1:15, 2:15
done [2] - 68:9, 73:7
Donnelly [1] - 30:11
door [12] - 62:19, 62:21, 63:6, 63:10, 63:12, 63:16, 63:22, 64:10, 72:10, 76:7, 76:9, 87:3
DORMER [2] - 1:7,

2:7
double [2] - 7:25, 24:19
doubt [2] - 97:24, 99:16
down [7] - 6:3, 54:6, 60:6, 62:9, 76:20, 83:9, 92:8
drive [1] - 45:23
driving [1] - 111:16
drove [3] - 14:3, 22:13, 90:19
drugs [4] - 70:17, 75:19, 87:4, 87:17
dry [1] - 82:18
duly [2] - 5:3, 114:12
DUNNE [14] - 3:13, 13:12, 19:20, 31:8, 33:9, 61:3, 66:3, 68:2, 69:15, 86:16, 95:18, 112:6, 112:13, 113:5
during [5] - 19:12, 21:8, 72:23, 109:11, 112:8
During [5] - 13:9, 24:2, 24:4, 72:12, 110:20
duties [6] - 7:7, 8:17, 8:24, 10:19, 11:7, 40:18
duty [2] - 7:10, 77:6

**E**

e-mail [2] - 17:7, 104:19
e-mailed [1] - 17:13
EA6Bs [1] - 12:2
ear [9] - 36:24, 37:2, 37:5, 37:19, 37:22, 81:15, 81:20, 81:23
earing [2] - 80:7, 81:22
earings [1] - 76:21
early [2] - 8:2, 103:2
earring [2] - 81:14, 110:15
earrings [7] - 79:24, 86:24, 87:2, 109:24, 110:3, 110:6, 110:8
east [1] - 42:18
East [1] - 1:23
Eastbound [1] - 43:7
eastbound [5] - 43:21, 45:17, 45:20, 46:7, 71:18
EASTERN [2] - 1:2, 2:2
effect [1] - 4:17
either [6] - 18:22, 36:22, 83:18, 91:17,

101:5, 102:23
Either [2] - 52:3, 101:3
electronic [3] - 10:21, 11:9, 11:25
electronics [1] - 11:3
Emergency [1] - 72:4
emergency [2] - 50:22, 95:3
employed [4] - 6:14, 6:16, 6:19, 6:22
employees [4] - 1:17, 2:17, 29:19, 30:16
employment [3] - 11:13, 11:15, 11:17
empties [1] - 43:20
EMT [2] - 27:5, 35:13
end [1] - 109:14
ended [3] - 11:12, 25:7, 96:24
ending [1] - 97:3
enforcement [2] - 8:6, 9:10
entered [1] - 10:5
entire [2] - 13:13, 112:8
entrance [14] - 43:16, 43:17, 43:25, 44:2, 44:4, 44:5, 44:6, 44:10, 44:11, 44:13, 46:21, 46:22, 95:8
equipment [3] - 19:11, 24:9, 26:5
ER [5] - 92:20, 94:16, 94:19, 94:22, 95:6
Esq [1] - 3:3
ESQ [3] - 3:7, 3:13, 3:20
essentially [1] - 8:24
Essentially [1] - 9:3
Estate [2] - 1:4, 2:4
evaluation [1] - 67:25
eventually [2] - 18:14, 96:14
evidence [1] - 106:13
exact [1] - 35:5, 42:23, 92:6
Exactly [1] - 10:3
EXAMINATION [3] - 5:6, 112:5, 113:3
examination [5] - 7:2, 7:5, 9:5, 12:9, 12:11
Examination [1] - 2:20
examined [1] - 5:4
except [1] - 4:9
excessive [5] - 16:2,

117

16:5, 16:17, 18:7, 20:9
  excessively [1] - 69:9
  Exhibit [16] - 32:10, 32:12, 32:16, 34:6, 37:10, 37:12, 37:16, 39:5, 44:22, 44:24, 45:4, 46:13, 69:12, 101:7, 101:9, 101:14
  EXHIBITS [1] - 113:11
  exhibits [1] - 113:18
  exit [2] - 46:10
  exited [2] - 53:11, 71:18
  exonerated [1] - 14:8
  experience [2] - 8:6, 9:10
  expire [1] - 35:14
  Expired [1] - 35:13
  expired [1] - 35:22
  eye [5] - 36:13, 36:14, 69:14, 69:23, 70:8
  eyebrow [2] - 70:3, 70:7

**F**

  face [22] - 24:4, 32:4, 32:6, 33:2, 34:2, 34:9, 34:25, 35:24, 63:18, 64:3, 64:6, 64:8, 65:19, 68:12, 68:21, 71:9, 81:24, 82:4, 82:11, 82:24, 86:12, 90:4
  facing [2] - 52:10, 64:10
  Facing [1] - 64:23
  fact [2] - 24:22, 57:15
  factory [1] - 12:25
  fair [3] - 36:16, 52:17, 70:10
  fall [4] - 9:7, 62:18, 79:6, 103:25
  Fall [1] - 9:21
  falls [1] - 62:17
  familiar [1] - 102:14
  Fandry [7] - 98:5, 98:9, 98:12, 98:21, 101:5, 102:23, 102:25
  far [3] - 14:7, 48:22, 53:22
  favor [1] - 24:14
  February [2] - 10:7, 11:11
  Federal [1] - 1:19
  federal [2] - 19:20,

30:25
  feet [11] - 45:25, 46:5, 50:17, 50:18, 52:14, 53:22, 53:25, 54:7, 54:10, 59:16, 60:14
  fell [4] - 75:5, 75:6, 75:14, 87:19
  felt [1] - 66:21
  female [2] - 17:12, 25:18
  few [6] - 15:18, 18:8, 45:25, 46:4, 92:7, 95:24
  fidgeting [1] - 73:5
  field [1] - 14:16
  fifteen [1] - 16:14
  Fifth [4] - 5:12, 6:11, 71:18, 71:19
  filed [5] - 18:18, 19:15, 22:20, 22:22, 103:12
  filing [1] - 4:5
  fill [4] - 29:10, 97:25, 98:24, 99:7
  filled [3] - 97:13, 97:14, 102:6
  filling [1] - 99:11, 99:14, 99:17, 99:22
  films [1] - 27:13
  finally [1] - 108:2
  fine [1] - 73:18
  finish [1] - 91:23
  Finished [1] - 10:10
  Firm [1] - 3:13
  First [2] - 44:16, 96:18
  first [28] - 5:3, 15:14, 15:23, 31:17, 33:22, 36:11, 36:22, 38:5, 44:2, 44:5, 44:10, 45:12, 47:16, 47:18, 48:13, 50:2, 58:10, 64:5, 65:9, 69:25, 87:12, 89:15, 89:19, 90:19, 97:10, 98:3, 108:25
  five [9] - 16:9, 22:23, 27:13, 85:17, 85:25, 86:2, 92:12, 98:13, 109:8
  flashlight [6] - 22:5, 22:8, 22:12, 84:6, 93:7, 93:11
  Florida [1] - 10:13
  fog [2] - 54:17, 54:22
  following [1] - 11:21
  follows [1] - 5:5
  FOR [1] - 113:12
  force [23] - 4:17, 16:2, 16:5, 16:17,

