# EXHIBIT N

# GONZALEZ -V- COUNTY OF SUFFOLK

## JAMES SCIMONE - 1/5/2011

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**REALTIME REPORTING, INC.**
**124 East Main Street**
**Suite 202**
**Babylon, New York  11702**
**Phone:  (516) 938-4000**
**Fax:  (631) 983-8938**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

PATRICIA GONZALEZ and JENNIFER GONZALEZ, individually and as co-administrators of the Estate of KENNY LAZO, Plaintiffs,

- against -

COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity, POLICE OFFICER CHRISTOPHER TALT, in his individual and official capacity, POLICE OFFICER LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT ATTORNEY JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of the Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney), Defendants.

---

100 Federal Plaza
Central Islip

January 5, 2011
10:15 a.m.

Deposition of the Defendant, SGT. JAMES SCIMONE, pursuant to Notice, before Florence Syskrot, a Stenotype Reporter and Notary Public of the State of New York.

REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702
516-938-4000
www.realtimereporting.com

APPEARANCES:

LAW OFFICES OF FREDERICK K. BREWINGTON
Attorneys for Plaintiffs
556 Peninsula Boulevard
Hempstead, New York 11550
BY: FREDERICK K. BREWINGTON, ESQ.
- and -
WILLIAM GERMANO ESQ.

SCHOENFELD, SCHOENFELD & PINCUS, P.C.
Co-Counsel for Plaintiffs
999 Walt Whitman Road
Melville, New York 11747
BY: DAVID A. PINCUS, ESQ. (At times)

SUFFOLK COUNTY ATTORNEY CHRISTINE MALAFI, ESQ.
Attorney for Defendants
100 Veterans Memorial Highway
Hauppauge, New York 11788-0099
BY: RICHARD T. DUNNE, ESQ.

APPEARANCES: (Continued)

ALSO PRESENT:
P.O. William Judge
Det. Christopher Talt
Det. John Newton
Sgt. James Scimone
Jennifer Gonzalez (at times)

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

SGT. JAMES SCIMONE, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. BREWINGTON:

**Q.** Please state your name.
**A.** **Sgt. James Scimone.**
**Q.** What is your present address?
**A.** **Suffolk County Police Department, Third Precinct, 1630 Fifth Avenue, Bay Shore, New York 11706.**
**Q.** Sgt. Scimone, good morning. How are you?
**A.** **Very good.**
**Q.** Good. My name is Fred Brewington. I am the attorney representing the Estate of Kenny Lazo and the legal representatives of that estate.

I am going to be asking you some questions today concerning the lawsuit that is pending in the Eastern District of New York, of which there may be different subject areas relating to your involvement, your knowledge,

as well as general information about you as it relates to the aspects of this case.

If at any point you do not understand the questions that I ask, please let me know that. I will be happy to rephrase them so that they are understandable to you. If you don't hear the question, even though we are in fairly close quarters, let me know that. I will speak up, or we will ask our court reporter, who is expert at taking down what we say. She will be able to repeat the question so that you have it squarely before you.

If you do respond to a question, I am going to assume that you have heard the the question and that you understand the question. So it is important that you have the question squarely before you before you are responding to the question. Alright?

**A.** **Yes.**
**Q.** As you just did respond verbally to that inquiry, I will ask you to respond verbally to each of the questions that I ask. It is difficult for the court reporter to

interpret a nod, or a shrug, or some type of gesture of the head. There is only one person in here whose head rattles.

MR. BREWINGTON: That was to you, Mr. Dunne.

MR. DUNNE: I got it.

**Q.** In that regard we want to make sure that your response is clear on the record. Alright?
**A.** **Yes.**
**Q.** If you need a break at any point, let me know that. We will be happy to accommodate you. The only request that I have is, if there is a question pending, we try to get the question and the answer on the record. If we can't do that, then the attorneys will work that out. Alright?
**A.** **Yes.**
**Q.** Now, sir, are you currently employed?
**A.** **Yes.**
**Q.** By whom are you employed, please?
**A.** **Suffolk County Police Department.**
**Q.** How long have you been employed

by the Suffolk County Police Department?
**A.** **Almost twenty-three years.**
**Q.** In those twenty-three years, sir, what is the highest rank that you have achieved?
**A.** **Sergeant.**
**Q.** When did you achieve the rank of sergeant?
**A.** **September 2001.**
**Q.** Was that as a result of taking a competitive examination?
**A.** **Yes.**
**Q.** Had you taken the sergeant's examination more than once?
**A.** **Yes.**
**Q.** How many times did you take the sergeant's examination?
**A.** **Three times all together.**
**Q.** For any of those three times, were you --

MR. BREWINGTON: Withdrawn.

**Q.** For each of those three times, were you placed on an eligible list?
**A.** **Yes.**

9

Scimone

Q. The third time was the charm, where they were able to reach you on the list; is that correct?
A. **Yes.**
Q. Have you served as a police officer for any other police department or police entity other than Suffolk County?
A. **Not a police officer. I was a Corrections Officer in Rikers Island.**
Q. For about five months?
A. **A little bit longer. After the academy, yes.**
Q. Let's go back to Suffolk.
A. **Okay.**
Q. Prior to becoming a sergeant, what was your rank?
A. **Police Officer.**
Q. How long were you actually a Police Officer for Suffolk?
A. **It would have been from '88. I'm trying to think in my head.**
Q. Take your time.
A. **Almost thirteen years.**
Q. From 1988 to?

10

Scimone

A. **To 2001. January of '88 to September of 2001.**
Q. During that time period, from January of '88 to approximately 2001, what type of services did you provide to the Suffolk County Police Department? That being Patrol or some other unit?
A. **Initially upon graduation from the Police Academy, I was assigned to the Third Precinct as a Patrol Officer.**
**I worked predominantly in the Bay Shore area in the 314 car, Sector 314, which covers Bay Shore and Brightwaters.**
Q. You said that was in the beginning. Did that change at some point?
A. **Yes.**
Q. How did it change, please?
A. **I was transferred about six years, five years later to the Police Academy, where I was an Emergency Vehicle Operations Instructor to do the police driving. I was also cross trained as a Fire Arms Instructor.**
Q. Were you providing firearms instruction to persons who were in the academy

11

Scimone

as well as persons who needed to re-up?
A. **It was mostly to inservice.**
Q. Just so that we are clear in our terminology exactly, when you say inservice, what do you mean?
A. **Officers who are currently on the job, not newly appointed police officers.**
Q. Other than handling Emergency Vehicle Training and Firearm Training at the academy, did you have any other instruction or teaching responsibilities?
A. **No. I was certified as a General Topic Instructor. But the only courses that I taught were Emergency Vehicle Operations and Firearms Instruction.**
Q. Thank you. How long did you provide services at the academy?
A. **Almost eight years.**
Q. Where did you go from the academy?
A. **I was promoted to Sergeant. I was transferred to the Third Precinct as a Sergeant.**
Q. Your initial promotion was as a

12

Scimone

Sergeant doing what? Patrol?
A. **Yes.**
Q. Going back to your service as a Police Officer, any other special units other than being transferred to the academy to do Emergency Vehicle Operation and Firearms Instruction?
A. **No.**
Q. Any other training that you received in any particular specialty area, that being hostage work, special teams, or tactical, or anything else?
A. **The only class that I can remember was Field Training Officer. That is the only one that I can remember.**
Q. At the time that you were transferred to the Third as a Patrol Sergeant, could you please describe what your duties were as a Patrol Sergeant?
A. **Initially I was -- as a new sergeant basically you do desk duty and you fill in on the road as a patrol supervisor on the road.**
**I was fortunate enough to get a**

Scimone

**spot on the road rather quickly. So I was assigned Sector 336 -- Zone 336, which covers West Islip, Bay Shore, Brightwaters, and that is it. Bay Shore and Brightwaters.**

(Ms. J. Gonzalez entered the room at this time.)

Q. Since that assignment, have your duties changed?

A. **I was transferred to the COPE Unit. I don't even remember what year it was. It had to be four or five years ago. I don't know what year I was transferred to COPE.**

Q. COPE stands for what?

A. **Community Oriented Police Enforcement.**

Q. How did your duties change at the time that you were transferred to COPE?

A. **As Patrol Supervisor -- as Patrol Officer, you respond to 911 calls. That means you patrol around. When you get a 911 call, you respond.**

**As a COPE officer we have -- if you are familiar with what conditions are like in the City, it is very similar. So, we**

Scimone

**address more or less the problem areas of the precinct. If it is an identified problem area, be it a drug problem, a youth problem, a speeding problem, those are the areas we are assigned to.**

**So we generally do not listen to the radio. We choose our assignments. We are given our assignments at the discretion of the Inspector of the precinct.**

Q. When were you assigned to the COPE Unit?

A. **I don't remember. I would guess about five years ago, four years ago.**

Q. That is year best approximation?

A. **Yes.**

Q. If necessary, we will leave a blank in the transcript.

A. **I don't remember.**

TO BE FURNISHED:______________________________

______________________________________________

Q. If you can place the date of your assignment to the COPE Unit in, if you do remember it, I would appreciate that.

A. **Okay.**

Scimone

MR. BREWINGTON: Let's take a quick break. I need to call my office real quick.

(Recess taken.)

MR. BREWINGTON: Please read back the last question and answer.

(Record read.)

Q. Sir, what is your highest level of education?

A. **I have some college. No degree. I would guess about twenty credits.**

Q. Twenty, twenty-seven credits?

A. **I don't know.**

Q. The reason I say that, on your application it says twenty-seven credits.

A. **Okay.**

Q. Where did you achieve those credits, please?

A. **Nassau Community.**

Q. You graduated from Carey?

A. **Yes.**

Q. When did you graduate from Carey High School?

A. **June of 1981. Does that sound**

Scimone

**right? I think so.**

Q. Was Dr. DeSonne still there at the time that you graduated from the high school?

A. **I have no idea.**

Q. Did you go right from high school to college?

A. **Yes.**

Q. Was there any break in your college work? Meaning, did you go for some time, stop, and go back, or did you go straight through?

A. **I went without getting a degree. And then I got a job for an aerospace testing company called Lawrence Ripek Corporation or Inc., something like that.**

Q. After the job working for the aerospace company, where did you go?

A. **I went to Corrections.**

Q. Now, had you made application to be a police officer or law enforcement officer in any jurisdictions other than Suffolk County?

A. **Yes.**

Scimone

Q. Can you tell me where first?
A. **New York City Police Department.**
Q. Did you go through the application process?
A. **Yes.**
Q. After having passed the examination?
A. **Yes.**
Q. At some point were you disqualified from the process?
A. **Yes.**
Q. Was that as a result of a heart murmur?
A. **Yes.**
Q. Did you appeal that, sir?
A. **I think yes. Yes, I did.**
Q. What was the result of the appeal?
A. **I lost the appeal.**
Q. Did you have an attorney representing you on the appeal?
A. **No.**
Q. So you did an Internal Administrative Appeal, as best as you recall,

Scimone

is that correct?
A. **I guess so, yes.**
Q. Any other police departments that you sought to be a member of, other than New York City and Suffolk County?
A. **I remember taking the trooper's test. But I never went through the application process. I got like an 85 on it. And that was it. I never heard from them.**
Q. You also took the New York City Department of Corrections Corrections Officer exam?
A. **Yes.**
Q. You passed that, obviously?
A. **Yes.**
Q. When did you start your service as a New York City Corrections Officer?
A. **I don't know. Some time in 1987.**
Q. How long did you actually serve as a Corrections Officer?
A. **I'm thinking like ten months.**
Q. Including --
A. **The Academy.**
Q. -- the Academy?

Scimone

A. **Yes.**
Q. During the time that you were actually serving as a Corrections Officer, where were you assigned?
A. **Rikers Island.**
Q. Were you stationary at Rikers, doing transport, or anything else?
A. **I was stationary at the Women's House of Detention.**
Q. Did there come a time when you left that position?
A. **Yes.**
Q. What was the reason for your leaving that position?
A. **I received a job with Suffolk County Police Department.**
Q. At the time that you received the job with the Suffolk County Police Department, were you working any other jobs other than Correction?
A. **No.**
Q. Did you then attend the Suffolk County Police Academy?
A. **Yes.**

Scimone

Q. Did you complete the prescribed course offerings at the Police Academy?
A. **Yes.**
Q. Did you fail any portions of your Police Academy work?
A. **No.**
Q. Now, sir, have you taken any other college courses, other than taking the number of credits that we have talked about at Nassau Community College?
A. **No.**
Q. Have you taken any online college level or higher level learning courses related to any institution?
A. **No.**
Q. Sir, do you hold any licenses in the State of New York, other than a driver's license?
A. **No.**
Q. Are you licensed to carry a firearm, or is that as a result of your police --
A. **I think that is as a result of employment. I don't actually have a license.**

Scimone

Q. Have you ever sought any licenses, other than a driver's license, in the State of New York?
**A. No.**
Q. Could you please tell us when was the last time you took any courses at the Academy yourself?
**A. We just had online training at the Academy six months ago.**
Q. When you say "online training," you are able to do it on the computer?
**A. Yes.**
Q. What was that training that you took?
**A. I was training on how to use the computers in the cars and in the precinct.**
Q. How to get in and out of the software, fill out forms, things of that nature?
**A. Right.**
Q. Any other training that you have had within the past two years through or at the Academy?
**A. I went to Laser School. Laser**

Scimone

**being Radar School.**
Q. Where was that held?
**A. At the Academy.**
Q. What does that relate to?
**A. Speeding vehicles. Rather than radar, you are using an actual laser unit instead, so it is a different school.**
Q. Did you receive a certificate --
**A. Yes.**
Q. -- in Laser unit application, or something of that nature?
**A. Yes.**
Q. Any other training in the past two years at the academy?
**A. No.**
Q. As a Sergeant, have you had any responsibility to oversee any special units, that being a supervisor over any special units?
**A. A few years back I was a -- one of the sergeants in the SCET Team, which is the Street Crime Enforcement Team, that operated out of the 1st, 2nd and 3rd Precincts.**

Scimone

Q. How long did you serve in that role, sir?
**A. That was only I believe eight weeks.**
Q. As a supervisor in that unit, what were your duties?
**A. We had small teams of officers comprised from the 1st, 2nd, 3rd Precincts. And we would just operate out of each precinct targeting specific locations designated by the precinct commanding officers.**
Q. When you say targeting, target in what way?
**A. Wherever the problems were within a specific precinct.**
Q. You were doing basically enforcement?
**A. Street crime enforcement, yes.**
Q. In your role as a supervisor, when you did that, how many people would you supervise at any particular time?
**A. It would vary night to night depending on how many guys were at work. I don't think at any time more than eight**

Scimone

**people.**
Q. Sir, have you at any time commanded --
MR. BREWINGTON: Withdrawn.
Q. Have you at any time served as a supervisor for any other special units?
**A. Just the COPE Unit.**
Q. Sir, do you know the name Kenny Lazo?
**A. Yes.**
Q. How do you know that name, please?
**A. From the incident that happened that night.**
Q. Do you recall what day or night that happened?
**A. April 12th.**
Q. Of which year, please?
**A. I would have to look at my paperwork. (Perusing.) 2008.**
Q. Prior to that time, did you know the name or the person identified with the name Kenny Lazo?
**A. No, sir.**

Scimone

Q. On April 12, 2008 were you a Patrol Sergeant?

**A. Yes.**

Q. When for the first time on April 12, 2008 did you come in contact with the person known as Kenny Lazo?

**A. At approximately 8:00 p.m.**

Q. 8:00 p.m.?

**A. Yes.**

MR. BREWINGTON: Just note that the defendant is looking at a document entitled "Supplemental Report."

**A. "8:05."**

Q. You are looking at Attachment #25 to the Internal Affairs' report; is that correct?

**A. No. This is the Supplementary Report.**

MR. DUNNE: Attachment 25. Yes, this is it.

THE WITNESS: This is not the Internal Affairs' report.

MR. DUNNE: It is the attachment to it, Attachment 25.

Scimone

THE WITNESS: Okay. I'll go with it.

MR. DUNNE: By Counsel: That is correct.

Q. Why don't we do this --

MR. DUNNE: He may not know that.

MR. BREWINGTON: Not a problem. That is why we are both here.

Q. Just since you have now pulled that out and looked at that, let's mark that for identification purposes.

MR. BREWINGTON: I'm taking the document from the witness. For the record, this is the "Supplementary Report." It has down at the bottom right-hand side "ATT #25." So we will mark this as Scimone 1 for identification.

(Scimone Exhibit 1, Attachment #25 Supplementary Report, marked for identification.)

Q. Sir, I'm going to place before you what we have now identified as Scimone 1 for identification (handing).

Scimone

Just tell us, what is that document, please?

**A. (Perusing.) It is a supplementary report regarding the incident.**

Q. When you say "a supplementary report," is it a report that you prepared?

**A. Yes.**

Q. Under what circumstances did you prepare it?

**A. I was asked to do so by the Homicide Detective at the scene.**

Q. What is the date of that document, please?

**A. "4/13/08."**

Q. At the time that you prepared that report, had Mr. Lazo already passed away?

**A. Yes, sir.**

Q. Do you need to refer to that report to refresh your recollection of the particulars of this incident?

**A. Not the particulars. But you were asking me the specific time. So I wanted to be certain on the time.**

Q. I wanted to be clear. Very well.

Scimone

So, at or about 8:05 p.m. how was it that you came to be involved with Kenny Lazo?

**A. Earlier in the evening Detective Talt had called me on my cellphone to ask if we could be in the West Islip area because they would be operating over there and they may need a car pulled over.**

Q. Sir, at the time were you operating in a marked car?

**A. Yes.**

Q. Were you operating in uniform?

**A. Yes.**

Q. Do you recall what unit it was that you were traveling in?

**A. I believe it was the COPE 37 car.**

Q. You said you received a telephone call. Was that on a cellphone --

**A. Yes.**

Q. -- that you received the call?

**A. Yes.**

Q. Was that your personal cellphone?

**A. Yes.**

Q. That call -- did you receive any radio transmissions from Detective Talt or

Scimone

anyone else prior to coming in contact with Kenny Lazo about pulling over a car?

**A. Immediately before I was in radio contact with him when I switched to Detective. But earlier in the evening Detective Talt called me to ask if we could be in West Islip in case they needed help.**

Q. At that time who was your cellphone carrier?

**A. Verizon.**

RQ MR. BREWINGTON: At this time pursuant to Rule 34 we call for the production of any cellphone records as they may exist for this sergeant on or about April 12th, starting from about 3:00 in the afternoon up and through the 13th of April 2008.

If the documents do not currently exist and cannot be had by any reasonable attempts by the defendants, we ask for the identifying information so that we may appropriately subpoena that information from the Verizon carrier.

Scimone

MR. DUNNE: That is fine. Put that in a written demand for me.

MR. BREWINGTON: No problem. You will get that too when the transcript comes. There will be a request in the transcript.

Q. Now, sir, after you received this call from Detective Talt, what did you do?

**A. I had received it earlier in the evening. It wasn't immediately before we headed over there.**

Q. Okay.

**A. But I think he had given us an approximate time that we should head over there. So we started over towards West Islip. We were in Central Islip. We being myself and Officer Judge. Officer Judge was driving the police vehicle.**

Q. When you said that you had received a call earlier in the evening, how much earlier, that being prior to 8:05, if you can approximate, please?

**A. I don't recall. I would have to say within the hour. But I don't know exactly**

Scimone

**when.**

Q. At the time that you did receive the call, what was it that Detective Talt said to you, as best as you can recall?

**A. As best I recall is he asked if we could be in West Islip in case they needed help.**

**We work with them often. We know the way they operate. And we are available, unlike Patrol who have to answer calls. That is why he asked the COPE guys to help him.**

Q. When you say work with them and available to them, what do you mean?

**A. They are plainclothes detectives. They cannot pull cars over too easily. You like to have a marked car do that. So they ask uniformed officers to do that. They cannot always get a sector car to do that, because they are busy. If we can help them, we do that.**

Q. Would it be accurate to say that at 6:00 or 7:00, whenever the time was that it was called, it had already been predetermined that Kenny Lazo was going to get pulled over?

Scimone

**A. Not Kenny Lazo. They knew they were working there. And I don't know what their mission was that night. But they said they may need help that night. So I said, We would be available.**

Q. The help that they were asking for was going to be to pull over a car?

**A. Possibly to pull over a car. It could have been something else.**

Q. Sir, did they inform you where and when?

**A. They just said, In West Islip.**

Q. Did they inform you about what time?

**A. They said later.**

Q. You said earlier that they called you on the cellphone to talk about possibly pulling over a car. Any other possibilities that were mentioned during that conversation?

**A. They said they may need help. It could be pulling over a car. It could be going to a house. It could be anything. They said, Can you be in West Islip if we need you? And I said, Yes.**

Scimone

Q. Did you have any further contact with Detective Talt, or anyone from his plainclothes unit at that time?

**A. Not until we started over towards West Islip.**

Q. When you started over to West Islip, first tell us what you did in terms of going over to West Islip?

**A. We -- I told Billy, let's head over to see what Chris and Detective Newton are doing. We jumped on the Southern State Parkway westbound from Central Islip.**

Q. When you say Billy, you are referring to Officer Judge?

**A. Yes.**

Q. Did you then try to contact Detectives Newton and Talt?

**A. I switched to Detective on the radio because I could hear what they are doing. I switched on the police radio to Detective, and I told them we were heading over.**

Q. When you say you switched the radio to Detective, to a channel that the

Scimone

detectives used?

**A. Yes.**

Q. What channel is that?

**A. Detective on the radio. To tell you the numbers, I couldn't tell you right off the top of my head.**

Q. What channel does the Third normally operate on?

**A. Channel 3.**

Q. Is there an administrative channel other than Channel 3 that the Third operates on?

**A. No.**

Q. Any other channels that the Third Precinct operates on other than Channel 3?

**A. We could switch to PD South if we have to talk to each other car to car. There is also car to car. But our main radio band is Channel 3.**

Q. The Channel 3 radio transmissions, are they recorded?

**A. Yes.**

Q. Are the PD South transmissions recorded?

Scimone

**A. Everything is recorded.**

Q. Car to car is recorded?

**A. Yes.**

Q. The cellphone conversations, are not recorded, though; is that correct?

**A. No.**

MR. DUNNE: No, it is not recorded, or no, it is not correct?

**A. No, they are not recorded.**

Q. As far as you know?

**A. As far as I know.**

Q. When you switched to Detective Channel as you were proceeding to West Islip, what occurred?

**A. I heard Chris, Detective Newton, and Detective Talt talking to each other. So I assumed they were in separate cars. I didn't know if they were in one car when we were heading over there. We were trying to coordinate where they were to where we were and where we needed to be. We were just trying to figure out where they were.**

Q. When you say you were trying to coordinate where you needed to be, what did

Scimone

you understand at that time was going to be your duty and/or responsibility?

**A. I was -- I just wanted to be close in case they needed us. So the closer we are to their vicinity -- whatever they needed, we wanted to be as close as we could be without being visible.**

Q. Did you inject yourself into their radio discussion?

**A. I remember asking them -- I remember getting on the radio and telling them, We are heading over.**

Q. Did they speak with you?

**A. I think they just said, Okay.**

Q. Did they tell you where to be in terms of being closer?

**A. They didn't tell me where to be. But I knew where they were. I knew the flow of traffic. We were just trying to coordinate where we should be in relation to the Sunrise Highway.**

Q. How did you know where they were?

**A. I could hear them mention Herbie Dodge. And I could hear them mention Bob's.**

Scimone

**I know where they are in West Islip.**

Q. What you did, you took the information they were discussing and kind of figured out on your own where about that was?

A. **Right.**

Q. Did you hear them discuss what they were doing while they were at those locations?

A. **No.**

Q. Did you hear them say any names while they were at that location?

A. **No.**

Q. Did you hear them mention what they planned to do at that location?

A. **No.**

Q. Did they mention at that time, if you recall, what they planned to do when they left that location?

A. **No.**

Q. Did they give you any instructions, other than what you have just said already up to this point?

A. **No.**

Q. What did you do next?

Scimone

A. **We finally -- we, being Officer Judge and myself, we positioned ourselves on Sunrise Highway right near the Robert Moses Causeway.**

Q. Why did you do that?

A. **Because I heard Detectives Newton and Tait saying they had a car -- they were observing a car that they might want pulled over. So we were just waiting if they needed help.**

Q. At that time you had not seen any car that needed to be pulled over, correct?

A. **No.**

Q. At that time had Detective Newton or Tait indicated to you on the telephone or on the radio any traffic violations that had occurred?

A. **No.**

Q. But they had identified a car that they might need to have pulled over, correct?

A. **They said they were following a Cadillac, and we should get on the Robert Moses Causeway.**

Scimone

Q. Did you do that?

A. **Yes.**

Q. What did you do next?

A. **We saw the Cadillac that they were following traveling at a high rate of speed on the Robert Moses Causeway traveling northbound in the right lane. As he was approaching Southern State Parkway and the Bay Shore Road exit --**

Q. Actually my question was: What did you do next? You got on the parkway?

A. **We got on the Robert Moses Causeway.**

Q. Then what did you do once you got on the Robert Moses Causeway?

A. **We tried to identify the car that they were looking at.**

Q. Did you identify the car?

A. **We did.**

Q. Then after you identified the car, what next happened?

A. **We observed the car. I was watching the car. It looked like he was going to go left, so he would go westbound on the**

Scimone

**Southern State Parkway. He had his left-turn signal on. He was traveling at a high rate of speed.**

**As he approached the Bay Shore Road exit, he very quickly made the right turn. So he failed to signal. He crossed over two lanes of traffic. And he made the right to go to Bay Shore Road. So he made a couple of traffic infractions.**

**So I asked Detective Newton if he wanted us to stop the car there. So we did.**

Q. The couple of traffic infractions, did you indicate that the Cadillac was in the right lane?

A. **It was in the right lane as it was proceeding to the Southern State Parkway going westbound. And then there is two lanes of traffic that goes towards Bay Shore Road. So he very quickly made the right with his left-turn signal on.**

Q. Did the car that you were in have video capability?

A. **No.**

Q. The car that you were in, did you

Scimone

have a telephone that had video capability?

A. **Other than my cellphone?**

Q. Yes.

A. **Yes.**

**We don't use our cellphones to record traffic infractions.**

Q. But you do use your cellphones to conduct police business, right?

A. **I wasn't conducting police business. He just asked me to be in West Islip.**

Q. Was that while you were on duty?

A. **Yes.**

Q. That was relating to the work that you were doing as a police officer, right?

A. **Yes.**

Q. That was police business, right?

A. **We had a casual conversation first. And then he said, We are going to be in West Islip.**

Q. And that was police business, correct?

A. **At that time, yes.**

Scimone

Q. Now, as you got behind this car and you saw what you claim to be the traffic infractions, what did you do next?

A. **I asked Detective Newton if he wanted the car stopped. And he said yes. So we stopped the car on the right shoulder.**

Q. When you say you asked Detective Newton if he wanted the car stopped, how did you do that, please?

A. **I asked him if he wanted us to stop the car.**

Q. I understand that. Did you do that by telephone, by radio?

A. **By radio, yes.**

Q. Were you operating the radio at that time, or was Officer Judge?

A. **I believe I was operating the radio.**

Q. After you asked Detective Newton if he wanted the car stopped, what was his response?

A. **Yes.**

Q. What did you do?

A. **We pulled the car over on the**

Scimone

**right shoulder.**

Q. Did you ask for any further information about this individual or the car that you were being asked to pull over?

A. **He just identified the car. He said the car with the blinker on, and that was it. I didn't know the individual in the car or anything. I didn't know how many subjects were in the car. He just identified the car.**

Q. Did you make any such inquiry of Detective Newton?

A. **No.**

Q. Did you make any such inquiry of Detective Talt?

A. **No.**

Q. Were you speaking to Officer Judge while all this was happening?

A. **Yes.**

Q. What was your conversation with Officer Judge?

A. **I don't recall. We were just trying to coordinate getting on -- where we were going to stop him.**

**I can't tell you specifically**

Scimone

**what my conversation was.**

Q. After you got the response to stop the car, what did you do?

A. **We stopped the car on the right shoulder.**

Q. When you stopped the car on the right shoulder, please tell us what transpired.

A. **Officer Judge was the driver of the police vehicle, so he was the contact officer. He got out and he approached the driver. I got out just as the safety cover officer. I was on the passenger side of the vehicle while Officer Judge engaged the operator.**

Q. At the time that you emerged from your vehicle, was Officer Judge's gun drawn?

A. **No.**

Q. Was your gun drawn?

A. **No.**

Q. As you were serving as the safety cover officer, where did you position yourself, please?

A. **Initially at the right rear of**

45

Scimone

**the vehicle. Then as the conversation proceeded, I just moved alongside to the passenger side. And I was watching, just observing from the passenger side.**

Q. Did you hear any of the conversation?

A. **No, not really. There was cars going by very loud. I could just see Officer Judge talking.**

Q. What is the next thing that happened?

A. **I remember Officer Judge asking -- I didn't hear him. I could see him gesturing for the operator's license. He asked him to shut the car off. I saw him push the button on the dashboard.**

Q. What year approximately was this vehicle?

A. **2005.**

Q. At the time that Officer Judge -- you said you saw him gesturing to the driver. Did you actually hear any words that were being said by Officer Judge at that time?

A. **No. But I have worked with**

46

Scimone

**Officer Judge long enough. I know the way he says, I'm Officer Judge. I work in the Third Precinct. He is very cordial when he engages the operator. But I didn't hear specifically what he was saying.**

Q. Then after you saw the gestures that you say that you saw, what's the next thing that happened?

A. **Officer Judge took the license, and the registration, insurance card, and went back to the police vehicle. Then I was on the passenger side. So I walked around the front of the car. And then I just came around to the driver's side, and I started talking to the operator.**

Q. Did you engage the operator in conversation?

A. **Just, How are you doing? Where are you coming from? You were going a little bit fast back there. Very casual, nothing specific type of questions.**

Q. Exactly how fast had the car been going?

A. **We paced him approximately 65**

47

Scimone

**miles per hour.**

Q. When you say you paced him, how long did you pace him?

A. **About an eighth of a mile.**

Q. At any time while you were pacing this car for an eighth of a mile, did you report your whereabouts to Command?

A. **No.**

Q. At any time while you were pulling this car over, did you give Command indication that you were exiting your car to make this stop?

A. **No.**

Q. After you were -- you came around to the driver's side, what did Mr. Lazo say?

A. **I don't remember specifically.**

Q. Do you recall any conversation that he had with you at that time?

A. **No. I mentioned his car. I said, It is a nice car. I said, Is it yours? He said, No. It is his friend's car.**

**I was more or less standing there waiting for Billy to come back with the paperwork.**

48

Scimone

Q. Did you tell Mr. Lazo at that time anything about him being under arrest?

A. **No.**

Q. At that time was he under arrest?

A. **No.**

Q. Did he attempt to try and flee at that point?

A. **No.**

Q. Did he talk to you in a normal tone at that point?

A. **Yes.**

Q. Then what happened?

A. **At some point Detective Newton pulled up and parked behind the police vehicle. I saw him pull up. And then I saw Detective Newton speaking with Officer Judge. And then he, Detective Newton came over and spoke with me.**

**I walked a little towards Detective Newton towards the back of the car. I mentioned the push button start on the dashboard. And we decided we should ask Officer Lazo -- Mr. Lazo to get out of the car. I didn't know it was Mr. Lazo at the**

49

Scimone

time until Billy Judge came out. But we asked the operator to get out of the car. This way he couldn't take off. Because we usually ask for the keys. We couldn't do that with the push button start.

Q. On normal traffic stops you ask for people to give you their keys?

A. **After I spoke to Detective Newton and he told me what happened, he said, He just did a deal back in West Islip.**

Q. I didn't get that part.

A. **We had a short conversation. I mentioned the dashboard to him. I said, Maybe we should ask him to step out of the car. And that is what we did, because we couldn't take his keys.**

Q. I appreciate that. Let's go back for a second.

You indicated that Detective Newton came up; is that correct?

A. **Yes.**

Q. Initially he spoke to --

A. **Officer Judge.**

Q. -- Officer Judge; is that

50

Scimone

correct?

A. **Yes.**

Q. Then after he spoke to Officer Judge, he spoke with you; is that correct?

A. **Yes.**

Q. Was Officer Judge present when he spoke with you?

A. **No. I believe he was still in the car running data.**

Q. You had stepped away from the door, stepped a little bit further back away from the door; is that correct?

A. **Yeah. I mean it was only a matter of a couple of feet. I don't even think I passed the back of the car. I walked over to him. He told me what happened, and I walked right back. It was a matter of a few feet.**

Q. Even if it was a few feet, you were no long directly at the driver's side door; is that correct?

A. **Right.**

Q. When you stepped back, did the vehicle attempt to flee?

51

Scimone

A. **No.**

Q. At that time was the vehicle's engine running?

A. **I don't think so. No.**

Q. He had already pushed the button, correct?

A. **Right.**

Q. At the time that you were speaking with Detective Newton, what exactly did Detective Newton tell you?

A. **I don't know exactly what he said. I know now -- I know that he said, He did a deal back there. But exactly what he said, I can't say.**

Q. Do you recall any further details as to what he said?

A. **No.**

Q. What did you say in response?

A. **That is when I said, Well, we don't have his keys to the car. Maybe we should ask him to get out because he has a push button start. So that is what we did.**

Q. It was your request for Mr. Lazo to get out of the car?

52

Scimone

A. **I don't know if it was myself or Detective Newton. We both asked him to step out of the car. Because normally we say, Usually we can disable the car with keys. However, you have a push button start. Would you mind stepping to the back of the vehicle? And he complied.**

Q. You explained that to Mr. Lazo?

A. **Yes.**

Q. At that point Mr. Lazo had been allegedly stopped by you and Officer Judge for some traffic infraction; is that correct?

A. **Yes.**

Q. How -- did you introduce Detective Newton to him and say this is --

A. **No.**

Q. No. So you just -- yourself and Detective Newton went back to his window and told him to get out of the car?

A. **Asked him to get out of the car.**

Q. At that time was he free not to get out of the car?

A. **Was he free not to get out of the car?**

Scimone

I asked him to get out of the car. I don't know what would have happened if he refused.

Q. Not my question.

A. Go ahead.

Q. Within your understanding as a police officer now speaking to a citizen, was he free to just drive away at that point?

A. No. The traffic stop was still going on. Billy didn't come back with the data. I didn't know if he had a warrant. I didn't know what his license looked like. No, he wasn't free to go. If he had told me he wouldn't get out of the car, I would have just said, Okay. I'll just stand here and watch you.

Q. Sir, at the time that you were there and he was told to get -- asked to get out of the car by yourself or Detective Newton, what words did you use or did Detective Newton use to ask him to get out of the car?

A. I think I just explained that normally we ask for the keys to disable the

Scimone

car. However, he didn't have keys, that's why I asked him to get out of the car.

Q. When you say normally we ask for keys, had you done this type of stop for Detective Newton before?

A. Sure.

Q. At the time that you asked Mr. Lazo to get out of the car, did he ask why?

A. We had already explained why, so he didn't ask why.

I told him, Normally we get the keys. I can't disable your car, because all you have to do is push the button. He seemed to understand, so he didn't have a problem getting out of the car.

Q. When he got out of the car, how close were you to him?

A. Right next to him. He just walked to the back of the car.

Q. Essentially as you are to your attorney right now?

A. Sure.

Q. Approximately two-and-a-half to

Scimone

three feet?

A. Sure.

Q. Did you notice any injuries to Mr. Lazo's face --

A. No.

Q. -- at that time?

Let me finish my question before you respond.

A. Okay.

Q. Did you notice any injuries to his neck at that time?

A. No.

Q. Did you notice any injuries to his body at all at that time?

A. No.

Q. How did he ambulate, that being move toward the back of the car? Was there anything which restricted him, a limp or anything of that nature?

A. No.

Q. At the time that he moved to the back of the car, is that where you asked him to move?

A. I just said, Step to the back of

Scimone

the car.

Q. At the time that he stepped to the back of the car, had Officer Judge come back at that point?

A. I remember standing, staying on the passenger side and Detective Newton started talking to Mr. Lazo. At some point Office Judge -- I was standing there close in proximity while they spoke. Then Officer Judge walked up.

Q. Sir, at the time you were standing close, what was the conversation between Detective Newton and Mr. Lazo, if any?

A. I just remember, How are you doing? Where are you coming from? Where do you live? Nothing specific. I can't tell you.

Q. Then what happened?

A. Officer Judge approached and started talking to Detective Newton. So I kind of drifted away. I was just looking around the car in the grassy area to see if I saw anything on the floor or anything.

Q. When you say you drifted away,

Scimone

Mr. Lazo was out of the car; is that correct?

A. **Yes.**

Q. Was he handcuffed?

A. **No.**

Q. So, his hands were free?

A. **Yes.**

Q. Were his hands on the back of the car, or was he just standing?

A. **He was just standing there.**

Q. You say you drifted away. What do you mean by that?

A. **I was just looking around. I know that he just did a deal. I was looking around to see if I saw any contraband in the grass. I'm looking in the back seat of the car. I'm more or less looking around while Detective Newton and Officer Judge are speaking with Mr. Lazo.**

Q. When you say that you know that he just did a deal, that is what you were told; is that correct?

A. **Yes.**

Q. You had not seen Mr. Lazo do anything?

Scimone

A. **No.**

Q. After you drifted away, what happened next?

A. **Then I saw Detective Newton get thrown back. And Mr. Lazo was running towards the front of his car.**

Q. When you say "saw Detective Newton get thrown back," please describe where you were and where Detective Newton was at the time that you say that he got thrown back?

A. **I was on the driver's side of the car towards the rear. And Detective Newton was on the opposite side. And I just saw Detective Newton going back.**

**I don't know if it was an elbow. I just saw a motion. I couldn't tell you exactly what it was. And I saw Detective Newton going back.**

Q. Just so we are clear, before you said that you saw Detective Newton get thrown back. You never saw Detective Newton get thrown, did you?

A. **I saw him going back. I don't know if he was thrown back, or struck back, or**

Scimone

**pushed back. I don't know. I just saw him going back.**

Q. You don't know if that was under his own power either, do you?

A. **It didn't look like it was under his own power.**

Q. Well, sir, when you say it didn't look like it, do you know?

A. **No.**

Q. When you saw Detective Newton go back, you say saw Mr. Lazo moving toward the front of his car?

A. **Running towards the front of the car.**

Q. As he was running towards the front of the car, you would have been in between him and the front of the car?

A. **No. I had to run around the back. I was more or less at the back. And I think Officer Judge -- he only got a couple of steps and Officer Judge was right there, and Detective Newton. So it was Officer Judge, Detective Newton. And I was more towards the back of the vehicle.**

Scimone

Q. Was Officer Judge between Mr. Lazo and the front of the car?

A. **I believe so.**

Q. So, Mr. Lazo was actually running toward Officer Judge, the two steps?

A. **No. I think at some point Billy got around. I think Billy had to grab him first and then get around. Then he got away.**

Q. I'm not to the grabbing part. I'm not to the getting away part.

A. **Billy was -- we were just sitting there talking. It was Mr. Lazo, and Detective Newton, and Officer Judge.**

**I don't know how they were standing in relation to Mr. Lazo, but they were more towards the back of the car. Mr. Lazo, Detective Newton and Officer Judge towards the back of the car. And I was on the opposite side.**

Q. As Detective Newton and Officer Judge were standing next to Mr. Lazo, were they on the traffic side of the car or on the shoulder side of the car?

A. **They were on the shoulder side of**

Scimone

the car.

Q. Mr. Lazo was closer to the traffic?

A. **No. Because he was on the passenger side. I was on the traffic side.**

Q. My question is: As he ran toward the front of the car, was that -- was he running towards the front of the car on the driver's side or on the passenger's side?

A. **On the passenger side.**

Q. You said as he took approximately two steps, what next happened?

A. **Officer Judge was able to grab him around the waist.**

Q. When you say "grab him around the waist," can you just describe a little more in what way?

A. **Just bear hugged him around his waist (indicating).**

Q. Indicating wrapping his arm in a semi-circular fashion around his waist?

A. **Right.**

Q. Then at that time, what did you do?

Scimone

A. **I was just towards the back of the vehicle. I was more or less just trying to block off that escape route. I was more or less standing like this (indicating). And I saw Officer Judge grab him. I thought it was over. I thought he was going to give up, or whatever. And then I saw him break away again.**

Q. Sir, at the time that you say that you saw Mr. Lazo take these approximately two steps, had you heard any discussion between himself, Officer Judge and/or Detective Newton?

A. **No.**

Q. What had you heard, if anything?

A. **I just heard garbled talking because I was on the other side with the traffic going by.**

Q. As you blocked off this potential escape route, as you indicated, what did you next do?

A. **I was just standing there more or less thinking it was over, that he was going to put his hands behind his back. And he ran away again.**

Scimone

Q. Did you tell him to put his hands behind his back?

A. **No.**

Q. Did you hear anybody say anything at that time?

A. **No. I think Officer Judge -- I don't know. I can't say for sure who said anything.**

Q. At that time what was Officer Judge doing, other than holding him around his waist?

A. **Nothing.**

Q. At that time what was Detective Newton doing, if anything?

A. **Nothing.**

Q. Did you see Detective Talt at that time?

A. **No.**

Q. Was he on the scene at that time?

A. **No.**

Q. Just so that we are clear. At the time Mr. Lazo was now being placed in this bear hug, it is your testimony that it was yourself, correct?

Scimone

A. **Yes.**

Q. Officer Judge, correct?

A. **Yes.**

Q. And Detective Newton; is that correct?

A. **Right.**

Q. Any other police personnel at that time?

A. **No.**

Q. Sir, were you carrying a radio at that particular point?

A. **Yes.**

Q. At that point when you saw Mr. Lazo take these two steps, did you make any radio transmissions?

A. **No.**

Q. Did you make any radio transmissions at the time that Officer Judge placed Mr. Lazo in this bear hug and you thought he was just going to give up?

A. **No.**

Q. What is the next thing that happened?

A. **Mr. Lazo broke away and started**

Scimone

running towards the front of the car again.

Q. When you say broke way, please describe what you mean.

A. He just got away. I can't describe it. It just looked like Billy was letting go. Or he got away from Billy.

Q. When you say --

A. I can't describe it.

Q. I'm sorry?

A. I can't describe it. I just saw him break away and just start running towards the front of the car.

Q. When you say start running towards the front of the car, how many steps, if any, did he take?

A. I'm guessing four, five.

Q. Then after the four or five steps, what happened?

A. Officer Judge got him again around the waist. And then he kind -- we kind -- Officer Judge kind of tripped him to the ground so that we were towards the front of the Cadillac on the shoulder, nearest the traffic, facing the traffic. And I came

Scimone

around Officer Judge's right side towards Mr. Lazo's right arm. We were all pretty much facing traffic on the shoulder of the Southern State Parkway at Robert Moses.

Q. Sir, at the time that you were facing traffic as you indicated, traffic would have been coming from the rear of the Cadillac towards the front; is that correct?

A. Right.

Q. As you were facing the traffic, were you on the grass, or concrete, or some other surface?

A. We initially started out on the grass. But Mr. Lazo kept pushing me towards the shoulder. Because I was on the closest side of the traffic. I was basically straddling the traffic lane. And I had his right side. And we were all facing the traffic. And he kept trying to get away crawling. And I'm just trying to hold onto his right arm. And the whole time he is pushing at me, pushing. And we are moving towards -- I'm on the traffic lane at this point. We are all laying prone. We are all

Scimone

on the ground. Nobody is standing up.

Q. Let's go back for a second. At the point that you say that Officer Judge engaged or bear hugged Mr. Lazo again, you said, We were towards the front of the car. So you moved your location?

A. Right. As he ran around the front, we all ran around the front also.

Q. When you say ran around the front, you ran toward the front of the vehicle. You didn't run into the street to run --

A. No. But the vehicle -- the Cadillac, we had to run around the front of the Cadillac. We all came down towards the front of the Cadillac nearest the shoulder.

Q. Just so that I'm clear, when you say you ran around the front, you ran from the rear portion towards the front on the passenger side; is that accurate?

A. On the passenger, and we wound up on the driver's side.

Q. So you ran essentially around that way?

Scimone

A. Right.

Q. You said that Mr. Lazo was either tripped down or taken down by Officer Judge; is that correct?

A. Yes.

Q. Did you assist in that taking down of Mr. Lazo?

A. No. He went down. And I just went to grab his right arm.

Q. When you went to grab his right arm, which hand or hands did you use to do that?

A. I had Detective Newton's flashlight. So I basically was grabbing with my left arm. And I had the flashlight in my right. And he was pushing, pushing with his right arm.

Q. You were grabbing for his arm with one hand?

A. Right.

Q. While you held the flashlight in the right hand?

A. Right.

Q. Just so that I am clear, are you

right-handed or left-handed, sir?
A. **Right-handed.**
Q. When you did, or if you ever have thrown a ball, do you use your right hand?
A. **Yes.**
Q. What hand do you write with, sir?
A. **Right hand.**
Q. By the way, sir, have you ever kicked a ball?
A. **Right footed.**
Q. Sir, can you tell us, please, as you held this flashlight that was -- I think you said it was -- whose flashlight was it?
A. **Detective Newton's.**
Q. Where did you get the flashlight from?
A. **When Detective Newton approached me initially, I didn't have my flashlight. I had left mine back in my bag in the car.**
**When Detective Newton came up to me and Officer Judge approached Detective Newton, I asked Detective Newton for his flashlight so I could look around the grass and look inside the car.**

Q. So you specifically asked for the flashlight to do those tasks?
A. **Right.**
Q. Please describe the flashlight.
A. **It is a Mag light, three or four cell, metal.**
Q. By three or four cell, you mean three or four D batteries?
A. **I believe.**
Q. As you reached for Mr. Lazo's hand with your left hand, which hand was it that you were attempting to grab with your left hand?
A. **His right hand.**
Q. Where was Detective --
MR. BREWINGTON: Withdrawn.
Q. Where was Officer Judge at the time you were grabbing for Mr. Lazo's left hand?
A. **Officer Judge was around his midsection, around the middle of his body.**
Q. On top of him?
A. **I think he was more towards his buttocks, but, yeah, on top of him. But, you**

**know, his legs were kicking and he was kind of in between. So he was grabbing him around the waist, and he was lower towards his buttocks.**
Q. Just going back to my question so we are clear. Was Officer Judge on top of Mr. Lazo's body, whether or not it was his buttocks, his legs, his chest, or otherwise?
A. **Yes.**
Q. As you said that -- you said that his legs were kicking. You were referring to Mr. Lazo?
A. **Yes. Because Billy was kind of between his legs. He is trying to crawl, and he is kicking, and the arm is pushing. I don't know what is happening on the left side. That is what was going on on the right side.**
Q. When you say Billy, you are referring to Officer Judge?
A. **Officer Judge.**
Q. Officer Judge you said was kind of between his legs. Were his legs spread, that being Mr. Lazo's?
A. **He was -- I don't know where. I just know he was around the middle of his**

**body. And Mr. Lazo's right leg was free.**
Q. When you say free, how was it kicking?
A. **I can't explain kicking more than kicking.**
Q. Well, sir, was it kicking backwards, forwards, sideways?
A. **He is laying down. So I guess he is kicking sideways.**
Q. I don't want you to guess.
A. **You are asking me to give you an answer to something that I don't know.**
Q. You can tell me you don't know.
A. **I don't know.**
Q. With regard to this kicking that you did see, when you say you don't know, is it that you don't recall, or you don't -- really cannot describe it?
A. **I really cannot describe it.**
Q. As this -- as you were grabbing for his left hand -- his right hand with your left hand?
A. **Right.**
Q. As you were grabbing for his

73

Scimone

right hand with your left hand, where was Officer Newton at the time?

A. **I don't know.**

Q. Were you able to grab Mr. Lazo's right hand?

A. **I would grab it and he would break away. And I would grab it again. It was kind of this motion (indicating). He kept pushing back. Because I'm trying to grab him. He keeps throwing the arm towards me and getting it away. So I couldn't grab onto it good, no.**

Q. Jus so I'm clear, what you just demonstrated seemed to use two hands. You were still using one hand?

A. **No. Boom. It was this arm going back.**

Q. I'm talking about your actions.

A. **Right. My hand is just trying to grab onto it. I had the flashlight, but I'm using both hands. Although this is here, I can still use my right hand for leverage. I can't grab with it. But I can still try and put my weight on the right arm. So that's**

74

Scimone

**what I'm doing. I'm trying to control that right arm.**

Q. You were leaning forward like you are doing now?

A. **I was laying down. I'm laying on the grass doing all this.**

Q. You weren't using the flashlight at that time to illuminate anything, were you?

A. **No.**

Q. At that particular time, sir, did you make any efforts to relieve yourself of the flashlight in any way so that you could use both of your hands?

A. **No.**

Q. Then as you lay on the grass doing as you just described, what was Officer Judge doing?

A. **I just know he was trying to control him. I don't know specifically what he was doing.**

Q. Did you have any conversation with Officer Judge at that time?

A. **No.**

Q. Did you have any conversation

75

Scimone

with Mr. Lazo at that time?

A. **No. I keep telling him, You are under arrest. Give me your hand.**

Q. Okay. You did say that, You are under arrest?

A. **At that point, absolutely.**

Q. I am going to ask you to let me finish my question. I know you want to get your information out. I'll give you every opportunity to do that.

As you were laying on the grass, what words did you actually use in speaking to Mr. Lazo?

A. **I was yelling at him, You are under arrest. Give me your hand. I must have said it fifty times.**

Q. Then, whether or not it was one or fifty times, what did you continue to do?

A. **I keep trying to control his right hand.**

**After minutes of not being able to control his right hand, I took my flashlight and I struck him in the right wrist in the hand area to try and gain compliance.**

76

Scimone

Q. So, you, having that Mag flashlight in this situation hit Mr. Lazo in the wrist with this metal object, this flashlight?

A. **Yes.**

Q. At that time what weapons had Mr. Lazo deployed, if any?

A. **None.**

Q. At that time had Mr. Lazo hit you?

A. **He kept trying to push me into traffic.**

Q. Actually not my question, sir.

A. **He didn't hit me.**

Q. So, you struck actually the first blow to Mr. Lazo's wrist, that being between yourself and Mr. Lazo, correct?

A. **Right.**

Q. Sir, please describe without breaking anything in here, how hard you struck his wrist.

A. **It was just (indicating), Give me your hand, (indicating) Give me your hand.**

MR. BREWINGTON: Indicating

Scimone

closed fist going against the table with a reasonable amount of force.

MR. DUNNE: Whatever that means.

MR. BREWINGTON: Whatever that means.

MR. DUNNE: We can demonstrate that at another time.

Q. Sir, at the time that you kept saying, "Give me your hand, Give me your hand," what portion of the flashlight were you using to hit Mr. Lazo?

A. **The back end.**

Q. That being the cylindrical portion?

A. **Yes.**

Q. Were you using it in a baton fashion or in a jabbing fashion?

A. **Baton fashion.**

Q. By baton fashion I mean using it, this cylindrical portion, using the curved cylindrical portion to come down on his hand rather than hitting him with the end of the flashlight; is that correct?

A. **Yes, that's correct.**

Scimone

Q. How many times did you hit him in the wrist at that time?

A. **I don't know. Five or six times.**

Q. Was Mr. Lazo wearing gloves of any sort?

A. **I don't believe so.**

Q. Was there any cloth or padding between the flashlight that you were using and his skin?

A. **No.**

Q. Did Mr. Lazo react audibly to your hitting his hand?

A. **I am remembering him cursing at us several times, if that is what you are referring to.**

Q. Was that five or six times that he cursed at you?

A. **He was cursing the whole time.**

Q. That was after he was taken to the ground; is that correct?

A. **Right.**

Q. He didn't curse at any time before then, did he?

A. **Not to me. I didn't have any**

Scimone

**words with him until we went to the ground, other than when I was talking to him by the car.**

Q. When you were talking to him by the car, as I think you indicated that it was just general conversation?

A. **Right.**

Q. Didn't curse at you at that time?

A. **No.**

Q. At the time that you claim that he was cursing at you, did you continue to hit him?

A. **I was saying, You are under arrest, Give me your hand. He would curse, Fuck you, or something to that effect. He would keep resisting. And I would hit him again and say, Give me your hand.**

Q. When you say, "Fuck you, or something to that effect," I am not quite sure --

A. **I can't tell you specifically what he said. But he was not compliant.**

Q. How many times did you curse at him, if any?

Scimone

A. **I just kept telling him, Give me your hand. You are under arrest.**

Q. My question to you: How many times did you curse at him?

A. **Never.**

Q. You never used any curse words?

A. **No.**

Q. After hitting his hand or his wrist five or six times, what next happened?

A. **I just kept getting pushed to the road, I keep feeling myself. And I keep digging in trying to stay on the road. Staying on the road, my right foot keeps losing traction.**

**Then at some point I heard the word gun. And then I said, Shit, this guy's got a gun. So I said, I'm going to try and hit him in the back. So I hit him two, three times. It was a long flashlight. I hit him in the back. And I know he was moving his head. So I hit him boom, boom, boom. I h him two or three times. I don't hear no shots. So then at that point I dropped the flashlight, and I put all my body weight on**

Scimone

**his right side, on his right arm.**

Q. Sir, the dropping of the flashlight, was that after you had hit him five or six times in the wrist, correct?

A. **Yes.**

Q. And after you hit him in the back or -- and/or possibly the head, correct?

A. **Yes.**

Q. How many times total before you decided to drop the flashlight did you strike Mr. Lazo?

A. **I don't understand your question.**

**I hit him five or six times trying to get his arm back.**

Q. So five or six then?

A. **And then I hit him two or three times in the back when I heard the word gun.**

Q. The word gun, where did you hear that word from?

A. **I heard Officer Judge yell it.**

Q. Sir, at the time that you heard this word gun and you struck Mr. Lazo two or three times in the back, are you certain that you only hit him in the back?

Scimone

A. **No, I'm not certain. No, because I was on the side. I know he was moving. I have might have struck his head as well. I know I had the small of his back there. Not the small of his back. The upper part of his back. And he was moving, and I don't hear any shot after two or three times, that is when I go back down. I assume the gun is away, and I'm just holding him at that point.**

Q. You never actually saw any gun, did you?

A. **No.**

Q. This statement that was made of gun, during the two or three times that you hit Mr. Lazo, you had already seen his right hand, correct?

A. **I had his right hand.**

Q. Did you know where his left hand was?

A. **No.**

Q. So, you knew that there was no gun in his right hand, correct?

A. **Right.**

Q. Sir, with what level of force, if

Scimone

you could describe it, did you hit Mr. Lazo with the flashlight?

A. **The same level as when I struck him in the wrist.**

Q. Each time that you struck Mr. Lazo, did he make any audible noises as you hit him in the back and/or the head with the flashlight?

A. **I don't recall.**

Q. Did you hear what it sounded like when you hit him with the flashlight in his flesh or in his head?

A. **I don't recall.**

Q. How many times had you used a flashlight in that fashion before?

A. **I don't recall ever using a flashlight like that.**

Q. Had you ever hit anyone with a flashlight before, sir?

A. **I don't recall. No.**

Q. When you say you don't recall, you are not saying you didn't do it, you are saying you just don't have a recollection of doing it, right?

Scimone

A. **I have no recollection of doing it. No.**

Q. Sir, Officer, while he was holding Mr. Lazo, he was using his hands as well on Mr. Lazo, wasn't he?

A. **I don't know what he was doing. I just know basically where he was. I don't know what he was doing. I was just trying to control his right arm.**

Q. Sir, you didn't observe Officer Judge hit Mr. Lazo with a smaller flashlight, did you?

A. **I don't know what Officer Judge did.**

**After I heard the word gun, I know I struck him, and then I went back to his arm.**

**I know Billy was there, but I can't say specifically what he was doing.**

Q. After you struck Mr. Lazo the two to three times as you indicated you did, what did Mr. Lazo do?

A. **Well, at that point when I let go of my flashlight and I'm just holding his arm**

85

Scimone

down, and I told Officer Judge -- I said, Just hold him. Let's just hold him. And then I yelled to call -- Get out an assist.

Then Detective Newton -- I didn't know where he was -- ran back to the police car. I didn't even see him run back to the police car. I learned later that he ran back to the police car to call for help.

I asked Officer Judge where the gun was. And he said he was grabbing for his gun. I said, Just hold on. Just hold him down.

We just held Mr. Lazo until Detective Newton came running up. And I asked if he put out the assist. And he said they were coming.

Q. So, you are using your left hand to grab Mr. Lazo's right hand; is that correct?

A. Yes.

Q. Which hand was it, if you know, that Mr. Lazo was allegedly reaching for Officer Judge's gun?

A. I didn't know. I just heard the

86

Scimone

word gun. I didn't know if he was reaching for his gun or if Mr. Lazo had his own gun.

Q. You never saw that happen?

A. No. I just had his right arm.

Q. Then at that time that you were holding Mr. Lazo and you yelled out, Get out an assist, what was Mr. Lazo doing?

A. He was just still trying to get up. And we are just holding him down. He was just trying to get up. We are holding him down, just putting our body weight on him.

Q. At that point who is hitting Mr. Lazo, if anyone?

A. Nobody. We are just holding him.

Q. Was Mr. Lazo saying anything?

A. I don't recall.

Q. How long did you hold Mr. Lazo down in that prone position?

A. I would say less than thirty seconds.

Q. He did remain prone the entire time, correct?

A. We were all prone.

Q. Prone, just so that we are clear,

87

Scimone

we are not mixing our descriptions, prone is with chest down to the ground; is that correct?

A. Yes.

Q. Sir, at the time that Mr. Lazo --

MR. BREWINGTON: Withdrawn.

Q. After you held Mr. Lazo for that approximately thirty seconds or so, what's the next thing that happened?

A. Detective Newton came running up, approached us from the front. I asked if he got out of the assist.

He said, They are coming. And Mr. Lazo, I just felt him stop resisting us. And I said, Now can you give me your hand? And he just put his right hand behind his back. And somebody asked for his left hand.

We used two separate cuffs to cuff him up. I don't know whose cuffs we used. We just cuffed him behind his back. It seems like as soon as we had him cuffed, I saw police cars heading in our direction. And somebody had pulled up on the shoulder. And I believe it was Officer Link was the first one

88

Scimone

there.

Q. Sir, at the time that you were placing cuffs on Mr. Lazo, did you actually cuff him?

A. I don't know who cuffed him. I think I just took his right arm back, and I think somebody had -- I think Billy had a pair of cuffs and Detective Newton had a pair of cuffs. I just more or less guided his right arm back and held it while they cuffed him.

And then they took his left arm back, and they put the two cuffs together.

Q. At any time during the interaction that you had with Mr. Lazo before cuffing him, did you pull at any of his clothing?

A. No. Did I pull at any of his clothing? No. But it was a fight. And he was crawling. But no, I didn't pull at his clothing.

Q. Sir, at any time did you -- do you have any recollection of you tearing any of his clothing?

A. No.

Scimone

Q. At the time that you struck Mr. Lazo --

MR. BREWINGTON: Withdrawn.

Q. Have you ever been hit with a pipe or a flashlight like that before, yourself?

A. **No.**

Q. Ever been hit with a baseball bat accidentally?

A. **Yes.**

Q. How did that feel?

A. **It hurt.**

Q. A lot of pain?

A. **Sure.**

Q. In this situation after you hit Mr. Lazo, did you ask him if he wanted to go to the hospital?

A. **No.**

Q. Did you make any inquiry of him about his status?

A. **No. I was pretty much just glad it was over.**

Q. It was over for you?

A. **Over for me, yes.**

Scimone

Q. At that particular time that you had Mr. -- or Mr. Lazo was cuffed, once he was cuffed, what's the next thing that you did?

A. **I just remember standing up. And I was covered with dirt and grass. I started dusting myself off. And I saw Officer Link pull up.**

Q. As you were dusting yourself off, what did you do?

A. **I was just standing there. And Officer Link came out. I remember being gassed. I had no energy left. I was having a hard time breathing. So I was just trying to get my breath back.**

**Officer Link said he would take him into the precinct. Officer Link, and I don't know who else -- they turned Kenny -- Officer Lazo -- Mr. Lazo -- and Mr. Lazo got in the back of the 314 car.**

Q. The 314 car, is that a double or a solo car?

A. **It is a single car.**

Q. What do you understand to be the regulations with regard to transporting a

Scimone

prisoner? Is it to be done by a solo car?

A. **No. Joe should have took another officer with him.**

Q. Who was the sergeant at that time?

A. **I was.**

Q. You said Joe?

A. **Officer Link.**

Q. Did you give Officer Link any such instruction?

A. **No. I was too busy trying to get my breath.**

Q. I understand that you wanted to explain that. My question to you --

A. **No.**

Q. -- did you give him any such command?

A. **No.**

Q. Who was the ranking officer at the scene at that time?

A. **I was.**

Q. That would have been your responsibility to make sure that he was transported in accordance with regulations?

Scimone

A. **Yes.**

Q. Now, sir, at the time that Mr. Lazo was placed in Officer Link's car to be transported, did you consciously make any assessment of Mr. Lazo?

A. **I was just -- I looked. I saw him walking. He was still cursing at everybody, calling us a bunch of pussies. I saw him get into the back of the 314 car.**

Q. How did you feel about being called a bunch of pussies?

A. **I don't care. I worked in the jail.**

Q. Having -- not really affecting you in that regard, was there anything which prevented you from doing an assessment of Mr. Lazo, consciously doing an assessment of him?

A. **Yes. I was trying to get my own breath. I was gassed. I was tired. We just had a violent struggle there on the side of the road. I was being pushed in traffic the whole time. I was trying to gain my own composure.**

93

Scimone

Q. Did you understand that that was part of your responsibility?

A. **I did. But I saw him get up. And I saw him walk into the car. The precinct was only two minutes away.**

Q. I understand. My question, just so I have it clear: Did you understand that that was part of your responsibility?

A. **Yes.**

Q. In light of your understanding that as being part of your responsibility, you wanted -- you didn't do that; is that correct?

A. **Right.**

Q. What you did instead was try and catch your breath, correct?

A. **Right.**

Q. Now, at the point that Mr. Lazo was taken away by Officer Link, please tell us what instructions you gave Officer Link, if any?

A. **Other than take him to the precinct, that is all I remember telling Officer Link.**

Q. Did you tell Officer Link at any

94

Scimone

point, Assess this person that is now your prisoner and see if he needs to be taken to the hospital?

A. **No.**

Q. At that time you knew that you had already struck this gentleman no less than seven, perhaps as many as eight or nine times, correct?

A. **Right.**

Q. After hitting someone with a flashlight six, seven, or eight times, would you anticipate that they would have no injury?

A. **No.**

Q. You would anticipate they would have some injury, correct?

A. **It was my intention to get him to the hospital, but not immediately. I wanted him to go to the precinct first.**

Q. I understand, again, that you want to explain that.

My question to you was: Did you anticipate after Mr. Lazo was struck the number of times that you say that you struck him that he would have some injury, yes or no?

95

Scimone

A. **Yes.**

Q. With regard to your own regulations, that being Suffolk County Police regulations with regard to use of force and assessment of prisoners, you understand that it was -- the regulations require that he be transported immediately to the hospital, correct?

A. **Not at that time.**

Q. Sir, you had done no assessment of him, correct?

A. **I had no time.**

Q. That is not my question.

A. **I did no assessment of him, no.**

Q. At the time that you were dealing with Mr. Lazo, would you agree, sir, if a person has suffered a physical injury, or complains of an injury, or has pain, the person shall be transported to a hospital emergency room?

A. **Yes.**

Q. Sir, is it your testimony that before going to a hospital emergency room, it is all right if someone has physical injuries,

96

Scimone

for them to go to the precinct first?

A. **It was a physical injury. I didn't think that he was going to die. It was a physical injury.**

Q. Sir, he did die, right?

A. **Yes.**

Q. Let's go back for a second. Your thinking that he was wasn't going to die was what was in your head, correct?

A. **He gave me no indication of that at the scene.**

Q. Sir, I understand that you want to say certain things. I am going to ask you to answer my question, sir.

A. **Go ahead and ask again.**

Q. I will. What medical school did you go to?

A. **I didn't go to medical school.**

Q. Sir, have you done any work in any triage center for traumatic injury?

A. **No.**

Q. Sir, have you done any evaluative work with regard to cardiovascular health?

A. **No.**

Scimone

Q. Have you done anything with regard to the respiratory system from a medical standpoint?

**A. No.**

Q. What training, other than CPR training, and first aid, and emergency response have you received outside of the academy?

**A. None.**

MR. BREWINGTON: Let's take a short five-minute break for a leg stretch. Then we will come back and continue the questioning.

(Recess taken.)

Q. Sergeant, at the time that Mr. Lazo was being transported by Officer Link, what did you do?

**A. Talked to Officer Judge. He said he hurt his hand. So I brought him down to Southside Hospital.**

Q. Did you go to right to the precinct first?

**A. No.**

Q. Why did you go directly to the

Scimone

hospital?

**A. I didn't have nothing to do in the precinct, and he said he was hurt. So, I went with Officer Judge to the hospital.**

Q. Did you have any injuries that were treated at the hospital?

**A. Later on I had an injury that I was treated for. Not immediately, no.**

Q. At the time that you went to the hospital, did you make any complaints to any doctors or nurses about any injuries on that day?

**A. Not at that time, no.**

Q. Did you make any complaints at some point later on that day?

**A. Right.**

Q. Was that after Mr. Lazo was taken to the hospital?

**A. Yes.**

Q. So you realized that you needed treatment for injuries after Mr. Lazo was taken to the hospital?

**A. Well, that is when a supervisor in the precinct asked me if I was all right.**

Scimone

**I was more worried about Billy at the time. That is when I said, I just hurt my wrist a little bit, otherwise I'm fine.**

Q. When you say you hurt your wrist a little bit, was it broken?

**A. No.**

Q. Was there an actual sprain?

**A. It was a strain.**

Q. It was a strain. As a result of that strain you took two days off, two working days off?

**A. They told me to take two days off. I didn't think I needed two days off. They told me to take two days off.**

Q. Would it be accurate to say that your first complaint lodged to anyone about injury was after Mr. Lazo was transported from the precinct to the hospital?

**A. Yes.**

Q. Sir, can you tell us when for the first time after taking Officer Judge to the hospital did you go back to the precinct?

**A. After he was treated. I don't know how long that it was.**

Scimone

Q. After who was treated?

**A. Officer Judge.**

Q. Were you present during the time he was receiving treatment?

**A. No. I went to clean up in the bathroom. And the security guard asked me if I could go up to the -- I think it was ICU because they were having a problem with a family upstairs. So I had to handle a call while I was there.**

Q. Did you see any of the treatment that Officer Judge received?

**A. Other than the initial triage, no.**

Q. Did there come a time when you left the hospital?

**A. Yes.**

Q. What hospital was it again, please?

**A. Southside Hospital, Bay Shore.**

Q. After you left Southside Hospital, where did you go?

**A. We went back to the precinct.**

Q. Sir, at that time that you were

Scimone

going from the hospital to the precinct, where was the flashlight that you had received from Detective Newton?

A. **I don't know. I don't know if I had it or if I gave it back to John. I don't know.**

Q. At some time did you see that flashlight again?

A. **Only at Grand Jury.**

Q. Did you have your flashlight in your bag?

A. **Yes.**

Q. Same type of Mag flashlight?

A. **No.**

Q. What type of flashlight?

A. **The same like Officer Judge, small Stinger.**

Q. When you got back to the precinct, did you see Mr. Lazo again?

A. **No.**

Q. When you got back to the precinct, was Mr. Lazo present?

A. **No.**

Q. When you got back to the

Scimone

precinct, did you have any conversation about what happened with yourself and Mr. Lazo out at the scene?

A. **No. Other than Officer Judge, no.**

Q. Anybody ask you any questions about what happened?

A. **No.**

Q. Anybody ask you at that particular time whether you were injured?

A. **Not immediately, no.**

Q. Who asked you at some point if you were injured?

A. **I believe it was Lieutenant Gruenfelder from Crime Control.**

Q. Crime Control does what type of work?

A. **They do plainclothes police officer work.**

Q. Was Gruenfelder at that time conducting any type of investigation about what happened with Kenny Lazo?

A. **No.**

Q. Is he from the Third Precinct,

Scimone

Gruenfelder?

A. **Yes.**

Q. When Lieutenant Gruenfelder spoke to you about or asked you about any injuries, how did that discussion come about?

A. **He just asked if I were okay.**

Q. Had you told him that you were involved with any interaction with Kenny Lazo?

A. **I guess he heard about it because he asked me about it.**

Q. What did he say?

A. **I don't know specifically what he said.**

Q. Did he ask you to reiterate any facts relating to the incident?

A. **He just asked me what happened. I just -- I can't say specifically what I said.**

Q. I wasn't asking you what you said yet. Did he ask you to reiterate what had happened at the scene with Mr. Lazo?

A. **He asked, What happened, and are you okay?**

Q. Did you lay out for him what you

Scimone

say happened?

A. **I spoke to him. I don't know specifically what I said to him.**

Q. Then when he said, Are you okay, you indicated that you had some concern with your wrist; is that correct?

A. **Yes.**

Q. What did you say?

A. **I -- my wrist bothers me, but otherwise I'm fine.**

Q. What did he say?

A. **He said, Why don't we just get it checked out just to be sure?**

Q. Then what happened?

A. **He took me down to the hospital.**

Q. So the Lieutenant transported you to the hospital?

A. **Yes.**

Q. Was this Southside Hospital?

A. **Yes.**

Q. The same place where you had just been previously?

A. **Yes.**

Q. How long after having first been

Scimone

at Southside was it that you returned there with the Lieutenant?

A. **I have no idea.**

Q. Was it minutes?

A. **No.**

Q. Hours?

A. **It was at least an hour.**

Q. How long were you treated at Southside Hospital?

A. **I would say within an hour.**

Q. After that time period, what transpired?

A. **We -- Lieutenant Gruenfelder brought me back to the precinct.**

Q. When you got back to the precinct, did anybody ask you any questions?

A. **By that time Homicide was already there. So I had to prepare a supplemental report, which is here today.**

Q. We will get to that.

Let's go back. When you came back to the precinct after taking Officer Judge, were you aware that Mr. Lazo had been taken to the hospital?

Scimone

A. **Yes.**

Q. How did you learn that?

A. **I heard it on the radio.**

Q. What did you hear on the radio, please?

A. **I heard them call for an ambulance when I was in the hospital.**

Q. How long after arriving at the hospital did you hear them calling for an ambulance?

A. **I guess about half an hour.**

Q. At the time that you heard them calling for an ambulance, did you know that it was with regard to Mr. Lazo?

A. **No.**

Q. Did you make any inquiry of anyone about who was in need of an ambulance?

A. **I was in the middle of the call. And I remember being upstairs dealing with what I was dealing with.**

**Then when I came downstairs, there was other officers there who told me what happened.**

Q. So other officers came to the

Scimone

hospital to tell you what happened?

A. **Yes.**

Q. Who were those officers, please?

A. **I don't remember specifically who was there.**

Q. Do you recall any one or any of them?

A. **I think there was Officer Broderick was there.**

Q. Any others that you recall?

A. **I know who was working, but I don't recall who was at the hospital. No.**

Q. What did Officer Broderick, or any of the other officers say to you when they saw you in the hospital?

A. **He said, They had to call an ambulance, and Mr. Lazo was in cardiac arrest.**

Q. Why did they come to tell you, do you know?

A. **I don't think they came to tell me. I think Mark might have been on the ambulance. I know Mark treated him in the precinct. I don't think they came specifically to tell me.**

Scimone

Q. Mark who?

A. **Mark Broderick. Officer Broderick. I just happened to be there.**

Q. So you were present at the hospital when Mr. Lazo arrived at the hospital?

A. **Yes.**

Q. What did you do when they told you that?

A. **I was just in the hallway talking to Billy and Mark.**

Q. Did you see Mr. Lazo at the hospital?

A. **No.**

Q. The hallway that you were in, was that in or around the emergency room?

A. **Yes.**

Q. Was that where Mr. Lazo was being treated, in or around the emergency room?

A. **I think he was in like their trauma room.**

Q. Which is right off the emergency room?

A. **Right.**

Scimone

Q. How long did you remain at the hospital once you learned that Mr. Lazo had been brought in?
**A. I don't recall. I would say about thirty minutes.**
Q. Had you learned that Mr. Lazo had died before you left Southside Hospital?
**A. I don't believe so, no.**
Q. When did you learn that Mr. Lazo had died?
**A. I don't know. I think I was in the precinct when I found out.**
Q. Who told you?
**A. I don't recall.**
Q. Was it someone that told you in person?
**A. I don't recall how I found out. I don't know if I heard it on the radio. I don't know if guys were just talking about it. I don't remember somebody specifically telling me.**
Q. At any point did you have any discussion with anyone on that day about how you had utilized the flashlight to strike

Scimone

Mr. Lazo?
**A. Other than the Homicide Detective, no.**
Q. Which Homicide Detective did you speak to?
**A. Portello.**
Q. When you spoke to the Homicide Detective, that being Detective Portello, did the detective take any notes?
**A. I believe so.**
Q. Did you actually write a supplementary report?
**A. Yes.**
Q. Is that what we have marked as Exhibit number 1?
**A. Yes.**
Q. At the bottom where it says "Reporting Officer's Signature," is that your signature, sir?
**A. Yes.**
Q. Whose signature is that as a "Supervisor's Signature," do you know?
**A. I believe it is "Lieutenant Ellen Sansone."**

Scimone

Q. With regard to this supplementary report, who typed this?
**A. I believe I did on the precinct computer.**
Q. Did you actually fill out the boxes for this report?
**A. Yes, I believe so.**
Q. In the box down at the bottom where it says "Founded," tell me, you checked "Yes," what does that mean?
**A. Well, with a death investigation, the incident and the case status is active, means the detectives are investigating.**
Q. I said founded.
**A. Founded. Any time the case is going to be investigated, it is founded.**
Q. You checked that; is that correct?
**A. I believe so.**
Q. At the time that you were filling this document out, had you received any instructions to actually fill this document out?
**A. I was told by Detective Portello**

Scimone

**to prepare a supplementary report.**
Q. Without him telling you to do so, did you have any intentions of doing so?
**A. I didn't know what we had to do. I was waiting to be told. I didn't know what we had to do.**
Q. Other than this supplementary report, have you been required or asked to fill out any other reports concerning this case?
**A. The one to Internal Affairs.**
MR. BREWINGTON: Let us mark that now as Scimone 2 for identification.
It is a single-page document, bearing a date December 17, 2008. It has at the bottom "Attachment # 26."
(Scimone Exhibit 2, Attachment # 26, marked for identification.)
Q. I'm placing before you Scimone 2 for identification (handing). Do you have that document?
**A. (Perusing.)**
Q. This is the form that you filled out for Internal Affairs; is that correct?

Scimone

A. **Yes.**

Q. This incident happened in April of 2008; is that correct?

A. **Yes.**

Q. You were asked in December of 2008, that was the first time someone from Internal Affairs asked you to put what happened down in writing?

A. **Other than the supplementary report, yes.**

Q. From April to December of 2008, how many times were you questioned by anyone concerning what happened with regard to Mr. Lazo?

A. **Other than that night, I wasn't.**

Q. At any time from April of 2008 through and including December of 2008, were you asked to provide any statement before a stenographer, such as the court reporter that we have here?

A. **No.**

Q. From April 2008 to December 2008, did anyone ask you any questions where a recording was done, either audio or video of

Scimone

you, concerning Mr. Lazo?

A. **No.**

Q. At the time that you signed this document, sir, where were you when you were preparing it?

A. **I believe the precinct.**

Q. Did you actually prepare this yourself?

A. **Yes.**

Q. Did anyone provide you with any information to help fill this document out?

A. **There were specific questions that they wanted addressed that I had to answer.**

Q. In answering these specific questions, what did you rely on to fill in the information?

A. **I relied on myself.**

Q. Did you go and look at any documents to help refresh your memory from April of 2008 to December of 2008?

A. **I would assume. I'm not certain. But I would assume I looked at my supplementary report.**

Scimone

Q. In your supplementary report -- I'm going to look at that again. In your supplementary report, this was the document that was done on the 13th of April, correct?

A. **Yes. It was the 12th. It just wound up being the 13th by the time I prepared it.**

Q. Going over and passed midnight; is that correct?

A. **Yes.**

Q. At the time that you filled out what we have now identified as Scimone 2 for identification, other than your supplementary report, do you recall having any other documents in front of you to review?

A. **No.**

Q. Did you speak with anyone when you drafted Scimone 2 for identification?

A. **No.**

Q. In this document, which is Scimone 1 for identification, you reference Officer Judge in this document; is that correct?

A. **Yes.**

Scimone

Q. On 1. And you also reference Officer Judge in Scimone 2; is that correct?

A. **Yes.**

Q. And you reference Officer Judge's identification numbers; is that correct?

A. **Yes.**

Q. You also in 2 reference Officer Link's identification numbers; is that correct? Last paragraph.

A. **Yes.**

Q. Do you reference Officer Link with regard to his identification numbers in Scimone 1 at all?

A. **I don't believe, no.**

Q. What did you rely on to obtain Officer Link's identification numbers, or did you have them in your head?

A. **I had them in my head. I used to be his supervisor.**

Q. So you know his identification numbers by heart?

A. **Yes.**

Q. The same thing for Officer Judge, did you know that by heart, or did you rely on

Scimone

Scimone 1?

A. **I relied on Scimone 1.**

Q. Now, if I may look at this for a second. The reference to Mr. Lazo in Scimone 1, do you actually mention Mr. Lazo in Scimone 1?

A. **No.**

Q. But by the time you filled out Scimone 2, you knew Mr. Lazo's name, correct?

A. **Yes.**

Q. Now in not referencing Mr. Lazo in Scimone 1, you don't reference Mr. Lazo's date of birth in Scimone 1, do you?

A. **No.**

Q. Do you reference his date of birth in Scimone 2?

A. **Yes.**

Q. Where did you get that from? Did you have that in your head as well?

A. **I must have looked at something else. I don't remember.**

Q. What else did you look at with regard to filling out this document?

A. **I don't know. Maybe -- I don't**

Scimone

**know. The activity log. I don't know what I looked at.**

**I might have just brought it up on the computer to get his date of birth. I don't recall what I looked at.**

Q. Just to go back now, when you said the only thing that you looked at was the supplementary report, is that accurate?

A. **I believe so.**

Q. So, if that is accurate, where did you get Mr. Lazo's date of birth?

A. **I don't recall. I might have just put his name in the computer to get his date of birth to fill this out.**

Q. You would have referred to something in the computer?

A. **It would have just been a license check or something so I could see his date of birth.**

Q. Now let's go back to my question.

A. **I can't tell you specifically. I don't remember.**

Q. I understand that. With regard to this document, you indicated that -- I am

Scimone

looking at Scimone 2 for identification, you indicated in the second paragraph, "We became involved in a physical struggle with arrestee Lazo, Kenny 12/30/83 while attempting to affect a lawful arrest."

What were you arresting Mr. Lazo for?

A. **For assaulting Detective Newton and for trying to flee.**

Q. I want to go back now, sir. You actually said you never saw Mr. Lazo actually strike or hit Officer Newton, right?

A. **I didn't at the time, right.**

Q. Detective Newton. At the time you had no conversation with Detective Newton about Mr. Lazo striking him, right?

A. **No.**

Q. So at that time you did not know of any assault or alleged assault on Officer -- Detective Newton, correct?

A. **I didn't see him hit him, but I assumed he did. Yes.**

Q. Your assumption is what you were arresting him for?

Scimone

A. **Yes.**

Q. In the next paragraph it says, "After the struggle I observed an abrasion to the face of Mr. Lazo and I do not recall any other observable injuries."

Where was the abrasion on Mr. Lazo's face that you saw?

A. **I don't recall.**

Q. That abrasion was an indication of physical injury, correct?

A. **Yes.**

Q. It says -- you write "That injury may have been caused when the subject was taken to the ground during the struggle or during the struggle itself."

Do you recall on what side of his face that abrasion was?

A. **Not sitting here today, no.**

Q. When you say it "may have been caused when the subject was taken to the ground during the struggle or during the struggle itself," let's start with taken to the ground.

Did you see Mr. Lazo strike his

Scimone

head on anything where it can cause an abrasion when he was taken to the ground?

A. **I don't know. He went to the ground. It could have happened then. I don't know. That is why I said it may have.**

Q. I'm taking it one at a time. My question to you was: Did you actually see him strike his head?

A. **No.**

Q. Other than you hitting Mr. Lazo in the head, who else hit Mr. Lazo in the head?

A. **Sitting here today I know who else hit him in the head. Officer Judge.**

Q. So you now know that you hit him in the head. And at the time -- and now you have learned that Officer Judge hit him in the head.

At the time that Mr. Lazo was being taken away by Police Officer Link, did you know that Officer Judge had hit him in the head?

A. **No.**

Q. When did you first learn that?

Scimone

A. **I don't recall. Some time later that evening.**

Q. By the way, sir, that evening would have been before filling out Scimone 2; is that correct?

A. **I believe so, yes.**

Q. Did you report anywhere in here that you learned that Officer Judge also hit Mr. Lazo in the head?

A. **No. On this form I was just doing what I did.**

Q. I'm looking at Scimone 2.

A. **Scimone 2, no.**

Q. In Scimone 2 is there any indication, that being the report to Internal Affairs, that you struck Mr. Lazo in the hand five or six times with a flashlight and then in the back and/or the head two or three times, is that written here?

A. **No.**

Q. Can I just see this, please, Scimone 1?

When you filled out the Internal Affairs' report, which is Scimone 2 for

Scimone

identification, was one of the questions that was specifically asked of you as to what you actually did?

A. **I don't know what the question was. I can tell you what my answers were. I don't have the question in front of me.**

Q. Sir, you write here that "The subject was not immediately transported to the hospital due to the fact that he did not appear to require immediate medical attention."

The subject would be Mr. Lazo; is that correct?

A. **Yes.**

Q. When you say "He did not appear to require immediate medical attention," that was not based on any close assessment; is that correct?

A. **No.**

Q. Is that correct?

A. **Yes.**

Q. Sir, you also write at the bottom of this document with regard to the transport of Mr. Lazo, you were "unaware that Police

Scimone

Officer Link transported Mr. Lazo as a solo unit until later in the tour."

When did you learn for the first time that Officer Link transported Mr. Lazo as a solo unit?

A. **Some time later that evening. Joe told me, I brought him myself. I don't know when specifically.**

Q. Joe being who?

A. **Officer Link.**

Q. At the time you did not give anyone else any instructions to accompany Officer Link?

A. **Right.**

Q. You didn't give Officer Link any instructions to get someone else to go with him?

A. **Yes.**

Q. You did know that Officer Link was a solo car, correct?

A. **Yes.**

Q. With regard to this document, after submitting this document on December 17, 2008 (indicating), did you have any discussion

Scimone

with anyone, other than your attorney, about the content of this document?

A. **The Internal Affairs' Lieutenant spoke to me over the phone. Other than that, no.**

Q. Was there ever an in-person Internal Affairs' interview with you?

A. **No.**

Q. All done by telephone?

A. **Yes.**

Q. Let's put that one aside for a second.

I will ask you to take a look at this document that we will identify as Scimone 3 for identification.

MR. BREWINGTON: Single-page document, has down on the right-hand side "Attachment # 12."

(Scimone Exhibit 3, Attachment # 12, marked for identification.)

Q. Sergeant, I will ask you to take a look at that document (handing.) Do you have it?

A. **(Perusing.) Yes.**

Scimone

Q. Can you tell us what this is, please?

A. **Use of Force Report.**

Q. Is this a document that you filled out?

A. **Lieutenant Robert Williams filled it out.**

Q. Was Lieutenant Williams present at the scene when this force was used?

A. **No.**

Q. Did you speak with him about the use of force that was used?

A. **I did, but I don't remember when.**

Q. Was it before or after he filled this form out?

A. **Before.**

Q. Do you actually know -- at the time that you spoke with him, you gave him a rundown as to what happened?

A. **Yes.**

Q. So, there was someone else with whom you did speak about what happened on the road; is that correct?

A. **Yes. But this wasn't prepared**

Scimone

**that night. This was prepared a little bit later.**

Q. How much later?

A. **When I came back to work a wee[k] later.**

Q. The date of the report says "4/13." Is that accurate?

A. **The date of the incident. That was not accurate, because I wasn't there.**

Q. Would it be accurate to say that this document is not appropriately dated?

A. **Yes.**

Q. Had you ever seen this document before today?

A. **Sure. Yes.**

Q. When had you seen this document for the first time?

A. **I believe at the Grand Jury.**

Q. At the time that you saw it in the Grand Jury, did you point out or did you note the date of the report was inaccurate?

A. **I didn't realize, no.**

Q. So this document was actually back dated?

Scimone

A. **No.**

MR. DUNNE: Objection. That is your interpretation of this. He is not the author of this.

From his perspective, it might be inaccurate. It doesn't mean from the author's perspective it is inaccurate.

You referenced the entire line of questioning when he spoke to the Lieutenant.

MR. BREWINGTON: I'm sorry.

Q. Do you know when this document was filled out, sir?

A. **I didn't fill it out.**

Q. I know that, sir. But you didn't speak to the Lieutenant until when?

A. **Until when I came back to work.**

Q. Which was what date, sir?

A. **I don't recall.**

Q. It wasn't the 13th, was it?

A. **No.**

Q. So with regard to any information from you, this document doesn't contain information which you provided on the 13th,

Scimone

right?

A. **Well, the incident summary is -- refers to the supplementary report. Doesn't refer to my conversation with him.**

Q. Did you have a conversation with this Lieutenant Williams at any time on the 13th?

A. **I don't recall. I don't know if he was still in the precinct.**

Q. With regard to this document, it indicates with regard to you that the officer was hospitalized.

Do you see that down at the bottom right-hand corner with regard to yourself?

A. **Yes. It just means we went to the hospital. It doesn't mean we stayed in the hospital.**

Q. Thank you for answering the question that I hadn't asked yet.

My question to you is: On the 13th, was that the date that you went to the hospital?

A. **The 12th into the 13th, yes.**

Scimone

Q. With regard to the physical injury that you suffered, you said that you were told to take a couple of days off; is that correct?

A. **Yes.**

Q. Did you make a request of anyone to actually take days off?

A. **No.**

Q. Were you ever seen by a police surgeon concerning your injury?

A. **Yes.**

Q. Was that so that you could return to duty?

A. **Yes.**

RQ MR. BREWINGTON: At this time we will call for any records relating to any visits that Officer Scimone made to the police surgeon from the 12th of April 2008 up to and including the date of his return to work, and any records, notes, memoranda, diagnostic tests or others conducted by the police surgeon, including any notations made in any portions of any medical jackets which

Scimone

are maintained but have not yet been produced.

Q. Sir, with regard to --

MR. BREWINGTON: Withdrawn.

Q. In the "Charges" section against Mr. Lazo, do you see that, "Use Of Force Specific Information," right up here (indicating)?

A. **Un hum.**

Q. Any traffic, any VTL, Vehicle and Traffic Violations which are cited there?

A. **No.**

Q. Let's put that aside for a second.

Let's take a look at this document which we will identify as Scimone 4 for identification.

MR. BREWINGTON: Single-page document that has "Attachment # 13" at the bottom.

(Scimone Exhibit 4, Attachment # 13, marked for identification.)

Q. I'll ask you to take a look at that document, please (handing).

Scimone

A. **(Perusing.)**

Q. Do you recognize it?

A. **Yes.**

Q. What do you recognize it to be?

A. **"Injured Employee Report."**

Q. Did you fill this document out?

A. **I just filled out the middle part. "Employee's Specific Statement."**

**I don't know who did the report.**

Q. When you say you just filled out the middle part, where it says "Employee's Specific Statement Of Injury, And Circumstances Leading To Its Occurrence," that is your portion that you filled out?

A. **Yes.**

Q. That is your "Employee's Signature" there; is that correct?

A. **Yes.**

Q. Could you read into the record what you wrote, please?

A. **"On 4/12/08 at approximately 2020 hours I injured my right wrist during a violent struggle while attempting to arrest a subject at I/L."**

Scimone

Q. What is I/L?

**A. It is at incident location, which is referred to at the top of the report.**

Q. Other than that, did you fill out any other portion of this?

**A. No.**

Q. In the area where it says "Name of doctor treating employee," did you fill that information out?

**A. No.**

Q. Where it says "Sprained right wrist," and "left" is crossed out, did you fill that out?

**A. No.**

Q. Who did you tell that you had a sprained wrist?

**A. I don't recall. Whoever filled this out. I have no idea.**

Q. Did you ever tell someone that you had a sprained wrist?

**A. There was a hospital report. Maybe it said that on the hospital report. But I don't recall telling anybody I had a sprained wrist.**

Scimone

Q. It also says "Photos are taken." Do you see that?

**A. Yes.**

Q. What photos were taken?

**A. Back in the precinct.**

Q. Of who?

**A. Of me.**

Q. Have you seen those photos?

**A. I saw one of them.**

MR. DUNNE: I didn't bring them. The Crime Scene photos and the photos taken by Identification has got to be 2 or 300 pictures.

RQ MR. BREWINGTON: Yes. The good thing is that they are all -- they can be digitized.

I'm calling for their production. I don't know why I don't have them.

MR. DUNNE: I indicated to you that I would make them available for either ordering or copying. And there was no response.

MR. BREWINGTON: I don't know about no response.

Scimone

With regard to the photos taken as pursuant to this report, are you saying that it is contained --

MR. DUNNE: That is an assumption.

MR. BREWINGTON: Let me finish my statement. I'm not assuming anything.

My question to you: Are the scene -- the photos that you just referenced -- are the photos which are referenced here contained in those photos? That's all I want to know.

MR. DUNNE: I don't know. I don't know what photos they are looking at. I don't know if there are a separate set of photographs that were taken in connection with this report.

My guess is that they were not. They were referring to photographs that were part of that package. In other words, ID had one CC number for this incident. And all photographs taken in connection with this incident would be under that CC. Contained in that, there

Scimone

are standup photographs of Sgt. Scimone at the precinct.

MR. BREWINGTON: Do we have those?

MR. DUNNE: I have them in my office.

MR. BREWINGTON: Do we, that being plaintiffs?

MR. DUNNE: No.

RQ MR. BREWINGTON: We are calling for production of those.

And we will reserve our right to continue this deposition once they are produced.

MR. BREWINGTON: Let's take a break.

(Recess taken.)

(Mr. Pincus not present at this time.)

(Ms. J. Gonzalez not present at this time.)

Q. Sergeant, I will ask you to take a look at, please, Scimone 1 again, same document.

Scimone

At the time that you attached your signature, was this document completely filled out?

A. **Yes.**

Q. So the heading at the top where it says "Complaint," that all was filled out and then you signed it when you completed it, correct?

A. **Yes.**

Q. That was some time on the 13th after you had come back from the hospital, correct?

A. **Yes.**

Q. Now, if we could take a look at Scimone 3 for identification. It appears as though when we looked at this a little while ago -- it says, "See attached supplementary reports."

Did you fill out any other supplementary reports other than the one that we have identified as Scimone 1 for identification?

A. **I didn't. But I know there were other ones prepared.**

Scimone

Q. But yours was done at least by the time you had come back, when you came back from the hospital, right?

A. **Yes.**

Q. At that time you had already known that Mr. Lazo had passed away, correct?

A. **Yes.**

Q. As a matter of fact, you referenced at the top of your supplementary report that it was -- the incident was a death investigation, correct?

A. **Yes.**

Q. The reference on Scimone 3 references "Attached supplementary reports." So that could be yours as well as others, correct?

A. **Yes.**

Q. Now, going down in the box where it says, "Use Of Force Specific Information," there is a reference to the citizen being injured and hospitalized.

So, at the time this report was filled out, do you know if Mr. Lazo had already gone to the hospital?

Scimone

A. **I can't draw conclusions on somebody else's report. I don't know.**

Q. Sir, had you seen this report before today?

A. **Yes.**

Q. Had you ever reviewed it for accuracy?

A. **I reviewed it, yes.**

Q. Did you review it for accuracy?

A. **Yes.**

Q. Did you review it to see if it was in compliance with whatever rules and regulations you understood to exist?

A. **Yes.**

Q. Going over to the area -- in the that same area where it says "Use Of Force Specific Information," where it says "Citizen photographed," it says "No." Do you know if Mr. Lazo was photographed?

MR. DUNNE: Can you show me where you are referring to?

MR. BREWINGTON: Far right.

MR. DUNNE: I'm looking in the wrong section. Sorry.

Scimone

Q. See where it says "Citizen photographed," and it says "No"? Do you know if Mr. Lazo was photographed at the time he was first arrested?

A. **I don't know.**

Q. You didn't order that, did you?

A. **No.**

Q. You don't know if he was photographed at the time that he was brought to the precinct, correct?

A. **I don't know.**

Q. You don't know?

A. **No.**

Q. Now, going down, it says "Involved Citizen Information." You agree that Mr. Lazo was weaponless, correct?

A. **Yes.**

Q. Then it says "Injury Sustained By Citizen." It is X'd "Physical Injury."

But by the time you filled out your supplementary report, this was a death investigation, correct?

A. **Yes.**

Q. So, based on accuracy, if this

Scimone

was filled out after your supplementary report was submitted, is that accurate?

MR. DUNNE: I'll object to the form of the question.

Go ahead. Answer that the best you can.

**A. The injury we caused was the physical injury, yes.**

Q. It says "Injury sustained"?

**A. He sustained physical injury.**

Q. Was he dead?

**A. He had a heart attack, yes.**

Q. Sir, when you say "he had a heart attack," it was a death investigation at the time, right?

**A. Yes.**

Q. Just looking at that same area with regard to Mr. Lazo, do you know if at any point during the time that he was at the Third Precinct he was examined by any other superior officers, that being sergeants or lieutenants?

**A. I don't know.**

MR. BREWINGTON: Let's identify this document as Scimone 5 for

Scimone

identification. It is a four-page document that we have copied back and front. It is entitled "Department General Order, Subject, Use Of Physical Force." It starts with Attachment number 52-1.

(Scimone Exhibit 5, Attachments # 52-1 through 52-4, marked for identification.)

Q. Sergeant, I will ask you to take a look at those pages (handing).

**A. (Perusing.)**

Q. Have you had a chance to look at that?

**A. Yes.**

Q. Are you familiar with what these pages are?

**A. Yes.**

Q. What are they, please?

**A. General guidelines pertaining to the use of force.**

Q. You refer to them as general guidelines. Are these part of any rules or procedures that you are supposed to follow?

Scimone

**A. Yes. They are guidelines.**

Q. Let me ask you to turn to the second page, that being the second back page there, that has "52-2." Do you have that?

**A. Yes.**

Q. Where it says "VI. Procedure B 1." Do you see where I'm referring?

**A. Yes.**

Q. It says "Photographs will be taken if a person is subjected to any force, including restraining force, or is charged with Resisting Arrest, whether or not the person is injured or alleges injury."

Did you understand that to be a procedure that was in place at the time that Mr. Lazo was taken into custody?

**A. Yes.**

Q. Was that done?

**A. I told you, I wasn't in the precinct. I don't know if it was done.**

Q. Sir, but you didn't do it, correct?

**A. No.**

Q. You didn't have anybody do it,

Scimone

correct?

**A. I wasn't in the precinct.**

Q. That wasn't my question. You didn't ask anyone to do it by radio, by telephone --

**A. No.**

Q. -- or other form?

**A. No.**

Q. You didn't tell Officer Link to make sure that that was done, correct?

**A. No.**

Q. Is that correct?

**A. Correct.**

Q. If you go onto the next page where there is a reference to "The Precinct Crime Section or Crime Scene Section will take the photographs, whenever possible. Digital cameras or 35 mm. film cameras will be used."

Was the Precinct Crime Section involved in the arrest of Mr. Lazo?

**A. No.**

Q. Going down to number 4 on this document where it says, "The photographs of the person subjected to force will be

documented on a Supplementary Report by the Officer taking the photographs."

Did you ever see a supplementary report indicating photographs taken of Mr. Lazo?

**A. No.**

Q. Then let's go to C which is listed there. It says, "If it has been necessary to use force, the Officer shall immediately determine if the person requires medical treatment."

MR. DUNNE: Physical force.

MR. BREWINGTON: Yes, physical force. Thank you very much.

Q. You agree physical force was used on Mr. Lazo, correct?

**A. Yes.**

Q. Did you have any discussion with Officer Judge about Mr. Lazo getting medical treatment?

**A. Not immediately, no.**

Q. Did you have any discussion with anyone about Mr. Lazo getting medical treatment?

**A. Not initially, no.**

Q. Other than yourself and now having learned that Officer Judge used physical force on Mr. Lazo, do you know anyone else that did an assessment of Mr. Lazo's status?

**A. No.**

Q. Sir, as a supervisor on the scene when Mr. Lazo was taken into custody, do you agree that it was your job to -- I'm quoting D2 "Ensure that medical treatment for an injured prisoner is obtained"?

**A. If he needed immediate attention, he would have been sent to the hospital immediately.**

Q. That was not my question. My question was: Was that your responsibility?

**A. Yes.**

Q. Sir, with regard to the type of investigation that was being done at the time that you filled out your supplemental and the Use Of Force Report was done, would you agree that at that time this was an investigation that dealt with Mr. Lazo's death?

**A. Yes.**

Q. Sir, at the time that you filled out your Supplementary Report, were you aware that Homicide was involved in the investigation?

**A. I told you that Detective -- Officer -- Detective Portello told me to fill it out.**

Q. In cases where an investigation is being conducted by Homicide section, are Use Of Force forms such as we have identified as Scimone 3 for identification supposed to be used?

**A. I don't believe so. I think you just go with the supplementary report. But --**

Q. If you just turn back to the document that we have identified as Scimone 5, flip the page over, Section E.

**A. Section E, yes.**

Q. Where it says that where "Homicide Section is conducting the investigation, Use Of Force Report shall not be completed."

Do you know who made the

determination that the Use Of Force Report would be completed in this situation?

**A. No.**

Q. Do you know why the Use Of Force Report should not be completed in a Homicide investigation?

**A. No.**

Q. In the -- let's go on.

I'll ask you to take a look at this document that we will identify as Scimone 6 for identification.

MR. BREWINGTON: It is a single page. It says "Attachment # 16."

(Scimone Exhibit 6, Attachment # 16, marked for identification.)

Q. Sir, do you have that document before you?

**A. Yes.**

Q. Have you ever seen this document before?

**A. No.**

Q. Set it aside then now.

Did you ever see any hospital records relating to Mr. Lazo?

Scimone

A. **No.**

Q. Did you ever learn what type of injuries were on Mr. Lazo's body?

A. **Not specific, no.**

Q. Have you ever seen the autopsy in this case?

A. **No.**

Q. Let me ask you to take a look at this document that we are going to identify as Scimone 7 for identification.

MR. BREWINGTON: It has no identification numbers on it. But it is a multiple page document that begins with "Report Of Autopsy" as listed on the front. And the very back page is a signature page containing the signature of "Yvonne I.," the last name is "Milewski, M.D."

(Scimone Exhibit 7, Report Of Autopsy, marked for identification.)

Q. Would it be accurate to say that as you look at it very quickly, you have not seen this autopsy report before, correct?

A. **I have not seen it before, no.**

Scimone

Q. Was it ever read to you in any form or fashion during the Grand Jury or any time before the Grand Jury?

A. **No.**

Q. You did testify in the Grand Jury, correct?

A. **Yes.**

Q. I'll ask you to turn to -- it would be a page that says "Microscopic Examination." It looks like this (indicating).

MR. DUNNE: After page 8. Here.

A. **(Perusing.)**

Q. I'll ask you to turn to the page after the heading "Microscopic Examination." I'm looking now at an area that says "Soft Tissue Samples." Do you see that?

A. **Yes.**

Q. There are references to the "Right Frontal Scalp" and the "Left Frontal Scalp," where it says "Acute hemorrhage without reactive inflammation."

Did you see any scarring or hemorrhaging on Mr. Lazo's scalp in the front

Scimone

right or left side?

A. **I think I already testified that the only abrasion I recall seeing was the one on his face.**

Q. Did you see any on his ear?

A. **No.**

Q. How about on his right and left neck?

A. **No.**

Q. How about his right back, did you ever see any injuries there?

A. **No.**

Q. You hit him in his back, though, right?

A. **Yes.**

Q. How about his left back, did you ever see any hemorrhages on his left back?

A. **No.**

Q. You indicated that you hit Mr. Lazo's right wrist, correct?

A. **Yes.**

Q. Do you see where there is a reference to "Injury acute hemorrhage without active inflammation" on his "Left wrist"?

Scimone

A. **Yes.**

Q. Did anybody ever tell you that injuries to -- Mr. Lazo had injuries to his left wrist?

A. **No.**

Q. Sir, at any time did anyone indicate to you that a study had been done of Mr. Lazo's skin throughout his body, that being his overall -- his outside skin as well as his second layer of skin?

A. **No.**

Q. So, you didn't know that he had multiple contusions throughout his body?

A. **No.**

Q. Did anyone tell you what the cause of death of this case was?

A. **Other than the detective saying it was a heart attack, no.**

Q. I'll ask you to turn to the first page of this document.

Did anyone ever tell you -- the first page, I'm looking at "I." Anyone ever tell you that part of the diagnosis was "Sudden cardiac death following exertion

Scimone

associated with prolonged physical altercation with multiple blunt impacts"? Anybody ever tell you that?

A. **No.**

Q. Anybody ever tell you that that was part of the cause of death, the multiple blunt impacts?

A. **No.**

Q. Let's go down to "III," where it says "Blunt impacts to head with multiple abrasions, contusions and lacerations of face and scalp."

When, if ever, were you told as a sergeant that interactions with Mr. Lazo, that that had been found by the Medical Examiner?

A. **Never.**

Q. The next one, "IV," where it says "Blunt impacts to torso with multiple contusions and abrasions." Were you aware there were those type of injuries?

A. **No.**

Q. The same thing for "V." Are you aware of "Blunt impacts to upper extremities with multiple contusions"?

Scimone

A. **No.**

Q. Do you know how those injuries got on Mr. Lazo?

A. **No.**

Q. Were you aware that in this situation that the manner of death was identified as being caused at the hands of another?

A. **Yes.**

Q. That was identified as a homicide, correct?

A. **Yes.**

Q. Now, other than being told that Mr. Lazo died of a heart attack, anybody tell you anything else about any of the findings in the autopsy?

A. **No.**

Q. Even in the Grand Jury no one asked you any questions about that?

A. **No.**

Q. Any of the questions that I'm asking you now about how those injuries got on Mr. Lazo, anybody ever ask you that before?

A. **Other than the detective, no.**

Scimone

**Not specific injuries, no.**

Q. Other than the detective telling you to write out your supplementary report?

A. **Right.**

Q. That is all?

A. **Right.**

Q. By the way, during the Grand Jury were you questioned to the degree that I'm questioning you now?

A. **No.**

Q. By the way, who did the questioning of you at the Grand Jury?

A. **Mr. Collins.**

Q. Now, as a result of this, sir, there was an Internal Affairs' report, correct?

A. **Yes.**

Q. Did you ever see the Internal Affairs' report, the findings?

A. **I have got a reprimand. I don't know if you are talking about that or some other report that I have not seen.**

Q. Fair enough. And I'll make sure that you get a chance to look at it.

Scimone

Just tell me what was the reprimand that you received, and what was it for?

A. **It was for not sending Mr. Lazo to the hospital.**

Q. What type of reprimand did you get? Just a written reprimand?

A. **Yes.**

Q. Any time taken?

A. **No.**

Q. Any loss of any benefits of any type?

A. **No.**

Q. No loss of pay, correct?

A. **No.**

Q. You just got a letter. Was it a written reprimand or verbal reprimand?

A. **I don't know. I think it was a verbal reprimand, but I'm not certain. I believe it was verbal.**

Q. You indicated before that you are not sure if that you had seen the report. I'll show you two. You can tell me if either one is the one that you saw.

Scimone

I'll show you a one-page document that we will identify as Scimone 8 for identification.

MR. BREWINGTON: It is a document dated February 10, 2009.

(Scimone Exhibit 8, Document dated February 2, 2009, marked for identification.)

Q. Sir, I place before you that single page (handing). Do you have it?

A. **(Perusing.) Yes.**

Q. Is this a document that you have seen before?

A. **No.**

Q. Did you ever see the document signed off on by the signatures that appear on this left-hand side, whoever signatures those are?

A. **No.**

Q. Have you ever received anything from "Captain Hatton, Captain of the Internal Affairs Bureau"?

A. **No.**

Q. Were you ever informed that

Scimone

Internal Affairs, as part of their investigation, determined that "This investigation revealed Lazo suffered several injuries during his initial confrontation with police. These injuries consisted of contusions around his eyes and an abrasion on his face. Lieutenant Capolino has determined Sgt. Scimone failed to ensure that Lazo was transported from the scene directly to a hospital for treatment."

Anybody ever provide you with that specific language?

A. **No.**

Q. Is that accurate that you --

MR. BREWINGTON: Withdrawn.

Q. Do you agree that you failed to ensure that Lazo was transported from the scene directly to the hospital?

A. **Yes. He wasn't transported directly from the scene to the hospital.**

Q. Now, sir, you said that you did see some other document relating to Internal Affairs?

A. **Just the document I got from**

Scimone

**Internal Affairs regarding my -- I don't know what you would call it -- rules and procedures violation being substantiated.**

Q. Was that in a letter form?

A. **Yes.**

MR. BREWINGTON: Off the record.

(Discussion off the record.)

RQ MR. BREWINGTON: Pursuant to Rule 34 we request a copy of any documents relating to the Internal Affairs' report, investigations or reporting out of the investigation, including notification letters made to this witness or any other subjects of the investigation that have not been yet produced, specifically any letters which relate to any level of discipline, reprimand or other punishment which was meted out or intended to be meted out by the Suffolk County Police Department as to this witness or any other subjects of the investigation.

Q. Sir, let me show you this briefly. We will identify this as Scimone 9

Scimone

for identification.

MR. BREWINGTON: It is a document which has 36 pages. It is entitled "Internal Correspondence," to "David Ferrara from Lieutenant Joseph Capolino."

(Scimone Exhibit 9, Document dated February 9, 2009, marked for identification.)

Q. Sir, I show you what has been identified as Scimone 9 for identification (handing).

A. **(Perusing.)**

Q. My question -- you can thumb through it very quickly. Have you ever seen this compilation of pages before?

A. **(Perusing.) No.**

Q. You have never been asked to respond or to add anything in any Internal Affairs' report, other than what you have testified to here today?

A. **Correct.**

Q. Thank you, sir.

MR. BREWINGTON: Why don't we

Scimone

take a five minute leg stretch.

(Recess taken.)

MR. BREWINGTON: I have no further questions for this witness at this time.

I still reserve my right to recall this witness once the documents and the information that we have requested are supplied, if necessary.

MR. DUNNE: I wanted to ask some follow-up questions.

MR. BREWINGTON: Then I may have some more.

EXAMINATION BY
MR. DUNNE:

Q. Sergeant, let me ask you this: In terms of going back to April 12th of 2008, what were the rules and procedures regarding the circumstances in which a subject would be taken to the hospital?

**A. You assess the prisoner. And at some point in time if you feel that prisoner needs to go to the hospital, the prisoner goes to the hospital.**

Scimone

Q. When you say we, who makes that determination?

**A. Any supervisor. The supervisor at the scene, the supervisor in the precinct that interviews him. Any of the supervisors within the precinct can make that determination at any time. If a supervisor sees something, he can just go ahead and call somebody in and have him go.**

**If at any time the prisoner says, I want to go to the hospital, we always err on the side of safety and take him immediately to the hospital.**

**At no time did Mr. Lazo ever say, I would like to go to the hospital or ever complain of any injury.**

Q. If you had heard that at the scene, would you have directed him to be taken to the hospital if he had asked to go to the hospital?

MR. BREWINGTON: Objection.

**A. Absolutely.**

Q. Now, based on the fact that there was a physical altercation between yourself,

Scimone

other officers and the decedent, Mr. Lazo, at some point during his processing had he not gone into stress, would Mr. Lazo have been taken to the hospital?

MR. BREWINGTON: Objection to going into stress. I do not know what that means.

MR. DUNNE: Fair enough.

**A. Absolutely. I had every intention. If another supervisor didn't send him, he would have been sent to the hospital.**

Q. Explain under what discretion you would use as a supervisor to reach the conclusion you just gave? Why would he have been going to the hospital?

**A. At any time we use force, we send somebody to the hospital. Any time somebody complains of pain or injury, they are interviewed again in the precinct. If they complain of pain or injury, they say they want to go to the hospital, they get sent immediately to the hospital.**

Q. What about in instances where there is a physical altercation between a

Scimone

prisoner and members of the Suffolk County Police Department, from your experience as a supervisor, would that person be taken to a hospital?

**A. Prior to this incident, it was the supervisor's discretion to send somebody immediately from the scene or during the processing. So we make a determination.**

**He did not appear to be in immediate medical stress. I am not a medical expert. Although I know he had physical injuries after the incident, I had every intention to send him to the hospital. However, I did not have a chance.**

Q. In circumstances where you make a determination that someone will go to the hospital but doesn't in your estimation need immediately hospitalization, at what point in the process, in the arrest process would that or could that occur?

MR. BREWINGTON: Objection. Calls for speculation.

**A. At any time. He could have gone immediately upon entering into the precinct.**

Scimone

**Another supervisor could have saw him and sent him immediately from the precinct.**

Q. Is there any question at some point in time, had not other events occurred, that Mr. Lazo would have been taken to the hospital?

MR. BREWINGTON: Objection. Calls for speculation.

Q. From your experience as a supervisor and involved in this incident, what would you have done?

A. **Sent him to the hospital.**

Q. At some point during this process?

A. **Absolutely.**

MR. BREWINGTON: Same objection.

MR. DUNNE: I have no further questions.

FURTHER EXAMINATION

BY MR. BREWINGTON:

Q. Let's just take a look at the procedures, the guidelines that you referred to which existed at the time of this incident, which is Scimone 5.

Scimone

Do you have that in front of you?

A. **Yes.**

Q. What is the effective date of that document?

A. **"8/2/07."**

Q. How many months before Mr. Lazo's death was that?

A. **Six.**

Q. You were aware of these regulations, correct?

A. **Yes.**

Q. Now, with regard to the determination to --

MR. BREWINGTON: Withdrawn.

Q. With regard to the determination to send Mr. Lazo to the hospital, that would require the supervising officer to make an assessment, right?

A. **I made an assessment when I saw him walking, and talking, and cursing at us that he didn't need immediate medical attention.**

Q. Sir, do you remember me asking you questions about that before?

Scimone

A. **Yes.**

Q. Do you remember telling me that you made no such assessment?

MR. DUNNE: The record will stand.

MR. BREWINGTON: It sure will.

A. **I didn't make a formal assessment. However, I saw him walking, and talking, and cursing at people.**

Q. Sir, with regard to evaluating Mr. Lazo, which parts of his body did you visually check to see if he had any injuries?

A. **I just saw his face when he was walking away.**

Q. That was walking away with Officer Link?

A. **Yes.**

Q. Officer Link was the person that you basically instructed to take Mr. Lazo, right?

A. **Yes.**

Q. Please tell me what instructions you gave Officer Link about making sure Mr. Lazo was assessed in any way?

Scimone

A. **I just told Joe -- Officer Link to take him to the hospital.**

Q. You told Officer Link to take him to the hospital?

A. **Excuse me. No. To the precinct.**

Q. Other than that, any other instructions?

A. **No, sir.**

Q. Are you saying that Internal Affairs was wrong?

A. **I am saying Internal Affairs made a decision after this incident and said send everybody at the scene to the hospital. That is a decision that I made eight years prior to this.**

Q. I am not asking you --

A. **You are asking me if they are wrong. Yes, they are wrong.**

Q. You don't agree --

A. **No.**

Q. -- with Internal Affairs having given you a verbal reprimand?

A. **No.**

Q. With regard to this document

Scimone

which is before you, Scimone 5 for identification, is there anything in this document --

MR. BREWINGTON: Withdrawn.

Q. Let me just ask a question. The injuries that Mr. Lazo -- you said that you did see. You said that you saw one mark someplace. Where was that?

A. **On his face, I believe.**

Q. Who did you tell to take pictures of that?

A. **I didn't have a chance.**

Q. No, no. You had a radio, correct?

A. **We don't do it that way.**

Q. Sir, did you have a radio?

A. **We don't do it that way.**

Q. Sir, did you have a radio?

A. **Yes, I did.**

Q. Did you have a telephone, like you had used before to stop Mr. Lazo?

A. **It would have been done during the evening.**

Q. Sir, did you have a telephone?

Scimone

A. **Yes.**

Q. Did you call anyone on your telephone or the radio to say, Hey, when you get to the precinct, check this guy out?

A. **No.**

MR. BREWINGTON: No further questions.

FURTHER EXAMINATION

BY MR. DUNNE:

Q. Why did you not do that?

A. **Because I knew it was going to be done.**

Q. Explain what you mean by that so the record is clear.

A. **If it wasn't done prior to me arriving at the precinct, I would have ensured it was done. These are all seasoned detectives. All supervisors in the precinct know what to do.**

MR. BREWINGTON: Move to strike the portion which is unresponsive.

Are you finished, Mr. Dunne?

MR. DUNNE: No. He has answered my question. That is fine for me. And

Scimone

I'm not raising an objection to strike it.

MR. BREWINGTON: I did.

MR. DUNNE: He was responding to my question. It is on the record.

Q. One other question. Sergeant, could you describe Mr. Lazo's demeanor at the point in time you observed him at the point in time he was being set to be taken to the precinct per your direction?

A. **He stood up. He walked to the car. He was just escorted. He wasn't lifted up. And he was still cursing and yelling at the guys.**

Q. Did you make any observations of Mr. Lazo at the scene that would have lead you to conclude that he needed immediate medical attention?

A. **No.**

MR. DUNNE: Thank you. I have nothing further.

FURTHER EXAMINATION

BY MR. BREWINGTON:

Q. When were your injuries

Scimone

photographed?

A. **I don't think my specific injury was photographed. I was photographed. But I don't believe -- there was nothing to photograph. It was just a strain.**

Q. But Mr. Lazo did have injuries to photograph, didn't he?

A. **Obviously.**

Q. My question to you: You said that it would have been done. Who did assess Mr. Lazo before he collapsed? Do you know?

A. **I wasn't in the precinct.**

Q. My question: This is a person that you had physical contact with, right?

A. **Yes.**

Q. Did you ask anyone if an assessment ever took place with regard to Mr. Lazo?

A. **It is not routine to do an assessment in the precinct. If somebody is walking and talking, that is the assessment that we do. I'm not a medical professional, as you pointed out.**

Q. Therefore, sir, would it be

accurate to say that you had no expectation that an assessment would be done at the precinct?

**A. Not a formal one.**

Q. Thank you.

MR. DUNNE: Now I need to clarify.

FURTHER EXAMINATION

BY MR. DUNNE:

Q. Could you explain for the record, when a prisoner is taken into custody before he is processed, where does that prisoner go? In front of who?

**A. In front of a sergeant.**

Q. What is the sergeant's responsibility at the time the prisoner comes into the precinct?

**A. He asks the condition, and if he wants to go to the hospital, if he takes medication.**

Q. Did you have an expectation that that would occur at a point in time when Mr. Lazo was taken to the precinct, despite the fact that you were going to go to the

hospital?

**A. Yes.**

MR. BREWINGTON: I have no further questions for this witness.

(Time noted: 2:15 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF SUFFOLK )

I, SGT. JAMES SCIMONE, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of January 5, 2011; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

________________________
SGT. JAMES SCIMONE

Signed and subscribed to before me, this day of , 2011.

________________________
Notary Public, State of New York

-----------------I N D E X-----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| SGT. J. SCIMONE | MR. BREWINGTON | 5, 165, 171 |
| | MR. DUNNE | 161, 170, 173 |

-------------DOCUMENT REQUEST---------------

PAGE 29 Verizon cellphone records for witness from 3:00 p.m. April 12, 2008 to April 13, 2008

130 Any records relating to any visits witness made to Police Surgeon from April 12, 2008 up to and including date of his return to work, and any records, notes, memoranda, diagnostic tests or others conducted by Police Surgeon, including any notations made in any portions of any medical jackets which are maintained, but not yet produced

134 Crime Scene photos

136 All photographs

--------DOCUMENT REQUEST (Continued)----------

PAGE 159 Copy of any documents relating to Internal Affairs' report, investigations or reporting out of investigation, including notification letters made to this witness or any other subjects of investigation not yet produced, specifically any letter which relate to any level of discipline, reprimand or other punishment which was meted out or to be meted out by Suffolk County Police Department as to this witness or any other subjects of investigation

---------INFORMATION TO BE FURNISHED----------

PAGE 14 Date of assignment to COPE Unit

-------------------EXHIBITS-------------------

| SCIMONE | | FOR I.D. |
|---|---|---|
| 1 | Attachment # 25 | 26 |
| 2 | Attachment # 26 | 112 |
| 3 | Attachment # 12 | 125 |

-------------EXHIBITS (Continued)-------------

| SCIMONE | | FOR I.D. |
|---|---|---|
| 4 | Attachment # 13 | 131 |
| 5 | Attachment # 52-1 through 52-4 | 142 |
| 6 | Attachment # 16 | 148 |
| 7 | Autopsy Report | 149 |
| 8 | Document dated 2/10/2009 | 157 |
| 9 | Document dated 2/9/09 | 160 |

(Counsel retained exhibits.)

C E R T I F I C A T E

STATE OF NEW YORK )
) ss:
COUNTY OF NASSAU )

I, FLORENCE SYSKROT, a Notary Public within and for the State of New York, do hereby certify:

That, SGT. JAMES SCIMONE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of January, 2011.

------------------------
FLORENCE SYSKROT

**#**

**#25** [3] - 25:15, 26:17, 26:21

**'**

**'88** [3] - 9:21, 10:2, 10:5

**1**

**1** [18] - 26:18, 26:20, 26:24, 110:16, 115:22, 116:2, 116:14, 117:2, 117:3, 117:6, 117:7, 117:13, 117:14, 122:23, 136:24, 137:22, 143:8, 177:23
**1-10** [1] - 1:12
**10** [1] - 157:6
**100** [2] - 1:16, 2:19
**10:15** [1] - 1:18
**112** [1] - 177:24
**11550** [1] - 2:6
**11702** [1] - 1:24
**11706** [1] - 5:13
**11747** [1] - 2:14
**11788-0099** [1] - 2:20
**12** [7] - 25:2, 25:6, 125:19, 125:21, 176:9, 176:13, 177:25
**12/30/83** [1] - 119:5
**124** [1] - 1:23
**125** [1] - 177:25
**12th** [6] - 24:18, 29:16, 115:6, 129:25, 130:19, 161:18
**13** [4] - 131:20, 131:23, 176:10, 178:4
**130** [1] - 176:11
**131** [1] - 178:4
**134** [1] - 176:22
**136** [1] - 176:23
**13th** [10] - 29:18, 115:5, 115:7, 128:21, 128:25, 129:8, 129:23, 129:25, 137:11, 179:21
**14** [1] - 177:19
**142** [1] - 178:5
**148** [1] - 178:6
**149** [1] - 178:7
**157** [1] - 178:8
**159** [1] - 177:3
**16** [3] - 148:14, 148:16, 178:6
**160** [1] - 178:9
**161** [1] - 176:5
**1630** [1] - 5:12
**165** [1] - 176:4
**17** [2] - 112:16, 124:24
**170** [1] - 176:5
**171** [1] - 176:4
**173** [1] - 176:5
**1981** [1] - 15:25
**1987** [1] - 18:19
**1988** [1] - 9:25
**1st** [2] - 22:24, 23:9

**2**

**2** [18] - 112:14, 112:18, 112:20, 115:13, 115:19, 116:3, 116:8, 117:10, 117:17, 119:2, 122:5, 122:13, 122:14, 122:15, 122:25, 134:13, 157:8, 177:24
**2/10/2009** [1] - 178:8
**2/9/09** [1] - 178:9
**2001** [4] - 8:10, 10:2, 10:3, 10:5
**2005** [1] - 45:20
**2008** [20] - 24:21, 25:2, 25:6, 29:18, 112:16, 113:4, 113:7, 113:12, 113:17, 113:18, 113:23, 114:22, 124:25, 130:20, 161:18, 176:10, 176:13
**2009** [3] - 157:6, 157:8, 160:9
**2011** [4] - 1:17, 175:10, 175:19, 179:22
**202** [1] - 1:23
**2020** [1] - 132:22
**25** [3] - 25:20, 25:25, 177:23
**26** [4] - 112:17, 112:19, 177:23, 177:24
**29** [1] - 176:8
**2:15** [1] - 174:6
**2nd** [2] - 22:24, 23:9

**3**

**3** [11] - 34:10, 34:12, 34:16, 34:20, 34:21, 125:16, 125:20, 137:16, 138:14, 147:13, 177:25
**300** [1] - 134:14
**314** [5] - 10:13, 90:20, 90:21, 92:10
**336** [2] - 13:3
**34** [2] - 29:13, 159:10
**35** [1] - 144:19
**36** [1] - 160:4
**37** [1] - 28:16
**3:00** [2] - 29:17, 176:9
**3rd** [2] - 22:24, 23:9

**4**

**4** [4] - 131:17, 131:22, 144:23, 178:4
**4/12/08** [1] - 132:22
**4/13** [1] - 127:8
**4/13/08** [1] - 27:15

**5**

**5** [9] - 1:17, 141:25, 142:8, 147:18, 165:25, 169:2, 175:10, 176:4, 178:5
**516-938-4000** [1] - 1:24
**52-1** [3] - 142:7, 142:9, 178:5
**52-2** [1] - 143:5
**52-4** [2] - 142:9, 178:5
**556** [1] - 2:5

**6**

**6** [3] - 148:12, 148:15, 178:6
**65** [1] - 46:25
**6:00** [1] - 31:23

**7**

**7** [3] - 149:11, 149:20, 178:7
**7:00** [1] - 31:23

**8**

**8** [4] - 150:13, 157:3, 157:7, 178:8
**8/2/07** [1] - 166:6
**85** [1] - 18:9
**8:00** [2] - 25:8, 25:9
**8:05** [3] - 25:14, 28:2, 30:22

**9**

**9** [5] - 159:25, 160:8, 160:9, 160:12, 178:9
**911** [2] - 13:20, 13:21
**999** [1] - 2:13

**A**

**a.m** [1] - 1:18
**able** [6] - 6:12, 9:3, 21:12, 61:14, 73:5, 75:22
**abrasion** [7] - 120:4, 120:7, 120:10, 120:18, 121:3, 151:4, 158:7
**abrasions** [2] - 153:12, 153:20
**absolutely** [4] - 75:7, 162:23, 163:10, 165:16
**academy** [8] - 9:13, 10:25, 11:11, 11:18, 11:21, 12:6, 22:15, 97:9
**Academy** [11] - 10:10, 10:20, 18:24, 18:25, 19:24, 20:3, 20:6, 21:8, 21:10, 21:24, 22:4
**accidentally** [1] - 89:10
**accommodate** [1] - 7:14
**accompany** [1] - 124:13
**accordance** [1] - 91:25
**accuracy** [3] - 139:8, 139:10, 140:25
**accurate** [12] - 31:22, 67:21, 99:16, 118:9, 118:11, 127:8, 127:10, 127:11, 141:3, 149:22, 158:15, 173:2
**achieve** [2] - 8:8, 15:18
**achieved** [1] - 8:6
**action** [1] - 179:17
**actions** [1] - 73:19
**active** [2] - 111:13, 151:25
**activity** [1] - 118:2
**actual** [2] - 22:7, 99:8
**Acute** [1] - 150:22
**acute** [1] - 151:24
**add** [1] - 160:20
**address** [2] - 5:10, 14:2
**addressed** [1] - 114:14
**administer** [1] - 4:16
**Administrative** [1] - 17:25
**administrative** [1] - 34:11
**administrators** [1] - 1:4
**aerospace** [2] - 16:15, 16:19
**Affairs** [11] - 112:12, 112:25, 113:8, 122:17, 157:23, 158:2, 158:24, 159:2, 168:11, 168:12, 168:22
**Affairs'** [10] - 25:16, 25:23, 122:25, 125:4, 125:8, 155:16, 155:20, 159:11, 160:21, 177:4
**affect** [1] - 119:6
**affecting** [1] - 92:15
**afternoon** [1] - 29:17
**ago** [5] - 13:12, 14:14, 21:10, 137:18
**agree** [7] - 95:17, 140:16, 145:16, 146:11, 146:23, 158:17, 168:20
**AGREED** [3] - 4:3, 4:9, 4:14
**ahead** [4] - 53:6, 96:16, 141:6, 162:9
**aid** [1] - 97:7
**alleged** [1] - 119:20
**allegedly** [2] - 52:12, 85:23
**alleges** [1] - 143:14
**almost** [3] - 8:3, 9:24, 11:19
**alongside** [1] - 45:3
**alright** [2] - 6:20, 7:10
**Alright** [1] - 7:18
**ALSO** [1] - 3:4
**altercation** [3] - 153:2, 162:25, 163:25
**ambulance** [6] - 106:8, 106:11, 106:14, 106:18, 107:18, 107:23
**ambulate** [1] - 55:17
**amount** [1] - 77:3
**AND** [4] - 1:12, 4:2, 4:8, 4:13
**answer** [7] - 7:16, 15:7, 31:11, 72:13, 96:15, 114:15, 141:6
**answered** [1] - 170:24
**answering** [2] - 114:16, 129:20
**answers** [2] - 123:6, 175:12
**anticipate** [3] -

94:13, 94:15, 94:23
Appeal [1] - 17:25
appeal [4] - 17:16, 17:19, 17:20, 17:22
appear [4] - 123:11, 123:16, 157:17, 164:10
application [5] - 15:16, 16:21, 17:5, 18:9, 22:11
appointed [1] - 11:8
appreciate [2] - 14:24, 49:18
approached [6] - 40:5, 44:12, 56:20, 69:18, 69:22, 87:12
approaching [1] - 39:9
appropriately [2] - 29:23, 127:12
approximate [2] - 30:15, 30:23
approximation [1] - 14:15
April [16] - 24:18, 25:2, 25:5, 29:16, 29:18, 113:3, 113:12, 113:17, 113:23, 114:22, 115:5, 130:20, 161:18, 176:9, 176:10, 176:13
area [11] - 10:13, 12:11, 14:4, 28:6, 56:23, 75:25, 133:8, 139:16, 139:17, 141:18, 150:17
areas [3] - 5:24, 14:2, 14:5
arm [22] - 61:21, 66:3, 66:22, 68:10, 68:12, 68:16, 68:18, 68:19, 71:15, 73:11, 73:17, 73:25, 74:3, 81:2, 81:15, 84:10, 84:18, 84:25, 86:5, 88:7, 88:11, 88:12
Arms [1] - 10:23
Arrest [1] - 143:13
arrest [12] - 48:3, 48:5, 75:4, 75:6, 75:16, 79:15, 80:3, 107:18, 119:6, 132:24, 144:21, 164:20
arrested [1] - 140:5
arrestee [1] - 119:4
arresting [2] - 119:7, 119:25
arrived [1] - 108:6
arriving [2] - 106:9, 170:17
aside [3] - 125:12, 131:14, 148:23
aspects [1] - 6:3
assault [2] - 119:20
assaulting [1] - 119:9
assess [2] - 161:22, 172:11
Assess [1] - 94:2
assessed [1] - 167:25
assessment [16] - 92:6, 92:17, 92:18, 95:6, 95:11, 95:15, 123:18, 146:6, 166:19, 166:20, 167:4, 167:9, 172:18, 172:21, 172:22, 173:3
assigned [5] - 10:10, 13:3, 14:6, 14:11, 19:5
assignment [3] - 13:8, 14:23, 177:19
assignments [2] - 14:8, 14:9
assist [5] - 68:7, 85:4, 85:16, 86:8, 87:13
associated [1] - 153:2
ASST [1] - 1:11
assume [4] - 6:16, 82:9, 114:23, 114:24
assumed [2] - 35:18, 119:23
assuming [1] - 135:8
assumption [2] - 119:24, 135:6
ATT [1] - 26:17
attached [2] - 137:2, 137:18
Attached [1] - 138:15
Attachment [19] - 25:15, 25:20, 25:25, 26:20, 112:17, 112:18, 125:19, 125:20, 131:20, 131:22, 142:6, 148:14, 148:15, 177:23, 177:24, 177:25, 178:4, 178:5, 178:6
attachment [1] - 25:24
Attachments [1] - 142:8
attack [4] - 141:13, 141:15, 152:19, 154:15
attempt [2] - 48:7, 50:25
attempting [3] - 70:13, 119:5, 132:24
attempts [1] - 29:21
attend [1] - 19:23
attention [5] - 123:12, 123:17, 146:14, 166:23, 171:19
ATTORNEY [4] - 1:10, 1:10, 1:11, 2:17
attorney [4] - 5:18, 17:21, 54:23, 125:2
Attorney [3] - 1:13, 1:14, 2:18
attorneys [2] - 4:3, 7:17
Attorneys [1] - 2:4
audible [1] - 83:7
audibly [1] - 78:12
audio [1] - 113:25
author [1] - 128:5
author's [1] - 128:8
authorized [1] - 4:16
autopsy [3] - 149:6, 149:24, 154:17
Autopsy [3] - 149:15, 149:21, 178:7
available [4] - 31:10, 31:14, 32:6, 134:21
Avenue [1] - 5:12
aware [6] - 105:24, 147:4, 153:20, 153:24, 154:6, 166:10

B

Babylon [1] - 1:24
backwards [1] - 72:8
bag [2] - 69:20, 101:12
ball [2] - 69:5, 69:10
band [1] - 34:19
baseball [1] - 89:9
based [3] - 123:18, 140:25, 162:24
bat [1] - 89:9
bathroom [1] - 100:7
baton [3] - 77:17, 77:19, 77:20
batteries [1] - 70:9
Bay [10] - 5:12, 10:12, 10:14, 13:4, 13:5, 39:9, 40:5, 40:9, 40:19, 100:21
BE [2] - 14:20, 177:18
bear [4] - 61:19, 63:24, 64:20, 67:5
bearing [1] - 112:16
became [1] - 119:3
becoming [1] - 9:16
beginning [1] - 10:16
begins [1] - 149:14
behind [6] - 42:2, 48:15, 62:24, 63:3, 87:17, 87:21
benefits [1] - 156:12
best [5] - 14:15, 17:25, 31:5, 31:6, 141:6
between [12] - 4:3, 56:14, 59:18, 60:2, 62:13, 71:3, 71:14, 71:22, 76:17, 78:9, 162:25, 163:25
Billy [16] - 33:10, 33:14, 47:24, 49:2, 53:11, 60:7, 60:8, 60:12, 65:6, 65:7, 71:13, 71:18, 84:19, 88:8, 99:2, 108:12
birth [6] - 117:14, 117:17, 118:5, 118:12, 118:15, 118:20
bit [6] - 9:12, 46:21, 50:12, 99:4, 99:6, 127:2
blank [1] - 14:18
blinker [1] - 43:7
block [1] - 62:4
blocked [1] - 62:20
blood [1] - 179:17
blow [1] - 76:17
blunt [2] - 153:3, 153:8
Blunt [3] - 153:11, 153:19, 153:24
Bob's [1] - 36:25
body [10] - 55:15, 70:22, 71:7, 72:2, 80:25, 86:12, 149:4, 152:9, 152:14, 167:12
boom [4] - 73:17, 80:22
bothers [1] - 104:10
bottom [7] - 26:16, 110:18, 111:9, 112:17, 123:23, 129:15, 131:21
Boulevard [1] - 2:5
box [2] - 111:9, 138:19
boxes [1] - 111:7
break [8] - 7:12, 15:3, 16:10, 62:8, 65:12, 73:8, 97:12, 136:17
breaking [1] - 76:21
breath [4] - 90:15, 91:13, 92:21, 93:16
breathing [1] - 90:14
Brewington [1] - 180 5:18
BREWINGTON [60] - 2:3, 2:7, 5:7, 7:5, 8:22, 15:2, 15:6, 24:5, 25:11, 26:8, 26:13, 29:12, 30:4, 70:17, 76:25, 77:5, 87:7, 89:4, 97:11, 112:13, 125:17, 128:12, 130:16, 131:5, 131:19, 134:15, 134:24, 135:7, 136:4, 136:8, 136:11, 136:16, 139:23, 141:24, 145:14, 148:13, 149:12, 157:5, 158:16, 159:7, 159:9, 160:3, 160:25, 161:4, 161:13, 162:22, 163:6, 164:22, 165:8, 165:17, 165:21, 166:15, 167:7, 169:5, 170:7, 170:21, 171:4, 171:24, 174:4, 176:4
briefly [1] - 159:25
Brightwaters [3] - 10:14, 13:4, 13:5
bring [1] - 134:11
Broderick [4] - 107:10, 107:14, 108:3, 108:4
broke [2] - 64:25, 65:3
broken [1] - 99:6
brought [6] - 97:20, 105:15, 109:4, 118:4, 124:8, 140:10
bunch [2] - 92:9, 92:12
Bureau [1] - 157:23
business [4] - 41:9, 41:11, 41:19, 41:23
busy [2] - 31:20, 91:12
buttocks [3] - 70:25, 71:4, 71:8
button [7] - 45:17, 48:22, 49:6, 51:6, 51:23, 52:6, 54:15
BY [10] - 2:7, 2:15, 2:21, 5:6, 161:15, 165:21, 170:10, 171:24, 173:10, 176:3

C

Cadillac [8] - 38:24, 39:5, 40:15, 65:24, 66:8, 67:15, 67:16,

67:17
cameras [2] - 144:19
cannot [5] - 29:20, 31:16, 31:19, 72:19, 72:20
capability [2] - 40:23, 41:2
capacities [1] - 1:13
capacity [8] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:11, 1:11
Capolino [2] - 158:8, 160:7
Captain [2] - 157:22
car [123] - 10:13, 28:8, 28:10, 28:16, 29:3, 31:17, 31:19, 32:8, 32:9, 32:19, 32:22, 34:18, 34:19, 35:3, 35:19, 38:8, 38:9, 38:13, 38:20, 39:17, 39:19, 39:22, 39:23, 39:24, 40:12, 40:22, 40:25, 42:2, 42:6, 42:7, 42:9, 42:12, 42:21, 42:25, 43:4, 43:6, 43:7, 43:8, 43:10, 44:4, 44:5, 44:7, 45:16, 46:14, 46:23, 47:7, 47:11, 47:12, 47:20, 47:21, 47:22, 48:21, 48:25, 49:3, 49:15, 50:10, 50:16, 51:21, 51:25, 52:4, 52:5, 52:20, 52:21, 52:23, 52:25, 53:3, 53:15, 53:20, 53:23, 54:2, 54:3, 54:9, 54:14, 54:17, 54:18, 54:21, 55:18, 55:23, 56:2, 56:4, 56:23, 57:2, 57:9, 57:17, 58:7, 58:13, 59:13, 59:15, 59:17, 59:18, 60:3, 60:17, 60:19, 60:23, 60:24, 61:2, 61:8, 61:9, 65:2, 65:13, 65:15, 67:6, 69:20, 69:25, 79:4, 79:6, 85:7, 85:8, 85:9, 90:20, 90:21, 90:22, 90:23, 91:2, 92:4, 92:10, 93:5, 124:21, 171:13
card [1] - 46:11
cardiac [2] - 107:18, 152:25
cardiovascular [1] - 96:24
care [1] - 92:13
Carey [2] - 15:21, 15:23

carrier [2] - 29:10, 29:25
carry [1] - 20:21
carrying [1] - 64:11
cars [5] - 21:17, 31:16, 35:18, 45:8, 87:23
case [9] - 6:3, 29:8, 31:7, 36:5, 111:13, 111:16, 112:11, 149:7, 152:17
cases [1] - 147:10
casual [2] - 41:20, 46:21
catch [1] - 93:16
caused [4] - 120:14, 120:21, 141:8, 154:8
Causeway [5] - 38:5, 38:25, 39:7, 39:14, 39:16
CC [2] - 135:22, 135:25
cell [2] - 70:7, 70:8
cellphone [9] - 28:5, 28:18, 28:22, 29:10, 29:14, 32:18, 35:5, 41:3, 176:8
cellphones [2] - 41:6, 41:8
center [1] - 96:21
Central [3] - 1:16, 30:17, 33:13
certain [6] - 27:24, 81:24, 82:2, 96:14, 114:23, 156:20
certificate [1] - 22:9
certification [1] - 4:6
certified [1] - 11:13
certify [3] - 175:8, 179:9, 179:15
chance [4] - 142:14, 155:25, 164:15, 169:13
change [3] - 10:16, 10:18, 13:17
changed [1] - 13:9
channel [4] - 33:25, 34:4, 34:8, 34:12
Channel [6] - 34:10, 34:12, 34:16, 34:20, 34:21, 35:14
channels [1] - 34:15
charged [1] - 143:12
Charges [1] - 131:6
charm [1] - 9:2
check [3] - 118:19, 167:13, 170:5
checked [3] - 104:14, 111:10, 111:18
chest [2] - 71:8, 87:3

choose [1] - 14:8
Chris [2] - 33:11, 35:16
CHRISTINE [1] - 2:17
CHRISTOPHER [1] - 1:8
Christopher [1] - 3:6
circular [1] - 61:22
circumstances [3] - 27:9, 161:20, 164:16
Circumstances [1] - 132:14
cited [1] - 131:12
citizen [2] - 53:8, 138:21
Citizen [4] - 139:18, 140:2, 140:16, 140:20
City [5] - 13:25, 17:3, 18:6, 18:11, 18:18
claim [2] - 42:3, 79:11
clarify [1] - 173:8
class [1] - 12:14
clean [1] - 100:6
clear [12] - 7:9, 11:4, 27:25, 58:20, 63:22, 67:18, 68:25, 71:6, 73:14, 86:25, 93:8, 170:15
close [7] - 6:9, 36:5, 36:7, 54:19, 56:9, 56:13, 123:18
closed [1] - 77:2
closer [3] - 36:5, 36:17, 61:3
closest [1] - 66:16
cloth [1] - 78:8
clothing [4] - 88:17, 88:19, 88:21, 88:24
Co [1] - 2:12
co [1] - 1:4
co-administrators [1] - 1:4
Co-Counsel [1] - 2:12
collapsed [1] - 172:12
college [5] - 15:11, 16:8, 16:11, 20:9, 20:13
College [1] - 20:11
Collins [1] - 155:14
COLLINS [1] - 1:11
coming [6] - 29:2, 46:20, 56:16, 66:8, 85:17, 87:14
command [1] - 91:18
Command [2] - 47:8, 47:11
commanded [1] -

24:4
commanding [1] - 23:12
COMMISSIONER [1] - 1:6
community [1] - 13:15
Community [2] - 15:20, 20:11
company [2] - 16:16, 16:19
competitive [1] - 8:12
compilation [1] - 160:17
complain [2] - 162:17, 163:21
complains [2] - 95:19, 163:19
Complaint [1] - 137:7
complaint [1] - 99:17
complaints [2] - 98:11, 98:15
complete [2] - 20:2, 175:11
completed [4] - 137:8, 147:24, 148:3, 148:6
completely [1] - 137:3
compliance [2] - 75:25, 139:13
compliant [1] - 79:23
complied [1] - 52:8
composure [1] - 92:25
comprised [1] - 23:9
computer [5] - 21:12, 111:5, 118:5, 118:14, 118:17
computers [1] - 21:17
concern [1] - 104:6
concerning [5] - 5:22, 112:10, 113:14, 114:2, 130:11
conclude [1] - 171:18
conclusion [1] - 163:15
conclusions [1] - 139:2
concrete [1] - 66:12
condition [1] - 173:19
conditions [1] - 13:24
conduct [1] - 41:9
conducted [3] - 130:23, 147:11,

176:17
conducting [3] - 41:10, 102:22, 147:22
confrontation [1] - 158:5
connection [2] - 135:18, 135:24
consciously [2] - 92:5, 92:18
consisted [1] - 158:6
contact [7] - 25:6, 29:2, 29:5, 33:2, 33:17, 44:11, 172:15
contain [1] - 128:24
contained [3] - 135:4, 135:12, 135:25
containing [1] - 149:17
content [1] - 125:3
continue [4] - 75:19, 79:12, 97:14, 136:14
Continued [3] - 3:2, 177:2, 178:2
contraband [1] - 57:15
control [5] - 74:2, 74:20, 75:20, 75:23, 84:10
Control [2] - 102:16, 102:17
contusions [5] - 152:14, 153:12, 153:20, 153:25, 158:7
conversation [17] - 32:20, 41:20, 43:20, 44:2, 45:2, 45:7, 46:18, 47:18, 49:13, 56:13, 74:22, 74:25, 79:7, 102:2, 119:16, 129:5, 129:6
conversations [1] - 35:5
coordinate [4] - 35:21, 35:25, 36:20, 43:23
COPE [11] - 13:10, 13:13, 13:14, 13:18, 13:23, 14:12, 14:23, 24:8, 28:16, 31:12, 177:19
copied [1] - 142:3
Copy [1] - 177:3
copy [1] - 159:10
copying [1] - 134:22
cordial [1] - 46:4
corner [1] - 129:15
Corporation [1] - 16:16
correct [87] - 9:4, 18:2, 25:17, 26:5, 35:6, 35:9, 38:13,

38:22, 41:24, 49:21, 50:2, 50:5, 50:13, 50:22, 51:7, 52:13, 57:2, 57:22, 63:25, 64:3, 64:6, 66:9, 68:5, 76:18, 77:24, 77:25, 78:21, 81:5, 81:8, 82:17, 82:23, 85:20, 86:23, 87:4, 93:13, 93:16, 94:9, 94:16, 95:9, 95:12, 96:10, 104:7, 111:19, 112:25, 113:4, 115:5, 115:10, 115:24, 116:3, 116:6, 116:10, 117:10, 119:21, 120:11, 122:6, 123:14, 123:19, 123:21, 124:21, 126:24, 130:5, 132:18, 137:9, 137:13, 138:7, 138:12, 138:17, 140:11, 140:17, 140:23, 143:23, 144:2, 144:11, 144:13, 144:14, 145:17, 149:24, 150:7, 151:21, 154:12, 155:17, 156:15, 160:23, 166:11, 169:15, 175:11, 175:13
**Correction** [1] - 19:21
**Corrections** [7] - 9:10, 16:20, 18:12, 18:18, 18:21, 19:4
**Correspondence** [1] - 160:5
**Counsel** [3] - 2:12, 26:4, 178:11
**COUNTY** [6] - 1:5, 1:9, 1:10, 2:17, 175:5, 179:5
**County** [16] - 1:13, 1:14, 5:11, 7:24, 8:2, 9:8, 10:7, 16:24, 18:6, 19:17, 19:19, 19:24, 95:4, 159:21, 164:2, 177:14
**couple** [5] - 40:10, 40:13, 50:15, 59:21, 130:4
**course** [1] - 20:3
**courses** [4] - 11:14, 20:9, 20:14, 21:7
**COURT** [1] - 1:2
**Court** [1] - 4:19
**court** [3] - 6:11, 6:25, 113:20
**cover** [2] - 44:13, 44:23
**covered** [1] - 90:6
**covers** [2] - 10:14, 13:3
**CPR** [1] - 97:6
**crawl** [1] - 71:14
**crawling** [2] - 66:21, 88:20
**credits** [5] - 15:12, 15:13, 15:16, 15:19, 20:10
**Crime** [8] - 22:23, 102:16, 102:17, 134:12, 144:17, 144:20, 176:22
**crime** [1] - 23:19
**cross** [1] - 10:23
**crossed** [2] - 40:7, 133:13
**cuff** [2] - 87:20, 88:5
**cuffed** [6] - 87:21, 87:22, 88:6, 88:11, 90:3, 90:4
**cuffing** [1] - 88:16
**cuffs** [6] - 87:19, 87:20, 88:4, 88:9, 88:10, 88:13
**curse** [6] - 78:23, 79:9, 79:15, 79:24, 80:5, 80:7
**cursed** [1] - 78:18
**cursing** [7] - 78:14, 78:19, 79:12, 92:8, 166:21, 167:10, 171:14
**curved** [1] - 77:21
**custody** [3] - 143:17, 146:10, 173:12
**cylindrical** [3] - 77:14, 77:21, 77:22

**D**

**D2** [1] - 146:12
**dashboard** [3] - 45:17, 48:23, 49:14
**data** [2] - 50:10, 53:12
**date** [17] - 14:22, 27:13, 112:16, 117:14, 117:16, 118:5, 118:12, 118:15, 118:19, 127:7, 127:9, 127:22, 128:19, 129:23, 130:20, 166:4, 176:14
**Date** [1] - 177:19
**dated** [7] - 127:12, 127:25, 157:6, 157:8, 160:9, 178:8, 178:9
**David** [1] - 160:5
**DAVID** [1] - 2:15
**days** [7] - 99:11, 99:12, 99:13, 99:14, 99:15, 130:4, 130:8
**dead** [1] - 141:12
**deal** [4] - 49:11, 51:14, 57:14, 57:21
**dealing** [3] - 95:16, 106:20, 106:21
**dealt** [1] - 146:25
**death** [10] - 111:12, 138:11, 140:22, 141:15, 146:25, 152:17, 152:25, 153:7, 154:7, 166:7
**decedent** [1] - 163:2
**December** [7] - 112:16, 113:6, 113:12, 113:18, 113:23, 114:22, 124:24
**decided** [2] - 48:23, 81:11
**decision** [2] - 168:13, 168:15
**defendant** [1] - 25:12
**Defendant** [1] - 1:19
**Defendants** [2] - 1:14, 2:18
**defendants** [1] - 29:21
**degree** [3] - 15:11, 16:14, 155:9
**demand** [1] - 30:3
**demeanor** [1] - 171:8
**demonstrate** [1] - 77:7
**demonstrated** [1] - 73:15
**DEPARTMENT** [1] - 1:5
**department** [1] - 9:7
**Department** [12] - 5:11, 7:24, 8:2, 10:7, 17:3, 18:12, 19:17, 19:19, 142:4, 159:21, 164:3, 177:14
**departments** [1] - 18:4
**deployed** [1] - 76:8
**Deposition** [1] - 1:19
**deposition** [6] - 4:6, 4:14, 136:14, 175:9, 179:11, 179:13
**describe** [13] - 12:19, 58:9, 61:17, 65:4, 65:6, 65:9, 65:11, 70:5, 72:19, 72:20, 76:20, 83:2, 171:8
**described** [1] - 74:17
**descriptions** [1] - 87:2
**designated** [1] - 23:11
**desk** [1] - 12:22
**DeSonne** [1] - 16:3
**despite** [1] - 173:24
**Det** [2] - 3:6, 3:7
**details** [1] - 51:16
**detective** [4] - 110:10, 152:18, 154:25, 155:3
**Detective** [82] - 27:12, 28:4, 28:25, 29:5, 29:7, 30:9, 31:4, 33:3, 33:11, 33:19, 33:22, 33:25, 34:5, 35:13, 35:16, 35:17, 38:15, 40:11, 42:5, 42:8, 42:20, 43:12, 43:15, 48:14, 48:17, 48:18, 48:21, 49:9, 49:20, 51:10, 51:11, 52:3, 52:16, 52:19, 53:20, 53:22, 54:6, 56:7, 56:14, 56:21, 57:18, 58:5, 58:8, 58:10, 58:13, 58:15, 58:18, 58:21, 58:22, 59:11, 59:23, 59:24, 60:13, 60:18, 60:21, 62:14, 63:14, 63:17, 64:5, 68:14, 69:15, 69:18, 69:21, 69:22, 69:23, 70:16, 85:5, 85:15, 87:11, 88:9, 101:4, 110:4, 110:5, 110:9, 111:25, 119:9, 119:15, 119:16, 119:21, 147:7, 147:8
**detectives** [4] - 31:15, 34:2, 111:14, 170:19
**Detectives** [2] - 33:18, 38:7
**Detention** [1] - 19:10
**determination** [7] - 148:2, 162:3, 162:8, 164:9, 164:17, 166:14, 166:16
**determine** [1] - 145:11
**determined** [2] - 158:3, 158:8
**diagnosis** [1] - 152:24
**diagnostic** [2] - 130:22, 176:16
**die** [3] - 96:4, 96:6, 96:9
**died** [3] - 109:8, 109:11, 154:15
**different** [2] - 5:24, 22:8
**difficult** [1] - 6:25
**digging** [1] - 80:13
**digital** [1] - 144:18
**digitized** [1] - 134:17
**directed** [1] - 162:19
**direction** [2] - 87:23, 171:11
**directly** [5] - 50:21, 97:25, 158:10, 158:19, 158:21
**dirt** [1] - 90:6
**disable** [3] - 52:5, 53:25, 54:14
**discipline** [2] - 159:18, 177:11
**discretion** [3] - 14:9, 163:13, 164:7
**discuss** [1] - 37:7
**discussing** [1] - 37:4
**Discussion** [1] - 159:8
**discussion** [7] - 36:10, 62:12, 103:6, 109:24, 124:25, 145:19, 145:23
**disqualified** [1] - 17:11
**DISTRICT** [5] - 1:2, 1:2, 1:10, 1:10, 1:11
**District** [3] - 1:13, 1:14, 5:23
**doctor** [1] - 133:9
**doctors** [1] - 98:12
**document** [56] - 25:12, 26:14, 27:3, 27:14, 111:22, 111:23, 112:15, 112:22, 114:5, 114:12, 115:4, 115:21, 115:23, 117:24, 118:25, 123:24, 124:23, 124:24, 125:3, 125:15, 125:18, 125:23, 126:5, 127:12, 127:14, 127:17, 127:24, 128:13, 128:24, 129:11, 131:17, 131:20, 131:25, 132:7, 136:25, 137:3, 141:25, 142:3, 144:24, 147:18, 148:11, 148:17, 148:20, 149:10, 149:14, 152:21, 157:2, 157:5, 157:13, 157:16, 158:23, 158:25, 160:3, 166:5, 168:25, 169:4

Document [4] - 157:7, 160:8, 178:8, 178:9
DOCUMENT [2] - 176:7, 177:2
documented [1] - 145:2
documents [6] - 29:19, 114:21, 115:15, 159:10, 161:8, 177:3
Dodge [1] - 36:25
DOES [1] - 1:12
done [23] - 54:5, 91:2, 95:11, 96:20, 96:23, 97:2, 113:25, 115:5, 125:10, 138:2, 143:19, 143:21, 144:11, 146:21, 146:23, 152:8, 165:12, 169:23, 170:13, 170:16, 170:18, 172:11, 173:3
door [3] - 50:12, 50:13, 50:22
DORMER [1] - 1:6
double [1] - 90:21
down [27] - 6:11, 26:16, 67:16, 68:4, 68:8, 68:9, 72:9, 74:6, 77:22, 82:9, 85:2, 85:13, 86:10, 86:12, 86:19, 87:3, 97:20, 104:16, 111:9, 113:9, 125:18, 129:14, 138:19, 140:15, 144:23, 153:10
downstairs [1] - 106:22
Dr [1] - 16:3
drafted [1] - 115:19
draw [1] - 139:2
drawn [2] - 44:18, 44:20
drifted [4] - 56:22, 56:25, 57:11, 58:3
drive [1] - 53:9
driver [3] - 44:10, 44:13, 45:22
driver's [8] - 20:18, 21:3, 46:15, 47:16, 50:21, 58:12, 61:10, 67:23
driving [2] - 10:22, 30:18
drop [1] - 81:11
dropped [1] - 80:24
dropping [1] - 81:3
drug [1] - 14:4
due [1] - 123:10
duly [2] - 5:3, 179:12
Dunne [2] - 7:6, 170:23
DUNNE [34] - 2:21, 7:7, 25:20, 25:24, 26:4, 26:7, 30:2, 35:8, 77:4, 77:7, 128:3, 134:11, 134:20, 135:5, 135:14, 136:6, 136:10, 139:21, 139:24, 141:4, 145:13, 150:13, 161:11, 161:16, 163:9, 165:18, 167:5, 170:10, 170:24, 171:5, 171:21, 173:7, 173:10, 176:5
during [19] - 10:4, 19:3, 32:20, 82:15, 88:14, 100:4, 120:15, 120:16, 120:22, 132:23, 141:20, 150:3, 155:8, 158:5, 163:3, 164:8, 165:14, 169:23
dusting [2] - 90:7, 90:9
duties [4] - 12:19, 13:9, 13:17, 23:7
duty [4] - 12:22, 36:3, 41:13, 130:14

E

ear [1] - 151:6
easily [1] - 31:16
East [1] - 1:23
EASTERN [1] - 1:2
Eastern [1] - 5:23
education [1] - 15:10
effect [3] - 4:17, 79:16, 79:20
effective [1] - 166:4
efforts [1] - 74:12
eight [6] - 11:19, 23:4, 23:25, 94:8, 94:12, 168:15
eighth [2] - 47:5, 47:7
either [5] - 59:5, 68:3, 113:25, 134:22, 156:24
elbow [1] - 58:16
eligible [1] - 8:24
Ellen [1] - 110:24
emerged [1] - 44:17
emergency [6] - 95:21, 95:24, 97:7, 108:17, 108:20, 108:23
Emergency [4] - 10:21, 11:9, 11:15, 12:7
employed [3] - 7:21, 7:23, 7:25
Employee [1] - 132:6
employee [1] - 133:9
Employee's [3] - 132:9, 132:12, 132:17
employees [1] - 1:13
employment [1] - 20:25
end [2] - 77:13, 77:23
energy [1] - 90:13
Enforcement [2] - 13:16, 22:23
enforcement [3] - 16:22, 23:18, 23:19
engage [1] - 46:17
engaged [2] - 44:15, 67:5
engages [1] - 46:4
engine [1] - 51:4
Ensure [1] - 146:12
ensure [2] - 158:9, 158:18
ensured [1] - 170:17
entered [1] - 13:6
entering [1] - 164:25
entire [2] - 86:22, 128:9
entitled [3] - 25:13, 142:4, 160:4
entity [1] - 9:8
err [1] - 162:12
escape [2] - 62:4, 62:20
escorted [1] - 171:13
ESQ [5] - 2:7, 2:9, 2:15, 2:17, 2:21
essentially [2] - 54:22, 67:24
estate [1] - 5:20
Estate [2] - 1:4, 5:19
estimation [1] - 164:18
evaluating [1] - 167:11
evaluative [1] - 96:23
evening [8] - 28:4, 29:6, 30:11, 30:21, 122:3, 122:4, 124:7, 169:24
events [1] - 165:5
exactly [7] - 11:5, 30:25, 46:23, 51:10, 51:12, 51:14, 58:18
exam [1] - 18:13
examination [4] - 8:12, 8:15, 8:18, 17:8
Examination [2] - 150:11, 150:16
EXAMINATION [7] - 5:6, 161:15, 165:20, 170:9, 171:23, 173:9, 176:3
examined [2] - 5:4, 141:21
Examiner [1] - 153:16
except [1] - 4:9
excuse [1] - 168:6
exertion [1] - 152:25
Exhibit [10] - 26:20, 110:16, 112:18, 125:20, 131:22, 142:8, 148:15, 149:20, 157:7, 160:8
EXHIBITS [2] - 177:21, 178:2
exhibits [1] - 178:11
exist [3] - 29:15, 29:20, 139:14
existed [1] - 165:24
exit [2] - 39:10, 40:6
exiting [1] - 47:12
expectation [2] - 173:2, 173:22
experience [2] - 164:3, 165:10
expert [2] - 6:11, 164:12
explain [6] - 72:5, 91:15, 94:21, 163:13, 170:14, 173:11
explained [3] - 52:9, 53:24, 54:11
extremities [1] - 153:24
eyes [1] - 158:7

F

face [9] - 55:5, 120:5, 120:8, 120:18, 151:5, 153:12, 158:8, 167:14, 169:10
facing [5] - 65:25, 66:4, 66:7, 66:11, 66:19
fact [4] - 123:10, 138:9, 162:24, 173:25
facts [1] - 103:16
fail [1] - 20:5
failed [3] - 40:7, 158:9, 158:17
fair [2] - 155:24, 163:9
fairly [1] - 6:9
familiar [2] - 13:24, 142:17
family [1] - 100:10
far [3] - 35:11, 35:12, 139:23
fashion [7] - 61:22, 77:18, 77:19, 77:20, 83:16, 150:3
fast [2] - 46:21, 46:23
February [3] - 157:6, 157:8, 160:9
Federal [1] - 1:16
feet [4] - 50:15, 50:19, 50:20, 55:2
felt [1] - 87:15
Ferrara [1] - 160:6
few [3] - 22:21, 50:18, 50:20
Field [1] - 12:15
Fifth [1] - 5:12
fifty [2] - 75:17, 75:19
fight [1] - 88:19
figure [1] - 35:23
figured [1] - 37:5
filing [1] - 4:5
fill [15] - 12:23, 21:19, 111:6, 111:23, 112:10, 114:12, 114:17, 118:15, 128:15, 132:7, 133:5, 133:9, 133:14, 137:20, 147:8
filled [19] - 112:24, 115:12, 117:9, 122:24, 126:6, 126:7, 126:15, 128:14, 132:8, 132:11, 132:15, 133:18, 137:4, 137:7, 138:24, 140:21, 141:2, 146:22, 147:3
filling [3] - 111:21, 117:24, 122:5
film [1] - 144:19
finally [1] - 38:2
findings [2] - 154:16, 155:20
fine [4] - 30:2, 99:4, 104:11, 170:25
finish [3] - 55:8, 75:9, 135:7
finished [1] - 170:23
Fire [1] - 10:23
firearm [1] - 20:22
Firearm [1] - 11:10
firearms [1] - 10:24
Firearms [2] - 11:16, 12:7
first [21] - 17:2, 25:5, 33:8, 41:21, 60:9, 76:16, 87:25, 94:19, 96:2, 97:7, 97:23, 99:17, 99:22, 104:25,

113:7, 121:25, 124:4, 127:18, 140:5, 152:20, 152:23
**fist** [1] - 77:2
**five** [15] - 9:11, 10:20, 13:12, 14:14, 65:17, 65:18, 78:4, 78:17, 80:10, 81:5, 81:14, 81:16, 97:12, 122:18, 161:2
**five-minute** [1] - 97:12
**flashlight** [40] - 68:15, 68:16, 68:22, 69:13, 69:14, 69:16, 69:19, 69:24, 70:3, 70:5, 73:21, 74:8, 74:13, 75:24, 76:3, 76:5, 77:11, 77:24, 78:9, 80:20, 80:25, 81:4, 81:11, 83:3, 83:9, 83:12, 83:16, 83:18, 83:20, 84:12, 84:25, 89:6, 94:12, 101:3, 101:9, 101:11, 101:14, 101:16, 109:25, 122:18
**flee** [3] - 48:7, 50:25, 119:10
**flesh** [1] - 83:13
**flip** [1] - 147:19
**floor** [1] - 56:24
**Florence** [1] - 1:21
**FLORENCE** [2] - 179:7, 179:25
**flow** [1] - 36:19
**follow** [2] - 142:25, 161:12
**follow-up** [1] - 161:12
**following** [3] - 38:23, 39:6, 152:25
**follows** [1] - 5:5
**foot** [1] - 80:14
**footed** [1] - 69:11
**FOR** [2] - 177:22, 178:3
**Force** [10] - 126:4, 131:7, 138:20, 139:17, 142:6, 146:23, 147:12, 147:23, 148:2, 148:5
**force** [16] - 4:17, 77:3, 82:25, 95:5, 126:10, 126:13, 142:22, 143:11, 143:12, 144:25, 145:10, 145:13, 145:15, 145:16, 146:5, 163:17
**form** [8] - 4:10, 112:24, 122:11, 126:16, 141:5, 144:8, 150:3, 159:5
**formal** [2] - 167:8, 173:5
**forms** [2] - 21:19, 147:12
**forth** [1] - 179:12
**fortunate** [1] - 12:25
**forward** [1] - 74:4
**forwards** [1] - 72:8
**Founded** [1] - 111:10
**founded** [3] - 111:15, 111:16, 111:17
**four** [8] - 13:12, 14:14, 65:17, 65:18, 70:6, 70:8, 70:9, 142:2
**four-page** [1] - 142:2
**Fred** [1] - 5:17
**FREDERICK** [2] - 2:3, 2:7
**free** [7] - 52:22, 52:24, 53:9, 53:14, 57:6, 72:2, 72:3
**friend's** [1] - 47:22
**front** [32] - 46:13, 58:7, 59:13, 59:14, 59:17, 59:18, 60:3, 61:8, 61:9, 65:2, 65:13, 65:15, 65:23, 66:9, 67:6, 67:9, 67:11, 67:15, 67:17, 67:19, 67:20, 87:12, 115:15, 123:7, 142:4, 149:16, 150:25, 166:2, 173:14, 173:15
**Frontal** [2] - 150:21
**Fuck** [2] - 79:16, 79:19
**FURNISHED** [2] - 14:20, 177:18
**FURTHER** [6] - 4:8, 4:13, 165:20, 170:9, 171:23, 173:9

G

**gain** [2] - 75:25, 92:24
**garbled** [1] - 62:17
**gassed** [2] - 90:13, 92:21
**general** [4] - 6:2, 79:7, 142:21, 142:23
**General** [2] - 11:13, 142:5
**generally** [1] - 14:7
**gentleman** [1] - 94:7
**GERMANO** [1] - 2:9
**gesture** [1] - 7:3
**gestures** [1] - 46:7
**gesturing** [2] - 45:15, 45:22
**given** [5] - 14:9, 30:14, 168:23, 175:13, 179:14
**glad** [1] - 89:22
**gloves** [1] - 78:5
**GONZALEZ** [2] - 1:3
**Gonzalez** [3] - 3:9, 13:6, 136:21
**grab** [15] - 60:8, 61:14, 61:16, 62:6, 68:10, 68:11, 70:13, 73:5, 73:7, 73:8, 73:10, 73:12, 73:21, 73:24, 85:19
**grabbing** [8] - 60:10, 68:15, 68:19, 70:19, 71:3, 72:21, 72:25, 85:11
**graduate** [1] - 15:23
**graduated** [2] - 15:21, 16:4
**graduation** [1] - 10:9
**Grand** [9] - 101:10, 127:19, 127:21, 150:3, 150:4, 150:6, 154:19, 155:8, 155:13
**grass** [8] - 57:16, 66:12, 66:15, 69:24, 74:7, 74:16, 75:12, 90:6
**grassy** [1] - 56:23
**ground** [10] - 65:23, 67:2, 78:21, 79:2, 87:3, 120:15, 120:22, 120:24, 121:3, 121:5
**Gruenfelder** [5] - 102:16, 102:21, 103:2, 103:4, 105:14
**guard** [1] - 100:7
**guess** [8] - 14:13, 15:12, 18:3, 72:9, 72:11, 103:10, 106:12, 135:19
**guessing** [1] - 65:17
**guided** [1] - 88:10
**guidelines** [4] - 142:21, 142:24, 143:2, 165:23
**gun** [18] - 44:18, 44:20, 80:17, 80:18, 81:18, 81:19, 81:23, 82:9, 82:11, 82:15, 82:23, 84:16, 85:11, 85:12, 85:24, 86:2, 86:3
**guy** [1] - 170:5
**guys** [4] - 23:24, 31:12, 109:20, 171:15

H

**half** [2] - 54:25, 106:12
**hallway** [2] - 108:11, 108:16
**hand** [53] - 26:17, 68:12, 68:20, 68:23, 69:5, 69:7, 69:8, 70:12, 70:14, 70:15, 70:20, 72:22, 72:23, 73:2, 73:6, 73:16, 73:20, 73:23, 75:4, 75:16, 75:21, 75:23, 75:25, 76:24, 77:10, 77:11, 77:22, 78:13, 79:15, 79:18, 80:3, 80:9, 82:17, 82:18, 82:19, 82:23, 85:18, 85:19, 85:22, 87:16, 87:17, 87:18, 97:20, 122:17, 125:18, 129:15, 157:18, 179:21
**handcuffed** [1] - 57:4
**handed** [3] - 69:2, 69:3
**handing** [1] - 125:23
**handing)** [6] - 26:25, 112:21, 131:25, 142:12, 157:11, 160:13
**handle** [1] - 100:10
**handling** [1] - 11:9
**hands** [10] - 57:6, 57:8, 62:24, 63:2, 68:12, 73:15, 73:22, 74:14, 84:5, 154:8
**happy** [2] - 6:6, 7:13
**hard** [2] - 76:21, 90:14
**Hatton** [1] - 157:22
**Hauppauge** [1] - 2:20
**head** [26] - 7:3, 7:4, 9:22, 30:15, 33:10, 34:7, 80:22, 81:8, 82:4, 83:8, 83:13, 96:10, 116:18, 116:19, 117:20, 121:2, 121:9, 121:12, 121:13, 121:15, 121:17, 121:19, 121:23, 122:10, 122:19, 153:11
**headed** [1] - 30:12
**heading** [6] - 33:22, 35:20, 36:13, 87:23, 137:6, 150:16
**health** [1] - 96:24
**hear** [18] - 6:8, 33:20, 36:24, 36:25, 37:7, 37:11, 37:14, 45:6, 45:14, 45:23, 46:5, 63:5, 80:23, 81:19, 82:7, 83:11, 106:5, 106:10
**heard** [19] - 6:16, 18:10, 35:16, 38:7, 62:12, 62:16, 62:17, 80:16, 81:18, 81:21, 81:22, 84:16, 85:25, 103:10, 106:4, 106:7, 106:13, 109:19, 162:18
**heart** [7] - 17:13, 116:22, 116:25, 141:13, 141:14, 152:19, 154:15
**held** [6] - 22:3, 68:22, 69:13, 85:14, 87:8, 88:11
**help** [11] - 29:8, 31:8, 31:12, 31:20, 32:5, 32:7, 32:21, 38:11, 85:9, 114:12, 114:21
**hemorrhage** [2] - 150:22, 151:24
**hemorrhages** [1] - 151:18
**hemorrhaging** [1] - 150:25
**Hempstead** [1] - 2:6
**Herbie** [1] - 36:24
**HEREBY** [1] - 4:2
**hereby** [2] - 175:7, 179:9
**herein** [1] - 4:4
**hereinbefore** [1] - 179:11
**hereunto** [1] - 179:21
**High** [1] - 15:24
**high** [4] - 16:4, 16:7, 39:6, 40:3
**higher** [1] - 20:14
**highest** [2] - 8:5, 15:9
**Highway** [3] - 2:19, 36:22, 38:4
**himself** [1] - 62:13
**hit** [36] - 76:3, 76:10, 76:15, 77:12, 78:2, 79:12, 79:17, 80:19, 80:20, 80:22, 81:4, 81:7, 81:14, 81:17, 81:25, 82:16, 83:2, 83:8, 83:12, 83:19, 84:12, 89:5, 89:9, 89:16, 119:13, 119:22, 121:12,

121:15, 121:16, 121:18, 121:22, 122:9, 151:14, 151:20
**hitting** [6] - 77:23, 78:13, 80:9, 86:13, 94:11, 121:11
**hold** [7] - 20:17, 66:21, 85:3, 85:12, 86:18
**holding** [8] - 63:11, 82:10, 84:5, 84:25, 86:7, 86:10, 86:11, 86:15
**Homicide** [9] - 27:12, 105:18, 110:3, 110:5, 110:8, 147:5, 147:11, 147:22, 148:6
**homicide** [1] - 154:12
**hospital** [69] - 89:18, 94:4, 94:18, 95:8, 95:20, 95:24, 98:2, 98:5, 98:7, 98:11, 98:19, 98:23, 99:19, 99:23, 100:17, 100:19, 101:2, 104:16, 104:18, 105:25, 106:8, 106:10, 107:2, 107:13, 107:16, 108:6, 108:7, 108:14, 109:3, 123:10, 129:18, 129:19, 129:24, 133:22, 133:23, 137:12, 138:4, 138:25, 146:15, 148:24, 156:6, 158:11, 158:19, 158:21, 161:21, 161:24, 161:25, 162:12, 162:14, 162:16, 162:20, 162:21, 163:5, 163:12, 163:16, 163:18, 163:22, 163:23, 164:5, 164:14, 164:18, 165:7, 165:13, 166:17, 168:3, 168:5, 168:14, 173:20, 174:2
**Hospital** [6] - 97:21, 100:21, 100:23, 104:20, 105:10, 109:8
**hospitalization** [1] - 164:19
**hospitalized** [2] - 129:13, 138:22
**hostage** [1] - 12:12
**hour** [5] - 30:25, 47:2, 105:8, 105:11, 106:12
**hours** [2] - 105:7, 132:23
**house** [1] - 32:23
**House** [1] - 19:10
**hug** [2] - 63:24, 64:20
**hugged** [2] - 61:19, 67:5
**hum** [1] - 131:10
**hurt** [5] - 89:13, 97:20, 98:4, 99:3, 99:5

I

**I.D** [2] - 177:22, 178:3
**I/L** [2] - 132:25, 133:2
**ICU** [1] - 100:8
**ID** [1] - 135:22
**idea** [3] - 16:6, 105:4, 133:19
**identification** [37] - 26:12, 26:19, 26:22, 26:25, 112:14, 112:19, 112:21, 115:14, 115:19, 115:22, 116:6, 116:9, 116:13, 116:17, 116:21, 119:2, 123:2, 125:16, 125:21, 131:18, 131:23, 137:16, 137:23, 142:2, 142:10, 147:13, 148:12, 148:16, 149:11, 149:13, 149:21, 157:4, 157:9, 160:2, 160:10, 160:12, 169:3
**Identification** [1] - 134:13
**identified** [14] - 14:3, 24:23, 26:24, 38:20, 39:21, 43:6, 43:10, 115:13, 137:22, 147:12, 147:18, 154:8, 154:11, 160:12
**identify** [9] - 39:17, 39:19, 125:15, 131:17, 141:24, 148:11, 149:10, 157:3, 159:25
**identifying** [1] - 29:22
**ill** [1] - 153:10
**illuminate** [1] - 74:9
**immediate** [6] - 123:11, 123:17, 146:14, 164:11, 166:22, 171:18
**immediately** [16] - 29:4, 30:11, 94:18, 95:8, 98:9, 102:12, 123:9, 145:11, 145:22, 146:16, 162:13, 163:23, 164:8, 164:19, 164:25, 165:3
**impacts** [5] - 153:3, 153:8, 153:11, 153:19, 153:24
**important** [1] - 6:18
**IN** [1] - 179:20
**in-person** [1] - 125:7
**inaccurate** [3] - 127:22, 128:7, 128:8
**Inc** [1] - 16:17
**INC** [1] - 1:23
**incident** [17] - 24:14, 27:5, 27:21, 103:16, 111:13, 113:3, 127:9, 129:3, 133:3, 135:23, 135:24, 138:11, 164:6, 164:13, 165:11, 165:24, 168:13
**including** [9] - 18:23, 113:18, 130:20, 130:24, 143:12, 159:13, 176:13, 176:18, 177:6
**indicate** [2] - 40:14, 152:8
**indicated** [12] - 38:16, 49:20, 62:21, 66:7, 79:6, 84:22, 104:6, 118:25, 119:3, 134:20, 151:20, 156:22
**indicates** [1] - 129:12
**indicating** [7] - 61:21, 76:23, 76:24, 76:25, 124:25, 131:9, 145:5
**indicating)** [4] - 61:20, 62:5, 73:9, 150:12
**indication** [4] - 47:12, 96:11, 120:10, 122:16
**individual** [11] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:10, 1:11, 1:13, 43:4, 43:8
**individually** [1] - 1:3
**inflammation** [2] - 150:23, 151:25
**inform** [2] - 32:11, 32:14
**Information** [4] - 131:8, 138:20, 139:18, 140:16
**information** [12] - 6:2, 29:22, 29:24, 37:4, 43:4, 75:10, 114:12, 114:18, 128:23, 128:25, 133:10, 161:9
**INFORMATION** [1] - 177:18
**informed** [1] - 157:25
**infraction** [1] - 52:13
**infractions** [4] - 40:10, 40:14, 41:7, 42:4
**initial** [3] - 11:25, 100:14, 158:5
**inject** [1] - 36:9
**injured** [7] - 102:11, 102:14, 132:6, 132:23, 138:22, 143:14, 146:13
**injuries** [24] - 55:4, 55:11, 55:14, 95:25, 98:6, 98:12, 98:22, 103:5, 120:6, 149:4, 151:12, 152:4, 153:21, 154:3, 154:23, 155:2, 158:5, 158:6, 164:13, 167:13, 169:7, 171:25, 172:7
**Injury** [5] - 132:13, 140:19, 140:20, 141:10, 151:24
**injury** [22] - 94:13, 94:16, 94:25, 95:18, 95:19, 96:3, 96:5, 96:21, 98:8, 99:18, 120:11, 120:13, 130:3, 130:11, 141:8, 141:9, 141:11, 143:14, 162:17, 163:19, 163:21, 172:3
**inquiry** [5] - 6:23, 43:11, 43:14, 89:20, 106:17
**inservice** [2] - 11:3, 11:5
**inside** [1] - 69:25
**Inspector** [1] - 14:10
**instances** [1] - 163:24
**instead** [2] - 22:8, 93:15
**institution** [1] - 20:15
**instructed** [1] - 167:20
**instruction** [3] - 10:25, 11:11, 91:11
**Instruction** [2] - 11:16, 12:8
**instructions** [7] - 37:22, 93:20, 111:23, 124:13, 124:17, 167:23, 168:8
**Instructor** [3] - 10:22, 10:23, 11:14
**insurance** [1] - 46:11
**intended** [1] - 159:20
**intention** [3] - 94:17, 163:11, 164:14
**intentions** [1] - 112:4
**interaction** [2] - 88:15, 103:9
**interactions** [1] - 153:15
**interested** [1] - 179:18
**Internal** [23] - 17:24, 25:16, 25:23, 112:12, 112:25, 113:8, 122:16, 122:24, 125:4, 125:8, 155:16, 155:19, 157:22, 158:2, 158:23, 159:2, 159:11, 160:5, 160:20, 168:10, 168:12, 168:22, 177:4
**interpret** [1] - 7:2
**interpretation** [1] - 128:4
**interview** [1] - 125:8
**interviewed** [1] - 163:20
**interviews** [1] - 162:6
**introduce** [1] - 52:15
**investigated** [1] - 111:17
**investigating** [1] - 111:14
**investigation** [19] - 102:22, 111:12, 138:12, 140:23, 141:15, 146:21, 146:24, 147:6, 147:10, 147:23, 148:7, 158:3, 158:4, 159:13, 159:16, 159:23, 177:6, 177:9, 177:16
**investigations** [2] - 159:12, 177:5
**Involved** [1] - 140:16
**involved** [6] - 28:3, 103:9, 119:4, 144:21, 147:5, 165:11
**involvement** [1] - 5:25
**IS** [3] - 4:2, 4:8, 4:13

Island [2] - 9:10, 19:6
Islip [18] - 1:16, 13:4, 28:6, 29:8, 30:16, 30:17, 31:7, 32:13, 32:24, 33:6, 33:8, 33:9, 33:13, 35:14, 37:2, 41:12, 41:22, 49:11
IT [3] - 4:2, 4:8, 4:13
itself [2] - 120:16, 120:23
IV [1] - 153:18

J

jabbing [1] - 77:18
jackets [2] - 130:25, 176:19
jail [1] - 92:14
James [2] - 3:8, 5:9
JAMES [5] - 1:7, 1:20, 175:7, 175:16, 179:10
JANE [1] - 1:12
January [5] - 1:17, 10:2, 10:5, 175:10, 179:22
JENNIFER [1] - 1:3
Jennifer [1] - 3:9
job [6] - 11:8, 16:15, 16:18, 19:16, 19:19, 146:11
jobs [1] - 19:20
Joe [5] - 91:3, 91:8, 124:8, 124:10, 168:2
John [2] - 3:7, 101:6
JOHN [3] - 1:6, 1:11, 1:12
Joseph [1] - 160:6
JUDGE [1] - 1:8
Judge [79] - 3:5, 30:18, 33:15, 38:3, 42:17, 43:18, 43:21, 44:10, 44:15, 45:10, 45:13, 45:21, 45:24, 46:2, 46:3, 46:10, 48:17, 49:2, 49:24, 49:25, 50:5, 50:7, 52:12, 56:4, 56:9, 56:11, 56:20, 57:18, 59:21, 59:22, 59:23, 60:2, 60:6, 60:14, 60:18, 60:22, 61:14, 62:6, 62:13, 63:7, 63:11, 64:3, 64:19, 65:20, 65:22, 67:4, 68:4, 69:22, 70:18, 70:21, 71:6, 71:19, 71:20, 71:21, 74:18, 74:23, 81:21, 84:12, 84:14, 85:2, 85:10, 97:19, 98:5, 99:22, 100:3, 100:13, 101:17, 102:5, 105:24, 115:23, 116:3, 116:24, 121:15, 121:18, 121:22, 122:9, 145:20, 146:4
Judge's [4] - 44:18, 66:2, 85:24, 116:5
jumped [1] - 33:12
June [1] - 15:25
jurisdictions [1] - 16:23
Jury [9] - 101:10, 127:19, 127:21, 150:3, 150:4, 150:7, 154:19, 155:8, 155:13
jus [1] - 73:14

K

keep [5] - 75:3, 75:20, 79:17, 80:12
keeps [2] - 73:11, 80:14
Kenny [12] - 5:19, 24:9, 24:24, 25:7, 28:3, 29:3, 31:25, 32:2, 90:18, 102:23, 103:9, 119:5
KENNY [1] - 1:4
kept [7] - 66:15, 66:20, 73:9, 76:12, 77:9, 80:2, 80:11
keys [9] - 49:5, 49:8, 49:17, 51:21, 52:5, 53:25, 54:2, 54:5, 54:14
kicked [1] - 69:10
kicking [9] - 71:2, 71:11, 71:15, 72:4, 72:5, 72:6, 72:7, 72:10, 72:16
kind [9] - 37:4, 56:22, 65:21, 65:22, 71:2, 71:13, 71:21, 73:9
knowledge [1] - 5:25
known [2] - 25:7, 138:7

L

lacerations [1] - 153:12
lane [5] - 39:8, 40:15, 40:16, 66:18, 66:24
lanes [2] - 40:8, 40:18
language [1] - 158:13
Laser [2] - 21:25, 22:11
laser [2] - 21:25, 22:7
last [4] - 15:7, 21:7, 116:10, 149:18
LAW [1] - 2:3
law [1] - 16:22
lawful [1] - 119:6
Lawrence [1] - 16:16
lawsuit [1] - 5:22
lay [2] - 74:16, 103:25
layer [1] - 152:11
laying [5] - 66:25, 72:9, 74:6, 75:12
Lazo [166] - 5:19, 24:10, 24:24, 25:7, 27:17, 28:3, 29:3, 31:25, 32:2, 47:16, 48:2, 48:24, 48:25, 51:24, 52:9, 52:11, 54:9, 56:8, 56:14, 57:2, 57:19, 57:24, 58:6, 59:12, 60:3, 60:5, 60:13, 60:16, 60:18, 60:22, 61:3, 62:11, 63:23, 64:15, 64:20, 64:25, 66:15, 67:5, 68:3, 68:8, 71:12, 75:2, 75:14, 76:3, 76:8, 76:10, 76:18, 77:12, 78:5, 78:12, 81:12, 81:23, 82:16, 83:2, 83:7, 84:5, 84:6, 84:12, 84:21, 84:23, 85:14, 85:23, 86:3, 86:7, 86:8, 86:14, 86:16, 86:18, 87:6, 87:8, 87:15, 88:4, 88:15, 89:3, 89:17, 90:3, 90:19, 92:4, 92:6, 92:18, 93:18, 94:23, 95:17, 97:17, 98:18, 98:22, 99:18, 101:20, 101:23, 102:3, 102:23, 103:9, 103:22, 105:24, 106:15, 107:18, 108:6, 108:13, 108:19, 109:3, 109:7, 109:10, 110:2, 113:15, 114:2, 117:5, 117:6, 117:12, 119:5, 119:7, 119:12, 119:17, 120:5, 120:25, 121:11, 121:12, 121:20, 122:10, 122:17, 123:13, 123:25, 124:2, 124:5, 131:7, 138:7, 138:24, 139:20, 140:4, 140:17, 141:19, 143:17, 144:21, 145:6, 145:17, 145:20, 145:24, 146:5, 146:10, 148:25, 152:4, 153:15, 154:4, 154:15, 154:24, 156:5, 158:4, 158:9, 158:18, 162:15, 163:2, 163:4, 165:6, 166:17, 167:12, 167:20, 167:25, 169:7, 169:22, 171:17, 172:7, 172:12, 172:19, 173:24
LAZO [1] - 1:4
Lazo's [22] - 55:5, 66:3, 70:11, 70:19, 71:7, 71:23, 72:2, 73:5, 76:17, 85:19, 117:10, 117:13, 118:12, 120:8, 146:6, 146:25, 149:4, 150:25, 151:21, 152:9, 166:7, 171:8
lead [1] - 171:17
Leading [1] - 132:14
leaning [1] - 74:4
learn [5] - 106:3, 109:10, 121:25, 124:4, 149:3
learned [6] - 85:8, 109:3, 109:7, 121:18, 122:9, 146:4
learning [1] - 20:14
least [2] - 105:8, 138:2
leave [1] - 14:17
leaving [1] - 19:15
Left [2] - 150:21, 151:25
left [30] - 19:12, 37:19, 39:25, 40:2, 40:21, 68:16, 69:2, 69:20, 70:12, 70:14, 70:19, 71:16, 72:22, 72:23, 73:2, 82:19, 85:18, 87:18, 88:12, 90:13, 100:17, 100:22, 109:8, 133:13, 151:2, 151:8, 151:17, 151:18, 152:5, 157:18
left-hand [1] - 157:18
left-handed [1] - 69:2
left-turn [2] - 40:2, 40:21
leg [3] - 72:2, 97:12, 161:2
legal [1] - 5:19
legs [6] - 71:2, 71:8, 71:11, 71:14, 71:22
less [10] - 14:2, 47:23, 57:17, 59:20, 62:3, 62:5, 62:23, 86:20, 88:10, 94:7
letter [3] - 156:17, 159:5, 177:10
letters [3] - 159:14, 159:17, 177:7
letting [1] - 65:7
level [7] - 15:9, 20:14, 82:25, 83:4, 159:18, 177:11
leverage [1] - 73:23
license [7] - 20:19, 20:25, 21:3, 45:15, 46:10, 53:13, 118:18
licensed [1] - 20:21
licenses [2] - 20:17, 21:3
lieutenant [1] - 158:8
Lieutenant [13] - 102:15, 103:4, 104:17, 105:3, 105:14, 110:24, 125:4, 126:7, 126:9, 128:11, 128:17, 129:7, 160:6
lieutenants [1] - 141:22
lifted [1] - 171:13
light [2] - 70:6, 93:11
limp [1] - 55:19
line [1] - 128:9
Link [26] - 87:25, 90:7, 90:12, 90:16, 90:17, 91:9, 91:10, 93:19, 93:20, 93:24, 93:25, 97:18, 116:12, 121:21, 124:2, 124:5, 124:11, 124:14, 124:16, 124:20, 144:10, 167:17, 167:19, 167:24, 168:2, 168:4
LINK [1] - 1:9
Link's [3] - 92:4, 116:9, 116:17
list [2] - 8:24, 9:3
listed [2] - 145:9, 149:15
listen [1] - 14:7
live [1] - 56:17
location [5] - 37:12, 37:15, 37:19, 67:7,

186

133:3
locations [2] - 23:11, 37:9
lodged [1] - 99:17
log [1] - 118:2
look [22] - 24:20, 59:6, 59:9, 69:24, 69:25, 114:20, 115:3, 117:4, 117:23, 125:14, 125:23, 131:16, 131:24, 136:24, 137:15, 142:12, 142:14, 148:10, 149:9, 149:23, 155:25, 165:22
looked [11] - 26:11, 39:24, 53:13, 65:6, 92:7, 114:24, 117:21, 118:3, 118:6, 118:8, 137:17
looking [15] - 25:12, 25:15, 39:18, 56:22, 57:13, 57:14, 57:16, 57:17, 119:2, 122:13, 135:15, 139:24, 141:18, 150:17, 152:23
looks [1] - 150:11
losing [1] - 80:15
loss [2] - 156:12, 156:15
lost [1] - 17:20
loud [1] - 45:9
lower [1] - 71:4

M

M.D [1] - 149:19
Mag [3] - 70:6, 76:2, 101:14
Main [1] - 1:23
main [1] - 34:19
maintained [2] - 131:2, 176:20
MALAFI [1] - 2:17
manner [1] - 154:7
Mark [3] - 107:22, 107:23, 108:12
mark [6] - 26:11, 26:18, 108:2, 108:3, 112:13, 169:8
marked [12] - 26:21, 28:10, 31:17, 110:15, 112:19, 125:21, 131:23, 142:9, 148:16, 149:21, 157:8, 160:9
marriage [1] - 179:17
matter [4] - 50:15, 50:18, 138:9, 179:19
mean [11] - 11:6, 31:14, 50:14, 57:12, 65:4, 70:8, 77:20, 111:11, 128:7, 129:18, 170:14
meaning [1] - 16:11
means [6] - 13:20, 77:4, 77:6, 111:14, 129:17, 163:8
medical [16] - 96:17, 96:19, 97:4, 123:11, 123:17, 130:25, 145:12, 145:20, 145:24, 146:12, 164:11, 166:22, 171:18, 172:23, 176:19
Medical [1] - 153:16
medication [1] - 173:21
Melville [1] - 2:14
member [1] - 18:5
members [2] - 1:12, 164:2
memoranda [2] - 130:22, 176:15
Memorial [1] - 2:19
memory [1] - 114:21
mention [5] - 36:24, 36:25, 37:14, 37:17, 117:6
mentioned [4] - 32:20, 47:20, 48:22, 49:14
metal [2] - 70:7, 76:4
meted [4] - 159:20, 177:13
Microscopic [2] - 150:10, 150:16
middle [5] - 70:22, 71:25, 106:19, 132:8, 132:12
midnight [1] - 115:9
midsection [1] - 70:22
might [7] - 38:9, 38:21, 82:4, 107:22, 118:4, 118:13, 128:6
mile [2] - 47:5, 47:7
miles [1] - 47:2
Milewski [1] - 149:19
mind [1] - 52:7
mine [1] - 69:20
minute [2] - 97:12, 161:2
minutes [4] - 75:22, 93:6, 105:5, 109:6
mission [1] - 32:4
mixing [1] - 87:2
months [4] - 9:11, 18:22, 21:10, 166:7
morning [1] - 5:14
Moses [6] - 38:4, 38:25, 39:7, 39:13, 39:16, 66:5
mostly [1] - 11:3
motion [2] - 58:17, 73:9
move [3] - 55:18, 55:24, 170:21
moved [3] - 45:3, 55:22, 67:7
moving [5] - 59:12, 66:23, 80:21, 82:3, 82:7
MR [91] - 5:7, 7:5, 7:7, 8:22, 15:2, 15:6, 24:5, 25:11, 25:20, 25:24, 26:4, 26:7, 26:8, 26:13, 29:12, 30:2, 30:4, 35:8, 70:17, 76:25, 77:4, 77:5, 77:7, 87:7, 89:4, 97:11, 112:13, 125:17, 128:3, 128:12, 130:16, 131:5, 131:19, 134:11, 134:15, 134:20, 134:24, 135:5, 135:7, 135:14, 136:4, 136:6, 136:8, 136:10, 136:11, 136:16, 139:21, 139:23, 139:24, 141:4, 141:24, 145:13, 145:14, 148:13, 149:12, 150:13, 157:5, 158:16, 159:7, 159:9, 160:3, 160:25, 161:4, 161:11, 161:13, 161:16, 162:22, 163:6, 163:9, 164:22, 165:8, 165:17, 165:18, 165:21, 166:15, 167:5, 167:7, 169:5, 170:7, 170:10, 170:21, 170:24, 171:4, 171:5, 171:21, 171:24, 173:7, 173:10, 174:4, 176:4, 176:5
multiple [7] - 149:14, 152:14, 153:3, 153:7, 153:11, 153:19, 153:25
murmur [1] - 17:14
must [2] - 75:16, 117:21

N

name [9] - 5:8, 5:17, 24:9, 24:12, 24:23, 24:24, 117:10, 118:14, 149:18
Name [1] - 133:8
names [1] - 37:11
NASSAU [1] - 179:5
Nassau [2] - 15:20, 20:11
nature [3] - 21:20, 22:12, 55:20
near [1] - 38:4
nearest [2] - 65:24, 67:17
necessary [3] - 14:17, 145:10, 161:10
neck [2] - 55:12, 151:9
need [12] - 7:12, 15:3, 27:19, 28:8, 32:5, 32:21, 32:24, 38:21, 106:18, 164:18, 166:22, 173:7
needed [13] - 11:2, 29:8, 31:7, 35:22, 35:25, 36:5, 36:7, 38:10, 38:13, 98:21, 99:14, 146:14, 171:18
needs [2] - 94:3, 161:24
never [10] - 18:8, 18:10, 58:22, 80:6, 80:7, 82:11, 86:4, 119:12, 153:17, 160:19
new [1] - 12:21
New [15] - 1:22, 1:24, 2:6, 2:14, 2:20, 5:13, 5:23, 17:3, 18:5, 18:11, 18:18, 20:18, 21:4, 175:22, 179:8
NEW [3] - 1:2, 175:4, 179:3
newly [1] - 11:8
Newton [61] - 3:7, 33:11, 33:18, 35:16, 38:7, 38:15, 40:11, 42:5, 42:9, 42:20, 43:12, 48:14, 48:17, 48:18, 48:21, 49:9, 49:21, 51:10, 51:11, 52:3, 52:16, 52:19, 53:21, 53:22, 54:6, 56:7, 56:14, 56:21, 57:18, 58:5, 58:9, 58:10, 58:13, 58:15, 58:19, 58:21, 58:22, 59:11, 59:23, 59:24, 60:14, 60:18, 60:21, 62:14, 63:15, 64:5, 69:18, 69:21, 69:23, 73:3, 85:5, 85:15, 87:11, 88:9, 101:4, 119:9, 119:13, 119:15, 119:16, 119:21
NEWTON [1] - 1:6
Newton's [2] - 68:14, 69:15
next [19] - 37:25, 39:4, 39:12, 39:22, 42:4, 45:11, 46:8, 54:20, 58:4, 60:22, 61:13, 62:21, 64:23, 80:10, 87:10, 90:4, 120:3, 144:15, 153:18
nice [1] - 47:21
night [8] - 23:23, 24:15, 24:16, 32:4, 32:5, 113:16, 127:2
nine [1] - 94:8
nobody [2] - 67:2, 86:15
noises [1] - 83:7
none [2] - 76:9, 97:10
normal [2] - 48:10, 49:7
normally [4] - 34:9, 52:4, 53:25, 54:4
Normally [1] - 54:13
northbound [1] - 39:8
Notary [4] - 1:22, 5:4, 175:22, 179:7
notations [2] - 130:24, 176:18
note [2] - 25:11, 127:22
noted [1] - 174:6
notes [3] - 110:10, 130:22, 176:15
nothing [7] - 46:21, 56:17, 63:13, 63:16, 98:3, 171:22, 172:5
notice [3] - 55:4, 55:11, 55:14
Notice [1] - 1:20
notification [2] - 159:14, 177:7
number [6] - 20:10, 94:24, 110:16, 135:22, 142:7, 144:23
numbers [7] - 34:6, 116:6, 116:9, 116:13, 116:17, 116:22, 149:13
nurses [1] - 98:12

O

oath [2] - 4:17, 175:9
object [2] - 76:4, 141:4

objection [7] - 128:3, 162:22, 163:6, 164:22, 165:8, 165:17, 171:2
objections [1] - 4:9
observable [1] - 120:6
observations [1] - 171:16
observe [1] - 84:11
observed [3] - 39:23, 120:4, 171:9
observing [2] - 38:9, 45:5
obtain [1] - 116:16
obtained [1] - 146:13
obviously [2] - 18:15, 172:9
occur [2] - 164:21, 173:23
occurred [3] - 35:15, 38:18, 165:5
Occurrence [1] - 132:14
OF [9] - 1:2, 1:5, 1:10, 2:3, 175:4, 175:5, 179:3, 179:5
offerings [1] - 20:3
office [2] - 15:3, 136:7
OFFICE [1] - 1:10
Office [3] - 1:12, 1:13, 56:9
Officer [130] - 9:10, 9:18, 9:20, 10:11, 12:5, 12:15, 13:20, 18:12, 18:18, 18:21, 19:4, 30:18, 33:15, 38:2, 42:17, 43:17, 43:21, 44:10, 44:15, 44:18, 45:9, 45:13, 45:21, 45:24, 46:2, 46:3, 46:10, 48:17, 48:24, 49:24, 49:25, 50:4, 50:7, 52:12, 56:4, 56:10, 56:20, 57:18, 59:21, 59:22, 59:23, 60:2, 60:6, 60:14, 60:18, 60:21, 61:14, 62:6, 62:13, 63:7, 63:10, 64:3, 64:19, 65:20, 65:22, 66:2, 67:4, 68:4, 69:22, 70:18, 70:21, 71:6, 71:19, 71:20, 71:21, 73:3, 74:17, 74:23, 81:21, 84:4, 84:11, 84:14, 85:2, 85:10, 85:24, 87:25, 90:7, 90:12, 90:16, 90:17, 90:19, 91:10, 92:4, 93:19, 93:20, 93:24, 93:25, 97:17, 97:19, 98:5, 99:22, 100:3, 100:13, 101:17, 102:5, 105:23, 107:9, 107:14, 115:23, 116:3, 116:5, 116:8, 116:12, 116:17, 116:24, 119:13, 119:21, 121:15, 121:18, 121:21, 121:22, 122:9, 124:2, 124:5, 124:11, 124:14, 124:16, 124:20, 130:18, 144:10, 145:3, 145:10, 145:20, 146:4, 147:8, 167:17, 167:19, 167:24, 168:2, 168:4
officer [19] - 4:16, 9:7, 9:9, 13:23, 16:22, 30:18, 41:16, 44:12, 44:14, 44:23, 53:8, 91:4, 91:9, 91:20, 102:20, 108:3, 129:12, 166:18
OFFICER [5] - 1:6, 1:7, 1:8, 1:8, 1:9
Officer's [1] - 110:19
officers [11] - 11:7, 11:8, 23:8, 23:12, 31:18, 106:23, 106:25, 107:4, 107:15, 141:22, 163:2
OFFICES [1] - 2:3
official [9] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:11, 1:11, 1:13
often [1] - 31:9
once [6] - 8:15, 39:15, 90:3, 109:3, 136:14, 161:8
one [25] - 7:3, 12:16, 22:21, 35:19, 68:20, 73:16, 75:18, 87:25, 107:7, 112:12, 121:7, 123:2, 125:12, 134:10, 135:22, 137:21, 151:4, 153:18, 154:19, 156:25, 157:2, 169:8, 171:7, 173:5
one-page [1] - 157:2
ones [1] - 137:25
online [3] - 20:13, 21:9, 21:11
oOo [1] - 4:21
operate [3] - 23:10, 31:10, 34:9
operated [1] - 22:24
operates [2] - 34:13, 34:16
operating [5] - 28:7, 28:10, 28:12, 42:16, 42:18
Operation [1] - 12:7
Operations [2] - 10:21, 11:15
operator [5] - 44:16, 46:5, 46:16, 46:17, 49:3
operator's [1] - 45:15
opportunity [1] - 75:11
opposite [2] - 58:14, 60:20
order [1] - 140:7
Order [1] - 142:5
ordering [1] - 134:22
Oriented [1] - 13:15
otherwise [3] - 71:8, 99:4, 104:11
ourselves [1] - 38:3
outcome [1] - 179:18
outside [2] - 97:8, 152:10
overall [1] - 152:10
oversee [1] - 22:18
own [7] - 37:5, 59:5, 59:7, 86:3, 92:20, 92:24, 95:3

P

P.C [1] - 2:11
p.m [5] - 25:8, 25:9, 28:2, 174:6, 176:9
p.O [1] - 3:5
pace [1] - 47:4
paced [2] - 46:25, 47:3
pacing [1] - 47:6
package [1] - 135:21
padding [1] - 78:8
PAGE [4] - 176:3, 176:8, 177:3, 177:19
page [19] - 112:15, 125:17, 131:19, 142:2, 143:4, 144:15, 147:19, 148:14, 149:14, 149:16, 149:17, 150:10, 150:13, 150:15, 152:21, 152:23, 157:2, 157:11
pages [4] - 142:12, 142:18, 160:4, 160:17
pain [4] - 89:14, 95:19, 163:19, 163:21
pair [2] - 88:8, 88:9
paperwork [2] - 24:21, 47:25
paragraph [3] - 116:10, 119:3, 120:3
parked [1] - 48:15
parkway [1] - 39:12
Parkway [5] - 33:13, 39:9, 40:2, 40:17, 66:5
part [14] - 49:12, 60:10, 60:11, 82:6, 93:3, 93:9, 93:12, 132:9, 132:12, 135:21, 142:24, 152:24, 153:7, 158:2
particular [6] - 12:11, 23:22, 64:12, 74:11, 90:2, 102:11
particulars [2] - 27:21, 27:22
parties [2] - 4:4, 179:16
parts [1] - 167:12
passed [6] - 17:7, 18:15, 27:17, 50:16, 115:9, 138:7
passenger [9] - 44:14, 45:4, 45:5, 46:13, 56:7, 61:6, 61:11, 67:21, 67:22
passenger's [1] - 61:10
past [2] - 21:23, 22:14
PATRICIA [1] - 1:3
Patrol [8] - 10:8, 10:11, 12:18, 12:20, 13:19, 25:3, 31:11
patrol [3] - 12:2, 12:23, 13:21
pay [1] - 156:15
PD [2] - 34:17, 34:24
pending [2] - 5:23, 7:15
Peninsula [1] - 2:5
people [4] - 23:21, 24:2, 49:8, 167:10
per [2] - 47:2, 171:11
perhaps [1] - 94:8
period [2] - 10:4, 105:12
person [15] - 7:3, 24:23, 25:7, 94:2, 95:18, 95:20, 109:17, 125:7, 143:11, 143:14, 144:25, 145:11, 164:4, 167:19, 172:14
personal [1] - 28:22
personnel [1] - 64:8
persons [2] - 10:25, 11:2
perspective [2] - 128:6, 128:8
pertaining [1] - 142:21
Perusing [7] - 24:21, 112:23, 125:25, 142:13, 150:14, 157:12, 160:18
perusing [3] - 27:4, 132:2, 160:14
phone [1] - 125:5
photograph [2] - 172:6, 172:8
photographed [8] - 139:19, 139:20, 140:3, 140:4, 140:10, 172:2, 172:4
photographs [9] - 135:17, 135:20, 135:23, 136:2, 144:18, 144:24, 145:3, 145:5, 176:23
Photographs [1] - 143:10
Photos [1] - 134:2
photos [10] - 134:5, 134:9, 134:12, 135:2, 135:10, 135:11, 135:13, 135:15, 176:22
physical [18] - 95:18, 95:25, 96:3, 96:5, 119:4, 120:11, 130:2, 141:9, 141:11, 145:13, 145:14, 145:16, 146:5, 153:2, 162:25, 163:25, 164:12, 172:15
Physical [2] - 140:20, 142:5
pictures [2] - 134:14, 169:11
PINCUS [2] - 2:11, 2:15
pincus [1] - 136:19
pipe [1] - 89:6
place [6] - 14:22, 26:23, 104:22, 143:16, 157:10, 172:18
placed [4] - 8:24, 63:23, 64:20, 92:4
placing [2] - 88:4, 112:20
plainclothes [3] - 31:15, 33:4, 102:19
Plaintiffs [3] - 1:4, 2:4, 2:12
plaintiffs [1] - 136:9
planned [2] - 37:15, 37:18

**Plaza** [1] - 1:16
**point** [38] - 6:4, 7:12, 10:16, 17:10, 37:23, 48:8, 48:11, 48:14, 52:11, 53:9, 56:5, 56:8, 60:7, 64:12, 64:14, 66:25, 67:4, 75:7, 80:16, 80:24, 82:10, 84:24, 86:13, 93:18, 94:2, 98:16, 102:13, 109:23, 127:21, 141:20, 161:23, 163:3, 164:19, 165:5, 165:14, 171:9, 173:23
**pointed** [1] - 172:24
**police** [31] - 9:6, 9:7, 9:8, 9:9, 9:18, 10:22, 11:8, 16:22, 18:4, 20:23, 30:19, 33:21, 41:9, 41:10, 41:16, 41:19, 41:23, 44:11, 46:12, 48:15, 53:8, 64:8, 85:6, 85:8, 85:9, 87:23, 102:19, 130:10, 130:19, 130:23, 158:6
**POLICE** [7] - 1:5, 1:6, 1:7, 1:8, 1:8, 1:9
**Police** [23] - 5:11, 7:24, 8:2, 9:20, 10:7, 10:10, 10:20, 12:5, 13:15, 17:3, 19:17, 19:19, 19:24, 20:3, 20:6, 95:4, 121:21, 123:25, 159:21, 164:3, 176:12, 176:17, 177:14
**Portello** [4] - 110:7, 110:9, 111:25, 147:8
**portion** [8] - 67:20, 77:11, 77:15, 77:21, 77:22, 132:15, 133:6, 170:22
**portions** [3] - 20:5, 130:25, 176:19
**position** [4] - 19:12, 19:15, 44:23, 86:19
**positioned** [1] - 38:3
**possibilities** [1] - 32:19
**possible** [1] - 144:18
**possibly** [3] - 32:9, 32:18, 81:8
**potential** [1] - 62:20
**power** [2] - 59:5, 59:7
**precinct** [49] - 14:3, 14:10, 21:17, 23:10, 23:12, 23:16, 90:17, 93:5, 93:23, 94:19, 96:2, 97:23, 98:4, 98:25, 99:19, 99:23, 100:24, 101:2, 101:20, 101:23, 102:2, 105:15, 105:17, 105:23, 107:24, 109:13, 111:4, 114:7, 129:10, 134:6, 136:3, 140:11, 143:21, 144:3, 162:5, 162:7, 163:20, 164:25, 165:3, 168:6, 170:5, 170:17, 170:19, 171:11, 172:13, 172:21, 173:4, 173:18, 173:24
**Precinct** [9] - 5:12, 10:11, 11:23, 34:16, 46:4, 102:25, 141:21, 144:16, 144:20
**Precincts** [2] - 22:25, 23:9
**predetermined** [1] - 31:24
**predominantly** [1] - 10:12
**prepare** [4] - 27:10, 105:19, 112:2, 114:8
**prepared** [6] - 27:7, 27:16, 115:7, 126:25, 127:2, 137:25
**preparing** [1] - 114:6
**prescribed** [1] - 20:2
**PRESENT** [1] - 3:4
**present** [8] - 5:10, 50:7, 100:4, 101:23, 108:5, 126:9, 136:19, 136:21
**pretty** [2] - 66:3, 89:22
**prevented** [1] - 92:17
**previously** [1] - 104:23
**prisoner** [11] - 91:2, 94:3, 146:13, 161:22, 161:23, 161:24, 162:11, 164:2, 173:12, 173:13, 173:17
**prisoners** [1] - 95:6
**problem** [9] - 14:2, 14:3, 14:4, 14:5, 26:8, 30:4, 54:16, 100:9
**problems** [1] - 23:15
**Procedure** [1] - 143:7
**procedure** [1] - 143:16
**procedures** [4] - 142:25, 159:3, 161:19, 165:23
**proceeded** [1] - 45:3
**proceeding** [2] - 35:14, 40:17
**process** [6] - 17:5, 17:11, 18:9, 164:20, 165:15
**processed** [1] - 173:13
**processing** [2] - 163:3, 164:9
**produced** [5] - 131:3, 136:15, 159:17, 176:21, 177:9
**production** [3] - 29:14, 134:18, 136:12
**professional** [1] - 172:23
**prolonged** [1] - 153:2
**promoted** [1] - 11:22
**promotion** [1] - 11:25
**prone** [6] - 66:25, 86:19, 86:22, 86:24, 86:25, 87:2
**provide** [5] - 10:6, 11:18, 113:19, 114:11, 158:12
**provided** [1] - 128:25
**providing** [1] - 10:24
**proximity** [1] - 56:10
**Public** [4] - 1:22, 5:4, 175:22, 179:8
**pull** [9] - 31:16, 32:8, 32:9, 43:5, 48:16, 88:16, 88:18, 88:20, 90:8
**pulled** [9] - 26:10, 28:8, 31:25, 38:9, 38:13, 38:21, 42:25, 48:15, 87:24
**pulling** [4] - 29:3, 32:19, 32:22, 47:11
**punishment** [2] - 159:19, 177:12
**purposes** [1] - 26:12
**pursuant** [4] - 1:20, 29:13, 135:3, 159:9
**push** [7] - 45:16, 48:22, 49:6, 51:23, 52:6, 54:15, 76:12
**pushed** [4] - 51:6, 59:2, 80:11, 92:23
**pushing** [7] - 66:15, 66:23, 68:17, 71:15, 73:10
**pussies** [2] - 92:9, 92:12
**put** [12] - 30:2, 62:24, 63:2, 73:25, 80:25, 85:16, 87:17, 88:13, 113:8, 118:14, 125:12, 131:14
**putting** [1] - 86:12

**Q**

**quarters** [1] - 6:9
**questioned** [2] - 113:13, 155:9
**questioning** [4] - 97:14, 128:10, 155:10, 155:13
**questions** [18] - 5:22, 6:5, 6:24, 46:22, 102:7, 105:17, 113:24, 114:13, 114:17, 123:2, 154:20, 154:22, 161:5, 161:12, 165:19, 166:25, 170:8, 174:5
**quick** [2] - 15:3, 15:4
**quickly** [5] - 13:2, 40:6, 40:20, 149:23, 160:16
**quite** [1] - 79:20
**quoting** [1] - 146:11

**R**

**Radar** [1] - 22:2
**radar** [1] - 22:7
**radio** [27] - 14:8, 28:25, 29:4, 33:20, 33:21, 33:25, 34:5, 34:19, 34:21, 36:10, 36:12, 38:17, 42:14, 42:15, 42:16, 42:19, 64:11, 64:16, 64:18, 106:4, 106:5, 109:19, 144:5, 169:14, 169:17, 169:19, 170:4
**raising** [1] - 171:2
**ran** [11] - 61:7, 62:24, 67:8, 67:9, 67:10, 67:11, 67:19, 67:24, 85:6, 85:8
**rank** [3] - 8:5, 8:8, 9:17
**ranking** [1] - 91:20
**rate** [2] - 39:6, 40:3
**rather** [3] - 13:2, 22:6, 77:23
**rattles** [1] - 7:4
**re** [1] - 11:2
**re-up** [1] - 11:2
**reach** [2] - 9:3, 163:14
**reached** [1] - 70:11
**reaching** [2] - 85:23, 86:2
**react** [1] - 78:12
**reactive** [1] - 150:23
**read** [5] - 15:6, 15:8, 132:20, 150:2, 175:8
**real** [1] - 15:4
**realize** [1] - 127:23
**realized** [1] - 98:21
**really** [4] - 45:8, 72:19, 72:20, 92:15
**REALTIME** [1] - 1:23
**rear** [4] - 44:25, 58:13, 66:8, 67:20
**reason** [2] - 15:15, 19:14
**reasonable** [2] - 29:21, 77:3
**receive** [3] - 22:9, 28:24, 31:3
**received** [14] - 12:11, 19:16, 19:18, 28:17, 28:20, 30:8, 30:10, 30:21, 97:8, 100:13, 101:3, 111:22, 156:3, 157:21
**receiving** [1] - 100:5
**recess** [4] - 15:5, 97:15, 136:18, 161:3
**recognize** [2] - 132:3, 132:5
**recollection** [4] - 27:20, 83:24, 84:2, 88:23
**record** [15] - 7:10, 7:16, 15:8, 26:15, 41:7, 132:20, 159:7, 159:8, 167:5, 170:15, 171:6, 173:11, 175:11, 175:12, 179:13
**recorded** [7] - 34:22, 34:25, 35:2, 35:3, 35:6, 35:9, 35:10
**recording** [1] - 113:25
**records** [7] - 29:14, 130:17, 130:21, 148:25, 176:8, 176:11, 176:15
**refer** [3] - 27:19, 129:5, 142:23
**reference** [12] - 115:22, 116:2, 116:5, 116:8, 116:12, 117:5, 117:13, 117:16, 138:14, 138:21, 144:16, 151:24
**referenced** [4] - 128:9, 135:11, 135:12, 138:10
**references** [2] - 138:15, 150:20
**referencing** [1] -

117:12
**referred** [3] - 118:16, 133:4, 165:23
**referring** [7] - 33:15, 71:11, 71:19, 78:16, 135:20, 139:22, 143:8
**refers** [1] - 129:4
**refresh** [2] - 27:20, 114:21
**refused** [1] - 53:4
**regard** [30] - 7:8, 72:16, 90:25, 92:16, 95:3, 95:5, 96:24, 97:3, 106:15, 111:2, 113:14, 116:13, 117:24, 118:24, 123:24, 124:23, 128:23, 129:11, 129:12, 129:15, 130:2, 131:4, 135:2, 141:19, 146:20, 166:13, 166:16, 167:11, 168:25, 172:18
**regarding** [3] - 27:5, 159:2, 161:19
**registration** [1] - 46:11
**regulations** [7] - 90:25, 91:25, 95:4, 95:5, 95:7, 139:14, 166:11
**reiterate** [2] - 103:15, 103:21
**relate** [3] - 22:5, 159:18, 177:11
**related** [2] - 20:14, 179:16
**relates** [1] - 6:3
**relating** [9] - 5:25, 41:15, 103:16, 130:17, 148:25, 158:23, 159:11, 176:11, 177:3
**relation** [2] - 36:21, 60:16
**relied** [2] - 114:19, 117:3
**relieve** [1] - 74:12
**rely** [3] - 114:17, 116:16, 116:25
**remain** [2] - 86:22, 109:2
**remember** [24] - 12:15, 12:16, 13:11, 14:13, 14:19, 14:24, 18:7, 36:11, 36:12, 45:13, 47:17, 56:6, 56:15, 90:5, 90:12, 93:23, 106:20, 107:5, 109:21, 117:22, 118:23, 126:14, 166:24, 167:3
**remembering** [1] - 78:14
**repeat** [1] - 6:12
**rephrase** [1] - 6:6
**Report** [15] - 25:13, 25:19, 26:16, 26:21, 126:4, 132:6, 145:2, 146:23, 147:4, 147:23, 148:2, 148:6, 149:15, 149:20, 178:7
**report** [49] - 25:16, 25:23, 27:5, 27:7, 27:17, 27:20, 47:8, 105:20, 110:13, 111:3, 111:7, 112:2, 112:9, 113:11, 114:25, 115:2, 115:4, 115:14, 118:9, 122:8, 122:16, 122:25, 127:7, 127:22, 129:4, 132:10, 133:4, 133:22, 133:23, 135:3, 135:18, 138:11, 138:23, 139:3, 139:4, 140:22, 141:2, 145:5, 147:16, 149:24, 155:4, 155:16, 155:20, 155:23, 156:23, 159:12, 160:21, 177:4
**Reporter** [1] - 1:21
**reporter** [3] - 6:11, 6:25, 113:20
**reporting** [2] - 159:12, 177:5
**Reporting** [1] - 110:19
**REPORTING** [1] - 1:23
**reports** [4] - 112:10, 137:19, 137:21, 138:15
**representatives** [1] - 5:20
**representing** [3] - 1:12, 5:18, 17:22
**reprimand** [10] - 155:21, 156:3, 156:7, 156:8, 156:18, 156:20, 159:19, 168:23, 177:12
**request** [5] - 7:14, 30:6, 51:24, 130:7, 159:10
**REQUEST** [2] - 176:7, 177:2
**requested** [1] - 161:10
**require** [4] - 95:7, 123:11, 123:17, 166:18
**required** [1] - 112:9
**requires** [1] - 145:11
**reserve** [2] - 136:13, 161:7
**reserved** [1] - 4:11
**resisting** [2] - 79:17, 87:15
**Resisting** [1] - 143:13
**respective** [1] - 4:4
**respiratory** [1] - 97:3
**respond** [7] - 6:15, 6:22, 6:23, 13:20, 13:22, 55:9, 160:20
**responding** [2] - 6:20, 171:5
**response** [7] - 7:9, 42:22, 44:3, 51:19, 97:8, 134:23, 134:25
**responsibilities** [1] - 11:12
**responsibility** [8] - 22:18, 36:3, 91:24, 93:3, 93:9, 93:12, 146:18, 173:17
**restraining** [1] - 143:12
**restricted** [1] - 55:19
**result** [7] - 8:11, 17:13, 17:18, 20:22, 20:24, 99:10, 155:15
**retained** [1] - 178:11
**return** [3] - 130:13, 130:21, 176:14
**returned** [1] - 105:2
**revealed** [1] - 158:4
**review** [3] - 115:16, 139:10, 139:12
**reviewed** [2] - 139:7, 139:9
**RICHARD** [2] - 1:6, 2:21
**right-hand** [3] - 26:17, 125:18, 129:15
**right-handed** [2] - 69:2, 69:3
**Rikers** [3] - 9:10, 19:6, 19:7
**Ripek** [1] - 16:16
**road** [8] - 12:23, 12:24, 13:2, 80:12, 80:13, 80:14, 92:23, 126:24
**Road** [5] - 2:13, 39:10, 40:6, 40:9, 40:19
**Robert** [7] - 38:4, 38:24, 39:7, 39:13, 39:16, 66:5, 126:7
**role** [2] - 23:3, 23:20
**room** [7] - 13:6, 95:21, 95:24, 108:17, 108:20, 108:22, 108:24
**route** [2] - 62:4, 62:21
**routine** [1] - 172:20
**RQ** [4] - 29:12, 130:16, 136:11, 159:9
**rQ** [1] - 134:15
**Rule** [2] - 29:13, 159:9
**rules** [4] - 139:13, 142:24, 159:3, 161:19
**run** [5] - 59:19, 67:12, 67:13, 67:15, 85:7
**rundown** [1] - 126:20
**running** [12] - 50:10, 51:4, 58:6, 59:14, 59:16, 60:5, 61:9, 65:2, 65:12, 65:14, 85:15, 87:11

**S**

**safety** [3] - 44:13, 44:22, 162:13
**Samples** [1] - 150:18
**Sansone** [1] - 110:25
**saw** [45] - 39:5, 42:3, 45:16, 45:22, 46:7, 46:8, 48:16, 56:24, 57:15, 58:5, 58:8, 58:14, 58:17, 58:18, 58:21, 58:22, 58:24, 59:2, 59:11, 59:12, 62:6, 62:8, 62:11, 64:14, 65:11, 82:11, 86:4, 87:22, 90:7, 92:7, 92:10, 93:4, 93:5, 107:16, 119:12, 120:8, 127:20, 134:10, 156:25, 165:2, 166:20, 167:9, 167:14, 169:8
**Scalp** [2] - 150:21, 150:22
**scalp** [2] - 150:25, 153:13
**scarring** [1] - 150:24
**scene** [17] - 27:12, 63:20, 91:21, 96:12, 102:4, 103:22, 126:10, 135:10, 146:9, 158:10, 158:19, 158:21, 162:5, 162:19, 164:8, 168:14, 171:17
**Scene** [3] - 134:12, 144:17, 176:22
**SCET** [1] - 22:22
**SCHOENFELD** [2] - 2:11
**School** [3] - 15:24, 21:25, 22:2
**school** [5] - 16:5, 16:7, 22:8, 96:17, 96:19
**Scimone** [55] - 3:8, 5:9, 5:14, 26:18, 26:20, 26:24, 112:14, 112:18, 112:20, 115:13, 115:19, 115:22, 116:3, 116:14, 117:2, 117:3, 117:5, 117:6, 117:10, 117:13, 117:14, 117:17, 119:2, 122:5, 122:13, 122:14, 122:15, 122:23, 122:25, 125:15, 125:20, 130:18, 131:17, 131:22, 136:2, 136:24, 137:16, 137:22, 138:14, 141:25, 142:8, 147:13, 147:18, 148:11, 148:15, 149:11, 149:20, 157:3, 157:7, 158:9, 159:25, 160:8, 160:12, 165:25, 169:2
**SCIMONE** [8] - 1:7, 1:20, 175:7, 175:16, 176:4, 177:22, 178:3, 179:10
**sealing** [1] - 4:5
**seasoned** [1] - 170:18
**seat** [1] - 57:16
**second** [10] - 49:19, 67:3, 96:8, 117:5, 119:3, 125:13, 131:15, 143:4, 152:11
**seconds** [2] - 86:21, 87:9
**section** [4] - 131:6, 139:25, 147:11, 147:20
**Section** [5] - 144:17, 144:20, 147:19, 147:22
**sector** [1] - 31:19
**Sector** [2] - 10:13, 13:3
**security** [1] - 100:7
**See** [1] - 137:18
**see** [37] - 33:11, 45:9, 45:14, 56:23, 57:15, 63:17, 72:17, 85:7, 94:3, 100:12, 101:8, 101:20,

108:13, 118:19, 119:22, 120:25, 121:8, 122:22, 129:14, 131:7, 134:3, 139:12, 140:2, 143:8, 145:4, 148:24, 150:18, 150:24, 151:6, 151:12, 151:18, 151:23, 155:19, 157:16, 158:23, 167:13, 169:8

**seeing** [1] - 151:4

**sees** [1] - 162:9

**semi** [1] - 61:22

**semi-circular** [1] - 61:22

**send** [6] - 163:11, 163:17, 164:7, 164:14, 166:17, 168:13

**sending** [1] - 156:5

**sent** [5] - 146:15, 163:12, 163:22, 165:2, 165:13

**separate** [3] - 35:18, 87:19, 135:17

**September** [2] - 8:10, 10:3

**Sergeant** [8] - 11:22, 11:24, 12:2, 12:18, 12:20, 22:17, 25:3, 161:17

**sergeant** [13] - 8:7, 8:9, 9:16, 12:22, 29:15, 91:5, 97:16, 125:22, 136:23, 142:11, 153:15, 171:7, 173:15

**sergeant's** [3] - 8:14, 8:18, 173:16

**sergeants** [2] - 22:22, 141:22

**serve** [2] - 18:20, 23:2

**served** [2] - 9:6, 24:6

**service** [2] - 12:4, 18:17

**services** [2] - 10:6, 11:18

**serving** [2] - 19:4, 44:22

**set** [5] - 135:17, 148:23, 171:10, 179:12, 179:21

**seven** [4] - 15:13, 15:16, 94:8, 94:12

**several** [2] - 78:15, 158:4

**SGT** [5] - 1:19, 175:7, 175:16, 176:4, 179:10

**Sgt** [4] - 3:8, 5:14, 136:2, 158:9

**sgt** [1] - 5:9

**shall** [4] - 4:11, 95:20, 145:10, 147:23

**Shit** [1] - 80:17

**Shore** [10] - 5:12, 10:13, 10:14, 13:4, 13:5, 39:10, 40:5, 40:9, 40:19, 100:21

**short** [2] - 49:13, 97:12

**shot** [1] - 82:8

**shots** [1] - 80:24

**shoulder** [11] - 42:7, 43:2, 44:6, 44:8, 60:24, 60:25, 65:24, 66:4, 66:16, 67:17, 87:24

**show** [5] - 139:21, 156:24, 157:2, 159:24, 160:11

**shrug** [1] - 7:2

**shut** [1] - 45:16

**side** [36] - 26:17, 44:14, 45:4, 45:5, 46:13, 46:15, 47:16, 50:21, 56:7, 58:12, 58:14, 60:20, 60:23, 60:24, 60:25, 61:6, 61:10, 61:11, 62:18, 66:2, 66:17, 66:19, 67:21, 67:23, 71:16, 71:17, 81:2, 82:3, 92:22, 120:17, 125:19, 151:2, 157:18, 162:13

**sideways** [2] - 72:8, 72:10

**signal** [3] - 40:3, 40:7, 40:21

**Signature** [3] - 110:19, 110:23, 132:18

**signature** [5] - 110:20, 110:22, 137:3, 149:17

**signatures** [2] - 157:17, 157:18

**Signed** [1] - 175:18

**signed** [5] - 4:15, 4:18, 114:4, 137:8, 157:17

**similar** [1] - 13:25

**single** [6] - 90:23, 112:15, 125:17, 131:19, 148:13, 157:11

**single-page** [3] - 112:15, 125:17, 131:19

**sitting** [3] - 60:12, 120:19, 121:14

**situation** [4] - 76:3, 89:16, 148:3, 154:7

**six** [11] - 10:19, 21:10, 78:4, 78:17, 80:10, 81:5, 81:14, 81:16, 94:12, 122:18, 166:9

**skin** [4] - 78:10, 152:9, 152:10, 152:11

**small** [4] - 23:8, 82:5, 82:6, 101:18

**smaller** [1] - 84:12

**Soft** [1] - 150:17

**software** [1] - 21:19

**solo** [5] - 90:22, 91:2, 124:2, 124:6, 124:21

**someone** [8] - 94:11, 95:25, 109:16, 113:7, 124:17, 126:22, 133:20, 164:17

**someplace** [1] - 169:9

**soon** [1] - 87:22

**Sorry** [1] - 139:25

**sorry** [2] - 65:10, 128:12

**sort** [1] - 78:6

**sought** [2] - 18:5, 21:2

**sound** [1] - 15:25

**sounded** [1] - 83:11

**South** [2] - 34:17, 34:24

**Southern** [5] - 33:12, 39:9, 40:2, 40:17, 66:4

**Southside** [7] - 97:21, 100:21, 100:22, 104:20, 105:2, 105:10, 109:8

**speaking** [6] - 43:17, 48:17, 51:10, 53:8, 57:19, 75:13

**special** [5] - 12:5, 12:12, 22:18, 22:19, 24:7

**specialty** [1] - 12:11

**specific** [11] - 23:11, 23:16, 27:23, 46:22, 56:17, 114:13, 114:16, 149:5, 155:2, 158:13, 172:3

**Specific** [5] - 131:8, 132:9, 132:13, 138:20, 139:18

**specifically** [18] - 43:25, 46:5, 47:17, 70:2, 74:20, 79:22, 84:20, 103:13, 103:18, 104:4, 107:5, 107:25, 109:21, 118:22, 123:3, 124:9, 159:17, 177:10

**speculation** [2] - 164:23, 165:9

**speed** [2] - 39:7, 40:4

**speeding** [2] - 14:5, 22:6

**spot** [1] - 13:2

**SPOTA** [1] - 1:10

**sprain** [1] - 99:8

**Sprained** [1] - 133:12

**sprained** [3] - 133:17, 133:21, 133:25

**spread** [1] - 71:22

**squarely** [2] - 6:13, 6:19

**ss** [2] - 175:4, 179:4

**stand** [2] - 53:16, 167:6

**standing** [13] - 47:23, 56:6, 56:9, 56:13, 57:9, 57:10, 60:16, 60:22, 62:5, 62:22, 67:2, 90:5, 90:11

**standpoint** [1] - 97:4

**stands** [1] - 13:14

**standup** [1] - 136:2

**start** [8] - 18:17, 48:22, 49:6, 51:23, 52:6, 65:12, 65:14, 120:23

**started** [9] - 30:16, 33:5, 33:7, 46:15, 56:8, 56:21, 64:25, 66:14, 90:6

**starting** [1] - 29:16

**starts** [1] - 142:6

**STATE** [2] - 175:4, 179:3

**State** [10] - 1:22, 20:18, 21:4, 33:12, 39:9, 40:2, 40:17, 66:5, 175:22, 179:8

**state** [1] - 5:8

**statement** [3] - 82:14, 113:19, 135:8

**Statement** [2] - 132:9, 132:13

**STATES** [1] - 1:2

**stationary** [2] - 19:7, 19:9

**status** [3] - 89:21, 111:13, 146:7

**stay** [1] - 80:13

**stayed** [1] - 129:18

**staying** [2] - 56:6, 80:14

**stenographer** [1] - 113:20

**Stenotype** [1] - 1:21

**step** [2] - 49:15, 52:3

**Step** [1] - 55:25

**stepped** [4] - 50:11, 50:12, 50:24, 56:3

**stepping** [1] - 52:7

**steps** [7] - 59:22, 60:6, 61:13, 62:12, 64:15, 65:15, 65:19

**still** [11] - 16:3, 50:9, 53:10, 73:16, 73:23, 73:24, 86:9, 92:8, 129:10, 161:7, 171:14

**Stinger** [1] - 101:18

**STIPULATED** [3] - 4:2, 4:8, 4:13

**stood** [1] - 171:12

**stop** [10] - 16:12, 40:12, 42:12, 43:24, 44:4, 47:13, 53:10, 54:5, 87:15, 169:22

**stopped** [7] - 42:6, 42:7, 42:9, 42:21, 44:5, 44:7, 52:12

**stops** [1] - 49:7

**straddling** [1] - 66:18

**straight** [1] - 16:13

**strain** [4] - 99:9, 99:10, 99:11, 172:6

**Street** [2] - 1:23, 22:23

**street** [2] - 23:19, 67:12

**stress** [3] - 163:4, 163:7, 164:11

**stretch** [2] - 97:13, 161:2

**strike** [7] - 81:11, 109:25, 119:13, 120:25, 121:9, 170:21, 171:2

**striking** [1] - 119:17

**struck** [15] - 58:25, 75:24, 76:16, 76:21, 81:23, 82:4, 83:4, 83:6, 84:17, 84:21, 89:2, 94:7, 94:23, 94:24, 122:17

**struggle** [8] - 92:22, 119:4, 120:4, 120:15, 120:16, 120:22, 120:23, 132:24

**study** [1] - 152:8

**subject** [7] - 5:24, 120:14, 120:21,

123:9, 123:13, 132:25, 161:20
**Subject** [1] - 142:5
**subjected** [2] - 143:11, 144:25
**subjects** [5] - 43:9, 159:15, 159:22, 177:8, 177:16
**submitted** [1] - 141:3
**submitting** [1] - 124:24
**subpoena** [1] - 29:23
**subscribed** [1] - 175:18
**substantiated** [1] - 159:4
**Sudden** [1] - 152:25
**suffered** [3] - 95:18, 130:3, 158:4
**SUFFOLK** [6] - 1:5, 1:10, 2:17, 175:5
**Suffolk** [18] - 1:12, 1:14, 5:11, 7:24, 8:2, 9:8, 9:14, 9:20, 10:7, 16:23, 18:6, 19:16, 19:19, 19:23, 95:4, 159:21, 164:2, 177:14
**Suite** [1] - 1:23
**summary** [1] - 129:3
**Sunrise** [2] - 36:21, 38:4
**superior** [1] - 141:21
**supervise** [1] - 23:22
**supervising** [1] - 166:18
**supervisor** [17] - 12:23, 22:19, 23:6, 23:20, 24:7, 98:24, 116:20, 146:9, 162:4, 162:5, 162:8, 163:11, 163:14, 164:4, 165:2, 165:11
**Supervisor** [1] - 13:19
**supervisor's** [1] - 164:7
**Supervisor's** [1] - 110:23
**supervisors** [2] - 162:6, 170:19
**Supplemental** [1] - 25:13
**supplemental** [2] - 105:19, 146:22
**supplementary** [22] - 27:5, 27:6, 110:13, 111:2, 112:2, 112:8, 113:10, 114:25, 115:2, 115:4, 115:14, 118:9, 129:4, 137:18, 137:21, 138:10, 138:15, 140:22, 141:2, 145:4, 147:16, 155:4
**Supplementary** [5] - 25:18, 26:15, 26:21, 145:2, 147:4
**supplied** [1] - 161:10
**supposed** [2] - 142:25, 147:13
**surface** [1] - 66:13
**surgeon** [3] - 130:11, 130:19, 130:23
**Surgeon** [2] - 176:12, 176:17
**Sustained** [1] - 140:19
**sustained** [2] - 141:10, 141:11
**switch** [1] - 34:17
**switched** [5] - 29:5, 33:19, 33:21, 33:24, 35:13
**sworn** [4] - 4:15, 4:18, 5:3, 179:12
**Syskrot** [1] - 1:21
**SYSKROT** [2] - 179:7, 179:25
**system** [1] - 97:3

**T**

**table** [1] - 77:2
**tactical** [1] - 12:13
**TALT** [1] - 1:8
**Talt** [13] - 3:6, 28:5, 28:25, 29:7, 30:9, 31:4, 33:3, 33:18, 35:17, 38:8, 38:16, 43:15, 63:17
**target** [1] - 23:13
**targeting** [2] - 23:11, 23:13
**tasks** [1] - 70:3
**taught** [1] - 11:15
**teaching** [1] - 11:12
**Team** [2] - 22:22, 22:23
**teams** [2] - 12:12, 23:8
**tearing** [1] - 88:23
**telephone** [9] - 28:17, 38:16, 41:2, 42:14, 125:10, 144:6, 169:21, 169:25, 170:4
**ten** [1] - 18:22
**terminology** [1] - 11:5
**terms** [3] - 33:8, 36:17, 161:18
**test** [1] - 18:8
**testified** [3] - 5:5, 151:3, 160:22
**testify** [1] - 150:6
**testimony** [5] - 63:24, 95:23, 175:9, 175:12, 179:14
**testing** [1] - 16:15
**tests** [2] - 130:22, 176:16
**THE** [2] - 25:22, 26:2
**therefore** [1] - 172:25
**thinking** [3] - 18:22, 62:23, 96:9
**Third** [10] - 5:12, 10:11, 11:23, 12:18, 34:8, 34:12, 34:15, 46:3, 102:25, 141:20
**third** [1] - 9:2
**thirteen** [1] - 9:24
**thirty** [3] - 86:20, 87:9, 109:6
**THOMAS** [1] - 1:10
**three** [17] - 8:3, 8:4, 8:19, 8:20, 8:23, 55:2, 70:6, 70:8, 70:9, 80:19, 80:23, 81:17, 81:24, 82:8, 82:15, 84:22, 122:19
**throughout** [2] - 152:9, 152:14
**throwing** [1] - 73:11
**thrown** [7] - 58:6, 58:9, 58:11, 58:21, 58:23, 58:25, 69:5
**thumb** [1] - 160:15
**tired** [1] - 92:21
**Tissue** [1] - 150:18
**TO** [2] - 14:20, 177:18
**today** [7] - 5:22, 105:20, 120:19, 121:14, 127:15, 139:5, 160:22
**together** [2] - 8:19, 88:13
**tone** [1] - 48:11
**took** [13] - 18:11, 21:7, 21:15, 37:3, 46:10, 61:12, 75:23, 88:7, 88:12, 91:3, 99:11, 104:16, 172:18
**top** [7] - 34:7, 70:23, 70:25, 71:6, 133:4, 137:6, 138:10
**Topic** [1] - 11:14
**torso** [1] - 153:19
**total** [1] - 81:10
**tour** [1] - 124:3
**toward** [5] - 55:18, 59:12, 60:6, 61:7, 67:11
**towards** [28] - 30:16, 33:5, 40:19, 48:20, 48:21, 58:6, 58:13, 59:14, 59:16, 59:24, 60:17, 60:19, 61:9, 62:2, 65:2, 65:12, 65:15, 65:23, 66:2, 66:9, 66:15, 66:24, 67:6, 67:16, 67:20, 70:24, 71:4, 73:11
**traction** [1] - 80:15
**Traffic** [1] - 131:12
**traffic** [28] - 36:20, 38:17, 40:8, 40:10, 40:13, 40:19, 41:7, 42:3, 49:7, 52:13, 53:10, 60:23, 61:4, 61:6, 62:19, 65:25, 66:4, 66:7, 66:11, 66:17, 66:18, 66:20, 66:24, 76:13, 92:23, 131:11
**trained** [1] - 10:23
**training** [9] - 12:10, 21:9, 21:11, 21:14, 21:16, 21:22, 22:14, 97:6, 97:7
**Training** [3] - 11:10, 12:15
**transcript** [5] - 14:18, 30:5, 30:7, 175:8, 175:10
**transferred** [7] - 10:19, 11:23, 12:6, 12:18, 13:10, 13:13, 13:18
**transmissions** [5] - 28:25, 34:22, 34:24, 64:16, 64:19
**transpired** [2] - 44:9, 105:13
**transport** [2] - 19:8, 123:24
**transported** [13] - 91:25, 92:5, 95:8, 95:20, 97:17, 99:18, 104:17, 123:9, 124:2, 124:5, 158:10, 158:18, 158:20
**transporting** [1] - 90:25
**trauma** [1] - 108:22
**traumatic** [1] - 96:21
**traveling** [4] - 28:15, 39:6, 39:7, 40:3
**treated** [7] - 98:7, 98:9, 99:24, 100:2, 105:9, 107:23, 108:20
**treating** [1] - 133:9
**treatment** [8] - 98:22, 100:5, 100:12, 145:12, 145:21, 145:25, 146:12, 158:11
**triage** [2] - 96:21, 100:14
**trial** [1] - 4:12
**tried** [1] - 39:17
**tripped** [2] - 65:22, 68:4
**trooper's** [1] - 18:7
**true** [3] - 175:11, 175:13, 179:13
**try** [7] - 7:15, 33:17, 48:7, 73:24, 75:25, 80:18, 93:15
**trying** [26] - 9:22, 35:20, 35:23, 35:24, 36:20, 43:23, 62:3, 66:20, 66:21, 71:14, 73:10, 73:20, 74:2, 74:19, 75:20, 76:12, 80:13, 81:15, 84:9, 86:9, 86:11, 90:14, 91:12, 92:20, 92:24, 119:10
**turn** [8] - 40:2, 40:7, 40:21, 143:3, 147:17, 150:9, 150:15, 152:20
**turned** [1] - 90:18
**twenty** [6] - 8:3, 8:4, 15:12, 15:13, 15:16
**twenty-seven** [2] - 15:13, 15:16
**twenty-three** [2] - 8:3, 8:4
**two** [27] - 21:23, 22:15, 40:8, 40:18, 54:25, 60:6, 61:13, 62:12, 64:15, 73:15, 80:19, 80:23, 81:17, 81:23, 82:8, 82:15, 84:21, 87:19, 88:13, 93:6, 99:11, 99:13, 99:14, 99:15, 122:19, 156:24
**two-and-a-half** [1] - 54:25
**type** [13] - 7:2, 10:6, 46:22, 54:5, 101:14, 101:16, 102:17, 102:22, 146:20, 149:3, 153:21, 156:7, 156:13
**typed** [1] - 111:3

**U**

**unaware** [1] - 123:25
**under** [13] - 27:9, 48:3, 48:5, 59:4, 59:6, 75:4, 75:6, 75:16,

79:14, 80:3, 135:25, 163:13, 175:9
understandable [1] - 6:7
understood [1] - 139:14
unidentified [1] - 1:12
uniform [1] - 28:12
uniformed [1] - 31:18
unit [8] - 10:8, 22:7, 22:11, 23:6, 28:14, 33:4, 124:3, 124:6
Unit [5] - 13:11, 14:12, 14:23, 24:8, 177:19
UNITED [1] - 1:2
units [4] - 12:5, 22:18, 22:20, 24:7
unknown [1] - 1:12
unlike [1] - 31:11
unresponsive [1] - 170:22
up [32] - 6:10, 11:2, 29:17, 37:23, 48:15, 48:16, 49:21, 56:11, 62:7, 64:21, 67:2, 67:22, 69:21, 85:15, 86:10, 86:11, 87:11, 87:20, 87:24, 90:5, 90:8, 93:4, 100:6, 100:8, 115:7, 118:4, 130:20, 131:8, 161:12, 171:12, 171:14, 176:13
upper [2] - 82:6, 153:24
upstairs [2] - 100:10, 106:20
utilized [1] - 109:25

V

vary [1] - 23:23
Vehicle [5] - 10:21, 11:10, 11:15, 12:7, 131:11
vehicle [14] - 30:19, 44:11, 44:15, 44:18, 45:2, 45:19, 46:12, 48:16, 50:25, 52:7, 59:25, 62:3, 67:12, 67:14
vehicle's [1] - 51:3
vehicles [1] - 22:6
verbal [4] - 156:18, 156:20, 156:21, 168:23
verbally [2] - 6:22, 6:24
Verizon [3] - 29:11, 29:24, 176:8
Veterans [1] - 2:19
VI [1] - 143:7
vicinity [1] - 36:6
video [3] - 40:23, 41:2, 113:25
violation [1] - 159:4
Violations [1] - 131:12
violations [1] - 38:17
violent [2] - 92:22, 132:24
visible [1] - 36:8
visits [2] - 130:18, 176:11
visually [1] - 167:13
VTL [1] - 131:11

W

waist [7] - 61:15, 61:17, 61:20, 61:22, 63:12, 65:21, 71:4
waiting [3] - 38:10, 47:24, 112:6
waived [1] - 4:7
walk [1] - 93:5
walked [7] - 46:13, 48:20, 50:16, 50:18, 54:21, 56:11, 171:12
walking [6] - 92:8, 166:21, 167:9, 167:15, 167:16, 172:22
Walt [1] - 2:13
wants [1] - 173:20
warrant [1] - 53:12
watch [1] - 53:16
watching [2] - 39:24, 45:4
weaponless [1] - 140:17
weapons [1] - 76:7
wearing [1] - 78:5
week [1] - 127:5
weeks [1] - 23:5
weight [3] - 73:25, 80:25, 86:12
West [15] - 13:4, 28:6, 29:8, 30:16, 31:7, 32:13, 32:24, 33:6, 33:7, 33:9, 35:14, 37:2, 41:11, 41:22, 49:11
westbound [3] - 33:13, 39:25, 40:18
whereabouts [1] - 47:8
WHEREOF [1] - 179:20
Whitman [1] - 2:13
whole [3] - 66:22, 78:19, 92:24
WILLIAM [1] - 1:8
wILLIAM [1] - 2:9
William [1] - 3:5
Williams [3] - 126:7, 126:9, 129:7
window [1] - 52:19
withdrawn [9] - 8:22, 24:5, 70:17, 87:7, 89:4, 131:5, 158:16, 166:15, 169:5
WITNESS [4] - 25:22, 26:2, 176:3, 179:20
witness [13] - 5:3, 26:14, 159:15, 159:22, 161:5, 161:8, 174:5, 176:9, 176:12, 177:8, 177:15, 179:11, 179:14
Women's [1] - 19:9
word [7] - 80:17, 81:18, 81:19, 81:20, 81:23, 84:16, 86:2
words [6] - 45:23, 53:21, 75:13, 79:2, 80:7, 135:22
worried [1] - 99:2
wound [2] - 67:22, 115:7
wrapping [1] - 61:21
wrist [20] - 75:24, 76:4, 76:17, 76:22, 78:3, 80:10, 81:5, 83:5, 99:4, 99:5, 104:7, 104:10, 132:23, 133:13, 133:17, 133:21, 133:25, 151:21, 151:25, 152:5
write [6] - 69:7, 110:12, 120:13, 123:8, 123:23, 155:4
writing [1] - 113:9
written [4] - 30:3, 122:20, 156:8, 156:18
wrote [1] - 132:21
www.realtimereporting.com [1] - 1:25

X

X'd [1] - 140:20

Y

year [5] - 13:11, 13:13, 14:15, 24:19, 45:18
years [13] - 8:3, 8:4, 9:24, 10:20, 11:19, 13:12, 14:14, 21:23, 22:15, 22:21, 168:15
yell [1] - 81:21
yelled [2] - 85:4, 86:7
yelling [2] - 75:15, 171:14
York [15] - 1:22, 1:24, 2:6, 2:14, 2:20, 5:13, 5:23, 17:3, 18:6, 18:11, 18:18, 20:18, 21:4, 175:22, 179:9
YORK [3] - 1:2, 175:4, 179:3
yourself [15] - 21:8, 36:9, 44:24, 52:18, 53:20, 63:25, 74:12, 76:18, 89:7, 90:9, 102:3, 114:9, 129:16, 146:3, 162:25
youth [1] - 14:4
Yvonne [1] - 149:18

Z

Zone [1] - 13:3

# EXHIBIT O

# GONZALEZ -V- COUNTY OF SUFFOLK

## WILLIAM JUDGE- 11/18/2010

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**REALTIME REPORTING, INC.**
**124 East Main Street**
**Suite 202**
**Babylon, New York 11702**
**Phone: (516) 938-4000**
**Fax: (631) 983-8938**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
PATRICIA GONZALEZ and JENNIFER GONZALEZ, individually and as co-administrators of the Estate of KENNY LAZO,
Plaintiffs,

- against -

COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity, POLICE OFFICER CHRISTOPHER TALT, in his individual and official capacity, POLICE OFFICER LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT ATTORNEY JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of the Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney),
Defendants.

Docket No.: CV09-1023(TCP)(ETB)
--------------------------------------------------x

100 Federal Plaza
Central Islip, New York

November 18, 2010
10:05 a.m.

Deposition of the Defendant, POLICE OFFICER WILLIAM JUDGE,, pursuant to Notice, before Florence Syskrot, a Notary Public of the State of New York.

REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702
516-938-4000

A P P E A R A N C E S:

LAW OFFICES OF FREDERICK K. BREWINGTON
Attorneys for Plaintiffs
556 Peninsula Boulevard
Hempstead, New York 11550
BY: FREDERICK K. BREWINGTON, ESQ.

CHRISTINE MALAFI, ESQ.
Suffolk County Attorney
Attorney for Defendants
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788-0099
BY: RICHARD T. DUNNE, ESQ.

ALSO PRESENT:
JAMES SCIMONE
CHRISTOPHER TALT
JOHN NEWTON

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

W I L L I A M J U D G E, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. BREWINGTON:

Q. Please state your name.
A. **William Judge.**
Q. What is your present address?
A. **Suffolk County Police Department, 30 Yaphank Avenue, Yaphank, New York 11980.**
Q. Mr. Judge, my name is Fred Brewington.
A. **Good morning.**
Q. Good morning. I'm the attorney for the Estate of Kenny Lazo through Patricia Gonzalez and Jennifer Gonzalez.

I am going to be asking you some questions today concerning the lawsuit, in which you are a defendant, that is now pending in the Eastern District of New York.

At any time if you don't understand the question as I pose it, let me know that. I will be happy to try and

Judge

rephrase it so that it is understandable. If you don't hear the question, even though we are rather close, I will try and speak up, or I will ask our court reporter, who is writing everything down, to repeat the question.

If you don't understand or you don't hear the question, it is important that you let me know that. Because I want to make sure that you have the question squarely before you before you respond. Alright?

**A. Thank you, Mr. Brewington. I understand.**

Q. You are welcome. Just as you did respond verbally to that inquiry, I'm going to ask you to respond verbally to each of the questions I pose, so that we don't have an interpretation by our court reporter as to what a shrug may mean, or a nod, or a gesture. If you could respond verbally, as you just did, I would appreciate that.

**A. Yes, sir, I will.**

Q. If at any point you need a break, you want to take a comfort break, or stretch your legs, or speak to your attorney who is

Judge

seated to your right, let know me that. We will take a break so that you have the opportunity.

The only request that I have is, if there is a question that's pending, we try and get an answer to the question so that there is a question and answer.

If we cannot do that, the attorneys will work that out. Is that alright?

**A. Yes, it is.**

Q. If at any point also, sir, that you have any other needs or have any requests, feel free to speak up. And I will be happy to accommodate that.

Let me just tell you, as we go through this deposition, I'm going to be asking some questions. I may be showing you some documents. Feel free to take your time and look at whatever documents that I place before you. Because questions may be coming regarding those documents. So I'm going to ask you to make sure that you had a chance TO review them. You may not read them

Judge

completely. But I may ask you questions as to particular portions of those documents. Alright?

**A. Yes, I understand.**

Q. Now, prior to coming here, sir, did you review any documents?

**A. Yes.**

Q. What did you review, please?

**A. I reviewed my Internal 42 it is called. It is a document that was written to our Internal Affairs.**

Q. The Internal 42, how many pages was that? Do you recall?

**A. One.**

Q. Other than the 42, did you review any other documents?

**A. I wrote what they call a supporting depo, supporting deposition.**

Q. When you say you wrote it, is that what somebody also reviewed?

**A. Yes, sir.**

Q. Any other documents that you reviewed in preparation for this deposition?

**A. Just went over our rules and**

Judge

**procedures. We call them R&Ps, rules and procedures.**

Q. Sir, with regard to the rules and procedures, did you review the entire rules and procedures and orders that come from the Commissioner, or just the rules and procedures -- or any particular rules and procedures?

**A. Did not read the entire rules and procedures. No.**

Q. Do you recall which particular rules and procedures you did review?

**A. Yes.**

Q. Which ones were they?

**A. The use of deadly physical force.**

Q. Any others?

**A. I believe there was one with equipment.**

Q. Any others that you recall?

**A. Not offhand.**

Q. Other than your Internal 42, supporting deposition, and the portions of the rules and procedures, any other documents that you reviewed prior to this deposition?

Judge

A. **There was one. I don't know the name of it.**

Q. Okay.

MR. DUNNE: It is the interrogatory responses (indicating).

Q. Those would the interrogatory responses that are referenced as being Defendant Judge's Interrogatory Responses?

A. **That's correct.**

Q. Sir, those documents -- just you can put it back in the folder, if you would like.

Those documents or those pages that were the interrogatory responses, you did not sign those; is that correct?

A. **Interrogatory? Which page were you referring to?**

Q. The one you just held up.

A. **I did not sign that, no.**

Q. Were you ever provided an opportunity to review them before they were signed?

A. **I reviewed them.**

Q. Before they were signed?

Judge

A. **Before they were signed, no.**

Q. At any point have you been asked to provide a verification?

THE WITNESS: Did I sign this?

MR. DUNNE: Yes.

By Counsel: There was a verification that they did sign. And it is a while ago.

Q. What date did you sign it?

MR. DUNNE: (Indicating.)

A. **January 14th of 2010.**

MR. BREWINGTON: For the record, let's mark this for identification as Plaintiffs' Exhibit Judge 1 for identification.

(Plaintiffs' Exhibit Judge 1, Defendant William Judge's Response To Interrogatories, marked for identification.)

Q. I am placing before you what we have marked today as Plaintiffs' Judge 1 for identification (handing).

Now, I'll just represent to you that this is the document that was provided to

Judge

us. And we don't have a verification.

MR. DUNNE: I must have sent the wrong copies out. I will correct that.

MR. BREWINGTON: Off the record.

(Discussion off the record.)

Q. Mr. Judge, thank you.

A. **You want this back, Mr. Brewington?**

Q. No. Hold onto it for a second.

Judge 1 that is before you, prior to preparation of or for this deposition, had you seen this document before?

A. **Had I seen this document before? Yes.**

Q. When was the first time that you saw it?

A. **I got it in the interoffice mail at work.**

Q. When was that, please?

A. **I would be lying to you if I told you a date. I don't know.**

Q. Can you give me an approximation?

A. **Last year.**

Q. Did you execute a verification,

Judge

if you know?

A. **Can you explain what you mean did I execute a verification?**

Q. Sure. The page that we were looking at that was attached, that came out of your blue folder that doesn't have a signature on it, my question is: Did you sign a verification in or about 2008 or --

MR. BREWINGTON: Withdrawn.

Q. -- in or about January of 2010, if you recall?

A. **I do not recall, Mr. Brewington.**

RQ MR. BREWINGTON: We will make a request for a copy of the full document with signatures and signed verification, if indeed it does exist.

MR. DUNNE: So noted.

Q. You can push that away.

A. **Do you want it back?**

Q. No. We will make a pile.

Any other documents that you recall reviewing prior to coming to this deposition today?

A. **No.**

Judge

Q. Did you review any photos?
A. **Yes.**
Q. Were those the photos that Mr. Dunne allowed me to take a look at a few minutes ago?
A. **That's correct.**
Q. Do you know when those photos were taken?
A. **No.**
Q. Do you know who took those photos?
A. **Personally, I don't know. I would assume it would be our Crime Scene.**
Q. Have you come to learn who took those photos?
A. **No.**
Q. When for the first time did you see those photos?
A. **Last year.**
Q. Under what circumstances did you come to see those photos last year?
A. **Grand Jury.**
**Mr. Brewington, do you know when Grand Jury was?**

Judge

Q. I will leave that to your memory.
A. **Because that is when it was.**
Q. At or about the time of the Grand Jury presentation is when you first saw the photos?
A. **That's correct.**
Q. You appeared before the Grand Jury; is that correct?
A. **Yes.**
Q. And testified?
A. **Yes.**
**October.**
Q. Whatever your memory is, we will go with that.
Tell me what your highest level of education is, please?
A. **Second year of college.**
Q. Where did you attend college?
A. **Gibbs in Melville. It was a computer technical school.**
Q. When you say second year of college, did you finish any portion of it, a degree?
A. **I did finish my degree prior to**

Judge

**two years. I was able to finish it earlier. I doubled up on my classes.**
Q. What degree did you earn?
A. **It is a Local Area Network, LAN, computers.**
Q. This LAN degree, is that an Associate's degree, a Bachelor's degree, or is it a certificate?
A. **It is a certificate with college credits.**
Q. In addition to earning the certificate and the college credits, have you earned any actual degree, that being a Bachelor's or an Associate's degree?
A. **No.**
Q. Other than your work at Gibbs, any other college work that you have done?
A. **Completing the Police Academy I received college credits.**
Q. Any other college work that you have done, other than receiving college credits from the Academy and your work at Gibbs?
A. **No.**

Judge

Q. When did you join the Suffolk County Police Department, please?
A. **2001.**
Q. Prior to becoming a police officer for the Suffolk County Police Department, had you done any police enforcement work prior to 2001?
A. **No.**
Q. Now, sir, other than your employment with the Suffolk County Police Department, please describe what other employment you are currently engaged in?
A. **Besides the Suffolk County Police Department?**
Q. Yes, sir.
A. **None.**
Q. During your stint with the Suffolk County Police Department, have you worked at any other jobs other than the Suffolk County Police Department?
A. **No.**
Q. Have you done any bartending work prior to coming to the Suffolk County Police Department?

Judge

A. **Prior to coming to the Suffolk County Police Department?**

Q. Yes, sir.

A. **Yes.**

Q. When was the last time you did bartending work?

A. **1998, '99.**

Q. Prior to becoming a Suffolk County Police Officer, can you please describe what your employment was just before you came to the Suffolk County Police Department? By whom and where were you employed?

A. **Pulver Dot Com.**

Q. Pulver Dot Com, what type of employer is that?

A. **That is the -- it is a computer company that I worked for.**

Q. How long did you work for Pulver?

A. **A year.**

Q. Prior to working at Pulver and/or at the same time as working at Pulver, did you have any other employment?

A. **Yes.**

Q. Where was that, please?

Judge

A. **It was a bar in East Meadow. And it was called -- I can't recall offhand. It will come back to me.**

Q. Made that big of an impression on you?

A. **Yeah. It has been that long ago.**

Q. How long ago was it, please?

A. **That was '97ish.**

Q. Did you work from '97ish to '98ish?

A. **Correctish.**

Q. Prior to working at the computer company and this establishment in East Meadow, were you employed?

A. **Sure. Yes.**

Q. Where did you work?

A. **It was in the City. And I was working at a bar called Naked Lunch. It is located on Thompson and Grand Street in Soho.**

Q. How long did you work at Naked Lunch?

A. **I would say two years.**

Q. During that time any other employment?

Judge

A. **Not that I remember.**

Q. Before Naked Lunch, any employment?

A. **I can't recall where I worked before that.**

Q. Prior to Gibbs, did you attend high school?

A. **Yes.**

Q. Where did you attend high school?

A. **St. John the Baptist.**

Q. Here on Long Island?

A. **West Islip.**

Q. That is Long Island.

What year did you graduate high school, please?

A. **1989.**

Q. Your joining the Suffolk County Police Department, was that as a result of you taking a competitive examination?

A. **Yes.**

Q. When did you first take an examination to become a Suffolk County police officer?

A. **May of 1999.**

Judge

Q. Prior to that time, had you taken any competitive examinations for any other police departments?

A. **Yes.**

Q. What other police departments, please?

A. **Florida, Las Vegas.**

Q. Any others?

A. **New York City.**

Q. When did you take the examinations? Let's start with Florida first, please.

A. **'94.**

Q. Let's stay with Florida for a second.

Did you pass that examination?

A. **Yes.**

Q. Were you called to work?

A. **Yes.**

Q. Did you work at all?

A. **No.**

Q. Why not?

A. **My wife didn't want to stay in Florida.**

Judge

Q. When did you take the test for Las Vegas?

**A. '98.**

Q. Did you pass that examination?

**A. Yes.**

Q. Were you called to work?

**A. No.**

Q. Were you interviewed?

**A. No.**

Q. Were you ever canvassed for that job?

**A. No.**

Q. New York City, when did you take that test?

**A. 1990.**

Q. Did you pass that exam?

**A. Yes.**

Q. Were you called to work?

**A. No.**

Q. Were you interviewed, that being going through the background interview?

**A. No, sir.**

Q. Were you reachable on the list?

**A. No. I think that is why I never**

Judge

**was contacted.**

Q. Do you have any military service, sir?

**A. I was in the United States Marine Corp.**

Q. When were you in the Marines?

**A. 1989.**

Q. For how long?

**A. Two months.**

Q. For that two-month stint --

MR. BREWINGTON: Withdrawn.

Q. Did you finish basic?

**A. No.**

Q. Why not?

**A. I injured my spinal chord.**

Q. Was there a discharge?

**A. Yes.**

Q. What was your discharge?

**A. COG, Convenience of the Government.**

Q. As a result of that, were you afforded any official military status, that being whether or not you retired, for any benefits, or otherwise?

Judge

**A. I waived my benefits. I didn't accept them.**

Q. The injury to the spine, to what degree was the injury, please?

**A. Spondylolisthesis.**

Q. What do you understand the injury to be?

**A. Fracture of the coccyx bone.**

Q. Was there any surgical intervention?

**A. No.**

Q. Following the fracture of the coccyx bone, did you have any residual problems or aftermath, concerns?

**A. Just pain.**

Q. Any other military service other than that two-month stint?

**A. No.**

Q. Sir, did you undertake and complete the normal course of study at the Suffolk County Police Academy?

**A. Yes.**

Q. How long were you in the Academy?

**A. Six months.**

Judge

Q. During that six months, did you take the normal courses, Penal Law, Physical Education, all the other courses that are part of the regular curriculum?

**A. Yes.**

Q. Did you take any training or courses outside the normal curriculum?

**A. No.**

Q. When you graduated --

MR. BREWINGTON: Withdrawn.

Q. Prior to your graduation, did you have to repeat any courses?

**A. I'm sorry. I couldn't hear you.**

Q. Sure. Prior to your graduation from the Academy, did you have to repeat any courses?

**A. No.**

Q. You graduated in or about 2001; is that correct?

**A. June 2001 to November of 2[illegible].**

Q. So, it was a little less than six months that you were in the Academy?

**A. It is considered six months.**

Q. When you graduated, were you

Judge

assigned to any field training?

A. **Yes.**

Q. Where were you first assigned to field training?

A. **Third Precinct. That is located in Bay Shore.**

Q. How long did you train there?

A. **Six weeks.**

Q. Were you assigned to a Field Training Officer?

A. **Several.**

Q. Do you recall their names?

A. **Joe Link.**

Q. Any others?

A. **Richard Schmidt.**

Q. Un hum. Any others that you recall?

A. **Jerry Linder.**

Q. Anyone else that you recall?

A. **No.**

Q. Did you successfully complete your field training?

A. **Yes.**

Q. After you did that, where were

Judge

you assigned?

A. **Permanent was in the Third Precinct.**

Q. As Patrol Officer?

A. **Correct.**

Q. Was that in a radio motor patrol or squad car?

A. **That is correct.**

Q. Did you ride one in a car or two?

A. **Initially it was one.**

Q. Did there come a time when you began to ride two in a car?

A. **Yes.**

Q. Was that a person with whom you were a regular partner?

A. **Yes.**

Q. Who was your regular partner at that time?

A. **Michael Ronca.**

Q. How long were you regular partners with Mr. Ronca?

A. **Two-and-a-half years.**

Q. What lead to him no longer being your partner?

Judge

A. **He went to the Police Academy**

Q. At the conclusion of your partnering with Mr. Ronca, did you have another partner that became your regular partner?

A. **Yes.**

Q. Who was that?

A. **Craig Capolino.**

Q. How long was Mr. Capolino your regular partner?

A. **Again, I think it was two-and-a-half years.**

Q. At the end of that two-and-a-half years, what lead to the partnership no longer being in existence?

A. **I was sent to an anti gang task force.**

Q. At that time did you remain a police officer?

A. **Yes.**

Q. As part of this anti gang task force, what was the name of it? Did it have a name?

A. **It was SCET, Street Crime**

Judge

**Enforcement Team.**

Q. How long did you serve in the SCET?

A. **Three months.**

Q. At the end of three months, where did you go?

A. **COPE.**

Q. How long were you on the COPE unit?

A. **Almost three years.**

Q. Just for the record, can you just tell us what COPE stand for?

A. **Community Oriented Police Enforcement.**

Q. While you were in SCET, did you have a regular partner?

A. **Yes.**

Q. Who was that?

A. **Randy Misa.**

Q. When you went to the COPE Unit for the approximately three years, did you have a regular partner there?

A. **Yes.**

Q. Who was that?

Judge

A. **Frances Rathgeber.**

Q. Did you remain in COPE? After three years --

A. **I'm sorry?**

Q. -- did you go to another unit?

A. **No, sir.**

Q. Are you still in COPE?

A. **No, sir.**

Q. When did you leave COPE?

A. **2009.**

Q. When you left in 2009, where did you go?

A. **The Emergency Service Section.**

Q. Was that as the rank of police officer?

A. **Yes.**

Q. You remain in the Emergency Service Section as a police officer? Is that your current assignment?

A. **Yes, it is.**

Q. You remain currently employed by the Suffolk County Police Department?

A. **Yes.**

Q. Do you have a partner in the ESS?

Judge

A. **Yes.**

Q. Who is that?

A. **Daniel Colondona.**

Q. What do you do? What is your job assignment in the ESS?

A. **We do heavy rescue.**

Q. After leaving the --

A. **I'm sorry, Mr. Brewington. We do other things. Do you want the whole --**

Q. Sure. Why don't you tell me the other things you do in the ESS?

A. **Heavy rescue, hazardous material, bomb tech, and special weapons and tactics.**

Q. After leaving the Academy following your passing the competitive examination, have you received any specialized training, other than your regular firearms qualification?

A. **After graduation from the Academy?**

Q. Yes, sir.

A. **Yes, I have.**

Q. What have you received?

A. **Officer Survival School.**

Judge

Q. Where was that held?

A. **At the Police Academy.**

Q. When did you receive that training, if you recall?

A. **'06.**

Q. That being 2006?

A. **I apologize. 2006.**

Q. I want to make sure I understand you.

Any other special training?

A. **Yes.**

Q. What else?

A. **Laser and radar enforcement. That was given by our Highway Patrol at the Police Academy.**

Q. Approximately when was that?

A. **2004.**

Q. Any other special training?

A. **Since I have been in the Emergency Services, quite a few.**

Q. Can you delineate any of those, please?

A. **Several hazardous materials schools and radiological detection scho[illegible]**

Judge

**heavy rescue training.**

Q. Anything else that you can recall?

A. **Special Weapons and Tactics School by the F.B.I.**

Q. Where was that conducted?

A. **Fort Lee.**

Q. When did you do the special tactics training?

A. **2009.**

Q. When did you receive the heavy rescue training?

A. **2009.**

Q. Any other special units that you have been assigned to other than ESS, SCET or COPE?

A. **Yes.**

Q. What other special units?

A. **Airport Operations.**

Q. When was that?

A. **2008.**

Q. Was that an ongoing assignment, or is it as needed?

A. **It is an ongoing assignment.**

Judge

Q. What do you do as your Airport Operations Unit?

A. **Are you familiar with the TSA?**

Q. Yes, sure I am. A lot of people are these days.

A. **We assist them.**

Q. So, you serve as a backup to them, or a coordinated -- or a unit that is coordinated with them?

A. **That's correct. We have a desk located right next to their area.**

Q. Is that your place of assignment currently?

A. **No, sir.**

Q. I would like to turn your attention to April 12, 2008. Are you able to go back to that date, sir?

A. **Yes, I am.**

Q. What was your assignment on that day, if you recall?

A. **I was assigned to a marked unit.**

Q. Was that a sector car?

A. **It is not a sector car. It looks just like a sector car. We don't have a**

Judge

**particular sector, per se.**

Q. What unit were you assigned to that? Do you recall?

A. **The physical number on the side of the car said COPE 37.**

Q. Were you working with anyone on that day?

A. **Yes, I was.**

Q. With whom were you working?

A. **Sgt. James Scimone.**

Q. Was Sgt. James Scimone a supervising officer for you on that day?

A. **Yes.**

Q. What was your assignment on that day?

A. **Routine patrol.**

Q. Now, Sgt. Scimone, do you know if on previous occasions prior to the occurrence on April 12, 2008, was Sgt. Scimone a supervising officer that conducted investigations into civilian complaints against you on prior occasions?

A. **I believe so.**

Q. Do you know how many he has

Judge

actually conducted?

A. **Personally on me, Mr. Brewington?**

Q. Yes, sir.

A. **I believe it was one.**

Q. Do you recall what that allegation was?

A. **I don't recall what the allegation was, no.**

Q. Do you recall anything about the complaint?

A. **Yes.**

Q. What do you recall?

A. **A large domestic dispute. I believe somebody was stabbed. And several officers were involved in trying to end the -- basically the fight that was going on between the family and another family due to a fight.**

Q. Do you recall anything about what the allegations were made against you?

A. **Me, personally, no.**

Q. In total do you know how many complaints you have received, that being civilian complaints first?

A. **No.**

Judge

MR. DUNNE: Just for the record, I know that the Federal stips apply. I object to this line of questioning. I'm just preserving that.

Officer Judge, answer the questions as best you can.

Q. Have you had more than one, as far as you recall?

A. **More than one what, sir?**

Q. Civil complaint?

A. **Civil complaint, yes.**

Q. Do you recall any of the facts of any of them?

A. **No.**

**Prior to the one that we just discussed?**

Q. Yes, sir.

A. **No.**

Q. Prior to or after.

A. **No, I'm not aware of.**

Q. Do you know in total how many you have been the subject of?

A. **I believe two.**

Q. Have you been the subject of any

Judge

Internal Affairs' investigations?

**A. Yes.**

Q. How many?

**A. Including this Lazo case?**

Q. Yes, sir.

**A. Two.**

Q. Do you recall what the allegations were or the basis for the investigation?

**A. Yes.**

Q. What were they, please?

**A. I had shot at a subject in a vehicle.**

Q. When was that, please?

**A. '07. 2007.**

Q. Where did that occur?

**A. Brentwood.**

Q. This vehicle that you shot at, was it as part of an apprehension?

**A. Yes.**

Q. Was the person apprehended?

**A. Yes.**

Q. Prosecuted?

**A. Yes.**

Judge

Q. Was anyone injured as a result of you shooting at a vehicle?

**A. No.**

Q. What was the result of the Internal Affairs' investigation, if you recall?

**A. Cleared.**

Q. Have you ever been found either responsible or had any claim or allegation coming from a civilian complaint, or Internal Affairs' complaint, or investigation where it has been substantiated against you?

**A. You mean found guilty?**

Q. I guess that is --

**A. No.**

Q. With regard to the civilian complaint that was involved in this large domestic dispute that you referred to, who was the investigating officer?

**A. I believe it was James Scimone.**

Q. With regard to the two Internal Affairs that you recall, you said that they were dealing with the Lazo case and then this was -- the other one was the shooting at the

Judge

vehicle in Brentwood; is that correct?

**A. That is correct.**

Q. Any others that you recall as yo[u] sit here today?

**A. No.**

Q. Going back to that particular day, that being the 12th of April of 2008, what was your tour, please?

**A. 4:00 p.m. to 12:00 midnight.**

Q. Were you asked to go to or assigned to any general geographic area for that time period?

**A. No.**

Q. Other than regular patrol, did you have any other assignment?

**A. That particular night?**

Q. That particular night.

**A. No.**

Q. Of course, other than answering, you know --

**A. I understand.**

Q. -- radio calls or assignments you would get through the night, did you come out of the house with any particular assignme[nt]?

Judge

**A. Not that evening, no.**

Q. By the house I'm referring to coming out of the station house or the squad.

**A. I understand.**

Q. I would like to turn your attention to at or about 8:00, 8:15 p.m. Where were you on that evening, if you recall?

**A. The approximate area --**

Q. Yes.

**A. -- was Central Islip.**

Q. Yes, sir.

In or about that time, did you receive --

MR. BREWINGTON: Withdrawn.

Q. In or about that time, did you hear or receive any radio transmissions?

**A. No.**

Q. Did you receive any requests that you participate in any activities by any oth[er] police officers?

**A. Yes.**

Q. How did that come about, please?

**A. Via the cellphone.**

Q. Did you receive a call?

Judge

A. **I did not, Mr. Brewington.**
Q. Did someone receive a phone call?
A. **Yes.**
Q. Who received the phone call?
A. **Sgt. Scimone.**
Q. Did you know or did you come to learn from whom he received the cellphone call?
A. **Yes.**
Q. From whom?
A. **From Detective Chris Talt.**
Q. Was there anything wrong with your radio at that time?
A. **No.**
Q. Did you have an operating communication device via radio or other electronic communication that was Department issued within the car?
A. **Other than the computer and our issued radios?**
Q. Yes, sir.
A. **No.**
Q. But you did have the computer, correct?

Judge

A. **Correct.**
Q. And you had the radios?
A. **Correct.**
Q. This cellphone, was this a Department issued cellphone?
A. **I don't know if Sgt. Scimone's cellphone was Department issued.**
Q. Do you have a cellphone that is issued by the Department?
A. **No.**
Q. Do you know if the Department issues cellphones to officers, including the sergeant?
A. **I have no idea.**
Q. As part of your normal procedure, is it normal to communicate with other officers and other cars within the precinct via cellphone as opposed to radio?
A. **Is it normal?**
Q. Is it your normal practice?
A. **Normal practice, sure.**
Q. Now, you are aware, sir, that the radio transmissions from car to car, and station to car, and even handheld units of

Judge

radio transmissions are recorded, are you aware of that?
A. **Yes, I am.**
Q. Are the cellphone transmissions recorded?
A. **No.**
Q. From whom did the sergeant, if you know, receive this cellphone transmission, please?
A. **I'm sorry, Mr. Brewington?**
Q. Was it Det. Talt that called the sergeant on the cellphone?
A. **Yes.**
Q. How do you know it was Det. Talt?
A. **I heard Sgt. Scimone say Chris.**
Q. That lead you to believe that it was Chris Talt?
A. **That's correct.**
Q. Did you hear any other part of that conversation?
A. **No.**
Q. Did you make any observations of Sgt. Scimone as he was having that telephone

Judge

conversation?
A. **No, Mr. Brewington. But I assumed that Chris was asking for an assistance.**
Q. What lead you to that assumption?
A. **Because we do that on a regular basis with our NESOT detectives.**
Q. What does NESOT stand for?
A. **That is a good question, Mr. Brewington. I'm going to take a guess.**
Q. I don't want you to guess.
A. **I don't know the exact.**
Q. Do you know or have a reasonable belief as to what at least some of those letters in that acronym stand for?
A. **Yes.**
Q. What is that?
A. **Narcotics.**
Q. At the time that you received this call, do you know when or about what time that was on that day?
A. **Approximately?**
Q. Yes.
A. **8:00 p.m., or maybe prior,**

Judge

Mr. Brewington, or within that time period.

Q. In or around 8:00?

A. **That's correct.**

Q. What did you do?

A. **I waited for Sgt. Scimone to get off the phone.**

Q. After he got off the phone -- were you rolling at that time?

A. **Yes, sir.**

Q. At the time that he got off the phone, what did you do?

A. **I asked, What's up?**

Q. What was your discussion between yourself and Sgt. Scimone at that time?

A. **Sgt. Scimone had instructed me to respond to a particular area of the Robert Moses Causeway and the Sunrise Highway.**

Q. When you say he instructed you to respond, did he say, I am instructing you to respond?

What did he say? What did you say to him?

A. **No. It was a very relaxed conversation. Billy --**

Judge

Q. Referring to you?

A. **Referring to me. -- start heading to that area that I had just described.**

Q. Did you do that?

A. **Of course.**

Q. With what haste did you make that move?

A. **I proceeded smartly. I was going probably about 70 miles an hour, to be honest.**

Q. Lights and siren?

A. **No.**

Q. Do you recall what route you took?

A. **Westbound Hecksher State, to Robert Moses southbound, to Route 27.**

Q. Did you have an idea as to what your exact designation was to be?

A. **Exact designation?**

Q. Yes.

A. **No, sir.**

Q. Did you have a general understanding as to where you would be ending up?

Judge

A. **No.**

Q. As you went to Route 27, what occurred?

A. **Mr. Brewington, can I back up for a minute?**

Q. Certainly.

A. **I switched our primary radio from the Third Precinct band (indicating). I'm pointing to this, being that this is the location of our radio inside the radio car. I'm driving.**

Q. Hold on for a second. You are pointing down and to your right as though you are dealing with the console between the seats?

A. **That's correct.**

Q. -- or console that is right on the floor?

A. **No, not on the floor.**

Q. It is between the seats?

A. **Correct.**

Q. You are driving, and to your right as the driver.

A. **I switched our primary radio fr**

Judge

**the Third Precinct Band.**

Q. To what?

A. **To the Detective Band.**

**When I say band, Mr. Brewington, I'm referring to a channel.**

Q. I understand that.

Does the Third Precinct normally run on more than one channel?

A. **No.**

Q. Is the channel on which the Third Precinct transmits, is that shared with any other precinct?

A. **No.**

Q. What channel does the Third Precinct transmit on normally?

A. **Third Band.**

Q. When you switched to the Detective Band, what channel did you switch to?

A. **It is actually called the Detective Band.**

Q. Why did you do that?

A. **To hear communications from our detectives to us.**

49

Judge

Q. Are those channels, as far as you know, recorded as well?

A. **Yes.**

RQ MR. BREWINGTON: At this time we will call for production of all radio runs and recordings on the Third Channel or band and the Detective Band or channel as it relates to this incident, starting on or about 7:00 p.m. of April 12, 2008, up to and including any final transmissions as they may exist concerning this matter on that subject day, including, but not limited to, any transmissions made from and/or to the precinct at the time of Mr. Lazo coming into the Third Precinct.

MR. DUNNE: Mr. Brewington, just to respond to that. We have provided those recordings on two separate occasions to Mr. Germano.

I believe in the first instance he indicated he had misplaced them in your office move. And I resent a copy to him.

50

Judge

You should have those. Double check.

If you don't, we will address it.

MR. BREWINGTON: I just want to be clear. I want to be comprehensive in making sure that we did ask for the Detective Band.

MR. DUNNE: That is included as well. And it is a much wider swathe of time than you asked for. There is probably an hour in front and an hour after.

MR. BREWINGTON: We will check that. Thank you.

Q. At the time that you switched, sir, did you hear any discussion on the Detective Band?

A. **Yes, I did.**

Q. What did you hear?

A. **I heard decisions between Det. Newton.**

Q. And?

A. **Det. Talt.**

Q. What did you hear them

51

Judge

discussing?

A. **That they were observing and following a vehicle.**

**Mr. Brewington, during their discussion it became apparent to me that they were in two separate vehicles. I'm referring to Det. Talt and Det. Newton.**

Q. What lead you to believe that?

A. **When they were talking to each other, they were in different locations.**

Q. You gave me kind of an overview of what you believe they were talking about.

Did you hear what they said to each other?

A. **I couldn't testify to it, no.**

Q. Have you heard those transmissions since that day?

A. **Yes.**

Q. When did you last hear these transmissions?

A. **Grand Jury.**

Q. Any other time?

A. **No.**

Q. As you listened to these

52

Judge

transmissions, what did you do?

A. **Proceeded. We were in -- quite a distance away, Mr. Brewington. We were actually just passing the courthouse in Central Islip en route to that location.**

Q. Did you get to the location?

A. **Yes.**

Q. What was the location that you arrived at?

A. **It was pretty confusing at first. The location kept changing.**

Q. Okay.

A. **So it was difficult for me to lock in on a particular or exact location.**

Q. What made it difficult for you to lock in to a particular location?

A. **The vehicle which they were following or observing was making different turns or several turns.**

Q. Were you listening to them transmit the location of this vehicle?

A. **Yes.**

Q. Then what did you do?

A. **I actually was going through the**

Judge

**cloverleaf quite a few times. I was at the cloverleaf of the Robert Moses and Sunrise Highway.**

Q. Approximately how long were you in that -- moving around the cloverleaf?

A. **Minutes, Mr. Brewington.**

Q. Okay.

A. **It had constantly changed. The reason being was, with the cloverleaf, I wasn't too sure if the vehicle was continuing westbound on Sunrise, or if it was going to go north or south on Robert Moses.**

**So it actually came to a point where I just pulled my vehicle over on the cloverleaf and positioned it so that if the vehicle was to continue to go westbound on the Sunrise, I could just go right on the Sunrise Highway, or if it was to go on north or south Robert Moses, I could just get right onto the Robert Moses and go north or south.**

**So I literally just pulled the vehicle onto the grass in the center of the cloverleaf.**

Q. Was Sgt. Scimone still with you?

Judge

A. **Yes.**

Q. Did you speak to him during the time that you were listening to these transmissions and driving?

A. **Yes.**

Q. Do you recall what your conversation was between -- with him at that time?

A. **Basically it was direction of which way to go. We were discussing, I think he is going westbound, or maybe they are going northbound or southbound.**

**It came to a point where we just pulled the vehicle over, like I said, in the cloverleaf.**

Q. After you pulled the vehicle over, what next happened?

A. **We heard --**

MR. DUNNE: I am assuming that you are discussing the sector car being pulled over in the cloverleaf?

MR. BREWINGTON: That is where I am in the time period, yes.

A. **I'm sorry, Mr. Brewington. Can**

Judge

**you repeat the question?**

Q. What next happened?

A. **In the cloverleaf then we heard Det. Newton give the direction in which the vehicle was fleeing.**

Q. What did he say?

A. **It was going onto the Southern State Parkway from the Robert Moses.**

Q. At that time did you receive any more specifics as to why your assist was being requested?

A. **Did I receive? No.**

Q. So, other than the cellphone call that had come into Sgt. Scimone, you had not actually received any more details as to why you were being asked to assist?

A. **I did not, Mr. Brewington.**

Q. Were you apprised at that time as to why you were being asked to assist?

A. **To pull the vehicle over.**

Q. After you heard the transmission as to where the vehicle was going, what did you do?

A. **Obviously they gave a descripti**

Judge

**of the vehicle.**

Q. What did they describe the vehicle to be?

A. **A late model Cadillac, four-door.**

Q. Then what happened?

A. **He gave the registration of the vehicle.**

Q. He being who?

A. **Det. Newton.**

Q. Anything else at that time?

A. **Besides direction, description, reg, no.**

Q. What did you do?

A. **We got onto the Robert Moses. Det. Newton had said the vehicle seemed as if it was going westbound on the Southern State Parkway.**

Q. Okay. So you got onto the Robert Moses. What did you find after you got onto the Robert Moses?

A. **I was almost directly behind Det. Newton.**

Q. So you pulled in behind him?

A. **Approximately. Maybe he was one**

Judge

car ahead of me.

Q. After you took up that position, what is the next thing that you did?

A. **Det. Newton had said it was the vehicle with the signal on.**

Q. So he identified the vehicle to you?

A. **Correct.**

Q. Via radio?

A. **Yes.**

Q. This is still on the Detective Band, correct?

A. **That's correct.**

Q. After this identification, that being the car with the signal on, what did you do?

A. **Det. Newton had said he is going westbound. It seemed he was going westbound on the Southern State Parkway. And then the vehicle went from the left lane immediately to the right lane, and headed towards the Bay Shore Road exit.**

Q. Then what did you do?

A. **Det. -- excuse me. Sgt. Scimone**

Judge

**said to Det. Newton, Do you want us to take him? Referring to, do you want us to do a vehicle and traffic stop on the vehicle? And we did so.**

Q. At that time when Sgt. Scimone asked if you want us to take him, what was your understanding as to why that request was being made?

A. **My understanding was that we were there to identify the operator of the vehicle.**

Q. What next happened?

A. **I performed a vehicle and traffic stop using my overhead takedown lights.**

Q. What was the violation or the VTL at that time?

A. **Speeding.**

Q. What was the speed?

A. **Approximately 65.**

Q. Was that by estimate or radar?

A. **Visual speed estimate.**

Q. What happened then?

A. **Pulled the vehicle over at the split on Bay Shore Road and the Southern State Parkway.**

Judge

Q. After you did your overhead, how long was it until the vehicle pulled over?

A. **Immediately.**

Q. Then what happened?

A. **The vehicle pulled over to the shoulder of the roadway.**

Q. What was the flow of traffic at that time?

A. **Moderate.**

Q. Then after the vehicle pulled over, what next happened?

A. **The first thing I immediately observed, that the vehicle did not pull over far off of the shoulder of the roadway. So I actually parked my car at an angle, a bit askew so that I can have a lane of safety to approach the vehicle.**

**Does that make sense?**

Q. Sure.

A. **So the way the vehicle pulled over, it did not give me much room from the actual roadway to interview the driver, the operator of the vehicle.**

Q. When you say it didn't give you a

Judge

lot of room, it didn't pull up far onto the grass?

A. **Correct.**

Q. It was closer to the roadside, but still pulled over?

A. **Oh, yeah.**

Q. At that point the vehicle had still obeyed your commands?

A. **Correct.**

Q. What happened next?

A. **Prior to exiting the vehicle, I told Sgt. Scimone, I said, I will be contact. And we are pulling him over for speeding. I exited my vehicle. And I approached the driver.**

Q. Now, when you said, I'll be contact. We are pulling him over for speeding, why did you tell Sgt. Scimone that?

A. **That I would be contact, and he would be cover.**

Q. We are pulling him over for speeding, why did you tell him that?

A. **To be on the same page.**

Q. Then what happened?

Judge

A. **I approached the driver of the vehicle.**
Q. From the driver's side?
A. **Correct.**
Q. Then what happened?
A. **I introduced myself, as I always do. I said, Good evening. I'm Officer Judge from the Third Precinct. The reason that I pulled you over is that I paced you doing 65 in a 55 mile an hour zone. Do you have a justifiable reason for doing so? If not, I need to see your driver's license.**
Q. And what was the response?
A. **He apologized.**
Q. When you say he apologized, what did he say?
A. **I apologize.**
Q. What next happened?
A. **He produced a New York State permit, learner's permit.**
Q. Then what happened?
A. **I asked him if he had a valid driver's license.**
Q. Then what happened?

Judge

A. **He said, Yes, I do. He was just waiting for the physical driver's license to come in the mail.**
**He had just got done paying a bunch of tickets. And the learner's card was the only thing he had for identification.**
Q. What did you do at that time?
A. **I said, You do have a valid driver's license?**
**He said, Yes, sir. I said, Okay. I said, Can you shut the vehicle off for my safety and yours?**
Q. What did he do?
A. **He pressed a button that was on the dashboard of the vehicle, and that actually shut the vehicle off.**
Q. At the time that this person produced a New York State learner's permit, did you learn the identity of this person?
A. **Yes.**
Q. What was the identity of this person?
A. **Kenny Lazo.**
Q. Did you know that name prior to

Judge

that day?
A. **No.**
Q. Had you been told the name of Kenny Lazo either through secondhand information from the phone call or via the radio runs?
A. **No.**
Q. Now, at the time that you saw Mr. Lazo, what was his physical condition? Were you able to ascertain looking in the car?
Did he appear to have any scrapes, or bumps, or bruises, or anything on his face or head?
A. **No.**
Q. What happened next?
A. **I asked him to shut the vehicle off. He pressed the button.**
Q. I'm sorry. I want to go back for a second.
Did he have any apparent scrapes, bumps, bruises or lacerations on his face, or his head, or any portions of the body that you could see from your vantage point?
A. **No.**

Judge

Q. After he pushed the button and the car went off, what next happened?
A. **I said, What was that? He said -- referring to pushing the button --**
Q. Yes.
A. **-- he said, That is the ignition. I said, I never seen that before. I said, Start the car. And he pushes the button again, and the vehicle starts.**
Q. Okay.
A. **So, I said, Okay. Can you shut it off again for me? So then he shut it off again, terminating the vehicle. Okay?**
Q. Stopping the engine?
A. **Correct.**
Q. Okay. What happened next?
A. **I had never seen that before in a vehicle. And I said, How are you able to do that?**
**He said, I have the key in my pocket. And it sends a signal to the dash. I said, Okay.**
**With that I took the permit.**
Q. Okay. Then what happened?

A. **I walked back to my radio car.**
**As I'm walking back to the car, Sgt. Scimone comes over to the driver's side.**
Q. Driver's side of?
A. **Of the Cadillac.**
Q. Of the Cadillac?
A. **I tell Sgt. Scimone that I'm going back to the PD. I'm going back to the car to run the license and the registration on the vehicle.**
Q. Okay. What did Sgt. Scimone say?
A. **He comes to contact on the driver's side of the Cadillac. And I tell him about the push button --**
Q. Okay.
A. **-- on the dash.**
Q. All right. What did he say?
A. **He said, Okay.**
Q. All right. Then what did you do?
A. **I went back to the vehicle -- my vehicle, the police car.**
Q. When you went back to the vehicle, what transpired?
A. **I ran the data based on the**

**license.**
Q. You did that through the computer in your car?
A. **That's correct.**
Q. What was the outcome of your running the data?
A. **I don't know if I ran the data as far as his name, or if I put his identification number from his -- the State identification number on the card. I don't remember which one I did.**
**But once I did that, his -- a short abstract of his driver's license came up on the screen.**
Q. Did you view that abstract?
A. **Yes.**
Q. When you viewed the abstract, what did you see?
A. **That his license, the status was valid.**
Q. What did you do then?
A. **At that time I was in radio communication with Det. Talt.**
Q. Through the radio in the car?

A. **Correct.**
Q. What occurred with regard to that radio communication?
A. **He asked me the name of the operator of the vehicle.**
Q. So, at that time he did not know the operator based on that question; is that correct?
A. **Correct.**
Q. What did you tell him?
A. **Kenny Lazo.**
Q. Was there any further conversation at that time?
A. **He asked me to call him on his cellphone, referring to Det. Talt.**
Q. You were already talking to him via radio at that time, correct?
A. **Correct.**
Q. He wanted you to get off the radio and call him on the cellphone; is that correct?
A. **Right.**
Q. Is that normally done?
A. **It is.**

Q. To get off the radio and call on the cellphone?
A. **It is called, actually, officer safety. Because Sgt. Scimone was on the same radio band as the detectives. We didn't want the operator of the vehicle to know that we were talking, referring to him. It is an officer safety issue.**
Q. You were in your car, correct?
A. **Correct.**
Q. So the operator of the vehicle was in front of you with Sgt. Scimone outside his window, correct?
A. **Correct.**
Q. On the contact side?
A. **Yes.**
Q. Correct? And you were talking to Det. Talt by radio?
A. **Correct.**
Q. Where was Det. Talt?
A. **In his car. I have no idea where he was.**
Q. What was your reason for going from the radio to the telephone?

Judge

**A. Jimmy Scimone on his portable radio, Sgt. Scimone, was on the same band as we were.**

Q. He had switched to the Detective Band as well?

**A. Sure.**

Q. Sgt. Scimone on his radio could turn the volume down on his radio, correct?

**A. Correct.**

Q. He could switch the band on the radio if he so chose, correct?

**A. Sure.**

Q. In doing so, he wouldn't be in contact with you or Det. Talt on his radio if he turned it down, right, he wouldn't be able to hear that conversation?

**A. Understood.**

Q. When you got on the cellphone with Det. Talt, Sgt. Scimone couldn't hear that conversation either, right?

**A. Correct.**

Q. So, Sgt. Scimone would have been out of the loop if he turned his radio down or off, which he shouldn't shut it off, which he

Judge

shouldn't turn it off?

**A. Shouldn't turn it down either.**

Q. In this situation you went to a telephone from a recorded transmission to a non-recorded transmission, right?

**A. Correct.**

Q. When you went to the non-recorded transmission on cellphone, that was something that Sgt. Scimone couldn't hear, correct?

**A. Right.**

**Mr. Brewington, may I answer your question, please?**

Q. I think you did.

So, when you went to the cellphone, could you just tell us, sir, did you anticipate that that cellphone conversation would be recorded?

**A. No.**

Q. What was said on the cellphone conversation?

**A. Chris, Det. Talt, asked me if he had a valid driver's license and if he had any warrants.**

Q. What did you tell him?

Judge

**A. I said no.**

Q. So no as to both questions?

**A. No as to no warrants.**

Q. And yes as to a valid driver's license?

**A. That's correct.**

Q. So at that time you have a traffic stop with a possible -- or based on your pacing, a speed violation?

**A. Right.**

**Mr. Brewington, with all due respect, you are not letting me finish answering the questions.**

Q. I think you have answered my questions.

**A. I don't feel comfortable with the answer. I don't feel that, like, I answered it fully. You didn't let me finish my answer.**

Q. What answer didn't you finish?

**A. The reason why we don't have Jimmy Scimone lower his radio down, the volume, is for several reasons. There are other detectives that are on the band. If there was somebody else in the area asking for**

Judge

**help, Jimmy won't hear.**

**It is officer safety wise. If I need to get something to Sgt. Scimone, he will not hear it.**

**Also, if Mr. Lazo, or anybody else in that vehicle, hears a transmission come over the radio, it is also a safety issue, Mr. Brewington.**

Q. With regard to the safety issue, the safety issue exists whether or not it is your phone call, or whether or not it is your radio transmission or anyone else's radio transmission, right?

**A. I understand.**

Q. You agree?

**A. I do.**

Q. Now, that you have finished that answer, what happened after you told him that there were no warrants and there was a valid license?

**A. He said he just saw that vehicle do a hand to hand in West Islip.**

Q. He said he saw the vehicle do a hand to hand?

Judge

A. **The person in the vehicle do a hand to hand.**

Q. Did he say the person or the vehicle?

A. **The person.**

Q. Was he able to give you a description of the person?

A. **No.**

Q. Did you ever get a description of the person?

A. **No.**

RL Q. Did you ever ask for a description of the person?

MO A. No.

I was confident that the vehicle that we had pulled over with the registration that they gave over the radio was in fact the vehicle that we had in front of us.

MR. BREWINGTON: Note for the record, I move to strike that portion of the answer which is unresponsive to the question that was asked.

Mark it for a ruling.

Q. My question to you, sir: At the

Judge

time that you got this statement that there was -- that he saw this person do a hand to hand, you had no description of the person, correct?

A. **Correct.**

Q. Then what did you do?

A. **At that time Det. Talt -- I beg your pardon, Det. Newton had pulled up to the passenger side of my vehicle. He was operating an unmarked Ford Explorer.**

Q. Did you have any conversation with Det. Newton at that time?

A. **Yes, I did.**

Q. Was he speaking to you from his car, or did he get out and come to your window?

A. **No. He got out of his vehicle, approached my vehicle from the passenger side. And I rolled my window down from the passenger side. I had just hung up the phone with Det. Talt. I looked over to my right side and saw Det. Newton. I showed him the driver's license of the operator.**

Q. The permit?

Judge

A. **The permit.**

Q. Yes, sir.

A. **Of the operator.**

**And Det. Newton had asked me the similar questions, Does he have a valid driver's license? And does he have any warrants?**

**I said, No. He said, We just saw him do a deal down in West Islip.**

Q. Alright.

MR. DUNNE: Do you want to take a break here?

MR. BREWINGTON: Let's take a break.

(Recess taken.)

MR. BREWINGTON: Read back the last question and answer.

(Record read.)

Q. Going back on the record, sir, with regard to your conversations with Det. Newton, at the time that you had this conversation with Det. Newton, are you still seated in your car?

A. **Yes.**

Judge

Q. Are you still seated in the driver's side of your car?

A. **Correct.**

Q. At that point are you able to see Sgt. Scimone?

A. **Yes.**

Q. You have visual contact with your supervisor who was riding with you on that day, right?

A. **Correct.**

Q. When Officer Newton --

A. **Det. Newton.**

Q. Excuse me. When Det. Newton came to your window, did he remain on the passenger side, or did he change positions at any point while you remained in the car?

A. **He stayed on the passenger side of my vehicle.**

**There did come a time where he left and went up to the vehicle that was in front of me with Sgt. Scimone.**

Q. At the time that he left the passenger side of your vehicle, did you remain in your vehicle?

A. **Yes.**
Q. When you remained in your vehicle from the time that he came on the scene and came to your passenger window until the time he left your passenger window, did you make any radio transmissions?
A. **No.**
Q. At the time that he left the side, the passenger side of your car going towards where Sgt. Scimone was, did you make any radio transmissions at that point?
A. **No.**
Q. What next happened?
A. **Right before Det. Newton had gone up, he had asked if I ran the registration on the vehicle. I said, No. I'm going to do it right now. At that time, when he left, I stayed in the car to run the registration on the computer on the vehicle.**
Q. Did you do that?
A. **Yes.**
Q. You did that by entering that into the computer that was on the console on the side there?

A. **Yes.**
Q. Did you get a hit back on that? Or did you get a response to your inquiry?
A. **Yes.**
Q. What was the response?
A. **I don't recall who the registered owner of the vehicle was.**
**I do know that it was not Kenny Lazo.**
Q. Was it a valid registration?
A. **Yes.**
Q. So with regard to the registration, was there any indication of anything improper or wrong at that time concerning the registration?
A. **No.**
Q. What happened next?
A. **Det. Newton went up to Sgt. Scimone.**
**I continued running the data on the registration of the vehicle.**
Q. Right.
A. **I took my -- so, I'm taking my hands to my right, referring to using the**

**keyboard on the laptop (indicating).**
Q. Okay.
A. **I just got done putting the registration in for the vehicle. I look up like this (indicating), referring to the front of my vehicle. And I see Det. Newton, Sgt. Scimone. And they have Kenny Lazo walking out of the vehicle, exiting the vehicle in front.**
Q. Just so that we are clear. At this point, the basis for the stop was the traffic stop essentially initially; is that correct?
A. **The speed, yes.**
Q. At this point you have already related to Det. Talt and Det. Newton that there is a valid driver's license, correct?
A. **Yes.**
Q. And no warrants?
A. **Correct.**
Q. So, they have Mr. Lazo out of the car?
A. **Correct.**
Q. Based on what you can see?
A. **Yes.**

Q. Had there been anything going over the radio between the time that you began to run the registration until the time that you looked up and saw Mr. Lazo outside the car?
A. **Any radio transmissions?**
Q. Yes, sir.
A. **No.**
Q. Had you received any phone calls on your cellphone?
A. **Other than the first one I had testified to earlier?**
Q. Yes.
A. **No.**
Q. So, when you looked up as you were working with your computer, what next happened?
A. **I exited my vehicle.**
Q. Did you finish your computer transmissions and/or inquiries?
A. **Yes.**
Q. By that time you also knew that the registration was solid? There was a valid registration?

Judge

A. **The registration was valid.**

Q. When you exited the vehicle, did you transmit that information in any form or fashion verbally or electronically to Det. Newton and Sgt. Scimone?

A. **No.**

Q. What next happened?

A. **I walked up to the Cadillac in front of me. Det. Newton had Kenny Lazo on the passenger side rear outside of the vehicle.**

**I had walked up. And I was basically at the trunk area of the Cadillac. There was a conversation going on between Det. Newton and Kenny Lazo.**

Q. Did you hear that conversation?

A. **I didn't hear what Det. Newton was saying. But I was listening to Kenny Lazo's response to the questions.**

Q. What did you hear Mr. Lazo say, if anything?

A. **Just -- he just kept saying no, sir, yes, sir, no, sir, yes, sir.**

Q. So, what you would consider in

Judge

normal parlance he was being responsive to questions in a respectful manner at that time?

A. **It had struck me odd that he was so militant in his responses to yes, sir and no, sir at that time.**

Q. I didn't ask you what your thoughts were.

A. **I didn't tell you what my thoughts were.**

Q. You said it struck you. I just want to be clear.

MR. BREWINGTON: Can I have my last question read back, please.

(Record read.)

Q. Yes or no?

A. **Yes.**

Q. As he responded in that way, did you make observations of him?

A. **Yes.**

Q. What was he doing as he was responding?

A. **He was -- he seemed very uncomfortable with his body language.**

Q. Can you tell me what you saw,

Judge

instead of the conclusion?

I understand that that is your conclusion.

A. **I don't think you are -- I'm trying to explain to you with the utmost respect. And you keep interrupting me.**

Q. I'm interrupting you because you didn't answer my question. I'll ask it again.

A. **I'm getting to the question. Can you repeat it now again?**

Q. Sure. As you were there, what did you observe him do?

A. **My observation was that he was becoming very uncomfortable while answering these questions. He was rocking back and forth in a manner of uncomfort.**

**And I had asked Mr. Lazo, I said, Were you in the military?**

**He said, No, sir. I said, So you are not a veteran? He said, No, sir.**

**I said, Have you ever been arrested? He said, No, sir. Why, sir?**

**I said, I'm just asking you. I said, Because we just had a casual**

Judge

**conversation and now you just seem to be uncomfortable.**

**He goes, Sir, I am a church going man. I said, I am too. I said, But you just seem to be uncomfortable. I said, We are the police. That was the conversation I had with him.**

Q. With regard to your asking him if he has ever been arrested before, had you run his name on the computer at that time?

A. **It was an abstract. The criminal history does not come up.**

Q. Did you run his name on the computer for any criminal history?

A. **No.**

Q. You just run a vehicle, traffic, Department of Motor Vehicles' abstract?

A. **Correct.**

Q. At the time that he responded in this fashion, no, sir, yes, sir in response to your questions, did you have any further conversation, other than what you have testified to already?

A. **With Mr. Lazo, no.**

Judge

Q. At the time was he standing, was he leaning, was he seated, as you had that conversation with him?

A. **He was standing. But like I said, he was rocking back and forth while he was standing. He was looking around like this (indicating). It was very obvious he was becoming uncomfortable with the conversation.**

Q. When you say it was obvious, that was your take on it; is that correct?

A. **Correct.**

Q. What next happened?

A. **Lazo had turned towards his vehicle. He was originally facing Det. Newton.**

Q. Mr. Lazo?

A. **I'm sorry?**

Q. Mr. Lazo turned towards his vehicle?

A. **Right. He had leaned towards the Cadillac, towards the trunk area.**

Q. Facing the Cadillac?

A. **Correct.**

**This table that I'm pointing to**

Judge

**in front of me (indicating), let's just say it is the Cadillac.**

Q. Okay.

A. **Myself would be Mr. Lazo.**

Q. Okay.

A. **He turns and faces the Cadillac.**

Q. Right.

A. **I am standing to the left of Mr. Lazo.**

Q. Right.

A. **I'm pointing to the stenographer right here, referring to the trunk of the vehicle (indicating).**

Q. So, you are by the left rear quarter panel?

A. **I'm literally standing behind the license plate, if you need a focal point. I'm literally standing behind the license plate of the trunk area of the car.**

Q. Okay. Is Mr. Lazo directly behind the car, or is he on the side of the grass?

A. **On the side of the vehicle, passenger side, rear part, standing two feet**

Judge

**from my side.**

Q. Okay. What happened next?

A. **Det. Newton is back to Mr. Lazo right.**

Q. Okay.

A. **He looks at me, looks at Det. Newton and throws an elbow back towards Det. Newton.**

Q. Indicating right elbow going backwards?

A. **Correct. Right elbow going back towards the area where Det. Newton was standing.**

Q. Okay.

A. **At that time I come from the trunk area of the vehicle around to the passenger side of the car.**

Q. Alright. Then what happened?

A. **Myself and Det. Newton grabbed Mr. Lazo. And we pushed him up against the vehicle.**

Q. Against the Cadillac?

A. **Correct. Is that still on the rear portion or near the passenger side be[illegible]**

Judge

**the passenger side door?**

A. **It was a four-door vehicle.**

Q. Yes, sir.

A. **So, I would say it was by the rear door, not past the front door. The back rear passenger side of the vehicle.**

Q. Then what happened?

A. **Myself and Det. Newton pushed him up against the car. Put your hands behind your back. Knock it off. You are under arrest.**

**With that Sgt. Scimone comes. I don't know exactly where Sgt. Scimone was in regards to the vehicle at that time. But there did come a time where Jimmy -- Sgt. Scimone came around to us.**

Q. Just so I am clear, it is yourself, Sgt. Scimone and Det. Newton that are around Mr. Lazo at this point; is that right?

A. **Correct.**

Q. What next happens?

A. **Mr. Lazo gets in between myself and Det. Newton and starts to run towards the**

Judge

**area of the front of the vehicle.**

Q. On the grass side or on the driver's side?

**A. The grass side.**

Q. So that would be the passenger's side?

**A. Correct.**

**We have not left the passenger's side of the vehicle at this time.**

Q. Okay. What next?

**A. I grabbed Mr. Lazo around the waist (indicating).**

Q. Indicating wrapping your hands around like a bear hug?

**A. Correct. Like this (indicating). Firmly. We go down to the ground. And Mr. Lazo is saying, I'll take it out. I'll take it out. He just kept say, Alright, I'll take it out. I'll take it out. I'll take it out.**

Q. Those were his words?

**A. Correct.**

Q. Had anybody said anything to him at that point, either yourself, or Det.

Judge

Newton, or Sgt. Scimone?

**A. We had told him to stop fighting. He was under arrest. That is what we had told him.**

Q. Then what happened after he said, I'll take it, I'll take it?

**A. I let go.**

Q. Okay.

**A. He gets up, and now starts to take off again, and makes a left turn towards the front of the vehicle.**

Q. I just want to go back for a second.

MR. BREWINGTON: Let's take a break.

(Recess taken.)

Q. At the time that you had Mr. Lazo essentially around the waist, as you had indicated, and went down to the ground, what was his status when he was down on the ground? Was he face down on his side, or some other way?

**A. Face down.**

Q. And then you indicated that

Judge

you -- after he said, I'll take it out, I'll take it out, you released your hold around his waist; is that correct?

**A. Correct.**

Q. Were your hands underneath him at that time when you pulled your hands out?

**A. Yes.**

Q. Then you said he got up. How was it that he got up?

**A. He just kind of did a crawl, and he then he got to his feet.**

Q. At the time that he crawled and got to his feet, where was Sgt. Scimone?

**A. To my rear.**

Q. Where was Det. Newton?

**A. To my rear.**

Q. At the time that he crawled, was that --

MR. BREWINGTON: Withdrawn.

Q. Did you have a hold of him at all while he was crawling?

**A. I was trying to.**

Q. In what way were you trying to?

**A. The same way I was.**

Judge

Q. I'm sorry?

**A. A bear hug.**

Q. A bear hug. When you say that you had released the bear hug, did you try and reinstitute the bear hug? Is that what you say you tried to do?

**A. Yes.**

Q. You were unable to do that?

**A. It took a second or two. I was able to reengage it, yes.**

Q. Did he -- he was still able to get up?

**A. Yes.**

Q. Did he actually stand up vertically on his two feet?

**A. Not fully vertically, no.**

Q. Was he on his two feet, or was he crawling? What was happening at that point?

**A. Still on his two feet, trying to get his balance as he was running towards the front of the car. And then made a left.**

Q. You had him around the waist?

**A. Yep.**

Q. He was getting up, and he was

Judge

running?

A. **Not running. I said he was crawling.**

Q. Then you said he was running. He was running you said towards the front of the car?

A. **No. I said he tried to run. I said he was crawling. And as he started to get up on his two feet, he was off balance. I reengaged him as he was going towards the left of the vehicle.**

Q. Was he running?

A. **No. He was moving quickly.**

**When you are referring to a run --**

Q. I'm just going --

A. **I'm trying to clarify what you are --**

Q. You said -- at one point you said he was running. I just want to be clear. Was he or was he not running?

A. **He was not running.**

Q. Did you maintain your hold around him around his waist?

Judge

A. **I was trying to.**

Q. Were you able to reengage that?

A. **Yes. He had a very large waist.**

Q. At what point were you able to reengage him?

A. **I actually tripped him. I reengaged my bear hug. And I took my foot and I wrapped it around his foot. And we fell to the ground together again.**

Q. He fell face forward?

A. **Yes.**

**At this time, Mr. Brewington, you understand we are in front of the car. We are no longer on the passenger side of the car.**

Q. Are you still on the side of the car? Or are you actually in front of the car?

A. **Directly in front of the Cadillac.**

Q. Okay. Then what happened?

A. **He kept trying to crawl to get away from me.**

Q. Okay.

A. **At that time Det. Newton came to his left. Kenny Lazo's left.**

Judge

Q. So he came to his left, which would be more in the front of the car?

A. **Right.**

Q. Was Mr. Lazo -- was he between Mr. Lazo and the car?

A. **Yes.**

Q. What happened next?

A. **Sgt. Scimone went to the right side of Kenny Lazo.**

Q. So your right as well?

A. **Correct.**

Q. Then what happened?

A. **I'm still wrapped around Kenny Lazo's waist.**

Q. You got his waist as though you had just finished tackling him or tripping him?

A. **Both. Correct.**

Q. Then what happened?

A. **He is fighting to get out of our custody.**

Q. When you say fighting to get out of our custody, rather than bring me to that conclusion, tell me what he did.

Judge

A. **He was flaring his elbows, trying to keep going, I'm referring to pushing my arms forward, to get away from us. He was trying to push Sgt. Scimone and Det. Newton off of him.**

**I am wrapped around his waist. I do not leave his waist.**

Q. Okay.

A. **There came a point --**

Q. At this point his hands are free?

A. **I couldn't tell you 100 percent, Mr. Brewington. I know that Det. Newton and Sgt. Scimone were attempting to get his hands to place handcuffs on him to put him into custody.**

Q. And you are around his waist?

A. **Correct.**

Q. Then what happens?

A. **My head is buried down like this (indicating). I'm trying to get -- I'm repositioning myself.**

**And at that point we started to get close to the roadway.**

**The reason that I know that we**

**are getting close to the roadway, because I can feel the cars passing me, like this on my chest (indicating) as the vehicles pass.**

**Did you ever change a tire on side of the roadway and the cars, when they are passing you, you can actually feel that?**

Q. I just want to go back. I appreciate that.

MR. BREWINGTON: Indicating that the witness was hitting his chest with an open palm several times to indicate the passing of cars.

Q. You had positioned your car on an angle behind his car?

A. **That's correct.**

Q. Pulled up to the rear of his Cadillac so that traffic would essentially have to go around your vehicle to give you some safety as you approached from the contact side?

A. **No, that is not true.**

Q. Okay. Alright. Now, you are feeling the cars, as you indicated by pounding your chest, passing by?

A. **Yes.**

Q. You are still wrapped around Mr. Lazo around his waist?

A. **Right.**

Q. So what next happened?

A. **As I feel the cars pushing to me, I realized that we are getting close to the roadway.**

Q. Okay.

A. **I can see the cars passing us. And they are literally I'm going to say five feet from where we are. That is approximate.**

**As I look to my top right, I can see that Jimmy Scimone is sideways in the roadway.**

Q. Okay. Then what happened?

A. **I see that Jimmy Scimone is actually going -- is in the lane of traffic.**

Q. Now, okay, he is in the lane of traffic. What is the next thing that happens?

A. **I release myself from Kenny Lazo.**

Q. Okay.

A. **And I go to pull Jimmy off, Sgt. Scimone off the roadway.**

Q. So you released Mr. Lazo. Do you get up?

A. **No.**

Q. How is it that you pull Mr. -- that you go to pull Sgt. Scimone off the roadway?

A. **I grabbed at his belt.**

Q. So, you reached for his belt. Did you stay engaged in any way to Mr. Lazo?

A. **No.**

Q. Were you still touching Mr. Lazo?

A. **I was on top of him.**

Q. You were engaged with him in that way. You were lying on top of him, and his front would be down, and your front would be on his back?

A. **Correct.**

Q. You reach with what hand to get Sgt. Scimone?

A. **My left and my right.**

Q. So you stayed on top of Mr. Lazo and reached with both hands to get Sgt. Scimone?

A. **Off of the road, yes.**

Q. Wherever he was, you reached to get him?

A. **I'm telling you, I'm pulling him off the road.**

Q. Wherever he was, you reached for him?

A. **On the road.**

Q. Then what happened?

A. **As I was trying to grab Jimmy to pull him off, I feel the --**

Q. Jimmy is Sgt. Scimone?

A. **Yes.**

**I feel a tug on the left side of my gun belt.**

Q. Now, as you are reaching for Sgt. Scimone, are you looking at Sgt. Scimone?

A. **Of course.**

Q. Then you say that you felt a tug at your gun belt. Describe that.

A. **A tug being a pull.**

Q. Okay. Then what happened?

A. **As I'm pulling Jimmy Scimone, I can fell the tug on my left side. I am lefty. My weapon is on the left side of my belt.**

Judge

Q. Okay. This would have been on the side closest to the front of the car, right?

**A. No.**

Q. You have now turned around?

**A. No, no.**

**Det. Newton is on the side closest to the car. Sgt. Scimone is on his right.**

Q. Have you now turned around somehow?

**A. No.**

Q. What happened?

**A. Where did I lose you, Mr. Brewington, so I can simplify it for you?**

Q. I'm not lost.

When you reached for Sgt. Scimone, did you reach to your right or to your left?

**A. To my right.**

Q. Is the roadway to your left or to your right?

**A. Directly in front of me.**

Q. Are you facing the roadway as you

Judge

lay on Mr. Lazo?

**A. Yes.**

Q. The front of the car would be to your left, correct?

**A. Right.**

Q. You said you felt a tug on your left-hand side?

**A. Correct.**

Q. So, that tug would be coming from the side closest to the front of the car?

**A. Yes.**

Q. Okay. What happened next?

**A. As I'm pulling Jimmy in, I look to my left. I can see Lazo's hand on the left side of my holster.**

Q. His hand was on your holster?

**A. Yes.**

Q. Then what happened?

**A. I came down with two elbows on his hand. Like that (indicating).**

THE WITNESS: Sounds like Mr. Brewington wants the details.

MR. BREWINGTON: Off the record.

(Discussion off the record.)

Judge

Q. So, you just -- before we took the break, you took a couple of swipes with your elbow down to the table.

MR. BREWINGTON: Mr. Dunne, you want to put something on the record?

MR. DUNNE: Yes. Just so the record is clear, my client wanted to demonstrate to you the force with which he used his elbows when he brought them down on Mr. Lazo at the point in time he felt the tug. And he was demonstrating the force that he used.

MR. BREWINGTON: Just for the record, the level of force was -- appeared to be powerful, to the point that it --

MR. DUNNE: If we get that far, he will demonstrate it again to the jury.

MR. BREWINGTON: I don't want to do that. Not now, anyhow. I want to make sure that the record is clear.

The level of power was sufficient to cause vibration to the table to mak

Judge

water bottles spill over.

MR. DUNNE: Open water bottle.

MR. BREWINGTON: Yes. We didn't get into a volcano thing.

Q. After you did that twice with your elbow, did you make any contact --

**A. Yes.**

Q. -- with your elbow?

**A. Correct.**

Q. What did you contact, if anything?

**A. The hand and my holster.**

Q. Whose hand did you contact at that point?

**A. Mr. Lazo's.**

Q. Where was Mr. Lazo as you were contacting his hand? Did you see where he was, where his body was positioned?

**A. He is still on the ground.**

Q. Underneath you?

**A. Correct.**

Q. As he is underneath you --

**A. Not directly underneath me.**

Q. As he is underneath you, what

Judge

portion of his body is underneath you?

**A. His right side.**

Q. What hand is it that you hit, if any hand, when you throw your left elbow back?

**A. Referring to Mr. Lazo's hand?**

Q. Yes, sir.

**A. His left hand.**

Q. After you hit his hand, what happened next?

**A. I started screaming.**

Q. What did you scream?

**A. You want me to scream, or you want me to just say what I screamed?**

MR. DUNNE: Just say what you screamed.

Q. What did you scream?

**A. Gun, gun, gun. My gun.**

Q. So, gun, gun, gun, my gun is what you screamed; is that right?

**A. That's correct.**

Q. Then what happened?

**A. I struck Mr. Lazo in the head.**

Q. At that time where was he in relation to you when you struck him?

Judge

**A. Underneath me.**

Q. How many times did you strike him at that time?

**A. Three to five.**

Q. What did you strike him with?

**A. My flashlight.**

Q. Now, at this time had you finished your maneuver in getting Sgt. Scimone off the roadway?

**A. Yes.**

Q. Where was Sgt. Scimone at the time that you threw your elbow back and then struck Mr. Lazo?

**A. Repeat. Say it one more time, please.**

Q. Where was Sgt. Scimone at the time --

Let me take it one at a time. At the time that you threw your elbow back, where was Sgt. Scimone?

**A. To my right.**

Q. At the time that you say you struck Mr. Lazo in the head three to five times with your flashlight, where was Sgt.

Judge

Scimone?

**A. To my right.**

Q. Was he standing?

**A. No.**

Q. Was he laying down? He was on the ground?

**A. Yes.**

Q. Had you pulled him to the ground?

**A. I'm sorry?**

Q. Had you pulled Sgt. Scimone to the ground?

**A. He was already on the ground.**

Q. When you grabbed him from the roadway --

**A. Yes.**

Q. -- had you pulled him to the ground when you grabbed him by his belt?

**A. He was on the ground. He was in the roadway. And I pulled him back.**

Q. So he wasn't standing when you reached for him?

**A. No.**

Q. You pulled him back as he was on the ground?

Judge

**A. That's correct.**

Q. At the time that you began to strike Mr. Lazo -- just prior to that time, where was this flashlight?

**A. In my left hand.**

Q. Excuse me?

**A. In my left hand.**

Q. So, the flashlight was already out?

**A. Correct.**

Q. You had at that point the flashlight in your left hand?

**A. Yes.**

Q. You had just reached out with two hands, as you demonstrated before, to grab Sgt. Scimone off the roadway who was already laying down?

**A. Yes.**

Q. And you did that with a flashlight in your hand; is that right?

**A. It is a miniature flashlight, just this big (indicating).**

Q. You didn't answer my question.

**A. Yes. It is a Stinger flashlight.**

Judge

Q. You pulled Sgt. Scimone off the roadway with a flashlight in your hand, correct?

**A. Correct.**

Q. Now, which hand did you have the flashlight in?

**A. Left.**

Q. So, when you struck back with your left elbow, you also had the flashlight in your hand at that time?

**A. Correct.**

Q. Then what did you do after you --

Well, let's go back.

You said you had the flashlight already in your hand, correct?

**A. Correct.**

Q. Had you had the flashlight in your hand the entire time when you had given this kind of bear hug to Mr. Lazo?

**A. Yes.**

Q. When you tripped him and fell to the ground, that being essentially the second time you bear hugged him, was the flashlight still in your hand?

Judge

**A. Yes.**

Q. Then when you say you struck him in the head, he was underneath you; is that correct?

**A. Correct.**

Q. What portion of the head did you hit him with the flashlight?

**A. The rear.**

Q. At the time that you were hitting him, you had thrown the elbows back; is that correct?

**A. First I threw the elbows.**

Q. You had already done that?

**A. Correct.**

Q. At that particular time, you had hit his hand away from your gun and your holster; is that correct?

**A. Correct.**

Q. Now, when you hit him in the head, could you tell me with what force did you hit him in the head? Tell me.

**A. I got that. How do you want me to tell you that?**

Q. Describe it.

Judge

**A. Hard.**

Q. As he was underneath you when you were hitting him hard in the head with your flashlight, did the flashlight make contact with his head?

**A. Yes.**

Q. You say you hit him three to five times. Did you hit him three to five times in approximately the same area?

**A. Approximate.**

Q. Where was Det. Newton at that time, if you know?

**A. To my left.**

Q. To the side where you had felt the tug?

**A. Correct.**

Q. Did he ever leave that area?

**A. Who?**

Q. Det. Newton.

**A. Not yet. But yes, he did.**

Q. I'm talking about up until this time.

**A. Not up to this time.**

Q. At the time that you struck

Judge

Mr. Lazo three to five times, did anybody else strike him at that time?

**A. Not to my knowledge. Not to my knowledge at that time.**

Q. Then after -- at the time that you struck him three to five times in the back of the head --

By the way, when you struck him in the back of the head, was his face down?

**A. Yes.**

Q. What happened next?

**A. Sgt. Scimone started to scream.**

Q. What did he start to scream?

**A. We need help. We need help. Billy get us help.**

Q. When you say Billy, was he referring to you do you believe?

**A. Yes.**

Q. At the time that you struck Mr. Lazo in the head, how did he respond you striking him in the head?

**A. He didn't.**

Q. What was he doing after you struck him in the head?

Judge

A. **Continuing to resist.**

Q. Again, can you tell me what he was actually doing?

A. **Pushing and shoving, trying to get away.**

Q. Was this still with his face down?

A. **Face in the dirt down?**

Q. Yes.

A. **No. Facing to where he wanted to go.**

Q. Was his stomach, his chest still down?

A. **Yes.**

Q. You are still on top of him?

A. **Yes.**

Q. You say Sgt. Scimone is telling you, Billy, get us help?

A. **Yes.**

Q. What did you do at that time?

A. **I stopped hitting and I reengaged around the waist of Kenny Lazo.**

Q. Still with the flashlight in your hand?

Judge

A. **Yes.**

Q. Then what happened?

A. **I had gotten down really low on Mr. Lazo (indicating). And I'm pointing to my thigh area. And I just rewrapped him again. And I said, I'm not letting go. I'm not losing him. I'm not losing him, answering Jimmy's question.**

Q. Jimmy being Sgt. Scimone?

A. **I apologize. Jimmy being Sgt. Scimone, yes.**

Q. It is okay. So you reengaged him and wrapped your arms around his middle thigh?

A. **Between his knee -- above his knee, below his hips.**

Q. Somewhere in the thigh area, is that fair?

A. **Sure.**

Q. Did you have a good hold around his legs?

A. **Yes.**

Q. As you said I'm not letting go, what next happened?

A. **Det. Newton went back to the**

Judge

**radio car to call for help.**

Q. What were you doing when he went back to the car to call for help?

A. **Holding on as tight as I could.**

Q. What was Mr. Lazo doing?

A. **Continuing to escape. And then he actually, I'm going to say posted. Meaning that he put his hands into the ground in an attempt to stand up (indicating).**

Q. You are still wrapped around his thighs?

A. **Correct.**

Q. And you didn't let go?

A. **No.**

**When he did that, that put his butt in my face, like this (indicating). And I'm using my hand referring to his butt in my face.**

Q. Yes. Then what happened?

A. **I bit him.**

Q. You bit his butt?

A. **Yes.**

Q. How hard did you bite him?

A. **As hard as I could.**

Judge

Q. When he posted, as you said, where was Sgt. Scimone?

A. **To his right.**

Q. You said that he posted in a way where he kind of used his hands to brace his upper body, raising his head and his shoulders off the ground --

A. **Yes.**

Q. -- and pushing his butt up towards your face and right into your face, correct?

A. **Yes.**

Q. So his hands were solidly in the ground posting you, right?

A. **I guess. His butt was in my face. It is kind of hard to see exactly how his hands were.**

Q. I want to go back to what you demonstrated. Did you actually see him post, as you described it?

A. **No.**

Q. Okay. Did you --

A. **I did not see him physically post.**

Judge

**But for his butt to be in my face, the only way would be by him attempting to stand up.**

Q. Well, you had his legs. So his legs were not underneath him.

My question is: You were on top of his legs, right?

A. **Yes.**

Q. So, when you say that he posted, those were your words, so that was an assumption on your part?

A. **Yes, it is, Mr. Brewington.**

Q. So, as you bit him, did you bite him on one side or the other of his butt?

A. **His left side.**

Q. What happened as you bit him?

A. **Nothing.**

Q. Did he respond?

A. **No.**

Q. Did he say anything?

A. **No.**

Q. How many times did you bite him?

A. **Once.**

Q. Then what happened?

Judge

A. **Det. Newton came back. And he said, They are coming. Help is coming.**

Q. By the time Det. Newton had gone and come back, what had Sgt. Scimone done, if anything, based on your observations, to engage Kenny Lazo?

A. **I just heard screaming. I just heard Sgt. Scimone screaming.**

Q. You didn't actually see him touch Kenny Lazo at that time?

A. **No.**

Q. But he is standing nearby, correct?

A. **Sgt. Scimone?**

Q. Yes.

A. **Yes.**

Q. Then what happened?

A. **Det. Newton came back.**

Q. After that. He came back and said, They are coming, they are coming.

A. **He just stopped fighting. Mr. Lazo just stopped fighting.**

Q. Then what did you do when he stopped fighting?

Judge

A. **Det. Newton put a cuff on his left side, referring to Mr. Lazo, his left hand.**

**I took my cuff out. I attached it to the end of Det. Newton's handcuff to reach the right hand of Mr. Lazo.**

Q. Did you reach his right hand?

A. **I don't know if -- I don't really recall if I put the right cuff on him, or Sgt. Scimone did.**

Q. Did someone cuff his right hand?

A. **Yes.**

Q. Was this a rear cuffing at this time?

A. **Yes.**

Q. This would have been -- when he stopped fighting, did you let go of your thigh hold?

A. **At some point yes, I did. Of course.**

Q. I want to go back. You said Mr. Lazo stopped fighting.

Is that when you let go of the thigh hold?

Judge

A. **When Det. Newton came back and put a left handcuff on Mr. Lazo's left hand, that is when -- then I reached up, hooked my cuff up to his, and passed it off.**

**Like I said, I don't remember if I cuffed his right hand or if I gave it to Sgt. Scimone. But his right hand did get cuffed. Whether I did it or Mr. Scimone, I don't know.**

Q. You keep your cuffs on your belt?

A. **Yes.**

Q. Where on your belt do you keep your cuffs?

A. **On my left side.**

Q. Are your cuffs loose, clipped, or in a sheath?

A. **In a case, snapped case.**

Q. Referred to as a sheath?

A. **Yes.**

Q. So you had to unsnap your case, take the cuffs out?

A. **I think at the time -- I think I had a Velcro. So it was just a matter of lifting the Velcro up.**

Judge

Q. Either way you had to disengage the apparatus that kept it in the case and get the cuffs out?

A. **Yes.**

Q. Were you able to use both hands to configure your cuffs around the cuff on the left hand, or one cuff?

A. **Just one.**

Q. Snapped it on?

A. **Flip it and hook.**

Q. Using one hand?

A. **Yes.**

Q. What was your other hand doing?

A. **Taking the other part of the cuff.**

Q. So, in terms of engaging your cuff with the other cuff, you used both hands; is that correct?

A. **Yes.**

Q. Was Mr. Lazo still underneath you at that time?

A. **Yes.**

Q. What level of resistance was he providing at that particular point?

Judge

A. **None.**

Q. Was he cuffed fully after you either cuffed him yourself or handed the cuff off to be cuffed?

A. **Was he?**

Q. Did he become actually cuffed?

A. **Yes.**

Q. It was with two sets of cuffs, correct?

A. **Correct.**

Q. After he was cuffed, what happened next?

A. **I rolled over off of him. And I thought I had broken my hand. And then I remember Joe Link walking up -- Police Officer Joe Link, who was the first unit to respond.**

Q. Yes.

A. **He walked up. I rolled off. Basically all of us just rolled off. And then myself and Officer Link picked Mr. Lazo up.**

Q. Let's just go back for a second.

You said you rolled off. That was off his back?

A. **After he was cuffed, un hum.**

Judge

Q. You also said, all of us rolled off. Who else was on top of him?

A. **I refer to that, Det. Newton and Sgt. Scimone went off.**

Q. When you say went off, backed off?

A. **I don't know what they did. I have no idea.**

Q. Were they in contact with Mr. Lazo other than just cuffing him?

A. **Referring to being on his back like I was?**

Q. Any other physical contact that you saw between Det. Newton, Sgt. Scimone and Mr. Lazo?

A. **I did not see any other -- any contact. I know they were going for his hands. But to actually see it, no. I know they were attempting to grab his hands up. I didn't see it.**

Q. When Officer Link approached, what next happened?

A. **We picked Mr. Lazo up. And we were -- I was walking with Officer Link.**

Judge

Q. I want to go back for a second.

When you picked him up, how did you pick him up?

A. **I rolled him to his side, buttocks. He stood right up.**

Q. Then as you got him to his feet, what next happened?

A. **Mr. Lazo was very irritated. He was cursing, mother Fing us. And then I had handed him over to Officer Link. And I said, He hasn't been searched. He hasn't been searched. And I said, I'm going to the hospital, referring to me.**

Q. Did you make any observations of Mr. Lazo at that time, that being any observations of his face, his head, or any other portion of his body?

A. **He had scratches and abrasions on his face.**

Q. Where?

A. **His forehead area and his eye area.**

Q. Did you see any blood?

A. **No.**

Judge

Q. What portions of his face had abrasions?

A. **His forehead area. I believe it was the -- his right side of his forehead and his eye.**

**I could be wrong on the left or right side. I think it was right side.**

Q. Up until that time, did you see anyone else strike Mr. Lazo with a hand or any other instrument?

A. **At what point? After he was handcuffed?**

Q. Up to that time, other than you striking him with a flashlight?

A. **No, I did not make any observations, no.**

Q. Up until the time that he was handcuffed, you were essentially engaged with him so that you were touching him at all times; is that correct?

A. **Correct.**

Q. As he was being walked with Officer Link and you said that you were going to the hospital, what did you do?

Judge

A. **I told Officer Link that he had not been searched.**

**At that point I met with Sgt. Scimone to take me to Southside Hospital.**

Q. Did Sgt. Scimone take you to the hospital?

A. **Yes.**

Q. In the car in which you had driven?

A. **Yes.**

Q. When was the last time you saw Mr. Lazo?

A. **When I gave him to Officer Link.**

Q. Where was Mr. Lazo at the time that you saw him before you went to the hospital?

A. **He was walking with Officer Link.**

Q. What was the condition of his clothing at that time?

A. **Jeans. I think he fought out of his shirt. I think he had an undershirt on. Like an -- I just know it as a Ginnie T. A white tank top, I guess.**

Q. You say fought out of the shirt,

Judge

when did that occur?

A. **When he was trying to get out the second time. After I released him, after he had said, he'll get it out, he'll get it out.**

Q. After the time when he was crawling forward?

A. **Yes.**

Q. And you were still on top of him, correct?

A. **Not directly on top of him. I was grabbing at him. And his shirt ripped off.**

Q. His shirt?

A. **I think it was a sweatshirt maybe.**

Q. I just want to go back. You say he fought out of the shirt. I'm trying to understand.

Did he actually disrobe himself, or was that a result of you grabbing him?

A. **That was a result of me trying to grab him, attempting to stop his escape.**

Q. You ripped his shirt off?

A. **Not completely off, no.**

Judge

Q. Partially off?

A. **Yes.**

Q. When you handed him off to Officer Link, what was the status of his upper body clothing?

A. **His shirt was ripped. He had the white -- I don't know what you call it, tank top. Jeans. I have no idea.**

Q. Still have his shoes on?

A. **I don't know.**

Q. Did you ever see his shoes come off?

A. **No.**

Q. After you handed him off to Officer Link, what further contact did you have with Kenny Lazo, if any, on that day?

A. **None.**

Q. Sir, at the time that you last saw Kenny Lazo, can you describe for me how he was walking?

A. **Fine.**

Q. From the time that you last saw Kenny Lazo, can you describe for me when you said he was MFing you and cursing, was his

speech clear?
A. **Yes. I can hear him very clearly cursing at me.**
Q. After you bit him, did you have any further contact where you either bit, or hit, or kicked, or took any physical action toward Mr. Lazo, other than cuffing him?
A. **Other than cuffing him, no.**
Q. At the time that you handed Mr. Lazo over to Officer Link, did you see or observe anyone having any other physical contact with Mr. Lazo, other than walking with him as you indicated?
A. **No.**
**Other than the walking -- Mr. Brewington, just to clear this up, please. Other than walking him to the PD?**
Q. Right.
A. **No.**
Q. By PD you are referring to the police vehicle; is that correct?
A. **Correct.**
Q. What hospital did you go to?
A. **Southside.**

Q. Now, after you stated that you were going to go to the hospital, did you believe that Mr. Lazo had some form of injury?
A. **No.**
Q. Just talking about the bruising on the forehead, the scratches on the face, you had hit him in the head three to five times with a flashlight, and you had bitten him as hard as you could, and you didn't think he would have any injuries; is that your testimony?
A. **I would assume he would have injuries. But I didn't -- I was more concerned with my injury.**
Q. At any time with that assumption, did you consider taking him to the hospital or obtaining medical treatment for him?
A. **For him, no.**
Q. At any time did you ask anyone to get him medical treatment?
A. **No.**
Q. I am going to ask you to take a look at a couple of documents.
MR. BREWINGTON: Off the record.

(Discussion off the record.)
MR. DUNNE: Let's take a break.
(Recess taken.)
Q. Officer Judge, you indicated that you went to Southside Hospital; is that correct?
A. **That's correct.**
Q. What was your complaint at the time that you went to Southside Hospital?
A. **Hand injury.**
Q. Which hand was that?
A. **Left.**
Q. Can you tell us what was the injury to your hand that you were complaining of at that point?
A. **Pain.**
Q. Pain where?
A. **In my hand.**
Q. Which part of your hand?
A. **The left thumb area.**
Q. Is that the same hand with which you hit Mr. Lazo utilizing the flashlight?
A. **Correct.**
Q. Any other injuries about which

you complained?
A. **No.**
Q. Sir, at any time did you see Sgt. Scimone use a flashlight when Mr. Lazo was on the ground?
A. **No.**
Q. Did you come to learn that a Mag flashlight had been used to hit Mr. Lazo?
A. **Yes.**
Q. How did you come to learn that, sir?
A. **That evening.**
Q. From whom?
A. **Sgt. Scimone.**
Q. Did you speak with him about that?
A. **No further than that. No.**
Q. Can you tell me when that evening did you learn that?
A. **On the way to the hospital.**
Q. On the way to the hospital did you have a discussion with Sgt. Scimone about him using a flashlight?
A. **No.**

Judge

Q. How did you learn that he had used a flashlight?

**A. I told him I hit him with a flashlight.**

Q. What did Sgt. Scimone say?

**A. I had to too.**

Q. What did Sgt. Scimone say about hitting Mr. Lazo with a flashlight?

**A. I couldn't recall exactly.**

Q. Can you recall in sum and substance if you can't recall exactly?

**A. I just did. I said he hit him too.**

Q. Did he tell you how many times he hit Kenny Lazo?

**A. No.**

Q. At the time that you were hitting Mr. Lazo with your flashlight. Mr. Lazo's head was down; is that correct?

**A. Facing down, correct.**

Q. When you were hitting him with a flashlight, were you looking at where you were hitting him?

**A. Yes.**

Judge

Q. At that time did you see anyone strike Mr. Lazo in the head, that being the front part of his head or in the crown area of his head?

**A. I did not, no.**

Q. At any time before Mr. Lazo was released to Officer Link, did you see Sgt. Scimone hit Mr. Lazo with his flashlight?

**A. No.**

Q. Sir, did you see Sgt. Scimone with a flashlight that evening?

**A. Earlier, yes.**

Q. Describe it, please.

**A. A black flashlight.**

Q. About how long, sir?

**A. I wouldn't know.**

Q. Do you recall seeing it?

**A. Sure.**

Q. Sgt. Scimone was in your car on that evening; is that correct?

**A. He borrowed the flashlight when we were at the scene when we did the vehicle and traffic stop. I believe he borrowed it from Det. Newton. So, I had not seen it prior**

Judge

**to that. It wasn't something that Jimmy had on him all the time.**

Q. Thank you for volunteering that. But the question was: Had you seen him with it that evening prior?

**A. Yes.**

Q. At the time that you said to him that you were going to be the contact and he was going to go essentially on the passenger side when you emerged from your car, did he have that flashlight?

**A. I don't believe so.**

Q. When Det. Newton came to your window to speak with you, did Det. Newton have that flashlight?

**A. I don't know.**

Q. When, if at all, if you know, did Det. Newton allow Sgt. Scimone to borrow his flashlight?

**A. I don't know.**

Q. Did you ever hear anyone say, or Sgt. Scimone say, Let me hold your flashlight, let me borrow your flashlight?

**A. No.**

Judge

Q. Did you see Det. Newton with his flashlight out at any time that evening?

**A. No.**

Q. When you learned that Sgt. Scimone had hit Mr. Lazo with his flashlight, what did you say?

**A. I didn't say anything.**

Q. Did you tell him that you didn't see that?

**A. No.**

Q. Did you ask him where he hit Mr. Lazo?

**A. No.**

Q. Sir, with regard to the flashlight that you used to hit Mr. Lazo, have you seen that flashlight since this incident?

**A. The exact flashlight?**

Q. Yes.

**A. I might have seen it at Grand Jury.**

Q. Do you know what condition it was in?

**A. Fine.**

Q. Is it a metal flashlight?

Judge

A. **Yes.**

Q. Did you see Sgt. --

MR. BREWINGTON: Withdrawn.

Q. Did you see the flashlight that Sgt. Scimone had utilized on that evening in the Grand Jury as well?

A. **No. I don't recall. No.**

Q. Now, sir, you were interviewed by I believe Internal Affairs; is that correct?

A. **I was not interviewed by Internal Affairs, no.**

Q. Other than appearing in the Grand Jury, were you ever interviewed by anyone else, other than the Grand Jury and myself here today, about the particulars of this incident?

A. **No.**

**Just to make this clear --**

Q. Yes.

A. **-- other than Grand Jury?**

Q. Yes.

A. **No.**

Q. You submitted a written statement about this incident; is that correct?

Judge

A. **Correct.**

Q. How many written statements did you submit?

A. **Two.**

Q. To whom did you submit those written statements?

A. **Internal Affairs.**

Q. Both to Internal Affairs?

A. **No. One was to our department. I don't know where it goes.**

Q. After submitting your written statement to Internal Affairs, anybody ask you any questions about the details of that statement?

A. **No.**

Q. Anybody ask you, as I have been going through more of the details, today, anybody ask you questions similar to the ones I'm asking you?

A. **Prior to today without Grand Jury?**

Q. Yes.

A. **No.**

Q. With regard to your Grand Jury

Judge

testimony, was it as detailed as we have just gone through?

A. **By whom? Who are you referring to who I was talking to?**

**I don't understand the question.**

Q. When you were in the Grand Jury and you testified --

A. **In the actual room of the Grand Jury?**

Q. Yes, in the actual room, was it as detailed as we are going through right now?

A. **Yes.**

Q. I think I'm done. Give me one second.

MR. DUNNE: Sure.

Off the record.

(Discussion off the record.)

Q. With regard to either of the statements that you have given in writing to the Department, whether it is Internal Affairs or wherever it went, you indicated you weren't quite sure where it went, but it went to the Department, has anyone asked you any questions about either of those statements?

Judge

A. **No.**

MR. DUNNE: You mean, of course, other than me?

MR. BREWINGTON: Anyone --

MR. DUNNE: He is aware that our conversations are privileged. He is answering from that perspective.

Q. Other than speaking to your attorney?

A. **No.**

MR. BREWINGTON: I have no further questions for this witness.

(Time noted: 1:15 p.m.)

Judge

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF SUFFOLK )

I, WILLIAM JUDGE, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of November 18, 2010; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

____________________
WILLIAM JUDGE

Signed and subscribed to before me, this day of , 2010.

____________________
Notary Public, State of New York

--------------------I N D E X-----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| WILLIAM JUDGE | MR. BREWINGTON | 4 |

RULINGS: PAGE 73
MOTIONS: PAGE 73

--------------DOCUMENT REQUEST---------------

PAGE 12 Copy of full document with signatures and signed verification

49 All radio runs and recordings on the Third channel or band and the Detective Band or channel as it relates to this incident starting on or about 7:00 p.m. of April 12, 2008 up to and including any final transmissions as they may exist concerning this matter on that subject day, including, but not limited to, any transmissions made from and/or to the precinct at the time of Mr. Lazo coming into the Third Precinct

-------------------EXHIBITS-----------------

| PLAINTIFFS' JUDGE | | FOR I.D. |
|---|---|---|
| 1 | Defendant William Judge's Response To Interrogatories | 10 |

(Counsel retained exhibit.)

C E R T I F I C A T E

STATE OF NEW YORK )
) ss:
COUNTY OF NASSAU )

I, FLORENCE SYSKROT, a Notary Public within and for the State of New York, do hereby certify:

That, WILLIAM JUDGE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of December, 2010.

____________________
FLORENCE SYSKROT

'

'06 [1] - 31:6
'07 [1] - 37:16
'94 [1] - 20:14
'97ish [2] - 18:9, 18:10
'98 [1] - 21:4
'98ish [1] - 18:11
'99 [1] - 17:8

1

1 [5] - 10:15, 10:17, 10:22, 11:11, 143:4
1-10 [1] - 1:12
10 [1] - 143:5
100 [3] - 1:16, 2:13, 96:12
10:05 [1] - 1:18
11550 [1] - 2:6
11702 [1] - 1:24
11788-0099 [1] - 2:15
11980 [1] - 4:12
12 [5] - 33:17, 34:20, 49:11, 142:10, 142:16
124 [1] - 1:24
12:00 [1] - 39:10
12th [1] - 39:8
14th [1] - 10:12
18 [2] - 1:18, 141:10
1989 [2] - 19:17, 22:8
1990 [1] - 21:16
1998 [1] - 17:8
1999 [1] - 19:25
1:15 [1] - 140:14

2

2001 [5] - 16:4, 16:8, 24:19, 24:21
2004 [1] - 31:18
2006 [2] - 31:7, 31:8
2007 [1] - 37:16
2008 [7] - 12:9, 32:22, 33:17, 34:20, 39:8, 49:11, 142:17
2009 [4] - 29:11, 29:12, 32:11, 32:14
2010 [6] - 1:18, 10:12, 12:11, 141:10, 141:20, 144:22
202 [1] - 1:24
27 [2] - 46:17, 47:3

3

30 [1] - 4:12
37 [1] - 34:6
3rd [1] - 144:21

4

4 [1] - 142:4
42 [4] - 7:10, 7:13, 7:16, 8:22
49 [1] - 142:12
4:00 [1] - 39:10

5

516-938-4000 [1] - 1:25
55 [1] - 61:11
556 [1] - 2:5

6

6100 [1] - 2:14
65 [2] - 58:19, 61:10

7

70 [1] - 46:11
73 [2] - 142:6, 142:7
7:00 [2] - 49:10, 142:16

8

8:00 [3] - 40:7, 44:25, 45:3
8:15 [1] - 40:7

A

a.m [1] - 1:18
able [12] - 15:2, 33:17, 63:11, 64:19, 69:16, 73:7, 76:5, 92:11, 92:12, 94:3, 94:5, 121:6
abrasions [2] - 124:19, 125:3
abstract [5] - 66:14, 66:16, 66:18, 84:12, 84:18
Academy [11] - 15:19, 15:23, 23:22, 23:24, 24:16, 24:23, 27:2, 30:15, 30:21, 31:3, 31:16
accept [1] - 23:3
accommodate [1] - 6:16
acronym [1] - 44:16
action [2] - 129:7, 144:17
activities [1] - 40:20
actual [4] - 15:14, 59:23, 139:9, 139:11
addition [1] - 15:12
address [2] - 4:10, 50:4
administer [1] - 3:16
administrators [1] - 1:4
Affairs [8] - 7:12, 38:23, 137:10, 137:12, 138:8, 138:9, 138:13, 139:21
Affairs' [3] - 37:2, 38:6, 38:12
afforded [1] - 22:23
aftermath [1] - 23:15
ago [4] - 10:9, 13:6, 18:7, 18:8
agree [1] - 72:16
AGREED [3] - 3:3, 3:9, 3:14
ahead [1] - 57:2
airport [1] - 32:20
Airport [1] - 33:2
allegation [3] - 35:7, 35:9, 38:10
allegations [2] - 35:20, 37:9
allow [1] - 135:19
allowed [1] - 13:5
almost [2] - 28:11, 56:22
Alright [2] - 5:11, 89:19
alright [5] - 6:11, 7:4, 75:11, 87:19, 97:23
ALSO [1] - 2:19
AND [4] - 1:12, 3:2, 3:8, 3:13
angle [2] - 59:16, 97:15
answer [12] - 6:7, 6:8, 36:6, 70:12, 71:18, 71:19, 71:20, 72:19, 73:22, 75:18, 83:9, 108:24
answered [2] - 71:15, 71:18
answering [5] - 39:20, 71:14, 83:15, 114:8, 140:8
answers [1] - 141:12
anti [2] - 27:17, 27:22
anticipate [1] - 70:17
anyhow [1] - 103:22
apologize [3] - 31:8, 61:18, 114:11
apologized [2] - 61:15, 61:16
apparatus [1] - 121:3
apparent [2] - 51:6, 63:21
appear [1] - 63:12
appeared [2] - 14:8, 103:16
appearing [1] - 137:13
apply [1] - 36:3
appreciate [2] - 5:21, 97:9
apprehended [1] - 37:22
apprehension [1] - 37:20
apprised [1] - 55:19
approach [1] - 59:18
approached [5] - 60:15, 61:2, 74:19, 97:20, 123:22
approximate [3] - 40:9, 98:13, 111:11
approximation [1] - 11:23
April [5] - 33:17, 34:20, 39:8, 49:10, 142:16
Area [1] - 15:5
area [21] - 33:12, 39:12, 40:9, 45:17, 46:4, 71:25, 81:14, 85:22, 86:20, 87:13, 87:17, 89:2, 111:10, 111:18, 114:6, 114:17, 124:22, 124:23, 125:4, 131:21, 134:4
arms [2] - 96:4, 114:14
arrest [2] - 88:12, 90:4
arrested [2] - 83:23, 84:10
arrived [1] - 52:10
ascertain [1] - 63:11
askew [1] - 59:17
assigned [8] - 25:2, 25:4, 25:10, 26:2, 32:16, 33:22, 34:3, 39:12
assignment [8] - 29:20, 30:6, 32:23, 32:25, 33:13, 33:20, 34:15, 39:16
assignments [2] - 39:23, 39:25
assist [4] - 33:7, 55:11, 55:17, 55:20
assistance [1] - 44:5
Associate's [2] - 15:8, 15:15
ASST [1] - 1:11
assume [2] - 13:14, 130:13
assumed [1] - 44:4
assuming [1] - 54:20
assumption [3] - 44:6, 117:12, 130:16
attached [2] - 12:6, 119:5
attempt [1] - 115:10
attempting [4] - 96:14, 117:3, 123:20, 127:23
attend [3] - 14:19, 19:7, 19:10
attention [2] - 33:17, 40:7
ATTORNEY [3] - 1:10, 1:10, 1:11
attorney [3] - 4:16, 5:25, 140:10
Attorney [4] - 1:13, 1:14, 2:10, 2:11
Attorneys [1] - 2:4
attorneys [2] - 3:3, 6:10
authorized [1] - 3:16
Avenue [1] - 4:12
aware [4] - 36:21, 42:23, 43:3, 140:6

B

Babylon [1] - 1:24
Bachelor's [2] - 15:8, 15:15
backed [1] - 123:6
background [1] - 21:22
backup [1] - 33:8
backwards [1] - 87:11
balance [2] - 92:21, 93:10
band [8] - 47:9, 48:5, 49:8, 68:6, 69:3, 69:11, 71:24, 142:13
Band [11] - 48:2, 48:4, 48:17, 48:19, 48:22, 49:8, 50:8, 50:18, 57:13, 69:6, 142:14
Baptist [1] - 19:11
bar [2] - 18:2, 18:19
bartending [2] - 16:23, 17:7
based [5] - 65:25, 67:8, 71:9, 79:24, 118:6
basic [1] - 22:13
basis [3] - 37:9, 44:8, 79:11
Bay [3] - 25:7, 57:22, 58:24

144

bear [8] - 89:15, 92:3, 92:4, 92:5, 92:6, 94:8, 109:20, 109:24
became [2] - 27:5, 51:6
become [2] - 19:23, 122:7
becoming [4] - 16:5, 17:9, 83:15, 85:9
beg [1] - 74:8
began [3] - 26:13, 80:3, 108:3
behind [8] - 56:22, 56:24, 86:17, 86:19, 86:22, 87:25, 88:10, 97:15
belief [1] - 44:15
below [1] - 114:16
belt [8] - 99:8, 99:9, 100:15, 100:20, 100:25, 107:18, 120:11, 120:13
benefits [2] - 22:25, 23:2
best [1] - 36:7
between [13] - 3:3, 35:17, 45:14, 47:15, 47:21, 50:21, 54:8, 80:3, 81:15, 88:24, 95:5, 114:15, 123:15
big [2] - 18:5, 108:23
Billy [4] - 45:25, 112:16, 112:17, 113:19
bit [7] - 59:16, 115:21, 115:22, 117:14, 117:17, 129:5, 129:6
bite [3] - 115:24, 117:14, 117:23
bitten [1] - 130:9
black [1] - 134:15
blood [2] - 124:24, 144:17
blue [1] - 12:7
body [7] - 63:23, 82:24, 104:19, 105:2, 116:7, 124:18, 128:6
bomb [1] - 30:14
bone [2] - 23:9, 23:14
borrow [2] - 135:19, 135:24
borrowed [2] - 134:22, 134:24
bottle [1] - 104:3
bottles [1] - 104:2
Boulevard [1] - 2:5
Box [1] - 2:14
brace [1] - 116:6
break [8] - 5:23, 5:24, 6:3, 75:13, 75:15, 90:16, 103:3, 131:3
Brentwood [2] - 37:18, 39:2
brewington [1] - 35:3
Brewington [28] - 4:14, 5:12, 11:9, 12:13, 13:24, 30:9, 41:2, 43:11, 44:3, 44:11, 45:2, 47:5, 48:5, 49:18, 51:5, 52:4, 53:7, 54:25, 55:18, 70:12, 71:12, 72:9, 94:13, 96:13, 101:16, 102:23, 117:13, 129:17
BREWINGTON [31] - 2:3, 2:7, 4:7, 10:13, 11:5, 12:10, 12:14, 22:12, 24:11, 40:15, 49:5, 50:5, 50:14, 54:23, 73:20, 75:14, 75:17, 82:13, 90:15, 91:20, 97:10, 102:24, 103:5, 103:14, 103:21, 104:4, 130:25, 137:4, 140:5, 140:12, 142:4
bring [1] - 95:24
broken [1] - 122:15
brought [1] - 103:10
bruises [2] - 63:13, 63:22
bruising [1] - 130:6
Building [1] - 2:12
bumps [2] - 63:13, 63:22
bunch [1] - 62:6
buried [1] - 96:20
butt [7] - 115:17, 115:18, 115:22, 116:10, 116:16, 117:2, 117:15
buttocks [1] - 124:6
button [6] - 62:15, 63:18, 64:2, 64:5, 64:9, 65:15
BY [4] - 2:7, 2:16, 4:6, 142:3

C

Cadillac [13] - 56:5, 65:6, 65:7, 65:14, 81:9, 81:14, 85:22, 85:23, 86:3, 86:7, 87:23, 94:19, 97:18
cannot [1] - 6:9
canvassed [1] - 21:11
capacities [1] - 1:13
capacity [8] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:11, 1:11
Capolino [2] - 27:9, 27:10
car [58] - 26:8, 26:10, 26:13, 33:23, 33:24, 33:25, 34:6, 41:19, 42:24, 42:25, 47:11, 54:21, 57:2, 57:16, 59:16, 63:11, 64:3, 64:9, 65:2, 65:3, 65:10, 65:22, 66:4, 66:25, 68:10, 68:22, 74:16, 75:24, 76:3, 76:17, 77:10, 77:19, 79:22, 80:6, 86:20, 86:22, 87:18, 88:10, 92:22, 93:7, 94:14, 94:15, 94:17, 95:3, 95:6, 97:14, 97:15, 101:3, 101:9, 102:4, 102:11, 115:2, 115:4, 126:9, 134:20, 135:11
card [2] - 62:6, 66:11
cars [7] - 42:18, 97:3, 97:6, 97:13, 97:24, 98:7, 98:11
case [6] - 37:5, 38:24, 120:18, 120:21, 121:3
casual [1] - 83:25
Causeway [1] - 45:18
cellphone [20] - 40:24, 41:8, 42:5, 42:6, 42:8, 42:9, 42:19, 43:5, 43:9, 43:13, 55:14, 67:16, 67:21, 68:3, 69:19, 70:9, 70:16, 70:17, 70:20, 80:11
cellphones [1] - 42:13
center [1] - 53:23
Central [3] - 1:17, 40:11, 52:6
certainly [1] - 47:7
certificate [3] - 15:9, 15:10, 15:13
certification [1] - 3:6
certify [3] - 141:7, 144:9, 144:15
chance [1] - 6:24
change [2] - 76:16, 97:5
changed [1] - 53:9
changing [1] - 52:12
channel [8] - 48:6, 48:9, 48:11, 48:15, 48:19, 49:9, 142:13, 142:14
Channel [1] - 49:7
channels [1] - 49:2
check [2] - 50:3, 50:14
chest [4] - 97:4, 97:11, 97:25, 113:13
chord [1] - 22:16
chose [1] - 69:12
Chris [5] - 41:12, 43:17, 43:19, 44:4, 70:22
CHRISTINE [1] - 2:9
CHRISTOPHER [2] - 1:8, 2:21
church [1] - 84:4
circumstances [1] - 13:21
City [3] - 18:18, 20:10, 21:14
civil [2] - 36:11, 36:12
civilian [4] - 34:22, 35:24, 38:11, 38:17
claim [1] - 38:10
clarify [1] - 93:18
classes [1] - 15:3
clear [10] - 50:6, 79:10, 82:12, 88:18, 93:21, 103:8, 103:23, 129:2, 129:17, 137:19
cleared [1] - 38:8
clearly [1] - 129:3
client [1] - 103:8
clipped [1] - 120:16
close [4] - 5:4, 96:24, 97:2, 98:8
closer [1] - 60:5
closest [3] - 101:3, 101:9, 102:11
clothing [2] - 126:20, 128:6
cloverleaf [9] - 53:2, 53:3, 53:6, 53:10, 53:16, 53:24, 54:16, 54:22, 55:4
co [1] - 1:4
co-administrators [1] - 1:4
coccyx [2] - 23:9, 23:14
COG [1] - 22:20
college [9] - 14:18, 14:19, 14:23, 15:10, 15:13, 15:18, 15:20, 15:21, 15:22
COLLINS [1] - 1:11
Colondona [1] - 30:4
Com [2] - 17:14, 17:15
comfort [1] - 5:24
comfortable [1] - 71:17
coming [14] - 6:22, 7:6, 12:23, 16:24, 17:2, 38:11, 40:4, 49:16, 102:10, 118:3, 118:21, 142:23
commands [1] - 60:9
COMMISSIONER [1] - 1:6
Commissioner [1] - 8:7
communicate [1] - 42:17
communication [4] - 41:17, 41:18, 66:24, 67:4
communications [1] - 48:24
community [1] - 28:14
company [2] - 17:18, 18:14
competitive [3] - 19:20, 20:3, 30:16
complained [1] - 132:2
complaining [1] - 131:15
complaint [7] - 35:11, 36:11, 36:12, 38:11, 38:12, 38:18, 131:9
complaints [3] - 34:22, 35:23, 35:24
complete [3] - 23:21, 25:22, 141:11
completely [2] - 7:2, 127:25
completing [1] - 15:19
comprehensive [1] - 50:6
computer [12] - 14:21, 17:17, 18:13, 41:20, 41:24, 66:3, 77:20, 77:24, 80:17, 80:20, 84:11, 84:15
computers [1] - 15:6
concerned [1] - 130:15
concerning [4] - 4:20, 49:13, 78:16, 142:19
concerns [1] - 23:15
conclusion [4] - 27:3, 83:2, 83:4, 95:25
condition [3] - 63:10,

126:19, 136:22
conducted [3] - 32:7, 34:21, 35:2
confident [1] - 73:16
configure [1] - 121:7
confusing [1] - 52:11
consider [2] - 81:25, 130:17
considered [1] - 24:24
console [3] - 47:15, 47:18, 77:24
constantly [1] - 53:9
contact [19] - 60:13, 60:18, 60:20, 65:13, 68:16, 69:15, 76:8, 97:20, 104:7, 104:11, 104:14, 111:5, 123:10, 123:14, 123:18, 128:16, 129:6, 129:13, 135:9
contacted [1] - 22:2
contacting [1] - 104:18
continue [1] - 53:17
continued [1] - 78:21
continuing [3] - 53:11, 113:2, 115:7
Convenience [1] - 22:20
conversation [18] - 43:22, 44:2, 45:25, 54:8, 67:14, 69:17, 69:21, 70:18, 70:21, 74:12, 75:23, 81:15, 81:17, 84:2, 84:7, 84:23, 85:4, 85:9
conversations [2] - 75:21, 140:7
coordinated [2] - 33:9, 33:10
COPE [9] - 28:8, 28:9, 28:13, 28:21, 29:3, 29:8, 29:10, 32:17, 34:6
copies [1] - 11:4
Copy [1] - 142:10
copy [2] - 12:15, 49:24
Corp [1] - 22:6
Correct [1] - 89:16
correct [111] - 9:10, 9:16, 11:4, 13:7, 14:7, 14:9, 24:20, 26:6, 26:9, 33:11, 39:2, 39:3, 41:25, 42:2, 42:4, 43:20, 45:4, 47:17, 47:22, 57:9, 57:13, 57:14, 60:4, 60:10, 61:5, 64:16, 66:5, 67:2, 67:9, 67:10, 67:18, 67:19, 67:22, 68:10, 68:11, 68:14, 68:15, 68:18, 68:20, 69:9, 69:10, 69:12, 69:22, 70:7, 70:10, 71:7, 74:5, 74:6, 76:4, 76:11, 79:13, 79:17, 79:20, 79:23, 84:19, 85:11, 85:12, 85:24, 87:12, 87:24, 88:22, 89:8, 89:23, 91:4, 91:5, 95:12, 95:19, 96:18, 97:16, 99:18, 102:5, 102:9, 104:10, 104:22, 105:21, 108:2, 108:11, 109:4, 109:5, 109:12, 109:16, 109:17, 110:5, 110:6, 110:12, 110:15, 110:18, 110:19, 111:17, 115:13, 116:12, 118:14, 121:19, 122:10, 122:11, 125:21, 125:22, 127:10, 129:22, 129:23, 131:7, 131:8, 131:24, 133:20, 133:21, 134:21, 137:10, 137:25, 138:2, 141:11, 141:13
correctish [1] - 18:12
Counsel [2] - 10:7, 143:7
COUNTY [5] - 1:5, 1:9, 1:10, 141:5, 144:5
County [18] - 1:13, 1:14, 2:10, 4:11, 16:3, 16:6, 16:11, 16:14, 16:19, 16:21, 16:24, 17:3, 17:10, 17:12, 19:18, 19:23, 23:22, 29:23
couple [2] - 103:3, 130:24
course [6] - 23:21, 39:20, 46:7, 100:18, 119:21, 140:3
courses [5] - 24:3, 24:4, 24:8, 24:13, 24:17
Court [1] - 3:19
COURT [1] - 1:2
court [2] - 5:5, 5:18
courthouse [1] - 52:5
cover [1] - 60:21
Craig [1] - 27:9
crawl [2] - 91:11, 94:21
crawled [2] - 91:13, 91:18
crawling [5] - 91:22, 92:19, 93:4, 93:9, 127:7
credits [4] - 15:11, 15:13, 15:20, 15:23
Crime [2] - 13:14, 27:25
criminal [2] - 84:12, 84:15
crown [1] - 134:4
cuff [11] - 119:2, 119:5, 119:10, 119:12, 120:5, 121:7, 121:8, 121:16, 121:18, 122:4
cuffed [8] - 120:7, 120:9, 122:3, 122:4, 122:5, 122:7, 122:12, 122:25
cuffing [4] - 119:14, 123:11, 129:8, 129:9
cuffs [7] - 120:11, 120:14, 120:16, 120:22, 121:4, 121:7, 122:9
current [1] - 29:20
curriculum [2] - 24:5, 24:8
cursing [3] - 124:10, 128:25, 129:4
custody [3] - 95:22, 95:24, 96:16
CV09-1023(TCP)(ETB [1] - 1:15

D

Daniel [1] - 30:4
dash [2] - 64:22, 65:17
dashboard [1] - 62:16
data [4] - 65:25, 66:7, 66:8, 78:21
date [3] - 10:10, 11:22, 33:18
days [1] - 33:6
deadly [1] - 8:16
deal [1] - 75:10
dealing [2] - 38:24, 47:15
December [1] - 144:22
decisions [1] - 50:21
Defendant [4] - 1:19, 9:9, 10:18, 143:4
defendant [1] - 4:21
Defendants [2] - 1:14, 2:11
degree [9] - 14:24, 14:25, 15:4, 15:7, 15:8, 15:14, 15:15, 23:5
delineate [1] - 31:22
demonstrate [2] - 103:9, 103:19
demonstrated [2] - 108:16, 116:20
demonstrating [1] - 103:13
Dennison [1] - 2:12
Department [20] - 4:11, 16:3, 16:7, 16:12, 16:15, 16:19, 16:21, 16:25, 17:3, 17:12, 19:19, 29:23, 41:18, 42:6, 42:8, 42:10, 42:12, 84:18, 139:21, 139:24
department [1] - 138:10
DEPARTMENT [1] - 1:5
departments [2] - 20:4, 20:6
depo [1] - 7:19
Deposition [1] - 1:19
deposition [12] - 3:6, 3:14, 6:18, 7:19, 7:24, 8:23, 8:25, 11:12, 12:24, 141:9, 144:11, 144:13
describe [8] - 16:12, 17:10, 56:3, 100:20, 110:25, 128:20, 128:24, 134:14
described [2] - 46:5, 116:21
description [6] - 55:25, 56:12, 73:8, 73:10, 73:14, 74:4
designation [2] - 46:19, 46:20
desk [1] - 33:11
det [1] - 118:2
Det [70] - 43:12, 43:15, 50:21, 50:24, 51:8, 55:5, 56:10, 56:16, 56:22, 57:5, 57:18, 57:25, 58:2, 66:24, 67:16, 68:19, 68:21, 69:15, 69:20, 70:22, 74:8, 74:9, 74:13, 74:21, 74:23, 75:5, 75:21, 75:23, 76:13, 76:14, 77:15, 78:19, 79:7, 79:16, 81:5, 81:10, 81:15, 81:18, 85:15, 87:4, 87:7, 87:8, 87:13, 87:20, 88:9, 88:19, 88:25, 89:25, 91:16, 94:24, 96:5, 96:13, 101:8, 111:12, 111:20, 114:25, 118:4, 118:19, 119:2, 119:6, 120:2, 123:4, 123:15, 134:25, 135:14, 135:15, 135:19, 136:2
detailed [2] - 139:2, 139:12
details [4] - 55:16, 102:23, 138:14, 138:18
detection [1] - 31:25
Detective [10] - 41:12, 48:4, 48:19, 48:22, 49:8, 50:8, 50:18, 57:12, 69:5, 142:14
detectives [4] - 44:8, 48:25, 68:6, 71:24
device [1] - 41:17
different [2] - 51:11, 52:19
difficult [2] - 52:14, 52:16
direction [3] - 54:10, 55:5, 56:12
directly [6] - 56:22, 86:21, 94:18, 101:24, 104:24, 127:11
dirt [1] - 113:9
discharge [2] - 22:17, 22:19
discussed [1] - 36:17
discussing [3] - 51:2, 54:11, 54:21
Discussion [4] - 11:6, 102:25, 131:2, 139:18
discussion [4] - 45:14, 50:17, 51:6, 132:23
disengage [1] - 121:2
dispute [2] - 35:14, 38:19
disrobe [1] - 127:20
distance [1] - 52:4
DISTRICT [5] - 1:2, 1:2, 1:10, 1:10, 1:11
District [3] - 1:13, 1:14, 4:22
Docket [1] - 1:15
DOCUMENT [1] - 142:9
document [6] - 7:11,

10:25, 11:13, 11:14, 12:15, 142:10
**documents** [12] - 6:20, 6:21, 6:23, 7:3, 7:7, 7:17, 7:23, 8:24, 9:11, 9:14, 12:22, 130:24
**DOES** [1] - 1:12
**domestic** [2] - 35:14, 38:19
**done** [10] - 15:18, 15:22, 16:7, 16:23, 62:5, 67:24, 79:4, 110:14, 118:5, 139:14
**door** [5] - 56:5, 88:2, 88:3, 88:6
**DORMER** [1] - 1:6
**Dot** [2] - 17:14, 17:15
**double** [1] - 50:2
**doubled** [1] - 15:3
**down** [28] - 5:6, 47:14, 69:9, 69:16, 69:24, 70:3, 71:22, 74:20, 75:10, 89:17, 90:20, 90:21, 90:22, 90:24, 96:20, 99:16, 102:20, 103:4, 103:11, 107:6, 108:18, 112:10, 113:8, 113:9, 113:14, 114:4, 133:20, 133:21
**driven** [1] - 126:10
**driver** [4] - 47:24, 59:23, 60:16, 61:2
**driver's** [16] - 61:4, 61:13, 61:24, 62:3, 62:10, 65:4, 65:5, 65:14, 66:14, 70:23, 71:5, 74:23, 75:7, 76:3, 79:17, 89:4
**driving** [3] - 47:12, 47:23, 54:5
**due** [2] - 35:18, 71:12
**duly** [2] - 4:3, 144:12
**DUNNE** [19] - 2:16, 9:5, 10:6, 10:11, 11:3, 12:18, 36:2, 49:18, 50:9, 54:20, 75:12, 103:7, 103:18, 104:3, 105:15, 131:3, 139:16, 140:3, 140:6
**Dunne** [2] - 13:5, 103:5
**during** [5] - 16:18, 18:24, 24:2, 51:5, 54:3

**E**

**earn** [1] - 15:4
**earned** [1] - 15:14
**earning** [1] - 15:12
**East** [3] - 1:24, 18:2, 18:14
**EASTERN** [1] - 1:2
**Eastern** [1] - 4:22
**education** [1] - 14:17
**Education** [1] - 24:4
**effect** [1] - 3:17
**either** [10] - 38:9, 63:5, 69:21, 70:3, 89:25, 121:2, 122:4, 129:6, 139:19, 139:25
**elbow** [10] - 87:8, 87:10, 87:12, 103:4, 104:7, 104:9, 105:5, 106:13, 106:20, 109:10
**elbows** [5] - 96:2, 102:20, 103:10, 110:11, 110:13
**electronic** [1] - 41:18
**electronically** [1] - 81:5
**emerged** [1] - 135:11
**Emergency** [3] - 29:14, 29:18, 31:21
**employed** [3] - 17:13, 18:15, 29:22
**employees** [1] - 1:13
**employer** [1] - 17:16
**employment** [6] - 16:11, 16:13, 17:11, 17:23, 18:25, 19:4
**en** [1] - 52:6
**end** [4] - 27:14, 28:6, 35:16, 119:6
**ending** [1] - 46:24
**enforcement** [2] - 16:8, 31:14
**Enforcement** [2] - 28:2, 28:15
**engage** [1] - 118:7
**engaged** [4] - 16:13, 99:10, 99:14, 125:19
**engaging** [1] - 121:17
**engine** [1] - 64:15
**entering** [1] - 77:23
**entire** [3] - 8:5, 8:10, 109:19
**equipment** [1] - 8:19
**escape** [2] - 115:7, 127:23
**ESQ** [3] - 2:7, 2:9, 2:16
**ESS** [4] - 29:25, 30:6, 30:12, 32:16
**essentially** [6] - 79:12, 90:19, 97:18, 109:23, 125:19, 135:10
**establishment** [1] - 18:14
**Estate** [2] - 1:4, 4:17
**estimate** [2] - 58:20, 58:21
**evening** [10] - 40:2, 40:8, 61:8, 132:13, 132:19, 134:12, 134:21, 135:6, 136:3, 137:6
**exact** [5] - 44:13, 46:19, 46:20, 52:15, 136:18
**exactly** [4] - 88:14, 116:17, 133:10, 133:12
**exam** [1] - 21:17
**EXAMINATION** [2] - 4:6, 142:3
**examination** [5] - 19:20, 19:23, 20:17, 21:5, 30:17
**examinations** [2] - 20:3, 20:12
**examined** [1] - 4:4
**except** [1] - 3:9
**excuse** [3] - 57:25, 76:14, 108:7
**execute** [2] - 11:25, 12:4
**Exhibit** [2] - 10:15, 10:17
**exhibit** [1] - 143:7
**EXHIBITS** [1] - 143:2
**exist** [3] - 12:17, 49:12, 142:18
**existence** [1] - 27:16
**exists** [1] - 72:11
**exit** [1] - 57:23
**exited** [3] - 60:15, 80:19, 81:3
**exiting** [2] - 60:12, 79:9
**explain** [2] - 12:3, 83:6
**Explorer** [1] - 74:11
**eye** [2] - 124:22, 125:6

**F**

**F.B.I** [1] - 32:6
**face** [18] - 63:14, 63:22, 90:22, 90:24, 94:11, 112:10, 113:7, 113:9, 115:17, 115:19, 116:11, 116:17, 117:3, 124:17, 124:20, 125:2, 130:7
**faces** [1] - 86:7
**facing** [5] - 85:15, 85:23, 101:25, 113:11, 133:21
**fact** [1] - 73:18
**facts** [1] - 36:13
**fair** [1] - 114:18
**familiar** [1] - 33:4
**family** [2] - 35:18
**far** [6] - 36:9, 49:2, 59:15, 60:2, 66:9, 103:18
**fashion** [2] - 81:5, 84:21
**Federal** [2] - 1:16, 36:3
**feet** [9] - 86:25, 91:12, 91:14, 92:16, 92:18, 92:20, 93:10, 98:13, 124:7
**fell** [4] - 94:9, 94:11, 100:24, 109:22
**felt** [4] - 100:19, 102:7, 103:12, 111:15
**few** [3] - 13:5, 31:21, 53:2
**field** [3] - 25:2, 25:5, 25:23
**Field** [1] - 25:10
**fight** [2] - 35:17, 35:18
**fighting** [8] - 90:3, 95:21, 95:23, 118:22, 118:23, 118:25, 119:18, 119:23
**filing** [1] - 3:5
**final** [2] - 49:11, 142:17
**fine** [2] - 128:22, 136:24
**Fing** [1] - 124:10
**finish** [8] - 14:23, 14:25, 15:2, 22:13, 71:13, 71:19, 71:20, 80:20
**finished** [3] - 72:18, 95:17, 106:9
**firearms** [1] - 30:18
**firmly** [1] - 89:17
**first** [14] - 4:3, 11:16, 13:18, 14:5, 19:22, 20:12, 25:4, 35:24, 49:22, 52:11, 59:13, 80:12, 110:13, 122:17
**five** [8] - 98:12, 106:5, 106:24, 111:8, 111:9, 112:2, 112:7, 130:8
**flaring** [1] - 96:2
**flashlight** [45] - 106:7, 106:25, 108:5, 108:9, 108:13, 108:21, 108:22, 108:25, 109:3, 109:7, 109:10, 109:15, 109:18, 109:24, 110:8, 111:5, 113:24, 125:15, 130:9, 131:23, 132:5, 132:9, 132:24, 133:3, 133:5, 133:9, 133:19, 133:23, 134:9, 134:12, 134:15, 134:22, 135:12, 135:16, 135:20, 135:23, 135:24, 136:3, 136:6, 136:16, 136:17, 136:18, 136:25, 137:5
**fleeing** [1] - 55:6
**flip** [1] - 121:11
**floor** [2] - 47:19, 47:20
**Florence** [1] - 1:20
**FLORENCE** [2] - 144:7, 144:25
**Florida** [4] - 20:8, 20:12, 20:15, 20:25
**flow** [1] - 59:8
**focal** [1] - 86:18
**folder** [2] - 9:12, 12:7
**following** [4] - 23:13, 30:16, 51:4, 52:19
**follows** [1] - 4:5
**foot** [2] - 94:8, 94:9
**FOR** [1] - 143:3
**force** [8] - 3:17, 8:16, 27:18, 27:23, 103:9, 103:13, 103:15, 110:21
**Ford** [1] - 74:11
**forehead** [4] - 124:22, 125:4, 125:5, 130:7
**form** [3] - 3:10, 81:4, 130:4
**Fort** [1] - 32:8
**forth** [3] - 83:17, 85:6, 144:12
**forward** [3] - 94:11, 96:4, 127:7
**fought** [3] - 126:21, 126:25, 127:18
**four** [2] - 56:5, 88:3
**four-door** [2] - 56:5, 88:3
**fracture** [2] - 23:9, 23:13
**Frances** [1] - 29:2
**Fred** [1] - 4:13
**FREDERICK** [2] - 2:3, 2:7



free [3] - 6:15, 6:20, 96:11
front [24] - 50:12, 68:13, 73:19, 76:22, 79:6, 79:9, 81:10, 86:2, 88:6, 89:2, 90:12, 92:22, 93:6, 94:14, 94:17, 94:18, 95:3, 99:16, 101:3, 101:24, 102:4, 102:11, 134:4
full [2] - 12:15, 142:10
fully [3] - 71:19, 92:17, 122:3
FURTHER [2] - 3:8, 3:13

G

gang [2] - 27:17, 27:22
general [2] - 39:12, 46:23
geographic [1] - 39:12
Germano [1] - 49:21
gesture [1] - 5:19
Gibbs [4] - 14:20, 15:17, 15:24, 19:7
Ginnie [1] - 126:23
given [5] - 31:15, 109:19, 139:20, 141:13, 144:14
GONZALEZ [2] - 1:3
Gonzalez [2] - 4:18
Government [1] - 22:21
grab [4] - 100:10, 108:16, 123:20, 127:23
grabbed [5] - 87:20, 89:12, 99:8, 107:14, 107:18
grabbing [2] - 127:12, 127:21
graduate [1] - 19:15
graduated [3] - 24:10, 24:19, 24:25
graduation [3] - 24:12, 24:15, 30:20
Grand [15] - 13:23, 13:25, 14:4, 14:8, 18:20, 51:22, 136:20, 137:7, 137:13, 137:15, 137:21, 138:21, 138:25, 139:7, 139:9
grass [5] - 53:23, 60:3, 86:23, 89:3, 89:5
ground [17] - 89:17, 90:20, 90:21, 94:10, 104:20, 107:7, 107:9, 107:12, 107:13, 107:18, 107:19, 107:25, 109:23, 115:9, 116:8, 116:15, 132:6
guess [5] - 38:15, 44:11, 44:12, 116:16, 126:24
guilty [1] - 38:14
gun [11] - 100:15, 100:20, 105:18, 105:19, 110:17

H

half [3] - 26:23, 27:13, 27:14
hand [53] - 72:23, 72:25, 73:3, 74:3, 74:4, 99:19, 102:8, 102:15, 102:17, 102:21, 104:13, 104:14, 104:18, 105:4, 105:5, 105:6, 105:8, 105:9, 108:6, 108:8, 108:13, 108:21, 109:3, 109:6, 109:11, 109:16, 109:19, 109:25, 110:17, 113:25, 115:18, 119:4, 119:7, 119:8, 119:12, 120:3, 120:7, 120:8, 121:8, 121:12, 121:14, 122:15, 125:10, 131:11, 131:12, 131:15, 131:19, 131:20, 131:22, 144:21
handcuff [2] - 119:6, 120:3
handcuffed [2] - 125:13, 125:19
handcuffs [1] - 96:15
handed [5] - 122:4, 124:11, 128:4, 128:15, 129:10
handheld [1] - 42:25
handing) [1] - 10:23
hands [17] - 78:25, 88:10, 89:14, 91:6, 91:7, 96:11, 96:14, 99:23, 108:16, 115:9, 116:6, 116:14, 116:18, 121:6, 121:18, 123:19, 123:20
happy [2] - 4:25, 6:15
hard [6] - 111:2, 111:4, 115:24, 115:25, 116:17, 130:10
haste [1] - 46:8
Hauppauge [1] - 2:15
hazardous [2] - 30:13, 31:24
head [23] - 63:14, 63:23, 96:20, 105:23, 106:24, 110:4, 110:7, 110:21, 110:22, 111:4, 111:6, 112:8, 112:10, 112:21, 112:22, 112:25, 116:7, 124:17, 130:8, 133:20, 134:3, 134:4, 134:5
headed [1] - 57:22
heading [1] - 46:4
hear [21] - 5:3, 5:8, 24:14, 40:17, 43:21, 48:24, 50:17, 50:20, 50:25, 51:14, 51:20, 69:17, 69:20, 70:10, 72:2, 72:5, 81:17, 81:18, 81:21, 129:3, 135:22
heard [8] - 43:17, 50:21, 51:17, 54:19, 55:4, 55:22, 118:8, 118:9
hears [1] - 72:7
heavy [4] - 30:7, 30:13, 32:2, 32:12
Hecksher [1] - 46:16
held [2] - 9:19, 31:2
help [8] - 72:2, 112:15, 112:16, 113:19, 115:2, 115:4, 118:3
Hempstead [1] - 2:6
hereby [2] - 141:7, 144:9
HEREBY [1] - 3:2
herein [1] - 3:4
hereinbefore [1] - 144:11
hereunto [1] - 144:21
high [3] - 19:8, 19:10, 19:15
highest [1] - 14:16
Highway [5] - 2:13, 31:15, 45:18, 53:4, 53:19
himself [1] - 127:20
hips [1] - 114:16
history [2] - 84:13, 84:15
hit [20] - 78:3, 105:4, 105:9, 110:8, 110:17, 110:20, 110:22, 111:8, 111:9, 129:7, 130:8, 131:23, 132:9, 133:4, 133:13, 133:16, 134:9, 136:6, 136:12, 136:16
hitting [8] - 97:11, 110:10, 111:4, 113:22, 133:9, 133:18, 133:22, 133:24
hold [9] - 11:10, 47:13, 91:3, 91:21, 93:24, 114:20, 119:19, 119:25, 135:23
holding [1] - 115:5
holster [4] - 102:16, 102:17, 104:13, 110:18
honest [1] - 46:11
hook [1] - 121:11
hooked [1] - 120:4
hospital [9] - 124:14, 125:25, 126:7, 126:17, 129:24, 130:3, 130:17, 132:21, 132:22
Hospital [3] - 126:5, 131:6, 131:10
hour [4] - 46:11, 50:12, 61:11
house [3] - 39:25, 40:3, 40:4
hug [7] - 89:15, 92:3, 92:4, 92:5, 92:6, 94:8, 109:20
hugged [1] - 109:24
hum [2] - 25:17, 122:25
hung [1] - 74:21

I

I.D [1] - 143:3
idea [5] - 42:15, 46:18, 68:22, 123:9, 128:9
identification [8] - 10:14, 10:16, 10:20, 10:23, 57:15, 62:7, 66:10, 66:11
identified [1] - 57:7
identify [1] - 58:11
identity [2] - 62:20, 62:22
ignition [1] - 64:7
immediately [3] - 57:21, 59:4, 59:13
important [1] - 5:8
impression [1] - 18:5
improper [1] - 78:15
IN [1] - 144:20
INC [1] - 1:23
incident [5] - 49:9, 136:17, 137:17, 137:25, 142:15
included [1] - 50:9
including [6] - 37:5, 42:13, 49:11, 49:14, 142:17, 142:20
indeed [1] - 12:17
indicate [1] - 97:12
indicated [7] - 49:23, 90:20, 90:25, 97:24, 129:14, 131:5, 139:22
indicating [7] - 10:11, 79:6, 86:2, 87:10, 89:14, 97:4, 97:10
indicating) [13] - 9:6, 47:9, 79:2, 85:8, 86:14, 89:13, 89:16, 96:21, 102:21, 108:23, 114:5, 115:10, 115:17
indication [1] - 78:14
individual [9] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:10, 1:11, 1:13
individually [1] - 1:3
information [2] - 63:6, 81:4
injured [2] - 22:16, 38:2
injuries [3] - 130:11, 130:14, 131:25
injury [7] - 23:4, 23:5, 23:7, 130:4, 130:15, 131:11, 131:15
inquiries [1] - 80:21
inquiry [2] - 5:15, 78:4
inside [1] - 47:11
instance [1] - 49:22
instead [1] - 83:2
instructed [2] - 45:16, 45:19
instructing [1] - 45:20
instrument [1] - 125:11
interested [1] - 144:18
internal [1] - 138:8
Internal [13] - 7:10, 7:12, 7:13, 8:22, 37:2, 38:6, 38:11, 38:22, 137:10, 137:11,

148

138:9, 138:13, 139:21
interoffice [1] - 11:18
interpretation [1] - 5:18
Interrogatories [2] - 10:19, 143:5
interrogatory [4] - 9:6, 9:7, 9:15, 9:17
Interrogatory [1] - 9:9
interrupting [2] - 83:7, 83:8
intervention [1] - 23:11
interview [2] - 21:22, 59:23
interviewed [5] - 21:9, 21:21, 137:9, 137:11, 137:14
introduced [1] - 61:7
investigating [1] - 38:20
investigation [3] - 37:10, 38:6, 38:12
investigations [2] - 34:22, 37:2
involved [2] - 35:16, 38:18
irritated [1] - 124:9
IS [3] - 3:2, 3:8, 3:13
Island [2] - 19:12, 19:14
Islip [6] - 1:17, 19:13, 40:11, 52:6, 72:23, 75:10
issue [4] - 68:9, 72:9, 72:10, 72:11
issued [5] - 41:19, 41:21, 42:6, 42:8, 42:10
issues [1] - 42:13
IT [3] - 3:2, 3:8, 3:13

J

James [3] - 34:11, 34:12, 38:21
JAMES [1] - 1:7
jAMES [1] - 2:20
JANE [1] - 1:12
January [2] - 10:12, 12:11
Jeans [1] - 128:9
jeans [1] - 126:21
Jennifer [1] - 4:18
JENNIFER [1] - 1:3
Jerry [1] - 25:19
Jimmy [14] - 69:2, 71:22, 72:2, 88:16, 98:15, 98:18, 98:24, 100:10, 100:12, 100:23, 102:14, 114:10, 114:11, 135:2
Jimmy's [1] - 114:9
job [2] - 21:12, 30:5
jobs [1] - 16:20
Joe [3] - 25:14, 122:16, 122:17
JOHN [4] - 1:6, 1:11, 1:12, 2:22
John [1] - 19:11
join [1] - 16:2
joining [1] - 19:18
Judge [8] - 4:9, 4:13, 10:15, 10:17, 10:22, 36:6, 61:8, 131:5
judge [2] - 11:7, 11:11
JUDGE [7] - 1:8, 1:20, 141:7, 141:17, 142:4, 143:3, 144:10
Judge's [3] - 9:9, 10:18, 143:4
June [1] - 24:21
jury [1] - 103:20
Jury [14] - 13:23, 13:25, 14:5, 14:9, 51:22, 136:21, 137:7, 137:14, 137:15, 137:21, 138:22, 138:25, 139:7, 139:10
justifiable [1] - 61:12

K

keep [4] - 83:7, 96:3, 120:11, 120:13
Kenny [20] - 4:17, 62:24, 63:5, 67:12, 78:9, 79:8, 81:10, 81:16, 81:19, 94:25, 95:10, 95:14, 98:22, 113:23, 118:7, 118:11, 128:17, 128:20, 128:24, 133:16
KENNY [1] - 1:4
kept [5] - 52:12, 81:23, 89:19, 94:21, 121:3
key [1] - 64:21
keyboard [1] - 79:2
kicked [1] - 129:7
kind [5] - 51:12, 91:11, 109:20, 116:6, 116:17
knee [2] - 114:15, 114:16
knock [1] - 88:11
knowledge [2] - 112:4, 112:5

L

lacerations [1] - 63:22
LAN [2] - 15:5, 15:7
lane [5] - 57:21, 57:22, 59:17, 98:19, 98:20
language [1] - 82:24
laptop [1] - 79:2
large [3] - 35:14, 38:18, 94:4
Las [2] - 20:8, 21:3
laser [1] - 31:14
last [10] - 11:24, 13:20, 13:22, 17:6, 51:20, 75:18, 82:14, 126:12, 128:19, 128:23
late [1] - 56:5
LAW [1] - 2:3
Law [1] - 24:3
lawsuit [1] - 4:20
lay [1] - 102:2
laying [2] - 107:6, 108:18
LAZO [1] - 1:4
Lazo [88] - 4:17, 37:5, 38:24, 49:16, 62:24, 63:5, 63:10, 67:12, 72:6, 78:10, 79:8, 79:21, 80:5, 81:10, 81:16, 81:21, 83:18, 84:25, 85:14, 85:17, 85:19, 86:5, 86:10, 86:21, 87:21, 88:20, 88:24, 89:12, 89:18, 90:18, 95:5, 95:6, 95:10, 98:4, 98:22, 99:2, 99:10, 99:12, 99:22, 102:2, 103:11, 104:17, 105:23, 106:14, 106:24, 108:4, 109:20, 112:2, 112:21, 113:23, 114:5, 115:6, 118:7, 118:11, 118:23, 119:3, 119:7, 119:23, 121:21, 122:21, 123:11, 123:16, 123:24, 124:9, 124:16, 125:10, 126:13, 126:15, 128:17, 128:20, 128:24, 129:8, 129:11, 129:13, 130:4, 131:23, 132:5, 132:9, 133:9, 133:16, 133:19, 134:3, 134:7, 134:9, 136:6, 136:13, 136:16, 142:23
Lazo's [9] - 81:20, 87:4, 94:25, 95:15, 102:15, 104:16, 105:6, 120:3, 133:19
lead [5] - 26:24, 27:15, 43:18, 44:6, 51:9
leaned [1] - 85:21
leaning [1] - 85:3
learn [7] - 13:15, 41:8, 62:20, 132:8, 132:11, 132:20, 133:2
learned [1] - 136:5
learner's [3] - 61:21, 62:6, 62:19
least [1] - 44:15
leave [4] - 14:2, 29:10, 96:8, 111:18
leaving [2] - 30:8, 30:15
Lee [1] - 32:8
lee [1] - 2:12
left [44] - 29:12, 57:21, 76:21, 76:23, 77:6, 77:9, 77:18, 86:9, 86:15, 89:9, 90:11, 92:22, 93:11, 94:25, 95:2, 99:21, 100:14, 100:24, 100:25, 101:20, 101:22, 102:5, 102:8, 102:15, 105:5, 105:8, 108:6, 108:8, 108:13, 109:8, 109:10, 111:14, 117:16, 119:3, 120:3, 120:15, 121:8, 125:7, 131:13, 131:21
left-hand [1] - 102:8
lefty [1] - 100:24
legs [5] - 5:25, 114:21, 117:5, 117:6, 117:8
less [1] - 24:22
letters [1] - 44:16
letting [3] - 71:13, 114:7, 114:23
level [4] - 14:16, 103:15, 103:24, 121:24
license [16] - 61:13, 61:24, 62:3, 62:10, 65:10, 66:2, 66:14, 66:20, 70:23, 71:6, 72:21, 74:24, 75:7, 79:17, 86:18, 86:19
lifting [1] - 120:25
lights [2] - 46:12, 58:14
limited [2] - 49:14, 142:21
Linder [1] - 25:19
line [1] - 36:4
LINK [1] - 1:9
Link [15] - 25:14, 122:16, 122:17, 122:21, 123:22, 123:25, 124:11, 125:24, 126:2, 126:14, 126:18, 128:5, 128:16, 129:11, 134:8
list [1] - 21:24
listened [1] - 51:25
listening [3] - 52:21, 54:4, 81:19
literally [4] - 53:22, 86:17, 86:19, 98:12
Local [1] - 15:5
located [3] - 18:20, 25:6, 33:12
location [8] - 47:11, 52:6, 52:7, 52:9, 52:12, 52:15, 52:17, 52:22
locations [1] - 51:11
lock [2] - 52:15, 52:17
look [6] - 6:21, 13:5, 79:5, 98:14, 102:14, 130:24
looked [3] - 74:22, 80:5, 80:16
looking [5] - 12:6, 63:11, 85:7, 100:17, 133:23
looks [3] - 33:24, 87:7
loop [1] - 69:24
loose [1] - 120:16
lose [1] - 101:15
losing [2] - 114:8
lost [1] - 101:17
low [1] - 114:4
lower [1] - 71:22
Lunch [3] - 18:19, 18:22, 19:3
lying [2] - 11:21, 99:15

M

Mag [1] - 132:8
mail [2] - 11:18, 62:4
Main [1] - 1:24
maintain [1] - 93:24
MALAFI [1] - 2:9
man [1] - 84:5
maneuver [1] - 106:9
manner [2] - 82:3, 83:17



Marine [1] - 22:5
Marines [1] - 22:7
mark [2] - 10:14, 73:24
marked [3] - 10:19, 10:22, 33:22
marriage [1] - 144:17
material [1] - 30:13
materials [1] - 31:24
matter [4] - 49:13, 120:24, 142:19, 144:19
Meadow [2] - 18:2, 18:14
mean [4] - 5:19, 12:3, 38:14, 140:3
meaning [1] - 115:8
medical [2] - 130:18, 130:21
Melville [1] - 14:20
members [1] - 1:12
Memorial [1] - 2:13
memory [2] - 14:2, 14:14
met [1] - 126:4
metal [1] - 136:25
MFing [1] - 128:25
Michael [1] - 26:20
middle [1] - 114:14
midnight [1] - 39:10
might [1] - 136:20
mile [1] - 61:11
miles [1] - 46:11
militant [1] - 82:5
military [4] - 22:3, 22:23, 23:17, 83:19
miniature [1] - 108:22
minute [1] - 47:6
minutes [2] - 13:6, 53:7
Misa [1] - 28:20
misplaced [1] - 49:23
MO [1] - 73:15
model [1] - 56:5
moderate [1] - 59:10
month [2] - 22:11, 23:18
months [7] - 22:10, 23:25, 24:2, 24:23, 24:24, 28:5, 28:6
morning [2] - 4:15, 4:16
Moses [10] - 45:18, 46:17, 53:3, 53:13, 53:20, 53:21, 55:9, 56:15, 56:20, 56:21
mother [1] - 124:10
MOTIONS [1] - 142:7
Motor [1] - 84:18
motor [1] - 26:7
move [3] - 46:9, 49:24, 73:21
moving [2] - 53:6, 93:14
MR [47] - 4:7, 9:5, 10:6, 10:11, 10:13, 11:3, 11:5, 12:10, 12:14, 12:18, 22:12, 24:11, 36:2, 40:15, 49:5, 49:18, 50:5, 50:9, 50:14, 54:20, 54:23, 73:20, 75:12, 75:14, 75:17, 82:13, 90:15, 91:20, 97:10, 102:24, 103:5, 103:7, 103:14, 103:18, 103:21, 104:3, 104:4, 105:15, 130:25, 131:3, 137:4, 139:16, 140:3, 140:5, 140:6, 140:12, 142:4
must [1] - 11:3

**N**

Naked [3] - 18:19, 18:21, 19:3
name [11] - 4:8, 4:13, 9:3, 27:23, 27:24, 62:25, 63:4, 66:9, 67:5, 84:11, 84:14
names [1] - 25:13
narcotics [1] - 44:19
NASSAU [1] - 144:5
near [1] - 87:25
nearby [1] - 118:13
need [6] - 5:23, 61:13, 72:4, 86:18, 112:15
needed [1] - 32:24
needs [1] - 6:14
NESOT [2] - 44:8, 44:9
Network [1] - 15:5
never [3] - 21:25, 64:8, 64:18
NEW [3] - 1:2, 141:4, 144:3
New [14] - 1:17, 1:21, 1:24, 2:6, 2:15, 4:4, 4:12, 4:22, 20:10, 21:14, 61:20, 62:19, 141:23, 144:8
Newton [56] - 50:22, 51:8, 55:5, 56:10, 56:16, 56:23, 57:5, 57:18, 58:2, 74:9, 74:13, 74:23, 75:5, 75:22, 75:23, 76:12, 76:13, 76:14, 77:15, 78:19, 79:7, 79:16, 81:6, 81:10, 81:16, 81:18, 85:16, 87:4, 87:8, 87:9, 87:13, 87:20, 88:9, 88:19, 88:25, 90:2, 91:16, 94:24, 96:5, 96:13, 101:8, 111:12, 111:20, 114:25, 118:2, 118:4, 118:19, 119:2, 120:2, 123:4, 123:15, 134:25, 135:14, 135:15, 135:19, 136:2
NEWTON [2] - 1:6, 2:22
newton's [1] - 119:6
next [29] - 33:12, 54:18, 55:3, 57:4, 58:12, 59:12, 60:11, 61:19, 63:16, 64:3, 64:17, 77:14, 78:18, 80:17, 81:8, 85:13, 87:3, 88:23, 89:11, 95:8, 98:6, 98:21, 102:13, 105:10, 112:12, 114:24, 122:13, 123:23, 124:8
night [3] - 39:17, 39:18, 39:24
non [2] - 70:6, 70:8
non-recorded [2] - 70:6, 70:8
none [3] - 16:17, 122:2, 128:18
normal [9] - 23:21, 24:3, 24:8, 42:16, 42:17, 42:20, 42:21, 42:22, 82:2
normally [3] - 48:8, 48:16, 67:24
north [3] - 53:13, 53:19, 53:21
northbound [1] - 54:13
Notary [4] - 1:20, 4:3, 141:23, 144:7
note [1] - 73:20
noted [2] - 12:18, 140:14
nothing [1] - 117:18
Notice [1] - 1:20
November [3] - 1:18, 24:21, 141:10
number [3] - 34:5, 66:10, 66:11

**O**

oath [2] - 3:17, 141:9
obeyed [1] - 60:9
object [1] - 36:4
objections [1] - 3:9
observation [1] - 83:14
observations [6] - 43:24, 82:19, 118:6, 124:15, 124:17, 125:17
observe [2] - 83:13, 129:12
observed [1] - 59:14
observing [2] - 51:3, 52:19
obtaining [1] - 130:18
obvious [2] - 85:8, 85:10
obviously [1] - 55:25
occasions [3] - 34:19, 34:23, 49:21
occur [2] - 37:17, 127:2
occurred [2] - 47:4, 67:3
occurrence [1] - 34:19
October [1] - 14:13
odd [1] - 82:4
OF [9] - 1:2, 1:5, 1:10, 2:3, 141:4, 141:5, 144:3, 144:5
offhand [2] - 8:21, 18:3
office [1] - 49:24
OFFICE [1] - 1:10
Office [2] - 1:12, 1:13
Officer [18] - 17:10, 25:11, 26:5, 61:8, 76:12, 122:16, 122:21, 123:22, 123:25, 124:11, 125:24, 126:2, 126:14, 126:18, 128:5, 128:16, 129:11, 134:8
officer [15] - 3:16, 16:6, 19:24, 27:20, 29:16, 29:19, 30:25, 34:13, 34:21, 36:6, 38:20, 68:4, 68:9, 72:3, 131:5
OFFICER [6] - 1:6, 1:7, 1:8, 1:8, 1:9, 1:20
officers [4] - 35:16, 40:21, 42:13, 42:18
OFFICES [1] - 2:3
official [10] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:11, 1:11, 1:13, 22:23
once [2] - 66:13, 117:24
one [24] - 7:15, 8:18, 9:2, 9:19, 26:10, 26:11, 35:5, 36:8, 36:10, 36:16, 38:25, 48:9, 56:25, 66:12, 80:12, 93:20, 106:15, 106:19, 117:15, 121:8, 121:9, 121:12, 138:10, 139:14
ones [2] - 8:15, 138:19
ongoing [2] - 32:23, 32:25
oOo [1] - 3:21
open [2] - 97:12, 104:3
operating [2] - 41:16, 74:11
Operations [2] - 32:20, 33:3
operator [8] - 58:11, 59:24, 67:6, 67:8, 68:7, 68:12, 74:24, 75:4
opportunity [2] - 6:4, 9:22
opposed [1] - 42:19
orders [1] - 8:6
Oriented [1] - 28:14
originally [1] - 85:15
otherwise [1] - 22:25
outcome [2] - 66:6, 144:18
outside [4] - 24:8, 68:13, 80:5, 81:11
overhead [2] - 58:14, 59:2
overview [1] - 51:12
owner [1] - 78:8

**P**

p.m [6] - 39:10, 40:7, 44:25, 49:10, 140:14, 142:16
P.O [1] - 2:14
paced [1] - 61:10
pacing [1] - 71:10
page [3] - 9:17, 12:5, 60:24
PAGE [4] - 142:3, 142:6, 142:7, 142:10
pages [2] - 7:13, 9:14
pain [3] - 23:16, 131:17, 131:18
palm [1] - 97:12
panel [1] - 86:16
pardon [1] - 74:9
parked [1] - 59:16





Parkway [4] - 55:9, 56:18, 57:20, 58:25
parlance [1] - 82:2
part [10] - 24:4, 27:22, 37:20, 42:16, 43:21, 86:25, 117:12, 121:15, 131:20, 134:4
partially [1] - 128:2
participate [1] - 40:20
particular [13] - 7:3, 8:8, 8:12, 34:2, 39:7, 39:17, 39:18, 39:25, 45:17, 52:15, 52:17, 110:16, 121:25
particulars [1] - 137:16
parties [2] - 3:4, 144:16
partner [9] - 26:16, 26:18, 26:25, 27:5, 27:6, 27:11, 28:17, 28:23, 29:25
partnering [1] - 27:4
partners [1] - 26:22
partnership [1] - 27:15
pass [4] - 20:17, 21:5, 21:17, 97:4
passed [1] - 120:5
passenger [17] - 74:10, 74:19, 74:20, 76:15, 76:18, 76:24, 77:5, 77:6, 77:10, 81:11, 86:25, 87:18, 87:25, 88:2, 88:7, 94:15, 135:10
passenger's [2] - 89:6, 89:9
passing [7] - 30:16, 52:5, 97:3, 97:7, 97:13, 97:25, 98:11
past [1] - 88:6
PATRICIA [1] - 1:3
Patricia [1] - 4:17
Patrol [2] - 26:5, 31:15
patrol [3] - 26:7, 34:17, 39:15
paying [1] - 62:5
PD [3] - 65:9, 129:18, 129:21
Penal [1] - 24:3
pending [2] - 4:21, 6:6
Peninsula [1] - 2:5
people [1] - 33:5
per [1] - 34:2
percent [1] - 96:12
performed [1] - 58:13
period [3] - 39:13, 45:2, 54:24
permanent [1] - 26:3
permit [6] - 61:21, 62:19, 64:24, 74:25, 75:2
person [13] - 26:15, 37:22, 62:18, 62:20, 62:23, 73:2, 73:4, 73:6, 73:8, 73:11, 73:14, 74:3, 74:4
personally [3] - 13:13, 35:3, 35:21
perspective [1] - 140:8
phone [9] - 41:3, 41:5, 45:7, 45:8, 45:12, 63:6, 72:12, 74:21, 80:10
photos [8] - 13:2, 13:4, 13:8, 13:12, 13:16, 13:19, 13:22, 14:6
Physical [1] - 24:3
physical [7] - 8:16, 34:5, 62:3, 63:10, 123:14, 129:7, 129:12
physically [1] - 116:24
pick [1] - 124:4
picked [3] - 122:21, 123:24, 124:3
pile [1] - 12:21
place [3] - 6:21, 33:13, 96:15
placing [1] - 10:21
Plaintiffs [2] - 1:4, 2:4
PLAINTIFFS' [1] - 143:3
Plaintiffs' [3] - 10:15, 10:17, 10:22
plate [2] - 86:18, 86:19
Plaza [1] - 1:16
pocket [1] - 64:22
point [30] - 5:23, 6:13, 10:3, 53:14, 54:14, 60:8, 63:24, 76:5, 76:16, 77:12, 79:11, 79:15, 86:18, 88:20, 89:25, 92:19, 93:20, 94:5, 96:10, 96:11, 96:23, 103:11, 103:16, 104:15, 108:12, 119:20, 121:25, 125:12, 126:4, 131:16
pointing [5] - 47:10, 47:14, 85:25, 86:12, 114:5
police [12] - 16:5, 16:7, 19:23, 20:4, 20:6, 27:20, 29:15, 29:19, 40:21, 65:22, 84:7, 129:22
Police [20] - 4:11, 15:19, 16:3, 16:6, 16:11, 16:14, 16:19, 16:21, 16:24, 17:3, 17:10, 17:12, 19:19, 23:22, 27:2, 28:14, 29:23, 31:3, 31:16, 122:16
POLICE [8] - 1:5, 1:6, 1:7, 1:8, 1:8, 1:9, 1:19
portable [1] - 69:2
portion [6] - 14:23, 73:21, 87:25, 105:2, 110:7, 124:18
portions [4] - 7:3, 8:23, 63:23, 125:2
pose [2] - 4:24, 5:17
position [1] - 57:3
positioned [3] - 53:16, 97:14, 104:19
positions [1] - 76:16
possible [1] - 71:9
post [2] - 116:20, 116:25
posted [4] - 115:8, 116:2, 116:5, 117:10
posting [1] - 116:15
pounding [1] - 97:24
power [1] - 103:24
powerful [1] - 103:16
practice [2] - 42:21, 42:22
Precinct [10] - 25:6, 26:4, 47:9, 48:2, 48:8, 48:12, 48:16, 49:17, 61:9, 142:24
precinct [4] - 42:18, 48:13, 49:16, 142:22
preparation [2] - 7:24, 11:12
PRESENT [1] - 2:19
present [1] - 4:10
presentation [1] - 14:5
preserving [1] - 36:5
pressed [2] - 62:15, 63:18
pretty [1] - 52:11
previous [1] - 34:19
primary [2] - 47:8, 47:25
privileged [1] - 140:7
problems [1] - 23:15
procedure [1] - 42:16
procedures [9] - 8:2, 8:3, 8:5, 8:6, 8:8, 8:9, 8:11, 8:13, 8:24
proceeded [2] - 46:10, 52:3
produced [2] - 61:20, 62:19
production [1] - 49:6
prosecuted [1] - 37:24
provide [1] - 10:4
provided [3] - 9:21, 10:25, 49:19
providing [1] - 121:25
Public [4] - 1:20, 4:3, 141:23, 144:8
pull [8] - 55:21, 59:14, 60:2, 98:24, 99:5, 99:6, 100:11, 100:21
pulled [23] - 53:15, 53:22, 54:15, 54:17, 54:22, 56:24, 58:23, 59:3, 59:6, 59:11, 59:21, 60:6, 61:10, 73:17, 74:9, 91:7, 97:17, 107:9, 107:11, 107:17, 107:20, 107:24, 109:2
pulling [6] - 60:14, 60:18, 60:22, 100:4, 100:23, 102:14
Pulver [5] - 17:14, 17:15, 17:19, 17:21, 17:22
pursuant [1] - 1:20
push [3] - 12:19, 65:15, 96:5
pushed [3] - 64:2, 87:21, 88:9
pushes [1] - 64:9
pushing [5] - 64:5, 96:3, 98:7, 113:5, 116:10
put [10] - 9:12, 66:9, 88:10, 96:15, 103:6, 115:9, 115:16, 119:2, 119:10, 120:3
putting [1] - 79:4

Q

qualification [1] - 30:19
quarter [1] - 86:16
questioning [1] - 36:4
questions [18] - 4:20, 5:17, 6:19, 6:22, 7:2, 36:7, 71:3, 71:14, 71:16, 75:6, 81:20, 82:3, 83:16, 84:22, 138:14, 138:19, 139:24, 140:13
quickly [1] - 93:14
quite [4] - 31:21, 52:3, 53:2, 139:23

R

R&Ps [1] - 8:2
radar [2] - 31:14, 58:20
radio [42] - 26:7, 39:23, 40:17, 41:14, 41:17, 42:19, 42:24, 43:2, 47:8, 47:11, 47:25, 49:6, 57:10, 63:7, 65:2, 66:23, 66:25, 67:4, 67:18, 67:21, 68:2, 68:6, 68:19, 68:25, 69:3, 69:8, 69:9, 69:12, 69:15, 69:24, 71:22, 72:8, 72:13, 73:18, 77:7, 77:12, 80:3, 80:7, 115:2, 142:12
radiological [1] - 31:25
radios [2] - 41:21, 42:3
raising [1] - 116:7
ran [3] - 65:25, 66:8, 77:16
Randy [1] - 28:20
rank [1] - 29:15
rather [2] - 5:4, 95:24
Rathgeber [1] - 29:2
reach [4] - 99:19, 101:19, 119:7, 119:8
reachable [1] - 21:24
reached [8] - 99:9, 99:23, 100:2, 100:6, 101:18, 107:22, 108:15, 120:4
reaching [1] - 100:16
read [7] - 6:25, 8:10, 75:17, 75:19, 82:14, 82:15, 141:8
realized [1] - 98:8
really [2] - 114:4, 119:9
REALTIME [1] - 1:23
rear [11] - 81:11, 86:15, 86:25, 87:25, 88:6, 88:7, 91:15, 91:17, 97:17, 110:9, 119:14
reason [6] - 53:10, 61:9, 61:12, 68:24, 71:21, 96:25



**reasonable** [1] - 44:14
**reasons** [1] - 71:23
**receive** [10] - 31:4, 32:12, 40:14, 40:17, 40:19, 40:25, 41:3, 43:9, 55:10, 55:13
**received** [9] - 15:20, 30:17, 30:24, 35:23, 41:5, 41:8, 44:20, 55:16, 80:10
**receiving** [1] - 15:22
**recess** [3] - 75:16, 90:17, 131:4
**record** [20] - 10:13, 11:5, 11:6, 28:12, 36:2, 73:21, 75:20, 102:24, 102:25, 103:6, 103:8, 103:15, 103:23, 130:25, 131:2, 139:17, 139:18, 141:11, 141:12, 144:13
**Record** [2] - 75:19, 82:15
**recorded** [7] - 43:2, 43:6, 49:3, 70:5, 70:6, 70:8, 70:18
**recordings** [3] - 49:7, 49:20, 142:12
**reengage** [3] - 92:11, 94:3, 94:6
**reengaged** [4] - 93:11, 94:8, 113:22, 114:13
**refer** [1] - 123:4
**referenced** [1] - 9:8
**referred** [2] - 38:19, 120:19
**referring** [23] - 9:18, 40:3, 46:2, 46:3, 48:6, 51:7, 58:3, 64:5, 67:16, 68:8, 78:25, 79:6, 86:13, 93:15, 96:3, 105:6, 112:18, 115:18, 119:3, 123:12, 124:14, 129:21, 139:4
**reg** [1] - 56:13
**regard** [11] - 8:4, 38:17, 38:22, 67:3, 72:10, 75:21, 78:13, 84:9, 136:15, 138:25, 139:19
**regarding** [1] - 6:23
**regards** [1] - 88:15
**registered** [1] - 78:7
**registration** [14] - 56:7, 65:10, 73:17, 77:16, 77:19, 78:11, 78:14, 78:16, 78:22, 79:5, 80:4, 80:24, 80:25, 81:2
**regular** [11] - 24:5, 26:16, 26:18, 26:21, 27:5, 27:11, 28:17, 28:23, 30:18, 39:15, 44:7
**reinstitute** [1] - 92:6
**related** [2] - 79:16, 144:16
**relates** [2] - 49:9, 142:15
**relation** [1] - 105:25
**relaxed** [1] - 45:24
**release** [1] - 98:22
**released** [5] - 91:3, 92:5, 99:2, 127:4, 134:8
**remain** [6] - 27:19, 29:3, 29:18, 29:22, 76:15, 76:24
**remained** [2] - 76:17, 77:3
**remember** [4] - 19:2, 66:12, 120:6, 122:16
**repeat** [6] - 5:6, 24:13, 24:16, 55:2, 83:11, 106:15
**rephrase** [1] - 5:2
**reporter** [2] - 5:5, 5:18
**REPORTING** [1] - 1:23
**repositioning** [1] - 96:22
**represent** [1] - 10:24
**representing** [1] - 1:12
**REQUEST** [1] - 142:9
**request** [3] - 6:5, 12:15, 58:8
**requested** [1] - 55:12
**requests** [2] - 6:14, 40:19
**rescue** [4] - 30:7, 30:13, 32:2, 32:13
**resent** [1] - 49:24
**reserved** [1] - 3:11
**residual** [1] - 23:14
**resist** [1] - 113:2
**resistance** [1] - 121:24
**respect** [2] - 71:13, 83:7
**respectful** [1] - 82:3
**respective** [1] - 3:4
**respond** [11] - 5:11, 5:15, 5:16, 5:20, 45:17, 45:20, 45:21, 49:19, 112:21, 117:19, 122:17
**responded** [2] - 82:18, 84:20
**responding** [1] - 82:22
**response** [5] - 61:14, 78:4, 78:6, 81:20, 84:21
**Response** [2] - 10:18, 143:5
**responses** [4] - 9:6, 9:8, 9:15, 82:5
**Responses** [1] - 9:9
**responsible** [1] - 38:10
**responsive** [1] - 82:2
**result** [6] - 19:19, 22:22, 38:2, 38:5, 127:21, 127:22
**retained** [1] - 143:7
**retired** [1] - 22:24
**review** [8] - 6:25, 7:7, 7:9, 7:16, 8:5, 8:13, 9:22, 13:2
**reviewed** [5] - 7:10, 7:21, 7:24, 8:25, 9:24
**reviewing** [1] - 12:23
**rewrapped** [1] - 114:6
**Richard** [1] - 25:16
**RICHARD** [2] - 1:6, 2:16
**ride** [2] - 26:10, 26:13
**riding** [1] - 76:9
**ripped** [3] - 127:12, 127:24, 128:7
**RL** [1] - 73:13
**Road** [2] - 57:23, 58:24
**road** [3] - 99:25, 100:5, 100:8
**roadside** [1] - 60:5
**roadway** [17] - 59:7, 59:15, 59:23, 96:24, 97:2, 97:6, 98:9, 98:16, 98:25, 99:7, 101:22, 101:25, 106:10, 107:15, 107:20, 108:17, 109:3
**Robert** [10] - 45:17, 46:17, 53:3, 53:13, 53:20, 53:21, 55:9, 56:15, 56:19, 56:21
**rocking** [2] - 83:16, 85:6
**rolled** [7] - 74:20, 122:14, 122:19, 122:20, 122:23, 123:2, 124:5
**rolling** [1] - 45:9
**Ronca** [3] - 26:20, 26:22, 27:4
**room** [4] - 59:22, 60:2, 139:9, 139:11
**Route** [2] - 46:17, 47:3
**route** [2] - 46:14, 52:6
**routine** [1] - 34:17
**RQ** [2] - 12:14, 49:5
**rules** [9] - 7:25, 8:2, 8:4, 8:5, 8:7, 8:8, 8:10, 8:13, 8:24
**ruling** [1] - 73:24
**RULINGS** [1] - 142:6
**run** [10] - 48:9, 65:10, 77:19, 80:4, 84:10, 84:14, 84:17, 88:25, 93:8, 93:16
**running** [11] - 66:7, 78:21, 92:21, 93:2, 93:3, 93:5, 93:6, 93:13, 93:21, 93:22, 93:23
**runs** [3] - 49:7, 63:7, 142:12

## S

**safety** [9] - 59:17, 62:13, 68:5, 68:9, 72:3, 72:8, 72:10, 72:11, 97:20
**saw** [15] - 11:17, 14:5, 63:9, 72:22, 72:24, 74:3, 74:22, 75:9, 80:5, 82:25, 123:15, 126:12, 126:16, 128:20, 128:23
**scene** [2] - 77:4, 134:23
**Scene** [1] - 13:14
**SCET** [4] - 27:25, 28:4, 28:16, 32:16
**Schmidt** [1] - 25:16
**School** [2] - 30:25, 32:6
**school** [4] - 14:21, 19:8, 19:10, 19:16
**schools** [2] - 31:25
**SCIMONE** [2] - 1:7, 2:20
**Scimone** [92] - 34:11, 34:12, 34:18, 34:20, 38:21, 41:6, 43:17, 43:25, 45:6, 45:15, 45:16, 53:25, 55:15, 57:25, 58:6, 60:13, 60:19, 65:3, 65:8, 65:12, 68:5, 68:13, 69:2, 69:3, 69:8, 69:20, 69:23, 70:10, 71:22, 72:4, 76:6, 76:22, 77:11, 78:20, 79:8, 81:6, 88:13, 88:14, 88:17, 88:19, 90:2, 91:14, 95:9, 96:5, 96:14, 98:15, 98:18, 98:25, 99:6, 99:20, 99:24, 100:12, 100:17, 100:23, 101:9, 101:19, 106:9, 106:12, 106:17, 106:21, 107:2, 107:11, 108:17, 109:2, 112:13, 113:18, 114:10, 114:12, 116:3, 118:5, 118:9, 118:15, 119:11, 120:8, 120:9, 123:5, 123:15, 126:5, 126:6, 132:5, 132:15, 132:23, 133:6, 133:8, 134:9, 134:11, 134:20, 135:19, 135:23, 136:6, 137:6
**Scimone's** [1] - 42:7
**scrapes** [2] - 63:13, 63:21
**scratches** [2] - 124:19, 130:7
**scream** [5] - 105:12, 105:13, 105:17, 112:13, 112:14
**screamed** [3] - 105:14, 105:16, 105:20
**screaming** [3] - 105:11, 118:8, 118:9
**screen** [1] - 66:15
**se** [1] - 34:2
**sealing** [1] - 3:5
**searched** [3] - 124:12, 124:13, 126:3
**seated** [4] - 6:2, 75:24, 76:2, 85:3
**seats** [2] - 47:16, 47:21
**second** [13] - 11:10, 14:18, 14:22, 20:16, 47:13, 63:20, 90:14, 92:10, 109:23, 122:22, 124:2, 127:4, 139:15
**secondhand** [1] - 63:5
**Section** [2] - 29:14, 29:19
**sector** [5] - 33:23, 33:24, 33:25, 34:2, 54:21

**see** [32] - 13:19, 13:22, 61:13, 63:24, 66:19, 76:5, 79:7, 79:24, 98:11, 98:15, 98:18, 102:15, 104:18, 116:17, 116:20, 116:24, 118:10, 123:17, 123:19, 123:21, 124:24, 125:9, 128:12, 129:11, 132:4, 134:2, 134:8, 134:11, 136:2, 136:10, 137:3, 137:5
**seeing** [1] - 134:18
**seem** [2] - 84:2, 84:6
**sends** [1] - 64:22
**sense** [1] - 59:19
**sent** [2] - 11:3, 27:17
**separate** [2] - 49:20, 51:7
**sergeant** [3] - 42:14, 43:8, 43:13
**serve** [2] - 28:3, 33:8
**service** [2] - 22:3, 23:17
**Service** [2] - 29:14, 29:19
**Services** [1] - 31:21
**set** [2] - 144:11, 144:21
**sets** [1] - 122:9
**several** [6] - 25:12, 31:24, 35:15, 52:20, 71:23, 97:12
**Sgt** [87] - 34:11, 34:12, 34:18, 34:20, 41:6, 42:7, 43:17, 43:25, 45:6, 45:15, 45:16, 53:25, 55:15, 57:25, 58:6, 60:13, 60:19, 65:3, 65:8, 65:12, 68:5, 68:13, 69:3, 69:8, 69:20, 69:23, 70:10, 72:4, 76:6, 76:22, 77:11, 78:19, 79:7, 81:6, 88:13, 88:14, 88:16, 88:19, 90:2, 91:14, 95:9, 96:5, 96:14, 98:24, 99:6, 99:20, 99:23, 100:12, 100:16, 100:17, 101:9, 101:18, 106:9, 106:12, 106:17, 106:21, 106:25, 107:11, 108:17, 109:2, 112:13, 113:18, 114:10, 114:11, 116:3, 118:5, 118:9, 118:15, 119:10, 120:8, 123:5, 123:15, 126:4, 126:6, 132:4, 132:15, 132:23, 133:6, 133:8, 134:8, 134:11, 134:20, 135:19, 135:23, 136:5, 137:3, 137:6
**shall** [1] - 3:11
**shared** [1] - 48:12
**sheath** [2] - 120:17, 120:19
**shirt** [7] - 126:22, 126:25, 127:12, 127:14, 127:18, 127:24, 128:7
**shoes** [2] - 128:10, 128:12
**shooting** [2] - 38:3, 38:25
**Shore** [3] - 25:7, 57:23, 58:24
**short** [1] - 66:14
**shot** [2] - 37:13, 37:19
**shoulder** [2] - 59:7, 59:15
**shoulders** [1] - 116:7
**shoving** [1] - 113:5
**showed** [1] - 74:23
**showing** [1] - 6:19
**shrug** [1] - 5:19
**shut** [6] - 62:12, 62:17, 63:17, 64:12, 64:13, 69:25
**side** [56] - 34:5, 61:4, 65:4, 65:5, 65:14, 68:16, 74:10, 74:19, 74:21, 74:22, 76:3, 76:16, 76:18, 76:24, 77:10, 77:25, 81:11, 86:22, 86:24, 86:25, 87:2, 87:18, 87:25, 88:2, 88:7, 89:3, 89:4, 89:5, 89:7, 89:10, 90:22, 94:15, 94:16, 95:10, 97:6, 97:21, 100:14, 100:24, 100:25, 101:3, 101:8, 102:8, 102:11, 102:16, 105:3, 111:15, 117:15, 117:16, 119:3, 120:15, 124:5, 125:5, 125:8, 135:11
**sideways** [1] - 98:15
**sign** [6] - 9:16, 9:20, 10:5, 10:8, 10:10, 12:8
**signal** [3] - 57:6, 57:16, 64:22
**signature** [1] - 12:7
**signatures** [2] - 12:16, 142:11
**Signed** [1] - 141:19
**signed** [7] - 3:15, 3:18, 9:23, 9:25, 10:2, 12:16, 142:11
**similar** [2] - 75:6, 138:19
**simplify** [1] - 101:16
**siren** [1] - 46:12
**sit** [1] - 39:5
**situation** [1] - 70:4
**six** [5] - 23:25, 24:2, 24:22, 24:24, 25:9
**smartly** [1] - 46:10
**snapped** [2] - 120:18, 121:10
**Soho** [1] - 18:20
**solid** [1] - 80:24
**solidly** [1] - 116:14
**someone** [2] - 41:3, 119:12
**somewhere** [1] - 114:17
**sorry** [9] - 24:14, 29:5, 30:9, 43:11, 54:25, 63:19, 85:18, 92:2, 107:10
**sounds** [1] - 102:22
**south** [3] - 53:13, 53:19, 53:21
**southbound** [2] - 46:17, 54:13
**Southern** [4] - 55:8, 56:17, 57:20, 58:24
**Southside** [4] - 126:5, 129:25, 131:6, 131:10
**speaking** [2] - 74:15, 140:9
**special** [7] - 30:14, 31:11, 31:19, 32:5, 32:9, 32:15, 32:19
**specialized** [1] - 30:17
**specifics** [1] - 55:11
**speech** [1] - 129:2
**speed** [4] - 58:18, 58:21, 71:10, 79:14
**speeding** [4] - 58:17, 60:14, 60:19, 60:23
**spill** [1] - 104:2
**spinal** [1] - 22:16
**spine** [1] - 23:4
**split** [1] - 58:24
**spondylolisthesis** [1] - 23:6
**SPOTA** [1] - 1:10
**squad** [2] - 26:8, 40:4
**squarely** [1] - 5:10
**ss** [2] - 141:4, 144:4
**St** [1] - 19:11
**stabbed** [1] - 35:15
**stand** [6] - 28:13, 44:9, 44:16, 92:15, 115:10, 117:4
**standing** [11] - 85:2, 85:5, 85:7, 86:9, 86:17, 86:19, 86:25, 87:14, 107:4, 107:21, 118:13
**start** [3] - 20:12, 46:3, 112:14
**Start** [1] - 64:9
**started** [4] - 93:9, 96:23, 105:11, 112:13
**starting** [2] - 49:10, 142:15
**starts** [3] - 64:10, 88:25, 90:10
**state** [1] - 4:8
**STATE** [2] - 141:4, 144:3
**State** [12] - 1:21, 4:4, 46:16, 55:9, 56:17, 57:20, 58:24, 61:20, 62:19, 66:10, 141:23, 144:8
**statement** [4] - 74:2, 137:24, 138:13, 138:15
**statements** [4] - 138:3, 138:7, 139:20, 139:25
**STATES** [1] - 1:2
**States** [1] - 22:5
**station** [2] - 40:4, 42:25
**status** [4] - 22:23, 66:20, 90:21, 128:5
**stay** [3] - 20:15, 20:24, 99:10
**stayed** [3] - 76:18, 77:19, 99:22
**stenographer** [1] - 86:12
**still** [24] - 29:8, 53:25, 57:12, 60:6, 60:9, 75:23, 76:2, 87:24, 92:12, 92:20, 94:16, 95:14, 98:3, 99:12, 104:20, 109:25, 113:7, 113:13, 113:16, 113:24, 115:11, 121:21, 127:9, 128:10
**Stinger** [1] - 108:25
**stint** [3] - 16:18, 22:11, 23:18
**stips** [1] - 36:3
**STIPULATED** [3] - 3:2, 3:8, 3:13
**stomach** [1] - 113:13
**stood** [1] - 124:6
**stop** [8] - 58:4, 58:14, 71:9, 79:11, 79:12, 90:3, 127:23, 134:24
**stopped** [6] - 113:22, 118:22, 118:23, 118:25, 119:18, 119:23
**stopping** [1] - 64:15
**Street** [3] - 1:24, 18:20, 27:25
**stretch** [1] - 5:24
**strike** [7] - 73:21, 106:3, 106:6, 108:4, 112:3, 125:10, 134:3
**striking** [2] - 112:22, 125:15
**struck** [13] - 82:4, 82:11, 105:23, 105:25, 106:14, 106:24, 109:9, 110:3, 111:25, 112:7, 112:9, 112:20, 112:25
**study** [1] - 23:21
**subject** [5] - 36:23, 36:25, 37:13, 49:13, 142:20
**submit** [2] - 138:4, 138:6
**submitted** [1] - 137:24
**submitting** [1] - 138:12
**subscribed** [1] - 141:19
**substance** [1] - 133:12
**substantiated** [1] - 38:13
**successfully** [1] - 25:22
**sufficient** [1] - 103:24
**SUFFOLK** [5] - 1:5, 1:10, 141:5
**Suffolk** [18] - 1:12, 1:14, 2:10, 4:11, 16:2, 16:6, 16:11, 16:14, 16:19, 16:21, 16:24, 17:2, 17:9, 17:12, 19:18, 19:23, 23:22, 29:23
**Suite** [1] - 1:24
**sum** [1] - 133:11
**Sunrise** [5] - 45:18, 53:3, 53:12, 53:18
**supervising** [2] - 34:13, 34:21



supervisor [1] - 76:9
supporting [3] - 7:19, 8:23
surgical [1] - 23:10
Survival [1] - 30:25
swathe [1] - 50:10
sweatshirt [1] - 127:15
swipes [1] - 103:3
switch [2] - 48:19, 69:11
switched [5] - 47:8, 47:25, 48:18, 50:16, 69:5
sworn [4] - 3:15, 3:18, 4:3, 144:12
Syskrot [1] - 1:20
SYSKROT [2] - 144:7, 144:25

T

table [3] - 85:25, 103:4, 103:25
tackling [1] - 95:17
Tactics [1] - 32:5
tactics [2] - 30:14, 32:10
takedown [1] - 58:14
Talt [16] - 41:12, 43:12, 43:16, 43:19, 50:24, 51:8, 66:24, 67:16, 68:19, 68:21, 69:15, 69:20, 70:22, 74:8, 74:22, 79:16
TALT [2] - 1:8, 2:21
tank [2] - 126:24, 128:8
task [2] - 27:17, 27:22
Team [1] - 28:2
tech [1] - 30:14
technical [1] - 14:21
telephone [3] - 43:25, 68:25, 70:5
terminating [1] - 64:14
terms [1] - 121:17
test [2] - 21:2, 21:15
testified [5] - 4:5, 14:11, 80:13, 84:24, 139:8
testify [1] - 51:16
testimony [5] - 130:12, 139:2, 141:9, 141:12, 144:14
THE [2] - 10:5, 102:22
thigh [5] - 114:6, 114:14, 114:17, 119:18, 119:25
thighs [1] - 115:12
third [2] - 25:6, 48:17
Third [11] - 26:3, 47:9, 48:2, 48:8, 48:11, 48:15, 49:7, 49:17, 61:9, 142:13, 142:24
THOMAS [1] - 1:10
Thompson [1] - 18:20
thoughts [2] - 82:8, 82:10
three [12] - 28:5, 28:6, 28:11, 28:22, 29:4, 106:5, 106:24, 111:8, 111:9, 112:2, 112:7, 130:8
threw [3] - 106:13, 106:20, 110:13
throw [1] - 105:5
thrown [1] - 110:11
throws [1] - 87:8
thumb [1] - 131:21
tickets [1] - 62:6
tight [1] - 115:5
tire [1] - 97:5
TO [1] - 6:24
today [7] - 4:20, 10:22, 12:24, 39:5, 137:16, 138:18, 138:21
together [1] - 94:10
took [12] - 13:11, 13:15, 46:15, 57:3, 64:24, 78:24, 92:10, 94:8, 103:2, 103:3, 119:5, 129:7
top [11] - 98:14, 99:13, 99:15, 99:22, 113:16, 117:7, 123:3, 126:24, 127:9, 127:11, 128:9
total [2] - 35:22, 36:22
touch [1] - 118:10
touching [2] - 99:12, 125:20
tour [1] - 39:9
toward [1] - 129:8
towards [14] - 57:22, 77:11, 85:14, 85:19, 85:21, 85:22, 87:8, 87:13, 88:25, 90:11, 92:21, 93:6, 93:11, 116:11
traffic [10] - 58:4, 58:13, 59:8, 71:9, 79:12, 84:17, 97:18, 98:19, 98:21, 134:24
train [1] - 25:8
training [11] - 24:7, 25:2, 25:5, 25:23, 30:18, 31:5, 31:11, 31:19, 32:2, 32:10, 32:13
Training [1] - 25:11
transcript [2] - 141:8, 141:10
transmission [8] - 43:9, 55:22, 70:5, 70:6, 70:9, 72:7, 72:13, 72:14
transmissions [16] - 40:17, 42:24, 43:2, 43:5, 49:12, 49:15, 51:18, 51:21, 52:2, 54:5, 77:7, 77:12, 80:7, 80:21, 142:18, 142:21
transmit [3] - 48:16, 52:22, 81:4
transmits [1] - 48:12
transpired [1] - 65:24
treatment [2] - 130:18, 130:21
trial [1] - 3:12
tried [2] - 92:7, 93:8
tripped [2] - 94:7, 109:22
tripping [1] - 95:17
true [4] - 97:22, 141:11, 141:13, 144:13
trunk [5] - 81:14, 85:22, 86:13, 86:20, 87:17
try [4] - 4:25, 5:4, 6:6, 92:5
trying [16] - 35:16, 83:6, 91:23, 91:24, 92:20, 93:18, 94:2, 94:21, 96:2, 96:5, 96:21, 100:10, 113:5, 127:3, 127:18, 127:22
TSA [1] - 33:4
tug [8] - 100:14, 100:19, 100:21, 100:24, 102:7, 102:10, 103:12, 111:16
turn [6] - 33:16, 40:6, 69:9, 70:2, 70:3, 90:11
turned [6] - 69:16, 69:24, 85:14, 85:19, 101:6, 101:11
turns [3] - 52:20, 86:7
twice [1] - 104:6
two [25] - 15:2, 18:23, 22:10, 22:11, 23:18, 26:10, 26:13, 26:23, 27:13, 27:14, 36:24, 37:7, 38:22, 49:20, 51:7, 86:25, 92:10, 92:16, 92:18, 92:20, 93:10, 102:20, 108:15, 122:9, 138:5
two-and-a-half [3] - 26:23, 27:13, 27:14
two-month [2] - 22:11, 23:18
type [1] - 17:15

U

unable [1] - 92:9
uncomfort [1] - 83:17
uncomfortable [5] - 82:24, 83:15, 84:3, 84:6, 85:9
under [4] - 13:21, 88:11, 90:4, 141:9
underneath [11] - 91:6, 104:21, 104:23, 104:24, 104:25, 105:2, 106:2, 110:4, 111:3, 117:6, 121:21
undershirt [1] - 126:22
understandable [1] - 5:2
understood [1] - 69:18
undertake [1] - 23:20
unidentified [1] - 1:12
unit [6] - 28:10, 29:6, 33:9, 33:22, 34:3, 122:17
Unit [2] - 28:21, 33:3
United [1] - 22:5
UNITED [1] - 1:2
units [3] - 32:15, 32:19, 42:25
unknown [1] - 1:12
unmarked [1] - 74:11
unresponsive [1] - 73:22
unsnap [1] - 120:21
up [54] - 5:4, 6:15, 9:19, 15:3, 45:13, 46:25, 47:5, 49:11, 57:3, 60:2, 66:14, 74:9, 74:21, 76:21, 77:16, 78:19, 79:5, 80:5, 80:16, 81:9, 81:13, 84:13, 87:21, 88:10, 90:10, 91:9, 91:10, 92:13, 92:15, 92:25, 93:10, 97:17, 99:3, 111:22, 111:24, 115:10, 116:10, 117:4, 120:4, 120:5, 120:25, 122:16, 122:19, 122:21, 123:20, 123:24, 124:3, 124:4, 124:6, 125:9, 125:14, 125:18, 129:17, 142:17
upper [2] - 116:7, 128:5
utilized [1] - 137:6
utilizing [1] - 131:23
utmost [1] - 83:6

V

valid [11] - 61:23, 62:9, 66:21, 70:23, 71:5, 72:20, 75:6, 78:11, 79:17, 80:24, 81:2
vantage [1] - 63:24
Vegas [2] - 20:8, 21:3
vehicle [96] - 37:14, 37:19, 38:3, 39:2, 51:4, 52:18, 52:22, 53:11, 53:15, 53:17, 53:23, 54:15, 54:17, 55:6, 55:21, 55:23, 56:2, 56:4, 56:8, 56:16, 57:6, 57:7, 57:21, 58:4, 58:11, 58:13, 58:23, 59:3, 59:6, 59:11, 59:14, 59:18, 59:21, 59:24, 60:8, 60:12, 60:15, 61:3, 62:12, 62:16, 62:17, 63:17, 64:10, 64:14, 64:19, 65:11, 65:21, 65:22, 65:24, 67:6, 68:7, 68:12, 72:7, 72:22, 72:24, 73:2, 73:5, 73:16, 73:19, 74:10, 74:18, 74:19, 76:19, 76:21, 76:24, 76:25, 77:3, 77:17, 77:20, 78:8, 78:22, 79:5, 79:7, 79:9, 80:19, 81:3, 81:12, 84:17, 85:15, 85:20, 86:14, 86:24, 87:17, 87:22, 88:3, 88:7, 88:15, 89:2, 89:10, 90:12, 93:12, 97:19, 129:22, 134:23
vehicles [2] - 51:7, 97:4
Vehicles' [1] - 84:18
Velcro [2] - 120:24,



120:25
verbally [4] - 5:15, 5:16, 5:20, 81:5
verification [8] - 10:4, 10:8, 11:2, 11:25, 12:4, 12:9, 12:16, 142:11
vertically [2] - 92:16, 92:17
veteran [1] - 83:21
Veterans [1] - 2:13
via [6] - 40:24, 41:17, 42:19, 57:10, 63:6, 67:18
vibration [1] - 103:25
view [1] - 66:16
viewed [1] - 66:18
violation [2] - 58:15, 71:10
visual [2] - 58:21, 76:8
volcano [1] - 104:5
volume [2] - 69:9, 71:23
volunteering [1] - 135:4
VTL [1] - 58:15

W

waist [13] - 89:13, 90:19, 91:4, 92:23, 93:25, 94:4, 95:15, 95:16, 96:7, 96:8, 96:17, 98:4, 113:23
waited [1] - 45:6
waiting [1] - 62:3
waived [2] - 3:7, 23:2
walked [5] - 65:2, 81:9, 81:13, 122:19, 125:23
walking [9] - 65:3, 79:8, 122:16, 123:25, 126:18, 128:21, 129:13, 129:16, 129:18
wants [1] - 102:23
warrants [5] - 70:24, 71:4, 72:20, 75:8, 79:19
water [2] - 104:2, 104:3
weapon [1] - 100:25
weapons [1] - 30:14
Weapons [1] - 32:5
weeks [1] - 25:9
welcome [1] - 5:14
West [3] - 19:13, 72:23, 75:10
westbound [7] - 46:16, 53:12, 53:17, 54:12, 56:17, 57:19
WHEREOF [1] - 144:20
white [2] - 126:24, 128:8
whole [1] - 30:10
wider [1] - 50:10
wife [1] - 20:24
william [1] - 4:9
WILLIAM [6] - 1:8, 1:20, 141:7, 141:17, 142:4, 144:10
William [2] - 10:18, 143:4
window [7] - 68:14, 74:17, 74:20, 76:15, 77:5, 77:6, 135:15
wise [1] - 72:3
withdrawn [6] - 12:10, 22:12, 24:11, 40:15, 91:20, 137:4
WITNESS [4] - 10:5, 102:22, 142:3, 144:20
witness [4] - 97:11, 140:13, 144:10, 144:14
words [2] - 89:22, 117:11
wrapped [6] - 94:9, 95:14, 96:7, 98:3, 114:14, 115:11
wrapping [1] - 89:14
writing [2] - 5:5, 139:20
written [5] - 7:11, 137:24, 138:3, 138:7, 138:12
wrote [2] - 7:18, 7:20

Y

Yaphank [2] - 4:12
year [7] - 11:24, 13:20, 13:22, 14:18, 14:22, 17:20, 19:15
years [8] - 15:2, 18:23, 26:23, 27:13, 27:15, 28:11, 28:22, 29:4
YORK [3] - 1:2, 141:4, 144:3
York [14] - 1:17, 1:21, 1:24, 2:6, 2:15, 4:4, 4:12, 4:22, 20:10, 21:14, 61:20, 62:19, 141:23, 144:9
yourself [4] - 45:15, 88:19, 89:25, 122:4

Z

zone [1] - 61:11



# EXHIBIT P

# GONZALEZ -V- COUNTY OF SUFFOLK

## DET. JOHN NEWTON - 1/6/2011

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**REALTIME REPORTING, INC.**
**124 East Main Street**
**Suite 202**
**Babylon, New York  11702**
**Phone:  (516) 938-4000**
**Fax:  (631) 983-8938**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------x

PATRICIA GONZALEZ and JENNIFER GONZALEZ, individually and as co-administrators of the Estate of KENNY LAZO,

Plaintiffs,

- against -

COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity, POLICE OFFICER CHRISTOPHER TALT, in his individual and official capacity, POLICE OFFICER LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT ATTORNEY JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of the Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney),

Defendants.

-----------------------------------------------x

100 Federal Plaza
Central Islip, New York

January 6, 2011
10:15 a.m.

Deposition of the Defendant, DET. JOHN NEWTON, pursuant to Notice, before Florence Syskrot, a Notary Public of the State of New York.

REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702
516-938-4000

APPEARANCES:

LAW OFFICES OF FREDERICK K. BREWINGTON
Attorneys for Plaintiffs
556 Peninsula Boulevard
Hempstead, New York 11550
BY: GREGORY CALLISTE, JR., ESQ.
- and -
WILLIAM GERMANO, ESQ.

SUFFOLK COUNTY ATTORNEY
CHRISTINE MALAFI, ESQ.
Attorney for Defendants
100 Veterans Memorial Highway
Hauppauge, New York 11788-0099
BY: RICHARD T. DUNNE, ESQ.

ALSO PRESENT:
P.O. William Judge
Det. Christopher Talt
Sgt. James Scimone
Jennifer Gonzalez

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

D E T. J O H N N E W T O N, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. CALLISTE:

Q. Please state your name.

A. **Det. John Newton.**

Q. What is your present address?

A. **Suffolk County Police Department, Third Precinct, 1630 Fifth Avenue, Bay Shore, New York 11706.**

Q. Good morning, Detective.

A. **Good morning.**

Q. My name is Gregory Calliste, Jr. I'm an associate at the Law Offices of Frederick K. Brewington. We represent the deceased plaintiff, Kenny Lazo, and his family, and his estate in a lawsuit that was filed against the County of Suffolk, Suffolk County Police Department, and other individual officers, including yourself.

Today we are going to conduct your deposition, as you have been named in the

Newton

complaint to find out what information you may have relevant to the complaint.

Have you ever sat in on deposition before?

A. **Yes.**

Q. So you are familiar with the ground rules of a deposition. Generally we ask that you keep all of your responses to my question verbal. As you can see we have a court reporter here. She cannot interrupt gestures such as head nods.

If you don't understand a question that I ask, please let me know. Ask me to rephrase. I can rephrase it.

If you need to speak to your attorney, or you need to take a break for any reason, we can take a break at any time.

I just ask that if there is a question on the table pending, so to speak, that you answer that question first. Same thing with respect to if you want to speak to your attorney. I ask if there is a question pending, just answer the question first.

A. **Okay.**

Newton

Q. Sir, have you taken any medications or any substances that would impair your ability to answers questions today?

A. **No.**

Q. Did you review any documents in preparation for this deposition today?

A. **Yes.**

Q. What documents did you review?

A. **Paperwork that I submitted for this case.**

Q. When you say paperwork that you submitted for this case, what exactly -- what paperwork are you referring to?

A. **A supplemental report. A 42, which is an internal correspondence that I sent to Internal Affairs, and paperwork with reference to the initial case of the drug possession.**

MR. CALLISTE: Let's take a break.

(Recess taken.)

Q. Sir, you referred to arrest paperwork that related to the drug sale which

Newton

you mentioned earlier?

A. **It wasn't arrest paperwork. I picked up the case on the original drug possession, which was a separate case from the drug investigation.**

MR. DUNNE: I will make it easy. Those items that he is referring to are attachments to the Internal Affairs' report. There is a lab report. There was other incidental stuff in addition to what happened at the incident.

The stuff that he is referring to are all attachments to the reports that you guys got.

If you go through them, you will see that there is some reference to the narcotics that were recovered, and tests, and things that were done subsequent to that. I think that is what the detective is referring to.

Q. Sir, in preparation for this deposition today, did you have any discussions with anyone, other than your counsel?

A. **No.**

Newton

Q. What is your date of birth?

A. **July 2, 1957.**

Q. Your highest level of education?

A. **I have a four-year degree from Southampton College.**

(Miss J. Gonzalez present at this time.)

Q. When did you obtain that degree? What year?

A. **I graduated in 1979.**

Q. Was there a particular course of study that you underwent when you were at Southampton College?

A. **I concentrated on Criminal Justice.**

Q. Do you currently have a degree in Criminal Justice from that university?

A. **I have a degree in Social Science with a concentration in Criminal Justice.**

Q. Do you have any professional licenses or certifications?

A. **No.**

Q. Have you ever served in the military?

Newton

A. **No.**
Q. Sir, are you currently employed?
A. **Yes, I am.**
Q. By whom are you employed?
A. **Suffolk County Police Department.**
Q. How long have you been employed by the Suffolk County Police Department?
A. **Approximately 27 and a half years.**
Q. Are you part of any particular precinct or squad at this time?
A. **I am presently assigned to the Third Squad NESOT, which stands for Neighborhood Enforcement Special Operations Team.**
Q. Where is the Third Squad located?
A. **It is located on Fifth Avenue in Bay Shore.**
Q. Are there any particular areas that the Third Squad patrols or deals with?
A. **We patrol most of the Town of Islip.**
Q. What is your current rank with the police department?

Newton

A. **Detective.**
Q. How long have you been a Detective with the Suffolk County Police Department?
A. **Approximately sixteen years.**
Q. Prior to being or becoming a Detective --
MR. CALLISTE: Withdrawn.
Q. Do you have any ranks as a Detective? Do you understand what I mean by that?
A. **I believe I do. There is only rank of detective. There is nothing else besides that.**
Q. Have you ever held any other ranks or titles with the Suffolk County Police Department?
A. **I was a Police Officer.**
Q. How long did you serve as a police officer?
A. **Approximately ten years.**
Q. While you were serving as a police officer, did you have any titles or ranks higher than a police officer?

Newton

A. **No.**
Q. During your employment with the Suffolk County Police Department, have you ever worked in any specialized units such as Hazmat, SWAT?
A. **For a brief time I worked in Crime Scene. It was brief. It was less than six months.**
Q. When you were working in Crime Scene, out of what precinct were you working?
A. **They work out of the -- their building is by MacArthur Airport.**
Q. When you worked for Crime Scene, what were your duties in that particular department?
A. **I was in training. I really didn't have official duties.**
Q. Was the purpose of you joining or becoming a member of Crime Scene to get training?
A. **Yes.**
Q. Would it be accurate to say after you received that training you went back to your normal duties?

Newton

A. **No. After receiving that training, I would have been a Crime Scene Officer. And I would have handled crime scenes.**
Q. Have you ever served as a Crime Scene Officer?
A. **Well, I was -- like I said, I was there for six months. I was more of an assistant than full Crime Scene Officer.**
Q. Have you ever worked for any precincts other than the Third?
A. **No.**
Q. Prior to you becoming a member of the Suffolk County Police Department, were you ever a member of any other police departments?
A. **No.**
**I'm sorry. I was a Deputy Sheriff, again, for a brief time. Three, four months.**
Q. Was that also in the County of Suffolk?
A. **Yes.**
Q. Did you work at any particular location or facility at the time that you

Newton

served as a Deputy Sheriff?

A. **I worked out of the Riverhead jails. I was in Transportation.**

Q. In your duties -- in your position in Transportation --

MR. CALLISTE: Withdrawn.

Q. What were your duties in Transportation?

A. **Transport prisoners back and forth to the court, doctors. Whatever transportation they needed.**

Q. Again, how long were you in that position?

A. **A brief time. Three or four months.**

Q. Do you recall what year or years? Do you recall what year you worked in the Sheriff's Department?

A. **1983.**

Q. At that time were you still actively employed by -- with the Suffolk County Police Department?

A. **This is prior to being a police officer.**

Newton

Q. Prior to being a police officer -- prior to being a police officer, you worked in the Sheriff's Department?

A. **Correct.**

Q. Was that immediately prior to your --

MR. CALLISTE: Withdrawn.

Q. Following your employment in the Sheriff's office, did you enter an academy, police academy?

A. **Yes.**

Q. What academy did you attend?

A. **Suffolk County Police Department.**

Q. Do you recall what year you attended Suffolk County Police Department Academy?

A. **May of 1983.**

Q. Prior to working in the Sheriff's Department, did you have any other employment?

A. **Prior to the Sheriff's Department, I was a civilian employee with the Identification Section in the Suffolk County Police Department.**

Q. As a civilian employee with the

Newton

Suffolk County Police Department, did you have any particular title?

A. **Evidence Technician.**

Q. Do you recall what years you were employed as --

A. **From 1979 until I became a Deputy. 1983.**

Q. Prior to working as a civilian employee for the Suffolk County Police Department, where did you work?

A. **Prior to that I went to college. I worked part-time at Buyrite Liquor Store in Ronkonkoma.**

Q. So, as a civilian employee Evidence Technician with the Suffolk County Police Department, what were your duties?

A. **Again, I assisted the detectives in handling cases. I did fingerprint analysis, courtroom testimony, and photographed crime scenes.**

Q. Did you ever have any supervisory authority in that position?

A. **No.**

Q. What location did you work at

Newton

when you were a civilian employee Evidence Tech?

A. **Police headquarters in Yaphank.**

Q. Following your --

MR. CALLISTE: Withdrawn.

Q. Did you graduate from the Police Academy of Suffolk County?

A. **Yes, I did.**

Q. Following your graduation from the Suffolk County Police Academy, would it be accurate to say that you went directly to the Third Precinct, and that is where you have been ever since?

A. **Correct.**

Q. Other than this current lawsuit here, have you ever been sued in your official capacity as a police officer with the Suffolk County Police Department?

A. **Yes, I have.**

MR. DUNNE: Objection to this line of questioning.

Go ahead and answer.

A. **Yes, I have.**

Q. How many times? Do you recall?

Newton

A. **Twice.**

Q. With respect to the first lawsuit, do you recall what year that lawsuit was instituted?

A. **No. It was within the last five or six years. I couldn't tell you exactly what year it was.**

Q. Do you know the name of that matter?

A. **No, I don't.**

Q. Do you know the name of the plaintiff in that case?

A. **I believe her name was Gonzalez.**

Q. Do you know the first name of Gonzalez?

A. **No, I don't.**

Q. Do you know if this plaintiff was male or female?

A. **Female.**

Q. Besides yourself, were there other officers named as defendants in that case?

A. **Yes.**

Q. Do you know the names of those

Newton

officers?

A. **Detective Michael O'Connor.**

Q. Anyone else?

A. **And Detective Nancy Doroughty. There might have been others involved, but I don't recall.**

Q. With respect to Detectives O'Connor and Doroughty, are those also detectives out of the Third Squad?

A. **At the time we all worked in the Third NESOT. They no longer work there.**

Q. Do you recall the sum and substance of the allegations in that complaint? What was alleged by the plaintiff?

A. **She alleged that we made an improper strip search at the precinct.**

Q. Do you know what court that matter proceeded in? Was it in Federal Court? Supreme Court?

A. **Yes, Federal Court.**

Q. As of today, do you know if that case is still active?

A. **No, it is not.**

Q. What was the outcome of that

Newton

case?

A. **It was in our favor.**

Q. Did it go to trial?

A. **Yes.**

Q. A full trial?

A. **Yes.**

Q. You gave testimony during that trial?

A. **Yes.**

**If I can add. I don't believe I was a defendant in the case, but I was named in the lawsuit.**

Q. When you say you were named in the lawsuit, do you mean your actions were at issue in that complaint?

A. **I believe I was named as a John Doe.**

Q. Did there ever come a time that you were actually named as a defendant in that lawsuit? Was there an amendment to the complaint, if you know?

A. **I don't believe so, no.**

Q. With respect to the second lawsuit, do you recall the name of the

Newton

plaintiff in that suit?

A. **I can give you the address. No.**

Q. Do you know what court that matter proceeded in?

A. **That was also Federal Court.**

Q. Besides yourself, were there other individuals named in that lawsuit, officers?

A. **I don't know if they were named. I was named by name. And again, there was John Does.**

Q. Do you recall what year that action was filed?

A. **I don't know when it was filed. But we went to trial last year, 2009. Two years ago.**

Q. Do you recall the name of the judge in that matter?

A. **No, I do not.**

Q. Do you know what the sum and substance of the allegations are that were made by the plaintiff in that case?

A. **Yes. We conducted a search warrant at his house. And he claimed that it**

Newton

**was an improper search warrant.**

Q. What was the outcome of that case?

**A. It was in our favor.**

Q. Was that after a full trial?

**A. A full trial, but it never went to the jury.**

Q. To your knowledge, was the case dismissed before the jury could deliberate that case?

**A. Yes. It was dismissed by the judge.**

Q. The judge in that matter, was that a male or a female?

**A. Male.**

Q. With respect to any of the lawsuits that you just mentioned, were there allegations of excessive force in any of those cases?

**A. No.**

Q. Besides the two lawsuits that you just mentioned, are there any other lawsuits that you were named in?

**A. No.**

Newton

Q. Have you ever been a party to any lawsuits outside of your official duties as a Suffolk County Police Officer?

**A. No.**

MR. CALLISTE: Mark this.

(Newton Exhibit 1, Complaint, marked for identification.)

Q. Sir, I am placing before you what has been marked now as Newton 1 (handing).

Do you have that document before you, sir?

**A. (Perusing.) Yes, I do.**

Q. With respect to the document, have you ever seen this document and/or a document that looked exactly like this before?

**A. Yes, I have.**

Q. When did you first see that document?

**A. Some time in the year of 2009.**

Q. How did you come to first see that document?

**A. It was sent to me via I believe interoffice mail.**

Q. When you received that, were you

Newton

at the precinct?

**A. Yes.**

Q. When you first received a copy of this complaint, what did you do?

**A. I read it.**

Q. At the time that you read the complaint, were you familiar with the plaintiff, or the deceased plaintiff, Mr. Lazo?

**A. Yes.**

Q. At the time that you read the complaint, were you familiar with the incident to which the complaint related to?

**A. Yes.**

Q. Did you have any discussions with anyone regarding the complaint at the time that you first read it?

**A. No.**

Q. After receiving the complaint, did you ever have any discussions with any of the named defendants in this complaint regarding the sum and substance or the allegations made in the complaint?

**A. I don't understand what you are**

Newton

**saying. Did I talk to anybody?**

Q. Yes.

**A. Yes.**

Q. Who did you talk to?

**A. A couple of guys that are named in this complaint. I wanted to know if they received the complaint too.**

Q. Who did you speak to?

**A. Detective Talt. And it says "Police Officer Scimone." But it is Sgt. Scimone.**

Q. What did you speak to Detective Talt about?

**A. I just wanted to see if they had received it too.**

Q. Did you have any discussions regarding any of the allegations in the complaint?

**A. No.**

Q. When you discussed whether Mr. -- Police Officer -- Detective Talt received the complaint, how did he respond, if at all?

**A. He received the complaint. They both did.**

Newton

Q. Did you have those conversations with Detective Talt and Sgt. Scimone on the same day?
A. **I don't recall.**
Q. I would like to draw your attention to April 12, 2008. At that time you were employed by the Suffolk County Police Department; is that correct?
A. **Yes, I was.**
Q. At that time your rank or your title was Detective?
A. **Correct.**
Q. On April 12, 2008, were you working that day?
A. **Yes, I was.**
Q. What were the hours of your tour that day?
A. **I was working a 5:00 p.m. to 1:00 a.m. tour.**
Q. Did you work that same tour or those same hours every day at that time?
A. **No.**
Q. Did you have a specific schedule at that time in terms of tours and hours

Newton

worked?
A. **Yes.**
Q. Can you recall as you sit here today what those hours were?
A. **We worked a Tuesday through Saturday, 9:00 am to 5 p.m., five days, off for two. And then we work a 5:00 p.m. to 1:00 a.m. tour, five days, off for two.**
Q. Did you have any particular duty or assignment on that date, April 12, 2008, that you can recall?
A. **No.**
Q. Did you have any specific or particular detail that you were placed on on that date?
A. **No.**
Q. What were your duties as a Detective with the Third Squad on April 12, 2008?
A. **My duties as Third Squad NESOT Detective are, we handle drug complaints that occur in the Third Precinct area. We do drug surveillances of known or drug locations. We attempt to do surveillances of street**

Newton

**narcotics investigations. We also assist our narcotics units. That would be our duties all the time.**
Q. Besides investigating drug complaints and dealing with narcotics related issues, did you also investigate other matters?
A. **We would be assigned, if necessary, to specific areas concerning robberies, burglaries, that sort of thing. That would be up to the discretion of the Detective Lieutenant.**
Q. Does the Third Squad have a unit that deals particularly with robberies, and burglaries, and those sort of matters?
A. **No.**
Q. At the time, in April of 2008, would it be accurate to say that your duties were mostly involved with narcotic-related offenses?
A. **That's correct.**
Q. Did you have a partner at that time?
A. **Yes, I did.**

Newton

Q. Who was your partner at that time?
A. **Detective Christopher Talt.**
Q. Now, was Detective Talt your partner on a daily basis?
A. **We worked mainly together. But there is a three-man team with a Detective Sergeant. So when Detective Talt is off, or I'm off, we assist with the other detective.**
Q. What was that detective's name?
A. **Thomas Wisely.**
Q. Was Detective Wisely, if you can recall, on that day, April 12, 2008?
A. **I don't believe he was.**
Q. Do you recall having any discussions with Detective Wisely on that day?
A. **No.**
Q. Now with respect to the NESOT Unit, how did you become a member of NESOT, if that makes sense?
A. **Well, when I became a member of NESOT out of the Narcotics Division. It would have been out of the Third Squad. I applied for and was transferred to that unit.**

Newton

Q. Was this a written application?
A. **Written transfer application, yes.**
Q. After you filed the application to be transferred into NESOT, what, if anything, took place?
A. **Eventually I went to NESOT.**
Q. Did you have to be interviewed pursuant to that application?
A. **Yes.**
Q. Did you have to undergo any training to be a part of or a member of NESOT?
A. **No.**
Q. Did you have to have any particular skills before applying to enter NESOT?
A. **No.**
Q. Do you recall what year you became a member of NESOT?
A. **1999.**
Q. Would it be accurate to say that you have maintained your membership in NESOT, in that division, from 1999 to the current date?

Newton

A. **Yes.**
Q. Sir, have you ever heard of COPE?
A. **Yes, I have.**
Q. What is COPE?
A. **It is a uniform patrol unit that works out of each precinct.**
Q. Just for the record, what does COPE stand for?
A. **I believe it is Community Oriented Policing Enforcement. I'm not sure.**
Q. Have you ever been a member of COPE?
A. **No.**
Q. Do you know what the duties or the mission of the COPE Unit is?
A. **I think they patrol high priority areas that, again -- that are up to the discretion of the Inspector or the bosses of the precinct.**
Q. Does your department, NESOT, work closely with COPE?
A. **Yes, we do.**
Q. In what way?
A. **They assist us on, again,**

Newton

**conducting search warrants, conducting vehicle and traffic enforcement -- I mean traffic stops. They also assist us when we have to work with Narcotics.**
Q. Now, is COPE a specialized unit for uniformed officers in the same way that NESOT is a specialized unit?
A. **I guess you could say so, yes.**
Q. Do you know if police officers have to apply to become members of COPE?
A. **I would assume they do, yes.**
Q. Do you know for sure as you sit here today?
A. **No.**
MR. CALLISTE: Off the record.
(Discussion off the record.)
Q. So, on April 18, 2008, you began work at 5:00 p.m.?
MR. DUNNE: You said 18th. You meant 12th?
MR. CALLISTE: Right.
Q. On April 12, 2008 you began work at 5:00 p.m. What was the first thing you did when you went to work, if you recall?

Newton

A. **I go into the precinct. I sign in. And I don't recall what I exactly did.**
Q. Do you have specific duties set at the time that you go to work each day? In other words, do you know what it is that you are going to be doing on that particular day?
A. **No.**
Q. How are assignments assigned to you on a daily basis?
A. **They are not. We don't have any assignments assigned.**
Q. How do you know what your duties will be on any particular day?
A. **Our duties can change at any time. We can go out and do street surveillance. We can conduct search warrants. It depends on that particular day.**
**That particular day we didn't have any particular assignment.**
Q. How are assignments assigned to particular officers?
A. **They are not.**
Q. How do officers know what they are going to be doing any particular day? Do

Newton

you have a supervisor that tells you what you are going to be doing?

A. **No. We have a supervisor. But he doesn't tell us what to do.**

Q. How do you determine what it is you are going to be doing on a particular day?

A. **That depends on what we do during the day. It depends on what complaints we have had prior to that. For the most part, we go out and do street work. But we don't have any particular assignment.**

Q. Did you patrol that day the streets?

A. **Yes, we did.**

Q. Did you go out on that tour with or without a partner?

A. **I went out with a partner, but we were in separate cars.**

Q. Who was your partner that day?

A. **Detective Talt.**

Q. Did you have a particular vehicle at that time, in April of 2008?

A. **We have -- I believe at the time we had three vehicles.**

Newton

Q. Were any of those vehicles particularly assigned to you, a vehicle that you would drive normally or daily?

A. **No.**

Q. When you went out on patrol, was that in a marked car or unmarked car?

A. **Unmarked car.**

Q. What color was that car? Do you recall?

A. **No, I do not.**

Q. Did that car have any identifying marks on it? Police symbols, overhead lights, anything like that?

A. **No.**

Q. Was it equipped with a siren?

A. **Yes.**

Q. Did it have any grille lights or lights in the grille?

A. **Yes.**

Q. Did it have any other sort of lights, such as strobes, or anything else like that?

A. **I believe at that time we had a strobe light on one of the visors, passenger**

Newton

**visor.**

Q. Do you keep logs or records regarding what vehicle you -- what particular vehicle you may have taken out on any particular day?

A. **No.**

Q. Have you ever seen any sort of document or written paperwork which describes what particular vehicle you took out on any particular day?

A. **I don't understand the question.**

Q. Do you know if it is recorded in any central location in any manner what vehicle you took out on any particular day?

A. **No.**

Q. Now, how did it come about that you ended up going out in separate cars -- with a partner, but in separate cars?

A. **We occasionally do that. We occasionally go out in separate cars. Because then we can patrol a broader area. It is now two people in two cars instead of two people in one car.**

Q. On this particular day, on April

Newton

12, 2008, did you go out with any particular purpose or reason?

A. **No.**

Q. Would it be accurate to say that on that day, April 12, 2008, you and your partner went out to do general patrol?

A. **Yes.**

Q. Did you have any subjects, or situations, or circumstances that you were looking at on that particular day?

A. **We get a number of complaints from anonymous sources. People call in about complaints. So at some point during the day we would go by those complaints or those areas that we had complaints about.**

Q. On that particular day, April 12, 2008, were you responding to or investigating any particular complaints that you know of?

A. **We were responding to the West Islip area because we had had complaints about that area.**

Q. Do you recall what those complaints were?

A. **My partner, Detective Talt, had**

Newton

**received a complaint that there was a subject in the area or subjects in the area doing deals out of parking lots, streets, side streets off of Sunrise Highway.**

Q. Do you know how Detective Talt got those complaints?

A. **No.**

Q. Do you know who made those complaints?

A. **No.**

Q. Do you know when in relation to April 12, 2008 Detective Talt got that specific complaint about drug sales in that area?

A. **No.**

Q. Do you know if that complaint came in that same day?

A. **No.**

Q. Do you know if there were any investigations conducted into that complaint prior to you going out to investigate it?

A. **No.**

Q. Did you personally do anything with respect to investigating or doing some

Newton

preliminary investigations in that area or anything -- doing any preliminary investigations regarding that complaint before you went out on tour that day?

A. **No.**

Q. Do you know if Detective Talt did?

A. **No, I do not.**

Q. Do you know if anyone at the Third Squad did any background information, or research, or investigations in that area prior to you going out that day?

A. **No, I do not.**

Q. Other than the information that was received from the anonymous caller that there were drug sales in parking lots and such, did you have any other particular information that you were looking up or researching that day?

A. **One of the calls was a subject named Carlos dealing out of a dark colored, newer Cadillac.**

Q. Was this person named Carlos, was his last name identified to you?

Newton

A. **No.**

Q. Do you know when the particular complaint about this person named Carlos came in?

A. **No, I do not.**

Q. How are complaints received by NESOT?

A. **Most of the time they are done via phone. We do get narcotics tips through our Crime Stoppers.**

Q. So, at the time that you went out on your tour on April 12, 2008 with your partner, were you going to investigate this individual particularly named Carlos?

A. **We weren't going to investigate him in particular. We were headed out in that direction to see what, if anything, was going on in that area.**

Q. At the time that you received the complaint about this individual named Carlos, did you have any prior knowledge about who this Carlos was or may have been?

A. **I did not personally, no.**

Q. Did you know if any of the other

Newton

detectives did?

A. **No.**

Q. Did you do any research or investigation regarding this Carlos individual before you left the precinct?

A. **No, I did not.**

Q. Do you know if Detective Talt did?

A. **I don't know.**

Q. Did you have any discussions at all about this person named Carlos with Detective Talt?

A. **Yes.**

Q. What discussions were those?

A. **He advised me that he had gotten a complaint about a subject named Carlos dealing out of a dark colored Caddy.**

Q. Besides that information, was there any other information?

A. **Regarding Carlos?**

Q. Yes.

A. **No.**

Q. Did you have a description of Carlos?

Newton

A. **I believe he did. But I don't recall.**

Q. When you went out on tour on that day, April 12, 2008, did you know what Carlos looked like?

A. **No.**

Q. Did you have a general description of Carlos?

A. **We might have. I just don't recall.**

Q. During your patrol that evening, did there come a time that you came to see Mr. Kenny Lazo?

A. **Yes.**

Q. Where were you when you first saw Mr. Lazo?

A. **I didn't see Mr. Lazo. I saw the car. First time I saw the car was on the overpass at Higbie Lane at Sunrise Highway in West Islip.**

Q. At the time that you first saw the car, where was Detective Talt at that time?

A. **He was in a separate car behind**

Newton

**me.**

Q. When you saw the car identified as the blue Cadillac, what, if anything, did you do?

A. **I advised Detective Talt that I had seen the car, and that we should follow it.**

Q. Did you follow the car?

A. **Yes, we did.**

Q. Where did you follow the car to?

A. **I followed the car to Pine Street off of the service road in West Islip. I then broke off. And Detective Talt followed the car.**

Q. For how long did you follow that car before the car made it to Pine Street?

A. **Only a couple of minutes, short period of time.**

Q. During the time that you were following this vehicle, were you in communication with Detective Talt?

A. **Yes.**

Q. How were you communicating with Detective Talt?

A. **Over the Detective Band of our**

Newton

**radios.**

Q. What, if anything, were you saying, if you recall, to Detective Talt at the time that you were following this individual prior to arriving at Pine Street?

A. **I told him I saw a dark colored car parked in front of Herbie Dodge and we were going to follow it.**

Q. Was that all?

A. **Yes.**

Q. Did you discuss anything regarding the car, such as the license plate or anything like that?

A. **I believe I did give over the license plate, but I don't recall the plate number.**

Q. Do you recall running that plate?

A. **No, I do not.**

Q. Do you know if Detective Talt ran that plate?

A. **No, I do not.**

Q. Do you know if any reports were ever made to the precinct with respect to trying to determine the owner of the vehicle

Newton

while you were following it?

A. **I don't believe there was any requests.**

Q. The blue Cadillac, did it have tints?

A. **Yes.**

Q. Were you able to observe the subject inside the car?

A. **No, I was not.**

Q. When you first saw the car, the blue Cadillac that you described, was there any point that you were able to see who the driver of that car was?

A. **No.**

Q. Now, you indicated that at some point you did see Mr. Lazo that day, correct?

A. **Correct.**

Q. Did you know Mr. Lazo prior to April 12, 2008?

A. **No, I did not.**

Q. Did you know of Mr. Lazo prior to April 12, 2008?

A. **No.**

Q. Do you know if Detective Talt, if

Newton

you know, knew of Mr. Lazo before April 12, 2008?

A. **I believe he did. Yes.**

Q. What leads you to believe that Detective Talt knew who Mr. Lazo was?

A. **I believe he had gotten via the DEA, he had gotten Kenny Lazo's name, might have been involved in a bigger drug ring. But you would have to ask Detective Talt.**

Q. I'm asking you what you know with respect to this, what you personally know.

A. **Okay.**

Q. Have you ever had any discussions with Detective Talt regarding Kenny Lazo prior to you going out on tour that day, April 12, 2008?

A. **No.**

Q. How did you come to learn that Detective Talt may have gotten information from the DEA regarding Kenny Lazo?

A. **We figured that out after this incident.**

Q. Prior to April 12, 2008, do you know if there were any active investigations

Newton

being conducted by NESOT, or the DEA, or any other agencies of the Suffolk County Police Department into Kenny Lazo?

A. **As far as NESOT, there was not. I can't say for the other units.**

Q. When NESOT gets information from other agencies regarding an individual who may be a person of interest, what, if anything, does NESOT do with respect to the name they get?

A. **We would do whatever that unit asked us to do.**

Q. Would you maintain files on the individuals that you are investigating?

A. **I don't know.**

Q. Do you know if NESOT maintains files?

A. **No.**

Q. Do you know if there was a file regarding the information that was obtained from the DEA on Mr. Lazo prior to April 12, 2008?

A. **No.**

Q. Do you know if NESOT maintained

Newton

any sort of information regarding Mr. Lazo prior to April 12, 2008?

A. **I do not know.**

Q. At some point you arrested Mr. Lazo, correct?

A. **Yes.**

Q. Did you make any other arrests that day?

A. **No.**

Q. Did you make any other stops that day other than Mr. Lazo, which will we will get to?

A. **I don't recall making any other stops.**

Q. Besides investigating the blue or the dark colored Cadillac, were you investigating any other vehicles specifically, or people?

A. **No.**

Q. The person who made this anonymous call regarding Carlos, do you know if that person was ever identified by the Suffolk County Police?

A. **No, I do not.**

Newton

Q. Were you or Detective Talt familiar with anyone that may have fit the description of the person that was given by the informant, if you will?

A. **If I understand your question, did we investigate anybody else fitting that description?**

Q. No. Well --

MR. CALLISTE: Withdrawn.

Q. The question is: Were you or Detective Talt familiar with anyone -- when the call came in describing an individual named Carlos dealing with narcotics out of a certain area, did you or Detective Talt know who this Carlos person was, or did you have any prior information regarding anyone named Carlos dealing with narcotics in that area?

A. **No.**

Q. At the time that you first left the precinct on April 12, 2008 with Detective Talt, was it your intention to pull over and stop the vehicle if you did see it?

A. **Our intention was to investigate drug activity in that area. If we had seen**

Newton

that car, it could have changed. We weren't necessarily going to pull it over.

Q. Well, what were your intentions with respect to this vehicle?

A. Follow it, see what his activity was.

Q. I'm not asking you what you could have done. I'm asking you: What were your specific intentions?

A. We didn't have any specific intentions.

Q. But you did go out looking for this vehicle?

A. Not that particular vehicle, no.

Q. At the time that you went out with Detective Talt on April 12, 2008, you were not looking for the vehicle that was mentioned in this complaint, is that your testimony?

A. I'm saying we didn't go out specifically for that vehicle. But if we did see that vehicle, we would have investigated it.

Q. If you did see that vehicle that

Newton

was described in the complaint, was it your intention, or did you have any discussions with Detective Talt regarding what you would have done if that vehicle came into your view?

A. No, I did not.

Q. So, at the point that you followed the vehicle from Pine Street -- to Pine Street, did the vehicle make any stops?

A. Stopped at a red light at Higbie and the service road.

Q. Besides stopping at lights, did the vehicle stop to do anything that you believe was suspect, or did you see the vehicle make any stops other than red lights?

A. I did not personally see him make any other stops.

Q. Have you ever had any discussions with -- did you have any discussions with any of the other -- with Detective Scimone -- Sgt. Scimone prior to your going out on April 12, 2008?

A. No, I did not.

Q. Did you ever have any cellphone conversations with Sgt. Scimone regarding the

Newton

blue Cadillac?

A. No, I did not.

Q. How about Detective Judge?

A. Officer Judge. No, I did not.

Q. So, at Pine Street, what happened when you arrived?

A. He made a right onto Pine Street. I kept going. And Detective Talt followed him.

Q. Where did you proceed to?

A. I proceeded to West 1st Street and parked my car.

Q. How far is West 1st Street from Pine Street?

A. Less than a quarter of a mile.

Q. What, if anything, did Detective Talt do?

A. He followed the car.

Q. Do you know specifically where Detective Talt followed the car to?

A. Pine Street.

Q. Was there any particular location on Pine Street that Detective Talt followed the car to?

Newton

A. He followed the car to an area on Pine Street where the car made a stop.

Q. At the time that you broke off from following the vehicle and Detective Talt continued with his surveillance, were you in contact with Detective Talt?

A. Yes.

Q. How were you in contact with Detective Talt at that time?

A. Police radio.

Q. Do you know if these police radio runs are recorded?

A. I believe they are, yes.

Q. Have you ever heard any recordings of any radio runs that night?

A. Yes.

Q. When did you first hear those radio runs?

A. During the prep for this deposition.

Q. What, if any, items all together, in total did you review in preparation for this deposition today?

A. Any items?

Newton

Q. Right.
A. **Well, we reviewed the tapes. I reviewed my paperwork.**
Q. The tapes, how many tapes did you review?
A. **They are actually CDs. I believe there was just one.**
Q. What, if anything, did Detective Talt say to you while he was following this blue vehicle on Pine Street?
A. **I don't recall Detective Talt saying anything.**
Q. You indicated at some point the vehicle had stopped and something occurred at that stop, correct?
A. **Yes.**
Q. How do you know that that happened?
A. **Again, I found out later on that that is what happened.**
Q. At the time that you -- at the time that you broke off from Detective Talt, was Detective Talt describing to you what he was observing?

Newton

A. **No.**
Q. Did you know at the time that you broke off from Detective Talt exactly what Detective Talt was observing?
A. **No.**
Q. You said you came to learn later on that there was some sort of stop, correct?
A. **Correct.**
Q. To your knowledge, what happened, or what, if anything, did Detective Talt observe during that stop?
A. **He observed what was an apparent hand-to-hand drug transaction between the operator of the dark Cadillac and another vehicle.**
Q. Did Detective Talt say it was a hand-to-hand drug transaction?
A. **Yes.**
Q. As you sit here, within your knowledge, do you know how Detective Talt was able to determine that there were actually drugs handed --
A. **He observed it. He saw it.**
Q. At this time you were following

Newton

these individuals at night, correct?
A. **Correct.**
Q. Approximately how far in terms of distance were you officers trailing behind the blue Cadillac in terms of car lengths?
A. **I believe I was directly behind him. That is why I got off of him and Detective Talt followed him onto Pine Street.**
Q. In terms of car lengths, how far were you following him?
A. **I was directly behind him. In car lengths, I don't know. Two car lengths, a car length. I don't know.**
Q. Do you know if Detective Talt maintained the same distance from the vehicle at the time that you broke off from it?
A. **I don't know.**
Q. You indicated that at the time you were communicating with Detective Talt via radio, correct?
A. **Correct.**
Q. Detective Talt at the time did not describe to you what he was seeing when you broke off from the vehicle?

Newton

A. **I don't recall if he said it over the radio or not at that time. I don't recall.**
Q. On the day, April 12, 2008, while you were in the car after you broke off from the surveillance, did you know at that time that Detective Talt claimed to have seen a hand-to-hand drug sale, while you were in your car?
A. **At what point in time? I'm sorry.**
Q. When you broke off from the surveillance, Detective Talt continued with the surveillance on Pine Street, correct?
A. **Correct.**
Q. At the time that you broke off and Detective Talt continued with the surveillance, was Detective Talt describing to you what he was observing?
A. **No.**
Q. Sir, at this time could you remember what particular point you were told by Detective Talt or you learned that there was some sort of hand-to-hand transaction on

Newton

Pine Street?

A. **If I can explain. My opinion was that he went down that side street to do a hand-to-hand deal. I did not observe it.**

**But when they passed me when I was parked, I was facing out. They passed me. The Cadillac was first. Detective Talt came by. He gave me an acknowledgement that something had happened. So I meant that to be that a hand-to-hand had just taken place.**

Q. How did he give you that acknowledgment?

A. **He gave me a thumbs up.**

Q. Did you know what that thumbs up meant?

A. **I took that to mean that he had just done a hand-to-hand.**

Q. Was that ever personally communicated to you over the radio?

A. **No.**

Q. Do you know if there was any reason why that wasn't -- if you know why that wasn't communicated to you over the radio?

A. **No.**

Newton

Q. Was that something that you would normally communicate over the radio?

A. **Not necessarily.**

Q. After the blue Cadillac passed you by with the detective following it, what, if anything, did you do at that point?

A. **I proceeded to follow him.**

Q. Where did you follow him to?

A. **I -- we went onto the service road, the south service road of the Sunrise Highway. I followed him.**

**He then went onto the Robert Moses Causeway going northbound. He then made an exit onto the Bay Shore Road slash Southern State Parkway eastbound exit.**

Q. At any time while you were surveilling this vehicle and or following the vehicle, did you ever run the plates to find out who owned that vehicle?

A. **No.**

Q. Did you care at that point?

A. **No.**

Q. Did it matter to you one way or the other?

Newton

A. **Yes, it did matter to me. Yes.**

Q. Was there any particular reason -- did you have equipment in your vehicles to run plates if you need to?

A. **The equipment would be, I would have to do it over primary on our radio.**

Q. Was there any particular reason why you did not run that plate at that time?

A. **No.**

Q. Are those vehicles equipped with cameras?

A. **No.**

Q. Were either of you detectives taking pictures or doing any other visual recording?

A. **No.**

Q. How long after you left the precinct on April 12, 2008 initially --

MR. CALLISTE: Withdrawn.

Q. Do you recall what time you first left the precinct on April 12, 2008?

A. **No, I don't.**

Q. Do you recall how long you were in the precinct approximately before you went

Newton

out with Detective Talt?

A. **No.**

Q. Do you recall how long after you initially went out with Detective Talt you came to see this blue Cadillac?

A. **No.**

Q. Do you recall approximately how long?

A. **No.**

Q. Do you recall how long you were on the road before you came to see this blue Cadillac?

A. **No.**

Q. Do you recall how long you were on the road that day in total at all?

A. **No.**

Q. Do you know how long you observed that Cadillac for?

A. **For what?**

Q. Do you know how long you observed that Cadillac, length of time?

A. **Length of time, from the initial time I saw him to the traffic stop?**

Q. Yes.

Newton

**A. I would say it was probably five to ten minutes.**

Q. Did there come a time that that vehicle was stopped?

**A. Yes.**

Q. Where was that vehicle stopped?

**A. It was stopped in the shoulder portion of Bay Shore Road entering onto Southern State Parkway.**

Q. How did it come about that the determination was made that the car would be stopped?

**A. I made the determination to stop the car because it had conducted a couple of traffic infractions.**

Q. What traffic infractions did you see the car commit?

**A. He failed to stop at the service road at West 1st. I'm sorry. The service road at West 1st. There was a stop sign. He didn't make a complete stop. And improper lane change on the service road. And then an improper lane change on the Robert Moses Causeway.**

Newton

Q. Did you typically conduct traffic stops?

**A. Yes.**

Q. Was that part of your duties, to conduct traffic stops?

**A. Yes.**

Q. For vehicle violations, moving violations?

**A. Yes.**

Q. At the time that you stopped the vehicle, did you stop the vehicle at all as a result of what Detective Talt claims that he may have seen occur on Pine Street?

**A. You would have to ask that again.**

Q. Certainly. The hand-to-hand drug transaction that Detective Talt may have seen on Pine Street, was that -- did that serve as any basis to stop the vehicle at all?

**A. Yes, it did.**

Q. So, would it be accurate to say that that alleged transaction was also a reason for the stop?

**A. It was part of the reason, yes.**

Q. Did you perform the traffic stop

Newton

yourself?

**A. I assisted in the traffic stop. But the traffic stop was conducted by the COPE Unit.**

Q. How was the COPE Unit notified -- or notified by you that you would be conducting a stop?

**A. We were on the Detective Band. The sergeant asked me if they should conduct a traffic stop. And I said yes.**

Q. When did you first speak to the sergeant from COPE?

**A. It was around that time, maybe a minute before that.**

Q. Were you in the vehicle at that time?

**A. Yes.**

Q. Prior to speaking to the sergeant -- for the record, what sergeant are you referring to?

**A. Sergeant Scimone.**

Q. Prior to speaking to Sgt. Scimone -- prior to speaking to Sgt. Scimone while you were surveilling the blue Cadillac, had you had any

Newton

conversations with Sgt. Scimone or any other officers from COPE prior to that?

**A. No, I did not.**

Q. Who contacted COPE to make the traffic stop?

**A. Detective Talt.**

Q. Where were you at the time that Detective Talt made this request to COPE?

**A. I believe I was in my vehicle.**

Q. Did you know at that time that Detective Talt had called COPE to make the stop?

**A. Yes.**

Q. Is there any particular reason why you used COPE to make the stop and you didn't make the stop yourself?

**A. Because we usually try to get a uniformed car to make a traffic stop. It is easier that way. It is safer.**

Q. How many police unit cars were involved in that traffic stop initially?

**A. Just the COPE Unit and my vehicle.**

Q. Was that one police car?

Newton

A. **One COPE car.**

Q. That was a marked police car?

A. **Yes, sir.**

Q. Were you anywhere in the area when the stop was conducted itself?

A. **Yes.**

Q. Did you see the stop occur?

A. **Yes.**

Q. Where were you at the time that you saw the stop occur?

A. **I was behind them. I would say fifty yards maybe behind them to their right.**

Q. Do you know where Detective Talt's vehicle was at that time?

A. **He kept going on the Southern State. So he proceeded past us and stopped in front where he couldn't be seen. But I don't know exactly where that was.**

Q. Do you know for a fact that Detective Talt stopped in an area where he couldn't be seen?

A. **Yes.**

Q. Do you know if that was his intention to stop in an area where he couldn't

Newton

be seen?

A. **Yes.**

Q. Why was Detective Talt stopping in any area where he couldn't be seen?

A. **So the person that was operating that car would not see him.**

Q. Was there any reason why Detective Talt didn't want the person operating the car to see him?

A. **A couple of reasons. One, he didn't want the person to see the car that we were using. Two, he didn't want that traffic stop to seem like it was more than just a traffic stop.**

Q. Sir, did you have the same concerns?

A. **Yes.**

Q. You were directly involved in the stop, correct?

A. **Yes, after the stop was initiated. Yes.**

Q. Why was it a concern that the suspect not see the car that Detective Talt was driving?

Newton

A. **Because we don't like to give up the cars that we use.**

Q. You gave up the car that you used, correct?

A. **No, I did not.**

Q. You participated in the traffic stop?

A. **Yes. But I was far enough behind and to the right that he couldn't see my car.**

Q. As far as you knew?

A. **Correct.**

Q. Did you know one way or the other if this person did actually see your car or not?

A. **No, I do not know.**

Q. What happened after the initial stop?

A. **I waited a few minutes. And then I walked up to the police car.**

Q. Approximately how long did you wait?

A. **A couple of minutes.**

Q. At the time that you were waiting, what were you doing?

Newton

A. **Just observing.**

Q. What did you observe?

A. **I observed the COPE car do a traffic stop.**

Q. Did you observe anything in particular occur while that traffic stop -- when that traffic stop was initiated while you were sitting in your car?

A. **No.**

Q. Did the individual driving the car get out of the car while you were sitting in yours?

A. **No.**

Q. Were you in communication with any of the officers from COPE at the time that the stop had taken place?

A. **No.**

Q. Were you listening in on what was going on at the stop?

A. **Not really, no.**

Q. Did you know one way or the other what was being discussed by the officers of COPE, sergeant -- was it the sergeant that actually made the stop?

Newton

A. **They were together.**
Q. When you say they --
A. **Officer Judge was driving. Sgt. Scimone was the passenger.**
Q. With respect to that initial stop, what actions, if any, were you able to observe Officer -- Sgt. Scimone make with respect to the vehicle?
A. **I observed Officer Judge and Sgt. Scimone approach the car.**
Q. How did they approach the car?
A. **Officer Judge approached on the driver's side. Sgt. Scimone was on the passenger side.**
Q. Were you able to determine at that time who was communicating with the driver?
A. **I believe it was Officer Judge.**
Q. Were you able to see what, if anything, Sgt. Scimone was doing?
A. **No. He was just on the passenger side.**
Q. Did these individuals have their guns drawn?

Newton

A. **Not that I could see, no.**
Q. Besides communicating with the driver, did you see Sgt. Scimone or Officer Judge do anything with respect to the driver?
A. **No.**
Q. Did you see them take his identification?
A. **I couldn't see that, no.**
Q. Do you know if they asked him for his identification?
A. **Yes.**
Q. How do you know that?
A. **Because when I approached them -- when I approached Officer Judge, he had his identification.**
Q. Officer Judge had Mr. Lazo's identification?
A. **Yes, he did.**
Q. At the time that you approached, you say you waited a few minutes, do you know approximately how long that few minutes was?
A. **A couple of minutes.**
Q. Less than five minutes?
A. **I don't know for sure.**

Newton

Q. Were you having any communications or were you communicating with Detective Talt at the time that you were stopped behind the COPE car?
A. **No.**
Q. At that time did you have any idea where Detective Talt was or where his vehicle was situated?
A. **No.**
Q. Do you know if Detective Talt was on the Southern State Parkway or somewhere nearby?
A. **I believe he was on the Southern State Parkway.**
Q. How did you come to that belief?
A. **Because that is where I believe he was.**
**He would be close enough that if he had to, he could get to our car. So I believed he was on the Southern State Parkway.**
Q. Did Detective Talt communicate to you that he was on the Southern State Parkway at that time?
A. **No.**

Newton

Q. So at the time you got out of your car and proceeded to the blue Cadillac where the stop occurred, what, if anything, did you observe at the time that you were walking from your car to the blue Cadillac?
A. **I observed Officer Judge in the police car and Sgt. Scimone on the driver's side of the vehicle, of the Cadillac.**
Q. You say at that time Officer Judge was in the police car?
A. **Yes, he was.**
Q. And Sgt. Scimone was still on the passenger's side?
A. **No. He was on the driver's side.**
Q. Did you have any discussions with Officer Judge?
A. **Yes.**
Q. What, if any, discussions did you have with Officer Judge?
A. **I asked him who was operating the vehicle and if he owned the vehicle.**
Q. What, if anything, did Officer Judge tell you?
A. **Officer Judge told me that the**

Newton

**operator of the vehicle was Kenny Lazo. And I'm not sure if he knew who the owner of the vehicle was at that time. And that he was going to check his license to make sure it was valid.**

Q. Did you have any other discussions with Officer Judge?

A. **No.**

Q. Did you have any discussions -- do you know if COPE had any information regarding the alleged hand-to-hand incident that occurred before?

A. **No.**

Q. Did you have any conversations with Officer Judge regarding the fact that this person may possibly have been involved in a drug transaction?

A. **I don't recall if I did or didn't.**

Q. At the time that you were first speaking to Officer Judge about who was driving the vehicle, did you make mention of any other crimes that you witnessed or that you may have seen?

Newton

A. **No.**

Q. Did you make mention of the fact that this person was a witness in the investigation that was being conducted by yourself?

A. **A witness?**

Q. I am sorry. That he was a suspect.

A. **No.**

Q. Do you know one way or the other if Officer Judge knew that this person was a suspect in an alleged narcotics transaction?

A. **Again, I don't recall if I said to him that he had just done a hand-to-hand, so I can't answer that.**

Q. Did you have any other discussions with Officer Judge while he was in his police car?

A. **No.**

Q. That police car, do you know if the police car that was being operated by COPE was equipped with a computer?

A. **Yes, it was.**

Q. Do you know if Officer Judge was

Newton

running Mr. Lazo's information?

A. **Yes, he was.**

Q. Was he running that via radio, or computer, or some other method?

A. **I don't know.**

Q. Did you hear Officer Judge having any communications with the dispatcher or anyone from the police precinct?

A. **No.**

Q. What, if anything -- what did you do next after having this conversation with Officer Judge?

A. **I walked up to the vehicle.**

Q. The vehicle meaning the blue Cadillac?

A. **Yes.**

Q. What, if anything, did you observe at the time that you walked up to the blue Cadillac?

A. **I observed Sgt. Scimone at the driver's side window and the operator of the vehicle sitting in the car.**

Q. What, if anything, was Sgt. Scimone doing at that time?

Newton

A. **He was just standing there.**

Q. Was he having any discussions with the driver?

A. **I don't recall.**

Q. Do you recall if Sgt. Scimone had a flashlight out or anything else like that?

A. **No.**

Q. Do you recall if Sgt. Scimone was standing at the -- directly at the driver's door or behind it?

A. **I don't recall.**

Q. Did you have any conversation with Sgt. Scimone at that time?

A. **Yes, I did.**

Q. What, if any, conversation did you have with Sgt. Scimone?

A. **I quickly explained to Sgt. Scimone that we believe the operator of the vehicle just did a hand-to-hand on the street and that we were going to see if we can find out who he was and what he was doing.**

Q. What, if anything, did Officer -- Sgt. Scimone say in response to that?

A. **He didn't.**

Newton

Q. Did you have any discussions with Sgt. Scimone regarding possibly searching the vehicle?

A. **No.**

Q. Did you have any intent at that point to have the vehicle searched?

A. **No.**

Q. Sir, though it is your testimony that, to your knowledge Detective Talt witnessed a hand-to-hand sale, you had no intention of doing anything with respect to that sale at that time, is that your testimony right now?

A. **That's correct.**

Q. Just to be clear, the only reason that you pulled over this vehicle was because of the vehicle stop?

A. **As I stated before, it was also to identify the operator of the vehicle who just conducted a hand-to-hand transaction.**

Q. Sir, as you sit here, do you know if Sgt. Talt knew --

A. **Detective Talt.**

Q. As you sit here today, do you

Newton

know if Detective Talt actually saw a hand-to-hand transaction?

A. **As I sit here today, yes, I do.**

Q. And you had no intention of arresting the operator of that vehicle at the time that you pulled him over for the hand-to-hand transaction that you saw?

A. **That is correct.**

Q. What happened next after you had the discussion with Sgt. Scimone?

A. **During the discussion with Sgt. Scimone, he advised me that the vehicle had a push button start, which I had never seen before. I didn't even know how that worked. Our concern was that he could take off at any point in time. So we asked the operator, Kenny Lazo, if he would exit the vehicle. And he voluntarily did.**

Q. Did you have any discussions with Kenny Lazo before that time?

A. **No.**

Q. While Sgt. Scimone was standing next to the vehicle, did you hear Mr. Lazo say anything?

Newton

A. **No.**

Q. After Mr. Lazo exited the vehicle, what happened next?

A. **We walked around behind the vehicle to the rear of the passenger side of the vehicle.**

Q. At that time it was yourself, Sgt. Scimone, and Mr. Lazo?

A. **Correct.**

Q. Where was Officer Judge at that time that Mr. Lazo exited the vehicle?

A. **He was still in the police vehicle.**

Q. Do you know at that time where Detective Talt may have been?

A. **I believe he was still in the same spot he was originally at.**

Q. At that time did you have any idea what that spot was?

A. **Exactly where that was, no.**

Q. So, at that time you had no knowledge where your partner was; is that correct?

A. **Again, I believed he was in front**

Newton

**of us, a spot where the operator of the vehicle could not see what was going on. But he was close enough that if we needed an assist, he would help us.**

Q. Sir, at any point that evening while you were surveilling the vehicle and/or after the vehicle had been stopped, were you using cellphones to communicate?

A. **No, I did not.**

Q. Do you know if Sgt. -- if Detective Talt was using a cellphone?

A. **No, I do not.**

Q. Do you know if any of the police officers with the COPE Unit were using cellphones?

A. **No, I do not.**

Q. Sir, after Mr. Lazo had exited the vehicle and walked to the back passenger side of the vehicle, what happened next?

A. **He went to the back passenger side of the vehicle. I started to ask him some basic questions.**

Q. Such as -- what questions did you ask him?

Newton

A. **Such as name, date of birth, address.**

Q. Who began asking him those questions?

A. **I did.**

Q. Why did you begin asking him those questions?

A. **Again, just to find out who he was and where he lived.**

Q. At that time you had Mr. Kenny's identification before you, correct?

A. **I didn't.**

Q. At that time it was discussed -- at least it was advised -- it was told to you by Officer Judge who the driver was, correct?

A. **Correct.**

Q. You knew his identity at the time?

A. **Yes.**

Q. Did you ask him any other questions besides his name and date of birth?

A. **At that particular time I was just asking basic questions.**

Q. What questions did you ask him?

Newton

A. **His name, his date of birth, and address.**

Q. What other questions did you ask him besides that?

A. **Besides that. After asking him those questions, I asked him -- I got more particular questions, like where he was coming from, what he was doing in the area, whose car it was. Things along that line.**

Q. Did Mr. Kenny -- Mr. Lazo respond to your questions?

A. **Yes. But he was becoming nervous.**

Q. When you asked Mr. Lazo where he was coming from, how did he respond?

A. **He said from up the road.**

Q. Are those the specific words he used?

A. **No.**

Q. Do you recall what specific words he used?

A. **No.**

Q. Were you taking notes at this time?

Newton

A. **No, I was not.**

Q. Do you recall what Mr. Lazo said to you with respect -- specifically with respect to where he was coming from?

A. **No.**

Q. When you asked Mr. Lazo what he was doing, do you recall how he responded to that?

A. **No.**

Q. What did Mr. Lazo tell you while he was pulled over -- while he was in the back of the police vehicle -- while he was in the back of his vehicle? What did he tell you?

A. **What did he tell me?**

Q. Yes.

A. **He told me that -- I don't remember exactly. But he did not tell me he was coming from an area that he was just at. It wasn't the same as where he was.**

Q. At this point you allege that Mr. Kenny was observed in a hand-to-hand, correct?

A. **Mr. Lazo. Yes.**

Q. Sorry. That Mr. Lazo was

Newton

involved in a hand-to-hand transaction, correct?

A. **Yes.**

Q. You were interviewing him to find out more information about him, correct?

A. **I was interviewing him to develop any information we can about him, yes.**

Q. At this point, as you testified today about the conversations that you had with him during that initial stop, you cannot remember anything that he said to you in that regard?

A. **I can remember, again, that where he said he was was not where he was at.**

Q. Did you ever write down anywhere where Mr. Lazo claimed he was?

A. **No, I did not.**

Q. Did you ever write down anywhere, in any documents, or did you ever record anywhere anything that Mr. Lazo told you while he was standing behind his car?

A. **No, I did not. Except his name and date of birth.**

Q. When you asked Mr. Lazo whose car

Newton

he was driving, how did Mr. Lazo respond to that?

A. **He stated it wasn't his car.**

Q. Did Mr. Lazo explain whose car it was?

A. **I don't recall if he did or didn't.**

Q. Did it matter to you whose car he was driving?

A. **Sure.**

Q. Did you believe that information to be important?

A. **Yes.**

Q. Did you believe the information regarding where he was coming from to be important?

A. **Well, it was important to see if he was being honest. But we knew where he was coming from.**

Q. Did you believe that the fact that Mr. Lazo had told you something different regarding where he had been and where he was coming from was relevant to your investigation?

Newton

A. **Yes.**

Q. You didn't record that information down anywhere, is that accurate?

A. **That he was lying? I know he was lying.**

Q. Did you record that information down anywhere?

A. **That he was lying?**

Q. Yes.

A. **No.**

Q. Is there any reason why you didn't put that information down if you thought it was relevant?

A. **I put it up here (indicating), in my head, that he was lying.**

Q. You were trained in the academy?

A. **Yes.**

Q. You were trained in police procedures, correct?

A. **Yes.**

Q. Did they train you in the academy to keep information that you believed material and relevant to a case in your head?

A. **Yes.**

Newton

Q. Did they train in the academy to not record that information anywhere?

A. **They didn't train us either way.**

Q. They didn't train you?

A. **This was an ongoing investigation. He was lying to me. I didn't need to write that down. I knew he was lying to me.**

Q. Sir, at the time that you were discussing -- having these discussions with Mr. Kenny at the rear of his vehicle --

A. **Mr. Lazo.**

Q. Sorry. I have another client named Mr. Kenny. I did a deposition recently.

MR. DUNNE: Been in the same spot many times. I understand.

Q. Describe to us what he looked like at that time.

A. **He was an Hispanic male, kind of heavyset. More than heavyset. Heavy. About five eight, five nine. I don't remember exactly what clothes he was wearing.**

Q. Was Mr. Kenny -- Lazo yelling at that time?

Newton

A. **No.**

Q. Did Mr. Lazo appear agitated?

A. **No.**

Q. Now, you indicated that Mr. Lazo appeared nervous, correct?

A. **Correct.**

Q. At what point did Mr. Lazo become nervous, in your observation?

A. **When I started to ask him those specific questions.**

Q. Did Mr. Lazo appear nervous initially when he was told to exit the vehicle?

A. **No.**

Q. Did he appear nervous at the point when he was sitting in the vehicle?

A. **No.**

Q. So at the point that Mr. Lazo became nervous, in your opinion, what was his demeanor at that time? How was he acting nervous?

A. **He was fidgety. He was moving with his hands. His questions weren't -- initially when I would ask him a question, he**

Newton

**would say yes, sir or no, sir, that type of thing.**

**He was no longer doing that. He became, why do I need to know those answers? Why are you asking me these questions?**

Q. So, what happened once you -- at the time that you were asking Mr. Lazo these questions regarding where he was, where he was coming from, et cetera, what, if anything, was Sgt. Scimone doing?

**A. Sgt. Scimone was -- had borrowed my flashlight and was looking around the area.**

Q. When you say Sgt. Scimone was looking around the area, in what area was Sgt. Scimone looking?

**A. Around the vehicle, on the grass, seeing if any contraband was dropped.**

Q. At that time did you see Sgt. Scimone point the flashlight inside the vehicle?

**A. I believe he did, yes.**

Q. After Sgt. Scimone surveyed the area with the flashlight as you just described, what, if anything, did he do?

Newton

**A. I don't know.**

Q. While Sgt. Scimone was surveying the area with the flashlight, what were you doing?

**A. I was talking to Kenny Lazo.**

Q. Then what happened?

**A. Originally Mr. Lazo and myself, we were facing each other. At some point in time Mr. Lazo turned. So now he is facing away from me towards the Southern State Parkway.**

Q. At the time that you were asking Mr. Lazo where he had come from, where he had been, did you indicate to Mr. Lazo that you had allegedly saw him doing anything unlawful or illegal?

**A. No, I did not.**

Q. With respect to Mr. Lazo's physical condition at that time, can you describe that? You described he was heavyset. Did he have any bruises on him?

**A. I didn't see any.**

Q. Was he bleeding at that time?

**A. No, he was not.**

Newton

Q. Did he appear to be limping at that time when he walked from the passenger -- from the driver's side to the back?

**A. No.**

Q. Did he appear to be in pain?

**A. No.**

Q. Did he appear at that point to need medical treatment?

**A. No, he did not.**

Q. What happened next?

**A. As he is facing the opposite direction, I'm now -- his back is towards me. He throws his elbow back towards me, and hits me in my shoulder, and knocks me back.**

Q. At that time did you do anything to Mr. Kenny -- Mr. Lazo prior to him throwing that elbow as you allege?

**A. No.**

Q. Did you do anything physically? Did you make any physical movements?

**A. No.**

Q. Did the conversation become hostile before that point?

**A. He was becoming a little more**

Newton

**agitated. Becoming agitated, I should say.**

Q. Did you mention to Mr. Kenny -- With respect to Mr. Lazo, did you advise Mr. Lazo as to whether you saw him involved in any sort of suspect activity at any point that night?

**A. No.**

Q. Did you advise Mr. Lazo that you were following him?

**A. No.**

Q. Did you advise Mr. Lazo that a complaint had come in involving a possible narcotic sales out of a particular vehicle that matched the description of the one that he was driving?

**A. No.**

Q. Did you describe anything involving narcotics, or any sort of crime, or anything at all to Mr. Kenny prior to him throwing the elbow?

**A. No.**

Q. Is it your testimony that Mr. Lazo just threw his elbow just like that?

**A. Yes.**

Newton

Q. Was that in response to any particular question that you asked him?

**A. Again, I was asking him questions on where he was, what he was doing, where he was coming from.**

Q. What question did you ask him immediately prior to him throwing that elbow at you?

**A. I don't recall.**

Q. When he threw the elbow at you as you described, what happened next?

**A. He knocked me back, and then he started to run.**

Q. How far back did he knock you?

**A. Just a slight bit. Just enough to get away from me.**

Q. At the time that he knocked you back, where was Sgt. Scimone?

**A. Sgt. Scimone, I don't know exactly where he was. But he was not -- in the general vicinity. I think he was on the driver's side of the vehicle.**

Q. At the time that you were knocked backwards, would it be accurate to say that

Newton

you were the only officer in the immediate vicinity of Mr. Lazo?

**A. No.**

Q. Where was Officer -- where was Officer Judge at that time?

**A. He was back with me and Mr. Lazo.**

Q. At what point during the conversation that you were having with Mr. Lazo did Officer Judge come back?

**A. I don't recall.**

Q. How long was Officer Judge in his car before he returned to the place where the conversation was talking place?

**A. I don't know.**

Q. Where was Officer Judge in relation to you at the time that this elbow was thrown by Mr. Kenny as you described -- by Mr. Lazo?

**A. I believe he was behind me to my left.**

MR. DUNNE: Off the record.

(Discussion off the record.)

MR. DUNNE: Let's take a break.

(Recess taken.)

Newton

Q. Sir, prior to Mr. Lazo throwing his elbow as you just described, was there any search conducted of that vehicle?

**A. No.**

Q. Were any flashlights or anything, to your knowledge, flashed inside the vehicle doing a preliminary search?

**A. I believe Sgt. Scimone did a cursory search of the vehicle with the flashlight.**

Q. At the time that Sgt. Scimone did a cursory search of the vehicle with the flashlight, do you know if Sgt. Scimone saw anything inside the vehicle?

**A. No, I do not.**

Q. Did Sgt. Scimone raise any concerns to you that there was something that he was concerned about in the vehicle?

**A. No.**

Q. Once Mr. Lazo's elbow connected with you --

By the way, it did connect, correct?

**A. Correct.**

Newton

Q. Where did it hit you?

**A. On my shoulder, my right shoulder.**

Q. Was that the upper portion of your shoulder, the lower portion of your shoulder? Where exactly?

**A. Well, I guess between my shoulder and my arm, my right arm.**

Q. Sir, do you know for sure if it was between your shoulder and right arm?

**A. Yes.**

Q. Could you point to the area on your shoulder where Mr. Lazo hit you?

**A. Right in this area (indicating).**

MR. CALLISTE: The witness is indicating the upper shoulder area.

**A. I would say this would be more my upper arm. And this would be my shoulder. So somewhere in this area (indicating).**

Q. I was looking at your shoulder pad.

**A. More upper arm than shoulder.**

Q. Was it -- what kind of force was the impact on your shoulder?

97

Newton

A. **It was enough to knock me back. It was wasn't a big force, but it was enough to knock me back.**

Q. What happened next?

A. **I tried to grab him. But I wasn't able to grab him.**

Q. You tried to grab him?

A. **Tried to grab him with my arm.**

Q. Where did you try to grab him?

A. **Just tried to grab him. It wasn't really in any specific area.**

Q. At the time that you were trying to grab him, what was he doing, Mr. Lazo?

A. **He was trying to run away.**

Q. In which direction was he trying to run?

A. **He was running parallel to the Southern State Parkway on the passenger side of the vehicle. So he was heading east.**

Q. How far did Mr. Lazo -- well --

MR. CALLISTE: Withdrawn.

Q. Did there come a time that he was stopped?

A. **He was stopped by Officer Judge.**

98

Newton

Q. How did Officer Judge stop him from running?

A. **He bear hugged him around his waist.**

Q. How far did Mr. Kenny -- Mr. Lazo run before he was stopped by Officer Judge?

A. **A few strides. He was still on the side of the vehicle.**

Q. When Mr. Lazo was bear hugged by Officer Judge, what portion of his body did Officer Judge wrap his arms around?

A. **I would say it was around his waist.**

Q. When that occurred, what happened next?

A. **I thought that we had Mr. Lazo.**

Q. What, if anything, did Mr. Lazo do when he was being bear hugged by Officer Judge?

A. **I didn't see him doing anything. I saw just Mr. -- Officer Judge release his bear hug, and Mr. Lazo started running again.**

Q. Did you see at that point Mr. Lazo attempt to strike Officer Judge or do

99

Newton

anything to break the hold?

A. **No.**

Q. Do you know why Officer Judge released his bear hug?

A. **At that time?**

Q. Yes.

A. **No.**

Q. At the time that the bear hug was taking place by Officer Judge, do you know where Sgt. Scimone was?

A. **No.**

Q. Where were you at that time?

A. **I was behind Officer Judge.**

Q. With respect to Detective Talt, did you know where Detective Talt was at that time?

A. **No.**

Q. While this scuffle was taking place, were there any words being said?

A. **If they were, I couldn't hear.**

Q. Do you recall if Mr. Lazo said anything that you could recall at that time?

A. **At that time, no.**

Q. At the time Mr. Lazo threw the

100

Newton

elbow that connected with your shoulder, do you recall Mr. Lazo saying anything at that point?

A. **No.**

Q. Did there come a time after Mr. Lazo had broke the bear hug --

MR. CALLISTE: Withdrawn.

Q. After Mr. Lazo was released from the bear hug of Officer Judge, what happened next?

A. **He started to run -- again, started out running east and then he ran in front of his car. Now I guess he would be heading north towards Southern State Parkway roadway.**

Q. Then what happened?

A. **Officer Judge was able to take him down again.**

Q. When you say "take him down again," was Mr. Kenny thrown to the ground at that point -- Mr. Lazo?

A. **He was able to be brought down to the ground, yes.**

Q. Was he ever on the ground prior

Newton

to that?

**A. Not that I recall, no.**

Q. How was he taken to the ground?

**A. I don't know. He was taken to the ground by Officer Judge. But I don't know exactly how it was done.**

Q. Were you at all involved in the process of taking him down to the floor?

**A. No.**

Q. At the point that he was taken down to the ground by Officer Judge, where were you at that point?

**A. Again, I was still behind Officer Judge. But now I was going towards Officer Judge and Kenny Lazo.**

Q. Did you have occasion to see or did you notice where Sgt. Scimone was at that point?

**A. No.**

Q. Did you have occasion to observe how Mr. Kenny went down to the ground?

**A. No.**

Q. Do you know if Police Officer Judge was on top of Mr. Kenny as he went down?

Newton

**A. It was I guess sort of like a tackle. And he, Mr. Lazo, went down face first. And Officer Judge was on his legs and waist area.**

Q. How far was he in relation to his vehicle at the time that he was taken down?

**A. Well, he was in front of his vehicle. I don't know exactly how far it was.**

Q. When Mr. Lazo went to the ground, did you see him -- how did he fall? Did you see that?

**A. He fell down like it was a football type tackle, face first.**

Q. Were you able to observe whether Mr. Lazo put his hand out or his arm out to break his fall?

**A. No.**

Q. Do you know if Mr. Lazo was able to break his fall at all?

**A. No.**

Q. Do you know what portion of Mr. Lazo's body hit the ground when he was taken down first?

**A. What portion?**

Newton

Q. Yes.

**A. Eventually all of his body was on the ground.**

Q. Did you have occasion to notice how Officer Judge hit the ground?

**A. How Officer Judge hit the ground?**

Q. Yes.

**A. No.**

Q. Was Officer Judge on the ground at some point?

**A. He was laying on top of Mr. Lazo, and some portion of his body was on the ground. Yes.**

Q. Was there ever a point that Mr. Lazo was on top of Officer Judge?

**A. No.**

Q. Was there ever a point where Mr. Lazo was on top of any of the officers?

**A. No.**

Q. When Mr. Lazo was taken down to the ground by Officer Judge, what happened next?

**A. I ran up to Officer Judge and Mr. Lazo, and I got on my knees. And I took**

Newton

**hold of Mr. Lazo's left-hand or left arm.**

Q. At the time that you took a hold of Mr. Lazo's left arm, was he facing up or down?

**A. Down.**

Q. What, if anything, was he doing with his arm at that time?

**A. He was flailing his arms. He wouldn't let me initially grab his arm.**

Q. How long after Mr. Lazo hit the ground did you attempt to take his arm?

**A. Right away. As soon as I got up to him. So, a few seconds.**

Q. What, if anything, was Officer Judge doing at the time that you were trying to take his arm?

**A. He was holding onto Mr. Lazo.**

Q. How was he holding onto Mr. Lazo?

**A. He was holding onto him again with a bear hug around his leg and waist ar**

Q. At that time was Officer Judge -- where was he positioned in relation to Mr. Lazo's body?

**A. On top of him.**

Newton

Q. At that time were you able to see Sgt. Scimone?

A. **At some point in time I do observe Sgt. Scimone go to the right side of Mr. Lazo and try to grab onto his other arm.**

Q. How long after you first made contact with Mr. Lazo's arm did Sgt. Scimone appear?

A. **I don't recall.**

Q. How was Sgt. Scimone trying to grab Mr. Lazo's arm?

A. **I don't know.**

Q. Were any words being spoken at the time that Officer Judge, yourself and Mr. Lazo were on the ground?

A. **Yes.**

Q. What was being said?

A. **I was yelling that, You are under arrest. Put your arms behind your back so we can handcuff you.**

Q. Did Mr. Lazo respond to that verbally?

A. **Verbally by cursing and yelling. But he didn't respond by any direct answer to**

Newton

**that.**

Q. Do you recall Officer Judge saying anything at that time?

A. **Pretty much we were all saying something. I don't know exactly what was being said.**

Q. Do you recall anything being said by Sgt. Scimone at that time?

A. **The same. I know things were being said. But I don't know what was exactly being said.**

Q. At that point you were trying to grab his left arm. What happened next?

A. **Well, I was holding onto his left arm, trying to get control of that arm so that I could put it behind his back. Again, I wasn't being -- I wasn't able to do that. And my concern is that at some point in time we have to handcuff him. So I had to get my handcuffs.**

Q. Would it be accurate to say from the point that Mr. Lazo hit the ground initially, you had taken his left arm, correct?

Newton

A. **Correct.**

Q. Then at some point Sgt. Scimone took his right arm, correct?

A. **Correct.**

Q. Then what happened?

A. **I was trying to control his arm. And at some point I was concerned that we have to handcuff him. So I went to get my handcuffs.**

Q. Where were your handcuffs at that time?

A. **I normally keep them in the small of my back in my belt.**

**I went to grab them there, and they were not there. I took one hand off to grab my handcuffs, and they were not there.**

Q. What did you do next?

A. **So I took off both my hands and started looking around, and feeling my pockets to see if I could get my handcuffs.**

Q. At the time that you took both of your hands off, what, if anything, happened with respect with Mr. Lazo?

A. **At that point in time -- sometime**

Newton

**when I was looking for my handcuffs,** I heard Officer Judge yell, My gun. My gun.

Q. How long after you took your hands off Mr. Lazo to look for your handcuffs did you hear Officer Judge yell, My gun, my gun?

A. **I can't give you an exact time.**

Q. Was it more than a minute, do you know?

A. **No.**

MR. CALLISTE: Let's take a break.

(Recess taken.)

Q. At the time that you heard Officer Judge mention something about his gun, what exactly did Officer Judge say?

A. **I remember him saying, My gun. My gun.**

Q. At that time did you form a belief as to what Officer Judge was trying to say? What did you believe Officer Judge was saying?

A. **That something was going on with his gun. That possibly Mr. Lazo was grabbing**

Newton

**for his gun.**

Q. Did you see Mr. Lazo grabbing for Officer Judge's gun?

**A. No.**

Q. At the time that Officer Judge yelled, My gun, my gun, where was he in relation to Mr. Kenny -- I mean Mr. Lazo?

**A. I believe he was in the same position that he was in when he originally tackled him. I don't know exactly where he was, though.**

Q. What was Officer Judge doing with his hands?

**A. I don't know.**

Q. Did he still have Mr. Lazo in a bear hug, as far as you know?

**A. I believe he did. But I don't know for sure.**

Q. You also indicated that Officer Judge had control of Mr. Kenny's -- Mr. Lazo's knees, correct?

**A. No.**

Q. You testified earlier that Officer Judge went down on Mr. Lazo's knees?

Newton

**A. No, I did not.**

Q. What happened after that, after you heard Officer Judge say gun?

**A. I went right back to Mr. Lazo's left arm. I took control of it.**

Q. How did you take control of Mr. Lazo's arm?

**A. I grabbed his arm with both of my hands.**

Q. Were you able to find your handcuffs?

**A. No.**

Q. So after you grabbed his -- you took control of his left arm again, what happened next?

**A. I could see that he didn't have a gun in his hand. I could see that he didn't have a gun in his right hand. So I knew that he was not -- did not have Officer Judge's gun. So I just tried to keep control of his hand and his arm.**

Q. At the time that Officer Judge yelled gun, what, if anything, was Sgt. Scimone doing?

Newton

**A. Again, he was just on the other side of Mr. Lazo. I don't know exactly what he was doing.**

Q. Did you ever hear Sgt. Scimone indicate that Mr. Lazo had a gun?

**A. No.**

Q. Did you ever hear Sgt. Scimone indicate that Mr. Lazo was attempting to reach for Officer Judge's gun?

**A. No.**

Q. Again, Sgt. Scimone had control of Mr. Lazo's right arm, correct?

**A. He was over on that side of Mr. Lazo. I don't know if he had control or not.**

Q. You indicated that Sgt. Scimone was grabbing his right arm, correct?

**A. Attempting to grab his right arm, correct.**

Q. Sir, at any time while Mr. Lazo was on the floor --

MR. CALLISTE: Withdrawn.

Q. What happened next?

**A. At some point in time**

Newton

**Sgt. Scimone yells out that somebody call for an assist. We need help.**

Q. How long after Officer Judge made that exclamation about the gun did Sgt. Scimone yell for backup?

**A. I don't know exactly how long. It was less than a minute.**

Q. At that time where was Officer Talt -- Detective Talt, if you know?

**A. Don't know.**

Q. During that entire scuffle, did Detective Talt appear anywhere?

**A. No.**

Q. Detective Talt at the time that you described was staying back but at a safe distance for your safety, correct?

**A. He was ahead of us, yes.**

Q. You knew he was in the area, correct?

**A. Correct.**

Q. To your knowledge, he had a visual on you, correct?

**A. I don't know that.**

Q. To your knowledge, he was within

Newton

a safe distance so that he could respond in the event that something happened, correct?

A. **Correct.**

MR. DUNNE: Object to the form of the question. I don't know what safe means.

The answer stands. It is just to form. Go ahead.

A. **Yes.**

Q. Did Detective Talt appear at any point when Mr. Lazo was on the ground?

A. **No.**

Q. Did Detective Talt appear at any point during that stop?

A. **After Mr. Lazo was placed in handcuffs and we had a controlled situation, Detective Talt appeared.**

Q. Now, while Mr. Lazo was on the ground, did you observe anyone -- observe any officer strike Mr. Lazo?

A. **I could sense that he was being hit, but I didn't exactly observe.**

Q. Did you personally strike Mr. Lazo?

Newton

A. **No, I did not.**

Q. How was it that you were able to sense that Mr. Lazo was being hit?

A. **I could sense again that he was being hit with something.**

Q. How were you able to sense that?

A. **Just -- could feel it, could sense it.**

Q. What was that sense, if you could describe it?

A. **I could feel that something was being hit -- Mr. Lazo was being hit with something.**

Q. Were you able to determine where those hits were coming from?

A. **No.**

Q. Do you know if Mr. Lazo was the one hitting?

A. **No.**

Q. Did you hear anything that made you determine that Mr. Lazo was being hit?

A. **No.**

Q. Did you feel anything that made you determine that Mr. Lazo was being hit?

Newton

A. **No.**

Q. Did you see anything that made you determine that Mr. Lazo was being hit?

A. **No.**

Q. What is the sense --

A. **I could just feel that he was being hit with something. I was concentrating on his arm. I was looking at his arm. I wasn't looking up. I don't know who was hitting him. I don't know where he was being hit. But I could sense that he was being hit.**

Q. At the time that you could sense that Mr. Lazo was being hit, did you hear Mr. Lazo saying anything?

A. **The whole time all he was doing was cursing. He was agitated and upset.**

Q. The sense that you had that Mr. Lazo was being hit, did you have the sense that Mr. Lazo was being hit with objects, or with fists, or something else?

A. **He was being hit with something. Whether it was a fist or object, I don't know.**

Q. At any point during the scuffle, was Mr. Lazo placed in handcuffs?

Newton

A. **Yes.**

Q. At what point?

A. **After I asked for an assist over the radio, I run back towards Mr. Lazo and the officers. I locate my handcuffs which were in my left back pocket. I was able to handcuff Mr. Lazo's left wrist. His right wrist was handcuffed I assume by Sgt. Scimone. I don't know that for sure. Then we handcuffed the two handcuffs together. We were not able to get his arms close enough together to use one handcuff.**

Q. At the time that you ran to your vehicle to call for assistance, as you testified a moment ago, was Mr. Lazo in cuffs?

A. **No.**

Q. Was Mr. Lazo's left arm, the arm that you had, under control?

A. **If it was, it wasn't by me.**

Q. Well, you had his arm, correct?

A. **Yes. When I left, I don't know if anybody had control of his arm.**

Q. At the time that you got up, was Mr. Lazo's arm under control immediately?

Newton

A. **What do you mean when I got up?**

Q. When you got up to make the call, correct?

A. **Yes.**

Q. At the time that you got up, when you immediately got up, what was Mr. Lazo's arm doing?

A. **I let go of his arm and I ran back to the car. So I don't know what his arm was doing.**

Q. You didn't -- at that point there were some allegations, or it was possible that Mr. Lazo was trying to reach for a gun, correct? There was an officer yelling that, correct?

A. **At that point or prior to that?**

Q. During the scuffle.

A. **Correct.**

Q. And Mr. Lazo was flailing, according to you, correct?

A. **Correct.**

Q. He wasn't under control?

A. **Correct.**

Q. He was on the side of the

Newton

parkway, correct?

A. **Yes.**

Q. By the way, were there cars moving?

A. **Yes, there were.**

Q. So, this was a pretty dangerous situation, correct?

A. **Yes.**

Q. It wasn't under control at the point that you got up to go to make that call for backup, was it?

A. **What do you mean by "wasn't under control"?**

Q. You didn't have control of Mr. Lazo?

A. **I had his arm, yes.**

Q. When you got up, you left his arm loose, correct?

A. **Correct.**

Q. Sir, at the point that you got up, did you see anyone striking Mr. Lazo?

A. **No.**

Q. At the point that you got up, did you still have that sense that Mr. Lazo was

Newton

being struck?

A. **No.**

Q. So you ran to -- what car did you go to to call 911? Did you go to your car?

A. **No. I went to the marked COPE Unit. And I didn't call 911.**

Q. You called Dispatch, correct?

A. **I attempted to. But it was actually on the Detective Band when I made the initial safety request. It didn't go to a dispatcher.**

Q. Where did that call go to, to your knowledge?

A. **We don't have a dispatcher on the Detective Band. So it just went out. I actually -- I realized that Detective Talt heard it. And he dispatched it over the primary or over the Third Precinct Band.**

Q. At what point did you realize that Detective Talt heard it?

A. **As I was running back to the car, I could hear him on Detective Band.**

Q. Did you have a radio on your person at that time?

Newton

A. **No.**

Q. So you were able to hear Detective Talt on the band coming from the vehicle, correct?

A. **Yes.**

Q. While the scuffle was occurring, correct?

A. **I was running back to assist Detective -- Officer Judge, Sgt. Scimone. I could hear Detective Talt saying that I was on Detective Band, yes.**

Q. What, if anything, did you hear Detective Talt say?

A. **I heard Detective Talt say that I was on Detective Band.**

Q. That he, himself, was on Detective Band?

A. **That I, me, was on Detective Band.**

Q. That you were on Detective Band?

A. **I, yes.**

Q. What does that mean?

A. **That I was broadcasting on Detective Band.**

Newton

Q. I'm not sure I'm following you.

MR. DUNNE: Explain what you mean in more detail.

A. **There are seven precincts. Each precinct has its own band. We have a Detective Band and other bands. The Detective Band or Detective channel is what we would use, and what we were using during this incident.**

**When I went back to the police car, I did not know that it was still on the Detective channel. So when I broadcasted I needed an assist, it went out on the Detective channel. And so there is no dispatcher to help me.**

**Detective Talt was monitoring that channel. So as I was running back, I could hear the police radio, I could hear him go over Detective Band. I could hear him say, John, you are on Detective Band.**

**I find out later on that he then broadcast it on primary that we needed an assist.**

Q. As you left the vehicle, the COPE

Newton

vehicle to go back to where the scuffle was taking place, what happened next?

A. **As I went back to make -- assist Sgt. Scimone and Officer Judge, I located my handcuffs. They were in my back left pocket. I was able -- I went back to Kenny Lazo's left arm. I was able to get a handcuff on his left wrist.**

Q. How long in total did that scuffle last?

A. **I don't know for sure. A couple of minutes. Five minutes.**

Q. You reviewed radio runs regarding this incident, correct?

A. **Correct.**

Q. You reviewed other documentation regarding this incident, correct?

A. **Correct.**

Q. Were you able during your review to determine what had occurred at certain times and things that you viewed at certain times, correct?

A. **Correct.**

Q. During your review of the

Newton

incident that occurred, were you able to make a determination as to how long the scuffle lasted?

A. **No.**

Q. Were you ever asked by anyone how long the scuffle lasted?

A. **I was asked, How long do you think the scuffle lasted? I said, A few minutes to five minutes.**

Q. While you were returning from the COPE vehicle where you placed the call back to the area where the arrest was taking place, what did you see, if anything, Mr. Lazo doing?

A. **He was still on the ground. And Officer Scimone and Sgt. -- I mean Sgt. Scimone and Officer Judge were still trying to control him.**

Q. So at the point that you were turning back from making the call over the Detective --

MR. CALLISTE: Withdrawn.

Q. The vehicle that you made the call from was a COPE vehicle, correct?

A. **Correct.**

Newton

Q. The detectives weren't driving that vehicle?

A. **No. Officer Scimone -- Officer Judge was driving. Sgt. Scimone was the passenger.**

Q. Did you make the call intentionally over the Detective Band?

A. **Did I intentionally make that? No.**

Q. From the vehicle that was not a detective vehicle?

A. **I don't understand.**

Q. In other words, would the COPE vehicle have been set to the Detective Band, to your knowledge?

A. **It was set to the Detective Band.**

Q. Though there were no detectives in that vehicle?

A. **No, there were no detectives in that vehicle.**

Q. When you picked up the device to make the call back -- to call for backup, is it your testimony that the radio, the band in the COPE car was already set to the Detective

Band?
A. **That is my testimony, yes.**
Q. Did there come a time -- there came a time that you were able to place Mr. Lazo's hands in cuffs, correct?
A. **Correct.**
Q. At the time that Mr. Lazo was in cuffs, did you make any observations of his physical appearance?
A. **Like what? He was still laying on the ground when he was in handcuffs.**
Q. Did you see any blood?
A. **No.**
Q. Did you see any bruising on Mr. Lazo?
A. **No.**
Q. Did Mr. Lazo have his clothes on?
A. **He was partially clothed, yes.**
Q. When you say "partially clothed," what items of his clothing were off?
A. **I believe he was wearing either a sweatshirt or sweater that -- he no longer had that on.**
Q. What, if anything, was Mr. Lazo

wearing on the upper portion of his body at the time that the scuffle was talking place?
A. **I believe it was a T-shirt, but I'm not sure.**
Q. Was that T-shirt still on at the point where Mr. Lazo was cuffed?
A. **Yes.**
Q. Did you notice any blood on the T-shirt?
A. **No.**
Q. As far as Mr. Lazo's face, did you notice any bruising, scars, anything like that?
A. **He had an abrasion on his face.**
Q. On what portion of his face did he have an abrasion?
A. **I don't recall. I know his face had an abrasion on it.**
Q. Can you describe the abrasion?
A. **It was more like a cut. A scrape I guess would be better.**
Q. At the time that Mr. Lazo was on the ground and was trying to -- and was being subdued by the officers, did you see any

officers hit Mr. Lazo in the face?
A. **No.**
Q. Did you ever hit Mr. Lazo in his face?
A. **No, I did not.**
Q. Were there any other items of clothing off of Mr. Lazo that were originally on, before the scuffle took place?
A. **Not that I recall, no.**
Q. Did Mr. Lazo have his shoes on?
A. **I don't remember if he had both shoes on or not.**
Q. What happened next?
A. **The first car, Unit 314, arrived. The situation was pretty much under control. Mr. Lazo was handcuffed. He was still laying on the ground, still agitated.**
**We were able to -- he was able to get to his feet with the assistance of Officer Link. And he was brought to Officer Link's car.**
Q. Now, was Officer Link operating Unit 314?
A. **Yes, he was.**

Q. Unit 314 was the first unit to arrive on the scene?
A. **Yes.**
Q. Now, at what point did Detective Talt arrive at the scene?
A. **Later on. There was only a few police cars there.**
Q. Approximately how many police cars had arrived at the scene before Detective Talt arrived?
A. **I couldn't give you an exact number. I don't know. There was more than one police car there.**
Q. You just described that Mr. Lazo was able to get up to his feet. Was he able to walk on his own at that point?
A. **Yes.**
Q. At the point that Mr. Lazo was able to get up to his feet, did you observe or make any observations about his physical condition at that time?
A. **I was able to observe him walk to the police car on his own power.**
Q. Just for the record, there was no

Newton

mace or tasers used in this case, correct?

A. **That is correct.**

Q. Now, when Mr. Lazo was walking towards the car, describe his physical condition at that time. Was he limping?

A. **No.**

Q. Did he appear to be hurt?

A. **No.**

Q. Did you notice any blood, or abrasions, or bruises on his body --

A. **Again --**

Q. -- other than the one on his face?

A. **No.**

Q. Was Mr. Lazo saying anything that you recall?

A. **He was still cursing at us. Still agitated.**

Q. What was he cursing? What was he saying?

A. **You mother fuckers, you pussies. This is the best you got?**

Q. What, if anything, were you saying to Mr. Lazo?

Newton

A. **I didn't say anything to him.**

Q. Were any of the officers saying anything to Mr. Lazo that you are able to recall?

A. **They were just telling him to get in the car.**

Q. Was he placed in the car?

A. **Yes.**

Q. That is Officer Link's car?

A. **Yes.**

Q. Was Officer Link in uniform or not?

A. **Yes, he was in uniform.**

Q. Officer Link's car, was that a marked vehicle or unmarked?

A. **It is a marked vehicle.**

Q. Is Officer Link part of COPE as well?

A. **No.**

Q. Do you know if -- what precinct Officer Link works out of?

A. **Works in the Third Precinct.**

Q. You knew Officer Link before this incident?

Newton

A. **Yes.**

Q. Then what happened after Mr. Lazo was placed in Officer Link's vehicle?

A. **I was standing off to the side. I believe it was Officer Link came over with a quantity of what appeared to be crack cocaine that he recovered from Mr. Lazo.**

Q. Did you make any personal observations of the bag of crack cocaine that you just described?

A. **It was handed to me. I observed that it had a number of individually wrapped pieces of crack cocaine. So in my opinion it was enough for a felony.**

Q. How big was the bag?

A. **It fit in the palm of my hand. It wasn't a very big bag.**

Q. Did you have any discussions with Mr. Lazo about -- about the bag?

A. **No, I did not.**

Q. Did Officer Link inform you as to where this bag was found?

A. **I believe he found it on the ground, or -- I don't know exactly where it**

Newton

**was found. I believe it was on the ground as he was walking Mr. Lazo to the car. But I don't know for sure.**

Q. As you sit here today, have you ever known exactly where that bag of drugs was found?

A. **No.**

Q. Did Officer Link ever tell you that that bag of drugs, that was recovered somewhere off of Mr. Lazo?

A. **Yes.**

Q. Did he tell you where the drugs were -- the drugs were recovered from?

A. **He probably did. I just don't recall exactly where it was recovered from.**

Q. To your knowledge, have you ever known where the bag of drugs was recovered from?

A. **Yes. I just don't recall where it was.**

Q. Did you ever place that in writing anywhere? Do you ever recall making any writings of where you understood the bag of drugs to be found?

Newton

**A. I don't know. I might have done it on my paperwork.**

Q. Was that in any of the documents that you reviewed in preparation for this deposition today?

**A. Yes.**

Q. What happened after that?

**A. Mr. Lazo was transported into the precinct by Unit 314. Myself and Detective Talt transported the Cadillac into the precinct. I believe Detective Talt operated the Cadillac. And I followed him in the unmarked police vehicle.**

Q. When Mr. Lazo was placed in the patrol car of Officer Link, did he remain seated in that patrol car for a time before the car left the scene, or did the car leave the scene immediately?

**A. It was a short period of time. It wasn't a long period of time that he was transported into the precinct.**

Q. Were you able to make observations of Mr. Lazo while he was in the car of Officer Link?

Newton

**A. No. Other than he was just sitting in the back seat of the car.**

Q. At the time when Mr. Lazo's placed in cuffs to the time that he was placed in Officer Link's vehicle, did Mr. Lazo make any complaints about being in pain?

**A. No.**

Q. Did you ever hear Mr. Lazo moan or make sounds as though he was in pain?

**A. No, I did not.**

Q. Did Mr. Lazo appear to be in pain?

**A. No.**

Q. Did anyone ask, as far as you know, Mr. Lazo at the scene whether he needed medical attention?

**A. No.**

Q. Did anyone call for an ambulance at the scene of the arrest?

**A. No.**

Q. Did any ambulance ever respond to the scene of the arrest?

**A. No.**

Q. Did you ever make a determination

Newton

following -- given the fact that there was a scuffle wherein use of force was used that Mr. Lazo should be transported to the hospital?

**A. No.**

Q. Did you ever have those discussions with any officers, regarding whether he should be transported to the hospital?

**A. When we got back to the precinct, when he was having problems in the Squad Room, that is when it was determined that he was going to go to the hospital.**

Q. Prior to the Squad Room?

**A. No.**

Q. We are talking about at the scene.

**A. No.**

Q. You and the other officers made the determination, even though there was a scuffle, that he would go straight to the precinct, correct?

**A. Correct.**

Q. Now, do you know if there are any

Newton

rules and regulations that state that a prisoner has to be taken to the hospital after a scuffle, after the use of force is used by officers?

**A. If he makes a complaint, or if we feel that he should go to the hospital, yes, he should go to the hospital.**

Q. That would be before he is brought into the precinct, correct?

**A. No, it is not.**

Q. At what point -- if a scuffle took place and a person is bruised as a result of the scuffle, what duty, if any, do you have as an officer to assess that and determine whether he is to be taken to the hospital?

**A. At some point in time if we feel that he should go to the hospital or if he makes a complaint to go to the hospital, we make every effort to get him to the hospital.**

Q. You indicated that you knew that Mr. Lazo was being hit? You had that feeling?

**A. Correct.**

Q. Even with that you didn't believe that it was important to have him checked out

Newton

before bringing him to the precinct, did you?

**A. At that point in time it was determined that he was going to go into the precinct. If need be, he would go from the precinct to the hospital.**

Q. Sir, at that point that Mr. Lazo was sitting in the vehicle --

MR. CALLISTE: Withdrawn.

Q. At what point did Officer Talt respond to the scene?

**A. He was at the scene. I don't exactly remember if it was before or after Mr. Lazo was transported to the precinct.**

Q. Do you recall having any face-to-face conversations with Detective Talt while Mr. Lazo was seated in the vehicle?

**A. Yes. Well, I remember -- I'm sorry. I remember having conversations with Detective Talt. Again, I don't remember if it was before or after Mr. Lazo's transport.**

Q. Was it at the scene of the arrest?

**A. Yes.**

Q. What, if any, conversations did

Newton

you have with Detective Talt at that time?

**A. I just explained to him kind of briefly what happened. That Mr. -- that he didn't want to get handcuffed, that he was fighting us.**

Q. Did you have any conversations with Detective Talt regarding the drugs that were found?

**A. I don't recall if I did or didn't.**

Q. With respect to the drugs that you were found at the scene, where was that item placed?

**A. Where was it placed?**

Q. Yes.

**A. What do you mean? Eventually it went to the lab.**

Q. Who transported it from the scene to the lab?

**A. I did.**

Q. At the time that you were --

MR. CALLISTE: Withdrawn.

Q. When Mr. Lazo was taken in the car by Officer Link, where were you at that

Newton

point?

**A. I was off to the side.**

Q. Were you still at the scene?

**A. Yes.**

Q. Were you outside or inside of your car?

**A. Outside.**

Q. What, if anything, were you doing at that time?

**A. I wasn't doing anything.**

Q. When Mr. Lazo left the scene in Officer Link's car, where were you at that time?

**A. Same spot I was before.**

Q. Did there come a time that you left the scene?

**A. Yes.**

Q. Prior to leaving the scene, what did you do, if anything?

**A. Checked the area to make sure there was no other contraband around. We then transported his vehicle into the precinct.**

Q. How was his vehicle transported to the precinct?

Newton

**A. Detective Talt drove the vehicle. And I followed him in a police vehicle.**

Q. At that time do you know where Detective Talt's vehicle was?

**A. It was at the scene.**

Q. Detective Talt left his vehicle there?

**A. Yes, he did.**

Q. On the side of the parkway?

**A. Yes, he did.**

Q. Now, what happened after the vehicle was transported back to the Third Precinct?

**A. Detective Talt got in my vehicle, and we went back to get his vehicle.**

Q. Did you have any discussions with Detective Talt during this time that you recall?

**A. We talked. But I don't know what it was about.**

Q. Do you recall having any conversations about the arrest, or the scuffle, or anything that you testified to about earlier?

Newton

**A. I don't recall.**

Q. Sir, do you know if the DEA was ever called to the scene that night?

**A. No, they weren't. At least they weren't called by us.**

Q. Do you know if the DEA responded to the scene that day?

**A. I don't believe they were.**

Q. Do you know if the DEA was ever involved in this case at all?

**A. Involved as to what?**

Q. In terms of --

**A. I don't know if they were ever spoken to. As far as the investigation, I don't believe they were.**

Q. What was done with Mr. Lazo's car?

**A. It was brought to the precinct and eventually impounded to Westhampton.**

Q. Did there come a time that you saw Mr. Lazo again that evening, or that morning?

**A. The next time I saw Mr. Lazo, he was being put on a gurney and taken out of the**

Newton

**precinct.**

Q. Prior to Mr. Lazo being placed on a gurney, had you seen him at all in the precinct?

**A. No, I did not.**

Q. Did you have any discussions with Mr. Lazo at all pursuant to your arrest of Mr. Lazo?

**A. No, I did not.**

Q. Do you know where Mr. Lazo was at the time that he was placed on this gurney?

**A. He was placed -- originally placed into a Third Squad interview room.**

Q. Do you know if Mr. Lazo went from -- do you know if Mr. Lazo was placed on the gurney from the Third Squad interview room?

**A. Yes.**

Q. Do you know how that came about?

**A. No.**

Q. As you sit here today, have you ever had any discussions with any of the officers as to how Mr. Lazo ended up on a gurney?

Newton

**A. No.**

Q. As you sit here today, do you know how Mr. Lazo ended up on a gurney?

**A. Yes. The ambulance crew, the Brentwood ambulance crew put him on a gurney to transport him to the hospital.**

Q. Do you know what happened immediately prior to Mr. Lazo having been placed on a gurney?

**A. No.**

Q. Do you know if there was any additional scuffles or fights in the police precinct?

**A. No, there was not.**

Q. Were you ever told what happened to Mr. Lazo while he was in the precinct?

**A. Yes.**

Q. What were you told?

**A. I was told that he started to have some type of distress, and that an ambulance was called to take him to the hospital.**

Q. Who told you that?

**A. Detective Talt.**

Newton

Q. At the time that this was occurring, where were you?

**A. I was in another part of the squad room.**

Q. How long was Mr. Lazo in the precinct before he had this episode?

**A. Approximately 25 minutes, I guess.**

Q. At that point had you already gone and gotten Detective Talt's car?

**A. Yes.**

Q. How far is the precinct from the scene of the arrest?

**A. Two or three minutes.**

Q. Did anyone tell you specifically what had happened to Mr. Lazo at the point where he had that distress?

**A. That he was -- other than that he was having some type of medical distress, no.**

Q. Do you know if any officers were in Mr. Lazo's presence at the time that he had this distress?

**A. Yes.**

Q. Which officers were that?

Newton

A. **Officer Broderick and Officer Cotler. And I believe there might have been a third officer involved.**

Q. That other officer is Officer Cotler?

A. **Yes.**

**They had the defib machine. Those officers were either EMTs or above.**

Q. At the time that the distress had occurred, were you aware that it was occurring at the time that it was occurring, at the very moment that it was occurring, this distress?

A. **I knew something was up when I saw the officers come back with the oxygen machines and the defibs.**

Q. When you first saw officers returning with the defibrillator machines and other items to assist someone for some reason, did you inquire as to what was going on?

A. **I knew Mr. Lazo was having some type of medical distress.**

Q. Did you report to the area where Mr. Lazo was having the distress?

A. **Did I report? No.**

Newton

Q. What were you doing at the time that you learned that Mr. Lazo was having the distress?

A. **I was in our office sorting out paperwork, trying to figure out what we had.**

Q. Is there any reason why you didn't go to the area where Mr. Lazo was having the distress?

A. **Because there was enough competent people there that I wasn't needed.**

Q. Were you not concerned with what was happening with Mr. Lazo?

A. **Sure I was.**

Q. Did you have any reason to believe that Mr. Lazo had the distress as a result of what occurred at the scene of the arrest?

A. **No.**

Q. Did you believe that Mr. Lazo had or began to experience this distress as a result of something that was occurring in the precinct?

A. **I don't --**

MR. DUNNE: Objection to the last

Newton

two questions.

A. **I don't know why he was having distress.**

Q. Did you ever ask?

A. **No.**

Q. Do you know how long this episode happened wherein Mr. Lazo was having distress while in the precinct?

A. **It happened some time I believe around 9:00, but I don't know the exact time.**

Q. My question is: Do you know how long the distress was occurring for?

A. **Before what?**

Q. How long did the distress occur for from the time it began to the time that he was placed on the gurney?

A. **I don't know.**

Q. Do you know if the distress was dealt with in the precinct?

A. **Yes.**

Q. Do you know -- what, if anything, do you know about this distress that Mr. Lazo was experiencing?

A. **Again, that he was having medical**

Newton

**problems, that he was being assisted by uniformed officers with oxygen and the defib machine.**

Q. How long was this episode occurring, to your knowledge?

A. **I don't know.**

Q. You were in the precinct that day, correct?

A. **I was in the squad, yes.**

Q. You saw officers running with defibrillator machines and other items, correct?

A. **Correct.**

Q. Then --

A. **I didn't notice it on my watch. So I couldn't tell you exactly when it started and how long it lasted.**

Q. Then you noticed Mr. Lazo on a gurney, correct?

A. **Correct.**

Q. So from the point in time that you saw officers running with the defibrillator machine to the point where Mr. Lazo was being carried out on a gurney,

Newton

how long did that last?

A. **I do not know.**

Q. Approximately how long?

A. **I do not know.**

Q. Did you care, sir?

A. **Yes, I did. I already answered that.**

Q. Perhaps. Sir, was there a Desk Sergeant on duty that evening?

A. **I don't know.**

Q. Sir, is there usually a Desk Sergeant on?

A. **Not necessarily. There is a Desk Lieutenant.**

Q. Was there a Desk Lieutenant --

A. **Yes, there was.**

Q. Was there a Desk Lieutenant on duty that evening, if I can just finish my question?

A. **Yes, there was.**

Q. Who was the Desk Lieutenant, sir?

A. **Robert Williams.**

Q. Did you have any discussions with Robert Williams regarding the arrest of Kenny

Newton

Lazo?

A. **No, I did not.**

Q. Did you have any discussions with any supervisors regarding the arrest of Mr. Lazo?

A. **Yes, I did.**

Q. Who did you speak to, sir?

A. **Detective Sergeant Robert Koerber.**

Q. When did you have discussions with Detective Koerber?

A. **When I was in the squad after transporting the car back.**

Q. What discussions did you have with Detective Koerber?

A. **I explained to him what had happened. That we had a roll around with Mr. Lazo, and that he had drugs on him.**

Q. Was this before or after the distress of Mr. Lazo occurred?

A. **Before.**

Q. What, if anything, did Detective Koerber say to you?

A. **He didn't say anything. He said**

Newton

okay.

Q. Sir, what are the duties of a Desk Lieutenant, if you know?

A. **The Desk Lieutenant or the Desk Sergeant oversees the workings of the precinct.**

Q. That would include arrests, correct?

A. **Correct. Uniform arrests.**

Q. Would it be accurate to say that the Desk Sergeant or the Desk Lieutenant has to review arrest paperwork?

A. **If it was a uniform arrest, correct.**

Q. This situation, sir, was this regarded as a uniform arrest?

A. **No. This was a squad arrest.**

Q. Who reviews squad arrests?

A. **Detective Sergeant, if available.**

Q. Was there a Detective Sergeant available that evening?

A. **Yes.**

Q. Who was that?

A. **Det. Sgt. Robert Koerber.**

Newton

Q. Sir, the name of the Desk Lieutenant?

A. **Robert Williams.**

Q. When I asked you before the name of the Desk Lieutenant, you said Robert Koerber. Was that accurate?

A. **You asked me who the Desk Lieutenant was. I said Robert Williams. The Detective Sergeant was Robert Koerber.**

Q. Just for the purpose of the record, I didn't hear Williams. But now we have that on the record. Thank you.

Sir, do you know where Mr. Lazo was taken after he was placed on the gurney?

A. **To Southside Hospital.**

Q. Do you know that for sure?

A. **Yes.**

Q. How do you know?

A. **Because I know he was brought to Southside Hospital.**

Q. How do you know that?

A. **Because I know he was.**

Q. Sir, who told you that Mr. Lazo was brought to Southside Hospital?

Newton

A. **Because I know that he was brought to Southside Hospital.**
Q. Did anyone tell you that Mr. Lazo was brought to Southside Hospital?
A. **Somebody might have. But I know he was brought to Southside Hospital.**
Q. Sir, how did you make the determination that Mr. Lazo was being brought to Southside Hospital?
A. **Because I overheard people saying that he was going to Southside Hospital.**
Q. Sir, who did you overhear saying that Mr. Lazo --
A. **I overheard the ambulance crew said that they were --**
Q. If I could finish my question, please, sir.
MR. DUNNE: What we are going to do is take a lunch break now, right after this question is answered.
MR. CALLISTE: Please read back the last question.
(Record read.)
Q. Sir, you indicated that you

Newton

overheard people saying that he was going to Southside Hospital.
Do you recall who you overheard saying that he was going to Southside Hospital?
A. **Somebody from the ambulance crew. They said, We are taking him to Southside Hospital.**
MR. DUNNE: Break for lunch.
(Recess taken.)
Q. Prior to us taking the break, we were discussing your -- I guess what you knew about Mr. Lazo being taken out of the precinct on a stretcher. Sir, do you recall that?
A. **Yes.**
Q. Now, do you know if there were any discussions by any police officers at all prior to Mr. Lazo having his episode wherein it was discussed that Mr. Lazo should be taken to the hospital?
A. **No.**
Q. Did you as an officer being involved in a use of force against Mr. Lazo have to go to the hospital?

Newton

A. **Yes.**
Q. When did you go to the hospital?
A. **That night.**
Q. What hospital did you go to?
A. **Southside.**
Q. When did you go to Southside Hospital?
A. **Around 10:00, I guess. 9:30, 10:00.**
Q. How long was that after Mr. Lazo had been taken out of the precinct?
A. **Half hour to an hour.**
Q. While you were at Southside Hospital what, if anything, was --
MR. CALLISTE: Withdrawn.
Q. What did you go to Southside Hospital for?
A. **I was treated for my left thumb.**
Q. What specifically was wrong with your left thumb?
A. **I had a pain from jamming my thumb.**
Q. Did you undergo any other treatment for any other parts of your body?

Newton

A. **No. I had a small cut on my finger that they bandaged, but no.**
Q. Did you have occasion to check up on Mr. Lazo's situation when you went to Southside Hospital?
A. **When I got to Southside Hospital, I was advised that Mr. Lazo had passed away.**
Q. What, if any, information were you given, specifically given regarding Mr. Lazo's passing away?
A. **None. Just that he had passed away.**
Q. Do you recall who told you that he had passed away?
A. **No. It could have been a police officer, hospital personnel. I don't know for sure.**
Q. When you had learned that Mr. Lazo passed away, what, if anything, did you do?
A. **I still had to be treated. So I stayed at the hospital. After that I went back to the precinct.**
Q. When you got back to the

Newton

precinct, what, if anything, did you do?

**A. Started to do some paperwork with reference to this case.**

Q. At the time that you went back to the precinct, did you make any inquiries as to what had happened to Mr. Lazo in that room where he had that episode?

**A. No.**

Q. Did you ever make any inquiries to anybody as to what had happened in that room?

**A. Again, I knew that he had some type of medical problem. Detective Talt told me that he was having some type of medical distress. Other than that, no.**

Q. Do you know if any members of the police department began processing Mr. Lazo when he was in the precinct?

**A. What do you mean by processing?**

Q. When a person is taken into custody, certain things are done with regard to the pedigree information, correct?

**A. Correct.**

Q. Mug shots, correct?

Newton

**A. Correct.**

Q. Fingerprinting, things like that. Do you know if any of those things were done?

**A. I don't believe they were.**

Q. Do you know if any photos were taken of Mr. Lazo in the precinct?

**A. No, there was none.**

Q. Were any photos of you taken at the precinct?

**A. Later on.**

Q. When you say "later on," how long after? When did pictures get taken of you?

**A. Some time after I came back from the hospital. So some time probably after 10:30, 11:00.**

Q. What areas did they take pictures of?

**A. They just took an overall of me standing up.**

Q. Do you know why that was taken?

**A. No.**

Q. Do you know who took that picture?

**A. Crime Scene officer.**

Newton

Q. Why is it -- do you know why a -- was it ever described to you or told to you why they were taking a picture of you standing of your whole body?

**A. Just to show what I looked like. My injury to my hand was taped up.**

Q. Do you know if those pictures were taken pursuant to some sort of investigation being handled by Crime Scene?

**A. I would assume it was because of the death investigation handled by Homicide.**

Q. That wasn't my question. Do you know if they were specifically -- Crime Scene was specifically investigating the incident that occurred at the arrest, or were they investigating what had occurred in the precinct with Mr. Lazo --

MR. DUNNE: He clarified the answer by saying Crime Scene wouldn't investigate. Homicide would. Crime Scene may do something at Homicide's request.

The way the question sounded was that Crime Scene was running it.

Newton

I think his last answer clarified that. In other words, Crime Scene doesn't do a separate investigation. Homicide took the death investigation over.

Q. My question was: Do you know if that investigation was pursuant to the arrest at the scene on the Southern State Parkway, or if it was pursuant to what happened at the precinct wherein Mr. Lazo had that episode? Do you know what they were investigating, what they were taking pictures of you for?

**A. They were just taking pictures of me I guess for my appearance at the time. I don't know why they were taking photos, if that answers your question.**

Q. Did anyone take pictures of the injury that you received to your -- that you were treated for at the hospital?

**A. Again, it would have been the same picture of me standing up. There was close up of those injuries I don't believe.**

Q. Do you know if any other officers involved, like, for example, Sgt. Scimone, do

Newton

you know Sgt. Scimone had to go to the hospital?

A. **He was treated at the hospital, yes.**

Q. Was that at the same time as you?

A. **No.**

Q. Do you know what Sgt. Scimone was treated for?

A. **No.**

Q. With respect to Officer Judge, do you know if Officer Judge had to go to the hospital?

A. **Yes, he did.**

Q. Now, do you know what precinct Officer Judge works out of?

A. **The Third Precinct.**

Q. Do you know when Officer Judge went to the hospital in relation to you, to when you went?

A. **I believe he went to the hospital from the scene.**

Q. Do you know if -- do you know what Officer Judge was being treated for?

A. **No.**

Newton

Q. Sir, are there surveillance cameras at the Third?

A. **Yes.**

Q. Were those surveillance cameras on on April 12, 2008?

A. **Yes.**

Q. Where are those surveillance cameras situated within the precinct, if you know?

A. **They have cameras in the parking lot.**

Q. Anywhere else in the precinct?

A. **I believe there are other locations. I just don't know exactly where they are.**

Q. Are there cameras in the interview rooms, as far as you know?

A. **No.**

Q. With respect to the cameras of the parking lot, the cameras in the parking lot, do you know what areas of the parking lot those cameras are directed towards?

A. **I believe they show the parking lot itself where cars would be parked. Maybe**

Newton

**entrance to the front door.**

Q. Have you ever seen any surveillance video of Mr. Lazo from anywhere taken from the Third Precinct?

A. **No.**

Q. If Mr. Lazo was brought through the front entrance of the Third, would that be depicted on the surveillance video?

A. **I don't believe so.**

MR. DUNNE: Off the record.

(Discussion off the record.)

Q. Have you ever seen any photos of Mr. Lazo taken after he was arrested?

A. **Yes.**

Q. When did you first see those photos?

A. **The trial. The deposition prep back in January.**

Q. Those photos were depictions of Mr. Lazo?

A. **Yes.**

Q. Do you know, those pictures that you were referring to, who took those pictures?

Newton

A. **Crime Scene.**

Q. Where were those pictures taken, if you know?

A. **I believe it was at Southside Hospital.**

Q. In those pictures -- at the time those pictures were taken of Mr. Lazo, was Mr. Lazo alive, or was he not alive?

A. **I believe he had already expired.**

Q. Have you seen pictures of Mr. Lazo following the arrest where he was alive?

A. **No.**

Q. Do you know if mug shots were taken of Mr. Lazo before the episode?

A. **They were not.**

Q. Do you know if Mr. Lazo was fingerprinted before the distress happened?

A. **He was not.**

Q. So, are you aware as to whether any sort of processing of Mr. Lazo had occurred before his distress occurred?

A. **As far as his arrest processing, there was none done.**

Newton

Q. Would you have been involved in the arrest processing?

**A. Probably at some point in time, yes.**

Q. At that point in time when Mr. Lazo had had the distress, had you begun to work on any paperwork related to the arrest?

**A. I was sorting out what we had. And the drugs, I was taking care of the drugs.**

Q. After you went to the hospital that day, did you return to the precinct?

**A. Yes.**

Q. What did you do after you returned to the precinct?

**A. Started to do some of the paperwork.**

Q. Did you complete that paperwork that day?

**A. I would say most of it, yes.**

Q. Sir, do you know what an Unusual Occurrence Report is?

**A. No.**

Q. Does the Suffolk County Police

Newton

Department, to your knowledge, use documents called Unusual Occurrence Reports?

**A. I don't know.**

Q. Do you know what a -- do you know what a Use Of Force Report is?

**A. Yes.**

Q. What is a Use Of Force Report?

**A. Any time a use of force is used against a civilian, that report has to be completed.**

Q. Have you seen a Use Of Force Report prepared in this case with respect to Mr. Lazo?

**A. Yes.**

Q. When did you see that?

**A. I saw it being passed around yesterday.**

Q. Do you know who prepared that Use Of Force Report?

**A. I believe it was Lieutenant Williams.**

Q. Did you ever prepare yourself a Use Of Force Report?

**A. No.**

Newton

Q. Is there any reason why you did not?

**A. We were told not to.**

Q. Who told you not to?

**A. The Homicide Unit.**

Q. Did the Homicide Unit give you a reason as to why they did not want you to prepare a Use Of Force Report?

**A. I believe it was where our R&Ps are concerned. During a homicide investigation, Use Of Force Report is not supposed to be done.**

Q. Is there something in writing or some sort of documentation that would indicate what it is that you just testified to?

**A. I believe it is in --**

MR. DUNNE: You guys marked it yesterday.

**A. It is in our R&Ps, rules and procedures.**

Q. So, at any time do you know if this Homicide investigation ended, or was ended?

**A. I would assume at some point in**

Newton

**time it ended, yes.**

Q. After the Homicide investigation ended, did you prepare a Use Of Force Report?

**A. No.**

Q. Did you ever prepare a Use Of Force Report?

**A. No. Regarding this case, no.**

Q. Now, you indicated earlier that there was an investigation being conducted by Internal Affairs and you reviewed those documents in preparing for this deposition, correct?

**A. Yes.**

Q. Do you know how that investigation started, and/or why?

**A. By Internal Affairs?**

Q. Yes.

**A. They responded to the precinct the night of the incident. At whose request, I don't know.**

Q. Do you know what their purpose was for responding to the precinct?

**A. I guess at some point in time they were going to pick up an Internal**

Newton

**Affairs' case on the incident.**

Q. When you say "incident," what incident? Was it regarding the arrest, or was it regarding the death of the detainee?

A. **I would say probably both.**

Q. Do you know how that --

MR. CALLISTE: Withdrawn.

Q. Were you interviewed pursuant to -- by Internal Affairs?

A. **Verbally, no.**

Q. How, if at all, were you interviewed by Internal Affairs?

A. **If you consider a written document as an interview, I was given a set of questions that I had to answer.**

Q. After you prepared the answers to those questions, was there ever any follow-up, as far as you know, by Internal Affairs to interview you personally?

A. **No.**

Q. Did you ever speak to anyone over the phone or by some other method regarding what you placed in your written report?

A. **No.**

Newton

Q. Did you ever provide any documents or supply any documents, other than your written report, to Internal Affairs pursuant to their investigation?

A. **No.**

Q. Have you ever been asked to do anything at all pursuant to any investigation that was being conducted into the arrest and/or the death of Mr. Lazo?

A. **By who?**

Q. By Internal Affairs.

A. **I had to write an internal correspondence regarding those questions that were written to me.**

Q. Besides that internal correspondence that they asked you to submit, was there arrest paperwork or any other documents that were prepared pertaining to the arrest of Mr. Lazo that day?

A. **No.**

Q. Do you know if there was a conclusion or outcome to that investigation being conducted by Internal Affairs?

A. **I would assume there was one.**

Newton

Q. Do you know, to this day, what that conclusion was?

A. **No.**

Q. Were you ever told what the conclusion was --

A. **No.**

Q. -- at some point?

A. **No.**

Q. Do you care what the conclusion was?

MR. DUNNE: Object to the form of the question.

Q. Does it matter to you?

A. **Sure, it matters to me.**

Q. Sir, during your employment with the Suffolk County Police Department, have you ever been the subject of any other Internal Affairs' investigations?

A. **Yes, I have.**

Q. How many approximately?

A. **I don't know.**

Q. More than five?

A. **I don't know. I don't know how many complaints they have of me. I have been**

Newton

**involved in cases with Internal Affairs. I just cannot tell you how many.**

Q. Are you aware as to whether you have ever been --

MR. CALLISTE: Withdrawn.

Q. As a result of any Internal Affairs' investigations that were opened up related to you, have you ever been disciplined as a result of those?

A. **Yes, I have.**

Q. Do you recall what -- under what circumstances you have been disciplined pursuant to an Internal Affairs' investigation?

A. **I was disciplined regarding an improper entry or wrong entry on my memo book.**

Q. When you say "improper entry," do you mean improper writing that you placed in your own memo book?

A. **I shouldn't say improper. It was a VIN number that wasn't documented correctly.**

Q. Do you recall what year you were disciplined for that?

A. **I don't know. It was**

Newton

**approximately twenty years.**

Q. Do you know what kind of discipline was handed out?

A. **Yes.**

Q. What was that?

A. **I got reprimanded ten days.**

Q. Ten days what?

A. **I lost ten days of vacation time.**

Q. Besides that discipline, have you ever been disciplined for any other Internal Affairs' investigations or as a result of any other Internal Affairs' investigation being conducted?

A. **No.**

Q. Have you ever been suspended?

A. **No.**

Q. Have you ever been sent back to the Academy for retraining at all?

A. **Well, we go back to the Academy for training.**

Q. Besides like -- I'm not referring to recertifications of your gun training, stuff like that. I'm talking about as a result of an Internal Affairs' investigation,

Newton

have you ever been sent back to the Academy for retraining in any specific areas?

A. **No.**

Q. Besides qualifying and things like that?

A. **Correct.**

MR. CALLISTE: Let's take a break.

(Recess taken.)

Q. Sir, with respect to the death of Mr. Lazo, do you know if that death was being investigated by any agency or departments, law enforcement departments that were not police agencies, any outside agencies?

A. **You mean besides Suffolk County?**

Q. Besides Suffolk County Police Department.

A. **No.**

Q. Do you know if the District Attorney's Office was investigating that --

A. **Yes.**

Q. -- the death of Mr. Lazo?

A. **Yes.**

Q. How do you know that?

Newton

A. **We conducted a Grand Jury on it.**

Q. Were you ever interviewed by any district attorneys?

A. **No.**

Q. Did you ever speak to any district attorneys regarding the death of Mr. Lazo?

A. **No.**

Q. Were you ever asked by your police department, or the District Attorney's Office, or anyone to supply any information or documentation regarding the arrest or the whole situation with Mr. Lazo on April 12, 2008?

A. **I was asked to supply a supplementary report the night of the incident, and then again the Internal Affairs' report.**

Q. I'm asking specifically about the District Attorney's Office. Did the District Attorney's Office ever ask you to supply any documentation to them?

A. **No.**

Q. Did you ever have any

Newton

conversations with your superiors or -- with your superiors regarding the Grand Jury presentment?

A. **What do you mean?**

Q. Did you ever have any discussions with anyone in the police department regarding the fact that a Grand Jury was convened in this matter?

A. **I knew a Grand Jury was convened. The Homicide Unit told me that we were going to have to go to Grand Jury.**

Q. Did you ever have any discussions, besides being told that you have to go to the Grand Jury, about that Grand Jury proceeding?

A. **No.**

Q. Were you prepped for your testimony at the Grand Jury before you went to the Grand Jury?

A. **No.**

Q. Did you speak to any district attorneys prior to going to the Grand Jury?

A. **No.**

Q. Did you speak with any of the

Newton

officers prior to going to the Grand Jury?

A. **No.**

Q. Do you know if the Suffolk County Police Department has a legal bureau?

A. **Yes, they do.**

Q. Did you ever speak to anyone from the Legal Department?

A. **No.**

Q. Did you give testimony in the Grand Jury?

A. **Yes, I did.**

Q. At that time, sir, do you know if your name -- do you know if you were one of the individuals being investigated by the Grand Jury at that point?

A. **Yes.**

Q. Were you ever served with charges?

A. **No.**

Q. Were you ever served with a complaint, a felony complaint?

A. **No.**

Q. Have you ever seen a felony complaint in this matter regarding Mr. Lazo or

Newton

the death of Mr. Lazo?

A. **No.**

MR. CALLISTE: I have no further questions.

MR. DUNNE: Just a few follow-ups.

EXAMINATION BY MR. DUNNE:

Q. Detective, let me ask you: With respect to Counsel's last line of questions with respect to that Grand Jury presentation, you, in fact, were a subject of that Grand Jury presentation, correct?

A. **Yes.**

Q. You had to testify with a waiver of immunity, correct?

A. **Correct.**

Q. After you gave a supplementary report on the night of the incident, you were not asked anything about this case by virtue of the fact that you were a subject of that Grand Jury investigation?

A. **Correct.**

MR. CALLISTE: Objection.

Newton

Q. It was only after the Grand Jury had concluded that Internal Affairs asked you to submit the 42 to them?

MR. CALLISTE: Objection.

A. **Correct.**

Q. Now, Counsel had earlier asked you about searching that particular vehicle while it was on the side of the road.

Is there any particular reason why you were not necessarily focused on making an arrest that night?

A. **At that point in time prior to Mr. Lazo's striking me, there was no reason for an arrest.**

Q. What was the basis for the stop at that point?

A. **The basis for the stop was to help us with the investigation of who was dealing drugs out of that Cadillac. We were able to ascertain the name, and address, the type of Cadillac to further our investigation.**

Q. Under what circumstances would Mr. Lazo have been arrested on the side of the road?

Newton

A. **If we had recovered some type of contraband, he would have been arrested, or some other -- like a suspended license or something like that. Other than that he wouldn't have been arrested.**

Q. At any point while you were on the side of the road, did Sgt. Scimone ever indicate to you that after he had shown the flashlight in the car or looked around that he had found anything?

A. **No, he didn't.**

Q. At that point, since no contraband was found, had there not been a confrontation, what would have happened?

A. **He could have received tickets and moved on. Or we could have just told him why he was stopped and moved on without getting tickets.**

MR. DUNNE: I have nothing further.

FURTHER EXAMINATION BY MR. CALLISTE:

Q. Is a hand-to-hand drug sale, is that a crime, sir?

Newton

**A. Yes, it is.**

Q. That is an arrestable offense, correct?

**A. If you know it is an obvious hand-to-hand drug transaction. You would need more than just an observation. You would need some other party. You would need drugs is probably the second part of that hand-to-hand.**

Q. At that point -- well, you indicated that Officer -- Detective Talt -- you indicated that an actual hand-to-hand was observed?

**A. I said an apparent hand-to-hand.**

Q. I will let the record speak for itself.

Sir, you did indicate -- also, you indicated earlier that one of the purposes of the stop was because a hand-to-hand transaction was actually observed?

**A. An apparent hand-to-hand transaction.**

Q. Was it an apparent hand-to-hand transaction, or was it an actual hand-to-hand transaction?

Newton

**A. There was a hand-to-hand. Was it drugs or something else? We couldn't tell. But it was an apparent hand-to-hand where something was exchanged. Now, I can't explain exactly what Detective Talt saw, whether he saw money or not. But it was an apparent hand-to-hand transaction. No drugs were recovered at any time.**

Q. Sir, you indicated that Detective Talt passed you by and gave you the thumbs up --

**A. Correct.**

Q. -- indicating that he did see something go down, correct?

**A. Correct.**

Q. At that point in time you formed a belief that there was a hand-to-hand transaction?

**A. Apparent hand-to-hand transaction, correct.**

Q. Sir, but earlier when you testified, you didn't say it was apparent, you said it was actual, correct?

**A. I believe I did. If I didn't,**

Newton

**I'm saying it now. It was an apparent hand-to-hand drug transaction.**

MR. CALLISTE: I have no further questions.

FURTHER EXAMINATION

BY MR. DUNNE:

Q. Detective Newton, do you have an investigative function in the unit that you were assigned to on April 12th of 2008?

**A. Yes.**

Q. What would some of your investigative functions entail?

**A. Again, we would be out patrolling for street level drug sales. Arrest people with drugs at known drug locations.**

Q. Do you ever conduct investigations that go beyond just one individual dealing drugs?

**A. Yes.**

Q. Under what circumstances would you do that?

**A. Again, if we saw what we thought was a drug deal or hand-to-hand, we don't necessarily make an arrest. We try to get to**

Newton

**the person that is dealing to that person. It is just the beginning of a drug investigation.**

Q. To your knowledge, were any drugs in plain view of the vehicle that Mr. Lazo was driving and that was stopped at the side of the road on April 12, 2008?

**A. No, there was not.**

MR. CALLISTE: Objection.

**A. No, there was not.**

MR. CALLISTE: No further questions.

(Time noted: 2:15 p.m.)

Newton

ACKNOWLEDGMENT

STATE OF NEW YORK )
:ss
COUNTY OF )

I, DET. JOHN NEWTON, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of January 6, 2011; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_______________________
DET. JOHN NEWTON

Signed and subscribed to before me, this day of , 2011.

_______________________
Notary Public, State of New York

-------------------I N D E X-------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| DET. JOHN NEWTON | MR. CALLISTE | 4, 180 |
| | MR. DUNNE | 178, 183 |

-------------------EXHIBITS-------------------

| NEWTON | | FOR I.D. |
|---|---|---|
| 1 | Complaint | 22 |

(Counsel retained exhibit.)

CERTIFICATE

STATE OF NEW YORK :
: ss.:
COUNTY OF NASSAU

I, FLORENCE SYSKROT, a Notary Public within and for the State of New York, do hereby certify:

That DET. JOHN NEWTON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of January, 2010.

-------------------------
FLORENCE SYSKROT

**1**

**1** [3] - 22:7, 22:10, 186:10
**1-10** [1] - 1:12
**100** [2] - 1:16, 2:14
**10:00** [2] - 155:9, 155:10
**10:15** [1] - 1:18
**10:30** [1] - 158:16
**11550** [1] - 2:6
**11702** [1] - 1:24
**11706** [1] - 4:13
**11788-0099** [1] - 2:15
**11:00** [1] - 158:16
**12** [28] - 25:7, 25:14, 26:11, 26:19, 28:14, 31:23, 36:2, 36:6, 36:17, 37:13, 39:13, 41:5, 44:20, 44:23, 45:2, 45:16, 45:24, 46:22, 47:3, 48:21, 49:17, 50:21, 56:5, 59:19, 59:22, 162:6, 175:14, 184:7
**124** [1] - 1:24
**12th** [2] - 31:21, 183:10
**1630** [1] - 4:12
**178** [1] - 186:5
**18** [1] - 31:18
**180** [1] - 186:4
**183** [1] - 186:5
**18th** [1] - 31:20
**1957** [1] - 8:3
**1979** [2] - 8:11, 15:7
**1983** [3] - 13:20, 14:18, 15:8
**1999** [2] - 29:21, 29:24
**1:00** [2] - 25:19, 26:8
**1st** [4] - 51:12, 51:14, 61:20, 61:21

**2**

**2** [1] - 8:3
**2008** [32] - 25:7, 25:14, 26:11, 26:20, 27:18, 28:14, 31:18, 31:23, 33:23, 36:2, 36:6, 36:18, 37:13, 39:13, 41:5, 44:20, 44:23, 45:3, 45:17, 45:24, 46:23, 47:3, 48:21, 49:17, 50:22, 56:5, 59:19, 59:22, 162:6, 175:15, 183:10, 184:7
**2009** [2] - 20:16, 22:20
**2010** [1] - 187:22
**2011** [3] - 1:18, 185:10, 185:21
**202** [1] - 1:24
**22** [1] - 186:10
**24th** [1] - 187:21
**25** [1] - 144:8
**27** [1] - 9:9
**2:15** [1] - 184:13

**3**

**314** [4] - 127:15, 127:24, 128:2, 133:10

**4**

**4** [1] - 186:4
**42** [2] - 6:16, 179:4

**5**

**5** [1] - 26:7
**516-938-4000** [1] - 1:25
**556** [1] - 2:5
**5:00** [4] - 25:19, 26:8, 31:19, 31:24

**6**

**6** [2] - 1:18, 185:10

**9**

**911** [2] - 119:5, 119:7
**9:00** [2] - 26:7, 147:11
**9:30** [1] - 155:9

**A**

**a.m** [3] - 1:18, 25:20, 26:9
**ability** [1] - 6:4
**able** [34] - 44:8, 44:13, 54:22, 69:7, 69:16, 69:20, 97:7, 100:18, 100:23, 102:15, 102:19, 105:2, 106:18, 110:11, 114:3, 114:7, 114:15, 116:7, 116:11, 120:3, 122:7, 122:8, 122:20, 123:2, 125:5, 127:19, 128:16, 128:20, 128:23, 130:4, 133:23, 179:21
**abrasion** [4] - 126:15, 126:17, 126:19, 126:20
**abrasions** [1] - 129:11
**academy** [6] - 14:10, 14:11, 14:13, 86:17, 86:22, 87:2
**Academy** [6] - 14:17, 16:8, 16:11, 173:19, 173:20, 174:2
**according** [1] - 117:21
**accurate** [11] - 11:23, 16:12, 27:19, 29:22, 36:5, 62:21, 86:4, 93:25, 106:22, 151:11, 152:7
**acknowledgement** [1] - 57:9
**acknowledgment** [1] - 57:13
**acting** [1] - 88:21
**action** [2] - 20:14, 187:17
**actions** [2] - 19:15, 69:7
**active** [2] - 18:23, 45:25
**actively** [1] - 13:22
**activity** [3] - 48:25, 49:6, 92:6
**actual** [3] - 181:12, 181:24, 182:24
**add** [1] - 19:11
**addition** [1] - 7:11
**additional** [1] - 143:13
**address** [5] - 4:10, 20:3, 81:3, 82:3, 179:21
**administer** [1] - 3:16
**administrators** [1] - 1:4
**advise** [3] - 92:4, 92:9, 92:12
**advised** [5] - 40:16, 42:6, 78:13, 81:15, 156:8
**Affairs** [11] - 6:18, 168:11, 168:17, 169:10, 169:13, 169:19, 170:4, 170:12, 170:24, 172:2, 179:3
**Affairs'** [9] - 7:9, 169:2, 171:19, 172:8, 172:14, 173:12, 173:13, 173:25, 175:18
**agencies** [4] - 46:3, 46:8, 174:15
**agency** [1] - 174:13
**agitated** [6] - 88:3, 92:2, 115:17, 127:18, 129:19
**ago** [2] - 20:17, 116:16
**AGREED** [3] - 3:3, 3:9, 3:14
**ahead** [3] - 16:23, 112:18, 113:9
**Airport** [1] - 11:13
**alive** [3] - 164:9, 164:13
**allegations** [6] - 18:14, 20:22, 21:19, 23:24, 24:18, 117:13
**allege** [2] - 83:21, 91:18
**alleged** [5] - 18:15, 18:16, 62:22, 73:12, 74:13
**allegedly** [1] - 90:16
**ALSO** [1] - 2:18
**ambulance** [7] - 134:19, 134:22, 143:5, 143:6, 143:22, 153:15, 154:7
**amendment** [1] - 19:21
**analysis** [1] - 15:20
**AND** [4] - 1:12, 3:2, 3:8, 3:13
**anonymous** [3] - 36:13, 38:16, 47:22
**answer** [9] - 5:21, 5:24, 16:23, 74:16, 105:25, 113:8, 159:20, 160:2, 169:16
**answered** [2] - 149:7, 153:21
**answers** [5] - 6:4, 89:5, 160:17, 169:17, 185:12
**apparent** [9] - 54:13, 181:14, 181:21, 181:23, 182:4, 182:7, 182:20, 182:23, 183:2
**appear** [12] - 88:3, 88:12, 88:16, 91:2, 91:6, 91:8, 105:9, 112:13, 113:11, 113:14, 129:8, 134:12
**appearance** [2] - 125:10, 160:15
**appeared** [3] - 88:6, 113:18, 131:7
**application** [4] - 29:2, 29:3, 29:5, 29:10
**applied** [1] - 28:24
**apply** [1] - 31:11
**applying** [1] - 29:16
**approach** [2] - 69:11, 69:12
**approached** [4] - 69:13, 70:14, 70:15, 70:20
**April** [32] - 25:7, 25:14, 26:11, 26:19, 27:18, 28:14, 31:18, 31:23, 33:23, 35:25, 36:6, 36:17, 37:13, 39:13, 41:5, 44:20, 44:23, 45:2, 45:16, 45:24, 46:22, 47:3, 48:21, 49:17, 50:21, 56:5, 59:19, 59:22, 162:6, 175:14, 183:10, 184:7
**area** [37] - 26:23, 35:22, 36:21, 36:22, 37:3, 37:15, 38:2, 38:12, 39:19, 48:15, 48:18, 48:25, 52:2, 65:5, 65:21, 65:25, 66:5, 82:9, 83:19, 89:13, 89:15, 89:24, 90:4, 96:13, 96:15, 96:17, 96:20, 97:12, 102:5, 104:21, 112:19, 123:13, 139:21, 145:23, 146:8
**areas** [7] - 9:20, 27:10, 30:18, 36:15, 158:17, 162:22, 174:3
**arm** [43] - 96:9, 96:11, 96:19, 96:23, 97:9, 102:16, 104:2, 104:4, 104:8, 104:10, 104:12, 104:17, 105:6, 105:8, 105:12, 106:14, 106:16, 106:24, 107:4, 107:7, 110:6, 110:8, 110:9, 110:15, 110:22, 111:13, 111:18, 111:19, 115:9, 116:18, 116:21, 116:23, 116:25, 117:8, 117:9, 117:10, 118:17, 118:18, 122:8
**arms** [4] - 98:12, 104:9, 105:20, 116:12
**arrest** [32] - 6:24, 7:3, 105:20, 123:13, 134:20, 134:23, 137:23, 140:23, 142:8, 144:14, 146:18, 149:25, 150:5, 151:13, 151:14, 151:17, 151:18, 159:16, 160:8, 164:12, 164:24, 165:3, 165:9,

169:4, 170:9, 170:18, 170:20, 175:13, 179:12, 179:15, 183:15, 183:25
arrestable [1] - 181:3
arrested [5] - 47:5, 163:14, 179:24, 180:3, 180:6
arresting [1] - 78:6
arrests [4] - 47:8, 151:8, 151:10, 151:19
arrive [2] - 128:3, 128:6
arrived [4] - 51:7, 127:15, 128:10, 128:11
arriving [1] - 43:6
ascertain [1] - 179:21
assess [1] - 136:15
assigned [7] - 9:13, 27:9, 32:9, 32:12, 32:21, 34:3, 183:10
assignment [3] - 26:11, 32:20, 33:12
assignments [3] - 32:9, 32:12, 32:21
assist [12] - 27:2, 28:10, 30:25, 31:4, 80:5, 112:3, 116:4, 120:9, 121:14, 121:24, 122:4, 145:19
assistance [2] - 116:15, 127:20
assistant [1] - 12:10
assisted [3] - 15:18, 63:3, 148:2
associate [1] - 4:17
ASST [1] - 1:11
assume [5] - 31:12, 116:9, 159:11, 167:25, 170:25
attachments [2] - 7:9, 7:14
attempt [3] - 26:25, 98:25, 104:12
attempted [1] - 119:9
attempting [2] - 111:9, 111:19
attend [1] - 14:13
attended [1] - 14:16
attention [2] - 25:7, 134:17
attorney [2] - 5:17, 5:23
ATTORNEY [4] - 1:10, 1:11, 2:11
Attorney [3] - 1:13, 1:14, 2:13
Attorney's [4] - 174:21, 175:11,

175:21, 175:22
Attorneys [1] - 2:4
attorneys [4] - 3:3, 175:4, 175:7, 176:23
authority [1] - 15:23
authorized [1] - 3:16
available [2] - 151:20, 151:22
Avenue [2] - 4:12, 9:18
aware [3] - 145:11, 164:21, 172:4

**B**

Babylon [1] - 1:24
background [1] - 38:11
backup [3] - 112:6, 118:12, 124:23
backwards [1] - 93:25
bag [9] - 131:10, 131:16, 131:18, 131:20, 131:23, 132:6, 132:10, 132:18, 132:24
band [3] - 120:4, 121:6, 124:24
Band [20] - 42:25, 63:9, 119:10, 119:16, 119:19, 119:23, 120:12, 120:16, 120:18, 120:20, 120:21, 120:25, 121:7, 121:8, 121:20, 121:21, 124:8, 124:15, 124:17, 125:2
bandaged [1] - 156:3
bands [1] - 121:7
basic [2] - 80:23, 81:24
basis [5] - 28:6, 32:10, 62:19, 179:16, 179:18
Bay [4] - 4:12, 9:19, 58:15, 61:9
bear [10] - 98:4, 98:10, 98:19, 98:23, 99:5, 99:9, 100:7, 100:10, 104:21, 109:17
became [5] - 15:7, 28:22, 29:20, 88:20, 89:5
become [4] - 28:20, 31:11, 88:8, 91:23
becoming [6] - 10:7, 11:20, 12:14, 82:13, 91:25, 92:2
began [6] - 31:18,

31:23, 81:4, 146:21, 147:16, 157:18
begin [1] - 81:7
beginning [1] - 184:3
begun [1] - 165:7
behind [16] - 41:25, 55:5, 55:7, 55:12, 65:12, 65:13, 67:9, 71:5, 76:11, 79:5, 84:22, 94:20, 99:14, 101:14, 105:20, 106:17
belief [3] - 71:16, 108:21, 182:18
belt [1] - 107:14
best [1] - 129:23
better [1] - 126:22
between [4] - 3:3, 54:14, 96:8, 96:11
beyond [1] - 183:18
big [3] - 97:3, 131:16, 131:18
bigger [1] - 45:9
birth [5] - 8:2, 81:2, 81:22, 82:2, 84:24
bit [1] - 93:16
bleeding [1] - 90:24
blood [4] - 125:13, 126:9, 129:10, 187:17
blue [15] - 42:4, 44:5, 44:12, 47:16, 51:2, 53:11, 55:6, 58:5, 60:6, 60:12, 63:25, 72:3, 72:6, 75:15, 75:20
body [9] - 98:11, 102:23, 103:3, 103:13, 104:24, 126:2, 129:11, 155:25, 159:5
book [2] - 172:17, 172:20
borrowed [1] - 89:12
bosses [1] - 30:19
Boulevard [1] - 2:5
break [12] - 5:17, 5:18, 6:22, 94:24, 99:2, 102:17, 102:20, 108:13, 153:20, 154:10, 154:12, 174:9
Brentwood [1] - 143:6
Brewington [1] - 4:18
BREWINGTON [1] - 2:3
brief [4] - 11:7, 11:8, 12:19, 13:15
briefly [1] - 138:4
bringing [1] - 137:2
broadcast [1] -

121:23
broadcasted [1] - 121:13
broadcasting [1] - 120:24
broader [1] - 35:22
Broderick [1] - 145:2
broke [10] - 42:13, 52:4, 53:23, 54:4, 55:17, 55:25, 56:6, 56:13, 56:17, 100:7
brought [11] - 100:23, 127:21, 136:10, 141:19, 152:20, 152:25, 153:3, 153:5, 153:7, 153:9, 163:7
bruised [1] - 136:13
bruises [2] - 90:22, 129:11
bruising [2] - 125:15, 126:13
building [1] - 11:13
bureau [1] - 177:5
burglaries [2] - 27:11, 27:16
button [1] - 78:14
Buyrite [1] - 15:13
BY [7] - 2:7, 2:16, 4:6, 178:8, 180:23, 183:7, 186:3

**C**

Caddy [1] - 40:18
Cadillac [24] - 38:23, 42:4, 44:5, 44:12, 47:17, 51:2, 54:15, 55:6, 57:8, 58:5, 60:6, 60:13, 60:19, 60:22, 63:25, 72:3, 72:6, 72:9, 75:16, 75:20, 133:11, 133:13, 179:20, 179:22
caller [1] - 38:16
CALLISTE [33] - 2:7, 4:7, 6:21, 10:9, 13:7, 14:8, 16:6, 22:6, 31:16, 31:22, 48:10, 59:20, 96:16, 97:22, 100:8, 108:12, 111:23, 123:22, 137:9, 138:23, 153:22, 155:16, 169:8, 172:6, 174:8, 178:4, 178:25, 179:5, 180:23, 183:4, 184:9, 184:11, 186:4
Calliste [1] - 4:16
cameras [9] - 59:12, 162:3, 162:5, 162:9,

162:11, 162:17, 162:20, 162:21, 162:23
cannot [3] - 5:11, 84:11, 172:3
capacities [1] - 1:14
capacity [9] - 1:6, 1:7, 1:8, 1:8, 1:9, 1:10, 1:11, 1:12, 16:18
car [105] - 34:7, 34:8, 34:9, 34:12, 35:24, 41:19, 41:23, 41:25, 42:3, 42:7, 42:9, 42:11, 42:12, 42:14, 42:16, 43:8, 43:13, 44:9, 44:11, 44:14, 49:2, 51:13, 51:19, 51:21, 51:25, 52:2, 52:3, 55:6, 55:10, 55:13, 55:14, 56:6, 56:10, 61:12, 61:15, 61:18, 64:19, 64:25, 65:2, 65:3, 66:7, 66:10, 66:12, 66:24, 67:4, 67:10, 67:14, 67:20, 68:4, 68:9, 68:12, 69:11, 69:12, 71:5, 71:20, 72:3, 72:6, 72:8, 72:11, 74:19, 74:21, 74:22, 75:23, 82:9, 84:22, 84:25, 85:4, 85:5, 85:9, 94:13, 100:14, 117:10, 119:4, 119:5, 119:22, 121:12, 124:25, 127:15, 127:22, 128:14, 128:24, 129:5, 130:7, 130:8, 130:10, 130:15, 132:3, 133:16, 133:17, 133:18, 133:25, 134:3, 138:25, 139:7, 139:13, 141:18, 144:11, 150:14, 180:10
care [4] - 58:22, 149:6, 165:11, 171:10
Carlos [17] - 38:22, 38:24, 39:4, 39:15, 39:21, 39:23, 40:5, 40:12, 40:17, 40:21, 40:25, 41:5, 41:9, 47:22, 48:14, 48:16, 48:18
carried [1] - 148:25
cars [11] - 33:19, 35:18, 35:19, 35:21, 35:23, 64:21, 67:3, 118:4, 128:8, 128:10, 162:25

case [22] - 6:12, 6:14, 6:19, 7:4, 7:5, 17:13, 17:23, 18:23, 19:2, 19:12, 20:23, 21:4, 21:9, 21:11, 86:24, 129:2, 141:11, 157:4, 166:13, 168:8, 169:2, 178:21
cases [3] - 15:19, 21:20, 172:2
Causeway [2] - 58:14, 61:25
CDs [1] - 53:7
cellphone [2] - 50:24, 80:12
cellphones [2] - 80:9, 80:16
central [1] - 35:14
Central [1] - 1:17
certain [4] - 48:15, 122:21, 122:22, 157:22
certainly [1] - 62:16
certification [1] - 3:6
certifications [1] - 8:22
certify [3] - 185:7, 187:9, 187:15
cetera [1] - 89:10
change [3] - 32:15, 61:23, 61:24
changed [1] - 49:2
channel [4] - 121:8, 121:13, 121:15, 121:18
charges [1] - 177:19
check [2] - 73:5, 156:4
checked [2] - 136:25, 139:21
cHRISTINE [1] - 2:12
CHRISTOPHER [1] - 1:9
Christopher [2] - 2:20, 28:4
circumstances [4] - 36:10, 172:13, 179:23, 183:21
civilian [6] - 14:22, 14:25, 15:9, 15:15, 16:2, 166:10
claimed [3] - 20:25, 56:8, 84:17
claims [1] - 62:13
clarified [2] - 159:19, 160:2
clear [1] - 77:16
client [1] - 87:14
close [4] - 71:19, 80:4, 116:12, 160:23
closely [1] - 30:22
clothed [2] - 125:19, 125:20
clothes [2] - 87:23, 125:18
clothing [2] - 125:21, 127:8
co [1] - 1:4
co-administrators [1] - 1:4
cocaine [3] - 131:7, 131:10, 131:14
College [2] - 8:6, 8:14
college [1] - 15:12
COLLINS [1] - 1:11
color [1] - 34:9
colored [4] - 38:22, 40:18, 43:7, 47:17
coming [11] - 82:8, 82:16, 83:5, 83:19, 85:16, 85:20, 85:24, 89:10, 93:5, 114:16, 120:4
COMMISSIONER [1] - 1:6
commit [1] - 61:18
communicate [3] - 58:3, 71:22, 80:9
communicated [2] - 57:20, 57:24
communicating [5] - 42:23, 55:20, 69:17, 70:3, 71:3
communication [2] - 42:21, 68:15
communications [2] - 71:3, 75:8
Community [1] - 30:10
competent [1] - 146:11
Complaint [2] - 22:7, 186:10
complaint [34] - 5:2, 5:3, 18:15, 19:16, 19:22, 23:5, 23:8, 23:13, 23:14, 23:17, 23:20, 23:22, 23:24, 24:7, 24:8, 24:19, 24:23, 24:24, 37:2, 37:14, 37:17, 37:21, 38:4, 39:4, 39:21, 40:17, 49:19, 50:2, 92:13, 136:6, 136:19, 177:22, 177:25
complaints [15] - 26:22, 27:6, 33:9, 36:12, 36:13, 36:15, 36:16, 36:19, 36:21, 36:24, 37:7, 37:10, 39:7, 134:7, 171:25
complete [3] - 61:22, 165:19, 185:11
completed [1] - 166:11
computer [2] - 74:23, 75:5
concentrated [1] - 8:15
concentrating [1] - 115:8
concentration [1] - 8:20
concern [3] - 66:23, 78:16, 106:19
concerned [4] - 95:19, 107:8, 146:12, 167:11
concerning [1] - 27:10
concerns [2] - 66:17, 95:18
concluded [1] - 179:3
conclusion [4] - 170:23, 171:3, 171:6, 171:10
condition [3] - 90:20, 128:22, 129:6
conduct [6] - 4:24, 32:17, 62:2, 62:6, 63:10, 183:17
conducted [14] - 20:24, 37:21, 46:2, 61:15, 63:4, 65:6, 74:5, 77:21, 95:4, 168:10, 170:9, 170:24, 173:14, 175:2
conducting [3] - 31:2, 63:8
confrontation [1] - 180:15
connect [1] - 95:23
connected [2] - 95:21, 100:2
consider [1] - 169:14
contact [3] - 52:7, 52:9, 105:8
contacted [1] - 64:5
continued [3] - 52:6, 56:14, 56:18
contraband [4] - 89:18, 139:22, 180:3, 180:14
control [18] - 106:16, 107:7, 109:21, 110:6, 110:7, 110:15, 110:21, 111:12, 111:15, 116:19, 116:23, 116:25, 117:23, 118:10, 118:14, 118:15, 123:18, 127:16
controlled [1] - 113:17
convened [2] - 176:8, 176:10
conversation [6] - 75:12, 76:13, 76:16, 91:23, 94:9, 94:14
conversations [11] - 25:2, 50:25, 64:2, 73:15, 84:10, 137:16, 137:19, 137:25, 138:7, 140:23, 176:2
COPE [32] - 30:3, 30:5, 30:9, 30:13, 30:16, 30:22, 31:6, 31:11, 63:4, 63:6, 63:13, 64:3, 64:5, 64:9, 64:12, 64:16, 64:23, 65:2, 68:4, 68:16, 68:24, 71:5, 73:11, 74:22, 80:15, 119:6, 121:25, 123:12, 123:24, 124:14, 124:25, 130:18
copy [1] - 23:4
correct [107] - 14:5, 16:15, 25:9, 25:13, 27:22, 44:17, 44:18, 47:6, 53:16, 54:8, 54:9, 55:2, 55:3, 55:21, 55:22, 56:15, 56:16, 66:20, 67:5, 67:12, 77:15, 78:9, 79:10, 79:24, 81:12, 81:16, 81:17, 83:23, 84:3, 84:6, 86:20, 88:6, 88:7, 95:24, 95:25, 106:25, 107:2, 107:4, 107:5, 109:22, 111:13, 111:18, 111:20, 112:17, 112:20, 112:21, 112:23, 113:3, 113:4, 116:21, 117:4, 117:15, 117:16, 117:19, 117:21, 117:22, 117:24, 118:2, 118:8, 118:19, 118:20, 119:8, 120:5, 120:8, 122:15, 122:16, 122:18, 122:19, 122:23, 122:24, 123:24, 123:25, 125:6, 125:7, 129:2, 129:3, 135:23, 135:24, 136:10, 136:23, 148:9, 148:13, 148:14, 148:20, 148:21, 151:9, 151:10, 151:15, 157:23, 157:24, 157:25, 158:2, 168:13, 174:7, 178:14, 178:17, 178:18, 178:24, 179:6, 181:4, 182:13, 182:15, 182:16, 182:21, 182:24, 185:11, 185:13
correctly [1] - 172:22
correspondence [3] - 6:17, 170:14, 170:17
Cotler [2] - 145:3, 145:6
counsel [1] - 7:24
Counsel [2] - 179:7, 186:12
Counsel's [1] - 178:11
COUNTY [6] - 1:5, 1:10, 1:10, 2:11, 185:5, 187:5
County [31] - 1:13, 1:14, 4:11, 4:21, 4:22, 9:6, 9:8, 10:4, 10:17, 11:4, 12:15, 12:21, 13:23, 14:14, 14:16, 14:23, 15:2, 15:10, 15:16, 16:8, 16:11, 16:19, 22:4, 25:8, 46:3, 47:24, 165:25, 171:17, 174:16, 174:17, 177:4
couple [7] - 24:6, 42:17, 61:15, 66:11, 67:23, 70:23, 122:12
course [1] - 8:12
Court [5] - 3:19, 18:19, 18:20, 18:21, 20:6
court [4] - 5:11, 13:11, 18:18, 20:4
COURT [1] - 1:2
courtroom [1] - 15:20
crack [3] - 131:7, 131:10, 131:14
crew [4] - 143:5, 143:6, 153:15, 154:7
crime [6] - 12:4, 15:21, 92:19, 158:25, 164:2, 180:25
Crime [14] - 11:8, 11:10, 11:14, 11:20, 12:3, 12:6, 12:10, 39:11, 159:10, 159:14, 159:20, 159:21, 159:25, 160:3
crimes [1] - 73:24
Criminal [3] - 8:15, 8:18, 8:20

cuffed [1] - 126:7
cuffs [4] - 116:16, 125:6, 125:9, 134:5
current [3] - 9:24, 16:16, 29:24
cursing [4] - 105:24, 115:17, 129:18, 129:20
cursory [2] - 95:10, 95:13
custody [1] - 157:22
cut [2] - 126:21, 156:2

D

daily [3] - 28:6, 32:10, 34:4
dangerous [1] - 118:7
dark [5] - 38:22, 40:18, 43:7, 47:17, 54:15
date [8] - 8:2, 26:11, 26:16, 29:25, 81:2, 81:22, 82:2, 84:24
days [5] - 26:7, 26:9, 173:7, 173:8, 173:9
DEA [7] - 45:8, 45:21, 46:2, 46:22, 141:3, 141:7, 141:10
deal [2] - 57:5, 183:24
dealing [8] - 27:6, 38:22, 40:18, 48:14, 48:18, 179:20, 183:19, 184:2
deals [3] - 9:21, 27:15, 37:4
dealt [1] - 147:20
death [9] - 159:12, 160:5, 169:5, 170:10, 174:11, 174:12, 174:23, 175:7, 178:2
deceased [2] - 4:19, 23:9
defendant [2] - 19:12, 19:20
Defendant [1] - 1:20
Defendants [2] - 1:15, 2:13
defendants [2] - 17:22, 23:22
defib [2] - 145:8, 148:3
defibrillator [3] - 145:18, 148:12, 148:24
defibs [1] - 145:16
degree [4] - 8:5, 8:9, 8:17, 8:19
deliberate [1] - 21:10
demeanor [1] - 88:21
department [6] - 9:25, 11:16, 30:21, 157:18, 175:11, 176:7
DEPARTMENT [1] - 1:5
Department [27] - 4:11, 4:22, 9:6, 9:8, 10:5, 10:18, 11:4, 12:15, 13:19, 13:23, 14:4, 14:14, 14:16, 14:20, 14:22, 14:24, 15:2, 15:11, 15:17, 16:19, 25:9, 46:4, 166:2, 171:17, 174:18, 177:5, 177:8
departments [3] - 12:16, 174:13, 174:14
depicted [1] - 163:9
depictions [1] - 163:20
Deposition [1] - 1:20
deposition [16] - 3:6, 3:14, 4:25, 5:5, 5:8, 6:8, 7:23, 52:21, 52:24, 87:15, 133:6, 163:18, 168:12, 185:9, 187:11, 187:13
Deputy [3] - 12:18, 13:2, 15:8
describe [7] - 55:24, 87:18, 90:21, 92:18, 114:11, 126:20, 129:5
described [11] - 44:12, 50:2, 89:25, 90:21, 93:12, 94:18, 95:3, 112:16, 128:15, 131:11, 159:3
describes [1] - 35:9
describing [3] - 48:13, 53:24, 56:19
description [5] - 40:24, 41:9, 48:4, 48:8, 92:15
Desk [14] - 149:9, 149:12, 149:14, 149:16, 149:18, 149:22, 151:4, 151:5, 151:12, 152:2, 152:6, 152:8
det [1] - 4:9
DET [5] - 1:20, 185:7, 185:17, 186:4, 187:10
Det [2] - 2:20, 151:25
detail [2] - 26:15, 121:4
detainee [1] - 169:5
detective [6] - 7:21, 10:14, 28:10, 58:6, 124:12, 178:10
Detective [161] - 4:14, 10:2, 10:4, 10:8, 10:11, 18:3, 18:5, 24:10, 24:13, 24:22, 25:3, 25:12, 26:19, 26:22, 27:13, 28:4, 28:5, 28:8, 28:9, 28:13, 28:17, 33:21, 36:25, 37:6, 37:13, 38:7, 40:8, 40:13, 41:23, 42:6, 42:14, 42:21, 42:24, 42:25, 43:4, 43:20, 44:25, 45:6, 45:10, 45:15, 45:20, 48:2, 48:12, 48:15, 48:21, 49:17, 50:4, 50:20, 51:4, 51:9, 51:17, 51:21, 51:24, 52:5, 52:7, 52:10, 53:9, 53:12, 53:23, 53:24, 54:4, 54:5, 54:11, 54:17, 54:21, 55:9, 55:15, 55:20, 55:23, 56:8, 56:14, 56:18, 56:19, 56:24, 57:8, 60:2, 60:5, 62:13, 62:17, 63:9, 64:7, 64:9, 64:12, 65:14, 65:21, 66:4, 66:9, 66:24, 71:4, 71:8, 71:11, 71:22, 77:10, 77:24, 78:2, 79:16, 80:12, 99:15, 99:16, 112:10, 112:13, 112:15, 113:11, 113:14, 113:18, 119:10, 119:16, 119:17, 119:21, 119:23, 120:4, 120:10, 120:11, 120:12, 120:14, 120:15, 120:16, 120:18, 120:19, 120:21, 120:25, 121:7, 121:8, 121:13, 121:14, 121:17, 121:20, 121:21, 123:21, 124:8, 124:15, 124:17, 124:25, 128:5, 128:10, 133:10, 133:12, 137:16, 137:20, 138:2, 138:8, 140:2, 140:5, 140:7, 140:15, 140:18, 143:25, 144:11, 150:9, 150:12, 150:16, 150:23, 151:20, 151:21, 152:10, 157:14, 181:11, 182:6, 182:10, 183:8
detective's [1] - 28:11
detectives [7] - 15:18, 18:10, 40:2, 59:14, 124:2, 124:18, 124:20
Detectives [1] - 18:8
determination [6] - 61:12, 61:14, 123:3, 134:25, 135:21, 153:9
determine [10] - 33:6, 43:25, 54:22, 69:16, 114:15, 114:22, 114:25, 115:4, 122:21, 136:15
determined [2] - 135:13, 137:4
develop [1] - 84:7
device [1] - 124:22
different [1] - 85:22
direct [1] - 105:25
directed [1] - 162:23
direction [3] - 39:18, 91:13, 97:16
directly [5] - 16:12, 55:7, 55:12, 66:19, 76:10
discipline [2] - 173:4, 173:10
disciplined [5] - 172:9, 172:13, 172:16, 172:24, 173:11
discretion [2] - 27:12, 30:19
discuss [1] - 43:12
discussed [4] - 24:21, 68:23, 81:14, 154:20
discussing [2] - 87:11, 154:13
Discussion [3] - 31:17, 94:23, 163:12
discussion [2] - 78:11, 78:12
discussions [32] - 7:23, 23:16, 23:21, 24:17, 28:17, 40:11, 40:15, 45:14, 50:3, 50:18, 50:19, 72:16, 72:19, 73:8, 73:10, 74:18, 76:3, 77:2, 78:20, 87:11, 131:19, 135:8, 140:17, 142:7, 142:23, 149:24, 150:4, 150:11, 150:15, 154:18, 176:6, 176:14
dismissed [2] - 21:10, 21:12
Dispatch [1] - 119:8
dispatched [1] - 119:18
dispatcher [4] - 75:8, 119:12, 119:15, 121:15
distance [4] - 55:5, 55:16, 112:17, 113:2
distress [23] - 143:21, 144:18, 144:20, 144:23, 145:10, 145:13, 145:22, 145:24, 146:4, 146:9, 146:16, 146:21, 147:4, 147:8, 147:13, 147:15, 147:19, 147:23, 150:21, 157:16, 164:19, 164:23, 165:7
DISTRICT [5] - 1:2, 1:2, 1:10, 1:11
district [3] - 175:4, 175:7, 176:22
District [6] - 1:13, 1:14, 174:20, 175:11, 175:21
Division [1] - 28:23
division [1] - 29:24
doctors [1] - 13:11
document [8] - 22:11, 22:14, 22:15, 22:16, 22:19, 22:22, 35:9, 169:15
documentation [4] - 122:17, 167:15, 175:13, 175:23
documented [1] - 172:22
documents [9] - 6:7, 6:10, 84:20, 133:4, 166:2, 168:12, 170:3, 170:19
Dodge [1] - 43:8
Doe [1] - 19:18
DOES [1] - 1:12
done [13] - 7:19, 39:9, 49:9, 50:5, 57:18, 74:15, 101:7, 133:2, 141:17, 157:22, 158:4, 164:25, 167:13
door [2] - 76:11, 163:2
DORMER [1] - 1:6
Doroughty [2] - 18:5, 18:9
down [23] - 57:4, 84:16, 84:19, 86:4, 86:8, 86:13, 87:8, 100:19, 100:20, 100:23, 101:9, 101:12, 101:22,

101:25, 102:3, 102:7, 102:13, 102:24, 103:21, 104:5, 104:6, 109:25, 182:15
**draw** [1] - 25:6
**drawn** [1] - 69:25
**drive** [1] - 34:4
**driver** [6] - 44:14, 69:18, 70:4, 70:5, 76:4, 81:16
**driver's** [7] - 69:14, 72:8, 72:15, 75:22, 76:10, 91:4, 93:23
**driving** [10] - 66:25, 68:11, 69:4, 73:23, 85:2, 85:10, 92:16, 124:2, 124:5, 184:6
**dropped** [1] - 89:18
**drove** [1] - 140:2
**drug** [24] - 6:19, 6:25, 7:4, 7:6, 26:22, 26:23, 26:24, 27:5, 37:14, 38:17, 45:9, 48:25, 54:14, 54:18, 56:9, 62:16, 73:18, 180:24, 181:6, 183:3, 183:15, 183:16, 183:24, 184:3
**drugs** [19] - 54:23, 132:6, 132:10, 132:13, 132:14, 132:18, 132:25, 138:8, 138:12, 150:19, 165:11, 179:20, 181:8, 182:3, 182:8, 183:16, 183:19, 184:4
**duly** [2] - 4:3, 187:12
**DUNNE** [21] - 2:16, 7:7, 16:21, 31:20, 87:16, 94:22, 94:24, 113:5, 121:3, 146:25, 153:19, 154:10, 159:19, 163:11, 167:18, 171:12, 178:6, 178:9, 180:20, 183:7, 186:5
**during** [21] - 11:3, 19:8, 33:8, 36:14, 41:12, 42:19, 52:20, 54:12, 78:12, 84:11, 94:8, 112:12, 113:15, 115:24, 117:18, 121:9, 122:20, 122:25, 140:18, 167:11, 171:16
**duties** [17] - 11:15, 11:18, 11:25, 13:5, 13:8, 15:17, 22:3, 26:18, 26:21, 27:3, 27:19, 30:15, 32:4, 32:13, 32:15, 62:5, 151:3
**duty** [4] - 26:10, 136:14, 149:10, 149:19

E

**easier** [1] - 64:20
**East** [1] - 1:24
**east** [2] - 97:20, 100:13
**eastbound** [1] - 58:16
**EASTERN** [1] - 1:2
**easy** [1] - 7:7
**education** [1] - 8:4
**effect** [1] - 3:17
**effort** [1] - 136:20
**eight** [1] - 87:22
**either** [4] - 59:14, 87:4, 125:22, 145:9
**elbow** [10] - 91:14, 91:18, 92:21, 92:24, 93:8, 93:11, 94:17, 95:3, 95:21, 100:2
**employed** [6] - 9:3, 9:5, 9:7, 13:22, 15:6, 25:8
**employee** [5] - 14:22, 14:25, 15:10, 15:15, 16:2
**employees** [1] - 1:14
**employment** [4] - 11:3, 14:9, 14:20, 171:16
**EMTs** [1] - 145:9
**ended** [7] - 35:18, 142:24, 143:4, 167:23, 167:24, 168:2, 168:4
**Enforcement** [2] - 9:15, 30:11
**enforcement** [2] - 31:3, 174:14
**entail** [1] - 183:13
**enter** [2] - 14:10, 29:16
**entering** [1] - 61:9
**entire** [1] - 112:12
**entrance** [2] - 163:2, 163:8
**entry** [3] - 172:17, 172:18
**episode** [7] - 144:7, 147:7, 148:5, 154:19, 157:8, 160:11, 164:16
**equipment** [2] - 59:4, 59:6
**equipped** [3] - 34:16, 59:11, 74:23
**ESQ** [4] - 2:7, 2:9, 2:12, 2:16
**Estate** [1] - 1:4
**estate** [1] - 4:20
**et** [1] - 89:10
**evening** [6] - 41:12, 80:6, 141:22, 149:10, 149:19, 151:22
**event** [1] - 113:3
**eventually** [4] - 29:8, 103:3, 138:17, 141:20
**evidence** [1] - 15:4
**Evidence** [2] - 15:16, 16:2
**exact** [3] - 108:8, 128:12, 147:11
**exactly** [27] - 6:14, 17:7, 22:16, 32:3, 54:4, 65:19, 79:21, 83:18, 87:23, 93:21, 96:7, 101:7, 102:9, 106:6, 106:11, 108:17, 109:11, 111:3, 112:7, 113:23, 131:25, 132:6, 132:16, 137:13, 148:17, 162:15, 182:6
**EXAMINATION** [5] - 4:6, 178:8, 180:22, 183:6, 186:3
**examined** [1] - 4:4
**example** [1] - 160:25
**except** [2] - 3:9, 84:23
**excessive** [1] - 21:19
**exchanged** [1] - 182:5
**exclamation** [1] - 112:5
**exhibit** [1] - 186:12
**Exhibit** [1] - 22:7
**EXHIBITS** [1] - 186:8
**exit** [4] - 58:15, 58:16, 78:18, 88:13
**exited** [3] - 79:3, 79:12, 80:18
**experience** [1] - 146:21
**experiencing** [1] - 147:24
**expired** [1] - 164:10
**explain** [4] - 57:3, 85:5, 121:3, 182:5
**explained** [3] - 76:18, 138:3, 150:17

F

**face** [11] - 102:3, 102:14, 126:12, 126:15, 126:16, 126:18, 127:2, 127:5, 129:14, 137:16
**face-to-face** [1] - 137:16
**facility** [1] - 12:25
**facing** [5] - 57:7, 90:9, 90:10, 91:12, 104:4
**fact** [8] - 65:20, 73:16, 74:3, 85:21, 135:2, 176:8, 178:13, 178:22
**failed** [1] - 61:19
**fall** [3] - 102:11, 102:17, 102:20
**familiar** [5] - 5:7, 23:8, 23:13, 48:3, 48:12
**family** [1] - 4:20
**far** [19] - 46:5, 51:14, 55:4, 55:10, 67:9, 67:11, 93:15, 97:21, 98:6, 102:6, 102:9, 109:17, 126:12, 134:15, 141:15, 144:13, 162:18, 164:24, 169:19
**favor** [2] - 19:3, 21:5
**Federal** [4] - 1:16, 18:19, 18:21, 20:6
**feet** [3] - 127:20, 128:16, 128:20
**fell** [1] - 102:13
**felony** [3] - 131:15, 177:22, 177:24
**female** [3] - 17:19, 17:20, 21:15
**few** [8] - 67:19, 70:21, 70:22, 98:8, 104:14, 123:9, 128:7, 178:6
**fidgety** [1] - 88:23
**Fifth** [2] - 4:12, 9:18
**fifty** [1] - 65:13
**fighting** [1] - 138:6
**fights** [1] - 143:13
**figure** [1] - 146:6
**figured** [1] - 45:22
**file** [1] - 46:20
**filed** [4] - 4:21, 20:14, 20:15, 29:5
**files** [2] - 46:14, 46:18
**filing** [1] - 3:5
**finger** [1] - 156:3
**fingerprint** [1] - 15:19
**fingerprinted** [1] - 164:19
**fingerprinting** [1] - 158:3
**finish** [2] - 149:19, 153:17
**first** [27] - 5:21, 5:24, 17:3, 17:15, 22:18, 22:21, 23:4, 23:18, 31:24, 41:16, 41:19, 41:22, 44:11, 48:20, 52:18, 57:8, 59:21, 63:12, 73:21, 102:4, 102:14, 102:24, 105:7, 127:15, 128:2, 145:17, 163:16
**fist** [1] - 115:23
**fists** [1] - 115:21
**fit** [2] - 48:3, 131:17
**fitting** [1] - 48:7
**five** [10] - 17:6, 26:7, 26:9, 61:2, 70:24, 87:22, 122:13, 123:10, 171:23
**flailing** [2] - 104:9, 117:20
**flashed** [1] - 95:7
**flashlight** [8] - 76:7, 89:13, 89:20, 89:24, 90:4, 95:11, 95:14, 180:10
**flashlights** [1] - 95:6
**floor** [2] - 101:9, 111:22
**Florence** [1] - 1:21
**FLORENCE** [2] - 187:7, 187:25
**focused** [1] - 179:11
**follow** [10] - 42:7, 42:9, 42:11, 42:15, 43:9, 49:6, 58:8, 58:9, 169:18, 178:7
**follow-up** [1] - 169:18
**follow-ups** [1] - 178:7
**followed** [12] - 42:12, 42:14, 50:8, 51:9, 51:19, 51:21, 51:24, 52:2, 55:9, 58:12, 133:13, 140:3
**following** [16] - 14:9, 16:5, 16:10, 42:20, 43:5, 44:2, 52:5, 53:10, 54:25, 55:11, 58:6, 58:18, 92:10, 121:2, 135:2, 164:12
**follows** [1] - 4:5
**football** [1] - 102:14
**FOR** [1] - 186:9
**Force** [9] - 166:6, 166:8, 166:12, 166:20, 166:24, 167:9, 167:12, 168:4, 168:7
**force** [8] - 3:17,

21:19, 96:24, 97:3, 135:3, 136:4, 154:24, 166:9
**form** [5] - 3:10, 108:20, 113:5, 113:9, 171:12
**formed** [1] - 182:17
**forth** [2] - 13:11, 187:12
**four** [3] - 8:5, 12:19, 13:15
**four-year** [1] - 8:5
**Frederick** [1] - 4:18
**FREDERICK** [1] - 2:3
**front** [7] - 43:8, 65:18, 79:25, 100:14, 102:8, 163:2, 163:8
**fuckers** [1] - 129:22
**full** [4] - 12:10, 19:6, 21:6, 21:7
**function** [1] - 183:9
**functions** [1] - 183:13
**FURTHER** [4] - 3:8, 3:13, 180:22, 183:6

G

**general** [3] - 36:7, 41:8, 93:22
**generally** [1] - 5:8
**GERMANO** [1] - 2:9
**gestures** [1] - 5:12
**given** [7] - 48:4, 135:2, 156:10, 169:15, 185:13, 187:14
**Gonzalez** [4] - 2:22, 8:7, 17:14, 17:16
**GONZALEZ** [2] - 1:3
**grab** [14] - 97:6, 97:7, 97:8, 97:9, 97:10, 97:11, 97:14, 104:10, 105:6, 105:12, 106:14, 107:15, 107:17, 111:19
**grabbed** [2] - 110:9, 110:14
**grabbing** [3] - 108:25, 109:3, 111:18
**graduate** [1] - 16:7
**graduated** [1] - 8:11
**graduation** [1] - 16:10
**Grand** [17] - 175:2, 176:3, 176:8, 176:10, 176:12, 176:15, 176:19, 176:20, 176:23, 177:2, 177:11, 177:16, 178:12, 178:13, 178:23, 179:2
**grass** [1] - 89:17
**gREGORY** [1] - 2:7
**Gregory** [1] - 4:16
**grille** [2] - 34:18, 34:19
**ground** [27] - 5:8, 100:21, 100:24, 100:25, 101:4, 101:6, 101:12, 101:22, 102:10, 102:23, 103:4, 103:6, 103:7, 103:10, 103:14, 103:22, 104:12, 105:16, 106:23, 113:12, 113:20, 123:15, 125:12, 126:24, 127:18, 131:25, 132:2
**guess** [10] - 31:9, 96:8, 100:14, 102:2, 126:22, 144:9, 154:13, 155:9, 160:15, 168:24
**gun** [22] - 108:3, 108:6, 108:7, 108:16, 108:18, 108:19, 108:25, 109:2, 109:4, 109:7, 110:4, 110:18, 110:19, 110:21, 110:24, 111:6, 111:10, 112:5, 117:14, 173:23
**guns** [1] - 69:25
**gurney** [12] - 141:25, 142:4, 142:12, 142:17, 142:25, 143:4, 143:6, 143:10, 147:17, 148:20, 148:25, 152:15
**guys** [3] - 7:15, 24:6, 167:18

H

**half** [2] - 9:9, 155:13
**hand** [75] - 54:14, 54:18, 56:9, 56:25, 57:5, 57:11, 57:18, 62:16, 73:12, 74:15, 76:20, 77:11, 77:21, 78:3, 78:8, 83:22, 84:2, 102:16, 104:2, 107:16, 110:18, 110:19, 110:22, 131:17, 159:7, 180:24, 181:6, 181:9, 181:12, 181:14, 181:19, 181:21, 181:23, 181:24, 182:2, 182:4, 182:8, 182:18, 182:20, 183:3, 183:24, 187:21
**hand-to-hand** [33] - 54:14, 54:18, 56:9, 56:25, 57:5, 57:11, 57:18, 62:16, 73:12, 74:15, 76:20, 77:11, 77:21, 78:3, 78:8, 83:22, 84:2, 180:24, 181:6, 181:9, 181:12, 181:14, 181:19, 181:21, 181:23, 181:24, 182:2, 182:4, 182:8, 182:18, 182:20, 183:3, 183:24
**handcuff** [6] - 105:21, 106:20, 107:9, 116:7, 116:13, 122:8
**handcuffed** [4] - 116:9, 116:10, 127:17, 138:5
**handcuffs** [14] - 106:21, 107:10, 107:11, 107:17, 107:21, 108:2, 108:5, 110:12, 113:17, 115:25, 116:6, 116:11, 122:6, 125:12
**handed** [3] - 54:23, 131:12, 173:4
**handing)** [1] - 22:10
**handle** [1] - 26:22
**handled** [3] - 12:4, 159:10, 159:12
**handling** [1] - 15:19
**hands** [7] - 88:24, 107:19, 107:23, 108:5, 109:14, 110:10, 125:6
**Hauppauge** [1] - 2:15
**Hazmat** [1] - 11:6
**head** [3] - 5:12, 86:16, 86:24
**headed** [1] - 39:17
**heading** [2] - 97:20, 100:15
**headquarters** [1] - 16:4
**hear** [18] - 52:18, 75:7, 78:24, 99:21, 108:6, 111:5, 111:8, 114:21, 115:14, 119:23, 120:3, 120:11, 120:13, 121:19, 121:20, 134:9, 152:12
**heard** [8] - 30:3, 52:15, 108:3, 108:15, 110:4, 119:18, 119:21, 120:15
**heavy** [1] - 87:21
**heavyset** [3] - 87:21, 90:21
**held** [1] - 10:16
**help** [4] - 80:5, 112:3, 121:16, 179:19
**Hempstead** [1] - 2:6
**Herbie** [1] - 43:8
**hereby** [2] - 185:7, 187:9
**HEREBY** [1] - 3:2
**herein** [1] - 3:4
**hereinbefore** [1] - 187:11
**hereunto** [1] - 187:21
**Higbie** [2] - 41:20, 50:10
**high** [1] - 30:17
**higher** [1] - 10:25
**highest** [1] - 8:4
**Highway** [4] - 2:14, 37:5, 41:20, 58:12
**himself** [1] - 120:17
**Hispanic** [1] - 87:20
**hit** [25] - 96:2, 96:14, 102:23, 103:6, 103:7, 104:11, 106:23, 113:23, 114:4, 114:6, 114:13, 114:22, 114:25, 115:4, 115:8, 115:12, 115:14, 115:19, 115:20, 115:22, 127:2, 127:4, 136:22
**hits** [2] - 91:14, 114:16
**hitting** [2] - 114:19, 115:11
**hold** [3] - 99:2, 104:2, 104:3
**holding** [4] - 104:18, 104:19, 104:20, 106:15
**homicide** [1] - 167:11
**Homicide** [8] - 159:12, 159:21, 160:5, 167:6, 167:7, 167:23, 168:3, 176:11
**Homicide's** [1] - 159:22
**honest** [1] - 85:19
**hospital** [27] - 135:5, 135:10, 135:14, 136:3, 136:7, 136:8, 136:16, 136:18, 136:19, 136:20, 137:6, 143:7, 143:23, 154:21, 154:25, 155:3, 155:5, 156:17, 156:23, 158:15, 160:20, 161:3, 161:4, 161:13, 161:19, 161:21, 165:12
**Hospital** [17] - 152:16, 152:21, 152:25, 153:3, 153:5, 153:7, 153:10, 153:12, 154:3, 154:6, 154:9, 155:8, 155:15, 155:18, 156:6, 156:7, 164:6
**hostile** [1] - 91:24
**hour** [2] - 155:13
**hours** [4] - 25:17, 25:22, 25:25, 26:5
**house** [1] - 20:25
**hug** [7] - 98:23, 99:5, 99:9, 100:7, 100:10, 104:21, 109:17
**hugged** [3] - 98:4, 98:10, 98:19
**hurt** [1] - 129:8

I

**I.D** [1] - 186:9
**idea** [2] - 71:8, 79:20
**identification** [6] - 22:8, 70:8, 70:11, 70:16, 70:18, 81:12
**Identification** [1] - 14:23
**identified** [3] - 38:25, 42:3, 47:23
**identify** [1] - 77:20
**identifying** [1] - 34:12
**identity** [1] - 81:18
**illegal** [1] - 90:17
**immediate** [1] - 94:2
**immediately** [6] - 14:6, 93:8, 116:25, 117:7, 133:19, 143:9
**immunity** [1] - 178:17
**impact** [1] - 96:25
**impair** [1] - 6:4
**important** [4] - 85:13, 85:17, 85:18, 136:25
**impounded** [1] - 141:20
**improper** [8] - 18:17, 21:2, 61:22, 61:24, 172:17, 172:18, 172:19, 172:21
**IN** [1] - 187:20
**INC** [1] - 1:23
**incident** [16] - 7:12, 23:13, 45:23, 73:12,

121:10, 122:15, 122:18, 123:2, 130:25, 159:15, 168:20, 169:2, 169:3, 169:4, 175:18, 178:20
**incidental** [1] - 7:11
**include** [1] - 151:8
**including** [1] - 4:23
**indicate** [6] - 90:15, 111:6, 111:9, 167:15, 180:9, 181:17
**indicated** [13] - 44:16, 53:14, 55:19, 88:5, 109:20, 111:17, 136:21, 153:25, 168:9, 181:11, 181:12, 181:18, 182:10
**indicating** [3] - 86:15, 96:17, 182:14
**indicating)** [2] - 96:15, 96:20
**individual** [18] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:9, 1:11, 1:12, 1:13, 4:22, 39:15, 39:21, 40:5, 43:6, 46:8, 48:13, 68:11, 183:19
**individually** [2] - 1:3, 131:13
**individuals** [5] - 20:8, 46:15, 55:2, 69:24, 177:15
**inform** [1] - 131:22
**informant** [1] - 48:5
**information** [25] - 5:2, 38:11, 38:15, 38:19, 40:19, 40:20, 45:20, 46:7, 46:21, 47:2, 48:17, 73:11, 75:2, 84:6, 84:8, 85:12, 85:15, 86:4, 86:7, 86:13, 86:23, 87:3, 156:9, 157:23, 175:12
**infractions** [2] - 61:16, 61:17
**initial** [6] - 6:19, 60:23, 67:17, 69:6, 84:11, 119:11
**initiated** [2] - 66:22, 68:8
**injuries** [1] - 160:23
**injury** [2] - 159:7, 160:19
**inquire** [1] - 145:20
**inquiries** [2] - 157:6, 157:10
**inside** [5] - 44:9, 89:20, 95:7, 95:15, 139:6
**Inspector** [1] - 30:19
**instead** [1] - 35:23
**instituted** [1] - 17:5
**intent** [1] - 77:6
**intention** [6] - 48:22, 48:24, 50:3, 65:25, 77:12, 78:5
**intentionally** [2] - 124:8, 124:9
**intentions** [3] - 49:4, 49:10, 49:12
**interest** [1] - 46:9
**interested** [1] - 187:18
**internal** [3] - 6:17, 170:13, 170:16
**Internal** [20] - 6:18, 7:9, 168:11, 168:17, 168:25, 169:10, 169:13, 169:19, 170:4, 170:12, 170:24, 171:18, 172:2, 172:7, 172:14, 173:11, 173:13, 173:25, 175:18, 179:3
**interoffice** [1] - 22:24
**interrupt** [1] - 5:11
**interview** [5] - 142:14, 142:17, 162:18, 169:15, 169:20
**interviewed** [4] - 29:9, 169:9, 169:13, 175:3
**interviewing** [2] - 84:5, 84:7
**investigate** [7] - 27:7, 37:22, 39:14, 39:16, 48:7, 48:24, 159:21
**investigated** [3] - 49:23, 174:13, 177:15
**investigating** [10] - 27:5, 36:18, 37:25, 46:15, 47:16, 47:18, 159:15, 159:17, 160:12, 174:21
**investigation** [26] - 7:6, 40:5, 74:5, 85:25, 87:7, 141:15, 159:10, 159:12, 160:4, 160:5, 160:8, 167:12, 167:23, 168:3, 168:10, 168:16, 170:5, 170:8, 170:23, 172:15, 173:13, 173:25, 178:23, 179:19, 179:22, 184:3
**investigations** [10] - 27:2, 37:21, 38:2, 38:4, 38:12, 45:25, 171:19, 172:8, 173:12, 183:18
**investigative** [2] - 183:9, 183:13
**involved** [16] - 18:6, 27:20, 45:9, 64:22, 66:19, 73:17, 84:2, 92:5, 101:8, 141:11, 141:12, 145:4, 154:24, 160:25, 165:2, 172:2
**involving** [2] - 92:13, 92:19
**IS** [3] - 3:2, 3:8, 3:13
**Islip** [5] - 1:17, 9:23, 36:21, 41:21, 42:13
**issue** [1] - 19:16
**issues** [1] - 27:7
**IT** [3] - 3:2, 3:8, 3:13
**item** [1] - 138:14
**items** [7] - 7:8, 52:22, 52:25, 125:21, 127:7, 145:19, 148:12
**itself** [3] - 65:6, 162:25, 181:16

J

**jails** [1] - 13:4
**JAMES** [1] - 1:7
**James** [1] - 2:21
**jamming** [1] - 155:22
**JANE** [1] - 1:12
**January** [4] - 1:18, 163:19, 185:10, 187:22
**JENNIFER** [1] - 1:3
**Jennifer** [1] - 2:22
**JOHN** [8] - 1:6, 1:11, 1:12, 1:20, 185:7, 185:17, 186:4, 187:10
**John** [4] - 4:9, 19:17, 20:12, 121:21
**joining** [1] - 11:19
**JR** [1] - 2:7
**Jr** [1] - 4:16
**judge** [3] - 20:19, 21:13, 21:14
**JUDGE** [1] - 1:8
**Judge** [81] - 2:19, 51:4, 51:5, 69:4, 69:10, 69:13, 69:19, 70:5, 70:15, 70:17, 72:7, 72:11, 72:17, 72:20, 72:24, 72:25, 73:8, 73:16, 73:22, 74:12, 74:18, 74:25, 75:7, 75:13, 79:11, 81:16, 94:6, 94:10, 94:12, 94:16, 97:25, 98:2, 98:7, 98:11, 98:12, 98:20, 98:22, 98:25, 99:4, 99:10, 99:14, 100:10, 100:18, 101:6, 101:12, 101:15, 101:16, 101:25, 102:4, 103:6, 103:7, 103:10, 103:16, 103:22, 103:24, 104:16, 104:22, 105:15, 106:3, 108:3, 108:6, 108:16, 108:17, 108:21, 108:22, 109:6, 109:13, 109:21, 109:25, 110:4, 110:23, 112:4, 120:10, 122:5, 123:17, 124:5, 161:11, 161:12, 161:16, 161:18, 161:24
**Judge's** [3] - 109:4, 110:20, 111:10
**July** [1] - 8:3
**Jury** [17] - 175:2, 176:3, 176:8, 176:10, 176:12, 176:15, 176:19, 176:20, 176:23, 177:2, 177:11, 177:16, 178:12, 178:14, 178:23, 179:2
**jury** [2] - 21:8, 21:10
**Justice** [3] - 8:16, 8:18, 8:20

K

**keep** [5] - 5:9, 35:3, 86:23, 107:13, 110:21
**KENNY** [1] - 1:4
**Kenny** [27] - 4:19, 41:14, 45:8, 45:15, 45:21, 46:4, 73:2, 78:18, 78:21, 82:11, 83:22, 87:12, 87:15, 87:24, 90:6, 91:17, 92:3, 92:20, 94:18, 98:6, 100:21, 101:16, 101:22, 101:25, 109:8, 122:7, 149:25
**Kenny's** [2] - 81:11, 109:21
**kept** [2] - 51:9, 65:16
**kind** [4] - 87:20, 96:24, 138:3, 173:3
**knees** [3] - 103:25, 109:22, 109:25
**knock** [3] - 93:15, 97:2, 97:4
**knocked** [3] - 93:13, 93:18, 93:24
**knocks** [1] - 91:15
**knowledge** [15] - 21:9, 39:22, 54:10, 54:21, 77:10, 79:23, 95:7, 112:22, 112:25, 119:14, 124:16, 132:17, 148:6, 166:2, 184:4
**known** [4] - 26:24, 132:6, 132:18, 183:16
**Koerber** [7] - 150:10, 150:12, 150:16, 150:24, 151:25, 152:7, 152:10

L

**lab** [3] - 7:10, 138:18, 138:20
**Lane** [1] - 41:20
**lane** [2] - 61:23, 61:24
**last** [9] - 17:6, 20:16, 38:25, 122:11, 146:25, 149:2, 153:23, 160:2, 178:11
**lasted** [4] - 123:4, 123:7, 123:9, 148:18
**Law** [1] - 4:17
**LAW** [1] - 2:3
**law** [1] - 174:13
**lawsuit** [9] - 4:20, 16:16, 17:4, 19:13, 19:15, 19:21, 19:25, 20:8
**lawsuits** [4] - 21:18, 21:22, 21:23, 22:3
**laying** [3] - 103:12, 125:11, 127:17
**Lazo** [233] - 4:19, 23:10, 41:14, 41:17, 41:18, 44:17, 44:19, 44:22, 45:2, 45:6, 45:15, 45:21, 46:4, 46:22, 47:2, 47:6, 47:12, 73:2, 78:18, 78:21, 78:24, 79:3, 79:9, 79:12, 80:18, 82:11, 82:15, 83:3, 83:7, 83:11, 83:24, 83:25, 84:17, 84:21, 84:25, 85:2, 85:5, 85:22, 87:13, 87:24, 88:3, 88:5, 88:8, 88:12, 88:19, 89:8, 90:6, 90:8, 90:10, 90:14, 90:15, 91:17, 92:4, 92:5, 92:9, 92:12, 92:24, 94:3,

94:7, 94:10, 94:19, 95:2, 96:14, 97:14, 97:21, 98:6, 98:10, 98:17, 98:18, 98:23, 98:25, 99:22, 99:25, 100:3, 100:7, 100:9, 100:22, 101:16, 102:3, 102:10, 102:16, 102:19, 103:12, 103:16, 103:19, 103:21, 103:25, 104:11, 104:18, 104:19, 105:6, 105:16, 105:22, 106:23, 107:24, 108:5, 108:25, 109:3, 109:8, 109:16, 111:3, 111:6, 111:9, 111:15, 111:21, 113:12, 113:16, 113:19, 113:21, 113:25, 114:4, 114:13, 114:18, 114:22, 114:25, 115:4, 115:14, 115:15, 115:19, 115:20, 115:25, 116:5, 116:16, 117:14, 117:20, 118:16, 118:22, 118:25, 123:14, 125:8, 125:16, 125:18, 125:25, 126:7, 126:23, 127:2, 127:4, 127:8, 127:11, 127:17, 128:15, 128:19, 129:4, 129:16, 129:25, 130:4, 131:3, 131:8, 131:20, 132:3, 132:11, 133:9, 133:15, 133:24, 134:6, 134:9, 134:12, 134:16, 135:4, 136:22, 137:7, 137:14, 137:17, 138:24, 139:12, 141:22, 141:24, 142:3, 142:8, 142:9, 142:11, 142:15, 142:16, 142:24, 143:4, 143:9, 143:17, 144:6, 144:17, 145:21, 145:24, 146:3, 146:8, 146:13, 146:16, 146:20, 147:8, 147:23, 148:19, 148:25, 150:2, 150:6, 150:19, 150:21, 152:14, 152:24, 153:4, 153:9, 153:14, 154:14, 154:19, 154:20, 154:24, 155:11, 156:8, 156:20, 157:7, 157:18, 158:7, 159:18, 160:11, 163:4, 163:7, 163:14, 163:21, 164:8, 164:9, 164:12, 164:16, 164:18, 164:22, 165:7, 166:14, 170:10, 170:20, 174:12, 174:23, 175:8, 175:14, 177:25, 178:2, 179:24, 184:5

**LAZO** [1] - 1:4

**Lazo's** [30] - 45:8, 70:17, 75:2, 90:19, 95:21, 102:23, 104:2, 104:4, 104:24, 105:8, 105:12, 109:21, 109:25, 110:5, 110:8, 111:13, 116:8, 116:18, 116:25, 117:7, 122:7, 125:6, 126:12, 134:4, 137:21, 141:17, 144:22, 156:5, 156:11, 179:14

**leads** [1] - 45:5

**learn** [2] - 45:19, 54:7

**learned** [3] - 56:24, 146:3, 156:19

**least** [2] - 81:15, 141:5

**leave** [1] - 133:18

**leaving** [1] - 139:19

**left** [28] - 40:6, 48:20, 59:18, 59:22, 94:21, 104:2, 104:4, 106:14, 106:15, 106:24, 110:6, 110:15, 116:7, 116:8, 116:18, 116:22, 118:18, 121:25, 122:6, 122:7, 122:8, 133:18, 139:12, 139:17, 140:7, 155:19, 155:21

**left-hand** [1] - 104:2

**leg** [1] - 104:21

**legal** [1] - 177:5

**Legal** [1] - 177:8

**legs** [1] - 102:4

**length** [3] - 55:14, 60:22, 60:23

**lengths** [4] - 55:6, 55:10, 55:13

**less** [4] - 11:8, 51:16, 70:24, 112:8

**level** [2] - 8:4, 183:15

**license** [4] - 43:13, 43:16, 73:5, 180:4

**licenses** [1] - 8:22

**Lieutenant** [12] - 27:13, 149:15, 149:16, 149:18, 149:22, 151:4, 151:5, 151:12, 152:3, 152:6, 152:9, 166:21

**light** [2] - 34:25, 50:10

**lights** [6] - 34:13, 34:18, 34:19, 34:22, 50:12, 50:15

**limping** [2] - 91:2, 129:6

**line** [3] - 16:22, 82:10, 178:11

**LINK** [1] - 1:9

**Link** [12] - 127:21, 127:23, 130:12, 130:18, 130:22, 130:24, 131:6, 131:22, 132:9, 133:16, 133:25, 138:25

**Link's** [6] - 127:21, 130:10, 130:15, 131:4, 134:6, 139:13

**Liquor** [1] - 15:13

**listening** [1] - 68:19

**lived** [1] - 81:10

**locate** [1] - 116:6

**located** [3] - 9:17, 9:18, 122:5

**location** [4] - 12:25, 15:25, 35:14, 51:23

**locations** [3] - 26:24, 162:15, 183:16

**logs** [1] - 35:3

**look** [1] - 108:5

**looked** [5] - 22:16, 41:6, 87:18, 159:6, 180:10

**looking** [12] - 36:11, 38:19, 49:13, 49:18, 89:13, 89:15, 89:16, 96:21, 107:20, 108:2, 115:9, 115:10

**loose** [1] - 118:19

**lost** [1] - 173:9

**lower** [1] - 96:6

**lunch** [2] - 153:20, 154:10

**lying** [6] - 86:5, 86:6, 86:9, 86:16, 87:7, 87:8

M

**MacArthur** [1] - 11:13

**mace** [1] - 129:2

**machine** [3] - 145:8, 148:4, 148:24

**machines** [3] - 145:16, 145:18, 148:12

**mail** [1] - 22:24

**Main** [1] - 1:24

**maintain** [1] - 46:14

**maintained** [3] - 29:23, 46:25, 55:16

**maintains** [1] - 46:17

**MALAFI** [1] - 2:12

**male** [4] - 17:19, 21:15, 21:16, 87:20

**man** [1] - 28:8

**manner** [1] - 35:14

**mark** [1] - 22:6

**marked** [8] - 22:8, 22:10, 34:7, 65:3, 119:6, 130:16, 130:17, 167:18

**marks** [1] - 34:12

**marriage** [1] - 187:17

**matched** [1] - 92:15

**material** [1] - 86:23

**matter** [12] - 17:10, 18:19, 20:5, 20:19, 21:14, 58:24, 59:2, 85:9, 171:14, 176:9, 177:25, 187:19

**matters** [3] - 27:8, 27:16, 171:15

**mean** [15] - 10:11, 19:15, 31:3, 57:17, 109:8, 117:2, 118:13, 120:23, 121:3, 123:16, 138:17, 157:20, 172:19, 174:16, 176:5

**meaning** [1] - 75:15

**means** [1] - 113:7

**meant** [3] - 31:21, 57:10, 57:16

**medical** [7] - 91:9, 134:17, 144:20, 145:22, 147:25, 157:14, 157:15

**medications** [1] - 6:3

**member** [8] - 11:20, 12:14, 12:16, 28:20, 28:22, 29:13, 29:20, 30:12

**members** [3] - 1:13, 31:11, 157:17

**membership** [1] - 29:23

**memo** [2] - 172:17, 172:20

**Memorial** [1] - 2:14

**mention** [4] - 73:23, 74:3, 92:3, 108:16

**mentioned** [4] - 7:2, 21:18, 21:23, 49:19

**method** [2] - 75:5, 169:23

**Michael** [1] - 18:3

**might** [6] - 18:6, 41:10, 45:8, 133:2, 145:3, 153:6

**mile** [1] - 51:16

**military** [1] - 8:25

**minute** [3] - 63:15, 108:9, 112:8

**minutes** [14] - 42:17, 61:3, 67:19, 67:23, 70:21, 70:22, 70:23, 70:24, 122:13, 123:10, 144:8, 144:15

**miss** [1] - 8:7

**mission** [1] - 30:16

**moan** [1] - 134:9

**moment** [2] - 116:16, 145:13

**money** [1] - 182:7

**monitoring** [1] - 121:17

**months** [4] - 11:9, 12:9, 12:20, 13:16

**morning** [3] - 4:14, 4:15, 141:23

**Moses** [2] - 58:14, 61:24

**most** [4] - 9:22, 33:10, 39:9, 165:21

**mostly** [1] - 27:20

**mother** [1] - 129:22

**moved** [2] - 180:17, 180:18

**movements** [1] - 91:21

**moving** [3] - 62:8, 88:23, 118:5

**MR** [52] - 4:7, 6:21, 7:7, 10:9, 13:7, 14:8, 16:6, 16:21, 22:6, 31:16, 31:20, 31:22, 48:10, 59:20, 87:16, 94:22, 94:24, 96:16, 97:22, 100:8, 108:12, 111:23, 113:5, 121:3, 123:22, 137:9, 138:23, 146:25, 153:19, 153:22, 154:10, 155:16, 159:19, 163:11, 167:18, 169:8, 171:12, 172:6, 174:8, 178:4, 178:6, 178:9, 178:25, 179:5, 180:20, 180:23,

183:4, 183:7, 184:9, 184:11, 186:4, 186:5
**mug** [2] - 157:25, 164:15

## N

**name** [21] - 4:8, 4:16, 17:9, 17:12, 17:14, 17:15, 19:25, 20:11, 20:18, 28:11, 38:25, 45:8, 46:10, 81:2, 81:22, 82:2, 84:23, 152:2, 152:5, 177:14, 179:21
**named** [22] - 4:25, 17:22, 19:12, 19:14, 19:17, 19:20, 20:8, 20:10, 20:11, 21:24, 23:22, 24:6, 38:22, 38:24, 39:4, 39:15, 39:21, 40:12, 40:17, 48:14, 48:17, 87:15
**names** [1] - 17:25
**Nancy** [1] - 18:5
**narcotic** [2] - 27:20, 92:14
**narcotic-related** [1] - 27:20
**narcotics** [9] - 7:18, 27:2, 27:3, 27:6, 39:10, 48:14, 48:18, 74:13, 92:19
**Narcotics** [2] - 28:23, 31:5
**NASSAU** [1] - 187:5
**nearby** [1] - 71:13
**necessarily** [5] - 49:3, 58:4, 149:14, 179:11, 183:25
**necessary** [1] - 27:10
**need** [11] - 5:16, 5:17, 59:5, 87:8, 89:5, 91:9, 112:3, 137:5, 181:6, 181:7, 181:8
**needed** [6] - 13:12, 80:4, 121:14, 121:23, 134:16, 146:11
**Neighborhood** [1] - 9:15
**nervous** [7] - 82:14, 88:6, 88:9, 88:12, 88:16, 88:20, 88:22
**NESOT** [21] - 9:14, 18:12, 26:21, 28:19, 28:20, 28:23, 29:6, 29:8, 29:13, 29:17, 29:20, 29:23, 30:21, 31:8, 39:8, 46:2, 46:5, 46:7, 46:10, 46:17, 46:25
**never** [2] - 21:7, 78:14
**New** [8] - 1:17, 1:21, 1:24, 2:6, 2:15, 4:13, 185:23, 187:8
**NEW** [3] - 1:2, 185:4, 187:3
**newer** [1] - 38:23
**Newton** [4] - 4:9, 22:7, 22:10, 183:8
**NEWTON** [7] - 1:6, 1:20, 185:7, 185:17, 186:4, 186:9, 187:10
**next** [18] - 75:12, 78:10, 78:24, 79:4, 80:20, 91:11, 93:12, 97:5, 98:16, 100:11, 103:23, 106:14, 107:18, 110:16, 111:24, 122:3, 127:14, 141:24
**night** [9] - 52:16, 55:2, 92:7, 141:4, 155:4, 168:20, 175:17, 178:20, 179:12
**nine** [1] - 87:22
**none** [3] - 156:12, 158:8, 164:25
**normal** [1] - 11:25
**normally** [3] - 34:4, 58:3, 107:13
**north** [1] - 100:15
**northbound** [1] - 58:14
**Notary** [4] - 1:21, 4:4, 185:23, 187:7
**noted** [1] - 184:13
**notes** [1] - 82:24
**nothing** [2] - 10:14, 180:20
**notice** [6] - 101:18, 103:5, 126:9, 126:13, 129:10, 148:16
**Notice** [1] - 1:20
**noticed** [1] - 148:19
**notified** [2] - 63:6, 63:7
**number** [5] - 36:12, 43:17, 128:13, 131:13, 172:22

## O

**O'Connor** [2] - 18:3, 18:9
**oath** [2] - 3:17, 185:9
**object** [3] - 113:5, 115:23, 171:12
**objection** [5] - 16:21, 146:25, 178:25, 179:5, 184:9
**objections** [1] - 3:9
**objects** [1] - 115:20
**observation** [2] - 88:9, 181:7
**observations** [4] - 125:9, 128:21, 131:10, 133:24
**observe** [16] - 44:8, 54:12, 57:5, 68:3, 68:6, 69:8, 72:5, 75:19, 101:21, 102:15, 105:5, 113:20, 113:23, 128:20, 128:23
**observed** [12] - 54:13, 54:24, 60:18, 60:21, 68:4, 69:10, 72:7, 75:21, 83:22, 131:12, 181:13, 181:20
**observing** [4] - 53:25, 54:5, 56:20, 68:2
**obtain** [1] - 8:9
**obtained** [1] - 46:21
**obvious** [1] - 181:5
**occasion** [4] - 101:17, 101:21, 103:5, 156:4
**occasionally** [2] - 35:20, 35:21
**occur** [6] - 26:23, 62:14, 65:8, 65:11, 68:7, 147:15
**occurred** [13] - 53:15, 72:4, 73:13, 98:15, 122:21, 123:2, 145:11, 146:17, 150:21, 159:16, 159:17, 164:23
**Occurrence** [2] - 165:23, 166:3
**occurring** [8] - 120:7, 144:3, 145:11, 145:12, 145:13, 146:22, 147:13, 148:6
**OF** [9] - 1:2, 1:5, 1:10, 2:3, 185:4, 185:5, 187:3, 187:5
**offense** [1] - 181:3
**offenses** [1] - 27:21
**office** [2] - 14:10, 146:5
**OFFICE** [1] - 1:10
**Office** [6] - 1:13, 1:14, 174:21, 175:12, 175:21, 175:22
**Officer** [117] - 10:19, 12:4, 12:7, 12:10, 22:4, 24:11, 24:22, 51:5, 69:4, 69:8, 69:10, 69:13, 69:19, 70:4, 70:15, 70:17, 72:7, 72:10, 72:17, 72:20, 72:23, 72:25, 73:8, 73:16, 73:22, 74:12, 74:18, 74:25, 75:7, 75:13, 76:23, 79:11, 81:16, 94:5, 94:6, 94:10, 94:12, 94:16, 97:25, 98:2, 98:7, 98:11, 98:12, 98:19, 98:22, 98:25, 99:4, 99:10, 99:14, 100:10, 100:18, 101:6, 101:12, 101:14, 101:15, 101:24, 102:4, 103:6, 103:7, 103:10, 103:16, 103:22, 103:24, 104:15, 104:22, 105:15, 106:3, 108:3, 108:6, 108:16, 108:17, 108:21, 108:22, 109:4, 109:6, 109:13, 109:20, 109:25, 110:4, 110:20, 110:23, 111:10, 112:4, 112:9, 120:10, 122:5, 123:16, 123:17, 124:4, 127:20, 127:21, 127:23, 130:10, 130:12, 130:15, 130:18, 130:22, 130:24, 131:4, 131:6, 131:22, 132:9, 133:16, 133:25, 134:6, 137:10, 138:25, 139:13, 145:2, 145:5, 161:11, 161:12, 161:16, 161:18, 161:24, 181:11
**officer** [18] - 3:16, 10:21, 10:24, 10:25, 13:25, 14:3, 16:18, 94:2, 113:21, 117:15, 136:15, 145:2, 145:4, 145:5, 154:23, 156:17, 158:25
**OFFICER** [5] - 1:6, 1:7, 1:8, 1:8, 1:9
**officers** [33] - 4:23, 17:22, 18:2, 20:9, 31:7, 31:10, 32:22, 32:24, 55:5, 64:3, 68:16, 68:23, 80:15, 103:19, 116:6, 126:25, 127:2, 130:3, 135:8, 135:20, 136:5, 142:24, 144:21, 144:25, 145:9, 145:15, 145:17, 148:3, 148:11, 148:23, 154:18, 160:24, 177:2
**OFFICES** [1] - 2:3
**Offices** [1] - 4:17
**official** [12] - 1:6, 1:7, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:14, 11:18, 16:17, 22:3
**once** [2] - 89:7, 95:21
**one** [21] - 34:25, 35:24, 38:21, 53:8, 58:24, 64:25, 65:2, 66:11, 67:13, 68:22, 74:11, 92:15, 107:16, 114:19, 116:12, 128:14, 129:13, 170:25, 177:14, 181:18, 183:18
**ongoing** [1] - 87:6
**oOo** [1] - 3:21
**opened** [1] - 172:8
**operated** [2] - 74:22, 133:12
**operating** [4] - 66:6, 66:10, 72:21, 127:23
**Operations** [1] - 9:15
**operator** [8] - 54:15, 73:2, 75:22, 76:19, 77:20, 78:6, 78:17, 80:2
**opinion** [3] - 57:3, 88:20, 131:14
**opposite** [1] - 91:12
**Oriented** [1] - 30:11
**original** [1] - 7:4
**originally** [5] - 79:18, 90:8, 109:10, 127:8, 142:13
**outcome** [4] - 18:25, 21:3, 170:23, 187:18
**outside** [4] - 22:3, 139:6, 139:8, 174:15
**overall** [1] - 158:19
**overhead** [1] - 34:13
**overhear** [1] - 153:13
**overheard** [4] - 153:11, 153:15, 154:2, 154:4
**overpass** [1] - 41:20
**oversees** [1] - 151:6
**own** [4] - 121:6, 128:17, 128:24, 172:20
**owned** [2] - 58:20, 72:22

**owner** [2] - 43:25, 73:3
**oxygen** [2] - 145:15, 148:3

P

**p.m** [6] - 25:19, 26:7, 26:8, 31:19, 31:24, 184:13
**P.O** [1] - 2:19
**pad** [1] - 96:22
**PAGE** [1] - 186:3
**pain** [5] - 91:6, 134:7, 134:10, 134:13, 155:22
**palm** [1] - 131:17
**paperwork** [16] - 6:11, 6:13, 6:15, 6:18, 6:25, 7:3, 35:9, 53:4, 133:3, 146:6, 151:13, 157:3, 165:8, 165:18, 165:19, 170:18
**parallel** [1] - 97:18
**parked** [4] - 43:8, 51:13, 57:7, 162:25
**parking** [7] - 37:4, 38:17, 162:11, 162:21, 162:22, 162:24
**Parkway** [10] - 58:16, 61:10, 71:12, 71:15, 71:21, 71:23, 90:12, 97:19, 100:15, 160:9
**parkway** [2] - 118:2, 140:10
**part** [9] - 9:11, 15:13, 29:13, 33:10, 62:5, 62:24, 130:18, 144:4, 181:9
**part-time** [1] - 15:13
**partially** [2] - 125:19, 125:20
**participated** [1] - 67:7
**particular** [45] - 8:12, 9:11, 9:20, 11:15, 12:24, 15:3, 26:10, 26:15, 29:16, 32:7, 32:14, 32:18, 32:19, 32:20, 32:22, 32:25, 33:7, 33:12, 33:22, 35:4, 35:6, 35:10, 35:11, 35:15, 35:25, 36:2, 36:11, 36:17, 36:19, 38:18, 39:3, 39:17, 49:15, 51:23, 56:23, 59:3, 59:8, 64:15, 68:7, 81:23, 82:8, 92:14, 93:3, 179:8, 179:10
**particularly** [3] - 27:15, 34:3, 39:15
**parties** [2] - 3:4, 187:16
**partner** [11] - 27:23, 28:2, 28:6, 33:17, 33:18, 33:20, 35:19, 36:7, 36:25, 39:14, 79:23
**parts** [1] - 155:25
**party** [2] - 22:2, 181:8
**passed** [9] - 57:6, 57:7, 58:5, 156:8, 156:12, 156:15, 156:20, 166:17, 182:11
**passenger** [10] - 34:25, 69:5, 69:15, 69:22, 79:6, 80:19, 80:21, 91:3, 97:19, 124:6
**passenger's** [1] - 72:14
**passing** [1] - 156:11
**past** [1] - 65:17
**PATRICIA** [1] - 1:3
**patrol** [10] - 9:22, 30:6, 30:17, 33:13, 34:6, 35:22, 36:7, 41:12, 133:16, 133:17
**patrolling** [1] - 183:14
**patrols** [1] - 9:21
**pedigree** [1] - 157:23
**pending** [2] - 5:20, 5:24
**Peninsula** [1] - 2:5
**people** [8] - 35:23, 36:13, 47:19, 146:11, 153:11, 154:2, 183:15
**perform** [1] - 62:25
**perhaps** [1] - 149:9
**period** [3] - 42:18, 133:20, 133:21
**person** [20] - 38:24, 39:4, 40:12, 46:9, 47:21, 47:23, 48:4, 48:16, 66:6, 66:9, 66:12, 67:14, 73:17, 74:4, 74:12, 119:25, 136:13, 157:21, 184:2
**personal** [1] - 131:9
**personally** [7] - 37:24, 39:24, 45:12, 50:16, 57:19, 113:24, 169:20
**personnel** [1] - 156:17
**pertaining** [1] - 170:19
**Perusing** [1] - 22:13
**phone** [2] - 39:10, 169:23
**photographed** [1] - 15:21
**photos** [6] - 158:6, 158:9, 160:16, 163:13, 163:17, 163:20
**physical** [5] - 90:20, 91:21, 125:10, 128:21, 129:5
**physically** [1] - 91:20
**pick** [1] - 168:25
**picked** [2] - 7:4, 124:22
**picture** [3] - 158:24, 159:4, 160:22
**pictures** [13] - 59:15, 158:13, 158:17, 159:8, 160:13, 160:14, 160:18, 163:23, 163:25, 164:3, 164:7, 164:8, 164:11
**pieces** [1] - 131:14
**Pine** [17] - 42:12, 42:16, 43:6, 50:8, 50:9, 51:6, 51:8, 51:15, 51:22, 51:24, 52:3, 53:11, 55:9, 56:15, 57:2, 62:14, 62:18
**place** [14] - 29:7, 57:11, 68:17, 94:13, 94:14, 99:10, 99:20, 122:3, 123:13, 125:5, 126:3, 127:9, 132:22, 136:13
**placed** [21] - 26:15, 113:16, 115:25, 123:12, 130:8, 131:4, 133:15, 134:5, 138:14, 138:15, 142:3, 142:12, 142:13, 142:14, 142:16, 143:10, 147:17, 152:15, 169:24, 172:19
**placing** [1] - 22:9
**plain** [1] - 184:5
**plaintiff** [8] - 4:19, 17:13, 17:18, 18:15, 20:2, 20:23, 23:9
**Plaintiffs** [2] - 1:4, 2:4
**plate** [6] - 43:13, 43:16, 43:18, 43:21, 59:9
**plates** [2] - 58:19, 59:5
**Plaza** [1] - 1:16
**pocket** [2] - 116:7, 122:6
**pockets** [1] - 107:20
**point** [79] - 36:14, 44:13, 44:17, 47:5, 50:7, 53:14, 56:11, 56:23, 58:7, 58:22, 77:7, 78:17, 80:6, 83:21, 84:9, 88:8, 88:17, 88:19, 89:20, 90:9, 91:8, 91:24, 92:6, 94:8, 96:13, 98:24, 100:4, 100:22, 101:11, 101:13, 101:19, 103:11, 103:15, 103:18, 105:4, 106:13, 106:19, 106:23, 107:3, 107:8, 107:25, 111:25, 113:12, 113:15, 115:24, 116:3, 117:12, 117:17, 118:11, 118:21, 118:24, 119:20, 123:19, 126:7, 128:5, 128:17, 128:19, 136:12, 136:17, 137:3, 137:7, 137:10, 139:2, 144:10, 144:17, 148:22, 148:24, 165:4, 165:6, 167:25, 168:24, 171:8, 177:16, 179:13, 179:17, 180:7, 180:13, 181:10, 182:17
**police** [44] - 9:25, 10:21, 10:24, 10:25, 12:16, 13:24, 14:2, 14:3, 14:11, 16:4, 16:18, 31:10, 34:13, 52:11, 52:12, 64:21, 64:25, 65:3, 67:20, 72:8, 72:11, 74:19, 74:21, 74:22, 75:9, 79:13, 80:14, 83:13, 86:19, 121:11, 121:19, 128:8, 128:9, 128:14, 128:24, 133:14, 140:3, 143:13, 154:18, 156:16, 157:18, 174:14, 175:11, 176:7
**Police** [30] - 4:11, 4:22, 9:6, 9:8, 10:4, 10:17, 10:19, 11:4, 12:15, 13:23, 14:14, 14:16, 14:24, 15:2, 15:10, 15:17, 16:7, 16:11, 16:19, 22:4, 24:11, 24:22, 25:8, 46:3, 47:24, 101:24, 165:25, 171:17, 174:17, 177:5
**POLICE** [7] - 1:5, 1:6, 1:7, 1:8, 1:8, 1:9
**Policing** [1] - 30:11
**portion** [9] - 61:9, 96:5, 96:6, 98:11, 102:22, 102:25, 103:13, 126:2, 126:16
**position** [4] - 13:6, 13:14, 15:23, 109:10
**positioned** [1] - 104:23
**possession** [2] - 6:20, 7:5
**possible** [2] - 92:13, 117:13
**possibly** [3] - 73:17, 77:3, 108:25
**power** [1] - 128:24
**precinct** [57] - 9:12, 11:11, 18:17, 23:2, 30:7, 30:20, 32:2, 40:6, 43:24, 48:21, 59:19, 59:22, 59:25, 75:9, 121:6, 130:21, 133:10, 133:12, 133:22, 135:11, 135:23, 136:10, 137:2, 137:5, 137:6, 137:14, 139:23, 139:25, 141:19, 142:2, 142:5, 143:14, 143:17, 144:7, 144:13, 146:23, 147:9, 147:20, 148:8, 151:7, 154:14, 155:12, 156:24, 157:2, 157:6, 157:19, 158:7, 158:10, 159:18, 160:11, 161:15, 162:9, 162:13, 165:13, 165:16, 168:19, 168:23
**Precinct** [8] - 4:12, 16:13, 26:23, 119:19, 130:23, 140:14, 161:17, 163:5
**precincts** [2] - 12:12, 121:5
**preliminary** [3] - 38:2, 38:3, 95:8
**prep** [2] - 52:20, 163:18
**preparation** [4] - 6:8, 7:22, 52:23, 133:5
**prepare** [4] - 166:23, 167:9, 168:4, 168:6
**prepared** [4] -

196

166:13, 166:19, 169:17, 170:19
preparing [1] - 168:12
prepped [1] - 176:18
presence [1] - 144:22
PRESENT [1] - 2:18
present [2] - 4:10, 8:7
presentation [2] - 178:12, 178:14
presently [1] - 9:13
presentment [1] - 176:4
pretty [3] - 106:5, 118:7, 127:16
primary [3] - 59:7, 119:19, 121:23
priority [1] - 30:17
prisoner [1] - 136:3
prisoners [1] - 13:10
problem [1] - 157:14
problems [2] - 135:12, 148:2
procedures [2] - 86:20, 167:21
proceed [1] - 51:11
proceeded [6] - 18:19, 20:5, 51:12, 58:8, 65:17, 72:3
proceeding [1] - 176:16
process [1] - 101:9
processing [5] - 157:18, 157:20, 164:22, 164:24, 165:3
professional [1] - 8:21
provide [1] - 170:2
Public [4] - 1:21, 4:4, 185:23, 187:8
pull [2] - 48:22, 49:3
pulled [3] - 77:17, 78:7, 83:12
purpose [4] - 11:19, 36:3, 152:11, 168:22
purposes [1] - 181:18
pursuant [10] - 1:20, 29:10, 142:8, 159:9, 160:8, 160:10, 169:9, 170:5, 170:8, 172:14
push [1] - 78:14
pussies [1] - 129:22
put [7] - 86:13, 86:15, 102:16, 105:20, 106:17, 141:25, 143:6

Q

qualifying [1] - 174:5
quantity [1] - 131:7
quarter [1] - 51:16
questioning [1] - 16:22
questions [25] - 6:4, 80:23, 80:24, 81:5, 81:8, 81:22, 81:24, 81:25, 82:4, 82:7, 82:8, 82:12, 88:11, 88:24, 89:6, 89:9, 93:4, 147:2, 169:16, 169:18, 170:14, 178:5, 178:11, 183:5, 184:12
quickly [1] - 76:18

R

R&Ps [2] - 167:10, 167:20
radio [16] - 52:11, 52:12, 52:16, 52:19, 55:21, 56:3, 57:20, 57:24, 58:3, 59:7, 75:4, 116:5, 119:24, 121:19, 122:14, 124:24
radios [1] - 43:2
raise [1] - 95:17
ran [6] - 43:20, 100:13, 103:24, 116:14, 117:9, 119:4
rank [3] - 9:24, 10:14, 25:11
ranks [3] - 10:10, 10:17, 10:25
reach [2] - 111:9, 117:14
read [7] - 23:6, 23:7, 23:12, 23:18, 153:22, 153:24, 185:8
realize [1] - 119:20
realized [1] - 119:17
really [3] - 11:17, 68:21, 97:12
REALTIME [1] - 1:23
rear [2] - 79:6, 87:12
reason [18] - 5:18, 36:3, 57:23, 59:4, 59:8, 62:23, 62:24, 64:15, 66:8, 77:16, 86:12, 145:19, 146:7, 146:15, 167:2, 167:8, 179:10, 179:14
reasons [1] - 66:11
received [13] - 11:24, 22:25, 23:4, 24:8, 24:16, 24:22, 24:24, 37:2, 38:16, 39:7, 39:20, 160:19, 180:16
receiving [2] - 12:2, 23:20
recently [1] - 87:15
recertifications [1] - 173:23
recess [5] - 6:23, 94:25, 108:14, 154:11, 174:10
record [19] - 30:8, 31:16, 31:17, 63:20, 84:20, 86:3, 86:7, 87:3, 94:22, 94:23, 128:25, 152:12, 152:13, 163:11, 163:12, 181:15, 185:11, 185:12, 187:13
Record [1] - 153:24
recorded [2] - 35:13, 52:13
recording [1] - 59:16
recordings [1] - 52:16
records [1] - 35:3
recovered [8] - 7:18, 131:8, 132:10, 132:14, 132:16, 132:18, 180:2, 182:9
red [2] - 50:10, 50:15
reference [3] - 6:19, 7:17, 157:4
referred [1] - 6:24
referring [7] - 6:15, 7:8, 7:13, 7:21, 63:21, 163:24, 173:22
regard [2] - 84:13, 157:22
regarded [1] - 151:17
regarding [41] - 23:17, 23:23, 24:18, 35:4, 38:4, 40:5, 40:21, 43:13, 45:15, 45:21, 46:8, 46:21, 47:2, 47:22, 48:17, 50:4, 50:25, 73:12, 73:16, 77:3, 85:16, 85:23, 89:9, 122:14, 122:18, 135:8, 138:8, 149:25, 150:5, 156:10, 168:8, 169:4, 169:5, 169:23, 170:14, 172:16, 175:7, 175:13, 176:3, 176:7, 177:25
regulations [1] - 136:2
related [7] - 6:25, 23:14, 27:6, 27:20, 165:8, 172:9, 187:16
relation [6] - 37:12, 94:17, 102:6, 104:23, 109:8, 161:19
release [1] - 98:22
released [2] - 99:5, 100:9
relevant [4] - 5:3, 85:24, 86:14, 86:24
remain [1] - 133:16
remember [11] - 56:23, 83:18, 84:12, 84:14, 87:22, 108:18, 127:12, 137:13, 137:18, 137:19, 137:20
rephrase [2] - 5:15
Report [10] - 165:23, 166:6, 166:8, 166:13, 166:20, 166:24, 167:9, 167:12, 168:4, 168:7
report [11] - 6:16, 7:10, 145:23, 145:25, 166:10, 169:24, 170:4, 175:17, 175:19, 178:20
reporter [1] - 5:11
REPORTING [1] - 1:23
Reports [1] - 166:3
reports [2] - 7:14, 43:23
represent [1] - 4:18
representing [1] - 1:12
reprimanded [1] - 173:7
request [4] - 64:9, 119:11, 159:23, 168:20
requests [1] - 44:4
research [2] - 38:12, 40:4
researching [1] - 38:20
reserved [1] - 3:11
respect [29] - 5:22, 17:3, 18:8, 19:24, 21:17, 22:14, 28:19, 37:25, 43:24, 45:12, 46:10, 49:5, 69:6, 69:9, 70:5, 77:12, 83:4, 83:5, 90:19, 92:4, 99:15, 107:24, 138:12, 161:11, 162:20, 166:13, 174:11, 178:11, 178:12
respective [1] - 3:4
respond [9] - 24:23, 82:11, 82:16, 85:2, 105:22, 105:25, 113:2, 134:22, 137:11
responded [3] - 83:8, 141:7, 168:19
responding [3] - 36:18, 36:20, 168:23
response [2] - 76:24, 93:2
responses [1] - 5:9
result [8] - 62:13, 136:13, 146:17, 146:22, 172:7, 172:10, 173:12, 173:25
retained [1] - 186:12
retraining [2] - 173:19, 174:3
return [1] - 165:13
returned [2] - 94:13, 165:16
returning [2] - 123:11, 145:18
review [7] - 6:7, 6:10, 52:23, 53:6, 122:20, 122:25, 151:13
reviewed [6] - 53:3, 53:4, 122:14, 122:17, 133:5, 168:11
reviews [1] - 151:19
RICHARD [2] - 1:6, 2:16
ring [1] - 45:9
Riverhead [1] - 13:3
road [14] - 42:13, 50:11, 58:11, 60:12, 60:16, 61:20, 61:21, 61:23, 82:17, 179:9, 179:25, 180:8, 184:7
Road [2] - 58:15, 61:9
roadway [1] - 100:16
robberies [2] - 27:11, 27:15
Robert [10] - 58:13, 61:24, 149:23, 149:25, 150:9, 151:25, 152:4, 152:6, 152:9, 152:10
roll [1] - 150:18
Ronkonkoma [1] - 15:14
Room [2] - 135:12, 135:15
room [5] - 142:14, 142:18, 144:5, 157:7, 157:12
rooms [1] - 162:18
rules [3] - 5:8, 136:2, 167:20
run [9] - 58:19, 59:5,

59:9, 93:14, 97:15, 97:17, 98:6, 100:12, 116:5
**running** [13] - 43:18, 75:2, 75:4, 97:18, 98:3, 98:23, 100:13, 119:22, 120:9, 121:18, 148:11, 148:23, 159:25
**runs** [4] - 52:13, 52:16, 52:19, 122:14

**S**

**safe** [3] - 112:16, 113:2, 113:6
**safer** [1] - 64:20
**safety** [2] - 112:17, 119:11
**sale** [5] - 6:25, 56:9, 77:11, 77:13, 180:24
**sales** [4] - 37:14, 38:17, 92:14, 183:15
**sat** [1] - 5:4
**Saturday** [1] - 26:7
**saw** [26] - 41:16, 41:18, 41:19, 41:22, 42:3, 43:7, 44:11, 54:24, 60:24, 65:11, 78:2, 78:8, 90:16, 92:5, 95:14, 98:22, 141:22, 141:24, 145:15, 145:17, 148:11, 148:23, 166:17, 182:6, 182:7, 183:23
**scars** [1] - 126:13
**Scene** [15] - 11:8, 11:11, 11:14, 11:20, 12:3, 12:7, 12:10, 158:25, 159:10, 159:14, 159:20, 159:22, 159:25, 160:3, 164:2
**scene** [25] - 128:3, 128:6, 128:10, 133:18, 133:19, 134:16, 134:20, 134:23, 135:18, 137:11, 137:12, 137:22, 138:13, 138:19, 139:4, 139:12, 139:17, 139:19, 140:6, 141:4, 141:8, 144:14, 146:17, 160:9, 161:22
**scenes** [2] - 12:5, 15:21
**schedule** [1] - 25:24
**Science** [1] - 8:19
**SCIMONE** [1] - 1:7
**Scimone** [71] - 2:21, 24:11, 24:12, 25:3, 50:20, 50:21, 50:25, 63:22, 63:23, 63:24, 64:2, 69:5, 69:8, 69:11, 69:14, 69:21, 70:4, 72:8, 72:13, 75:21, 75:25, 76:6, 76:9, 76:14, 76:17, 76:19, 76:24, 77:3, 78:11, 78:13, 78:23, 79:9, 89:11, 89:12, 89:14, 89:16, 89:20, 89:23, 90:3, 93:19, 93:20, 95:9, 95:12, 95:14, 95:17, 99:11, 101:18, 105:3, 105:5, 105:8, 105:11, 106:9, 107:3, 110:25, 111:5, 111:8, 111:12, 111:17, 112:2, 112:6, 116:9, 120:10, 122:5, 123:16, 123:17, 124:4, 124:5, 160:25, 161:2, 161:8, 180:8
**scrape** [1] - 126:21
**scuffle** [18] - 99:19, 112:12, 115:24, 117:18, 120:7, 122:2, 122:11, 123:3, 123:7, 123:9, 126:3, 127:9, 135:3, 135:22, 136:4, 136:12, 136:14, 140:24
**scuffles** [1] - 143:13
**sealing** [1] - 3:5
**search** [9] - 18:17, 20:24, 21:2, 31:2, 32:17, 95:4, 95:8, 95:10, 95:13
**searched** [1] - 77:7
**searching** [2] - 77:3, 179:8
**seat** [1] - 134:3
**seated** [2] - 133:17, 137:17
**second** [2] - 19:24, 181:9
**seconds** [1] - 104:14
**Section** [1] - 14:23
**see** [55] - 5:10, 7:17, 22:18, 22:21, 24:15, 39:18, 41:13, 41:18, 44:13, 44:17, 48:23, 49:6, 49:23, 49:25, 50:14, 50:16, 60:6, 60:12, 61:18, 65:8, 66:7, 66:10, 66:12, 66:24, 67:10, 67:14, 69:20, 70:2, 70:4, 70:7, 70:9, 76:21, 80:3, 85:18, 89:19, 90:23, 98:21, 98:24, 101:17, 102:11, 102:12, 105:2, 107:21, 109:3, 110:17, 110:18, 115:3, 118:22, 123:14, 125:13, 125:15, 126:25, 163:16, 166:16, 182:14
**seeing** [2] - 55:24, 89:18
**seem** [1] - 66:14
**sense** [13] - 28:21, 113:22, 114:4, 114:5, 114:7, 114:9, 114:10, 115:6, 115:12, 115:13, 115:18, 115:19, 118:25
**sent** [4] - 6:18, 22:23, 173:18, 174:2
**separate** [7] - 7:5, 33:19, 35:18, 35:19, 35:21, 41:25, 160:4
**Sergeant** [9] - 28:9, 149:10, 149:13, 150:9, 151:6, 151:12, 151:20, 151:21, 152:10
**sergeant** [7] - 63:10, 63:13, 63:20, 63:22, 68:24
**serve** [2] - 10:20, 62:18
**served** [5] - 8:24, 12:6, 13:2, 177:18, 177:21
**service** [7] - 42:13, 50:11, 58:10, 58:11, 61:19, 61:20, 61:23
**serving** [1] - 10:23
**set** [7] - 32:4, 124:15, 124:17, 124:25, 169:15, 187:12, 187:21
**seven** [1] - 121:5
**sgt** [1] - 69:4
**Sgt** [69] - 2:21, 24:11, 25:3, 50:20, 50:25, 63:23, 63:24, 64:2, 69:8, 69:10, 69:14, 69:21, 70:4, 72:8, 72:13, 75:21, 75:24, 76:6, 76:9, 76:14, 76:17, 76:18, 76:24, 77:3, 77:23, 78:11, 78:12, 78:23, 79:9, 80:11, 89:11, 89:12, 89:14, 89:15, 89:19, 89:23, 90:3, 93:19, 93:20, 95:9, 95:12, 95:14, 95:17, 99:11, 101:18, 105:3, 105:5, 105:8, 105:11, 106:9, 107:3, 110:25, 111:5, 111:8, 111:12, 111:17, 112:2, 112:6, 116:9, 120:10, 122:5, 123:16, 123:17, 124:5, 151:25, 160:25, 161:2, 161:8, 180:8
**shall** [1] - 3:11
**Sheriff** [2] - 12:19, 13:2
**Sheriff's** [5] - 13:19, 14:4, 14:10, 14:19, 14:21
**shirt** [3] - 126:4, 126:6, 126:10
**shoes** [2] - 127:11, 127:13
**Shore** [4] - 4:12, 9:19, 58:15, 61:9
**short** [2] - 42:17, 133:20
**shots** [2] - 157:25, 164:15
**shoulder** [15] - 61:8, 91:15, 96:3, 96:4, 96:6, 96:7, 96:8, 96:11, 96:14, 96:17, 96:19, 96:21, 96:23, 96:25, 100:2
**show** [2] - 159:6, 162:24
**shown** [1] - 180:9
**side** [27] - 37:4, 57:4, 69:14, 69:15, 69:23, 72:9, 72:14, 72:15, 75:22, 79:6, 80:20, 80:22, 91:4, 93:23, 97:19, 98:9, 105:5, 111:3, 111:14, 117:25, 131:5, 139:3, 140:10, 179:9, 179:24, 180:8, 184:6
**sign** [2] - 32:2, 61:21
**signed** [2] - 3:15, 3:18
**Signed** [1] - 185:20
**siren** [1] - 34:16
**sit** [9] - 26:4, 31:13, 54:20, 77:22, 77:25, 78:4, 132:5, 142:22, 143:3
**sitting** [6] - 68:9, 68:12, 75:23, 88:17, 134:3, 137:8
**situated** [2] - 71:9, 162:9
**situation** [6] - 113:17, 118:8, 127:16, 151:16, 156:5, 175:14
**situations** [1] - 36:10
**six** [3] - 11:9, 12:9, 17:7
**sixteen** [1] - 10:6
**skills** [1] - 29:16
**slash** [1] - 58:15
**slight** [1] - 93:16
**small** [2] - 107:13, 156:2
**Social** [1] - 8:19
**someone** [1] - 145:19
**sometime** [1] - 107:25
**somewhere** [3] - 71:12, 96:20, 132:11
**soon** [1] - 104:13
**Sorry** [1] - 87:14
**sorry** [6] - 12:18, 56:12, 61:20, 74:8, 83:25, 137:19
**sort** [13] - 27:11, 27:16, 34:21, 35:8, 47:2, 54:8, 56:25, 92:6, 92:19, 102:2, 159:9, 164:22, 167:15
**sorting** [2] - 146:5, 165:10
**sounded** [1] - 159:24
**sounds** [1] - 134:10
**sources** [1] - 36:13
**south** [1] - 58:11
**Southampton** [2] - 8:6, 8:14
**Southern** [11] - 58:15, 61:10, 65:16, 71:12, 71:14, 71:21, 71:23, 90:11, 97:19, 100:15, 160:9
**Southside** [18] - 152:16, 152:21, 152:25, 153:3, 153:5, 153:7, 153:10, 153:12, 154:3, 154:5, 154:8, 155:6, 155:7, 155:14, 155:17, 156:6, 156:7, 164:5
**speaking** [4] - 63:19, 63:23, 63:24, 73:22
**Special** [1] - 9:15
**specialized** [3] - 11:5, 31:6, 31:8
**specific** [12] - 25:24, 26:14, 27:10, 32:4, 37:14, 49:10, 49:11, 82:18, 82:21, 88:11, 97:12, 174:3
**specifically** [10] - 47:18, 49:22, 51:20,

83:4, 144:16, 155:20, 156:10, 159:14, 159:15, 175:20
spoken [2] - 105:14, 141:15
spot [5] - 79:18, 79:20, 80:2, 87:16, 139:15
SPOTA [1] - 1:11
squad [6] - 9:12, 144:5, 148:10, 150:13, 151:18, 151:19
Squad [13] - 9:14, 9:17, 9:21, 18:10, 26:19, 26:21, 27:14, 28:24, 38:11, 135:12, 135:15, 142:14, 142:17
ss [2] - 185:4, 187:4
stand [1] - 30:9
standing [8] - 76:2, 76:10, 78:23, 84:22, 131:5, 158:20, 159:4, 160:22
stands [2] - 9:14, 113:8
start [1] - 78:14
started [12] - 80:22, 88:10, 93:14, 98:23, 100:12, 100:13, 107:20, 143:20, 148:17, 157:3, 165:17, 168:16
State [14] - 1:21, 58:16, 61:10, 65:17, 71:12, 71:15, 71:21, 71:23, 90:11, 97:19, 100:15, 160:9, 185:23, 187:8
STATE [2] - 185:4, 187:3
state [2] - 4:8, 136:2
STATES [1] - 1:2
stayed [1] - 156:23
staying [1] - 112:16
still [20] - 13:21, 18:23, 72:13, 79:13, 79:17, 98:8, 101:14, 109:16, 118:25, 121:12, 123:15, 123:17, 125:11, 126:6, 127:17, 127:18, 129:18, 129:19, 139:4, 156:22
STIPULATED [3] - 3:2, 3:8, 3:13
stop [50] - 48:23, 50:13, 52:3, 53:16, 54:8, 54:12, 60:24, 61:14, 61:19, 61:21, 61:22, 62:12, 62:19, 62:23, 62:25, 63:3, 63:4, 63:8, 63:11, 64:6, 64:13, 64:16, 64:17, 64:19, 64:22, 65:6, 65:8, 65:11, 65:25, 66:14, 66:15, 66:20, 66:21, 67:8, 67:18, 68:5, 68:7, 68:8, 68:17, 68:20, 68:25, 69:7, 72:4, 77:18, 84:11, 98:2, 113:15, 179:16, 179:18, 181:19
stopped [16] - 50:10, 53:15, 61:5, 61:7, 61:8, 61:13, 62:11, 65:17, 65:21, 71:5, 80:8, 97:24, 97:25, 98:7, 180:18, 184:6
Stoppers [1] - 39:11
stopping [2] - 50:12, 66:4
stops [8] - 31:4, 47:11, 47:15, 50:9, 50:15, 50:17, 62:3, 62:6
Store [1] - 15:13
straight [1] - 135:22
street [6] - 26:25, 32:16, 33:11, 57:4, 76:20, 183:15
Street [20] - 1:24, 42:12, 42:16, 43:6, 50:8, 50:9, 51:6, 51:8, 51:12, 51:14, 51:15, 51:22, 51:24, 52:3, 53:11, 55:9, 56:15, 57:2, 62:14, 62:18
streets [3] - 33:14, 37:4, 37:5
stretcher [1] - 154:15
strides [1] - 98:8
strike [3] - 98:25, 113:21, 113:24
striking [2] - 118:22, 179:14
strip [1] - 18:17
strobe [1] - 34:25
strobes [1] - 34:22
struck [1] - 119:2
study [1] - 8:13
stuff [3] - 7:11, 7:13, 173:24
subdued [1] - 126:25
subject [7] - 37:2, 38:21, 40:17, 44:9, 171:18, 178:13, 178:22
subjects [2] - 36:9, 37:3
submit [2] - 170:17, 179:4
submitted [2] - 6:11, 6:14
subscribed [1] - 185:20
subsequent [1] - 7:20
substance [3] - 18:14, 20:22, 23:23
substances [1] - 6:3
sued [1] - 16:17
SUFFOLK [5] - 1:5, 1:10, 1:10, 2:11
Suffolk [31] - 1:13, 1:14, 4:11, 4:21, 9:6, 9:8, 10:4, 10:17, 11:4, 12:15, 12:22, 13:22, 14:14, 14:16, 14:23, 15:2, 15:10, 15:16, 16:8, 16:11, 16:18, 22:4, 25:8, 46:3, 47:24, 165:25, 171:17, 174:16, 174:17, 177:4
suit [1] - 20:2
Suite [1] - 1:24
sum [3] - 18:13, 20:21, 23:23
Sunrise [3] - 37:5, 41:20, 58:11
superiors [2] - 176:2, 176:3
supervisor [2] - 33:2, 33:4
supervisors [1] - 150:5
supervisory [1] - 15:22
supplemental [1] - 6:16
supplementary [2] - 175:17, 178:19
supply [4] - 170:3, 175:12, 175:16, 175:22
supposed [1] - 167:13
Supreme [1] - 18:20
surveillance [11] - 32:17, 52:6, 56:7, 56:14, 56:15, 56:19, 162:2, 162:5, 162:8, 163:4, 163:9
surveillances [2] - 26:24, 26:25
surveilling [3] - 58:18, 63:25, 80:7
surveyed [1] - 89:23
surveying [1] - 90:3
suspect [5] - 50:14, 66:24, 74:9, 74:13, 92:6
suspended [2] - 173:16, 180:4
SWAT [1] - 11:6
sweater [1] - 125:23
sweatshirt [1] - 125:23
sworn [4] - 3:15, 3:18, 4:3, 187:12
symbols [1] - 34:13
SYSKROT [2] - 187:7, 187:25
Syskrot [1] - 1:21

T

T-shirt [3] - 126:4, 126:6, 126:10
table [1] - 5:20
tackle [2] - 102:3, 102:14
tackled [1] - 109:11
TALT [1] - 1:9
Talt [114] - 2:20, 24:10, 24:14, 24:22, 25:3, 28:4, 28:5, 28:9, 33:21, 36:25, 37:6, 37:13, 38:7, 40:8, 40:13, 41:23, 42:6, 42:14, 42:21, 42:24, 43:4, 43:20, 44:25, 45:6, 45:10, 45:15, 45:20, 48:2, 48:12, 48:15, 48:22, 49:17, 50:4, 51:9, 51:18, 51:21, 51:24, 52:5, 52:7, 52:10, 53:10, 53:12, 53:23, 53:24, 54:4, 54:5, 54:11, 54:17, 54:21, 55:9, 55:15, 55:20, 55:23, 56:8, 56:14, 56:18, 56:19, 56:24, 57:8, 60:2, 60:5, 62:13, 62:17, 64:7, 64:9, 64:12, 65:21, 66:4, 66:9, 66:24, 71:4, 71:8, 71:11, 71:22, 77:10, 77:23, 77:24, 78:2, 79:16, 80:12, 99:15, 99:16, 112:10, 112:13, 112:15, 113:11, 113:14, 113:18, 119:17, 119:21, 120:4, 120:11, 120:14, 120:15, 121:17, 128:6, 128:11, 133:11, 133:12, 137:10, 137:16, 137:20, 138:2, 138:8, 140:2, 140:7, 140:15, 140:18, 143:25, 157:14, 181:11, 182:6, 182:11
Talt's [3] - 65:15, 140:5, 144:11
taped [1] - 159:7
tapes [3] - 53:3, 53:5
tasers [1] - 129:2
team [1] - 28:8
Team [1] - 9:16
Tech [1] - 16:3
Technician [2] - 15:4, 15:16
ten [5] - 10:22, 61:3, 173:7, 173:8, 173:9
terms [5] - 25:25, 55:4, 55:6, 55:10, 141:13
testified [7] - 4:5, 84:9, 109:24, 116:16, 140:24, 167:16, 182:23
testify [1] - 178:16
testimony [13] - 15:20, 19:8, 49:20, 77:9, 77:13, 92:23, 124:24, 125:3, 176:19, 177:10, 185:9, 185:12, 187:14
tests [1] - 7:19
third [1] - 145:4
Third [23] - 4:12, 9:14, 9:17, 9:21, 12:12, 16:13, 18:10, 18:12, 26:19, 26:21, 26:23, 27:14, 28:24, 38:11, 119:19, 130:23, 140:13, 142:14, 142:17, 161:17, 162:3, 163:5, 163:8
THOMAS [1] - 1:11
Thomas [1] - 28:12
three [5] - 12:19, 13:15, 28:8, 33:25, 144:15
three-man [1] - 28:8
threw [3] - 92:24, 93:11, 99:25
throwing [4] - 91:17, 92:21, 93:8, 95:2
thrown [2] - 94:18, 100:21
throws [1] - 91:14
thumb [3] - 155:19, 155:21, 155:23
thumbs [3] - 57:14, 57:15, 182:11
tickets [2] - 180:16, 180:19

tints [1] - 44:6
tips [1] - 39:10
title [2] - 15:3, 25:12
titles [2] - 10:17, 10:24
today [15] - 4:24, 6:5, 6:8, 7:23, 18:22, 26:5, 31:14, 52:24, 77:25, 78:4, 84:10, 132:5, 133:6, 142:22, 143:3
together [5] - 28:7, 52:22, 69:2, 116:11, 116:12
took [19] - 29:7, 35:10, 35:15, 57:17, 103:25, 104:3, 107:4, 107:16, 107:19, 107:22, 108:4, 110:6, 110:15, 127:9, 136:13, 158:19, 158:23, 160:5, 163:24
top [5] - 101:25, 103:12, 103:16, 103:19, 104:25
total [3] - 52:23, 60:16, 122:10
tour [9] - 25:17, 25:20, 25:21, 26:9, 33:16, 38:5, 39:13, 41:4, 45:16
tours [1] - 25:25
towards [8] - 90:11, 91:13, 91:14, 100:15, 101:15, 116:5, 129:5, 162:23
Town [1] - 9:22
traffic [20] - 31:3, 60:24, 61:16, 61:17, 62:2, 62:6, 62:25, 63:3, 63:4, 63:11, 64:6, 64:19, 64:22, 66:13, 66:15, 67:7, 68:5, 68:7, 68:8
trailing [1] - 55:5
train [4] - 86:22, 87:2, 87:4, 87:5
trained [2] - 86:17, 86:19
training [7] - 11:17, 11:21, 11:24, 12:3, 29:13, 173:21, 173:23
transaction [20] - 54:14, 54:18, 56:25, 62:17, 62:22, 73:18, 74:13, 77:21, 78:3, 78:8, 84:2, 181:6, 181:20, 181:22, 181:24, 181:25, 182:8, 182:19, 182:21, 183:3
transcript [2] - 185:8, 185:10
transfer [1] - 29:3
transferred [2] - 28:25, 29:6
transport [3] - 13:10, 137:21, 143:7
Transportation [3] - 13:4, 13:6, 13:9
transportation [1] - 13:12
transported [10] - 133:9, 133:11, 133:22, 135:4, 135:9, 137:14, 138:19, 139:23, 139:24, 140:13
transporting [1] - 150:14
treated [6] - 155:19, 156:22, 160:20, 161:4, 161:9, 161:24
treatment [2] - 91:9, 155:25
trial [8] - 3:12, 19:4, 19:6, 19:9, 20:16, 21:6, 21:7, 163:18
tried [5] - 97:6, 97:8, 97:9, 97:11, 110:21
true [3] - 185:11, 185:13, 187:13
try [4] - 64:18, 97:10, 105:6, 183:25
trying [14] - 43:25, 97:13, 97:15, 97:16, 104:16, 105:11, 106:13, 106:16, 107:7, 108:21, 117:14, 123:18, 126:24, 146:6
Tuesday [1] - 26:6
turned [1] - 90:10
turning [1] - 123:20
twenty [1] - 173:2
twice [1] - 17:2
Two [1] - 66:13
two [11] - 20:16, 21:22, 26:8, 26:9, 35:23, 55:13, 116:11, 144:15, 147:2
type [9] - 89:2, 102:14, 143:21, 144:20, 145:22, 157:14, 157:15, 179:22, 180:2
typically [1] - 62:2

U

under [11] - 105:19, 116:19, 116:25, 117:23, 118:10, 118:13, 127:16, 172:12, 179:23, 183:21, 185:9
undergo [2] - 29:12, 155:24
understood [1] - 132:24
underwent [1] - 8:13
unidentified [1] - 1:13
uniform [6] - 30:6, 130:12, 130:14, 151:10, 151:14, 151:17
uniformed [3] - 31:7, 64:19, 148:3
unit [9] - 27:14, 28:25, 30:6, 31:6, 31:8, 46:12, 64:21, 128:2, 183:9
Unit [14] - 28:20, 30:16, 63:5, 63:6, 64:23, 80:15, 119:7, 127:15, 127:24, 128:2, 133:10, 167:6, 167:7, 176:11
UNITED [1] - 1:2
units [3] - 11:5, 27:3, 46:6
university [1] - 8:18
unknown [1] - 1:12
unlawful [1] - 90:16
unmarked [4] - 34:7, 34:8, 130:16, 133:14
Unusual [2] - 165:22, 166:3
up [42] - 7:4, 27:12, 30:18, 35:18, 38:19, 57:14, 57:15, 67:2, 67:4, 67:20, 75:14, 75:19, 82:17, 86:15, 103:24, 104:4, 104:13, 115:10, 116:24, 117:2, 117:3, 117:6, 117:7, 118:11, 118:18, 118:22, 118:24, 124:22, 128:16, 128:20, 142:24, 143:4, 145:14, 156:4, 158:20, 159:7, 160:22, 160:23, 168:25, 169:18, 172:8, 182:12
upper [5] - 96:5, 96:17, 96:19, 96:23, 126:2
ups [1] - 178:7
upset [1] - 115:17

V

vacation [1] - 173:9
valid [1] - 73:6
vehicle [123] - 31:2, 33:22, 34:3, 35:4, 35:5, 35:10, 35:15, 42:20, 43:25, 48:23, 49:5, 49:14, 49:15, 49:18, 49:22, 49:23, 49:25, 50:5, 50:8, 50:9, 50:13, 50:15, 52:5, 53:11, 53:15, 54:16, 55:16, 55:25, 58:18, 58:19, 58:20, 61:5, 61:7, 62:8, 62:12, 62:19, 63:16, 64:10, 64:24, 65:15, 69:9, 71:9, 72:9, 72:22, 73:2, 73:4, 73:23, 75:14, 75:15, 75:23, 76:20, 77:4, 77:7, 77:17, 77:18, 77:20, 78:6, 78:13, 78:18, 78:24, 79:4, 79:6, 79:7, 79:12, 79:14, 80:3, 80:7, 80:8, 80:19, 80:20, 80:22, 83:13, 83:14, 87:12, 88:14, 88:17, 89:17, 89:21, 92:14, 93:23, 95:4, 95:7, 95:10, 95:13, 95:15, 95:19, 97:20, 98:9, 102:7, 102:9, 116:15, 120:5, 121:25, 122:2, 123:12, 123:23, 123:24, 124:3, 124:11, 124:12, 124:15, 124:19, 124:21, 130:16, 130:17, 131:4, 133:14, 134:6, 137:8, 137:17, 139:23, 139:24, 140:2, 140:3, 140:5, 140:7, 140:13, 140:15, 140:16, 179:8, 184:5
vehicles [5] - 33:25, 34:2, 47:18, 59:5, 59:11
verbal [1] - 5:10
verbally [3] - 105:23, 105:24, 169:11
Veterans [1] - 2:14
via [5] - 22:23, 39:10, 45:7, 55:20, 75:4
vicinity [2] - 93:22, 94:3
video [2] - 163:4, 163:9
view [2] - 50:5, 184:5
viewed [1] - 122:22
VIN [1] - 172:22
violations [2] - 62:8, 62:9
virtue [1] - 178:21
visor [1] - 35:2
visors [1] - 34:25
visual [2] - 59:15, 112:23
voluntarily [1] - 78:19

W

waist [4] - 98:5, 98:14, 102:5, 104:21
wait [1] - 67:22
waited [2] - 67:19, 70:21
waiting [1] - 67:25
waived [1] - 3:7
waiver [1] - 178:16
walk [2] - 128:17, 128:23
walked [6] - 67:20, 75:14, 75:19, 79:5, 80:19, 91:3
walking [3] - 72:6, 129:4, 132:3
warrant [2] - 20:25, 21:2
warrants [2] - 31:2, 32:17
watch [1] - 148:16
wearing [3] - 87:23, 125:22, 126:2
West [7] - 36:20, 41:21, 42:13, 51:12, 51:14, 61:20, 61:21
Westhampton [1] - 141:20
wherein [4] - 135:3, 147:8, 154:19, 160:11
WHEREOF [1] - 187:20
whole [3] - 115:16, 159:5, 175:14
WILLIAM [1] - 1:8
wILLIAM [1] - 2:9
William [1] - 2:19
Williams [6] - 149:23, 149:25, 152:4, 152:9, 152:12, 166:22
window [1] - 75:22
Wisely [3] - 28:12, 28:13, 28:17
withdrawn [15] - 10:9, 13:7, 14:8, 16:6, 48:10, 59:20, 97:22,

100:8, 111:23, 123:22, 137:9, 138:23, 155:16, 169:8, 172:6
**WITNESS** [2] - 186:3, 187:20
**witness** [6] - 4:3, 74:4, 74:7, 96:16, 187:11, 187:14
**witnessed** [2] - 73:24, 77:11
**words** [7] - 32:6, 82:18, 82:21, 99:20, 105:14, 124:14, 160:3
**workings** [1] - 151:6
**works** [4] - 30:7, 130:22, 130:23, 161:16
**wrap** [1] - 98:12
**wrapped** [1] - 131:13
**wrist** [3] - 116:8, 122:9
**write** [4] - 84:16, 84:19, 87:8, 170:13
**writing** [3] - 132:23, 167:14, 172:19
**writings** [1] - 132:24
**written** [7] - 29:2, 29:3, 35:9, 169:14, 169:24, 170:4, 170:15

Y

**Yaphank** [1] - 16:4
**yards** [1] - 65:13
**year** [12] - 8:5, 8:10, 13:17, 13:18, 14:15, 17:4, 17:8, 20:13, 20:16, 22:20, 29:19, 172:23
**years** [8] - 9:10, 10:6, 10:22, 13:17, 15:5, 17:7, 20:17, 173:2
**yell** [3] - 108:3, 108:6, 112:6
**yelled** [2] - 109:7, 110:24
**yelling** [4] - 87:24, 105:19, 105:24, 117:15
**yells** [1] - 112:2
**yesterday** [2] - 166:18, 167:19
**YORK** [3] - 1:2, 185:4, 187:3
**York** [8] - 1:17, 1:21, 1:24, 2:6, 2:15, 4:13, 185:23, 187:9
**yourself** [9] - 4:23, 17:21, 20:7, 63:2, 64:17, 74:6, 79:8,
105:15, 166:23

# EXHIBIT Q

# GONZALEZ -V- COUNY OF SUFFOLK

# CHRISTOPHER TALT– 5/3/11

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**REALTIME REPORTING, INC.**
**124 East Main Street**
**Suite 202**
**Babylon, New York   11702**
**Phone:  (516) 938-4000**
**Fax:  (631) 983-8938**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------x
PATRICIA GONZALEZ and JENNIFER GONZALEZ, , individually and as co-administrators of the Estate of KENNY LAZO,
Plaintiffs,

- against -

COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity , POLICE OFFICE CHRISTOPHER TALK, in his individual and official capacity, POLICE OFFICER JOSEPH LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney),
Defendants.
---------------------------------------------x
100 Federal Court Plaza
Central Islip, New York

May 3, 2011
10:14 a.m.

(Continued)

REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702
516-938-4000
www.realtimereporting.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------x
PATRICIA GONZALEZ and JENNIFER GONZALEZ, , individually and as co-administrators of the Estate of KENNY LAZO,
Plaintiffs,
- against -
COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity , POLICE OFFICE CHRISTOPHER TALK, in his individual and official capacity, POLICE OFFICER JOSEPH LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney),
Defendants.
---------------------------------------------x

Examination Before Trial of the Defendant, CHRISTOPHER TALT, pursuant to Notice, on at Before a Notary Public of the State of New York.

APPEARANCES:

FREDERICK K. BREWINGTON, Esq.
Attorneys for Plaintiff
556 Peninsula Boulevard
Hempstead, New York 11550
BY: WILLIAM GERMANO, JR., ESQ.

CHRISTINE MILAFI
Attorneys for Defendants
100 Veterans Memorial Highway
Hauppauge, New York
BY: RICHARD T. DUNNE, ESQ. Firm

SCHOENFELD, SCHOENFELD & PINCUS, P.C.
Attorneys for Plaintiff
999 Walt Whitman Road
Melville, New York 11747
BY: DAVID A. PINCUS, ESQ.

ALSO PRESENT:
JAMES SCIMONE
JOSEPH LINK
BILLY JUDGE
JOHN NEWTON

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

CHRISTOPHER TALT, called as a witness, having been first duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. GERMANO:

Q. Please state your name for the record.

A. **Christopher Talt.**

Q. What is your address?

A. **1630 Fifth Avenue, Bay Shore,** New York 11706.

Q. Good morning, Detective Talt. My name is William Germano and I am one of the attorneys that represent the plaintiffs in this matter.

Will you please again state your name for the record and your business address?

A. **Christopher Talt, T-A-L-T. 3rd** precinct 1630, 5th Avenue, Bay Shore.

Q. Detective, what is your current rank?

A. **Detective.**

Talt

Q. Detective, you have sat through a few of these depositions so I want to go over a couple of the ground rules. I, along with Fred Brewington, Greg Collise (phonetic) and David Pincus represent the plaintiffs in this matter.

I am going to ask you questions concerning your knowledge that you may have relative to these facts and circumstances of this case. If at any point you don't understand my question please let me know and I will rephrase the question. If you don't hear my question let me know and I will state it again. When you respond be sure to use words and not gestures or groans. The court reporter's task is to accurately record everything being discussed today. Do you understand?

A. **Yes.**

Q. If you need a break just say so, but I ask to provide an answer if a question is pending.

A. **Okay.**

Talt

Q. Detective Talt, what is your current employment?

A. **Employed by Suffolk County** Police Department.

Q. How long have you been employed by the Suffolk County Police Department?

A. **Approximately 15 years.**

Q. What year did you take the competitive examination?

A. **Maybe 1993, 1994.**

Q. How many times did you take the competitive examination?

A. **Once.**

Q. What was your position when you began with the Suffolk County Police Department?

A. **I was a police officer.** Recruit first and then police officer.

Q. What years were you a recruit?

A. **I was hired by the Suffolk** County Police Department in 1995. October of '95.

Q. How long was your status as a

Talt

recruit, approximately?

A. **Six months.**

Q. What were your duties as a recruit?

A. **I attended the Suffolk County** Police Academy.

Q. During your attendance with the Suffolk County Police Academy, what type of training did you have?

A. **In the academy we had law** training, we had physical training, tactical training, training with our rules and procedures.

Q. Anything else that you can remember right now?

A. **No.**

Q. In terms of law, what kind of training in law did you have?

A. **General law, penal law, CPL.**

Q. Did that also include training in the penal law?

A. **Penal law, yes.**

Q. CPL as you understand it is the penal law?

Talt

**A. We had training in both the New York State penal law, along with some training in the CPL.**

Q. Since your training in law in 1995, did you have any further training in those areas since then up until this point in time?

**A. Yes. I have gone back to the academy for in-service training for a variety of classes of drug awareness, surveillance, detective investigating classes, physical training.**

Q. Approximately, how often did you have in-service training?

**A. A couple of times a year.**

Q. How long did the in-service training last each time?

**A. It varies. Could be anywhere from one day to three days.**

Q. Where does the training take place?

**A. At the Suffolk County Academy and also the firing range.**

Q. When was the last time from

Talt

today that you had in-service training?

**A. Approximately two months ago.**

Q. What was that training in?

**A. Fire arms.**

Q. Prior to the training in fire arms, when did you again have in-service training?

**A. Sometime last year.**

Q. With respect to the rules and procedure that you earlier described, do you recall in what areas you were trained?

**A. From the police academy?**

Q. Yes.

**A. General rules and procedures.**

Q. Can you recall any specific areas at this point in time?

**A. No.**

Q. When did you graduate from the police academy?

**A. 1996.**

Q. After your graduation, where were you stationed?

**A. The 3rd Precinct.**

Q. In what capacity were you

Talt

stationed at the 3rd Precinct?

**A. First I was in a field training unit.**

Q. Did you have any immediate supervisors in that unit?

**A. Sergeant Ensalta, E-N-S-A-L-T-A.**

Q. Did you have any other immediate supervisors or mentors while you were in the field training unit?

**A. I had field training officers.**

Q. Who were those officers?

**A. Detective Mark Bendetti.**

Q. Can you spell that please?

**A. B-E-N-D-E-T-T-I.**

Q. How long were you in the field training unit for?

**A. Approximately one month.**

Q. After one month where did you go?

**A. I was assigned to the 3rd Precinct COPE unit. Community Orientated Police Enforcement.**

Q. What were your

Talt

responsibilities in the COPE unit?

**A. At that time I walked foot posts from Bay Shore through East Islip, and I was involved in a community youth program.**

Q. For approximately how long were you with the COPE unit?

**A. Six months.**

Q. Did you have a supervisor?

**A. Yes.**

Q. Who was your supervisor?

**A. Sergeant Burke.**

Q. Did you have any other supervisors?

**A. No.**

Q. Did you have a partner?

**A. No.**

Q. After six months with the COPE unit, where were you assigned?

**A. 3rd Precinct patrol.**

Q. How long did you remain with patrol?

**A. Approximately seven to nine years.**

Talt

**Q.** Did you have a partner during that patrol?

**A. Yes.**

**Q.** Who was your partner?

**A. Detective Wisely, W-I-S-E-L-Y.** At the time he was a police officer.

**Q.** Did you have any other partners during the seven to nine years?

**A. Police Officer Joseph White,** police officer Rocchio, R-O-C-C-H-I-O.

**Q.** Any others?

**A. Police Officer O'Sullivan.**

**Q.** Any others?

**A. I believe that is it.**

**Q.** Approximately what year did you end being --

MR. GERMANO: Withdrawn.

**Q.** Where were you assigned after you were a patrol officer?

**A. I was reassigned in the end of** 2001, I was transferred to the COPE unit.

**Q.** Any particular reason you were reassigned to the COPE unit?

**A. No.**

Talt

**Q.** Were you ever made aware of any reason for your reassignment to the COPE unit?

**A. No.**

**Q.** Did you ever ask anybody, any supervisor or any other officer employed by the Suffolk County Police Department why you were being reassigned?

**A. I applied to be assigned to** the COPE unit. I worked in patrol and then there were openings in the COPE unit. I asked to be transferred there.

**Q.** Any reason why you were reassigned from the COPE unit originally to patrol?

**A. I was a New York City police** officer prior to being hired by the Suffolk County Police Department. Because of that, my field training was shortened. When I graduated the academy, completed the field training, myself, being that I was done earlier than the other officers in the field training, I manned the foot post. I did that, like I said, for six

Talt

months. That was through summer months and part of the fall. Then I was -- the foot post had ended and I was reassigned to patrol.

**Q.** Is it fair to say it's a seasonal type of post?

**A. I wouldn't say it was a** seasonal. It was just a spot that was not filled at the time. The real reason why I went there was because my field training was over earlier than other officers, so it was a manpower issue where the department used me to fill that spot.

**Q.** For approximately how long were you with the COPE unit from 2001?

**A. Approximately a year and a** half.

**Q.** Did you have any partners?

**A. Yes. I was partners with** Officer Wisely again, Officer Bertucci, I believe that was it.

**Q.** Were you in a vehicle during your assignment with the COPE unit?

**A. I was in a vehicle. I walked**

Talt

foot posts. I rode a bicycle.

**Q.** Were you ever in an unmarked vehicle during your assignment with the COPE unit?

**A. Occasionally, but not in a** permanent way. There were some nights that I was in an unmarked vehicle.

**Q.** Being with the COPE unit, what would lead you to be using in an unmarked police vehicle?

**A. When I was with the COPE unit** I was involved in community complaints and if the community complaint warranted us to be in an unmarked vehicle, then our supervisor would put us in one. It was not a permanent thing. It was as long as it took until the problem was corrected.

**Q.** After the year and a half with the COPE unit, where were you assigned?

**A. Third precinct gang unit.**

**Q.** What were your duties and responsibilities with the gang unit?

**A. I gave classes to the public,** to schools, about gang awareness. I

Talt

identified and debriefed and arrested gang members, and again handled community complaints in reference to gang issues.

Q. When, if ever, did you have training with the gang unit?

**A. During my year and a half** there I went to different gang seminars.

Q. Were you partnered with anybody during your assignment with the gang unit?

**A. Yes. Again, I was partners** with Officer Wisely and Officer O'Sullivan.

Q. Approximately how long were you with the gang unit?

**A. Approximately a year and a** half.

Q. After a year and a half were you reassigned?

**A. Yes.**

Q. Where were you reassigned to?

**A. To my current assignment.**

Q. Approximately what year was that?

Talt

**A. 2004. End of 2004.**

Q. What is your current assignment?

**A. I am assigned to the 3rd** Precinct Detective Squad. I work in the NESOT section. It stands for Neighborhood Enforcement Special Operations Team.

Q. Can you please describe your duties and responsibilities with your current assignment?

**A. My current assignment, I make** street level drug arrests. I execute search warrants for both drugs and weapons. I assist our undercover narcotics unit with identifying and arresting people who sell drugs. I debrief all prisoners in the precinct, reference any type of crime. I assist our other detectives in the precinct with crime patterns such as robberies, burglaries, shootings. I also process felony drug arrests made by uniformed officers, and handle community complaints. Once again reference drug activity in the

Talt

3rd Precinct area.

Q. Did you have to take any examination of any kind in order to be assigned or placed in the detective squad?

**A. No.**

Q. In your role as a detective, do you supervise any other police officers?

**A. No.**

Q. Do you have any partners?

**A. Yes.**

Q. Who are your partners?

**A. My parter is Detective John** Newton, N-E-W-T-O-N.

Q. For how long have you been partnered with Detective Newton?

**A. Approximately six years.**

Q. Have you had any other partners since you have been assigned to the detective squad?

**A. Wisely.**

Q. Is Detective Wisely still employed by the County of Suffolk?

**A. Yes, he is.**

Talt

Q. Can you take me through your supervisors from the time you started with the detective squad?

**A. They have not changed --**

MR. DUNNE: You are talking about immediate sergeants or all the way up the command chain?

MR. GERMANO: Immediate sergeants.

**A. My sergeant since I have been** there has not changed and he is Detective Sergeant John Diffely, D-I-F-F-L-E-Y, and my Lieutenant has not changed and he is Detective Matthew Sullivan.

Q. In your current assignment do you have any -- have you had any in-service training with respect to the rules and procedures?

**A. With respect to rules and** procedures? Yes.

Q. When?

**A. We take classes during, since** I have been there, like I said, a couple

Talt

of times a year I have had training.

Q. You indicated that you worked for the NYPD before your employment with the Suffolk County Police Department, when did you become employed by the NYPD?

A. **January 1992.**

Q. What was your assignment with the NYPD?

A. **I was first assigned to the** New York City Police Academy as a recruit.

Q. What year was that?

A. **January '92.**

Q. Did you take the competitive examination prior to that assignment?

A. **Yes.**

Q. How many times did you take the competitive examination?

A. **I took the test twice.**

Q. When was the first time you took the test?

A. **Approximately 1988, 1989.**

Q. After the first examination, did you receive a call?

A. **Yes.**

Talt

Q. What was that call?

A. **I was called to start the** process for the hiring for the police department.

Q. Did you start the process?

A. **Yes.**

Q. Then, for what reason did you have to take the examination a second time?

A. **Due to my age my hiring was** delayed for the first examination, so another test was given and I took that test.

Q. How old were you when you first took the examination?

A. **I believe I was 17 years old.**

Q. For approximately how long were you in the police academy?

A. **Six months.**

Q. Upon graduation, where were you assigned?

A. **I was assigned to the New York** City Transit Police Department District Two.

Talt

Q. What rank did you hold?

A. **Police officer.**

Q. For approximately how long did you hold that rank?

A. **Approximately two years.**

Q. Did your rank change at all during your employment with the NYPD or the New York City Transit Department?

A. **No.**

Q. What were your duties and responsibilities with the Transit Department?

A. **First I did train patrol. I** would ride trains throughout New York City from 8:00 at night to 4:00 in the morning. Just regular train patrol.

Q. Did you have any other duties and responsibilities during your employment with the NYPD?

A. **Yes.**

Q. What were they?

A. **I was transferred to a quality** of life anti-crime unit that was city wide.

Talt

Q. When were you transferred to that unit?

A. **The end of the '93.**

Q. For approximately how long were you with that unit?

A. **A couple of months.**

Q. After a couple of months?

A. **I laterally transferred to the** NYPD.

Q. For approximately how long were you with the NYPD?

A. **Approximately two years.**

Q. Where were you assigned?

A. **I was assigned to the 83rd** Precinct in Bushwick, Brooklyn.

Q. What was your rank with the 83rd?

A. **Police officer.**

Q. Approximately how long did you remain with the 83rd?

A. **Until I was hired by the** Suffolk County Police Department, which was approximately two years.

Q. Do you recall if you were

Talt

the -- if you received any civilian complaints, or were named in any civilian complaints during your employment with the NYPD or the New York City Transit Department?

MR. DUNNE: Note my objection for the record. Go ahead and answer the best that you can.

A. **Yes, I was.**

Q. How many complaints?

A. **I don't recall.**

Q. Do you recall if you were specifically named as the subject or were your actions named in some other way?

A. **I don't recall.**

Q. Do you recall the outcome of any of those complaints?

A. **No.**

Q. Do you recall if you were the named in more than five complaints or less than five complaints?

A. **Less than.**

Q. More than one complaint?

Talt

A. **I don't recall.**

Q. At this time, do you have any recollection of the sum and substance of those complaints?

A. **No.**

Q. Prior to being employed by the NYPD, what jobs did you hold if any?

A. **I worked for Nassau County** Parks doing maintenance, cutting lawns, emptying garbage.

Q. Did you go to high school?

A. **Yes.**

Q. Where did you go to high school?

A. **Mineola High School.**

Q. Did you work at the parks during your high school years?

A. **No.**

Q. It was a position after high school?

A. **Yes.**

Q. Did you hold any other positions after high school?

A. **Yes.**

Talt

Q. What other positions?

A. **I worked at a food store,** stocking shelves.

Q. What year was that?

A. **It was in high school and out** of high school.

Q. What year did you work for the parks?

A. **Right out of high school.**

Q. Any other jobs?

A. **Yes, I worked for Wheatly** Hills Golf Club.

Q. In what capacity?

A. **The locker room.**

Q. Did you receive your diploma from high school?

A. **Yes.**

Q. Did you go to college?

A. **Yes.**

Q. When did you go to college?

A. **For two years after high** school.

Q. What college did you go to?

A. **Nassau Community.**

Talt

Q. Did you receive a degree?

A. **No, I did not.**

Q. Approximately how many credits did you receive?

A. **Sixty.**

Q. Did you have a particular focus during those two years?

A. **Criminal justice.**

Q. So you never received an associates degree or anything like that?

A. **I was two classes shy.**

Q. Do you have any military experience?

A. **No, I don't.**

Q. During your employment with the Suffolk County Police Department, have you ever been a subject of an Internal Affairs Bureau investigation?

MR. DUNNE: Note my objection to the line of questioning. Go ahead, Detective, and answer that the best that you can.

A. **Yes.**

Talt

Q. Approximately how many complaints?

A. **Approximately 15 to 20.**

Q. When did you receive your -- when were you made aware of the first complaint made against you?

A. **I don't recall the first** complaint.

Q. When was the last complaint -- when were you made aware of the last complaint concerning your actions as a police officer or detective?

A. **Approximately six months to a** year ago.

Q. What was the sum and substance of the complaint against you?

A. **False arrest, I believe, and** use of force.

Q. What officers, if any, were also named in that complaint?

A. **Officer Michael C-O-R-B-E-T-T.**

Q. Do you know the outcome of that complaint?

A. **Still pending.**

Talt

Q. Have you been interviewed by Internal Affairs regarding this complaint?

A. **Yes.**

Q. When were you interviewed?

A. **Approximately six months ago.**

Q. Was this an in-person interview or something else?

A. **It was in-person.**

Q. Approximately how long did it last?

A. **Approximately an hour.**

Q. What officers questioned you during this interview?

A. **Lieutenant Fasano, F-A-S-A-N-O** and Detwiler, D-E-T-W-I-L-E-R.

Q. What is Detwiler's rank?

A. **I believe they are both** lieutenants. Detwiler might be a sergeant but --

Q. Do you recall the claim of use of force in that complaint? The sum and substance of the complaint of the use of force in that complaint?

A. **That the person claimed to**

Talt

have been struck by myself and Officer Corbett.

Q. Did the complaint indicate what the complainant was struck with?

A. **Yes.**

Q. What was that?

A. **Hands, feet, and expandable** baton.

Q. Does the expandable baton have another name?

A. **Asp.**

Q. Was there more than one complainant?

A. **No, there was one subject.**

Q. Did that individual require medical treatment?

A. **Yes.**

Q. Did you or any other officer provide, administer, or bring the individual to receive medical treatment?

A. **Yes. He was transported to** the hospital by police officers. I don't recall who. He was treated. There were no injuries, and he was then returned to

Talt

the 3rd Precinct where he was held and then brought to court the next day.

Q. Who made the decision to transport that individual to the hospital?

A. **I don't recall.**

Q. Was he transported to Southside Hospital or some other hospital?

A. **Southside Hospital.**

Q. You indicated that --

A. **He was first transported to** the 3rd Precinct, later transported to Southside Hospital, and then transported back to the 3rd Precinct.

Q. Approximately, how much time passed, from the time he was brought to the 3rd Precinct the first time, until he was brought to Southside Hospital?

A. **I don't recall.**

Q. Do you recall if it was more than 30 minutes?

A. **I don't recall.**

Q. Did you make the arrest?

A. **I was involved in the arrest,** yes.

Talt

Q. Did you transport that subject to the 3rd Precinct?
**A. No, I did not.**
Q. Did you transport that subject to the hospital?
**A. No, I did not.**
Q. Did you interview that subject at the 3rd precinct the first time?
**A. I don't recall.**
Q. You indicated that that subject had no injuries, was that your determination or somebody else?
**A. Well, he was brought to the** hospital and released. When I say injuries, he had -- I should say he had minor scrapes and bruises.
Q. But he did receive treatment at that hospital?
**A. Yes.**
Q. Prior to that complaint, did you have any other -- were you named in any other Internal Affairs Bureau investigation complaints?
**A. Yes.**

Talt

Q. Did any others include complaints of excessive force?
**A. Yes.**
Q. Can you start -- do you recall those specifically?
**A. Specifically, no.**
Q. Prior to the most recent one you described, when did you have another complaint claiming excessive force?
**A. I don't recall.**
Q. Other than claims of excessive force, what other types of complaints were made against you?
**A. False arrest.**
Q. Any others?
MR. GERMANO: This is Valerie Cartright. She is an associate with the Law Offices of Frederick K. Brewington.
**A. To my recollection I have** complaints of false arrest and use of force.
Q. As a result of any of the --
MR. GERMANO: Withdrawn.

Talt

Q. Have you had any lawsuits naming you as a defendant?
**A. Yes.**
Q. Approximately how many lawsuits?
**A. Approximately three.**
Q. When was the first lawsuit?
**A. Approximately 2000.**
Q. What rank did you hold at that time?
**A. Police officer.**
Q. What was the sum and substance of that action?
**A. I was involved in a motor** vehicle accident.
Q. While on duty?
**A. Yes.**
Q. What was the outcome of that matter?
**A. I went to a deposition and I** have never heard anything about it.
Q. Was there anybody else named as a defendant in that action?
**A. I don't recall. I was an**

Talt

operator of a vehicle that was involved in a motor vehicle accident. I was named, I don't recall if anybody else was named.
Q. Why were you named as a defendant in that action?
MR. DUNNE: Objection to the form but go ahead and answer the best that you can.
**A. I was the operator of the** vehicle that collided with another person, and was sued.
Q. As far as you know, or don't know, the case never went to trial?
**A. I know it didn't go to trial.**
Q. Do you know if it settled?
**A. I don't know if it did. As** far as I went was I went to a deposition and I never heard anything after that.
Q. What were the allegations specifically concerning your actions in that complaint?
**A. I don't recall the actual** allegations. Again, my vehicle struck his vehicle.

Talt

Q. Were you driving?
A. **I was driving a marked police car.**
Q. Where did your vehicle come into contact with the driver of the other vehicle?
A. **The driver's side of his vehicle.**
Q. Were both cars moving at that time?
A. **Yes.**
Q. Where were you driving immediately before the accident?
A. **Central Islip.**
Q. For what reason were you driving in Central Islip?
A. **I was on patrol and I was responding to the assist of another police officer.**
Q. Were your sirens on?
A. **Yes.**
Q. Were your lights on?
A. **Yes.**
Q. What intersection did this

Talt

occur at?
A. **I know I was on Willow Street in Central Islip, and I was either at the intersection of Wilson or Ferndale Boulevard. I don't recall which intersection, one or the other.**
Q. Was anybody else in the vehicle with you at the time?
A. **Yes.**
Q. Who was that?
A. **Officer Rocchio, R-O-C-C-H-I-O. He was the front passenger in my vehicle.**
Q. Was there anybody else in the vehicle?
A. **No.**
Q. Did you receive an injury?
A. **Minor injuries.**
Q. Did you receive medical treatment?
A. **Yes.**
Q. How about your passenger, did he?
A. **Yes, minor injuries, again**

Talt

**medical treatment.**
Q. The other person involved in the accident, did he or she receive injuries?
A. **Yes.**
Q. What kind of injuries did he or she receive?
A. **I believe back and neck injuries, and he was also transported to Southside Hospital for treatment.**
Q. By way of ambulance?
A. **Yes.**
Q. The second lawsuit that you were involved in as a defendant, when was that?
A. **Approximately 2000, 2001.**
Q. What was the sum and substance of that complaint naming you as a defendant?
A. **Again, there was another officer that was involved in the arrest of a subject. I don't recall what that was for. I was working that day and I was named, but again the arrest processing wa**

Talt

**in the uniform squad room where at the 3rd Precinct prisoners are processed for their arrest. There were multiple officers named in it. I don't recall what -- why I was actually even named.**
Q. Do you recall the officer that arrested the subject?
A. **No.**
Q. Do you recall, was that a complaint of false arrest or something else?
A. **I believe it was false arrest. That was one of the complaints.**
Q. Any other complaints?
A. **Yes. There was a, I believe, it was like a discourteous complaint, but that is as much as I remember about that.**
Q. What is a discourteous complaint?
A. **Whether is was verbal, someo said something that offended the party. That is as much as I recall about that incident.**
Q. Were you ever deposed?

Talt

A. **I don't recall. I don't believe so, but I can't say for certain.**

Q. Do you know the outcome of that case?

A. **Never heard anything.**

Q. Were you ever investigated by Internal Affairs regarding the circumstances that led to that complaint?

A. **I don't recall.**

Q. Going back to the first lawsuit, were you ever investigated by Internal Affairs or questioned by Internal Affairs about the circumstances that led to that complaint?

A. **I was never questioned. I don't recall if I made an internal correspondence or not, a written report. I don't recall.**

Q. Do you know if Internal Affairs ever made a finding concerning your actions with respect to the allegations in the first lawsuit?

A. **No.**

Q. No, you don't recall?

Talt

A. **No, I don't recall. I know the supervisor that handled the motor vehicle accident, he writes up -- he wrote up a report about the accident and I don't believe Internal Affairs was given that.**

Q. With respect to the third lawsuit, when did that occur?

A. **Approximately 2002, 2003.**

Q. What was the sum and substance of complaint?

A. **False arrest, excessive force.**

Q. Were any other police officers or persons employed by the County of Suffolk named in that lawsuit?

A. **Yes.**

Q. Who were they?

A. **Officer William O' Sullivan.**

Q. What was your relationship with Officer O' Sullivan at that time?

A. **He was my partner.**

Q. What were the specifics about the complaint of excessive force concerning that complaint?

A. **The specifics, that the person claimed that he was struck by myself and Officer O' Sullivan.**

Talt

Q. What did the plaintiff claim he was struck by, if anything?

A. **Hands and asp.**

Q. What was your rank at that time?

A. **Police Officer.**

Q. Did you carry an asp on your person at that time?

A. **I don't recall.**

Q. In or around 2002, 2003 was it routine for police officers to carry the asp on their persons?

A. **Some had it. It was being introduced to the department.**

Q. Do you recall if Police Officer O' Sullivan carried the asp on his person at about that time?

A. **I believe so.**

Q. Did the plaintiff in that matter claim injury?

A. **Yes.**

Q. What type of injury was claimed?

Talt

A. **Bruises. Scratches.**

Q. At any particular part of the body were those bruises and scratches claimed?

A. **I don't recall.**

Q. Did Internal Affairs investigate your actions prior to the lawsuit commencing?

A. **Yes.**

Q. What did that investigation consist of?

A. **An internal correspondence written by myself.**

Q. Were you ever interviewed concerning your actions?

A. **I don't recall.**

Q. Did you ever have any telephonic communications with any officer/investigator from Internal Affairs regarding your actions that were the subject of the lawsuit?

A. **Telephonic, you said?**

Q. Yes.

Talt

**A. I don't recall.**

Q. It is fair to say you never sat down and were questioned by the investigators concerning those allegations?

**A. No. It's not fair to say** that. I don't recall if I was. I do recall writing the correspondence, but I don't recall if I had an interview.

Q. Did anybody assist you in drafting the correspondence?

**A. No.**

Q. Did anybody review, other than the Internal Affairs, did anybody review what you drafted?

**A. A member of the PBA.**

Q. What was the outcome of that lawsuit?

**A. I believe the plaintiff** received a $5,000 award.

Q. So that matter went through trial and a jury deliberated?

**A. No, there was no trial.**

Q. Did the case settle?

Talt

**A. Yes, for $5,000.**

Q. Have you been named as a defendant in any other lawsuit?

**A. Not to my recollection.**

MR. DUNNE: Other than this one.

**A. No, not to my recollection.**

Q. Have any of your actions ever been subject of a lawsuit, but you were not named as an officer?

**A. Just rephrase that?**

Q. Were any of your actions ever, if you weren't named but your actions were involved, were you ever involved in any type --

MR. GERMANO: Withdrawn.

Q. Were you ever a witness to a lawsuit where fellow officers were being sued in their capacity as a police officer?

**A. I don't believe so.**

Q. With respect to the three lawsuits that we just went through, do you know the race or ethnicity of the

Talt

plaintiff in the first lawsuit?

**A. He was Hispanic.**

Q. Do you know the race or ethnicity of the plaintiff in the second lawsuit?

**A. White, female.**

Q. Same question, third lawsuit?

**A. Male, Hispanic.**

Q. With respect to the third lawsuit, was Officer O' Sullivan investigated by Internal Affairs?

**A. Yes.**

Q. Was he disciplined in any way as a result of the action that led to the complaint?

**A. I don't recall.**

Q. Were you disciplined in any way?

**A. No, I was not.**

Q. With respect to the second lawsuit, were you disciplined in any way?

**A. No, I was not.**

Q. With respect to the first lawsuit, were you disciplined in any way?

Talt

**A. I don't recall.**

Q. When an individual makes a complaint with Internal Affairs, what is the process from that point forward in terms of investigating that complaint to the best of your knowledge?

MR. DUNNE: Object to the line of questioning. Go ahead, if you know.

**A. There are different ways that** complaints are investigated. It could be an internal correspondence from the officer to the Internal Affairs unit.

It could be an internal -- just an interview with Internal Affairs.

It could be both internal correspondence and an interview.

Q. Do you know why one is chosen over the other at certain points in time?

**A. No.**

Q. With respect to complaints of excessive force, do you know the process used in investigating those claims?

**A. The same.**

Talt

Q. Earlier you indicated you were named in approximately 15 to 20 Internal Affairs complaints, is that right?
A. **Yes.**
Q. Approximately, how many of those complaints occurred while you held the rank of detective?
A. **I don't recall.**
Q. Approximately, how many of those complaints occurred while you were a member of the gang unit?
A. **I don't know.**
Q. Approximately, how many of those complaints occurred while you were a member of the COPE unit?
A. **Again, I don't know.**
Q. Approximately, how many of those complaints occurred while you were a patrol officer?
A. **I don't know.**
Q. Were you ever disciplined in any way for any of your actions that were subject of the 15 to 20 complaints with Internal Affairs?

Talt

A. **No, I was not.**
Q. Have you ever received a verbal warning of any kind for any of those complaints?
A. **Well, again, when we go back** to the motor vehicle accident that I was involved in, I may have been verbally reprimanded on the accident, but I don't recall if I was or wasn't. It's common practice with the Suffolk County Police Department, again, for the road supervisor investigates the motor vehicle accident.
Q. With respect to those 15 to 20 complaints, how many of them made allegations of undue force or excessive force?
A. **I don't know.**
Q. Do you recall if it was more than five?
A. **No, I don't.**
Q. Of those complaints, those 15 to 20 complaints, how many alleged a claim of mistreatment?
A. **I don't recall the break down**

Talt

of the complaints.
Q. Do you recall if any of those complainants had received injury and they claimed they were not given proper and speedy treatment by the officers?
A. **I don't recall that happening.**
Q. Do you recall how many of those complaints, if any, involved claims of false arrest or false imprisonment?
A. **Again, I don't know the break** down of the complaints.
Q. Of those 15 to 20 complaints, did that include 15 to 20 complainants or more?
A. **It would be 15 to 20** complainants, people who complained about the specific incident.
Q. Was there ever a complaint where there was more than one complainant alleging that your actions should be investigated?
A. **I don't recall. I don't know.**
Q. Do you recall how many of those complainants were white?

Talt

A. **No, I don't.**
Q. Do you recall how many of those complainants were Hispanic?
A. **No.**
Q. Do you recall if any of those complainants were Hispanic?
A. **Yes.**
Q. Approximately how many, can you recall, at this time that were Hispanic?
A. **I can recall three.**
Q. Do you recall their names?
A. **Yes, well, I recall two of** them.
Q. What were their names?
A. **The motor vehicle accident I** believe was Mr. Rivera.
Q. Do you know Mr. Rivera's first name?
A. **No.**
Q. Do you know Mr. Rivera's last known address?
A. **No.**
Q. The second Hispanic, what was

Talt

his or her name?

**A. Edwin Caballero, C-A-B-A-L-L-E-R-O.**

Q. Do you know Mr. Caballero's last known address?

**A. Federal prison.**

MR. DUNNE: He was an illegal alien. He was deported.

Q. Which complaint that you previously discussed involved Edwin Caballero?

**A. The one with myself and** Officer O' Sullivan.

Q. That was the lawsuit that settled for $5,000?

**A. Correct.**

Q. Did anybody else --

MR. GERMANO: Withdrawn.

Q. Was there any other individual named as a plaintiff or a complainant in that action?

**A. Not to my recollection.**

Q. Of those 15 to 20 Internal

Talt

Affairs complaints naming you, how many of those complainants were African American?

**A. I don't recall.**

Q. Do you recall how many of those complainants were black?

**A. No.**

Q. Do you recall any of the injuries received by or alleged to be received by these complainants with respect to your actions in these 15 to 20 IAB complaints?

**A. Mr. Rivera, with the motor** vehicle accident I believe was back and neck. Mr. Caballero had abrasions, he had bit me. He bit my finger, I couldn't get my finger out of his mouth so I struck him in the face to dislodge my finger that he was chewing on, so he had a mouth injury.

I think the last -- the complaint that we spoke about with Officer Corbett. I believe his last name is Motta. He had a couple of lines, red lines, from being struck with the asp on his body and abrasions, I believe, on his

Talt

elbow.

Q. That is the most recent action?

**A. That is the most recent one.**

Q. Which is still pending today, correct?

**A. Correct.**

Q. Do you know how to spell Mr. Motta's last name?

**A. I believe it's M-O-T-T-A. I** am not positive.

Q. What is his ethnicity?

**A. He is he Hispanic.**

Q. Do you know his first name?

**A. I don't recall.**

Q. Who used the asp against Mr. Motta?

**A. Officer Corbett.**

Q. Did you see him use the asp?

**A. Yes.**

Q. Where did you see him strike Mr. Motta with the asp, in terms of on Mr. Motta's body?

**A. I believe it was his back.**

Talt

Q. How many times did --

MR. GERMANO: Withdrawn.

Q. Is Officer Corbett a police officer, police officer, detective --

**A. Police officer.**

Q. How many times did Officer Corbett strike Mr. Motta that you saw?

**A. Approximately two.**

Q. Did Officer Corbett strike Mr. Motta more than two times that you didn't see?

MR. DUNNE: How would he know?

MR. GERMANO: Withdrawn.

Q. Did you learn at any point in time whether Mr. Motta claimed officer Corbett struck him more than two times?

**A. Officer Corbett -- I observed** Officer Corbett strike Mr. Motta and it was approximately two times. Again -- and then -- he was not struck, he was in my presence the whole time. He was not struck again later or before me witnessing that occurrence.

Talt

**Q.** I understand.
Do you know if Mr. Motta claimed he was struck more than twice?
**A. I don't know.**
**Q.** Where did that incident occur?
**A. The north Bay Shore area.**
**Q.** Did it occur on a street or somewhere else?
**A. The physical altercation?**
**Q.** Yes.
**A. In front of Mr. Motta's** residence.
**Q.** Do you recall why the police were at Mr. Motta's residence in the first place?
**A. I was involved in a drug** investigation that brought me there, and Officer Corbett.
**Q.** Were any other officers involved in the investigation other than you and Officer Corbett?
**A. In the investigation or the** physical altercation?
**Q.** In the investigation.

Talt

**A. Yes.**
**Q.** Who were those officers?
**A. My partner, Detective John** Newton.
**Q.** Anyone else?
**A. No.**
**Q.** Were any other officers involved in the physical altercation?
**A. Units, we had called for the** assistance of other officers. They responded. Prior to them responding myself and Officer Corbett were able to subdue Mr. Motta, so there was nobody else involved physically.
**Q.** Where was Detective Newton while you were involved in the physical altercation, if you know?
**A. At another location conducting** surveillance.
**Q.** Did Mr. Motta have any weapon on him that you noticed?
**A. No.**
**Q.** Was Mr. Motta charged with a crime?

Talt

**A. Yes.**
**Q.** What crime was he charged with?
**A. He was charged with DWI,** harassment, and resisting arrest.
**Q.** How did it come about that Mr. Motta became investigated by you and/or Detective Newton?
**A. I was involved in a drug** investigation, which is still ongoing.
**Q.** Mr. Motta was never charged with a drug related crime that day, correct?
**A. Correct.**
**Q.** Did any of the --
MR. GERMANO: Withdrawn.
**Q.** Were any of the complaints involving your actions called into question by a representative of someone who had died, other than this case?
**A. I am sorry? One more time?**
MR. DUNNE: Did any of the complainants ever die necessitating someone else to

Talt

bring the lawsuit?
THE WITNESS: No.
**Q.** Other than the motor vehicle accident, what was the most serious injury alleged that you can recall?
**A. Serious injury? Lacerations,** bruises.
**Q.** Is that based on your observation or something else?
**A. My observations.**
**Q.** Do you recall any injury --
MR. GERMANO: Withdrawn.
**Q.** Was it ever related to you an injury that was determined by a medical provider?
**A. Not that I recall.**
**Q.** Was there ever an allegation that an individual received a fracture or some other broken bone?
**A. I don't recall.**
**Q.** Do you recall if any complainant ever received, or alleged to have received, stitches as a result of your actions?

Talt

MR. DUNNE: As a result of the alleged actions.

MR. GERMANO: That is fine.

A. **I don't recall. Again, I said** lacerations, but stitches, I don't recall.

Q. Who received those lacerations?

A. **Well, I recall Edwin Caballero** having lacerations, bleeding. Again I struck him in the mouth when he was biting my finger, which he was bleeding from.

Q. Were you ever disciplined as a result of your actions with respect to Edwin Caballero's complaints?

A. **No.**

Q. Did you ever have to receive additional training as a result of the complaint lodged against you?

A. **No.**

Q. In any of the 15 to 20 complaints, did you have to receive additional training due to the complaint lodged against you?

Talt

A. **No.**

Q. Did all of the 15 to 20 complaints involve an arrest?

A. **No.**

Q. Approximately, how many involved an arrest?

A. **I don't know.**

Q. Do you know if there were more arrests or no arrests during these allegations that led to complaints?

A. **Again, I don't know the** breakdown.

Q. I would like to turn your attention to April 12, 2008.

Do you have a recollection of the incident involving Kenny Lazo?

A. **Yes.**

Q. What is your recollection based upon?

A. **Intelligence that I had** gathered, my own observations.

Q. Anything else?

A. **No. That is what it is based** on.

Talt

Q. Prior to this deposition, did you review any documents in order to prepare for the deposition?

A. **A supplementary report that I** prepared.

Q. How many supplementary reports did you prepare as a result of -- subsequent to the death of Kenny Lazo?

A. **I prepared one for the case.** That is what I reviewed, and then I also, which I didn't review, I prepared internal correspondence for Internal Affairs.

Q. With respect to the allegations in this case, have you ever been questioned to the extent you are being questioned today, or to the extent that you observed the prior three depositions of your colleagues?

A. **No.**

Q. Did you ever have an interview with Internal Affairs?

A. **No, I did not.**

Q. Who instructed you to prepare an internal correspondence?

Talt

MR. DUNNE: To IA?

MR. GERMANO: Yes.

A. **I believe it was Captain, or** Lieutenant Capalino, I believe.

Q. Lieutenant Capalino is a lieutenant with Internal Affairs, correct?

A. **Possibly a captain, I don't** recall, but yes he was with Internal Affairs.

Q. Approximately, how many conversations did you have with Lieutenant or Sergeant Capalino?

A. **Lieutenant or Captain** Capalino. Conversations?

Q. Yes, concerning the allegations in the complaint.

A. **I don't recall having any** conversations with him.

Q. In what form did Capalino instruct you to prepare and provide internal correspondence to IA?

A. **He sent me a written list of** questions that he had for me, and at the end of the questions it was noted that if

Talt

the questions were not answered in full detail that an interview would be followed up.

Q. When did you receive the memo from Capalino?

**A. I don't recall.**

Q. Was it more than a month after the incident subject of this complaint?

**A. I don't remember when I got the memo.**

Q. Did you have to go before the grand jury in this matter?

**A. I testified as a witness in the grand jury.**

Q. Did you receive the memo from Lieutenant or Captain Capalino before or after you testified with the grand jury as a witness?

**A. I don't know.**

Q. Other than providing Internal Affairs with the internal correspondence, did you have any other meetings, interviews, conversations, or discussions with any supervisors concerning this

Talt

incident?

**A. Any supervisors?**

MR. DUNNE: You mean his in the PD?

MR. GERMANO: Yes.

**A. The only supervisors I spoke to about this incident were from Internal Affairs.**

Q. Who is your current supervisor?

**A. Detective Sergeant John Diffley?**

Q. Detective Sergeant John Diffley he was the detective segreant and your supervisor in or around April 12, 2008?

**A. He was my immediate supervisor but he was not working that night. The night of the incident I did speak with Detective Sergeant Koerber, K-O-E-R-B-E-R. He was the detective assigned to the 3rd squad that night.**

Q. Did you speak to Detective Sergeant Koerber after you learned of

Talt

Mr. Lazo's death?

**A. Yes.**

Q. About the incident?

**A. I spoke to him after, yes.**

Q. Who was --

MR. GERMANO: Withdrawn.

Q. Where did you speak to him?

**A. At the 3rd precinct.**

Q. How long after you learned of Mr. Lazo's death did you speak to him?

**A. Very soon after.**

Q. What time did your tour end that morning?

**A. It was scheduled to end at 1:00 o'clock in the morning on the 13th, but I don't recall when I actually ended that morning. It was after that.**

Q. For approximately how long did you speak to Detective Sergeant Koerber?

**A. A very brief conversation with Sergeant Koerber.**

Q. Less than five minutes?

**A. Yes.**

Q. What was the sum and substance

Talt

of that conversation you had with Detective Sergeant Koerber?

**A. I came back from the hospital after Mr. Lazo was pronounced. When I got back to the precinct, I recall telling Detective Sergeant Koerber that that was what just occurred.**

Q. What, if anything, did Detective Sergeant Koerber say to you?

**A. I don't recall.**

Q. Was anybody else around or involved in the conversation that you had with Detective Sergeant Koerber?

**A. Not to my recollection.**

Q. Did you speak with any other officers concerning the incident after speaking to Detective Sergeant Koerber?

**A. Yes.**

Q. Who did you speak to?

**A. I spoke to Detective Portela.**

Q. When did you speak to Detective Portela?

**A. When I was back at the precinct, sometime after 10:00 o'clock,**

Talt

10:00 p.m.

Q. During the same tour?

A. **Yes.**

Q. Where, within the precinct, did you meet with Detective Portela?

A. **In the detective squad room.**

Q. Was anybody else present?

A. **No.**

Q. What was the sum and substance of your conversation with Detective Portela?

A. **He asked me what happened.** And I explained to him again my observations and the information intelligence that I had with reference to the incident. My involvement from the beginning to the end.

Q. For approximately how long, did you meet Detective Portela to relay your perspective?

A. **I don't recall exactly.**

Q. Was it more than 20 minutes?

A. **It was about that.**

Q. You gave a detailed account of

Talt

your understanding of the circumstances to Detective Portela?

A. **Yes.**

MR. DUNNE: Object to the word detailed. I don't know what that means. Go ahead and answer that if you can.

A. **Yes.**

Q. Did Detective Portela instruct you to do anything after your meeting, with respect to further investigations or anything else?

A. **I actually knew on my own that** I was to complete a supplementary report of the incident.

Q. When did you complete the supplementary report?

A. **That night during the same** tour.

Q. That was after your conversation and meeting with Detective Portela?

A. **Yes.**

Q. Did anybody assist you in

Talt

drafting your supplemental report?

A. **No.**

Q. Did anybody review the supplemental report after you drafted it?

A. **Yes.**

Q. Who reviewed it?

A. **An attorney from my union.**

Q. Who did you provide your supplementary report to after it was completed?

A. **Detective Portela.**

Q. When did you supply it to Detective Portela?

A. **That tour.**

Q. After you supplied Detective Portela with the supplementary report, what interactions did you have with him concerning the incident set forth in this complaint?

A. **That was it.**

Q. Did you have any other meetings, interviews, conversations, or discussions with any other police personnel after you supplied Detective

Talt

Portela the supplementary report, aside from your internal correspondence with IA?

A. **Police personnel?**

Q. Yes.

A. **No.**

Q. Same question but with anybody else?

A. **Yes.**

Q. Who?

A. **I met with District Attorney** Bureau Chief John Collins. Assistant District Attorney Bureau Chief.

Q. When did you meet with Mr. Collins?

A. **Before the grand jury.**

Q. When was the grand jury convened?

A. **I don't recall.**

Q. Approximately, how many times did you meet with Mr. Collins before the grand jury?

A. **Twice.**

Q. During your meetings Mr. Collins --

Talt

MR. GERMANO: Withdrawn.

Q. When was the first meeting?

**A. I don't recall the date.**

Q. Was it during the summer or sometime thereafter?

**A. Again, I don't recall when the meeting actually took place.**

Q. During your first meeting with Mr. Collins was anybody else present?

**A. No.**

Q. Where did you meet Mr. Collins?

**A. At the District Attorney's office.**

Q. For approximately how long did you meet with Mr. Collins?

**A. Approximately an hour.**

Q. Did you travel with anybody else to the meeting with Mr. Collins?

**A. No.**

Q. Was any other police officer interviewed or questioned by Mr. Collins that day?

**A. I don't know.**

Talt

Q. What was the sum and substance of your conversation with Mr. Collins?

**A. I gave Mr. Collins a detailed story of what occurred, my observations, the intelligence that I had from start to finish of this investigation.**

Q. When did your second interview with Mr. Collins occur?

**A. Just prior to the grand jury, again, I don't recall when.**

Q. Do you recall if it was the same day as the grand jury, the testimony that you gave?

**A. I am not sure. It was at the District Attorney's office.**

Q. For approximately how long did that meeting last?

**A. Less than the first one.**

Q. What was the conversation in sum and substance that you had with Mr. Collins during that second interview?

**A. We went everything from the first meeting.**

Q. Did Mr. Collins indicate to

Talt

you the process for the grand jury?

**A. At that time he told me that I was going to be a witness.**

Q. Did he explain to you the process for which you would be questioned at the grand jury?

**A. No. I am familiar with the grand jury, how grand jury operates. He didn't really explain it to me. He just told me that I was going to be a witness. That I would not have to -- I was not going to be a subject where I would be waiving my rights.**

Q. Did Mr. Collins give you any preparation prior to the grand jury?

**A. No.**

Q. Did he ever suggest how he would be --

MR. GERMANO: Withdrawn.

Q. Did he question you at the grand jury?

**A. Yes.**

Q. Did anybody else question you at the grand jury?

Talt

**A. Yes.**

Q. Who else questioned you at the grand jury?

**A. Members of the panel.**

Q. Approximately, how long were you questioned --

**A. I don't recall.**

Q. -- in total?

**A. I don't recall.**

Q. Was it more than 20 minutes?

**A. Yes.**

Q. Was it more than 30 minutes?

**A. I believe so.**

Q. Was it more than 40 minutes?

**A. I don't think so.**

Q. Approximately how many members were in the panel?

**A. I don't even know.**

Q. Was it more than five?

**A. Yes.**

Q. More than ten?

**A. Yes.**

Q. More than twenty?

**A. No.**

Talt

Q. Approximately, how many members from that panel asked you questions?

**A. I don't recall. I received questions. I don't remember how many or from who or --**

Q. Did the majority of the questions come from Mr. Collins or from the panel?

**A. Both. I had a long narrative, detailed speaking of my own recollection of the incident without even being questioned, and then I also received questions from both the grand jury and Mr. Collins.**

Q. Were any documents utilized during this presentation?

**A. Yes.**

Q. Were any videos utilized during this presentation?

**A. Photographs.**

Q. What photographs were used?

**A. Photographs of evidence recovered, photographs of the scene.**

Talt

Q. When you say the scene, which scene are you speaking of?

**A. Actually I believe both the precinct -- the scene of where the arrest occurred, and then there were photographs of evidence which were taken at the 3rd Precinct, and I testified to the evidence.**

Q. What photos of the evidence do you recall seeing or utilizing during the presentation?

**A. I don't recall.**

Q. Did those photographs include photos of the flashlights used by your colleagues in subduing Mr. Lazo?

**A. No.**

Q. Did those photographs include pictures of any alleged contraband found?

**A. Yes.**

Q. Did those photographs include pictures of Mr. Lazo's injuries?

**A. No.**

Q. Did those photographs include pictures of Mr. Lazo in any way?

**A. Not that I recall.**

Talt

Q. In terms of the documents that you said were utilized during the presentation, what documents do you rec... being utilized?

**A. I had a copy of my supplementary report, but I don't recall if I needed to go back to that for the testimony or not.**

Q. Were any other documents utilized during the presentation when you were a witness?

**A. Not to my recollection.**

Q. Do you recall if the autopsy report was utilized?

**A. While I was testifying?**

Q. Yes, while you were testifying.

**A. No.**

Q. The photographs that depicted the scene at the precinct and on the road, let's split those up.
The scene on the road, what did those photographs depict that you can recall?

Talt

**A. I don't recall that part.**

Q. Do you recall if it was just of the landscape of where the incident occurred or something else?

**A. I don't recall.**

Q. Do any of the vehicles that were used by the officers who did the stop, and who subdued Mr. Lazo, did any of those vehicles have cameras?

**A. No.**

Q. With respect to the photos that depicted the scene at the precinct, what do you recall those photos depicting?

**A. Large amount of drugs, U.S. currency, I believe earings, Mr. Lazzo's earings. Did I say U.S. currency?**

Q. Yes.

**A. That is what I recall.**

Q. Did those photographs depict the room that Mr. Lazo was being detaine. when he collapsed?

**A. I don't recall if the photos depicted that, but I gave a detailed description in my testimony of that room.**

Talt

**Q.** After the grand jury presentation, did you have any other meetings, interviews, or conversations with any other people about the matter which is the subject of the complaint?

**A. Again, as I said earlier, I** don't recall when the Internal Affairs internal correspondence were completed. I don't know if they were done prior to the grand jury or after. If it was done after, then I would have had that with the Internal Affairs unit.

**Q.** Anything else other than the Internal Affairs?

**A. No. Are you including** Mr. Dunne?

**Q.** No, I am not including Mr. Dunne.

**A. Then no.**

MR. GERMANO: May we have this marked as Plaintiff's Exhibit 1.

(Document was marked as Plaintiff's Exhibit 1 for

Talt

identification, as of this date.)

**Q.** Detective Talt, I am placing before you Plaintiff's Exhibit 1. I request you to skim through that document?

**A. (Witness complying).**

**Q.** Have you had an opportunity to review the document?

**A. Yes.**

**Q.** Are you familiar with this document?

**A. Yes.**

**Q.** What is this document?

**A. These are interrogatories that** were completed by me.

**Q.** You had an opportunity to verify that these responses were truthful and accurate to the best of your knowledge, correct?

**A. Correct.**

**Q.** When is this document dated?

**A. January 14, 2010.**

**Q.** Have you ever seen, at any point in time have you ever seen a copy of

Talt

the decedent's autopsy report?

**A. No.**

**Q.** To this date you never reviewed that autopsy report?

**A. No.**

**Q.** Prior to April 12, 2008, which is the date that this incident occurred, did you have any interactions with Mr. Lazo?

**A. Not to my knowledge, my** recollection.

**Q.** Was Mr. Lazo ever the subject of one of your investigations prior to April 12, 2008?

**A. Yes.**

**Q.** When was that?

**A. Prior to the incident Mr. Lazo** was identified by an outside agency as being involved in a major drug operation connected to Gilberto Rivera, a/k/a Macho, who was selling a large amount of drugs in Suffolk County, and Kenny Lazo was identified as one of his main drug dealers who also used the nickname Carlos, and

Talt

sold cocaine and crack cocaine for Gilberto Rivera, a/k/a Macho.

I also spoke with drug dealers that I have encountered -- drug addicts that I have encountered in the Third Precinct area who described Kenny Lazo and without identifying him by full name, vehicle and locations where he sold drugs. I also have --

**Q.** I need to stop you there.

Can you just explain what you mean that the drug addicts described Mr. Lazo to you? In what sense did they describe him to you?

**A. They were purchasing drugs,** cocaine, crack cocaine, from a heavy-set male Hispanic operating a new blue Cadillac vehicle along Sunrise Highway in different parking lots.

**Q.** When did you have these conversations with these drug addicts?

**A. A couple of different** occasions from several weeks leading up to the actually day of incident.

Talt

**Q.** How many drug addicts did you speak to?

**A. Two or three people gave me** similar information, reference this activity.

**Q.** Have you ever, prior to that time, arrested those drug addicts and charged them with crimes?

**A. No. Well, there is different** sources of information. There is a source of information that was arrested and debriefed by an outside agency who identified Kenny Lazo as being part of this large ring of, narcotics ring connected to Gilberto Rivera a/k/a Macho. Yes, there was one person arrested for drug charges who identified him.

**Q.** That one source, you labeled him as one of the drug addicts?

**A. Drug addict, drug dealer.**

**Q.** What was that source charged with previously?

**A. The day that he was debriefed?** Just that day?

Talt

**Q.** That day, yes.

**A. I believe it was a possession** arrest and possibly a parole violation.

**Q.** You indicated this occurred weeks leading up to the April 12, 2008 incident?

**A. This was sometime earlier than** that.

**Q.** How much time earlier?

**A. I don't recall.**

**Q.** More than two months earlier?

**A. Again, I don't recall.**

**Q.** Were you the police officer that made the arrest on that source?

**A. No, I was not.**

**Q.** Do you know if he was ever convicted of a crime based on those charges brought on that day?

**A. I don't know.**

**Q.** Do you know what police officer made the arrest?

**A. A detective who assisted in** the processing of the arrest, but I don't know the actual police officer who made

Talt

the arrest.

**Q.** What detective assisted in that arrest?

**A. Detective O'Hara.**

**Q.** What is that source's ethnicity?

**A. I don't know.**

**Q.** Did you ever meet that source?

**A. No, I did not.**

**Q.** By whom did you learn of that source's information which you described earlier?

**A. From Detective O'Hara and** another Detective O'Hara who is assigned to the drug enforcement agency.

MR. DUNNE: Is that a federal agency?

THE WITNESS: Yes.

**Q.** Have you ever seen the DEA, Drug Enforcement Agency file pertaining to Kenny Lazo?

**A. The entire file?**

**Q.** Yes.

**A. No.**

Talt

**Q.** Have you ever seen portions of that file?

**A. Yes.**

**Q.** When did you first see portions of that file?

**A. Right after the debriefing.**

**Q.** What do you recall seeing in that file?

**A. I recall seeing an operation** that was drawn out with Gilberto Rivera, a/k/a Macho, being the ringleader, with spokes coming out from him, lines drawn, identifying multiple subjects by name, nickname, and some details about their involvement in this large drug ring.

**Q.** Do you recall seeing the name Kenny Lazo in that diagram?

**A. Yes. A/k/a Carlos.**

**Q.** Did the diagram specifically state Kenny Lazo?

**A. Yes.**

**Q.** It stated Carlos as well as Kenny Lazo?

**A. He goes by Carlos. His name**

Talt

is Kenny Lazo.

Q. The question I had is, did the diagram indicate both names?

A. **Yes.**

Q. Who was present during the debriefing?

A. **I was not there so I don't** know.

Q. Other than the one source you described, you indicated there were a couple of drug addicts who you had contact with prior to the April 12, 2008 incident?

A. **Yes.**

Q. Approximately how many others?

A. **Approximately two or three** people that I came in contact with on the street, and I also have a phone call into the precinct, again not naming Kenny Lazo in the phone call, but giving me a description and area, some details about drug dealing, a vehicle in the 3rd Precinct area.

Q. The other two or three drug addicts, were they considered, at that

Talt

time, sources for you?

A. **A source, yes. They are** giving me information.

Q. Approximately, how many encounters did you have with each of those sources?

A. **One with each. Didn't revisit** them.

Q. How did you come about having a conversation or encounter with each of the sources?

A. **Every tour that I work I go** out on patrol. I am in an unmarked car. Obviously the main part of my job description is to make street level drug arrests. I patrol drug locations. Over the last ten years or so the drug trade has changed where it's become very common for drug dealers to use major roadways and residential streets off of main roadways and parking lots where they will meet, they will do a drug deal. They will go window to window. The people never even get out of their car. Every tour that I

Talt

work, practically, I ride main thoroughfares along with checking parking lots and the streets that come off of them. So while on patrol, I stop and speak with people all day long, encounter people.

Q. Had you at any time prior arrested or charged those two or three sources with crimes?

A. **No.**

Q. How do you know those sources were in fact drug addicts?

A. **That is pretty much how I** encountered them. They were in locations where drugs are usually sold and after stopping them they gave me a description of people, locations, where they purchased drugs.

Q. Did these sources at any point in time admit to you that they had purchased drugs from Carlos or someone else?

A. **From a Carlos.**

Q. Did the sources ever show you

Talt

what, if anything, they purchased from a Carlos?

A. **No.**

Q. What was the race of each source?

A. **The phone call, I couldn't** tell you. The debriefing done by the outside agency and Detective O'Hara, I was not present for, I don't know. The other people that I spoke with were white males.

Q. Did you ever investigate these white male sources at any other time?

A. **Again, every tour that I work,** I told you that I will ride Sunrise Highway. I will check the LIE. I check major parking lots, and if I encounter anyone who is selling drugs or it fits that I just observed a drug transaction, I am going to investigate that.

Q. With respect to the two to three sources that you indicated who were white, that gave you the description of a Carlos, did you ever have any further investigations or encounters with them?

Talt

A. No.
Q. Can you describe the --
MR. GERMANO: Withdrawn.
Q. What was the description that you received of this Carlos individual?
A. There were similar descriptions of a heavyset male, Hispanic, in his twenties, possibly named Carlos, operating, this was common, was a dark blue, new Cadillac. One person I believe told me that he had glasses.
Q. Did your sources ever describe Mr. Lazzo's disposition? In terms of -- do you know what I mean by disposition?
A. Yes, but no.
Q. Did any source tell you that Mr. Lazo was aggressive?
A. No.
Q. Did you have any reason to believe while you were conducting your investigation that Mr. Lazo was aggressive?
A. No.
Q. How did you initiate contact

Talt

with the sources during your investigations during your patrols?
A. One of them I received a phone call from at the precinct. The others occurred while checking parking lots in the 3rd Precinct area. It's become very common for people to meet in these parking lots, as I explained earlier. A lot of times people involved they chose to meet in a large parking lot. They park far away from everybody else's traffic in that parking lot. Again, I regularly conduct surveillance of these people. It's not normal to sit in a vehicle by yourself, at the end a parking lot away from all of the stores. During my tours sometimes I will interrupt a drug deal, sometimes I will sit and conduct surveillance and no drug deal will occur. Then I will take it upon myself to call a time to go over and interview the person and find out why they are there, and people talk to the police, and that is how --
Q. When you spoke to these

Talt

sources, you were in an unmarked car, correct?
A. Yes.
Q. Did you ever get out of your vehicle during your interaction with the sources --
A. Yes.
Q. -- that we are talking about that led to your investigation of Kenny Lazo?
A. Yes. I don't approach people and stay in my vehicle. It's not safe. I will exit my vehicle almost every time before I speak to someone.
Q. During your conversations with these sources, did they ever represent to you that they did not want to speak to you?
A. These?
Q. Yes, the two sources.
A. No.
Q. Did you ever threaten those sources with arrest?
A. No.

Talt

Q. Do you know if those sources had any criminal history?
A. No, I don't know.
Q. Did you ever promise these sources that you would not arrest them for drug related offenses if they gave you information?
A. No.
Q. Other than the DEA file, was there an active file with NESOT, which you described earlier?
A. An active file, no.
Q. Detective Talt, I would like to step back for a moment on a couple of areas.

During the grand jury presentation were you aware if anybody else testified?
A. I knew other people were testifying, I don't --
Q. Who did you know would be testifying?
A. I knew my partner was going to testify. I knew Officer Judge and

Talt

Sergeant Scimone and Link, everybody involved. I didn't have a list of who was testifying.

**Q.** Do you know of anybody else who testified in the grand jury?

**A. Police officers who** administered aid. I don't know which officers, but I know at least one of the officers who rendered aid testified.

**Q.** You don't know who that officer is?

**A. I don't recall who testified.** I know who was there rendering the aid, but I don't recall who testified.

**Q.** What police officer rendered the aid?

**A. Officer Broderick,** B-R-O-D-E-R-I-C-K, Officer Zurl, Z-U-R-L, Officer Frederick, F-R-I-D-R-I-C-K.

**Q.** Anyone else?

**A. Officer Quesad, Q-U-E-S-A-D-A,** and Officer Cotter, C-O-T-T-E-R.

**Q.** How do you know that one of those officers testified in the grand

Talt

jury?

**A. I believe it was Officer** Quesad. I think I saw her at the court house. I don't know her testimony, but I saw her there.

**Q.** When did you see her at the court house?

**A. One of the days of the grand** jury. I don't remember the day.

**Q.** Did you see any other officers during the time you interviewed with Mr. Collins, both times?

**A. Were they in there speaking** with me?

**Q.** Not speaking with you, but if you saw anybody who was going to be interviewed by Mr. Collins?

**A. No, I didn't see anybody.**

**Q.** What type of -- do you recall the questions that you were being asked during the grand jury presentation?

**A. Specific questions, no I** don't.

**Q.** Other than Mr. Collins, did

Talt

you speak to any other people, either from the District Attorney's office, County Attorney's office, or the police department in preparation for your presentation to the grand jury?

**A. Earlier on I spoke to** Detective Portela.

MR. DUNNE: Other than what you already testified to.

**A. No.**

**Q.** What did Mr. Collins specifically ask you during the grand jury presentation?

**A. I don't recall the questions** that he asked.

**Q.** Do you recall the responses you gave to the questions?

**A. What I recall is, I recall** describing the incident from start to finish to the grand jury. I recall a couple of questions from the grand jury. I recall Mr. Collins asking some questions. I recall identifying some items referencing the investigation, again

Talt

back to the drugs. That is my recollection.

**Q.** You are talking about the photographs and the evidence we talked about earlier?

**A. Correct.**

**Q.** Do you recall any of the questions that the panel asked you?

**A. The specific questions, no.**

**Q.** The account that you gave --

MR. GERMANO: Withdrawn.

**Q.** Did you review the supplementary report in preparation for your presentation to the grand jury?

**A. Yes.**

**Q.** Did you review any other documents?

**A. Yes. I reviewed the case** reference, the drugs that were recovered that night, that was in the name of my partner Detective Newton. He handled the case ON the actual drugs that were recovered on the night in question and I remember reviewing some of that paperwork.

Talt

Q. You reviewed documents --

MR. GERMANO: Withdrawn.

Q. Or than the supplementary report, you reviewed the drug case file with respect to this case?

**A. Yes.**

Q. What kind of documents were maintained in the drug case?

**A. Evidence, paperwork.**

Q. Do you recall specifically what kind of paperwork?

**A. Property evidence paperwork,** evidence analysis for the lab. It was incident paperwork, basically an incident report. It describes the entire incident, facts, evidence recovered.

Q. Does that incident report also include the circumstances that led to Mr. Lazo's death?

**A. No.**

Q. Is it fair to say that it only includes the drug references?

**A. The drugs reference. The two** charges that the case is being -- that

Talt

Detective Newton handling the case it would be criminal possession, controlled substance, third degree.

Q. Other than the drug case, the file, and the supplementary report, did you review any other documents in preparation for the grand jury testimony?

**A. Not that I recall.**

Q. The account that you provided during your testimony was --

MR. GERMANO: Withdrawn. Can you please mark this as Exhibit 2.

(Document was marked as Plaintiff's Exhibit 2 for identification, as of this date.)

Q. Detective Talt, I am placing before you what has been identified as Plaintiff's Exhibit 2. I ask that you take a look at that document?

**A. Yes, I am familiar with it.**

Q. What is the date of that document?

Talt

**A. 4/12/08.**

Q. When did you draft this document?

**A. 4/12/08.**

Q. What is the title of this document?

**A. Death investigation.**

Q. This specific document, what is its title?

**A. Supplementary report.**

Q. Is this an accurate representation of circumstances of this case to the best of your understanding?

**A. It's accurate, yes.**

Q. Is this narrative described in this report similar to the narrative you provided during your testimony to the grand jury?

**A. Similar. My narrative to the** grand jury was a lot more detailed.

Q. With respect to the grand jury, what was in the grand jury testimony that was not included in the supplementary report, excluding any prior investigation

Talt

of who we now know as Kenny Lazo, from the point you actually began to investigate?

MR. DUNNE: That is a different question. Just so I am clear, in terms of the facts excluding that other stuff.

**A. Excluding what other stuff?**

Q. The prior investigation of Mr. Lazo. Prior to 4/12/08. I am specifically talking about from 4/12/08 onward?

**A. What is not included in here?**

Q. What was in your narrative at the grand jury that was not included in here?

**A. Some of the conversations that** I had with Mr. Lazo in the interview room 129A. Every officer who came in and rendered aid, every officer's name is not listed, who I recall rendering what type of aid.

Q. Anything else?

**A. A full description of**

Talt

interview room 129A. There is a lot.

Q. Anything else?

A. **There was a lot. My testimony in the grand jury was a lot longer than this.**

Q. Anything else that you can think of at this point in time?

A. **At this time, no.**

Q. This supplementary report, this was the first report closest in time to the incident that you drafted, correct?

A. **Correct.**

Q. This is a true and accurate representation of the circumstances insofar as you perceived them on that date, correct?

A. **Correct.**

Q. Did you ever indicate in this report that you saw contusions on Mr. Lazzo's face?

A. **No.**

Q. Did you ever show a photographer --

MR. GERMANO: Withdrawn.

Talt

Q. Did you ever receive a photograph during your prior investigations of the person identified as Carlos?

A. **No.**

Q. Therefore is it fair to say that you never showed a photograph of a person who you learned to be Carlos while you were speaking to the sources?

A. **Correct.**

Q. You previously indicated that people talked to the police when we were talking about why the sources had a conversation with you about the individual identified as Carlos.

What occurred during the conversation with the sources --

MR. GERMANO: Withdrawn.

Q. Why did those sources actually have a conversation with you?

MR. DUNNE: I am going object to the extent that it calls for someone else's state

Talt

of mind.

Go ahead if you know.

A. **Somebody called me on the** telephone at the Third Precinct, that was one time. They took it upon themself to just reach out to the precinct and I get the phone call. They want to remain anonymous. They explained to me some details of someone selling drugs. Not Kenny Lazo. It's a description that later fits Kenny Lazo. I have that phone conversation, I recall, again, like I said, approximately two times meeting people in parking lots where I just approach them, I identify myself, we have a conversation. I explained to them what I do and I asked them what are they are there. At the time they tell me that they have drug problems and we get into some details about where they buy drugs, who they buy drugs from.

Q. And you indicated to them that you were an officer as you stated?

A. **When I approach them I am in**

Talt

plain clothes. I am in a suit, in jeans, a T shirt, a sweatshirt. When I approach somebody, I approach them with my shield hung around my neck and I identify myself as a Suffolk County detective.

Q. On April 12, 2008, what was your tour?

A. **5:00 at night to 1:00 in the** morning.

Q. Who was your supervisor during that tour?

A. **That night was Detective** Sergeant Koerber.

Q. Who were you partnered with that night?

A. **John Newton.**

Q. For approximately how long were you partners with John Newton?

A. **We have been partners for** approximately six years.

Q. That tour, did you have any expectations in terms of your duties and roll as a police officer at the start of that tour?

Talt

A. **I explained to you my duties earlier on in the testimony.**

Q. I am asking, if you had essentially a mission planned out for that tour?

A. **No. We left the precinct and we were checking known drug locations in the precinct, but we were not on a mission to arrest Kenny Lazo. If I would have come across two people selling drugs in a car in the Home Depot parking lot, in the Bob's parking lot, in the South Shore Mall, they would have been arrested.**

Q. What vehicle were you operating that day?

A. **I was in an unmarked Montego.**

Q. Was your partner in that same vehicle?

A. **No. He was in another unmarked vehicle, an SUV.**

Q. Is it routine for detectives to operate separate vehicles?

A. **Yes.**

Q. Under what circumstances do

Talt

you operate a vehicle with another detective or patrol officer as a passenger in your vehicle?

A. **I do it both ways. That night it was just my partner and I. We were in separate vehicles in radio contact and phone contact both in the same area. Sometimes we are together, sometimes we separate. It is just one of the ways we do it.**

Q. So you don't always have -- you are not always in view of one another, is that accurate to say?

A. **In view, no. But we stay close in contact so we know what is going on.**

Q. You indicated that you are in radio and phone contact with one another, what band did you operate on that day?

A. **We operated on the 3rd Precinct band, radio band, and the detective radio band.**

Q. When you are operating on one or the other, are you able to listen in on

Talt

the one that you are not operating on?

A. **If you have a portable radio with you you can have one on one channel and another -- depending on how many radios you have, you can be on multiple channels.**

Q. How many radios did you carry on 4/12/08?

A. **The car radio and the portable radio.**

Q. Did you in fact have each radio tuned in to a different band?

A. **Yes.**

Q. Which band was your car radio tuned into?

A. **I don't recall which way I had it. I know I was on both, but I don't know which way I had it set up.**

Q. You use the mobile device in order to stay in contact with Detective Newton, correct?

A. **Mobile device?**

Q. Cell phone.

A. **Yes. That is one of the ways.**

Talt

Q. Is this a County issued cell phone or a personal cell phone?

A. **We have both.**

Q. On April 12, 2008, did you have both?

A. **I don't recall.**

Q. Do both of your cell phones, the County issued cell phone and your personal cell phone, utilize the same network or different networks in terms of Sprint, Verizon, AT&T?

A. **Different, but we don't have phones that are assigned to us. There phones that are assigned to the detective squad. We don't have actual phones. We can take a phone or --**

Q. Do you recall if you took a phone that day?

A. **No. I don't recall.**

Q. Is there a document which would indicate whether you took a phone that day that you would have to fill out in order to obtain a phone from the County?

Talt

A. **No.**

Q. Approximately, how many cell phones are maintained for use by the detectives?

A. **Three to five.**

Q. How is it determined whether a detective uses a cell phone for a tour?

A. **If you need to use a cell phone, you can use the cell phone that is assigned to the third squad, otherwise you can use your own cell phone.**

Q. But when you arrive for a tour and you are suiting up for your tour, how is it determined if you take a cell phone or don't take a cell phone?

A. **If you need one, you take it and you return it at the end of the tour or when you are done using it.**

Q. Is it your usual practice to take a cell phone for a tour?

MR. DUNNE: Object to usual. I don't know what it means but go ahead and answer as best you can.

Talt

A. **Sometimes I do and sometimes I don't.**

Q. Today you don't recall one way or another if you used one issued from the County that day?

A. **No, I don't recall.**

Q. There is no documentation that an officer or detective needs to fill out prior to taking a cell phone and using it for a tour?

A. **You can put something down that you took the phone but the phones are out for use for anyone. You can put a note there that you have the phone. I can put a cell phone number on a radio log. I generally use one of two cell phones in the precinct, but I don't use one every tour.**

Q. Can you identify those two cell phones for us today? Are they labeled with any particular number or identifiable mark?

A. **They are two Nextel cell phones.**

Talt

Q. Are the three to five phones that exist in the detective squad room all Nextel phones?

A. **Yes.**

Q. Do they have identifying numbers labeled?

A. **Yes, they have phone numbers. That is how -- they are not labeled 1, 2, 3, 4, 5. They have three to five phones and they all have their own number.**

Q. Do you recall if Detective Newton carried one of the Nextel phones?

A. **No. I don't recall.**

Q. In your personal --

MR. GERMANO: Withdrawn.

Q. In the office issued cell phone, how are the phones identified?

A. **By phone number.**

Q. Is there any other label within the contact list that states something else?

A. **No.**

Q. In your personal cell phone, how is Detective Newton identified?

Talt

A. **In my personal cell phone?**

Q. In your contact list.

A. **By his name, I believe.**

Q. By his full name?

A. **I don't know.**

Q. On April 12, 2008, how did you come to observe Mr. Lazo?

A. **Shortly after 8:00 p.m. my partner advised me that he observed a blue Cadillac parked in front of Herbee Dodge in West Islip.**

Q. The fact that your partner explained to you that he observed a blue Cadillac in front of the Herbee Dodge, what did that mean to you?

A. **It meant that we had info in the past fitting the description of that vehicle and he saw one just parked by itself in front of a business that was closed at the time. It was 8:00 o'clock on a Saturday night. He was going to start conducting surveillance on that vehicle.**

Q. Did you receive that

Talt

message -- did you have that conversation with Detective Newton over the radio, or cell phone, or something else?

A. **I believe it was over the radio.**

Q. What, if anything, did you tell Detective Newton?

A. **I don't know what I told him, but I know I started heading right over. I was in the area but I made my way over to that location.**

Q. Where were you located when you received the call from Detective Newton?

A. **I was in West Islip. I believe I was on the service road on Sunrise Highway on the opposite side.**

Q. You would have been on the north side?

A. **North side.**

Q. Did you actually begin to make your way over to Herbee Dodge?

A. **Yes.**

Q. What route did you take to get

Talt

there?

A. **I went over, I believe it's Higbie Lane which crosses over Sunrise Highway and when I got over the overpass I positioned myself so I can go in the eastbound direction.**

Q. Are you certain that you were on Higbie Lane when you crossed over Sunrise?

A. **Am I certain, no.**

Q. What happened when you placed yourself in an easterly position?

A. **The vehicle began to travel eastbound on -- the blue the vehicle, the Cadillac, started to travel eastbound on the service road of Sunrise Highway and I started heading in that direction also.**

Q. How did you come to learn that the vehicle began to travel eastbound on the service road?

A. **Detective Newton.**

Q. What did you do at that point?

A. **I started to travel east also.**

Q. What was Detective Newton

Talt

doing at that time?

A. **Following that vehicle.**

Q. What happened after you began to follow the vehicle?

A. **It was eastbound on Sunrise Service, came to a -- Detective Newton was behind him. I was one or two cars behind Detective Newton and the vehicle came to a stop at a red light on Udall Road.**

Q. Was that the first time that you actually visibly saw Detective Newton's vehicle and the blue Cadillac?

A. **I believe so.**

Q. What happened after the car came to a stop?

A. **Waited for the light to turn green, and then I proceeded eastbound on the Sunrise Highway service.**

Q. What happened next?

A. **We followed the vehicle. I later learned that that vehicle is being operated by Kenny Lazo. He is the only occupant in the vehicle.**

Q. Did you later learn that he

Talt

was the only occupant or did you actually see at the time that he was the only occupant?

A. **At the time I can only see him but I could not say for certain that he was the only one in the car but that is the only person I saw, the head.**

Q. Then what happened?

A. **The vehicle reached West First Street in West Islip and made a right turn on to the block.**

Q. Did the vehicle use a signal when it made the turn?

A. **I don't recall.**

Q. You said it made a right turn onto West First?

A. **Yes.**

Q. Then what happened?

A. **There is a slight bend in that road. The vehicle continued around the bend. My partner, who was behind him, continued east on the service road, so Lazo, on normal surveillance would not realize that he was being followed.**

Talt

I paused for a very short time. Lazo entered the block and went around that bend. I then entered the block and pulled over when I saw Mr. Lazo stop in the middle of the roadway.

**Q.** When you paused for that period of time, approximately, how long did you pause for?

**A. Seconds. No more than ten seconds.**

**Q.** When you paused, did you at any point in time lose site of the blue vehicle as it went around the bend?

**A. Yes.**

**Q.** Then you began to proceed and then you saw that the vehicle -- when you proceeded forward, did you notice that the blue vehicle was already stopped?

**A. The vehicle was stopped, yes.**

**Q.** What, if anything, did you see next?

**A. I pulled over and I observed** another vehicle park, that was traveling -- Mr. Lazo now, at that time,

Talt

is traveling in an easterly direction on West First and there is another vehicle traveling in -- there is kind of a curve to it, it would be driving west. And those two vehicles met in the middle of the street, driver's window to driver's window.

**Q.** When you say in the middle of the street, was it between stop signs on a particular block?

**A. It was before -- it was west** of Pine Avenue, or Pine Street, which is the first intersection of that block.

**Q.** Approximately, how far from the intersection were they parked, these two vehicles?

**A. I don't recall. It is a short** block. I don't recall.

**Q.** Did they pull over to the side of the road --

**A. No.**

**Q.** -- at any time?

**A. No.**

**Q.** Was it dark out that evening

Talt

at 8:00 o'clock?

**A. It wasn't totally dark, but it** was dark. There were street lights. It's a residential block.

**Q.** Were the street lights in fact activated?

**A. Yes.**

**Q.** What did you see when these two vehicles were parked next to each other?

**A. They were driver's window to** driver's window and I observed hands come out of both vehicles. Lazzo's vehicle and the other vehicle and hands meet between the two cars.

**Q.** Did you see anything in either person's hand?

**A. No.**

**Q.** Ones you saw the hands meet, then what did you see?

**A. The vehicles both left in** different directions, the directions that they were facing. One vehicle came towards me at a regular speed, and Lazo

Talt

accelerated at a very high rate of speed immediately after the hand to hand transaction.

**Q.** You just indicated there was a hand to hand transaction, but you never saw anything exchanged between the two parties, correct?

**A. I saw the hands meet. The** hand to hand meet.

**Q.** Approximately, how far were you from the hand to hand contact?

**A. A few houses.**

**Q.** More than two houses?

**A. More than two, yes.**

**Q.** More than four houses?

**A. Pretty close, about that. I** can't say for sure. Went around the bend, I saw them stopped, I pulled over right away.

**Q.** Was your perspective from on the bend?

**A. I was around the bend.**

**Q.** You did not have a straight view of the vehicles?

Talt

**A. I went around the bend. I had a pretty straight view of the vehicles.**

Q. Were you stopped at that point?

**A. I pulled over, yes.**

Q. Did you pull to the right side of the road?

**A. I pulled to the right side. I did not pull all the way over to the curb, but I pulled over.**

Q. Did your headlights remain on?

**A. Yes.**

Q. Then after you saw the blue Cadillac accelerate at a high rate of speed, what did you do?

**A. I started to follow it. Lazo drove to -- the first intersection there is Pine. I don't recall if it is Pine Street or Pine Avenue. He made a left turn there. I followed him, made a left turn there. I was behind him. He then approached Sunrise Service Road.**

Q. May I stop you right there. Approximately, how many stop

Talt

signs did you have to proceed through in order to reach that point at the service road?

**A. Two.**

Q. Did Mr. Lazo stop at each stop sign?

**A. No, he did not completely stop at them. He braked, but did not come to a complete stop.**

Q. Are you talking about two times or one time?

**A. Two times.**

Q. Those two occurrences, was that sufficient enough to stop him and issue him a traffic infraction based on your experience?

**A. Yes.**

Q. But you did not stop him at that time?

**A. No.**

Q. Was he driving at a rate of speed in violation of the posted speed limit before he reached that point at Sunrise Highway?

Talt

**A. He accelerated at a very -- I could hear his motor rev when he left, the two subjects met hands, he accelerated, but he did not have that much of a distance to go to get to the stop sign.**

**Once he went through the first stop sign he accelerated again. Yes, I don't know the posted speed limit on those two side blocks, but he was driving at an imprudent, unsafe speed, I can tell you that.**

RL MR. GERMANO: Move to strike the portion that is unresponsive. We'll just mark it for a ruling.

Q. You indicated you don't know what the posted speed limit was, correct?

**A. No, I don't.**

Q. Did you pace him and notice what his rate of speed was at any point?

**A. No.**

Q. Once you reached that point on Sunrise Highway Service Road, what happened?

Talt

**A. He makes a right turn onto the Service Road, I am following him --**

Q. At this point you are heading east?

**A. I am heading east on the Service Road. Now he's accelerating even faster now having hit the Service Road. He is traveling towards the Robert Moses. He gets on the Robert Moses and again is driving very fast. I am behind him. At that time I am not pacing him, but I am aware that we are driving at a high rate of speed.**

Q. Do you know what rate of speed your vehicle was at?

**A. No, I don't. I know it was more than 55 miles per hour.**

Q. Did you ever document anywhere, at any point in time, that you were driving at a rate faster than 55 miles an hour?

**A. No.**

Q. Based on your experience, did you receive any indication that Mr. Lazo

observed your vehicle?

A. I was starting to suspect that he might have.

Q. You were driving north on the Robert Moses, correct?

A. Correct.

Q. What happened as you were driving north?

A. Mr. Lazo was in the left lane heading north, where you reach the Southern State Parkway, if he stayed in that left lane, which I thought he was going to do, because it comes up pretty fast, you would head westbound on the Southern State Parkway. At the last second that Mr. Lazo had, he cut across the traffic lanes and proceeded to the Bay Shore Road entrance which leads you to eastbound Southern State Parkway. At the same time that is what I do.

Q. Where was Detective Newton while you were tailing the blue Cadillac?

A. Behind us, following us, exactly where I don't know, but he had

pulled away and caught up to us.

Q. At any point did you notice his vehicle in your rearview mirror or any other mirror?

A. I don't recall.

Q. Approximately, how many lanes did Mr. Lazo cut across in order to take the Bay Shore Road exit?

A. I believe it's three. I can tell you that he went from the far-left lane over to the far-right lane, however many lanes that may be. That was his route.

Q. That change over three lanes was that an offense that one could receive for a traffic infraction?

A. Yes. It was an unsafe lane change.

Q. Mr. Lazo was never stopped at that point in time?

A. Not at that point.

Q. Up until this point, did you have any conversations with any other police officers?

A. I believe I had a few conversations. That was with the officers that were involved.

Q. What officers did you have conversations with? We are talking about up until the time that Mr. Lazo, or the blue Cadillac, made the lane change?

A. I believe there were some radio transmissions of the direction of travel.

Q. Between who?

A. Between, I don't remember, recall exactly who was transmitting but the officers that were present were Officer Judge, Sergeant Scimone, and my partner, Detective Newton.

Q. Is it Sergeant Scimone or Scimone?

A. The correct pronunciation?

MR. DUNNE: Scimone.

Q. At what point, did you first contact somebody other than Detective Newton regarding your surveillance, pertaining to the surveillance, pertaining

to you tailing the blue Cadillac?

A. Prior to all of this I asked Sergeant Scimone if he would be available. He was with Officer Judge, if they would be available to assist us.

Q. When you asked if they were going to be available to assist you, did you have an expectation of what they would be assisting you with?

A. Could be anything, a traffic stop, an arrest.

Q. Did this conversation take place before Detective Newton informed you that he recognized the blue Cadillac at Herbee Dodge?

A. Before.

Q. At that point did you have any further conversations with Sergeant Scimone or Police Officer Judge?

A. At that it was just -- no. We are going to be in that area, can you help us out. They agreed, came over our way, and that is it.

Q. While you were traveling on --

Talt

up until the point where the blue Cadillac made the lane change, did you have any further conversations with Sergeant Scimone, Officer Judge or Detective Newton?

**A. One more time?**

Q. Up until the point where the blue Cadillac was observed making that lane change, did you have any conversations with Officer Judge, Sergeant Scimone, or Detective Newton, other than the one where you said are you going to be available to help us out?

**A. There was some direction,** direction of travel, some identifying the vehicle. Transmissions of that nature.

Q. Did you make any requests of those officers?

**A. Make any requests, I requested** that Sergeant Scimone and Officer Judge come over and assist us.

Q. At what point in time did you make that request?

**A. I don't know, approximately**

Talt

7:30, 8:00 o'clock --

Q. I am talking about when you were already on the road tailing the blue Cadillac, when was the first time you made contact with Sergeant Scimone and/or Officer Judge --

MR. GERMANO: Withdrawn.

Q. From the time that Detective Newton indicated that he observed a blue Cadillac to the point where there was that lane change that you observed on the Robert Moses Causeway, when was the first point in time you made contact with Sergeant Scimone or Police Officer Judge?

**A. Again, I don't recall who** actually had the radio transmissions but it was car is here, the car is traveling eastbound, we are at Udall Road. I don't recall if I made the transmissions, but we are all on the same radio band so we are all having this same conversation, so we are all aware of our direction of travel.

Q. Those officers would not be aware of your route or what you were doing

Talt

unless you told them, correct?

**A. Again, this is what I believe** that they understood that I was following because these were transmissions that were being given of where the vehicle was. We are asking them for help and we are giving directions, so I am assuming that they know where I am. That I am behind him.

Q. Do you know what type of vehicle Sergeant Scimone and Officer Judge were in?

**A. A marked police vehicle.**

Q. From the point in time when you observed the blue Cadillac make the lane change, what happened next?

**A. As you had asked earlier if I** was suspicious of him thinking that he may know that I was following him, that is when I became very suspicious that he saw me behind him, being that we left a residential area, and now we are all the way up the parkway and he made some different changes in his route. That is when I actually pass. The vehicle traffic

Talt

stop occurs at the Bay Shore Road entrance to the Southern State Parkway, east. At that moment, I decide that I am going to pass the traffic stop rather than pull over where, if Lazo was aware that I was following him, now that he would know that I followed him from this hand to hand movement I saw him involved in between his vehicle and the other vehicle.

So I pass the actual traffic stop and I go on to the Southern State Parkway in an eastbound direction and I pull over around the first bend onto the shoulder of the roadway -- onto the grass of the roadway.

Q. What exit were you closest to?

**A. I was between, closest -- in** reverse, I was closest to that Bay Shore Road exit and the next exit east of me would be Fifth Avenue. I was much closer to Bay Shore Road.

Q. Did you instruct Sergeant Scimone or Police Officer Judge to make a traffic stop of the blue Cadillac?

Talt

**A. I believe I did.**

Q. At what point in time, did you instruct those officers to make a traffic stop?

**A. There was discussion of are we** going to stop him and that is when the traffic stop occurred. Right at that moment when we got on the entrance to hit the Southern State Parkway, we were talking and there was transmissions of, yes, this is where we are going to stop him. I don't recall the exact words that are said, but I wanted them to stop the car at that point.

Q. At the point from the lane change?

**A. Yes.**

Q. Do you have in your personal cell phone Scimone's cell phone number?

**A. Yes.**

Q. Do you have Officer Judge's cell number in your personal cell phone?

**A. Yes.**

Q. Barring the Nextels that you

Talt

described earlier --

MR. GERMANO: Withdrawn.

Q. Do the Nextels that you described earlier contain Sergeant Scimone's and Officer Judge's telephone number?

**A. No.**

Q. Do you recall earlier in the evening when you first had contact with Scimone how you had that contact, was it over the radio, or cell phone, or something else?

**A. First contact was cell phone.**

Q. Would that have been with your personal cell phone?

**A. I don't recall.**

Q. Does Sergeant Scimone, to the best of your knowledge, have those five Nextel phone numbers in his possession?

**A. I don't believe he does.**

RQ MR. GERMANO: To the extent that they have not already been demanded, we make a demand for any and all cell

Talt

phone records from 4/12/08 from Detective Talt's personal cell phone and the from the police issued Nextel phones.

MR. DUNNE: Put it in writing and I will take it under advisement.

Q. Did you indicate to either Detective Newton, Sergeant Scimone, or Officer Judge the reason you wanted them to make a vehicle stop of the blue Cadillac?

**A. Yes.**

Q. What was that reason that you gave them?

**A. I advised my partner, earlier** on, that I observed a reason for the vehicle to be stopped.

Q. What was that reason?

**A. The first reason that I wanted** it stopped was the apparent hand to hand transaction that I witnessed. Then after that there were numerous traffic violations and that is why the vehicle was

Talt

stopped.

Q. Did you ever tell Sergeant Scimone or Officer Judge that you wanted the vehicle stopped?

**A. Again, I believe that there** was a radio transmission between me and my partner that we wanted to stop the vehicle. I don't recall the exact words but, yes, I wanted them to stop the vehicle.

Q. But you don't recall if you gave instructions for them to stop the vehicle?

**A. I don't recall how it was** given to them. I just know that they were aware, that I wanted the vehicle stopped.

Q. While you were situated in front of the vehicle stop, for approximately how long did you remain stationed there?

**A. Initially, I pulled over and I** was on the grass, a couple of minutes went by, I believe, when a New York State trooper in a marked police unit pulled

Talt

over to me to see if I needed any type of assistance, thinking I was a disabled motorist, I imagine.

Q. What conversation did you have with the state trooper?

**A. I identified myself as a** police officer. I told him that I was with the officers that were involved in the traffic stop to the west of us, that he had just passed. He said okay. He told me that they were okay, they were on a stop. He proceeded east on the Southern State Parkway and again I sat for another few minutes. During that time --

Q. Let's stop there for one second. I will allow you to finish that answer.

A couple of minutes passed when that trooper arrived, what was that trooper's name if you know?

**A. I don't know.**

Q. What did that trooper look like?

**A. He was a male.**

Talt

Q. Was he white?

**A. I don't recall if he was** white, Black, Hispanic. He was a male.

Q. Did he get out of his vehicle to talk to you?

**A. No, he pulled up next to me.**

Q. When you said earlier that he said -- he saw the vehicle stopped, correct?

**A. Yes.**

Q. Did he tell you about anything about what he saw?

**A. No. Obviously, if there was** something going on he would not have made it to me, he would have stopped. I said, I am with them. I don't remember his exact comment, but he said they are right back there. He continued eastbound and I sat.

Q. You sat for approximately how much longer?

**A. That was probably like a** minute or two before he came up, then a minute or so later, a couple of minutes

Talt

later I got a radio transmission and a phone conversation with Officer Judge who told me who was in the vehicle. He identified the operator to me from a driver's license ID that it was, subject's name was Kenny Lazo.

Q. One moment.

When you said Officer Judge contacted you via radio and phone, which came first?

**A. Radio.**

Q. What did he specifically say over the radio?

**A. It was a very short** transmission. I don't recall. I believe he was turning up his -- turning on his -- going, getting cell phone and --

Q. What was that?

**A. He was either turning on his** cell phone or getting his cell phone and we were going to talk over the phone so Kenny Lazo couldn't hear the radio.

Q. Was Officer Judge next to or near Kenny Lazo when he was making the transmissions to you?

Talt

**A. I am not sure where he was** exactly.

Q. What, if anything, did you tell Officer Judge?

**A. I told him that I observed the** operator of that vehicle involved in a hand to hand transaction back on a street in West Islip.

Q. Did you give Officer Judge any instruction or suggestion at that time?

**A. No.**

Q. What, if anything, happened next?

**A. We stopped communication. I** sat for another minute or two, a couple of minutes. I didn't have -- it was actually a couple of minutes. I started feeling uncomfortable not hearing from them, no phone calls, no radio transmissions.

Q. Was it more than five minutes?

**A. I would say so.**

Q. Was it more than ten minutes?

**A. No, I don't believe so.**

Talt

Q. What did you do after not hearing from them for five to ten minutes?

A. **I entered traffic in the eastbound direction on the Southern State Parkway and I was heading to the Fifth Avenue exit, where I was going to circle around, and go back westbound on the Southern State Parkway. Before I reached Fifth Avenue on my detective radio band is when I first heard the transmission of my partner screaming for help and --**

Q. You heard Detective Newton screaming for help?

A. **Correct.**

Q. On the detective band?

A. **On the detective band.**

Q. What did you hear Detective Newton say on the detective band?

A. **He identified himself and said we need an assist at the Bay Shore Road entrance to the Southern State Parkway.**

Q. Did he give an explanation for needing an assist?

A. **Need an assist.**

Talt

Q. What, if anything, did you do when you heard that transmission come through?

A. **I immediately advised him, that he was on a detective radio band, and that is where he put that out to, which is not monitored by a radio dispatcher. As soon as I advised him of that, I immediately went to the other radio that I had, which is the 3rd Precinct radio band, and put over a radio transmission that my partner and a COPE unit needed an assist at that location.**

Q. Did somebody respond to your request?

A. **Yes.**

Q. Did somebody respond to your radio transmission to you?

A. **Yes.**

Q. Who responded to you?

A. **The dispatcher.**

Q. What did the dispatcher tell you?

A. **The dispatcher acknowledged me and then other units from the precinct started answering up saying that they were responding.**

Talt

Q. Did the dispatcher ask for any further information about what the assist was for?

A. **No. Just -- it was just information of where it was, where the officer was that needed the assist.**

Q. At that point in time, did you pull over or did you do this while driving?

A. **While I was driving.**

Q. What happened next?

A. **I got off at Fifth Avenue. I went over the overpass on Fifth Avenue to the Southern State Parkway westbound. I entered the Southern State Parkway and I proceeded west looking for a median where I can cut through to come up behind the vehicles, behind the officers who needed the assist.**

Q. Did you ever find a median to cut through?

Talt

A. **Yes.**

Q. Did you hear any further transmissions over the radio up until that point in time?

A. **I heard other officers responding. They would give out -- I don't recall exactly who was responding, but you would give your car number, that you are responding and that was it.**

Q. Did you have any further cell phone communications with anybody up until that point?

A. **No.**

Q. What happened when you reached the median?

A. **I cut through.**

Q. Where is this median located?

A. **Far away. I had to go a good distance --**

Q. How far?

A. **It was a long distance before I found one that I could cut through.**

Q. More than a mile?

A. **About a mile. Seemed longer**

Talt

than a mile, but it was probably a mile or two miles I would say.

Q. Can you give any specific location where it was?

**A. In the middle of Southern** State Parkway. There is a path that the state troopers use to gain entrance to both sides of the roadway and that is what I went through.

Q. Do you know what exits it was between?

**A. It was definitely west -- the** one that I found was definitely west of Bay Shore Road, because I had to cut across and then come back around in an eastbound direction.

Q. What happened after that?

**A. I arrived back at the -- I** arrived at the scene.

Q. Where did you park your vehicle?

**A. To the west of the officers on** the left side of the road, on the grass.

Q. The left side of the road

Talt

would be the opposite side of the road?

**A. Which is the -- you have the** Bay Shore Road entrance to the Southern State Parkway. I was to the north of the roadway where I had to walk over the roadway to them.

Q. You only had to walk over the roadway that was heading one direction of traffic, right?

**A. Right.**

Q. You were not totally on the opposite side?

**A. No. Just the eastbound** traffic coming from the Bay Shore Road is what I had to cross over.

Q. Approximately, how far back were you from where the stop was?

**A. Not far.**

Q. A matter of feet, or yards?

**A. Yards.**

Q. At that point in time, do you believe your vehicle was noticed --

MR. GERMANO: Withdrawn.

Q. At that point in time you put

Talt

your vehicle in a position that it could be noticed from Mr. Lazo, correct?

**A. Mr. Lazo was already in** custody.

Q. When you say in custody, was he already -- was he at the scene?

**A. I believe he was just pulling** away from the scene, just had left. There were a few cars that were pulling away, but he was no longer there.

Q. When you first arrived and parked your vehicle on the left side of the road, how many vehicles did you see?

**A. I saw a couple of marked** police cars. I saw Lazo's vehicle, and I saw my partner's vehicle.

Q. The two marked cars, were either of them the COPE unit vehicle?

**A. Yes, one of them was.**

Q. Who was the driver of the second marked car that you saw?

**A. I don't know.**

Q. Did you see Officer Link at the scene?

Talt

**A. No.**

Q. What officers did you see at the scene?

**A. I saw Officer Judge and** Sergeant Scimone, that I remember. I immediately went to my partner and had a brief conversation with him.

Q. Did you see anybody other than Judge and Scimone and Newton at the scene?

**A. I don't know who. I know** there were more, I don't recall who.

Q. Approximately how many other officers do you recall seeing?

**A. No idea.**

Q. More than two?

**A. I have no idea. I was just** going to find out what happened to my partner.

Q. Approximately, how many minutes passed from the time you first drove past the blue Cadillac until the point where you returned and wrapped around and parked your vehicle on the side of the road behind the scene?

A. **At least ten minutes.**

Q. Did you hear any radio transmissions or cell phone conversations once Mr. Lazo was placed in handcuffs?

A. **Cell phone?**

Q. Cell phone.

A. **No.**

Q. Any radio transmissions that he was actually in handcuffs?

A. **I don't recall hearing any.**

Q. Did you hear -- what other conversations or transmissions did you hear while you were wrapping around to come to that point?

A. **I heard officers answering up** on the radio saying they are responding. I don't remember the exact words that were used, but I recall hearing something to the affect that they were controlled.

Q. Who did you hear that transmission from?

A. **I don't recall which officer** said it, but there was a notification something to the affect of that the

situation was controlled.

Q. Did you have an understanding as to why it was not -- why the situation became that way in the first place, at that point in time?

A. **When an officer calls for an** assist, other officers respond. And when those officers get there or when the officer who called for the assist gets it under control, for the safety of everybody, police officers, public, responding, we put out a notification that the situation is, there are many ways to say it but, that the situation is controlled, so police officers are not responding at a high rate of speed with lights and sirens, for the safety of everybody.

Q. At that point in time you didn't know what led to the situation not being in control, other than that officer needed an assist?

A. **Yes.**

Q. Was each officer who responded

to the scene that you saw white?

A. **I have no idea. Again, when I** responded there, I know I saw these officers --

Q. You are referring to the --

A. **I am referring to Officer** Scimone and Officer Judge, and I saw my partner, and I don't know, I have no idea of color.

Q. Did you ever see Kenny Lazo at that scene?

A. **No.**

Q. Do you actually recall seeing the vehicle pulling away that Mr. Lazo may have been detained in?

A. **I may have, but I don't know** for certain that that was the vehicle.

Q. The vehicle that you saw pulling away, was it marked or unmarked?

A. **Marked.**

Q. Did you notice what officer was driving that vehicle?

A. **No.**

Q. Did you notice if there was

more than one officer in that vehicle?

A. **No.**

Q. No you didn't notice or no there wasn't?

A. **No, I did not notice.**

Q. When you arrived at the scene what conversations, if any, did you have with Detective Newton?

A. **My partner told me that who he** was referring to as Kenny Lazo was fighting. He didn't want to get handcuffed. He was out of breath, my partner, he was disheveled. Just on about how the guy wouldn't get handcuffed.

Q. Did he ever, did Detective Newton, at that point in time, ever tell you that Mr. Lazo was fighting the other officers?

A. **Yes. He said that he was** fighting and he wouldn't let them handcuff him.

Q. Did he specifically say how Mr. Lazo was fighting?

A. **No.**

Talt

Q. Did he say that Mr. Lazo punched an officer?

A. **No.**

Q. Did he say that Mr. Lazo elbowed an officer?

A. **He didn't say specifics. He** said fighting.

Q. Did Detective Newton tell you he had to use force in order to make Mr. Lazo come into compliance?

A. **He didn't say that he used** force. He didn't say that he -- he just said there was fighting. He didn't say anything specific about what force was used.

Q. Did you ask Detective Newton if he had to use force?

A. **No. It was apparent to me** that obviously he did.

Q. How was it apparent to you that Detective Newton used force?

A. **Because he told he me that he** was fighting with him.

Q. What conversation did you have

Talt

with Officer Judge at the scene, if any?

A. **I don't recall having a** conversation with him there.

Q. What conversation did you have with Sergeant Scimone at the scene, if any?

A. **I don't recall.**

Q. Approximately, how long did you remain at that scene for?

A. **A short time.**

Q. Less than five minutes?

A. **Less than five minutes.**

Q. Did any officer, sergeant, or detective indicate to you that force was used specifically?

MR. DUNNE: You mean the word force?

MR. GERMANO: Sure. The word force.

A. **No.**

Q. Did any officer tell you that they had to hit Mr. Lazo with their flashlights during the period of time when he was fighting?

Talt

A. **No.**

Q. Did you notice whether any officer received, or appeared to be injured at that time?

A. **They all appeared to be** exhausted and somehow injured. They were hands -- you know, bending over. My partner, I remember my partner saying something about his hand hurting.

Q. Other than your partner indicating that his hand was hurting, did any other officer, detective, or sergeant, or police officer indicate that he was injured in any way?

A. **No.**

Q. Did you ask if any officers were injured in any way?

A. **I asked my partner if he was** okay.

Q. Other than indicating that his hand was hurting --

MR. GERMANO: Withdrawn.

Q. Did he say what hand was hurting?

Talt

A. **He made a gesture with his** hand that was hurting. I don't recall which hand it was. He moved his hand. He showed me his hand, that he hurt his hand.

Q. Did he tell you how he hurt his hand?

A. **No.**

Q. Did you ask how he hurt his hand?

A. **No.**

Q. Did you make any suggestion or instruction to Detective Newton at that point in time?

A. **No.**

Q. What, if anything, did you do next?

A. **Went the 3rd Precinct.**

Q. How did you get to the 3rd Precinct?

A. **Drove.**

Q. What vehicle did you drive?

A. **My police car.**

Q. Did you at any point in time drive the blue Cadillac?

Talt

A. **Yes.**

Q. When did you drive the blue Cadillac?

A. **I drove to the precinct,** dropped off one of the -- either mine or Detective Newton's vehicle, and then responded back, and I drove the Cadillac to the precinct.

Q. The first time you drove back to the precinct, who did you drive with?

A. **Myself.**

Q. Detective Newton followed you?

A. **He had his own car, yes.**

Q. You met at the precinct?

A. **Yes.**

Q. Is that where you dropped off your vehicle?

A. **A vehicle. I don't remember** which vehicle we returned.

Q. Did you drive back to the scene or did he drive back to the scene?

A. **I don't know who drove back to** the scene, but I drove the Cadillac into the precinct.

Talt

Q. Approximately, how much time passed from the time you left the scene until the time you returned to the scene?

A. **Minutes, less than -- the 3rd** precinct is located on Fifth Avenue, just north of the parkway. We drove directly there, dropped the car, went directly back, picked up the car, and went right back to the precinct.

Q. When you arrived at the scene the initial time, did you do any investigation in and around the scene?

A. **Alls I did was talk to my** partner.

Q. It is fair to say you never looked for contraband in or around the blue Cadillac?

A. **Yes. I did not.**

Q. When you arrived back at the scene the second time, who was there, if anybody?

A. **There were marked police cars,** but I don't recall who.

Q. Were there more than two

Talt

officers there?

A. **I have no recollection of how** many were there. I know there were police officers, but I have -- I went immediately back. I got in the blue Cadillac. I drove it to the precinct.

Q. When you arrived at the scene the second time to get to the blue Cadillac, did you see Sergeant Scimone there?

A. **No.**

Q. Did you see Officer Judge there?

A. **Not that I recall.**

Q. Approximately, how much time passed, from the time you left the first time to drop off your vehicle and return to the scene?

A. **Minutes.**

Q. Approximately what time was it?

A. **It was approximately 8:30,** 8:35, somewhere around there. I don't know.

Talt

Q. Is it fair to say it was dark out?

A. **Yes.**

Q. Were there any stop lights --

MR. GERMANO: Withdrawn.

Q. Were there any street lights in or around the area where the stop occurred?

A. **There were lights on the** parkway.

Q. Specifically, within that region where it occurred, do you recall seeing any street lights?

A. **I don't recall seeing them,** but there are street lights, road lights.

Q. Approximately, what time did you return to the precinct with the Cadillac?

A. **Approximately 8:40 p.m.**

Q. Where did you place the vehicle, park the vehicle?

A. **In the back lot of the** precinct.

Q. What did you do once you

Talt

returned to the precinct after parking the vehicle?

A. **I entered the detective squad room.**

Q. Who was in the detective squad room, if anybody?

A. **Detective Sergeant Koerber,** and Officer Link.

Q. Did you have any conversations with either officer?

A. **Yes.**

Q. Did you have a conversation with Detective Sergeant Koerber?

A. **Yes.**

Q. What conversation did you have with him?

A. **I believe I first spoke to** Officer Link. Officer Link turned over to myself and partner a clear plastic bag that he recovered from Kenny Lazo, while walking him into the precinct, that contained 12 individual packages of cocaine, powdered cocaine, along with money that he recovered from Kenny Lazo's

Talt

pants.

Q. Again, the question was what conversation did you have with Detective Sergeant Koerber at that time?

A. **At that point, I didn't have** one. I had a conversation with Link.

Q. When was the first conversation you had with Detective Sergeant Koerber?

A. **Immediately after I spoke with** Link.

Q. What conversation did you have with Detective Sergeant Koerber?

A. **I advised him that Kenny Lazo** was under arrest at the Third Precinct by us, my partner and I, and that he is our prisoner.

Q. Did you have any further conversations with Officer Link at that time?

A. **Gave me the evidence, no.**

Q. At this point in time, where did you go next?

A. **I went into our office. I**

Talt

secured the money and the -- the money and the drugs, along with my firearm, and then I entered interview room 129A with Kenny Lazo where he was lodged.

Q. At no point in time, up until you entered room 129A, did you learn that Mr. Lazo was hit by flashlights?

A. **No.**

Q. Was that the first time you saw Mr. Lazo, did you see him at any other point in time prior to being in interview room 129A?

A. **If you consider me seeing him** while he was operating a vehicle not knowing who he was, then it is not the first time. The first time that I come face to face with Mr. Lazo, is in the interview room 129A.

Q. Did you see him pass by you at any point in time while you were at the precinct before you went into interview room 129A?

A. **I don't think so.**

Q. Were you involved in any of

Talt

the booking procedures?

A. **Yes.**

Q. How were you involved?

A. **When I entered the room, I** entered the room to start the arrest process.

Q. When you entered that room what observations did you make of Mr. Lazo?

A. **He was very angry.**

Q. How did he express that he was angry?

A. **He kept cursing very loud.**

Q. What was he saying?

A. **Fuck, shit, fuck. Constant** fucking and shiting. At the same time, while he was doing that, his left hand was handcuffed the -- he was sitting in a chair that has handcuffs connected to a desk where I was processing him and he kept ripping the handcuff away from the desk. One hand is in a cuff. One hand is attached to a ring which is affixed to the desk. He just keeps ripping his hand away

Talt

as he is screaming and cursing.

Q. With respect to Mr. Lazo's behavior, did you draw any conclusions?

**A. He was angry. And then he** switched he was upset with -- he said he didn't want to go to jail.

Q. So the fact that he transitioned from anger to feelings of upset-ness, did that behavior appear to be bizarre at any point?

MR. DUNNE: Whatever that means. But go ahead and answer it.

**A. Most people who get caught** doing something don't want to go to jail. No one wants to go to jail. So he was angry and upset at the same time because he knew he was in a lot of trouble.

Q. My question is, did that behavior, did it exhibit -- did the behavior that Mr. Lazo exhibited to you appear to be, how would you characterize that behavior?

**A. Typical. He is upset that he**

Talt

got arrested and he is angry about it and he is carrying on, and I am trying to calm him down.

Q. How did you try and calm him down?

**A. I was telling him calm down,** relax. We have some things we have to do here.

Q. What things did you have to do?

**A. This is just the start of an** arrest. I am going to advise Mr. Lazo of his rights. I am going to do an arrest worksheet, process the arrest, process the evidence, fingerprint Mr. Lazo, photograph Mr. Lazo.

Q. What did you do?

**A. I tried to calm him down by** saying calm down. Relax, calm down. He kept yelling, cursing. The fuck, the shit. I don't know want to go to jail.

Q. Did you fill out any of the paperwork?

**A. I never got started.**

Talt

Q. You never photographed Mr. Lazo?

**A. No.**

Q. While you were in the interview room with Mr. Lazo, did any other officer come into that room? By officer I am including sergeants, detectives, et cetera?

**A. Prior to anyone coming in the** room, he did calm down a little bit and he asked me for some water. So I exited the room and I got him two styrofoam cups of water.

Q. Did you see any other officer enter that room at that time?

**A. No.**

Q. So as far as you know you were the only one that had contact with him in that room at that time?

**A. Yes.**

Q. After you got two cups of water, what happened?

**A. I got two styrofoam cups of** water. I immediately returned to the

Talt

interview room. I placed the two cups of water on the corner of the desk where Mr. Lazo was sitting. He was calming down. He took with his right hand which was not cuffed, he reached over and took one of the cups and drank from the cup and placed the cup back on the desk.

Q. Then what happened?

**A. That is when he just, he was** just staring at the wall in front of him, and that is when Detective Sergeant Koerber entered the room.

Q. For approximately how long was he in that position before Detective Sergeant Koerber entered the room?

**A. Just started. Seconds. He** drank the water. He put the cup down. He was looking straight ahead. The sergeant walked in the room. It was immediate.

Q. At any point in time did you contact a supervisor or anybody else about Mr. Lazo's behavior before you went and retrieved the water for him?

**A. I didn't contact anybody, but**

173

Talt

the way the detective squad room is set up, interview room 129A comes right out to the -- there is one door into that room. When you exit that room, you are in the detective squad room. So anybody who was in that squad room heard him yelling and knew how he was behaving.

**Q.** So you suspect that Detective Sergeant Koerber did in fact hear Mr. Lazo yelling?

**A. Yes.**

**Q.** He did in fact hear your instructions to the Mr. Lazo or your conversations with Mr. Lazo during that period of time?

**A. No, I don't know if he would** have heard my conversation because I was talking to him in a calm manner just trying to get him to relax.

**Q.** Were Mr. Lazo's legs shackled at the time?

**A. No.**

**Q.** At this point in time you had no knowledge that there had been force

174

Talt

used against Mr. Lazo?

**A. I knew that there was force** used. My partner told me he was involved in a fight with Mr. Lazo.

**Q.** Did you know, at that point in time, that your fellow officers used flashlights and hit Mr. Lazo on, or about, his body with flashlights?

**A. No. I did not have detailed** information of force.

**Q.** So you did not know that?

**A. No.**

**Q.** What did Mr. Lazo's face look like to you from the moment you stepped into the interview room?

**A. He looked very angry.**

**Q.** Did you see any bruising or contusions about his face?

**A. He had some bruising, I** recall, on one side of his face.

**Q.** What side of his face did he have bruising?

**A. I believe it was some bruising** on the right side of his face.

175

Talt

**Q.** When you saw that bruising on the right side of his face, did you tell a supervisor or sergeant that you saw that bruising?

**A. It was abrasions. At that** point the Detective Sergeant was going to come in and conduct an interview of that prisoner.

**Q.** So you did not contact a supervisor that you saw bruising and abrasions on Mr. Lazo's face?

**A. No, I did not.**

**Q.** You never contacted or requested that an ambulance be dispatched for Mr. Lazo, correct?

**A. Yes, I did.**

MR. GERMANO: Withdrawn.

**Q.** When you first saw Mr. Lazo and acknowledged that he had bruising about his face, did you ever contact or have an ambulance dispatched for him?

**A. No.**

**Q.** It wasn't until after Mr. Lazo collapsed that you had an ambulance or y

176

Talt

requested medical attention for Mr. Lazo?

**A. No. You are wrong. That is** not what happened.

**Q.** Okay, so we will get there. How do you want do this?

**A. Do you want to ask me a** question or do you want to just tell me what happened?

MR. DUNNE: Off the record.

(Discussion off the record.)

(Time Noted: 3:30 p.m.)

Talt

ACKNOWLEDGMENT

STATE OF NEW YORK )
:ss
COUNTY OF )

I, CHRISTOPHER TALT, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of May 3, 2011; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________
CHRISTOPHER TALT

Signed and subscribed to before me, this day of , 2011.

______________________
Notary Public, State of New York

-----------------I N D E X-----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| CHRISTOPHER TALT | MR. GERMANO | 4 |

RULING: 126

---------------DOCUMENT REQUEST---------------

PAGE 138 Cell phone number records

------------------EXHIBITS------------------

| PLAINTIFF'S | | FOR I.D. |
|---|---|---|
| 1 | Document | 81 |
| 2 | Document | 102 |

(Counsel retained exhibits.)

CERTIFICATE

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

I, JUDY GROB, a Notary Public within and for the State of New York, do hereby certify:

That CHRISTOPHER TALT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of May, 2011.

____________________
JUDY GROB

**$**

**$5,000** [3] - 45:21, 46:2, 53:17

**'**

**'92** [1] - 21:13
**'93** [1] - 24:4
**'95** [1] - 7:24

**1**

**1** [5] - 81:23, 81:25, 82:5, 115:9, 178:13
**1-10** [2] - 1:15, 2:15
**100** [2] - 1:19, 3:11
**102** [1] - 178:14
**10:00** [2] - 68:25, 69:2
**10:14** [1] - 1:21
**11550** [1] - 3:6
**11702** [1] - 1:24
**11706** [1] - 5:13
**11747** [1] - 3:18
**12** [10] - 62:15, 66:16, 83:7, 83:15, 86:6, 89:13, 108:7, 112:5, 116:7, 165:23
**124** [1] - 1:23
**126** [1] - 178:6
**129A** [8] - 104:20, 105:2, 167:4, 167:7, 167:13, 167:19, 167:23, 173:3
**138** [1] - 178:9
**13th** [1] - 67:16
**14** [1] - 82:23
**15** [13] - 7:9, 29:4, 49:3, 49:24, 50:14, 50:22, 51:13, 51:14, 51:16, 53:25, 54:11, 61:22, 62:3
**1630** [2] - 5:12, 5:22
**17** [1] - 22:17
**1988** [1] - 21:22
**1989** [1] - 21:22
**1992** [1] - 21:7
**1993** [1] - 7:12
**1994** [1] - 7:12
**1995** [2] - 7:23, 9:6
**1996** [1] - 10:21
**1:00** [2] - 67:16, 108:9

**2**

**2** [5] - 102:14, 102:16, 102:21, 115:9, 178:14
**20** [14] - 29:4, 49:3, 49:24, 50:14, 50:23, 51:13, 51:14, 51:16, 53:25, 54:11, 61:22, 62:3, 69:23, 76:11
**2000** [2] - 35:9, 39:17
**2001** [3] - 13:22, 15:16, 39:17
**2002** [2] - 42:9, 43:13
**2003** [2] - 42:9, 43:13
**2004** [2] - 18:2
**2008** [9] - 62:15, 66:17, 83:7, 83:15, 86:6, 89:13, 108:7, 112:5, 116:7
**2010** [1] - 82:23
**2011** [4] - 1:21, 177:10, 177:21, 179:22
**202** [1] - 1:23

**3**

**3** [3] - 1:21, 115:10, 177:10
**30** [2] - 32:21, 76:13
**3:30** [1] - 176:14
**3rd** [25] - 5:21, 10:24, 11:2, 11:22, 12:21, 18:5, 19:2, 32:2, 32:12, 32:14, 32:17, 33:3, 33:9, 40:2, 66:22, 67:9, 78:7, 89:22, 94:7, 110:21, 146:11, 160:18, 160:19, 162:5, 179:21

**4**

**4** [2] - 115:10, 178:4
**4/12/08** [6] - 103:2, 103:5, 104:11, 104:12, 111:9, 139:2
**40** [1] - 76:15
**4:00** [1] - 23:16

**5**

**5** [1] - 115:10
**516-938-4000** [1] - 1:24
**55** [2] - 128:18, 128:22
**556** [1] - 3:5
**5:00** [1] - 108:9
**5th** [1] - 5:22

**7**

**7:30** [1] - 134:2

**8**

**81** [1] - 178:13
**83rd** [3] - 24:15, 24:18, 24:21
**8:00** [5] - 23:16, 116:9, 116:21, 123:2, 134:2
**8:30** [1] - 163:23
**8:35** [1] - 163:24
**8:40** [1] - 164:20

**9**

**999** [1] - 3:17

**A**

**a.m** [1] - 1:21
**A/k/a** [1] - 88:19
**a/k/a** [4] - 83:21, 84:3, 85:16, 88:12
**able** [2] - 58:13, 110:25
**abrasions** [4] - 54:15, 54:25, 175:6, 175:12
**Academy** [4] - 8:7, 8:9, 9:23, 21:11
**academy** [6] - 8:11, 9:10, 10:13, 10:20, 14:21, 22:19
**accelerate** [1] - 125:15
**accelerated** [4] - 124:2, 127:2, 127:4, 127:8
**accelerating** [1] - 128:7
**accident** [12] - 35:16, 36:3, 37:14, 39:4, 42:4, 42:5, 50:7, 50:9, 50:13, 52:17, 54:14, 60:5
**account** [3] - 69:25, 100:11, 102:10
**accurate** [5] - 82:19, 103:12, 103:15, 105:14, 110:14
**accurately** [1] - 6:18
**acknowledged** [2] - 146:25, 175:20
**action** [7] - 35:14, 35:24, 36:6, 47:15, 53:23, 55:4, 179:17
**actions** [17] - 25:16, 29:12, 36:21, 41:22, 44:9, 44:17, 44:22, 46:9, 46:13, 46:14, 49:23, 51:21, 54:11, 59:19, 60:25, 61:3, 61:15
**activated** [1] - 123:7
**active** [2] - 96:11, 96:13
**activity** [2] - 18:25, 85:6
**actual** [5] - 36:23, 86:25, 100:23, 112:16, 136:11
**addict** [1] - 85:21
**addicts** [9] - 84:5, 84:13, 84:22, 85:2, 85:8, 85:20, 89:12, 89:25, 91:13
**additional** [2] - 61:19, 61:24
**address** [4] - 5:11, 5:20, 52:23, 53:6
**administer** [2] - 4:16, 31:20
**administered** [1] - 97:8
**administrators** [2] - 1:4, 2:4
**admit** [1] - 91:21
**advise** [1] - 170:13
**advised** [5] - 116:10, 139:17, 146:5, 146:9, 166:15
**advisement** [1] - 139:8
**Affairs** [27] - 28:19, 30:3, 33:23, 41:8, 41:13, 41:14, 41:21, 42:6, 44:8, 44:21, 45:15, 47:12, 48:4, 48:14, 48:16, 49:4, 49:25, 54:2, 63:13, 63:22, 64:7, 64:10, 65:22, 66:9, 81:8, 81:13, 81:15
**affect** [2] - 153:20, 153:25
**affixed** [1] - 168:24
**African** [1] - 54:3
**age** [1] - 22:11
**agency** [5] - 83:19, 85:13, 87:16, 87:18, 92:9
**Agency** [1] - 87:21
**aggressive** [2] - 93:18, 93:23
**ago** [3] - 10:3, 29:15, 30:6
**agreed** [1] - 132:23
**AGREED** [3] - 4:3, 4:9, 4:14
**ahead** [9] - 25:9, 28:22, 36:8, 48:10, 70:7, 107:3, 113:24, 169:13, 172:19
**aid** [6] - 97:8, 97:10, 97:14, 97:17, 104:21, 104:23
**alien** [1] - 53:9
**allegation** [1] - 60:18
**allegations** [8] - 36:20, 36:24, 41:23, 45:6, 50:16, 62:11, 63:15, 64:17
**alleged** [6] - 50:23, 54:9, 60:6, 60:23, 61:3, 78:18
**alleging** [1] - 51:21
**allow** [1] - 141:17
**Alls** [1] - 162:14
**almost** [1] - 95:14
**ALSO** [1] - 3:21
**altercation** [4] - 57:10, 57:24, 58:9, 58:18
**ambulance** [4] - 39:12, 175:15, 175:22, 175:25
**American** [1] - 54:3
**amount** [2] - 80:15, 83:22
**analysis** [1] - 101:14
**AND** [5] - 1:14, 2:14, 4:2, 4:8, 4:13
**anger** [1] - 169:9
**angry** [6] - 168:11, 168:13, 169:5, 169:18, 170:2, 174:17
**anonymous** [1] - 107:9
**answer** [6] - 6:23, 25:9, 28:23, 36:9, 70:8, 113:25, 141:18, 169:14
**answered** [1] - 65:2
**answering** [2] - 147:3, 153:16
**answers** [1] - 177:12
**anti** [1] - 23:24
**anti-crime** [1] - 23:24
**apparent** [3] - 139:22, 157:19, 157:21
**appear** [2] - 169:10, 169:23
**appeared** [2] - 159:4, 159:6
**applied** [1] - 14:10
**approach** [5] - 95:12, 107:16, 107:25, 108:3, 108:4
**approached** [1] - 125:23
**April** [9] - 62:15, 66:16, 83:7, 83:15, 86:6, 89:13, 108:7,

112:5, 116:7
area [11] - 19:2, 57:7, 84:7, 89:21, 89:23, 94:7, 110:8, 117:11, 132:22, 135:22, 164:8
areas [4] - 9:7, 10:12, 10:17, 96:16
arms [2] - 10:5, 10:7
arrest [31] - 29:18, 32:23, 32:24, 34:15, 34:22, 39:22, 39:25, 40:4, 40:11, 40:13, 42:12, 51:10, 59:6, 62:4, 62:7, 78:5, 86:4, 86:15, 86:22, 86:24, 87:2, 87:4, 95:24, 96:6, 109:10, 132:12, 166:16, 168:6, 170:13, 170:14, 170:15
arrested [8] - 17:2, 40:8, 85:8, 85:12, 85:17, 91:9, 109:14, 170:2
arresting [1] - 18:17
arrests [5] - 18:13, 18:23, 62:10, 90:17
arrive [1] - 113:13
arrived [8] - 141:20, 149:19, 149:20, 151:12, 156:7, 162:11, 162:20, 163:8
aside [1] - 72:2
asp [8] - 43:6, 43:10, 43:15, 43:19, 54:24, 55:17, 55:20, 55:23
Asp [1] - 31:12
assigned [18] - 11:22, 12:20, 13:19, 14:10, 16:20, 18:5, 19:5, 19:20, 21:10, 22:22, 22:23, 24:14, 24:15, 66:22, 87:15, 112:14, 112:15, 113:11
assignment [10] - 15:24, 16:4, 17:10, 17:23, 18:4, 18:11, 18:12, 20:17, 21:8, 21:15
assist [18] - 18:15, 18:19, 37:19, 45:11, 70:25, 132:6, 132:8, 133:22, 145:21, 145:24, 145:25, 146:13, 147:6, 147:10, 147:23, 154:8, 154:10, 154:23
assistance [2] - 58:11, 141:3
Assistant [1] - 72:12
assisted [2] - 86:23, 87:3
assisting [1] - 132:10
associate [1] - 34:19
associates [1] - 28:11
ASST [2] - 1:13, 2:13
assuming [1] - 135:8
AT&T [1] - 112:12
attached [1] - 168:24
attendance [1] - 8:8
attended [1] - 8:6
attention [2] - 62:15, 176:2
ATTORNEY [4] - 1:12, 1:13, 2:12, 2:13
attorney [1] - 71:8
Attorney [6] - 1:16, 1:17, 2:16, 2:17, 72:11, 72:13
Attorney's [4] - 73:14, 74:16, 99:3, 99:4
Attorneys [3] - 3:4, 3:10, 3:16
attorneys [2] - 4:3, 5:16
authorized [1] - 4:16
autopsy [3] - 79:14, 83:2, 83:5
available [4] - 132:4, 132:6, 132:8, 133:14
Avenue [10] - 5:12, 5:22, 122:13, 125:20, 136:21, 145:7, 145:10, 147:16, 147:17, 162:6
award [1] - 45:21
aware [9] - 14:2, 29:6, 29:11, 96:18, 128:13, 134:23, 134:25, 136:6, 140:17
awareness [2] - 9:11, 16:25

B

B-E-N-D-E-T-T-I [1] - 11:16
Babylon [1] - 1:24
bag [1] - 165:20
band [13] - 110:20, 110:22, 110:23, 111:13, 111:15, 134:21, 145:10, 145:16, 145:17, 145:19, 146:6, 146:11
Barring [1] - 137:25
based [5] - 60:9, 62:20, 62:24, 86:18, 126:16
Based [1] - 128:24
baton [2] - 31:9, 31:10
Bay [13] - 5:12, 5:22, 12:4, 57:7, 129:18, 130:9, 136:2, 136:19, 136:22, 145:21, 149:15, 150:4, 150:15
became [3] - 59:8, 135:20, 154:5
become [3] - 21:6, 90:19, 94:7
began [6] - 7:17, 104:3, 118:14, 118:20, 119:4, 121:16
begin [1] - 117:22
beginning [1] - 69:18
behaving [1] - 173:8
behavior [6] - 169:4, 169:10, 169:21, 169:22, 169:24, 172:23
behind [10] - 119:8, 120:22, 125:22, 128:11, 135:9, 135:21, 147:21, 147:22, 152:25
Behind [1] - 129:24
bend [9] - 120:20, 120:22, 121:4, 121:14, 124:18, 124:22, 124:23, 125:2, 136:14
Bendetti [1] - 11:14
bending [1] - 159:8
Bertucci [1] - 15:21
best [6] - 25:9, 28:24, 36:9, 48:7, 82:19, 103:14, 113:25, 138:19
between [8] - 4:3, 122:10, 123:15, 124:7, 136:9, 136:18, 140:7, 149:12
Between [2] - 131:12, 131:13
bicycle [1] - 16:2
BILLY [1] - 3:24
bit [3] - 54:16, 171:11
biting [1] - 61:12
bizarre [1] - 169:11
Black [1] - 142:4
black [1] - 54:6
bleeding [2] - 61:11, 61:13
block [7] - 120:12, 121:3, 121:5, 122:11, 122:14, 122:19, 123:5
blocks [1] - 127:10
blood [1] - 179:17
blue [26] - 84:18, 93:11, 116:10, 116:14, 118:15, 119:13, 121:13, 121:19, 125:14, 129:23, 131:8, 132:2, 132:15, 133:2, 133:9, 134:4, 134:10, 135:15, 136:25, 139:12, 152:22, 160:25, 161:3, 162:18, 163:6, 163:9
Bob's [1] - 109:13
body [4] - 44:5, 54:25, 55:24, 174:9
bone [1] - 60:20
booking [1] - 168:2
Boulevard [2] - 3:5, 38:6
braked [1] - 126:9
break [3] - 6:22, 50:25, 51:11
breakdown [1] - 62:13
breath [1] - 156:13
BREWINGTON [1] - 3:3
Brewington [2] - 6:5, 34:20
brief [2] - 67:21, 152:8
bring [2] - 31:20, 60:2
Broderick [1] - 97:18
BRODERICK [1] - 97:19
broken [1] - 60:20
Brooklyn [1] - 24:16
brought [6] - 32:3, 32:16, 32:18, 33:14, 57:18, 86:19
bruises [3] - 33:17, 44:5, 60:8
Bruises [1] - 44:3
bruising [8] - 174:18, 174:20, 174:23, 174:24, 175:2, 175:5, 175:11, 175:20
Bureau [4] - 28:19, 33:23, 72:12, 72:13
burglaries [1] - 18:22
Burke [1] - 12:13
Bushwick [1] - 24:16
business [2] - 5:19, 116:20
buy [2] - 107:21, 107:22
BY [5] - 3:7, 3:13, 3:19, 5:6, 178:3

C

C-A-B-A-L-L-E-R-O [1] - 53:4
C-O-R-B-E-T-T [1] - 29:22
C-O-T-T-E-R [1] - 97:23
Caballero [4] - 53:3, 53:13, 54:15, 61:10
Caballero's [2] - 53:5, 61:16
Cadillac [27] - 84:19, 93:11, 116:11, 116:15, 118:16, 119:13, 125:15, 129:23, 131:8, 132:2, 132:15, 133:2, 133:9, 134:5, 134:11, 135:15, 136:25, 139:13, 152:22, 160:25, 161:4, 161:8, 161:24, 162:18, 163:6, 163:10, 164:19
calm [8] - 170:3, 170:5, 170:7, 170:19, 170:20, 171:11, 173:19
calming [1] - 172:4
cameras [1] - 80:10
capacities [2] - 1:16, 2:16
capacity [19] - 1:8, 1:9, 1:10, 1:10, 1:11, 1:12, 1:13, 1:14, 2:8, 2:9, 2:10, 2:10, 2:11, 2:12, 2:13, 2:14, 10:25, 27:14, 46:20
Capalino [7] - 64:5, 64:6, 64:13, 64:15, 64:20, 65:6, 65:17
Captain [3] - 64:4, 64:14, 65:17
captain [1] - 64:8
car [18] - 37:4, 90:14, 90:25, 95:2, 109:12, 111:10, 111:15, 119:15, 120:7, 134:18, 137:15, 148:9, 151:22, 160:23, 161:14, 162:8, 162:9
Carlos [13] - 83:25, 88:19, 88:23, 88:25, 91:22, 91:24, 92:3, 92:24, 93:6, 93:9, 106:5, 106:9, 106:16
carried [2] - 43:19, 115:13
carry [3] - 43:10, 43:14, 111:8

carrying [1] - 170:3
cars [7] - 37:10, 119:8, 123:16, 151:10, 151:16, 151:18, 162:23
Cartright [1] - 34:18
case [16] - 6:11, 36:14, 41:5, 45:25, 59:21, 63:10, 63:15, 100:19, 100:23, 101:5, 101:6, 101:9, 101:25, 102:2, 102:5, 103:14
caught [2] - 130:2, 169:15
Causeway [1] - 134:13
Cell [4] - 111:24, 153:6, 153:7, 178:9
cell [36] - 112:2, 112:3, 112:8, 112:9, 112:10, 113:3, 113:8, 113:9, 113:10, 113:12, 113:15, 113:16, 113:21, 114:10, 114:16, 114:17, 114:21, 114:24, 115:17, 115:24, 116:2, 117:4, 137:20, 137:23, 138:12, 138:14, 138:16, 138:25, 139:4, 143:18, 143:21, 148:11, 153:4
Central [3] - 37:15, 37:17, 38:4
central [1] - 1:20
certain [6] - 41:3, 48:20, 118:8, 118:11, 120:6, 155:18
certification [1] - 4:6
certify [3] - 177:7, 179:9, 179:15
cetera [1] - 171:9
chain [1] - 20:9
chair [1] - 168:20
change [9] - 23:7, 130:15, 130:19, 131:8, 133:3, 133:10, 134:12, 135:16, 137:17
changed [4] - 20:5, 20:13, 20:15, 90:19
changes [1] - 135:24
channel [1] - 111:4
channels [1] - 111:7
characterize [1] - 169:23
charged [7] - 58:24, 59:3, 59:5, 59:12, 85:9, 85:22, 91:9
charges [3] - 85:18, 86:19, 101:25
check [2] - 92:16
checking [3] - 91:3, 94:6, 109:8
chewing [1] - 54:19
Chief [2] - 72:12, 72:13
chose [1] - 94:10
chosen [1] - 48:19
CHRISTINE [1] - 3:9
CHRISTOPHER [7] - 1:11, 2:11, 2:22, 177:7, 177:17, 178:4, 179:10
Christopher [2] - 5:10, 5:21
circle [1] - 145:7
circumstances [8] - 6:11, 41:9, 41:14, 70:2, 101:19, 103:13, 105:15, 109:25
City [6] - 14:17, 21:11, 22:24, 23:9, 23:15, 25:5
city [1] - 23:24
civilian [2] - 25:2, 25:3
claim [4] - 30:21, 43:4, 43:23, 50:23
claimed [7] - 30:25, 43:2, 44:2, 44:6, 51:5, 56:17, 57:4
claiming [1] - 34:10
claims [3] - 34:12, 48:24, 51:9
classes [5] - 9:11, 9:13, 16:24, 20:24, 28:12
clear [2] - 104:6, 165:20
close [2] - 110:16, 124:17
closed [1] - 116:21
closer [1] - 136:21
closest [4] - 105:11, 136:17, 136:18, 136:19
clothes [1] - 108:2
Club [1] - 27:13
co [2] - 1:4, 2:4
co-administrators [2] - 1:4, 2:4
cocaine [6] - 84:2, 84:17, 165:24
collapsed [2] - 80:22, 175:25
colleagues [2] - 63:19, 78:15
college [3] - 27:19, 27:21, 27:24
collided [1] - 36:11
Collins [22] - 72:12, 72:15, 72:21, 72:25, 73:10, 73:13, 73:17, 73:20, 73:23, 74:3, 74:4, 74:9, 74:22, 74:25, 75:15, 77:9, 77:16, 98:13, 98:18, 98:25, 99:12, 99:23
COLLINS [2] - 1:14, 2:14
Collise [1] - 6:6
color [1] - 155:10
coming [3] - 88:13, 150:15, 171:10
command [1] - 20:9
commencing [1] - 44:10
comment [1] - 142:18
COMMISSIONER [2] - 1:7, 2:7
common [4] - 50:10, 90:19, 93:10, 94:8
communication [1] - 144:16
communications [2] - 44:20, 148:12
Community [2] - 11:23, 27:25
community [5] - 12:5, 16:13, 16:14, 17:3, 18:24
competitive [4] - 7:11, 7:14, 21:14, 21:18
complainant [5] - 31:5, 31:14, 51:20, 53:22, 60:23
complainants [10] - 51:4, 51:14, 51:17, 51:25, 52:4, 52:7, 54:3, 54:6, 54:10, 59:24
complained [1] - 51:17
complaint [38] - 16:14, 25:25, 29:7, 29:9, 29:10, 29:12, 29:17, 29:21, 29:24, 30:3, 30:22, 30:23, 30:24, 31:4, 33:21, 34:10, 36:22, 39:19, 40:11, 40:17, 40:20, 41:9, 41:15, 42:11, 42:23, 42:24, 47:16, 48:4, 48:6, 51:19, 53:11, 54:21, 61:20, 61:24, 64:17, 65:9, 71:20, 81:6
complaints [40] - 16:13, 17:4, 18:24, 25:3, 25:4, 25:12, 25:19, 25:22, 25:23, 26:5, 29:3, 33:24, 34:3, 34:13, 34:22, 40:14, 40:15, 48:12, 48:22, 49:4, 49:7, 49:11, 49:15, 49:19, 49:24, 50:5, 50:15, 50:22, 50:23, 51:2, 51:9, 51:12, 51:13, 54:2, 54:12, 59:18, 61:16, 61:23, 62:4, 62:11
complete [4] - 70:15, 70:17, 126:10, 177:11
completed [4] - 14:21, 71:11, 81:9, 82:16
completely [1] - 126:8
compliance [1] - 157:11
complying) [1] - 82:7
concerning [11] - 6:9, 29:12, 36:21, 41:21, 42:24, 44:17, 45:5, 64:16, 65:25, 68:17, 71:19
conclusions [1] - 169:4
conduct [3] - 94:13, 94:19, 175:8
conducting [3] - 58:19, 93:21, 116:23
connected [3] - 83:21, 85:16, 168:20
consider [1] - 167:14
considered [1] - 89:25
consist [1] - 44:13
Constant [1] - 168:16
contact [23] - 37:6, 89:12, 89:17, 93:25, 110:7, 110:8, 110:16, 110:19, 111:21, 115:21, 116:3, 124:12, 131:23, 134:6, 134:14, 138:10, 138:11, 138:14, 171:19, 172:22, 172:25, 175:10, 175:21
contacted [2] - 143:10, 175:14
contain [1] - 138:5
contained [1] - 165:23
continued [3] - 120:21, 120:23, 142:19
Continued [1] - 1:22
contraband [2] - 78:18, 162:17
control [2] - 154:11, 154:22
controlled [4] - 102:3, 153:20, 154:2, 154:16
contusions [2] - 105:20, 174:19
convened [1] - 72:18
conversation [29] - 67:21, 68:2, 68:13, 69:11, 70:22, 74:3, 74:20, 90:11, 106:15, 106:18, 106:21, 107:13, 107:17, 117:2, 132:13, 134:22, 141:5, 143:3, 152:8, 157:25, 158:4, 158:5, 165:13, 165:16, 166:4, 166:7, 166:9, 166:13, 173:18
conversations [20] - 64:12, 64:19, 65:24, 71:23, 81:4, 84:22, 95:16, 104:18, 130:24, 131:3, 131:6, 132:19, 133:4, 133:11, 153:4, 153:13, 156:8, 165:10, 166:20, 173:15
Conversations [1] - 64:15
convicted [1] - 86:18
COPE [19] - 11:23, 12:2, 12:8, 12:19, 13:22, 13:24, 14:4, 14:11, 14:12, 14:15, 15:16, 15:24, 16:5, 16:9, 16:12, 16:20, 49:16, 146:13, 151:19
copy [2] - 79:6, 82:25
Corbett [12] - 31:3, 54:22, 55:19, 56:4, 56:8, 56:10, 56:18, 56:19, 56:20, 57:19, 57:22, 58:13
corner [1] - 172:3
Correct [10] - 53:18, 55:8, 59:15, 82:21, 100:7, 105:13, 105:18, 106:11, 129:7, 145:15
correct [18] - 55:7, 59:14, 64:7, 82:20, 95:3, 105:12, 105:17, 111:22, 124:8, 127:18, 129:6, 131:20, 135:2,

142:10, 151:3, 175:16, 177:11, 177:13
**corrected** [1] - 16:18
**correspondence** [12] - 41:18, 44:14, 45:9, 45:12, 48:13, 48:18, 63:13, 63:25, 64:22, 65:22, 72:3, 81:9
**Cotter** [1] - 97:23
**Counsel** [1] - 178:16
**COUNTY** [8] - 1:7, 1:12, 1:13, 2:7, 2:12, 2:13, 177:5, 179:5
**County** [27] - 1:16, 1:17, 2:16, 2:17, 7:4, 7:7, 7:17, 7:23, 8:6, 8:9, 9:23, 14:8, 14:19, 19:24, 21:5, 24:23, 26:9, 28:17, 42:14, 50:11, 83:23, 99:3, 108:6, 112:2, 112:9, 112:25, 114:6
**couple** [16] - 6:4, 9:16, 20:25, 24:7, 24:8, 54:23, 84:23, 89:12, 96:15, 99:22, 140:23, 141:19, 142:25, 144:17, 144:19, 151:15
**Court** [2] - 1:19, 4:19
**COURT** [2] - 1:2, 2:2
**court** [4] - 6:17, 32:3, 98:4, 98:8
**CPL** [3] - 8:20, 8:24, 9:4
**crack** [2] - 84:2, 84:17
**credits** [1] - 28:4
**crime** [7] - 18:19, 18:21, 23:24, 58:25, 59:3, 59:13, 86:18
**crimes** [2] - 85:9, 91:10
**criminal** [2] - 96:3, 102:3
**Criminal** [1] - 28:9
**cross** [1] - 150:16
**crossed** [1] - 118:9
**crosses** [1] - 118:4
**cuff** [1] - 168:23
**cuffed** [1] - 172:6
**cup** [3] - 172:7, 172:8, 172:18
**cups** [5] - 171:13, 171:22, 171:24, 172:2, 172:7
**curb** [1] - 125:10
**currency** [2] - 80:16, 80:17
**current** [8] - 5:23, 7:3, 17:23, 18:3, 18:11, 18:12, 20:17, 66:10
**cursing** [3] - 168:14, 169:2, 170:21
**curve** [1] - 122:4
**custody** [2] - 151:5, 151:6
**cut** [7] - 129:17, 130:8, 147:21, 147:25, 148:17, 148:23, 149:15
**cutting** [1] - 26:10

D

**D-E-T-W-I-L-E-R** [1] - 30:16
**dark** [5] - 93:10, 122:25, 123:3, 123:4, 164:2
**date** [7] - 73:4, 82:3, 83:4, 83:8, 102:18, 102:24, 105:17
**dated** [1] - 82:22
**DAVID** [1] - 3:19
**David** [1] - 6:6
**days** [2] - 9:20, 98:9
**DEA** [2] - 87:20, 96:10
**deal** [3] - 90:23, 94:18, 94:20
**dealer** [1] - 85:21
**dealers** [3] - 83:24, 84:4, 90:20
**dealing** [1] - 89:22
**Death** [1] - 103:8
**death** [4] - 63:9, 67:2, 67:11, 101:20
**debrief** [1] - 18:18
**debriefed** [3] - 17:2, 85:13, 85:24
**debriefing** [3] - 88:7, 89:7, 92:8
**decedent's** [1] - 83:2
**decide** [1] - 136:4
**decision** [1] - 32:4
**Defendant** [1] - 2:22
**defendant** [6] - 35:3, 35:24, 36:6, 39:15, 39:20, 46:4
**defendants** [2] - 1:18, 2:18
**Defendants** [1] - 3:10
**definitely** [2] - 149:13, 149:14
**degree** [3] - 28:2, 28:11, 102:4
**delayed** [1] - 22:12
**deliberated** [1] - 45:23
**demand** [1] - 138:25
**demanded** [1] - 138:24
**DEPARTMENT** [2] - 1:7, 2:7
**Department** [14] - 7:5, 7:8, 7:18, 7:23, 14:8, 14:19, 21:5, 22:24, 23:9, 23:13, 24:23, 25:6, 28:17, 50:12
**department** [4] - 15:14, 22:5, 43:17, 99:5
**depict** [2] - 79:24, 80:20
**depicted** [3] - 79:20, 80:13, 80:24
**depicting** [1] - 80:14
**deported** [1] - 53:10
**deposed** [1] - 40:25
**deposition** [9] - 4:6, 4:14, 35:21, 36:18, 63:2, 63:4, 177:9, 179:11, 179:13
**depositions** [2] - 6:3, 63:19
**Depot** [1] - 109:12
**describe** [4] - 18:9, 84:15, 93:3, 93:13
**described** [10] - 10:11, 34:9, 84:7, 84:13, 87:12, 89:11, 96:12, 103:16, 138:2, 138:5
**describes** [1] - 101:16
**describing** [1] - 99:20
**description** [9] - 80:25, 89:21, 90:16, 91:17, 92:23, 93:5, 104:25, 107:11, 116:18
**descriptions** [1] - 93:8
**desk** [5] - 168:21, 168:23, 168:25, 172:3, 172:8
**detail** [1] - 65:3
**detailed** [7] - 69:25, 70:6, 74:4, 77:12, 80:24, 103:21, 174:10
**details** [4] - 88:15, 89:21, 107:10, 107:21
**detained** [2] - 80:21, 155:16
**detective** [31] - 9:12, 19:5, 19:7, 19:21, 20:4, 29:13, 49:8, 56:5, 66:15, 66:22, 69:7, 86:23, 87:3, 108:6, 110:3, 110:23, 112:15, 113:8, 114:9, 115:3, 145:10, 145:16, 145:17, 145:19, 146:6, 158:15, 159:13, 165:4, 165:6, 173:2, 173:6
**Detective** [89] - 5:14, 5:23, 5:25, 6:2, 7:2, 11:14, 13:6, 18:6, 19:14, 19:17, 19:23, 20:13, 20:16, 28:23, 58:4, 58:16, 59:9, 66:12, 66:14, 66:21, 66:24, 67:20, 68:3, 68:7, 68:10, 68:14, 68:18, 68:21, 68:23, 69:6, 69:11, 69:20, 70:3, 70:10, 70:22, 71:12, 71:14, 71:16, 71:25, 82:4, 87:5, 87:14, 87:15, 92:9, 96:14, 99:8, 100:22, 102:2, 102:19, 108:13, 111:21, 115:12, 115:25, 117:3, 117:8, 117:14, 118:22, 118:25, 119:7, 119:9, 119:12, 129:22, 131:17, 131:23, 132:14, 133:5, 133:12, 134:9, 139.3, 139.10, 145:13, 145:18, 156:9, 156:16, 157:9, 157:17, 157:22, 160:13, 161:7, 161:13, 165:8, 165:14, 166:4, 166:9, 166:14, 172:12, 172:15, 173:9, 175:7
**detectives** [4] - 18:20, 109:22, 113:5, 171:9
**determination** [1] - 33:13
**determined** [3] - 60:15, 113:7, 113:15
**Detwiler** [2] - 30:16, 30:19
**Detwiler's** [1] - 30:17
**device** [2] - 111:20, 111:23
**diagram** [3] - 88:18, 88:20, 89:4
**die** [1] - 59:24
**died** [1] - 59:21
**Diffely** [1] - 20:14
**different** [10] - 17:8, 48:11, 84:20, 84:23, 85:10, 104:5, 111:13, 112:11, 123:23, 135:24
**Different** [1] - 112:13
**Diffley** [2] - 66:13, 66:15
**DIFFLEY** [1] - 20:14
**diploma** [1] - 27:16
**direction** [11] - 118:7, 118:18, 122:2, 131:10, 133:15, 133:16, 134:23, 136:13, 145:5, 149:17, 150:9
**directions** [3] - 123:23, 135:8
**directly** [2] - 162:7, 162:8
**disabled** [1] - 141:3
**disciplined** [6] - 47:14, 47:18, 47:22, 47:25, 49:22, 61:14
**discourteous** [2] - 40:17, 40:19
**discussed** [2] - 6:19, 53:12
**discussion** [2] - 137:6, 176:12
**discussions** [2] - 65:24, 71:24
**disheveled** [1] - 156:14
**dislodge** [1] - 54:18
**dispatched** [2] - 175:15, 175:22
**dispatcher** [5] - 146:8, 146:22, 146:23, 146:25, 147:5
**disposition** [2] - 93:14, 93:15
**distance** [3] - 127:6, 148:20, 148:22
**DISTRICT** [10] - 1:2, 1:2, 1:12, 1:13, 1:14, 2:2, 2:2, 2:12, 2:13, 2:14
**District** [10] - 1:16, 1:17, 2:16, 2:17, 22:24, 72:11, 72:13, 73:14, 74:16, 99:3
**DOCUMENT** [1] - 178:8
**Document** [4] - 81:24, 102:15, 178:13, 178:14
**document** [12] - 82:6, 82:9, 82:12, 82:14, 82:22, 102:22, 102:25, 103:4, 103:7, 103:9, 112:21, 128:19

documentation [1] - 114:8
documents [9] - 63:3, 77:17, 79:2, 79:4, 79:10, 100:18, 101:2, 101:8, 102:7
Dodge [4] - 116:11, 116:15, 117:23, 132:16
DOES [2] - 1:15, 2:15
done [5] - 14:23, 81:10, 81:11, 92:8, 113:19
door [1] - 173:4
DORMER [2] - 1:7, 2:7
down [13] - 45:4, 50:25, 51:12, 114:12, 170:4, 170:6, 170:7, 170:19, 170:20, 171:11, 172:5, 172:18
draft [1] - 103:3
drafted [3] - 45:16, 71:5, 105:12
drafting [2] - 45:12, 71:2
drank [2] - 172:7, 172:18
draw [1] - 169:4
drawn [2] - 88:11, 88:13
drive [6] - 160:22, 160:25, 161:3, 161:11, 161:21, 161:22
driver [2] - 37:6, 151:21
driver's [6] - 37:8, 122:7, 123:12, 123:13, 143:6
driving [15] - 37:2, 37:3, 37:13, 37:17, 122:5, 126:22, 127:10, 128:11, 128:13, 128:21, 129:5, 129:9, 147:13, 147:14, 155:23
drop [1] - 163:18
dropped [3] - 161:6, 161:17, 162:8
drove [9] - 125:18, 152:22, 161:5, 161:8, 161:10, 161:23, 161:24, 162:7, 163:7
Drove [1] - 160:21
drug [39] - 9:11, 18:13, 18:23, 18:25, 57:17, 59:10, 59:13, 83:20, 83:24, 84:4, 84:5, 84:13, 84:22, 85:2, 85:8, 85:18, 85:20, 85:21, 87:16, 88:16, 89:12, 89:22, 89:24, 90:16, 90:17, 90:18, 90:20, 90:23, 91:13, 92:19, 94:18, 94:19, 96:7, 101:5, 101:9, 101:23, 102:5, 107:20, 109:8
Drug [2] - 85:21, 87:21
drugs [19] - 18:14, 18:17, 80:15, 83:22, 84:9, 84:16, 91:16, 91:19, 91:22, 92:18, 100:2, 100:20, 100:23, 101:24, 107:10, 107:21, 107:22, 109:11, 167:3
due [1] - 61:24
Due [1] - 22:11
duly [2] - 5:3, 179:12
Dunne [2] - 81:17, 81:19
DUNNE [24] - 3:13, 20:6, 25:7, 28:20, 36:7, 46:6, 48:8, 53:8, 56:13, 59:23, 61:2, 64:2, 66:4, 70:5, 87:17, 99:9, 104:4, 106:22, 113:22, 131:21, 139:6, 158:17, 169:12, 176:10
during [35] - 13:2, 13:9, 15:23, 16:4, 17:10, 20:24, 23:8, 23:19, 25:4, 26:18, 28:8, 30:14, 62:10, 70:19, 73:5, 74:22, 77:18, 77:21, 78:10, 79:3, 79:11, 89:6, 94:2, 94:3, 95:6, 98:12, 98:22, 99:13, 102:11, 103:18, 106:3, 106:17, 108:11, 158:24, 173:15
During [10] - 8:8, 17:7, 28:16, 69:3, 72:24, 73:9, 94:17, 95:16, 96:17, 141:15
duties [7] - 8:4, 16:22, 18:10, 23:11, 23:18, 108:23, 109:2
duty [1] - 35:17
DWI [1] - 59:5

E

E-N-S-A-L-T-A [1] - 11:8
earings [2] - 80:16, 80:17
east [7] - 118:24, 120:23, 128:5, 128:6, 136:3, 136:20, 141:13
East [2] - 1:23, 12:4
eastbound [13] - 118:7, 118:15, 118:16, 118:20, 119:6, 119:18, 129:20, 134:19, 136:13, 142:19, 145:5, 149:17, 150:14
easterly [2] - 118:13, 122:2
EASTERN [2] - 1:2, 2:2
Edwin [4] - 53:3, 53:12, 61:10, 61:16
effect [1] - 4:17
either [8] - 38:4, 99:2, 123:17, 139:9, 143:20, 151:19, 161:6, 165:11
elbow [1] - 55:2
elbowed [1] - 157:6
Employed [1] - 7:4
employed [6] - 7:7, 14:7, 19:24, 21:6, 26:7, 42:14
employees [2] - 1:17, 2:17
employment [6] - 7:3, 21:4, 23:8, 23:20, 25:4, 28:16
emptying [1] - 26:11
encounter [3] - 90:11, 91:6, 92:17
encountered [3] - 84:5, 84:6, 91:15
encounters [2] - 90:6, 92:25
End [1] - 18:2
end [9] - 13:17, 13:21, 24:4, 64:25, 67:13, 67:15, 69:18, 94:16, 113:18
ended [2] - 15:4, 67:17
enforcement [1] - 87:16
Enforcement [3] - 11:24, 18:8, 87:21
Ensalta [1] - 11:7
enter [1] - 171:16
entered [12] - 121:3, 121:4, 145:4, 147:19, 165:4, 167:4, 167:7, 168:5, 168:6, 168:8, 172:13, 172:16
entire [2] - 87:23, 101:16
entrance [6] - 129:19, 136:2, 137:9, 145:22, 149:8, 150:4
Esq [1] - 3:3
ESQ [3] - 3:7, 3:13, 3:19
essentially [1] - 109:5
Estate [2] - 1:4, 2:4
et [1] - 171:9
ethnicity [4] - 46:25, 47:5, 55:13, 87:7
evening [2] - 122:25, 138:10
evidence [10] - 77:24, 78:7, 78:8, 78:9, 100:5, 101:13, 101:14, 101:17, 166:22, 170:16
Evidence [1] - 101:10
exact [4] - 137:13, 140:9, 142:18, 153:18
exactly [5] - 69:22, 129:25, 131:14, 144:4, 148:8
EXAMINATION [2] - 5:6, 178:3
Examination [1] - 2:21
examination [9] - 7:11, 7:14, 19:4, 21:15, 21:18, 21:23, 22:9, 22:12, 22:16
examined [1] - 5:4
except [1] - 4:9
excessive [7] - 34:3, 34:10, 34:12, 42:12, 42:23, 48:23, 50:16
exchanged [1] - 124:7
excluding [2] - 103:25, 104:7
Excluding [1] - 104:9
execute [1] - 18:13
exhausted [1] - 159:7
exhibit [1] - 169:21
Exhibit [6] - 81:23, 81:25, 82:5, 102:14, 102:16, 102:21
exhibited [1] - 169:22
EXHIBITS [1] - 178:11
exhibits [1] - 178:16
exist [1] - 115:3
exit [7] - 95:14, 130:9, 136:17, 136:20, 145:7, 173:5
exited [1] - 171:12
exits [1] - 149:11
expandable [2] - 31:8, 31:10
expectation [1] - 132:9
expectations [1] - 108:23
experience [3] - 28:14, 126:17, 128:24
explain [3] - 75:5, 75:10, 84:12
explained [6] - 69:14, 94:9, 107:9, 107:17, 109:2, 116:14
explanation [1] - 145:23
express [1] - 168:12
extent [4] - 63:16, 63:17, 106:23, 138:23

F

F-R-I-D-R-I-C-K [1] - 97:20
face [12] - 54:18, 105:21, 167:18, 174:14, 174:19, 174:21, 174:22, 174:25, 175:3, 175:12, 175:21
facing [1] - 123:24
fact [7] - 91:13, 111:12, 116:13, 123:6, 169:8, 173:10, 173:13
facts [3] - 6:10, 101:17, 104:7
fair [7] - 15:6, 45:3, 45:7, 101:22, 106:7, 162:16, 164:2
fall [1] - 15:3
false [5] - 34:22, 40:11, 40:13, 51:10
False [3] - 29:18, 34:15, 42:12
familiar [3] - 75:8, 82:11, 102:23
Far [1] - 148:19
far [11] - 36:13, 36:18, 94:11, 122:15, 124:11, 130:11, 130:12, 148:21, 150:17, 150:19, 171:18
far-left [1] - 130:11
far-right [1] - 130:12
Fasano [1] - 30:15
FASANO [1] - 30:15
fast [2] - 128:11, 129:15
faster [2] - 128:8,

128:21
federal [1] - 87:18
Federal [2] - 1:19, 53:7
feelings [1] - 169:9
feet [2] - 31:8, 150:20
fellow [2] - 46:19, 174:7
felony [1] - 18:23
female [1] - 47:7
Ferndale [1] - 38:5
few [5] - 6:3, 124:13, 131:2, 141:15, 151:10
field [8] - 11:3, 11:11, 11:12, 11:17, 14:20, 14:22, 14:24, 15:11
Fifth [7] - 5:12, 136:21, 145:6, 145:10, 147:16, 147:17, 162:6
fight [1] - 174:5
fighting [8] - 156:12, 156:18, 156:21, 156:24, 157:8, 157:14, 157:24, 158:25
file [10] - 87:21, 87:23, 88:3, 88:6, 88:9, 96:10, 96:11, 96:13, 101:5, 102:6
filing [1] - 4:5
fill [4] - 15:14, 112:23, 114:9, 170:23
filled [1] - 15:10
fine [1] - 61:5
finger [4] - 54:16, 54:17, 54:18, 61:13
fingerprint [1] - 170:16
finish [3] - 74:7, 99:21, 141:17
Fire [1] - 10:5
fire [1] - 10:6
firearm [1] - 167:3
firing [1] - 9:24
Firm [1] - 3:13
first [49] - 5:3, 7:20, 21:10, 21:20, 21:23, 22:12, 22:16, 29:6, 29:8, 32:11, 32:17, 33:9, 35:8, 41:11, 41:23, 47:2, 47:24, 52:19, 55:15, 57:15, 73:3, 73:9, 74:19, 74:24, 88:5, 105:11, 119:11, 122:14, 125:18, 127:7, 131:22, 134:5, 134:13, 136:14, 138:10, 139:21, 143:11, 145:11, 151:12, 152:21, 154:5, 161:10, 163:17, 165:18, 166:8, 167:10, 167:17, 175:19
First [6] - 11:3, 23:14, 120:10, 120:17, 122:3, 138:14
fits [2] - 92:18, 107:12
fitting [1] - 116:18
five [13] - 25:22, 25:23, 50:20, 67:23, 76:20, 113:6, 115:2, 115:10, 138:19, 144:22, 145:3, 158:12, 158:13
flashlights [5] - 78:14, 158:24, 167:8, 174:8, 174:9
focus [1] - 28:8
follow [2] - 119:5, 125:17
followed [6] - 65:3, 119:21, 120:25, 125:21, 136:8, 161:13
following [5] - 128:3, 129:24, 135:4, 135:19, 136:7
Following [1] - 119:3
follows [1] - 5:5
food [1] - 27:3
foot [4] - 12:3, 14:24, 15:4, 16:2
FOR [1] - 178:12
force [24] - 4:17, 29:19, 30:22, 30:24, 34:3, 34:10, 34:13, 34:23, 42:12, 42:23, 48:23, 50:16, 50:17, 157:10, 157:13, 157:15, 157:18, 157:22, 158:15, 158:18, 158:20, 173:25, 174:3, 174:11
form [3] - 4:10, 36:8, 64:20
forth [2] - 71:19, 179:12
forward [2] - 48:5, 121:18
four [1] - 124:16
fracture [1] - 60:19
Fred [1] - 6:5
FREDERICK [1] - 3:3
Frederick [2] - 34:20, 97:20
front [7] - 38:13, 57:12, 116:11, 116:15, 116:20, 140:19, 172:11
Fuck [1] - 168:16
fuck [2] - 168:16, 170:21
fucking [1] - 168:17
full [4] - 65:2, 84:8, 104:25, 116:5
FURTHER [2] - 4:8, 4:13

G

gain [1] - 149:8
gang [10] - 16:21, 16:23, 16:25, 17:2, 17:4, 17:6, 17:8, 17:11, 17:16, 49:12
garbage [1] - 26:11
gathered [1] - 62:22
General [2] - 8:20, 10:15
generally [1] - 114:17
Germano [1] - 5:15
GERMANO [36] - 3:7, 5:7, 13:18, 20:10, 34:17, 34:25, 46:17, 53:20, 56:3, 56:15, 59:17, 60:13, 61:4, 64:3, 66:6, 67:7, 73:2, 75:20, 81:21, 93:4, 100:12, 101:3, 102:12, 105:25, 106:19, 115:16, 127:13, 134:8, 138:3, 138:22, 150:24, 158:19, 159:23, 164:6, 175:18, 178:4
gesture [1] - 160:2
gestures [1] - 6:17
Gilberto [4] - 83:21, 84:3, 85:16, 88:11
given [7] - 22:13, 42:6, 51:5, 135:6, 140:16, 177:12, 179:14
glasses [1] - 93:12
Golf [1] - 27:13
GONZALEZ [4] - 1:3, 2:3
graduate [1] - 10:19
graduated [1] - 14:21
graduation [2] - 10:22, 22:21
grand [36] - 65:13, 65:15, 65:18, 72:16, 72:17, 72:22, 74:10, 74:13, 75:2, 75:7, 75:9, 75:16, 75:22, 75:25, 76:4, 77:15, 81:2, 81:11, 96:17, 97:6, 97:25, 98:9, 98:22, 99:6, 99:13, 99:21, 99:22, 100:15, 102:8, 103:19, 103:21, 103:22, 103:23, 104:16, 105:5
grass [3] - 136:15, 140:23, 149:24
green [1] - 119:18
Greg [1] - 6:6
groans [1] - 6:17
GROB [2] - 179:7, 179:25
ground [1] - 6:4
guy [1] - 156:15

H

half [5] - 15:18, 16:19, 17:7, 17:18, 17.19
hand [32] - 123:18, 124:3, 124:6, 124:10, 124:12, 136:8, 139:22, 144:9, 159:10, 159:12, 159:22, 159:24, 160:3, 160:4, 160:5, 160:7, 160:10, 168:18, 168:23, 168:25, 172:5, 179:21
handcuff [2] - 156:21, 168:22
handcuffed [3] - 156:13, 156:15, 168:19
handcuffs [3] - 153:5, 153:10, 168:20
handle [1] - 18:24
handled [3] - 17:3, 42:3, 100:22
handling [1] - 102:2
hands [6] - 123:13, 123:15, 123:20, 124:9, 127:4, 159:8
Hands [2] - 31:8, 43:6
harassment [1] - 59:6
Hauppauge [1] - 3:12
head [2] - 120:8, 129:15
heading [7] - 117:10, 118:18, 128:4, 128:6, 129:11, 145:6, 150:9
headlights [1] - 125:12
hear [11] - 6:14, 127:3, 143:23, 145:18, 148:3, 153:3, 153:12, 153:14, 153:21, 173:10, 173:13
heard [10] - 35:22, 36:19, 41:6, 145:11, 145:13, 146:3, 148:6, 153:16, 173:7, 173:18
hearing [4] - 144:20, 145:3, 153:11, 153:19
heavy [1] - 84:17
heavy-set [1] - 84:17
heavyset [1] - 93:8
held [2] - 32:2, 49:7
help [5] - 132:22, 133:14, 135:7, 145:12, 145:14
Hempstead [1] - 3:6
Herbee [4] - 116:11, 116:15, 117:23, 132:16
hereby [2] - 177:7, 179:9
HEREBY [1] - 4:2
herein [1] - 4:4
hereinbefore [1] - 179:11
hereunto [1] - 179:21
Higbie [2] - 118:4, 118:9
high [14] - 26:12, 26:14, 26:18, 26:20, 26:24, 27:6, 27:7, 27:10, 27:17, 27:22, 124:2, 125:15, 128:13, 154:17
High [1] - 26:16
Highway [9] - 3:11, 84:19, 92:16, 117:18, 118:5, 118:17, 119:19, 126:25, 127:24
Hills [1] - 27:13
himself [1] - 145:20
hired [3] - 7:22, 14:18, 24:22
hiring [2] - 22:4, 22:11
Hispanic [10] - 47:3, 47:9, 52:4, 52:7, 52:11, 52:25, 55:14, 84:18, 93:8, 142:4
history [1] - 96:3
hit [5] - 128:8, 137:9, 158:23, 167:8, 174:8
hold [5] - 23:2, 23:5, 26:8, 26:23, 35:10
Home [1] - 109:12
hospital [7] - 31:23,

32:5, 32:8, 33:6, 33:15, 33:19, 68:4
Hospital [5] - 32:8, 32:9, 32:13, 32:18, 39:11
hour [4] - 30:12, 73:18, 128:18, 128:22
house [2] - 98:5, 98:8
houses [3] - 124:13, 124:14, 124:16
hung [1] - 108:5
hurt [3] - 160:5, 160:6, 160:9
hurting [5] - 159:10, 159:12, 159:22, 159:25, 160:3

I

I.D [1] - 178:12
IA [3] - 64:2, 64:22, 72:3
IAB [1] - 54:12
ID [1] - 143:6
idea [4] - 152:15, 152:17, 155:3, 155:9
identifiable [1] - 114:23
identification [2] - 82:2, 102:17
identified [13] - 17:2, 83:19, 83:24, 85:14, 85:18, 102:20, 106:4, 106:16, 115:18, 115:25, 141:7, 143:5, 145:20
identify [3] - 107:16, 108:5, 114:20
identifying [6] - 18:16, 84:8, 88:14, 99:24, 115:6, 133:16
illegal [1] - 53:9
imagine [1] - 141:4
immediate [5] - 11:5, 11:10, 20:7, 66:18, 172:20
Immediate [1] - 20:10
Immediately [1] - 166:11
immediately [7] - 37:14, 124:3, 146:5, 146:10, 152:7, 163:5, 171:25
imprisonment [1] - 51:10
imprudent [1] - 127:11
IN [1] - 179:20
in-person [2] - 30:7, 30:9
in-service [6] - 9:10, 9:15, 9:17, 10:2, 10:7, 20:19
INC [1] - 1:23
incident [26] - 40:24, 51:18, 57:6, 62:17, 65:9, 66:2, 66:8, 66:20, 67:4, 68:17, 69:17, 70:16, 71:19, 77:13, 80:4, 83:8, 83:18, 84:25, 86:7, 89:13, 99:20, 101:15, 101:16, 101:18, 105:12
include [8] - 8:21, 34:2, 51:14, 78:13, 78:17, 78:20, 78:23, 101:19
included [3] - 103:24, 104:14, 104:16
includes [1] - 101:23
including [3] - 81:16, 81:18, 171:8
indicate [8] - 31:4, 74:25, 89:4, 105:19, 112:22, 139:9, 158:15, 159:14
indicated [13] - 21:3, 32:10, 33:11, 49:2, 86:5, 89:11, 92:22, 106:12, 107:23, 110:18, 124:5, 127:17, 134:10
indicating [2] - 159:12, 159:21
indication [1] - 128:25
individual [27] - 1:8, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:16, 2:8, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16, 31:16, 31:21, 32:5, 48:3, 53:21, 60:19, 93:6, 106:15, 165:23
individually [2] - 1:4, 2:4
info [1] - 116:17
information [10] - 69:15, 85:5, 85:11, 85:12, 87:12, 90:4, 96:8, 147:6, 147:9, 174:11
informed [1] - 132:14
infraction [2] - 126:16, 130:17
initial [1] - 162:12
initiate [1] - 93:25
injured [4] - 159:5, 159:7, 159:15, 159:18
injuries [10] - 31:25, 33:12, 33:16, 38:19, 38:25, 39:5, 39:7, 39:10, 54:9, 78:21
injury [9] - 38:18, 43:23, 43:25, 51:4, 54:19, 60:5, 60:7, 60:12, 60:15
insofar [1] - 105:16
instruct [4] - 64:21, 70:10, 136:23, 137:4
instructed [1] - 63:24
instruction [2] - 144:12, 160:13
instructions [2] - 140:13, 173:14
intelligence [2] - 69:16, 74:6
Intelligence [1] - 62:21
interaction [1] - 95:6
interactions [2] - 71:18, 83:9
interested [1] - 179:18
Internal [27] - 28:18, 30:3, 33:23, 41:8, 41:13, 41:20, 42:6, 44:8, 44:21, 45:15, 47:12, 48:4, 48:14, 48:16, 49:3, 49:25, 53:25, 63:13, 63:22, 64:7, 64:9, 65:21, 66:8, 81:8, 81:13, 81:15
internal [11] - 41:17, 44:14, 48:13, 48:15, 48:17, 63:12, 63:25, 64:22, 65:22, 72:3, 81:9
interrogatories [1] - 82:15
interrupt [1] - 94:18
intersection [6] - 37:25, 38:5, 38:7, 122:14, 122:16, 125:18
interview [22] - 30:8, 30:14, 33:8, 45:10, 48:16, 48:18, 63:21, 65:3, 74:8, 74:22, 94:22, 104:19, 105:2, 167:4, 167:12, 167:19, 167:22, 171:6, 172:2, 173:3, 174:16, 175:8
interviewed [6] - 30:2, 30:5, 44:16, 73:23, 98:12, 98:18
interviews [3] - 65:24, 71:23, 81:4
introduced [1] - 43:17
investigate [4] - 44:9, 92:12, 92:20, 104:3
investigated [6] - 41:7, 41:12, 47:12, 48:12, 51:22, 59:8
investigates [1] - 50:13
investigating [3] - 9:12, 48:6, 48:24
investigation [16] - 28:19, 33:24, 44:12, 57:18, 57:21, 57:23, 57:25, 59:11, 74:7, 93:22, 95:10, 99:25, 103:8, 103:25, 104:10, 162:13
investigations [5] - 70:12, 83:14, 92:25, 94:3, 106:4
investigators [1] - 45:5
involve [1] - 62:4
involved [31] - 12:5, 16:13, 32:24, 35:15, 36:2, 39:3, 39:15, 39:22, 46:15, 50:8, 51:9, 53:12, 57:17, 57:21, 58:9, 58:15, 58:17, 59:10, 62:7, 68:13, 83:20, 94:10, 97:3, 131:4, 136:9, 141:9, 144:8, 167:25, 168:4, 174:4
involvement [2] - 69:17, 88:16
involving [2] - 59:19, 62:17
IS [3] - 4:2, 4:8, 4:13
Islip [9] - 1:20, 12:4, 37:15, 37:17, 38:4, 116:12, 117:16, 120:11, 144:10
issue [2] - 15:13, 126:16
issued [5] - 112:2, 112:9, 114:5, 115:17, 139:5
issues [1] - 17:4
IT [3] - 4:2, 4:8, 4:13
items [1] - 99:25
itself [1] - 116:20

J

jail [4] - 169:7, 169:16, 169:17, 170:22
JAMES [3] - 1:9, 2:9, 3:22
JANE [2] - 1:14, 2:14
January [3] - 21:7, 21:13, 82:23
jeans [1] - 108:2
JENNIFER [2] - 1:3, 2:3
job [1] - 90:15
jobs [2] - 26:8, 27:11
JOHN [7] - 1:8, 1:14, 1:14, 2:8, 2:14, 2:14, 3:25
John [8] - 19:14, 20:14, 58:4, 66:12, 66:14, 72:12, 108:17, 108:19
Joseph [1] - 13:10
JOSEPH [3] - 1:11, 2:11, 3:23
JR [1] - 3:7
JUDGE [3] - 1:10, 2:10, 3:24
Judge [23] - 96:25, 131:16, 132:5, 132:20, 133:5, 133:11, 133:21, 134:7, 134:15, 135:11, 136:24, 139:11, 140:4, 143:3, 143:9, 143:24, 144:6, 144:11, 152:5, 152:10, 155:8, 158:2, 163:13
Judge's [2] - 137:22, 138:6
JUDY [2] - 179:7, 179:25
jury [37] - 45:23, 65:13, 65:15, 65:18, 72:16, 72:17, 72:22, 74:10, 74:13, 75:2, 75:7, 75:9, 75:16, 75:22, 75:25, 76:4, 77:15, 81:2, 81:11, 96:17, 97:6, 98:2, 98:10, 98:22, 99:6, 99:13, 99:21, 99:22, 100:15, 102:8, 103:19, 103:21, 103:23, 104:16, 105:5
justice [1] - 28:9

K

K-O-E-R-B-E-R [1] - 66:21
keeps [1] - 168:25
Kenny [26] - 62:17,

63:9, 83:23, 84:7, 85:14, 87:22, 88:18, 88:21, 88:24, 89:2, 89:19, 95:10, 104:2, 107:11, 107:12, 109:10, 119:23, 143:7, 143:23, 143:25, 155:11, 156:11, 165:21, 165:25, 166:15, 167:4

**KENNY** [2] - 1:4, 2:4
**kept** [3] - 168:14, 168:22, 170:21
**kind** [7] - 8:18, 19:4, 39:7, 50:4, 101:8, 101:12, 122:4
**knowing** [1] - 167:16
**knowledge** [6] - 6:9, 48:7, 82:20, 83:11, 138:19, 173:25
**known** [3] - 52:23, 53:6, 109:8
**Koerber** [18] - 66:21, 66:25, 67:20, 67:22, 68:3, 68:7, 68:10, 68:14, 68:18, 108:14, 165:8, 165:14, 166:5, 166:10, 166:14, 172:13, 172:16, 173:10

L

**lab** [1] - 101:14
**label** [1] - 115:20
**labeled** [4] - 85:19, 114:22, 115:7, 115:9
**Lacerations** [1] - 60:7
**lacerations** [3] - 61:7, 61:9, 61:11
**landscape** [1] - 80:4
**lane** [11] - 129:10, 129:13, 130:12, 130:18, 131:8, 133:3, 133:10, 134:12, 135:16, 137:16
**Lane** [2] - 118:4, 118:9
**lanes** [4] - 129:18, 130:7, 130:13, 130:15
**Large** [1] - 80:15
**large** [4] - 83:22, 85:15, 88:16, 94:11
**last** [14] - 9:18, 9:25, 10:9, 29:10, 29:11, 30:11, 52:22, 53:6, 54:20, 54:22, 55:10, 74:18, 90:18, 129:16
**laterally** [1] - 24:9
**law** [10] - 8:11, 8:18, 8:19, 8:20, 8:22, 8:23, 8:25, 9:3, 9:5
**Law** [1] - 34:19
**lawns** [1] - 26:10
**lawsuit** [20] - 35:8, 39:14, 41:12, 41:23, 42:8, 42:15, 44:10, 44:23, 45:19, 46:4, 46:10, 46:19, 47:2, 47:6, 47:8, 47:11, 47:22, 47:25, 53:16, 60:2
**lawsuits** [3] - 35:2, 35:6, 46:24
**LAZO** [2] - 1:4, 2:4
**Lazo** [84] - 62:17, 63:9, 68:5, 78:15, 78:24, 80:9, 80:21, 83:10, 83:13, 83:18, 83:23, 84:7, 84:14, 85:14, 87:22, 88:18, 88:21, 88:24, 89:2, 89:19, 93:18, 93:22, 95:11, 104:2, 104:11, 104:19, 107:11, 107:12, 109:10, 116:8, 119:23, 120:24, 121:3, 121:5, 121:25, 123:25, 125:17, 126:6, 128:25, 129:10, 129:17, 130:8, 130:20, 131:7, 136:6, 143:7, 143:23, 143:25, 151:3, 151:4, 153:5, 155:11, 155:15, 156:11, 156:18, 156:24, 157:2, 157:5, 157:11, 158:23, 165:21, 166:15, 167:5, 167:8, 167:11, 167:18, 168:10, 169:22, 170:13, 170:16, 170:17, 171:3, 171:6, 172:4, 173:10, 173:14, 173:15, 174:2, 174:5, 174:8, 175:16, 175:19, 175:24, 176:2
**Lazo's** [11] - 67:2, 67:11, 78:21, 101:20, 151:16, 165:25, 169:3, 172:23, 173:21, 174:14, 175:12
**Lazzo's** [4] - 80:16, 93:14, 105:21, 123:14
**lead** [1] - 16:10
**leading** [2] - 84:24, 86:6
**leads** [1] - 129:19
**learn** [5] - 56:16, 87:11, 118:19, 119:25, 167:7
**learned** [4] - 66:25, 67:10, 106:9, 119:22
**least** [2] - 97:9, 153:2
**led** [7] - 41:9, 41:14, 47:15, 62:11, 95:10, 101:19, 154:21
**left** [16] - 109:7, 123:22, 125:20, 125:21, 127:3, 129:10, 129:13, 130:11, 135:21, 149:24, 149:25, 151:9, 151:13, 162:3, 163:17, 168:18
**legs** [1] - 173:21
**less** [2] - 25:22, 162:5
**Less** [5] - 25:24, 67:23, 74:19, 158:12, 158:13
**level** [2] - 18:13, 90:16
**license** [1] - 143:6
**LIE** [1] - 92:16
**lieutenant** [1] - 64:7
**Lieutenant** [7] - 20:15, 30:15, 64:5, 64:6, 64:12, 64:14, 65:17
**lieutenants** [1] - 30:19
**life** [1] - 23:24
**light** [2] - 119:10, 119:17
**lights** [10] - 37:23, 123:4, 123:6, 154:18, 164:5, 164:7, 164:10, 164:14, 164:16
**limit** [3] - 126:24, 127:9, 127:18
**line** [2] - 28:21, 48:9
**lines** [3] - 54:23, 54:24, 88:13
**Link** [8] - 97:2, 151:24, 165:9, 165:19, 166:7, 166:12, 166:20
**LINK** [3] - 1:11, 2:11, 3:23
**list** [4] - 64:23, 97:3, 115:21, 116:3
**listed** [1] - 104:22
**listen** [1] - 110:25
**located** [3] - 117:13, 148:18, 162:6
**location** [4] - 58:19, 117:12, 146:14, 149:5
**locations** [5] - 84:9, 90:17, 91:15, 91:18, 109:8
**locker** [1] - 27:15
**lodged** [3] - 61:20, 61:25, 167:5
**log** [1] - 114:16
**look** [3] - 102:22, 141:23, 174:14
**looked** [2] - 162:17, 174:17
**looking** [2] - 147:20, 172:19
**lose** [1] - 121:13
**loud** [1] - 168:14

M

**M-O-T-T-A** [1] - 55:11
**Macho** [4] - 83:21, 84:3, 85:16, 88:12
**Main** [1] - 1:23
**main** [4] - 83:24, 90:15, 90:21, 91:2
**maintained** [2] - 101:9, 113:4
**maintenance** [1] - 26:10
**major** [3] - 83:20, 90:20, 92:17
**majority** [1] - 77:8
**Male** [1] - 47:9
**male** [5] - 84:18, 92:13, 93:8, 141:25, 142:4
**males** [1] - 92:11
**Mall** [1] - 109:14
**manned** [1] - 14:24
**manner** [1] - 173:19
**manpower** [1] - 15:13
**mark** [3] - 102:13, 114:23, 127:15
**Mark** [1] - 11:14
**marked** [11] - 37:3, 81:22, 81:24, 102:15, 135:13, 140:25, 151:15, 151:18, 151:22, 155:20, 162:23
**Marked** [1] - 155:21
**marriage** [1] - 179:17
**matter** [9] - 5:17, 6:7, 35:20, 43:23, 45:22, 65:13, 81:5, 150:20, 179:19
**Matthew** [1] - 20:16
**mean** [5] - 66:4, 84:13, 93:15, 116:16, 158:17
**means** [3] - 70:7, 113:24, 169:13
**meant** [1] - 116:17
**median** [4] - 147:20, 147:24, 148:16, 148:18
**medical** [6] - 31:17, 31:21, 38:20, 39:2, 60:15, 176:2
**meet** [14] - 69:6, 69:20, 72:14, 72:21, 73:12, 73:17, 87:9, 90:22, 94:8, 94:10, 123:15, 123:20, 124:9, 124:10
**meeting** [9] - 70:11, 70:22, 73:3, 73:8, 73:9, 73:20, 74:18, 74:24, 107:14
**meetings** [4] - 65:23, 71:23, 72:24, 81:4
**Melville** [1] - 3:18
**member** [3] - 45:17, 49:12, 49:16
**Members** [1] - 76:5
**members** [5] - 1:15, 2:15, 17:3, 76:17, 77:3
**memo** [3] - 65:5, 65:11, 65:16
**Memorial** [1] - 3:11
**mentors** [1] - 11:10
**message** [1] - 117:2
**met** [4] - 72:11, 122:6, 127:4, 161:15
**Michael** [1] - 29:22
**middle** [4] - 121:6, 122:6, 122:9, 149:6
**might** [2] - 30:19, 129:4
**MILAFI** [1] - 3:9
**mile** [4] - 148:24, 148:25, 149:2
**miles** [3] - 128:18, 128:22, 149:3
**military** [1] - 28:13
**mind** [1] - 107:2
**mine** [1] - 161:6
**Mineola** [1] - 26:16
**minor** [2] - 33:17, 38:25
**Minor** [1] - 38:19
**minute** [3] - 142:24, 142:25, 144:17
**minutes** [19] - 32:21, 67:23, 69:23, 76:11, 76:13, 76:15, 140:23, 141:15, 141:19, 142:25, 144:18, 144:19, 144:22, 144:24, 145:3, 152:21, 153:2,

158:12, 158:13
**Minutes** [2] - 162:5, 163:20
**mirror** [2] - 130:4, 130:5
**mission** [2] - 109:5, 109:9
**mistreatment** [1] - 50:24
**mobile** [1] - 111:20
**Mobile** [1] - 111:23
**moment** [5] - 96:15, 136:4, 137:9, 143:8, 174:15
**money** [3] - 165:25, 167:2
**monitored** [1] - 146:8
**Montego** [1] - 109:17
**month** [3] - 11:19, 11:20, 65:8
**months** [12] - 8:3, 10:3, 12:9, 12:19, 15:2, 22:20, 24:7, 24:8, 29:14, 30:6, 86:12
**morning** [6] - 5:14, 23:16, 67:14, 67:16, 67:18, 108:10
**Moses** [4] - 128:9, 128:10, 129:6, 134:13
**Most** [1] - 169:15
**most** [4] - 34:8, 55:3, 55:5, 60:5
**motor** [9] - 35:15, 36:3, 42:3, 50:7, 50:13, 52:17, 54:13, 60:4, 127:3
**motorist** [1] - 141:4
**Motta** [13] - 54:23, 55:18, 55:23, 56:8, 56:11, 56:17, 56:20, 57:3, 58:14, 58:21, 58:24, 59:8, 59:12
**Motta's** [4] - 55:10, 55:24, 57:12, 57:15
**mouth** [3] - 54:17, 54:19, 61:12
**Move** [1] - 127:13
**moved** [1] - 160:4
**movement** [1] - 136:9
**moving** [1] - 37:10
**MR** [58] - 5:7, 13:18, 20:6, 20:10, 25:7, 28:20, 34:17, 34:25, 36:7, 46:6, 46:17, 48:8, 53:8, 53:20, 56:3, 56:13, 56:15, 59:17, 59:23, 60:13, 61:2, 61:4, 64:2, 64:3, 66:4, 66:6, 67:7, 70:5, 73:2, 75:20, 81:21, 87:17, 93:4, 99:9, 100:12, 101:3, 102:12, 104:4, 105:25, 106:19, 106:22, 113:22, 115:16, 127:13, 131:21, 134:8, 138:3, 138:22, 139:6, 150:24, 158:17, 158:19, 159:23, 164:6, 169:12, 175:18, 176:10, 178:4
**multiple** [3] - 40:4, 88:14, 111:6

## N

**N-E-W-T-O-N** [1] - 19:15
**name** [19] - 5:8, 5:15, 5:19, 31:11, 52:20, 53:2, 54:22, 55:10, 55:15, 84:8, 88:14, 88:17, 88:25, 100:21, 104:21, 116:4, 116:5, 141:21, 143:7
**named** [20] - 25:3, 25:15, 25:16, 25:22, 29:21, 33:22, 35:23, 36:3, 36:4, 36:5, 39:25, 40:5, 40:6, 42:15, 46:3, 46:11, 46:14, 49:3, 53:22, 93:9
**names** [3] - 52:13, 52:16, 89:4
**naming** [4] - 35:3, 39:19, 54:2, 89:19
**narcotics** [2] - 18:16, 85:15
**narrative** [5] - 77:11, 103:16, 103:17, 103:20, 104:15
**NASSAU** [1] - 179:5
**Nassau** [2] - 26:9, 27:25
**nature** [1] - 133:17
**near** [1] - 143:25
**necessitating** [1] - 59:25
**neck** [3] - 39:9, 54:15, 108:5
**Need** [1] - 145:25
**need** [5] - 6:22, 84:11, 113:9, 113:17, 145:21
**needed** [6] - 79:8, 141:2, 146:13, 147:10, 147:22, 154:23
**needing** [1] - 145:24
**needs** [1] - 114:9
**Neighborhood** [1] - 18:7
**NESOT** [2] - 18:7, 96:11
**ness** [1] - 169:10
**network** [1] - 112:11
**networks** [1] - 112:11
**never** [16] - 28:10, 35:22, 36:14, 36:19, 41:16, 45:3, 59:12, 83:4, 90:24, 106:8, 124:6, 130:20, 162:16, 170:25, 171:2, 175:14
**Never** [1] - 41:6
**NEW** [4] - 1:2, 2:2, 177:4, 179:3
**new** [2] - 84:18, 93:11
**New** [17] - 1:20, 1:24, 2:24, 3:6, 3:12, 3:18, 5:13, 9:3, 14:17, 21:11, 22:23, 23:9, 23:15, 25:5, 140:24, 177:23, 179:8
**Newton** [37] - 19:15, 19:17, 58:5, 58:16, 59:9, 100:22, 102:2, 108:17, 108:19, 111:22, 115:13, 115:25, 117:3, 117:8, 117:15, 118:22, 118:25, 119:7, 119:9, 129:22, 131:17, 131:24, 132:14, 133:6, 133:12, 134:10, 139:10, 145:13, 145:19, 152:10, 156:9, 156:17, 157:9, 157:17, 157:22, 160:13, 161:13
**NEWTON** [3] - 1:8, 2:8, 3:25
**Newton's** [2] - 119:13, 161:7
**next** [12] - 32:3, 119:20, 121:22, 123:10, 135:16, 136:20, 142:7, 143:24, 144:15, 147:15, 160:17, 166:24
**Nextel** [5] - 114:24, 115:4, 115:13, 138:20, 139:5
**Nextels** [2] - 137:25, 138:4
**nickname** [2] - 83:25, 88:15
**night** [12] - 23:16, 66:19, 66:20, 66:23, 70:19, 100:21, 100:24, 108:9, 108:13, 108:16, 110:5, 116:22
**nights** [1] - 16:7
**nine** [2] - 12:24, 13:9
**nobody** [1] - 58:14
**normal** [2] - 94:15, 120:24
**north** [7] - 57:7, 117:20, 129:5, 129:9, 129:11, 150:5, 162:7
**North** [1] - 117:21
**Notary** [4] - 2:23, 5:4, 177:23, 179:7
**note** [1] - 114:15
**Note** [2] - 25:7, 28:20
**Noted** [1] - 176:14
**noted** [1] - 64:25
**notice** [8] - 121:18, 127:20, 130:3, 155:22, 155:25, 156:4, 156:6, 159:3
**Notice** [1] - 2:23
**noticed** [3] - 58:22, 150:23, 151:3
**notification** [2] - 153:24, 154:13
**number** [9] - 114:16, 114:22, 115:11, 115:19, 137:20, 137:23, 138:7, 148:9, 178:9
**numbers** [3] - 115:7, 115:8, 138:20
**numerous** [1] - 139:24
**NYPD** [9] - 21:4, 21:6, 21:9, 23:8, 23:20, 24:10, 24:12, 25:5, 26:8

## O

**O'** [6] - 42:18, 42:20, 43:3, 43:19, 47:11, 53:15
**o'clock** [5] - 67:16, 68:25, 116:21, 123:2, 134:2
**O'Hara** [4] - 87:5, 87:14, 87:15, 92:9
**O'Sullivan** [2] - 13:13, 17:14
**oath** [2] - 4:17, 177:9
**object** [1] - 106:23
**Object** [3] - 48:8, 70:5, 113:22
**Objection** [1] - 36:7
**objection** [2] - 25:8, 28:21
**objections** [1] - 4:9
**observation** [1] - 60:10
**observations** [5] - 60:11, 62:22, 69:15, 74:5, 168:9
**observe** [1] - 116:8
**observed** [14] - 56:19, 63:18, 92:19, 116:10, 116:14, 121:23, 123:13, 129:2, 133:9, 134:10, 134:12, 135:15, 139:18, 144:7
**obtain** [1] - 112:24
**Obviously** [2] - 90:15, 142:14
**obviously** [1] - 157:20
**Occasionally** [1] - 16:6
**occasions** [1] - 84:24
**occupant** [3] - 119:24, 120:2, 120:4
**occur** [6] - 38:2, 42:8, 57:6, 57:8, 74:9, 94:20
**occurred** [15] - 49:7, 49:11, 49:15, 49:19, 68:8, 74:5, 78:6, 80:5, 83:8, 86:5, 94:6, 106:17, 137:8, 164:9, 164:13
**occurrence** [1] - 56:25
**occurrences** [1] - 126:14
**occurs** [1] - 136:2
**October** [1] - 7:23
**OF** [12] - 1:2, 1:7, 1:12, 2:2, 2:7, 2:12, 177:4, 177:5, 179:3, 179:5
**offended** [1] - 40:22
**offense** [1] - 130:16
**offenses** [1] - 96:7
**OFFICE** [4] - 1:11, 1:12, 2:11, 2:12
**office** [6] - 73:15, 74:16, 99:3, 99:4, 115:17, 166:25
**Office** [4] - 1:15, 1:17, 2:15, 2:17
**Officer** [62] - 13:10, 13:13, 15:21, 17:13, 29:22, 31:2, 38:12,

42:18, 42:20, 43:3, 43:9, 43:19, 47:11, 53:15, 54:21, 55:19, 56:4, 56:7, 56:10, 56:19, 56:20, 57:19, 57:22, 58:13, 96:25, 97:18, 97:19, 97:20, 97:22, 97:23, 98:3, 131:16, 132:5, 132:20, 133:5, 133:11, 133:21, 134:7, 134:15, 135:11, 136:24, 137:22, 138:6, 139:11, 140:4, 143:3, 143:9, 143:24, 144:6, 144:11, 151:24, 152:5, 155:7, 155:8, 158:2, 163:13, 165:9, 165:19, 166:20

**officer** [55] - 4:16, 7:19, 7:20, 13:7, 13:11, 13:20, 14:7, 14:18, 23:3, 24:19, 29:13, 31:19, 35:12, 37:20, 39:22, 40:7, 46:11, 46:21, 48:14, 49:20, 56:5, 56:6, 56:17, 73:22, 86:14, 86:22, 86:25, 97:12, 97:16, 104:20, 107:24, 108:24, 110:3, 114:9, 141:8, 147:10, 153:23, 154:7, 154:10, 154:22, 154:25, 155:22, 156:2, 157:3, 157:6, 158:14, 158:22, 159:4, 159:13, 159:14, 165:11, 171:7, 171:8, 171:15

**OFFICER** [8] - 1:8, 1:9, 1:10, 1:11, 2:8, 2:9, 2:10, 2:11

**officer's** [1] - 104:21

**officer/investigator** [1] - 44:21

**officers** [49] - 11:12, 11:13, 14:23, 15:12, 18:24, 19:9, 29:20, 30:13, 31:23, 40:4, 42:13, 43:14, 46:19, 51:6, 57:20, 58:3, 58:8, 58:11, 68:17, 80:8, 97:7, 97:9, 97:10, 97:25, 98:11, 130:25, 131:3, 131:5, 131:15, 133:19, 134:24, 137:4, 141:9, 147:22, 148:6, 149:23, 152:3, 152:14, 153:16, 154:8, 154:9, 154:12, 154:16, 155:5, 156:19, 159:17, 163:2, 163:5, 174:7

**Offices** [1] - 34:19

**official** [18] - 1:8, 1:9, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:16, 2:8, 2:9, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:16

**often** [1] - 9:14

**old** [2] - 22:15, 22:17

**ON** [1] - 100:23

**Once** [4] - 7:15, 18:25, 127:7, 127:23

**once** [2] - 153:5, 164:25

**one** [60] - 5:15, 9:20, 11:19, 11:20, 16:16, 25:25, 31:13, 31:15, 34:8, 38:7, 40:14, 46:7, 48:19, 51:20, 53:14, 55:5, 63:10, 74:19, 83:14, 83:24, 85:17, 85:19, 85:20, 89:10, 97:9, 97:24, 107:6, 110:10, 110:13, 110:19, 110:24, 111:2, 111:4, 111:25, 113:17, 114:4, 114:5, 114:17, 114:18, 115:13, 116:19, 119:8, 120:7, 126:12, 130:16, 133:13, 141:16, 148:23, 149:14, 150:9, 151:20, 156:2, 161:6, 166:7, 169:17, 171:19, 172:7, 173:4, 174:21

**One** [10] - 59:22, 90:8, 93:11, 94:4, 98:9, 123:24, 133:7, 143:8, 168:23

**Ones** [1] - 123:20

**ongoing** [1] - 59:11

**onward** [1] - 104:13

**oOo** [1] - 4:21

**openings** [1] - 14:12

**operate** [3] - 109:23, 110:2, 110:20

**operated** [2] - 110:21, 119:23

**operates** [1] - 75:9

**operating** [6] - 84:18, 93:10, 109:16, 110:24, 111:2, 167:15

**operation** [2] - 83:20, 88:10

**Operations** [1] - 18:8

**operator** [4] - 36:2, 36:10, 143:5, 144:8

**opportunity** [2] - 82:8, 82:17

**opposite** [3] - 117:18, 150:2, 150:13

**order** [7] - 19:4, 63:3, 111:21, 112:24, 126:3, 130:8, 157:10

**Orientated** [1] - 11:23

**originally** [1] - 14:15

**otherwise** [1] - 113:11

**outcome** [6] - 25:18, 29:23, 35:19, 41:4, 45:18, 179:18

**outside** [3] - 83:19, 85:13, 92:9

**overpass** [2] - 118:5, 147:17

**own** [6] - 62:22, 70:14, 77:12, 113:12, 115:11, 161:14

**P**

**P.C** [1] - 3:15

**p.m** [4] - 69:2, 116:9, 164:20, 176:14

**pace** [1] - 127:20

**pacing** [1] - 128:12

**packages** [1] - 165:23

**PAGE** [2] - 178:3, 178:9

**panel** [5] - 76:5, 76:18, 77:3, 77:10, 100:9

**pants** [1] - 168:2

**paperwork** [6] - 100:25, 101:10, 101:12, 101:13, 101:15, 170:24

**park** [4] - 94:11, 121:24, 149:21, 164:22

**parked** [6] - 116:11, 116:19, 122:16, 123:10, 151:13, 152:24

**parking** [13] - 84:20, 90:22, 91:3, 92:17, 94:6, 94:8, 94:11, 94:13, 94:16, 107:15, 109:12, 109:13, 165:2

**Parks** [1] - 26:10

**parks** [2] - 26:17, 27:9

**Parkway** [14] - 129:12, 129:16, 129:20, 136:3, 136:13, 137:10, 141:14, 145:6, 145:9, 145:22, 147:18, 147:19, 149:7, 150:5

**parkway** [3] - 135:23, 162:7, 164:11

**parole** [1] - 86:4

**part** [5] - 15:3, 44:4, 80:2, 85:14, 90:15

**parter** [1] - 19:14

**particular** [5] - 13:23, 28:7, 44:4, 114:22, 122:11

**parties** [3] - 4:4, 124:8, 179:16

**partner** [30] - 12:17, 13:2, 13:5, 42:21, 58:4, 96:24, 100:22, 109:18, 110:6, 116:10, 116:13, 120:22, 131:17, 139:17, 140:8, 145:12, 146:13, 152:7, 152:19, 155:9, 156:10, 156:14, 159:9, 159:11, 159:19, 162:15, 165:20, 166:17, 174:4

**partner's** [1] - 151:17

**partnered** [3] - 17:9, 19:17, 108:15

**partners** [9] - 13:9, 15:19, 15:20, 17:12, 19:11, 19:13, 19:20, 108:19, 108:20

**party** [1] - 40:22

**pass** [4] - 135:25, 136:5, 136:11, 167:20

**passed** [6] - 32:16, 141:11, 141:19, 152:21, 162:3, 163:17

**passenger** [3] - 38:13, 38:23, 110:3

**past** [2] - 116:18, 152:22

**path** [1] - 149:7

**PATRICIA** [2] - 1:3, 2:3

**patrol** [15] - 12:21, 12:23, 13:3, 13:20, 14:11, 14:16, 15:5, 23:14, 23:17, 37:18, 49:20, 90:14, 90:17, 91:5, 110:3

**patrols** [1] - 94:3

**patterns** [1] - 18:21

**pause** [1] - 121:9

**paused** [3] - 121:2, 121:7, 121:12

**PBA** [1] - 45:17

**PD** [1] - 66:5

**penal** [4] - 8:20, 8:22, 8:25, 9:3

**Penal** [1] - 8:23

**pending** [3] - 6:24, 29:25, 55:6

**Peninsula** [1] - 3:5

**people** [21] - 18:17, 51:17, 81:5, 85:4, 89:17, 90:24, 91:6, 91:7, 91:18, 92:11, 94:8, 94:10, 94:14, 94:23, 95:12, 96:20, 99:2, 106:13, 107:15, 109:11, 169:15

**per** [1] - 128:18

**perceived** [1] - 105:16

**period** [3] - 121:8, 158:24, 173:16

**permanent** [2] - 16:7, 16:17

**person** [14] - 30:7, 30:9, 30:25, 36:11, 39:3, 42:25, 43:11, 43:20, 85:17, 93:11, 94:22, 106:4, 106:9, 120:8

**person's** [1] - 123:18

**personal** [9] - 112:3, 112:10, 115:15, 115:24, 116:2, 137:19, 137:23, 138:16, 139:3

**personnel** [2] - 71:25, 72:4

**persons** [2] - 42:14, 43:15

**perspective** [2] - 69:21, 124:21

**pertaining** [3] - 87:21, 131:25

**phone** [55] - 89:18, 89:20, 92:7, 94:4, 107:8, 107:12, 110:8, 110:19, 111:24, 112:3, 112:9, 112:10, 112:17, 112:19, 112:22, 112:24, 113:8, 113:10, 113:12, 113:15, 113:16, 113:21, 114:10, 114:13, 114:15, 114:16, 115:8, 115:18, 115:19, 115:24, 116:2, 117:4, 137:20, 137:23, 138:12, 138:14, 138:16, 138:20, 139:2, 139:4, 143:3, 143:10, 143:18, 143:21,

143:22, 144:21, 148:12, 153:4, 153:6, 153:7, 178:9
**phones** [15] - 112:8, 112:14, 112:15, 112:16, 113:4, 114:13, 114:17, 114:21, 114:25, 115:2, 115:4, 115:10, 115:13, 115:18, 139:5
**phonetic** [1] - 6:6
**photograph** [3] - 106:3, 106:8, 170:16
**photographed** [1] - 171:2
**photographer** [1] - 105:24
**Photographs** [2] - 77:22, 77:24
**photographs** [11] - 77:23, 77:25, 78:6, 78:13, 78:17, 78:20, 78:23, 79:20, 79:24, 80:20, 100:5
**photos** [5] - 78:9, 78:14, 80:12, 80:14, 80:23
**physical** [6] - 8:12, 9:13, 57:10, 57:24, 58:9, 58:17
**physically** [1] - 58:15
**picked** [1] - 162:9
**pictures** [3] - 78:18, 78:21, 78:24
**PINCUS** [2] - 3:15, 3:19
**Pincus** [1] - 6:6
**Pine** [5] - 122:13, 125:19, 125:20
**place** [6] - 9:22, 57:16, 73:8, 132:14, 154:5, 164:21
**placed** [5] - 19:5, 118:12, 153:5, 172:2, 172:8
**placing** [2] - 82:4, 102:19
**plain** [1] - 108:2
**plaintiff** [6] - 43:4, 43:22, 45:20, 47:2, 47:5, 53:22
**Plaintiff** [2] - 3:4, 3:16
**PLAINTIFF'S** [1] - 178:12
**Plaintiff's** [5] - 81:22, 81:25, 82:5, 102:16, 102:21
**plaintiffs** [4] - 1:5, 2:5, 5:17, 6:7
**planned** [1] - 109:5
**plastic** [1] - 165:20
**Plaza** [1] - 1:19
**point** [55] - 6:12, 9:7, 10:17, 48:5, 56:16, 82:25, 91:20, 104:3, 105:8, 118:23, 121:13, 125:5, 126:3, 126:24, 127:21, 127:23, 128:4, 128:20, 130:3, 130:21, 130:22, 130:23, 131:22, 132:18, 133:2, 133:8, 133:23, 134:11, 134:14, 135:14, 137:3, 137:15, 137:16, 147:11, 148:5, 148:13, 150:22, 150:25, 152:23, 153:15, 154:6, 154:20, 156:17, 160:14, 160:24, 166:6, 166:23, 167:6, 167:12, 167:21, 169:11, 172:21, 173:24, 174:6, 175:7
**points** [1] - 48:20
**POLICE** [14] - 1:7, 1:7, 1:8, 1:9, 1:10, 1:10, 1:11, 2:7, 2:7, 2:8, 2:9, 2:10, 2:10, 2:11
**Police** [28] - 7:5, 7:7, 7:17, 7:23, 8:7, 8:9, 11:24, 13:10, 13:13, 14:8, 14:19, 21:5, 21:11, 22:24, 23:3, 24:19, 24:23, 28:17, 35:12, 43:9, 43:18, 50:11, 56:6, 72:4, 97:7, 132:20, 134:15, 136:24
**police** [43] - 7:19, 7:20, 10:13, 10:20, 13:7, 13:11, 14:17, 16:11, 19:8, 22:4, 22:19, 29:13, 31:23, 37:3, 37:19, 42:13, 43:14, 46:20, 56:4, 56:5, 57:14, 71:24, 73:22, 86:14, 86:21, 86:25, 94:23, 97:16, 99:4, 106:13, 108:24, 130:25, 135:13, 139:5, 140:25, 141:8, 151:16, 154:12, 154:16, 159:14, 160:23, 162:23, 163:4
**portable** [2] - 111:3, 111:10
**Portela** [13] - 68:21, 68:23, 69:6, 69:12, 69:20, 70:3, 70:10, 70:23, 71:12, 71:14, 71:17, 72:2, 99:8
**portion** [1] - 127:14
**portions** [2] - 88:2, 88:6
**position** [5] - 7:16, 26:20, 118:13, 151:2, 172:15
**positioned** [1] - 118:6
**positions** [2] - 26:24, 27:2
**positive** [1] - 55:12
**possession** [3] - 86:3, 102:3, 138:20
**Possibly** [1] - 64:8
**possibly** [2] - 86:4, 93:9
**post** [3] - 14:25, 15:4, 15:7
**posted** [3] - 126:23, 127:9, 127:18
**posts** [2] - 12:4, 16:2
**powdered** [1] - 165:24
**practically** [1] - 91:2
**practice** [2] - 50:11, 113:20
**Precinct** [23] - 10:24, 11:2, 11:23, 12:21, 18:6, 19:2, 24:16, 32:2, 32:12, 32:14, 32:17, 33:3, 40:3, 78:8, 84:7, 89:23, 94:7, 107:5, 110:22, 146:11, 160:18, 160:20, 166:16
**precinct** [32] - 5:22, 16:21, 18:18, 18:20, 33:9, 67:9, 68:6, 68:25, 69:5, 78:5, 79:21, 80:13, 89:19, 94:5, 107:7, 109:7, 109:9, 114:18, 147:2, 161:5, 161:9, 161:11, 161:15, 161:25, 162:6, 162:10, 163:7, 164:18, 164:24, 165:2, 165:22, 167:22
**preparation** [4] - 75:16, 99:5, 100:14, 102:8
**prepare** [4] - 63:4, 63:8, 63:24, 64:21
**prepared** [3] - 63:6, 63:10, 63:12
**presence** [1] - 56:23
**PRESENT** [1] - 3:21
**present** [5] - 69:8, 73:10, 89:6, 92:10, 131:15
**presentation** [11] - 77:18, 77:21, 78:11, 79:4, 79:11, 81:3, 96:18, 98:22, 99:6, 99:14, 100:15
**Pretty** [1] - 124:17
**pretty** [3] - 91:14, 125:3, 129:14
**previously** [3] - 53:12, 85:23, 106:12
**prison** [1] - 53:7
**prisoner** [2] - 166:18, 175:9
**prisoners** [2] - 18:18, 40:3
**problem** [1] - 16:18
**problems** [1] - 107:20
**procedure** [1] - 10:11
**procedures** [5] - 8:14, 10:15, 20:20, 20:22, 168:2
**proceed** [2] - 121:16, 126:2
**proceeded** [5] - 119:18, 121:18, 129:18, 141:13, 147:20
**process** [10] - 18:22, 22:4, 22:6, 48:5, 48:23, 75:2, 75:6, 168:7, 170:15
**processed** [1] - 40:3
**processing** [3] - 39:25, 86:24, 168:21
**program** [1] - 12:6
**promise** [1] - 96:5
**pronounced** [1] - 68:5
**pronunciation** [1] - 131:20
**proper** [1] - 51:5
**Property** [1] - 101:13
**provide** [4] - 6:23, 31:20, 64:21, 71:9
**provided** [2] - 102:10, 103:18
**provider** [1] - 60:16
**providing** [1] - 65:21
**Public** [4] - 2:23, 5:4, 177:23, 179:7
**public** [2] - 16:24, 154:12
**pull** [6] - 122:20, 125:7, 125:10, 136:5, 136:14, 147:12
**pulled** [10] - 121:5, 121:23, 124:19, 125:6, 125:9, 125:11, 130:2, 140:22, 140:25, 142:7
**pulling** [4] - 151:8, 151:10, 155:15, 155:20
**punched** [1] - 157:3
**purchased** [3] - 91:18, 91:22, 92:2
**purchasing** [1] - 84:16
**pursuant** [1] - 2:22
**put** [9] - 16:16, 114:12, 114:14, 114:16, 146:7, 146:12, 150:25, 154:13, 172:18
**Put** [1] - 139:6

## Q

**quality** [1] - 23:23
**Quesad** [2] - 97:22, 98:4
**QUESADA** [1] - 97:22
**questioned** [11] - 30:13, 41:13, 41:16, 45:4, 63:16, 63:17, 73:23, 75:6, 76:3, 76:7, 77:14
**questioning** [2] - 28:22, 48:9
**questions** [16] - 6:9, 64:24, 64:25, 65:2, 77:4, 77:6, 77:9, 77:15, 98:21, 98:23, 99:15, 99:18, 99:22, 99:24, 100:9, 100:10

## R

**R-O-C-C-H-I-O** [2] - 13:11, 38:13
**race** [3] - 46:25, 47:4, 92:5
**radio** [33] - 110:7, 110:19, 110:22, 110:23, 111:3, 111:10, 111:11, 111:13, 111:15, 114:16, 117:3, 117:6, 131:10, 134:17, 134:21, 138:12, 140:7, 143:2, 143:10, 143:14, 143:23, 144:21, 145:10, 146:6, 146:8, 146:10, 146:11, 146:12, 146:19, 148:4, 153:3, 153:9, 153:17

**Radio** [1] - 143:12
**radios** [2] - 111:6, 111:8
**range** [1] - 9:24
**rank** [9] - 5:24, 23:2, 23:5, 23:7, 24:17, 30:17, 35:10, 43:7, 49:8
**rate** [8] - 124:2, 125:15, 126:22, 127:21, 128:13, 128:15, 128:21, 154:17
**rather** [1] - 136:5
**reach** [3] - 107:7, 126:3, 129:11
**reached** [6] - 120:10, 126:24, 127:23, 145:9, 148:15, 172:6
**read** [1] - 177:8
**real** [1] - 15:10
**realize** [1] - 120:25
**really** [1] - 75:10
**REALTIME** [1] - 1:23
**rearview** [1] - 130:4
**reason** [12] - 13:23, 14:3, 14:14, 15:10, 22:8, 37:16, 93:20, 139:11, 139:15, 139:18, 139:20, 139:21
**reassigned** [7] - 13:21, 13:24, 14:9, 14:15, 15:4, 17:20, 17:22
**reassignment** [1] - 14:3
**receive** [19] - 21:24, 27:16, 28:2, 28:5, 29:5, 31:21, 33:18, 38:18, 38:20, 39:4, 39:8, 61:18, 61:23, 65:5, 65:16, 106:2, 116:25, 128:25, 130:16
**received** [17] - 25:2, 28:10, 45:21, 50:3, 51:4, 54:9, 54:10, 60:19, 60:23, 60:24, 61:8, 77:5, 77:14, 93:6, 94:4, 117:14, 159:4
**recent** [3] - 34:8, 55:3, 55:5
**recognized** [1] - 132:15
**recollection** [13] - 26:4, 34:21, 46:5, 46:8, 53:24, 62:16, 62:19, 68:15, 77:12, 79:13, 83:12, 100:3, 163:3
**record** [9] - 5:9, 5:19, 6:18, 25:8, 176:11, 176:13, 177:11, 177:12, 179:13
**records** [2] - 139:2, 178:9
**recovered** [6] - 77:25, 100:20, 100:24, 101:17, 165:21, 165:25
**Recruit** [1] - 7:20
**recruit** [4] - 7:21, 8:2, 8:5, 21:11
**red** [2] - 54:23, 119:10
**reference** [7] - 17:4, 18:19, 18:25, 69:16, 85:5, 100:20, 101:24
**references** [1] - 101:23
**referencing** [1] - 99:25
**referring** [3] - 155:6, 155:7, 156:11
**regarding** [4] - 30:3, 41:8, 44:22, 131:24
**region** [1] - 164:13
**regular** [2] - 23:17, 123:25
**regularly** [1] - 94:13
**related** [4] - 59:13, 60:14, 96:7, 179:16
**relationship** [1] - 42:19
**relative** [1] - 6:10
**relax** [2] - 170:8, 173:20
**Relax** [1] - 170:20
**relay** [1] - 69:20
**released** [1] - 33:15
**remain** [6] - 12:22, 24:21, 107:8, 125:12, 140:20, 158:10
**remember** [12] - 8:16, 40:18, 65:10, 77:6, 98:10, 100:25, 131:13, 142:17, 152:6, 153:18, 159:9, 161:19
**rendered** [3] - 97:10, 97:16, 104:21
**rendering** [2] - 97:14, 104:22
**rephrase** [2] - 6:13, 46:12
**report** [25] - 41:18, 42:5, 63:5, 70:15, 70:18, 71:2, 71:5, 71:10, 71:17, 72:2, 79:7, 79:15, 83:2, 83:5, 100:14, 101:5, 101:16, 101:18, 102:6, 103:11, 103:17, 103:25, 105:10, 105:11, 105:20
**reporter's** [1] - 6:18
**REPORTING** [1] - 1:23
**reports** [1] - 63:7
**represent** [3] - 5:16, 6:7, 95:17
**representation** [2] - 103:13, 105:15
**representative** [1] - 59:20
**representing** [2] - 1:15, 2:15
**reprimanded** [1] - 50:9
**request** [3] - 82:6, 133:24, 146:16
**REQUEST** [1] - 178:8
**requested** [3] - 133:20, 175:15, 176:2
**requests** [2] - 133:18, 133:20
**require** [1] - 31:16
**reserved** [1] - 4:11
**residence** [2] - 57:13, 57:15
**residential** [3] - 90:21, 123:5, 135:22
**resisting** [1] - 59:6
**respect** [20] - 10:10, 20:19, 20:21, 41:22, 42:7, 46:23, 47:10, 47:21, 47:24, 48:22, 50:14, 54:11, 61:15, 63:14, 70:12, 80:12, 92:21, 101:6, 103:22, 169:3
**respective** [1] - 4:4
**respond** [4] - 6:16, 146:15, 146:18, 154:8
**responded** [5] - 58:12, 146:21, 154:25, 155:4, 161:8
**responding** [9] - 37:19, 58:12, 147:4, 148:7, 148:8, 148:10, 153:17, 154:13, 154:17
**responses** [2] - 82:18, 99:17
**responsibilities** [5] - 12:2, 16:23, 18:10, 23:12, 23:19
**result** [7] - 34:24, 47:15, 60:24, 61:2, 61:15, 61:19, 63:8
**retained** [1] - 178:16
**retrieved** [1] - 172:24
**return** [3] - 113:18, 163:18, 164:18
**returned** [6] - 31:25, 152:23, 161:20, 162:4, 165:2, 171:25
**rev** [1] - 127:3
**reverse** [1] - 136:19
**review** [9] - 45:14, 45:15, 63:3, 63:12, 71:4, 82:9, 100:13, 100:17, 102:7
**reviewed** [6] - 63:11, 71:7, 83:5, 100:19, 101:2, 101:5
**reviewing** [1] - 100:25
**revisit** [1] - 90:8
**RICHARD** [3] - 1:7, 2:7, 3:13
**ride** [3] - 23:15, 91:2, 92:15
**rights** [2] - 75:14, 170:14
**ring** [4] - 85:15, 88:16, 168:24
**ringleader** [1] - 88:12
**ripping** [2] - 168:22, 168:25
**Rivera** [6] - 52:18, 54:13, 83:21, 84:3, 85:16, 88:11
**Rivera's** [2] - 52:19, 52:22
**RL** [1] - 127:13
**Road** [17] - 3:17, 119:10, 125:23, 127:24, 128:3, 128:7, 128:8, 129:19, 130:9, 134:19, 136:2, 136:20, 136:22, 145:21, 149:15, 150:4, 150:15
**road** [18] - 50:12, 79:21, 79:23, 117:17, 118:17, 118:21, 120:21, 120:23, 122:21, 125:8, 126:4, 134:4, 149:24, 149:25, 150:2, 151:14, 152:25, 164:16
**roadway** [7] - 121:6, 136:15, 136:16, 149:9, 150:6, 150:7, 150:9
**roadways** [2] - 90:20, 90:21
**robberies** [1] - 18:21
**Robert** [4] - 128:9, 128:10, 129:6, 134:13
**Rocchio** [2] - 13:11, 38:12
**rode** [1] - 16:2
**role** [1] - 19:7
**roll** [1] - 108:24
**room** [35] - 27:15, 40:2, 69:7, 80:21, 80:25, 104:19, 105:2, 115:3, 165:5, 165:7, 167:4, 167:7, 167:13, 167:19, 167:23, 168:5, 168:6, 168:8, 171:6, 171:7, 171:11, 171:13, 171:16, 171:20, 172:2, 172:13, 172:16, 172:20, 173:2, 173:3, 173:4, 173:5, 173:6, 173:7, 174:16
**route** [4] - 117:25, 130:14, 134:25, 135:24
**routine** [2] - 43:14, 109:22
**RQ** [1] - 138:22
**rules** [6] - 6:5, 8:13, 10:10, 10:15, 20:20, 20:21
**RULING** [1] - 178:6
**ruling** [1] - 127:16

S

**safe** [1] - 95:13
**safety** [2] - 154:11, 154:18
**sat** [6] - 6:2, 45:4, 141:14, 142:20, 142:21, 144:17
**Saturday** [1] - 116:22
**saw** [33] - 56:8, 98:4, 98:6, 98:17, 105:20, 116:19, 119:12, 120:8, 121:5, 121:17, 123:20, 124:7, 124:9, 124:19, 125:14, 135:20, 136:9, 142:9, 142:13, 151:15, 151:16, 151:17, 151:22, 152:5, 155:2, 155:4, 155:8, 155:19, 167:11, 175:2, 175:4, 175:11, 175:19
**scene** [30] - 77:25, 78:2, 78:3, 78:5, 79:21, 79:23, 80:13, 149:20, 151:7, 151:9, 151:25, 152:4,

152:10, 152:25, 155:2, 155:12, 156:7, 158:2, 158:6, 158:10, 161:22, 161:24, 162:3, 162:4, 162:11, 162:13, 162:21, 163:8, 163:19

**scheduled** [1] - 67:15

**SCHOENFELD** [2] - 3:15

**school** [10] - 26:12, 26:15, 26:18, 26:21, 26:24, 27:6, 27:7, 27:10, 27:17, 27:23

**School** [1] - 26:16

**schools** [1] - 16:25

**Scimone** [23] - 97:2, 131:16, 131:18, 131:19, 131:21, 132:4, 132:20, 133:5, 133:12, 133:21, 134:6, 134:15, 135:11, 136:24, 138:11, 138:18, 139:10, 140:4, 152:6, 152:10, 155:8, 158:6, 163:10

**SCIMONE** [3] - 1:9, 2:9, 3:22

**Scimone's** [2] - 137:20, 138:6

**scrapes** [1] - 33:17

**Scratches** [1] - 44:3

**scratches** [1] - 44:5

**screaming** [3] - 145:12, 145:14, 169:2

**sealing** [1] - 4:5

**search** [1] - 18:14

**seasonal** [2] - 15:7, 15:9

**second** [12] - 22:9, 39:14, 47:5, 47:21, 52:25, 74:8, 74:22, 129:17, 141:17, 151:22, 162:21, 163:9

**Seconds** [2] - 121:10, 172:17

**seconds** [1] - 121:11

**section** [1] - 18:7

**secured** [1] - 167:2

**see** [25] - 55:20, 55:22, 56:12, 88:5, 98:7, 98:11, 98:19, 120:3, 120:5, 121:21, 123:9, 123:17, 123:21, 141:2, 151:14, 151:24, 152:3, 152:9, 155:11, 163:10, 163:13, 167:11, 167:20, 171:15, 174:18

**seeing** [9] - 78:10, 88:8, 88:10, 88:17, 152:14, 155:14, 164:14, 164:15, 167:14

**segregant** [1] - 66:15

**sell** [1] - 18:17

**selling** [4] - 83:22, 92:18, 107:10, 109:11

**seminars** [1] - 17:8

**sense** [1] - 84:14

**sent** [1] - 64:23

**separate** [3] - 109:23, 110:7, 110:10

**sergeant** [6] - 20:12, 30:19, 158:14, 159:13, 172:19, 175:4

**Sergeant** [44] - 11:7, 12:13, 20:14, 64:13, 66:12, 66:14, 66:21, 66:25, 67:20, 67:22, 68:3, 68:7, 68:10, 68:14, 68:18, 97:2, 108:14, 131:16, 131:18, 132:4, 132:19, 133:4, 133:11, 133:21, 134:6, 134:15, 135:11, 136:23, 138:5, 138:18, 139:10, 140:3, 152:6, 158:6, 163:10, 165:8, 165:14, 166:5, 166:10, 166:14, 172:12, 172:16, 173:10, 175:7

**sergeants** [3] - 20:8, 20:11, 171:8

**serious** [1] - 60:5

**Serious** [1] - 60:7

**Service** [6] - 119:7, 125:23, 127:24, 128:3, 128:7, 128:8

**service** [12] - 9:10, 9:15, 9:17, 10:2, 10:7, 20:19, 117:17, 118:17, 118:21, 119:19, 120:23, 126:3

**set** [6] - 71:19, 84:17, 111:19, 173:2, 179:12, 179:21

**settle** [1] - 45:25

**settled** [2] - 36:16, 53:17

**seven** [2] - 12:24, 13:9

**several** [1] - 84:24

**shackled** [1] - 173:21

**shall** [1] - 4:11

**shelves** [1] - 27:4

**shield** [1] - 108:4

**shirt** [1] - 108:3

**shit** [2] - 168:16, 170:22

**shiting** [1] - 168:17

**shootings** [1] - 18:22

**Shore** [14] - 5:12, 5:22, 12:4, 57:7, 109:13, 129:19, 130:9, 136:2, 136:19, 136:22, 145:21, 149:15, 150:4, 150:15

**short** [4] - 121:2, 122:18, 143:15, 158:11

**shortened** [1] - 14:20

**Shortly** [1] - 116:9

**shoulder** [1] - 136:15

**show** [2] - 91:25, 105:23

**showed** [2] - 106:8, 160:5

**shy** [1] - 28:12

**side** [18] - 37:8, 117:18, 117:20, 117:21, 122:20, 125:7, 125:9, 127:10, 149:24, 149:25, 150:2, 150:13, 151:13, 152:24, 174:21, 174:22, 174:25, 175:3

**sides** [1] - 149:9

**sign** [3] - 126:7, 127:6, 127:8

**signal** [1] - 120:13

**Signed** [1] - 177:20

**signed** [2] - 4:15, 4:18

**signs** [2] - 122:10, 126:2

**Similar** [1] - 103:20

**similar** [3] - 85:5, 93:7, 103:17

**sirens** [2] - 37:21, 154:18

**sit** [2] - 94:15, 94:19

**site** [1] - 121:13

**sitting** [2] - 168:19, 172:4

**situated** [1] - 140:18

**situation** [5] - 154:2, 154:4, 154:14, 154:15, 154:21

**six** [6] - 12:19, 14:25, 19:18, 29:14, 30:6, 108:21

**Six** [3] - 8:3, 12:9, 22:20

**Sixty** [1] - 28:6

**skim** [1] - 82:6

**slight** [1] - 120:20

**sold** [3] - 84:2, 84:9, 91:16

**someone** [7] - 40:21, 59:20, 59:25, 91:22, 95:15, 106:24, 107:10

**sometime** [3] - 68:25, 73:6, 86:8

**Sometime** [1] - 10:9

**sometimes** [4] - 94:17, 94:18, 110:9, 114:2

**Sometimes** [2] - 110:9, 114:2

**somewhere** [2] - 57:9, 163:24

**soon** [2] - 67:12, 146:9

**sorry** [1] - 59:22

**source** [9] - 85:11, 85:19, 85:22, 86:15, 87:9, 89:10, 90:3, 92:6, 93:17

**source's** [2] - 87:6, 87:12

**sources** [23] - 85:11, 90:2, 90:7, 90:12, 91:10, 91:12, 91:20, 91:25, 92:13, 92:22, 93:13, 94:2, 95:2, 95:7, 95:17, 95:21, 95:24, 96:2, 96:6, 106:10, 106:14, 106:18, 106:20

**South** [1] - 109:13

**Southern** [14] - 129:12, 129:16, 129:20, 136:3, 136:12, 137:10, 141:13, 145:5, 145:9, 145:22, 147:18, 147:19, 149:6, 150:4

**Southside** [5] - 32:8, 32:9, 32:13, 32:18, 39:11

**speaking** [6] - 68:18, 77:12, 78:3, 98:14, 98:16, 106:10

**Special** [1] - 18:8

**specific** [6] - 10:16, 51:18, 100:10, 103:9, 149:4, 157:15

**Specific** [1] - 98:23

**specifically** [10] - 25:15, 34:6, 36:21, 88:20, 99:13, 101:11, 104:12, 143:13, 156:23, 158:16

**Specifically** [2] - 34:7, 164:12

**specifics** [3] - 42:22, 42:25, 157:7

**speed** [12] - 123:25, 124:2, 125:16, 126:23, 127:9, 127:11, 127:18, 127:21, 128:14, 128:15, 154:17

**speedy** [1] - 51:6

**spell** [2] - 11:15, 55:9

**split** [1] - 79:22

**spokes** [1] - 88:13

**spot** [2] - 15:9, 15:14

**SPOTA** [2] - 1:13, 2:13

**Sprint** [1] - 112:12

**squad** [14] - 19:5, 19:21, 20:4, 40:2, 66:23, 69:7, 112:16, 113:11, 115:3, 165:4, 165:6, 173:2, 173:6, 173:7

**Squad** [1] - 18:6

**ss** [2] - 177:4, 179:4

**stands** [1] - 18:7

**staring** [1] - 172:11

**start** [9] - 22:3, 22:6, 34:5, 74:6, 99:20, 108:24, 116:23, 168:6, 170:12

**started** [10] - 20:3, 117:10, 118:16, 118:18, 118:24, 125:17, 144:19, 147:3, 170:25, 172:17

**starting** [1] - 129:3

**state** [7] - 5:8, 5:18, 6:15, 88:21, 106:25, 141:6, 149:8

**State** [19] - 2:24, 9:3, 129:12, 129:16, 129:20, 136:3, 136:12, 137:10, 140:24, 141:14, 145:5, 145:9, 145:22, 147:18, 147:19, 149:7, 150:5, 177:23, 179:8

**STATE** [2] - 177:4, 179:3

**states** [1] - 115:21

**STATES** [2] - 1:2, 2:2

**stationed** [3] - 10:23, 11:2, 140:21

**status** [1] - 7:25

**stay** [3] - 95:13, 110:15, 111:21

**stayed** [1] - 129:12

**step** [1] - 96:15

**stepped** [1] - 174:15

**Still** [1] - 29:25
**still** [3] - 19:23, 55:6, 59:11
**STIPULATED** [3] - 4:2, 4:8, 4:13
**stitches** [2] - 60:24, 61:7
**stocking** [1] - 27:4
**stop** [38] - 80:9, 84:11, 91:5, 119:10, 119:16, 121:6, 122:10, 125:24, 125:25, 126:6, 126:8, 126:10, 126:15, 126:19, 127:6, 127:8, 132:12, 136:2, 136:5, 136:12, 136:25, 137:5, 137:7, 137:8, 137:12, 137:14, 139:12, 140:8, 140:10, 140:13, 140:19, 141:10, 141:13, 141:16, 150:18, 164:5, 164:8
**stopped** [13] - 121:19, 121:20, 124:19, 125:4, 130:20, 139:19, 139:22, 140:2, 140:5, 140:17, 142:9, 142:16, 144:16
**stopping** [1] - 91:17
**store** [1] - 27:3
**stores** [1] - 94:17
**story** [1] - 74:5
**straight** [3] - 124:24, 125:3, 172:19
**Street** [5] - 1:23, 38:3, 120:11, 122:13, 125:20
**street** [12] - 18:13, 57:8, 89:18, 90:16, 122:7, 122:10, 123:4, 123:6, 144:9, 164:7, 164:14, 164:16
**streets** [2] - 90:21, 91:4
**strike** [5] - 55:22, 56:8, 56:10, 56:20, 127:14
**struck** [12] - 31:2, 31:5, 36:24, 43:2, 43:5, 54:17, 54:24, 56:18, 56:22, 56:24, 57:4, 61:12
**stuff** [2] - 104:8, 104:9
**styrofoam** [2] - 171:13, 171:24
**subdue** [1] - 58:14
**subdued** [1] - 80:9
**subduing** [1] - 78:15
**subject** [16] - 25:15, 28:18, 31:15, 33:2, 33:5, 33:8, 33:12, 39:23, 40:8, 44:23, 46:10, 49:24, 65:9, 75:13, 81:6, 83:13
**subject's** [1] - 143:6
**subjects** [2] - 88:14, 127:4
**subscribed** [1] - 177:20
**subsequent** [1] - 63:9
**substance** [11] - 26:4, 29:16, 30:23, 35:13, 39:18, 42:10, 67:25, 69:10, 74:2, 74:21, 102:4
**sued** [2] - 36:12, 46:20
**sufficient** [1] - 126:15
**SUFFOLK** [8] - 1:7, 1:12, 1:13, 2:7, 2:12, 2:13
**Suffolk** [21] - 1:15, 1:17, 2:15, 2:17, 7:4, 7:7, 7:17, 7:22, 8:6, 8:9, 9:23, 14:8, 14:19, 19:24, 21:5, 24:23, 28:17, 42:15, 50:11, 83:23, 108:6
**suggest** [1] - 75:18
**suggestion** [2] - 144:12, 160:12
**suit** [1] - 108:2
**Suite** [1] - 1:23
**suiting** [1] - 113:14
**Sullivan** [7] - 20:16, 42:18, 42:20, 43:3, 43:19, 47:11, 53:15
**sum** [10] - 26:4, 29:16, 30:22, 35:13, 39:18, 42:10, 67:25, 69:10, 74:2, 74:21
**summer** [2] - 15:2, 73:5
**Sunrise** [11] - 84:19, 92:15, 117:18, 118:4, 118:10, 118:17, 119:6, 119:19, 125:23, 126:25, 127:24
**supervise** [1] - 19:8
**supervisor** [13] - 12:10, 12:12, 14:7, 16:16, 42:3, 50:12, 66:11, 66:16, 66:18, 108:11, 172:22, 175:4, 175:11
**supervisors** [7] - 11:6, 11:10, 12:15, 20:3, 65:25, 66:3, 66:7
**supplemental** [2] - 71:2, 71:5
**Supplementary** [1] - 103:11
**supplementary** [13] - 63:5, 63:7, 70:15, 70:18, 71:10, 71:17, 72:2, 79:7, 100:14, 101:4, 102:6, 103:24, 105:10
**supplied** [2] - 71:16, 71:25
**supply** [1] - 71:13
**surveillance** [8] - 9:12, 58:20, 94:14, 94:19, 116:23, 120:24, 131:24, 131:25
**suspect** [2] - 129:3, 173:9
**suspicious** [2] - 135:18, 135:20
**SUV** [1] - 109:21
**sweatshirt** [1] - 108:3
**switched** [1] - 169:6
**sworn** [4] - 4:15, 4:18, 5:3, 179:12

**T**

**T-A-L-T** [1] - 5:21
**tactical** [1] - 8:13
**tailing** [3] - 129:23, 132:2, 134:4
**TALK** [2] - 1:11, 2:11
**TALT** [5] - 2:22, 177:7, 177:17, 178:4, 179:10
**Talt** [7] - 5:10, 5:14, 5:21, 7:2, 82:4, 96:14, 102:19
**Talt's** [1] - 139:3
**task** [1] - 6:18
**Team** [1] - 18:8
**telephone** [2] - 107:5, 138:6
**telephonic** [1] - 44:20
**Telephonic** [1] - 44:24
**ten** [6] - 76:22, 90:18, 121:10, 144:24, 145:3, 153:2
**terms** [8] - 8:18, 48:6, 55:23, 79:2, 93:14, 104:6, 108:23, 112:11
**test** [4] - 21:19, 21:21, 22:13, 22:14
**testified** [11] - 5:5, 65:14, 65:18, 78:8, 96:19, 97:6, 97:10, 97:13, 97:15, 97:25, 99:10
**testify** [1] - 96:25
**testifying** [5] - 79:16, 79:18, 96:21, 96:23, 97:4
**testimony** [13] - 74:13, 79:9, 80:25, 98:5, 102:8, 102:11, 103:18, 103:23, 105:4, 109:3, 177:9, 177:11, 179:14
**THE** [2] - 60:3, 87:19
**themself** [1] - 107:6
**thereafter** [1] - 73:6
**Therefore** [1] - 106:7
**thinking** [2] - 135:18, 141:3
**Third** [4] - 16:21, 84:6, 107:5, 166:16
**third** [5] - 42:7, 47:8, 47:10, 102:4, 113:11
**THOMAS** [2] - 1:13, 2:13
**thoroughfares** [1] - 91:3
**threaten** [1] - 95:23
**three** [14] - 9:20, 35:7, 46:23, 52:12, 63:18, 85:4, 89:16, 89:24, 91:9, 92:22, 115:2, 115:10, 130:10, 130:15
**Three** [1] - 113:6
**throughout** [1] - 23:15
**title** [2] - 103:6, 103:10
**Today** [1] - 114:4
**today** [5] - 6:19, 10:2, 55:6, 63:17, 114:21
**together** [1] - 110:9
**took** [12] - 16:18, 21:19, 21:21, 22:13, 22:16, 73:8, 107:6, 112:18, 112:22, 114:13, 172:5, 172:6
**total** [1] - 76:9
**totally** [2] - 123:3, 150:12
**tour** [19] - 67:13, 69:3, 70:20, 71:15, 90:13, 90:25, 92:14, 108:8, 108:12, 108:22, 108:25, 109:6, 113:8, 113:13, 113:14, 113:18, 113:21, 114:11, 114:19
**tours** [1] - 94:17
**towards** [2] - 123:25, 128:9
**trade** [1] - 90:18
**traffic** [16] - 94:12, 126:16, 129:18, 130:17, 132:11, 135:25, 136:5, 136:11, 136:25, 137:4, 137:8, 139:24, 141:10, 145:4, 150:10, 150:15
**train** [2] - 23:14, 23:17
**trained** [1] - 10:12
**training** [33] - 8:10, 8:12, 8:13, 8:19, 8:21, 9:2, 9:4, 9:5, 9:6, 9:10, 9:13, 9:15, 9:18, 9:21, 10:2, 10:4, 10:6, 10:8, 11:4, 11:11, 11:12, 11:18, 14:20, 14:22, 14:24, 15:11, 17:6, 20:19, 21:2, 61:19, 61:24
**trains** [1] - 23:15
**transaction** [5] - 92:19, 124:4, 124:6, 139:23, 144:9
**transcript** [2] - 177:8, 177:10
**transferred** [5] - 13:22, 14:13, 23:23, 24:2, 24:9
**Transit** [4] - 22:24, 23:9, 23:12, 25:5
**transitioned** [1] - 169:9
**transmission** [8] - 140:7, 143:2, 143:16, 145:11, 146:3, 146:12, 146:19, 153:22
**transmissions** [11] - 131:10, 134:17, 134:20, 135:5, 137:11, 144:2, 144:21, 148:4, 153:4, 153:9, 153:13
**Transmissions** [1] - 133:17
**transmitting** [1] - 131:14
**transport** [3] - 32:5, 33:2, 33:5
**transported** [6] - 31:22, 32:7, 32:11,

32:12, 32:13, 39:10
travel [8] - 73:19, 118:14, 118:16, 118:20, 118:24, 131:11, 133:16, 134:23
traveling [6] - 121:25, 122:2, 122:4, 128:9, 132:25, 134:18
treated [1] - 31:24
treatment [7] - 31:17, 31:21, 33:18, 38:21, 39:2, 39:11, 51:6
trial [5] - 4:12, 36:14, 36:15, 45:23, 45:24
Trial [1] - 2:21
tried [1] - 170:19
trooper [4] - 140:25, 141:6, 141:20, 141:23
trooper's [1] - 141:21
troopers [1] - 149:8
trouble [1] - 169:19
true [4] - 105:14, 177:10, 177:13, 179:13
truthful [1] - 82:18
try [1] - 170:5
trying [2] - 170:3, 173:20
tuned [2] - 111:13, 111:16
turn [8] - 62:14, 119:17, 120:11, 120:14, 120:16, 125:21, 125:22, 128:2
turned [1] - 165:19
turning [3] - 143:17, 143:20
twenties [1] - 93:9
twenty [1] - 76:24
twice [2] - 21:19, 57:4
Twice [1] - 72:23
two [46] - 10:3, 23:6, 24:13, 24:24, 27:22, 28:8, 28:12, 52:14, 56:9, 56:11, 56:18, 56:21, 86:12, 89:16, 89:24, 91:9, 92:21, 95:21, 101:24, 107:14, 109:11, 114:17, 114:20, 114:24, 119:8, 122:6, 122:17, 123:10, 123:16, 124:7, 124:14, 124:15, 126:11, 126:14, 127:4, 127:10, 142:24, 144:17, 149:3, 151:18, 152:16, 162:25, 171:13, 171:22, 171:24, 172:2
Two [4] - 22:25, 85:4, 126:5, 126:13
type [9] - 8:10, 15:7, 18:19, 43:25, 46:16, 98:20, 104:22, 135:10, 141:2
types [1] - 34:13
Typical [1] - 169:25

U

U.S [2] - 80:15, 80:17
Udall [2] - 119:10, 134:19
uncomfortable [1] - 144:20
Under [1] - 109:25
under [4] - 139:8, 154:11, 166:16, 177:9
undercover [1] - 18:15
understood [1] - 135:4
undue [1] - 50:16
unidentified [2] - 1:15, 2:15
uniform [1] - 40:2
uniformed [1] - 18:23
union [1] - 71:8
unit [36] - 11:4, 11:6, 11:11, 11:18, 11:23, 12:2, 12:8, 12:20, 13:22, 13:24, 14:4, 14:11, 14:12, 14:15, 15:16, 15:24, 16:5, 16:9, 16:12, 16:20, 16:21, 16:23, 17:6, 17:11, 17:16, 18:16, 23:24, 24:3, 24:6, 48:14, 49:12, 49:16, 81:13, 140:25, 146:13, 151:19
UNITED [2] - 1:2, 2:2
Units [1] - 58:10
units [1] - 147:2
unknown [2] - 1:15, 2:15
unless [1] - 135:2
unmarked [9] - 16:3, 16:8, 16:10, 16:15, 90:14, 95:2, 109:17, 109:21, 155:20
unresponsive [1] - 127:15
unsafe [2] - 127:11, 130:18
Up [2] - 130:23, 133:8
up [26] - 9:7, 20:8, 42:4, 42:5, 65:4, 79:22, 84:24, 86:6, 111:19, 113:14, 129:14, 130:2, 131:7, 133:2, 135:23, 142:7, 142:24, 143:17, 147:3, 147:21, 148:4, 148:12, 153:16, 162:9, 167:6, 173:3
upset [4] - 169:6, 169:10, 169:18, 169:25
upset-ness [1] - 169:10
uses [1] - 113:8
usual [2] - 113:20, 113:23
utilize [1] - 112:10
utilized [6] - 77:17, 77:20, 79:3, 79:5, 79:11, 79:15
utilizing [1] - 78:10

V

Valerie [1] - 34:18
varies [1] - 9:19
variety [1] - 9:11
vehicle [106] - 15:23, 15:25, 16:4, 16:8, 16:11, 16:15, 35:16, 36:2, 36:3, 36:11, 36:24, 36:25, 37:5, 37:7, 37:9, 38:9, 38:14, 38:16, 42:4, 50:7, 50:13, 52:17, 54:14, 60:4, 84:9, 84:19, 89:22, 94:15, 95:6, 95:13, 95:14, 109:15, 109:19, 109:21, 110:2, 110:4, 116:19, 116:24, 118:14, 118:15, 118:20, 119:3, 119:5, 119:9, 119:13, 119:21, 119:22, 119:24, 120:10, 120:13, 120:21, 121:14, 121:17, 121:19, 121:20, 121:24, 122:3, 123:14, 123:15, 123:24, 128:16, 129:2, 130:4, 133:17, 135:6, 135:11, 135:13, 135:25, 136:10, 139:12, 139:19, 139:25, 140:5, 140:9, 140:11, 140:14, 140:17, 140:19, 142:5, 142:9, 143:4, 144:8, 149:22, 150:23, 151:2, 151:13, 151:16, 151:17, 151:19, 152:24, 155:15, 155:18, 155:19, 155:23, 156:2, 160:22, 161:7, 161:18, 161:19, 161:20, 163:18, 164:22, 165:3, 167:15
vehicles [13] - 80:7, 80:10, 109:23, 110:7, 122:6, 122:17, 123:10, 123:14, 123:22, 124:25, 125:3, 147:22, 151:14
verbal [2] - 40:21, 50:4
verbally [1] - 50:8
verify [1] - 82:18
Verizon [1] - 112:12
Veterans [1] - 3:11
via [1] - 143:10
videos [1] - 77:20
view [4] - 110:13, 110:15, 124:25, 125:3
violation [2] - 86:4, 126:23
violations [1] - 139:25
visibly [1] - 119:12

W

W-I-S-E-L-Y [1] - 13:6
Waited [1] - 119:17
waived [1] - 4:7
waiving [1] - 75:14
walk [2] - 150:6, 150:8
walked [3] - 12:3, 15:25, 172:20
walking [1] - 165:22
wall [1] - 172:11
Walt [1] - 3:17
wants [1] - 169:17
warning [1] - 50:4
warranted [1] - 16:14
warrants [1] - 18:14
water [7] - 171:12, 171:14, 171:23, 171:25, 172:3, 172:18, 172:24
ways [5] - 48:11, 110:5, 110:10, 111:25, 154:14
weapon [1] - 58:21
weapons [1] - 18:15
weeks [2] - 84:24, 86:6
west [7] - 122:5, 122:12, 141:10, 147:20, 149:13, 149:14, 149:23
West [7] - 116:12, 117:16, 120:10, 120:11, 120:17, 122:3, 144:10
westbound [3] - 129:15, 145:8, 147:18
Wheatly [1] - 27:12
WHEREOF [1] - 179:20
white [7] - 51:25, 92:11, 92:13, 92:23, 142:2, 142:4, 155:2
White [2] - 13:10, 47:7
Whitman [1] - 3:17
whole [1] - 56:23
wide [1] - 23:25
William [2] - 5:15, 42:18
WILLIAM [3] - 1:10, 2:10, 3:7
Willow [1] - 38:3
Wilson [1] - 38:5
window [6] - 90:24, 122:7, 122:8, 123:12, 123:13
Wisely [5] - 13:6, 15:21, 17:13, 19:22, 19:23
Withdrawn [24] - 13:18, 34:25, 46:17, 53:20, 56:3, 56:15, 59:17, 60:13, 67:7, 73:2, 75:20, 93:4, 100:12, 101:3, 102:12, 105:25, 106:19, 115:16, 134:8, 138:3, 150:24, 159:23, 164:6, 175:18
WITNESS [4] - 60:3, 87:19, 178:3, 179:20
witness [9] - 5:3, 46:18, 65:14, 65:19, 75:4, 75:11, 79:12, 179:11, 179:14
Witness [1] - 82:7
witnessed [1] - 139:23
witnessing [1] - 56:24
word [3] - 70:6, 158:18, 158:20
words [4] - 6:16, 137:13, 140:9, 153:18

**worksheet** [1] - 170:15
**wrapped** [1] - 152:23
**wrapping** [1] - 153:14
**writes** [1] - 42:4
**writing** [2] - 45:9, 139:7
**written** [3] - 41:18, 44:15, 64:23
**wrote** [1] - 42:4
**www. realtimereporting. com** [1] - 1:25

Y

**yards** [1] - 150:20
**Yards** [1] - 150:21
**year** [15] - 7:10, 9:16, 10:9, 13:16, 15:17, 16:19, 17:7, 17:17, 17:19, 17:24, 21:2, 21:12, 27:5, 27:8, 29:15
**years** [14] - 7:9, 7:21, 12:25, 13:9, 19:18, 22:17, 23:6, 24:13, 24:24, 26:18, 27:22, 28:8, 90:18, 108:21
**yelling** [3] - 170:21, 173:7, 173:11
**YORK** [4] - 1:2, 2:2, 177:4, 179:3
**York** [17] - 1:20, 1:24, 2:24, 3:6, 3:12, 3:18, 5:13, 9:3, 14:17, 21:11, 22:23, 23:9, 23:15, 25:5, 140:24, 177:23, 179:8
**yourself** [2] - 94:15, 118:13
**youth** [1] - 12:5

Z

**Zurl** [1] - 97:19
**ZURL** [1] - 97:19

# GONZALEZ –V- COUNTY OF SUFFOLK

## CHRISTOPHER TALT - 5/19/11

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**REALTIME REPORTING, INC.**
**124 East Main Street**
**Suite 202**
**Babylon, New York  11702**
**Phone:  (516) 938-4000**
**Fax:  (631) 983-8938**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
PATRICIA GONZALEZ and JENNIFER GONZALEZ, , individually and as co-administrators of the Estate of KENNY LAZO,
Plaintiffs,

- against -

COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity , POLICE OFFICE CHRISTOPHER TALK, in his individual and official capacity, POLICE OFFICER JOSEPH LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney),
Defendants.
-----------------------------------------------x

100 Federal Court Plaza
Central Islip, New York

May 19, 2011
10:10 a.m.

(Continued)

REALTIME REPORTING, INC.
124 East Main Street, Suite 202
Babylon, New York 11702
516-938-4000
www.realtimereporting.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
PATRICIA GONZALEZ and JENNIFER GONZALEZ, , individually and as co-administrators of the Estate of KENNY LAZO,
Plaintiffs,
- against -
COUNTY OF SUFFOLK, SUFFOLK POLICE DEPARTMENT, POLICE COMMISSIONER RICHARD DORMER, in his individual and official capacity, POLICE OFFICER JOHN NEWTON, in his individual and official capacity, POLICE OFFICER JAMES SCIMONE, in his individual and official capacity, POLICE OFFICER WILLIAM JUDGE, in his individual and official capacity , POLICE OFFICE CHRISTOPHER TALK, in his individual and official capacity, POLICE OFFICER JOSEPH LINK, in his individual and official capacity, COUNTY OF SUFFOLK OFFICE OF DISTRICT ATTORNEY, SUFFOLK COUNTY DISTRICT ATTORNEY THOMAS SPOTA, in his individual and official capacity, ASST. DISTRICT JOHN B. COLLINS, in his individual and official capacity, and "JOHN AND JANE DOES 1-10" representing as yet unknown and unidentified members of the Office of Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney),
Defendants.
-----------------------------------------------x

Continued Examination Before Trial of the Defendant, CHRISTOPHER TALT, pursuant to Notice, Before a Notary Public of the State of New York.

APPEARANCES:

FREDERICK K. BREWINGTON, Esq.
Attorneys for Plaintiff
556 Peninsula Boulevard
Hempstead, New York 11550
BY: WILLIAM GERMANO, JR., ESQ.

CHRISTINE MILAFI
Attorneys for Defendants
100 Veterans Memorial Highway
Hauppauge, New York
BY: RICHARD T. DUNNE, ESQ.

ALSO PRESENT:
SCHOENFELD, SCHOENFELD & PINCUS, P.C.
Attorneys for Plaintiff
999 Walt Whitman Road
Melville, New York 11747
BY: DAVID A. PINCUS, ESQ.

JAMES SCIMONE
JOSEPH LINK
BILLY JUDGE
JOHN NEWTON

CHRISTOPHER TALT, called as a witness, having been first duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. GERMANO:

Q. Good morning.
A. **Good morning.**
Q. We are going to continue the deposition that we started a couple of weeks ago. I am sure you recall the ground rules since we have been doing this for a pretty long time now.
I believe we left off when you were inside the precinct with Mr. Lazo, is that correct?
A. **Yes.**
Q. In the last conversation, I think we were talking about was you went to retrieve water for Mr. Lazo, is that correct?
A. **I don't recall exactly where we left off.**
Q. Let's start from the point in

Talt

time when Mr. Lazo was settled in the interview room. Okay?

A. **Okay.**

Q. Who brought Mr. Lazo into the interview room?

A. **Officer Link.**

Q. From the time Mr. Lazo was brought into the interview room, what conversation, if any, did you have with Mr. Lazo at the precinct?

A. **When I walked into the room he** was upset and angry and we were not, at first, having a real conversation. He was yelling. With his left hand he was being cuffed to the table. He was yelling, continuously cursing fuck, shit, fuck, shit, while yanking his cuffs, his hand away from the table. I was trying to get him to calm down. I was telling him to calm down. He said to me that he didn't want to go to jail. He later said to me that he was sorry that he fought with the officers. He started cursing again. The same, fuck, shit curses.

Talt

Again, I was trying to calm him down, which he did calm down. That is when he asked me for some water.

Q. Did you see, prior to that interaction with Mr. Lazo, did you see Mr. Lazo in the precinct at any other time?

A. **No.**

Q. Was the handcuff that Mr. Lazo was held by, you indicated that it was attached to a table?

A. **Yes.**

Q. How big was the room?

A. **It's an interview room. It's** approximately 8 feet by 8 feet.

Q. How big is the table?

A. **A regular size desk. Smaller** than this desk here. Probably about this big.

Q. Is that about 3 or 4 feet?

A. **Yes.**

Q. Was the desk pushed against a wall or anything?

A. **The layout of the room is**

Talt

about 8 feet, by 8 feet. There is a desk. When you step into the room the desk is tr your left flush up against the wall and the far left corner of the room. At the end of the desk is a chair for the prisoner to sit in.

Q. That chair would be on the right side of the desk?

A. **If you are looking at the desk** it would be on the left side, yes. There are handcuffs that are bolted into the desk that come off the side of the desk where Mr. Lazo was sitting in his chair and his left hand was cuffed, one set of cuffs, left-hand cuffed, the other cuff is bolted to the desk.

Q. Is the table or desk in any way bolted to the floor?

A. **No.**

Q. Is it in any way bolted to the wall?

A. **No. There is another chair for the detective to sit in to conduct the** interview.

Talt

Q. That would be on the opposite end of the table?

A. **It would be at the front of** the desk, typical desk. And there is the door that you step in, one door in and one door out. That door exits to the detective squad room.

Q. In order to get into the interview room, is the only path through the detective squad room?

A. **Yes.**

Q. When you were with Mr. Lazo in the interview room --

A. **Just one more, there is a** window in that room for viewing.

Q. What does it view?

A. **You can see in to the** interview room.

Q. But from the interview room you cannot see into the detective squad room, correct?

A. **It actually goes to a** different room, to a conference room that window. It's there for viewing of

204

Talt

sometimes narcotics prisoners.

Q. Was anybody in the detective squad room, that you knew of, while you were with Mr. Lazo in the interview room?

**A. Yes.**

Q. Who was that?

**A. Well, I can't say who was actually in the squad room while I was in the room because they could have left, but I recall a few people that were working. Detective Sergeant Koerber was working, he was the supervisor during that tour. Police officer, at the time, Zambitto, Z-A-M-B-I-T-T-O. Detective O'Leary was working, but again I don't know if they were actually in the room while I was in the interview room, but they were working.**

Q. Do you know if they were in the precinct at the time you were with Mr. Lazo?

**A. No, I don't know.**

Q. In the viewing room, do you recall if anyone was in that room?

**A. No.**

205

Talt

Q. No you don't recall --

**A. It's a conference room where you can view. I don't recall -- I don't know, I shouldn't say I don't recall, but there was no reason for anyone to be in there looking in.**

Q. For approximately how long did you interact with Mr. Lazo in the interview room?

**A. Less than five minutes.**

Q. During that period of time, did any other officer, or personnel, enter that room?

**A. Eventually Detective Sergeant Koerber entered the room.**

Q. Did you have any conversations with Detective Sergeant Koerber at that point in time?

**A. I was present with him when he came in. He began to ask Mr. Lazo some basic questions of his pedigree.**

Q. Did you have any conversation up until that point with Detective Sergeant Koerber?

206

Talt

**A. When Mr. Lazo didn't respond to any of the questions that he had asked, both Detective Sergeant Koerber and I saw a change in his behavior and that is when both of us agreed that he should get medical attention.**

Q. When Detective Sergeant Koerber first entered --

MR. GERMANO: Withdrawn.

Q. What observations did you have of Mr. Lazo's physical attributes, if any, while you were in the interview room?

**A. First he was very angry --**

Q. I said physical attributes.

**A. He was moving his arm around. He had abrasions on the right side of his face.**

Q. Anything else?

**A. No.**

Q. When Detective Sergeant Koerber entered the room, did you point out the abrasions on Mr. Lazo's face?

**A. No.**

Q. Was it your responsibility to

207

Talt

point out that Mr. Lazo had abrasions on his face to the detective sergeant?

**A. No, Detective Sergeant Koerber came in to interview Mr. Lazo to see if he had any pain or injury that he complained of, and the only visible marks that I recall were on the side of his face. They were clear for Detective Sergeant Koerber to see for himself.**

Q. When was the first point in time you observed the abrasions on Mr. Lazo's face?

**A. When I walked into the room.**

Q. From the time that Mr. Lazo was subdued at the scene to that point in time, did you have any observation of Mr. Lazo?

**A. No.**

Q. I think I recall you mentioned you obtained water for Mr. Lazo?

**A. Yes.**

Q. When did that occur?

**A. When he calmed down after his outburst of the cursing, and the**

Talt

apologizing, being upset that he was going to go to jail. He then calmed down and he asked me, can I have a drink of water.

**Q.** Detective Sergeant Koerber, was he in the room at that point in time?

**A.** **No, he had not come in yet.**

**Q.** You left and went to retrieve water for Mr. Lazo?

**A.** **Yes.**

**Q.** When you left, do you know if any other officer entered the room?

**A.** **No.**

**Q.** No you don't know?

**A.** **No. No officer entered the room.**

**Q.** Approximately how long after you returned with water, did Detective Sergeant Koerber enter the room?

**A.** **I would say less than a minute.**

**Q.** Did Mr. Lazo, from the time you reentered the room with water, did you have any conversation with Mr. Lazo?

**A.** **No.**

Talt

**Q.** For approximately how long --

MR. GERMANO: Withdrawn.

**Q.** Did you ask him any questions when you reentered the room with water?

**A.** **No.**

**Q.** Did you notice that he was not speaking to you?

**A.** **Yes. He was staring -- when I walked into the room he was looking at the wall straight ahead. I walked into the room and I placed the two styrofoam cups of water on the left front corner of the desk that we were both sitting at.**

**Q.** When Mr. Lazo was staring off at the wall in front of him what, if anything, did you do?

**A.** **He was looking straight ahead when I walked in the room. He then went to pick up one cup of water. Picked up a cup of water with his right hand, that was not handcuffed and he drank from that cup of water. Then he put down, put the cup of water back on the desk. Again he was looking straight ahead.**

Talt

**Q.** At that point in time, did you ask him any questions?

**A.** **I started to try to have a conversation with him. I don't recall what I said, but at that time, that is when he stopped talking to me and was staring straight ahead.**

**Q.** For approximately how long was he staring before Detective Sergeant Koerber entered the room?

**A.** **Right away.**

**Q.** What happened when Detective Sergeant Koerber entered the room?

**A.** **He entered the room, he started to ask Mr. Lazo basic pedigree questions, he was filling out an activity log on him. Mr. Lazo did not respond to any of his questions and both Detective Sergeant Koerber and I, at that point, said we should get him medical attention.**

**Q.** Do you know approximately how many questions were asked to Mr. Lazo?

**A.** **No. It was quick. I don't know how many.**

Talt

**Q.** Would it have been less than five questions?

**A.** **I don't recall.**

**Q.** At that point in time did you have a conversation -- what other conversation, if any, did you have with Detective Sergeant Koerber?

**A.** **We are going to call for medical, for an ambulance to come to the precinct for medical treatment. Detective Sergeant Koerber said to me that he was going to do that.**

**Q.** At that point, what did you do, if anything?

**A.** **I stayed with Mr. Lazo.**

**Q.** Did you have any radio communication with anybody while you were staying with Mr. Lazo?

**A.** **Later on I did. I was in radio contact with the dispatcher, but this comes later. It comes when the ambulance is notified. I am on the radio directing Brentwood Legion Ambulance to the third squad area of the building so**

212

Talt

Mr. Lazo, they can enter the building in the right location so he can be treated.

**Q.** Did Detective Sergeant Koerber leave the interview room when you and him determined it was time to obtain medical attention?

**A. Yes.**

**Q.** What happened next?

**A. About a minute later, as I am** sitting there with Mr. Lazo, at the same time he kind of slumps down in the chair and his head falls back against the wall behind him.

**Q.** During that minute, did any other personnel enter the room?

**A. No.**

**Q.** What was Mr. Lazo wearing?

**A. He had -- he didn't have a** shirt on. He had boxer shorts on, socks.

**Q.** Anything else?

**A. No.**

**Q.** What, if anything, did you observe about Mr. Lazo's body from the neck down?

213

Talt

**A. He's very heavyset. He's very** round, overweight.

**Q.** Did you notice if there was any marks on Mr. Lazo's body from the neck down?

**A. I didn't notice any.**

**Q.** Did Mr. Lazo have any tattoos that you noticed?

**A. I don't recall.**

**Q.** During the point in time, that one minute or less that you were sitting with Mr. Lazo after Detective Sergeant Koerber left the room to get medical attention, did you try to provide any support to Mr. Lazo in any way?

**A. I was trying to have a** conversation with him to get him to respond to me, and he didn't. No. He wasn't. At that point, there was no labored breathing. There was no sign of him needing anything from me other than he is staring straight ahead and he is not responding to my questions.

**Q.** You said there was no

214

Talt

belabored breathing?

**A. He was having no difficulty** breathing.

**Q.** Did you check his pulse?

**A. No. But I could see. He was** sitting there without a shirt on. He was not breathing heavy. It was normal breathing. He was staring straight ahead.

**Q.** Did his breathing change from any point in time when you first sat in the interview room with him until that point in time?

**A. When I first came into the** room, he was yelling and cursing and he was worked up, but I didn't see a change in actual breathing, no.

**Q.** When Mr. Lazo slumped down what, if anything, did you do?

**A. He slumped down and at the** same time his head went back and rested up against the wall behind him. I immediately grabbed his left arm that was handcuffed to the desk and shook it, trying to get a response from him and

215

Talt

there was no response.

**Q.** Was this, was the handcuff removed at that time?

**A. At the same time I yelled to** the detectives or anybody who was in the detective squad room alerting them to what was going on, that I needed a rush on rescue, at the same time, I uncuffed him. I uncuffed his left hand from the desk.

**Q.** Did you yell anything other than a rush was needed?

**A. I don't recall my exact words** but put a rush on rescue, again notifying them of the situation in the room. I don't recall exactly what medical terms I used, but I needed help.

**Q.** When you uncuffed his hand, did he remain in the chair?

**A. Yes.**

**Q.** What, if anything, happened next?

**A. Officer Broderick entered the** room. He was in the building, in the precinct at the time when this happened.

Talt

He immediately entered the room. That is B-R-O-D-E-R-I-C-K. He entered the room with me and the two of us placed Mr. Lazo on the floor of the interview room to begin CPR.

When we laid him down on the floor, we positioned him with his feet towards the door and his head towards the back wall where there is that window that I had described earlier.

Q. You said that you and Officer Broderick entered the room, did you leave the room?

**A. No. Officer Broderick entered** the room. I never left the room. He entered the room when I called for the assistance and he assisted me.

Q. Do you have, at that point in time, on April 12, 2008, did you have training in CPR?

**A. When I was a police officer, I** had training in CPR.

Q. How long does that --

MR. GERMANO: Withdrawn.

Talt

Q. Do you get a license?

**A. We have verified -- I was** certified through the state as an EMTD, but that has since expired.

Q. Was that expired on April 12, 2008?

**A. Yes.**

Q. When did it expire?

**A. I don't recall when it exactly** expired but it is -- when I was transferred to the detective unit bureau, that is no longer included in the training.

Q. When you and Officer Broderick placed Mr. Lazo on the floor what, if anything, did you do next?

**A. Almost immediately two other** officers entered the room. Officer Zurl, Z-U-R-L, and Officer Friedrick, F-R-I-E-D-R-I-C-K entered the room. Officer Zurl came in carrying medical equipment. Oxygen, I believe, a defibrillator.

Q. Before they entered the room,

Talt

did Officer Broderick attempt CPR?

**A. Yes, as that was starting** these other officers who were also in the building at the time when this was happening, they came into the room bringing in the equipment.

Q. For approximately how long was Officer Broderick conducting CPR before the two other officers entered with the oxygen and the defibrillator?

**A. I don't know exactly. It was** quick.

Q. Less than five minutes?

**A. It was less than a minute.** Again, I don't know what Officer Broderick, Zurl, and Friedrick, what their business was in the precinct at the time of the incident, but they were all present in the building when this happened.

Q. What, if anything, did you observe next after they entered with the oxygen and the defibrillator?

**A. They were using the oxygen,** using a breathing mask. They also

Talt

utilized the defibrillator. During that time two other officers entered the room. Officer Quesada, Q-U-E-S-A-D-A, and officer Cotter, C-O-T-T-E-R.

Q. For what purpose did those officers enter the room, that you know of?

**A. They were administering aid** also.

Q. What kind of aid were they administering?

**A. They were using a breathing** mask, they were using the oxygen, at the time the defibrillator was being used, chest compressions were being done. That is when, when they were administering the aid. That is when I was on the portable radio inside the precinct directing the ambulance crew to come to a certain door in the building to come in so they will be able to render aid faster.

Q. Did the ambulance crew eventually show up?

**A. Yes.**

Q. Approximately, how long did it

Talt

take the ambulance crew to arrive from the moment Officer Broderick left to retrieve the medical attention?

**A. I don't understand the** question.

**Q.** When Mr. Lazo first started to stare off and you and Detective Sergeant Koerber acknowledged that he needed medical treatment, how long did it take for the ambulance crew to arrive?

**A. Detective Sergeant Koerber,** approximately 8:55 p.m., he went to call for help, which he walked to the precinct desk and got on a direct line to the Third Precinct dispatcher. I believe rescue arrived at the precinct at approximately 9:05. Approximately ten minutes from when Detective Sergeant Koerber left the room to the ambulance crew being, arriving at the precinct.

**Q.** How do you know that Detective Sergeant Koerber walked to the desk to place the call?

**A. I later learned that from**

Talt

Sergeant Koerber that that was the method he used. There a different ways, obviously, we could call, we could get a radio, go through the dispatcher and the dispatcher has to notify, the dispatcher notifies the ambulance. You could call from a squad phone, but we have a direct line that goes straight to the precinct dispatcher on the precinct desk.

**Q.** How far is the precinct desk from the interview room in terms of however you can lay that out?

**A. You exit the detective squad** room, you walk about ten steps, make a turn and you probably walk about 20-yards to the precinct desk.

**Q.** Do you know if any officers were at the precinct desk at or around that time?

**A. The desk is always manned.** There is always officers on the desk. I don't know who was there.

**Q.** Did you carry a portable radio on you when you were in the interview room

Talt

with Mr. Lazo?

**A. I had a portable radio on my** belt.

**Q.** Did Detective Sergeant Koerber have a portable radio on him when he entered the room?

**A. No.**

**Q.** Could you have contacted the precinct desk with the portable radio?

**A. You can go direct with a** person on the radio. It's either -- I would have went through the dispatcher that way. I would not go to the precinct desk.

**Q.** Are you capable of contacting the precinct desk with your portable radio?

**A. Capable, yes.**

**Q.** After the ambulance crew arrived what, if anything, did you do?

**A. I stayed with the ambulance** crew while they were administering aid to Mr. Lazo.

**Q.** How many people from the

Talt

ambulance crew were in the interview room?

**A. I don't recall.**

**Q.** Did the other four officers and Detective Sergeant Koerber and yourself remain in the room while the ambulance crew was administering aid?

**A. No. Everyone would not be** able to fit in the room. I was standing outside the room and some of the officers that were present, rendering aid, assisted the ambulance crew with the continuation of the aid.

**Q.** For approximately, how long did the ambulance crew remain at the precinct for?

**A. Approximately 15 minutes.**

**Q.** They administered aid for 15 minutes?

**A. Yes.**

**Q.** After 15 minutes what happened?

**A. Mr. Lazo was brought outside** the precinct into the ambulance, Brentwood Legion Ambulance. They placed him in the

Talt

ambulance. Officer Cotter accompanied the ambulance crew on the rig to the hospital.

**Q.** Was Mr. Lazo breathing at that point in time?

**A. I don't know.**

**Q.** When Mr. Lazo, when he slumped down and his head went back in the interview room, did you notice a change in his breathing?

**A. No.**

**Q.** Was he breathing?

**A. I don't believe so.**

**Q.** When the ambulance left with Mr. Lazo, did you believe him to be alive?

**A. I don't know. I didn't know.**

**Q.** When did you learn that Mr. Lazo passed away?

**A. You want to jump ahead?** 9:45 p.m. I was in the trauma room at the Southside Hospital when Dr. Rutman pronounced Mr. Lazo dead.

**Q.** From the point in time the ambulance left the precinct, how did you end up in the trauma room?

Talt

**A. We leave the actual** building --

**Q.** Who is we?

**A. Mr. Lazo is transported into** the ambulance. Officer Cotter goes in to the ambulance with the ambulance crew. We are now going to transport to South Side Hospital. I follow the ambulance down to the hospital in a separate car. At that time, I have other available units, police cars, in the precinct blocking traffic to assist with the transport. The available units block intersections so we go directly from the precinct to South Side Hospital.

**Q.** Do you remain behind the ambulance the entire trip?

**A. A distance behind.**

**Q.** You were not involved in the blocking of traffic or anything else like that?

**A. No.**

**Q.** Were you in a solo car?

**A. No, I was with my partner,**

Talt

Detective Newton.

**Q.** Who was driving?

**A. I was driving. We arrive at** the emergency room entrance of South Side Hospital.

**Q.** What did you do next?

**A. The ambulance crew unloads** Mr. Lazo from the ambulance and I follow them in to the trauma room at South Side Hospital.

**Q.** Is Mr. Lazo handcuffed?

**A. No.**

**Q.** Did Detective Newton remain with you or go elsewhere?

**A. He didn't come in to the** trauma room with me.

**Q.** What, if anything, happened next?

**A. The hospital staff headed by** Dr. Rutman, R-U-T-M-A-N, rendered aid while I stand by in the trauma room and I believe that at approximately 9:45 p.m. Dr. Rutman pronounced Mr. Lazo's death.

**Q.** Was anyone else from the Third

Talt

Precinct with you in the room?

**A. Not that I recall.**

**Q.** Was any other officer or detective or personnel at the hospital?

**A. Officer Cotter was in the** ambulance on the way down to the hospital.

**Q.** What did you do when Mr. Lazo was pronounced dead?

**A. I stayed in the room where** Mr. Lazo was.

**Q.** How long did you stay in the room for?

**A. I don't recall.**

**Q.** More than ten minutes?

**A. I don't believe so.**

**Q.** Did anyone else remain in the room with you?

**A. There was hospital staff.**

**Q.** Why did you remain in the room for ten minutes?

**A. I stayed with Mr. Lazo until** later, other police officers had arrived at the hospital, and homicide detectives were notified of the situation.

Talt

Q. Did you notify anybody that Mr. Lazo was pronounced dead?

**A. I don't recall if I made any** of the notifications.

Q. Did you learn that homicide was en-route to the hospital?

**A. I learned that they were** notified of the situation.

Q. How did you learn that homicide was notified?

**A. I later see them, different** homicide detectives and supervisors.

Q. Were you under any obligation to remain at the hospital before you actually saw homicide?

**A. Under any obligation, no.**

Q. For what reason, if any, did you remain at the hospital?

**A. Mr. Lazo had just passed away** and I stayed in the room with him until there was an officer -- until officers got there, so in one sense, it becomes a scene.

Q. Did you actually notify any

Talt

officers?

**A. I don't recall if I made the** notifications or not, but I know that homicide was notified of the situation.

Q. What officers arrived later on that you remember?

**A. I don't recall what officers** were at the hospital.

Q. Did you have any contact with your partner while you were in the hospital?

**A. Yes. When I exited the room** and returned back to the precinct, I went back to the precinct with my partner.

Q. Did your partner remain in the vehicle while you were in the hospital?

**A. No.**

Q. Did he ever enter the trauma room?

**A. I don't recall him being in** the trauma room, no.

Q. How long did you remain in the hospital for?

**A. I am not sure.**

Talt

Q. Was it more than an hour?

**A. No, less than an hour.**

Q. Was it more than a half hour?

**A. Less than a half hour.**

Q. More than 20 minutes?

**A. I don't know, but less than** half an hour.

Q. Did you have any communication with any personnel from homicide?

**A. I later spoke to Detective** Portella from homicide. That was at the precinct. That was at the Third Precinct.

Q. At the hospital, did you have any contact, other than seeing them there, with homicide?

**A. I don't believe so.**

Q. What led you to actually leave the hospital, were you directed to leave, did you just decide to leave?

**A. I was not directed to leave,** but the scene was taken over by the uniform presence at the hospital. I responded back to the Third Precinct to continue with the process.

Talt

Q. What process was that?

**A. That later I was interviewed** by Detective Portella. I wrote a supplementary report of the incident. I was involved in assisting in the drug investigation of the aspect of the case.

Q. How long did Detective Portella interview you for?

**A. Approximately a half hour.**

Q. How many times did he interview you?

**A. I spoke to him, like I said,** for approximately a half hour at the precinct. He later -- I spoke to him a couple of other times short at the precinct, and that was -- that is it.

Q. When did you have the couple of other short conversations?

**A. While I was in the building** with him.

Q. Was it in passing or a scheduled meeting?

**A. In passing, while we were in** the building.

Talt

Q. What did you speak about on those couple of occasions?

**A. I don't recall. The main** thing was the half hour. I basically laid out --

Q. I'll get there. I am just asking about the --

**A. No, I don't recall.**

Q. Did you have any conversations with anybody else concerning your observations of Mr. Lazo or the incident with Mr. Lazo after you spoke to Detective Portella for that half hour?

**A. No.**

Q. What time did you return -- what time did you get back to the precinct after you left the hospital?

**A. Say approximately 10:30 p.m.**

Q. When did you have the interview with Detective Portella?

**A. I don't recall when I actually** spoke to him. I worked late that night, obviously into the morning. Soon after I was at the precinct, I spoke to him, but I

Talt

couldn't tell you when.

Q. What questions did Detective Portella ask you?

**A. I don't remember his exact** questions. I recall laying out, as we have today, and the other day, the investigation, how this all transpired.

Q. Do you recall if Detective Portella asked you if force was used on Mr. Lazo at any point in time?

**A. No. I don't believe he asked** me that. I was involved with the observations out on the street and then I was in the interview room with him. I don't recall his exact questioning, but I had no force. There was no force used by me.

Q. I understand. Did he ask you if you knew if force was used on Mr. Lazo?

**A. I don't recall.**

Q. Did Detective Portella ask you what you observed, what injuries you observed on Mr. Lazo, if any?

**A. Again, I don't recall the**

Talt

questions that he asked other than the fact that I laid out the entire night to him. Specific questions, I don't recall.

Q. Did you draft the supplementary report after you had the interview with Detective Portella?

**A. Yes.**

Q. If you just take a look at Plaintiff's Exhibit 2, which was previously marked and identified, you never indicated that there were abrasions on Mr. Lazo's face on this document, correct?

**A. I don't know. I have to** review it.

No.

MR. GERMANO: No further questions.

EXAMINATION BY

MR. DUNNE:

Q. Could you clarify how the cars got to the precinct?

**A. When I responded to the assist** of the officers at the Southern State

Talt

Parkway I parked on the side of -- on the middle of the Southern State Parkway, in my police vehicle. After I had spoke with my partner, I transported, first Mr. Lazo's vehicle that he was operating into the precinct, followed by my partner who was in his original vehicle.

When we got to the precinct, we dropped the Cadillac at the precinct. Immediately returned to pick up my vehicle. When we picked up my vehicle there were no police officers still at the scene, and then I drove my vehicle back to the Third Precinct.

MR. DUNNE: Thank you.

(Time Noted: 11:09 a.m.)

Talt

ACKNOWLEDGMENT

STATE OF NEW YORK )
:ss
COUNTY OF )

I,CHRISTOPHER TALT, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of May 19, 2011; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________
CHRISTOPHER TALT

Signed and subscribed to before me, this day of , 2011.

______________________
Notary Public, State of New York

-------------------I N D E X-------------------

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| CHRISTOPHER TALT | MR. GERMANO | 200 |
| | MR. DUNNE | 235 |

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

I, JUDY GROB, a Notary Public within and for the State of New York, do hereby certify:

That CHRISTOPHER TALT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of May, 2011.

--------------------------
JUDY GROB

**1**

1-10 [2] - 196:15, 197:15
100 [2] - 196:19, 198:11
10:10 [1] - 196:21
10:30 [1] - 232:19
11550 [1] - 198:6
11702 [1] - 196:24
11747 [1] - 198:19
11:09 [1] - 235:17
12 [2] - 216:20, 217:6
124 [1] - 196:23
15 [3] - 223:17, 223:18, 223:21
19 [2] - 196:21, 236:9

**2**

2 [1] - 234:10
20 [1] - 230:6
20-yards [1] - 221:16
200 [1] - 237:4
2008 [2] - 216:20, 217:7
2011 [4] - 196:21, 236:9, 236:20, 238:22
202 [1] - 196:23
235 [1] - 237:5
29th [1] - 238:21

**3**

3 [1] - 201:21

**4**

4 [1] - 201:21

**5**

516-938-4000 [1] - 196:24
556 [1] - 198:5

**8**

8 [4] - 201:16, 202:2
8:55 [1] - 220:13

**9**

999 [1] - 198:18
9:05 [1] - 220:18
9:45 [2] - 224:20, 226:23

**A**

a.m [2] - 196:21, 235:17
able [2] - 219:21, 223:9
abrasions [5] - 206:17, 206:23, 207:2, 207:12, 234:12
accompanied [1] - 224:2
acknowledged [1] - 220:9
action [1] - 238:17
activity [1] - 210:17
actual [2] - 214:17, 225:2
administered [1] - 223:18
administering [5] - 219:8, 219:11, 219:16, 222:23, 223:7
administrators [2] - 196:4, 197:4
ago [1] - 199:12
agreed [1] - 206:6
ahead [7] - 209:11, 209:18, 209:25, 210:8, 213:23, 214:9, 224:19
aid [10] - 219:8, 219:10, 219:17, 219:21, 222:23, 223:7, 223:11, 223:13, 223:18, 226:21
alerting [1] - 215:7
alive [1] - 224:15
Almost [1] - 217:18
ALSO [1] - 198:15
ambulance [27] - 211:10, 211:23, 219:19, 219:22, 220:2, 220:11, 220:20, 221:7, 222:20, 222:22, 223:2, 223:7, 223:12, 223:15, 223:24, 224:2, 224:3, 224:14, 224:24, 225:6, 225:7, 225:9, 225:18, 226:8, 226:9, 227:7
Ambulance [2] - 211:24, 223:25
AND [2] - 196:14, 197:14
angry [2] - 200:13, 206:14
answers [1] - 236:11
apologizing [1] - 208:2
April [2] - 216:20, 217:6
area [1] - 211:25
arm [2] - 206:16, 214:23
arrive [3] - 220:2, 220:11, 226:4
arrived [4] - 220:17, 222:21, 227:23, 229:6
arriving [1] - 220:20
aspect [1] - 231:7
assist [2] - 225:13, 234:24
assistance [1] - 216:18
assisted [2] - 216:18, 223:11
assisting [1] - 231:6
ASST [2] - 196:13, 197:13
attached [1] - 201:12
attempt [1] - 218:2
attention [5] - 206:7, 210:21, 212:7, 213:15, 220:4
ATTORNEY [4] - 196:12, 196:13, 197:12, 197:13
Attorney [4] - 196:16, 196:17, 197:16, 197:17
Attorneys [3] - 198:4, 198:10, 198:17
attributes [2] - 206:12, 206:15
available [2] - 225:11, 225:13

**B**

B-R-O-D-E-R-I-C-K [1] - 216:3
Babylon [1] - 196:24
basic [2] - 205:22, 210:16
becomes [1] - 228:23
began [1] - 205:21
begin [1] - 216:6
behavior [1] - 206:5
behind [4] - 212:14, 214:22, 225:17, 225:19
belabored [1] - 214:2
belt [1] - 222:4
big [3] - 201:14, 201:17, 201:20
BILLY [1] - 198:24
block [1] - 225:14
blocking [2] - 225:12, 225:21
blood [1] - 238:17
body [2] - 212:24, 213:5
bolted [4] - 202:12, 202:17, 202:19, 202:21
Boulevard [1] - 198:5
boxer [1] - 212:20
breathing [12] - 213:21, 214:2, 214:4, 214:8, 214:9, 214:10, 214:17, 218:25, 219:12, 224:4, 224:10, 224:12
Brentwood [2] - 211:24, 223:24
BREWINGTON [1] - 198:3
bringing [1] - 218:7
Broderick [8] - 215:23, 216:13, 216:15, 217:15, 218:2, 218:9, 218:17, 220:3
brought [3] - 200:5, 200:9, 223:23
building [9] - 211:25, 212:2, 215:24, 218:5, 218:20, 219:20, 225:3, 231:20, 231:25
bureau [1] - 217:12
business [1] - 218:18
BY [6] - 198:7, 198:13, 198:20, 199:6, 234:20, 237:3

**C**

C-O-T-T-E-R [1] - 219:5
Cadillac [1] - 235:10
calm [4] - 200:20, 200:21, 201:2, 201:3
calmed [2] - 207:24, 208:3
cannot [1] - 203:21
capable [1] - 222:16
Capable [1] - 222:19
capacities [2] - 196:16, 197:16
capacity [16] - 196:8, 196:9, 196:10, 196:10, 196:11, 196:12, 196:13, 196:14, 197:8, 197:9, 197:10, 197:10, 197:11, 197:12, 197:13, 197:14
car [2] - 225:10, 225:24
carry [1] - 221:24
carrying [1] - 217:22
cars [2] - 225:12, 234:22
case [1] - 231:7
central [1] - 196:20
certain [1] - 219:19
certified [1] - 217:4
certify [3] - 236:6, 238:9, 238:15
chair [6] - 202:6, 202:8, 202:14, 202:23, 212:12, 215:19
change [4] - 206:5, 214:10, 214:16, 224:9
check [1] - 214:5
chest [1] - 219:15
CHRISTINE [1] - 198:9
CHRISTOPHER [6] - 196:11, 197:11, 197:22, 236:16, 237:4, 238:10
clarify [1] - 234:22
clear [1] - 207:9
co [2] - 196:4, 197:4
co-administrators [2] - 196:4, 197:4
COLLINS [2] - 196:14, 197:14
COMMISSIONER [2] - 196:7, 197:7
communication [2] - 211:18, 230:9
complained [1] - 207:6
complete [1] - 236:10
compressions [1] - 219:15
concerning [1] - 232:11
conduct [1] - 202:24
conducting [1] - 218:9
conference [2] - 203:24, 205:3
contact [3] - 211:21, 229:10, 230:15
contacted [1] - 222:9
contacting [1] - 222:16
continuation [1] - 223:12
continue [2] - 199:10, 230:25
Continued [1] - 196:22
continued [1] -

197:21
continuously [1] - 200:17
conversation [9] - 199:19, 200:10, 200:14, 205:23, 208:24, 210:5, 211:6, 211:7, 213:18
conversations [3] - 205:17, 231:19, 232:10
corner [2] - 202:5, 209:13
correct [6] - 199:17, 199:22, 203:22, 234:14, 236:10, 236:12
Cotter [4] - 219:5, 224:2, 225:6, 227:6
COUNTY [8] - 196:7, 196:12, 196:13, 197:7, 197:12, 197:13, 236:4, 238:5
County [4] - 196:16, 196:17, 197:16, 197:17
couple [4] - 199:11, 231:16, 231:18, 232:3
Court [1] - 196:19
COURT [2] - 196:2, 197:2
CPR [5] - 216:6, 216:21, 216:23, 218:2, 218:9
crew [14] - 219:19, 219:22, 220:2, 220:11, 220:20, 222:20, 222:23, 223:2, 223:7, 223:12, 223:15, 224:3, 225:7, 226:8
cuff [1] - 202:16
cuffed [3] - 200:16, 202:15, 202:16
cuffs [2] - 200:18, 202:16
cup [4] - 209:20, 209:21, 209:22, 209:23
cups [1] - 209:12
curses [1] - 200:25
cursing [4] - 200:17, 200:24, 207:25, 214:15

D

DAVID [1] - 198:20
dead [3] - 224:22, 227:9, 228:3
death [1] - 226:24
decide [1] - 230:20
Defendant [1] - 197:22
defendants [2] - 196:18, 197:18
Defendants [1] - 198:10
defibrillator [5] - 217:24, 218:11, 218:23, 219:2, 219:14
DEPARTMENT [2] - 196:7, 197:7
deposition [4] - 199:11, 236:8, 238:11, 238:13
described [1] - 216:11
desk [29] - 201:18, 201:19, 201:23, 202:2, 202:3, 202:6, 202:9, 202:10, 202:13, 202:17, 202:18, 203:5, 209:14, 209:24, 214:24, 215:10, 220:15, 220:23, 221:10, 221:11, 221:17, 221:19, 221:21, 221:22, 222:10, 222:15, 222:17
detective [10] - 202:24, 203:8, 203:11, 203:21, 204:3, 207:3, 215:7, 217:12, 221:14, 227:5
Detective [36] - 204:12, 204:15, 205:15, 205:18, 205:24, 206:4, 206:8, 206:21, 207:4, 207:9, 208:5, 208:18, 210:10, 210:13, 210:19, 211:8, 211:11, 212:4, 213:13, 220:8, 220:12, 220:19, 220:22, 222:5, 223:5, 226:2, 226:14, 230:11, 231:4, 231:8, 232:13, 232:21, 233:3, 233:9, 233:22, 234:7
detectives [3] - 215:6, 227:24, 228:13
determined [1] - 212:6
different [3] - 203:24, 221:3, 228:12
difficulty [1] - 214:3
direct [3] - 220:15, 221:8, 222:11
directed [2] - 230:19, 230:21
directing [2] - 211:24, 219:18
directly [1] - 225:15
dispatcher [7] - 211:21, 220:16, 221:5, 221:6, 221:10, 222:13
distance [1] - 225:19
DISTRICT [10] - 196:2, 196:2, 196:12, 196:13, 196:14, 197:2, 197:2, 197:12, 197:13, 197:14
District [4] - 196:16, 196:17, 197:16, 197:17
document [1] - 234:13
DOES [2] - 196:15, 197:15
done [1] - 219:15
door [6] - 203:6, 203:7, 216:9, 219:19
DORMER [2] - 196:7, 197:7
down [16] - 200:20, 200:21, 201:3, 207:24, 208:3, 209:23, 212:12, 212:25, 213:6, 214:18, 214:20, 216:7, 224:8, 225:9, 227:7
Dr [3] - 224:21, 226:21, 226:24
draft [1] - 234:5
drank [1] - 209:22
drink [1] - 208:4
driving [2] - 226:3, 226:4
dropped [1] - 235:10
drove [1] - 235:14
drug [1] - 231:6
duly [2] - 199:3, 238:12
DUNNE [4] - 198:13, 234:21, 235:16, 237:5
During [4] - 205:12, 212:15, 213:11, 219:2
during [1] - 204:13

E

East [1] - 196:23
EASTERN [2] - 196:2, 197:2
either [1] - 222:12
elsewhere [1] - 226:15
emergency [1] - 226:5
employees [2] - 196:17, 197:17
EMTD [1] - 217:4
en [1] - 228:7
en-route [1] - 228:7
end [3] - 202:6, 203:3, 224:25
enter [6] - 205:13, 208:19, 212:2, 212:16, 219:7, 229:19
entered [21] - 205:16, 206:9, 206:22, 208:12, 208:15, 210:11, 210:14, 210:15, 215:23, 216:2, 216:3, 216:13, 216:15, 216:17, 217:19, 217:21, 217:25, 218:10, 218:22, 219:3, 222:7
entire [2] - 225:18, 234:3
entrance [1] - 226:5
equipment [2] - 217:23, 218:7
Esq [1] - 198:3
ESQ [3] - 198:7, 198:13, 198:20
Estate [2] - 196:4, 197:4
eventually [1] - 219:23
Eventually [1] - 205:15
exact [3] - 215:13, 233:5, 233:16
exactly [4] - 199:23, 215:16, 217:10, 218:12
Examination [1] - 197:21
EXAMINATION [3] - 199:6, 234:20, 237:3
examined [1] - 199:4
Exhibit [1] - 234:10
exit [1] - 221:14
exited [1] - 229:13
exits [1] - 203:7
expire [1] - 217:9
expired [3] - 217:5, 217:6, 217:11

F

face [6] - 206:18, 206:23, 207:3, 207:8, 207:13, 234:13
fact [1] - 234:3
falls [1] - 212:13
far [2] - 202:5, 221:11
faster [1] - 219:21
Federal [1] - 196:19
feet [6] - 201:16, 201:21, 202:2, 216:8
few [1] - 204:11
filling [1] - 210:17
first [8] - 199:3, 200:14, 206:9, 207:11, 214:11, 214:14, 220:7, 235:5
First [1] - 206:14
fit [1] - 223:9
five [3] - 205:11, 211:3, 218:14
floor [4] - 202:19, 216:5, 216:8, 217:16
flush [1] - 202:4
follow [2] - 225:9, 226:9
followed [1] - 235:7
follows [1] - 199:5
force [4] - 233:10, 233:17, 233:20
forth [1] - 238:12
fought [1] - 200:23
four [1] - 223:4
FREDERICK [1] - 198:3
FRIEDRICK [1] - 217:21
Friedrick [2] - 217:20, 218:17
front [3] - 203:4, 209:13, 209:16
fuck [3] - 200:17, 200:25

G

GERMANO [7] - 198:7, 199:7, 206:10, 209:3, 216:25, 234:18, 237:4
given [2] - 236:11, 238:14
GONZALEZ [4] - 196:3, 197:3
grabbed [1] - 214:23
GROB [2] - 238:7, 238:25
ground [1] - 199:13

H

half [7] - 230:4, 230:5, 230:8, 231:10, 231:14, 232:5, 232:14
hand [8] - 200:15,

200:18, 202:15, 202:16, 209:21, 215:10, 215:18, 238:21
handcuff [2] - 201:10, 215:3
handcuffed [3] - 209:22, 214:24, 226:12
handcuffs [1] - 202:12
Hauppauge [1] - 198:12
head [4] - 212:13, 214:21, 216:9, 224:8
headed [1] - 226:20
heavy [1] - 214:8
heavyset [1] - 213:2
held [1] - 201:11
help [2] - 215:17, 220:14
Hempstead [1] - 198:6
hereby [2] - 236:6, 238:9
hereinbefore [1] - 238:11
hereunto [1] - 238:21
Highway [1] - 198:11
himself [1] - 207:10
homicide [9] - 227:24, 228:6, 228:11, 228:13, 228:16, 229:5, 230:10, 230:12, 230:16
hospital [18] - 224:3, 225:10, 226:20, 227:5, 227:7, 227:19, 227:24, 228:7, 228:15, 228:19, 229:9, 229:12, 229:17, 229:24, 230:14, 230:19, 230:23, 232:18
Hospital [5] - 224:21, 225:9, 225:16, 226:6, 226:11
hour [9] - 230:2, 230:3, 230:4, 230:5, 230:8, 231:10, 231:14, 232:5, 232:14

I

I,CHRISTOPHER [1] - 236:6
identified [1] - 234:11
immediately [3] - 214:23, 216:2, 217:18
Immediately [1] - 235:11
IN [1] - 238:20
INC [1] - 196:23
incident [3] - 218:19, 231:5, 232:12
included [1] - 217:13
indicated [2] - 201:11, 234:12
individual [18] - 196:8, 196:8, 196:9, 196:10, 196:11, 196:12, 196:13, 196:14, 196:16, 197:8, 197:8, 197:9, 197:10, 197:11, 197:12, 197:13, 197:14, 197:16
individually [2] - 196:4, 197:4
injuries [1] - 233:23
injury [1] - 207:6
inside [2] - 199:16, 219:18
interact [1] - 205:9
interaction [1] - 201:6
interested [1] - 238:18
intersections [1] - 225:14
interview [26] - 200:3, 200:6, 200:9, 201:15, 202:25, 203:10, 203:14, 203:19, 203:20, 204:5, 204:18, 205:10, 206:13, 207:5, 212:5, 214:12, 216:5, 221:12, 221:25, 223:2, 224:9, 231:9, 231:12, 232:21, 233:15, 234:7
interviewed [1] - 231:3
investigation [2] - 231:7, 233:8
involved [3] - 225:20, 231:6, 233:13
Islip [1] - 196:20

J

jail [2] - 200:22, 208:3
JAMES [3] - 196:9, 197:9, 198:22
JANE [2] - 196:14, 197:14
JENNIFER [2] - 196:3, 197:3
JOHN [7] - 196:8, 196:14, 196:14, 197:8, 197:14, 197:14, 198:25
JOSEPH [3] - 196:11, 197:11, 198:23
JR [1] - 198:7
JUDGE [3] - 196:10, 197:10, 198:24
JUDY [2] - 238:7, 238:25
jump [1] - 224:19

K

KENNY [2] - 196:4, 197:4
kind [2] - 212:12, 219:10
Koerber [25] - 204:12, 205:16, 205:18, 205:25, 206:4, 206:9, 206:22, 207:4, 207:9, 208:5, 208:19, 210:11, 210:14, 210:20, 211:8, 211:12, 212:4, 213:14, 220:9, 220:12, 220:19, 220:23, 221:2, 222:5, 223:5

L

labored [1] - 213:21
laid [3] - 216:7, 232:5, 234:3
last [1] - 199:19
late [1] - 232:23
lay [1] - 221:13
laying [1] - 233:6
layout [1] - 201:25
LAZO [2] - 196:4, 197:4
Lazo [61] - 199:16, 199:21, 200:2, 200:5, 200:8, 200:11, 201:6, 201:7, 201:10, 202:14, 203:13, 204:5, 204:21, 205:9, 205:21, 206:2, 207:2, 207:5, 207:15, 207:18, 207:21, 208:9, 208:22, 208:24, 209:15, 210:16, 210:18, 210:23, 211:16, 211:19, 212:2, 212:11, 212:18, 213:8, 213:13, 213:16, 214:18, 216:4, 217:16, 220:7, 222:2, 222:24, 223:23, 224:4, 224:7, 224:15, 224:18, 224:22, 225:5, 226:9, 226:12, 227:8, 227:11, 227:22, 228:3, 228:20, 232:12, 232:13, 233:11, 233:20, 233:24
Lazo's [8] - 206:12, 206:23, 207:13, 212:24, 213:5, 226:24, 234:13, 235:6
learn [3] - 224:17, 228:6, 228:10
learned [2] - 220:25, 228:8
leave [7] - 212:5, 216:13, 225:2, 230:18, 230:19, 230:20, 230:21
led [1] - 230:18
left [21] - 199:15, 199:24, 200:15, 202:4, 202:5, 202:11, 202:15, 202:16, 204:10, 208:8, 208:11, 209:13, 213:14, 214:23, 215:10, 216:16, 220:3, 220:19, 224:14, 224:24, 232:18
left-hand [1] - 202:16
Legion [2] - 211:24, 223:25
Less [3] - 205:11, 218:14, 230:5
less [6] - 208:20, 211:2, 213:12, 218:15, 230:3, 230:7
license [1] - 217:2
line [2] - 220:15, 221:9
Link [1] - 200:7
LINK [3] - 196:11, 197:11, 198:23
location [1] - 212:3
log [1] - 210:18
look [1] - 234:9
looking [5] - 202:10, 205:7, 209:10, 209:18, 209:25

M

Main [1] - 196:23
main [1] - 232:4
manned [1] - 221:21
marked [1] - 234:11
marks [2] - 207:7, 213:5
marriage [1] - 238:17
mask [2] - 218:25, 219:13
matter [1] - 238:19
medical [10] - 206:7, 210:21, 211:10, 211:11, 212:6, 213:14, 215:16, 217:22, 220:4, 220:10
meeting [1] - 231:23
Melville [1] - 198:19
members [2] - 196:15, 197:15
Memorial [1] - 198:11
mentioned [1] - 207:20
method [1] - 221:2
middle [1] - 235:3
MILAFI [1] - 198:9
minute [5] - 208:21, 212:10, 212:15, 213:12, 218:15
minutes [9] - 205:11, 218:14, 220:18, 223:17, 223:19, 223:21, 227:15, 227:21, 230:6
moment [1] - 220:3
morning [3] - 199:8, 199:9, 232:24
moving [1] - 206:16
MR [9] - 199:7, 206:10, 209:3, 216:25, 234:18, 234:21, 235:16, 237:4, 237:5

N

narcotics [1] - 204:2
NASSAU [1] - 238:5
neck [2] - 212:25, 213:5
needed [4] - 215:8, 215:12, 215:17, 220:9
needing [1] - 213:22
never [2] - 216:16, 234:12
New [8] - 196:20, 196:24, 197:24, 198:6, 198:12, 198:19, 236:22, 238:8
NEW [4] - 196:2, 197:2, 236:3, 238:3
Newton [2] - 226:2,

226:14
**NEWTON** [3] - 196:8, 197:8, 198:25
**next** [6] - 212:9, 215:22, 217:17, 218:22, 226:7, 226:19
**night** [2] - 232:23, 234:3
**normal** [1] - 214:8
**Notary** [4] - 197:23, 199:4, 236:22, 238:7
**Noted** [1] - 235:17
**notice** [4] - 209:7, 213:4, 213:7, 224:9
**Notice** [1] - 197:23
**noticed** [1] - 213:9
**notifications** [2] - 228:5, 229:4
**notified** [5] - 211:23, 227:25, 228:9, 228:11, 229:5
**notifies** [1] - 221:7
**notify** [3] - 221:6, 228:2, 228:25
**notifying** [1] - 215:14

O

**O'Leary** [1] - 204:15
**oath** [1] - 236:8
**obligation** [2] - 228:14, 228:17
**observation** [1] - 207:17
**observations** [3] - 206:11, 232:12, 233:14
**observe** [2] - 212:24, 218:22
**observed** [3] - 207:12, 233:23, 233:24
**obtain** [1] - 212:6
**obtained** [1] - 207:21
**obviously** [2] - 221:4, 232:24
**occasions** [1] - 232:3
**occur** [1] - 207:23
**OF** [12] - 196:2, 196:7, 196:12, 197:2, 197:7, 197:12, 236:3, 236:4, 238:3, 238:5
**OFFICE** [4] - 196:11, 196:12, 197:11, 197:12
**Office** [4] - 196:15, 196:17, 197:15, 197:17
**officer** [8] - 204:14, 205:13, 208:12, 208:15, 216:22, 219:5, 227:4, 228:22
**OFFICER** [8] - 196:8, 196:9, 196:10, 196:11, 197:8, 197:9, 197:10, 197:11
**Officer** [16] - 200:7, 215:23, 216:12, 216:15, 217:15, 217:19, 217:20, 217:22, 218:2, 218:9, 218:16, 219:4, 220:3, 224:2, 225:6, 227:6
**officers** [17] - 200:24, 217:19, 218:4, 218:10, 219:3, 219:7, 221:18, 221:22, 223:4, 223:10, 227:23, 228:22, 229:2, 229:6, 229:8, 234:25, 235:13
**official** [18] - 196:8, 196:9, 196:9, 196:10, 196:11, 196:12, 196:13, 196:14, 196:16, 197:8, 197:9, 197:9, 197:10, 197:11, 197:12, 197:13, 197:14, 197:16
**one** [7] - 202:15, 203:6, 203:15, 209:20, 213:12, 228:23
**operating** [1] - 235:6
**opposite** [1] - 203:2
**order** [1] - 203:9
**original** [1] - 235:8
**outburst** [1] - 207:25
**outcome** [1] - 238:18
**outside** [2] - 223:10, 223:23
**overweight** [1] - 213:3
**Oxygen** [1] - 217:23
**oxygen** [4] - 218:11, 218:23, 218:24, 219:13

P

**P.C** [1] - 198:16
**p.m** [4] - 220:13, 224:20, 226:23, 232:19
**PAGE** [1] - 237:3
**pain** [1] - 207:6
**parked** [1] - 235:2
**Parkway** [2] - 235:2, 235:3
**parties** [1] - 238:16
**partner** [6] - 225:25, 229:11, 229:15, 229:16, 235:5, 235:7
**passed** [2] - 224:18, 228:20
**passing** [2] - 231:22, 231:24
**path** [1] - 203:10
**PATRICIA** [2] - 196:3, 197:3
**pedigree** [2] - 205:22, 210:16
**Peninsula** [1] - 198:5
**people** [2] - 204:11, 222:25
**period** [1] - 205:12
**person** [1] - 222:12
**personnel** [4] - 205:13, 212:16, 227:5, 230:10
**phone** [1] - 221:8
**physical** [2] - 206:12, 206:15
**pick** [2] - 209:20, 235:11
**picked** [1] - 235:12
**Picked** [1] - 209:20
**PINCUS** [2] - 198:16, 198:20
**place** [1] - 220:24
**placed** [4] - 209:12, 216:4, 217:16, 223:25
**Plaintiff** [2] - 198:4, 198:17
**Plaintiff's** [1] - 234:10
**plaintiffs** [2] - 196:5, 197:5
**Plaza** [1] - 196:19
**point** [20] - 199:25, 205:19, 205:24, 206:22, 207:2, 207:11, 207:16, 208:6, 210:2, 210:20, 211:5, 211:14, 213:11, 213:20, 214:11, 214:13, 216:19, 224:5, 224:23, 233:11
**Police** [1] - 204:14
**police** [5] - 216:22, 225:11, 227:23, 235:4, 235:13
**POLICE** [14] - 196:7, 196:7, 196:8, 196:9, 196:10, 196:10, 196:11, 197:7, 197:7, 197:8, 197:9, 197:10, 197:10, 197:11
**portable** [6] - 219:17, 221:24, 222:3, 222:6, 222:10, 222:17
**Portella** [9] - 230:12, 231:4, 231:9, 232:14, 232:21, 233:4, 233:10, 233:22, 234:7
**positioned** [1] - 216:8
**Precinct** [5] - 220:16, 227:2, 230:13, 230:24, 235:15
**precinct** [35] - 199:16, 200:11, 201:7, 204:20, 211:11, 215:25, 218:18, 219:18, 220:14, 220:17, 220:21, 221:9, 221:10, 221:11, 221:17, 221:19, 222:10, 222:14, 222:17, 223:16, 223:24, 224:24, 225:12, 225:15, 229:14, 229:15, 230:13, 231:15, 231:17, 232:17, 232:25, 234:23, 235:7, 235:9, 235:10
**presence** [1] - 230:23
**present** [3] - 205:20, 218:19, 223:11
**PRESENT** [1] - 198:15
**pretty** [1] - 199:14
**previously** [1] - 234:11
**prisoner** [1] - 202:7
**prisoners** [1] - 204:2
**process** [2] - 230:25, 231:2
**pronounced** [4] - 224:22, 226:24, 227:9, 228:3
**provide** [1] - 213:15
**Public** [4] - 197:23, 199:4, 236:22, 238:7
**pulse** [1] - 214:5
**purpose** [1] - 219:6
**pursuant** [1] - 197:22
**pushed** [1] - 201:23
**put** [3] - 209:23, 215:14

Q

**Quesada** [1] - 219:4
**QUESADA** [1] - 219:4
**questioning** [1] - 233:16
**questions** [14] - 205:22, 206:3, 209:4, 210:3, 210:17, 210:19, 210:23, 211:3, 213:24, 233:3, 233:6, 234:2, 234:4, 234:19
**quick** [2] - 210:24, 218:13

R

**radio** [11] - 211:17, 211:21, 211:23, 219:18, 221:5, 221:24, 222:3, 222:6, 222:10, 222:12, 222:18
**read** [1] - 236:7
**real** [1] - 200:14
**REALTIME** [1] - 196:23
**reason** [2] - 205:6, 228:18
**record** [3] - 236:10, 236:11, 238:13
**reentered** [2] - 208:23, 209:5
**regular** [1] - 201:18
**related** [1] - 238:16
**remain** [11] - 215:19, 223:6, 223:15, 225:17, 226:14, 227:17, 227:20, 228:15, 228:19, 229:16, 229:23
**remember** [2] - 229:7, 233:5
**removed** [1] - 215:4
**render** [1] - 219:21
**rendered** [1] - 226:21
**rendering** [1] - 223:11
**report** [2] - 231:5, 234:6
**REPORTING** [1] - 196:23
**representing** [2] - 196:15, 197:15
**rescue** [3] - 215:9, 215:14, 220:16
**respond** [3] - 206:2, 210:18, 213:19
**responded** [2] - 230:24, 234:24
**responding** [1] - 213:24
**response** [2] - 214:25, 215:2

**responsibility** [1] - 206:25
**rested** [1] - 214:21
**retrieve** [3] - 199:21, 208:8, 220:3
**return** [1] - 232:16
**returned** [3] - 208:18, 229:14, 235:11
**review** [1] - 234:16
**RICHARD** [3] - 196:7, 197:7, 198:13
**rig** [1] - 224:3
**Road** [1] - 198:18
**room** [94] - 200:3, 200:6, 200:9, 200:12, 201:14, 201:15, 201:25, 202:3, 202:5, 203:8, 203:10, 203:11, 203:14, 203:16, 203:19, 203:20, 203:22, 203:24, 204:4, 204:5, 204:9, 204:10, 204:17, 204:18, 204:23, 204:24, 205:3, 205:10, 205:14, 205:16, 206:13, 206:22, 207:14, 208:6, 208:12, 208:16, 208:19, 208:23, 209:5, 209:10, 209:12, 209:19, 210:11, 210:14, 210:15, 212:5, 212:16, 213:14, 214:12, 214:15, 215:7, 215:15, 215:24, 216:2, 216:3, 216:5, 216:13, 216:14, 216:16, 216:17, 217:19, 217:21, 217:25, 218:6, 219:3, 219:7, 220:19, 221:12, 221:15, 221:25, 222:7, 223:2, 223:6, 223:9, 223:10, 224:9, 224:20, 224:25, 226:5, 226:10, 226:17, 226:22, 227:2, 227:10, 227:13, 227:18, 227:20, 228:21, 229:13, 229:20, 229:22, 233:15
**round** [1] - 213:3
**route** [1] - 228:7
**rules** [1] - 199:13
**rush** [3] - 215:8, 215:12, 215:14
**Rutman** [3] - 224:21, 226:21, 226:24
**RUTMAN** [1] - 226:21

S

**sat** [1] - 214:11
**saw** [2] - 206:4, 228:16
**scene** [4] - 207:16, 228:24, 230:22, 235:14
**scheduled** [1] - 231:23
**SCHOENFELD** [2] - 198:16
**SCIMONE** [3] - 196:9, 197:9, 198:22
**see** [9] - 201:5, 201:6, 203:18, 203:21, 207:5, 207:10, 214:6, 214:16, 228:12
**seeing** [1] - 230:15
**sense** [1] - 228:23
**separate** [1] - 225:10
**Sergeant** [25] - 204:12, 205:15, 205:18, 205:25, 206:4, 206:8, 206:21, 207:4, 207:9, 208:5, 208:19, 210:10, 210:14, 210:20, 211:8, 211:12, 212:4, 213:13, 220:8, 220:12, 220:19, 220:23, 221:2, 222:5, 223:5
**sergeant** [1] - 207:3
**set** [3] - 202:15, 238:12, 238:21
**settled** [1] - 200:2
**shirt** [2] - 212:20, 214:7
**shit** [3] - 200:17, 200:18, 200:25
**shook** [1] - 214:24
**short** [2] - 231:16, 231:19
**shorts** [1] - 212:20
**show** [1] - 219:23
**side** [6] - 202:9, 202:11, 202:13, 206:17, 207:8, 235:2
**Side** [4] - 225:8, 225:15, 226:5, 226:10
**sign** [1] - 213:21
**Signed** [1] - 236:19
**sit** [2] - 202:7, 202:24
**sitting** [5] - 202:14, 209:14, 212:11, 213:12, 214:7
**situation** [4] - 215:15, 227:25, 228:9, 229:5
**size** [1] - 201:18
**slumped** [3] - 214:18, 214:20, 224:7
**slumps** [1] - 212:12
**Smaller** [1] - 201:18
**socks** [1] - 212:20
**solo** [1] - 225:24
**sometimes** [1] - 204:2
**Soon** [1] - 232:24
**sorry** [1] - 200:23
**South** [4] - 225:8, 225:15, 226:5, 226:10
**Southern** [2] - 234:25, 235:3
**Southside** [1] - 224:21
**speaking** [1] - 209:8
**Specific** [1] - 234:4
**SPOTA** [2] - 196:13, 197:13
**squad** [9] - 203:8, 203:11, 203:21, 204:4, 204:9, 211:25, 215:7, 221:8, 221:14
**ss** [2] - 236:3, 238:4
**staff** [2] - 226:20, 227:19
**stand** [1] - 226:22
**standing** [1] - 223:9
**stare** [1] - 220:8
**staring** [6] - 209:9, 209:15, 210:8, 210:10, 213:23, 214:9
**start** [1] - 199:25
**started** [5] - 199:11, 200:24, 210:4, 210:16, 220:7
**starting** [1] - 218:3
**state** [1] - 217:4
**STATE** [2] - 236:3, 238:3
**State** [5] - 197:23, 234:25, 235:3, 236:22, 238:8
**STATES** [2] - 196:2, 197:2
**stay** [1] - 227:12
**stayed** [5] - 211:16, 222:22, 227:10, 227:22, 228:21
**staying** [1] - 211:19
**step** [2] - 202:3, 203:6
**steps** [1] - 221:15
**still** [1] - 235:13
**stopped** [1] - 210:7
**straight** [7] - 209:11, 209:18, 209:25, 210:8, 213:23, 214:9, 221:9
**Street** [1] - 196:23
**street** [1] - 233:14
**styrofoam** [1] - 209:12
**subdued** [1] - 207:16
**subscribed** [1] - 236:19
**SUFFOLK** [8] - 196:7, 196:12, 196:13, 197:7, 197:12, 197:13
**Suffolk** [4] - 196:15, 196:17, 197:15, 197:17
**Suite** [1] - 196:23
**supervisor** [1] - 204:13
**supervisors** [1] - 228:13
**supplementary** [2] - 231:5, 234:6
**support** [1] - 213:16
**sworn** [2] - 199:4, 238:12

T

**table** [6] - 200:16, 200:19, 201:12, 201:17, 202:18, 203:3
**TALK** [2] - 196:11, 197:11
**TALT** [5] - 197:22, 236:6, 236:16, 237:4, 238:10
**tattoos** [1] - 213:8
**ten** [4] - 220:18, 221:15, 227:15, 227:21
**terms** [2] - 215:16, 221:12
**testified** [1] - 199:5
**testimony** [3] - 236:8, 236:10, 238:14
**Third** [5] - 220:15, 226:25, 230:13, 230:24, 235:15
**third** [1] - 211:25
**THOMAS** [2] - 196:13, 197:13
**today** [1] - 233:7
**tour** [1] - 204:13
**towards** [2] - 216:9
**traffic** [2] - 225:12, 225:21
**training** [3] - 216:21, 216:23, 217:14
**transcript** [2] - 236:7, 236:9
**transferred** [1] - 217:12
**transpired** [1] - 233:8
**transport** [2] - 225:8, 225:13
**transported** [2] - 225:5, 235:5
**trauma** [7] - 224:20, 224:25, 226:10, 226:17, 226:22, 229:19, 229:22
**treated** [1] - 212:3
**treatment** [2] - 211:11, 220:10
**Trial** [1] - 197:21
**trip** [1] - 225:18
**true** [3] - 236:9, 236:12, 238:13
**try** [2] - 210:4, 213:15
**trying** [4] - 200:19, 201:2, 213:17, 214:25
**turn** [1] - 221:16
**two** [5] - 209:12, 216:4, 217:18, 218:10, 219:3
**typical** [1] - 203:5

U

**uncuffed** [3] - 215:9, 215:10, 215:18
**under** [2] - 228:14, 236:8
**Under** [1] - 228:17
**unidentified** [2] - 196:15, 197:15
**uniform** [1] - 230:23
**unit** [1] - 217:12
**UNITED** [2] - 196:2, 197:2
**units** [2] - 225:11, 225:14
**unknown** [2] - 196:15, 197:15
**unloads** [1] - 226:8
**up** [10] - 202:4, 205:24, 209:20, 214:16, 214:21, 219:23, 224:25, 235:11, 235:12
**upset** [2] - 200:13, 208:2
**utilized** [1] - 219:2

V

**vehicle** [7] - 229:17, 235:4, 235:6, 235:8, 235:12, 235:14
**verified** [1] - 217:3
**Veterans** [1] - 198:11
**view** [2] - 203:17, 205:4
**viewing** [3] - 203:16, 203:25, 204:23
**visible** [1] - 207:7

W

**walk** [2] - 221:15, 221:16
**walked** [7] - 200:12, 207:14, 209:10, 209:11, 209:19, 220:14, 220:23
**wall** [8] - 201:24, 202:4, 202:22, 209:11, 209:16, 212:13, 214:22, 216:10
**Walt** [1] - 198:18
**water** [13] - 199:21, 201:4, 207:21, 208:4, 208:9, 208:18, 208:23, 209:5, 209:13, 209:20, 209:21, 209:23, 209:24
**ways** [1] - 221:3
**wearing** [1] - 212:18
**weeks** [1] - 199:12
**WHEREOF** [1] - 238:20
**Whitman** [1] - 198:18
**WILLIAM** [3] - 196:10, 197:10, 198:7
**window** [3] - 203:16, 203:25, 216:10
**Withdrawn** [3] - 206:10, 209:3, 216:25
**witness** [3] - 199:3, 238:11, 238:14
**WITNESS** [2] - 237:3, 238:20
**words** [1] - 215:13
**wrote** [1] - 231:4
**www.realtimereporting.com** [1] - 196:25

Y

**yanking** [1] - 200:18
**yell** [1] - 215:11
**yelled** [1] - 215:5
**yelling** [3] - 200:15, 200:16, 214:15
**York** [8] - 196:20, 196:24, 197:24, 198:6, 198:12, 198:19, 236:22, 238:8
**YORK** [4] - 196:2, 197:2, 236:3, 238:3
**yourself** [1] - 223:6

Z

**Z-A-M-B-I-T-T-O** [1] - 204:15
**Zambitto** [1] - 204:14
**Zurl** [3] - 217:19, 217:22, 218:17
**ZURL** [1] - 217:20

# EXHIBIT R

**From:** ecf_bounces@nyed.uscourts.gov
**To:** nobody@nyed.uscourts.gov
**Subject:** Activity in Case 2:09-cv-01023-LDW-GRB Gonzalez et al v. County of Suffolk et al Terminated Case
**Date:** Wednesday, April 08, 2015 3:06:49 PM

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

## Notice of Electronic Filing

The following transaction was entered on 4/8/2015 at 3:06 PM EDT and filed on 4/8/2015
**Case Name:** Gonzalez et al v. County of Suffolk et al
**Case Number:** 2:09-cv-01023-LDW-GRB
**Filer:**
**WARNING: CASE CLOSED on 04/08/2015**
**Document Number:** No document attached

**Docket Text:**
**ELECTRONIC ORDER. Jury Selection scheduled for April 13, 2015 is hereby adjourned without a date. Parties are directed to advise this Court within sixty (60) days of the date of this order of possible dates in July 2015 in which all parties are available for Jury Selection/Trial. IT IS HEREBY ORDERED that this case be Administratively Closed until such time that a new date is agreed upon by all parties. Ordered by Judge Leonard D. Wexler on 4/8/2015. (Russo, Eric)**

**2:09-cv-01023-LDW-GRB Notice has been electronically mailed to:**

Frederick K. Brewington fred@brewingtonlaw.com, brewingtonlawdocs@yahoo.com, office@brewingtonlaw.com, precilla.lockett@brewingtonlaw.com

Stephen Lee O'Brien Stephen@obrienandobrienlaw.com, maryjayne@obrienandobrienlaw.com

Brian C. Mitchell brian.mitchell@suffolkcountyny.gov, Stacy.Martella@suffolkcountyny.gov, cheryl.darcangelo@suffolkcountyny.gov, courtalert@suffolkcountyny.gov, susan.flynn@suffolkcountyny.gov

Gregory Calliste, Jr    gregory.calliste@brewingtonlaw.com

Stephanie Michelle Platt    stephanie.platt@brewingtonlaw.com, office@brewingtonlaw.com

**2:09-cv-01023-LDW-GRB Notice will not be electronically mailed to:**

# EXHIBIT S

THE LAW OFFICES OF
FREDERICK K. BREWINGTON

*Attorneys and Counselors at Law*

556 Peninsula Blvd., Hempstead, New York 11550
Phone: 516-489-6959 • Fax: 516-489-6958 www.brewingtonlaw.com

**Frederick K. Brewington**
**Ira Fogelgaren**
**Gregory Calliste, Jr.**

May 27, 2015

**BY ECF ONLY**
Honorable Leonard D. Wexler
United States District Court Judge
United States District Court
Eastern District of New York
Long Island Federal Courthouse
100 Federal Plaza
Central Islip, New York 11722

***RE:*** ***Gonzalez et al. v. County of Suffolk***
***Docket: 09-CV-1023* (LDW) (GRB)**

Dear Judge Wexler:

We are the attorneys representing the Plaintiffs in the above referenced case. Pursuant to the Court's Order, we respectfully provide the Court with this office's trial schedule for consideration in setting trial date for the instant matter:

On Monday, June 1, 2015, I am scheduled to begin jury selection with trial immediately following in the matter: *Joseph Ferlito, et. al. v. County of Suffolk, et.al.*, Docket No.: CV-06-5708 before the Honorable Denis R. Hurley, in the U.S. District Court, Eastern District of New York. It is anticipated that trial in the *Ferlito* matter will continue for two (2) weeks. Thereafter, I am scheduled to commence eight (8) trials in June and July. Those trials are both criminal and civil trials and include three trials which are now on the calendar before Your Honor. The last of those trials before Your Honor is on July 6, 2015, in the matter of *Gail Grenzig, v. Sachem School District*, Docket No.: CV-13-07278. Thereafter, on July 13, 2015, I am scheduled to begin jury selection in the matter of *People v. Ronel Danzy,* Docket No.: 2013 NA022732 before the Honorable Tricia M. Ferrell in the Hempstead District Court, Nassau County New York. It is anticipated that trial in the *Danzy* matter will continue for approximately eight days [trials don't start until after 11:00 a.m. and sometimes not until 2:00 p.m. each day].

For the month of August, I have a scheduled vacation as well as my annual obligation in the last week of August to the Malverne High School football program.

We have contacted the counsel for Defendants and their schedules pose challenges as well. The only window of time in July that seemed possible to us was around July 21, 2015, however, when conferring with Defense Counsel, they would run into witness availability concerns in the last week of July, specifically the 27th through the 31st.

Based on the foregoing, it is respectfully requested that we seek to try this case in October or the starting the third week of November.

Thank you for your consideration in granting this request.

Respectfully Submitted,

FREDERICK K. BREWINGTON

CC: Stephen O'Brien, Esq. (By ECF only)
Brian Mitchell, Esq. (By ECF Only)

FKB.rw

# EXHIBIT T

# U.S. District Court
# Eastern District of New York (Central Islip)
# CIVIL DOCKET FOR CASE #: 2:09-cv-01023-JS-GRB

Gonzalez et al v. County of Suffolk et al
Assigned to: Judge Joanna Seybert
Referred to: Magistrate Judge Gary R. Brown
Cause: 42:1983 Civil Rights Act

Date Filed: 03/12/2009
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Patricia Gonzalez** represented by

**Frederick K. Brewington**
Law Offices of Frederick K. Brewington
556 Peninsula Boulevard
Hempstead, NY 11550
516-489-6959
Fax: 516-489-6958
Email: fred@brewingtonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory Calliste , Jr.**
Law Offices of Frederick K. Brewington
556 Peninsula Boulevard
Hempstead, NY 11550
(516) 489-6959
Fax: (516) 489-6958
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Guy William Germano**
Germano & Cahill, P.C.
4250 Veterans Memorial Highway
Suite 275
Holbrook, NY 11741
631-588-8778
Fax: 631-588-2550
Email: gwg@employmentlawyernewyork.com
*TERMINATED: 03/19/2012*
*ATTORNEY TO BE NOTICED*

**Stephanie Michelle Platt**
Law Offices of Frederick K. Brewington
556 Peninsula Boulevard

Hempstead, NY 11550
(516)489-6959
Fax: (516)489-6958
Email:
stephanie.platt@brewingtonlaw.com
*TERMINATED: 04/17/2015*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Gonzalez**
*individually and as co-administrators of the Estate of Kenny Lazo*

represented by **Frederick K. Brewington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory Calliste , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Guy William Germano**
(See above for address)
*TERMINATED: 03/19/2012*
*ATTORNEY TO BE NOTICED*

**Stephanie Michelle Platt**
(See above for address)
*TERMINATED: 04/17/2015*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**County of Suffolk**

represented by **Brian C. Mitchell**
Suffolk County Dept. of Law-County Attorney
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788
631-853-4055
Fax: 631-853-5833
Email:
brian.mitchell@suffolkcountyny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
Suffolk County Department of Law
H. Lee Dennison Building

100 Veterans Memorial Highway
Hauppauge, NY 11788
(631) 853-5678
Fax: (631) 853-5833
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Suffolk Police Department** represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Commissioner Richard Dormer**
*in his individual and official capacity* represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer John Newton**
*in his individual and official capacity* represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer James Scimone**
*in his individual and official capacity* represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer William Judge**
*in his individual and official capacity*

represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Christopher Talt**
*in his individual and official capacity*

represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Polilce Officer Joseph Link**
*in his individual and official capacity*

represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Suffolk Cty. DA Thomas Spota**
*in his individual and official capacity*

represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Lee O'Brien**
O'Brein & O'Brein, LLP
168 Smithtown Boulevard
Nesconset, NY 11767
631-265-6660
Fax: 631-265-3991
Email:
Stephen@obrienandobrienlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Asst. District Atty. John B. Collins**
*in his individual and official capacity*

represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)
*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Lee O'Brien**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John and Jane Does 1-10**
*representing as yet unknown and unidentified members of the Office of the Suffolk County District Attorney (all in their individual and official capacities as employees of the Office of Suffolk County District Attorney)*

**Defendant**

**County of Suffolk Office of District Attorney**

represented by **Brian C. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard T. Dunne**
(See above for address)

*TERMINATED: 01/02/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/12/2009 | 1 | COMPLAINT *(Rec #29183)* against William Judge, Christopher Talt, Joseph Link, Thomas Spota, John B. Collins, John and Jane Does 1-10, County of Suffolk, Suffolk Police Department, Richard Dormer, John Newton, James Scimone $ 350 Disclosure Statement on Civil Cover Sheet completed -y,, filed by Patricia Gonzalez, Jennifer Gonzalez. (Attachments: # 1 Civil Cover Sheet) (Serret, Liliana) (Entered: 03/12/2009) |
| 03/12/2009 | | Summons Issued as to William Judge, Christopher Talt, Joseph Link, Thomas Spota, John B. Collins, John and Jane Does 1-10, County of Suffolk, Suffolk Police Department, Richard Dormer, John Newton, James Scimone. (Serret, Liliana) (Entered: 03/12/2009) |
| 03/12/2009 | 2 | SCHEDULING ORDER: Initial Conference set for 7/8/2009 11:00 AM in Courtroom 830 before Magistrate Judge E. Thomas Boyle. See order for further instructions. Counsel for Plaintiff(s) or Plaintiff pro se is obligated to serve a copy of this order on each defendant.. Ordered by Magistrate Judge E. Thomas Boyle on 3/12/2009. (Lundy, Lisa) (Entered: 03/12/2009) |
| 03/13/2009 | | Case Ineligible for Arbitration (Bollbach, Jean) (Entered: 03/13/2009) |
| 03/16/2009 | 3 | SUMMONS Returned Executed by Patricia Gonzalez, Jennifer Gonzalez. County of Suffolk Office of District Attorney served on 3/12/2009, answer due 5/11/2009; William Judge served on 3/12/2009, answer due 5/11/2009; Christopher Talt served on 3/12/2009, answer due 5/11/2009; Joseph Link served on 3/12/2009, answer due 5/11/2009; Thomas Spota served on 3/12/2009, answer due 5/11/2009; John B. Collins served on 3/12/2009, answer due 5/11/2009; County of Suffolk served on 3/12/2009, answer due 5/11/2009; Suffolk Police Department served on 3/12/2009, answer due 5/11/2009; Richard Dormer served on 3/12/2009, answer due 5/11/2009; John Newton served on 3/12/2009, answer due 5/11/2009; James Scimone served on 3/12/2009, answer due 5/11/2009. (Brewington, Frederick) (Entered: 03/16/2009) |
| 04/08/2009 | 4 | ANSWER to 1 Complaint, by William Judge, Christopher Talt, Joseph Link, Thomas Spota, John B. Collins, County of Suffolk Office of District Attorney, County of Suffolk, Suffolk Police Department, Richard Dormer, John Newton, James Scimone. (Dunne, Richard) (Entered: 04/08/2009) |
| 07/08/2009 | 5 | Minute Entry for proceedings held before Magistrate Judge E. Thomas Boyle:Initial Pretrial Conference held on 7/8/2009, ( Discovery due by 3/19/2010 fact discovery, 5/30/10 Experts., Proposed Pretrial Order due by 6/30/2010., Final Pretrial Conference by phone set for 7/9/2010 02:00 PM before Magistrate Judge E. Thomas Boyle.) The conference call should be made through the teleconference operator provided by your long-distance service *e.g., AT&T, MCI, Sprint). (So ordered by Mag. Judge Boyle on 7/8/09). (Lundy, Lisa) (Entered: 07/08/2009) |

| | | |
|---|---|---|
| 07/08/2009 | 6 | Proposed Scheduling Order *pursuant to Judge Boyle's July 8, 2009 Order* by Patricia Gonzalez, Jennifer Gonzalez (Germano, Guy) (Entered: 07/08/2009) |
| 07/09/2009 | 7 | SCHEDULING ORDER: See order for further details Final Pretrial Conference by phone set for 7/9/2010 02:00 PM before Magistrate Judge E. Thomas Boyle. The conference call should be made through the teleconference operator provided by your long-distance service (e.g., AT&T, MCI, Sprint).. Ordered by Magistrate Judge E. Thomas Boyle on 7/8/2009. (Lundy, Lisa) (Entered: 07/09/2009) |
| 09/18/2009 | 8 | Letter *motion for extension of time to submit ESI agreement* by Jennifer Gonzalez, Patricia Gonzalez (Attachments: # 1 Exhibit A) (Germano, Guy) (Entered: 09/18/2009) |
| 09/21/2009 | | ENDORSED ORDER re 8 extension of time to comply with an agreement between the parties relating to the disclosure and discovery of electronically stored information ("ESI") to September 28, 2009. SO ORDERED. Ordered by Magistrate Judge E. Thomas Boyle on 9/21/2009. (Joy, Dolores) (Entered: 09/21/2009) |
| 09/28/2009 | 9 | STIPULATION *regarding disclosure and discovery of ESI* by Jennifer Gonzalez, Patricia Gonzalez (Germano, Guy) (Entered: 09/28/2009) |
| 10/14/2009 | | ORDER re 9 Stipulation. SO ORDERED. Ordered by Magistrate Judge E. Thomas Boyle on 10/13/2009. (Joy, Dolores) (Entered: 10/14/2009) |
| 12/29/2009 | 10 | Letter MOTION to Compel by Jennifer Gonzalez, Patricia Gonzalez. (Attachments: # 1 Exhibit A - B) (Germano, Guy) (Entered: 12/29/2009) |
| 12/30/2009 | 11 | LETTER Motion For Extension Of Time To File A Response re 10 Letter MOTION to Compel filed by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Dunne, Richard) Modified on 1/4/2010 (Lundy, Lisa). (Entered: 12/30/2009) |
| 01/04/2010 | | ENDORSED ORDER granting 11 Motion for Extension of Time to File response to letter motion 10 to January 8, 2010. Ordered by Magistrate Judge E. Thomas Boyle on 1/4/2010. (Joy, Dolores) (Entered: 01/04/2010) |
| 01/08/2010 | 12 | RESPONSE to Motion re 10 Letter MOTION to Compel *with exhibit* filed by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Attachments: # 1 Exhibit A) (Dunne, Richard) (Entered: 01/08/2010) |
| 01/11/2010 | | SCHEDULING ORDER re 10 , 12 : A conference shall be held by telephone on January 13, 2010 at 3:30 p.m. Plaintiffs' counsel shall initiate the call and have all counsel on the line before connecting the court (631-712-5710). The conference call should be made through the teleconference operator provided by your long-distance service (e.g., AT&T, MCI, Sprint). Ordered by Magistrate Judge E. Thomas Boyle on 1/11/2010. Plaintiffs' counsel is directed to notify all counsel of this order upon receipt. (Joy, Dolores) (Entered: 01/11/2010) |

| | | |
|---|---|---|
| 01/13/2010 | 13 | Minute Order. for proceedings held before Magistrate Judge E. Thomas Boyle ;Status Telephone conference held on 1/13/10. The parties shall proceed on a dual track with respect to fact and expert discovery, which on the current schedule shall be completed by 5/30/10. Having failed to respond or object to the interrogatory requests served in September 2009, and the defendants having had more than ample opportunity to do so and having set forth no "good cause" for this failure the defendants have waived the right to object to said interrogatories and shall comply by 1/22/10. The plaintiff's letter motion to compel in all other respects is denied without prejudice to renewal upon completion of document production. The County defendants are directed to make a good faith effort to complete document production by 2/1/10.terminating 10 Motion to Compel; (So ordered by Mag. Judge Boyle on 1/13/10). (Lundy, Lisa) (Entered: 01/14/2010) |
| 01/14/2010 | 14 | Letter Motion to Compel the Court to so order a subpoena directed to the Suffolk County District Attorney's Office to produce documents, information, or objects related to this instant matter by Jennifer Gonzalez, Patricia Gonzalez (Attachments: # 1 Exhibit A and B) (Germano, Guy) Modified made letter request into a motion to compel on 1/15/2010 (Glueckert, Lisa). (Entered: 01/14/2010) |
| 01/15/2010 | 15 | RESPONSE to Motion re 14 MOTION to Compel filed by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Dunne, Richard) (Entered: 01/15/2010) |
| 01/19/2010 | | ORDER re 14 , 15 . Since the subpoena sought is directed against a party to this action, the court will treat this as a pre-motion conference request. The parties shall appear for said conference on January 27, 2010 at 10:30 a.m. Ordered by Magistrate Judge E. Thomas Boyle on 1/19/2010. Plaintiff's counsel is directed to notify all counsel of this order upon receipt. (Joy, Dolores) (Entered: 01/19/2010) |
| 01/27/2010 | | ENDORSED ORDER denying 14 Motion to Compel (see order dated 1/19/10). The demands for documents set forth in the annexed subpoena are deemed served on the County Attorney of Suffolk County with the latter's consent. Ordered by Magistrate Judge E. Thomas Boyle on 1/27/2010. (Joy, Dolores) (Entered: 01/27/2010) |
| 03/17/2010 | | NOTICE of Hearing on Motion for summary judgment Motion Hearing set for 5/7/2010 10:30 AM in Courtroom 1040 before Senior Judge Thomas C. Platt. (McMorrow, Karen) (Entered: 03/17/2010) |
| 03/22/2010 | 16 | Letter MOTION to Compel, Letter MOTION for Sanctions by Jennifer Gonzalez, Patricia Gonzalez. (Attachments: # 1 Exhibit A-C) (Germano, Guy) (Entered: 03/22/2010) |
| 03/23/2010 | 17 | RESPONSE to Motion re 16 Letter MOTION to CompelLetter MOTION for Sanctions filed by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John |

| | | |
|---|---|---|
| | | Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Dunne, Richard) (Entered: 03/23/2010) |
| 03/24/2010 | | SCHEDULING ORDER re 16 , 17 : A telephone conference shall be held on March 26, 2010 at 1:30 p.m. Plaintiffs' counsel shall initiate the call and have all counsel on the line before connecting the court (631-712-5710). The conference call should be made through the teleconference operator provided by your long-distance service (e.g., AT&T, MCI, Sprint). Ordered by Magistrate Judge E. Thomas Boyle on 3/24/2010. Plaintiffs' counsel is directed to notify all counsel of this order upon receipt. (Joy, Dolores) (Entered: 03/24/2010) |
| 03/26/2010 | | ELECTRONIC ORDER. The phone conference scheduled for March 26, 2010 at 1:30 p.m. is canceled. A conference shall be held on April 5, 2010 at 10:30 a.m. All counsel shall be present. Ordered by Magistrate Judge E. Thomas Boyle on 3/26/2010. Plaintiffs' counsel is directed to notify all counsel of this order upon receipt. (Joy, Dolores) (Entered: 03/26/2010) |
| 04/05/2010 | 18 | Minute Entry for proceedings held before Magistrate Judge E. Thomas Boyle:Status Conference held on 4/5/2010, ( Discovery due by 9/30/2010.) Adjourned Oral argument 9/15/10 at 2:00 p.m.. (So ordered by Mag. Judge Boyle on 4/5/10). (Lundy, Lisa) (Entered: 04/05/2010) |
| 04/26/2010 | 19 | MOTION to Dismiss by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Attachments: # 1 Rule 56.1 Statement, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Memorandum in Support) (Dunne, Richard) (Entered: 04/26/2010) |
| 04/26/2010 | 20 | RESPONSE in Opposition re 19 MOTION to Dismiss filed by Jennifer Gonzalez, Patricia Gonzalez. (Attachments: # 1 Declaration, # 2 Exhibit A-D, # 3 Exhibit E-J, # 4 Exhibit K-T, # 5 Exhibit U-CC, # 6 Exhibit DD-EE, # 7 Exhibit FF-II, # 8 Exhibit JJ, # 9 Exhibit KK-LL, # 10 Exhibit MM-NN, # 11 Exhibit OO, # 12 Exhibit PP-RR, # 13 Exhibit SS, # 14 Exhibit TT-UU, # 15 Memorandum in Opposition) (Dunne, Richard) (Entered: 04/26/2010) |
| 04/26/2010 | 21 | REPLY to Response to Motion re 19 MOTION to Dismiss filed by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department. (Dunne, Richard) (Entered: 04/26/2010) |
| 05/06/2010 | | NOTICE of Hearing on Motion 19 MOTION to Dismiss :**CHANGE OF TIME** Motion Hearing set for 5/7/2010 01:30 PM in Courtroom 1040 before Senior Judge Thomas C. Platt. (McMorrow, Karen) (Entered: 05/06/2010) |
| 05/07/2010 | | Minute Entry for proceedings held before Senior Judge Thomas C. Platt:Motion Hearing held on 5/7/2010 re 19 MOTION to Dismiss filed by William Judge, County of Suffolk, James Scimone, Suffolk Police Department, John Newton, Richard Dormer, Thomas Spota, Joseph Link, Christopher Talt, John B. Collins, County of Suffolk Office of District Attorney. Motion argued. DECISION |

| | | |
|---|---|---|
| | | RESERVED. (Court Reporter Dom Tursi.) (McMorrow, Karen) (Entered: 05/10/2010) |
| 06/23/2010 | 22 | SCHEDULING ORDER: The final conference previously scheduled by telephone for July 9, 2010 at 2:00 p.m. with the undersigned is canceled. Ordered by Magistrate Judge E. Thomas Boyle on 6/23/2010. Plaintiffs' counsel is directed to serve a copy of this order on all counsel upon receipt. (Joy, Dolores) (Entered: 06/23/2010) |
| 09/14/2010 | 23 | Letter MOTION to Adjourn Conference *oral arguments scheduled for September 15, 2010* by Jennifer Gonzalez, Patricia Gonzalez. (Germano, Guy) (Entered: 09/14/2010) |
| 09/14/2010 | | ENDORSED ORDER granting 23 Motion to Adjourn Conference. Application is granted. The motion is deemed withdrawn without prejudice. All discovery shall be completed by 9/30/10. SEE order dated 4/5/10. A joint pre-trial order shall be filed on 10/28/10. The final conference will be held on 11/9/10 at 1:30 p.m. by phone. Plaintiffs' counsel shall initiate the call and have all counsel on the line before connecting the court (631-712-5710). The conference call should be made through the teleconference operator provided by your long-distance service (e.g., AT&T, MCI, Sprint). Ordered by Magistrate Judge E. Thomas Boyle on 9/14/2010. Plaintiffs' counsel is directed to notify all counsel of this order upon receipt. (Joy, Dolores) (Entered: 09/14/2010) |
| 09/14/2010 | | ORDER withdrawing 16 Motion to Compel; withdrawing 16 Motion for Sanctions. SEE order dated 9/14/10. Ordered by Magistrate Judge E. Thomas Boyle on 9/14/2010. (Joy, Dolores) (Entered: 09/14/2010) |
| 09/24/2010 | 24 | Letter MOTION for Extension of Time to Complete Discovery by Jennifer Gonzalez, Patricia Gonzalez. (Germano, Guy) (Entered: 09/24/2010) |
| 09/27/2010 | | ORDER granting 24 Motion for Extension of Time to Complete Discovery: All discovery shall be completed by December 31, 2010. The final conference previously scheduled for November 9, 2010 is adjourned to January 27, 2011 at 11:00 a.m., by telephone. So Ordered by Magistrate Judge E. Thomas Boyle on 9/27/2010. (Minerva, Deanna) (Entered: 09/27/2010) |
| 12/20/2010 | 25 | Joint MOTION for Extension of Time to Complete Discovery by Jennifer Gonzalez, Patricia Gonzalez. (Brewington, Frederick) (Entered: 12/20/2010) |
| 12/21/2010 | | ENDORSED ORDER granting 25 Motion for Extension of Time to Complete Discovery;Application is granted. This is the final extension of discovery. all other discovery is certified as complete fact as well as expert except for the 4 depositions noted herein Scimone, Talt, Newton & Link.. Ordered by Magistrate Judge E. Thomas Boyle on 12/21/2010. (Lundy, Lisa) (Entered: 12/22/2010) |
| 12/29/2010 | 26 | Letter MOTION for Extension of Time to Complete Discovery *and Expert Discovery* by Jennifer Gonzalez, Patricia Gonzalez. (Germano, Guy) (Entered: 12/29/2010) |
| 01/06/2011 | | SCHEDULING ORDER: re 26 Letter MOTION for Extension of Time to Complete Discovery *and Expert Discovery* filed by Patricia Gonzalez, Jennifer Gonzalez. A conference shall be held on January 13, 2011 at 10:00 a.m. Counsel |

| | | |
|---|---|---|
| | | shall be present. Ordered by Magistrate Judge E. Thomas Boyle on 1/6/2011. (Joy, Dolores) (Entered: 01/06/2011) |
| 01/07/2011 | 27 | Letter MOTION to Adjourn Conference by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Dunne, Richard) (Entered: 01/07/2011) |
| 01/10/2011 | | ENDORSED ORDER granting 27 Motion to Adjourn Conference. Application is granted. The conference is adjourned to January 27, 2011 at 11:00 a.m. by phone. Ordered by Magistrate Judge E. Thomas Boyle on 1/10/2011. (Joy, Dolores) (Entered: 01/10/2011) |
| 01/26/2011 | 28 | SCHEDULING ORDER: The conference on January 27, 2011 is canceled. The order, dated December 21, 2010, is vacated. Discovery shall proceed on a dual track - expert and fact. All discovery shall be completed by April 30, 2011. A joint pre-trial order, consistent with Judge Platt's rules, shall be filed by May 31, 2011. The final conference is June 14, 2011 at 1:30 p.m. by phone. SEE order for further details. Ordered by Magistrate Judge E. Thomas Boyle on 1/26/2011. (Joy, Dolores) (Entered: 01/26/2011) |
| 03/14/2011 | 29 | ORDER granting in part and denying in part 19 Motion to Dismiss. SO ORDERED that Defts' motion for judgment on the pleadings is DENIED as to plaintiffs' municipal liability claim and GRANTED as to plaintiffs' claim for alternative municipal liability. Defts' motion for judgment on the pleadings as to plaintiffs' 42 U.S.C. §§ 1981 and 1985 claims is DENIED without prejudice to renew. Plaintiffs' request to amend their complaint is GRANTED to the extentset forth herein. Ordered by Senior Judge Thomas C. Platt on 3/14/2011. (Glueckert, Lisa) (Entered: 03/14/2011) |
| 04/13/2011 | 30 | AMENDED COMPLAINT against John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, John and Jane Does 1-10, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt, filed by Jennifer Gonzalez, Patricia Gonzalez. (Germano, Guy) (Entered: 04/13/2011) |
| 04/21/2011 | 31 | ANSWER to 30 Amended Complaint, by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Dunne, Richard) (Entered: 04/21/2011) |
| 04/28/2011 | 32 | Joint MOTION for Extension of Time to Complete Discovery by Jennifer Gonzalez, Patricia Gonzalez. (Germano, Guy) (Entered: 04/28/2011) |
| 05/16/2011 | | ENDORSED ORDER granting 32 Motion for Extension of Time to Complete Discovery. Application is granted. All discovery is extended to July 31, 2011. A joint pre-trial order, consistent with Judge Platt's individual rules, shall be filed by August 31, 2011. The final conference is adjourned to September 19, 2011 at 11:00 a.m. by phone. Plaintiff's counsel shall initiate the call and have all counsel on the line before connecting the court (631-712-5710). The conference call must be made through the teleconference operator provided by your long- |

| | | |
|---|---|---|
| | | distance service (e.g., AT&T, MCI, Sprint). Ordered by Magistrate Judge E. Thomas Boyle on 5/16/2011. (Joy, Dolores) (Entered: 05/16/2011) |
| 08/01/2011 | 33 | Joint MOTION for Extension of Time to Complete Discovery by Jennifer Gonzalez, Patricia Gonzalez. (Germano, Guy) (Entered: 08/01/2011) |
| 08/02/2011 | | ENDORSED ORDER granting 33 Motion for Extension of Time to Complete Discovery. Discovery has been extended on at least four prior occasions. This action commenced in March 2009--approximately two-and-a-half years ago. Discovery is extended to 12/1/11. There will be no further extensions. This includes any expert discovery. See Order dated 1/26/11. A joint pre-trial order, consistent with Judge Platt's rules, shall be filed by 1/3/12. The final conference shall be held in 1/11/12 at 11:00 a.m. by phone. Ordered by Magistrate Judge E. Thomas Boyle on 8/2/2011. (Bacchus, Michael) (Entered: 08/02/2011) |
| 10/04/2011 | 34 | Letter MOTION to Quash *subpoena/notice of depositions* by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt. (Attachments: # 1 Exhibit A, B, C and D) (Dunne, Richard) (Entered: 10/04/2011) |
| 10/05/2011 | 35 | MEMORANDUM in Opposition re 34 Letter MOTION to Quash *subpoena/notice of depositions* filed by All Plaintiffs. (Attachments: # 1 Exhibit A-B) (Germano, Guy) (Entered: 10/05/2011) |
| 11/10/2011 | 36 | ORDER denying 34 Motion to Quash: The Court finds the County's motion to quash to be premature at this time since discovery has yet to be completed. If plaintiffs are unable to obtain the information they seek from other sources and still wish to depose defendants Spota and Dormer after all fact discovery has been completed, the County may renew its request to have the deposition notices quashed. Accordingly, the County's motion to quash is denied without prejudice to renewal upon the completion of all fact discovery. So Ordered by Magistrate Judge E. Thomas Boyle on 11/10/2011. (Minerva, Deanna) (Entered: 11/10/2011) |
| 11/18/2011 | | Magistrate Judge Gary R. Brown added. Magistrate Judge E. Thomas Boyle no longer assigned to case. (McMahon, Carol) (Entered: 11/18/2011) |
| 11/18/2011 | 37 | Letter *requesting permission to file oversize letter motion or discovery motion accompanied by a memorandum of law* by Jennifer Gonzalez, Patricia Gonzalez (Attachments: # 1 Exhibit A) (Germano, Guy) (Entered: 11/18/2011) |
| 11/21/2011 | | ELECTRONIC ORDER: The request 37 is denied without prejudice to refiling as a "Motion." Ordered by Magistrate Judge Gary R. Brown on 11/21/2011. (Disbrow, Sandra) (Entered: 11/21/2011) |
| 11/21/2011 | 38 | Letter MOTION for pre motion conference *and/or requesting permission to file oversize letter motion and/or discovery motion accompanied by a memorandum of law* by Jennifer Gonzalez, Patricia Gonzalez. (Attachments: # 1 Exhibit A) (Germano, Guy) (Entered: 11/21/2011) |
| 12/01/2011 | | ELECTRONIC ORDER granting 38 Motion to the extent that a telephone conference has been scheduled for 12/6/11 at 3:00 p.m. Plaintiffs' counsel shall |

| | | |
|---|---|---|
| | | initiate the call and have all parties on the line before connecting to the court at (631)712-5700. Any request to adjourn this conference must be electronically filed as a "Motion" and must include proposed alternative dates. Ordered by Magistrate Judge Gary R. Brown on 12/1/2011. (Disbrow, Sandra) (Entered: 12/01/2011) |
| 12/06/2011 | 39 | Minute Entry for proceedings held before Magistrate Judge Gary R. Brown: Counsel present via telephone. Status Conference held on 12/6/2011. Parties are to contact the Court within 10 days of the resolution of the matter in state court. The pretrial conference scheduled for 1/11/12 is adjourned without a date. (Brienza, Lauren) (Entered: 12/06/2011) |
| 03/06/2012 | 40 | NOTICE of Appearance by Gregory Calliste, Jr on behalf of All Plaintiffs (aty to be noticed) (Calliste, Gregory) (Entered: 03/06/2012) |
| 03/06/2012 | 41 | Letter *regarding Grand Jury Minutes which are to be provided to Your Honor* by Jennifer Gonzalez, Patricia Gonzalez (Attachments: # 1 Exhibit Order of Hon. H. Patrick Leis III, unsealing Grand Jury Minutes) (Calliste, Gregory) (Entered: 03/06/2012) |
| 02/28/2013 | | SCHEDULING ORDER: A status conference is scheduled in courtroom 840 of the Long Island Courthouse on 3/22/2013 at 10:00 AM. Ordered by Magistrate Judge Gary R. Brown on 2/28/2013. (Brienza, Lauren) (Entered: 02/28/2013) |
| 03/12/2013 | 42 | NOTICE of Appearance by Brian C. Mitchell on behalf of John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt (aty to be noticed) (Mitchell, Brian) (Entered: 03/12/2013) |
| 03/19/2013 | 43 | Letter MOTION to Adjourn Conference by John B. Collins, County of Suffolk, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Christopher Talt. (Mitchell, Brian) (Entered: 03/19/2013) |
| 03/21/2013 | | ELECTRONIC ORDER granting 43 Motion to Adjourn Conference. The conference scheduled for March 22 is ADJOURNED to April 1, 2013 at 10:00 AM in Courtroom 840 of the Long Island courthouse. Ordered by Magistrate Judge Gary R. Brown on 3/21/2013. (Buehler, Brian) (Entered: 03/21/2013) |
| 04/01/2013 | 44 | Minute Order for proceedings held before Magistrate Judge Gary R. Brown: Counsel present. Status Conference held on 4/1/2013. Discovery cut-off date is extended to 7/31/2013. Dft to submit letter brief re grand jury minutes by 4/9/2013. Plff's response due 4/12/2013. SO ORDERED. (Brienza, Lauren) (Entered: 04/01/2013) |
| 04/09/2013 | 45 | Letter *brief opposing release of grand jury minutes* by John B. Collins, County of Suffolk, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Christopher Talt (Attachments: # 1 Exhibit A) (Mitchell, Brian) (Entered: 04/09/2013) |
| 04/12/2013 | 46 | Letter *motion in opposition to defendants letter brief opposing release of grand jury minutes* by Jennifer Gonzalez, Patricia Gonzalez (Brewington, Frederick) (Entered: 04/12/2013) |

| | | |
|---|---|---|
| 06/20/2013 | 47 | NOTICE of Appearance by Stephen Lee O'Brien on behalf of Thomas Spota (aty to be noticed) (O'Brien, Stephen) (Entered: 06/20/2013) |
| 06/20/2013 | 48 | NOTICE of Appearance by Stephen Lee O'Brien on behalf of John B. Collins (aty to be noticed) (O'Brien, Stephen) (Entered: 06/20/2013) |
| 07/25/2013 | 49 | Letter MOTION for Discovery *to the Honorable Gary R. Brown to extend time to complete discovery after the Court renders a decision to Plaintiffs' motion to unseal the grand jury minutes* by Jennifer Gonzalez, Patricia Gonzalez. (Calliste, Gregory) Modified on 4/3/2014 (Mahon, Cinthia). (Entered: 07/25/2013) |
| 03/31/2014 | | ELECTRONIC ORDER granting 49 Motion for Discovery. The Court hereby extends the deadline to complete discovery (including expert discovery). This extended deadline will be set after the Court issues a decision regarding the discovery motion for grand jury minutes. Ordered by Magistrate Judge Gary R. Brown on 3/31/2014. (Lam, Joseph) Modified on 4/3/2014 (Mahon, Cinthia). (Entered: 04/01/2014) |
| 04/23/2014 | 50 | ORDER granting in part and denying in part 46 Motion to unseal Grand Jury minutes. For the reasons set forth in the attached order, plaintiffs' motion to unseal is granted in part, but only to the extent described herein, and is denied in all other respects. Within fourteen days of the date of this order, counsel for defendants shall provide counsel for plaintiffs with a copy of pages 5 through 52 of the grand jury minutes dated October 27, 2008, which pages encompass the testimony of Dr. Milewski, and the legal instructions provided to the grand jury immediately preceding its deliberations. In addition, at the request of plaintiffs' counsel, counsel for defendants shall provide copies of all exhibits utilized during the testimony of Dr. Milewski, or otherwise identify such exhibits if they have already been provided in discovery.<br><br>The parties are further directed to appear at a conference before the undersigned on May 20, 2014, at 2:00 p.m., so that this matter may be fully prepared for trial. SO ORDERED. Ordered by Magistrate Judge Gary R. Brown on 4/23/2014. (Lam, Joseph) (Entered: 04/23/2014) |
| 05/20/2014 | 52 | Minute Order for proceedings held before Magistrate Judge Gary R. Brown:Status Conference held on 5/20/2014. Plff granted leave to depose dft Collins with the limitations as set forth on the record. Deposition limited to 90 minutes and shall take place in the next 30 days. Discovery will be concluded by 6/20/2014. Counsel for dfts to advise plff by 7/10/2014 of their intentions to move for summary judgment. Parties to take first step in summary judgment process or file a joint proposed pretrial order by 7/21/2014. (Posillico, Lauren) (Entered: 05/20/2014) |
| 07/08/2014 | | Case reassigned to Judge Leonard D. Wexler. Judge Thomas C. Platt no longer assigned to the case. (Gapinski, Michele) (Entered: 07/08/2014) |
| 07/17/2014 | 53 | Letter by Thomas Spota (O'Brien, Stephen) (Entered: 07/17/2014) |
| 07/22/2014 | 54 | Letter *in opposition to Defendants' Spota and Collins request to file a motion seeking summary judgment* by Jennifer Gonzalez, Patricia Gonzalez (Brewington, Frederick) (Entered: 07/22/2014) |

| | | |
|---|---|---|
| 08/28/2014 | 55 | NOTICE of Appearance by Stephanie Michelle Platt on behalf of All Plaintiffs (aty to be noticed) (Platt, Stephanie) (Entered: 08/28/2014) |
| 09/10/2014 | 56 | Letter *Status Conference* by Thomas Spota (O'Brien, Stephen) (Entered: 09/10/2014) |
| 09/29/2014 | 57 | Letter MOTION to Adjourn Conference *currently scheduled for 10/09/14 to 10/02/14 at 11:00 a.m.* by Jennifer Gonzalez, Patricia Gonzalez. (Brewington, Frederick) (Entered: 09/29/2014) |
| 09/30/2014 | | ELECTRONIC ORDER granting 57 Motion to Adjourn Conference. Status Conference is hereby rescheduled for 10/2/2014 at 11:00 AM in Courtroom 940 before Judge Leonard D. Wexler. Ordered by Judge Leonard D. Wexler on 9/30/2014. (Russo, Eric) (Entered: 09/30/2014) |
| 10/02/2014 | 58 | Minute Entry for proceedings held before Judge Leonard D. Wexler: In camera Pre Motion Conference held on 10/2/2014. Plaintiff(s) represented by Frederick K. Brewington, Esq. Defendant(s) represented by Brian C. Mitchell, Esq. and Stephen Lee OBrien, Esq. Parties agree to the following briefing schedule as to Defendants' "Spota" and "Collins" Motion to Dismiss: motion papers shall be served by October 16, 2014; opposition papers shall be served by November 6, 2014; reply papers shall be served by November 17, 2014. In accordance with Judge Wexler's motion practice and rules, all papers shall be filed, via ECF, on the reply date of November 17, 2014 and the Movant is directed to send courtesy copies to chambers. Jury Selection is set for December 15, 2014 at 9:30 AM in Courtroom 940. Jury Trial will begin on December 15, 2014 at 1:30 PM in Courtroom 940 before Judge Leonard D. Wexler. Parties are advised of and given hard copies of Judge Wexler's Trial Rules. Proceedings concluded. (Russo, Eric) (Entered: 10/02/2014) |
| 11/17/2014 | 59 | Second MOTION to Dismiss by Thomas Spota. Responses due by 11/17/2014 (O'Brien, Stephen) (Entered: 11/17/2014) |
| 11/17/2014 | 60 | REPLY in Opposition , RESPONSE in Opposition re 59 Second MOTION to Dismiss , REPLY in Support filed by Thomas Spota. (O'Brien, Stephen) (Entered: 11/17/2014) |
| 11/17/2014 | 61 | RESPONSE in Opposition re 59 Second MOTION to Dismiss filed by Jennifer Gonzalez, Patricia Gonzalez. (Attachments: # 1 Rule 56.1 Statement Plaintiffs' Satement of Disputed Facts in Oppositon to Defendants' Motion for Summary Judgment, and Counter-Statment of Facts Pursuant to Local Rule 56.1, # 2 Declaration Declaration of Frederick K. Brewington in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, # 3 Exhibit Brewington Declaration Exhibits A-G, # 4 Exhibit Brewington Declaration Exhibits H-M, # 5 Exhibit Brewington Declaration Exhibits N-O, # 6 Exhibit Brewington Declaration Exhibit P, # 7 Exhibit Brewington Declaration Exhibit O) (Brewington, Frederick) (Entered: 11/17/2014) |
| 12/04/2014 | 62 | Letter *moton to adjourn start of trial scheduled for 12/15/2014* by Jennifer Gonzalez, Patricia Gonzalez. (Brewington, Frederick) Modified on 12/5/2014 (Russo, Eric). (Entered: 12/04/2014) |

| | | |
|---|---|---|
| 12/05/2014 | | ORDER granting 62 Motion to Continue. Jury Selection is hereby adjourned to 3/16/2015 at 9:30 AM in Courtroom 940. Trial will begin on 3/16/2015 at 1:30 PM in Courtroom 940 before Judge Leonard D. Wexler. No further adjournments will be granted. Ordered by Judge Leonard D. Wexler on 12/5/2014. (Russo, Eric) (Entered: 12/05/2014) |
| 12/10/2014 | 63 | Letter MOTION *Requesting Adjournment of Trial* by Jennifer Gonzalez, Patricia Gonzalez (Platt, Stephanie) Modified on 12/12/2014 (Russo, Eric). (Entered: 12/10/2014) |
| 12/12/2014 | | ORDER granting 63 Motion to Continue. In light of Plaintiff's motion, Jury Selection is hereby adjourned to 4/13/2015 at 9:30 AM in Courtroom 940. Jury Trial will begin on 4/14/2015 at 9:30 AM in Courtroom 940 before Judge Leonard D. Wexler. No further adjournments will be granted. Ordered by Judge Leonard D. Wexler on 12/12/2014. (Russo, Eric) (Entered: 12/12/2014) |
| 04/08/2015 | | ELECTRONIC ORDER. Jury Selection scheduled for April 13, 2015 is hereby adjourned without a date. Parties are directed to advise this Court within sixty (60) days of the date of this order of possible dates in July 2015 in which all parties are available for Jury Selection/Trial. IT IS HEREBY ORDERED that this case be Administratively Closed until such time that a new date is agreed upon by all parties. Ordered by Judge Leonard D. Wexler on 4/8/2015. (Russo, Eric) (Entered: 04/08/2015) |
| 04/08/2015 | | ELECTRONIC ORDER terminating 59 Motion to Dismiss, without prejudice to renew. This motion is hereby terminated pending the scheduling of jury selection/trial, at which point the motion will be addressed by this Court before said trial. Ordered by Judge Leonard D. Wexler on 4/8/2015. (Russo, Eric) (Entered: 07/08/2015) |
| 05/27/2015 | 64 | Letter *proving the Court with Plaintiffs' availability for trial* by Jennifer Gonzalez, Patricia Gonzalez (Brewington, Frederick) (Entered: 05/27/2015) |
| 11/08/2018 | 65 | Letter MOTION *requesting that this matter be restored to the Court's calendar so that the parties may discuss a trial date* by Jennifer Gonzalez, Patricia Gonzalez (Brewington, Frederick) Modified on 11/9/2018 (Russo, Eric). (Entered: 11/08/2018) |
| 11/09/2018 | | Case Reassigned to Judge Joanna Seybert. Judge Leonard D. Wexler no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Russo, Eric) (Entered: 11/09/2018) |
| 11/20/2018 | | NOTICE of Hearing on 65 MOTION to Reopen Case: Motion Conference set for Tue. 12/11/2018 at 11:00am in Courtroom 1030 before Judge Joanna Seybert. (Baran, Charles) (Entered: 11/20/2018) |
| 12/11/2018 | 66 | Minute Order for proceedings held before Judge Joanna Seybert: Motion Hearing held on 12/11/2018 re: 65 MOTION to Reopen Case filed by Patricia Gonzalez, Jennifer Gonzalez; granting 65 Motion to Reopen Case. Motion to be filed by 12/26/2018; Response by 1/9/2019 (25 page limit); Reply by 1/16/2019 (6 page limit). (Baran, Charles) (Entered: 12/11/2018) |

| | | |
|---|---|---|
| 12/24/2018 | 67 | First MOTION to Dismiss for Lack of Prosecution *or in the alternative for summary judgment, by Thomas J. Spota and* by John B. Collins. (Attachments: # 1 Declaration in Support of defendants Spota's and Collins's motion to dismiss or in the alternative for summary judgment, # 2 Rule 56.1 Statement for defendants Spota and Collins, # 3 Exhibit A, # 4 Exhibit B, # 5 Memorandum in Support of defendants Spota's and Collins's Motion to Dismiss or in the alternative for Summary Judgment) (O'Brien, Stephen) (Entered: 12/24/2018) |
| 12/26/2018 | 68 | Letter *Advising Court that County will not be moving for Summary Judgment* by John B. Collins, County of Suffolk, County of Suffolk Office of District Attorney, Richard Dormer, William Judge, Joseph Link, John Newton, James Scimone, Thomas Spota, Suffolk Police Department, Christopher Talt (Mitchell, Brian) (Entered: 12/26/2018) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/08/2019 16:13:15 | | | |
| **PACER Login:** | frederickkbrewington | **Client Code:** | lazo/gonzalez |
| **Description:** | Docket Report | **Search Criteria:** | 2:09-cv-01023-JS-GRB |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |