

*Attorneys and Counselors at Law*
556 Peninsula Blvd., Hempstead, New York 11550
Phone: 516-489-6959 • Fax: 516-489-6958 •
www.brewingtonlaw.com

Frederick K. Brewington
Albert D. Manuel III
Leah Jackson
Cobia Powell

Of Counsel
Oscar Holt III
Jay D. Umans

July 2, 2023

**VIA ELECTRONIC CASE FILING**
Honorable Steven Tiscione
United States District Court
United States Magistrate Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        RE:    <u>Gonzalez v. County of Suffolk, et. al</u>
               Docket No.: CV-09-1023(ST)

Dear Judge Tiscione:

      This office represents the Plaintiff in the above referenced matter. We respectfully submit the instant letter in support of Plaintiff's motion *In Limine*. This case was brought against the Defendants for committing acts under color of law, depriving Plaintiffs' decedent of rights secured by the Constitution and laws of the United States and State of New York, as well as, battery, assault, wrongful death, negligence, intentional infliction of emotional distress, unnecessary use of deadly force, excessive force, failure to render medical treatment, deliberate indifference to medical needs, negligent supervision, and failure to properly train, failure to investigate, failure to supervise in violation of 42 U.S.C. §1983 (including Municipal Liability and violations of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution), 42 U.S.C. §§ 1985 and 1986, and related State laws. The triable issues here stem from an encounter on April 12, 2008 at approximately 8:15 p.m., Plaintiffs' decedent Kenny Lazo, a man of Latino heritage, was driving on or near the Southern State Parkway entrance ramp from Bay Shore Road acting in a lawful manner when he was stopped under the pretext of a traffic stop by Defendants. A computer query as to Mr. Lazo's license status revealed that his license was valid, and a further inquiry revealed that the vehicle registration was valid, and that Mr. Lazo was not the subject of any outstanding warrants. The reasons for the alleged traffic stop given by Defendants are at odds with each other.

      A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine. *See Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). In fact, "[t]he purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).

This case is fourteen (14) years old and it has been fifteen (15) years since the death of Mr. Kenny Lazo. In that time, Defendants have made neither a motion to dismiss or a motion for summary judgment. In the instant motion *In Limine* Defendants are attempting, through the back door just weeks from trial, to do what they failed to do when the schedule for motions allowed them that opportunity. Courts in this district have routinely rejected untimely motions for summary judgment filed under the guise of motions *in limine*. *See, e.g., Okeke v. N.Y. & Presbyterian Hosp.*, No. 16-cv-570 (CM), 2017 U.S. Dist. LEXIS 87449, at *3-4 (S.D.N.Y. June 6, 2017); *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital*, 2017 U.S. Dist. LEXIS 20721, at *10 (S.D.N.Y. Feb. 10, 2017); *Broadspring, Inc. v. Congoo*, LLC, No. 13-CV-1866 (JMF), 2014 U.S. Dist. LEXIS 177838, at *20 (S.D.N.Y. Dec. 29, 2014). Defendants should not be allowed to circumvent the Court's order that required them to file a Summary Judgment motion by July 24, 2020 (Court Document 21-1). Even if that Court Order was not in place, Defendants cannot avoid their utter failure to file a motion pursuant to FRCP 56(b) within 30 days of the close of all discovery. Defendants' *sub rosa* motion for summary judgment should be rejected. As Judge Cogan noted in *Funk v. Belneftekhim*, 2020 WL 5645190 at *2, an *in limine* motion is "generally not the appropriate vehicle for effecting dismissal of entire claims." *See also New Am. Mktg. FSI LLC v. MGA Entm't, Inc.*, 187 F.Supp.3d 476, 481 (S.D.N.Y. 2016); *Media Alliance, Inc. v. Mirch*, 09-CV-0659, 2012 WL 162375, at *5 (N.D.N.Y. Jan. 19, 2012) ["Defendants attempt, at this late date, to assert novel arguments in an effort to obtain dispositive relief in a motion *in limine* is improper."]. Essentially, Defendants have waived any right to file Summary Judgment motions, and now seek to revive that opportunity by masking their dispositive motion as an *In Limine* application. The Court should deny this application as being out of time and having been waived.