18:7, 19:2, 20:9, 20:10, 21:2, 21:4, 21:24, 21:25, 25:18, 25:22, 65:14, 65:17, 67:21, 68:20, 68:23, 71:5, 74:17, 74:21, 93:21
  forcefully [1] - 83:23
  forehead [4] - 38:19, 86:8, 86:11, 86:14
  forked [1] - 46:5
  form [4] - 4:10, 51:7, 68:3, 75:13, 95:19, 98:2
  forms [1] - 97:12
  forth [1] - 114:12
  forward [3] - 48:25, 63:7, 73:22
  four [4] - 8:2, 25:15, 50:5, 92:12
  frames [1] - 16:7
  Frank [2] - 22:6, 22:17
  Fred [1] - 5:15
  FREDERICK [1] - 3:3
  free [2] - 6:4, 77:2
  Friedrick [1] - 99:25
  friends [1] - 13:2
  frisked [1] - 67:3
  front [15] - 32:16, 46:13, 48:8, 49:4, 49:15, 49:23, 49:24, 50:12, 51:15, 51:18, 51:22, 51:24, 62:11, 63:6, 63:10
  fucked [1] - 72:15
  FURTHER [2] - 4:8, 4:13

**G**

  gallery [1] - 110:14
  general [2] - 40:17, 41:14
  generally [1] - 47:11
  geographic [1] - 8:22
  GERMANO [17] - 3:7, 5:7, 10:4, 29:2, 32:8, 36:25, 37:9, 39:7, 44:21, 47:23, 77:19, 86:18, 90:15, 101:6, 107:9, 112:3, 113:4
  Germano [1] - 5:15
  gestures [1] - 5:25
  given [1] - 114:14
  GONZALEZ [4] - 1:3, 2:3
  grab [1] - 60:15
  grabbed [2] - 60:13, 61:8

grabbing [1] - 83:23
  graduate [2] - 9:12, 9:14
  grand [19] - 103:23, 103:25, 104:2, 105:4, 105:12, 105:20, 107:11, 107:14, 107:17, 108:10, 108:24, 109:4, 109:7, 109:13, 110:21, 110:24, 111:4, 111:8, 111:12
  grass [8] - 49:8, 49:14, 51:11, 51:12, 54:5, 54:7, 54:12, 82:14
  gray [2] - 48:6, 49:11
  groans [1] - 5:25
  GROB [2] - 114:7, 114:25
  ground [4] - 50:7, 51:7, 51:8, 51:9
  group [2] - 25:15, 55:2
  Grumman [3] - 11:22, 11:24, 12:5
  guess [8] - 12:15, 17:18, 43:18, 52:18, 52:22, 82:5, 101:4, 106:25
  guiding [1] - 78:5
  gun [3] - 76:11, 90:19
  guy [2] - 14:3, 18:14
  guys [2] - 102:23, 102:25

**H**

  Hagstrom [1] - 45:5
  half [4] - 97:19, 97:23, 106:20, 109:3
  hallway [2] - 78:6, 79:4
  hallways [1] - 80:20
  hand [14] - 24:10, 37:20, 38:6, 38:16, 55:15, 60:25, 76:23, 77:2, 84:3, 92:25, 101:22, 102:10, 102:20, 114:21
  handcuff [2] - 76:24, 76:25
  handcuffed [5] - 50:8, 58:16, 59:21, 60:10, 89:17
  handcuffs [4] - 51:2, 62:18, 83:25, 93:19
  handed [4] - 60:21, 60:22, 60:23, 87:17
  hands [4] - 56:7,

56:10, 61:6, 78:3
  Hauppauge [1] - 3:12
  head [7] - 19:14, 42:8, 52:11, 73:21, 74:10, 78:10, 78:13
  heading [3] - 42:24, 43:5, 44:15
  headquarters [1] - 71:5, 71:11, 90:11
  heard [7] - 39:25, 42:16, 42:20, 43:8, 91:7, 91:9, 94:9
  hearing [2] - 56:8, 80:14
  heavily [1] - 55:11
  heavy [2] - 50:9, 55:22
  hectic [1] - 95:25
  held [1] - 29:10
  help [7] - 59:19, 60:12, 60:25, 63:4, 80:6, 81:13, 88:11
  helped [12] - 21:13, 59:15, 59:17, 60:11, 60:14, 62:5, 65:4, 73:16, 75:3, 76:21, 80:3, 86:24
  Hempstead [1] - 3:6
  HEREBY [1] - 4:2
  hereby [1] - 114:9
  herein [1] - 4:4
  hereinbefore [1] - 114:11
  hereunto [1] - 114:21
  high [4] - 9:12, 9:14, 53:19, 81:10
  Highway [1] - 3:11
  hip [2] - 52:4, 52:5
  hit [6] - 19:14, 22:4, 22:5, 53:20, 93:7, 93:10
  hold [1] - 11:23
  holding [1] - 55:14
  home [1] - 11:21
  homicide [9] - 96:16, 96:18, 97:11, 98:3, 100:2, 102:22, 102:25, 103:3, 111:14
  honestly [1] - 15:24
  hospital [8] - 67:24, 68:10, 69:10, 87:5, 91:3, 91:6, 93:3, 93:15
  hospitalization [1] - 35:8
  hour [7] - 93:25, 94:6, 97:19, 97:21, 97:23, 106:20, 109:3
  housed [1] - 22:12

1 1 8

**hundred** [2] - 45:25, 46:4
**hurt** [4] - 56:13, 56:16, 56:19, 73:13

**I**

**I.D** [1] - 113:12
**IAB** [5] - 16:9, 18:20, 18:22, 20:9, 21:16
**idea** [2] - 25:9, 94:10
**identification** [4] - 32:13, 37:13, 44:25, 101:10
**identified** [1] - 39:6
**immediately** [1] - 92:8
**IN** [1] - 114:20
**inappropriate** [1] - 17:17
**INC** [1] - 1:23
**inch** [1] - 84:12, 84:17
**inches** [3] - 54:23, 84:15, 84:18
**incident** [6] - 17:16, 20:7, 21:9, 22:10, 35:22, 103:17
**indicate** [3] - 19:10, 71:5, 109:23
**indicated** [8] - 12:8, 16:15, 32:21, 33:23, 33:25, 45:9, 68:22, 69:13
**indicating** [1] - 46:18
**individual** [19] - 1:8, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:16, 2:8, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16, 67:24
**individually** [2] - 1:4, 2:4
**inform** [5] - 33:6, 34:9, 39:9, 39:12, 65:20
**informed** [2] - 65:14, 94:17
**injured** [10] - 34:16, 35:7, 56:4, 65:21, 68:7, 68:15, 68:18, 69:7, 74:23, 92:24
**injuries** [1] - 39:10
**injury** [5] - 34:10, 36:2, 37:25, 39:13, 67:22
**inserts** [1] - 28:10
**inside** [1] - 76:10
**insisted** [1] - 24:5
**instructed** [1] - 97:25

**intense** [1] - 93:17
**interchange** [1] - 43:2
**interested** [1] - 114:18
**Internal** [8] - 14:25, 15:11, 16:25, 25:5, 103:7, 103:10, 103:14, 111:10
**internal** [2] - 28:5, 104:13, 104:16, 104:21, 104:23, 105:3
**interview** [1] - 76:20, 89:21, 90:17
**interviewed** [1] - 15:4
**investigation** [2] - 23:8, 23:20
**involved** [5] - 17:16, 22:16, 24:19, 31:16, 102:9
**involvement** [5] - 30:24, 88:5, 98:6, 98:17, 109:11
**IS** [3] - 4:2, 4:8, 4:13
**Islip** [1] - 1:20
**IT** [3] - 4:2, 4:8, 4:13
**item** [1] - 27:25