We urge the Court to reject the current motions presented by Defendants. However, should the Court entertain these motion and review them on the merits, we provide our responses below. The Defendants raise two issues as part of their *In Limine* motions. First, they seek to exclude and/or limit the testimony of Plaintiff's Police Practices Expert, Timothy Longo. Second, Defendants at this late hour seek to bifurcate this trial as to the *Monell* claims in this matter. We will address both of these issues in the order presented by the Defendants.

## I. DEFENDANTS' MOTION TO BIFURCATE SHOULD BE DENIED BECAUSE NONE OF THE BENEFITS TRADITIONALLY ASSOCIATED WITH BIFURCATION ARE PRESENT

### Defendants Attempt to Bifurcate the Monell Claims is Misplaced

While this Court has broad discretion to bifurcate claims, none of the factors that usually militate in favor of bifurcation are present. For instance, because the defendants have waited until after discovery and the eve of trial as currently scheduled to move for bifurcation, little of the Court's judicial resources will be saved by bifurcation. Additionally, the evidence that The Estate of Kenny Lazo (hereinafter "Plaintiff" or "Mr. Lazo") intends to introduce at trial to establish their federal claims against COUNTY OF SUFFOLK will also be admissible against the defendant officers under both Section 1983 and the State Law claims. Thus, the claimed concern of unfair prejudice is lacking.

After discovery and on the literal one month before the start of trial, County of Suffolk, Police Officer John Newton, Police Officer James Scimone, Police Officer William Judge, Police Officer Christopher Talt, Police Officer Joseph Link, seek to bifurcate the Monell claims from the state and federal claims Plaintiff asserts against the defendant officers. Defendants' motion comes after nearly fourteen (14) years of litigation, extensive fact and expert witness discovery concerning the *Monell* claims, and a fiercely contested motion for summary judgment.

Rule 42(b) provides, in pertinent part, that the "court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim. . . ." Fed. R. Civ. Proc. 42(b). While the district courts retain broad discretion to determine whether bifurcation is appropriate, *see, e.g., Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988); *Lewis v. Triborough Bridge and Tunnel Auth.*, No. 97 Civ. 0607, 2000 WL 423517, *2 (S.D.N.Y. Apr. 19, 2000), "separate trials remain the exception rather than the rule." *Pavone v. Gibbs*, No. CV 95-0033, 1997 WL 833472, *1 (E.D.N.Y. Sept. 29, 1997) (citation omitted). See *Lewis*, 2000 WL 423517 at *2. Rule 42(b) "is reserved for truly extraordinary situations of undue prejudice." *Monaghan v. SZS 33 Assocs.*, 827 F. Supp. 233, 246 (S.D.N.Y. 1993). In deciding whether to grant a motion to bifurcate, the Court needs to consider whether a particular party may be prejudiced or whether the litigation of the first issue may eliminate the need to litigate remaining issues. *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999). The key inquiries are whether in the absence of bifurcation, a party will be prejudiced, the proceedings will be expedited, or convenience provided. *Ricciuti v. New York City Trans. Auth.*, 796 F. Supp. 84, 86 (S.D.N.Y. 1992).

Reading between the lines, the linchpin of Defendants' motion is their concern of undue prejudice. While Defendants argue that bifurcation is appropriate where evidence of a defendant's past alleged misconduct may be relevant under a *Monell* analysis but is inadmissible at trial as unduly prejudicial, the converse proposition, that bifurcation is inappropriate where a defendant's past alleged misconduct is relevant to both individual and Monell claims, militates against bifurcation. *See Pavone*, 1997 WL 833472 at *1 ("[s]eparate trials are not appropriate when 'issues, witnesses and documentary evidence overlap'") (*citation omitted*); *Pavlovich v. City of New York*, No. 91 Civ. 5030, 1992 WL 230472, *3 (S.D.N.Y. Aug. 31, 1992). Here, the latter proposition governs the instant motion. This is particularly true in light of the Section 1983 claim and that requires Plaintiff to submit the very evidence that Defendants wish to sever.