**J**

**Jack** [1] - 25:20
**JAMES** [3] - 1:9, 2:9, 3:22
**JANE** [2] - 1:14, 2:14
**jeans** [1] - 53:2
**JENNIFER** [2] - 1:3, 2:3
**Jim** [1] - 30:12
**job** [1] - 11:23
**John** [2] - 21:24, 23:18
**JOHN** [7] - 1:8, 1:14, 1:14, 2:8, 2:14, 2:14, 3:25
**joined** [1] - 9:24
**Jose** [1] - 30:12
**Joseph** [2] - 5:10, 6:11
**JOSEPH** [5] - 1:11, 2:11, 2:21, 113:4, 114:10
**JR** [1] - 3:7
**JUDGE** [1] - 1:10, 2:10, 3:24
**Judge** [31] - 48:15, 51:17, 55:9, 55:14, 56:5, 56:9, 56:12, 59:15, 60:18, 61:16, 62:4, 62:6, 63:4, 66:18, 87:6, 91:2,

91:5, 91:18, 92:19, 92:22, 93:4, 93:6, 93:9, 93:14, 94:4, 96:7, 96:8, 99:24, 100:5, 100:9, 100:13
**Judge's** [1] - 100:17
**JUDY** [2] - 114:7, 114:25
**June** [1] - 114:22
**jury** [20] - 20:3, 103:23, 103:25, 104:2, 105:4, 105:12, 105:21, 107:11, 107:14, 107:17, 108:10, 108:24, 109:4, 109:7, 109:13, 110:21, 110:25, 111:4, 111:8, 111:12
**juvenile** [1] - 12:17

**K**

**keep** [4] - 15:21, 20:15, 28:7, 93:18
**Kenny** [18] - 31:24, 32:4, 32:19, 41:18, 57:3, 58:7, 58:9, 58:20, 58:24, 59:4, 59:10, 59:19, 61:11, 61:17, 62:8, 62:11, 93:3, 93:10
**KENNY** [2] - 1:4, 2:4
**kid's** [1] - 23:16
**kind** [9] - 10:23, 17:24, 43:22, 48:20, 52:3, 53:15, 58:14, 86:14, 95:25
**knees** [1] - 60:3
**knowledge** [1] - 5:19
**Koerber** [1] - 101:5

**L**

**lacerations** [1] - 82:21
**laid** [1] - 107:6
**Lake** [1] - 10:16
**Lane** [3] - 43:14, 45:10, 45:11
**lane** [1] - 54:16
**lanes** [2] - 54:6
**large** [3] - 61:5, 66:24, 75:6
**last** [5] - 20:17, 23:22, 25:13, 30:4, 46:14
**Last** [1] - 23:16
**law** [4] - 8:6, 9:10, 12:21, 27:5
**lawsuit** [9] - 18:15, 18:18, 19:15, 19:23,

22:20, 22:22, 24:16, 25:8, 26:22
**Lawsuit** [1] - 24:13
**lawsuits** [2] - 25:11, 26:18
**laying** [1] - 51:6
**LAZO** [2] - 1:4, 2:4
**Lazo** [95] - 31:25, 32:19, 33:22, 36:20, 37:3, 38:3, 38:7, 38:13, 38:25, 39:13, 39:21, 41:18, 50:7, 50:13, 50:15, 51:2, 51:18, 51:20, 51:25, 52:23, 53:23, 54:8, 55:3, 57:3, 57:16, 58:7, 58:9, 58:20, 58:25, 59:4, 59:10, 59:20, 60:5, 60:9, 60:12, 61:11, 61:17, 62:23, 63:5, 63:21, 64:24, 65:3, 65:8, 65:15, 66:8, 66:13, 66:15, 67:19, 68:11, 69:20, 71:8, 71:12, 72:2, 72:10, 72:13, 72:23, 73:13, 73:16, 73:17, 73:25, 75:16, 76:6, 76:12, 76:18, 77:20, 78:7, 79:15, 79:22, 80:12, 81:14, 86:24, 87:23, 88:3, 88:21, 89:4, 89:6, 89:12, 89:17, 90:4, 90:11, 93:3, 93:7, 93:10, 94:10, 94:17, 94:18, 95:5, 95:16, 110:22, 111:17, 112:9
**Lazo's** [32] - 32:4, 33:2, 34:10, 34:25, 35:24, 36:7, 36:13, 36:23, 37:19, 38:19, 48:9, 49:2, 49:3, 49:10, 51:5, 63:16, 63:18, 64:3, 64:6, 64:9, 65:19, 69:23, 70:17, 73:21, 76:3, 81:20, 81:23, 81:24, 82:23, 111:2, 111:20, 111:24
**learn** [3] - 53:8, 94:12, 95:15
**least** [1] - 27:13
**leave** [4] - 57:13, 88:2, 89:12, 92:5
**leaving** [3] - 30:10, 88:23, 88:25
**left** [40] - 32:25, 33:2, 36:13, 36:14, 36:23, 37:2, 37:5, 37:19,

38:6, 38:16, 39:19, 43:14, 43:15, 45:11, 45:12, 48:19, 60:21, 62:14, 64:16, 64:20, 67:7, 70:3, 70:12, 76:23, 77:2, 81:15, 87:4, 87:23, 88:11, 88:21, 89:6, 89:7, 89:8, 90:17, 91:11, 91:13, 96:14, 101:22, 112:9
**left-hand** [3] - 38:6, 38:16, 101:22
**Lemore** [1] - 10:15
**less** [2] - 20:5, 85:21
**letter** [2] - 104:19, 104:21
**level** [1] - 11:2
**lift** [1] - 61:6
**light** [1] - 42:10
**lights** [3] - 50:23, 72:2, 72:4
**likely** [3] - 63:14, 84:13, 85:20
**limited** [2] - 69:10, 98:6
**line** [8] - 13:13, 52:16, 54:17, 54:19, 54:22, 83:15, 83:17, 84:8
**lines** [1] - 70:24
**Link** [4] - 5:10, 6:11, 32:15, 112:7
**LINK** [5] - 1:11, 2:11, 2:21, 113:4, 114:10
**Link's** [3] - 29:4, 69:19, 113:8
**lip** [2] - 38:7, 38:10
**list** [2] - 12:12, 12:14, 12:15
**located** [2] - 14:17, 42:15
**location** [1] - 42:24
**locker** [1] - 76:11
**lodged** [1] - 39:19
**loitering** [1] - 13:4
**look** [3] - 38:5, 47:21, 109:20
**looked** [2] - 78:15, 83:6, 92:15
**looking** [2] - 38:18, 78:14
**Looking** [1] - 69:12
**looks** [1] - 17:13
**lost** [2] - 18:2, 44:12
**loudly** [1] - 81:5
**low** [1] - 81:11
**lower** [2] - 38:7, 38:16
**lying** [9] - 51:7, 51:10, 51:11, 51:18,

**M**

mail [2] - 17:7, 104:19
mailed [1] - 17:13
Main [1] - 1:23
male [2] - 17:13, 25:19
man [2] - 31:4, 32:17
Manel [1] - 13:15
Manor [3] - 43:14, 45:10, 45:11
Map [2] - 44:23, 113:15
map [1] - 45:4
Mario [5] - 20:19, 20:21, 20:22, 21:8, 23:11
Mark [3] - 37:9, 83:22, 101:6
mark [16] - 32:9, 37:25, 38:2, 38:11, 38:12, 44:21, 46:15, 70:3, 70:7, 70:11, 83:18, 83:19, 83:21, 84:10, 85:19, 86:14
marked [7] - 32:11, 37:11, 37:23, 44:23, 48:7, 101:8, 101:13
marking [2] - 35:24, 38:18
markings [1] - 81:20
marks [18] - 37:6, 82:4, 82:23, 83:2, 83:4, 83:8, 83:14, 84:21, 85:17, 85:21, 85:23, 86:2, 86:4, 86:7, 90:7, 90:11, 110:22, 110:25
marriage [1] - 114:17
match [1] - 83:7
matter [7] - 5:17, 22:25, 23:12, 24:21, 26:7, 30:5, 114:19
Matthew [2] - 18:11, 20:8
MBC [1] - 17:5
McCawly [2] - 18:11, 20:8
meal [1] - 28:19
mean [7] - 8:21, 30:22, 49:6, 49:11, 52:6, 55:20, 82:10
meaning [1] - 17:14
medical [10] - 35:10, 65:6, 65:9, 67:19, 67:24, 68:7, 68:25, 69:4, 71:12, 112:11