Plaintiff assumes that Defendants' argument of prejudice rests upon the contention that the County of Suffolk's and the individual officers' prior misconduct are inadmissible against Police Officer John Newton, Police Officer James Scimone, Police Officer William Judge, Police Officer Christopher Talt, Police Officer Joseph Link because they constitute propensity evidence within the meaning of Rule 404(b) of the Federal Rules of Evidence. While Rule 404(b) prohibits the use of propensity evidence, other wrongs or acts are admissible if relevant to a specific issue in the case. *Ismail v. Cohen*, 706 F. Supp. 243, 251 (S.D.N.Y. 1989), aff'd, 899 F.2d 183 (2d Cir. 1990). Defendants do not appear to dispute that evidence concerning the defendant officers' past misconduct

as relevant to the *Monell* claims and this Circuit is committed to an "inclusionary" approach to Rule 404(b) evidence. *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986)The Defendants engaged in custom, pattern, and practice of neglecting to address complaints by Hispanic and Latin persons to the Suffolk County Police Department and of failing to protect members of the Hispanic and Latino community from physical mistreatment, all of which proximately resulted in the deprivation of Lazo's freedom and life forever.

As the Court is aware from the Amended Complaint, it is Plaintiff's theory of the case that defendant officers deprived Mr. Lazo of his rights, privileges and immunities secured by the First, Fourth, Fifth, and Fourteenth Amendments, and broadcasted false accusations, statements and innuendos through the negative and alarmist media coverage of Mr. Lazo in an attempt to chill and punish Plaintiff Lazo based on the Defendants' perceptions and assumptions about Plaintiff. In paragraph 47 of the Amended Complaint Plaintiffs alleged:

> 47. Defendants SCPD and DORMER released a memorandum on July 18, 2008, three months prior to the DA OFFICE's presentation of the evidence to the Grand Jury and before the investigation was properly and fairly completed. The memo reads in part: "[t]he police officers involved used the minimum force necessary to subdue Mr. Lazo–a large, strong man who tried to grab an officer's gun and was pull the officer dangerously close to the entrance ramp of the Southern State Parkway." The Defendants rashly and unfairly exonerated the Defendant Officers before district attorney action and without full investigation.

SCPD and Commissioner Dormer improperly exonerated Defendant Officers prior to the completion of a full and fair investigation by the appropriate agencies and prior to the presentation of evidence to the Grand Jury. Furthermore, Plaintiff will illustrate and demonstrate Defendants' intent and motive to use excessive force as well as Defendants' pattern of misusing authority and willfully disregarding the rights of persons such as Mr. Lazo.

Examples of these rushes to judgments include:
Newsday, April 13, 2008:

> After he was pulled over, Lazo got out of his car and complied with officers but then swung an elbow at an officer and attempted to flee on foot. He was caught soon after and put up what police called "a violent struggle" in which he attempted to grab an officer's gun, police said.
>
> It took three officers to catch and subdue the 5-foot-8, 238-pound Lazo, who had $2,400 and more than a half-ounce of crack and powder cocaine on him, Fandrey said.

Newsday, July 14, 2008

> Police Commissioner Richard Dormer said an investigation found the officers did not violate police department policies or state law.
>
> "We stand behind their actions in defending themselves," he said.

A

As part of Plaintiff's allegations, it is alleged that:

4

65. Upon information and belief, specific systemic flaws in the COUNTY brutality review process include, but are not limited to, the following:

    a. **Preparing reports regarding investigations of beatings shooting incidents as routine point-by-point justifications of police officer actions, regardless of whether such actions are justified**;

    b. Police officers investigating beatings systemically fail to credit testimony by non-police officer witnesses, and uncritically rely on reports by police officers involved in the incident;

    c. **Police officers investigating beatings fail to include in their reports relevant factual information which would tend to contradict the statements of the police officers involved**;

    d. **Supervisory police officers at times issue public statements exonerating police officers for excessive use of force, improper beatings, and use of unnecessary and excessive force before the investigation of the incident by the police department has been completed**;

    e. **Reports in brutality cases are not reviewed for accuracy by supervisory officers. Conclusions are frequently permitted to be drawn on the basis of clearly incorrect or contradictory information**. (Amended Complaint ¶65) (Emphasis added)

The questioning of the several Defendant Officers in this case demonstrates that the regular practice of Suffolk County was to allow the level of abuse and violent use of force to occur without any meaningful process in place to deter these officers and others in the SCPD from engaging in actions that were clearly violations of the rights of persons such as Plaintiff.