Medically [1] - 66:9
meet [3] - 103:3, 105:23, 106:18
Melville [1] - 3:19
member [1] - 13:25
members [2] - 1:15, 2:15
memo [10] - 27:22, 28:7, 28:13, 28:16, 28:21, 28:23, 29:4, 92:14, 92:15, 113:8
Memo [1] - 28:9
Memorial [3] - 3:11
mentioned [2] - 26:21, 28:2
merging [1] - 54:6
mess [1] - 43:22
message [2] - 104:6, 104:18
met [4] - 36:11, 36:22, 106:7, 109:2
Midnight [1] - 8:3
midnights [1] - 77:9
Might [1] - 49:20
might [8] - 59:24, 66:18, 78:4, 79:2, 95:10, 98:4, 108:7, 109:12
MILAFI [1] - 3:9
Miller [1] - 24:21
Millington [1] - 10:14
Mineola [1] - 19:16
minute [3] - 47:16, 59:5, 71:24
minutes [12] - 30:25, 59:8, 88:6, 88:7, 88:13, 88:14, 88:15, 92:7, 92:12, 95:24, 98:14, 109:8
mission [1] - 41:15
misspoke [2] - 86:19, 91:24
mobile [1] - 17:6
moment [4] - 51:3, 51:4, 73:15, 101:14
money [3] - 66:22, 67:6, 67:7
month [1] - 103:17
months [1] - 9:6
morning [5] - 5:14, 30:6, 30:15, 103:2, 108:23
mortem [1] - 69:17
Moses [3] - 42:19, 43:20, 44:20
Moses/Southern [1] - 43:2
move [1] - 58:9
moved [1] - 63:7
moving [8] - 11:18, 55:23, 58:12, 72:25,

73:3, 73:23, 78:10, 78:13
MR [29] - 5:7, 10:4, 13:12, 19:20, 29:2, 31:8, 32:8, 33:9, 36:25, 37:9, 39:7, 44:21, 47:23, 61:3, 66:3, 68:2, 69:15, 77:19, 86:16, 86:18, 90:15, 95:18, 101:6, 107:9, 112:3, 112:6, 112:13, 113:4, 113:5
Munsy [5] - 42:18, 43:5, 43:12, 45:8, 45:9
muttering [4] - 80:17, 80:19, 80:24, 80:25

**N**

name [8] - 5:8, 5:14, 6:9, 23:16, 23:22, 40:2, 40:7
Named [1] - 22:17
named [19] - 13:20, 14:25, 15:10, 15:16, 16:8, 16:11, 18:9, 19:22, 20:8, 20:14, 20:20, 21:23, 23:21, 24:6, 24:15, 24:22, 25:19, 26:18, 27:18
naming [3] - 14:21, 23:13, 26:22
narcotics [3] - 66:24, 75:7, 75:9
narrative [3] - 109:16, 110:13, 110:20
narratively [1] - 107:6
NASSAU [1] - 114:5
Navy [6] - 9:24, 10:2, 10:12, 10:20, 11:8, 11:12
near [5] - 50:13, 54:19, 55:3, 95:8, 95:11
nearby [2] - 51:20, 51:21
neck [4] - 81:25, 83:9, 86:5
need [4] - 6:4, 35:7, 68:7, 112:2
needed [8] - 31:22, 41:21, 44:14, 61:6, 65:6, 65:9, 68:25, 97:13
never [1] - 47:12
NEW [1] - 1:2, 2:2, 114:3

New [19] - 1:20, 1:24, 2:22, 3:6, 3:12, 3:19, 5:13, 6:12, 8:7, 8:8, 8:15, 9:4, 9:8, 11:20, 12:7, 12:10, 13:9, 15:2, 114:8
Newton [8] - 48:7, 48:15, 55:25, 56:18, 67:10, 70:15, 91:18, 92:2
NEWTON [3] - 1:8, 2:8, 3:25
next [16] - 15:19, 20:13, 44:19, 45:23, 50:3, 50:15, 50:16, 57:11, 67:11, 70:15, 71:15, 75:2, 86:25, 96:6, 96:13, 98:21
night [1] - 96:25
nine [1] - 88:15
Nineteen [1] - 6:20
nineteen [2] - 6:21, 7:20
nobody [1] - 50:18
Nobody [2] - 24:7, 87:25
Noel [1] - 25:13
None [1] - 14:23
normal [2] - 60:24, 61:4
normally [2] - 82:5, 83:2
northbound [6] - 43:19, 43:20, 45:21, 46:6, 71:18, 71:19
nose [1] - 36:7
Notary [3] - 2:22, 5:4, 114:7
Note [1] - 13:12
Noted [1] - 112:14
nothing [1] - 30:18
Nothing [9] - 67:16, 72:14, 80:13, 81:3, 81:21, 83:5, 87:22, 93:20
notice [14] - 36:19, 38:2, 38:12, 38:24, 64:5, 73:25, 81:19, 81:23, 84:20, 85:5, 96:16, 103:12, 107:19, 111:20
Notice [1] - 2:21
noticed [4] - 64:16, 90:7, 96:18, 97:10
noticing [1] - 65:18
notification [2] - 105:14, 107:22
notify [1] - 39:17
numbers [1] - 91:22
NYPD [2] - 14:14, 14:19

o                     119

o'clock [1] - 96:25
oath [1] - 4:17
object [1] - 61:3
Objection [3] - 31:8, 68:2, 95:18
objection [4] - 13:13, 33:10, 33:16, 69:16
objections [1] - 4:9
obligation [2] - 10:10, 11:12
observation [1] - 73:20
observations [5] - 32:3, 55:8, 55:17, 55:24, 66:13
observed [1] - 33:15
observes [1] - 39:18
observing [1] - 31:24
obtain [2] - 11:15, 11:17
occurred [2] - 23:8, 57:7
occurrence [1] - 102:2
occurs [1] - 67:22
OF [10] - 1:2, 1:7, 1:12, 2:2, 2:7, 2:12, 114:3, 114:5
office [6] - 99:19, 99:22, 100:3, 100:6, 105:7, 111:6
OFFICE [4] - 1:11, 1:12, 2:11, 2:12
Office [4] - 1:15, 1:17, 2:15, 2:17
Officer [49] - 6:13, 29:3, 30:11, 32:15, 33:11, 33:14, 37:15, 46:12, 48:14, 51:17, 55:9, 55:14, 56:5, 56:9, 56:12, 59:15, 60:18, 61:16, 62:4, 62:5, 63:4, 68:4, 69:19, 76:8, 76:11, 77:3, 87:5, 88:19, 89:23, 91:2, 91:5, 91:17, 92:19, 92:22, 93:4, 93:6, 93:9, 93:14, 94:4, 96:7, 96:8, 99:24, 99:25, 100:9, 100:12, 100:17, 112:7, 113:8
officer [29] - 4:16, 5:14, 6:23, 7:8, 8:16, 16:20, 17:11, 19:22, 21:23, 21:25, 22:6, 24:3, 24:15, 24:25, 25:19, 28:20, 31:14, 34:10, 39:13, 56:3,