The lack of attention and level of investigation and discipline is illustrated in the testimony of Detective Newton. The clear lack of contact and failures in investigation cannot be ignored:

Q. When you say "incident," what incident? Was it regarding the arrest, or was it regarding the death of the detainee?
A. I would probably say both.
Q. Were you interviewed pursuant to - by Internal Affairs?
A. Verbally, no
Q. How, if at all, were you interviewed by Internal Affairs?
A. If you consider a written document as an interview, I was given a set of questions to answer
Q. After you prepared the answers to those questions, was there ever any follow-up, as far as you

know, by Internal Affairs to interview you personally?
A. No
Q. Did you ever speak to anyone over the phone or by some other method regarding what you placed in your written report?
A. No
Q. Did you ever provide any document or supply any documents, other than your written report, to Internal Affairs pursuant to their investigation?
A. No
Q. Have you ever been asked to do anything at all pursuant to any investigation that was being conducted into the arrest and/or the death of Mr. Lazo?
A. By who?
Q. By Internal Affairs
A. I had to write an Internal correspondence regarding those questions that were written to me.
Q. Besides that Internal correspondence that they asked you to submit, was there arrest paperwork or any other documents that were pertaining to the arrest of Mr. Lazo that day?
A. No
Q. Do you know if there was a conclusion or outcome to that investigation being conducted by Internal Affairs?
A. I would assume there was one.
Q. Do you know to this day what that conclusion was?
A. No
Q. Were you ever told what the conclusion was…
A. No
Q. … at some point?
A. No  (Newton deposition of January 6, 2011-_ Pages 168-171)
*********************
Q. Do you recall what - under what circumstances you have been disciplined pursuant to an Internal Affairs' investigation?
A. I was discipline regarding an improper entry or wrong entry on my memo book.
A. I shouldn't say improper. It was a VIN number that wasn't documented correctly.
Q. Do you recall what year you were disciplined for that?
A. I don't know It was approximately twenty years
Q. Do you know what kind of discipline was handed out?
A. yes
Q. What was that?
A. I got reprimanded ten days
Q. Ten days what?
A. I lost ten days of vacation time
Q. Besides that discipline, have you ever been disciplined for any other Internal Affairs investigations or as a result of any other Internal Affairs' investigations being conducted?
A. No
Q. Have you ever been suspended?
A. No

Q. Have you ever been sent back the academy for retraining at all?
A. Well, we go back to the Academy for training
Q. Besides like-I'm not referring to recertifications of your gun training, stuff like that. I'm talking about as a result of an Internal Affairs' investigation, have you ever been sent back to the academy for retraining in any specific areas?
A. No
Q. Besides qualifying and things like that?
A. Correct
(Recess Taken)
Q. Sir, with respect to the death of Mr. Lazo, do you know if the death was being investigated by any agency or departments, law enforcement departments that were not police agencies, any outside agencies?
A. You mean besides Suffolk County?
Q. Besides Suffolk County Police Department
A. No (Newton deposition of January 6, 2011pp 172-174)

Defendant Link confirms that there was a practice the internal affairs investigators not requiring anything but a written statement. No questioning followed and no interviews were conducted. He states:

Q. How did Captain Capalino contact you?
A. He sent me a message requesting a 42 with detailed questions.
Q. Did you speak to Capalino?
A. I don't remember speaking to him personally.
Q. At any time, did you have any conversation with Capalino about your internal correspondence or the circumstances from April 12, 2008?
A. No conversations. I think it was just on the internal correspondence. That was it.
Q. When he sent you a message was that a letter or an e-mail or something else?
A. A letter, internal correspondence
Q. When did you complete the internal correspondence?
A. Within days of getting his request. (Link deposition of May 19, 2011 p.104 lines 4-25)

These are just two examples of the common practice that existed at the time within the SCPD. It is the pattern of the lack of supervision, lack of investigation and lack of discipline that made the violations visited upon Mr. Lazo possible. The Defendants and other officers like them knew that other than writing a single statement, there was not process for them to be questioned any further.