58:23, 59:12, 74:13, 74:16, 75:23, 77:4, 89:16, 94:3, 99:21

**OFFICER** [8] - 1:8, 1:9, 1:10, 1:11, 2:8, 2:9, 2:10, 2:11

officers [15] - 21:6, 21:21, 21:22, 22:15, 24:6, 26:23, 29:19, 39:9, 48:12, 57:2, 57:6, 58:14, 87:8, 96:3

official [18] - 1:8, 1:9, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:16, 2:8, 2:9, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16

often [1] - 27:11

old [1] - 12:19

once [4] - 7:6, 45:15, 75:18, 105:25

Once [2] - 75:14, 79:20

One [1] - 63:19

one [40] - 9:18, 13:21, 15:5, 15:14, 16:21, 18:9, 20:18, 22:6, 25:13, 34:5, 44:6, 44:13, 44:17, 46:14, 49:20, 52:6, 54:6, 56:6, 56:10, 60:13, 66:23, 76:21, 76:22, 78:5, 79:3, 80:2, 80:3, 81:16, 85:19, 85:23, 85:24, 86:2, 86:12, 88:19, 96:11, 109:12, 110:4, 110:8, 112:2

ones [1] - 25:7

oOo [1] - 4:21

open [5] - 12:15, 62:19, 63:16, 63:21, 67:8

opened [6] - 62:20, 63:6, 63:10, 63:11, 72:9, 76:9

operate [1] - 65:22

operating [3] - 13:22, 40:21, 48:7

operator [1] - 13:23

opposite [2] - 44:20, 52:15

option [1] - 45:19

order [2] - 65:15, 77:13

Orlando [1] - 10:13

outcome [1] - 114:18

outside [4] - 75:20, 79:7, 87:3, 95:23

Outside [2] - 75:22, 77:16

overtime [1] - 29:9

own [5] - 62:3, 73:18, 77:22, 77:24

**P**

P.C [1] - 3:16

p.m [1] - 112:14

**PAGE** [2] - 113:3, 113:8

pages [1] - 28:9

pants [12] - 52:25, 67:9, 70:17, 75:4, 75:17, 75:19, 76:3, 79:11, 79:13, 79:17, 87:3, 87:19

paperwork [2] - 42:9, 97:15

park [1] - 48:18

parked [5] - 48:8, 49:7, 49:9, 54:15, 72:8

parking [1] - 72:8

Parkway [1] - 42:19, 43:2, 43:21, 45:17, 45:21, 46:3, 46:7, 71:17

parkway [5] - 41:22, 46:19, 46:25, 47:11, 109:23

Parsons [6] - 76:8, 76:12, 77:3, 87:9, 88:19, 89:23

part [3] - 23:19, 26:18, 31:11

particular [4] - 40:12, 55:6, 57:18, 58:21

parties [2] - 4:4, 114:16

partner [6] - 7:22, 7:24, 24:18, 24:20, 25:20, 40:15

parts [2] - 83:5, 85:6

pass [1] - 44:2

Passenger [1] - 62:24

passenger [3] - 63:7, 63:11, 64:10

past [2] - 68:9, 73:7

**PATRICIA** [2] - 1:3, 2:3

Patrol [2] - 8:22, 40:13

patrol [9] - 7:9, 8:19, 8:20, 8:25, 28:22, 40:19, 41:8, 41:16, 77:8

patrolling [1] - 41:11

pattern [1] - 111:21

Paul [1] - 30:11

Paula [1] - 30:11

paying [2] - 80:18, 81:3

pen [1] - 46:15

pending [1] - 6:6

Peninsula [1] - 3:5

people [1] - 30:9

perfect [1] - 83:18

perform [1] - 10:24

periodically [1] - 27:9

person [6] - 22:9, 50:2, 68:6, 89:15, 89:19, 98:4

personal [1] - 17:9

personally [2] - 104:10, 106:15

personnel [1] - 30:17

phone [1] - 91:21

phonetic [1] - 13:16

phonetic [1] - 25:14

phonetics) [1] - 30:13

photograph [7] - 36:7, 36:12, 36:24, 37:3, 37:18, 109:22, 110:17

Photograph [2] - 32:11, 113:13

Photographs [2] - 37:11, 113:14

photographs [2] - 37:17, 69:17

physical [2] - 25:25, 27:5

picked [3] - 12:17, 12:24, 75:18

picture [4] - 32:18, 32:22, 33:13, 64:19

pictures [2] - 109:24, 110:2

piece [1] - 26:5

**PINCUS** [2] - 3:16, 3:20

Pincus [2] - 5:16, 10:4

pistol [1] - 22:7

pitched [1] - 81:10

place [2] - 46:12, 63:4

placed [3] - 65:5, 66:15, 86:23

placing [3] - 32:15, 37:15, 101:12

plain [1] - 99:19

Plaintiff [2] - 3:4, 3:17

**PLAINTIFF'S** [1] - 113:12

Plaintiff's [15] - 32:9, 32:12, 32:16, 34:6,

37:10, 37:12, 37:16, 39:4, 44:22, 44:24, 45:3, 46:13, 69:12, 101:9, 101:13

plaintiffs [3] - 1:5, 2:5, 5:17

plastic [1] - 28:9

Plaza [1] - 1:19

pockets [2] - 66:21, 67:8

point [28] - 18:4, 33:25, 38:14, 46:25, 53:16, 56:21, 58:11, 59:9, 61:7, 61:12, 61:17, 64:12, 64:15, 64:21, 65:4, 69:7, 88:7, 88:8, 88:9, 88:11, 89:7, 89:11, 89:23, 95:3, 97:15, 98:25, 111:23, 112:7

pointing [1] - 32:23

police [12] - 6:23, 7:8, 8:15, 16:20, 21:6, 21:20, 27:2, 31:14, 56:25, 57:5, 58:23, 77:4

**POLICE** [14] - 1:7, 1:7, 1:8, 1:9, 1:10, 1:10, 1:11, 2:7, 2:7, 2:8, 2:9, 2:10, 2:10, 2:11

Police [7] - 8:16, 9:9, 12:7, 13:10, 15:3, 30:10, 35:13

Portella [2] - 102:23, 102:25

portion [2] - 13:16, 36:23

position [5] - 50:6, 51:5, 58:10, 59:22, 60:6

positioning [1] - 73:21

post [1] - 69:17

posture [1] - 73:25

power [1] - 73:19

precinct [40] - 7:13, 7:17, 14:13, 28:18, 30:3, 34:17, 34:18, 35:9, 39:19, 41:3, 53:21, 61:15, 67:13, 67:17, 70:20, 70:24, 71:3, 71:20, 72:7, 72:9, 75:2, 76:5, 76:8, 77:16, 78:20, 87:10, 88:11, 88:13, 88:16, 92:7, 94:9, 94:13, 94:16, 96:15, 96:19, 96:21, 97:10, 98:22, 111:19, 112:10