The law is clear that "it is not appropriate to bifurcate with respect to the City's potential *Monell* liability regarding its supervision, training, and discipline of its police officers. Any spillover prejudice to the individual officers that may be caused by the admission of Rule 404(b) evidence [at trial] to establish the Monell claim [pertaining to the Individual Defendants] could be cured by limiting instructions. *Rosa v. Town of E. Hartford*, No. 00-CV-1367, 2005 WL 752206, at *5 (D. Conn. Mar. 31, 2005). Moreover, separate trials would not be efficient and would inconvenience the court, the

jury, and the plaintiff. *Id."* *Ambrose v. City of New York*, 623 F.Supp.2d 454, 480 (S.D.N.Y. 2009).

The case of *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 549-50 (S.D.N.Y. 2005) provides instruction and makes it clear that "the presumption is that all claims in a case will be resolved in a single trial, and 'it is only in exceptional circumstances where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials'"; holding "use of a special verdict form, a well-adapted jury charge, and carefully crafted limiting [jury] instructions" is preferable to possibly holding two trials (citation omitted).

Defendants also claim that bifurcation would "further the goal of efficiency for the Court and the parties" (Defendants' Motion *In Limine* at p. 2). While it can be argued that a verdict in favor of the individual defendants would obviate the need for trial of the *Monell* claims, *see City of Los Angeles v. Heller*, 475 U.S. 796 (1986), that in and of itself cannot mandate bifurcation. If it did, then every action presenting a claim of municipal liability pursuant to Section 1983 would be bifurcated. Moreover, the clear and appropriate presence of Plaintiff's claims that Defendant County fostered an environment of little to no accountability that birthed the level of abuses, lack of investigation, lack of supervision and lack of discipline, which have been admitted to by these Defendants, weighs heavy against the application to bifurcate.

Further the efficiency and expedition that defendants extol are mitigated by their failure to seek bifurcation at an earlier date. As the Court is aware, one of the benefits of bifurcation is to avoid costly and time-consuming litigation, including the frequently complicated discovery involving *Monell* claims. The Defendants point to no specific facts to support this argument and their failure to do so negates one of the benefits to be considered by bifurcation.

Finally, it bears noting that bifurcation, from a practical perspective, spells doom for *Monell* claims. As mentioned above, if a plaintiff does not demonstrate an underlying federal constitutional deprivation, he or she cannot proceed with the *Monell* claim. If, however, a plaintiff prevails against an individual defendant, then she cannot recover any greater damages against the municipality. *Amato*, 170 F.3d at 317. Additionally, as Judge Jacobs astutely observed in her concurring opinion in *Amato*, the municipality has available to it a host of measures to defend itself in the second phase of a bifurcated trial that have no bearing on the substantive merits of the claims. *Id.* at 322-23 (Jacobs, J., concurring). Nothing in the Federal Rules of Civil Procedure or the federal common law, however, warrants relegating *Monell* claims to a lesser status than claims against individual defendants; yet, that is precisely the result that ensues from bifurcation. After the Court balances the costs and benefits of bifurcation in this case, it should be clear that the benefits traditionally associated with bifurcation do not outweigh the presumption in favor of unified trials. As such, defendants' motion to bifurcate should be denied.

## II. DEFENDANTS MOTION TO EXCLUDE AND/OR LIMIT THE TESTIMONY OF PLAINTIFF'S POLICE PRACTICES EXPERT SHOULD BE DENIED.

Defendants conducted no discovery, no depositions and no rebuttal reports as to Plaintiff's expert in Police Practices, Chief Timothy Longo. We note that in their vague and over broad objections Defendants do not cite to or reference any particular page or quote from Chief Longo's report. Rather, they use conclusory language and general references to case law, but fail to discuss their burden in asking the Court to apply that decisional law.