Precinct [5] - 7:15, 7:16, 7:20, 42:4,

44:16

preparation [3] - 27:21, 29:13, 29:20

prepare [2] - 107:8, 107:13

**PRESENT** [1] - 3:15

present [2] - 106:6, 109:21

presented [1] - 110:17

pretty [1] - 31:2

previous [1] - 53:17

previously [2] - 26:21, 68:22

print [2] - 84:2, 84:5

prisoner [1] - 94:15

prisoners [1] - 73:6

procedures [2] - 27:4, 27:17

proceeded [3] - 45:9, 70:20, 71:16

process [1] - 108:10

Production [1] - 113:8

production [1] - 29:3

Prosecutor [1] - 105:10

prostitute [1] - 17:14

provide [1] - 106:15

provided [1] - 70:14

public [1] - 14:2

Public [3] - 2:22, 5:4, 114:7

pull [1] - 67:9

pulled [3] - 19:8, 48:4, 50:3

pulse [1] - 111:24

punched [2] - 19:7, 24:3

purpose [1] - 41:15

pursuant [1] - 2:21

put [2] - 12:12, 12:14, 52:17, 61:14, 74:9, 76:10, 76:23, 87:2, 89:20

**Q**

quadrant [3] - 37:20, 38:6, 38:17

Queens [1] - 14:18

questioning [1] - 13:14

questions [8] - 5:19, 6:6, 69:21, 104:7, 106:24, 109:9, 109:18, 112:4

quick [1] - 110:13

quite [1] - 55:12

120

## R

radio [13] - 27:23, 41:19, 41:23, 42:16, 47:16, 47:18, 70:18, 70:22, 71:4, 71:14, 88:10, 91:16, 96:23
raised [1] - 52:7
ramp [21] - 42:25, 43:16, 43:17, 43:25, 44:3, 44:4, 44:5, 44:7, 44:10, 44:11, 44:13, 44:17, 44:19, 45:12, 45:16, 45:17, 45:24, 46:21, 46:22, 71:17
ramps [1] - 44:2
range [1] - 27:15
rank [3] - 8:14, 40:9, 77:4
rash [2] - 82:20, 82:22
rather [1] - 17:17
reached [5] - 77:25, 78:20, 79:17, 79:20, 81:13
reaching [1] - 77:11
read [5] - 100:14, 100:16, 100:19, 100:21, 101:14
REALTIME [1] - 1:23
rear [7] - 48:6, 49:23, 62:24, 63:12, 64:10, 72:9, 76:7
reason [4] - 9:22, 10:8, 19:9, 100:16
reasons [1] - 17:9
receive [5] - 11:4, 17:25, 26:15, 27:2, 107:19
received [2] - 42:16, 43:5
recertification [1] - 35:20
recognize [3] - 32:17, 101:17, 101:19
record [6] - 5:8, 6:3, 6:10, 47:24, 48:2, 114:13
recordings [2] - 29:13, 29:15
red [11] - 82:4, 82:23, 83:2, 83:4, 83:8, 83:14, 83:19, 83:20, 86:21, 90:7, 90:11
reference [2] - 29:11, 33:12
region [2] - 47:4, 47:8
regularly [1] - 41:8
related [1] - 114:16
relation [1] - 51:19

released [1] - 12:22
relevant [1] - 5:20
remain [3] - 50:20, 93:22, 95:22
remaining [1] - 89:4
remember [22] - 20:12, 23:16, 24:24, 25:4, 25:12, 26:3, 35:5, 52:18, 56:8, 62:16, 63:13, 81:17, 92:24, 95:14, 97:18, 104:3, 104:9, 107:6, 109:14, 110:12, 110:23, 111:3
remove [2] - 76:21, 86:24
removed [3] - 70:17, 76:22, 110:8
Rendon [2] - 22:7, 22:18
RENDON [1] - 22:18
renew [2] - 35:17, 69:16
rephrase [2] - 5:22, 33:21
report [15] - 29:11, 98:9, 98:25, 99:4, 99:8, 99:11, 99:15, 99:23, 100:13, 100:17, 100:23, 101:20, 101:24, 102:6, 102:14
reporter [1] - 6:2
REPORTING [1] - 1:23
reports [2] - 27:22, 28:3
represent [2] - 5:16, 102:5
representation [2] - 36:16, 98:17
representing [2] - 1:15, 2:15
request [3] - 74:12, 74:16, 104:25
requesting [1] - 104:7
REQUESTS [1] - 113:7
required [5] - 27:16, 28:12, 28:20, 67:19, 71:12
requires [1] - 28:11
reserved [1] - 4:11
resigned [1] - 8:12
respective [1] - 4:4
respond [2] - 5:24, 58:24
responded [3] - 41:19, 53:16, 79:25
responding [1] -

17:10
responsibilities [4] - 7:8, 8:18, 10:20, 11:8
responsibility [15] - 7:11, 10:25, 39:6, 39:8, 57:23, 65:20, 66:2, 67:23, 68:17, 68:24, 69:3, 74:15, 74:20, 77:7, 102:19
rest [3] - 71:16, 74:10, 75:17
result [10] - 16:25, 17:2, 17:21, 18:20, 21:15, 23:7, 24:11, 26:14, 31:18, 74:23
retained [1] - 113:18
retrained [2] - 27:7, 27:17
retraining [1] - 27:11
returned [1] - 90:18
review [4] - 27:20, 29:12, 100:9, 100:12
reviewed [1] - 99:5
reviewing [3] - 29:23, 42:8, 100:15
RICHARD [3] - 1:7, 2:7, 3:13
Richard [1] - 30:12
ride [1] - 73:11
right-hand [2] - 37:20, 102:10
Road [12] - 3:18, 42:18, 42:25, 43:5, 43:12, 43:15, 43:18, 43:24, 44:17, 45:8, 45:9, 45:11
road [6] - 34:23, 46:5, 51:11, 82:19, 82:22, 112:9
roadway [12] - 48:19, 48:21, 49:8, 49:10, 49:14, 52:21, 53:18, 53:23, 54:15, 60:18, 60:19, 93:19
roaming [1] - 12:25
Robert [4] - 42:19, 42:25, 43:20, 44:20
rode [1] - 7:25
Rodriguez [1] - 30:12
rolling [1] - 82:13
room [29] - 10:5, 76:15, 76:20, 77:11, 77:14, 77:25, 78:15, 78:21, 79:18, 79:21, 80:21, 87:14, 87:24, 88:22, 88:25, 89:21, 90:17, 94:21, 94:22, 95:3, 95:4, 95:7, 95:9, 95:17, 95:23, 96:9, 108:24, 109:4, 111:19

RQ [1] - 29:2
ruler [2] - 28:10, 38:17
Rules [1] - 27:4
rules [1] - 27:17
running [2] - 82:2, 82:17

## S

safety [1] - 48:20
Sagtikos [2] - 45:21, 46:6
Salace [1] - 30:11
San [2] - 10:17, 11:19
sat [1] - 62:8
saw [20] - 33:22, 33:23, 34:2, 34:5, 34:25, 46:16, 50:3, 50:5, 51:18, 58:10, 64:22, 68:22, 69:25, 79:5, 83:20, 85:16, 108:7, 108:25, 110:21, 110:25
scene [17] - 34:11, 39:14, 39:16, 47:14, 48:13, 56:22, 57:2, 57:21, 59:7, 63:2, 65:10, 65:13, 65:24, 66:8, 66:13, 66:14, 91:15
scheduled [1] - 97:3
schedules [1] - 35:19
SCHOENFELD [2] - 3:16
school [4] - 9:12, 9:15, 10:15, 10:16
SCIMONE [3] - 1:9, 2:9, 3:22
Scimone [15] - 34:12, 34:14, 34:20, 34:24, 35:4, 48:14, 55:18, 56:15, 57:12, 57:25, 67:12, 67:15, 67:18, 91:25
scuff [1] - 82:3
sealing [1] - 4:5
search [1] - 16:22
Seat [1] - 74:6
seat [7] - 62:24, 63:7, 63:8, 73:2, 73:4, 73:8, 74:2
seated [8] - 59:25, 60:2, 64:7, 64:13, 64:22, 67:2, 74:4, 76:20
second [2] - 44:3, 44:11
secrete [1] - 73:7