After reciting on paragraph 10 of his report the extensive amount of information reviewed in preparing his report and coming to his opinions, in paragraph 11 of his report Chief Longo states:

> The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes the leadership and management of a municipal police agency where I currently serve as the Chief Law Enforcement officer, my previous experience commanding various component parts of a very large municipal police agency, conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

It does not seem that Defendants challenge Chief Longo's credentials, qualifications or expertise. Nor do they challenge his research, depth of reasoning, or his correctness. Rather, what the Defendants seek to accomplish is the limiting of what Chief Longo should be allowed to opine on based on their word and their conclusions. As stated above, they decided not to depose this witness. They failed to provide any rebuttal reports from an otherwise qualified witness. Further, the Defendants wholesale approach is that:

A review of the expert report submitted by Mr. Longo reveals that his testimony would do nothing more than offer legal conclusions that would usurp the role of the Court and jury and address matters the jury would be capable of understanding without an expert's help. Mr. Longo's report reveals that he intends to offer opinions relating to the existence of probable cause, the lawfulness of the arrest, the acceptability of the level of force used, the nature of a duty to intervene, and whether the County and Suffolk County Police Department ("SCPD") had a policy and practice of discriminatory policing, among other subjects. Accordingly, the testimony of Mr. Longo should be precluded in its entirety. (Defendants' Motion *In Limine* at p. 2)

This position, which lands them in the conclusion that Chief Longo should be precluded from testifying is factually weak and legally anemic. Perhaps Defendants' imprecise reference to what it is exactly in the report that they object to is intentional. What is clear, however, is that the Supreme Court declared the admissibility standard under Rule 702 employs a dual requirement of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Moreover, "In *Daubert*, the Supreme Court articulated four factors pertinent to determining the

9

reliability of an expert's reasoning or methodology. *Lidle v. Cirrus Design Corp.*, 2010 U.S. Dist. LEXIS 67031 at *9-10 (S.D.N.Y. 2010) (*citing Daubert*, 509 U.S. at 593-94). However, the Court noted that the Fed. R. Evid. 702 admissibility inquiry is "a flexible one." Id. at *10 (*citing Daubert*, 509 U.S. at 594).

Equally troubling is that Defendants argue to Your Honor that "Mr. Longo's expert testimony remains subject to Fed. R. Evid. 403 and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Defendants provide this argument without a single quote to what will confuse the jury or mislead the trier of fact. Their shotgun attempt to see what they can hit without helping Plaintiff's Counsel or the Court understand what it is to which they refer is contrary to the purpose and intent of motions *in limine*. It appears that the Defendants are asking the Court to mask the search for the truth by removing facts, information and evaluations done by a qualified expert so that they do not have to cross examine him. "[T]he Second Circuit has found "there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995); *see In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (noting that "the assumption the court starts with is that a well qualified expert's testimony is admissible"); Fed. R. Evid. 702 Advisory Comm.'s note (observing that "a review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule"). "Therefore, a trial judge should exclude expert testimony based on reliability concerns only 'if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'" *Lidle*, 2010 U.S. Dist. LEXIS 67031 at *11-12 (*quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009)(internal quotation omitted). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id*. (*citing also Raskin v. Wyatt Co*, 125 F.3d 55 at 66 (2d Cir. 1997) (noting that "disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve" (internal citation omitted))). The proper course of action, therefore, is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, [which] are the traditional and appropriate means of attacking shaky but admissible evidence." *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 369 (S.D.N.Y. 2003)(*quoting Daubert*, 509 U.S. at 596).

For the above stated reasons, Plaintiff respectfully requests that these Defendants Motions *In Limine* be denied.

Respectfully submitted,

*Frederick K. Brewington*
FREDERICK K. BREWINGTON

cc: Marc A. Lindemann, Esq. (*via ECF*)