Sector [2] - 40:23, 40:25
sector [2] - 41:7, 41:11
see [29] - 36:6, 36:12, 37:2, 37:18, 38:7, 38:17, 48:4, 50:25, 53:5, 67:17, 82:7, 82:21, 82:23, 84:2, 84:5, 84:14, 85:8, 86:4, 86:7, 86:20, 91:13, 94:18, 95:2, 95:5, 96:3, 97:12, 105:15, 108:5, 108:22
seeing [3] - 33:5, 69:22, 110:3
seek [3] - 11:13, 31:18, 69:4
selection [1] - 20:3
self [1] - 27:13
semester [2] - 9:19, 9:20
send [1] - 27:15
sent [2] - 104:6, 104:18
Sergeant [24] - 30:13, 34:11, 34:13, 34:19, 34:20, 34:24, 35:4, 40:6, 40:10, 40:13, 48:14, 55:18, 56:15, 57:12, 57:25, 67:12, 67:15, 67:18, 91:18, 91:25, 98:5, 98:9, 98:12, 98:21
sergeant [7] - 33:7, 39:17, 40:11, 53:17, 58:24, 65:20, 65:23
series [2] - 5:18, 37:16
session [1] - 106:22
set [2] - 114:11, 114:21
settle [2] - 20:4, 26:9
settled [1] - 20:2
settlement [1] - 26:11
shall [1] - 4:11
shame [1] - 31:11
shape [3] - 83:15, 83:20, 85:2
shift [1] - 96:24
shirt [2] - 52:24, 85:8
shirtless [1] - 82:15
shoes [3] - 53:3, 53:5, 53:9
Shore [8] - 41:5, 41:6, 42:25, 43:15, 43:18, 43:23, 44:16, 45:11
shortly [1] - 15:21

121

Shortly [2] - 103:11, 105:12
shorts [1] - 75:6
shoulder [5] - 54:3, 54:4, 54:11, 54:15, 60:14
shoulders [1] - 52:6
show [1] - 64:19
showed [1] - 84:7
showing [1] - 45:3
Shurer [1] - 30:13
side [29] - 32:6, 32:25, 34:23, 38:6, 38:19, 49:21, 51:23, 52:2, 61:8, 62:10, 62:14, 62:15, 62:17, 62:22, 62:24, 62:25, 63:16, 63:17, 63:21, 63:23, 64:3, 64:9, 73:22, 75:18, 98:14, 101:22, 102:10, 112:9
signature [2] - 101:21, 102:11
signed [5] - 4:15, 4:18, 100:23, 101:2, 102:18
similar [2] - 8:25, 106:22
sit [1] - 64:8
sitting [7] - 24:23, 30:25, 45:6, 60:6, 96:19, 97:9, 100:3
situation [1] - 67:21
six [6] - 10:3, 30:25, 53:24, 88:6, 88:13, 88:15
Six [1] - 88:7
skin [1] - 85:2
slapped [1] - 24:4
sliding [3] - 73:6, 73:10, 74:2
slightly [1] - 49:2
Slightly [1] - 8:10
small [1] - 54:5
socks [1] - 53:2
softly [1] - 81:7
solid [1] - 54:18
Someone [1] - 110:13
someone [2] - 61:2, 93:10
Sometime [1] - 35:15
somewhere [5] - 18:17, 54:19, 62:9, 81:8, 81:9
sort [3] - 37:24, 51:7, 52:25
sought [1] - 35:17
Southern [6] - 43:21, 45:16, 45:20, 46:3, 46:6, 71:17

Southside [10] - 90:20, 90:22, 90:25, 92:5, 92:10, 92:18, 93:23, 94:3, 94:7, 96:21
spare [1] - 40:24
speaking [3] - 81:5, 81:7, 104:9
specific [11] - 21:3, 21:17, 25:21, 29:23, 30:18, 56:10, 61:14, 80:13, 88:4, 93:20
Specifically [1] - 51:19
specifically [13] - 13:20, 18:9, 19:5, 19:7, 20:20, 22:2, 23:21, 35:2, 35:3, 52:19, 72:19, 100:8, 100:20
speech [1] - 81:10
speed [1] - 53:19
spell [1] - 40:7
splotches [1] - 84:25
splotchy [2] - 85:3, 86:22
SPOTA [2] - 1:13, 2:13
spring [1] - 14:11
squad [13] - 76:13, 76:14, 77:11, 77:14, 77:25, 78:15, 78:21, 79:18, 79:21, 80:20, 87:14, 88:22, 111:19
square [1] - 81:17
squeezed [1] - 66:21
ss [1] - 114:4
stairs [1] - 77:15
stamps [2] - 47:22, 96:23
standing [8] - 50:9, 50:11, 50:14, 55:2, 60:17, 60:18, 63:15, 63:20
started [2] - 42:24, 58:13
Started [1] - 10:13
STATE [1] - 114:3
state [6] - 5:22, 6:9, 19:17, 70:22, 71:8, 71:11
State [10] - 2:22, 5:8, 43:2, 43:21, 45:17, 45:20, 46:3, 46:6, 71:17, 114:8
statement [1] - 53:17
statements [1] - 58:21
STATES [2] - 1:2, 2:2
stationed [1] - 10:11
stayed [3] - 62:7,

62:16, 63:9
steady [1] - 77:8
Steck [1] - 30:12
step [3] - 75:17, 79:10, 79:12
stepped [2] - 65:10, 79:16
Stepping [1] - 73:15
steps [3] - 77:17, 77:18, 77:21
Still [1] - 19:20
still [2] - 44:12, 80:16
stint [1] - 13:9
STIPULATED [3] - 4:2, 4:8, 4:13
stomach [2] - 52:2, 52:3
stood [1] - 75:4
stop [4] - 9:23, 28:18, 46:17, 73:2
stopped [3] - 26:10, 26:12, 76:10
stops [1] - 77:10
straight [1] - 84:8
Street [1] - 1:23
struck [1] - 26:3
struggle [4] - 55:13, 86:22, 93:13, 93:17
struggling [1] - 83:12
style [1] - 111:20
sub [1] - 27:22
Sub [1] - 28:3
subdue [1] - 65:15
subject [7] - 13:11, 67:22, 71:2, 71:6, 74:18, 74:22
subjects [2] - 31:14, 39:10
substance [6] - 15:22, 16:16, 18:24, 20:23, 23:24, 25:16
sued [1] - 25:14
SUFFOLK [8] - 1:7, 1:12, 1:13, 2:7, 2:12, 2:13
Suffolk [16] - 1:15, 1:17, 2:15, 2:17, 6:17, 6:19, 8:5, 9:2, 9:18, 9:23, 12:9, 12:13, 15:12, 17:3, 35:12, 45:5
suit [1] - 22:17
Suite [1] - 1:23
sum [6] - 15:22, 16:15, 18:24, 20:23, 23:24, 25:16
summer [2] - 103:20, 105:18
summing [1] - 72:18
sup [7] - 98:7, 99:8,

99:11, 99:15, 99:22, 100:13, 100:23
superior [2] - 33:7, 34:10
supervising [2] - 39:9, 39:12
supervisor [6] - 33:7, 40:4, 90:10, 100:24, 102:17, 102:20
supervisor's [1] - 102:11
supplementary [4] - 98:25, 99:4, 101:20, 102:14
supply [1] - 106:12
surprised [1] - 95:15
SUV [3] - 48:6, 49:11, 49:15
swaying [1] - 78:7
sweaty [1] - 82:3
sworn [4] - 4:15, 4:18, 5:3, 114:12
systems [3] - 10:21, 11:9, 11:25

T

table [1] - 25:2
tactics [2] - 27:6, 27:18
TALK [2] - 1:11, 2:11
Talt [20] - 41:20, 41:24, 42:17, 48:16, 56:23, 87:4, 87:13, 87:20, 88:19, 88:24, 89:3, 89:18, 89:22, 89:25, 90:3, 90:6, 91:18, 100:8, 108:10, 108:12
TALT [1] - 3:23
tasks [1] - 40:17
taught [1] - 27:13
telephone [2] - 91:17, 106:10
ten [7] - 16:12, 16:13, 50:18, 85:21, 85:23, 98:14
tend [2] - 59:12, 59:14
Tennessee [1] - 10:14
term [1] - 17:18
terms [8] - 21:20, 49:22, 51:10, 51:14, 53:22, 54:10, 61:14, 103:16
testified [2] - 5:5, 110:25
testifying [1] - 107:17

testimony [5] - 26:22, 105:2, 108:13, 108:16, 114:14
thereafter [1] - 103:11
third [1] - 70:19
Third [5] - 7:15, 7:16, 7:19, 42:4, 44:16
THOMAS [2] - 1:13, 2:13
threat [1] - 60:9
three [2] - 8:2, 8:10, 22:19, 25:15, 35:21, 50:8, 51:21, 58:15, 77:17, 77:18, 77:21, 93:17
Three [1] - 10:17
throughout [3] - 16:4, 27:10, 80:22
timestamps [1] - 27:23
tires [1] - 54:19
today [1] - 29:21
Tom [3] - 76:8, 77:3, 87:9
took [10] - 12:8, 12:10, 45:14, 45:24, 47:15, 58:15, 80:2, 80:9, 92:11, 98:13
top [2] - 42:8, 50:19
total [3] - 59:6, 88:14, 106:2
tour [2] - 29:6, 96:24
towards [1] - 42:24
track [2] - 15:21, 20:16
trade [1] - 10:15
traffic [5] - 47:4, 47:7, 47:11, 53:19
trained [2] - 27:9, 35:12
training [3] - 14:16, 26:25, 27:5
transcript [1] - 109:20
transmission [11] - 41:20, 41:23, 42:17, 42:21, 47:17, 47:18, 70:19, 70:22, 71:4, 71:15, 88:10
transmissions [1] - 27:24
transport [8] - 57:15, 57:19, 57:23, 72:12, 72:23, 74:13, 74:17, 74:21, 89:22
transported [2] - 70:4, 89:17
Transporting [1] - 71:2
transporting [3] -

122

123

71:25, 73:24, 111:17
trash [1] - 58:14
trauma [7] - 94:21,
95:2, 95:6, 95:9,
95:17, 95:23, 96:9
trespassing [1] -
13:4
Trespassing [1] -
13:5
Trial [1] - 2:20
trial [6] - 4:12, 19:25,
22:25, 24:13, 26:7,
30:20
true [1] - 114:13
trunk [1] - 19:14
try [1] - 6:5
trying [3] - 83:12,
83:23, 93:18
turn [4] - 44:3, 44:4,
44:9, 79:3
turned [2] - 42:13,
43:24
twice [1] - 86:17
two [6] - 12:4, 21:22,
43:25, 54:5, 54:6,
69:10
type [2] - 24:9, 26:25

**U**

U.S [1] - 9:24
unauthorized [1] -
17:7
under [5] - 36:7,
47:15, 60:13, 65:22,
73:18
undue [1] - 20:10
unfounded [1] -
18:23
unidentified [2] -
1:15, 2:15
Uniform [4] - 7:9,
40:19, 41:16, 77:8
uniform [2] - 8:23,
78:15
Uniformed [2] - 8:19,
28:22
uniformed [2] - 8:20,
8:25
unit [9] - 40:12, 48:7,
48:8, 48:25, 49:12,
49:16, 49:19, 49:22,
99:20
unit's [1] - 49:24
UNITED [2] - 1:2, 2:2
units [1] - 41:21
unknown [2] - 1:15,
2:15
unlawful [6] - 16:4,
16:16, 16:22, 19:2,
20:25, 25:20

Unnecessary [2] -
19:2, 25:18
unnecessary [3] -
21:2, 21:4, 25:22
unresponsive [1] -
94:15
unsubstantiated [1]
- 18:23
up [27] - 12:17,
12:24, 46:2, 46:5,
50:3, 53:14, 54:24,
59:17, 59:20, 60:12,
61:2, 61:6, 62:5, 65:4,
71:16, 72:15, 72:18,
73:16, 75:19, 76:7,
77:17, 83:9, 84:7,
97:15, 106:25, 107:4
upper [2] - 37:19,
38:6
upright [1] - 74:4

**V**

vacation [1] - 18:2
van [2] - 13:22, 13:23
various [3] - 27:4,
28:10, 83:5
Various [1] - 85:6
vehicle [12] - 22:13,
40:20, 43:9, 48:23,
53:11, 54:20, 63:5,
66:16, 70:18, 72:11,
75:4, 90:18
vehicles [1] - 48:4
verdict [2] - 23:3,
23:5
Veterans [1] - 3:11
video [1] - 29:12
Video [1] - 29:15
viewed [1] - 39:4
violating [1] - 12:21
visible [1] - 68:12
voluntarily [1] -
61:23
volunteer [1] -
108:20
volunteered [2] -
57:24, 58:2

**W**

W-E-L-S-C-H-I-M-E-
R [1] - 40:8
waist [1] - 85:7
waistband [2] -
66:20, 66:23
wait [1] - 12:12
Waited [1] - 98:22
Waiting [1] - 97:12
waiting [3] - 97:17,
100:2, 108:2

waived [1] - 4:7
walk [5] - 54:25,
59:16, 62:10, 73:17,
77:24
Walked [1] - 76:7
walked [14] - 53:14,
54:24, 59:23, 62:2,
62:8, 65:4, 73:16,
73:18, 76:10, 76:12,
77:22, 77:23, 78:16,
111:18
walking [3] - 78:8,
78:11, 111:25
wall [1] - 76:25
Walt [1] - 3:18
weapon [2] - 19:11,
24:8
weapons [1] - 66:19
wearing [1] - 52:23
week [1] - 105:20
Welschimer [1] -
40:6
West [1] - 41:5
WHEREOF [1] -
114:20
whipped [1] - 22:7
white [1] - 54:19
Whitman [1] - 3:18
whole [2] - 80:22,
88:5
wide [1] - 54:10
WILLIAM [3] - 1:10,
2:10, 3:7
William [2] - 5:15,
24:21
windows [1] - 78:15
Withdrawn [5] -
36:25, 39:7, 77:19,
90:15, 107:9
Witness [1] - 101:16
witness [6] - 5:3,
106:4, 107:10,
107:12, 114:10,
114:14
WITNESS [2] -
113:3, 114:20
words [4] - 5:25,
35:6, 72:17, 72:20
wrench [1] - 83:24
wrestling [3] - 82:6,
83:3, 83:7
write [1] - 28:16
wrote [2] - 100:10,
100:13
www.
realtimereporting.
com [1] - 1:25

**Y**

yard [1] - 13:2

year [2] - 27:10,
27:14
years [11] - 6:20,
6:21, 7:20, 8:2, 8:10,
10:3, 12:4, 12:19,
22:23, 35:21, 92:16
yield [1] - 46:24
YORK [3] - 1:2, 2:2,
114:3
York [19] - 1:20,
1:24, 2:23, 3:6, 3:12,
3:19, 5:13, 6:12, 8:7,
8:9, 8:15, 9:4, 9:9,
11:20, 12:7, 12:10,
13:10, 15:2, 114:8
yourself [1] - 62:5

**Z**

zone [1] - 48:20
Zurl [1] - 99:25

# EXHIBIT N